DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 17-CV-02162 EMC<br><br>**CORRECTED DEFENDANTS' POST-TRIAL BRIEF REGARDING STANDING**<br><br>Trial: June 8-17, 2020 |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 1

STANDARD OF REVIEW ........................................................................................................ 3

ARGUMENT ............................................................................................................................. 3

I.      PLAINTIFFS LACK CONSTITUTIONAL STANDING. ................................................. 3

        A.      Plaintiffs have not proven that they suffer the injury of headaches from
                community water fluoridation or that their proposed remedy is likely to redress
                their headaches. ................................................................................................................ 4

        B.      Any other injuries to adults that Plaintiffs may allege are not cognizable. ............ 9

        C.      Plaintiffs' residual theories of standing are deficient. ......................................... 10

II.     PLAINTIFFS DO NOT FALL WITHIN THE ZONE OF INTERESTS. ........................ 12

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp.*,
705 F.3d 1073 (9th Cir. 2013) ................................................................. 13

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) ............................................................. 10, 11

*Carrico v. City & Cty. of San Francisco*,
656 F.3d 1002 (9th Cir. 2011) ................................................................. 3

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................ 10

*Corrosion Proof Fittings v. E.P.A.*,
947 F.2d 1201 (5th Cir. 1991) ............................................................... 12

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 ......................................................................................... 10

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752, (2004) ............................................................................... 14

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) .................................................................................... 9

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ................................................................ 10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................................... 13

*Food & Water Watch, Inc. v. EPA*,
302 F. Supp. 3d 1058 (N.D. Cal. 2018) ................................................ 14

*Freeman v. Quicken Loans, Inc.*,
132 S. Ct. 2034 (2012) ........................................................................... 12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000) ...................................................................... 3, 4, 10

*Gest v. Bradbury*,
443 F.3d 1177 (9th Cir. 2006) ............................................................ 3, 4

*Hein v. Freedom From Religion Found., Inc.,*
   551 U.S. 587 (2007) ................................................................................. 9

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ................................................................................ 10

*Kirola v. City & Cty. of San Francisco,*
   860 F.3d 1164 (9th Cir. 2017) .................................................................. 4

*Lexmark Int'l Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ............................................................................ 3, 12

*Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................... 4

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 3, 4, 6

*Maracich* v. *Spears,*
   133 S. Ct. 2191 (2013) ........................................................................... 12

*McCormack v. Hiedeman,*
   694 F.3d 1004 (9th Cir. 2012) ................................................................ 12

*McInnis-Misenor v. Me. Med. Ctr.,*
   211 F. Supp. 2d 256 (D. Me. 2002),
   *aff'd sub nom.,* 319 F.3d 63 (1st Cir. 2003) ........................................... 12

*Mossville Envtl. Action Now v. EPA,*
   370 F.3d 1232 (D.C. Cir. 2004) .............................................................. 14

*Nat. Res. Def. Council v. EPA,*
   735 F.3d 873 (9th Cir. 2013) .................................................................. 11

*Nguyen v. Chater,*
   100 F.3d 1462 (9th Cir. 1996) .................................................................. 5

*Northside Sanitary Landfill, Inc. v. Thomas,*
   849 F.2d 1516 (D.C. Cir. 1988) .............................................................. 14

*Pennsylvania v. New Jersey,*
   426 U.S. 660 (1976) ............................................................................... 10

*Price v. Stevedoring Servs. of Am., Inc.*,
   697 F.3d 820 (9th Cir. 2012)..................................................................... 15

*Riva v. Pepsico, Inc.*,
   82 F. Supp. 3d 1045 (N.D. Cal. 2015) ........................................................ 9

*San Diego Cty. Gun Rights Comm. v. Reno*,
   98 F.3d 1121 (9th Cir. 1996)...................................................................... 4

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................................. 13

*Thomas v. Mundell*,
   572 F.3d 756 (9th Cir. 2009)...................................................................... 9

*Tobeler v. Colvin*,
   749 F. 3d 830 (9th Cir. 2014)..................................................................... 5

*U.S. Dep't of Energy v. Ohio*,
   503 U.S. 607 (1992) .................................................................................. 15

*United States v. $133,420.00 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012)...................................................................... 3

*United States v. Hays*,
   515 U.S. 737 (1995) .................................................................................. 3

*Wash. Envtl. Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013).................................................................... 5

*Washington v. Barr*,
   925 F.3d 109 (2d Cir. 2019) ...................................................................... 13

*Yates v. United States*,
   135 S. Ct. 1074 (2015) .............................................................................. 12

**United States Code**

15 U.S.C. § 2620.......................................................................................... 1

15 U.S.C. § 2620(a) ..................................................................................... 12

15 U.S.C. § 2620(b) ..................................................................................... 1

15 U.S.C. § 2620(b)(1) ................................................................................................ 12, 14

15 U.S.C. § 2620(b)(3) ...................................................................................................... 14

15 U.S.C. § 2620(b)(4)(A) ................................................................................................ 12

15 U.S.C. § 2620(b)(4)(B) ................................................................................................ 13

Defendants' Post-trial Brief on Standing
Case No. 17-cv-02162 EMC

## INTRODUCTION

Plaintiffs failed to demonstrate at trial that they have constitutional standing and that their claim falls within the zone of interests of the Toxic Substances Control Act ("TSCA"). 15 U.S.C. § 2620(b). Plaintiffs content that the best evidence of standing is the self-reported headaches of their declarants. But the evidence Plaintiffs offered on headaches at trial was, by their own expert's description, "weak" and unrelated to fluoride levels in community water fluoridation programs. Tr., Mot. Summ. J. 5:1-10 (Nov. 15, 2019); Trial Transcript ("Tr.") 308:1-13. Nor is Plaintiffs' passing reference to headaches in their administrative petition a sufficient basis to confer this Court with jurisdiction to address the neurodevelopmental harm that Plaintiffs attempted to prove at trial. None of Plaintiffs' standing declarants are pregnant, planning to become pregnant, or in guardianship of infants. Plaintiffs lack standing, and their case must be dismissed.

## BACKGROUND

As this Court is well aware, fluoride is a common, naturally occurring substance. In the United States, some communities add fluoridation chemicals to drinking water to reach 0.7 milligrams per liter (mg/L), the recommended optimal concentration for reducing tooth decay. US Ex. 516.

Despite these positive health effects, on November 23, 2016, a group led by Fluoride Action Network petitioned EPA to ban the addition of fluoridation chemicals to water. US Ex. 515. According to their petition, "neurotoxicity is a hazard of fluoride exposure" which presents the risks of loss of Intelligence Quotient (IQ) points and the onset of Attention Deficient Hyperactivity Disorder (ADHD). US Ex. 515.0002, 515.0008, 515.0010. In particular, the petition identifies the subpopulations of infants, young children, and the elderly as being susceptible to fluoride's alleged effects. US Ex. 515.0002.

EPA denied the petition because it did not set forth the necessary facts to provide a basis to initiate the requested rulemaking as required by TSCA. US Ex. 514 15 U.S.C. § 2620. EPA concluded that "[t]he petition has not set forth a scientifically defensible basis to conclude that any persons have suffered neurotoxic harm" from water fluoridation. US Ex. 514.004.

Following the petition denial, a smaller group of organizations and individuals filed this action on April 18, 2017. ECF No. 1. Plaintiffs stipulated that they would "*rely exclusively* on the

declarations attached [to ECF No. 100] to establish the factual basis" for standing. ECF No. 100 ¶ 1 (emphasis added). Though the petition claimed that neurotoxic harm was a hazard of fluoride, the Plaintiffs in this action have not identified a single individual Plaintiff or member of a Plaintiff organization who can credibly fear the neurotoxic harms of reduced IQ or ADHD. Not a single declarant is a member of the alleged susceptible subpopulations. None has infants or young children of any age of concern. It is undisputed no standing declarant is pregnant, expects to be pregnant, or even expressed a desire to become pregnant. None is elderly. In denying the parties' summary judgment motions, the Court found that Plaintiffs' declarations "r[o]se above the purely speculative, albeit perhaps barely" for standing at summary judgment. ECF No. 156 at 9.

Subsequent to the petition and the Complaint, studies from two birth cohorts emerged regarding the relationship between urinary fluoride levels and neurodevelopmental effects on IQ and ADHD behavior. The Canadian MIREC and Mexico City ELEMENT cohort studies were the foundation of Plaintiffs' case at trial and all four of Plaintiffs' experts focused on developmental exposure. Dr. Hu summarized his opinion that "the ELEMENT prospective cohort studies are consistent with and support the conclusion that fluoride is a *developmental* neurotoxicant." Hu Decl., ECF No. 198-1, ¶ 13(emphasis added). Dr. Lanphear similarly concluded that the MIREC studies "indicate that exposure to 'optimal' levels of fluoride *during fetal development* is associated with diminished intelligence in childhood" and "suggest[] that susceptibility to fluoride's adverse neurological effects may extend into *infancy.*" Lanphear Decl., ECF No. 198-2, ¶¶ 14-15 (emphasis added). Dr. Grandjean relied exclusively on these cohort studies for his risk calculations. Grandjean Decl., ECF No. 198-3, ¶¶ 136-143. Finally, Dr. Thiessen relied on prenatal animal studies for her risk calculations. Thiessen Decl., ECF No. 202-1, ¶ 118. EPA's experts, on the other hand, reached different conclusions from Plaintiffs after conducting systematic reviews and examining the weight of scientific evidence. Chang Decl., ECF No. 200, ¶ 13; Tr. 636:7-643:23 (summarizing NTP 2016); Tsuji Decl., ECF No. 199, ¶¶148-152.

At trial, the standing declarations were admitted into evidence, ECF No. 218, and, pursuant to stipulation, ECF No. 100, no additional factual basis of standing was presented. The Court

closed the record and requested briefing on standing given the undisputed fact that no Plaintiff can be personally concerned about fluoride exposure to a developing fetus or infant. Tr. 1136:1.

## STANDARD OF REVIEW

At trial, Plaintiffs bear the burden to demonstrate all elements of standing by the same standard that applied to all other elements of their case—preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (standing is an "indispensable part of the plaintiff's case" and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"); *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (factual predicate of standing must be proven at trial); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 683 (9th Cir. 2012) (facts must be proven by preponderance of the evidence). Unsupported, conclusory, and self-serving allegations of standing declarants are never enough to prove standing. *U.S. Currency*, 672 F.3d at 638; *Carrico v. San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011).

Plaintiffs must also establish by the preponderance standard that they fall within TSCA's zone of interests. *Lexmark Int'l Inc. v. Static Control Components*, 572 U.S. 118, 129 (2014).

## ARGUMENT

## I.   PLAINTIFFS LACK CONSTITUTIONAL STANDING.

Federal courts do not freely dispense advice; they resolve actual controversies. U.S. Const. art. III. And cases must be brought by the injured, not their advocates. Having a "special interest in the subject" is not an adequate basis to invoke federal jurisdiction. *Lujan*, 504 U.S. at 563. A plaintiff must show that the action it challenges "directly" affects it. *Id.*; *United States v. Hays*, 515 U.S. 737, 745 (1995). The doctrine of standing "functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191 (2000).

The Supreme Court has enumerated three elements of standing, which build upon each other to ensure that the remedy crafted by the federal courts is "likely" to redress the particular injury that the challenged action has inflicted on plaintiffs. Plaintiffs must prove that they have

suffered (1) injury-in-fact; (2) traceable to the challenged action; and (3) redressable by the federal courts. *Lujan*, 504 U.S. at 563.

The first requirement, of "injury-in-fact," is satisfied only by "concrete," "particularized," "actual," and "imminent" harm. *Laidlaw,* 528 U.S. at 180–81. This requirement "cannot be met where there is no showing of any real or immediate threat" to the plaintiffs. *Los Angeles v. Lyons*, 461 U.S. 95, 101(1983). Plaintiffs must demonstrate a "realistic threat" of injury that is particular to their exposure. *Id*. at 184. Any person can fear any harm, and fear alone is insufficient to confer standing. *Lyons*, 461 U.S. at 111. Because Plaintiffs here seek prospective relief, they must also demonstrate that their injury will likely reoccur in the future. *Id.* at 103; *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).

The second and third elements of standing require Plaintiffs to prove that their injury is "fairly traceable" to the challenged action, and that it is "likely" that a remedy selected by the court would redress the claimed injury. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. at 180–81; *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017). Plaintiffs seeking an injunction need to prove at trial that without an injunction against the challenged action, it is "likel[y]" they will be harmed. *Gest*, 443 F.3d at 1182; *see Lyons*, 461 U.S. at 111 (plaintiffs seeking equitable relief must demonstrate a "likelihood of substantial and immediate harm"). In sum, if a federal court is to expend its scarce resources to resolve a case, it must be likely that the remedy sought is likely to redress a real injury particular to the plaintiffs.

Plaintiffs have not proven that they have a personal, concrete interest in disputing EPA's denial of their petition. Rather, they have made vague allegations of injury without regard to the specific circumstances of their declarants and the evidence, and have failed to establish that their alleged injuries are traced to EPA's action or would be redressed if the Court grants relief. Plaintiffs' meager attempts to show standing at trial lack the necessary particularity and fall far short of fulfilling constitutional requirements.

**A. Plaintiffs have not proven that they suffer the possible headaches traceable to water fluoridation or that their proposed remedy is likely to redress their headaches.**

Plaintiffs admit that their "best example" of cognizable injury is self-reported headaches. Tr., Mot. Summ. J. 5:1-10 (Nov. 15, 2019). Julie Simms, a standing declarant, claims to suffer

headaches due to fluoridated drinking water. Simms Decl., ECF No. 100-6, ¶ 13. However, Ms. Simms admits to having at least twenty-four different headache "triggers," including wheat, sugar, dairy, cheese, aspirin, gas fumes, perfume, heat, bath soap, red wine, mold, and stress. Dep. Designations, ECF No. 237, at 45-50. Another standing declarant, Audrey Adams, believes that her adult son suffers headaches after showering with fluoridated water. Adams Decl., ECF No. 100-7, ¶ 11. She contends that her son has vaccine-induced autism, and that he has many sensitivities, including allergies to food and other chemicals, that exacerbate problems stemming from his autism. Dep. Designations, ECF No. 237, at 60-61, 63-64. Ms. Adams concedes that there are multiple possible causes of her son's headaches, and that the time, temperature, and pressure of his showers affect his headaches. Adams Decl., ¶¶ 11, 14, ECF No. 100-7, at 4-5. Ms. Simms and Mr. Adams have never been medically tested for a fluoride allergy, and their headaches are self-reported. Dep. Designations, ECF No. 237, at 51-52; Dep. Designations, ECF No. 237, at 66.

Because Ms. Simms' and Mr. Adams' claimed headaches have multiple possible causes, Plaintiffs needed to prove by preponderance of the evidence that they do, in fact, suffer injury in the form of headaches from exposure to fluoridated water. *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013) (standing demonstration is weak when there are multiple potential causes of injury). They did not meet this burden at trial. They adduced no new evidence to isolate fluoridated drinking water as a source of Ms. Simms and Mr. Adams' headaches. This Court has already decided that these untested, self-reported claims of headaches are not persuasive evidence of standing. Summ. J. Order, ECF No. 156 at 9.[1] Moreover, Plaintiffs have not shown that their headaches are fairly traceable to community water fluoridation. Plaintiffs cite dated case reports and a single study at high exposure levels to support their theory. In their direct testimony declarations, Plaintiffs' experts made, in total, three passing references to headaches: (1) case

---

[1] Though declarants cite to doctor's and non-medical professional's notes of the self-reported headaches, these notes can be only used to prove the facts of their self-reporting. The standing declarants are fact witnesses, and the stipulation allowing the declarations specifically stated that the declarations could be used only to establish the "factual" basis of standing. ECF No. 100 at 1-2, ¶¶ 1-3, 7. Fact witnesses cannot offer any medical diagnoses; and there are no expert medical diagnoses in evidence. *Tobeler v. Colvin*, 749 F. 3d 830, 833-34 (9th Cir. 2014); *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

5

1    reports in the National Research Council (NRC) 2006 report; (2) case reports of occupational

2    exposure; and (3) an epidemiological study on highly exposed populations in India. Thiessen Decl.

3    ¶ 61; Grandjean Decl. ¶¶ 59, 74. None of the documents indicates that exposure to the levels of

4    fluoride in artificially fluoridated water is fairly traceable to headaches. And neither individually

5    nor collectively do the documents establish injury or causation by a preponderance of the evidence.

6          First, the old case reports documented in NRC 2006 are not sufficient evidence to link

7    headaches and exposure to artificially fluoridated water. Plaintiffs' risk assessment expert, Dr.

8    Thiessen, conceded that case reports can do no more than "hypothesi[ze]" a connection between

9    an exposure and an effect. Tr. 576:22-24. A "hypothesis" is insufficient for standing. *Lujan*, 504

10    U.S. at 560. Though Dr. Thiessen attempted on rebuttal to recast these case reports as "double-

11    blinded experiments," her characterization in rebuttal testimony is refuted by the very document

12    on which she purports to rely, her prior testimony, and the testimony of EPA's expert

13    epidemiologist, Dr. Chang.

14          In NRC 2006, headaches are mentioned only once, as a finding in "case reports" by

15    Petraborg in 1977. Pltf. Ex. 13, p. 270. Dr. Thiessen herself described the studies in NRC 2006 as

16    "case reports" as documented by the NRC. Tr. 503:19-24. EPA's expert, epidemiologist Dr.

17    Chang, also described the "case reports" in which headaches are mentioned and confirmed there

18    was no blinding in the 1977 Petraborg case reports cited by NRC 2006. Tr. 839:16-23. Only after

19    speaking with Plaintiffs' counsel did Dr. Thiessen change her description of the reports in NRC

20    2006 to "double-blinded experiments." Tr. 1036:6-12; 526:22-527:2. Plaintiffs' counsel prefaced

21    Dr. Thiessen's rebuttal testimony with a reference to Waldbott 1958, though NRC 2006 does not

22    contain any description of any symptoms from Waldbott 1958, and Waldbott 1958 is not itself a

23    reference in NRC 2006.[2] Tr. 1034:14-35:25. In any case, Dr. Chang attested that Waldbott also

24

25    [2] In response to EPA's objections to expert testimony as beyond the scope of disclosures,
     reasserted by written motion, ECF No. 228, Plaintiffs' counsel represented that the studies, as

26    well as the "neurological manifestations" discussed by the expert, were described in NRC 2006.
     Tr. 502:18-503:2. Because the only mention of headaches in NRC 2006 is to case reports by

27    Petraborg, if Plaintiffs' counsel and expert were not simply misremembering the author of the
     case reports, then they exceeded the scope of disclosures, and EPA was prejudiced in its inability

28    to cross-examine Plaintiffs' expert with the undisclosed document.

wrote case reports in 1958 in which the doctor provided fluoridated water to patients, but the doctor was not blinded as to the fluoridation of the water, he did not test patients with water that was not fluoridated, and he did not report on patients who exhibited no symptoms. Tr. 841:8-23. Studies that fail to blind investigators are highly susceptible to bias, and without a control group or even a record of results from all cases, Waldbott 1958 is not a "valid basis" to conclude that headaches are traceable to fluoridated water. Tr. 840:20-841:23.

In addition to failing to demonstrate that the case reports in NRC 2006 were actually "double-blinded experiments," Plaintiffs never identified the concentration of fluoride at which headaches were reported, the characteristics of the studied population, or even the prevalence of the symptoms compared with a control population. Moreover, the American Academy of Allergy found in 1971, after Waldbott 1958, that no symptoms reported in any blinded experiments were caused by allergies to fluoride in the water. Pltf. Ex. 13, p. 293; Tr. 843:20-24. Thus, the case reports cited by Dr. Thiessen provide no basis to conclude that the Ms. Simms's headaches are traceable to her exposure to fluoride in the levels present in artificially fluoridated drinking water in the United States. Additionally, Plaintiffs presented no studies concerning showering and headaches. Therefore, these case reports provide no basis to conclude that Mr. Adams's headaches are traceable to showering with fluoridated water.

The only other case reports cited by Plaintiffs concern industrial occupational exposures to fluoride at very high levels. Tr. 300:13-301:9. Plaintiffs' epidemiologist, Dr. Grandjean, conceded that the workers described in the Roholm 1937 case reports were exposed to fluoride in the range of 30 mg/day, not even close to the intake rates of fluoride in drinking water as calculated by Dr. Thiessen. Tr. 300:5-301:9; Thiessen Decl., Tbl. 7, ECF No. 202-1 at 75 (applying 70 kg body weight for adults from NRC 2006, Pltf.  Ex. 13 at 23, would yield intake rates of .77 mg/day for average adults). These case reports also provide no basis to conclude that exposure to community fluoridated water will lead to headaches.

The last headache study Plaintiffs' experts cited in passing was conducted by Sharma in villages in India. Dr. Grandjean described this study as "weak" because of its poor design, and he expressed doubt that the questionnaire administered to the study participants was standardized or

7

even understandable. Tr. 308:1-13. EPA's epidemiology expert, Dr. Chang, concurred that this study was weak because the health effects studied were self-reported and not diagnosed by medical professionals, the study had virtually no control for confounding factors, and it lacked individual measurements of fluoride exposure. Tr. 843:1-17. She further explained that this study was "cross-sectional," meaning that information on village-wide fluoride exposure and symptoms were collected at the same time, and because no time elapses between exposure and outcome, cross-sectional studies cannot prove that an exposure causes an outcome. *Id*.; Chang Trial Decl. ¶ 121. Dr. Chang's testimony on Sharma is uncontested, and, indeed, supported, by Plaintiffs' expert. Plaintiffs cannot reasonably dispute that the Sharma study is uninformative.

In addition, Plaintiffs conceded that the only clear adverse effects shown in Sharma were in children exposed to concentrations of fluoride above 1.5 ppm, which is more than double the levels in the United States. Tr. 307:20-308:13. There was no difference in headaches among children or adults in the low fluoride villages, which were below 1 ppm and the medium fluoride villages, which were between 1-1.5 ppm. Tr. 842:1-17. The results of this study undermine Plaintiffs' claims that their declarants' headaches are connected to community water fluoridation.

It is notable that Plaintiffs failed to establish the intake of fluoridated water of Ms. Simms or Mr. Adams with any specificity such that their circumstances could be compared to the concentrations in any study discussed at trial. There is also no evidence in the record even suggesting that the remedy sought here—EPA action on the alleged unreasonable risk of neurotoxic harm of fluoridated water—would redress the headaches claimed to be suffered by Mr. Adams and Ms. Simms. As previously noted, Mr. Adams and Ms. Simms purportedly have many claimed headache triggers in addition to fluoride, and suffer from headaches (sometimes also described as pain to her son's head by Ms. Adams) notwithstanding their avoidance of fluoridated water. Dep. Designations, ECF No. 237, at 45-50, 57; Adams Decl., ECF No. 100-7, ¶¶ 11, 14; Dep. Designations, ECF No. 237, at 60-61, 67-68. Plaintiffs have never even attempted to prove redressability, or asserted that EPA action on the particular concentration of fluoride that they claim presents an unreasonable risk would also alleviate Mr. Adams' or Ms. Simms' headaches.

**B.  Any other injuries to adults that Plaintiffs may allege are not cognizable.**

At trial, Plaintiffs made fleeting references to other potential health impacts in adults, such as pain sensitivity and cognitive functioning in the elderly. Plaintiffs did not prove by preponderance of the evidence that these purported effects confer standing.

The scant evidence presented at trial regarding pain sensitivity also cannot provide the basis for Plaintiffs' standing. Although Dr. Thiessen claimed that the McPherson 2018 animal study found "increase in pain sensitivity" in rats, but actually rats exposed to fluoride take longer to react to heat than a control group. *Compare* Thiessen Decl. ¶ 79 *with* Tsuji Decl. ¶ 94 *and* Tr. 751:1-13; 753:13-18; 754:12-16. If anything, this result would suggest that fluoride exposure dulls pain. In any event, McPherson 2018 was a set of *animal* studies examining learning and memory due to *developmental* exposure to *ingesting* fluoride.  It provides no explanation for the pain or headaches that Ms. Adams' disabled adult son purports to suffer with "skin contact" to shower water. Adams Decl. ¶¶ 11, 16; *see also Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1061 (N.D. Cal. 2015) (animal studies may not readily translate to human effects for standing).

Finally, Plaintiffs previously made the sweeping argument that Plaintiffs have standing because their declarants will all presumably become elderly someday, which would increase their susceptibility to the neurotoxic harms of fluoride exposure. Tr. Mot. Summ. J. 20:5-21:19. The Court correctly questioned whether "anyone has standing" because "[a]nybody [is] going to be elderly." *Id.* at 20:23-24. Such a generalized grievance, which is not particular to any declarant's circumstances, cannot support standing. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998); *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009). In any event, not even Plaintiffs' own epidemiologist would testify to any human studies on the stand on this alleged harm.  And animal studies were of such little import that none of Plaintiffs' experts testified to them on the stand either. *Riva*, 82 F. Supp. 3d at 1061(animal studies may not readily translate to human effects for standing). Instead, Plaintiffs' expert, Dr. Grandjean, disclaimed providing an opinion on adults, Tr. 226:9-11, and conceded that the occupational evidence on adults "does not allow any detailed consideration of [neurotoxic harm's] dependence on dose, timing, and duration." Grandjean Decl. ¶ 64; *see also* Tr. 298:17-

9

1   300:23 *and* Grandjean Decl. ¶ 74 (noting that Shao 2003 compared "healthy" individuals with

2   those in endemic skeletal fluorosis areas from an unknown "heavy exposure" source); Tr. 304:8-

3   305:9 (Li 2016 showing no association).  Plaintiffs did not present any evidence on how, to what

4   degree, and with what consequences, fluoride exposure would cause neurotoxic harms to their

5   future elderly declarants. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("we

6   routinely refuse to permit such predictive assumptions to establish standing"). Thus, Plaintiffs have

7   not proven that community water fluoridation gives rise to a realistic threat of harm when the

8   declarants age sometime in the future. The Court should reject Plaintiffs' attempt to "dress up"

9   "hypothesized, non-imminent injuries" as "increased risk of future injury." *Ctr. for Law & Educ.*

10  *v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005).

11          In sum, Plaintiffs have failed to show that any declarant suffers an immediate risk of injury

12  from subsequent exposure to fluoridated drinking water at their present stage in life.

13      **C.  Plaintiffs' residual or derivative theories of standing are deficient.**

14          Plaintiffs' standing is premised entirely on injuries to their individual declarants. Because

15  their members lack standing, as explained here, so too do the organizations. *Hunt v. Wash. State*

16  *Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Any vague "loss of enjoyment" of tap water and

17  any costs Plaintiffs have incurred to avoid fluoridated water have been caused by their own

18  unsubstantiated concerns. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *Pennsylvania*

19  *v. New Jersey*, 426 U.S. 660, 664 (1976); *Cf. Laidlaw Envtl. Servs., Inc.*, 528 U.S. at 176 (finding

20  standing at summary judgment due to the release of mercury, an undisputed "extremely toxic

21  pollutant"). Plaintiffs' self-inflicted injuries are no basis for standing.

22          In attempting to salvage the shortcomings of their claim of standing, Plaintiffs cite two

23  additional cases in their trial brief, but both are inapposite. In *Baur v. Veneman*, 352 F.3d 625 (2d

24  Cir. 2003), the Second Circuit considered whether the meat-consuming plaintiffs in that case met

25  the lower burden of demonstrating standing at the pleading stage by alleging injury from

26  consumption of downed livestock that the agency allowed to be sold as food. There was no dispute

27  in *Baur* that plaintiffs fell within the group of people who would be harmed by the agency's

28  decision because plaintiffs consumed meat. Further, there was also no dispute about "two critical

factors" underpinning the standing inquiry– the agency itself recognized a hazard, and the hazard arose from an established agency policy. *Id*. at 628. Unlike in *Baur*, Plaintiffs and their declarants do not fall within the parts of the population to which Plaintiffs alleged harm, or to which Plaintiffs presented evidence at trial. No Plaintiff or standing declarant is pregnant, planning to become pregnant, or a guardian of an infant, and no Plaintiff or standing declarant is a member of the group of "susceptible subpopulations" that Plaintiffs identified in their petition or Complaint. And even if *Baur* were controlling, which it is not, the two critical factors alleged in that case are missing here. EPA has not recognized that neurotoxicity is a hazard of community water fluoridation. Instead, NTP 2016 found the evidence "low" so far and has a hazard conclusion pending. Tr. 636:7-643:23. And, there is no federal mandate to fluoridate water. More instructively, *Baur* recognizes that, while mere allegations are sufficient at the pleading stage, more is needed as the case proceeds. *Id*. at 631. *Baur* further acknowledges that, while plaintiffs may have constitutional standing, the "zone-of-interests" test further limits jurisdiction, *id*. at 636, and Plaintiffs here have failed to fulfill those requirements as well.

Plaintiffs also cite *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 735 F.3d 873, 878 (9th Cir. 2013). In that case, unlike here, there was no dispute that plaintiffs were guardians of small children, and there was *no dispute* that the level of exposure of a new chemical to small children would result in too high of a risk as originally *calculated by the agency itself.* Again, the characteristics of Plaintiffs and their declarants here do not match the characteristics of the subpopulations to which Plaintiffs allege harm or attempted to prove harm. Further, Plaintiffs themselves dispute that there is a single level of exposure common to all members of the population. Plaintiffs have failed to prove the exposure levels of their standing declarants with any particularity, connect such particular exposure levels with the specific harms complained of by the declarants, and demonstrate that the remedy would redress those harms.

Neither *Baur* nor *NRDC* excuses Plaintiffs' failure to identify a declarant who has a realistic interest in avoiding prenatal or infant exposure. Rather, these cases confirm well-established law that jurisdiction depends on the particular circumstances of the plaintiffs, and when the harm alleged is to pregnant women or parents of young of a certain age, plaintiffs themselves

1    must fall within those categories. *See NRDC,* 735 F.3d at 879; *McCormack v. Hiedeman*, 694 F.3d

2    1004, 1023 (9th Cir. 2012); *McInnis-Misenor v. Me. Med. Ctr.,* 211 F. Supp. 2d 256, 260 (D. Me.

3    2002); *aff'd sub nom.*, 319 F.3d 63 (1st Cir. 2003).

## II.        PLAINTIFFS DO NOT FALL WITHIN THE ZONE OF INTERESTS.

5            Even if Plaintiffs have constitutional standing, they must also fall within the zone of interests

6    to bring a claim under TSCA as set by Congress. *Lexmark*, 572 U.S. at 127, 129 (test "applies to all

7    statutorily created causes of action"). Determining whether a case falls within the zone of interests

8    entails "traditional principles of statutory interpretation" on "whether a legislatively conferred

9    cause of action encompasses a particular plaintiff's claim." *Id.* at 127-28. Because Plaintiffs claim to

10   suffer from harms not presented in their administrative petition to EPA, this case falls outside of

11   TSCA's zone of interests.

12           In TSCA, Congress required that a party petition EPA to take action on an alleged

13   unreasonable risk prior to seeking judicial review. 15 U.S.C. § 2620(a). The administrative

14   petition must "set forth the facts which it is claimed establish that it is necessary" to initiate the

15   desired rulemaking. *Id.* § 2620(b)(1). If EPA denies the petition, only "petitioner[s]" may bring

16   suit, and the only basis for their suit is the petition itself. The term "petitioner" must be read in

17   "the broader context" of the regulatory framework as a whole, *Yates v. United States*, 135 S. Ct.

18   1074, 1081-82 (2015), considering "neighboring words with which it is associated," *Freeman v.*

19   *Quicken Loans, Inc*., 132 S. Ct. 2034, 2042 (2012), "to avoid giving [a provision] unintended

20   breadth," *Maracich* v. *Spears*, 133 S. Ct. 2191, 2201 (2013).  *See e.g., Corrosion Proof Fittings*

21   *v. E.P.A.*, 947 F.2d 1201, 1209 (5th Cir. 1991) (TSCA's reference to "national economy"

22   precluded foreign entities from being within the zone of interests as "any person"). Under TSCA,

23   "the *petitioner* may commence a civil action . . . to compel [EPA] to initiate a rulemaking

24   proceeding *as requested in the petition*." 15 U.S.C. § 2620(b)(4)(A) (emphasis added). *Lexmark*

25   counsels the zone of interest test questions not only *who* may bring a claim, but *what* claim can

26   be brought and *when*. 572 U.S. at 127-28.  It follows that if petitioners do not suffer the

27   unreasonable risk presented to EPA, then they do not have a cause of action to challenge EPA's

28   denial of their petition in court.

1    Here, the entirety of Plaintiffs' petition concerned fluoride's alleged neurotoxicity. US Ex.

2   515.0002 ("neurotoxicity is a hazard of fluoride exposure"); US Ex. 515.0002, 515.0008, 515.0010

3   (discussing IQ loss and ADHD); US Ex. 515.0002 (citing infants, young children, and the elderly).

4   As the Court recognized, it is "obvious who would have standing" and fall within the zone of

5   interests:  pregnant women and potentially the parents of infants. Tr. 1135:25-36:2. No Plaintiff or

6   standing declarant has these characteristics. Nor is any Plaintiff a member of any of the susceptible

7   subpopulations like the elderly or those with iodine deficiencies as identified in the petition.

8   Despite the claims in the petition, Plaintiffs have not proffered even a single member who could

9   allege a credible fear of the neurotoxic harms of IQ loss or ADHD due to their exposure to

10  community water fluoridation.

11   Plaintiffs agree that they must show an unreasonable risk of neurotoxic harm, but seem to

12  contend that they can seek judicial review regarding the purportedly unreasonable risk of neurotoxic

13  harm without demonstrating any such risk to themselves. This argument has no basis in TSCA. Only

14  those at risk may sue the federal government for redress. *Summers v. Earth Island Inst.*, 555 U.S. 488,

15  495-96 (2009).  In other words, petitioners cannot claim one harm to EPA, then turn to the courts,

16  claiming that they suffer other harms never presented to EPA. Allowing any Plaintiff to do so here

17  would create an end-run around the administrative procedure that Congress established. Further, the

18  only relief Congress made available is for courts "to initiate a rulemaking proceeding as requested in

19  the petition"—based on the harm shown in the petition. 15 U.S.C. § 2620(b)(4)(B). In interpreting

20  TSCA, "the court must be guided to a degree by common sense as to the manner in which Congress

21  is likely to delegate a policy decision of such … magnitude to an administrative agency" and read

22  TSCA as a "harmonious," "coherent regulatory scheme."  *Food & Drug Admin. v. Brown &*

23  *Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000). There is no logical rationale for allowing

24  people who do not suffer the harm presented in the petition to demand that EPA conduct a rulemaking

25  to address that harm. To hold otherwise would deprive the agency its ability to "utilize their expertise,

26  correct mistakes, and avoid unnecessary judicial intervention." *Alaska Survival v. Surface Transp.*,

27  705 F.3d 1073, 1080 (9th Cir. 2013); *see Washington v. Barr*, 925 F.3d 109, 116 (2d Cir. 2019).

28

Plaintiffs' attempt to define neurotoxic harms to encompass any perceived impact or symptom on the brain and nervous system would eviscerate the requirement that the petition "set forth the facts which it is claimed establish that it is necessary" to initiate the desired rulemaking. 15 U.S.C. § 2620(b)(1). These facts will "frame" any case Plaintiffs may bring. *Food & Water Watch, Inc. v. EPA,* 302 F. Supp. 3d 1058, 1069–70 (N.D. Cal. 2018). The petition *never* mentions headaches as a potential injury, not even once, in the body of the text or even in the more than 300 named references. Physical pain is similarly not named. Plaintiffs did attach to the petition the Sharma study, which discussed self-reported headaches among multiple alleged symptoms of fluoride exposure. Attaching one study, among over 300 others documents, without any commentary or naming "headaches" as a potential harm is wholly insufficient to bring Plaintiffs claim within TSCA's zone of interest. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65, (2004) (A bedrock of administrative law is "alert[ing] the agency to the [parties'] position and contentions in order to allow the agency to give the issue meaningful consideration."); *see e.g., Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004); *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1519 (D.C. Cir. 1988). EPA cannot be expected to scour every attachment to identify every risk not mentioned in a petition or otherwise divine the petitioners' intent, particularly given the relatively short response deadline. 15 U.S.C. § 2620(b)(3). Plaintiffs do not fall within the zone of interests because the harm they allege, headaches, is divorced from the harm Plaintiffs named in their petition and attempted to prove at trial. The petition concerns neurotoxic harm, and Plaintiffs' risk calculations concern prenatal exposure. Plaintiffs never attempted to prove an unreasonable risk of headaches for adults in the petition or for their declarants at trial. *See supra* 1-2 (summarizing Plaintiffs' focus on prenatal/developmental exposure).

Unlike other environmental statutes, and contrary to Plaintiffs' argument that TSCA's zone of interest is commensurate with Article III standing, TSCA provides a limited, specific means to bring the type of claim at issue in this case.  Any TSCA Section 21 claim must be preceded by an administrative petition and be bound to the claimed harms in that petition. But if there is any ambiguity or doubt as to whether Plaintiffs' claim falls within TSCA's zone of interests, the Court should accept the more limited construction. The statutory interpretation

14

question at issue here concerns the scope of potential lawsuits against the United States, and in such instances, the statute must be "construed strictly in favor of the sovereign." *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992). Further, "given the specialized experience[,] investigations and information available to the agency, and [] the value of uniformity in its administrative and judicial understandings of what a national law requires," the Court should defer to EPA's reading of the zone of interests to require administrative exhaustion to allow the agency to consider the harms in the first instance. *Price v. Stevedoring Servs. of Am., Inc.,* 697 F.3d 820, 832 (9th Cir. 2012).

## CONCLUSION

For the forgoing reasons, and based on the lack of evidence at trial, the Court should dismiss for lack of standing or otherwise enter judgment in favor of EPA.


Date: July 1, 2020


Respectfully Submitted,

*/s/ John Thomas H. Do*
DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

Excerpt of US Trial Exhibit 514

cards, letters, and flats; USPS Marketing Mail automation letters and flats; USPS Marketing Mail Carrier Route, High Density, and Saturation letters; Periodicals Outside County barcoded or Carrier Route letters and flats; Periodicals In-County automation or Carrier Route letters and flats; and Bound Printed Matter Presorted, non-DDU barcoded flats. Mailers who present at least 95 percent of their eligible First-Class Mail and USPS Marketing Mail volume as Full-Service in a calendar month would receive electronic address correction notices for their qualifying Basic automation and non-automation First-Class Mail and USPS Marketing Mail pieces, at the address correction fee for pieces eligible for the Full-Service Intelligent Mail option as described in DMM 705.23.0 for future billing cycles. The Basic First-Class Mail and USPS Marketing Mail mailpieces must:

1. Bear a unique IMb printed on the mailpiece;

2. Include a Full-Service or OneCode ACS STID in the IMb;

3. Include the unique IMb in eDoc;

4. Be sent by an eDoc submitter providing accurate Mail Owner identification in eDoc, and;

5. Be sent by an eDoc submitter maintaining 95 percent Full-Service compliance to remain eligible for this service and undergo periodic Postal Service re-evaluation.

\*   \*   \*   \*   \*

**4.2.8 Address Correction Service Fee**

*[Revise 507.4.2.8 by deleting the old language and replacing with new language as follows:]*

ACS fees would be assessed as follows:

a. The applicable fee for address correction is charged for each separate notification of address correction or the reason for nondelivery provided, unless an exception applies.

b. Once the ACS fee charges have been invoiced, any unpaid fees for the prior invoice cycle (month) would be assessed an annual administrative fee of 10 percent for the overdue amount.

c. Mailers who present at least 95 percent of their eligible First-Class Mail and USPS Marketing Mail volume as Full-Service in a calendar month would receive electronic address correction notices for their qualifying Basic automation and non-automation First-Class Mail and USPS Marketing Mail mailpieces, as specified in 4.2.2. The electronic address correction notices are charged at the applicable Full-Service address correction fee for all future billing cycles.

\*   \*   \*   \*   \*

**600 Basic Mailing Standards for All Mailing Services**

\*   \*   \*   \*   \*

**602 Addressing**

\*   \*   \*   \*   \*

**5.0 Move Update Standards**

\*   \*   \*   \*   \*

*[Revise 602.5.3 by deleting former contents and replacing with new title and contents as follows:]*

**5.3 Move Update Verification**

Mailers who submit any Full-Service volume in a calendar month will be verified pursuant to the Address Quality Census Measurement and Assessment Process beginning in the next calendar month. First-Class Mail and USPS Marketing Mail letter and flat-size mailpieces with addresses that have not been updated in accordance with the Move Update Standard will be subject to the Move Update assessment charge, if submitted via eDoc with unique Basic or Full-Service IMbs. Supporting details are described in Publication 6850, *Publication for Streamlined Mail Acceptance for Letters and Flats,* available at *www.postalpro.usps.com.*

*[Revise 602.5.4 as follows:]*

**5.4 Mailer Certification**

The mailer's signature on the postage statement or electronic confirmation during eDoc submission certifies that the Move Update standard has been met for the address records including each address in the corresponding mailing presented to the USPS.

\*   \*   \*   \*   \*

**700 Special Standards**

\*   \*   \*   \*   \*

**705 Advanced Preparation and Special Postage Payment Systems**

\*   \*   \*   \*   \*

**23.0 Full-Service Automation Option**

\*   \*   \*   \*   \*

**23.5 Additional Standards**

\*   \*   \*   \*   \*

**23.5.2 Address Correction Notices**

\*   \*   \*   \*   \*

*[Revise 705.23.5.2a as follows:]*

a. Address correction notices would be provided at the applicable Full-Service address correction fee for letters and flats eligible for the Full-Service option, except for USPS Marketing Mail ECR flats, BPM flats dropshipped to DDUs, or BPM carrier route flats. Mailers who present at least 95 percent of their eligible First-Class Mail and USPS Marketing Mail volume as Full-

Service in a calendar month would receive electronic address correction notices for their qualifying Basic automation and non-automation First-Class Mail and USPS Marketing Mail mailpieces charged at the applicable Full-Service address correction fee for future billing cycles. The Basic automation and non-automation First-Class Mail and USPS Marketing Mail mailpieces must:

1. Bear a unique IMb printed on the mailpiece.

2. Include a Full-Service or OneCode ACS STID in the IMb.

3. Include the unique IMb in eDoc.

4. Be sent by an eDoc submitter providing accurate Mail Owner identification in eDoc.

5. Be sent by an eDoc submitter maintaining 95 percent Full-Service compliance to remain eligible for this service and undergo periodic USPS re-evaluation.

\*   \*   \*   \*   \*

We will publish an appropriate amendment to 39 CFR part 111 to reflect these changes, if our proposal is adopted.

**Stanley F. Mires,**

*Attorney, Federal Compliance.*

[FR Doc. 2017–03723 Filed 2–24–17; 8:45 am]

**BILLING CODE 7710–12–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Chapter I**

**[EPA–HQ–OPPT–2016–0763; FRL–9959–74]**

**Fluoride Chemicals in Drinking Water; TSCA Section 21 Petition; Reasons for Agency Response**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Petition; reasons for Agency response.

**SUMMARY:** This document announces the availability of EPA's response to a petition it received on November 23, 2016, under section 21 of the Toxic Substances Control Act (TSCA). The TSCA section 21 petition was received from the Fluoride Action Network, Food & Water Watch, Organic Consumers Association, the American Academy of Environmental Medicine, the International Academy of Oral Medicine and Toxicology, and other individual petitioners. The TSCA section 21 petition requested that EPA exercise its authority under TSCA section 6 to "prohibit the purposeful addition of fluoridation chemicals to U.S. water supplies." After careful consideration,

**U.S. EXHIBIT**

**514**

Food & Water v. EPA
3:17-cv-02162-EMC

EPA has denied the TSCA section 21 petition for the reasons discussed in this document.

**DATES:** EPA's response to this TSCA section 21 petition was signed February 17, 2017.

**FOR FURTHER INFORMATION CONTACT:**

*For technical information contact:* Darlene Leonard, National Program Chemicals Division (7404T), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001; telephone number: (202) 566–0516; fax number: (202) 566–0470; email address: *leonard.darlene@ epa.gov.*

*For general information contact:* The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554–1404; email address: *TSCA-Hotline@ epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Does this action apply to me?*

This action is directed to the public in general. This action may, however, be of interest to individuals or organizations interested in drinking water and drinking water additives, including fluoride. Since other entities may also be interested, the Agency has not attempted to describe all the specific entities that may be affected by this action.

*B. How can I access information about this petition?*

The docket for this TSCA section 21 petition, identified by docket identification (ID) number EPA–HQ–OPPT–2016–0763, is available online at *http://www.regulations.gov* or in person at the Office of Pollution Prevention and Toxics Docket (OPPT Docket), Environmental Protection Agency Docket Center (EPA/DC), EPA West Bldg., Rm. 3334, 1301 Constitution Ave. NW., Washington, DC. Six binders containing copies of references were submitted along with the petition (Ref. 1). Those binders are not available electronically in the docket but may be reviewed in the Public Reading Room. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OPPT Docket is (202) 566–0280. Please review the visitor instructions and additional information about the docket available at *http://www.epa.gov/dockets.*

**II. TSCA Section 21**

*A. What is a TSCA section 21 petition?*

Under TSCA section 21 (15 U.S.C. 2620), any person can petition EPA to initiate a rulemaking proceeding for the issuance, amendment, or repeal of a rule under TSCA sections 4, 6, or 8 or an order under TSCA sections 4, 5(e), or 5(f). A TSCA section 21 petition must set forth the facts that are claimed to establish the necessity for the action requested. EPA is required to grant or deny the petition within 90 days of its filing. If EPA grants the petition, the Agency must promptly commence an appropriate proceeding that is "in accordance" with the underlying TSCA authority. If EPA denies the petition, the Agency must publish its reasons for the denial in the **Federal Register**. 15 U.S.C. 2620(b)(3). A petitioner may commence a civil action in a U.S. district court to compel initiation of the requested rulemaking proceeding within 60 days of either a denial or the expiration of the 90-day period. 15 U.S.C. 2620(b)(4).

*B. What criteria apply to a decision on a TSCA section 21 petition?*

TSCA section 21(b)(1) requires that the petition "set forth the facts which it is claimed establish that it is necessary" to issue the rule or order requested. 15 U.S.C. 2620(b)(1). Thus, TSCA section 21 implicitly incorporates the statutory standards that apply to the requested action. In addition, TSCA section 21 establishes standards a court must use to decide whether to order EPA to initiate rulemaking in the event of a lawsuit filed by the petitioner after denial of a TSCA section 21 petition. 15 U.S.C. 2620(b)(4)(B). Accordingly, EPA has relied on the standards in TSCA section 21 (and those in the provisions under which action has been requested) to evaluate this TSCA section 21 petition.

**III. TSCA Section 6**

Of particular relevance to this TSCA section 21 petition are the legal standards regarding TSCA section 6(a) rules. These standards were significantly altered in 2016 by the "Frank R. Lautenberg Chemical Safety for the 21st Century Act," Public Law 114–182 (2016), which amended TSCA. One of the key features of the new law is the requirement that EPA now systematically prioritize and assess existing chemicals, and manage identified risks. Through a combination of new authorities, a risk-based safety standard, mandatory deadlines for action, and minimum throughput requirements, TSCA effectively creates a "pipeline" by which EPA will conduct

review and management of existing chemicals. This new pipeline—from prioritization to risk evaluation to risk management (when warranted)—is intended to drive forward steady progress on the backlog of existing chemical substances left largely unaddressed by the original law. (Ref. 2).

In the initial phase of the review pipeline, EPA is to screen a chemical substance for its priority status, propose a designation as either high or low priority, and then issue a final priority designation within one year of starting the screening process. 15 U.S.C. 2605(b)(1)(C). If the substance is high priority, EPA must initiate a risk evaluation for that substance. 15 U.S.C. 2605(b)(4)(C). EPA must define the scope of the risk evaluation within six months of starting, 15 U.S.C. 2605(b)(4)(D), and complete the risk evaluation within 3 to 3.5 years. 15 U.S.C. 2605(b)(4)(G). If EPA concludes that a chemical substance presents an unreasonable risk, EPA must propose a risk management rule under TSCA section 6(a) within one year and finalize that rule after another year, with limited provision for extension. 15 U.S.C. 2605(c). As EPA completes risk evaluations, EPA is to designate replacement high-priority substances, on a continuing basis. 15 U.S.C. 2605(b)(2)(C) and (b)(3)(C).

In general, to promulgate a rule under TSCA section 6(a), EPA must first determine "in accordance with section 6(b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture . . . presents an unreasonable risk." 15 U.S.C. 2605(a). TSCA section (b)(4)(A) is part of the risk evaluation process whereby EPA must determine "whether a chemical substance presents an unreasonable risk of injury to health or the environment," and thus, whether a rule under TSCA section 6(a) is necessary. 15 U.S.C. 2605(b)(4)(A). In particular, EPA must conduct this evaluation "without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use." Id. Unless EPA establishes an exemption under TSCA section 6(g) (whereby certain unreasonable risks may be allowed to persist for a limited period) or EPA is addressing a persistent, bioaccumulative, and toxic substance as set forth in TSCA section 6(h), the standard for an adequate rule under TSCA section 6(a) is that it regulates "so that the chemical

International Academy of Oral Medicine and Toxicology, Moms Against Fluoridation, and the following individuals signing on behalf of themselves and their children: Audrey Adams of Renton, Washington, Jacqueline Denton of Asheville, North Carolina, Valerie Green of Silver Spring, Maryland, Kristin Lavelle of Berkeley, California, and Brenda Staudenmaier of Green Bay, Wisconsin (Ref. 1). The general object of the petition is to urge EPA "to protect the public and susceptible subpopulations from the neurotoxic risks of fluoride by banning the addition of fluoridation chemicals to water" (Ref. 1). The specific action sought is a rule, under TSCA section 6(a)(2), to "prohibit the purposeful addition of fluoridation chemicals to U.S. water supplies." However, such a restriction on the allowable use of fluoridation chemicals would actually be based on a rule under TSCA section 6(a)(5), not a rule under TSCA section 6(a)(2). In light of the discrepancy between the description of the rule sought and the cited authority, EPA interprets the petition as requesting *both* a TSCA section 6(a)(5) rule whereby the purposeful addition of any fluoridation chemical to a drinking water supply would be prohibited *and* a TSCA section 6(a)(2) rule whereby the manufacture, processing, or distribution in commerce of any fluoridation chemical for such use would be prohibited.

*B. What support does the petition offer?*

The petition is focused on the potential for fluoride to have neurotoxic effects on humans; it cites numerous studies bearing on this issue. The petition contends that the purposeful fluoridation of drinking water presents an unreasonable risk to human health from neurotoxicity, and that a ban on this use of fluoridation chemicals is necessary to curtail this unreasonable risk. The following is a summary of the primary support given in the petition for this view:

1. *Fluoride neurotoxicity at levels relevant to U.S. population.* The petition claims that fluoride poses neurotoxic risks to the U.S. population. The petition claims that the cited studies of fluoride-exposed human populations have consistently found neurotoxic effects (lower-than-average IQs) at water fluoride levels below the current Maximum Contaminant Level Goal of 4 mg/L set by EPA's Office of Water. The petition argues that the difference between the fluoride levels in the United States and the greater levels in rural China (where most of the cited IQ studies were conducted) is "lessen[ed]"

by the abundance of fluoridated toothpaste in the U.S.

2. *Recent epidemiological studies corroborate neurotoxic risk in Western populations.* The petition cites two studies from Western populations to attempt to corroborate the assertion that exposure to fluoride in drinking water presents unreasonable risks for neurotoxicity (Refs. 6 and 7).

3. *Neurotoxic risks supported by animal and cell studies.* The petition argues that studies on both experimental animals and cell cultures are consistent with cited human research linking fluoride exposure with neurotoxic effects in humans.

4. *Susceptible subpopulations are at heightened risk.* The petition argues that certain subpopulations (*e.g.,* infants, the elderly, and persons with nutritional deficiencies, kidney disease or certain genetic predispositions) are more susceptible to fluoride neurotoxicity.

5. *RfD/RfC derivation and uncertainty factor application.* The petition argues that EPA's 1998 *Guidelines for Neurotoxicity Risk Assessment* support the need to apply a 10-fold uncertainty factor in deriving an oral Reference Dose (RfD) or inhalation Reference Concentration (RfC).

6. *Benefits to public health.* The petition bases, in part, its claim of unreasonable risk on the assertion that the fluoridation of drinking water confers little benefit to public health, relative to the alleged neurotoxic risks. The petition argues that since fluoride's primary benefit comes from topical contact with the teeth, there is little benefit from swallowing fluoride, in water or any other product. The petition argues that there is therefore "little justification" in exposing the public to "*any* risk" of fluoride neurotoxicity.

7. *Extent and magnitude of risk from fluoridation chemicals.* The petition bases, in part, its claim of unreasonable risk on estimates of the extent and magnitude of risk posed to portions of the U.S. population living in areas where artificial fluoridation occurs.

8. *Consequences of eliminating use of fluoridation chemicals.* The petition argues that the risks of fluoride exposure from fluoridated drinking water are unreasonable, in part, because they could be easily and cheaply eliminated, and because alternative products containing topical fluoride are widely available.

9. *Link to elevated blood lead levels.* The petition argues that artificial fluoridation chemicals are linked with pipe corrosion and elevated blood lead levels. The petition interprets data in several studies as demonstrating an association between fluoridation

chemicals and elevated blood lead levels.

In addition to supplying the petition, on January 30, 2017, the petitioners also delivered an in-person oral presentation of their views (Ref. 8). At their oral presentation, petitioners reiterated the information already supplied in writing, and requested that EPA also consider an additional study that was not part of the petition (Ref. 9). EPA has discretion (but not an obligation) to consider extra-petition materials when evaluating a petition submitted under TSCA section 21. In cases where the petitioners themselves attempt to enlarge the scope of materials under review while EPA's petition review is pending, EPA exercises its discretion to consider or not consider the additional material based on whether the material was submitted early enough in EPA's petition review process to allow adequate evaluation of the study prior to the petition deadline, the relation of the late materials to materials already submitted. Given the particularly late submittal of the additional study, EPA conducted an abbreviated review of the study and found that the health concerns covered were substantially the same as those covered in other studies submitted with the petition. Based on this abbreviated review, EPA does not believe that the new study provided any new scientific grounds for granting the petition.

**V. Disposition of TSCA Section 21 Petition**

*A. What was EPA's response?*

After careful consideration, EPA denied the TSCA section 21 petition, primarily because EPA concluded that the petition has not set forth a scientifically defensible basis to conclude that any persons have suffered neurotoxic harm as a result of exposure to fluoride in the U.S. through the purposeful addition of fluoridation chemicals to drinking water or otherwise from fluoride exposure in the U.S. In judging the sufficiency of the petition, EPA considered whether the petition set forth facts that would enable EPA to complete a risk evaluation under TSCA section 6(b).

EPA also denied the petition on the independent grounds that the petition neither justified the regulation of fluoridation chemicals as a category, nor identified an adequate section 6 rule as the action sought. Rather than comprehensively addressing the conditions of use that apply to a particular chemical substance, the petition requests EPA to take action on a single condition of use (water

Excerpt of US Trial Exhibit 515

**November 2016**

# Citizen Petition
# Under Section 21 of TSCA

## Regarding the Neurotoxic Risks Posed by Fluoride Chemicals in Drinking Water

**By Michael Connett, Esq.**
**Fluoride Action Network**

# Binder 1 of 7



U.S. EXHIBIT
515
Food & Water v. EPA
3:17-cv-02162-EMC

U.S. EXHIBIT 515

  

  

November 22, 2016

Gina McCarthy, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Dear Administrator McCarthy:

Pursuant to section 21 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2620, the Fluoride Action Network, Food & Water Watch, Organic Consumers Association, American Academy of Environmental Medicine, International Academy of Oral Medicine and Toxicology, Moms Against Fluoridation, and undersigned individuals (collectively, "Petitioners") hereby petition the U.S. Environmental Protection Agency to protect the public and susceptible subpopulations from the neurotoxic risks of fluoride by banning the addition of fluoridation chemicals to water.

Under Section 6 of TSCA, EPA is invested with the authority to prohibit the "particular use" of a chemical substance if the use presents an unreasonable risk to the general public or susceptible subpopulations.   15 U.S.C. § 2605(a).   EPA has recognized that its authority to regulate chemical substances under TSCA includes the authority to prohibit *drinking water additives*.

EPA should exercise its authority under TSCA to prohibit fluoridation additives because application of the Agency's own *Guidelines for Neurotoxicity Risk Assessment* to the existing database on fluoride shows that (1) neurotoxicity is a hazard of fluoride exposure, and (2) the reference dose that would reasonably protect against this hazard is incompatible with the doses now ingested by millions of Americans in fluoridated areas.  In fact, the amount of fluoride now regularly consumed by many people in fluoridated areas *exceeds* the doses *repeatedly* linked to IQ loss and other neurotoxic effects; with certain subpopulations standing at elevated risk of harm, including infants, young children, elderly populations, and those with dietary deficiencies, renal impairment, and/or genetic predispositions.

The risk to the brain posed by fluoridation additives is an unreasonable risk because, *inter alia*, it is now understood that fluoride's predominant effect on tooth decay comes from *topical* contact with teeth, not *ingestion*.  Since there is little benefit in *swallowing* fluoride, there is little justification in exposing the public to *any* risk of fluoride neurotoxicity, particularly via a source as essential to human sustenance as the public drinking water and the many processed foods and beverages made therefrom.  The addition of fluoridation chemicals to water thus represents the very type of unreasonable risk that EPA is duly authorized to prohibit pursuant to its powers and responsibilities under Section 6 of TSCA, and Petitioners urge the Agency to exercise its authority to do so.

Unlike EPA's 2010 risk assessment, a diligent evaluation of fluoride's neurotoxicity would consider the voluminous data that has been released since the NRC published its review in March 2006. Towards this end, Petitioners have attached an exhaustive list of human, animal, and cell studies of fluoride's neurotoxicity that have become available since NRC's review.[6]

In total, Petitioners have identified 196 published studies that have addressed the neurotoxic effects of fluoride exposure subsequent to the NRC's review, including 61 human studies, 115 animal studies, 17 cell studies, and 3 systematic reviews.

The post-NRC <u>human</u> studies include:

- 54 studies investigating fluoride's effect on cognition, including but not limited to IQ, with all but 8 of these studies finding statistically significant[7] associations between fluoride exposure and cognitive deficits.[8] (Appendix A)
- 3 studies investigating fluoride's effect on fetal brain, with each of the 3 studies reporting deleterious effects. (Appendix B)
- 4 studies investigating fluoride's association with other forms of neurotoxic harm, including ADHD, altered neonatal behavior, and various neurological symptoms. (Appendix C)

The post-NRC <u>animal</u> studies include:

- 105 studies investigating fluoride's ability to produce neuroanatomical and neurochemical changes, with all but 2 of the studies finding at least one detrimental effect in the fluoride-treated groups. (Appendix D)
- 31 studies investigating fluoride's effect on learning and memory, with all but one of the studies finding at least one deleterious effect in the fluoride-treated groups. (Appendix E)
- 18 studies investigating fluoride's impact on other parameters of neurobehavior besides learning and memory, with all but one of the studies finding effects. (Appendix F)

The post-NRC <u>cell</u> studies include:

- 17 studies, including 2 studies that investigated and found effects at fluoride levels that chronically occur in the blood of Americans living in fluoridated communities. (Appendix G)

---

[6] Included among these studies are Chinese language studies that were originally published in Chinese journals prior to 2006 but were not translated and made available in the U.S. until after the NRC's review. Excluded from these studies are those that are only available in abstract form, and animal/cell studies that have not yet been published and/or translated into English.

[7] In 4 of the 8 studies not finding statistically significant associations, the IQs of the children in the high-fluoride area were lower than in the low-fluoride area. (Eswar et al. 2011; Yang et al. 2008; Fan et al. 2007; Zhang et al. 1998) The 4 studies that did not find any association between fluoride exposure and IQ, significant or otherwise, are: Broadbent et al. 2015; Kang et al. 2011; He et al. 2010; and Li et al. 2010.

[8] Petitioners are aware of two unpublished fluoride/IQ studies from Mexico, one which reports a significant relationship between prenatal fluoride exposure and reduced IQ (water F = 3.1 mg/L; urine F = 2.0 mg/L) (Rocha Amador et al. 2016), and one which reports no association between childhood IQ and low-level prenatal and postnatal exposures (Thomas 2014). The Thomas study failed to detect an association between IQ and urinary/serum fluoride concentrations in a population with average urinary and serum fluoride levels among pregnant women of 0.89 mg/L and 0.02 mg/L, respectively, and average urinary fluoride concentrations among children of 0.64 mg/L. The Thomas study, however, failed to find a significant correlation between urinary and serum fluoride levels, which raises questions about whether the study's spot-sample testing method reliably reflected the chronic fluoride intake among the cohort.

U.S. EXHIBIT 515.0008

| TABLE 1: Water Fluoride Levels and Associated IQ Changes in Studies Reviewed by Choi, et al. | | |
|---|---|---|
| Study | Water F Level | IQ Change |
| Zhang et al. 1998 | 0.8 mg/L | -2.1[g] |
| Lin et al. 1991 | 0.9 mg/L [Ω] | -7.0[a] |
| Xu et al. 1994 | 2.0 mg/L [Ω] | -5.6[d] |
| Yao et al. 1996 | 2.0 mg/L | -3.6[d] |
| Yao et al. 1997 | 2.0 mg/L | -5.1[d] |
| Pourleslami et al. 2011 | 2.4 mg/L | -6.4[a] |
| Xiang et al. 2003 | 2.5 mg/L | -8.2[d] |
| Seraj et al. 2006 | 2.5 mg/L | -11.0[b] |
| An et al. 1992 | 2.7 mg/L | -7.9[f] |
| Hong et al. 2001 | 2.9 mg/L [Ω] | -7.2[d] |
| Wang 2001/Yang 1994[¶] | 3.0 mg/L | -5.0[h] |
| Lu et al. 2000 | 3.2 mg/L | -10.9[e] |
| Fan et al. 2007 | 3.2 mg/L | -2.3[g] |
| Zhao et al. 1996 | 4.1 mg/L | -7.5[c] |
| Chen et al. 1991 | 4.6 mg/L | -3.8[d] |
| Wang et al. 1996 | 4.8 mg/L | -5.6[a] |
| Wang et al. 2006 | 5.5 mg/L | -4.1[d] |
| Wang et al. 2007 | 8.3 mg/L | -6.0[a] |

[a] $p<0.05$; [b] $p=0.025$; [c] $p<0.02$; [d] $p<0.01$; [e] $p<0.005$; [f] Statistical significance not reported; [g] Not statistically significant; [h] Not statistically significant when analyzed in terms of average IQ, but "obvious" difference seen when analyzed in terms of percentage with low IQ; [Ω] High-fluoride + low-iodine versus low-fluoride + low-iodine; [¶] These two papers appear to be the same study.

Additional studies finding reduced IQ in communities with less than 4 mg/L have become available in the years since Choi's review, including Sudhir et al. 2009 (**0.7 to 1.2 mg/L**); Zhang S. et al. 2015 (**1.4 mg/L**), Das & Mondal 2016 (**2.1 mg/L**), Choi et al. 2015 (**2.2 mg/L**), Sebastian & Sunitha 2012 (**2.2 mg/L**); Trivedi et al. 2012 (**2.3 mg/L**), Khan et al. 2015 (**2.4 mg/L**); Nagarajappa et al. 2013 (**2.4 to 3.5 mg/L**), Seraj et al. 2012 (**3.1 mg/L**), and Karimzade et al. 2014a,b (**3.94 mg/L**). Another study (Ding et al. 2011), which did not fit within Choi's dichotomous exposure criteria, found reduced IQ in an area with fluoride levels ranging from **0.3 to 3 mg/L**. In total, there are now 23 studies reporting statistically significant reductions in IQ in areas with fluoride levels currently deemed safe by the EPA (less than 4 mg/L).[13]

## B.   Fluoride Linked to Cognitive Deficits at Levels of Individual Exposure Seen in Western Fluoridated Populations

Although the water fluoride levels associated with IQ reductions are modestly higher than the levels currently used in artificially water fluoridation programs, it is important to distinguish between the *concentration* of fluoride in a community's water supply and the *dose* of fluoride that an individual ingests. For example, in rural China (where most of the IQ studies have been conducted), fluoridated toothpaste is rarely used, with less than 10% of children using any fluoride toothpaste at all.[14] By contrast, in the United States, over 95% of toothpastes are fluoridated and research shows that toothpaste can contribute more fluoride to a child's daily intake than fluoridated water. (CDC 2013c; Zohoori et al. 2013, Zohoori et al. 2012; Levy et al.

---

[13] The 23 studies include the 10 studies listed in Table 1, the 11 studies listed in the paragraph above, and the studies by Eswar et al. 2011 and Shivaprakash et al. 2011.

[14] According to a 1996 national oral health survey in China, 75% of 12-year-old children use toothpaste, and of the children who use toothpaste, only 11% use fluoride-containing varieties. (Zhu et al. 2003, at 291, Tbl 1.)

U.S. EXHIBIT 515.0010

Another epidemiological study from 2015, by Peckham et al., provides further corroborative evidence that fluoridation can cause neurotoxic effects.   Peckham's study examined the relationship between water fluoride levels and hypothyroidism in the United Kingdom, and found that fluoride levels $\geq$ 0.7 mg/L significantly correlated with higher rates of hypothyroidism. This correlation was strengthened, not weakened, when controlling for the covariates of age, gender, and index of deprivation.

The correlation between fluoridation and hypothyroidism reported by Peckham is (i) plausible and (ii) adds further support for the capacity of fluoridated water to cause neurotoxic effects. First, the correlation is plausible because, as summarized by the NRC, multiple lines of research indicate that fluoride can lower thyroid function, including the fact that fluoride was once used as a drug for this precise purpose, at doses as low as 2 to 5 mg/day. (NRC 2006; Galletti & Joyet 1958). Second, the correlation between fluoridation and hypothyroidism adds further support for fluoridation's neurotoxic potential because, as recognized in EPA's *Guidelines*, "the development of the nervous system is intimately associated with the presence of circulating hormones such as thyroid hormone." (EPA 1998, at 50). Since both clinical and subclinical hypothyroidism during pregnancy have been associated with reduced IQ in offspring, (Korevaar et al. 2016; Murphy et al. 2015; Klein et al. 2001), the relationship between fluoridation and hypothyroidism provides a mechanism by which fluoridation can reduce IQ, even absent a direct neurotoxic effect.

## VIII.   SUSCEPTIBLE SUBPOPULATIONS ARE AT HEIGHTENED RISK OF FLUORIDE NEUROTOXICITY AND NEED PROTECTION

EPA's *Guidelines* recognize that individual susceptibility to the neurotoxicity of environmental toxicants can vary by a factor of ten or more,[29] and is influenced by factors such as nutritional status, age, genetics, and disease.   (EPA 1998, at 63-65, 78).   Each of these factors— nutritional status, age, genetics,[30] and disease—are known to influence an individual's susceptibility to chronic fluoride toxicity.[31]   Any factor that can predispose an individual to chronic fluoride toxicity should be suspected as a factor that will predispose to fluoride neurotoxicity as well.   In fact, recent research in both humans and animals has specifically demonstrated that nutrient deficiencies (i.e., iodine[32] and calcium[33]) amplify fluoride's neurotoxicity.[34]   Further, Zhang S. et al. (2015) reported that certain COMT gene polymorphism

---

[29] "In general, it is assumed that an uncertainty factor of 10 for intrapopulation variability will be able to accommodate differences in sensitivity among various subpopulations, including children and the elderly.  However, in cases where it can be demonstrated that a factor of 10 does not afford adequate protection, another uncertainty factor may be considered in conducting the risk assessment."  (EPA 1998, at 65)

[30] Studies have repeatedly confirmed that genetic factors can significantly increase susceptibility to fluoride toxicity, (Everett 2011), including effects on bone (Kobayashi et al. 2014; Yan et al. 2007; Mousny et al. 2006); teeth (Buzalaf et al. 2014; Ba et al. 2011; Huang et al. 2008; Everett et al. 2002); and reproductive hormones (Zhou et al. 2016).

[31] *See, e.g.*, Irigoyen-Camacho ME et al. (2016); Simon et al. (2014); Ravula et al. (2012); Itai et al. (2010); Schiffl (2008); NRC (2006); Teotia et al. (1998); Torra et al. (1998); Warady et al. (1989); and Turner et al. (1995). For additional citations and discussion, see http://www.fluoridealert.org/studies/skeletal_fluorosis03.

[32] *See, e.g.*, Ge et al. (2011); Hong et al. (2008); Ge et al. (2005); Wang et al. (2004); Xu et al. (1994); Lin et al. (1991); Ren et al. (1989); Guan et al. (1988).

[33] Sun et al. (2016); Ekambaram & Paul (2002).

[34] As discussed earlier, the study by Das & Mondal (2016) examined the impact of fluoride on IQ in a population with a high prevalence of underweight children, suggestive of an area with chronic malnutrition.  In this population, a daily fluoride dose of just 0.06 mg/kg/day was associated with a sharp 15-point drop in IQ among children with mild fluorosis.  (Das & Mondal 2016, at 218, Tbl. 3).

U.S. EXHIBIT 515.0021

Excerpt of US Trial Exhibit 516



collection contact Memuna Ifedirah at 410–786–6849).

2. *Type of Information Collection Request:* Extension of a currently approved collection; *Title of Information Collection:* Use of Restraint and Seclusion in Psychiatric Residential Treatment Facilities (PRTFs) for Individuals Under Age 21 and Supporting Regulations; *Use:* Psychiatric residential treatment facilities are required to report deaths, serious injuries and attempted suicides to the State Medicaid Agency and the Protection and Advocacy Organization. They are also required to provide residents the restraint and seclusion policy in writing, and to document in the residents' records all activities involving the use of restraint and seclusion. *Form Number:* CMS–R–306 (OMB Control Number 0938–0833); *Frequency:* Occasionally; *Affected Public:* Private sector (Business or other for-profits); *Number of Respondents:* 390; *Total Annual Responses:* 1,466,795; *Total Annual Hours:* 431,062. (For policy questions regarding this collection contact Cindy Ruff at 410–786–5916).

Dated: April 28, 2015.

**William N. Parham III,**
*Director, Paperwork Reduction Staff, Office of Strategic Operations and Regulatory Affairs.*

[FR Doc. 2015–10207 Filed 4–30–15; 8:45 am]
**BILLING CODE 4120–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Findings of Research Misconduct

**AGENCY:** Office of the Secretary, HHS.
**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the Office of Research Integrity (ORI) has taken final action in the following case:

*Venkata J. Reddy, University of Minnesota:* Based upon the evidence and findings of an investigation report by the University of Minnesota (UMN), an investigation conducted by another Federal agency, and additional information obtained by the Office of Research Integrity (ORI) during its oversight review of the UMN investigation, ORI found that Mr. Venkata J. Reddy, former Graduate Student, Department of Chemistry, UMN, engaged in research misconduct in research that was included in grant application R01 GM095559–01A1, submitted to the National Institute of General Medical Sciences (NIGMS), National Institutes of Health (NIH).

ORI found by a preponderance of the evidence that the Respondent intentionally and knowingly engaged in research misconduct by falsifying and/or fabricating data that was provided to his mentor to include in grant application R01 GM095559–01A1 submitted to NIGMS, NIH, to obtain U.S. Public Health Service (PHS) funds. Specifically, ORI found that the Respondent falsified data included in Figures 4, 9, 11, 15, and 25 in R01 GM095559–01A1 for enantiomer excess ("ee") to falsely show a high degree of selectivity for one enantiomer over another by a cut-and-paste method and manipulation of the instrument to give the desired result. Respondent also falsified the underlying nuclear magnetic resonance spectroscopy (NMR) data for Compound 22 reported in Figure 15 in R01 GM095559–01A1 by a cut-and-paste method to manipulate the NMR spectra and give the desired result.

Dr. Reddy has been debarred by the Federal agency with joint jurisdiction for a period of five (5) years, ending on August 26, 2018. ORI has implemented the following administrative action to coincide with the government-wide debarment:

(1) Respondent is prohibited from serving in any advisory capacity to PHS including, but not limited to, service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

**FOR FURTHER INFORMATION CONTACT:** Acting Director, Office of Research Integrity, 1101 Wootton Parkway, Suite 750, Rockville, MD 20852, (240) 453–8800.

**Donald Wright,**
*Acting Director, Office of Research Integrity.*
[FR Doc. 2015–10203 Filed 4–30–15; 8:45 am]
**BILLING CODE 4150–31–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Public Health Service Recommendation for Fluoride Concentration in Drinking Water for Prevention of Dental Caries

**AGENCY:** Office of the Secretary, HHS.
**SUMMARY:** Through this final recommendation, the U.S. Public Health Service (PHS) updates and replaces its 1962 Drinking Water Standards related to community water fluoridation—the controlled addition of a fluoride compound to a community water supply to achieve a concentration optimal for dental caries prevention. For these community water systems that add fluoride, PHS now recommends an

optimal fluoride concentration of 0.7 milligrams/liter (mg/L). In this guidance, the optimal concentration of fluoride in drinking water is the concentration that provides the best balance of protection from dental caries while limiting the risk of dental fluorosis. The earlier PHS recommendation for fluoride concentrations was based on outdoor air temperature of geographic areas and ranged from 0.7–1.2 mg/L. This updated guidance is intended to apply to community water systems that currently fluoridate or that will initiate fluoridation, and is based on considerations that include:

• Scientific evidence related to the effectiveness of water fluoridation in caries prevention and control across all age groups,
• Fluoride in drinking water as one of several available fluoride sources,
• Trends in the prevalence and severity of dental fluorosis, and
• Current evidence on fluid intake of children across various outdoor air temperatures.

**FOR FURTHER INFORMATION CONTACT:** Barbara F. Gooch, DMD, MPH, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Division of Oral Health, 4770 Buford Highway NE., MS F–80, Atlanta, GA 30341–3717; tel. 770–488–6054; fax 770–488–6080; email <BGooch@cdc.gov>.

**SUPPLEMENTARY INFORMATION:** Because fluoridation of public drinking water systems had been demonstrated as effective in reducing dental caries, the U.S. Public Health Service (PHS) provided recommendations regarding optimal fluoride concentrations in drinking water for community water systems in 1962 (U.S. DHEW, 1962). The U.S. Department of Health and Human Services (HHS) is releasing this updated PHS recommendation because of new data that address changes in the prevalence of dental fluorosis, the relationship between water intake and outdoor temperature in children, and the contribution of fluoride in drinking water to total fluoride exposure in the United States. Although PHS recommends community water fluoridation as an effective public health intervention, the decision to fluoridate water systems is made by state and local governments.

As of December 31, 2012, the Centers for Disease Control and Prevention (CDC) estimated that approximately 200 million people in the United States were served by 12,341 community water systems that added fluoride to water or



U.S. EXHIBIT 516

Excerpt of Pltf. Trial Exhibit 13

  

The National Academies of SCIENCES ENGINEERING MEDICINE

# THE NATIONAL ACADEMIES PRESS

This PDF is available at http://nap.edu/11571

SHARE



## Fluoride in Drinking Water: A Scientific Review of EPA's Standards (2006)

### DETAILS

530 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-10128-8 | DOI 10.17226/11571

GET THIS BOOK

FIND RELATED TITLES

### CONTRIBUTORS

Committee on Fluoride in Drinking Water; Board on Environmental Studies and Toxicology; Division on Earth and Life Studies; National Research Council

### SUGGESTED CITATION

National Research Council 2006. *Fluoride in Drinking Water: A Scientific Review of EPA's Standards*. Washington, DC: The National Academies Press. https://doi.org/10.17226/11571.



**Visit the National Academies Press at NAP.edu and login or register to get:**

– Access to free PDF downloads of thousands of scientific reports

– 10% off the price of print titles

– Email or social media notifications of new titles related to your interests

– Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. (Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

Pls' Ex. 13



Plaintiffs' Exhibit

**013**

Food & Water v. EPA
3:17-cv-02162-EMC

# FLUORIDE
## IN DRINKING WATER

### A SCIENTIFIC REVIEW OF
### EPA'S STANDARDS

Committee on Fluoride in Drinking Water

Board on Environmental Studies and Toxicology

Division on Earth and Life Studies

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Pls' Ex. 13

Copyright National Academy of Sciences. All rights reserved.

# 2

# Measures of Exposure to Fluoride in the United States

The major sources of internal exposure of individuals to fluorides are the diet (food, water, beverages) and fluoride-containing dental products (toothpaste, fluoride supplements). Internal exposure to fluorides also can occur from inhalation (cigarette smoke, industrial emissions), dermal absorption (from chemicals or pharmaceuticals), ingestion or parenteral administration of fluoride-containing drugs, and ingestion of fluoride-containing soil. Information on the pharmacokinetics of fluoride are provided in Chapter 3.

The National Research Council's (NRC's) 1993 review of the health effects of ingested fluoride reported estimates of average daily fluoride intake from the diet of 0.04-0.07 milligrams per kilogram (mg/kg) of body weight for young children in an area with fluoridated water (fluoride concentration in drinking water, 0.7-1.2 mg per liter [L]; NRC 1993). Dietary intake of fluoride by adults in an area with fluoridated water was variously estimated to be between 1.2 and 2.2 mg/day (0.02-0.03 mg/kg for a 70-kg adult). The fluoride intake from toothpaste or mouth rinse by children with good control of swallowing, assuming twice-a-day use, was estimated to equal the intake from food, water, and beverages. The review acknowledged that "substantially" higher intakes of fluoride from consumption of fluoridated water would result for individuals such as outdoor laborers in warm climates or people with high-urine-output disorders, but these intakes were not quantified. Similarly, children and others with poor control of swallowing could have intakes of fluoride from dental products that exceed the dietary intakes, but these intakes also were not quantified. Other factors cited as affecting individual fluoride intakes include changes in the guidelines for

*23*

Pls' Ex. 13

Copyright National Academy of Sciences. All rights reserved.

*270*

**TABLE 9-1** Studies of Gastrointestinal Effects in Humans

| Approximate Concentration of Fluoride in the Stomach[a] | Study Design | Findings | Application/ Proposed Mechanisms | Comments | Reference |
|---|---|---|---|---|---|
| *Water Fluoridation* | | | | | |
| 1.0 mg/L | Case reports of patients (n = 52) drinking artificially fluoridated water. | Stomach cramps, abdominal pain, and nausea resolved when patients stopped drinking fluoridated water. | Possible gastrointestinal hypersensitivity. | Low daily dose of fluoride; cluster of subjects selected on the basis of symptoms. | Waldbott 1956 |
| 1.0 mg/L | Double-blinded test of patients (n = 60) drinking artificially fluoridated water in Haarlem, Netherlands. | 50% of subjects had stomach and intestinal symptoms; 30% had stomatitis. | Possible gastrointestinal hypersensitivity. | Low daily dose of fluoride; self-reporting of symptoms. | Grimbergen 1974 |
| 1.0 mg/L | Case reports of symptoms in subjects (n = 20) drinking fluoridated water in Milwaukee. | Fatigue, pruritis, polydipsia, headaches, and gastrointestinal symptoms. | Possible gastrointestinal hypersensitivity. | Low daily dose; cluster of subjects selected on the basis of symptoms. | Petraborg 1977 |
| *Water Fluoridation Accidents* | | | | | |
| 75-300 mg/L[b] (range due to differences found in 2 fluoride feeders) | Symptoms reported in 34 children during accidental overfeed in school water supply. | Fluoride concentrations in water were 93.5 and 375 mg/L. 68% of the children had gastrointestinal upset. | Acute fluoride toxicity of the gastric epithelium. | Symptoms resolved after problem was corrected; doses of fluoride in mg/ kg were not reported. | Hoffman et al. 1980 |
| 250 mg/L, (based on 50-mL ingestion) | Symptoms reported in 22 subjects during accidental overfeed in school water supply. | Fluoride concentration in water was 1,041 mg/L. 91% of the subjects had nausea and vomiting. | Acute fluoride toxicity of the gastric epithelium. | Only small amounts of the beverages made with the school's water were consumed. | Vogt et al. 1982 |

Pls' Ex. 13

Copyright National Academy of Sciences. All rights reserved.

fatty acid components increased and polyunsaturated fatty acids decreased. Liver cholesterol and dolichol were unchanged. The authors concluded that fluoride-induced alteration in liver membrane lipids could be an important factor in the pathogenesis of chronic fluorosis.

Whether any of these changes has relevance to the long-term daily ingestion of drinking water containing fluoride at 4 mg/L will require careful analysis of liver function tests in areas with high and low concentrations of fluoride in the drinking water. The clinical trials involving fluoride therapy for treating osteoporosis require that subjects be administered fluoride at concentrations approaching 1.0 mg/kg/day. Although such studies are rarely carried out for more than 5 years, this period of time should be sufficient to measure any changes in hepatic function. Jackson et al. (1994) reported that there was a significant increase in liver function enzymes in test subjects taking 23 mg of fluoride a day for 18 months, but the enzyme concentrations were still within the normal range. It is possible that a lifetime ingestion of 5-10 mg/day from drinking water containing fluoride at 4 mg/L might turn out to have long-term effects on the liver, and this should be investigated in future epidemiologic studies.

Finally, because the liver is the primary organ for defluorinating toxic organofluorides, there is a concern that added fluoride body burden that would be experienced in areas where the drinking water had fluoride at 4 mg/L might interfere with the activity of the cytochrome P450 complex (Baker and Ronnenberg 1992; Kharasch and Hankins 1996).

## IMMUNE SYSTEM

### Hypersensitivity

In the studies by physicians treating patients who reported problems after fluoridation was initiated, there were several reports of skin irritation (Waldbott 1956; Grimbergen 1974; Petraborg 1977). Although blinded experiments suggested that the symptoms were the result of chemicals in the water supply, various anecdotal reports from patients complaining, for example, of oral ulcers, colitis, urticaria, skin rashes, nasal congestion, and epigastric distress, do not represent type I (anaphylactic), II (cytotoxic), III (toxic complex), or IV (delayed type reactivity) hypersensitivity, according to the American Academy of Allergy (Austen et al. 1971). These patients might be sensitive to the effects of silicofluorides and not the fluoride ion itself. In a recent study, Machalinski et al. (2003) reported that the four different human leukemic cell lines were more susceptible to the effects of sodium hexafluorosilicate, the compound most often used in fluoridation, than to NaF.

Nevertheless, patients who live in either an artificially fluoridated com-

Copyright National Academy of Sciences. All rights reserved.