C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY GUNDERSON REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO EPA'S POST-TRIAL BRIEF ON STANDING** |
| vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. | |
| Defendants. | |

### I. EPA HAS INACCURATELY CITED LEGAL AUTHORITIES

EPA's Post-Trial Brief on Standing contains many inaccurate citations to legal authority. The following are some material examples:

*****Center for Law & Educ. v. Dep't of Education** is cited as authority for EPA's demand that this Court "reject Plaintiffs' attempt to 'dress up' 'hypothesized, non-imminent injuries' as 'increased risk of future injury.'"[1] But EPA omitted the key qualifying language which specifically excepted environmental cases like this one from the court's criticism of "increased risk" as a basis for standing: "*Outside of increased exposure to environmental harms*, hypothesized 'increased risk' has never been deemed sufficient 'injury.'"[2]

***Natural Resources Defense Council v. U.S. Environmental Protection Agency ("NRDC")** is cited as support for EPA's position on the grounds that "[i]n that case, unlike here, there was no dispute that plaintiffs were guardians of small children, and there was *no dispute* that the level of exposure of a new chemical to small children would result in too high of a risk as originally *calculated by the agency itself*. . . . Plaintiffs have failed to prove the exposure levels of their standing declarants with any particularity, connect such particular exposure levels with the specific harms complained of by the declarants, and demonstrate that the remedy would redress those harms."[3]

EPA's characterization of *NRDC's* holdings is incorrect on all counts. First, plaintiffs were guardians of *infants,* not "small children"—an important distinction, given that the EPA argued that three-year old toddlers were a more vulnerable subpopulation than infants.[4] Second, EPA *did* "dispute" that the nanosilver chemicals posed a risk, as the court repeatedly noted.[5] Indeed, in order to issue the conditional pesticide registration being challenged in this case, EPA had to first find that the pesticide would *not* cause "unreasonable adverse effects on human health."[6] Third, *NRDC* did *not* require that the plaintiffs "prove

---

[1] 396 F.3d 1152, 1161(D.C. Cir. 2005) (cited in EPA Br. at 10).
[2] 396 F.3d at 1161 (emphasis added).
[3] 735 F.3d 873, 878 (9th Cir. 2013) (cited in EPA Br. at 11).
[4] Petitioner's Brief, *NRDC v. EPA*, No. 12-70268, 2012 WL 1423879 at *4 (9th Cir. April 16, 2012) (describing Plaintiffs as the guardians of "*infant* children"); NRDC v. EPA, 735 F.3d at 879 (discussing EPA's decision to use *three year-olds* and not infants as the most vulnerable subpopulation).
[5] 735 F.3d at 881, 884 ("Next, we address whether *EPA's determination that there is no risk concern for toddlers exposed to AGS–20–treated textiles* is supported by substantial evidence. . . . EPA's conclusion that short- and intermediate-term aggregate dermal and oral exposure to textiles surface-coated with AGS–20 *poses no risk concern* is not supported by substantial evidence.")
[6] 735 F.3d at 875.

the exposure levels of their standing declarants with any particularity, [or] connect such particular exposure levels with the specific harms complained of by the declarants," as EPA alleges. As Plaintiffs point out in their own standing brief, the Ninth Circuit in *NRDC* did *not* require that such particularized evidence of harm be established before standing could be found. Instead, it was the virtual impossibility of avoiding the exposure to nanosilver pesticides (also the case here, despite Plaintiffs' purchase of their own non-fluoridated drinking water) that convinced the Ninth Circuit that the plaintiffs had standing.[7]

* *Fed. Election Comm'n v. Akins* is cited for the proposition that "a generalized grievance, which is not particular to any declarant's circumstances, cannot support standing."[8] However, EPA fails to note that the *Akins* court ultimately rejected this argument, stating that "'[t]he fact that other citizens or groups of citizens might make the same complaint . . . does not lessen appellants' asserted injury.'"[9] On this point, *Akins* is entirely consistent with *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, where the Supreme Court made clear that "standing is not to be denied simply because many people suffer the same injury."[10] As the *SCRAP* Court explained, "to deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."[11]

* *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. ("Laidlaw")* is cited by EPA as a case that found standing "at summary judgment due to the release of mercury, an undisputed 'extremely toxic pollutant.'"[12] Leaving aside the fact that fluoride too is "extremely toxic" (as evident by its use as a pesticide),[13] the Supreme Court in *Laidlaw* did not base its holding on "the extremely toxic" pollutants at issue. Instead, the Court based its holding on the fact that the plaintiff's members refrained from fishing, swimming, and other activities on the river based on their subjective concerns about the impact of the pollutants.[14] As the Court explained, "We have held that environmental plaintiffs adequately

---

[7] 735 F.3d at 878-9.
[8] 524 U.S. 11, 23 (1998) (cited in EPA Br. at 9).
[9] 524 U.S. at 24 (quoting *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 449–450 (1989)).
[10] 412 U.S. 669, 687, 688 (1973).
[11] *Id. Akins* also supports Plaintiffs' procedural harm argument by holding that "the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts." 524 U.S. at 24-25.
[12] 528 U.S. 167, 176 (2000) (cited in EPA Br. at 10).
[13] Undisputed Fact No. 3 (ECF No. 150 at 2); 6/10 Tr. at 500:8-14 (Thiessen).
[14] *Id.*

allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."[15] The *Laidlaw* Court "required no evidence of actual harm."[16]

Finally, though this Court specifically tasked the parties with briefing issues of standing, many of the cases EPA cites do not address standing at all. Most notably, EPA cites five cases for the proposition that a "bedrock" of administrative law is "alert[ing] the agency to the [parties'] position and contentions in order to allow the agency to give the issue meaningful consideration.'"[17] Not one of these cases discusses standing to seek review of administrative decision making; instead, they describe the circumstances in which exhaustion of administrative remedies is required. Of course, Plaintiffs here *did* exhaust the administrative procedures required of them under TSCA Section 21.

## II. EPA REPEATEDLY MISREPRESENTS THE FACTUAL RECORD

EPA's Post-Trial Brief on Standing contains numerous misrepresentations of the evidence that Plaintiffs wish to correct.

**\* Dr. Grandjean Did Not Call the Evidence on Headaches "Weak":** EPA states that "the evidence Plaintiffs offered on headaches at trial was, by their own expert's description, weak and unrelated to fluoride levels in community water programs." EPA Br. at 1:5-6 (citing Dr. Grandjean's testimony at Tr. 308:8-13). This is false. The only testimony that EPA cites to support this statement is a passing comment on the Sharma study; it is *not* a general commentary on the broader set of evidence on headaches that Plaintiffs' introduced, including the National Research Council's reports from 2006 and 2009.

**\* Plaintiffs Did Produce Evidence Linking Headaches to Relevant Doses:** EPA claims that Plaintiffs did not produce evidence "indicat[ing] that exposure to the levels of fluoride in artificially fluoridated water is fairly traceable to headaches." EPA Br. at 6:3-4. This again is false. The National

---

[15] *Id.* at 182-3 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972).
[16] *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*., 204 F.3d 149, 159 (4th Cir. 2000) (en banc) (discussing *Laidlaw*).
[17] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65, (2004); *Washington v. Barr*, 925 F.3d 109, 115-6, 118 (2d Cir. 2019) (the district court held the plaintiffs lacked standing but the Second Circuit decided the case on other grounds, retaining jurisdiction to intercede if the agency did not act promptly); *Alaska Survival v. Surface Transp*., 705 F.3d 1073, 1080 (9th Cir. 2013); *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004); *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1519 (D.C. Cir. 1988).

Research Council report that EPA's own expert co-authored states that hypersensitive reactions to fluoride can occur at 0.02 mg/kg/day, which is a dose that many adults can exceed by drinking fluoridated water. 6/15 Tr. 738:5-23; 739:10-15 (Tsuji); 6/17 Tr. 1037:14-16 (Thiessen); Thiessen Dec. ¶ 153 & figure. Hypersensitive reactions to fluoride include headaches. 6/10 Tr. 501:14-502:14, 503:19-24 (Thiessen); 6/17 Tr. 1036:6-12 (Thiessen).

**\* Dr. Thiessen Did Not Testify that the Studies "Do No More Than Hypothesize":** EPA incorrectly implies that Dr. Thiessen testified that the evidence on fluoride hypersensitivity "can do no more than hypothesize a connection between an exposure and an effect." EPA Br. at 6:7-9 (citing Dr. Thiessen's testimony at Tr. 576:22-24). The testimony that EPA cites is a discussion of (non-experimental) case reports, but immediately prior to this testimony Dr. Thiessen stated that "some of the case reports that I referred to were, in effect, *experimental studies*, not simply case reports." 6/12 Tr. at 576:20-21. The NRC made the same observation in its 2006 report. Pls' Ex. 13 at 208-209. Experimental studies permit causal inferences.  6/10 Tr. 447:24-448:8. EPA has thus misrepresented Dr. Thiessen's testimony on the probative value of the hypersensitivity studies.

**\* Dr. Waldbott's Studies Are Not Limited to His 1958 Paper.**  EPA continues to misrepresent the extent of Dr. Waldbott's research. In its brief, EPA implies that Dr. Waldbott's research is confined to a single 1958 paper. EPA Br. at 6:20-23. This is false. As Plaintiffs' counsel explained during trial, the NRC's chapter on *neurotoxicity* cites Dr. Waldbott's 1978 *book* which summarizes the *multitude* of studies Waldbott published, including—but not limited to—his 1958 paper. 6/17 Tr. 1035:10-22; Pls' Ex. 13 at 208). The Court repeatedly invited EPA to explore this issue on cross (6/12 Tr. 515:8-516:5, 6/17 Tr. 1036:1-3), but EPA declined, opting instead to focus its cross-examination on NRC's discussion of *gastrointestinal* hypersensitivity in a *different section* of the NRC report where EPA only cites Dr. Waldbott's 1958 paper. 6/17 Tr. 1038:4-12 & 1039:4-6.

**\* Dr. Thiessen Did Not "Change" Her Description of the Studies**: EPA's brief claims that "[o]nly after speaking with Plaintiffs' counsel did Dr. Thiessen change her description of the reports in NRC 2006 to 'double blind experiments.'" EPA Br. at 6:18-20 (citing Tr. 1036:6-12, 526:22). This is baseless and false. When Dr. Thiessen was first asked by EPA counsel on June 12 about the hypersensitivity studies, she noted that the patients were blinded "*and in many cases the doctor* was

blinded to the current exposure *also*." 6/12 Tr. 502:9-14.[18] While Dr. Thiessen did not specifically use the term "double-blinded," her description of the studies make clear that she was describing double-blinded studies. When Dr. Thiessen testified on June 17 that Dr. Chang was wrong that there were no double-blind studies, she was not contradicting her prior testimony—she was *confirming* it. 6/17 Tr. 1036:6-12.

**\* It Is Undisputed that McPherson (2018) Found an Increase in Pain Sensitivity**: In its brief, EPA contends that Dr. Thiessen was wrong when she "*claimed* that the McPherson 2018 animal study found 'increase in pain sensitivity,'" because "actually rats exposed to fluoride take longer to react from a control group." EPA Br. at 9:6-8 (emphasis added). It is not, however, an opinion or a "claim" that McPherson found an increase in pain sensitivity: it is a *fact*, as evident by the declaration and testimony of EPA's own expert. Tsuji Dec. ¶ 94 ("McPherson 2018 observed significantly shorter response latencies in the 20 mg/L dose group indicative of hyperanalgesia (*higher pain sensitivity*)."); 6/15 Tr. 755:13-16.

The testimony that EPA cites to support its contention that fluoride *reduces* pain sensitivity in rats is based on separate, unidentified studies that Dr. Tsuji mentioned in passing at trial (which are nowhere to be found in her declaration, which contradict what she testified to at her deposition, and about which she offered no particulars, not even an author name). 6/15 Tr. at 753:13-18 & 754:3-16. The fact that EPA would rely on *unidentified animal studies* to override the findings of McPherson (a study Dr. Tsuji described as "much more robust and of higher quality than . . . *all the other studies in the literature,*" 6/15 Tr. 752:18-753:9; 753:2-6) reflects a double-standard where EPA is unwilling to adhere to its own stated policies about the need to evaluate data quality in a transparent manner, and unwilling to accept the specific contentions about the reliability of the McPherson study to which its own experts testified.

July 14, 2020                                            Respectfully submitted,

                                                         */s/ Kay Gunderson Reeves*
                                                         KAY GUNDERSON REEVES
                                                         Attorney for Plaintiffs

---

[18] *See also* 6/12 Tr. 577:22-578:1 (discussing a study where both the "subject" *and* the "physician" did not know the fluoride exposure status).