DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

FOOD & WATER WATCH, INC., et al.,

        Plaintiffs,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

        Defendants.

Case No. 3:17-cv-02162 EMC

**DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Proposed Findings of Fact** ................................................................................................. 1

   I.   The Administrative Petition ....................................................................................... 1

   II.  Standing ..................................................................................................................... 4

      A.   Headaches ............................................................................................................ 6

      B.   Physical Pain ....................................................................................................... 7

      C.   Dementia and Alzheimer's Disease .................................................................... 8

      D.   Neurodevelopmental Injury ................................................................................ 9

      E.   Economic Injury ................................................................................................. 9

      F.   Procedural Injury ................................................................................................ 9

   III.  There Is Inadequate Evidence to Identify Neurotoxicity as a Hazard of Community Water
        Fluoridation ........................................................................................................ 10

      A.   Systematic Review ........................................................................................... 14

      B.   Plaintiffs Failed to Conduct a Systematic Review ........................................... 16

      C.   Completed Systematic Reviews of Fluoride Exposure ..................................... 19

   IV.  Risk Evaluation ...................................................................................................... 23

      A.   Hazard Identification ........................................................................................ 25

      B.   Dose-Response Assessment .............................................................................. 43

      C.   Exposure Assessment ....................................................................................... 54

      D.   Risk Characterization ....................................................................................... 57

   V.  Risk Determination ................................................................................................ 62

**Proposed Conclusions of Law** ......................................................................................... 63

   I.   Plaintiffs Lack Standing ......................................................................................... 63

      A.   Plaintiffs Lack Constitutional Standing ........................................................... 64

      B.   Plaintiffs Fall Outside the Zone of Interests .................................................... 64

      C.   Without Standing, This Court Lacks Jurisdiction and Dismisses the Action ............... 66

   II.  Even If Plaintiffs Could Establish Standing, They Failed to Meet the Statutory Standards
        for Demonstrating Unreasonable Risk. .............................................................. 67

   III.  Plaintiffs Failed to Demonstrate Unreasonable Risk. ............................................ 70

   IV.  An Award of Costs Is Not Appropriate .................................................................. 73

## PROPOSED FINDINGS OF FACT

### I.    THE ADMINISTRATIVE PETITION

1.    Fluoride is a substance that occurs naturally in the environment. A common source of human exposure to fluoride is drinking water, in which the fluoride ion may be present naturally or added in controlled amounts for the prevention of dental caries. 80 Fed. Reg. 24,936, 24,936–27 (May 1, 2015), Trial Ex. 516. While some communities in the United States have elevated levels of naturally occurring (or "background") fluoride in their drinking water, other communities add fluoridation chemicals to drinking water to reach a recommended optimal concentration for reducing tooth decay. *Id.*; Joint Pre-Trial Conf. Statement, Undisputed Fact No. 3 ["Undisputed Facts"], ECF No. 150.

2.    The U.S. Public Health Service ("PHS") recommends that communities add fluoridation chemicals to drinking water. 80 Fed. Reg. at 24,936, Trial Ex. 516. PHS guidance is advisory, not regulatory, which means that while PHS recommends community water fluoridation as a public health intervention, the decision to fluoridate water systems is made by state and local governments. *Id.* For community water systems that add fluoridation chemicals, PHS recommends a fluoride concentration of 0.7 milligrams/liter ("mg/L"). *Id.* at 24,944.

3.    The dispute over community water fluoridation stems from concerns about the potential harmful effects of fluoride at certain doses. Effects on neurological function, among others, were assessed in a 2006 National Academy of Sciences (NAS) National Research Council (NRC) report—*Fluoride in Drinking Water: A Scientific Review of EPA's Standards* ("NRC 2006"). Undisputed Fact No. 23, ECF No. 150. The NRC review considered the potential for adverse effects from *naturally occurring* fluoride, focusing on a range of concentrations of 2–4 mg/L above the current 0.7 mg/L recommendation for community water fluoridation. NTP 2016, at 2, Trial Ex. 553. "At levels below 4.0 mg/L, NRC found no evidence substantial enough to support negative health effects other than severe dental fluorosis." *Id.*

4.    NRC 2006 describes numerous challenges in evaluating the literature addressing the neurotoxic effects of fluoride, including: deficiencies in reporting quality; consideration of all sources of exposure to fluoride, confounding, and use of similar comparison populations in the epidemiology

studies; and the relationship between histological, biochemical, and molecular changes and alterations in behavior or disease status. *See generally* NRC 2006, at 205–08, 222–23, Trial Ex. 13.

5.      Regarding neurotoxicity, the NRC 2006 report recommended:

- Although animal and human studies of fluoride reporting adverse cognitive and behavioral effects lack "sufficient detail for the committee to fully assess their quality and relevance to U.S. populations, the consistency of the results appears significant enough to warrant additional research on the effects of fluoride on intelligence." NRC 2006, at 8, Trial Ex. 13.

- Although animal studies have reported "molecular, cellular, and anatomical changes in the nervous system found after fluoride exposure, suggesting that functional changes could occur, these changes might be subtle or seen only under certain physiological or environmental conditions. More research is needed to clarify the effect of fluoride on brain chemistry and function." *Id.*; *see also id.* at 223 ("[Q]uestions about the effects of the many histological, biochemical, and molecular changes caused by fluorides cannot be related to specific alterations in behavior or to known diseases.").

6.      The National Toxicology Program of the National Institute of Environmental Health Sciences ("NTP") received a nomination in June 2015 from Plaintiff Fluoride Action Network to conduct an analysis of studies addressing the neurotoxic effects of fluoride exposure published subsequent to NRC 2006. *See* Thayer Trial Tr. Vol. 4, 614:21–24. To help in interpreting the human evidence, NTP agreed to undertake a systematic review to investigate whether fluoride exposure is associated with neurobehavior impairments in animals. NTP 2016, at vi, Trial Ex. 553.

7.      In 2016, NTP completed and published its comprehensive systematic review of animal neurotoxicology studies to develop conclusions about whether fluoride exposure is associated with impairments in learning and memory ("NTP 2016"). Trial Ex. 553; Tsuji Decl. ¶ 50, ECF No. 199. The review considered neurobehavioral outcomes from developmental and adult exposure as well as a broad range of behavioral outcomes, including learning and memory, motor and sensory function, depression

and motor endurance, and anxiety and motor activity. Tsuji Decl. ¶¶ 50–75.

8.      NTP researchers conducted a suite of follow-up experiments to address deficiencies that NTP identified in its systematic review. NTP decided to conduct these additional experiments before carrying out a full systematic review to incorporate human, animal, and potentially relevant mechanistic evidence and before reaching *hazard identification conclusions* for fluoride and learning and memory effects. Thayer Trial Tr. Vol. 4, 643:14–644:5, 645:16–18, 642:11–643:13. The results of the suite of studies were collectively published in a single article, McPherson 2018. Tsuji Decl. ¶ 22, ECF No. 199. NTP's full systematic review is currently pending publication after undergoing peer-review by the NAS. Thayer Trial Tr. Vol. 4, 642:11–643:13.

9.      Nevertheless, on November 23, 2016, the U.S. Environmental Protection Agency ("EPA") received a petition submitted by Plaintiffs pursuant to section 21 of the Toxic Substances Control Act ("TSCA") requesting that EPA ban the addition of fluoridation chemicals to water pursuant to EPA's authority under TSCA section 6. Pet., Trial Ex. 515. The petition "sought to regulate only one condition of use, fluoridation of drinking water." *Food & Water Watch, Inc. v. EPA*, 291 F. Supp. 3d 1033, 1053–54 (N.D. Cal. 2017). Plaintiffs referred to three chemical substances containing the fluoride ion that are added to community water systems: silicofluoride, fluorosilicic acid, and sodium fluoride (collectively, "fluoridation chemicals").

10.     On February 17, 2017, EPA denied the petition. 82 Fed. Reg. 11,878 (Feb. 27, 2017). EPA determined that TSCA section 6's requirements for "best available science," "weight of the scientific evidence," systematic review, and risk evaluation standards applied to this section 21 petition which requested a section 6 rulemaking. *Id*. at 11,879 (TSCA section 21 "incorporates the statutory standards that apply to the requested action").

11.     EPA also determined that the petition, on its face, did not set forth facts that provided a basis to initiate the requested rulemaking. Specifically, EPA concluded that "[t]he petition has not set forth a scientifically defensible basis to conclude that any persons have suffered neurotoxic harm as a result of exposure to fluoride in the U.S. through the purposeful addition of fluoridation chemicals to drinking water or otherwise from fluoride exposure in the U.S." *Id*. at 11,887.

12. On April 18, 2017, Plaintiffs commenced this action by filing a Complaint seeking to compel EPA to initiate a proceeding for the issuance of a rule prohibiting the addition of fluoridation chemicals to water under TSCA section 6. ECF No. 1.

**II.    STANDING**

13. The petition was submitted by the organizations Fluoride Action Network, American Academy of Environmental Medicine, Food & Water Watch, International Academy of Oral Medicine & Toxicology, Moms Against Fluoridation, and Organic Consumers Association and individuals Audrey Adams (individually and on behalf of her adult son Kyle Adams), Jaqueline Denton (individually and on behalf of her children), Valerie Green (individually and on behalf of her children), Kristin Lavelle (individually and on behalf of her son Neal Lavelle), and Brenda Staudenmaier (individually and on behalf of her children). Pet. 2, Trial Ex. 515.

14. Following EPA's denial of the administrative petition, this lawsuit was brought by Plaintiffs Fluoride Action Network, American Academy of Environmental Medicine, Food & Water Watch, International Academy of Oral Medicine & Toxicology, Moms Against Fluoridation, Audrey Adams, Kristin Lavelle, and Brenda Staudenmaier. ECF. No. 1. Plaintiffs American Academy of Environmental Medicine and International Academy of Oral Medicine & Toxicology were dismissed from the litigation on November 30, 2018. ECF No. 76.

15. Plaintiffs stipulated that they would "rely exclusively on the declarations attached [to ECF No. 100] to establish the factual basis" for standing. Standing Stip. ¶ 1, ECF No. 100. Plaintiffs Food & Water Watch, Moms Against Fluoridation, Kristin Lavelle (individually and on behalf of Neal Lavelle), Jessica Trader, Brenda Staudenmaier (individually and on behalf of Ko Staudenmaier and Hayden Staudenmaier), Julie Simms, and Audrey Adams (individually and on behalf of her adult son Kyle Adams) provided declarations. *Id.* ¶¶ 1–3.

16. Fluoride Action Network is the sole Plaintiff not to provide any declaration. Standing Stip. ¶ 4, ECF No. 100. Food & Water Watch and Moms Against Fluoridation only cite to claimed injuries of their members. Food & Water Watch Decl. ¶ 9, ECF No. 100-1, Trial Ex. 52; Moms Against Fluoridation Decl. ¶ 6, ECF No. 100-2, Trial Ex. 58. The organizational Plaintiffs (Fluoride Action

Network, Food & Water Watch, and Moms Against Fluoridation) did not claim standing independently of their individual members.

17.     Declarant Julie Simms is neither a Petitioner nor named Plaintiff, but purports to pay dues to Food & Water Watch and Fluoride Action Network. Simms Decl. ¶ 21, ECF No. 100-6, Trial Ex. 54.

18.     Declarant Jessica Trader is neither a Petitioner nor named Plaintiff, but purports to be a member of Food & Water Watch. Trader Decl. ¶ 9, ECF No. 100-4, Trial Ex. 57.

19.     Plaintiff Kristen Lavell purports to be a member of Fluoride Action Network and Moms Against Fluoridation. Lavelle Decl. ¶ 17, ECF No. 100-3, Trial Ex. 53.

20.     Plaintiff Audrey Adams purports to be a member of Food & Water Watch, Fluoride Action Network, and Moms Against Fluoridation. Adams Decl. ¶ 23, ECF No. 100-7, Trial Ex. 56.

21.      Plaintiff Brenda Staudenmaier does not claim to be a member of any Plaintiffs organization. Staudenmaier Decl., ECF No. 100-5, Trial Ex. 55.

22.     Plaintiffs' claims of headaches (Ms. Simms), physical pain (Ms. Adams's adult son, Kyle Adams), dementia and Alzheimer's disease (Ms. Lavelle), economic costs, and procedural injury are the bases of standing. Pls.' Supp. Br. on Standing, ECF No. 247 (citing Simms, Adams, and Lavelle Declarations).

23.     *Not a single study,* nor any expert testimony, in the trial record has drawn *any* association between community water fluoridation and headaches, physical pain, dementia or Alzheimer's disease.

24.     The administrative petition did not identify headaches, physical pain, or dementia and Alzheimer's disease as a harm resulting from community water fluoridation. Pet., Trial Ex. 515. Instead, the entire petition was premised on the theory "that (1) neurotoxicity is a hazard of fluoride exposure, and (2) the reference dose that would reasonably protect against this hazard is incompatible with the doses now ingested by millions of Americans in fluoridated areas." *Id*. at 2. According to the petition, neurotoxicity manifests in loss of Intelligence Quotient (IQ), and to a lesser extent, the onset of Attention Deficit Hyperactivity Disorder (ADHD). *Id*. at 2, 8, 10. In particular, the petition cited the subpopulations of infants, young children, and the elderly as being particularly susceptible to fluoride's alleged neurotoxic effects. *Id*. at 2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.     Headaches

25.     *Not a single study,* nor any expert testimony, in the trial record has drawn *any* association between community water fluoridation and headaches.

26.     Only one standing declarant, Ms. Simms, claimed to suffer headaches due to her consumption of fluoridated water. Simms Decl. ¶ 13, ECF No. 100-6, Trial Ex. 54.

27.     Ms. Simms stated that she has at least twenty-four different headache "triggers," including wheat, sugar, dairy, cheese, and aspirin. Dep. Designations 45–50, ECF No. 237.

28.     Some case reports cited in NRC 2006 can do no more than offer a hypothesis that consumption of fluoridated water may be linked with headaches. Thiessen Trial Tr. Vol. 4, 576:22–24.

29.     The only mention of headaches in NRC 2006 is to case reports by Petraborg. NRC 2006, at 270, Trial Ex. 13.

30.     NRC 2006 also refers to case reports published Waldbott, but not in the context of headaches. *Id*. Waldbott documented hypersensitive gastrointestinal effects. *Id*. There is no evidence that Waldbott found that headaches were a hypersensitive effect. Waldbott's case studies are not double-blinded experiments. *Id*.; Chang Trial Tr. Vol. 5, 840:11–841:23. The American Academy for Allergy investigated the Waldbott case reports and found that there was no evidence for hypersensitivity or allergy to fluoride. Chang Trial Tr. Vol. 5, 843:18–24.

31.     At trial, Dr. Grandjean discussed a publication by Roholm containing case reports on factory workers who were exposed to fluoride in the range of 30 mg/day, which is far in excess of exposure rates via drinking water in the United States. Grandjean Trial Tr. Vol. 2, 300:13–301:9; Thiessen Decl. 75, tbl. 7, ECF No. 202-1 (applying 70 kg body weight for adults from NRC 2006, at 23, Trial Ex. 13, would yield intake rates of .77 mg/day for average adults).

32.     Dr. Grandjean also discussed a publication by Sharma in villages in India. Grandjean Decl. ¶ 74, ECF No. 198-3; Grandjean Trial Tr. Vol. 2, 305:11–308:13. This is a "weak" study with a poor design, and it is doubtful that the questionnaire administered to the study participants was standardized or even understandable. Grandjean Trial Tr. Vol. 2, 308:1–13. This study is weak because the health effects were self-reported, it had virtually no control for confounding factors, and it lacked individual measurements of fluoride exposure. Chang Trial Tr. Vol. 5, 843:1–17; *see also* Grandjean

6

1   Trial Tr. Vol. 2, 307:20–308:13. The only increase in headaches documented in Sharma were at

2   concentrations above 1.5 ppm, which is more than double the levels in the United States. Grandjean Trial

3   Tr. Vol. 2, 307:20–308:13.

4       33.     Ms. Simms has never been medically tested for a fluoride allergy, and her headaches are

5   self-reported. Dep. Designations, ECF No. 237, at 51-52.

6       34.     No Plaintiff or standing declarant has established a real, substantial threat of impending

7   headaches due to their potential subsequent exposure to community water fluoridation.

8       **B.     Physical Pain**

9       35.     *Not a single study,* nor any expert testimony, in the trial record has drawn *any* association

10  between community water fluoridation and physical pain. *Not a single human study,* nor any expert

11  testimony, in the trial record has drawn *any* association between *any* level of fluoridation and pain

12  sensitivity.

13      36.     On behalf of her adult son Kyle Adams, Audrey Adams contends that fluoride in

14  Mr. Adams' shower water causes pain upon contact with his skin. Adams Decl. ¶¶ 11, 16, ECF No. 100-

15  7, Trial Ex. 56.

16      37.     McPherson 2018's hot plate latency test reported that the most highly exposed rats

17  jumped off a hot plate faster, but that test did not address whether topical exposure to fluoridated water

18  could cause physical pain or sensitivity to it. Tsuji Decl. ¶ 94. Rather, McPherson 2018 reported the

19  results of a suite of *animal* studies focused on examining learning and memory due to *developmental*

20  exposure to *ingesting* fluoride. It also examined fluoride exposures that *exceeded* comparable human

21  exposure from community water fluoridation. Tsuji Trial Tr. Vol. 4 686:11–14; Tsuji Trial Tr. Vol. 5,

22  761:18–19, 762:4–8; *see infra* ¶¶ 139–140.

23      38.     If anything, other animal studies support a finding that fluoride exposure dulls physical

24  pain. Tsuji Decl. ¶ 94, ECF No. 199; Tsuji Trial Tr. Vol. 5, 751:1–13, 753:13–18, 754:12–16.

25      39.     Ms. Adams contends that her son has vaccine-induced autism, and that he has many

26  sensitivities, including allergies to food and other chemicals, that exacerbate problems stemming from

27  his autism. Dep. Designations 60–61, 63–64, ECF No. 237. Mr. Adams have never been medically tested

28

1    for a fluoride allergy, and his pain is reported by him or his month. *Id.* at 66.

2      40.    No Plaintiff or standing declarant could assert potential *developmental* exposure to

3    community water fluoridation.

4      41.    No Plaintiff or standing declarant has established a real, substantial threat of impending

5    physical pain due to their potential subsequent exposure to community water fluoridation.

6      **C.**    **Dementia and Alzheimer's Disease**

7      42.    *Not a single study,* nor any expert testimony, in the trial record has drawn *any* association

8    between community water fluoridation and dementia or Alzheimer's disease. The evidence Plaintiffs

9    cite is "sparse." Thiessen Decl. ¶ 183, ECF No. 202-1.

10      43.    Plaintiffs' citation to page 222 of NRC 2006 offers no explanation on the dose or means

11    by which rats were exposed to *aluminum* fluoride and appears to show that aluminum was the substance

12    of concern. NRC 2006, at 222, Trial Ex. 13; Tsuji Decl. ¶¶ 38 (dose delivery is critical), 105 (fluoride

13    exposure without aluminum showed *no association* with adverse effects). On the next page, NRC 2006

14    concludes that study of "environmentally relevant doses" is required, and "effects . . . caused by fluorides

15    *cannot* be related to specific alterations in behavior or to known diseases." NRC 2006, at 223 (emphasis

16    added).

17      44.    The National Toxicology Program conducted a systematic review of animal

18    neurotoxicology studies in 2016, *see supra* ¶ 7, and reached no conclusions regarding dementia or

19    Alzheimer's disease. NTP 2016 Trial Ex. 553.

20      45.    Cao 2019 is an animal study for which Plaintiffs did not provide any relevant information

21    on the dosage, how the dose was administered, and what controls were taken. Thiessen Decl. ¶ 182, ECF

22    No. 202-1. No meaningful comparison can be made with human exposure to community water

23    fluoridation.

24      46.    Shao 2003 is a cross-sectional study that compared "healthy" adults to those with skeletal

25    fluorosis living in an endemic fluorosis area in China. No evidence on the other environmental

26    contaminants involved or the source or amount of the "heavy" fluoride exposure was provided.

27    Grandjean Trial Tr. Vol. 2, 304:8–305:9. Plaintiffs have not alleged that risk of skeletal (distinct from

28

dental) fluorosis or endemic fluorosis areas exist in the United States. Nor have Plaintiffs alleged that any declarant is at risk of skeletal (distinct from dental) fluorosis or lives in an endemic fluorosis area.

47.     The Russ 2019 study considered fluoride exposure based on residence after age 60 to "suggest further research" to examine a potential connection with dementia. Thiessen Decl. ¶ 183, ECF No. 202-1. No information on exposure levels for any time period was provided, preventing any meaningful comparison.

48.     Kristin Lavelle avers that she has "apprehension" of developing dementia or Alzheimer's disease as a result of fluoridated water. Lavelle Decl., ¶ 6, ECF No. 100-3, Trial Ex. 53. Any potential threat to Ms. Lavelle depends on an attenuated chain of events—that potential future exposure to fluoridated water could build up in her bones, which could be released later in life in such possible quantities to possibly cause Alzheimer's disease or dementia.

49.     No Plaintiff or standing declarant is elderly.

50.     No Plaintiff or standing declarant has a real, substantial threat of impending dementia or Alzheimer's disease due to their potential subsequent exposure to community water fluoridation.

**D.     Neurodevelopmental Injury**

51.     Given the ages of the individual Plaintiffs and standing declarants, none can establish a real threat of neurodevelopmental injury, reduced loss of IQ or ADHD from early, developmental exposure to community water fluoridation. This includes Ms. Lavelle's sixteen-year-old son (born 2004). Lavelle Decl., ¶ 3, ECF No. 100-3, Trial Ex. 53.

52.     Not a single study connects fluoride exposure in adolescence or adulthood to reduced IQ or ADHD, and Plaintiffs' own witness expressly refrained from extending such an opinion. Grandjean Trial Tr. Vol. 2, 226:9–11.

**E.     Economic Injury**

53.     Some individual Plaintiffs have chosen to spend funds to avoid community water fluoridation based, at least in part, on the unsubstantial fears discussed above. *See supra* ¶¶ 25–52.

**F.     Procedural Injury**

54.     In this case, Plaintiffs have received a meaningful *de novo* proceeding, including the full

1    panoply of pre-trial procedures in discovery and motions practice and a trial.

2    **III.    THERE IS INADEQUATE EVIDENCE TO IDENTIFY NEUROTOXICITY AS A**
     **HAZARD OF COMMUNITY WATER FLUORIDATION**

3

4        55.    Risk assessment is the process by which scientific judgments are made concerning the

5    potential for toxicity in humans. Undisputed Fact No. 11, ECF No. 150. The risk assessment paradigm

6    dates back to a report published by the NRC—*Risk Assessment in the Federal Government*: Managing

7    the Process. In this groundbreaking report, the NRC defined the risk assessment paradigm to include:

8    hazard identification, dose-response assessment, exposure assessment, and risk characterization. EPA

9    has integrated the principles of risk assessment from this report into its practices to this day. Undisputed

10   Fact No. 12.

11       56.    EPA's 1992 *Framework for Ecological Risk Assessment* and the 1998 *Guidelines for*

12   *Ecological Risk Assessment* introduced the concept of a Problem Formulation component in risk

13   assessment. The Problem Formulation establishes the goals, breadth, and focus of the assessment. It is

14   the systematic planning that identifies the major factors to be considered in a particular assessment, and

15   it is linked to the regulatory and policy context of the assessment. Henry Decl. ¶ 59, ECF No. 201.

16       57.    Consistent with the emphasis of problem formulation principles in risk assessment, TSCA

17   includes an explicit requirement that EPA publish the scope of the risk evaluation to be conducted. 15

18   U.S.C. § 2605(b)(4)(D). Based on an initial screening within six months after the initiation of a risk

19   evaluation, the scope document must include the hazards, exposures, conditions of use, and the

20   potentially exposed or susceptible subpopulations *expected to be considered* in the risk evaluation. *Id.*

21       58.    To presuppose a specific toxicity endpoint to the exclusion of all others is not consistent

22   with conducting a hazard assessment. Henry Decl. ¶ 106, ECF No. 201. However, when conducting a

23   risk evaluation under TSCA, the relevance of the *potential* neurotoxic hazard must be considered within

24   the context of a specific exposure scenario, or condition of use. *See* 15 U.S.C. § 2620(b)(4)(B)(ii)

25   (explaining that Plaintiffs must demonstrate by a preponderance of the evidence that the chemical

26   substance that was the subject of their petition presents an unreasonable risk under the conditions of use).

27   Because fluoridation chemicals are only used to increase water fluoride concentrations up to 0.7 mg/L,

28

EPA's experts were asked to provide opinions on the potential for neurotoxicity of fluoride at the community water exposure level in the range of 0.7 mg/L. Tsuji Trial Tr. Vol. 4, 679:20–24; Chang Trial Tr. Vol. 5, 791:8–13, 797:23–798:13.

59.     In 1994 the NRC stated that "[r]isk assessment sometimes consist only of a hazard assessment designed to evaluate the potential of a substance to *cause* human health effects." Thayer Trial Tr. Vol. 4, 671:7–13 (emphasis added).

60.     EPA's 1998 *Guidelines for Neurotoxicity Risk Assessment* ("1998 Guidelines") state: "Hazard characterization involves examining all available experimental animal and human data and the associated doses, routes, timing, and durations of exposure to determine qualitatively if an agent *causes* neurotoxicity in that species and under what conditions." 1998 Guidelines, at 2, Trial Ex. 17 (emphasis added).

61.     Consistent with NRC 1994 and EPA's 1998 Guidelines, the *Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act* ("Risk Evaluation Rule")[1] states: "A hazard assessment identifies the types of adverse health or environmental effects or hazards that can be *caused* by exposure to the chemical substance in question, and to characterize the quality and weight of the scientific evidence supporting this identification," 82 Fed. Reg. 33,726, 33,741 (July 20, 2017), Trial Ex. 544 (emphasis added), and defines hazard identification as "the process of determining whether exposure to a chemical stressor can *cause* an increase in the incidence of specific adverse health or environmental effects," *id*. at 33,741–42 (emphasis added).

62.     This is consistent with the principles of hazard assessment as explained by Dr. Grandjean: "hazard assessment . . . is the potential for fluoride also at lower exposures to *cause* neurotoxicity." Grandjean Trial Tr. Vol. 2, 161:16–20; *see also id.* at 162:2–3 ("A hazard represents an environmental factor that has the propensity of being able to *cause* some adverse effect." (emphasis added)).

63.     This is also consistent with the principles of hazard assessment as explained by Dr. Henry. Dr. Henry testified that "[h]azard identification is the process of determining whether exposure to a chemical stressor can *cause* an increase in the incidence of specific adverse health or environmental

---

[1]     *See infra* ¶ 111.

effects." Henry Decl. ¶ 106, ECF No. 201 (emphasis added).

64.    This is also consistent with the principles of hazard assessment as explained by Dr. Thayer. Dr. Thayer testified that hazard identification is "the process of determining whether a stressor . . . *causes* adverse health effects," Thayer Trial Tr. Vol. 4, 602:4–8; *see also id*. at 598:16–19 ("The IRIS program does . . . [h]azard identification. So does the chemical *cause* a hazard? And dose response assessment. If it does cause a hazard, at what dose or exposure levels?" (emphasis added)); *see also* Thayer Trial Tr. Vol. 3, 445:8–11 ("[T]he hazard inquiry is focused on whether a chemical can *cause* an effect at some level of exposure." (emphasis added)); *see also id*. at 447:24–448:11 (explaining that experimental animal studies can add confidence to *casual* inferences because of control over the experimental conditions).

65.    It is undisputed that causation is relevant to risk assessments. Thiessen Trial Tr. Vol. 4, at 563:22–564:3.

66.    EPA's 1998 Guidelines set forth the general scientific thinking and approaches for conducting and evaluating neurotoxic risk. Section 3.3 of the 1998 Guidelines is aimed at providing certain criteria to determine whether the existing "health related database can be characterized as sufficient or insufficient *for use in risk assessment*." 1998 Guidelines, at 2, Trial Ex. 17 (emphasis added); *see also id*. at 51–56 (section 3.3). In other words, a judgment that the toxicology database is sufficient to indicate a potential neurotoxic hazard is not the end of the analysis, rather it is the initial screening step for the purpose of identifying potential hazards that *should be considered* in the risk assessment. *Id*. at 55; *see also supra* ¶ 58 (explaining that is it inconsistent with the principles of hazard assessment to presuppose a specific toxicity endpoint).

67.    The 1998 Guidelines' sufficient evidence category includes human and experimental animal evidence to judge if *some* neurotoxic effect is associated with exposure (human) or whether a *potential* neurotoxic hazard *may* exist (animal). 1998 Guidelines, at 53, Trial Ex. 17. Thus, the toxicology database for fluoride is sufficient to indicate a *potential* neurotoxic hazard. However, the 1998 Guidelines recognize that "a great deal of scientific judgment, based on experience with neurotoxicity data and with the principles of study design and statistical analysis, is required to adequately evaluate

the database on neurotoxicity," *id*. at 55, and in some cases, "it may be that no individual study is judged sufficient to establish a hazard," based on the total available data, *id*. at 56.

68.     Evidence on hazard might involve observational epidemiologic studies, experimental studies of animals and possibly humans, in vitro mechanistic studies, and perhaps other mechanistic knowledge. Each source has its relative strengths and weaknesses. Thayer Trial Tr. Vol. 4, 623:19–624:20; *see also id.* at 640:15–641:16 (explaining that, in chemical-specific instances, one data stream may be useful for contextualizing or addressing limitations for reaching *causal* conclusions in the other evidence streams). The amount and quality of the various types of evidence can vary substantially from one chemical to another. A small number of environmental contaminants have extensive human data, often from relatively well-designed cohort studies, substantial animal data from several animal models, and mechanistic information. On a larger number of chemicals, there are few or no high-quality human data, but there are a small number of animal studies, some in vitro mechanistic studies, or both. For the great majority of the chemicals in the environment that might cause harm, however, there are virtually no human or animal data, although there might be some scientific knowledge relevant to a chemical's potential toxicity or putative mechanism. Thayer Trial Tr. Vol. 4, 622:12–17.

69.     Evidence integration is the process of evaluating the strength of evidence to infer *causation* by combining the different evidence streams based on the strengths and weaknesses across individual studies and a pattern of findings across the entire dataset into a single judgment on hazard. Thayer Trial Tr. Vol. 4, 640:15–641:16. The closer one can get to establishing causation, the more confidence can be attributed to the observed association. Henry Trial Tr. Vol. 6, 1013:8–12.

70.     "Because a complex interrelationship exists among study design, statistical analysis, and biological significance of the data, a great deal of scientific judgment, based on experience with neurotoxicity data and with the principles of study design and statistical analysis, is required to adequately evaluate [a] database on neurotoxicity." 1998 Guidelines, at 55, Trial Ex. 17. The term "weight of the scientific evidence" is a judgment-based process for evaluating the strength of evidence to infer causation. Henry Trial Tr. Vol. 6, 943:10–944:7, 1013:8–12; Thayer Trial Tr. Vol. 4, 607:14–16.

1    71.    Evidence integration is embedded within TSCA's requirements for conducting risk

2    evaluations. *See* 15 U.S.C. § 2605(b)(4)(F)(i), (v) (explaining that EPA "shall integrate and assess

3    available information on hazards and exposures for the conditions of use of the chemical substance," and

4    "describe the weight of the scientific evidence for the identified hazard and exposure."). Further,

5    decisions made under TSCA section 6, 15 U.S.C. § 2605, must be "based on the weight of the scientific

6    evidence." 15 U.S.C. § 2625(i).

7    72.    The Risk Evaluation Rule defines "weight of the scientific evidence" as "a systematic

8    review method, applied in a manner suited to the nature of the evidence or decision, that uses a pre-

9    established protocol to comprehensively, objectively, transparently, and consistently identify and

10   evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to

11   integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance." 82

12   Fed. Reg. at 33,748, Trial Ex. 544. The bulk of the definition is taken directly from TSCA's legislative

13   history. *See* 162 Cong. Rec. S3,511, S3,519 (daily ed. June 7, 2016).

14   73.    The definition of weight of the scientific evidence in the Risk Evaluation Rule is

15   consistent with the current state of the science for conducting and documenting hazard identification

16   conclusions supporting any risk assessment, Henry Decl. ¶ 66, ECF No. 201; Henry Trial Tr. Vol. 6,

17   944:8–12, and for addressing questions related to environmental health, Thayer Trial Tr. Vol. 4, 658:14–

18   17. Further, under TSCA, the weight-of-the-scientific-evidence approach is an interrelated part of

19   systematic review, and integrating systematic review into the TSCA risk evaluations is critical to meet

20   the statutory requirements of TSCA. 82 Fed. Reg. at 33,734, Trial Ex. 544.

21   74.    It is undisputed that weight of the scientific evidence requires considering significant data

22   gaps when assessing the entire body of scientific literature. Thiessen Trial Tr. Vol. 7, 1042:17–20.

23   **A.    Systematic Review**

24   75.    Systematic review is a methodology for conducting a literature-based assessment

25   designed to enhance transparency and inform scientific judgments. Thayer Trial Tr. Vol 4, 608:17–19.

26   The NRC has encouraged EPA to move towards these systematic review processes to enhance the

27   transparency of scientific literature review that support chemical specific risk assessments to inform

28

DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:17-cv-02162 EMC

regulatory decision making. *Id*. at 605:17–21.

76.     As defined by the Institute of Medicine systematic review "is a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies. The goal of systematic review methods is to ensure that the review is complete, unbiased, reproducible, and transparent." 82 Fed. Reg. at 33,734, Trial Ex. 544. EPA relied on the Institute of Medicine definition in providing further details on weight-of-the-scientific-evidence approaches to enhance the transparency of chemical specific risk assessments to inform regulatory decision making. *Id*.; Henry Trial Tr. Vol. 6, 943:10–23.

77.     The principles of systematic review that have been established in the context of evidence-based medicine are being adapted for use in addressing environmental health questions. Thayer Trial Tr. Vol. 4, 609:3–610:2. Critical to the Systematic Review, however, is the use of predefined processes to identify, select, critically assess, and synthesize evidence to arrive at a hazard identification conclusion for a chemical substance and describe the level of confidence in those conclusions. *Id*. at 608:20–609:2, 616:18–614:12. Evidence synthesis involves considering factors that decrease confidence in the body of evidence for a particular health endpoint (e.g., risk of bias, inconsistencies across studies, imprecision), as well as factors that increase confidence (e.g., magnitude of the effect, residual confounding, consistency). *Id*. at 629:1–4, 631:20–23. The factors considered regarding increasing or decreasing confidence in the observed association embody the Bradford Hill Guidelines for causation, and determine whether "the pattern of finding reflects the true relationship between the exposure and the effect." *Id*. at 626:23–627:1, 639:16–23; *see infra* ¶ 99 (discussing Bradford Hill Guidelines).

78.     Systematic reviews proceed through a sequence of common steps: problem formulation to clarify the specific research question and objectives of the review; developing a protocol; performing a comprehensive literature search; selecting relevant studies; assessing the risk of bias[2] of included studies; summarizing the methods and results from studies (a process often referred to as data extraction); and synthesizing the study data, especially with respect to looking at patterns of findings across studies and characterizing confidence in assessment conclusions. *Id*. at 610:8–611:17.

---

[2]     *See infra* ¶ 122 (explaining that risk of bias refers to the quality of individual studies in the available data set).

79.     Although, at the time of trial, EPA had not yet published a final risk assessment that implemented a complete systematic review methodology,[3] EPA's IRIS program has published toxicological assessments that included the critical aspects of the systematic review methodology, including using pre-established protocols. *Id.* at 672:22–673:2, 673:20–675:13. Moreover, there are published protocols and methods for systematic review that have been developed by the IRIS program, *id.* at 674:13–16, and specifically under TSCA, Trial Ex. 539, *Application of Systematic Review in TSCA Risk Evaluations*[4] none of which Plaintiffs or their experts relied on in support of their hazard conclusions.

80.     As Dr. Hu explained, assessment of the complete range of epidemiologic studies to understand the potential effects of a chemical is an "integral part" of the Bradford Hill Guidelines, which are "an important tool for looking at all the evidence and coming to a conclusion." Hu Trial Tr. Vol. 3, 340:14–23. Thus, the approach taken by EPA's experts to embed the concept of causation into their analyses are entirely consistent with the practice of hazard identification generally and with the practice of hazard identification EPA has articulated under TSCA.

81.     In EPA's draft risk evaluations under TSCA, EPA expressly considered quality, consistency, relevance, coherence, and biological plausibility, which correspond with factors in the Bradford Hill Guidelines and a causal analysis. *See* Thiessen Trial Tr. Vol. 4, 566:12–16, 567:14–17; EPA, Draft Risk Evaluation for N-Methylpyrrolidone 53 (Oct. 2019), Trial Ex. 49; EPA, Draft Risk Evaluation for Trichloroethylene 67 (Feb. 2020), Trial Ex. 50; EPA, Draft Risk Evaluation for 1,4-Dioxane 43 (June 2019), Trial Ex. 46; EPA, Draft Risk Evaluation for 1-Bromopropane (Aug. 2019), Trial Ex. 47.

**B.     Plaintiffs Failed to Conduct a Systematic Review**

82.     Dr. Kathleen Thiessen, Plaintiffs' toxicologist and risk assessment scientist, did not conduct a systematic review. Thiessen Trial Tr. Vol. 3, 469:21–24. Nor did Dr. Thiessen include in her

---

[3]     Just after the completion of trial, EPA published the final risk evaluation and supporting documents for methylene chloride. The draft risk evaluation (*see* Trial Ex. 48) and the final risk evaluation are based upon EPA's implementation of systematic review for TSCA risk evaluations (*see* Trial Ex. 539).

[4]     *See infra* ¶ 115.

documented analysis application of the practices discussed in the 1998 Guidelines that relate to the present day application of systematic review, including but not limited to, a discussion of the strengths, limitations, and uncertainties of the underlying dataset. Thiessen Trial Tr. Vol. 6, 1008:16–23. Dr. Thiessen admitted that she is not an expert in utilizing the 1998 Guidelines as EPA does. Thiessen Trial Tr. Vol. 4, 528:10–14. Dr. Thiessen did not cite or rely on the *Application of Systematic Review in TSCA Risk Evaluations*. Thiessen Trial Tr. Vol. 6, 1009:09–11. Dr. Thiessen did not establish pre-defined criteria and, therefore, did not complete a structured analysis of the identified data sources. Thiessen Trial Tr. Vol. 4, 528:10–14. Dr. Thiessen admitted that she did not conduct a comprehensive search of the scientific literature. *Id.* at 528:20–25. In fact, Plaintiffs' counsel provided Dr. Thiessen with dozens of studies to use in her expert report before she conducted her literature search. *Id.* at 573:24–575:3, 576:2–10. Indeed, it cannot be determined what criteria she employed to determine the strengths, limitations, and uncertainties associated with the reasonably available information within either the animal or human data streams or how that criteria was implemented. Thiessen Trial Tr. Vol. 6, 1013:22–1014:23. Dr. Thiessen's opinion focused on animal studies, and prior to offering an opinion in this case, she did not review Dr. Grandjean's opinion on the epidemiological literature. Thiessen Trial Tr. Vol. 4, 556:12– 24.

83.     Dr. Grandjean, Plaintiffs' expert epidemiologist, did not conduct a systematic review in this case. Grandjean Decl. ¶¶ 26, 96, ECF No. 198-3. He has never conducted one for fluoride either. Choi 2012 was a meta-analysis of the epidemiological studies on fluoride and IQ. Grandjean Decl. ¶¶ 14, 35, 75, 87, 114, 115. A meta-analysis is not a systematic review; it is a statistical procedure used to combine data from multiple studies of the same scientific hypothesis used to detect that effect with greater statistical precision based on aggregated data. Chang Decl. ¶ 100, ECF No. 200.

84.     Dr. Grandjean focused his opinion exclusively on human studies, but he did not document any pre-defined criteria to identify or assess the current epidemiological literature on fluoride and IQ. Grandjean Trial Tr. Vol. 2, 226:21–227:8. Nor can it be determined what criteria he employed to determine the strengths, limitations, and uncertainties associated with the reasonably available information within either the animal or human data streams or how that criteria was implemented. Henry

1    Trial Tr. Vol. 6, 1013:22–1014:23.

2    85.    Regulatory decision-making requires transparency and rigor in scientific judgments made

3    throughout the assessment process in support of conclusions. Henry Trial Tr. Vol. 6, at 1013:22–

4    1015:11. Systematic review is known for its transparency and rigor in looking across studies to reach

5    conclusions and to characterize confidence in those conclusions. Thayer Trial Tr. Vol. 4, 608:16–609:2,

6    627:2–10. Without providing a transparent context for scientific judgments through the lens of such a

7    complete and systematic approach, an evaluation of the dataset is susceptible to personal bias rather than

8    objective indicators of study quality. *Id.*

9    86.    For example, Dr. Grandjean offered a conclusory opinion that "the imprecision of the

10   fluoride exposure parameters would likely bias the results toward the null, not the reverse." Grandjean

11   Decl. ¶ 118, ECF No. 198-3 (emphasis omitted). However, as NTP noted, "differential misclassification

12   can bias towards or away from the null, and consideration of the source, direction, and magnitude of

13   potential biases in the body of evidence is required to interpret findings." NTP, Handbook for

14   Conducting a Literature-Based Health Assessment Using OHAT Approach for Systematic Review &

15   Evidence Integration 51 (2015) ["NTP 2015 Handbook"], Trial Ex. 518; *see also* Chang Decl. ¶¶ 90–95

16   (citing authorities with same conclusion), ECF No. 200; Chang Trial Tr. Vol. 6, 917:2–918:20. Thus, a

17   systematic consideration of risk of bias for all studies included in the analysis is useful for determining

18   the direction of bias. NTP 2015 Handbook 51, Trial Ex. 518.

19   87.    Plaintiffs' failure to conduct a systematic review—or to even implement the critical

20   aspects of the systemic review methodology, including using pre-established protocols—is both

21   scientifically flawed and highlights the personal biases of Plaintiffs' experts.

22   88.    Dr. Grandjean identified fluoride as meeting *his* criteria for demonstrating a known,

23   *causal* relationship between exposure and developmental neurotoxicity as early as 2014. Grandjean Trial

24   Tr. Vol. 2, 278:13–20. Dr. Grandjean's stated basis for identifying fluoride as a substance to be a known,

25   *causal* developmental neurotoxicant in humans was a paper on which he was a co-author (Choi 2012).

26   *Id.* at 279:12–16. Thus, the limitations of Choi 2012, *see infra* ¶¶ 163–169, apply with equal force to

27   Dr. Grandjean's conclusion that fluoride is known to *cause* developmental neurotoxicity in humans.

28

89.     Dr. Thiessen also held preconceived anti-fluoridation opinions regarding water fluoridation, dating as far back as 1998. Thiessen Trial Tr. Vol. 4, 572:11–15. Dr. Thiessen has advocated against water fluoridation based on unproven theories and retains a "mutually beneficial" relationship with Plaintiffs' counsel, Michael Connett. *Id.* at 571:15–19; Thiessen Trial Tr. Vol. 3, 468:20–24. Dr. Thiessen is personal friends with Michael Connett, his mother Ellen Connett, and his father Paul Connett, who was the head of Plaintiff Fluoride Action Network. Thiessen Trial Tr. Vol. 4, 568:5–10, 569:6–9. Dr. Thiessen attended a conference on fluoride organized by Paul Connett in 2006, *id.* at 568:15–23. Dr. Thiessen helped Paul Connett on his book *The Case Against Fluoride. Id.* at 571:10–14. Dr. Thiessen consults for and appears in promotional material for Plaintiff Fluoride Action Network. *Id.* at 570:6–22. Dr. Thiessen was selected for the NRC 2006 committee in part because of her anti-fluoridation viewpoint. *Id.* at 573:1–12.

## C.     Completed Systematic Reviews of Fluoride Exposure

### 1.     The National Toxicology Program's 2016 Systematic Review

90.     In 2016, NTP published a systematic review of the evidence from experimental animal studies of the effects of fluoride on learning and memory. The systematic review found a low-to-moderate level of evidence that learning and memory deficits occur in non-human mammals exposed to fluoride. The evidence for effects on learning and memory was weakest (low) in animals exposed during development. *See infra* ¶¶ 119–134.

91.     As detailed below, studies in animals have generally used fluoridated drinking water concentrations that far exceed the levels used in community water fluoridation, and the lack of studies at lower fluoride concentrations was identified as a data gap. *See infra* ¶ 127. Since the publication of the NTP's 2016 systematic review of the animal evidence, additional animal studies have been published. *See infra* ¶¶ 151–161.

### 2.     Dr. Joyce Tsuji's Systematic Review Method and Summary of Conclusions

92.     Using NTP's systematic review methodology as a roadmap, in combination with other well-accepted scientific principles, Dr. Tsuji, EPA's expert toxicologist, conducted a systematic review

and critical analysis of the relevant toxicological literature. Tsuji Decl. ¶ 19, ECF No. 199.

93.     Based on her critical analysis of the literature, including using systematic review methods, Dr. Tsuji concluded that the experimental animal toxicology evidence is lacking to support that 0.7 mg/L exposure level of fluoride is causing developmental neurotoxicity in the United States. Tsuji Decl. ¶ 17, ECF No. 199.

### 3. Dr. Ellen Chang's Systematic Review Method and Summary of Conclusions

94.     Dr. Chang, EPA's expert epidemiologist, conducted a systematic review of the published epidemiological evidence on the association between fluoride exposure and developmental neurotoxicity in humans. Chang Decl. ¶ 40, ECF No. 200; Chang Trial Tr. Vol. 5, 791:14–792:7, 792:23–796:19. As part of her systematic review, Dr. Chang also considered Dr. Tsuji's toxicological opinions and systematic review of experimental animal studies. Chang Decl. ¶¶ 200–22.

95.     For her systematic review and prior to developing an opinion in this case, Dr. Chang defined the scientific hypothesis, pre-defined her search terms, identified in advance the databases to search, pre-determined a set of standard criteria for evaluating the strengths and limitations of any given epidemiological study, and selected standard criteria to synthesize, integrate, and present her conclusions. Chang Trial Tr. Vol. 5, 792:23–794:3; Chang Decl. ¶¶ 40–51, ECF No. 200. She clearly explained the application of these criteria in her declaration. Chang Decl. Ex. C, tbl. 2, ECF No. 200. Dr. Chang's standard criteria included country, study design, study population, levels of exposure, exposure assessment outcome, confounders adjusted, and results. These criteria enabled her to evaluate strengths and weaknesses in an objective manner. *Id.*

96.     By consistently considering (1) the country where each study was conducted; (2) the study population; and (3) the levels of fluoride exposure at issue, Dr. Chang objectively evaluated the relevance to the U.S. population for each study included in her review. Chang Trial Tr. Vol. 5, 794:21–795:1. Dr. Chang's consideration of exposure assessment and outcome assessment methods enabled her to evaluate the quality and validity of data collected across the literature. Chang Trial Tr. Vol. 5, 795:2–4. Dr. Chang considered the confounders adjusted for in any study. Confounding is a systematic bias or

1   spurious association due to the presence of a third factor that is not the exposure or the outcome, but is

2   associated with both and is not on the causal pathway between the two. Chang Trial Tr. Vol. 5, 795:5–

3   23. To evaluate the robustness of a study's results, Dr. Chang consistently considered the results and the

4   underlying statistics. *Id*. at 795:24–796:4. Dr. Chang also considered selection bias by looking at any

5   information on study participation in all studies. Chang Trial Tr. Vol. 5, 796:5–8. Dr. Chang further

6   considered study design to evaluate the potential validity and strengths and limitations of any study.

7   Chang Trial Tr. Vol. 5, 796:9–12.

8       97.     Based on her critical analysis of the literature, including using systematic review

9   methods, Dr. Chang concluded that the overall weight of the scientific evidence: (1) does *not* establish

10  that any observed statistical associations between community water fluoridation in the range of 0.7 mg/L

11  and neurodevelopmental harm are a result of anything other than bias, confounding, or chance, and

12  (2) does *not* establish that neurodevelopment *harm is likely* to be a hazard of community water

13  fluoridation in the United States. Chang Decl. ¶¶ 13, 22, ECF No. 200; Chang Trial Tr. Vol. 5, 797:22–

14  798:13.

15      98.     The ultimate goal of epidemiological research is to determine whether the available

16  evidence supports a hypothesis that an exposure causes a harm. Chang Decl. ¶ 56, ECF No. 200. Thus,

17  in addition to her systematic review, Dr. Chang presented her conclusions regarding the overall weight

18  of the scientific evidence using the Bradford Hill Guidelines, including a causal analysis. *Id*. ¶¶ 56–64;

19  Chang Trial Tr. Vol. 5, 796:14–797:21. Dr. Chang concluded that causation had not been established in

20  the literature. Chang Decl. ¶ 22.

21      99.     As Dr. Hu explained, the Bradford Hill Guidelines are important to consider in policy-

22  making. Hu Trial Tr. Vol. 3, 340:14–23. There are nine factors considered under the Bradford Hill

23  Guidelines: strength, consistency, specificity, temporality, biological gradient, plausibility, coherence,

24  experiment, and analogy. Chang Decl. ¶ 61, ECF No. 200. The Bradford Hill Guidelines consider many

25  of the same factors that EPA considers relevant to risk assessment. EPA, Draft Risk Evaluation for N-

26  Methylpyrrolidone 53 (Oct. 2019), Trial Ex. 49; EPA, Draft Risk Evaluation for Trichloroethylene 67

27  (Feb. 2020), Trial Ex. 50; EPA, Draft Risk Evaluation for 1,4-Dioxane 43 (June 2019), Trial Ex. 46;

28

1    EPA, Draft Risk Evaluation for 1-Bromopropane (Aug. 2019), Trial Ex. 47.

2        100.    For each Bradford Hill Guidelines factor, Dr. Chang considered the scientific evidence

3    overall. Dr. Chang found that the weight of the scientific evidence does not show a strong, consistent,

4    coherent or biologically plausible association between fluoride exposure in the range relevant to

5    community water fluoridation and neurodevelopmental harm. Chang Decl. ¶ 14, ECF No. 200.

6    Biological gradient, or dose-response, evidence was so weak that a few outliers would change the

7    relationship. Chang Decl. ¶¶ 213; Chang Trial Tr. Vol. 5, 814:5–11; *see also* Lanphear Trial Tr. Vol. 3,

8    405:18–406:12. In addition, neurodevelopmental outcomes are not specific to fluoride exposure; fluoride

9    is analogous both to chemicals that have and do not have neurodevelopmental effects; and there are no

10   experimental studies on humans and the animal studies did not indicate biological plausibility. Chang

11   Decl. ¶¶ 225, 230, 231.

12       101.    Because neither Dr. Thiessen nor Dr. Grandjean applied transparent, predefined criteria

13   to find, assess, and synthesize the evidence, their analyses are not credible sources of evidence for

14   reaching hazard identification conclusions. Additionally, their failure to document the various degrees

15   of importance, concerns, uncertainties, strengths, limitations, deficiencies and any additional information

16   related to each individual metric and domain that impacted their conclusions carries forward to each

17   subsequent component of Plaintiffs' purported risk assessment, which cannot be relied upon to inform

18   risk management options under TSCA. Henry Decl. ¶¶ 109–110, 112, ECF No. 201.

19       102.    Moreover, none of the systematic reviews (Dr. Thayer's NTP 2016, Dr. Tsuji's review,

20   and Dr. Chang's review) that are presented in evidence have concluded that neurotoxicity is a hazard of

21   community water fluoridation. Rather, the NTP has not reached a hazard conclusion yet and its final

22   assessment remains pending. Thayer Trial Tr. Vol. 4, 642:11–643:13. Dr. Tsuji's and

23   Dr. Chang's systematic reviews concluded that there is inadequate evidence to identify neurotoxic

24   effects as a hazard of community water fluoridation. *See supra* ¶¶ 90–103.

25       103.    Where the scientific analysis is so uncertain that it cannot be relied upon to identify a

26   hazard *under the condition of use*, there can be no scientific (or administrative) justification for

27   proceeding through the subsequent components of the risk assessment.

28

104.   Additionally, as Plaintiffs repeatedly pointed out, the concept of "fit-for-purpose," as discussed in the Risk Evaluation Rule means that while the principles of weight of the scientific evidence will always be applied, "[t]he extent to which EPA will refine its evaluations for one or more conditions of use in any risk evaluation will vary as necessary to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment." 82 Fed. Reg. at 33,751, Trial Ex. 544; *see also id*. at 33,739–40 (discussing fit-for-purpose). Thus, the concept of "fit-for-purpose" provides the flexibility to reach risk determinations (including a determination of no unreasonable risk) when information and analysis (including screening methodologies) are sufficient. *Id*. at 33,739–40.

105.   EPA's approach in contextualizing the overall weight of the scientific evidence to exposures relevant to community water fluoridation is consistent with NTP's 2016 systematic review, which also contextualized NTP's conclusions for relevance to community water fluoridation. Thayer Trial Tr. Vol. 4, 635:17–636:6. NTP 2016 specifically limited its conclusions to "concentrations higher than 0.7 parts per million" because "[v]ery few studies assessed learning and memory effects in experimental animals (rats and mice) at exposure levels near 0.7 parts per million, the recommended level for community water fluoridation in the United States." NTP 2016, at 59, Trial Ex. 553.

106.   Contrary to Plaintiffs' suggestion, the concept of "fit-for-purpose" as discussed in the Risk Evaluation Rule does not justify their failure to conduct systematic review, because "integrating systematic review into the TSCA risk evaluations is critical to meet the statutory requirements of TSCA." 82 Fed. Reg. at 33,734, Trial Ex. 544.

## IV.   RISK EVALUATION

107.   A TSCA risk evaluation is the process for determining whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use, under TSCA section 6. 15 U.S.C. § 2605(b)(4); 82 Fed. Reg. 33,726 (July 20, 2017), Trial Ex. 544.

108.   As required under TSCA section 6(b)(4)(A), the Risk Evaluation Rule establishes a process for conducting risk evaluations. 15 U.S.C. § 2605(b)(4); 82 Fed. Reg. 33,726 (July 20, 2017),

1   Trial Ex. 544. The Risk Evaluation Rule requires that each TSCA risk evaluation include all of the

2   following components: (i) a scope; (ii) a Hazard Assessment; (iii) an Exposure Assessment; (iv) a Risk

3   Characterization; and (v) a Risk Determination. 82 Fed. Reg. 33,726, 33,750 (July 20, 2017), Trial Ex.

4   544. Thus, the traditional components of the risk assessment paradigm, together with a risk

5   determination, constitute a risk evaluation under TSCA. Henry Decl. ¶ 70, ECF No. 201.

6       109.    The Risk Evaluation Rule was subject to extensive public comment prior to being

7   finalized. Henry Decl. ¶ 78, ECF No. 201.

8       110.    EPA has a number of existing guidance documents that inform risk assessment. A

9   collection is available to the public on EPA's website. Henry Decl. ¶ 79, ECF No. 201. In developing

10  and refining risk assessment processes, frameworks, and guidance documents, EPA has incorporated

11  recommendations from expert technical panels, internal and external peer reviews, and a number of

12  influential reports from the NRC.

13      111.    Specifically, TSCA section 26(l)(5) directs EPA to develop guidance to assist interested

14  persons in developing and submitting draft risk evaluations, including the quality of the information and

15  the process to be followed in developing draft risk evaluations. 15 U.S.C. § 2625(*l*)(5). The *Guidance to*

16  *Assist Interested Persons in Developing and Submitting Draft Risk Evaluation Under the Toxic*

17  *Substances Control Act* urges external parties to use systematic review approaches when developing

18  draft TSCA risk evaluations, including a pre-established systematic review protocol as the beginning of

19  the draft risk evaluation with pre-specified criteria for identifying, selecting, assessing, and summarizing

20  the findings of studies including strengths, limitations, and relevance of each study, and how the evidence

21  would be integrated. *Guidance to Assist Interested Persons in Developing and Submitting Draft Risk*

22  *Evaluation Under the Toxic Substances Control Act*, Trial Ex. 538.

23      112.    Additionally, to support regulatory action under TSCA, EPA published *Application of*

24  *Systematic Review in TSCA Risk Evaluations*, which sets out a roadmap for preparing draft risk

25  evaluations that are "fit-for-purpose" under TSCA. *Application of Systematic Review in TSCA Risk*

26  *Evaluations*, Trial Ex. 539.

27      113.    These documents are not meant to replace scientific judgment, but are developed to guide

28

1   the basis for scientific judgments throughout the assessment process to demonstrate transparency, clarity,

2   consistency, and reasonableness in support of conclusions. Henry Decl. ¶ 88, ECF No. 201.

3        114.   Plaintiffs did not cite or rely on any of the EPA guidance documents developed for the

4   express purpose of supporting regulatory action under TSCA in their administrative petition or the

5   presentation of their case.

6        **A.**    **Hazard Identification**

7        115.   Consistent with the NRC risk assessment paradigm, the Risk Evaluation Rule requires

8   each risk evaluation under TSCA to include a hazard assessment, 82 Fed. Reg. at 33,750, Trial Ex. 544,

9   which includes a hazard identification and dose-response analysis, Henry Decl. ¶ 105, ECF No. 201.

10   *Hazard identification* entails characterizing the available evidence based on patterns of findings across

11   studies, which requires an understanding of the strengths and weaknesses across individual studies in

12   that evidence-base. Thayer Trial Tr. Vol. 4, 622:12–17. Fluoride has a large evidence base with an

13   abundance of human and animal evidence. Thayer Trial Tr. Vol. 4, 640:15-641:16.

14        **1.**    **Experimental Animal Toxicological Studies**

15        **a.**    **The National Toxicology Program's 2016 Systematic Review**

16        116.   In July 2016, the NTP published a comprehensive systematic review of animal

17   neurotoxicology studies to develop conclusions about whether fluoride exposure is associated with

18   impairments in learning and memory. Trial Ex. 553; Tsuji Decl. ¶ 50, ECF No. 199.

19        117.   NTP 2016 provided the most thorough and detailed analysis of the animal toxicological

20   literature published at that time. Tsuji Decl. ¶¶ 18, 51–60, ECF No. 199.

21        118.   NTP based its systematic review on the NTP Office of Health Assessment and Translation

22   ("OHAT") systematic review methods. These methods are an outgrowth of a recent broader national and

23   international recognition of the need for established systematic review methods that are scientifically

24   reliable, transparent, efficient, and reproducible, with emphasis on evaluation of study quality for basing

25   conclusions on the weight of the scientific evidence for health-based decision-making on environmental

26   chemicals. Tsuji Decl. ¶ 51, ECF No. 199.

27        119.   NTP identified all relevant published evidence using a documented search strategy and

28

assessed the quality of the individual studies ("risk of bias"). NTP's chief concerns regarding study quality included the insufficient characterization of the identity and purity of the test compound, unknown amount of fluoride in the rodent food ("chow"), indirectness of some of the tests used for assessing learning and memory, and lack of control for various other factors that could affect the results. Tsuji Decl. ¶¶ 52–53, ECF No. 199.

120.    NTP set aside the studies that it determined in its scientific judgment to have a high risk of bias, which is defined as having three or more serious deficiencies in study quality, such as lacking blinding during outcome assessment, randomization to treatment group, control for litter effects, and characterization of the administered chemical. NTP 2016, at 8, 14, Trial Ex. 553. NTP included studies with up to two serious deficiencies in study quality, even though such deficiencies can greatly compromise the validity of the results. If NTP had allowed no serious risk-of-bias issues, nearly all of the studies would have been eliminated. Tsuji Decl. ¶ 55, ECF No. 199.

121.    NTP identified the studies it selected as more reliable, the studies that were not reliable, and the reasons for its selections. Tsuji Decl. ¶ 57, ECF No. 199.

122.    NTP then synthesized and rated the evidence for effects on learning and memory. NTP uses the following level-of-evidence categories: (1) High; (2) Moderate; (3) Low; or (4) Very Low/No Evidence Available. Tsuji Decl. ¶ 58, ECF No. 199.

123.    NTP 2016 assessed the confidence in the evidence supporting neurotoxicity as a hazard of fluoride based on factors such as the magnitude of the effect, dose-response (i.e., increasing effect with increasing dose), the effect of potential confounding factors (other factors than fluoride exposure that might affect the outcome), consistency in results, risk of study bias, publication bias, whether measures of effects were direct or indirect, and the amount of precision in measures. Tsuji Decl. ¶ 60, ECF No. 199.

124.    At the time the NTP published its systematic review, there were very few studies of learning and memory effects at fluoride exposures of relevance for 0.7 mg/L, which is the relevant exposure level for community water fluoridation in the United States. NTP called for additional research to address this gap as well as other gaps identified by its systematic review. Tsuji Decl. ¶ 61, ECF No.

1    199.

2        125.    But even at concentrations higher than those that are relevant for U.S. community water

3    fluoridation (i.e., 0.7 mg/L), the studies that NTP 2016 reviewed showed considerable risk of bias and a

4    lack of scientific reliability for identifying points of departure[5] for a risk assessment of relevance for

5    human populations. Tsuji Decl. ¶¶ 61, 64, 77, 88, 99, ECF No. 199; Tsuji Trial Tr. Vol. 4, 682:17–683:8.

6        126.    NTP rated the evidence for effects on learning and memory in two categories: (1) animals

7    exposed during development; and (2) animals exposed as adults. Tsuji Decl. ¶ 65, ECF No. 199.

8        127.    First, at concentrations higher than those that are relevant for U.S. community water

9    fluoridation, NTP rated the evidence as low for supporting a finding of developmental neurotoxicity of

10   fluoride on learning and memory. NTP 2016, at 27, Trial Ex. 553. Much of the testing in the available

11   studies was indirect in that instead of testing learning and memory, treatment-group effects could result

12   from differences in motor or sensory function or possibly behavioral or physical differences. Further,

13   the studies reported associations between fluoride intake and adverse effects on growth. Thus, the studies

14   are not able to distinguish cognitive effects from those resulting from other effects on normal

15   development of the animals tested for this additional reason. Tsuji Decl. ¶¶ 67–72, ECF No. 199.

16       128.    The developmental studies thus provide an insufficient basis for a dose-response

17   relationship[6] between fluoride and neurodevelopmental effects. Tsuji Decl. ¶ 70, ECF No. 199.

18       129.    Second, in animals exposed after weaning through adulthood, NTP concluded that a

19   moderate level-of-evidence supported a finding of effects on learning and memory. NTP 2016, at 35,

20   Trial Ex. 553. This finding was based on studies using the Morris water maze test conducted at exposure

21   levels of 2.26 to 62.7 mg/L. *Id.* NTP rated other studies using different test methods as providing a low

22   level-of-evidence because of the indirectness of the measure of effects on learning and memory as well

23   as issues of bias, including failure to follow the well-established practice of investigator blinding. Tsuji

24   Decl. ¶ 73, ECF No. 199.

25       130.    Similar to the developmental studies, NTP noted its reservation regarding the inability to

26   distinguish whether the effects observed were the result of cognitive effects on learning and memory or

---

[5]    *See infra* ¶ 209.
[6]    *See infra* Section IV.B.: *Dose-Response Assessment*.

27

1    were secondary to motor or sensory function, which also could result from effects on growth as reflected

2    by dose-related differences in body weights. NTP 2016, at 35, Trial Ex. 553. NTP also noted that there

3    was little reporting of the amount of fluoride in animal food. *Id.* at 56; Tsuji Decl. ¶ 74, ECF No. 199.

4          131.    In several toxicology studies, reductions in body-weight gain in mother rats, their

5    offspring, and weanling to adult rats have been reported at fluoride exposure levels ranging from rat

6    doses of 22.6 mg/L to 120 mg/L. Tsuji Decl. ¶ 45, ECF No. 199. Some studies that have measured

7    drinking water intake have also noted reduced water consumption; however, most studies do not report

8    details on body weight, water or food consumption, or health of the animals. *Id.* Effects on growth could

9    result from metabolic or systemic effects or simply because the animal dislikes the taste of the sodium

10   fluoride in the water. *Id.* Further, less milk may be available to nursing animals in these studies. *Id.*

11   Indeed, reduced milk production by dams (mother rats) was reported at concentrations of 25 mg/L with

12   starvation in several litters. *Id.* The epidemiological literature has not identified similar effects on body

13   weight or growth in human populations. *Id.* Thus, the observed neurobehavioral effects in animals at

14   these fluoride concentrations may be secondary to other influences that are not relevant for the U.S.

15   population. *Id.*

### b.   McPherson 2018

17         132.    NTP addressed key data gaps in the experimental animal literature by conducting its own

18   follow-up experiments. Tsuji Decl. ¶¶ 77, 80, ECF No. 199. The results from NTP's suite of follow-up

19   animal research were published (McPherson 2018).

20         133.    In McPherson 2018, NTP researchers reported in detail the rigorous methodology and

21   results of several separate tests and endpoints examined. McPherson 2018 consists of 9 high-quality

22   behavioral tests that could each qualify as a separate study. Tsuji Decl. ¶ 83, ECF No. 199; Tsuji Trial

23   Tr. Vol. 4, 686:21–25.

24         134.    McPherson 2018 is the best-conducted recent developmental neurotoxicity study on

25   learning and memory and fluoride. Tsuji Decl. ¶¶ 22, 77, 82–89, ECF No. 199; Tsuji Trial Tr. Vol. 4,

26   685:8–18. NTP researchers used rigorous study methods in accordance with NTP's developmental

27   neurotoxicology protocols, which are generally consistent with guidelines of other national and

28

1    international programs. Tsuji Decl. ¶ 81. McPherson 2018 described its methodologies better than any

2    other recent developmental neurotoxicity study on fluoride. *Id*. ¶ 22.

3        135.    McPherson 2018 used four treatment groups with different fluoride concentrations in diet

4    and drinking water: (1) a standard rat diet (20.5 ppm fluoride) and reverse osmosis water; (2) low

5    fluoride custom diet (3.24 ppm fluoride) and reverse osmosis water; (3) low fluoride diet and 10 mg/L

6    fluoride in water; and (4) low fluoride diet and 20 mg/L fluoride in water. Tsuji Decl. ¶ 84, ECF No.

7    199.

8        136.    The fluoride water concentrations used by McPherson 2018 (10 and 20 mg/L) result in

9    generally similar (albeit overestimated) exposure to total fluoride exposures in U.S. children from

10   drinking water at the current U.S. Public Health Service (0.7 mg/L) and previous (0.7−1.2 mg/L)

11   recommended levels in combination with other sources including diet, toothpaste, and soil. The

12   calculations include a 90th percentile water intake rate and other sources of fluoride exposure reported

13   for 0.5-to-1-year-old and 14-year-old children based on survey data for U.S. populations. Tsuji Decl. ¶¶

14   39–43, 85, ECF No. 199; Tsuji Trial Tr. Vol. 4, 685:25–686:19.

15       137.    In fact, a rat dose of 20 mg/L of fluoride in drinking water is higher than the equivalent

16   total fluoride exposures to children in the United States at the current U.S. Public Health Service

17   recommendation (0.7 mg/L). Dental fluorosis was observed in rats at 20 mg/L in the McPherson 2018

18   study but less so in U.S. populations at 0.7 mg/L, indicating that 20 mg/L *overestimates* rather than

19   underestimates the current U.S. population equivalent concentration. Moreover, effects on growth in rats

20   observed at fluoride water concentrations above 20 mg/L, but not in U.S. infants and children, likewise

21   suggest that equivalent U.S. population exposures are not as high as in these studies. On the other hand,

22   the toxicity of fluoride could differ in rats and humans or the experimental designs are flawed, which in

23   either case would make studies in rats uninformative for understanding the dose-response of fluoride for

24   humans. Tsuji Decl. ¶¶ 22, 39–43 & Table 1, ECF No. 199; Tsuji Trial Tr. Vol. 4, 685:25–686:19.

25       138.    McPherson 2018 did *not* find evidence of developmental neurotoxicity on learning and

26   memory at doses similar to and higher than *total* fluoride doses in the U.S. population associated with

27   the recommended drinking water level and other sources, including for young children. Tsuji Decl. ¶¶ 22,

28

1   90–93, ECF No. 199; Tsuji Trial Tr. Vol. 4, 687:1–3.

2   139.   McPherson 2018 found statistically significant effects in the hot-plate latency test in the

3   20 mg/L group versus controls. This finding does not support the hypothesis that fluoride has an

4   exposure-related effect on learning and memory. A hot-plate latency test measures the latency of the

5   animal to respond to being placed on a hot-plate platform. It is a sensory test, not a test of learning and

6   memory. McPherson 2018 observed significantly shorter response latencies in the 20 mg/L dose group.

7   Many assume that this result could be indicative of hyperanalgesia (higher pain sensitivity). Tsuji Decl.

8   ¶ 94, ECF No. 199; Tsuji Trial Tr. Vol. 5, 750:23–751:13. However, when viewed in context of the

9   larger body of evidence on fluoride, where there are conflicting results on the hot plate latency test, it is

10  unclear whether this single result in one of McPherson 2018 experiments was a true effect or random

11  chance. Tsuji Trial Tr. Vol. 5, 750:23–751:13.

12  140.   McPherson 2018 observed a statistically significant difference in the Morris water maze

13  test in the 20 mg/L group versus controls, too, but again, this was not clearly an adverse effect. The rats

14  in the 20 mg/L dose group had significantly *shorter* latency to find the hidden platform. Tsuji Decl. ¶

15  94, ECF No. 199. No significant difference in path length was observed across the groups. In other

16  words, the rats in the 20 mg/L dose group swam faster to the platform than the control group.

17  141.   Because the rats' path in the 20 mg/L dose group was not more erratic than that of the

18  controls, it is not clear that the results of McPherson 2018's water maze test are indicative of

19  hyperactivity. Indeed, McPherson 2018 did not treat this result as an adverse effect. With the large

20  number of statistical comparisons conducted, a few statistically significant results would be expected

21  even in the absence of actual differences, and certainly do not indicate a pattern of adverse effects on

22  cognitive development. Tsuji Decl. ¶ 95, ECF No. 199.

23  142.   In addition to the various neurobehavioral tests, McPherson 2018 also reported on other

24  indicators of exposure and health effects such as body weight; fluoride levels in plasma, urine, brain,

25  and bone; thyroid hormone levels; histopathological examination of key areas of the brain; and general

26  pathological examination of the kidney, liver, heart, and reproductive organs. Tsuji Decl. ¶ 96, ECF

27  No. 199.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

143.   McPherson 2018 found *no* effects in these parameters that were attributed to fluoride exposure. In this respect, McPherson 2018's findings are different from other studies highlighted by Plaintiffs' experts that had less rigorous methods (e.g., no mention of investigator blinding or randomization of groups in testing). Plaintiffs' experts failed to explain why those less rigorous studies are more compelling than the findings from the well-conducted studies in McPherson 2018. Tsuji Decl. ¶ 97, ECF No. 199.

144.   McPherson 2018 observed dental fluorosis in the 20 mg/L dose group, increased levels of fluoride in the rats' brains, and inflammation in the prostate. However, none of these observations is relevant to whether there is a dose-related effect on learning and memory in the animal tests and what that may mean about neurotoxic effects in humans. If anything, it indicates that dental fluorosis is a more sensitive effect than developmental effects on learning and memory. Tsuji Decl. ¶ 98, ECF No. 199; Tsuji Trial Tr. Vol. 4, 687:4–12.

145.   As the most comprehensive and well-conducted study that addresses many of the key data gaps in the literature on the relationship between fluoride exposure and developmental neurotoxicity, the results of McPherson 2018 are therefore the most reliable. Tsuji Decl. ¶ 99, ECF No. 199.

146.   Plaintiffs' experts, Dr. Thiessen and Dr. Grandjean, discounted and largely ignored the NTP's observations in McPherson 2018. *See* Tsuji Decl. ¶¶ 23, 89, 100–11, ECF No. 199. Dr. Thiessen's and Dr. Grandjean's criticisms of McPherson 2018 are unfounded, do not track NTP quality criteria, and are derived from a non-authoritative and biased source. Thiessen Trial Tr. Vol. 4, 542:7–545:21; Tsuji Decl. ¶¶ 100–11, ECF No. 199. McPherson 2018 did not miss a critical period in rat gestation, nor did it use an especially hardy strain or gender of rat. Thiessen Trial Tr. Vol. 4, 542:7–545:21; Tsuji Decl. ¶¶ 100–11.

147.   Instead, Dr. Thiessen and Dr. Grandjean relied on overwhelmingly poor-quality studies on neurotoxicity. Dr. Thiessen's and Dr. Grandjean's critiques thus lack scientific support and rigor and suggest bias in their opinions. *See* Tsuji Decl. ¶¶ 23, 89, 100–11, ECF No. 199.

### c.   Other Recent Animal Toxicological Studies

148.   Twelve developmental neurotoxicity studies have been published since NTP's 2016

systematic review: McPherson 2018 and eleven others. These studies considered effects on learning and memory, although some also considered morphological or neurochemical effects. Tsuji Decl. ¶ 112, ECF No. 199.

149.    Dr. Tsuji conducted a critical analysis of the relevant toxicological literature, including using systematic review methods. Tsuji Decl. ¶ 19, ECF No. 199.

150.    Dr. Tsuji evaluated whether each study met the criteria NTP used to identify studies with a high risk of bias (at least three deficiencies). Among the twelve studies, five would have been included for analysis pursuant to NTP's systematic review methods: McPherson 2018; Bartos 2018; Bartos 2019; Zhou 2019; and Zhu 2017. All of the others had at least three serious deficiencies. Tsuji Decl. ¶ 113, ECF No. 199.

151.    Most studies published after NTP 2016 have similar problems of study quality and control for confounding and bias as identified in NTP 2016. Tsuji Decl. ¶ 21, ECF No. 199. None of the eleven other recent studies was as well-conducted or comprehensive as McPherson 2018. The other studies fall far short of the rigorous methodologies used and reported by NTP in the McPherson 2018 study. The other four studies that did not have a high risk of bias are less reliable and informative than McPherson 2018 in several ways. *Id.* ¶¶ 114–15.

152.    *The overall evidence indicates a lowest-observed-adverse-effect level ("LOAEL") for learning and memory that is likely at rat doses of greater than 20 mg/L of fluoride in drinking water*. The no-observed-adverse-effect level ("NOAEL") is likely at least as high as 20 mg/L of fluoride in drinking water. Exposure duration to fluoride in water after weaning did not appear to affect the outcomes. Tsuji Decl. ¶¶ 116–33 & App. C, ECF No. 199.

153.    Three studies reported an association in neurobehavioral testing at a lower exposure level (Bartos 2018, Bartos 2019, and Cui 2017). But the findings of those studies are inconsistent, and the studies are less reliable. Tsuji Decl. ¶ 117, ECF No. 199. Bartos 2018 and Bartos 2019 have serious limitations for quantifying the dose-response of fluoride exposure and developmental neurotoxicity on learning and memory. *Id.* ¶¶ 121–24. Bartos 2018 and 2019 tested the pups at weaning using the step-down passive avoidance test, a lesser quality, indirect measure for assessing learning and memory.

1    Bartos 2019 repeated the Bartos 2018 study but tested at a younger age and included testing of males in

2    addition to females; however, discrepancies in dose-response occurred. *Id*. ¶ 124. Cui 2017, the third

3    study, was a poor-quality study with inconsistent findings that appear to have been affected by random

4    variation. *Id*. ¶¶ 117, 130–32.

5         154.    Further, both Bartos 2018, 2019, and Cui 2017 had less complete control for litter effects

6    than in McPherson 2018, and did not report dietary fluoride levels. Therefore, comparisons of doses

7    among the recent studies is inexact because McPherson 2018 provided fluoride water concentrations

8    with a custom low fluoride diet (3.24 ppm) and reported that the standard rodent diet in their study had

9    a fluoride concentration of 20.5 ppm. The other recent studies and most previous studies did not report

10   the concentration of fluoride in the diet, which varies. Tsuji Decl. ¶ 117, ECF No. 199.

11        155.    Dr. Thiessen appears to have relied on nearly all of these recent studies for basing her

12   evaluation of neurotoxicity effect levels, but she failed to provide any specific discussion of the quality

13   and reliability of these studies. Tsuji Decl. ¶ 115, ECF No. 199; Tsuji Trial Tr. Vol. 4, 683:9–17. Dr.

14   Thiessen also failed to acknowledge that at high levels of fluoride exposure, the observations in animal

15   studies reflect systemic toxicity, rendering the results uninformative regarding health effects specifically

16   caused by fluoride exposure. Thiessen Trial Tr. Vol. 3, 455:18–464:22; Tsuji Trial Tr. Vol. 5, 747:8–20;

17   Chang Trial Tr. Vo. 5, 893:21–894:11. This further evidences bias in Dr. Thiessen's opinion.

18        156.    Overall, the experimental animal toxicological data on fluoride's effects on learning and

19   memory are poor. As NTP acknowledged in its 2016 systematic review, many of the available

20   developmental toxicology studies are poorly controlled and conducted, used low numbers of animals,

21   often administered unrealistically high doses of fluoride, had signs of internal issues affecting the results,

22   and lacked sufficient description of study details to judge the quality of the data. Tsuji Decl. ¶ 149, ECF

23   No. 199; Tsuji Trial Tr. Vol. 4, 682:20–683:4. Most of the studies published since 2016 had similar

24   deficiencies, with the exception of McPherson 2018. Tsuji Decl. ¶ 150.

25        157.    Several of the studies purporting to observe neurotoxic effects from fluoride, including

26   those on which Dr. Thiessen and Dr. Grandjean relied, were conducted in China. Study reproducibility

27   is particularly a high concern in China, with additional problems regarding study reliability, scientific

28

DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:17-cv-02162 EMC

1  misconduct, and peer review frauds, likely related to emphasis on quantity rather than quality of

2  publications as metrics for awarding promotions and financial rewards to researchers. A number of

3  Chinese studies have been withdrawn from journals because of plagiarism, fabrication, or republishing

4  the same data. Tsuji Decl. ¶ 48, ECF No. 199.

5       158.   The experimental animal study data was of such poor quality that Dr. Tsuji, a toxicologist

6  with 30 years of experience, characterized the extent of bias that NTP identified in its systematic review

7  as "quite unique." Tsuji Trial Tr. Vol. 4, 678:3–5, 683:8. Dr. Thiessen and Dr. Grandjean, by contrast,

8  failed to acknowledge that the data on which they relied had significant deficiencies. *Id.* at 683:9–17.

9       **2.**   **Human Studies**

10       159.   The vast majority of human studies are of very poor quality. Chang Trial Tr. Vol. 5,

11  798:22–800:20. Almost all human studies are cross-sectional in design, which means that exposures and

12  outcomes were assessed at the same time, preventing identification of which one came first. *Id.*; Chang

13  Decl. ¶¶ 121, 126, 149, 165–66, ECF No. 200. Many studies are ecological in design, which means that

14  exposures and outcomes were assessed at the group level, i.e., the average fluoride levels in the area.

15  Chang Trial Tr. Vol. 5, 798:22–800:20. Ecological studies are known to yield spurious associations that

16  are not found at the individual level. *Id.* Almost all studies had poor control for confounding. *Id.*; Chang

17  Decl. ¶ 171. Most studies did not report any information on selection bias. Chang Decl. ¶¶ 160–177.

18  Dr. Chang did not disregard these studies, but assigned them lesser weight in her review of the weight

19  of the scientific evidence. Chang Trial Tr. Vol. 5, 800:21–801:1.

20       160.   Choi 2012, co-authored by Dr. Grandjean, was a meta-analysis of 27 studies in China

21  (25) and India (2) investigating the possibility that fluoride exposure delays neurodevelopment in

22  children. Grandjean Decl. ¶ 75, ECF No. 198-3.

23       161.   The average levels of fluoride in the "exposed populations" in Choi 2012 were often more

24  than 2.5 times higher than the recommended level for community water fluoridation. Chang Decl. ¶ 129,

25  ECF No. 200.

26       162.   The authors of Choi 2012 identified a variety of data quality issues associated with this

27  collection of studies. Grandjean Decl. ¶ 69, ECF No. 198-3. For example, they noted that basic

28

1   information, such as the study subjects' sex and parental education, was missing in 80 percent of the

2   studies, and household income was missing in 93 percent of studies; they acknowledged that they could

3   not therefore control for these co-variables in their analysis. Grandjean Trial Tr. Vol. 2, 280:10–14.

4        163.    Twenty-four of the twenty seven studies considered in Choi 2012 were published in non-

5   MEDLINE journals, which is an indicator of poor quality. Chang Decl. ¶¶ 68, 71, ECF No. 200.

6   MEDLINE is the world's leading biomedical bibliographic database. *Id.* ¶ 66. Scientific journals are

7   selected on merit for indexing in MEDLINE by the U.S. National Library of Medicine. *Id.* ¶ 67.

8        164.    Choi 2012 applied equal weight to each of the twenty-seven studies in calculating the

9   results of the meta-analysis, even though the studies varied widely in their design. For example, the

10  studies used a variety of IQ tests, compared children with a variety of fluoride exposure ranges, did not

11  account for differences in susceptibility to fluoride by age, and used different exposure measures that

12  only delineated between high and low exposure groups. Grandjean Decl. ¶ 77, ECF No. 198-3. In

13  addition, many different measures of fluoride exposure were used across studies, including levels of

14  fluoride in drinking water, observed dental fluorosis, coal burning in houses (i.e., air fluoride levels),

15  and urine fluoride. *Id.* ¶ 75. In some studies, the populations were exposed to long-term coal burning or

16  elevated levels of arsenic in drinking water. Chang Decl. ¶ 129, ECF No. 200.

17       165.    The authors of Choi 2012 were restrained in their conclusions, noting that their results

18  support only the *possibility* of adverse effects of fluoride exposures on children's neurodevelopment and

19  that further research should include more precise individual-level exposures, including prenatal

20  exposures, and should better address potential confounders. Grandjean Trial Tr. Vol. 2, 280:24–281:2.

21       166.    Although there have been a number of studies published since Choi 2012, few studies

22  have addressed the issues identified in Choi 2012. Grandjean Decl. ¶ 80, ECF No. 198-3. The majority

23  of the available studies compare populations with high fluoride exposure to those with lower fluoride

24  exposure (many times in the range of drinking water fluoridation in the United States). *Id.*

25       167.    In most human studies, the studied populations diverge substantially from those in the

26  U.S. in their sociodemographic, geographical, cultural and environmental settings, which minimizes the

27  relevance of the findings from those studies to the U.S. population. Chang Decl. ¶ 161, ECF No. 200.

28

168.     Publication bias and even scientific misconduct are rampant in China, the country originating many of the human studies on which Dr. Grandjean relied. Chang Decl. ¶ 86, ECF No. 200. Thus, the findings of poor-quality Chinese studies may be strongly influenced by publication bias. *Id.* ¶ 89.

169.     Editorial bias is also a concern. Chang Decl. ¶¶ 76–82. Many studies were published in non-MEDLINE journals, including *Fluoride*, which is a biased publication. *Id.*

170.     There were ten published non-ecological studies conducted in Western areas that do not have very high levels of fluoride (non-fluorosis endemic). Chang Decl. ¶182, ECF No. 200. These ten studies are more informative than the rest of the epidemiological studies and methodologically superior as well. *Id.* ¶ 184, ECF No. 200.

171.     Studies are typically discussed with reference to their studied population, so all of the publications on the same population are discussed together. *See* Grandjean Decl. ¶ 136, ECF No. 198-3 (discussing two birth cohort studies—ELEMENT and MIREC).

172.     In epidemiology, a cohort study is a comparison of incidence rates of a specific health outcome between study subjects with various levels of a specific exposure who are observed over time. Undisputed Fact No. 10, ECF No. 150. Prospective birth cohort studies are of relatively high methodological quality. Chang Decl. ¶ 226, ECF No. 200; *see also* Thiessen Decl. ¶ 45, ECF No. 202-1. Nevertheless, "it is possible that studies can be conducted to the highest feasible standards, but there still may be important pieces of bias that remain of concern." Chang Trial Tr. Vol. 5, 622:18–21.

173.     There are four prospective birth cohorts reporting on fluoride exposure and IQ: Christchurch, New Zealand; Dunedin, New Zealand; Mexico City; Canada. It is undisputed that among those four birth cohorts, the Mexico City and Canadian birth cohorts assessed a wider range of potential exposure windows, which makes them more informative. Chang Trial Tr. Vol. 5, 883:10–884:1; Undisputed Fact No. 10, ECF No. 150. However, all four of these prospective birth cohort studies are reliable. Chang Trial Tr. Vol. 5, 883:10–884:1. There is no reason to think that the New Zealand studies are unreliable because they did not account for tea consumption. *Id.* at 805:6–806:14. The Mexico City cohort studies also did not control for tea consumption. *Id.*

174.    Christchurch, New Zealand cohort: Shannon et al. 1986 and Spittle et al. 1998 are two publications on the same cohort of children in Christchurch, New Zealand followed from birth to the age of six or seven years. Chang Decl. ¶ 191, ECF No. 200; Chang Trial Tr. Vol. 5, 801:20–802:18. The outcomes measured were conduct disorder and behavioral problems and IQ. *Id.* The exposures differed between communities with water fluoride concentrations of 1 mg/L, compared with less than 0.1 mg/L in non-fluoridated communities. *Id*. The study found no significant association between fluoride exposure and any of the outcomes. *Id.*

175.    Dunedin, New Zealand cohort: Broadbent et al. 2015 is a publication on the prospective birth cohort in Dunedin, Zealand who were all born the same year and followed from age 3 to age 38. Chang Decl. ¶ 193, ECF No. 200; Chang Trial Tr. Vol. 5, 802:19–803:10. Fluoride exposure was measured in many ways. *Id.* Outcomes were compared between groups based on their residence in an area with community water fluoridation (0.7–1.0 mg/L vs. 0.0–0.3 mg/L in unfluoridated areas); and also individual-level survey responses concerning use of fluoridated toothpaste and use of fluoride tablets. *Id.* IQ was measured at ages 7, 9, 11, 13, and 38 years. There was no statistically significant association between any fluoride exposure measures and child IQ. *Id.* In adults, there was a statistically significant association between community water fluoridation and higher IQ in adults, but no association between the other measures of fluoride exposure and IQ in adults. *Id.*

176.    Boston cross-sectional study: Morgan et al. 1998 is a cross-sectional study of children at a pediatric dental practice. Chang Decl. ¶ 192, ECF No. 200; Chang Trial Tr. Vol. 5, 803:11–22. The study measured fluoride exposure in many ways, including whether the children received infant formula with fluoridated water, used fluoride supplementation, used fluoridated toothpaste, their dental fluorosis score, and their residence in an area with community water fluoridation (at the time, the optimal recommended level was 1 mg/L), which together defined a fluoride exposure index. *Id*. No significant differences were found for any behavioral problems measured in children aged 7–11 years. *Id*.

177.    Canadian cross-sectional study: Barberio et al. 2017 is a publication based on the Canadian Health Measures Study, which is a cross-sectional study of nationally representative children, aged 3 to 12 years, at two times: 2009–2011 and 2012–13. Chang Decl. ¶ 194, ECF No. 200; Chang

1    Trial Tr. Vol. 5, 803:23–15. Fluoride exposure was measured by urinary fluoride levels, which were

2    adjusted for dilution with measurements of specific gravity or creatinine. *Id*. Outcomes were reported in

3    the forms of parent-reported diagnosis of any learning disability, ADHD, or ADD. *Id*. This study found

4    no significant association between any outcome and urinary fluoride levels. *Id*. A borderline statistically

5    significant positive association was found between unadjusted urinary fluoride levels and any learning

6    disability, but that association was non-significant after adjustment for dilution. *Id*.

7        178.    Mexico City cohort study: Bashash et al. 2017, Bashash et al. 2018, and Thomas et al.

8    2018 are publications on a prospective birth cohort in Mexico City (ELEMENT cohort), where salt is

9    fluoridated at 250 ppm, and natural levels of fluoride in drinking water may range from 0.15 to 1.38

10   mg/L. Chang Decl. ¶ 195, ECF No. 200. The ELEMENT cohort was recruited from clinics in Mexico

11   City that serve low-to-moderate income populations. Hu Trial Tr. Vol. 1, 88:4–8. Fluoride exposure was

12   measured by the concentration of fluoride in urine samples of the pregnant women who participated in

13   the cohorts. Hu Trial Tr. Vol. 1, 88:9–22; Chang Decl. ¶ 195, ECF No. 200. Outcomes were measured

14   by the Mental Development Index and the Psychomotor Development Index on the Bayley Scales of

15   Infant Development for 1–3 year olds, composite score on the General Cognitive Index for 4 year olds,

16   IQ score on the Wechsler Abbreviated Scale of Intelligence for 6–12 year olds, and indices of ADHD

17   for 6–12 year olds. Chang Decl. ¶ 195, ECF No. 200. For infants and toddlers, the authors reported a

18   modest negative association on one index of the Bayley Scales, but not the other. *Id*. For 4 year olds and

19   6–12 year olds, the authors also reported modest negative association in general cognitive/IQ scores. *Id*.

20   For 6–12 year olds, the authors reported negative associations for certain indices of ADHD, but non-

21   significant differences in scores for restlessness/impulsivity, hyperactivity, hyperactivity-impulsivity,

22   and attention problems. *Id*.; see also Hu Trial Tr. Vol. 1, 118:9–19.

23       179.    Canada cohort study: Green et al. (2019); Till et al. in review (published following the

24   close of expert discovery in 2020) are all publications on a prospective birth cohort in Canada (MIREC

25   cohort). Chang Decl. ¶ 196, ECF No. 200. The MIREC cohort was recruited from cities across Canada,

26   but unlike Barberio et al. 2017, it is not representative of the Canada population of pregnant women.

27   Lanphear Trial Tr. Vol. 3, 372:24–373:1. Fluoride exposure was estimated by the concentration of

28

1  fluoride in urine samples of the pregnant women who participated in the cohorts, as well as residential

2  postal-code drinking water fluoride levels, surveyed fluoride intake from beverages, and surveyed use

3  of fluoridated water with infant formula. Lanphear Decl. ¶¶ 39, 55–56, ECF No. 198-2; Chang Decl. ¶

4  196, ECF No. 200. Outcomes were measured using the Wechsler Preschool and Primary Scale of

5  Intelligence for children at ages 3–4 years. Chang Decl. ¶ 196, ECF No. 200. There was no statistically

6  significant association in full-scale IQ for boys and girls combined associated with maternal prenatal

7  urinary fluoride, adjusted for dilution. *Id*. There was also no statistically significant association between

8  use of fluoridated water for infant formula and full-scale IQ. Lanphear Trial Tr. Vol. 3, 405:18–406:12.

9  For boys, there was a small, statistically significant negative association in full-scale IQ and maternal

10  prenatal urinary fluoride averaged across all semesters and also when measured at the second trimester,

11  but not the first trimester or the third trimester. There was no statistically significant association in verbal

12  IQ for boys, but there was in performance IQ. *Id*. For girls, there was a small, statistically significant

13  *positive* association in full-scale IQ and maternal urinary fluoride, a small positive association in

14  performance IQ, and a smaller positive association in verbal IQ. For infants, there was no statistically

15  significant relationship between fluoride exposure and full-scale IQ. *Id*. at 405:18–406:12; *see also*

16  Chang Decl. ¶¶ 260–61. There are issues of potential selection bias. In the MIREC cohort study of the

17  potential effects from infant exposure, researchers did not analyze whether the cognitive outcomes in the

18  participants selected for the study were different from the larger MIREC cohort population. Lanphear

19  Trial Tr. Vol 3, 404:19–405:4.

20    180.    Among these ten more relevant studies, the results were inconsistent. Chang Decl. ¶ 208,

21  ECF 200; Chang Trial Tr. Vol. 5, 809:13–810:20. There were some positive associations, some negative

22  associations, and many non-significant associations. *Id.* The negative associations found were not strong.

23  Chang Decl. ¶ 200, ECF No. 200. Biological gradients were so weak that removing a few outliers

24  changed outcomes. *Id.* ¶ 218. The remaining Bradford Hill Guidelines criteria of biological plausibility,

25  coherence, specificity, temporality, experiment, and analogy also do not weigh strongly in favor of

26  determining that there is a true relationship between fluoride exposure and neurodevelopmental harm.

27  *Id.* ¶¶ 220–31.

28

1

#### a.   Consistency

2    181.   Across all of the more recent, relevant Western studies, the results were inconsistent.

3  Chang Decl. ¶¶ 203–09, ECF No. 200; Chang Trial Tr. Vol. 5, 809:13–810:20. No association was found

4  between fluoride exposure and neurodevelopmental outcomes in children in two cohorts, while in two

5  others, some positive, some negative, and some null associations were found. *Id.* In the two cross-

6  sectional studies, no significant association was found between fluoride exposure (urinary fluoride

7  adjusted for dilution in Canada and composite fluoride exposure index in Boston) and

8  neurodevelopmental outcomes. *Id.*

9    182.   Even within the two cohorts for which some negative associations were found, there were

10  inconsistencies. Chang Decl. ¶ 207, ECF No. 200; Chang Trial Tr. Vol. 5, 809:13–810:20.

11    183.   The MIREC study of cognitive effects in young children (Green 2019) observed IQ

12  effects in boys, but not in girls using maternal urinary fluoride as an estimate of exposure. Lanphear

13  Trial Tr. Vol. 3, 393:21–25. The researchers did *not* observe a sex-differential effect in the two other

14  fluoride exposure estimates used in the same study. Lanphear Trial Tr. Vol. 3, 395:3–7.

15    184.   The Green 2019 study also observed a non-significant positive association in IQ in the

16  female offspring. Lanphear Trial Tr. Vol. 3, 394:21–24.

17    185.   Researchers do not know why sex differential effects were observed. Dr. Lanphear is not

18  aware of any other published epidemiological study of fluoride exposure that found similar sex-

19  differential effect on IQ. Lanphear Trial Tr. Vol. 3, 395:8–20. Dr. Lanphear admitted that "the reason

20  for this discrepancy is not currently known." Lanphear Decl. ¶ 48, ECF No. 198-2.

21    186.   In his declaration, Dr. Lanphear cited a single animal study from twenty-five years ago,

22  Mullenix 1995, as support for the possibility that males are more sensitive to prenatal fluoride exposure

23  than females. Lanphear Decl. ¶ 49, ECF No. 198-2; Lanphear Trial Tr. Vol. 3, 395:24–396:24. But he

24  did not claim at trial that this study explains the sex-differential effects in his human epidemiology study.

25  In response to the Court's questioning, Dr. Lanphear testified that it is not known why male rats would

26  be more impacted by fluoride. Lanphear Trial Tr. Vol. 3, 396:20–397:5. Further, Mullenix 1995 tested

27  exposure to fluoride via "bolus" dose, which is a single, large dose injected at once, not consumed over

28

1   time as drinking water would be. Tsuji Trial Tr. Vol. 5, 771:19–772:2, 767:19–22. Though Plaintiffs
2   reviewed more than 100 animal studies, they never identified a single additional study repeating the
3   male-sensitive results of Mullenix 1995. Thiessen Trial Tr. Vol. 7, 1041:2–6. The results of Mullenix
4   1995 were also inconsistent with a more recent study, Bartos 2019. Tsuji Decl. ¶¶ 110–11, ECF No. 199.
5   The Bartos 2019 study is the only other developmental neurotoxicity study of fluoride described in the
6   record that found differential effects by sex. Tsuji Decl. ¶ 111. In Bartos 2019, the dose-related effects
7   were found in *female* offspring, but were inconsistent in *male* offspring, in direct contrast to the Mullenix
8   1995 observations.

9   187.   The ELEMENT cohort studies did not observe divergent results by sex in cognitive
10  testing. Hu Trial Tr. Vol. 1, 105:15–18.

11  188.   When asked why his studies did not find similar effects by sex, Dr. Hu testified that there
12  are "population differences between Canadians and Mexicans," including diet, genetics, and social
13  environment, which could explain why MIREC found sex-differential IQ effects. Hu Trial Tr. Vol. 3,
14  339:17–340:23. Dr. Hu emphasized this discrepancy as a reason why one must "look at the whole range
15  of epidemiologic studies to understand the . . . potential impacts on different populations." Hu Trial Tr.
16  Vol. 3, 340:15–19.

17  189.   Further, in the ELEMENT cohort study of cognitive effects, there were notable
18  thresholds. There was no association between IQ and fluoride exposure below approximately 0.80 mg/L
19  maternal urinary fluoride. Hu Trial Tr. Vol. 1, 105:23–106:1. There was no association between IQ and
20  fluoride exposure below 1.0 mg/L maternal urinary fluoride after performing a sensitivity analysis of
21  children for whom researchers also had contemporaneous urinary fluoride observations. Hu Trial Tr.
22  Vol. 1, 106:2–5, 108:20–25. By contrast, the MIREC cohort study did not observe any apparent threshold
23  in the association between maternal urinary fluoride and IQ. Lanphear Trial Tr. Vol 3, 355:1–3.

24  190.   In the ELEMENT cohort, there was no significant association between blood plasma
25  fluoride concentrations and offspring IQ. Hu Trial Tr. Vol. 1, 103:19–25.

26  191.   The general lack of consistency between and within studies "does not provide persuasive
27  evidence that neurodevelopmental harm is likely to be a hazard of consuming fluoridated drinking water

28

1    in the range of 0.7 mg/L." Chang Decl. ¶ 208, ECF No. 200.

2    **b.    Strength**

3        192.    In the two cohorts for which some negative associations between fluoride exposure and

4    neurodevelopmental outcome were found, those associations were not statistically strong. Chang Decl.

5    ¶ 201, ECF No. 200. Rather, the magnitude of the associations, if any, was relatively small in comparison

6    with normal, expected variation as indicated by average values and standard deviation. *Id*. ¶ 202. The

7    lack of strength weighs against finding that community water fluoridation poses a hazard of

8    neurodevelopmental harm. *Id*.

9    **c.    Biological Gradient**

10        193.    The biological gradient—meaning an indication of a trend of greater severity of an

11   outcome with increasing exposure—was also weak. Chang Decl. ¶ 212, ECF No. 200; Chang Trial Tr.

12   Vol. 5, 810:25–811:2. In the Mexico City birth cohort, just three outliers changed the shape of the curve:

13   with all data points, the curve suggested that ADHD symptoms increased and then decreased, but without

14   the three outliers, there was a linear trend. Chang Decl. ¶ 212; Chang Trial Tr. Vol. 5, 812:20–813:9.

15        194.    In the Canadian cohort, in the graph showing a negative association between maternal

16   urinary fluoride and full-scale IQ in boys, some of the data points appear to be outliers as defined by the

17   Mexico City method. Chang Trial Tr. Vol. 5, 814:4–815:11; Chang Decl. ¶ 215, ECF No. 200. Including

18   these outliers, as the authors did, would have exaggerated the association. *Id*. The Canadian cohort

19   authors did not present their data on full-scale IQ and maternal urinary fluoride with and without outliers

20   in the Mexico City method, even though presenting data with and without outliers is common in

21   scientific publications. *Id*. The Canadian cohort authors also did not provide their raw data, so it cannot

22   be confirmed that removing the data points would eliminate the negative association, but removing the

23   two highly negative IQ data points would have flattened the trend line. *Id*.

24        195.    In their publication on fluoride exposure in formula-fed infants and neurodevelopmental

25   outcome in the Canadian cohort, the authors did present their data with and without outliers, and

26   removing just two outliers eliminated the statistically significant negative association found between

27   fluoride exposure and full-scale IQ. Lanphear Trial Tr. Vol. 3, 405:18–406:12.

28

196. Overall, the evidence on a potential biological gradient also does not support finding that community water fluoridation poses a hazard of neurodevelopmental harm, as documented in NTP's and Dr. Tsuji's systematic reviews. Chang Decl. ¶ 218, ECF No. 200.

### d. Biological Plausibility

197. The lack of evidence on biological plausibility, as explained in the section on animal data, also does not support finding that community water fluoridation poses a hazard of neurodevelopmental harm. Chang Decl. ¶ 221, ECF No. 200.

### e. Other Factors

198. The Bradford Hill Guidelines, which Dr. Hu emphasized as important for policy making, Hu Trial Tr. Vol. 3, 340:20–23, also require considering coherence, specificity, temporality, experiment, and analogy, none of which support finding that community water fluoridation poses a hazard of neurodevelopmental harm. Chang Decl. ¶¶ 223–231, ECF No. 200.

### f. No Hazard

199. No study alone or in combination, including the Canadian and Mexico City cohort studies, is sufficient evidence to conclude that community water fluoridation poses a hazard of neurodevelopmental harm. Chang Trial Tr. Vol. 6, 914:19–917:1, 919:9–920:1; *see also* 1998 Guidelines, at 56, Trial Ex. 17 (explaining that in some cases, "it may be that no individual study is judged sufficient to establish a hazard," based on the total available data).

200. All observational epidemiological studies have limitations, and no independent health agency has ever found causation on the basis of two observational epidemiological studies, regardless of the quality of those studies. Chang Trial Tr. Vol. 6, 915:2–4, 924:8–20.

### B. Dose-Response Assessment

201. *If* a hazard is identified, the next component of risk assessment requires a dose-response assessment to identify a toxicity value for the purpose of calculating a reference dose (RfD) considered protective of human health. Thayer Trial Tr. Vol. 4, 647:10–15.

202. For neurotoxic hazards, it is assumed that individuals have a reserve capacity to adapt to an environmental stressor before exposure results in manifestations of adversity. Thayer Trial Tr. Vol.

1    4, 648:10–17; 1998 Guidelines, at 9, Trial Ex. 17. Thus, the individual threshold hypothesis holds that a

2    range of exposures from zero to some finite value can be tolerated by the organism with essentially no

3    chance of expression of the toxic effect. *Id*.

4    203.    An RfD is an estimate of a daily oral or dermal exposure to the human population

5    (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects

6    during a lifetime. The RfD becomes an input for characterizing risk in subsequent components of the

7    risk assessment and as a factor in risk management. Thayer Trial Tr. Vol. 4, 647:16–18.

8    204.    The dose-response assessment begins by identifying a critical study demonstrating the

9    toxic effect of concern. Thus, the dose-response assessment carries forward the confidence estimates

10   from the hazard identification conclusions including the quality, consistency, relevancy, coherence,

11   biological plausibility, assumptions, and uncertainty. Thayer Trial Tr. Vol. 4, 648:4–7; Henry Decl. ¶¶

12   115, 118, ECF No. 201.

13   205.    Once the critical study has been identified and critically assessed, a point of departure, or

14   POD, is defined by the point on the dose-response curve generally corresponding to an estimated effect

15   level. Thayer Trial Tr. Vol. 4, 650:11–14.

16   206.    There are two basic methods for identifying a POD: (1) the benchmark dose (BMD)

17   analysis approach; or the (2) no observed effect level ("NOAEL") or lowest observed effect level

18   ("LOAEL") approach. Thayer Trial Tr. Vol. 4, 650:18–24. The BMD approach has distinct advantages

19   over the NOAEL approach in that the modeled benchmark dose reflects the shape of the dose-response

20   curve and is less affected by the choice of experimental concentrations. The benchmark dose approach

21   is the preferred method by EPA, but requires a robust data set that may not always be available. Thayer

22   Trial Tr. Vol. 4, 652:10–13. In those cases EPA uses the NOAEL or LOAEL approach. *Id*.

23   207.    The benchmark dose is a numerical estimate, which means it has a lower confidence limit

24   and an upper confidence limit to bind it. Thayer Trial Tr. Vol. 4, 651:19–25. The benchmark dose lower

25   confidence limit, or BMDL, is typically chosen as the POD. *Id*.

26   208.    A NOAEL is the highest administered dose at which no significant adverse effects are

27   observed. Thayer Trial Tr. Vol. 4, 653:25–654:11. A LOAEL is the lowest administered dose at which

28

significant adverse effects are observed. Thayer Trial Tr. Vol. 4, 654:12–14. In circumstances where the expert judgment determines that application of the NOAEL or LOAEL approach is appropriate, EPA would prefer to have a NOEAL, but it is possible that in a given experimental study, that there is no dose level at which no observed effects were observed. Thayer Trial Tr. Vol. 4, 654:25–655:4.

209.    Once the point of departure is established, it marks the beginning of extrapolation to a reference dose ("RfD"). Thayer Trial Tr. Vol. 4, 650:11–14. RfD values are calculated by dividing the POD with corresponding uncertainty factors, although application of uncertainty factors to the POD may not always be appropriate. Tsuji Decl. ¶¶ 143–47, ECF No. 199.

210.    Uncertainty factors are used to take into account the following uncertainties in the extrapolation procedure: (1) inter- individual or intraspecies variability; (2) interspecies extrapolation; (3) sub-chronic to chronic exposure; (4) LOAEL to NOAEL; and (5) incomplete characterization of the chemical's toxicity. Henry Decl. ¶ 163, ECF No. 201; Thayer Trial Tr. Vol. 4, 655:24–656:12. While each of these uncertainty factors are considered, the numeric value applied could be one, which has no functional significance on the dose level. Thayer Trial Tr. Vol. 4, 656:13–17.

211.    Though the intraspecies uncertainty factor addresses the uncertainty of the effects in more susceptible subpopulations, reference doses do not need to be set to protect hypersensitive individuals. Thiessen Trial Tr. Vol. 4, 549:16–20.

### 3.    Dr. Grandjean's BMD Approach

#### a.    Uncertainty in Urinary Fluoride Measures

212.    The urinary fluoride measure of exposure is particularly problematic for assessing dose-response and calculating a BMD. Urinary fluoride is not an indicator of long-term fluoride exposure. Chang Trial Tr. Vol. 5, 807:19–808:21. Rather, the World Health Organization classified urinary fluoride as an indicator of short-term exposure. *Id.*

213.    Various factors can affect the concentration of fluoride in a urine sample, such as an individual's metabolism, when a urine sample is collected, and the time since the last void of the individual who provided the sample. Undisputed Fact No. 8, ECF No. 150.

214.    Mothers were not asked to fast before providing urine samples in the MIREC and

1    ELEMENT cohort studies. Hu Trial Tr. Vol. 1, 89:19–22, Lanphear Trial Tr. Vol. 3, 375:15–17. The

2    absence of a fasting requirement can introduce variability and make urinary fluoride measurements less

3    precise. Hu Trial Tr. Vol. 1, 89:23–90:4.

4        215.    Further, in the ELEMENT cohort, very few participants provided urine samples for all

5    three trimesters. Most participants provided only one urine sample. Hu Trial Tr. Vol. 1, 104:23–105:5,

6    111:3–6.

7        216.    The lead researcher from the ELEMENT cohort studies, Dr. Howard Hu, testified that a

8    single urine sample may represent what was happening around the time that the sample was provided

9    and not necessarily a complete representation of fluoride exposures across an entire pregnancy. Hu Trial

10   Tr. Vol. 1, 111:15–21, 114:4–9, 114:24–115:6. Dr. Hu further testified that a study that collects measures

11   from each trimester gives a more complete representation of fluoride exposures across a pregnancy. *Id.*

12   at 111:15–21; 114:4–9.

13       217.    And the lead researcher from the MIREC cohort studies, Dr. Bruce Lanphear, testified

14   that it is generally true that the more of any biomarker one can obtain, the more accurate the exposure

15   measurement. Lanphear Trial Tr. Vol. 3, 373:16–19. Dr. Lanphear further testified that the intake of high

16   fluoride foods immediately before providing a sample can influence the concentration of fluoride in the

17   sample. *Id.* at 375:11–14. In the MIREC cohort, community water fluoridation explained only 22–24%

18   of the variance in maternal urinary fluoride concentration, which confirms that there is no

19   straightforward conversion between urinary fluoride and drinking water fluoride concentrations. Chang

20   Decl. ¶ 246, ECF No. 200.

21       218.    Controlling for dilution by controlling for creatinine concentration is problematic

22   because creatinine excretion is affected by age, sex, race/ethnicity, body size and surface area, diabetes,

23   kidney function, pregnancy, diet, and other factors. Chang Decl. ¶ 254, ECF No. 200; Hu Trial Tr. Vol.

24   1, 99:7–10 (testifying that creatinine excretion can be confounded by "muscularity, physical activity,

25   urine flow, time of day, diet and other health issues"). An apparent association between higher maternal

26   prenatal creatinine-adjusted urinary fluoride concentration and lower child IQ could be due to an

27   underlying association between lower plasma volume expansion or poorer maternal kidney function and

1    adverse neurodevelopmental outcomes. Chang Decl. ¶ 254, ECF No. 200.

2        219.    Further, the ELEMENT cohort studies cite the creatinine adjustment methodology

3    prescribed by the World Health Organization ("WHO") methodology but in fact the methodology

4    actually employed in the ELEMENT cohort studies varied from the WHO methodology. Hu Trial Tr.

5    Vol. 1, 98:16–19. THE ELEMENT cohort study's creatinine adjustment methodology was novel in that

6    the researchers did not rely on another study that used the same variation from the WHO methodology.

7    *Id.* at 98:24–99:2.

8        220.    The novel creatinine adjustment methodology that the ELEMENT researchers chose was

9    critical to their finding statistically significant associations between urinary fluoride values and cognitive

10   outcomes. The graduate thesis that analyzed the same maternal urinary fluoride data from the same

11   cohort population (without applying the novel creatinine adjustment methodology) did *not* find

12   statistically significant associations between fluoride concentration and offspring IQ. Hu Trial Tr. Vol.

13   1, 102:22–103:18. Notably, the graduate thesis also did *not* observe a statistically significant association

14   between fluoride levels in maternal plasma samples and offspring cognitive test scores at ages one, two,

15   and three. *Id.* at 103:19–25.

16       221.    The existing uncertainty and variability in using urinary fluoride as a measure of exposure

17   must be carried forward to risk characterization. *See* Henry Decl. ¶¶ 115, 165, ECF No. 201 (explaining

18   that uncertainty carries forward to each subsequent component in the risk evaluation).

19           **b.        Uncertainty in the Linear Dose-Response Assumption**

20       222.    Dr. Grandjean offered two BMD calculations prepared in anticipation of this litigation:

21   the first was based on Bashash 2017 (ELEMENT cohort study) and the second was based on Green 2019

22   (MIREC cohort study). Grandjean Trial Tr. Vol. 2, 239:20–240:4.

23       223.    A benchmark dose level is calculated by applying a variety of mathematical models to a

24   given dose-response curve, and then evaluating those models for goodness of fit. Thayer Trial Tr. Vol.

25   4, 652:5–9. Evaluating for "goodness of fit" is the process of determining which model is the "best fit"

26   for the observed data prior to a specific model being selected from a BMD analysis. *Id.* at 652:20–653:2.

27       224.    EPA's *Benchmark Dose Technical Guidance* outlines a number of issues that need to be

28

1  addressed to support consistent application of the BMD approach for regulatory decision-making,

2  including transparency thorough justification of the choices made to support the toxicological values.

3  Henry Decl. ¶ 130–133, ECF No. 201. It is long-standing EPA practice for BMD analyses to include the

4  model fit criteria in its dose-response analyses, including all draft risk evaluations pursuant to amended

5  TSCA. *Id.* ¶ 134–135.

6      225.  Evaluating models for goodness of fit generally requires access to the raw observational

7  data. Grandjean Trial Tr. Vol. 2, 258:3–259:2; *see also id.* at 242:11–25, 258:12–15. Because Dr.

8  Grandjean did not have access to the raw data used for his BMD analysis, he was unable to evaluate his

9  models for goodness of fit. *Id.* at 258:3–259:2; *see also id.* at 180:15–19. Although use of the raw data

10  is more accurate, Dr. Grandjean attempted to compensate for the lack of raw data in two different ways.

11      226.  First, to calculate BMD values based on the individual adjusted GCI results from the

12  ELEMENT study, Dr. Budtz-Jorgensen digitized the authors' calculated values by scanning a figure

13  from the published paper. Grandjean Trial Tr. Vol. 2, 178:1–179:8; *see also id.* at 232:15–22 (explaining

14  that Dr. Budtz-Jorgensen digitized the published data). Of the original observations, the software

15  provided one fewer observation point than was reported in the published paper. *Id.* at 178:1–179:8. Dr.

16  Grandjean first suggested that the lacking observation point was *probably* due to overlapping

17  observations. Dr. Grandjean later clarified that the lacking observation point could indicate that the

18  observations were "not exactly linear or some other *minor* uncertainty." *Id.* at 182:3–13. However,

19  because Dr. Grandjean's BMD approach assumed a linear dependency, his inability to evaluate such an

20  assumption for goodness of fit adds significant uncertainty to the reliability of his BMD values. *Id.*

21      227.  Second, to calculate BMD values based on observed school-age IQ results from the

22  ELEMENT cohort studies and observed data report in the MIREC cohort studies, Dr. Grandjean relied

23  on the reported regression coefficients and standard deviations reported in the published studies.

24  Grandjean Decl. ¶ 141, ECF No. 198-3; Grandjean Trial Tr. Vol. 2, 183:20–184:7; *see also id.* at 182:3–

25  6 (explaining that he could not digitized the published data reporting school-age IQ results from the

26  ELEMENT study).

27      228.  The formal collaboration necessary to test a linear dose-response assumption is pending.

28

Grandjean Trial Tr. Vol. 2, 177:16–20 ("And I think we should—and it has already been agreed with Hu and Dr. Lanphear. We [will] [sic] do a joint study where we rely on the raw data from both, both studies, and *calculate the real benchmark dose levels* in accordance with EPA's recommendation." (emphasis added)); *id.* at 179:22–180:2 ("We have the permission from the Mexican study and the—at least we have an indication from the MIREC colleagues that if we want to pursue this, they are willing to help and they will—will recommend that we get the permission. But you can understand this is kind of complicated, so we haven't done it yet."); *id.* at 258:24–259:2 ("[W]e plan to, you know, generate those data so that everybody can be content that EPA's recommendation of the linear dose-response curve is appropriate.").

### c.   Benchmark Response

229.   The BMD approach starts with identifying a benchmark response (BMR), which is a predetermined change in response rate of an adverse effect. Grandjean Decl. ¶ 131, ECF No. 198-3. Dr. Grandjean set the BMR at the loss of one IQ point. Thus, his BMD value is a mathematical estimate of the point at which a one-point-IQ loss intersects with the dose-response curves reported in the MIREC and ELEMENT studies. Thayer Trial Tr. Vol. 4, 651:16–18.

230.   For the specific context of informing risk management options under TSCA section 6(a), selection of a BMR is a policy decision. For example, in the context of setting an MCLG for perchlorate, EPA made a policy decision to evaluate the level of perchlorate in water associated with a one-, two-, and three-point decrease in IQ. 84 Fed. Reg. 30,524, 30,536 (June 26, 2019), Trial Ex. 43. EPA then proposed in the rulemaking a two-IQ-point decrement in the population distribution of IQ for the sensitive population. *Id.* EPA specifically noted that it was not establishing a precedent for future actions on other contaminants, either under the Safe Drinking Water Act or any other statutory frameworks. *Id.*

231.   Dr. Grandjean's main rationale for selection of BMR of one was extrapolated from a recommendation to EPA by the Clean Air Scientific Advisory Committee ("CASAC") in the context of setting the target degree of protection from air-related IQ loss for use with the air quality criteria and national ambient air quality standards ("NAAQS") for lead under the Clean Air Act. Grandjean Decl. ¶ 132, ECF No. 198-3; 73 Fed. Reg. 66,964, 67,000 (Nov. 12, 2008), Trial Ex. 42.

232.     EPA specifically noted that it agreed with recommendations from the CASAC agreement that a magnitude on the order of one or two points should be considered as the target degree of protection from air-related IQ loss but that, in so doing, it was not establishing a quantitative public health policy goal in terms of an air-related IQ loss that is acceptable or unacceptable in the United States. 73 Fed. Reg. at 67,000, Trial Ex. 42. In the context of setting NAAQS for lead, EPA made a policy decision to select two IQ points in conjunction with the specific air-related IQ loss evidence-based framework in selecting an appropriate level for the standard. *Id.* at 67,005.

233.     In developing its rationale in setting the 2008 NAAQS for lead, EPA drew upon a body of evidence on human health effects associated with lead exposure of some 6,000 studies. 73 Fed. Reg. at 66,970, Trial Ex. 42. This body of evidence addressed a broad range of health endpoints associated with exposure to lead and included hundreds of epidemiologic studies conducted in the United States, Canada, and many countries around the world. *Id*. Among the broad range of health endpoints associated with lead exposures, there is general consensus among scientists that developmental neurotoxicity is among the, if not the, most sensitive endpoint. *Id.* at 66,976. EPA determined that the most compelling evidence of a dose at which lead effects IQ came from a 2005 international pooled analysis of *seven* prospective cohort studies, co-authored by Dr. Lanphear. *Id.* at 66,977; Lanphear Trial Tr. Vol. 3, 344:21–345:1, 410:24–411:3.

234.     Thus, EPA's policy decision to select 2 IQ points in conjunction with the specific air-related IQ loss was steeped in an evidence-based framework with a robust measure of exposure (i.e., blood), a very large data base of decades of studies, datasets that reflect specific U.S. population groups, a rigorous dose-response analyses conducted using a variety of models and repeated peer review, and well described variability and uncertainty. Henry Decl. ¶ 139, ECF No. 201.

235.     This contrasts sharply with a urine-fluoride IQ relationship, based on uncertain and variable data and a limited understanding of effects in Western populations, *supra* ¶¶ 184–194, and the high variability of urinary fluoride measurements, *supra* ¶¶ 216–225. Thus, Dr. Grandjean's rationale for his selection of a BMR is not well founded.

236.     Because there was uncertainty and variability that carried forward from the hazard

1    identification, uncertainty created by the lack of raw data and in the assumptions used in calculating

2    BMD values, and a failure to provide a range of BMRs for regulatory decision making, Dr. Grandjean's

3    BMD analysis cannot be relied on to support a finding of unreasonable risk or to inform or support a risk

4    management rulemaking under TSCA section 6(a). Henry Decl. ¶ 143, ECF No. 201.

5                        **2.        Dr. Thiessen's NOAEL/LOAEL Approach**

6          237.    Dr. Thiessen conceded that animal data are not the preferred source for identifying a POD

7    and has opined that recent human epidemiological studies concerning fluoride are sufficient to establish

8    a POD for fluoride neurotoxicity. Thiessen Trial Tr. Vol. 3, 487:3-5. Notwithstanding her testimony,

9    Dr. Thiessen' dose-response analysis used POD values derived from animal studies. Thiessen Decl. ¶

10   144, tbl. 2, ECF No. 202-1.

11         238.    In theory, one could use any study that claims to have found an effect, no matter how

12   poorly conducted, to derive a point of departure. Thiessen Trial Tr. Vol. 4, 527:16–22. However, it is

13   undisputed that if a study is unreliable, then points of departure based on that study are also unreliable.

14   *Id.* at 540:22–541:1.

15         239.    The developmental studies that NTP 2016 reviewed provide a poor scientific basis for

16   identifying points of departure for deriving toxicity reference doses in risk assessment of developmental

17   neurotoxicity of cognitive effects. Tsuji Decl. ¶ 69, ECF No. 199. NTP 2016 thus correctly found that

18   the data it reviewed were insufficient to have confidence in the magnitude of effects or points of

19   departure for developing toxicity reference values for risk assessment. *Id*. Dr. Tsuji's systematic review

20   of studies published since NTP 2016 resulted in the same conclusion. Tsuji Trial Tr. Vol. 4, 688:2–12,

21   688:22–689:12.

22         240.    Despite the poor quality of the animal studies, Dr. Thiessen selected ten animal studies

23   to attempt to calculate margins of exposure (as well as reference doses, which are calculated using the

24   same factors in a different order). Thiessen Decl. tbl. 2, ECF No. 201-1.

25         241.    Dr. Thiessen used animal studies that did not blind investigators as to outcome

26   assessment, Thiessen Decl. ¶ 203, ECF No. 201-1, even though it is best practice to blind investigators

27   as to outcome assessment, Thiessen Trial Tr. Vol. 4, 529:11–14, and even though the National

28

1    Toxicology Program considers studies that do not report blinding as to outcome assessment to be highly

2    susceptible to bias. NTP 2016, at 8, Trial Ex. 553.

3         242.    Dr. Thiessen also used animal studies that did not randomize animals to treatment groups,

4    Thiessen Trial Tr. Vol. 4, 531:14–533:11, even though the National Toxicology Program considers

5    studies that do not report randomization to treatment group to be highly susceptible to bias. NTP 2016,

6    at 8, Trial Ex. 553.

7         243.    Seven of the ten animal studies that Dr. Thiessen used did not control for litter effects,

8    which is considered a significant flaw in developmental studies. Thiessen Trial Tr. Vol. 4, 533:23–19;

9    Thiessen Decl. ¶ 122, ECF No. 202-1; Thayer Trial Tr. Vol 3, 453:10–454:1, 637:5–21; NTP 2016, at

10   8–9, Trial Ex. 553.

11        244.    Two of the remaining studies were authored by Bartos et al. Both of those studies used

12   the step-down passive avoidance test, a lesser quality, indirect measure for assessing learning and

13   memory. Tsuji Decl. ¶ 117, ECF No. 199. One of the studies, Bartos 2019, did not show a linear dose-

14   response trend in the male animals. Tsuji Decl. ¶ 124, ECF No. 199.

15        245.    When the Court asked Dr. Thiessen about an inconsistency in the results observed in

16   Bartos 2019 (no adverse effect observed in male rats), Dr. Thiessen was unable to provide any

17   explanation. Thiessen Trial Tr. Vol. 4, 536:25–537:25, 538:2–4 ("These, apparently, contradictory

18   effects are seen sometimes, and I apologize that I cannot give you a proper explanation at this moment.").

19   Dr. Tsuji explained how the inconsistency calls into question the results of other poor-quality animal

20   studies of the effects of fluoride exposure. Tsuji Trial Tr. Vol. 4, 690:6–24.

21        246.    The only animal study that does not exhibit flaws identified in the systematic reviews by

22   the NTP and also Dr. Tsuji is McPherson 2018. In McPherson 2018, the highest exposure level was 20

23   mg/L and no adverse effects were observed at that level. Thiessen Decl. ¶¶ 97–98, ECF No. 202-1.

24        247.    Thus, the overall evidence from recent developmental neurotoxicity studies indicates a

25   NOAEL for learning and memory that is likely greater than 20 mg/L of fluoride in rat drinking water.

26   Tsuji Decl. ¶¶ 116–134 & App. C, ECF No. 199.

27        248.    Dr. Thiessen inappropriately applied an uncertainty factor of ten (the highest default

28

value) for intraspecies variability to all subpopulations, even though this uncertainty factor is meant to account for variable susceptibility within the human population. Thiessen Decl. ¶ 132, ECF No. 202-1. Though Dr. Thiessen claimed that she looked at the most sensitive effect of fluoride, Thiessen Trial Tr. Vol. 4, 548:19–23, and that she based her calculations on exposure rates of susceptible subpopulations, *id.* at 549:5–7, she uniformly used the default intraspecies uncertainty factor of ten for all subpopulations. Thiessen Trial Tr. Vol. 4, 549:16–20. Dr. Thiessen attempted to sidestep her lack of analysis in her declaration by claiming that "if there are no chemical-specific data on toxicokinetics and toxicodynamics," EPA uses this default factor for intraspecies variability. Thiessen Decl. ¶ 135, ECF No. 202-1. However, at trial, Dr. Thiessen admitted that there was well-established data specific to fluoride on toxicokinetics and toxicodynamics, including blood-brain barrier movement and lack of metabolization. Thiessen Trial Tr. Vol. 4, 549:8–15; *see also* Grandjean Decl. ¶¶ 47–48, ECF No. 198-3. The 1998 Guidelines require the consideration of "relevant" information when adjusting uncertainty factors and never use the term "convincing" evidence. 1998 Guidelines, at 59, Trial Ex. 17. Dr. Thiessen never explained why, in light of this well-established information, she did not vary from the default factor. To the contrary, she agreed that human susceptibility is not as variable for fluoride as it is for other chemicals. Thiessen Trial Tr. Vol. 4, 550:13–17.

249.    Dr. Thiessen also used the default interspecies uncertainty factor of three for allometric scaling. Thiessen Decl. ¶ 139, ECF No. 202-1. However, Dr. Thiessen agreed that humans and animals are similar in that neither breaks down fluoride into metabolites. Thiessen Trial Tr. Vol. 4, 549:8–15. Given this similarity, a smaller interspecies uncertainty factor may have been more appropriate. Tsuji Decl. ¶ 145, ECF No. 199; *see also* EPA, Draft Risk Evaluation for N-Methylpyrrolidone (Oct. 2019), Trial Ex. 49 (EPA considers metabolization in calculating interspecies uncertainty factors). Dr. Thiessen never accounted for this similarity in selecting the interspecies uncertainty factor.

250.    Dr. Thiessen failed to use the best available scientific methodology (BMD analysis) and, based on her own concession that the available animal data would not be the preferred source for identifying a POD, Dr. Thiessen's dose-response analysis cannot be relied on to support a finding of unreasonable risk or to inform or support a risk management rulemaking under TSCA section 6(a). Henry

53

1    Decl. ¶ 125, ECF No. 201.

2        **C.    Exposure Assessment**

3        251.    Consistent with the NRC's risk assessment paradigm, and as described in TSCA section

4    6(b)(4)(F)(iv), the third component of risk evaluation requires an exposure assessment for the chemical

5    substance under the conditions of use. Exposure assessment is the process of estimating or measuring

6    the magnitude, frequency, and duration of exposure to an agent and the size and characteristics of the

7    population exposed. 15 U.S.C. § 2605(b)(4)(F)(iv); Henry Decl. ¶ 144, ECF No. 201.

8        252.    Pursuant to TSCA section 6(b)(4)(F)(i),(v), a weight of the scientific evidence approach

9    must be implemented to evaluate hazard and exposure data. 15 U.S.C. § 2605(b)(4)(F)(i),(v); Henry

10   Trial Tr. Vol. 6, 945:22–946:18; *see also supra* ¶ 71. Neither Dr. Thiessen nor Dr. Grandjean conducted

11   a systematic review to properly identify, integrate, and assess the available dataset for fluoride exposure.

12   S*ee supra* ¶ 71–73 (explaining that integrating systematic review into the TSCA risk evaluations is

13   critical to meet the statutory requirements of TSCA).

14       **3.    Dr. Thiessen's Exposure Methodology**

15       253.    Dr. Thiessen did not conduct an exposure assessment that was fit for the purpose of a

16   TSCA risk evaluation. Thiessen Trial Tr. Vol. 4, 553:6–14.

17       254.    Dr. Thiessen did not conduct a systematic review for her exposure assessment. Thiessen

18   Decl. ¶ 150, ECF No. 202-1.

19       255.    Instead, Dr. Thiessen selected values for drinking water consumption largely from NRC

20   2006, without providing any justification for her selection of those values, and multiplied by the

21   recommended concentration of fluoride in artificially fluoridated water in the United States—0.7 mg/L.

22   Thiessen Decl. ¶ 148, ECF No. 202-1.

23       256.    After the close of expert discovery, Plaintiffs' counsel informed Dr. Thiessen of a 2019

24   EPA report that was published and available during expert discovery. Thiessen Trial Tr. Vol. 4, 552:17–

25   553:4. In response to this information, Dr. Thiessen subsequently used values from that report, again

26   without providing any justification for her selection of those values. *Id.* at 552:17–553:4.

27       257.    The 2019 EPA Handbook report sets forth short-term survey data collected over two days

28

to calculate exposure rates of long-term consumption. Thiessen Decl. ¶ 156, ECF No. 202-1.

258.    The 2019 EPA Handbook states that it does not supersede standard or guidance established by EPA or other risk assessment organizations outside EPA and that risk assessors should consider how to use the data and recommendations in the report, which should be considered on a situation-specific basis. EPA, Exposure Factors Handbook 1-3 to 1-4, Trial Ex. 25.

259.    The 2019 EPA Handbook warns against using upper-percentile short-term rates to represent long-term consumption. Update for Chapter 3 of the Exposure Factors Handbook 3-2, Trial Ex. 26.

260.    Nevertheless, Dr. Thiessen used the upper-percentile short-term rates to estimate long-term consumption. Thiessen Decl. ¶ 152, ECF No. 202-1.

261.    Dr. Thiessen used upper-percentile values, even when they were not statistically reliable. Thiessen Trial Tr. Vol. 4, 554:6–10; Thiessen Decl. ¶ 152, ECF No. 202-1.

262.    Specifically, Dr. Thiessen used 95th percentile values for bottle-fed infants from the 2019 report, which are identified as statistically less reliable due to their small sample size. Thiessen Decl. ¶ 152, ECF No. 202-1; Update for Chapter 3 of the Exposure Factors Handbook 3-4, Trial Ex. 26.

263.    In addition to statistical unreliability, there are problems with using short-term survey data to calculate exposure rates specific to infants. Because infants grow as they drink, their body weight gains, and their consumption rate per body weight decreases. Tsuji Trial Tr. Vol. 5, 718:13–719:4; Tsuji Decl. ¶ 41, ECF No. 199. Thus, policymakers tend not to use 95th percentile short-term surveyed rates to estimate long-term exposure. Tsuji Trial Tr. Vol. 5, 718:13–719:4. Dr. Thiessen also used the "consumers-only" data to estimate exposure, including only the consumption of people who reported drinking tap water on the survey days, even though not everyone drinks tap water every day. Tsuji Decl. ¶ 41, ECF No. 199.

264.    The same 2019 Handbook given to Dr. Thiessen by Plaintiffs' counsel also includes "per capita" consumption rates, which are lower, and often substantially lower than the consumer-only data that she used. Update for Chapter 3 of the Exposure Factors Handbook 3-4, Trial Ex. 26.

265.    The 2019 Handbook also recommends that "mean or median ingestion values" from

1   short-term data may be suitable represent long-term consumption, but not higher values. Update for

2   Chapter 3 of the Exposure Factors Handbook 3-4, Trial Ex. 26.

3       266.    Dr. Thiessen often cites exposure rates of bottle-fed infants even though she believes that

4   there is only one study to have measured fluoride exposure to bottle-fed infants and neurodevelopmental

5   outcome—Till et al. 2020 on the Canadian cohort—but that study found no statistically significant

6   association with full-scale IQ. Thiessen Decl. ¶¶ 178–79, ECF No. 202-1.

7       267.    In fact, the Boston cross-sectional study (Morgan et al. 1998) also accounted for exposure

8   through the use of infant formula mixed with fluoridated water, and that study did not find any significant

9   differences in behavior problems between exposure groups. Chang Decl. ¶ 192, ECF No. 200.

10      268.    Additionally, the Dunedin, New Zealand study accounted for exposure by residence in

11  fluoridated areas at various times, including the birth of the children studied, which would have also

12  been indicative of the exposure of the mothers during pregnancy, assuming that they did not move during

13  their pregnancy before giving birth. Chang Trial Tr. Vol. 5, 802:19–805:6, 807:8–11. That study also

14  found no significant association between any measure of fluoride exposure and cognitive outcome. *Id.*

15  at 802:19–805:6. The study found that breastfed infants had a higher IQ than bottle-fed infants, even

16  though fluoride exposure did not vary between the two. *Id.* at 804:23–805:5.

17      269.    Of the more informative Western human studies, only the ones on the Canada and Mexico

18  City cohorts found statistically significant negative associations for certain subsets of maternal fluoride

19  exposure during pregnancy and cognitive outcome in children, but not bottle-fed infants. Chang Decl. ¶

20  206.

21      270.    Despite her reliance on the Canada and Mexico City cohort studies for risk determination,

22  Dr. Thiessen did not calculate exposures for pregnant women. Thiessen Trial Tr. Vol. 4, 551:17–24.

23      271.    Dr. Thiessen admitted that the exposure rates of pregnant women would be similar to

24  exposure rates of adult women. Thiessen Trial Tr. Vol. 4, 551:17–24. Exposure rates of adults are much

25  lower per kilogram of body weight than those of bottle-fed infants. Thiessen Decl. ¶ 167, ECF No. 202-

26  1.

27      272.    Dr. Grandjean did not conduct an exposure assessment. Henry Decl. ¶¶ 155–58, ECF No.

28

201. Rather, Dr. Grandjean estimated risk by comparing his calculated toxicity values directly to the maternal urine-fluoride concentrations in fluoridated areas of Canada. *See infra* ¶¶ 284–297.

### D.   Risk Characterization

273.   As described in the 1998 Guidelines, risk characterization is an integrative analysis and a summary intended to communicate the results of the risk assessment to the risk manager in a complete, informative, and useful format. *See* 1998 Guidelines, at 61, Trial Ex. 17. This analysis includes integration of the hazard identification and dose-response analysis with the human exposure estimates and provides an evaluation of the overall quality of the assessment and *the degree of confidence* in the estimates of risk and conclusions drawn. *Id.*

274.   The risk-characterization analysis should draw from the key points in each individual component part—hazard identification, dose-response analysis, and exposure assessment. *See* 1998 Guidelines, at 63, Trial Ex. 17. "A health risk assessment is only as good as its component parts" and "[c]onfidence in the results of a risk assessment is thus a function of confidence in the results of the analysis of these elements." *Id.*

275.   In conducting TSCA risk evaluations, EPA generally uses the Margin-of-Exposure (MOE) approach to characterize the risk. However, risk can also be characterized by comparing the RfD directly to the human exposure estimate. These methods merely communicate to the risk manager a sense of how close the exposures are to levels of concern. *See* 1998 Guidelines, at 66, Trial Ex. 17.

### 4.   Dr. Thiessen's Inappropriate Application of the MOE Methodology

276.   An MOE is calculated by comparing (dividing) the point of departure directly to the expected exposure level. The MOE is then compared to a benchmark MOE, which is the product of all relevant uncertainty factors. Undisputed Fact No. 25, ECF No. 150. Considerations for the evaluation of the MOE are similar to those for the uncertainty factor applied to the POD. *See supra* ¶¶ 213–215 (discussing uncertainty factors).

277.   The reference dose calculated by applying an intraspecies uncertainty factor of ten and applying an interspecies uncertainty factor of three (which are unjustified defaults) to the McPherson 2018 data, which is indisputably the most reliable animal study, would yield a reference dose of 0.03

1  mg/kg/day (if not higher, given that this calculation is based on a NOAEL). Thiessen Decl. ¶ 146, tbs.

2  2, 5, ECF No. 202-1. The calculated reference dose is higher than the exposure rate of 95th percentile

3  adult consumers. *Id.* ¶ 167. This reference dose does not indicate a potential for risk for 95th percentile

4  adult consumers. *Id.* Under Dr. Thiessen's reasoning, this reference dose would also not indicate a

5  potential for risk for the similar subpopulation of pregnant women. *See* Thiessen Trial Tr. Vol 4, 551:17–

6  24.

7        278.    The default intraspecies uncertainty factor of ten can be used when calculating margins

8  of exposure from the general population. 1998 Guidelines, at 248, Trial Ex. 47. Applying an intraspecies

9  uncertainty factor of ten and applying an interspecies uncertainty factor of three to the McPherson 2018

10 data, to the general subpopulation of average adults would yield a margin of exposure of 72, which

11 Plaintiffs admit does not indicate what they refer to as "unacceptable risk." Thiessen Decl. 74, tbl. 7,

12 ECF No. 202-1.

13       279.    The most sensitive effect reported in the McPherson 2018 data was dental fluorosis, not

14 a neurodevelopmental effect. Tsuji Decl. ¶ 98, ECF No. 199.

15              **5.  Dr. Grandjean's RfD is Not Generalizable to the United States**

16       280.    Dr. Grandjean estimated risk by comparing his calculated BMDLs (or RfD)[7] directly to

17 the maternal urine-fluoride concentrations in fluoridated areas of Canada. See Grandjean Decl. ¶¶ 145–

18 146, ECF No. 198-3 (using data reported in Till et al. 2018 and Green 2019 respectively).

19       281.    Neither Dr. Hu nor Dr. Lanphear, principal investigators of the ELEMENT and MIREC

20 cohort fluoride studies, conducted research regarding fluoride exposure in a United States population.

21 Hu Trial Tr. Vol. 1, 87:14–16.

22       282.    Dr. Hu testified that he was not aware of any studies on maternal urinary fluoride levels

23 in North America until publication of Till 2018, a study of urinary fluoride levels for women in Canada.

24

---

25  [7]    *See supra* ¶ 210, explaining that RfD values are calculated by dividing the POD with
26  corresponding uncertainty factors, although application of uncertainty factors to the POD may
    not always be appropriate. Where no uncertainty factor is applied, the POD is equal to the RfD.
27  Here, Dr. Grandjean applied the BMD approach for calculating a POD and compared the BMD
    lower confidence limit (BMDL), without application of an uncertainty factor, as the RfD for
28  purposes of his risk characterization.

Hu Trial Tr. Vol. 1, 75:17–76:8. In Dr. Hu's view, the findings of the ELEMENT studies are "relevant" to communities that add fluoride to their water because the maternal urinary fluoride levels in the ELEMENT and MIREC studies were similar. *Id.* at 76:11–20.

283.    Dr. Hu's generalizability opinion begins and ends with a comparison of urinary fluoride values across the ELEMENT and MIREC studies. Hu Decl. ¶¶ 42–46, ECF No. 198-1. Dr. Hu did not compare average creatinine values across the ELEMENT and MIREC populations. Hu Trial Tr. Vol. 1, 129:1–19. Dr. Hu did not compare differences in age across the ELEMENT and MIREC populations, even though he testified that age probably has an effect on the secretion of creatinine in the urine of pregnant women. *Id.* at 129:20–130:9. Dr. Hu also did not compare differences in pre-pregnancy body mass index scores across the ELEMENT and MIREC populations. *Id.* at 131:3–7.

284.    Dr. Hu testified that differences in the Canadian and Mexico City populations can cause differences in how those populations respond to neurotoxicants and advocated for an analysis that looks at a range of epidemiological studies. Hu Trial Tr. Vol. 3, 340:4–19 ("That being said, I have seen population differences between Canadians and Mexicans. It isn't surprising, because these people differ for all sorts of different reasons. They differ in terms of diet. They differ in terms of genetics. They differ in terms of their social environment. . . . That's precisely why—and, you know, in this situation I am not providing an opinion on policy. But that's precisely why when someone—when I am serving on committees that are trying to deliberate on policy, we need to look at the whole range of epidemiologic studies to understand the impacts, potential impacts on different populations.").

285.    Dr. Hu's reasoned opinion regarding the need to investigate and consider differences in populations when making policy decisions is in conflict with Dr. Lanphear's blanket statement—for which Dr. Lanphear did not describe any scientific methodology to support—that "[f]rom a biological standpoint, there is no credible basis to believe that people in the U.S. will respond differently to fluoride than people in Canada." Lanphear Decl. ¶ 71, ECF No. 198-2.

286.    Dr. Hu and Dr. Lanphear made assumptions about fluoride exposures across Mexico City, Canada, and U.S. populations. Dr. Hu testified that he assumed that populations living in salt fluoridation and water fluoridated areas received similar doses of fluoride. Hu Decl. ¶ 42, ECF No. 198-1; Hu Trial

59

1   Tr. Vol. 1, 119:12–25. In fact, as Dr. Hu testified, the participants in the ELEMENT study were exposed

2   to varying degrees of naturally occurring fluoride. *Id.* at 120:4–121:23. And data on the source of fluoride

3   exposure of the ELEMENT participants was not available to the ELEMENT study researchers. *Id.* at

4   123:19–22. Dr. Lanphear similarly assumed—without citing any data or describing any scientific

5   methodology to support his assumption—that there is no "credible reason to conclude, let alone suspect,

6   that people in water-fluoridated areas of the U.S. are exposed to materially less fluoride than people in

7   water-fluoridated cities of Canada." Lanphear Decl. ¶ 71, ECF No. 198-2.

8       287.   In Dr. Hu's view, lack of information regarding the source of exposure is not necessary

9   for his comparison of maternal urinary fluoride values across populations because maternal urinary

10   fluoride values are a biomarker that integrates exposure from multiple fluoride sources. Hu Trial Tr. Vol.

11   1, 124:7–14. But Dr. Hu did not investigate whether the absorption rate of fluoride in the body differs

12   by source. *Id.* at 124:15–22.

13       288.   Dr. Hu also testified that whether the source of fluoride exposure is from salt or water

14   could affect the concentration of fluoride observed in a spot urine sample. Hu Trial Tr. Vol. 1, 125:11–

15   15. As Dr. Hu explained, this would be comparing "apples and oranges." *Id.* at 125:16–24.

16       289.   Nor did Dr. Hu consider whether the very low number of women who provided urine

17   samples for all three trimesters from the ELEMENT cohort (only 71 women) affects the comparability

18   to the MIREC cohort, which only evaluated fluoride concentrations in women who provided samples

19   for all three trimesters (over 1500 women). Hu Trial Tr. Vol. 1, 125:25–128:2. Concentrations of fluoride

20   in bodily fluids tend to reflect acute (short-term current or recent) fluoride exposure. Chang Decl. ¶ 242,

21   ECF No. 200.

22       290.   Dr. Grandjean did not acquire or rely upon any contemporary large-scale studies of urine-

23   fluoride concentrations in the United States. Grandjean Decl. ¶ 148, ECF No. 198-3; Dep. Designations

24   12–13, ECF No. 237 (suggesting CDC collected a nationally representative sample of urine-fluoride

25   concentrations as part of the 2015 to 2016 National Health and Nutrition Examination Survey). To

26   address the lack of contemporary data on fluoride exposures of pregnant women in the United States,

27   Dr. Grandjean relies on a "small-scale" study conducted by researchers at the University of California

28

San Francisco (Uyghurturk 2020). Grandjean Decl. ¶ 153.

291.    Occupying only a single paragraph of the trial declaration he submitted in this case, Dr. Grandjean testified that Uyghurturk 2020 "supports the general similarity in fluoride exposures in the Canadian and U.S. populations. Grandjean Decl. ¶ 153, ECF No. 198-3. As with Dr. Hu's generalizability opinion, Dr. Grandjean's generalizability opinion is based *solely* on a comparison of maternal urinary fluoride values. *Id.*

292.    The Uyghurturk 2020 study is unreliable for a number of reasons. The study tested only 48 pregnant women in fluoridated and non-fluoridated communities. Grandjean Decl. ¶ 153, ECF No. 198-3. And because the participants provided urine samples while visiting a clinic in San Francisco, which fluoridates its water, the results were skewed. *Id.* at 45 n.27. That is because, as Dr. Grandjean explained, "current fluoride in urine partly reflects the recent intake at the hospital in San Francisco and could, therefore, be different from [the participants'] home community. Grandjean Trial Tr. Vol. 2, 322:13–15.

293.    More concerning, however, is that *Dr. Grandjean failed to disclose that the association between higher maternal urinary fluoride levels and community water fluoridation was not statistically significant*. Grandjean Trial Tr. Vol. 2, 289:15–291:14. Not only does this finding call into question the blanket assumptions Drs. Hu and Lanphear made about similarities in exposure across the Mexico City, Canada, and U.S. populations, Hu Decl. ¶ 42, ECF No. 198-1; Lanphear Decl. ¶ 71, ECF No. 198-2, but it seriously calls into question the objectivity and reliability of Dr. Grandjean's opinions.

294.    Given the uncertainty and variability carried forward from each individual component parts—hazard identification, dose-response analysis, and exposure assessment—combined with the uncertainty and variability in attempting to generalize exposures to the United States population, confidence in the results of Plaintiffs' risk assessment is low and cannot be relied on to support a finding of unreasonable risk or to inform or support a risk management rulemaking under TSCA section 6(a). *See supra* ¶274 (explaining that "[a] health risk assessment is only as good as its component parts" and "[c]onfidence in the results of a risk assessment is thus a function of confidence in the results of the analysis of these elements." (quoting 1998 Guidelines, Trial Ex. 17)).

## V.    RISK DETERMINATION

295.    The final component of a TSCA risk evaluation involves making a determination as to whether the chemical substance does or does not present an unreasonable risk of injury to health or the environment under the conditions of use. 15 U.S.C. § 2605(b)(4)(A).

296.    In general, Risk Evaluation Rule lists a variety of factors that may bear on whether a risk is unreasonable, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the population exposed (including any susceptible populations); the severity of hazard; and uncertainties. 82 Fed. Reg. at 33,735, Trial Ex. 544.

297.    Where a chemical substance has beneficial health effects, such as fluoride, consideration of those effects should be included as part of the risk evaluation and risk determination. Henry Decl. ¶¶ 51, 100, ECF No. 201; 82 Fed. Reg. at 33,735, Trial Ex. 544. Dr. Thiessen did not conduct a systematic review of fluoride's anti-caries health effects. Thiessen Trial Tr. Vol. 4, 578:21–25. Dr. Thiessen did not consider fluoride's anti-caries health effects in a dose-response assessment. *Id.* at 580:8–10. No evidence in the record demonstrates that Dr. Thiessen considered fluoride's anti-caries health effects as part of an exposure assessment, risk characterization, or risk determination.

298.    Only one of Plaintiffs' witnesses purports to reach a "risk determination" under TSCA, Dr. Thiessen. Dr. Thiessen never considered any guidance on risk determinations. The 1998 Guidelines do not extend to risk determinations. 1998 Guidelines, Ex. 17.

299.    Dr. Thiessen stated that her risk determination is premised on the risk of lost IQ. Thiessen Decl. ¶ 221, ECF No. 202-1. Dr. Thiessen considered the economic impact of IQ loss. *Id.*

300.    Dr. Thiessen's risk calculations were based on animal studies, not human studies on IQ.

301.    Dr. Thiessen did not even receive Dr. Grandjean's report on the human studies until after she had already reached her determination of unreasonable risk. Thiessen Trial Tr. Vol. 4, 556:12– 24.

302.    Dr. Thiessen admitted that she did not thoroughly look at the human data. *Id.* at 555:10– 13.

303.    Dr. Thiessen applied a standard of safety to every single person, not unreasonable risk. *Id.* at 561:2–22.

304.    Dr. Thiessen concluded that EPA should ban fluoride without understanding the full

impact of its effects. *Id.* at 563:12–18.

305.    Both Dr. Thiessen and Dr. Grandjean ignored a number of basic data quality issues and fail to account for the relatively poor quality of the exposure and effects data identified by Dr. Chang and Dr. Tsuji. Henry Decl. ¶ 182, ECF No. 201.

306.    Because Plaintiffs have failed to offer a credible risk characterization that considers reliability, relevance, uncertainty and variability in available information as well as credible considerations of alternative interpretations, Plaintiffs have not provided adequate and sufficient scientific information to make a determination of whether the practice of community water fluoridation presents an unreasonable risk of injury to human health or the environment.

307.    In addition to the critical limitations in the methodologies employed by Plaintiffs to assess risk, Plaintiffs have failed to employ the best available science, including the most up-to-date scientific methodologies for considering the weight of the scientific evidence. Henry Decl. ¶ 187, ECF No. 201.

308.    If the Court were to make a finding of unreasonable risk in the absence of a process that employs the most up-to-date scientific developments or understandings in risk assessment or their inappropriate application, EPA risk managers will not have the necessary information to properly inform and justify risk management options under TSCA. Henry Decl. ¶¶ 59, 188, ECF No. 201.

## PROPOSED CONCLUSIONS OF LAW

### I.    PLAINTIFFS LACK STANDING.

309.    To maintain their claim, Plaintiffs must establish constitutional and statutory standing. *Lexmark Int'l Inc. v. Static Control Components*, 572 U.S. 118, 129 (2014).

310.    At trial, Plaintiffs bear the burden to demonstrate all elements of standing by the same standard that applied to all other elements of their case—a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (standing is an "indispensable part of the plaintiff's case" and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"); *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (factual predicate of standing must be proven at trial); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (facts must be proven by preponderance of the evidence). Unsupported, conclusory, and self-

1    serving allegations of standing declarants are never enough to prove standing. *U.S. Currency*, 672 F.3d
2    at 638; *Carrico v. San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011).

3    311.   Because Plaintiffs seek injunctive relief, they must demonstrate a future "likelihood of
4    substantial and immediate irreparable injury." *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see San*
5    *Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (future harm, not past injury,
6    is needed).

7    **A.    Plaintiffs Lack Constitutional Standing**

8    312.   Plaintiffs must establish a "substantial risk" of "certainly impending," "imminen[t]"
9    harm. *Clapper v. Amnesty International, USA*, 568 U.S. 398, 401 (2013) (rejecting a "objectively
10   reasonable likelihood" of future injury standing); *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 922
11   (N.D. Cal. 2015) (describing *Covington*, 358 F.3d 629; *Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) and
12   *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002)); *see also Lyons*, 461 U.S.
13   at 111; *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) ("[T]his Court has
14   limited its jurisdiction over cases alleging the possibility of increased-risk-of-harm to those where the
15   plaintiff can show *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm
16   with that increase taken into account.").

17   313.   Because no study nor any expert testimony in the trial record has drawn any association
18   between community water fluoridation and headaches, physical pain, dementia or Alzheimer's disease,
19   Plaintiffs failed to establish standing from a sufficient threat of future injury. *See also Riva v. Pepsico,*
20   *Inc.*, 82 F. Supp. 3d 1045, 1061 (N.D. Cal. 2015) (rejecting the use of animal studies to support standing).
21   Plaintiffs have not shown a credible threat of injury, let alone a substantial risk of imminent injury. *Supra*
22   Section II: *Standing*.

23   **B.    Plaintiffs Fall Outside the Zone of Interests**

24   314.   Even if Plaintiffs have constitutional standing, they must also fall within the zone of
25   interests to bring a claim under TSCA as set by Congress. *Lexmark*, 572 U.S. at 127. This test "applies
26   to all statutorily created causes of action." *Id.* at 129. Determining who may bring a claim, what claim
27   may be brought, and when the claim becomes ripe is a matter of statutory interpretation. *Id.* at 127–28.

28

64

315.    If there is any ambiguity or doubt as to whether Plaintiffs' claim falls within TSCA's zone of interests, TSCA must be "construed strictly in favor of the sovereign" as this legal question here concerns the scope of potential lawsuits against the United States. *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992).

316.    TSCA provides a limited, specific means to bring the type of claim at issue in this case. Any TSCA Section 21 claim must be preceded by an administrative petition. If EPA denies the petition, "the *petitioner* may commence a civil action . . . to compel [EPA] to initiate a rulemaking proceeding *as requested in the petition*." 15 U.S.C. § 2620(b)(4)(A) (emphasis added). The term "petitioner" must be read in "the broader context" of the regulatory framework as a whole, *Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015), considering "neighboring words with which it is associated," *Freeman v. Quicken Loans, Inc*., 132 S. Ct. 2034, 2042 (2012), "to avoid giving [a provision] unintended breadth," *Maracich* v. *Spears*, 133 S. Ct. 2191, 2201 (2013); *see Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) ("common sense" should allow for a "harmonious" "coherent regulatory scheme."); s*ee, e.g.*, *Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1209 (5th Cir. 1991) (TSCA's reference to "national economy" precluded foreign entities from being within the zone of interests as "any person").

317.    By failing to show that any Plaintiff or standing declarant has a real, substantial risk of reduced IQ or ADHD due to future exposure to community water fluoridation, Plaintiffs' case falls outside of TSCA's zone of interests. *See, e.g.*, *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 802–04 (9th Cir. 2009) (a party cannot bring suit based on matters not presented in a required notice of intent to sue).

318.    In other words, because Plaintiffs claim to suffer from harms (headaches, physical pain, and dementia) not presented in their administrative petition to EPA, Plaintiffs' case falls outside of TSCA's zone of interests. To hold otherwise would deprive the agency its ability to "utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention." *Alaska Survival v. Surface Transp.*, 705 F.3d 1073, 1080 (9th Cir. 2013); *see Washington v. Barr*, 925 F.3d 109, 116 (2d Cir. 2019). Similarly, to credit Plaintiffs' expansive reading of the neurotoxic harms expressed in the petition would

eviscerate the requirement that the petition "set forth the facts which it is claimed establish that it is necessary" to initiate the desired rulemaking. 15 U.S.C. § 2620(b)(1); *Food & Water Watch, Inc. v. EPA*, 302 F. Supp. 3d 1058, 1069–70 (N.D. Cal. 2018) (These facts will "frame" any case Plaintiffs may bring). EPA should not be expected to scour every attachment to identify every risk not mentioned in a petition or otherwise divine the petitioners' intent, particularly given the relatively short response deadline. 15 U.S.C. § 2620(b)(3); *see Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65, (2004); *see, e.g.*, *Ctr. for Biological Diversity*, 566 F.3d at 802–04; *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004); *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1519 (D.C. Cir. 1988).

### C.    Without Standing, This Court Lacks Jurisdiction and Dismisses the Action

319.    Plaintiffs stipulated that they would "rely exclusively on the declarations attached [to ECF No. 100] to establish the factual basis" for standing. Standing Stip. ¶ 1, ECF No. 100. Because Fluoride Action Network did not provide a declaration, it has failed to make any showing of standing, and therefore, the organization lacks standing to sue on behalf of its members. Because, as explained below, no member of Food & Water Watch and Moms Against Fluoridation has standing, neither organization has standing to sue on behalf of its members. *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). Because no organizational Plaintiff (Fluoride Action Network, Food & Water Watch, and Moms Against Fluoridation) claimed or established an injury to the organization, no organizational Plaintiff has standing. *Id.* at 1154; *Food & Water Watch, Inc.*, 808 F.3d at 921.

320.    Plaintiff Brenda Staudenmaier (individually and on behalf of her children) and Declarant Jessica Trader offered only self-serving, uncorroborated declarations and therefore lack standing. *U.S. Currency*, 672 F.3d at 638; *Carrico*, 656 F.3d at 1006. Indeed, neither even reference any impending injury at all. Trader Decl., ECF No. 100-4, Trial Ex. 57; Staudenmaier Decl., ECF No. 100-5, Trial Ex. 55.

321.    Declarant Julie Simms has not demonstrated a credible, substantial threat of headaches from community water fluoridation and therefore lacks standing. Her claimed harm is also outside of

1    TSCA's zone of interests.

2        322.    Plaintiff Audrey Adams (individually and on behalf of her adult son Kyle Adams) has

3    not demonstrated a credible, substantial threat of pain from community water fluoridation and therefore

4    lacks standing. Her claimed harm, on behalf of her adult son, is also outside TSCA's zone of interests.

5        323.    Plaintiff Kristin Lavelle (individually and on behalf of her son Neal Lavelle) has not

6    demonstrated a credible, substantial threat of dementia or Alzheimer's disease from community water

7    fluoridation in later life and therefore lacks standing. Her claimed harm is too generalizable and also

8    outside of TSCA's zone of interests.

9        324.    Because Plaintiffs have failed to meet their burden to demonstrate a substantial, real threat

10   of injury from community water fluoridation, any economic costs, past or future, expended to avoid

11   community water fluoridation are self-inflicted and does not confer standing. *Food & Water Watch, Inc.*,

12   808 F.3d at 918–19 (increased costs that are "the product of their fear" does not confer standing); *San*

13   *Diego Cty. Gun Rights Comm.*, 98 F.3d at 1126 (future harm, not past injury, is needed).

14       325.    Because Plaintiffs received a *de novo* trial, there is no procedural injury to confer

15   standing.

16       326.    As explained above, Plaintiffs have not established an injury in fact. The claimed injuries

17   are not traceable to EPA. They cannot be redressed by this Court.

18       327.    No Plaintiff or standing declarant is pregnant or is the guardian of an infant. Plaintiffs'

19   claim therefore falls outside of TSCA's zone of interests.

20       328.    No Plaintiff has standing and the Court dismisses this action.

21   **II.    EVEN IF PLAINTIFFS COULD ESTABLISH STANDING, THEY FAILED TO MEET
       THE STATUTORY STANDARDS FOR DEMONSTRATING UNREASONABLE RISK.**

22

23       329.    In pertinent part, TSCA section 21(a), 15 U.S.C. § 2620(a), permits any person to petition

24   EPA to initiate a proceeding for the issuance of a rule under section 6, 15 U.S.C. §2605.

25       330.    The petition shall set forth the facts which it is claimed establish that it is necessary to

26   issue a rule under section 6. 15 U.S.C. § 2620(b)(1).

27       331.    If the Administrator denies a petition to initiate a proceeding for the issuance of a new

28   rule under section 6, the petitioner shall be provided an opportunity to have such petition considered by

1    the court in a de novo proceeding. 15 U.S.C. § 2620(b)(4)(B).

2        332.    The petitioner must demonstrate to the satisfaction of the court by a preponderance of the

3    evidence that fluoridation chemicals present an unreasonable risk of injury to health or the environment,

4    without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially

5    exposed or susceptible subpopulation, under the conditions of use. 15 U.S.C. § 2620 (b)(4)(B)(ii).

6        333.    Plaintiffs' petition requested that EPA initiate a proceeding for the issuance of a rule

7    under TSCA section 6(a).

8        334.    Plaintiffs' petition "sought to regulate only one condition of use, fluoridation of drinking

9    water." *Food & Water Watch, Inc. v. EPA*, 291 F. Supp. 3d 1033, 1053–54 (N.D. Cal. 2017).

10       335.    The petition complained of potential neurotoxic injury to people exposed to fluoridation

11   chemicals that are added to some community drinking-water supplies in the Unites States for the purpose

12   of reaching a recommended optimal water fluoride concentration for reducing tooth decay of 0.7 mg/L.

13       336.    Thus, Plaintiffs must demonstrate by a preponderance of the evidence that fluoridation

14   chemicals present an unreasonable risk of neurotoxic injury to health, without consideration of costs or

15   other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible

16   subpopulation, when added to community drinking-water supplies.

17       337.    When a plaintiff meets its burden, the Court shall order EPA to initiate a section 6(a), 15

18   U.S.C. § 2605(a), rulemaking, unless the extent of the risk to health is less than the extent of risks to

19   health or the environment with respect to which EPA is taking action under TSCA and there are

20   insufficient resources available to take such action. 15 U.S.C. § 2620 (b)(4)(B).

21       338.    EPA's authority to initiate action pursuant to section 6(a) requires a determination "in

22   accordance with subsection (b)(4)(A)" that a chemical substance under one or more conditions of use

23   presents an unreasonable risk of injury to health or the environment. 15 U.S.C. § 2605(a). Thus, TSCA

24   section 6(b)(4)(A) provides the basis for determining whether a chemical substance presents an

25   unreasonable risk of injury to health or the environment. *See* 82 Fed. Reg. at 11,879 (Feb. 27, 2017)

26   (TSCA section 21 "incorporates the statutory standards that apply to the requested action"); *see Davis v.*

27   *EPA*, 348 F.3d 772, 779 n.5 (9th Cir. 2003) (even informal adjudications are afforded *Chevron*

28

deference).

339.   TSCA section 6(b)(4)(A) requires EPA to conduct risk evaluations to determine whether a chemical substance presents an unreasonable risk of injury, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use. 15 U.S.C. § 2605(b)(4)(A).

340.   TSCA section 6(b)(4)(F) enumerates the minimum components of risk evaluation including by description, the scientifically accepted tenets of risk assessment, amongst other requirements. 15 U.S.C. § 2605(b)(4)(F). The end purpose of a risk evaluation is to determine whether a substance presents an unreasonable risk of injury to health or the environment. 82 Fed. Reg. at 33,748, Trial Ex. 544. Risk evaluation requires a step beyond the customary components of a risk assessment to include a "risk determination," that is, an ultimate determination of whether a chemical substance presents unreasonable risk of injury to health or the environment under the conditions of use. *Id*. at 33,750 (evaluation requirements), 33,752 (unreasonable risk determination). Accordingly, the traditional components of the risk assessment paradigm together with a risk determination constitute a risk evaluation under TSCA. *Id*. at 33,750 (evaluation requirements); Henry Decl. ¶ 70, ECF No. 201.

341.   TSCA also requires that risk evaluations be conducted in a manner that is consistent with the best available science and make decisions based on the weight of the scientific evidence. 15 U.S.C. §§ 2625(h) and (i).

342.   The Risk Evaluation Rule defines "weight of the scientific evidence" as "a systematic review method, applied in a manner suited to the nature of the evidence or decision, that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance." 82 Fed. Reg. at 33,748, Trial Ex. 544. The definition of weight of the scientific evidence in the Risk Evaluation Rule is consistent with the current state of the science for conducting and documenting hazard identification conclusions supporting any risk assessment. Further, under TSCA, the weight-of-the-

scientific-evidence approach is an interrelated part of systematic review, and integrating systematic review into the TSCA risk evaluations is critical to meet the statutory requirements of TSCA. 82 Fed. Reg. at 33,734, Trial Ex. 544.

343.    Each risk evaluation must describe the scope of the risk evaluation, which includes the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations that will be considered. 15 U.S.C § 2605(b)(4)(D).

344.    Each risk evaluation must also: (1) integrate and assess available information on hazards and exposure for the conditions of use of the chemical substance, including information on specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations; (2) describe whether aggregate or sentinel exposures were considered and the basis for that consideration; (3) take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use; and (4) describe the weight of the scientific evidence for the identified hazards and exposure. 15 U.S.C. § 2605(b)(4)(F)(i), (iii)–(v).

345.    Plaintiffs did not conduct a systematic review.

346.    Plaintiffs' evidence fails to satisfy the scientific standards, data quality considerations, and components of the risk evaluation process required to properly inform risk management options or otherwise justify the initiation of a TSCA section 6(a) rulemaking.

347.    Accordingly, because Plaintiffs failed to show by a preponderance of the evidence that the addition of fluoridation chemicals to public drinking water in the United States up to a level of 0.7 mg/L presents an unreasonable risk of injury to health. The Court finds in favor of EPA.

### III.    PLAINTIFFS FAILED TO DEMONSTRATE UNREASONABLE RISK.

348.    The purpose of risk assessment in the risk management and public policy context is to provide the best possible scientific characterization of human health and/or environmental risk, based on a rigorous analysis of reasonably available information.

349.    Systematic review is a methodology for conducting a literature-based assessment designed to enhance transparency and inform scientific judgments. Systematic review "is a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to

identify, select, assess, and summarize the findings of similar but separate studies. The goal of systematic review methods is to ensure that the review is complete, unbiased, reproducible, and transparent." 82 Fed. Reg. at 33,734, Trial Ex. 544. Systematic review is consistent with the current state of the science for conducting and documenting hazard identification conclusions supporting any risk assessment.

350. Plaintiffs did not conduct a systematic review.

351. Plaintiffs have failed to provide a credible scientific basis to support a finding of unreasonable risk of injury to human health or the environment posed by the practice of community water fluoridation due to critical limitations in the methodologies employed to assess risk, including but not limited to, their failure to demonstrate transparency, clarity, consistency, and reasonableness in assembling the relevant information, evaluating the information for quality and relevance, and synthesizing and integrating the different streams of evidence to support their conclusions. Accordingly, Plaintiffs failed to show by a preponderance of the evidence that the addition of fluoridation chemicals to public drinking water in the United States up to a level of 0.7 mg/L presents an unreasonable risk of injury to health.

352. Contextualizing the overall weight of scientific evidence to exposures relevant to community water fluoridation is consistent with reviewing the *potential* neurotoxic hazard of fluoridation chemicals within the context of a single condition of use, as required by TSCA, and supported by the concept of "fit-for-purpose" evaluations as that concept is described in the Risk Evaluation Rule. 82 Fed. Reg. at 33,734, Trial Ex. 544. Based on the strengths, limitations, and uncertainties reported by Dr. Tsuji and Dr. Chang, combined with the fact that most of the available data sources assess exposure to higher levels of fluoride than the fluoride concentrations achieved in community water fluoridation programs, and the overall poor quality of the reasonably available information, there is insufficient evidence to conclude that neurotoxic effects are a hazard of community water fluoridation.

353. Because Dr. Thiessen failed to use the best available scientific methodology (BMD analysis) and, based on her own concession that the available animal data would not be the preferred source for identifying a POD, Dr. Thiessen's dose-response analysis cannot be relied on to support a

finding of unreasonable risk.

354.    Because there was uncertainty and variability that carried forward from the hazard identification, uncertainty created by the lack of raw data and in the assumptions used in calculating BMD values, and a failure to provide a range of BMRs for regulatory decision making, Dr. Grandjean's BMD analysis cannot be relied on to support a finding of unreasonable risk.

355.    A credible exposure assessment, fit for the purpose of informing risk management decisions under TSCA, must include an integrative discussion based on the best available science and the weight of the evidence, including the strengths and limitations of the exposure evidence along with a discussion on the uncertainties, variability, degree of confidence, and underlying assumptions, including science policy assumptions, supporting the exposure estimates.

356.    Consistent with the NRC's risk assessment paradigm, the third component of risk evaluation requires an exposure assessment for the chemical substance under the conditions of use. Exposure assessment is the process of estimating or measuring the magnitude, frequency and duration of exposure to an agent and the size and characteristics of the population exposed.

357.    Plaintiffs failed to provide evidence on the extent to which the variability and uncertainty in the information and sources relied on for exposure estimates were evaluated and characterized. Dr. Thiessen also did not explain the scientific rationale for her selection of particular ingestion rates for each of the subpopulations for which she estimated exposures. Without a rationale for selection of ingestions rates, there is no basis on which to determine whether her exposure estimates are reliable and unbiased.

358.    Consistent with the NRC's risk assessment paradigm the fourth component of risk assessment requires risk characterization. Risk characterization is the culmination of the risk assessment process. The risk characterization step integrates information from the preceding components of the risk assessment and synthesizes an overall conclusion about risk that is complete, informative, and useful for risk managers. Given the uncertainty and variability carried forward from each individual component parts—hazard identification, dose-response analysis, and exposure assessment combined with the uncertainty and variability in attempting to generalize exposures to the United States population,

confidence in the results of Plaintiffs' risk assessment is low and cannot be relied on to support a finding of unreasonable risk.

359.   Accordingly, Plaintiffs' have failed to show by a preponderance of the evidence that the addition of fluoridation chemicals to public drinking water in the United States up to a level of 0.7 mg/L presents an unreasonable risk of injury to health. The Court finds in favor of EPA.

## IV.   AN AWARD OF COSTS IS NOT APPROPRIATE

360.   Because Plaintiffs' have failed to show by a preponderance of the evidence that the addition of fluoridation chemicals to public drinking water in the United States up to a level of 0.7 mg/L presents an unreasonable risk of injury to health, an award of costs for attorneys' fees and expert witnesses is not appropriate.

Respectfully Submitted,

Dated: July 27, 2020

*/s/ Debra J. Carfora*
DEBRA J. CARFORA
JOHN THOMAS H. DO
BRANDON N. ADKINS
SIMI BHAT
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2640
Fax: (202) 514-8865
Email: debra.carfora@usdoj.gov

*Attorneys for Defendants*