C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY GUNDERSON REEVES, ESQ., Pro Hac Vice
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, INC, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>U.S. Environmental Protection Agency, et al.,<br><br>　　　　　Defendants. | Case No.: 17-cv-02162-EMC<br><br>**PLAINTIFFS' FURTHER STATEMENT ON EPA'S POSITION REGARDING A NEW PETITION** |

　　　　As described in the parties' Joint Case Management Statement (ECF No. 257), one of EPA's threshold conditions for considering a new petition is that the Plaintiffs must produce the "raw data for the key studies upon which Plaintiffs' rely" (i.e., the ELEMENT and MIREC studies). As described in the Joint statement, Plaintiffs cannot comply with this demand because Plaintiffs did not conduct these studies and do not have access to the data.

　　　　In the Joint Statement, Plaintiffs also noted that EPA's demand for raw data would be "contrary to the health protective goals of TSCA." ECF No. 257 at 2. In order to provide further context for this position, Plaintiffs feel compelled to bring to the Court's attention the broader policy shift that EPA's raw data demand represents, and the overwhelming criticism this policy

has received from virtually all sectors of the public health and scientific communities.[1] This policy shift is articulated in a March 18, 2020 Supplemental Notice of Proposed Rulemaking in which EPA proposed limiting, or excluding altogether, its reliance on any peer reviewed study—no matter how relevant or well regarded—if the underlying raw data is not made publicly available. *See* 85 Fed. Reg. 15396 (March 18, 2020).

EPA's demand for raw data under the current Administration is strongly opposed by, among others, the *American Medical Association*, *American Public Health Association*, *American Association for the Advancement of Science*, *American Academy of Pediatrics*, *American Heart Association*, *American Lung Association*, *American Psychiatric Association*, *Association of American Universities*, *Association of American Medical Colleges*, *International Society for Environmental Epidemiology*, and *Union of Concerned Scientists*. In a July 16, 2020 position statement, these organizations (and others) state:

> If EPA excludes studies because the data cannot be made public, people may be exposed to real harm. The result would be decisions affecting millions based on inadequate information that fails to include well-supported studies by expert scientists. These efforts are misguided and will not improve the quality of science used by EPA nor allow the agency to fulfill its mandate of protecting human health and the environment. For the sake of the country's health, EPA must not restrict this research.

A copy of this position statement is attached herein. *See* **Exhibit A.**

EPA's demand for raw data has also received strong criticism from some of the world's leading medical and scientific journals, including *Nature*, *The Lancet*, *Science*, and *Proceedings of the National Academy of Sciences*. The Editors-in-Chief of these esteemed journals issued a Joint Statement in which they expressed "alarm" over what they see as a "mechanism for

---

[1] *See* Lisa Friedman, *EPA to Limit Science Used to Write Public Health Rules*, NY TIMES, Nov. 11, 2019.

suppressing the use of relevant scientific research in policy-making, including public health regulations." *See* **Exhibit B.**

The raw data-policy that EPA is seeking to implement throughout the Agency, and in its negotiations with Plaintiffs specifically, "is the ratification of efforts by special interests over more than two decades to undermine the science underpinning . . . pollution regulations." *See* **Exhibit C**. According to a commentary in the *American Journal of Public Health*, "some of the most important and informative studies in medicine generally, and environmental medicine particularly, include private and confidential data that cannot be made public." *Id.*

Finally, according to a detailed analysis signed by dozens of Harvard scientists, EPA's new policy "is based on a profoundly misguided view of how the scientific process works" and "unnecessarily impedes EPA's ability to base its internal analyses and regulatory decisions on the best available science."[2] Further, the rule "adopts a partial and biased approach to transparency that systematically favors industry science over academic science."[3]

Each of the aforementioned criticisms applies with equal force in the context of Section 21 citizen petitions, and helps to explain Plaintiffs' position vis-à-vis this summer's negotiations.

Dated:   August 3, 2020          Respectfully submitted,

    */s/ Michael Connett*
    MICHAEL CONNETT
    C. ANDREW WATERS
    WATERS, KRAUS & PAUL
    222 N. Pacific Coast Hwy
    El Segundo, CA 90245
    *Attorneys for Plaintiffs*

---

[2] *See* http://clinics.law.harvard.edu/environment/files/2020/05/Emmett-Clinic-Transparency-Supplemental-Notice-Comments-FINAL.pdf
[3] *Id.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing this 3rd day of August, 2020, upon all ECF registered counsel of record using the Court's CM/ECF system.

/s/ *Michael Connett*
Michael Connett
Attorney for Plaintiffs

# **Exhibit A**

Public health, medical, academic, and scientific groups oppose EPA transparency rule

For release July 16, 12:00 p.m. Eastern Daylight Time (UTC -04:00)

Nearly seventy public health, medical, academic, and scientific groups representing millions of Americans released the following statement to express concern over the U.S. Environmental Protection Agency's (EPA) "Strengthening Transparency in Regulatory Science" proposed rule:

We strongly oppose EPA's efforts to restrict the use of the best available science in its policymaking and encourage EPA to withdraw its proposal.

We support the goal of improving the transparency of science and access to data. When feasible, scientists should strive for appropriate public access to data to maximize independent validation and trust in the scientific process. However, there are many credible scientific studies where the exposure of raw data to the public is infeasible, or would reveal confidential patient information.

The research EPA relies on to make determinations is already transparent in most cases. Many scientific journals and research agencies now have policies governing the sharing of data among researchers and with appropriate access by the public at large.

==If EPA excludes studies because the data cannot be made public, people may be exposed to real harm. The result would be decisions affecting millions based on inadequate information that fails to include well-supported studies by expert scientists. These efforts are misguided and will not improve the quality of science used by EPA nor allow the agency to fulfill its mandate of protecting human health and the environment. For the sake of the country's health, EPA must not restrict this research.==

Academy of Integrative Health & Medicine

Allergy & Asthma Network

Alliance of Nurses for Healthy Environments

American Academy of Dermatology

American Academy of Family Physicians

American Academy of Pediatrics

American Association for Cancer Research

American Association for the Advancement of Science (AAAS)

American Association of Community Psychiatrists

American Brain Coalition

American College of Lifestyle Medicine

American College of Obstetricians and Gynecologists

American College of Physicians

American College of Preventive Medicine

American Geophysical Union

American Geriatric Society

American Heart Association

American Institute of Biological Sciences

American Lung Association

American Medical Association

American Medical Women's Association

American Parkinson Disease Association

American Physiological Society

| | |
|---|---|
| American Psychiatric Association | Environmental Protection Network |
| American Psychological Association | Geological Society of America |
| American Public Health Association | Health Care Without Harm |
| American Society for Investigative Pathology | International Society for Environmental Epidemiology (ISEE) |
| American Society of Naturalists | Jacobs Institute of Women's Health |
| American Thoracic Society | Medical Advocates for Healthy Air |
| Association for Psychological Science | National Asian Pacific American Women's Forum (NAPAWF) |
| Association of American Medical Colleges | National Association of County and City Health Officials |
| Association of American Universities | National Environmental Health Association |
| Association of Public and Land-grant Universities | National Multiple Sclerosis Society |
| Association of Public Health Laboratories | National Women's Health Network |
| Association of Reproductive Health Professionals | Physicians for Social Responsibility |
| Association of Schools and Programs of Public Health | Pittsburgh Institute for Neurodegenerative Diseases |
| Asthma and Allergy Foundation of America | Society for the Study of Evolution |
| Big Cities Health Coalition | Teratology Society |
| Breast Cancer Prevention Partners | The Medical Society Consortium on Climate and Health |
| Bridge the Gap - SYNGAP Education and Research Foundation | The Michael J. Fox Foundation for Parkinson's Research |
| Center for Open Science | The Parkinson Alliance |
| Center for Progressive Reform | The Prevent Cancer Foundation |
| Center for Reproductive Rights | Union of Concerned Scientists |
| Children's Environmental Health Network (CEHN) | The Parkinson's Unity Walk |
| Consortium of Social Science Associations | |
| David Geffen School of Medicine | |
| Ecological Society of America | |
| Endocrine Society | |

# **Exhibit B**

Case 3:17-cv-02162-EMC   Document 258   Filed 08/03/20   Page 9 of 12





EDITORIAL

# Joint statement on EPA proposed rule and public availability of data (2019)

H. Holden Thorp[a,1], Magdalena Skipper[b], Veronique Kiermer[c], May Berenbaum[d], Deborah Sweet[e], and Richard Horton[f]

Eighteen months after articulating our concerns (1) regarding the 2018 "Strengthening Transparency in Regulatory Science" rule proposed by the Environmental Protection Agency (EPA) (2), we have become more concerned in response to recent media coverage and a 13 November hearing on the role of science in decision-making at the EPA. These events suggest that the proposed rule is now moving toward implementation; whether it includes amendments sufficient to address the concerns raised by us and many others remains a question.

Our previous statement on the proposed rule, authored and published by the editors-in-chief of five major scientific journals in May 2018, reflected alarm that the proposal's push for "transparency" would be used as a mechanism for suppressing the use of relevant scientific evidence in policy-making, including public health regulations. After the public comment period for the proposed rule closed, the EPA reported more than 590,000 comments from individuals and scientific, medical, and legal groups, many of which articulated similar concerns (3).

As leaders of peer-reviewed journals, we support open sharing of research data, but we also recognize the validity of scientific studies that, for confidentiality reasons, cannot indiscriminately share absolutely all data. Datasets featuring personal identifiers—including studies evaluating genomes of thousands of people to characterize medically relevant genetic variants—are but one example. Such data may be critical to developing new drugs or diagnostic tools but cannot be shared openly; even anonymized personal data can be subject to re-identification, and it has been a longstanding practice for agencies and journals to acknowledge the value of data privacy adjustments. The principles of careful data management, as they inform medicine, are just as applicable to data regarding environmental influences on public health. Discounting evidence from the decision-making process on the basis that some data is confidential runs counter to the EPA stated mission "to reduce environmental risks...based on the best available scientific information" (4).

We are also concerned about how the agency plans to consider options related to existing regulations. Even if a new standard is not applied retroactively, the standard could apply when a regulation is updated; thus, foundational science from years past—research on air quality and asthma, for example, or water quality and human health—could be deemed by the EPA to be insufficient for informing our most significant public health issues. That would be a catastrophe.

We urge the EPA to continue to adopt an approach that ensures the data used in decision-making are the best available, which will at times require consideration of peer-reviewed scientific data, not all of which may be open to all members of the public. The most relevant science, vetted through peer review, should inform public policy. Anything less will harm decision-making that claims to protect our health.

We hope that in the end, decisions that are made to inform the proposed EPA rule will rise above any form of politics, focusing on what's best for our communities. We encourage anyone with concerns or opinions about this issue to express their views through relevant legislative channels. Whether submitting public comments to the EPA or communicating with lawmakers in Congress, it is important to emphasize that decision-making that affects us all should be informed by nothing less than the full suite of relevant science vetted through peer review.

**1** J. Berg, P. Campbell, V. Kiermer, N. Raikhel, D. Sweet, Joint statement on EPA proposed rule and public availability of data. *Science* **360**, eaau0116 (2018).
**2** US Environmental Protection Agency, EPA administrator Pruitt proposes rule to strengthen science used in EPA regulations (2018). https://www.epa.gov/newsreleases/epa-administrator-pruitt-proposes-rule-strengthen-science-used-epa-regulations. Accessed 22 November 2019.
**3** US Environmental Protection Agency, Strengthening transparency in regulatory science (2018). https://www.epa.gov/osa/strengthening-transparency-regulatory-science. Accessed 22 November 2019.
**4** US Environmental Protection Agency, Our mission and what we do (2018). https://www.epa.gov/aboutepa/our-mission-and-what-we-do. Accessed 22 November 2019.

[a]Editor-in-Chief, *Science* family of journals, Washington, DC 20005; [b]Editor-in-Chief, *Nature*, London, N1 9XW, United Kingdom; [c]Executive Editor, *Public Library of Science* (PLOS) Journals, San Francisco, CA 94111; [d]Editor-in-Chief, *Proceedings of the National Academy of Sciences* (PNAS) of the United States of America, Washington, DC 20001; [e]Vice President of Editorial, Cell Press, Cambridge, MA 02139; and [f]Editor-in-Chief, *The Lancet*, London, EC2Y 5AS, United Kingdom. Published under the PNAS license.
[1]To whom correspondence may be addressed. Email: hthorp@aaas.org.

Editor's note: This statement is being published simultaneously in *Science* [Thorp, H H, et al. (2019) *Science*, https://doi.org/10.1126/science.aba3197], which should be the primary citation. It will be disseminated by all the publications represented by the signatories.
First published November 26, 2019.

Downloaded by guest on August 1, 2020

# **Exhibit C**

# The Threat to Air Pollution Health Studies Behind the Environmental Protection Agency's Cloak of Science Transparency

 See also the *AJPH* Environmental Health Workforce & Regulation section, pp. 284–298.

This year marks the 50th anniversary of the first Earth Day (April 22), the Clean Air Act of 1970, and the creation of the Environmental Protection Agency (EPA). Over those five decades, we have seen remarkable improvements in air quality across the United States and significant improvements in public health. Indeed the Office of Management and Budget reports that regulation of fine particle ($PM_{2.5}$) air pollution is the most cost effective of all federal regulations.[1] This success in controlling air pollution should be celebrated as a public health triumph. Thus, the EPA's proposal to restrict the use of key scientific evidence regarding the health effects of air pollution under the guise of "scientific transparency" is disturbing.[2]

The EPA's "Strengthening Transparency in Regulatory Science" rule is the ratification of efforts by special interests over more than two decades to undermine the science underpinning air pollution regulations. Twenty-five years ago, we published with our colleagues results of two prospective cohort studies, the Harvard Six Cities Study[3] and the American Cancer Society Study,[4] reporting that mortality risk increased linearly with long-term exposure to $PM_{2.5}$ air pollution. Observed $PM_{2.5}$–mortality associations were remarkably robust, especially for cardiopulmonary mortality. Furthermore, associations were much larger than expected based on previous short-term associations observed in daily time series studies.

Under common scientific practice, publication of these results would lead to attempts to verify and replicate these results using studies in independent populations by independent investigators. However, because the EPA cited these studies as key in setting air quality standards for $PM_{2.5}$, there were calls for examination of the validity, analytic methods, and data quality of the original studies and demands for access to the raw data.

We support principles of data accessibility and transparency in conducting and reporting scientific research. We also respect and adhere to ethical and legal obligations to protect the private and confidential data of study participants, including guarantees of confidentiality given to each participant, agencies providing mortality data, and institutional review boards (human studies committees) overseeing these studies. Nevertheless, given the public health and policy importance of these studies, investigators of both studies agreed to provide cohort and related data for an unrestricted, intensive reanalysis by an independent research team selected and overseen by the Health Effects Institute with full assurance of confidentiality of participant information. These independent reviewers conducted data quality audits, evaluated the reproducibility of the originally published findings, and assessed the sensitivity of the analyses to alternative methods and additional data. After a three-year effort, they published a 300-page report that found the data were of good quality, the original analyses could be reproduced, and the results were relatively unaffected by alternative analyses.[5]

Although this reanalysis was reassuring, it does not provide the scientific validation that comes from replicating these results by independent investigators in independent cohorts. In the 25 years since these two seminal studies were published, there have been dozens of additional longitudinal cohort studies published using independent cohorts from the United States, Canada, Europe, and Asia, confirming and building on the $PM_{2.5}$–mortality association.[6]

Despite these efforts, the American Cancer Society and Harvard Six Cities studies continue to be characterized by special interest groups as "secret science." This characterization is simply false on its face. The methodology, protocol, and results of these studies have been published in high-quality peer-reviewed scientific journals. We provided full data access for audits and independent reanalyses. We have continued to be actively involved in open, collaborative, extended analysis efforts in a way that contributes to scientific understanding and that does not violate commitments to the privacy and confidentiality of research participants.

Prominent scientific organizations, editors of major scientific journals, and others have affirmed that some of the most important and informative studies in medicine generally, and environmental medicine particularly, include private and confidential data that cannot be fully made public.[7] They have noted the imprudence of discounting or disallowing the use of results from these studies in science-based public policy. Special interest groups still demand the release of the individual data and argue that without such release these studies should not be used to inform public policy.

Why can't we just anonymize the data, as is standard practice in clinical trials? In a clinical trial, essential individual data include age, sex, race, and an indicator of randomized treatment group. Participants can feel safe that they and their records cannot be identified. In environmental epidemiology, the essential

### ABOUT THE AUTHORS

*Douglas W. Dockery is with the Departments of Environmental Health and Epidemiology, Harvard T. H. Chan School of Public Health, Boston, MA. C. Arden Pope III is with the Department of Economics, Brigham Young University, Provo, UT.*

*Correspondence should be sent to Douglas W. Dockery, John L. Loeb and Frances Lehman Loeb Research Professor of Environmental Epidemiology, Harvard T.H. Chan School of Public Health, 665 Huntington Ave, Boston, MA 02115 (e-mail: ddockery@hsph.harvard.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This editorial was accepted December 14, 2019.*
*doi: 10.2105/AJPH.2019.305531*

individual data likewise include age, sex, race, and environmental exposure. However, environmental exposure is not randomly assigned. Rather a study participant's environment is defined by where they live, that is the air, the water, and the land at or near their residential location.

Consider $PM_{2.5}$ air pollution that can now be modeled and mapped across the United States by metropolitan areas, counties, zip codes, census tracts, one-kilometer square grids, and even geocoded residential addresses. Would people be willing to participate in a public health study if they understood that they could likely be identified based on their age, sex, race, and where they live? Even the US National Center for Health Statistics, which provides de-identified mortality and national health interview survey data, severely restricts the use and reporting of data linked to geographic information, because of the high risks of compromising required and assured confidentiality.

Further consider how environmental epidemiology informs public health policy. In evaluating therapeutic interventions, clinical trials provide evaluation of safety and efficacy before release to the public. In addition, retrospective postmarketing surveillance is required to detect unexpected adverse effects. For environmental contaminants, there is no prerelease evaluation of effects in populations who are exposed. Primary evidence of adverse effects comes from environmental epidemiology studies, often looking retrospectively at previous exposures based on residential location. That is, environmental epidemiology provides a critical scientific approach for detecting adverse effects of contaminants in the environment.

The EPA transparency rule would not only preclude consideration of previous studies but also hamstring future epidemiologic studies of hazards based on residential location, including air pollution, water contamination, hazardous waste, radiation, spills and accidental releases, and other known or unidentified hazards. The effect not only suppresses previous inconvenient evidence but also discourages participation in future epidemiologic studies. If potential participants are discouraged from participating in population studies, opponents of environmental regulation will have succeeded in removing a key scientific approach to detect and quantify hazards.

The EPA rule, although appearing to formalize good scientific practice under the cloak of scientific transparency, would severely limit the use of epidemiology for surveillance of the deleterious health effects of contaminants in the environment and surreptitiously discourage participation in studies that address environmental issues.

Imagine the effect of a rule that required release of approximate residential addresses of participants in clinical trials or in other studies that use medical records and other clinical-based data. The impact would be devastating to the conduct of these studies and in advancing knowledge and practice in clinic medicine. Imagine further a rule that similarly required release of approximate addresses of participants in postmarketing surveillance epidemiologic studies. The ability to detect and monitor unexpected adverse effects and interactions would be severely compromised. Why does the EPA propose to restrict our scientific ability to detect the adverse effects of environmental contaminants under the cloak of scientific transparency? AJPH

*Douglas W. Dockery, ScD*
*C. Arden Pope III, PhD*

**CONTRIBUTORS**
The authors contributed equally to this article.

**CONFLICTS OF INTEREST**
The authors have no conflicts of interest to declare.

**REFERENCES**
1. Office of Information and Regulatory Affairs. *2015 Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance With the Unfunded Mandates Reform Act*. US Office of Management and Budget. 2016; Available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/inforeg/inforeg/2015_cb/2015-cost-benefit-report.pdf. Accessed December 22, 2019.

2. US Environmental Protection Agency. Strengthening transparency in regulatory science: a proposed rule by the Environmental Protection Agency on 04/30/2018. *Fed Regist*. 2018;83(83):18768–18774. 40 CFR Part 30.

3. Dockery DW, Pope CA 3rd, Xu X, et al. An association between air pollution and mortality in six US cities. *N Engl J Med*. 1993;329(24):1753–1759.

4. Pope CA 3rd, Thun MJ, Namboodiri MM, et al. Particulate air pollution as a predictor of mortality in a prospective study of US adults. *Am J Respir Crit Care Med*. 1995;151(3 pt 1):669–674.

5. Krewski D, Burnett RT, Goldberg MS, et al. *Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality*. Cambridge, MA: Health Effects Institute; 2000.

6. Pope CA, Coleman N, Pond ZA, Burnett RT. Fine particulate air pollution and human mortality: 25+ years of cohort studies. *Environ Res*. 2019; Epub ahead of print.

7. Thorp HH, Skipper M, Kiermer V, Berenbaum M, Sweet D, Horton R. Joint statement on EPA proposed rule and public availability of data (2019). *Science* 2019;366(6470):eaba3197.