Pages 1 – 39

                      UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

                BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

FOOD & WATER WATCH, INC., et al.,   )
                                    )
             Plaintiffs,            )
                                    )
   VS.                              ) NO. C 17-02162 EMC
                                    )
ENVIRONMENTAL PROTECTION AGENCY,    )
Et al.,                             )
                                    ) San Francisco, California
             Defendants.            )
_____)

                                        Thursday, August 6, 2020

                      **<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:  (By Zoom Webinar)

For Plaintiffs:
                          WATERS KRAUS & PAUL
                          222 North Pacific Coast Highway
                          Suite 1900
                          El Segundo, California  90245
                    BY:  **MICHAEL P. CONNETT, ESQ.**

                          NIDEL & NACE, PLLC
                          5335 Wisconsin Avenue NW.
                          Suite 440
                          Washington, DC  20015
                    BY:  **CHRISTOPHER T. NIDEL, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

        (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED</u>:**


For Defendants:

                           U.S. DEPARTMENT OF JUSTICE
                           Environment & Natural Resources
                              Division
                           Post Office Box 7611
                           Washington, D.C.  20044
                BY:  **BRANDON N. ADKINS, ESQ.**
                    **DEBRA J. CARFORA, ESQ.**
                    **SIMI BHAT, ESQ.**
                    **JOHN THOMAS H. DO, ESQ.**

```
 1    Thursday - August 6, 2020                        11:00 a.m.

 2                        P R O C E E D I N G S

 3         THE CLERK:  Calling Civil Action 17-2162, Food and

 4    Water Watch versus EPA.

 5       Counsel, please state your appearances for the record,

 6    beginning with the plaintiffs.

 7         MR. CONNETT:  Good morning, Your Honor.  Michael

 8    Connett on behalf of the plaintiffs.

 9         THE COURT:  Good morning, Mr. Connett.

10         MR. NIDEL:  Good morning, Your Honor.  Chris Nidel on

11    behalf of the plaintiffs.

12         THE COURT:  All right.  Thank you, Mr. Nidel.

13         MS. CARFORA:  Good morning, Your Honor.  Debra

14    Carfora on behalf of EPA.

15         THE COURT:  Good afternoon, Ms. Carfora.

16         MR. ADKINS:  Good morning, Your Honor.  Brandon

17    Adkins on behalf of EPA.

18         THE COURT:  Good morning, Mr. Adkins.

19         MR. DO:  Good morning, Your Honor.  John Do, with

20    EPA.

21         THE COURT:  I can barely hear you, Mr. Do.  You might

22    have to speak up a little bit.

23         MR. DO:  I won't be doing most of the talking, so --

24         THE COURT:  Okay.  All right.

25       And, Ms. Bhat has her hand raised.
```

1          THE CLERK:  I see that.  I'm going to promote her as

2     well.

3          MS. BHAT:  Good afternoon, Your Honor.

4          THE COURT:  All right.  Welcome, Ms. Bhat.

5          MS. BHAT:  Good afternoon, Your Honor.

6          THE COURT:  All right.  So everybody is here.

7     I wanted to -- we had scheduled this previously to find

8     out whether or not the parties could come to an understanding

9     about the possibility of plaintiffs submitting a new petition

10    to the EPA.  And of course, that was motivated in part because

11    of the body and the volume of new evidence, the new scientific

12    evidence, as demonstrated, as was discussed at trial that was

13    not before the EPA in the original petition.

14        And it seemed to me that there had been significant enough

15    developments, including the MIREC and the ELEMENT studies, and

16    the studies that derived from that, that would seem to warrant

17    a closer look by the EPA.

18        I'm disappointed to see in the joint statement that -- at

19    least from the EPA's point of view, that -- an indication

20    that's not likely to bear any fruit or result in any

21    substantive review unless three conditions are met, two of

22    which the plaintiffs find to be -- well, disputable whether

23    it's already been met and can be met and really should be

24    required, and the other one, which has now become what appears

25    to be a hot-button issue regarding raw data.

1      So, let me hear from the EPA on the raw-data question

2 first.   That seems to be the one that has engendered a lot -- a

3 fair amount of public discussion, and, and dissent.

4      And I'm wondering whether this is now -- this is something

5 that is required as a matter of regulation, that anybody who

6 submits a petition would have to present raw data coming from

7 all studies that they present in support of that petition?

8      Or what is the EPA's position now?

9          **MS. CARFORA:**   Thank you, Your Honor.

10      I first want to clarify that the EPA has not put any

11 conditions -- has not established any conditions on a petition,

12 a new petition, or an amended petition.   I just want to clarify

13 for the Court, plaintiffs are -- you know, plaintiffs can file

14 a new petition at any time they choose.

15      What -- our impression of what the Court asked us to do

16 was find circumstances in which EPA could engage in a

17 meaningful substantive review of the new data.   And so we

18 engaged in a meet-and-confer with plaintiffs to discuss what

19 that might look like, based on what we knew from the trial

20 record.   And given, you know, our position in the trial record,

21 at trial, they're substantive concerns that the Agency has.

22      And so we discussed with plaintiffs those substantive

23 issues, and wondered if we can find a way to close those gaps

24 prior to plaintiffs submitting anything new to the Agency, so,

25 you know, so that we could engage in that meaningful process,

1  and within that 90-day timeframe that's permitted by the

2  statute.  So that's where that he three issues came into play

3  in our negotiations, or discussions, I should say.  And so

4  they're not conditions.  They're just, based on the trial

5  record, what EPA thinks it substantively would need, based on

6  the available evidence base for fluoride.

7      So with that being said, I can say the raw data -- I was

8  not aware -- I was not even aware until plaintiffs --

9  Mr. Connett first brought to my attention that this was a

10 policy issue that was an inappropriate policy issue that the

11 Agency was basing its position on.  And as I explained to

12 Mr. Connett, as I represented to him, it's just I'm not aware

13 of that being the case here.  I'm not aware that there is any

14 agency policy.

15     I first became aware of a proposed rule when Mr. Connett

16 attached it to his filing on Monday, this past Monday.  That is

17 the first I had seen or heard about it.  And all I could say is

18 represent to the Court the same as I represented to

19 Mr. Connett, is that that has just not been a consideration in

20 our discussions with plaintiffs; it's not been a consideration

21 in our presentation of trial evidence.  And it's just not an

22 issue for us.

23     The issue of raw data is based on the specific evidence

24 base available for fluoride.  The problem is that there are

25 inconsistencies in these two studies, and there are variances

1  and uncertainties in the urinary measure, fluoride urinary

2  measure.

3       And in order to take a look at that, and try to understand

4  if the MIREC and ELEMENT studies are best available science to

5  the extent that, if at all, regulation could be based on them,

6  EPA has requested the raw data.  And based on the trial record,

7  the raw data is forthcoming.

8       And so it just makes sense --

9       **THE COURT:**  Let me ask -- let me ask you about that.

10      What I understood was there wasn't raw data, there was raw

11  data sort of extrapolated from the -- the dot chart, whatever

12  you call it, that was sort of extrapolated.  And that

13  Dr. Grandjean did that, and the plaintiffs are willing to share

14  that extrapolation.  No guarantee is exactly right, but I

15  guess, you know, it's the best they could come up with.

16      But that was with respect to -- was it the MIREC study?

17      **MR. CONNETT:**  The ELEMENT study.

18      **THE COURT:**  The ELEMENT study.  That the MIREC study

19  didn't -- there was no such chart from which one could

20  extrapolate.  So you'd have to go to the authors of that

21  study, right, to get it.  And, you know, that's up to the

22  authors.  You know, I don't know what control the plaintiffs

23  have over that.

24      I mean, I would think the EPA would have as much, if not

25  more, access to that data than -- but so, what's available --

 1   because I understand it would be the extrapolated data points.

 2   And they're anonymized, so you don't have to worry about who --

 3   you know, personal identity, that sort of thing.  That could be

 4   produced.  And I understand that will be shared.

 5        And there may be issues there.  I remember, there was a

 6   whole thing about there's some outliers, and you exclude the

 7   outliers, you know, that could go into the methodology.  And I

 8   understand why that's important.  So that can be produced.

 9        I guess what would be missing is the actual data, if you

10   want the non-extrapolated, but you want the original, that may

11   not be there.  But you do have a representation of what was

12   there.

13        And then with respect to the other study, you know, I

14   don't know what the status is, but that may not be available.

15   Unless the authors --

16             **MR. CONNETT:**  And Your Honor, if I could --

17             **MS. CARFORA:**  Dr. Grandjean testified that he was in

18    contact with the authors and that they were planning on

19    releasing the raw data as part of a pooled analysis, part of a

20    pooled analysis for BMD work.  And that he was negotiating

21    that with the authors in terms of getting access to that data.

22    And so all that raw data is forthcoming.

23        But --

24             **THE COURT:**  I understood that to be pretty much --

25    you're talking about the pool of Canadian -- Mexico study?

1    That was alluded to?

2            **MS. CARFORA:**  Yes.

3            **THE COURT:**  Yeah.  I understood that that was a

4    proposal, that they had to go through the Canadian government,

5    the Canadian government had regulations, so they had to issue

6    some -- I forget what it is.  Some kind of rule or

7    dispensation for that.  They had to go through some

8    authorization process.  I don't recall there was a timetable,

9    I don't recall how far that commitment was, but it was

10   something that everybody wanted to do, including the authors

11   of both studies.

12       And I thought Dr. Grandjean thought it would be useful,

13   because there are some discrepancies, and this pooled study may

14   help.

15       But I don't know if that's what the timetable is.

16   Mr. Connett, do you know anything more?

17           **MR. CONNETT:**  I don't have a specific timetable,

18   Your Honor, but I just want to clarify something, because

19   counsel's conflating two very distinct things.

20       At trial, Dr. Grandjean testified about his intention, an

21   agreement with the authors of the studies to do a benchmark

22   dose analysis.  There was no discussion of releasing all of the

23   raw data, which is what EPA is now asking plaintiffs to do.

24   Those are very distinct things.

25       Doing a benchmark dose analysis of the data in concert

1   with the authors is not the same as what EPA is now requesting

2   for all studies that it bases regulations on, which is to make

3   all of the data for all of the subjects available so that EPA

4   and other interested parties can do a re-analysis.

5       So let's just say for a second that Dr. Grandjean and the

6   authors did a benchmark dose analysis and released their

7   results.  We would be back right where we are today, with EPA

8   saying:  Well, we need to see the underlying raw data so that

9   we can do the benchmark dose analysis ourselves.

10      And with respect to the MIREC study, you go to the MIREC

11  website, the MIREC website provides very clear conditions upon

12  which its data can be released.  And one of the conditions is

13  that the data must stay in Canada.  It must be done -- all

14  analyses of this must be done in Canada.  We're obviously not

15  in Canada.  Plaintiffs have no custody, control, or otherwise

16  of the NIH-funded data.  And EPA, as Your Honor may recall,

17  actually funded the ELEMENT study.

18      So the idea that EPA is putting the burden on plaintiffs

19  after trial has been completed in this case -- and never once

20  before in this case, Your Honor, never once did counsel for EPA

21  ever come to us, and say:  We need the raw data.  Never once.

22  The first time EPA made that request was in early July of this

23  summer.

24      And Your Honor, when they said that to us, they also --

25  counsel told me:  We will make EPA staff available to you.  And

1    they will further explain to you what EPA wants to see in a new

2    petition.

3          Immediately after our meet-and-confer, this is on

4    July 15th, Your Honor, immediately after that meet-and-confer,

5    I sent an email to counsel for EPA, saying:  Please -- I will

6    make myself available any day, any time, through the end of the

7    month.  Any day, any time.  Please tell me as soon as possible

8    who the staff will be who we will meet with, when they will be

9    available.

10         And then, it was on, I believe, August 2nd -- no, it

11   was -- I think July 30th or July 31st, I got an email from

12   Ms. Carfora, saying:  Well, we've thought about it further, and

13   we don't see any point, basically, in making staff available to

14   you.  All the information you need is available in our

15   publicly-available documents.

16         And I should say that on July 18th when I spoke with

17   Ms. Carfora immediately after trial, she made the same

18   statement to me.  That they would be making EPA staff available

19   to us so that we could be -- we could speak directly with EPA

20   staff, to better understand what EPA wants.  And we didn't hear

21   back from counsel until middle of July.  And then they again

22   told us they would make EPA staff available.  I asked for

23   dates, I asked for times.  And then it was the very last minute

24   they told us:  Sorry, we've decided it's not worth it.

25         So, we've tried, Your Honor.  I mean, I tried.  Right

1   after trial, based on Your Honor's comments -- and I can tell

2   you it's not something that our clients want to do.  We're not

3   keen on submitting a new petition, to be frank.  But we wanted

4   to work with the Court and give EPA a second look at this

5   evidence.  And we were prepared to present all of our evidence.

6   The trial declarations, the trial record, and now we would

7   submit the findings of fact.

8        And, and EPA not only maintained the systematic review and

9   insisted that we needed to do a new systematic review above and

10  beyond what we've done, but they added a condition that has

11  never once been part of this case.  They've never once made

12  that a condition or an issue in this case.

13       So --

14       **THE COURT:**  Let me clarify.  What is the EPA position

15   on this?

16       In the joint statement it states that:

17           "EPA maintains the position that a meaningful review

18           of a new petition should include..."

19       And it includes:

20           "No. 2, raw data on key studies/"

21       Which we're being told from MIREC is simply not available,

22  unless you somehow change Canadian law or convince the Canadian

23  authorities, which is not within the power of the plaintiffs to

24  do.

25       Does that mean that if a new petition is submitted, and

1    let's say it contains the data underlying the risk

2    calculations, including the benchmark dose analysis, and what I

3    guess, is debatably a systematic review or something close to a

4    systematic review but no raw data, that the EPA would not

5    review in a substantive way the new petition?

6            **MS. CARFORA:**  If plaintiffs filed a new petition, it

7    would be substantively reviewed by the Agency.  It absolutely

8    would.  Any -- any petitioner, any member of the public can

9    petition EPA under Section 21, and EPA will give careful

10   consideration to any petition that is filed with the Agency.

11   And so, we can't answer that question.

12       I can't, as counsel for EPA -- nobody within EPA can

13   answer that question.  Because until we have the -- until EPA

14   has the petition in front of them, then EPA will be able to

15   look at the petition in total, the body of evidence, within 90

16   days, to determine whether the facts are necessary to establish

17   a rule is required is available in the petition.

18       And I want to clarify for the Court, when we -- when

19   Mr. Connett says that EPA is putting a burden on plaintiffs, it

20   is plaintiffs' burden.  It is -- the plaintiffs carry that

21   burden not only under Section 21, but in trial, it is

22   plaintiffs' burden to prove the facts necessary to establish

23   that a Section 6(a) rule is necessary.  It is their burden.

24       And all that EPA has done in order to also work with the

25   Court is to say:  What -- what could a meaningful substantive

1    review look like?  We've seen the trial record.  EPA considers

2    the trial record.

3         Dr. Henry got on the stand on the last day of trial after

4    listening to all of the testimony, and said:  This is not

5    enough, there's too much inconsistency, there's too much

6    variability, there's too many questions that I need to answer.

7         And so the next step, based on what the Court asked us to

8    do, is:  How can EPA take a meaningful substantive review?

9         And what we wanted to avoid was plaintiffs just filing a

10   new petition, and then what he said originally in his email

11   was:  We're just going to package up the trial evidence, we're

12   going to give it to you, and if you don't respond in 90 days or

13   don't respond the way we want to in 90 days, we're going to go

14   back to the Court and tell them that.

15        That's not really realistic here.  And I think it's a

16   little unfair, and not consistent with what the Court asked us

17   to do, which is:  What does a meaningful substantive review

18   look like?

19        We've seen the trial record.  EPA said the trial record

20   just doesn't rise to the burden of establishing the facts

21   necessary for a 6(a) rule.

22        And so the next question becomes:  What might get us

23   there?  And these are the things that might get us there.  A

24   full systematic review, number one.  The raw data, number two.

25   That might help us try to understand these inconsistencies in

1    the --

2           **THE COURT:**  Is that indispensable?  Is the raw data

3    indispensable?

4           **MS. CARFORA:**  I can't answer that on behalf of EPA.

5    Not without seeing the petition.

6           **THE COURT:**  And what about -- what about what appears

7    to be an off-again/on-again idea of meeting with staff?  Where

8    is that?

9           **MS. CARFORA:**  The EPA has determined that it just

10   doesn't have the resources right now to do that.  It's in the

11   process of publishing the first ten risk evaluations, and it

12   is in the process of scoping out the next 20 risk evaluations.

13   And it is short-staffed, and just does not have the resources

14   to dedicate more to this case.

15      EPA's position is that a hazard of fluoride, a hazard of

16   community water fluoridation has not been established.  EPA's

17   position is they have not even established a hazard.  And so

18   EPA doesn't even get to the second step, which is the dose

19   response step.  And so, EPA just does not have the resources at

20   this time to dedicate to a meeting with plaintiffs.

21      EPA thinks the trial record is clear.  And we, you know,

22   set out for plaintiffs a number of things we think could help

23   meaningful substantive review.

24           **THE COURT:**  Let me ask, have we heard anything more

25   about the NTP final report?

1          **MS. CARFORA:**  I have.  NTP is going to send its

2   report back to the National Academies of Sciences for a second

3   round of peer review.

4          I understand that the single question that's going to be

5   based -- the single question for peer review that's going to be

6   asked is going to be:  Does the scientific data support NTP's

7   conclusion?  I don't know what those conclusions are.

8          That is expected to be public information very shortly.

9          And it's likely peer review will begin -- we'll have a

10  peer review meeting in October.  And NTP expects that a final

11  published systematic review will come first quarter of 2021.

12         **THE COURT:**  But the -- the -- the conclusion will be

13  made -- at least, the tentative conclusion that is going to be

14  submitted for peer review will be made public?

15         **MS. CARFORA:**  It will be made public.  The National

16  Academy of Sciences has a policy of publishing the report

17  seven days prior to a peer review.

18         So, when NAS announces their peer review panel, they will

19  publish the draft report on their website.  And that will be

20  the first time it will be publicly available.

21         And again, I understand that that's going to be some time

22  in October.  But I don't have the exact date.

23         **THE COURT:**  Okay.

24         Do you know anything different, Mr. Connett?

25         **MR. CONNETT:**  I -- my knowledge is consistent with

1    Ms. Carfora's.

2        There is an NAS meeting on October 19th, which is the

3    first meeting where they will be looking at the revised NTP

4    monograph.  NTP will be releasing that monograph publicly about

5    seven ten to ten days prior to October 19th.  But I -- as

6    Ms. Carfora noted, this will be a draft monograph, Your Honor.

7    And there's no date certain as to when this is completed.

8        The NTP has been working on this monograph for, now, three

9    years.  They issued their draft last fall.  They're now going

10   to issue a revised draft.  And so this process is taking a

11   considerable length of time.  And we have no way of knowing

12   when it's going to be finalized.

13       And as you may recall, last fall, plaintiffs did seek to

14   introduce the NTP report into evidence in the case.  And EPA

15   filed a motion in limine to exclude it, in part, on the grounds

16   that it's a draft monograph.  And so we're sort of right back

17   to where we were.  We're going to have a draft report, and

18   we're going to have an uncertain timeline for when it's

19   finalized.

20           **THE COURT:**  Well, this draft report will be one step

21   -- a more developed iteration than the draft monograph,

22   because it would already have gone through some review, one

23   level of review.  It's not the final.

24       And if -- if -- you know, I think you probably would have

25   some concept of how long peer review might take.  So at least

1  there is a foreseeable point where there's going to be a

2  conclusion coming out of the NTP.

3          **MR. CONNETT:**  There will be a conclusion.  However,

4   you basically have several processes.  You have the NAS peer

5   review commencing in October.  When it's completed, I don't

6   know.  End of the year, early next year.

7          But then, as happened last time, the NAS made a whole

8  number of recommendations that the NTP then had to incorporate,

9  which has taken about eight months now.  So if the NAS issues a

10  whole new slate of recommendations, we could be waiting, we

11  could be back to, you know, where we are now, next year, with

12  the -- another revised monograph.

13          So plaintiffs do have concern, Your Honor, about -- you

14  know, science is never complete.  You know.  I wish we could,

15  you know, know that there's the final study to definitively

16  resolve everything, and we knew a date for in December.  But I

17  think it's -- that's obviously not the burden, under TSCA, to

18  prove things to that level of --

19          **THE COURT:**  No, I understand that.  I understand that

20   science is not always exact, that it develops, changes, and

21   TSCA doesn't require any one particular thing.

22          But as I stated at the close of the trial, the NTP

23  analysis clearly is a -- at least presumptively, a credible

24  thorough source or assessment.  And I think would -- would

25  contribute substantially to this -- to the analysis here.

1      What about the pooled study?  Do we know anything more

2  about how that's progressed, or any sign as to when that's

3  going to be -- how far along is that?

4          **MR. CONNETT:**  I -- I don't have any details on that,

5  Your Honor.  I do know, as was mentioned at trial, there was

6  an abstract published in February where they did a

7  sex-specific analysis where they looked at the ELEMENT data

8  and the MIREC data that has not yet been published.

9      It is my understanding that that may be putting -- that

10  there may be a manuscript being written about that analysis.

11  But I don't have any further details with any kind of

12  specificity.

13          **THE COURT:**  And the other thing that came up at

14  trial, it's not in evidence, but there was mention of the

15  Spanish study that's being submitted for publication.

16      Is there any further word on whether that's been

17  peer-reviewed, and how far along that is in terms of

18  publication, or not?

19          **MR. CONNETT:**  We -- it's my understanding that that

20  analysis may have been stopped, but -- that they are

21  continuing forward with it, but that there's been some, I

22  think, maybe some re-analyses internally on that.

23      But I don't have any further details in terms of --

24          **THE COURT:**  All right.

25      Ms. Carfora, does the EPA know anything about that?

1    **MS. CARFORA:**  The only information we have is that

2    it's going to be submitted for publication soon.  That's the

3    best information we have.

4    **THE COURT:**  So you know nothing more than what was

5    said during the trial?

6    **MS. CARFORA:**  No, Your Honor.

7    **THE COURT:**  Okay.  Well, here's the situation.  There

8    are -- and I don't want to turn this into an oral argument,

9    but I want to indicate right now that I have been looking at

10   the standing issue.  The standing issues are very serious, and

11   it raises some -- some significant questions, and frankly,

12   doubts about standing.

13       So one of the benefits of filing a new petition -- and I

14   had hoped that, number one, that would give the plaintiffs an

15   opportunity to remove the complicated standing issues with

16   respect to the current named plaintiffs and those who filed the

17   original petition, because as we know, none of them present the

18   kind of risk that is the -- the topic of trial, and the focus

19   of all the evidence, which is the risk of the developmental and

20   cognitive impairments to infants and children as a result of

21   maternal exposure, and exposure particularly of bottle-fed

22   infants.

23       And it's an entirely different problem.  I understand the

24   issues about zone of interest and all that sort of stuff.  But

25   I think there are grave questions about standing.

 1          So one of the advantages of doing a new petition is that

 2    those issues can be cleaned up.  And at some point, if this

 3    Court has to, it can address the merits of the issue with the

 4    confidence that the merits will be properly addressable.

 5          Two, it's obviously my hope that with the new evidence,

 6    that the Agency, the EPA, would take a second look, and not

 7    sort of just prejudge this and say: Well, we've seen the

 8    evidence at trial, and...  You know, having a litigation

 9    position is one thing; taking an independent look may be

10    something else.

11          And particularly if the NTP comes out, depending on what

12    they do, you know, that at least there will be a publication of

13    their -- their proposed conclusions, which may be very useful.

14          If the NTP finds that there is a risk, regardless of what

15    is in the -- you know, whether the petition contains a

16    formalized systematic review, whether it contains the raw data

17    which is -- we now hear is almost impossible to get on the

18    Canadian side, I think it would be irresponsible for the Agency

19    just to say:  Well, we've seen this before, and we're not going

20    to pay attention to it.

21          This stuff is developing as we go along.  And

22    significantly.  And I would hope that the EPA would exercise --

23    I understand the timeframe is short.  I understand all the

24    arguments as to why it should be wrapped up in a complete

25    package with a nice ribbon on it, and a nice systematic review

1    and everything else.  But, you know, there's a lot on the table

2    now.

3         And so my inclination is to hold this case in abeyance.

4    And in fact, I'm going to hold the record open, because

5    depending on what happens with some of this other stuff, we may

6    need to take some additional evidence.

7         I am particularly interested, I will tell you, in what the

8    NTP says about this.  Even if it's not conclusory -- you know,

9    even if it's -- it hasn't reached a final conclusion, I'm

10   hoping that conclusion will be reached fairly quickly with NAS

11   review, peer review.

12        But the idea of not even waiting to see what that looks

13   like on such an important issue where there is clearly

14   substantial evidence -- whether it meets the standard or not,

15   that's the issue for the Court ultimately to decide or for the

16   EPA to decide on a new petition.  But one can't deny the

17   substantial questions that are raised by the ELEMENT and the

18   MIREC studies which, at least so far, are -- is the most

19   reliabile and the best-conducted evidence that we have on this

20   point.  Not to say that it is without, you know, any potential

21   flaws, problems or questions.

22        So that is -- that's where I'm headed.  I understand that

23   the plaintiffs are anxious to get a dispositive ruling out of

24   this Court, but I think this is something that needs some

25   further clarification.  And I think the standing question is a

1    substantial one.

2         And I would ask that the plaintiff, if they are going to

3    resubmit a petition, needs to do so with that issue in mind.

4         **MR. CONNETT:**  Your Honor, if I could, two issues I

5     want to follow up on briefly.  First, with respect to

6     standing.

7         Now, leaving aside the arguments in the briefing with

8    respect to what the burden is for standing, what -- if -- you

9    know, now that we are -- the case sounds like will be in

10   abeyance waiting for the NTP report, and the Court is open to

11   holding the record open and introducing potentially new

12   evidence in the case, I wanted to flag an issue with standing,

13   and if possible, get the Court's guidance on this.

14        As you know one, of the plaintiffs in the case is Food &

15   Water Watch.  And they are a large organization with 70,000

16   members.  And I can tell the Court that there are many pregnant

17   women in this organization.  There's many women of childbearing

18   age in this organization.  And it would not be difficult at all

19   for us to identify members of the plaintiff organization who

20   fit this class that Your Honor has identified today.

21        So -- and I know that we have -- obviously -- you know,

22   I'm sure counsel's jumping at the bit to remind the Court about

23   the stipulation that we had earlier in this case, where we

24   agreed to rest on the facts set forth in the declarations of

25   the plaintiffs.  And that's true, we did.

1        We're obviously post-trial now.  We went through the

2   trial, and we honored that agreement.  And -- we honored our

3   agreement.  And we're now entering a sort of a new --

4   potentially a new phase of this case.  And we're in a situation

5   where we have, clearly -- I mean, we probably have hundreds if

6   not thousands of members of plaintiff organizations that fit

7   the class that Your Honor has identified.

8        So, I guess I would just look for guidance from the Court

9   as to how we could basically introduce that fact into this

10  record.  And it might -- obviously, it would simplify the

11  standing analysis, if we did.  So that's one issue I wanted to

12  flag for the Court.

13       And two was to raise this -- you know, if the -- if we are

14  to -- if the record is to ultimately consider the findings of

15  the NTP's systematic review, we had flagged this back at the

16  end of trial.  But, you know, the EPA obviously -- the NTP and

17  EPA are distinct organizations, I understand that.  But the EPA

18  does have a say, an input into NTP reviews.  We learned that in

19  discovery in this case, in the 2016 systematic review, where

20  EPA provided substantial input into the NTP's earlier report.

21       So I guess one question we want -- that we're wondering is

22  if the Court is to consider the NTP systematic review from

23  later this year, would there be a potential right for discovery

24  for plaintiffs where we could discover the communications from

25  EPA to NTP?

1          **THE COURT:**  All right.   What's the government's

2     response to those two points?

3          **MS. CARFORA:**  Well, Your Honor, trial's over.   And

4     plaintiffs had an obligation and a burden to meet.   One of

5     those things was standing.   We made standing a point

6     throughout this -- we made it a point at summary judgment; we

7     made it a point at trial.

8          They're not -- we're not aware of -- I'm sorry.   Let me

9     put it this way.   Plaintiffs have been on notice of our

10    standing arguments since summary judgment and before.

11         We, in very early discovery, sought to depose all of their

12    standing witnesses.   And Mr. Connett put up a -- said he didn't

13    want to have to schedule 12 depositions and all of those

14    things, and so he agreed to do this via stipulation.   He agreed

15    to stand on -- on the evidence that we had.

16         So we took two depositions.   He agreed to stand on the

17    rest of the evidence.   Food & Water Watch, who Mr. Connett,

18    himself, is a member of, who Mr. Connett's parents are on the

19    board of, they, themselves, determined that they did not want

20    to be subject to deposition.   And instead, they didn't even --

21    they -- Food & Water Watch did not even file a declaration.

22    They determined that they did not --

23         **MR. CONNETT:**  That's (inaudible) false.

24         **THE COURT:**  Hold on.   One at a time, please.

25         **MS. CARFORA:**  It was my understanding at this time,

1   just based on my memory of the record, is that Food & Water

2   Watch did not even file a declaration, and that they did not

3   want to be deposed.  I might be wrong on that.  But they did

4   not want to be deposed.

5           **THE COURT:**  Right.  Well, in any event, here's where

6   we are.

7           **MS. CARFORA:**  Your Honor, if I may.

8           **THE COURT:**  Well, let me just finish.

9       I'm not going to allow any new evidence on standing.  That

10  door is closed.  I said I would leave the record open, to take

11  into account things -- intervening developments.  Not a redo:

12  Oh, I forget this study, or I forget to mention this.  No.

13  That's over.

14          **MS. CARFORA:**  Your Honor --

15          **THE COURT:**  Hold on.

16      If there's a new NTP study, if there's a new study coming

17  out, a pooled study somehow comes out and there is some early

18  publication of that, or if a Spanish study comes out, that are

19  on point that wasn't available at trial, that's the kind of

20  thing I would hold open.  And I'm deliberately holding it open

21  because I know the NTP is coming with something, and hopefully

22  with a final conclusion, soon.

23      So the short answer is no, I'm not going to allow further

24  declarations because that just -- then you're going to have to

25  have discovery, then you have to have depositions.  Because if

1    you're talking about organizational standing, then that opens

2    other -- that's a different -- that's a different vehicle for

3    standing.  And the elements necessary to demonstrate that are

4    different, and may require some factual inquiry, or at least,

5    to be fair to the to other side, an inquiry into the

6    organization, and the purpose of the organization, how the

7    organization is affected, how the public -- how the fisc of the

8    organization is affected by this issue, et cetera, et cetera.

9    So there are issues that -- that, if that was going to be the

10   theory, that should have been put forth earlier.

11       So I'm not going to allow the door to reopen on standing.

12   I'm just telling you right now, you've made your stand, and I'm

13   indicating to you I have serious, serious questions, there are

14   serious substantial questions about standing, which, if it

15   doesn't go your way, would obviate the entire effort.

16       And if you're going submit a new petition, you ought to

17   consider that.  That's all I'm suggesting.

18           MR. CONNETT:  Well, and Your Honor, we certainly, um,

19   as -- you know, we certainly have tried to work with EPA to

20   submit a new petition, pursuant to Your Honor's guidance from

21   trial.  But we are in a situation where EPA has effectively

22   said:  No, we're not going to consider it.  Because we can't

23   get the raw data.

24       So just -- we can't -- that's not an option available to

25   us at this time, Your Honor.

1          **THE COURT:**  Well, I'm not hearing that that is

2    necessarily a clear pre-condition.  I think it would be a huge

3    mistake, frankly, if that's going to be the EPA's decision:

4    We're not even going to look at this if we can't get the raw

5    data...  As is demonstrated by all of the comments now to the

6    proposed rule, if the EPA were to do this, it would be taking

7    a step that is certainly not favored by many, many

8    organizations in the scientific community.

9          But, you know, so I'll just have to see what the EPA does.

10   I'm urging the EPA to look at this substantively.  And by the

11   time they get a revised petition, there will be some indication

12   from the NTP.  And I think the EPA ought to look at this

13   *de novo*, as it should, and make an honest assessment.

14         Now, if they don't, you have got your remedies.  You

15   certainly have -- you can -- you know, we'd have to talk about

16   whether you file a new complaint, or amend the complaint to now

17   allege that you have filed a second petition.  Frankly, that

18   should not matter that much, I don't think.  One way or the

19   other, it'll be back here.

20         Whether you have APA remedies.  I mean, I know there's

21   some case law on this question.  Whether you could force the

22   Agency to not apply what might be an unfair rule or an

23   arbitrary and capricious rule, I don't know.  But there may be

24   other things.

25         But I do feel that it makes sense, if for no other reason

1   at least on the standing question to clean that up, that that's

2   what we ought do.

3         **MR. CONNETT:**  So with respect to filing a new

4    petition, the whole focus of our negotiations this summer with

5    EPA was this -- sort of idea-wise, we would file a new

6    petition, and EPA would have its 90 days to consider it.

7         And if EPA denied the petition, we would automatically

8    just go -- you know, the case would basically be stayed.  And

9    if EPA denied the petition, the case would go right back to

10   this Court, and, and the case would resume from there.

11        What we didn't -- so I -- the -- I guess the question I

12   have is if we were to just go out, the plaintiffs just to go

13   out, outside of this litigation, and file a new petition with

14   EPA -- which obviously we have the right to do, because anyone

15   can file a petition -- if EPA denies that petition, is there a

16   mechanism to get -- just get this back to this Court, so that

17   we don't start over?

18        Because starting over, Your Honor, I can tell you, is most

19   likely going to be just not -- it's just not going to be

20   feasible for the plaintiffs, I mean, to do this entire

21   litigation again.

22        So I don't know -- to the extent that that's an available

23   mechanism, where we file a new petition, and get -- and if they

24   deny the petition we get it brought back into this case right

25   here, that certainly makes it a far more -- that would make it

1  a feasible enterprise for plaintiffs.

2      **THE COURT:**  Well, one way to do this is to -- is to

3  amend the complaint here, after you've sort of exhausted your

4  -- your administrative process.  It would have to allege what

5  has happened since then, to bring it up to date.

6      And whether -- and if that occasions, you know, reopening

7  of evidence -- not new intervening evidence, but if that

8  reoccasions some other evidence that need to be done or other

9  motions, for instance, another standing motion, then we can

10  hear it.  Then I would be -- because a new complaint can

11  generate new activity.

12      I would assume that there's not going to be any new

13  evidence on the science, other than unless the -- you know,

14  intervening stuff that comes up, which I would -- I would leave

15  the evidence open for that purpose, in any event.

16      But I -- I don't see why you simply could just not just

17  simply amend the complaint herein -- which might precipitate a

18  motion to dismiss or something else.  But once we get the

19  pleadings squared away, the trial -- you know, I'm going to

20  deem that the trial record has been made on that problem.  I'm

21  not going to retry the case.  I'm not going to reexamine

22  everybody.  I'd just use this trial record.

23      **MS. CARFORA:**  Your Honor, I would have to look into

24  the case law on the procedural mechanisms you're suggesting.

25      There's a couple of issues I want to address.  Mainly, the

1    NTP review.  You know, my client has a real concern with giving

2    plaintiffs an opportunity now to close the gaps in their case,

3    in holding this case in abeyance.  My client objects to holding

4    this case in abeyance or staying it.  My client would like the

5    Court could go forward on the trial record, and issue a

6    decision.

7            As for the NTP review, monograph, whether it gets

8    published or not published, draft or not draft, the bottom line

9    is that it would be inappropriate at this time for the Court to

10   consider the new monograph, in a vacuum, outside of the context

11   of the rest of the evidence, and without the experts having the

12   opportunity to look at that and understand what all that means.

13   Especially if it's the case the NTP review officers a decision

14   in the context of community water fluoridation, which is a

15   possibility.  And so that context is going to be important for

16   everyone to understand, regardless of what the bottom line

17   conclusion is.

18           And that is why EPA, in October of 2019, came to this

19   Court and to plaintiffs when the original monograph draft was

20   issued, and said: Let's hold on a second, let's look at this.

21   Let's let our experts look at this, let's figure out what this

22   means.  And we asked everyone to pause and give us an

23   opportunity to do that.

24           Plaintiffs opposed it.  And the Court agreed with

25   plaintiffs, and decided:  No, we're going to go forward with

1    the record as it is.

2        So at this point, post-trial, we would -- we would

3    completely object that the Court would consider the monograph

4    in a vacuum outside the scope of all the evidence that was

5    presented, and without having our experts to have an

6    opportunity --

7            THE COURT:  I didn't -- I never said anything one way

8     or the other about "in a vacuum."  I'm just saying I'm going

9     to leave the record open for the limited purposes of taking

10    into account -- leaving the door open for intervening new

11    evidence that will include the NTP, in all likelihood.

12        And that may mean that we hear more testimony from

13    experts.  And we can talk about that.  I don't want to hear ten

14    experts, but I'd like to hear from a couple of experts on --

15    one on each side, perhaps, about what this means, and -- and

16    so, I -- yeah.  No, I'm not going to just take this NTP and go

17    into a closet and read it, and then come out with a conclusion.

18    I want to know more about it.

19        But it's simply, on an issue this important, where the --

20    where there are, I think, serious questions raised, but not

21    without, you know, potential issues within issues here, that

22    the NTP study, everybody -- I think everybody would agree here

23    that the NTP enjoys a high degree of respect and stature in the

24    scientific community, that this is their, you know, area that

25    they're looking at that is within their historic expertise.

1    They're using systematic review, which nobody doubts is a -- at

2    least, that's the best methodology.  May not be the only

3    methodology, but it is the best available at this point.  And

4    it may be that we have to have some more testimony.  I don't

5    know yet.

6        I'm just saying that is another reason why it makes sense,

7    frankly, to spend this time allowing the agency to take a

8    second look, allowing the plaintiff to straighten out the

9    standing issues which I also think are very serious, as I

10   mentioned.

11       And then if we have to come back here, if the Agency does

12   not take any action, and the plaintiffs decides they want to

13   take it up, there will be a mechanism.  I mean, we could

14   formally require to you file a new complaint and then I

15   consolidate the cases, or you just simply amend the complaint.

16       Frankly, I don't see why one or the other has to be done.

17   The simple way is to amend the complaint.  But that does mean

18   that there may be yet still a standing challenge.  There may be

19   other issues, when you amend the complaint, that does open the

20   door for some pleading work.

21       But as far as the trial record, that trial record still

22   stands.  And I would admit only things that are necessary and

23   warranted, in terms of any reopening.

24           **MR. CONNETT:**  Your Honor, in terms of -- two

25    questions.  One, would the Court consider oral argument on the

1   standing issue, as it has been presented to the Court?

2   Because I do believe that the case law is -- is strongly on

3   our side for having met our burden.

4       So we just -- I would -- to the extent that the Court

5   would entertain oral argument, we would certainly welcome that

6   opportunity.

7           **THE COURT:**  Okay.  The answer is no.  I've looked at

8   it, and I understand it.  And I'm just telling you that there

9   are serious questions.  And I'm not going to be convinced that

10  there's not serious questions.  And, and that's why -- one

11  reason why I'm going to put this case in abeyance until the

12  plaintiff goes through the petition process.

13          **MR. CONNETT:**  With respect to the NTP, Your Honor, in

14  terms of a timeframe on that, is the -- is the Court's

15  interest here the revised monograph that will be released in

16  October?  Or the finalized version, when that comes --

17          **THE COURT:**  Well, I don't know yet.  I mean,

18  obviously, the finalized version is what's going to be the

19  most, sort of, dispositive.  An interim monograph, you know,

20  may not have the same force and effect.

21      On the other hand, it may not be relevant.  I mean,

22  substantively, it's going to contain, I assume, some

23  explanation and some analysis.

24      And what I intend to do is we can schedule a status

25  conference, because it's not like the case is dismissed, the

1   case is still here while you're in a parallel track.   And

2   that's going take at least -- you know, however long it takes

3   for you to put together a petition.   And then the EPA has 90

4   days to respond.

5        So, you know, we could schedule something out into, let's

6   say, October.   Maybe after the NAS has their first meeting,

7   well, maybe we'll know a little more at that point.   We can

8   schedule a status conference in November.   And by that point,

9   your petition will hopefully, presumably, be well on its way,

10  and we'll see where that's at, and talk about case scheduling

11  from there.

12       So that's what I'm going to do.   I'm going to hold the

13  case in abeyance now.   I'm going to indicate that I am opening

14  -- I will -- I'm going to reopen, be willing to reopen the

15  evidence for things that arise, intervening developments,

16  intervening studies, intervening things.   And if necessary, to

17  resolve any standing or jurisdictional issues, if there's some

18  pleading questions or evidentiary questions that need to be

19  looked at.   Not on the existing members.   If you come back with

20  the same people, that's not -- but if you come back with a

21  different approach, and there are issues there and that raises,

22  you know, evidentiary questions, we may have to look at that,

23  too.   But I'll make that judgment when we get there.

24       And then let's set a status conference for November.

25  Angie?

 1          **THE CLERK:**  November 5th, Your Honor, 10:30.

 2          **THE COURT:**  Okay, November 5th at 10:30.

 3          **MR. CONNETT:**  Oh.  And one bit of housekeeping,

 4  Your Honor, I forgot to mention.

 5          **THE COURT:**  Yeah.

 6          **MR. CONNETT:**  We -- I've been in contact with Mr. Do

 7  from opposing counsel about -- we've identified some errors in

 8  the trial transcript.  And we've been -- we've had some

 9  communications about it.

10      We were thinking about filing something with the Court to

11  identify them and maybe make a request to the court reporter to

12  make -- to check the audio and make any necessary corrections.

13      Is that a process that the Court -- is that something that

14  -- should we be submitting that to Your Honor?  Or should we be

15  communicating directly with the court reporter?  Is there any

16  preference of the Court?

17          **THE COURT:**  I think what you should do is reach a

18  stipulation about the corrections, and just list all of those.

19  That way it will be in the record.  You can file that as a

20  stip.  And then we'll have -- I assume the court reporter will

21  then also correct the record, in that regard.

22          **MS. CARFORA:**  Just to clarify, Your Honor, I think

23  that for some of them, we might know -- we might be able to

24  stipulate:  This is what the word should be.  But for other

25  errors, we would actually need the court reporter to go back

1   and look, because we're not sure what was said.

2          THE COURT:  Yeah.  I mean, you can ask her to go back

3   and look at it, and then reach your stipulation, hopefully.

4   Hopefully there's not going to be a need for me to adjudicate,

5   you know.  I think you all can figure that out with the help

6   of the court reporter.

7          MR. CONNETT:  Yeah.

8          THE COURT:  And, just one master stipulation to

9   correct the record.

10          MR. CONNETT:  Yeah.

11          THE COURT:  That would be helpful.

12          MR. CONNETT:  That -- those should not be any

13   problem, Your Honor.

14          THE COURT:  Good.  All right.

15      Again, you know, I understand that there's a -- there's a

16   gap here in terms of the potential approach to this petition.

17      But I'm going to urge, number one, that the plaintiffs do

18   what you cannot only to address standing issues, but to the

19   extent that you can provide whatever you can -- you know what

20   they want.

21      Maybe you can't provide all of it, but I would provide as

22   much as you can, that you are comfortable in doing.  And if

23   that means the underlying calculations of Dr. Grandjean which

24   has some extrapolated data, it seems to me that that ought to

25   be presented.

1          And with respect to, you know, the question of systematic

2     review, you know, my view is that you can do a lot in terms of

3     trying to meet many of the elements of systematic review, such

4     as an evaluation and explanation of the weight given to, you

5     know, the various studies.  You've almost sort of done that in

6     some of your filings here.  You might want to look at it and

7     see if you can do it in a way that, if not gets to the T, at

8     least close to what a systematic review might like.

9          And I would urge the EPA not to exalt form over substance.

10    That to the extent the key elements of systematic review are

11    there, that the Agency consider that.  I hope the Agency does

12    not insist that it will not do anything absent raw data from

13    places that it can't be had from, like the Canadian study.  I

14    think that would be real mistake, and not in keeping with the

15    effort to try to make an honest determination of the scientific

16    evidence here.

17         I mean, I understand the value of that, but it is evident

18    that some of that just cannot be gotten.  And I hope that is

19    not a pre-condition to meaningful review.

20         But with that, I'm going to allow the plaintiff to go

21    back, file a new petition addressing the issues that I've

22    mentioned, keep this case in abeyance, and leave the door open

23    for new evidence that may develop in the interim.

24         And so we'll have -- we'll see you back here at the status

25    conference on November 5th.

1          **MR. CONNETT:**  Thank you.

2          **MS. CARFORA:**  Thank Your Honor.

3          **THE COURT:**  All right?  Thank you.  Good luck.

4          **MR. NIDEL:**  Thank you.

5          **MR. CONNETT:**  Thank you.

6      (Proceedings concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

_Belle Ball_

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, August 11, 2020