Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

FOOD & WATER WATCH, INC.,        )
et al.,                          )
                                 )
            Plaintiffs,          )
                                 )
    VS.                          )   NO. C 17-02162 EMC
                                 )
U.S. ENVIRONMENTAL PROTECTION    )
AGENCY, et al.,                  )
                                 )
            Defendants.          )
_____)

                         San Francisco, California
                         Wednesday, October 26, 2022

     **TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
                    WATERS KRAUS & PAUL LLP
                    222 North Pacific Coast Highway
                    Suite 1900
                    El Segunda, California 90245
             BY:  **MICHAEL P. CONNETT, ATTORNEY AT LAW**


For Defendant United States Environmental Protection Agency:
                    U.S. DEPARTMENT OF JUSTICE
                    Environment & Natural Resources Division
                    Environmental Defense Section
                    150 M Street, N.E.
                    Washington, D.C. 20002
             BY:  **BRANDON N. ADKINS, TRIAL ATTORNEY**
                  **PAUL A. CAINTIC, TRIAL ATTORNEY**


REPORTED REMOTELY BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

<u>**Wednesday - October 26, 2022**</u>                      <u>**3:31 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---o0o---**

**THE CLERK:**  Good afternoon, Your Honor.

**THE COURT:**  Good afternoon.

**THE CLERK:**  Everyone is present.  We're ready to begin.

**THE COURT:**  All right.  Thank you.

**THE CLERK:**  You're welcome.

These proceedings are being recorded by this court.  Any other recording of this proceeding, either by audio, video, including screenshots or other copying of the hearing, is strictly prohibited.

This Court is now in session.  The Honorable Edward M. Chen presiding.

Court is calling the case Food & Water Watch, Inc., et al. vs. Environmental Protection Agency, et al., Case Number 17-2162.

Counsel, please state your appearance for the record, beginning with the plaintiff.

**MR. CONNETT:**  Good afternoon, Your Honor.  Michael Connett for the plaintiffs.

**THE COURT:**  All right.  Good afternoon, Mr. Connett.

**MR. ADKINS:**  Good afternoon, Your Honor.  Brandon Adkins on behalf of EPA.  I also have with me today, I think just as an attendee, Mr. Paul Caintic, who's now counsel of record.

1          I'd like to note that Mr. Caintic was an intern with us

2     during the trial in this case, and he's now --

3          **THE COURT:**  Oh.

4          **MR. ADKINS:**  -- he's now joined our section at the

5     Department of Justice.

6          So welcome, Mr. Caintic.

7          **THE COURT:**  Excellent.  Excellent.  Welcome to him.

8          Does he want to join as a panel member, come into the

9     well, or stay as a --

10         **MR. ADKINS:**  Well, I think Madam Clerk offered him an

11    opportunity to do so and he didn't.  So I think we might want

12    to leave it at that, although I'm sure --

13         **THE COURT:**  All right.

14         **MR. ADKINS:**  -- he is prepared to join if you'd like to

15    see him.

16         **THE COURT:**  Okay.  Well, I'll leave it up to him.

17         Okay.  So let me try to understand a couple of things

18    here.  I guess I'm a little bit puzzled by what is happening

19    with the NTP monograph.

20         So it's been reviewed now, peer-reviewed -- is it four

21    times?  Is that right?

22         **MR. ADKINS:**  Well, it's been -- my understanding,

23    Your Honor, is it's been peer-reviewed by NASEM twice.  Once,

24    the 2019 version, and then the 2020 draft.

25         We were under the impression that there was another round

1    of review -- I'm not sure if it would be characterized as "peer

2    review" or what, and counsel will correct me if I'm misstating

3    this -- but near the beginning of last year.

4         Based on the declaration that we obtained from

5    Dr. Woychik, which we submitted together with our papers with

6    respect to the instant motion, there was the -- another draft

7    of the monograph was circulated to entities within HHS; and

8    from what I understand, that process is now complete.

9         And so I'm not sure where that leaves us in terms of

10   count, but there were at least two official peer reviews by

11   NASEM, plus this additional review.

12       **MR. CONNETT:**  And I would add to that, Your Honor.

13       As the parties reported to the Court in January of this

14   year, based on correspondence from NTP's attorney, NTP finished

15   a third draft of their monograph last fall, in November,

16   November 21.  At that time, NTP submitted that draft for

17   external peer review to five external peer reviewers, so --

18   which I understand to be scientists outside of the federal

19   government.

20       As you may have seen in our reply papers, that is a common

21   way for NTP to do review, is to do what's called a peer review

22   by letter, where they submit it to scientists outside

23   the Government for usually a one-month process, a couple

24   months.

25       So in November of last year, NTP submitted the draft for

1    review.

2         We heard in February from a source with knowledge that

3    that review -- all of the comments were received from those

4    five external reviewers and that NTP incorporated the

5    suggestions, which I understand were relatively -- you know,

6    not any major revisions were suggested.  NTP finished and

7    completed its report by May of this year.

8         And I have confirmed, Your Honor, last week with an

9    attorney for the Department of Justice in a separate action

10   that we have now, a FOIA action, that there is a May 2022

11   report.  They have it.  It's in the DOJ's possession.  It was a

12   final report.  It was set to be released on May 18th.  It was

13   final.  It had gone through, at that point, three complete peer

14   review processes.

15        For reasons that are currently unknown, in the days before

16   that report -- that final report was released, there was a

17   decision made to not release it.

18        And then during this summer, that report was submitted

19   again to agencies within the Department of -- entities within

20   the Department of Health and Human Services to allow them to

21   review it again.

22        Based on what counsel has just reported, those entities

23   within the Department of Health and Human Services apparently

24   have now completed that review.  So if you consider that a peer

25   review, that would be the fourth peer review of this document.

1          And now, based on the declaration by Dr. Woychik, the

2     director of NTP, this report, which has now been peer-reviewed

3     four times, is going to be submitted for a fifth peer review by

4     the -- by a working committee of the Board of Scientific

5     Counselors at NTP.

6          So there will now -- there will be at least five separate

7     peer review processes extending over four years.  And as you

8     may have seen, Your Honor, in our reply papers, this is, to put

9     it mildly, exceptionally unusual.

10          NTP's peer review process for every single monograph of

11     the 20 in its current library, the peer review process is

12     typically one public meeting lasting one or two days where four

13     or five or six or ten scientists hear comments and make a vote

14     in public as to whether they endorse NTP's conclusions or not,

15     a very public, pretty short process.  Here again, we're now on

16     to the fourth year.  We're going to have a fifth body review

17     this report.

18          Now, our concern, Your Honor, given that the peer review

19     process here is so unusual and is taking so long, it looks to

20     us like the results are not appreciated or liked by someone;

21     and it concerns us because we believe that report was finalized

22     in May of this year, after three complete rounds of peer

23     review.

24          We believe that report from May -- which I have never

25     seen, I do not know what it says.  But we believe that report

1    is what we've all been waiting for.  And we believe that having

2    that report from May '22, together with the public peer review

3    comments by NASEM, permits this Court and provides this Court

4    with a very rich body of information to assess the scientific

5    literature on this issue.  You're going to have a vigorous peer

6    review from NASEM, and you're going to have NTP's expert

7    synthesis of that peer review in that document, and you're

8    going to have experts on both sides commenting on those

9    documents.  I believe this will provide the Court with an

10   exquisite body of information in order to make its

11   determination in this case.

12       **THE COURT:**  All right.  Let me ask you a couple of

13   questions.

14       I'm trying to recall.  The second draft that was issued in

15   February of 2021, that's public?

16       **MR. CONNETT:**  Yes.

17       **THE COURT:**  That's publicly accessible?

18       **MR. CONNETT:**  Yes.  The NTP released its second draft,

19   Your Honor, in September of 2020.  It released its first draft

20   in September of 2019.

21       NASEM issued its first peer review in March of 2020, and

22   NASEM issued its second peer review in February of 2021.

23       So those four documents are all public:  NTP's first

24   draft, NASEM's first peer review, NTP's second draft and

25   NASEM's second peer review.  All of those are public documents

1    for everyone to see.

2          THE COURT:  And Dr. Woychik describes -- and I'm trying to

3    recall because I remember seeing one of the drafts -- says that

4    NTP subsequently removed the hazard conclusion for fluoride and

5    separated the report into two documents.

6          MR. CONNETT:  Yes, that is correct.

7          So in the third -- the third draft that NTP had completed

8    by November of '21, which was submitted for external peer

9    review the beginning of this year and which completed that

10   external peer review at the early part of this year, that

11   document, Your Honor, is what is called a state-of-the-science

12   report.  It's still a monograph, but it's providing a state of

13   the science, and it's not making any formal hazard conclusions

14   one way or the other.  The purpose of this report is just to

15   explain and synthesize the current scientific evidence on

16   fluoride neurotoxicity with a focus on the human

17   epidemiological literature.

18         MR. ADKINS:  May I be heard on a matter of clarification,

19   Your Honor?

20         THE COURT:  Yeah.

21         MR. ADKINS:  You know, I'm hesitant to rely on, you know,

22   unnamed sources; and that's one of the reasons why we submitted

23   this declaration from Dr. Woychik, so the Court could have

24   something in writing under pains of perjury to try to predict

25   where this is heading.

1    I'm not saying anything new about the DHS or the HHS

2    review.  That was in paragraph 5 of Dr. Woychik's declaration,

3    and that says that that review took place between July 2021 and

4    July 2022.

5    This Board of Scientific Counselors, I'm not sure I would

6    characterize that as a peer review.  Maybe it is; maybe it

7    isn't.  But what Dr. Woychik stated in his declaration is that

8    their task is to determine whether NTP's responses to the

9    reviews of the meta-analysis and the systemic review were

10   adequate.  So I'm not sure if that means it's a full-scale peer

11   review or if it's something more limited.  So those are two

12   important things to keep in mind.

13   The third is, I'm not sure what counsel means when he says

14   "NTP released."  I'm not aware of NTP actually making these

15   things public.

16   The way they became public is by NASEM, ahead of its

17   meetings, when it would report -- or when it had a public

18   meeting to discuss the two drafts of NTP's monograph, made

19   those drafts of NTP's monograph public on its website.  So it's

20   not that NTP is going out there and publishing interim drafts.

21   They became public through this review process.

22   **THE COURT:**  Right.  Right.  And so what's become public so

23   far, then, is only what we've been referring to as the

24   so-called second draft.

25   Any drafts after that, Mr. Connett described as sort of a

```
 1   third draft in late 2021, the one that was being reviewed
 2   internally, that's not accessible?
 3        MR. ADKINS:  No, Your Honor.
 4        MR. CONNETT:  That has not been publicly released.  And
 5   that draft, Your Honor, was released -- was reviewed externally
 6   as well by those five independent scientists that NTP submitted
 7   that draft for review from.
 8        THE COURT:  And that process was completed in May of this
 9   year?
10        MR. CONNETT:  In February.  The external -- the comments
11   from those five reviewers was received no later than
12   February 22nd.
13        THE COURT:  All right.  Then it was incorporated, you
14   said, by May?
15        MR. CONNETT:  Correct.
16        THE COURT:  But that document has not been made available
17   publicly?
18        MR. CONNETT:  It has not been made available publicly.
19   Again, it was confirmed to me last week by an attorney for
20   the Department of Justice that the report exists.  And it is
21   the subject of a FOIA action currently in this district, and my
22   hope is that we are going to obtain a copy of that full report
23   in the near future.
24        But, you know, we also are, as I mentioned in our brief,
25   you know, potentially looking at some discovery in this case,
```

1    depending on how things move forward, to obtain that report,

2    whether through EPA or some other means in this litigation.

3         **THE COURT:**  And your desire, I take it, then, is to obtain

4    that report, make that part of the record and perhaps the basis

5    of some further expert comment for the -- whether you call it

6    the second trial, further trial, or whatever the proceedings

7    are here; but you do not wish to await the working group with

8    its -- assisting the BSC with its comments which may not come

9    until sometime in 2023.

10        **MR. CONNETT:**  Right.  Our concern there, Your Honor, is

11   that not only have we had the delay that we've already had

12   waiting for NTP to complete this process; but as Dr. Woychik's

13   declaration makes clear on its face, there is no guarantee

14   whatsoever that NTP is ever going to release that report in an

15   official capacity.

16        Dr. Woychik ended his declaration by stating that after

17   the working group finishes its review and then after the

18   working group provides its recommendations to the

19   Board of Scientific Counselors and then after the Board of

20   Scientific Counselors provides its recommendations to

21   Dr. Woychik, none of which -- none of those steps have any

22   defined timeline -- but after those three steps are completed,

23   Dr. Woychik will then make a determination as to whether to

24   release the NTP report.

25        So my concern, Your Honor, is if we continue to wait for

 1   this final report, we may be waiting forever because we have no

 2   guarantee, nor any time line as to when it's going to be

 3   released.

 4        So it's plaintiffs' position, Your Honor, that we have a

 5   rich body of information for the Court and for the experts;

 6   namely, this very advanced, developed report that NTP completed

 7   and was days away from releasing in May of this year, as well

 8   as the NASEM peer reviews, as well as some of the other studies

 9   that Your Honor had expressed an interest in.  All of that is

10   available.  All of that is available.

11        **THE COURT:**  Yeah.  No, I understand that.

12        Let me ask the Government, Mr. Adkins, is it unusual --

13   and I'm trying to understand why, after all this, the director

14   might determine that there would be no publication and

15   dissemination of the report.  Has that ever happened before,

16   after a report's been done and been peer-reviewed one or more

17   times and then a decision is made not to release it?

18        **MR. ADKINS:**  I'm not aware either way, Your Honor.  And

19   unfortunately, I don't have any representations to make on --

20   from -- on behalf of NTP about what's happening behind the

21   scenes with that.

22        But I do know that there's -- the statement that NTP was

23   days away from releasing a draft of the monograph, there's

24   really no record support for that other than speculation and

25   hearsay at this point, which is another reason why we wanted to

1    get this declaration before you.

2         I think what's clear from the declaration is that there's

3    further process that they're undergoing, and it would be best

4    to wait until that process is complete, whether it results in

5    publication or not.  We should give NTP a chance to wait until

6    that process is over if the Court decides to allow additional

7    discovery.

8         **THE COURT:**  Well, it is clear that whatever you want to

9    call it, a third draft or something, this version is being

10   circulated to a working group and the BSC to assess the

11   adequacy of, as you put it or Dr. Woychik put it, NTP's

12   response to the reviews of both the meta-analysis, manuscript,

13   and the state-of-the-science monograph.  So there is something

14   they're looking at, something that has been evolved and is

15   probably the second, third, or whatever -- what do you call

16   it? -- fourth iteration of something.  So whether it was about

17   to be published or not kind of is not as important as the fact

18   that there's something actually concrete out there that has

19   been the result of a pretty extensive process.

20        What is the Government's view about having that available?

21   I mean, I don't know what the Government's position is under

22   FOIA and what its position would be of having that document

23   produced as part of discovery in this action, irrespective of

24   FOIA.

25        **MR. ADKINS:**  So I think that now we're referring to the

1    May 2022 draft.

2          **THE COURT:**  I think so.

3      **MR. ADKINS:**  Okay.

4          **THE COURT:**  Yeah.

5      **MR. ADKINS:**  In terms of FOIA, I'm not the attorney that's

6    lucky enough to handle that case.

7          **THE COURT:**  Yeah.

8      **MR. ADKINS:**  I have been in contact with that lawyer just,

9    you know, to reach out and make sure that we're coordinating to

10   some extent; but I'm not sure what the Government's position is

11   with respect to production of that document at this time.

12         In terms of discovery in this case, you know, our view --

13   counsel did reach out to see if EPA has had a -- has commented

14   on a draft of the -- the May 2022 draft.  Our position is that,

15   you know, discovery's closed; that we're not under an

16   obligation to produce anything at this time.

17         But we did make an attempt to check with the Agency to see

18   if they had a draft, and they confirmed that they did not have

19   a copy of the May 2022 draft.

20         Now, whether we can obtain it by other means, you know, it

21   sounds like the Department of Justice has a copy of this; so

22   that, I think, would be a different question.

23         But really, our position here is we need to wait until NTP

24   is complete.  If you look at the drafts that have been released

25   already -- so looking at the 2019 and the 2020 drafts -- there

1  are marks on each page of these drafts that say they're not for

2  public consumption.  The Agency has gone at length to try to

3  keep these from being disseminated widely because their

4  conclusions are not final yet.

5      So I don't think it would be appropriate to rely on the

6  May 2022 draft.  And to the extent it came up in discovery, I

7  think our position would be that it is irrelevant.

8      **MR. CONNETT:**  And, Your Honor --

9      **THE COURT:**  Well, let me -- hold on.

10     Let me ask.  Just because something is not ready for

11 general public consumption and publication doesn't necessarily

12 mean it's not discoverable, especially for purposes -- if what

13 we're looking at at the end of the day -- and we already saw

14 sort of Phase 1 of this trial -- expert testimony, the issue is

15 really a 702/703 question and is this the kind of thing that an

16 expert in the field could rely on.  Could they rely on a,

17 quote, draft that's been through several iterations and peer

18 review, but not a final sanctioned published thing of an

19 agency?  Is that something that an expert could rely on?

20     As you know, experts can rely on things that are not even

21 admissible otherwise.

22     And I don't know.  What's your view on that question?

23     **MR. ADKINS:**  We -- you may recall that our team tried to

24 extend -- we moved to extend the expert discovery period

25 briefly when we learned that this draft monograph was out

there.  Plaintiffs opposed that, and among the reasons they did

was because it was a draft.  And the Court denied our motion.

And so we, you know, concluded expert discovery, or at that

point expert discovery had been concluded, without

incorporating that draft into our expert reports.

When it came time to list trial exhibits, the plaintiffs

listed as a standalone exhibit a version of the draft NTP

monograph; and we filed a motion in limine to exclude that

because we had already, you know, tried to incorporate this

into our expert testimony, our expert opinions, and couldn't.

And after negotiating with plaintiffs, they withdrew that, and

our motion in limine was denied as moot.

So the litigation positions have been formed at this

point.  We did attempt to incorporate these drafts into the

expert opinions that we had.  That time has passed now.

You know, so it's hard to go back.  We formed our views about

the drafts, whether they can be used or not.

And at this point our expert epidemiologist is no longer

available as an expert witness in this case.  So EPA would be

prejudiced not just by the continued delay of a decision in

this case, but also because we can now not speak through the

mouthpiece of a single expert and provide the streamlined

expert testimony that we wanted to provide to the Court back

when we moved in 2019 for an extension of the discovery

deadline.

1       **THE COURT:**  Well, if I were to reopen the case, which I'm

2 inclined to do, whether it's now or at some point, I do not

3 accept the Government's position that we should just freeze the

4 record as it existed in 2020.  That would be putting our head

5 in the sand for, frankly, no good reason because there's

6 been -- things have developed.  I mean, wholly apart from the

7 NTP stuff, we've now got the consolidated study; we've got the

8 Spanish study; we've got other things that I want to hear about

9 and I want experts to hear about.

10       It's unfortunate your epidemiologist is not available, but

11 the Government, I assume, has the ability to find somebody

12 else.

13       **MR. ADKINS:**  Of course.

14       **THE COURT:**  And you'll be given a full opportunity.  I

15 hate to -- you know, time and expense of acquiring somebody

16 new.

17       So in terms of the proposition that we should just freeze

18 the record and ignore all the scientific development that has

19 occurred since is not one that I am going to accept.

20       And so I am going to look at a process that reopens the

21 process because that's one of the reasons why I stayed

22 everything, besides the standing issue, is because I knew that

23 there were all these things that we learned about at trial,

24 these studies that hadn't been peer-reviewed and one went one

25 way and the other went the other, and then you had the combined

1    Mexico-Canada study and then we had the NTP.

2         And frankly, this is -- since, under the act, the Court

3    has to make a *de novo* determination, I really wanted to get the

4    latest and the most available evidence possible.  And that's

5    still my goal, because it's an important decision and important

6    consequences either way and we want to try to get this correct.

7         So it just seems to me that the thing to do now -- and I'm

8    not going to necessarily set a trial date or anything yet -- is

9    to remove the stay to allow for some discovery.

10        And I assume this is basically discovery designed to get

11   some of these core documents that would be available for

12   experts.  We're not talking about -- I don't think we're --

13   you're not talking about percipient witness or kind of lay

14   testimony.  It's all about expert testimony, isn't it?

15        **MR. CONNETT:**  That's correct, Your Honor.  I mean, the

16   one, I guess you could consider it, fact discovery would be we

17   want to get a copy of that May 2022 report.  But beyond that,

18   the focus, from our vantage point, is expert discovery, which

19   presumably would be some expert reports, followed by expert

20   depositions, followed by the Phase 2 trial.

21        And for what it's worth, I would note, Your Honor, that

22   there's -- it may well be that when we look at that May 2022

23   report, it won't have the disclaimer that counsel has just

24   mentioned about it being a draft.  There may be no such

25   disclaimer on it.  It may just say "Final Report."  But we'll

1    see when we get a copy of it.

2         **THE COURT:**  Well --

3         **MR. ADKINS:**  Well, Your Honor, I would just -- maybe if I

4    could say one more word about reopening discovery --

5         **THE COURT:**  Yeah.

6         **MR. ADKINS:**  -- now.

7         You know, we would urge the Court to wait until NTP has

8    concluded this process.  If we reopen discovery now, it's going

9    to result in a disjointed process.

10        We could be in a situation where we're in the middle of a

11   discovery period, NTP may or may not have released the

12   report -- maybe it will release the report at the very end of

13   the process -- and we're going to end up having to redo work.

14        I think we're close here.  I don't want to say we're very

15   close because I would have said we were very close maybe a year

16   and a half ago and I would have been wrong.  But we do have

17   something from NTP.  It looks tangible.  It looks like they're

18   in motion to make, you know, some decision at the end of the

19   day on this in 2023.  I'm hoping that it's going to be early

20   2023 and not too late.

21        But I would urge the Court to just wait a little bit

22   longer before we reopen the discovery period so that we can do

23   this in a wholesale fashion.

24        **THE COURT:**  Well, let me ask.  Even if the working group

25   reports its findings to the BSC, there's still more process

after that.  Then the BSC, I take it, has to absorb that, then make recommendations to the director.

And so at best, assuming there's no other delays, we're probably talking about several months on top of the reportage from the working group to the BSC sometime early in 2023.  That puts us toward the end of 2023.  Is that a fair kind of projected timeline?

**MR. ADKINS:**  I think that's fair, Your Honor, but -- you know, and it does sound like a long time.  We had trial two years ago.  We're now talking about probably three years after trial.

But I would remind the Court, too, when Your Honor decided to allow plaintiffs to supplement the allegations in their complaint, EPA raised convincing, I think, arguments with respect to their prejudice.

And one of the ways Your Honor dealt with EPA's prejudice was to say:  EPA, you're going to have an opportunity to wait until this NTP monograph becomes final.

And that was because, otherwise, we're just relying on the cherry-picked studies that plaintiffs have brought to bear in their supplemental allegations.

So I think if the Court were to reopen discovery now and not allow EPA this opportunity to at least wait until NTP concludes its process, it's a reversal of that order; and if Your Honor is going to reverse yourself on that order, then

1    I think we should reverse everything that plaintiffs have been

2    able to supplement in their complaint, because that prejudice

3    component was the linchpin.

4        **THE COURT:**  Well, I'm not sure the only reason was

5    prejudice.  The reason I wanted to wait was because I wanted to

6    know what it said substantively.  But at that time, it was

7    promised to be:  Well, it's coming around the corner; we're

8    going to get the peer review done in a few months; let's see

9    how that goes.

10       I don't think anybody anticipated it would go through

11   three or four iterations or whatever.  So it's been unusual.

12       But let me ask Mr. Connett.  Besides the March 22nd, or

13   thereabouts, report, is there some other discovery that you are

14   seeking?

15       **MR. CONNETT:**  I guess I -- that's the primary focus,

16   Your Honor.  And it's -- you know, conceivably, you could look

17   at it and say, if there's going to be a new report released

18   that's been modified subsequent to May, that maybe

19   understanding what happened after that report may be relevant

20   and probative.  But I think we could live, Your Honor, with a

21   fact discovery that's focused just on getting that report.  I

22   could live with that.

23       I mean, I think everyone has an interest here in kind of

24   having some efficiency in the process, and, you know, we're

25   amenable to that.  You know, if we were starting from scratch

1    I'd probably recommend a broader -- broader scope of discovery.

2    But I understand that, you know, it's late in the day.  So,

3    you know, we would focus our fact discovery on just getting

4    that May 2022 report and then doing expert discovery.

5        THE COURT:  All right.

6        MR. CONNETT:  And if I could quickly respond to counsel's

7    comment about cherry-picked studies, I don't understand the

8    comment because there's nothing limiting EPA from using

9    whatever studies it finds relevant and probative.  And

10   certainly, in our brief, I think we try to, you know, adhere

11   closely to the studies that the Court expressed an interest in;

12   and that's what we're seeking to do here, is bring those

13   studies together to inform the Court of them.

14       So I just wanted to point that out.

15       THE COURT:  Right.  And as I recall, it was to

16   the Government's advantage, so to speak, with respect to at

17   least one of those, to the Spanish study.

18       MR. CONNETT:  Right.

19       THE COURT:  I mean, that was relied on, and now it's been

20   peer-reviewed and published.

21       MR. CONNETT:  Correct.

22       THE COURT:  So I don't think there's any cherry-picking.

23       MR. CONNETT:  Right.

24       THE COURT:  There's a lot of things in that basket.

25       So let me just ask.  What's the -- if I were -- I think

1    the only thing we're talking about at this point is not

2    necessarily setting trial, not necessarily saying it's

3    admissible, not necessarily saying what the evidentiary value

4    of this May 22nd report is, but to allow discovery, whether

5    it's through FOIA or if you think it's probably discoverable as

6    a matter of Rule 26 discovery in this case, probably Rule 26,

7    to make that motion here.

8         What's the harm in at least letting that play out?  If it

9    does get produced, the parties can look at it and decide more

10   clearly what their position would be on whether we should

11   await, and maybe the Court would have a better sense of what it

12   is that's -- knowing the context of any request, to await a

13   final working group response.  Is there a harm to at least

14   letting that limited discovery go forward?

15        Since Mr. Connett is not asking for a whole new set of, I

16   assume, broad discovery requests and contention

17   interrogatories.  He's looking for really something very

18   specific, which they could possibly get through FOIA -- I

19   don't know -- in any event.  But is there a downside to that?

20        **MR. ADKINS:**  I think there are two that I can think of

21   offhand.

22        One is, you know, there's a public interest here in not

23   disseminating scientific information that's not final.  I know

24   that's an important concern for the Agency.  I don't think that

25   this is a draft that NTP wants circulated and put out there.

1    If they did, it would be now.  So, you know, that's a little

2    bit of speculation on my part, but I think that is an important

3    interest here.

4        Two is, if we get through this process and at the end of

5    the day, NTP publishes a final systematic review, it will be

6    effort wasted.

7        And really, our position still is, irrespective of whether

8    the draft is discoverable, what should be admissible at the end

9    of the day and what really matters is the final NTP systematic

10   review.  So I'm not sure what the point would be of kind of

11   going through this process with counsel over -- you know,

12   having a discovery battle over this draft when he has a FOIA

13   case pending in this district already if, at the end of the

14   day, we might get the final report from NTP.

15       **MR. CONNETT:**  If I could, Your Honor, first, just because

16   we have a FOIA request, that's a separate -- completely

17   separate cause of action in order to obtain a copy of that

18   report; so I don't think that in any way removes our right to

19   seek, you know, discovery here from EPA to get a copy of that

20   report.

21       And I'd also point Your Honor to a ruling in this case by

22   Judge Westmore.  Back in 2019, we specifically sought to get

23   copies of the draft NTP report from 2016.

24       So the NTP, as you may recall, did a systematic review of

25   the animal studies which it published back in 2016.  EPA had in

1 its files two separate drafts of that report, one from May of

2 2016 and one from September of 2015.  EPA did not produce

3 those.  It objected on privilege grounds.

4   We moved to compel, and Judge Westmore granted our motion.

5 She granted the motion on the grounds that an NTP report on the

6 science cannot be protected by the deliberative process

7 privilege because there's no decision as understood under the

8 law.  This is not a policy decision.  As Judge Westmore said,

9 whether or not fluoride causes neurodevelopmental effects, it's

10 not a question of policy; it's a question of science.  And so

11 Judge Westmore ordered the EPA to produce the drafts that it

12 had of NTP's systematic review, and we now have them.

13   So this situation that we now have, Your Honor, is

14 directly analogous to what we've already addressed in this

15 litigation.  And I would hope that if counsel and EPA had a

16 copy of this report, they wouldn't kind of force all of us to

17 have to go through the needless paperwork of another motion

18 when it's already been decided.

19   And I think everything would be sped up and we'd all have

20 greater clarity if EPA would just produce a copy of their

21 report.  And then that would, I'm sure, facilitate

22 meet-and-confer discussions where the parties could discuss a

23 reasonable timeline for moving forward with expert discovery.

24   **THE COURT:**  All right.  Well, here's what we're going to

25 do.  I'm going to lift the stay for purposes of conducting

1    discovery, with the understanding that discovery is going to be

2    limited.  It's going to be focused on what you have referred to

3    as the May 2022 report but which we understand generally is the

4    report that is now being considered by the BSC and the working

5    group.

6         I'm not going to set any trial days.  I'm not ruling on

7    the admissibility of this thing.

8         I do think that the -- this document, even if it's not

9    public and meant for public consumption, is relevant probative

10   evidence because it could form the basis of expert opinion, it

11   seems to me, given the nature of the quality of the review and

12   the study that's been done.  But, obviously, I'm not ruling on

13   anything yet.  I'm not saying it's admissible or not.  But the

14   test of discovery is not just admissibility.  It's things that

15   are relevant.  And it seems to me that there's central

16   relevance.

17        To safeguard the Government's potential concern about

18   releasing publicly a document that was not intended to be

19   released, I'm going to ask the parties to stipulate to a

20   protective order so that it could be only used in this

21   litigation and may be shown to experts in this litigation who

22   would also be bound by the protective order.  This should not

23   be disseminated publicly until I rule otherwise.  And that

24   will, I think, safeguard the kind of concerns that Mr. Adkins

25   has raised, but it also meets your concerns so you can see

1    what's there.

2         And that might inform -- then I think what I want to do is

3    hold a status conference right after the first of the year and

4    figure out what we're going to do, because it may be that after

5    we get this, after maybe I've had a chance to look at it, I may

6    say:  I really do think we ought to wait for the "final" final,

7    or I may say not.

8         And one of the things I may do, just to give you a

9    heads-up, I may want to hear more from the director about his

10   expected timeline and the prospect of non-pub- -- that this may

11   never lead to publication, which implies one thing, or that it

12   likely will lead.  I do want a better understanding as to what

13   are the criteria.  What's he looking -- what's the chances?  He

14   just says "I will decide," but I have no idea what the basis of

15   that decision is, what the criteria is.  Is that governed by

16   some regulatory standards?  Is this something that's ever been

17   done?

18        So I may have to assess how helpful the "final" final

19   review is, how likely it is to actually happen, when the

20   timeline.  And then I can make a decision whether, yes, let's

21   finish up this thing.  Let's complete what I would call Phase 2

22   of the trial, which I would anticipate being some additional

23   expert testimony based on these new studies and everything else

24   to supplement what's been done.  I think what's been done is

25   already part of the record, so I'm not going to ignore that,

```
 1   but we can certainly build on that.
 2         And then the question is:  When do we do that?
 3         So I think it would be helpful to have this piece of
 4   information.
 5         MR. CONNETT:  And, Your Honor, just, if what counsel is
 6   saying is correct, that EPA -- which is surprising to the
 7   people I've spoken with at EPA -- as a federal agency with a
 8   very deep interest in fluoride policy, if it is correct that
 9   EPA somehow has not obtained a copy of a report that is
10   circulating within the federal government, if that proposition
11   is correct, then what I feel is important so that we're not
12   spinning our wheels here waiting for EPA to tell us in 30 days
13   that it doesn't have a copy, what I would propose to do is to
14   simultaneously serve a discovery request on EPA and the NTP as
15   a third party so that we're not left with a goose egg in 30
16   days, not having a report based on EPA's representation that it
17   doesn't have one.
18         So I just wanted to mention that for the Court and maybe
19   get the Court's guidance on that issue, because I don't want to
20   come to the Court in the first of January and say:  We don't
21   have a report yet.
22         THE COURT:  In other words, you want to hit all the bases,
23   make sure somebody's got this report.
24         MR. CONNETT:  (Nods head.)
25         THE COURT:  I mean, I'm not going to tell you how to do
```

1    it.  I'm just telling you that I'm opening discovery and

2    lifting the stay so you can conduct that discovery.

3         I'd rather you meet and confer with Mr. Adkins and figure

4    it out, rather than doing a big dance.  It shouldn't be too

5    hard to figure out where this report is, what agency has it,

6    and maybe it can be produced voluntarily, especially if it's

7    done under a protective order and especially since

8    the Government has a preliminary view or a view of my

9    preliminary views on this question.  But if push comes to shove

10   and you either need to issue subpoenas or move to compel or

11   something, you know where to find me.

12        **MR. CONNETT:**  Thank you.

13        **THE COURT:**  And what I'd like to do is, with that said,

14   set a date in January.  So hopefully by then, that part of the

15   matter will be -- the report will be obtained.  Each side will

16   have a chance to look at it.

17        And I'm going to ask that, if and when you get that,

18   I think I'd like -- the Court would like to see it.  So you can

19   file it under seal, again.

20        **MR. CONNETT:**  Certainly.

21        **THE COURT:**  So it'll be part of the record so I can look

22   at it.  And that might inform, then, when we get together in

23   January, what might be the schedule.

24        And, Mr. Adkins, you might prepare Director Woychik,

25   Dr. Woychik to -- in case I have questions for him, we may need

1    to follow up with him in one way or another.  So...

2        **MR. ADKINS:**  Okay.

3        **THE COURT:**  But, again, I'm not deciding anything about

4    when, whether it's worth waiting or not.  We need a little more

5    information.  But I do think it's worth getting the

6    information.

7        So I propose we have a status conference in January.

8        January 10 would be one date, Vicky, we have available?

9        **THE CLERK:**  We do, Your Honor.

10       **THE COURT:**  2:30?

11       **THE CLERK:**  Yes.

12       **THE COURT:**  2:30 on January 10th.  Does that work?

13       **MR. ADKINS:**  Yes, Your Honor.

14       **MR. CONNETT:**  Your Honor, if I could just -- if I could

15   just have one minute here, I might...  Just checking on one

16   thing.

17                     (Pause in proceedings.)

18       **MR. CONNETT:**  There's a chance I may be out of the

19   country.  I'm just trying to determine if I'm back on that day.

20   I think I am.

21                     (Pause in proceedings.)

22       **MR. CONNETT:**  Yes, Your Honor, I am back.  I can do

23   January 10.

24       **THE COURT:**  Good.  All right.  We'll see you then.

25       **MR. CONNETT:**  Thank you, Your Honor.

1      **MR. ADKINS:**  Thank you, Your Honor.

2      **THE COURT:**  Thanks, everyone.  Good seeing you again.

3      **MR. ADKINS:**  Great to see you.  Thank you.

4      **THE COURT:**  Thank you.

5              (Proceedings adjourned at 4:14 p.m.)

6                      ---o0o---

7

8              **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:  Wednesday, November 30, 2022

13

14

15                    *Ana Dub*

16   _____

17       Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
              Official United States Reporter

18

19

20

21

22

23

24

25