Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
FOOD & WATER WATCH, INC.,        )
                                 )
           Plaintiff,            )
    VS.                          )     NO. C 17-02162 EMC
                                 )
UNITED STATES ENVIRONMENTAL      )
PROTECTION AGENCY,               )
                                 )
           Defendant.            )
_____)
```

San Francisco, California
Thursday, January 12, 2023

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)
For Plaintiff:
                        WATERS KRAUS & PAUL LLP
                        222 North Pacific Coast Highway
                        Suite 1900
                        El Segundo, California  90245
                   BY:  **MICHAEL P. CONNETT, ATTORNEY AT LAW**

                        WATERS KRAUS & PAUL LLP
                        3141 Hood Street - Suite 700
                        Dallas, Texas  75219
                   BY:  **KAY G. REEVES, ATTORNEY AT LAW**
For Defendant:
                        UNITED STATES DEPARTMENT OF JUSTICE
                        Environment & Natural Resources Division
                        P.O. Box 7611
                        Washington, D.C.  20044
                   BY:  **BRANDON N. ADKINS, ATTORNEY AT LAW**
                        **PAUL CAINTIC, ATTORNEY AT LAW**

                        UNITED STATES ATTORNEY'S OFFICE
                        1301 Clay Street - Suite 340-S
                        Oakland, California  94612
                   BY:  **EMMET P. ONG, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

| | |
|---|---|
| **Thursday - January 12, 2023** | **11:30 a.m.** |

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  These proceedings are being recorded by this Court.  Any other recording of this proceeding, either by audio, video, including screenshots or other copying of the hearing is strictly prohibited.

This Court is now in session.  The Honorable Edward M. Chen presiding.

Court is calling the case Food & Water Watch, Inc., et al versus Environmental Protection Agency, et al., case number 17-2162.

Counsel, please state your appearance for the record beginning with the Plaintiff.

**MR. CONNETT:**  Good afternoon, Your Honor, or good morning, Michael Connett on behalf of the Plaintiff.

**THE COURT:**  All right.  Good morning and afternoon, Mr. Connett.

**MS. REEVES:**  Good morning, Your Honor, it is Kay Reeves for the Plaintiffs as well.

**THE COURT:**  All right.  Thank you, Ms. Reeves.

**MR. ADKINS:**  Good morning, Your Honor, Brandon Adkins for the United States.  And I'm joined today by my colleague Paul Caintic, a trial attorney in our division, and AUSA Emmett Ong, who is recently minted counsel of record in this case.

1          **THE COURT:**  Great.  Well, welcome to the case both of

2     you.  And thank you, Mr. Adkins.

3          Let's talk about sort of the larger question where we go

4     from here and the EPA's motion essentially to -- to -- as I

5     read it, to impose a stay and not have further proceedings

6     including a trial or other matters pending further developments

7     with regard to the NTP review.

8          And I guess my question is what's different now -- what do

9     we know now that is different than when I issued the order

10    lifting the stay?

11         It doesn't seem like there is greater promise of imminent

12    result other than, as I understand it, possibly one portion of

13    the report that is going to be subject -- we will hear back

14    from commentators with regard to the state of the science

15    monograph.  Maybe you can tell me what's different now, what is

16    more imminent.

17         **MR. ADKINS:**  Sure, thank you, Your Honor.

18         So the motion in essence is asking the Court to hold off

19    on scheduling expert disclosure deadlines, expert discovery

20    deadlines, and a trial date.

21         And my understanding was after the October hearing last

22    year, that the Court would take a look at the May 2022 draft

23    NTP monograph -- if Plaintiffs were successful in discovering

24    it and providing a copy to the Court -- and then make a

25    decision on what, if any, deadlines to schedule going forward.

1          So, our administrative motion was in an effort to do two

2     things.  One, to provide an update to the Court to

3     Dr. Woychik's declaration about where NTP is in that process.

4     And I think NTP has made a -- there are a couple progress

5     points I say that NTP can report.

6          One is that when we met in October NTP had not yet

7     finalized the personnel on the working group that is assisting

8     the BSC.  That is now checked off.

9          So they have gone through their process of screening

10    experts who will sit on the working group and the BSC is now --

11    or the working group for the BSC is now doing its work.

12         The second progress point we have is that the BSC expects

13    to meet with the working group to receive the working group's

14    recommendations on how to proceed in early 2023.

15         I know this is not an exacting date.  My understanding is

16    that that is intended to happen within the first quarter.

17         So we are getting closer to what I think is the end of the

18    process that NTP has set out through Dr. Woychik's

19    declarations.

20         I'm not here to say that we know exactly when any of these

21    drafts will be published, but I do think that NTP has been

22    making progress; and they have a process that the United States

23    thinks the Court should try to allow NTP to see through

24    completion before we start scheduling expert discovery

25    deadlines and trial.

1          **THE COURT:**  And -- well, let me ask you two questions

2    in that regard.  I thought I saw at one point maybe earlier

3    there was a target date of -- there was an actual month like

4    month -- February or March of 2023 -- and now it is just saying

5    "early."  It seems like we are taking a step backwards in terms

6    of some degree of -- not absolute certainty but the target date

7    has become more diffuse, not less.  That's one question.

8          And then the other question is, as I understand it, there

9    is a state of science monograph and there is a meta analysis

10   manuscript.

11         The working group do I have it right, that they are

12   looking only at the former, not the latter?

13         **MR. ADKINS:**  Okay.  So with respect to the first

14   question, Your Honor, I'm not sure what the March date is.  I

15   don't expect there to be any publication in March 2023.

16         What would happen is the working group is reporting to the

17   BSC, and then the BSC would make a recommendation to

18   Dr. Woychik with respect to how to proceed.

19         So I don't think anything is going to be published then,

20   but the benefit of waiting six months is that we can see where

21   NTP is in the process and Counsel in the case can concur and

22   propose a schedule.

23         So we are not proposing today to have a -- you know, a

24   series of six month continuances or a stay but to wait another

25   six months to try to allow NTP to complete this process.

1    Counsel and I, we can work together with Counsel for

2    Plaintiffs; propose a schedule to the Court that hopefully

3    reflects what is resulting from NTP's process, whether that

4    results in a publication or not.

5         With respect to the second group, my understanding is that

6    the working group is now considering both the state of the

7    science monograph and the meta analysis manuscript.

8         **THE COURT:**  And in your description it says that

9    the -- Dr. Woychik will make a final decision whether to

10   publish the state science monograph and whether to submit the

11   manuscript for publication.

12        What's the difference?  There is an additional step with

13   respect to the manuscript.  What is "submit for publication"

14   mean?

15        **MR. ADKINS:**  That's correct.  So after NASEM's second

16   peer review came back without a concurrence in the draft

17   monograph -- what we have been loosely referring to as the

18   draft monograph -- NTP split that document into two; a state of

19   the science monograph, which no longer has a hazard

20   categorization for fluoride exposure, and then a meta analysis

21   manuscript, which is a statistical analysis of fluoride's

22   potential effects on children's IQ.

23        The -- the state of the science monograph currently is

24   intended -- if it is published, it would be published as a

25   government document by NTP.

1      The meta analysis manuscript is currently intended to be

2  submitted to a peer reviewed journal if that's the decision

3  that NTP finally makes with respect to the draft.

4      So that would be an intervening step, the submission to a

5  peer reviewed journal.

6      **THE COURT:**  And I know it is impossible to predict,

7  but is that a process that generally takes a year or months or

8  years?

9      **MR. ADKINS:**  I'm afraid I don't know.  From, you know,

10  working on this case, which has given us quite a bit of

11  experience in peer reviewed journals and how that works, I

12  think it would be somewhere around a year.  For something like

13  this that has been reviewed several times, maybe I could

14  imagine it being reviewed a little more quickly.  I don't have

15  an estimate that I can give to the Court today about that.

16      **THE COURT:**  Well, when we were in the trial and the

17  Spanish cohort study came up, I remember there was some

18  discussion that hadn't been peer reviewed.  I think it has now

19  been peer reviewed.

20      **MR. ADKINS:**  Correct.

21      **THE COURT:**  So that took about -- it seems like

22  roughly that took a year or something.

23      **MR. ADKINS:**  I think that's roughly correct.

24      **THE COURT:**  All right.  So optimistically we might

25  have a state of science monograph if -- and it is an if --

1    Dr. Woychik decides to publish it after the working group

2    reports back.  And then there might be a decision to submit the

3    manuscript, which has a quantitative data, right; but that

4    would probably go through, if it gets to that stage, peer

5    review that may take months, a year, maybe a little bit longer.

6            **MR. ADKINS:**  I think that's generally correct, yes.

7            **THE COURT:**  And let me ask the parties:  I mean, it

8    seems like where the meat of the -- of the substance, wouldn't

9    it lie in the meta analysis, the quantitative -- isn't that --

10   I mean, I understand that the other -- the state of the science

11   will be kind of, as I understand it, the way it's described, it

12   is kind of a survey of the studies that have been done and the

13   results.

14           But isn't the critical question that will have to be

15   resolved is whether -- you know, in making that hazard

16   determination, it is quantitative.  It depends on

17   concentrations.  It depends on how strong the correlation is,

18   et cetera, et cetera.  It seems like that is a -- as between

19   the two, isn't that the thing that is perhaps most, I don't

20   know, probative, weighty, influential?  Let me ask Mr. Connett

21   that decision and then I will ask --

22           **MR. CONNETT:**  Yeah.  Your Honor, I don't think so.  I

23   think clearly both reports are important.

24           But the state of the science monograph is a systemic

25   review and we know EPA's position through this litigation has

1    emphasized the critical importance of systematic review to the

2    hazard identification component of a risk determination.

3         And so what you will see, as the Court already has in its

4    possession, the May 2022 state of the science monograph is you

5    see an assessment on things like confounding factors, whether

6    that can explain the association.

7         You see an assessment of the quality of the studies and

8    whether the high quality studies are confirming the

9    association.  You see a discussion of the consistency of the

10   data.

11        These are all matters that were discussed at length by the

12   parties' experts.  So I think the state of the science

13   monograph, while more qualitative than the meta analysis, is

14   the exact type of analysis that you would see for the hazard

15   assessment portion of a risk assessment.

16        And then from there we obviously get into, you know,

17   various methods for doing the -- if you establish a hazard, how

18   do you then determine whether there is a risk at the human

19   exposure level; but you don't need the NTP report to do that.

20        So I think the state of the science monograph is the --

21   from our vantage point the critical document.  It is the

22   systematic review.

23        Certainly the meta analysis will be an important

24   contribution.  No question about it.  But I don't think we

25   should diminish the importance of the monograph itself.

1     **THE COURT:**  Is it a fair characterization to say that

2     the -- that the question of hazard or not, you think, can be

3     determined by or informed by the state of science monograph.

4     The question of risk on humans at the levels of exposure,

5     that's what the -- that's where the meta analysis sort of comes

6     in.

7          **MR. CONNETT:**  I certainly agree with the first point;

8     that the state of the science monograph is a critical document

9     to the determination of hazard.

10         In terms of how the -- the meta analysis can absolutely be

11    relevant to the risk determination, but I don't think we need

12    to wait for the meta analysis to make that determination.

13         We already have, Your Honor, a very advanced developed

14    version of the meta analysis from NTP which includes the

15    Spanish study in it.

16         So the parties' experts and the Court will have that meta

17    analysis available to it, and I certainly don't think -- it is

18    certainly Plaintiffs' position that given Counsel's comments

19    today -- that the meta analysis may not be published for over a

20    year after NTP completes its process -- I just don't think we

21    have the luxury to wait for that to be published.

22         **THE COURT:**  All right.  So I understand your position.

23    Mr. Adkins, in terms of the -- the value of these two

24    components, do you agree with that kind of bifurcation in

25    principle or do you have a different view?

1          **MR. ADKINS:**  I would hate to undercut what EPA's

2   future experts may say about one or the other; but I do know

3   this:  When EPA considered Plaintiffs' supplement to their

4   administrative petition one of the things EPA said in response,

5   as you may recall, is that the NTP monograph is an important

6   piece of information.  And before that's finalized, it would be

7   difficult for the agency to -- in essence reconsider the

8   decision it made on Plaintiffs' petition originally.

9          I think both are important.  I'm not sure relative weighed

10  [sic] which one is going to be more important, but nothing that

11  Mr. Connett said, I think, is incorrect; just that I'm not sure

12  that the United States could really weigh one over the other at

13  this point.

14         **THE COURT:**  All right.  And remind me why the

15  bifurcation is that because of the amount -- because of the

16  nature of the feedback and the comments?

17         **MR. ADKINS:**  Well, this is where it gets a little

18  tricky because the drafts are subject to a protective order,

19  and we are in a public proceeding; and NTP has not waived its

20  right to assert that the drafts are protected by privilege and

21  claim a delivery of process privilege and comments thereto

22  including.

23         But, yes, it was some mix of response -- response and

24  feedback and addressing that feedback that the NTP received

25  from NASEM, the National Academy of Science Engineers --

1          **MR. CONNETT:**  Your Honor --

2          **THE COURT:**  But there is a differential that at least

3    in the agency's view warranted this bifurcation.

4          **MR. ADKINS:**  Yes, I think that's correct, yes.

5          **MR. CONNETT:**  Your Honor, if I could, just to respond

6    to Counsel's comment about waiting for the final report, this

7    Court and the parties have been waiting for two years for NTP's

8    final assessment.

9          To the best of my understanding, the Court and the parties

10   have not been waiting two years to determine whether the CDC

11   still advocates for water fluoridation.

12         The Court and the parties have been waiting for the

13   scientists at the National Toxicology Program to provide their

14   final assessment, and Counsel discussed earlier the process

15   that is under -- you know, the NTP's description of the process

16   it had.

17         But as you may recall, Your Honor, the NTP provided us the

18   remaining process back in January of last year, and that

19   remaining process was a single external peer review by five

20   experts in the field.  And according to NTP, so long as those

21   five external experts concurred with NTP's conclusions, the

22   monograph would be published.  That was the process.

23         And NTP completed that process.  The five external

24   reviewers -- as Dr. Woychik has confirmed in his second

25   declaration, the five external reviewers, the experts that NTP

1    selected to review that report, concurred with NTP's

2    conclusions.

3         NTP scientists -- as is abundantly clear in e-mails

4    obtained under the Freedom of Information Act, NTP scientists

5    considered the monograph to be complete as of May 2022.

6         On May 11th, Dr. Mary Wolfe, a director at NTP, stated

7    that the monograph was concluded; there was no further

8    revisions needed, and it would be released seven days later on

9    May --

10             **THE COURT:**  No.  I'm familiar with that.  I'm familiar

11   with your brief, and I'm familiar with the chain of e-mails and

12   your narrative about how then things got political and that's

13   when things sort of went south and it was all headed toward a

14   final review so we should treat that as final, etc.  I

15   understand your argument in that regard.

16        On the other hand, it is as a matter of technically

17   speaking, it is not final but you want -- you think that we

18   have enough information there that it should be treated, at

19   least for stay purposes, as the information now has been

20   obtained enough to go forward even if it's not the -- the hoped

21   for conclusive conclusion that we were all looking for.

22        And I think your argument is that, you know, obviously it

23   would be better, certainly from my perspective, to have

24   everything, both parts of the study available; but the question

25   is, you know, how long is that going to take?  Is it warranted

1    to stay this yet at least another year it sounds like even

2    optimistically speaking if there is not yet another interim

3    period and if the peer review -- if it does get sent for

4    publication -- and I know your point that there is not even a

5    promise of any publication.  Dr. Woychik may decide, as there

6    has been a decision in the past, not to have -- I think in one

7    instance there was a non-publication decision.

8        On the other hand, we will know more presumably -- well,

9    that's the other question.  Once the working group presents

10   it's -- its comments, I guess, we still don't have an idea how

11   long it will be before Dr. Woychik then decides to go with

12   publication or not.

13       **MR. CONNETT:**  Right.  And Your Honor, as you may

14   recall, in Dr. Woychik's declaration, he states that if the

15   BSC -- so there's several links to this process.  The first is

16   the working group provides its recommendations to the BSC.

17   Then the BSC, after reviewing the working group's

18   recommendations, makes its own recommendations to Dr. Woychik.

19       And if the recommendations from the BSC are substantial,

20   Dr. Woychik's declaration talks about the potential need for a

21   fifth external peer review.

22       So we would be going from the fourth peer review to the

23   fifth peer review.  So God only knows how long that review

24   would take.

25       And that's in Dr. Woychik's declaration.  So I go to the

1    Court's earlier question, there is nothing in Dr. Woychik's

2    declaration that provides any further certainty or clarity as

3    to when, if ever, NTP will release this report than there was

4    in his first declaration.

5        So there is no added basis -- there is no new basis here

6    to put the case back into a stay.  There is no further

7    certainty.  There is no further clarification.

8        If anything, Dr. Woychik's new declaration, particularly

9    when considered in the context of the FOIA e-mails, we have

10   less certainty today, less certainty as to when this report is

11   ever going to be released and if it is going to be released.

12       And I would add one last thing, Your Honor, not to belabor

13   the point; but I don't -- we don't believe it is Dr. Woychik's

14   decision.  It's a high -- it -- clearly we have seen here that

15   higher up political leadership in HHS has the authority to

16   instruct Dr. Woychik to not release the report.  And that's

17   what they did in May.

18       So we not only need to get Dr. Woychik to sign off on this

19   report, we need the higher levels of political leadership at

20   HHS.  So that's another --

21           **THE COURT:**  Let me ask you -- I understand that.  Let

22   me ask you, if you had your druthers at this point and I deny

23   the Government's request, what are you proposing in terms of

24   how we would proceed, the pace we would proceed, and what would

25   happen on what kind of timeline?

1          **MR. CONNETT:**  Right.  Your Honor, our experts would be

2     ready to go and testify at trial within two or three months.

3     And I think the Court -- our position would be that the Court

4     should set a trial date now and that the Court -- the parties

5     can work together on the respective deadlines for expert

6     disclosures, but that we should set the remaining schedule for

7     this litigation.

8          But I would add, based on some meet-and-confers that I

9     have had with Counsel, I anticipate that we may have some fact

10    discovery disputes coming up.

11         And so our proposal -- to accommodate some of those

12    disputes our proposal, Your Honor, would be to set the trial

13    date in July -- the earliest possible date in July and then get

14    a schedule on calendar for expert disclosures, expert

15    depositions, and trial documents to be submitted to the Court.

16         So that would be our proposal, Your Honor.

17         **THE COURT:**  Well, let me ask you, when you say "fact

18    discovery" or "fact" -- what kind of disputes?

19         **MR. CONNETT:**  Yes, Your Honor.  So in Dr. Woychik's

20    second declaration, he provided some important new information

21    from Plaintiffs' perspective.

22         Dr. Woychik talked about how personnel -- unidentified

23    personnel at the CDC and NICDR provided comments regarding --

24    that were critical of the NTP's state of the science review and

25    meta analysis.

And it was those comments, according to Dr. Woychik, that led -- what he claims responsibility for making the decision. We dispute that but nevertheless -- that led the HHS to put the report on hold because, as Dr. Woychik noted, he wanted to adjudicate the comments from HH [sic] personnel through the BSC working group peer review.

So we believe, Your Honor, that those comments would be exceptionally helpful for this litigation -- for the truth -- for the fact finding mission of this Court to understand what these agencies -- the HHS agencies, what their concerns were, what their scientific criticisms of the NTP report were.

We would welcome those comments being considered by the experts in this case and by the Court.

And we believe, Your Honor, that those comments basically eliminate the need to wait for Guido (phonetic), to wait for the NTP to complete this unusual and never-ending process because the Court would have at its disposal a robust set -- would have the NTP scientists' assessment; and it would have sort of the outer limit, if you will, of adversarial criticism of the NTP report by individuals who promote this practice of fluoridation.

We would then have sort of basically the full scientific debate.  There would be nothing -- there would be no surprises. The Court would have all of the current data, the latest science, and the current debate at its disposal.

1    The parties' experts would be able to look at those
2    comments and the NTP report and provide sort of synthesis for
3    the Court.  We have everything here, Your Honor.  All the
4    information is available.
5         So what we have -- upon receiving Dr. Woychik's
6    declaration, I immediately asked Counsel if they would
7    voluntarily produce those comments because Dr. Woychik's
8    declaration clearly places great emphasis on them; but Counsel
9    has refused to produce the comments and based on a
10   meet-and-confer that we have had about them, I believe they
11   will be asserting that they are privileged communications; and
12   they will not disclose them to the Court or to the parties.
13        I would note, Your Honor, that this is -- I think there is
14   a real problem here from the Government's position; and that
15   is, they are claiming that this peer review will be a public
16   process.
17        Dr. Woychik stated that the BSC working group would be
18   reporting its finding at a public meeting in 2023.  And yet,
19   the Government is claiming that the NTP monograph must be
20   secret and the comments about the monograph must be secret;
21   that no one in the public can read these comments or the
22   monograph, leaving aside the fact that HHS gave a copy of the
23   monograph to the lobbyist group American Dental Association.
24        Our position would be these comments should be public.  At
25   least they should be made available for this litigation.

 1          **THE COURT:**  Well, let me ask, if this were a normal

 2     trial and we go through the expert disclosure process and your

 3     experts say one thing, I would assume that your opponents, the

 4     Government, would say "Well, wait a minute, we have comments

 5     coming from our own experts at the CDC," et cetera, et cetera;

 6     and they would produce these -- they would have their own

 7     incentive to produce or use those critical comments to -- to

 8     support their position.  And so it wouldn't -- it normally

 9     would just -- wouldn't it come out through the normal

10     disclosure process?

11          **MR. CONNETT:**  That's one mechanism that it could come

12     out.  I think it would be beneficial for Plaintiffs' experts to

13     have access to those comments to be able to consider them and

14     provide their assessment of them versus waiting for the point

15     where EPA's experts disclosed them, which would be late in

16     expert discovery.

17          So we believe it would be more efficient for everyone to

18     have those comments up front, and then the experts for the

19     parties can then kind of provide their assessment of them.

20          So that's what we would be asking Your Honor is we --

21     Plaintiffs seek to discover those comments and provide those

22     comments to our experts.

23          **THE COURT:**  One last question and then I'm going to

24     turn to Mr. Adkins.  What about -- so the -- I will call it the

25     May draft, what you think is sort of the final draft that was

1   supposed to be published -- it was scheduled for publication

2   like the next month, in June; right?

3          **MR. CONNETT:**  May.

4          **THE COURT:**  Or May, I mean.  In any event, it's not

5   been published.  You say it has been shared with the ADA,

6   American Dental Association.

7       What's your position about if that is -- if the Government

8   asserts that as privileged, how would that be litigated?

9       I mean, I would have to decide that question because if it

10  is privileged, then what does that do to your case and your

11  expert's reliance on that?

12         **MR. CONNETT:**  Well, we strongly contest that that

13  monograph should be [sic] privileged.  Your Honor, as a --

14         **THE COURT:**  Should not be privileged?

15         **MR. CONNETT:**  Absolutely not.

16         **THE COURT:**  Yeah.

17         **MR. CONNETT:**  Especially if they have already

18  disclosed it to the ADA.

19         **THE COURT:**  I understand that and we may have to

20  litigate that.  I'm almost wondering whether that needs to be a

21  threshold issue because everything kind of hinges on it.

22      If it is privileged and it can't be disclosed, then I have

23  a hard time seeing how -- how we proceed and how your experts

24  can discuss it, et cetera, et cetera.

25         **MR. CONNETT:**  Understood, Your Honor.  And I do

1   think -- Plaintiffs do intend to ask the Court to lift the

2   protective order for these materials.

3        And without going into depth and into that argument, I

4   would just flag for the Court of the following point:  Every

5   single time -- every time -- the NTP has ever published a

6   monograph, every time it has released to the public at large --

7   not just to the American Dental Association but to the public

8   at large, it has released the draft monograph.  Ever single

9   time.

10        So now the Government's position is for fluoride, we will

11   release it to the American Dental Association, who will work

12   behind the scenes to discredit it; but we will not release it

13   to the public.

14        I think it's an untenable position, Your Honor.  It is an

15   untenable position.  But I do agree that this needs to be

16   litigated and we do intend to file a motion to lift the

17   protective order.

18        **THE COURT:**  All right.  Now I will hear from

19   Mr. Adkins.

20        **MR. ADKINS:**  Thank you, Your Honor.  I will try to

21   rewind a little bit here.

22        So in terms of Dr. Woychik's declaration, I think it's

23   true.  There isn't a deadline for when these drafts will be

24   published or released.  I don't think Dr. Woychik's candor

25   should be held against NTP here, and the United States isn't

asking the Court to wait to schedule deadlines until those

drafts are published.

    Rather, we are asking the Court to wait six more months --

let's see where NTP is with the process that it has outlined

now -- and then we will set a schedule.  It might be that we

are back here in three months, six months, whatever the Court

decides; and, you know, NTP has published or has not -- or has

decided not to publish and we can set a schedule based on what

NTP decided.

    But the point here is what we are asking is to wait just a

few more months so NTP can conclude the process that it has set

out to do.

            **THE COURT:**  Well, let me explore that with you.  So if

we wait, you say, six months and in six months we will have

some knowledge or we may or may not, depending on what's

decided, but you will get the response back from the working

group.  Maybe there will be a decision whether to submit that

for yet another round of peer review or not or maybe publish.

Maybe there will be a decision to have submitted the meta

analysis to peer review.

    If that's the case, let's say, at that juncture if --

whatever it is, do you think that would be the time -- it would

be ripe to set a trial at that point or is there some scenario

where you would still say "Well, we thought we would know more

but" -- you know, because you say "we are not going to ask for

1  a six-month extension, six-month extension."  What is going to

2  prevent a further extension if I were to grant some kind of

3  extension?

4       **MR. ADKINS:**  It's a good question.  It's a tough

5  question for us, of course.  We -- and I want to see this case

6  move along just as much as Plaintiffs do.  It has been pending

7  for a while.  It has been occupying the Court's time for many

8  years now.

9       I don't want to see this case continuing to just kind of

10 stick around on the docket for years and years.

11      I think in six months we are going to have more

12 information about where NTP is and -- and, you know, short of

13 there being something -- some drastic revelation, I think we

14 will be in a good position to be able to set a trial date in

15 six months.

16      And I can't identify for Your Honor right now anything

17 that would cause us to want to hold that up any further.

18                    (Pause in proceedings.)

19      **THE COURT:**  All right.  So, Mr. Connett, I know, you

20 know, time -- justice delayed is justice denied.  And at least

21 in your view, there is a public health concern; and every month

22 that goes by, there is concern.

23      Given what Mr. Adkins just said in that it sounds like the

24 Government would be prepared to set a trial date six months

25 from now and we would know more.  We may even have the state of

1    the science.   Maybe there is a possibility that will have been

2    published by then.

3         **MR. CONNETT:**  Your Honor, based on what happened last

4    May, we have no confidence at all that the HHS will ever

5    authorize the release of this report if it is contrary to HHS's

6    policy interests.

7         So we just don't have -- you know, I didn't hear from

8    Counsel any agreement that the Government would accept a

9    trial -- moving forward with a trial date at the six-month

10   juncture.

11        I can certainly envision getting another declaration from

12   another Government employee in six months saying:  "Hey, guess

13   what?  We may be two months or three months away from release

14   of a report."

15        And then the Government asks us to wait three or four more

16   months just to see if a final report comes out.  I have no

17   confidence whatsoever, one, that the HHS will ever release

18   this; and two, that in six months time the Government is going

19   to agree to move forward.

20        And I think --

21        **MR. ADKINS:**  May I be heard on that, Your Honor?

22        **THE COURT:**  Let him finish and I will give you a

23   chance.  Go ahead.  Complete your thought, Mr. Connett.

24        **MR. CONNETT:**  So, I would say, Your Honor -- and I

25   just want to respond and it relates to your question earlier,

```
 1   which I didn't directly respond to, about how do you move

 2   forward with a privileged document because it does relate to

 3   this timing issue.

 4        Our position on that, Your Honor, is clearly the NTP

 5   monograph is not a privileged document.  Leaving that aside,

 6   even if it were -- if it was determined to be a privileged

 7   document, our position is the case needs to move forward.  We

 8   don't wait forever for the release -- we don't need -- we

 9   ultimately do not need the NTP monograph to complete this case.

10        So that would be my position there is the extent that the

11   Court --

12        THE COURT:  In other words, your experts would rely

13   not on the draft but on the actual studies, the completion of

14   the -- the combined Mexico/Canada study taking into account the

15   Spanish cohort study, et cetera, et cetera.

16        MR. CONNETT:  Absolutely, absolutely.  No question

17   about it.

18        THE COURT:  Okay.  But then that runs a bit contrary

19   because I said, you know, it's kind of hard to imagine how this

20   Court would proceed without something from the NTP.  I mean,

21   because, you know, that's the center point of all this.  And to

22   kind of go there that -- I understand your point but that -- I

23   have already indicated some reluctance to kind of run on a

24   completely parallel track.

25        MR. CONNETT:  And I appreciate that, Your Honor, but I
```

1    think that's where -- and I know this is what we have been

2    discussing today -- but that's where the importance of that NTP

3    May 2022 monograph.  You saw there in those e-mails that NTP

4    scientists -- these are the people that we have been waiting to

5    hear from -- they consider that report to be their final

6    assessment.  They considered it.  Those are the scientists that

7    we were interested to hear from.  They considered it to be

8    their final assessment.

9         So we -- I don't want to mistake one thing.  We absolutely

10   believe the NTP monograph is not a privileged document and

11   intend to argue such.  But my point there, Your Honor, was to

12   the extent that the Court were to find it privileged, we do

13   believe we should -- we shouldn't be waiting for Guido and

14   waiting for two or three years for this process to complete

15   itself.

16        **THE COURT:**  All right.  Mr. Adkins, why shouldn't I

17   allow the litigation to proceed in this following fashion; that

18   we litigate and adjudicate this issue about the privilege?  I

19   think it is quite important, and you have got a discovery

20   dispute; and there is privilege attached to that issue as well.

21        But the bigger question of privilege is this whole

22   question about the -- you know, whether the NTP draft of

23   May 2022 can be commented on and used in a trial if it's not

24   final.

25        I think we have to resolve that or that will certainly

inform a lot of things.  And I don't see why we can't go
forward with adjudicating that.  And if I find that it is not
privileged and I find that the comments -- critical comments
are discoverable, I don't see -- as long as there is a
protective order still on that -- that that discovery can't be
had.

I think the Government's concern is a trial that is
uninformed; you know, that is -- which was my concern too --
that it was completely divorced from the NTP process.

And it may be that we don't get to trial quite within, you
know, the timeframe; but at least we have done stuff.  We have
set it up.  And so that if I do decide to hold a trial, you
know, at that point you are ready to go.  I mean, it is expert
disclosure, discovery; but the evidence will all be there and
then, you know, that can proceed fairly quickly.

And at the same time whether that -- we come back together
after, let's say, we adjudicate some of this stuff -- whether
it's three months from now or some period -- hopefully we will
know, you know, what has happened to the state of science.

So, in other words, we accomplish some things now.  We
don't swallow the whole, whatever it is, horse or some cow or
something; but we move forward and set it up so that we can
move so that the Plaintiffs' concern about delay is addressed
in part, the Government's concern about, you know, exposing
drafts that are not meant to be public and whatever damage that

1    could be done to the public could be respected because we will

2    maintain a confidentiality protective order during the pendency

3    of discovery at least.

4        And then we would be in a position to better set a trial

5    date.  And we will also know what's going on with the process.

6    Is there any reason why we shouldn't proceed along those lines?

7        **MR. ADKINS:**  Just one reflection on that, Your Honor,

8    which is there is a distinction between the draft monographs

9    and the comments.

10       When we had our October hearing, Your Honor may recall,

11   you asked Plaintiffs' Counsel, you know, "What fact discovery

12   do you want to take?"  And the representation we heard was "the

13   draft monograph," and "we can live with just the draft

14   monograph."

15       We have gone through that process.  NTP has produced it

16   pursuant to a protective order.  And in our negotiations over

17   the scope of that protective order, we have allowed the experts

18   for the parties to obtain copies of that draft monograph so

19   they can have it.  They can look at it and use it.  Whether it

20   gets broadcast at trial I think is a different issue.

21       But completely separate from the draft monograph are these

22   comments.

23       **THE COURT:**  No.  I understand that, and that's a

24   dispute you are claiming -- that could be a different privilege

25   or double privilege or something.

1          **MR. ADKINS:**  And there is really two issues now.  One

2     is are the comments -- is discovery over the comments within

3     the scope of the Court's leave to take discovery that followed

4     the October hearing?  And, two, are -- you know, are the

5     comments protected by some privilege?

6          So that's why we have asked -- you know, Plaintiffs want

7     to take that discovery.  The first step would be to file a

8     motion seeking leave to take additional fact discovery.

9          **MR. CONNETT:**  Your Honor --

10         **THE COURT:**  I think that's -- yeah, go ahead.

11         **MR. CONNETT:**  I just think that's -- just unnecessary

12    paperwork for everyone involved.

13         I mean, we are -- I have been upfront with Counsel on what

14    we want.  We want those comments.  We are going to serve

15    document requests on NIH to get those comments, and there is

16    going to obviously be --

17         **THE COURT:**  Here is what we are going to do:  I'm

18    going to allow you to initiate that discovery.  I'm not saying

19    it is discoverable because what you are going to get, you are

20    going to get an objection.  You are going to get an objection

21    of relevance, beyond the scope.  You are going to get an

22    objection it's privileged.  And then you are going to reply.

23    And I will adjudicate it in that process.

24         You need to fold in -- maybe it is a separate motion.  It

25    is not exactly discovery -- adjudication of the privileged

1    nature or not of the NTP report itself.

2        So there are two things but I would like to -- I think we

3    ought to address those two things because those are the two big

4    issues it seems to me.

5        **MR. CONNETT:**  I agree, Your Honor.  And that's why

6    when I mentioned the trial date, like I said, I think our

7    experts are ready to go within two or three months; but given

8    some of these discovery issues that we have and the privilege

9    issues, I do think we need to work them out.

10       But I -- you know, our hope, Your Honor, is that we

11   could -- obviously we need to resolve these discovery issues;

12   but our hope is that we could, you know, get a trial some time

13   in the summer.  That's what Plaintiffs' hope would be at this

14   point, Your Honor.

15       But I understand the Court is not in a position right now,

16   it sounds like it, not to set a date at this point; but, you

17   know, maybe it would be helpful for everyone to have a trial

18   date to at least -- to aspire to, to work around.

19       **MR. ADKINS:**  Your Honor, this is the first we have

20   heard any dates like that.  And I can say now, I would -- we

21   would -- the United States would appreciate an opportunity to

22   confer with Counsel and if necessary, file briefing over a

23   potential trial date because a trial date in two or three

24   months from now -- expert disclosures in two or three months

25   from now when, as Your Honor knows, we lost our epidemiologist.

1    We are now in search of a new expert including personnel

2    retirement at EPA, that would be a very difficult task for the

3    Government at this point.

4        So before we set any sort of trial date or expert

5    disclosure deadlines, at the very least, we would like the

6    opportunity to confer with Counsel and submit briefing if

7    necessary.

8        **THE COURT:**  I think that's the way to proceed.

9        Also, I have to tell you, there is scheduling issues on my

10   plate, and I have got trials set in some major cases in that

11   July into August timeframe and then I'm out a bit and then --

12   so it's going to be tricky.

13       I was going to tell, you know, I have a little slot in

14   May; but I think that's a little ambitious.  I was going to try

15   to spring that on you; but after hearing all this, I think

16   that's probably not going to work.

17       But obviously this case is a priority and -- but I have

18   got some other -- we are sort of backed up; but if you could

19   reach a stipulation and maybe give me a some -- a range of

20   dates and, you know, hopefully you can come to an agreement

21   anticipating that we are going to adjudicate this -- at least

22   front load questions -- you know, why don't you do that as well

23   in your report back to me.

24       What I would like to do is for the Plaintiff to tee up

25   these issues; privilege, disclosability, et cetera, usability

1  of the NTP draft, and propriety of discovery into the

2  comments -- the critical comments that are coming from HHS

3  and --

4          MR. CONNETT:  Your Honor, if I could ask for the

5  Court's guidance on one matter.

6          THE COURT:  Yeah.

7          MR. CONNETT:  We are seeking discovery here from NIH

8  because obviously based on Dr. Woychik's declaration, NIH has

9  all of the comments that we seek to discover.  So this would be

10 basically a third-party discovery dispute.

11     In terms of the -- you know, we will file a motion with

12 the Court or however that works out with the motion; but does

13 the Court prefer that to be through a discovery letter or does

14 the Court prefer that to be through a motion, opposition and

15 reply?

16         THE COURT:  Well, normally, you have to propound

17 discovery so I know exactly what it is you are asking for and

18 then get the formal response.  Then, under my standing order,

19 parties would normally submit a letter brief, et cetera, et

20 cetera; but this one -- I think we know that this is headed for

21 a full motion.  You know, this is not whether you get to -- you

22 know, where the deposition is going to take place or, you know,

23 that kind of thing or whether you get to propound one set of

24 expert interrogatories.

25     This is pretty substantive.  So I'm not going to

1    request -- require a letter brief prerequisite.  Let's just go

2    straight to -- it will be a motion to compel.  I can predict

3    that.  You are going to propound the request.  Government will

4    say no, and then you will set it up -- you can shorten time on

5    that.  We don't have to wait the full, whatever -- you know,

6    whatever you want to do, but I rather adjudicate that issue

7    along with the question of the usability and the privilege or

8    not nature of the NTP.

9         And I think that will give some clarity as to where we

10   will go.  And then also meet and confer -- once you have sort

11   of figured out timeline for that -- and, you know, with the

12   experts that need to be lined up, et cetera, et cetera -- what

13   you think is a feasible trial date in the not too distant

14   future because this has been pending and I hear what the

15   Plaintiffs are saying.  On the other hand, I want to do this in

16   an orderly way.

17        So if you can do that and report back to me sort of the

18   timeline for the motion stuff so I will have an idea when that

19   is coming in as well as any thoughts you have about potential

20   trial dates.

21        Let's set a status date for early April, ninety days from

22   now.  Hopefully we will know more from -- with respect to at

23   least the state of the science monograph is going to be --

24   where that's at.  And at that point I'm likely to set a trial

25   date.

1          **MR. CONNETT:**  Thank you, Your Honor.

2          **THE COURT:**  So --

3          **MR. CONNETT:**  We will certainly confer with Counsel

4    and start working through some potential trial dates, and I

5    expect we will be filing our motion on the privilege issue

6    shortly and -- but we -- I think a status conference and

7    setting a trial date in early April would be, I think, a good

8    way to move this case forward.

9          **THE COURT:**  All right.  Vicky, can we get a --

10         **THE CLERK:**  February 4th at 2:30, Your Honor.

11         **THE COURT:**  April.

12         **THE CLERK:**  I'm sorry, April 4th at 2:30.

13         **THE COURT:**  Okay.  April 4th.

14                    (Pause in proceedings.)

15         **MR. ADKINS:**  That works for me, Your Honor.  I'm

16   confused by Counsel's comment that he would be filing a motion.

17   I would expect discovery requests to precede a motion.

18         **MR. CONNETT:**  Yeah.

19         **THE COURT:**  There is going to be discovery requests

20   and then expected denial and then the motion, but I wanted you

21   to meet and confer in that timeline because I don't -- you

22   know, I don't know if you have to wait the full 28 days to

23   respond to his document request.  I think you already know what

24   it's going to be and -- but there is -- there will be a

25   motion -- I don't know what you are going to entitle it -- but

```
 1  some kind of declaration about the -- about the privilege
 2  nature or not of the NTP.  That's -- you can time that at the
 3  same time or, you know, whatever you want to do.
 4          MR. CONNETT:  Right.  And that's the motion I was
 5  referring to was --
 6          THE COURT:  Yes.
 7          MR. CONNETT:  -- the motion to lift the protective
 8  order.
 9          THE COURT:  Okay.  All right.
10          MR. ONG:  Your Honor, if I may?
11          THE COURT:  Yes.
12          MR. ONG:  With apologies, I'm on leave on April 4th.
13  It is spring break for my children, so I was hoping we could do
14  it on a different date.
15          THE COURT:  Well --
16          THE CLERK:  April 11th.
17          THE COURT:  How is April 11?
18          MR. ONG:  That's perfect.
19          THE COURT:  Okay, at 2:30.  Great.  All right.  So we
20  will talk to you then.  There are participants raising their
21  hands, but I don't think there is any other counsel; right?
22          MR. CONNETT:  Correct.
23          THE COURT:  All right.  So, that will conclude our
24  proceeding on this matter today.  Thank you.
25              (Proceedings adjourned at 12:19 p.m.)
```

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, January 24, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
             United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25