# EXHIBIT A
# (Notice of Deposition)

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY GUNDERSON REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
11601 Wilshire Blvd, Suite 1900
Los Angeles, CA 90025
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | | |
|---|---|---|
| FOOD & WATER WATCH, et al., | ) | Civ. No. 17-CV-02162-EMC |
| | ) | |
| Plaintiffs, | ) | **AMENDED NOTICE OF TAKING** |
| vs. | ) | **RULE 30(b)(6) DEPOSITION OF** |
| | ) | **ENVIRONMENTAL PROTECTION** |
| U.S. ENVIRONMENTAL PROTECTION | ) | **AGENCY** |
| AGENCY, et al. | ) | |
| | ) | Date:      July 25, 2023 |
| Defendants. | ) | Location: [To Be Determined] |
| | ) | Time:      9 am (EST) |

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition upon oral examination under oath of the designated representative(s) of the United States Environmental Protection Agency ("EPA"). The deposition will be taken before a notary public or other person authorized by law to administer oaths, will be stenographically recorded and videotaped. The deposition will take place on **July 25, 2023 at 9 am EST** at a place to be determined after conferring with counsel. (To the extent that this date does not work for EPA, Plaintiffs are amenable to finding another date in July that will be work for EPA.)

Such deposition(s) will be taken for purposes of discovery, for use as evidence at trial, and for any other permissible purpose under the Federal Rules of Civil Procedure and Federal Rules of Evidence. The deposition(s) shall continue from day-to-day, excluding weekends and holidays, until completed.

Plaintiffs request that the EPA provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on the EPA's behalf.

**TOPICS OF INQUIRY:**

1. Whether EPA considers its first ten risk evaluations under the Amended TSCA to satisfy Section 26(h)'s scientific requirements in light of NASEM's criticisms[1] of the systematic review protocol that EPA used.

2. The impact, if any, that NASEM's criticisms[2] of EPA's systematic review protocol will have on the first ten risk evaluations that EPA completed under the Amended TSCA. For example, will EPA be re-doing these risk evaluations to ensure that the evaluations comply with NASEM's extensive recommendations?

3. In EPA's first ten finalized risk evaluations of *non-cancer* risks under the Amended TSCA:

   a. Did EPA make Unreasonable Risk determinations where it had "medium" (as opposed to "high") confidence in the health hazard endpoint?

   b. Did EPA make Unreasonable Risk determinations where it had "low" or "medium" (as opposed to "high") confidence in the estimated human exposure level?

   c. Did EPA limit its selection of studies from which it derived Points of Departure (e.g., NOAELs, LOAELs, or BMDLs) to only those studies that EPA judged to be "high quality"?

   d. Did EPA require that there be a known "mode of action" (i.e., an explanation for how the chemical causes the hazard) before making a finding of unreasonable risk?

   e. Did EPA limit its determinations of unreasonable risk to only those Conditions of Use that have been shown to cause the hazard?

   f. Did EPA limit its determinations of unreasonable risk to only those Conditions of Use where the exposure level equals or exceeds the estimated hazard level?

---

[1] *See* National Academies of Sciences, Engineering, and Medicine. 2021. THE USE OF SYSTEMATIC REVIEW IN EPA'S TOXIC SUBSTANCES CONTROL ACT RISK EVALUATIONS. Washington, DC: The National Academies Press. https://doi.org/10.17226/25952 (concluding that EPA's systematic review protocol under TSCA is (A) "not comprehensive," (B) "unworkable," (C) "lacking objectivity," (D) "compromised" in its transparency, and (E) "d[oes] not meet the standards of systematic review methodology").

[2] See *supra* note 1.

     g. Did EPA limit its determinations of unreasonable risk to only those Conditions of Use where the human exposure level has been *associated* with the hazard (i.e., where the exposures generated by the Condition of Use equal or exceed the levels that have been associated with the hazard in published studies)?

     h. Did EPA limit its determinations of unreasonable risk to only those Conditions of Use where the hazard has been examined (through an epidemiological study, human experiment, or case report) in specific relation to that Condition of Use, or was EPA willing to extrapolate from studies of other conditions of use?

     i. Did limit its determination of unreasonable risk to only those Conditions of Use that had no uncertainties with respect to the hazard or exposure estimates?

     j. Did EPA limit its determinations of unreasonable risk to only those Conditions of Use where the average, typical, or "Central Tendency" exposures exceeded the levels of concern, or did EPA also consider individuals with high level (e.g., 95th percentile) exposures?

     k. Did EPA make Unreasonable Risk determinations where the average exposure from the Condition of Use was not considered to pose a risk, but where 5% of humans (i.e., those with 95th percentile exposures) had exposures of concern?

     l. Did EPA limit its consideration of epidemiological studies to only those studies conducted in the United States?

     m. Did EPA ever forego use of the Default Uncertainty Factor of 10 for intraspecies variability?

4. In the PCE risk evaluation, is it correct that:

     a. EPA found there to be an unreasonable risk of neurotoxicity for a Condition of Use[3] that produces exposures that are **89 times lower** than the lowest observed adverse effect level for this hazard in humans?

///

///

///

---

[3] Plaintiffs refer here to Occupational Non-Users (ONUs) with Central Tendency inhalation exposures from the "Dry Cleaning and Spot Cleaning Post-2006 Dry Cleaning" condition of use. See pages 481 and 530.

3

AMENDED NOTICE OF TAKING RULE 30(b)(6) DEPOSITION OF
ENVIRONMENTAL PROTECTION AGENCY

5. In the Dioxane risk evaluation, is it correct that:

    a. EPA found there to be an unreasonable risk of liver toxicity for a Condition of Use[4] that produces exposures that are **96.6 times lower** than the lowest observed adverse effect level for this hazard in animals?

6. In the HBCD risk evaluation, is it correct that:

    a. EPA found there to be an unreasonable risk of thyroid effects for a Condition of Use[5] that produces exposures that are **274 times lower** than the Point of Departure for this endpoint (i.e., a BMDL from an animal study)?

7. The BASIS for EPA's Unreasonable Risk Determination for the following three Populations/Conditions of Use:

    a. <u>PCE</u>: Occupational Non-Users (ONUs) with Central Tendency inhalation exposures to PCE from the "*Dry Cleaning and Spot Cleaning Post-2006 Dry Cleaning*" condition of use.

    b. <u>Dioxane</u>: Workers with Central Tendency dermal exposures to Dioxane from the "*Basic Organic Chemical Manufacturing (process solvent)*" condition of use.

    c. <u>HBCD</u>: Workers with High-End dermal exposures to HBCD from the "*Plastic Articles (hard) Construction and Building Materials covering Large Surface Areas (e.g., EPS/XPS foam insulation in residential, public and commercial buildings, and other structures) and Solder Paste*" condition of use.

    For purposes of Topic 7, the term BASIS shall mean:

    (A) The health hazard at issue;

    (B) EPA's estimate, based on the hazard data that EPA reviewed for the chemical, as to the lowest level of exposure that has caused the hazard;

    (C) EPA's estimate of the human exposure level resulting from the Condition of Use;

    (D) The study that was used for the Point of Departure (e.g., NOAEL, LOAEL, or BMDL)

---

[4] Plaintiffs refer here to Workers with Central Tendency dermal exposures from the "Basic Organic Chemical Manufacturing (process solvent)" condition of use. See pages 259 & 282.

[5] Plaintiffs refer here to Workers with High-End dermal exposures from the "Plastic Articles (hard) Construction and Building Materials covering Large Surface Areas (e.g., EPS/XPS foam insulation in residential, public and commercial buildings, and other structures) and Solder Paste" condition of use. See pages 463 & 480.

4

AMENDED NOTICE OF TAKING RULE 30(b)(6) DEPOSITION OF
ENVIRONMENTAL PROTECTION AGENCY

for the hazard, including (1) whether it was an animal study or human study and (2) EPA's qualitative assessment of the critical study's quality (e.g., "low," "medium," or "high");

    (E) The uncertainty factors that EPA used for the Benchmark Margin of Exposure, including whether they were Default uncertainty factors or Chemical-Specific uncertainty factors;

    (F) EPA's confidence in the data supporting the existence of the health hazard;

    (G) EPA's confidence in the data supporting EPA's estimate of exposure under the Condition of Use;

    (H) Any other important risk-related factors that EPA based its Unreasonable Risk determination on, including key assumptions and uncertainties.

8. Does EPA agree with the National Research Counsel's recommendation[6] that EPA should only forego the use of Default Uncertainty Factors in situations where EPA determines "that the alternative is clearly superior; that is, that it's plausibility clearly exceeds the plausibility of the default"?

**DOCUMENT REQUESTED:**

The deponent is requested to bring the most recent version of his or her curriculum vitae to the deposition.

Dated:   June 6, 2023

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

---

[6] *See* National Research Council. 2009. Science and Decisions: Advancing Risk Assessment. Washington, DC: The National Academies Press. https://doi.org/10.17226/12209, at 201 ("Because of the effort that EPA has invested in selecting its current defaults and the consistency that defaults confer on the risk-assessment process, the use of an alternative to the default in specific cases faces a substantial hurdle and should be supported by specific theory and evidence. The committee recommends that EPA adopt an alternative assumption in place of a default when it determines that the alternative is 'clearly superior,' that is, that its plausibility clearly exceeds the plausibility of the default.").

# CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5 and the mutual consent of the parties that email to counsel will constitute proper service of discovery, I served a copy of the foregoing *Amended Notice of Taking Rule 30(b)(6) Deposition Duces Tecum of Environmental Protection Agency* upon Defendants on June 6, 2023 via email to the following counsel:

Brandon Adkins
Paul Caintic
Emmet Ong
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
brandon.adkins@usdoj.gov
paul.caintic@usdoj.gov
emmet.ong@usdoj.gov

*Attorneys for Defendants*

Dated:   June 6, 2023

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs