# Defendants' Motion in Limine to Exclude the Testimony of Brian Berridge

TODD KIM
Assistant Attorney General

BRANDON N. ADKINS
PAUL A. CAINTIC
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174 (Adkins)
Tel: (202) 514-2593 (Caintic)
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Paul.Caintic@usdoj.gov

EMMET P. ONG
Assistant United States Attorney
United States Attorney's Office
1301 Clay Street, Suite 340-S
Oakland, CA 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., | Case No. 17-CV-02162-EMC |
| Plaintiffs, | **DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF BRIAN BERRIDGE** |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | Date:  Tuesday, January 16, 2024<br>Time:  2:30 PM (PST)<br>Place:  San Francisco Courthouse<br>450 Golden Gate Ave.<br>San Francisco, CA 94102<br>Courtroom 5, 17th Floor |
| Defendants. | |

## INTRODUCTION

The Court should exclude testimony by former National Toxicology Program ("NTP") employee Dr. Brian Berridge. Fed. R. Evid. 401, 402, 403. Plaintiffs disclosed Dr. Berridge as a fact witness regarding alleged political influence on the development of the draft NTP monograph. The Court already held that alleged political influence concerning the draft NTP monograph is not relevant. Plaintiffs have not sought leave to file a motion for reconsideration of that decision. *See* Civil L.R. 7-9. Plaintiffs instead attempt to circumvent the Court's relevancy ruling by calling Dr. Berridge as a fact witness on the same subject. In reliance on the Court's order, EPA forewent discovery on that topic, including by excusing Plaintiffs from disclosing third-party communications (including with Dr. Berridge) they withheld that were relevant to the issue. Permitting Dr. Berridge's testimony would therefore be unfairly prejudicial to EPA.

## BACKGROUND

In 2018, NTP named Dr. Berridge as its new associate director to manage day-to-day operations.[1] Dr. Berridge holds a doctorate in veterinary medicine. He is not an author of any version of the NTP draft monograph or meta-analysis. In fact, in Dr. Berridge's words, he had "no real skin in the game other than supporting the scientists in [his] Division who have produced [the draft monograph]." Email from Brian Berridge to Tara Schwetz and Rick Woychik dated May 12, 2022, Adkins Decl. Ex. B (see highlighted text).

Plaintiffs' initial disclosures list Dr. Berridge and six other current and former NTP scientists as individuals likely to have discoverable information about alleged political influence on the draft NTP monograph. The disclosure states:

> **Current and former NTP scientists who have knowledge of the Monograph**, including the history of its development, the peer review processes and scientific methodologies that it has employed, and the political pressures it has been subjected to by its officials and agencies with the strongest policy interests on fluoride. These scientists include, but are not necessarily limited to, Kristina Thayer, John Bucher, Brian Berridge, Kyla Taylor, Linda Birnbaum, Mary Wolfe, and Richard Woychik.

Pls.' Initial Disclosures 2, Adkins Decl. Ex. D.

---

[1]   NTP, Brian Berridge Tapped to Manage National Toxicology Program, *available at* https://www.nih.gov/news-events/news-releases/brian-berridge-tapped-manage-national-toxicology-program.

In April 2023, the parties submitted their Seventh Joint Status Report that referred to a potential issue of whether Plaintiffs must seek leave to exceed the presumptive limit of ten depositions. Seventh Joint Status Report 3, ECF No. 350. Plaintiffs sought leave to conduct fact depositions of federal officials at the Department of Health and Human Services regarding alleged political pressures exerted on NTP in the leadup to its decision not to publish a May 2022 draft of the monograph. At the ensuing status conference, Plaintiffs argued (as they seek to do at trial) that evidence regarding alleged political influence goes to the weight and scientific merit of the draft monograph. Plaintiffs' counsel stated: "the only reason [the NTP monograph] wasn't in final form last May is because of . . . political pressures." Status Conf. Tr. 10:18–20 (Apr. 11, 2023), Adkins Decl. Ex. A. The Court correctly noted that the draft report, as well as the criticisms and the NTP authors' responses to them, are all public and asked, "what does it matter? It seems like it's water under the bridge." *Id.* at 10:21–24. The Court's instructions were clear: "I want to focus on the science, and that's what this is about . . . that's more important [than] whether politicians got involved to squelch this thing. Whether they did or not, I have to look at the science at the end of the day." *Id.* at 12:16–24. The Court rejected Plaintiffs' argument and ordered without prejudice that the depositions not be permitted because they have no obvious relevance now that the draft monograph and the comments thereto have all been made public. *Id.* at 15:13–16:11; *see also* Minute Entry 2, ECF No. 352. "Absent good cause, the Court stated that it must proceed on the merits of the science which does not require the information Plaintiffs seek . . . ." *Id.* at 2.

Plaintiffs now identify Dr. Berridge as a fact witness they intend to call at trial. Plaintiffs explained that they will elicit testimony on the political influence issue and believe that the "principal relevance" of the testimony is how much weight to give to the NTP draft monograph. Adkins Decl. ¶ 3 (November 20, 2023 attorney conference). Plaintiffs offer Dr. Berridge to "explain why the May 2022 monograph was not published," "his assessment of the problems with not publishing the monograph at that time," and that he "considered the May 2022 monograph . . . to be NTP's final and complete monograph. Appendix A to Joint Pretrial Conference Statement. Further, several of Plaintiffs' proposed exhibits are emails for which Dr. Berridge is listed as the sponsoring witness; Plaintiffs' counsel described those same emails as evidencing "past political

interference with NTP." Adkins Decl. ¶¶ 4–5. Plaintiffs have not sought leave to move for reconsideration of the Court's relevancy order, as required by Civil Local Rule 7-9.

## ARGUMENT

## I.     THE COURT SHOULD EXCLUDE DR. BERRIDGE'S TESTIMONY.

*First*, Dr. Berridge's testimony has nothing to do with the heart of this matter—the merits of the scientific evidence about the potential hazard of water fluoridation. The Court previously held that alleged "political influence" on NTP is irrelevant. Indeed, the Court denied Plaintiffs leave to depose government officials on that exact subject. Status Conf. Tr. 15:13–16:11, Adkins Decl. Ex. A; Minute Order 2, ECF No. 352. Consistent with its prior order, the Court should exclude Dr. Berridge's testimony and any evidence relating to alleged political influence on NTP.

To be sure, the Court made its relevancy determination without prejudice to allow Plaintiffs to revisit the issue if appropriate. But no cause exists today to revisit the Court's order. Plaintiffs cannot proffer any reason why alleged political influence on NTP has somehow become relevant. No additional drafts of the monograph have been released, nor have Plaintiffs alleged any new political pressures since the April 2023 status conference.

*Second*, a party must obtain leave of court to notice a motion for reconsideration. Local Rule 7-9. Plaintiffs have not done so. Thus, Plaintiffs' attempt to reanimate their theory that the NTP draft was subject to "political influence" despite the Court's order at the April 2023 status conference is also procedurally defective, and the Court could and should exclude Dr. Berridge's testimony on this basis alone.

*Third*, Plaintiffs cannot reframe Dr. Berridge's testimony as relating to something other than the political influence issue. Plaintiffs' counsel represented that the testimony is relevant to the alleged political influence issue as well as what weight the Court should give the NTP draft monograph. Adkins Decl. ¶ 3. Dr. Berridge is not one of the scientists who authored any draft of the monograph. And virtually all the proposed exhibits for which Plaintiffs identified Dr. Berridge as the sponsoring witness were previously identified *by Plaintiffs* as evidencing "past political interference with NTP." Adkins Decl. ¶¶ 4–5. There can be no question that Plaintiffs seek to proffer evidence on the alleged political influence issue by calling Dr. Berridge as a witness.

*Fourth*, limiting Dr. Berridge's testimony to the history of the draft monograph and peer review and scientific methodologies NTP has employed would not resolve this issue. Federal Rule of Evidence 403 allows the Court to exclude evidence if its probative value is substantially outweighed by the danger that it will confuse the issues, waste time, or be needlessly cumulative. At best, Dr. Berridge's testimony will be irrelevant (consistent with the Court's April 2023 order) and lack any probative value about whether fluoridated drinking water poses an unreasonable risk.

The history of the draft monograph has no bearing on a relevant issue. In any event, the parties have informed the Court of the draft monograph's historical development throughout this case. Defs.' Opp'n to Mot. to Lift Stay 13–15, ECF No. 309 (describing history of NTP's monograph from first draft to the initiation of the BSC WG); Defs.' Admin. Mot. to Govern Proceedings 3–5, ECF No. 332 (detailing BSC WG's process); *see also* Joint Status Reports, ECF Nos. 295, 299, 304, 307, 316, 337, 350, 357, 366, 368 (providing updates on NTP's progress). Moreover, public versions of the draft monograph detail the documents' evolving history. It would be redundant at best to have Dr. Berridge survey the document's past.

The peer review and scientific methodologies NTP employed are relevant but will be the subject of testimony by no fewer than four *expert* witnesses in this case. The Court correctly noted the same at the April 2023 status conference. Status Conf. Tr. 13:3–12 ("And I think the money is going to be in the expert explorations on the science . . . . And you know, each side's position is going to be pretty obvious. Everybody gets their own expert."), Adkins Decl. Ex. A. Dr. Berridge, however, was not disclosed as an expert witness and cannot testify on these matters. *See Malkin v. Fed. Ins. Co.*, No. 2:21-cv-00172-CAS (PDx), 2023 WL 6967458, at *6 (C.D. Cal. Oct. 20, 2023) (excluding "any undisclosed expert evidence" from witnesses only disclosed as fact witnesses).

As a fact witness, Dr. Berridge can offer only "purely factual testimony" about the NTP monograph; he cannot "offer opinions based on his specialized knowledge." *Titus v. Golden Rule Ins. Co.*, No. 12-00316, 2014 WL 11515698, at *2–3 (D. Ariz. Apr. 4, 2014) (quotation marks omitted); *Zeiger v. WellPet, LLC*, 526 F. Supp. 3d 652, 677 (N.D. Cal. 2021) ("The definitions of lay and expert opinions are mutually exclusive."). Dr. Berridge cannot testify about why NTP used the methodologies it used or drew the conclusions it drew, as that would require him to "offer an

opinion or an impression based on his specialized knowledge and skill." *Titus,* 2014 WL 11515698, at *3 (finding doctor offered as a fact witness could testify that he performed a surgery on a patient but was barred from explaining why he did so); Fed. R. Evid. 701 (stating that fact witnesses cannot testify "based on scientific, technical, or other specialized knowledge"). Nor can Dr. Berridge offer his own conclusions about the fluoride science or explain the NTP monograph's methodologies. In *United States v. Frantz*, two tax auditors who were disclosed only as fact witnesses could "not testify to what they found out during their audit to the extent that their findings are based on their background and expertise as IRS auditors." No. 02-01267, 2004 WL 5642909, at *12 (C.D. Cal. Apr. 23, 2004) (cleaned up). So too here: Dr. Berridge cannot testify about what NTP found to the extent his testimony will be based on his background as a scientist. If Plaintiffs seek to introduce such testimony, it must be stricken as impermissible lay opinion. *See id.* (citing Fed. R. Evid. 701).

*Finally*, allowing Dr. Berridge to testify must be balanced against its risk of sidetracking this trial. EPA would likely offer one or more rebuttal witnesses regarding Dr. Berridge's proposed testimony. Dr. Berridge's testimony would create a satellite litigation divorced from what really matters in this case: the merit of the scientific studies on fluoride published since the first trial. *See* Order Granting Mot. to Lift Stay, ECF No. 3195 ("the narrow, targeted scope of discovery warrant[s] consideration of the scientific developments"). The Court has been clear: it "would rather spend [its] time looking at the science." Status Conf. Tr. 15:22–25. This trial should not be expanded to include, at worst, Plaintiffs' crusade against the Department of Health and Human Services, or, at best, Dr. Berridge's irrelevant, cumulative testimony about the NTP monograph's historical development. EPA is prepared to present its case based on the drafts of the NTP monograph that are now publicly available. The Court should exclude Dr. Berridge's irrelevant, improper, and needlessly cumulative testimony.

## II.   ALLOWING DR. BERRIDGE'S TESTIMONY WOULD BE UNFAIRLY PREJUDICIAL TO EPA

EPA would be unfairly prejudiced if the Court permits Dr. Berridge's testimony. In reliance on the Court's relevancy determination, EPA forewent certain discovery. Most obviously,

EPA would have deposed Dr. Berridge. But the Court's relevancy determination influenced document discovery, too. For example, EPA excused Plaintiffs from logging withheld third-party communications (including at least one communication with Dr. Berridge). Adkins Decl. ¶ 6. In fact, Plaintiffs asserted that EPA lacked a "substantial need" for the withheld communications under the work-product doctrine because the Court had the prior month held that the political influence issue is irrelevant. *Id.* ("Further, as you reiterated during our call on Monday, it is EPA's position that the political pressure exerted on NTP is irrelevant to this case. As such, it is hard to understand why you consider these communications to be relevant, let alone why EPA has a 'substantial need' for them."). EPA then resolved the issue without Court intervention upon Plaintiffs' confirmation that the withheld-but-not-logged communications dealt solely with Plaintiffs' political influence theory. Adkins Decl. ¶ 6. Allowing Plaintiffs to resurrect that issue well after the close of discovery and after Plaintiffs used the Court's relevancy determination as a shield to avoid producing a privilege log of withheld documents would be deeply unfair. *See also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial . . . .").

## CONCLUSION

For these reasons, the Court should exclude Dr. Brian Berridge's proposed testimony.

DATED:  December 8, 2023                    Respectfully submitted,

                                            TODD KIM
                                            Assistant Attorney General

                                            */s/ Paul A. Caintic*
                                            PAUL A. CAINTIC
                                            BRANDON N. ADKINS
                                            United States Department of Justice
                                            Environment & Natural Resources Division
                                            P.O. Box 7611
                                            Washington, D.C. 20044
                                            Tel: (202) 616-9174 (Adkins)
                                            Tel: (202) 514-2593 (Caintic)
                                            Fax: (202) 514-8865
                                            Brandon.Adkins@usdoj.gov

6

Paul.Caintic@usdoj.gov

EMMET P. ONG
Assistant United States Attorney

*Attorneys for Defendants*

Defendants' Motion in Limine to Exclude Testimony of Brian Berridge
Case No. 17-cv-02162 EMC

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of December 2023, true and correct copies of the foregoing Defendants' Motion in Limine to Exclude the Testimony of Brian Berridge, Declaration of Brandon Adkins, and accompanying exhibits were served via email to Plaintiffs' counsel Michael Connett.

*/s/ Paul A. Caintic*
PAUL A. CAINTIC
United States Department of Justice

# Declaration of Brandon N. Adkins

1
2
3
4
5

BRANDON N. ADKINS
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Email: brandon.adkins@usdoj.gov

6
7

*Attorney for Defendants*

8
9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

10
11
12
13
14
15
16

FOOD & WATER WATCH, INC., et al.,

               Plaintiffs,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

             Defendants.

Case No. 3:17-cv-02162 EMC

**DECLARATION OF
BRANDON N. ADKINS IN
SUPPORT OF DEFENDANTS'
MOTION IN LIMINE TO EXCLUDE
THE TESTIMONY OF
BRIAN BERRIDGE**

17
18

     I, Brandon N. Adkins, submit the following declaration in support of Defendants' Motion in Limine to Exclude the Testimony of Brian Berridge:

19
20

     1.     I am a trial attorney within the Environment and Natural Resources Division of the United States Department of Justice and lead counsel for Defendants in the above-captioned case.

21
22

     2.     Exhibit A is a true and correct copy of the transcript of the April 11, 2023, status conference in this case.

23
24
25
26
27
28

     3.     At the time of this declaration, the parties had not yet exchanged the descriptions of witness testimony that will be attached to the joint pretrial conference statement due on December 20, 2023. On November 20, 2023, I participated in an attorney conference regarding the parties forthcoming joint pretrial conference statement, during which counsel exchanged their prospective witness lists. Plaintiffs' counsel stated that Plaintiffs intend to call Brian Berridge, among others, as a purported fact witness on the National Toxicology Program draft monograph and political influence issue and that Dr.

Berridge's "principal relevance" is why and how much weight the Court should give to the draft monograph. On December 7, Plaintiffs' counsel emailed the following summary for Dr. Berridge:

> Dr. Brian Berridge, who served as the Scientific Director for the National Toxicology Program (NTP) from 2018 to January 2023, will provide background information about the NTP, including its purposes and procedures. Dr. Berridge will explain the extensive review process that the NTP's monograph and meta-analysis on fluoride neurotoxicity underwent. Dr. Berridge will testify that the scientists at NTP, including himself, considered the May 2022 monograph—which was ready and scheduled for publication— to be NTP's final and complete monograph. Dr. Berridge will also explain why the May 2022 monograph was not published, and his assessment of the problems with not publishing the monograph at that time. Taken together, Dr. Berridge's testimony will inform the weight that the Court should give to the NTP's monograph and meta-analysis on fluoride.

4.      At the time of this declaration, the parties have not finalized the exhibit list that will be attached to the joint pretrial conference statement due on December 20, 2023. Plaintiffs' preliminary exhibit list includes at least six emails that relate to Plaintiffs' contention that NTP's decision whether to publish the draft monograph was subject to political influence. Dr. Berridge is listed as the sponsoring witness for each such email:

| Description | Sponsoring Witness |
|---|---|
| April 28, 2022 Email from Mary Wolfe to Casey Hannan & Other CDC Employees | Berridge |
| May 11, 2022 Email from Mary Wolfe to Casey Hannan & Other CDC Employees | Berridge |
| May 11, 2022 Email from Rick Woychik to Brian Berridge, Mary Wolfe & Christine Flowers | Berridge |
| Mary [sic] 12, 2022 Email from Brian Berridge to Tara Schwetz & Rick Woychik | Berridge |
| May 12, 2022 Email from Karen Hacker to Mary Wolfe & Other NTP Employees | Berridge |
| May 27, 2022, 7:13 AM Email from Brian Berridge to Rena D'Souza | Berridge |

5.      Exhibit B is a true and correct copy of a May 19, 2023, email from Plaintiff's counsel attaching nine emails that counsel described as evidence "of past political interference with NTP." Five of the six emails identified in Plaintiffs' preliminary exhibit list above were attached to this May 19 email.

6.      Exhibit C is a true and correct copy of an email chain concerning Plaintiffs' withholding

2

1    and not logging communications that relate to the alleged political interference issue.  In a May 10, 2023,

2    email appearing in the chain, Plaintiffs' counsel stated, "Further, as you reiterated during our call on

3    Monday, it is EPA's position that the political pressure exerted on NTP is irrelevant to this case. As such,

4    it is hard to understand why you consider these communications to be relevant, let alone why EPA has

5    a 'substantial need' for them." Plaintiffs' counsel later confirmed in a May 23 email in the same chain

6    that the withheld communications that were not logged relate to the political interference issue at NTP.

7    And Plaintiffs' counsel later confirmed in a November 20 email in the same chain that communications

8    with Dr. Berridge were withheld and not logged.

9        7.    Exhibit D is a true and correct copy of Plaintiffs' initial disclosures.

10   I declare under penalty of perjury that the foregoing is true and correct.

11   Executed on December 8, 2023, in Washington, D.C.

12

13                                    _/s/ Brandon N. Adkins_____
                                      Brandon N. Adkins
14                                    U.S. Department of Justice
                                      Environmental Defense Section
15                                    P.O. Box 7611
                                      Washington, D.C. 20044
16                                    Tel: (202) 616-9174
                                      Fax: (202) 514-8865
17                                    Email: brandon.adkins@usdoj.gov

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

FOOD & WATER WATCH, INC.,        )
                                 )
          Plaintiff,             )
  VS.                            )     **NO. C 17-02162 EMC**
                                 )
UNITED STATES ENVIRONMENTAL      )
PROTECTION AGENCY,               )
                                 )
          Defendant.             )
_____)
                                 San Francisco, California
                                 Tuesday, April 11, 2023

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)
For Plaintiff:
                    WATERS KRAUS & PAUL LLP
                    222 North Pacific Coast Highway
                    Suite 1900
                    El Segundo, California  90245
          BY:  **MICHAEL P. CONNETT, ATTORNEY AT LAW**

                    WATERS KRAUS & PAUL LLP
                    3141 Hood Street - Suite 700
                    Dallas, Texas  75219
          BY:  **KAY G. REEVES, ATTORNEY AT LAW**
For Defendant:
                    UNITED STATES DEPARTMENT OF JUSTICE
                    Environment & Natural Resources Division
                    P.O. Box 7611
                    Washington, D.C.  20044
          BY:  **BRANDON N. ADKINS, ATTORNEY AT LAW**
               **PAUL CAINTIC, ATTORNEY AT LAW**

                    UNITED STATES ATTORNEY'S OFFICE
                    1301 Clay Street - Suite 340-S
                    Oakland, California  94612
          BY:  **EMMET P. ONG, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

<u>**Tuesday - April 11, 2023**</u>                                    <u>**3:10 p.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

       **THE CLERK:**  We will now be calling the case Food &

Water Watch, Inc., et al. versus Environmental Protection

Agency, et al., case number 17-2162.

       Counsel, please state your appearance for the record

beginning with the Plaintiff.

       **MR. CONNETT:**  Good afternoon, Your Honor, Michael

Connett on behalf of the Plaintiffs.

       **THE COURT:**  All right.  Thank you, Mr. Connett.

       **MS. REEVES:**  Hello.  It is Kay Reeves, also for the

Plaintiffs, Your Honor.

       **THE COURT:**  All right.  Thank you, Ms. Reeves.  We

can't see you but we can hear you.

       **MS. REEVES:**  There.

       **THE COURT:**  Now we can see you.

       **MR. ADKINS:**  Good afternoon, Your Honor, Brandon

Adkins for EPA, and joined with me today is Paul Caintic and

AUSA Emmett Ong.

       **THE COURT:**  All right.  Thank you, Mr. Adkins and

crew.  So there's going to be a public meeting on May 4th with

the BSC working group; is that right?

       **MR. CONNETT:**  That is correct.

       **THE COURT:**  What are we expecting?

1          **MR. CONNETT:**  Well, Your Honor, I'm happy to report

2     that on Friday of last week the working group for the BSC

3     released its report and so -- and that is the report,

4     Your Honor, that addresses the various HHS entity criticisms of

5     the NTP monograph and meta analysis; and they go

6     point-by-point, comment-by-comment through the agency

7     criticisms.

8        And so I on May 4th at that public meeting, the working

9     group will be presenting its, you know, conclusions and

10    recommendations; and then the BSC will be deliberating on them.

11         **THE COURT:**  So that's progress --

12         **MR. CONNETT:**  It is.

13         **THE COURT:**  -- from where we were last time.

14                    (Laughter)

15         **MR. CONNETT:**  Yes, it is progress after a long, slow,

16    road.

17                    (Pause in proceedings.)

18         **THE COURT:**  Well, no, I think that's good.  At least

19    from my perspective, I want to see as much information as

20    possible, whatever it is.

21         **MR. CONNETT:**  Right.

22         **THE COURT:**  And then remind me again, once it goes --

23    what's the next step after the working group makes its

24    presentation on the 4th?

25         **MR. CONNETT:**  Well --

```
 1              MR. ADKINS:  So --

 2              MR. CONNETT:  Sorry, Brandon.

 3              MR. ADKINS:  Sure.  As the, you know, attorney for

 4    EPA, you know, we don't represent -- I don't represent NTP in

 5    this case, but I can report that the BSC considers it, as

 6    Mr. Connett said, will make a recommendation to Dr. Woychik,

 7    the director of NTP.  And Dr. Woychik will make a decision

 8    whether or not to publish, whether any further revisions are

 9    needed before publication.

10              THE COURT:  Right.  But is the BSC -- just remind me

11    what -- they get the working group report.  Do they go through

12    another -- typically another series of hearings or any more

13    solicitation of comments or do they basically work off of that

14    working group?

15              MR. ADKINS:  I don't want to get ahead of the BSC, but

16    my understanding is that, no, that would not happen.  They

17    would have the working group report in hand.  And, you know,

18    subject to having follow-up questions or additional analysis

19    that they need to have done, which I'm not aware of whether or

20    not they will, the BSC would make its recommendation based on

21    the information that it has.

22              THE COURT:  Okay.  All right.  Well, I mean, that's --

23    I mean, that's good because things have progressed.  We were

24    fearful this could take who knew how long, but it sounds like

25    wheels are moving here.
```

1          **MR. CONNETT:**  Your Honor, if you --

2          **THE COURT:**  Go ahead.

3          **MR. CONNETT:**  As you may recall at the last hearing,

4    you had raised the issue of needing to determine the privilege

5    issue for the May 2022 monograph and meta analysis, you know,

6    on -- you know, considering that these are documents that

7    obviously Plaintiffs intend to introduce and have their experts

8    rely upon at trial.  And then the question if they are

9    privileged, can we consider those at trial, and as you have

10   seen, I'm sure, through the parties various filings, we have --

11   the privilege issue is no longer at issue.

12         **THE COURT:**  Right.

13         **MR. CONNETT:**  So then the May 2022 monograph is now a

14   public document and so is the meta analysis.  So there is no

15   longer any concerns about those materials being privileged.

16         **THE COURT:**  Well, and then the -- the criticisms and

17   the responses thereto are all public at this point?

18         **MR. CONNETT:**  Correct.

19         **THE COURT:**  Yeah.

20         **MR. CONNETT:**  It's all public.  And I think,

21   Your Honor, as I mentioned at the last hearing, I think what we

22   have now is a wonderful, like, diverse set of the full spectrum

23   of debate and discourse now before the Court.

24        You have the NTP's assessment, which, again, the NTP

25   scientists consider to be complete and final.  You have the

1   agency criticisms coming from agency personnel that are strong

2   advocates of water fluoridation.

3       And you have external peer reviewers.  We have the

4   external peer review comments now, and we have the working

5   group's responses to the NTP's responses to the agency's

6   criticisms.

7       So it is a really -- I really think, Your Honor, we now

8   have the complete spectrum of debate on the scientific level

9   that will provide the expert's in this case a rich amount of

10  data to inform the Court's analysis.

11      So I think we have more than enough at this point to

12  proceed to the second trial.

13          **THE COURT:**  So, the proposed schedule sounds like it

14  works, it fits, given the state of affairs and all of that.

15      What do the parties -- is there an agreement here that we

16  are looking at a trial date of January as an ideal --

17          **MR. CONNETT:**  Yes.  Your Honor, I can say from the

18  Plaintiff's vantage point, we were hopeful to have an earlier

19  trial date.  We have had a lot of constructive meet-and-confers

20  with EPA.

21      And I think in going through the schedule, you know, we

22  were persuaded that, you know, based on the guidelines set

23  forth by the Court in terms of when we need to schedule fact

24  discovery, expert discovery and various motion work, that I

25  think January -- November was going to be hard to pull off if

1    we were to keep with the Court's guidelines.  So we did

2    ultimately agree to January 29th as the trial date.

3            THE COURT:  All right.  That still works for the EPA?

4            MR. ADKINS:  Yes, Your Honor, it does.  That trial

5    date is amenable with us.  And, as Mr. Connett said, we met

6    very frequently over the schedule.

7            In terms of, you know, whether or not the state of the

8    science document and/or the meta analysis will be final by the

9    time of trial much less the close of discovery, I think that's

10   still -- you know, my best guestimate here is it's unlikely

11   just because publication of a scientific document through a

12   third party can take some time.

13           And so we have what we have.  I don't think we are going

14   to have the final documents, but we are willing to proceed

15   based on the Court's prior ruling on some of those issues.

16           THE COURT:  All right.  Well, you know, obviously if

17   it looks like something is imminent, you know, I will look at

18   it at that point; but I think that's a fair -- a fair date, and

19   it actually works with my schedule because anything earlier

20   than that I probably couldn't have gotten it in any way.

21           So, do we have an estimate at this point of how many days,

22   how long of a hearing we are going to have?

23           MR. CONNETT:  The parties have not yet reached an

24   agreement on that, Your Honor.

25           As I -- I have proposed that we -- we set aside two weeks;

1   and then as we get closer to trial with more clarity based on

2   the testimony and the evidence, we could fine tune that, but we

3   set aside two weeks with the expectation it will probably be

4   less than two full weeks of trial; but I would hate to see us

5   potentially squeezed out where maybe more evidence was needed.

6           THE COURT:  All right.  Your thoughts, Mr. Adkins.

7           MR. ADKINS:  EPA's position is that it does make sense

8   to set aside two weeks.  I think for what we are looking at, we

9   are probably more in the ballpark of needing one week.  But

10  given that there's four trial days in the Court's calendar, it

11  makes sense here to set aside at least two weeks.  That way if

12  we spill over, we have that time set aside.

13          THE COURT:  All right.  Okay.  So let me ask in terms

14  of -- there was talk about discovery and depositions.  What --

15  what kind of discovery is needed at this point?  Especially now

16  that one of the issues, it seems to have been made transparent,

17  everything is sort of public, what are we left with in terms

18  of -- is it expert depositions primarily or what are we looking

19  at?

20          MR. CONNETT:  Well, we certainly have expert

21  depositions.  In terms of fact discovery, Your Honor, EPA

22  served on us a number of document requests and special

23  interrogatories to understand some of the documents that

24  Plaintiffs have received through the Freedom of Information

25  Act.  We are in the process of responding to those requests.

1       We have a standing declaration, Your Honor, that we will

2   be serving on EPA in the next couple of weeks.

3       That is going to set forth the standing facts from Jessica

4   Trainor.  The EPA has the option, if it so chooses, to depose

5   Ms. Trainor at some point this summer.

6       In terms of what the Plaintiffs are seeking to obtain,

7   Your Honor, we have -- we intend -- we have just completed two

8   fact depositions that examined some of the -- some of the facts

9   surrounding NT -- the decision by the HHS to stop the NTP from

10  publishing its monograph last May.

11      And we -- we -- we seek to do some further depositions on

12  that issue to understand why the HHS instructed the NTP to not

13  publish the monograph.

14      And we have -- there are several federal officials that we

15  would like to depose including Dr. Woychik is someone that we

16  would be interested in deposing, an official from the CDC, from

17  the NIDCR, and potentially someone from the office of the

18  Assistant Secretary of Health office, all to understand why

19  that report, which was considered complete and final by NTP

20  scientists, why NTP was not allowed to publish it and --

21          **THE COURT:**  Let me ask you:  Why is that -- tell me

22  why that's relevant in view of now the publication on the

23  merits and all the criticisms are made public and the response

24  is made public.  Whether it is goodwill or ill-will, I mean, we

25  have now got that full dialogue that you talked about.  Isn't

```
 1   that what the Court should be concerned with, the scientific
 2   merits as opposed to --
 3           MR. CONNETT:  No question that this case, Your Honor,
 4   no question comes down to the science; but at the end of the
 5   day -- the Court will also need to -- will likely be confronted
 6   with the question of how much weight do you give to the NTP's
 7   May 2022 assessment because as Counsel for EPA just noted, it's
 8   very possible, in fact, likely, that by the time we go to trial
 9   next January, there will not be a final NTP monograph for us
10   all to rely upon.
11           And I suspect -- and maybe I'm wrong.  I suspect that EPA
12   is going to go to the Court and is going to argue:  Hey, this
13   May 22 monograph was criticized by these agencies and it's a
14   draft report and it shouldn't be given much weight if any
15   weight.
16           And our position, Your Honor, is this is precisely the
17   report that the Court had been waiting for two years to
18   receive.  It is the assessment of NTP scientists.  And the only
19   reason it wasn't in final form last May is because of the sort
20   of political pressures that --
21           THE COURT:  Well, I understand that; but now that the
22   report is there, it's public, the response and the criticism is
23   public -- I assume your experts are going to address it -- what
24   does it matter?  It seems like it's water under the bridge.
25           MR. CONNETT:  Well, I guess, Your Honor, it goes --
```

1    and my thinking here is it goes to this issue of how much --

2    like, we intend to -- our position, Your Honor, is that is a

3    report that absolutely should be considered, relied upon and

4    given substantial weight at the trial in this matter.

5         And to counter EPA's anticipated contention that this is

6    merely a draft and has -- you know, we need to wait for --

7    don't give weight to it, I think understanding the full context

8    as to the -- the lack of scientific merit behind the decision

9    to not publish that report will inform the question as to the

10   weight to give to that monograph.

11        Because if the evidence shows -- as I believe it will

12   that -- that there wasn't scientific merit to the agency

13   pressure on the NTP -- the HHS pressure on the NTP, and so it

14   goes to the weight to give to that monograph.

15        So that's -- that's our thinking on it, Your Honor, to

16   further understand that context because we do think it's a

17   very -- it's a critical report and critical evidence for this

18   case.

19        And I want to be sure that, to the extent EPA contends

20   that it shouldn't be given much weight or any weight, that we

21   have the necessary factual evidence to counter that.

22             THE COURT:  All right.  Let me ask Mr. Adkins for a

23   response.

24             MR. ADKINS:  I think the problem with that argument,

25   Your Honor, is the comments and NTP's responses to those

1    comments concerning the May 22 draft have all been made public.

2        So to the extent Counsel wants to -- first of all, I'm not

3    sure what EPA's position is with respect to this draft or we

4    are going to make the claims that Counsel is attributing to us

5    at this point.  But even if it did, Counsel can rebut them by

6    putting on expert testimony, explaining what the comments were,

7    and whether it was reasonable or not to stop publication.

8        But I think at this point the documents speak for

9    themselves.  The comments speak for themselves and the

10   responses speak for themselves.

11       This is really a tangential issue that is not at the heart

12   of this matter, which is whether the artificial fluoridation of

13   drinking water supplies presents an unreasonable risk.

14       This case isn't about EPA -- NTP's motivations on whether

15   or not to publish an interlocutory draft of a monograph.

16       **THE COURT:**  I think we ought to focus -- and I

17   don't -- I want to focus on the science, and that's what this

18   is about.  And to the extent that any attempt to criticize the

19   monograph and to down-play the importance of the draft and all

20   that sort of stuff, I mean, that will be the debate -- the

21   scientific debate that I'm going to have to listen to.

22       To me that's more important whether politicians got

23   involved and tried to squelch this thing.  Whether they did or

24   not, I have to look at the science at the end of the day.

25       And, you know, it was my hope that we would have the filed

1    complete published thing and then, you know -- but if we don't

2    have that, I'm going to have to look closely at all the stuff.

3        And I think the money is going to be in the expert

4    explorations on the science, and it does seem to me like --

5    especially now that it has been published and everything else,

6    it's -- you know, I can see, you know, perhaps an argument

7    about goes to motive, which might taint the criticism and give

8    less weight; but, frankly, this is not like eyewitness

9    testimony as to who saw what.

10       It's going to be about the science, it seems to me.  And,

11   you know, each side's position is going to be pretty obvious.

12   Everybody gets their own expert.

13       So the motive for delaying the publication especially now

14   that it's all out, it just seems to me, not really on point.

15       MR. CONNETT:  Your Honor, I would add another point

16   here, which is we are still in a live unfolding situation;

17   right.

18       We don't know what the BSC is going to say on May 4th.  We

19   don't know what the NTP is going to say.  We don't know what

20   representations the Government is going to come to this Court

21   and make.

22       And I would point Your Honor to last fall when the

23   Government took the position that the NTP monograph from May

24   was a privileged confidential document that should not be made

25   available to anyone in the public.

```
 1        And, Your Honor, we have now conclusively shown through
 2   documents we have recently received -- including the
 3   depositions taken this past month -- that by the time the
 4   Government made that representation to this Court, they knew
 5   that the American Dental Association had the monograph, was
 6   criticizing the monograph, was -- and there was no doubt about
 7   that.  The Government knew that at the highest levels of HHS.
 8        So in the situation where we are likely going to be
 9   relying upon representations made by HHS through -- for the
10   next six to eight to ten to twelve months, likely -- that
11   Plaintiffs deserve to be able to scrutinize those
12   representations because we have already seen, Your Honor, that
13   when you scrutinize them, some of them fall apart.
14        THE COURT:  Representations about what?
15   Representations about the science or about their intent or
16   what?
17        MR. CONNETT:  Well, going forward, I don't know what
18   representations the HHS is going to make this summer.  I don't
19   know what representations they are going to make in the fall
20   about what the NTP -- what's going to happen to the NTP
21   monograph.
22        So, the more that the Plaintiffs are able to do some fact
23   discovery to understand what has been happening, the more that
24   we are going to be able to have -- to vet some of the
25   representations.
```

```
 1          Again, the HHS took the position that the monograph was a
 2    privileged confidential report that should not be --
 3          THE COURT:  I understand that.  I understand that.
 4    But that's behind us at this point.  I'm trying to figure out
 5    what -- what it is that may be represented going forward that
 6    you will want to impeach essentially; and I'm not sure what
 7    that is.
 8          And until I see what that is, it's hard for me to see what
 9    the relevance of taking these depositions are.
10          If what is at stake is the merits -- the scientific
11    merits, this seems, you know -- this seems pretty tangential.
12                    (Pause in proceedings.)
13          THE COURT:  So I would propose -- what I would -- what
14    I'm going to do is order that these depositions not go forward
15    unless and until there is some indication that there's some
16    representation that affects the course of these proceedings,
17    which warrant some inquiry into whether these are genuine, you
18    know, representations, whether there's some attempt to sort of
19    thwart the process in some ways that warrants opening up this
20    area of inquiry.
21          But absent that, if we are just proceeding straight on the
22    merits of the science, I would rather spend our time looking at
23    the science and making sure that's all lined up and I have got
24    the body of evidence that I need in order to make this
25    assessment.  So I'm going to --
```

1          MR. CONNETT:  Understood.

2          THE COURT:  -- indicate, you know, it's without

3    prejudice.  Maybe something will come up that causes me to

4    question whether the EPA is acting in good faith and somehow --

5    that's somehow affecting these proceedings; but right now that

6    everything is public and things are on the way, I don't see

7    anything immediately.

8          So, I think we ought to proceed and get this timeline and

9    make sure we are on schedule to deal with these issues as you

10   set forth now in the very extensive scheduling that you have

11   proposed, which I will adopt, by the way.

12         MR. ADKINS:  Your Honor, at this point --

13         THE COURT:  Yes.

14         MR. ADKINS:  With respect to the schedule, EPA has

15   asked that the Court also impose initial disclosure deadlines.

16   This is an issue that came up in the parties' letter

17   briefing.  The parties had waived initial disclosures in the

18   first round of this case.

19         That was before Your Honor determined that the case would

20   be decided based on evidence that's beyond the administrative

21   record.  So at that time it made sense to waive disclosures.

22         I think for this second phase of trial, it makes a lot of

23   sense to have an initial disclosure deadline that's limited and

24   targeted at the evidence and the witnesses that the parties

25   intend to present at the second phase of trial.

```
1              THE COURT:  What do you have in mind in terms of a
2     timeline for that?
3              MR. ADKINS:  We are flexible.  I think two weeks would
4     make sense.  Of course, the parties would be under an
5     obligation under the Federal Rules to supplement as
6     appropriate.
7              THE COURT:  All right, response, Mr. --
8              MS. REEVES:  Your Honor, Mr. Connett I think had a
9     problem with his connection and is trying to sign on again.
10             THE COURT:  Oh.
11             MS. REEVES:  I would like for him to address this
12    if --
13             THE COURT:  I thought he was unusually silent on that.
14                         (Laughter)
15             MR. ADKINS:  I can give you a preview of his position
16    if you want.
17             THE COURT:  No.  I think I would probably like to hear
18    it.  Hopefully he will sign back on.  He will have to raise his
19    hand.
20                  (Pause in proceedings.)
21             THE CLERK:  Bringing him back in Your Honor.
22             THE COURT:  All right.  Good.
23                  (Pause in proceedings.)
24             MR. CONNETT:  Sorry about that, Your Honor.
25             THE COURT:  All right.  So we are back.  I don't know
```

1   which part you fell out, but Mr. Adkins was re-raising the

2   question about initial disclosures that had been previously

3   waived but thinks it would be fair and beneficial to have that

4   process in place here; and I want to get your thoughts on that.

5          **MR. CONNETT:**  I mean, the parties did waive the

6   disclosures.  We waived them at a time where there was a clear

7   dispute.  It wasn't like EPA was unaware at that time,

8   Your Honor, that the Plaintiffs' position was that there should

9   be full discovery; and the parties waived the initial

10  disclosures in that context.

11      Now, granted the Court had not yet ruled on the motion

12  we -- as to the scope of discovery, but the issue was not one

13  that was foreign to the agency at that time.

14      So I would just prefer that we keep to the -- the prior

15  agreement; but, you know, I could live with having initial

16  disclosures as well, but, I mean, the parties did have an

17  agreement to waive them.

18          **THE COURT:**  Well, there's value to initial disclosures

19  because it helps frame the issues and gives notice.  It avoids,

20  I think, problems down the line.  And I don't see why not now

21  that we have already been through one trial, we sort of know --

22  we have come a long way since then.

23      So I think it makes sense, and obviously you can

24  supplement it if there's good cause, et cetera, et cetera.

25          So I'm trying to figure out, what is a fair -- Mr. Adkins

1    suggested, I don't know, a couple of weeks.  I don't know if

2    you want to say a month but something --

3          **MR. CONNETT:**  My preference, Your Honor, would be

4    because I have a trial that's going to consume me for the

5    entire month of May, if -- I would ask for initial disclosures

6    in the sort of beginning part of June, which would leave us,

7    you know, I think ample time for fact discovery from there

8    because our fact discovery cut-off under the proposed schedule

9    is, I think, April 1st.  So that would be my proposal.

10         **THE COURT:**  August 1st.

11         **MR. CONNETT:**  Sorry, August 1st; right, sorry.

12         **MR. ADKINS:**  I think that's -- I want to be respectful

13   of Mr. Connett's trial schedule because he has returned the

14   same courtesy to me, but that does not leave us a whole lot of

15   time to do an investigation before the fact discovery cut-off

16   especially considering that that month would include the

17   Independence Day holidays when a lot of folks are just out of

18   town.

19       So I want to be flexible, but I think something more in,

20   like, the two to four-week range with supplementation as

21   appropriate would make more sense.

22         **MR. CONNETT:**  Well, I would also add that given the

23   Court's order today with respect to the fact depositions that

24   Plaintiffs had intended to notice for the summer, we now have,

25   I think, potentially not much discovery work to do for the full

1   month of June and July.  So, it's a pretty open schedule at

2   this point likely.

3        So I don't see -- knowing what our disclosures would be, I

4   don't see the EPA having any difficulty addressing and pursuing

5   them during those two months.

6            **THE COURT:**  All right.  I'm going to set a May 15th

7   deadline for initial disclosures.  Obviously, you know, that

8   can be amended for cause, but at least it sets forth the good

9   faith estimate of some sense of who the witnesses are going to

10  be and who is knowledgeable; and that also will help us as we

11  fine tune, you know, what kind of a trial it's going to look

12  like, how long.  So I think it makes sense.

13       I'm going to set that -- add that to the schedule,

14  May 15th.  So I'm going to adopt this schedule.  I may tweak it

15  a little bit here or there, but it will be pretty close to what

16  you-all recommended.

17       And I guess we will hold our breath and see what happens

18  with the BSC, and hopefully there will be some real progress

19  there because I very much would prefer to have a complete and

20  final record; but if that's, like, way off in the sunset, we

21  may have to proceed.  But I'm hopeful maybe things will move.

22       So in any event, let's set a further status after --

23  perhaps, before we get to first set of significant things,

24  maybe around that August discovery or before the August cut-off

25  date, maybe some time in July, maybe in the first week or so of

1  July, Vicky.

2          **THE CLERK:**  July 11th at 2:30, Your Honor.

3          **THE COURT:**  July 11th at 2:30.  And we will see where

4  we are at and maybe we'll hear what's happening with the BSC at

5  that point.  Who knows.

6          **MR. CONNETT:**  Your Honor, can I just ask one question

7  going back briefly to the depositions?

8          **THE COURT:**  Yeah.

9          **MR. CONNETT:**  So, we were obviously intending to do

10 those depositions as part of the fact discovery period which

11 ends on August 1st.

12      But understanding the Court's order today, I'm wondering

13 if the situation -- if the situation arises where, say, in

14 October or November, further out than we would have anticipated

15 doing fact depositions, whether facts arise at that time --

16 now, granted we would be in expert discovery at that time --

17 but if facts arise that give a basis for us to come to the

18 Court to seek a deposition of potentially a federal official or

19 whatnot --

20          **THE COURT:**  There is always a good cause exception to

21 the schedule.  If there's good cause and it becomes -- and you

22 demonstrate to me it is now relevant and that information may

23 well affect the decision making by this Court and it is

24 something that I earlier precluded but now it has become

25 relevant, that's the kind of thing that probably constitutes

1     good cause.

2          So that's why I say, you know, we are setting deadlines;

3     but there is a good cause, good faith overarching principle to

4     this.

5          So let's go forward and let's -- hopefully things progress

6     on the scientific front because the more the better from my

7     viewpoint, but I will incorporate this schedule and get out a

8     complete scheduling order.

9               **MR. ADKINS:**  Great.  Thank you, Your Honor.

10              **THE COURT:**  All right.

11              **MR. CONNETT:**  Thank you, Your Honor.

12              **THE COURT:**  Thanks, everyone.

13                   (Proceedings adjourned at 3:41 p.m.)

14                        ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4              I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    December 5, 2023

8

9

10

11                _____

12              Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                United States District Court - Official Reporter
13

# Exhibit B

| | |
|---|---|
| **From:** | Michael Connett |
| **To:** | Adkins, Brandon (ENRD) |
| **Subject:** | Re: [EXTERNAL] FWW v EPA - Discovery Dispute/Stipulation |
| **Date:** | Friday, May 19, 2023 12:10:53 PM |
| **Attachments:** | image483654.jpg |
| | image144580.jpg |
| | 2022 04 28.pdf |
| | 2022 05 11a.pdf |
| | 2022 05 11b.pdf |
| | 2022 05 11c.pdf |
| | 2022 05 12a.pdf |
| | 2022 05 12b.pdf |
| | 2022 05 12c.pdf |
| | 2022 06 03a.pdf |
| | 2022 06 03b.pdf |

Brandon – Attached are the emails that would be part of the stipulation I proposed this morning.

Under our proposal, Plaintiffs would agree to forego all further discovery on past political interference with the NTP. Plaintiffs would also agree to forego introducing any evidence at trial, other than the attached emails, of past political interference with NTP. For example, Plaintiffs would agree to forego putting up any fact witnesses at trial—including, but not limited to, current/former NTP employees—regarding the past political pressures on NTP. This agreement would be reflected in, inter alia, an amended Initial Disclosure by Plaintiffs.

In exchange, EPA would agree to (1) withdraw its request for attorney emails, and (2) forego any authenticity or hearsay objections to the attached emails at trial. That said, EPA would reserve all rights to move the Court to exclude the attached emails on relevance or any other grounds besides authenticity/hearsay.

Please let me know if EPA would like to move forward with this.

Thanks,
Michael



**Michael Connett | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Michael Connett <mconnett@waterskraus.com>

**Date:** Thursday, May 18, 2023 at 2:33 PM

**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>

**Subject:** Re: [EXTERNAL] FWW v EPA - Discovery Dispute/Stipulation

Yes, that works. I'll look for your call.



**Michael Connett | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Thursday, May 18, 2023 1:47:34 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Subject:** Re: [EXTERNAL] FWW v EPA - Discovery Dispute/Stipulation

[CAUTION]: External Email

Can I call you tomorrow morning?

Brandon N. Adkins
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

On May 18, 2023, at 6:46 AM, Michael Connett <mconnett@waterskraus.com> wrote:

Brandon –

I spoke with my clients about the potential stipulation (re: the NTP politics issues) that we discussed on Monday. If you had a moment to discuss today, please give me a call.

Thanks,
Michael
–
**Michael Connett | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information

associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Thursday, April 28, 2022 12:31 PM
**To:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <gju3@cdc.gov>; Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>
**Subject:** Prepublication SoS Monograph -- Internal Deliberative Communication

Casey,

Attached is the prepublication draft of the NTP Monograph on the State of the Science on Fluoride. We are sharing this document for your awareness. At this time the analysis and the conclusions are set. We are not requesting comment; however, please let us know if you identify any error in the text. Please note that this document is not public and should be kept confidential.

In October 2021 we sent you the draft state of the science monograph and CDC provided comments. We appreciated CDC's review, and I have attached a document with our response to those comments. For your awareness, in addition to interagency input, the NTP state of the science monograph has received external peer review by letter from five experts. All comments have been carefully considered in finalizing the monograph.

Currently, we are preparing our communications plan for when the monograph is released. We are working toward its release in mid/late May and will share the date when it's set. In the meantime, to assist with preparation of our communications plan, please send me the name and contact information to whom we should refer any media inquiries, if received, that would be best addressed by CDC.

Do not hesitate to contact us if questions.

Best regards,

Mary

| | |
|---|---|
| **From:** | Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) |
| **Sent:** | Wed, 11 May 2022 15:59:55 +0000 |
| **To:** | Holder, Gregory (CDC/DDNID/NCCDPHP/DOH); Espinoza, Lorena |

(CDC/DDNID/NCCDPHP/DOH); Johnson, Nicole (CDC/DDNID/NCCDPHP/DOH)

**Subject:**      RE: Communications plan for NTP SoS monograph -- internal deliberative communication

Glad the meetings with Donni and Sean were already on the calendar today!

---

**From:** Holder, Gregory (CDC/DDNID/NCCDPHP/DOH) <LHN5@cdc.gov>
**Sent:** Wednesday, May 11, 2022 11:34 AM
**To:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>; Espinoza, Lorena (CDC/DDNID/NCCDPHP/DOH) <lee6@cdc.gov>; Johnson, Nicole (CDC/DDNID/NCCDPHP/DOH) <nbg5@cdc.gov>
**Subject:** RE: Communications plan for NTP SoS monograph -- internal deliberative communication

> (b)(5)

We have a call with Donni at 1:30 today, and I think Nicole does with Sean at 330.

---

**From:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Sent:** Wednesday, May 11, 2022 11:25 AM
**To:** Espinoza, Lorena (CDC/DDNID/NCCDPHP/DOH) <lee6@cdc.gov>; Johnson, Nicole (CDC/DDNID/NCCDPHP/DOH) <nbg5@cdc.gov>; Holder, Gregory (CDC/DDNID/NCCDPHP/DOH) <LHN5@cdc.gov>
**Subject:** FW: Communications plan for NTP SoS monograph -- internal deliberative communication

FYI, here's their comms plan, which is a close hold.

---

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Wednesday, May 11, 2022 11:12 AM
**To:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>; Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>
**Subject:** Communications plan for NTP SoS monograph -- internal deliberative communication

Good morning,
On April 28, I shared the prepublication draft of the NTP Monograph on the State of the Science on Fluoride. We have set May 18, 2022, for publication of the monograph. The monograph will be posted to the NTP website, and we will email a notice of the posting to NTP listserv subscribers.

> (b)(5)

(b)(5)

Please let us know if you have any questions,
Mary


Mary S. Wolfe, Ph.D.

Acting Deputy Division Director for Policy and Communication

Director, Office of Policy, Review, and Outreach

Division of the National Toxicology Program

National Institute of Environmental Health Sciences

111 T.W. Alexander Drive

Research Triangle Park, NC 27709

Phone: 984-287-3209

Email: wolfe@niehs.nih.gov

| From: | _urklow, John (NIH/OD) [E] |
| To: | Schwetz, Tara (NIH/OD) [E] |
| c: | Fine, Amanda (NIH/OD) [E] |
| Subject: | Re: Fluoride Follow-up |
| Date: | Wednesday, May 11, 2022 10:2 :2  PM |
| ttac me t : | image001 png |
| | image001 png |

Thanks!

John

Sent from my iPhone

On May 11, 2022, at 10:05 PM, Schwetz, Tara (NIH/OD) [E]
< (b) (6) wrote:

Yes, and the findings aren't that it's bad for the environment—more complicated than that. Michael Iademarco reached out earlier today, and they are going to get looped in better. Also, there is no way this is going out on May 18.

We're meeting tomorrow and will discuss more. I'm going through the report now, and plan to join a meeting with NTP tomorrow where I will echo concerns. Before it goes out, we will need to clear it and brief the ASH.

Best,

**Tara A. Schwetz, PhD** *(she/her)*

Acting Principal Deputy Director, NIH

**A:** Building 1, Room 109

**P:** (b) (6)

**Executive Assistant:** Caroline Dzokoto-Pomenya ( (b) (6)

**Scheduler:** Dina Simon (b) (6)

**From:** "Burklow, John (NIH/OD) [E]" < (b) (6)

**Date:** Wednesday, May 11, 2022 at 8:42 PM

**To:** Tara Schwetz < (b) (6)

**Cc:** "Fine, Amanda (NIH/OD) [E]" < (b) (6)

**Subject:** Fwd: Fluoride Follow-up

Hi, Tara-

Please see below. Amanda suggested looping you in. Looks OASH needs an update on what's happening? Amanda and I will raise it with Bill tomorrow through the usual ASPA channels.

Thanks,

John

Sent from my iPhone

Begin forwarded message:

**From:** "Seigfreid, Kimberly (HHS/OASH)" <　　　(b) (6)　　　>
**Date:** May 11, 2022 at 5:53:56 PM EDT
**To:** "Burklow, John (NIH/OD) [E]" <　　(b) (6)　　>
**Cc:** "Iademarco, Michael (HHS/OASH)" <　　　(b) (6)　　>
**Subject: Fwd: Fluoride Follow-up**

Hi John,
Have you been tracking this fluoride issue? NIEHS is preparing to rollout
findings that fluoride is bad for the environment, contradicting NIDCR and
NICHD recommendations for fluoride in the water for tooth health. I know
there have been a lot of debates with Dr. Tabak and others on this. It
looks like NIEHS is moving forward with the announcement without
consensus and without clearance. It looks like some people at NIH are
setting up a meeting to discuss but I wanted to flag this for you as well,
given that NIEHS is planning on rolling it out, I believe next week.
Kim
Get Outlook for iOS

---

**From:** Joskow, Renee (NIH/NIDCR) [E] <　　(b) (6)　　>
**Sent:** Wednesday, May 11, 2022 1:50:16 PM
**To:** Iademarco, Michael (HHS/OASH) <　　(b) (6)　　>
**Cc:** Stevenson, Monica L (HHS/OASH) <　　(b) (6)　　>
Seigfreid, Kimberly (HHS/OASH) <　　(b) (6)　　> Calsyn,
Maura (HHS/OASH) <　　(b) (6)　　> States, Leith (HHS/OASH)
<　　(b) (6)　　>
**Subject:** Re: Fluoride Follow-up
My current understanding is that there will not be any trans NIH
clearance. I believe that NIEHS is going to directly publish / post on their
webpages.

On May 11, 2022, at 1:44 PM, Iademarco, Michael (HHS/OASH)
<　　　(b) (6)　　　> wrote:

Thanks. As best as you know, what is the clearance plan for NIH itself? Is
your center in official cross clearance? NIH OD? Who is in charge of such
clearance?

**From:** Joskow, Renee (NIH/NIDCR) [E] <　　(b) (6)　　>
**Sent:** Wednesday, May 11, 2022 1:38 PM
**To:** Iademarco, Michael (HHS/OASH) <　　(b) (6)　　>
**Cc:** Stevenson, Monica L (HHS/OASH) <　　(b) (6)　　>
Seigfreid, Kimberly (HHS/OASH) <　　(b) (6)　　> Calsyn,

Maura (HHS/OASH) < (b) (6) States, Leith (HHS/OASH)
< (b) (6)
**Subject:** Re: Fluoride Follow-up
GREAT questions ...
see below
V/r,
-r

On May 11, 2022, at 12:27 PM, Iademarco, Michael (HHS/OASH)
< (b) (6) wrote:

Renee, Thanks for the alert and update.

1. Have you seen and read the report? Received draft but have not read through completely- my colleagues who received it earlier said ithis version is much the same as previous versions and they expressed concerns that conclusions and statements are far reaching/ unsupported and do not reflect rigorous science, data nor feedback from HHS colleagues and NASEM. I plan to reread carefully.
2. If so, what is your view? Will weigh in but have significant concerns regarding previous versions and in sufficient response to feedback.
3. Has or would have the report come through clearance in HHS? not that i have seen- I do not believe it was nor intended to be submitted for NIH or Department Clearance
4. If so, was OASH and CDC included to your knowledge? N/a
5. Same 1-4 questions apply to the web-posting? dnk- will try to gather more detail re: web

V/r, Michael

**From:** Joskow, Renee (NIH/NIDCR) [E] < (b) (6)
**Sent:** Wednesday, May 11, 2022 11:57 AM
**To:** Iademarco, Michael (HHS/OASH) < (b) (6)
Calsyn, Maura (HHS/OASH) < (b) (6) Seigfried, Kimberly
(HHS/OASH) < (b) (6)
**Cc:** Stevenson, Monica L (HHS/OASH) < (b) (6)
**Subject:** RE: Fluoride Follow-up
FYI- I just learned that the NTP report is scheduled for release on **May 18** – next week and will be posted on the NTP website, and email posting announcement to NTP listserv.
-----Original Appointment-----
**From:** Stevenson, Monica L (HHS/OASH) < (b) (6)
**On Behalf Of** Iademarco, Michael (HHS/OASH)
**Sent:** Wednesday, May 11, 2022 11:11 AM
**To:** Joskow, Renee (NIH/NIDCR) [E]; Calsyn, Maura (HHS/OASH); Seigfried, Kimberly (HHS/OASH)

**Cc:** Stevenson, Monica L (HHS/OASH)
**Subject:** Fluoride Follow-up
**When:** Friday, May 13, 2022 11:30 AM-12:00 PM (UTC-05:00) Eastern
Time (US & Canada).
**Where:**              (b) (6)

*Thank you for scheduling.*

-------------------------------------------

Monica Stevenson is inviting you to a scheduled ZoomGov meeting.
Join ZoomGov Meeting
                    (b) (6)

Meeting ID:      (b) (6)
Passcode: (b) (6)
One tap mobile
            (b) (6)          US (San Jose)
            (b) (6)          US (New York)
Dial by your location
      (b) (6)      US (San Jose)
+      (b) (6)      US (New York)
+      (b) (6)      US
      (b) (6)      US (San Jose)
   (b) (6)    US Toll-free
Meeting ID:      (b) (6)
Find your local number:              (b) (6)
Join by SIP
            (b) (6)
Join by H.323
      (b) (6)    (US West)
      (b) (6)    (US East)
Meeting ID:      (b) (6)
Passcode: (b) (6)

| | |
|---|---|
| **From:** | Woychik, Rick (NIH/NIEHS) [E] |
| **To:** | Wolfe, Mary (NIH/NIEHS) [E]; Berridge, Brian (NIH/NIEHS) [E]; Flowers, Christine B (NIH/NIEHS) [E]; Woychik, Rick (NIH/NIEHS) [E] |
| **Subject:** | Fluoride SOS |
| **Date:** | Wednesday, May 11, 2022 4:46:09 PM |

Mary, Brian, and Christine,

Just received word that Adm Levine wants an official HHS review and clearance of the SoS monograph before it goes out. The publication date may have to be modified to accommodate this request.

Christine, do you know how this is done?

We can discuss more at the meeting tomorrow morning if necessary.

Rick

| | |
|---|---|
| **From:** | Woychik, Rick (NIH/NIEHS) [E] |
| **Sent:** | Thursday, May 12, 2022 9:52 AM |
| **To:** | Schwetz, Tara (NIH/OD) [E] |
| **Subject:** | RE: NTP monograph on the state of the science |

Tara,

This gives you a flavor of the nature of the communications here over the past several months, and which followed from my email last night to Brian and Mary Wolfe.  My suggestion is that we keep the discussion this morning focused on the topic of the upcoming BSC review of the comments back from the proposed submission of the Meta analysis paper that they are proposing to submit to JAMA Pediatrics.  Once we get through that, and everyone has a chance to weigh-in on the process (the Chair of the BSC will be a the meeting), then perhaps we can bring up the issue of the SoS monograph.  **My suggestion is that we focus on the accuracy of the toxicology science that is being summarized, i.e. does the SoS truly represent an unbiased presentation of the facts that are published within the literature.**  If we don't get to the latter point this morning, then perhaps a follow-up meeting including the OASH representation would be in order.

Does this work for you?

Thanks,
Rick

**From:** Schwetz, Tara (NIH/OD) [E] < (b) (6) >
**Sent:** Thursday, May 12, 2022 9:41 AM
**To:** Woychik, Rick (NIH/NIEHS) [E] < (b) (6) >
**Subject:** FW: NTP monograph on the state of the science

Not sure this bodes well for the 10 am...

Btw, my comments (which were not major) mostly focused on providing some clarity and context behind the statements.

Best,

**Tara A. Schwetz, PhD** *(she/her)*
**Acting Principal Deputy Director, NIH**
**A:** Building 1, Room 109
**P:**  (b) (6)
**Executive Assistant:** Caroline Dzokoto-Pomenya ( (b) (6) )
**Scheduler:** Dina Simon ( (b) (6) )



**From:** "Berridge, Brian (NIH/NIEHS) [E]" < (b) (6) >
**Date:** Thursday, May 12, 2022 at 8:51 AM

**To:** Tara Schwetz <　(b) (6)　>, "Woychik, Rick (NIH/NIEHS) [E]" <　(b) (6)　>, Larry Tabak <　(b) (6)　>
**Cc:** "Wolfe, Mary (NIH/NIEHS) [E]" <　(b) (6)　>
**Subject:** Re: NTP monograph on the state of the science

Hi Tara,

Thanks for your input and I'm sorry that you had to take your time to review these documents.  I've looked very briefly at your input and am not seeing anything that we haven't considered and adjudicated previously (with no intent to undermine the value of your input).

I will confess that I inherited this work and have no real skin in the game other than supporting the scientists in my Division who have produced it including ensuring that they are adhering to all relevant policies and standards of practice but also have the freedom to operate as independent scientists.

I have significant concerns that the level of engagement on this scientific product has crossed the line from rigorous peer review to ensure balance and accuracy to one that could be construed as attempting to influence the outcomes.  No doubt that this is a sensitive issue but I would like to think that much of what NIH produces has the potential for significant public health impact or we should be questioning why we're doing it.  We don't put all our products through this level of review.  After 17 years in industry, I've seen efforts to modify messages to fit commercial interests.  I wasn't party to that there and I'm not game to do that here.

I would like for a few key principals to get together and have a frank conversation about this.  I would like to feel more comfortable that we're still within the bounds of protecting scientific integrity with this.  It could be the discussion that Tara suggests below.

Brian


Brian R. Berridge, DVM, PhD, DACVP
Scientific Director, National Toxicology Program Division
Associate Director, NTP
National Institute of Environmental Health Sciences
National Institutes of Health
Research Triangle Park, NC
Office:　(b) (6)
Mobile:　(b) (6)

---

**From:** "Schwetz, Tara (NIH/OD) [E]" <　(b) (6)　>
**Date:** Thursday, May 12, 2022 at 8:01 AM
**To:** "Woychik, Rick (NIH/NIEHS) [E]" <　(b) (6)　>, "Tabak, Lawrence (NIH/OD) [E]" <　(b) (6)　>
**Cc:** "Berridge, Brian (NIH/NIEHS) [E]" <　(b) (6)　>, "Wolfe, Mary (NIH/NIEHS) [E]" <　(b) (6)　>
**Subject:** Re: NTP monograph on the state of the science

Rick,

I went through the state of the science and made several comments/questions throughout (the first 81 pages anyway). I also re-reviewed the background information on the comms document and provided some additional edits/comments (note: I did not re-review the QA).

Also, I don't think a release date of May 18 is feasible—there are too many folks interested in this, and it needs to be further refined, the communication needs to be carefully thought through, and we will need to brief the ASH on this. There is the possibility of using some time at an NTP meeting with her on Monday, but that timing may not work.

Happy to discuss this further later this morning. Thanks.

Best,

**Tara A. Schwetz, PhD** *(she/her)*
Acting Principal Deputy Director, NIH
A: Building 1, Room 109
P: <span>(b) (6)</span>

**Executive Assistant:** Caroline Dzokoto-Pomenya ( <span>(b) (6)</span> )
**Scheduler:** Dina Simon ( <span>(b) (6)</span> )



---

**From:** "Woychik, Rick (NIH/NIEHS) [E]" < <span>(b) (6)</span> >
**Date:** Thursday, May 5, 2022 at 10:10 AM
**To:** Larry Tabak < <span>(b) (6)</span> >, Tara Schwetz < <span>(b) (6)</span> >
**Cc:** "Berridge, Brian (NIH/NIEHS) [E]" < <span>(b) (6)</span> >, "Wolfe, Mary (NIH/NIEHS) [E]"
< <span>(b) (6)</span> >, "Woychik, Rick (NIH/NIEHS) [E]" < <span>(b) (6)</span> >
**Subject:** NTP monograph on the state of the science

Dear Tara and Larry,

I writing to share with you the *NTP Monograph on the State of the Science Concerning Fluoride Exposure and Neurodevelopment and Cognitive Health Effects*, and to let you know that we plan to post this report to the NTP public website on May 18.

As you may remember, following the NASEM committee's peer review of the draft NTP monograph on fluoride, information was added to create a revised NTP monograph on fluoride (Sept 2020). Following the NASEM review of the revised monograph, NTP decided to separate it and publish the information in two parts, (1) the *NTP Monograph on the State of the Science Concerning Fluoride Exposure and Neurodevelopment and Cognitive Health Effects* and (2) the meta-analysis. We have removed the hazard classification from the *NTP Monograph on the Science Concerning Fluoride* and instead provide a comprehensive compilation of the literature, including the strengths and limitations of the evidence, for interested readers to review and reach their own conclusions. **You will notice that the last sentence of the abstract indicates that "More studies are needed to fully understand the potential for lower fluoride exposure to affect children's IQ," which reflects that fact that the effects on IQ of children that the NTP group is documenting relate to higher levels of fluoride consumption.**   For the meta-analysis, we are currently setting up an NTP BSC Working Group that will peer review our response to comments we've received on it prior to submission of the meta-analysis manuscript to a journal for publication—we are planning a stakeholder (including the two of you) meeting to kick-off this effort as soon as we can find time on everyone's calendar.

The documents that I am sharing with you in this email include:

- Prepublication *NTP Monograph on the State of the Science Concerning Fluoride Exposure and Neurodevelopment and Cognitive Health Effects*
- The communications plan (we will not issue a press release, but will be prepared to respond to inquiries).  **You will notice that the answer to the first question is:  "The NTP review could not determine if the low level of fluoride (0.7 mg/L) recommended for fluoridated U.S. water supplies has adverse cognitive or neurodevelopmental effects. More studies are needed to fully understand if fluoride levels typically found in public water supplies in the United States affects cognition or neurodevelopment."**
- The NASEM committee's comments from peer review on the revised NTP monograph on fluoride (Sept 2020) with the NTP's response to those comments. This document does not include NTP's response to comments on the meta-analysis. Those comments and NTP's response will be part of the BSC Working Group project, which, as I indicated, is in its planning stage.

We have shared the prepublication *NTP Monograph on the State of the Science Concerning Fluoride Exposure* with NIDCR, CDC, FDA, and NIOSH. After your review, we will also share the communications plan with them, per their specific request.

Please let me know if you have questions or need other information. I look forward to receiving your feedback.

Rick

**From:**          Hacker, Karen (CDC/DDNID/NCCDPHP/OD)
**Sent:**          Thu, 12 May 2022 13:00:22 +0000
**To:**            Wolfe, Mary (NIH/NIEHS) [E]; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH)
**Cc:**            Mackar, Robin (NIH/NIEHS) [E]; Flowers, Christine B (NIH/NIEHS) [E]; Cucchi,
Sean (CDC/DDNID/NCCDPHP/OD); Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD); Woychik, Rick
(NIH/NIEHS) [E]; Berridge, Brian (NIH/NIEHS) [E]
**Subject:**       RE: Communications plan for NTP SoS monograph -- internal deliberative
communication

Thank you for the clarification. Has this gone through NIH clearance? We understand another NIH
institute had similar concerns to ours and I would like to make sure that NIH leadership is aware of this
monograph.

Best,
Karen

---

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Thursday, May 12, 2022 8:14 AM
**To:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Hannan, Casey J.
(CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E]
<bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi
(CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>;
Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>
**Subject:** Re: Communications plan for NTP SoS monograph -- internal deliberative communication

Dear Karen,
Thank you for your email. We have sent you the latest version of the prepublication monograph which
considers the breadth of input that we've received from all stakeholders.

I responded on May 9 to the May 4 email from Casey Hannan regarding CDC's suggested revision to text
in the abstract and summary of the prepublication monograph. My reply noted that we believe the
current findings, as stated in the monograph, reflect the scope of our evaluation and the available
scientific literature and no revision is needed.

Regards
Mary

Mary S. Wolfe, Ph.D.

Acting Deputy Division Director for Policy and Communication

Director, Office of Policy, Review, and Outreach

Division of the National Toxicology Program

National Institute of Environmental Health Sciences

111 T.W. Alexander Drive

Research Triangle Park, NC 27709

Phone: 984-287-3209

Email: wolfe@niehs.nih.gov

---

**From:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Sent:** Wednesday, May 11, 2022 4:57 PM
**To:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>
**Subject:** RE: Communications plan for NTP SoS monograph -- internal deliberative communication

Mary,
I don't believe we have seen the latest version that addressed our comments. Has this gone through NIH clearance yet and will it also be going through HHS interagency review?


Karen Hacker, MD MPH
Director, National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP)
Centers for Disease Control and Prevention
Phone: 770.488.5401
E-Mail: khacker@cdc.gov
Executive Assistant: Shantelle Graham
E-Mail: sln3@cdc.gov
On the web @ www.cdc.gov/chronicdisease/index.htm
Follow NCCDPHP on Twitter



NATIONAL CENTER FOR CHRONIC DISEASE
PREVENTION AND HEALTH PROMOTION
www.cdc.gov


This e-mail message is intended for the exclusive use of the recipient(s) named above. It may contain information that is deliberative or confidential, and it should not be disseminated, distributed, or copied to persons not authorized to receive such information. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think you have received this e-mail message in error, please notify the sender immediately.

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Wednesday, May 11, 2022 11:34 AM
**To:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>; Hacker, Karen
(CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Cc:** Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E]
<bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi
(CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** Re: Communications plan for NTP SoS monograph -- internal deliberative communication

here is our availability:
- Thurs, May 12, 11-noon and 3:30-4:30
- Fri, May 13, 9-noon
please let us know would work and we'll send zoom info.
Mary


Mary S. Wolfe, Ph.D.

Acting Deputy Division Director for Policy and Communication

Director, Office of Policy, Review, and Outreach

Division of the National Toxicology Program

National Institute of Environmental Health Sciences

111 T.W. Alexander Drive

Research Triangle Park, NC 27709

Phone: 984-287-3209

Email: wolfe@niehs.nih.gov

---

**From:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Sent:** Wednesday, May 11, 2022 11:27 AM
**To:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Wolfe, Mary (NIH/NIEHS) [E]
<wolfe@niehs.nih.gov>
**Cc:** Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E]
<bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi
(CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** RE: Communications plan for NTP SoS monograph -- internal deliberative communication

Having an additional day or two to better prepare ourselves for a meeting with NTP Comms staff would
be preferred.

Mary, would it be possible to check with your Comms staff re: availability on Thursday and Friday?

Thanks for considering,

Casey

**From:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Sent:** Wednesday, May 11, 2022 11:24 AM
**To:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** RE: Communications plan for NTP SoS monograph -- internal deliberative communication

Unfortunately, those don't work for me and we need to see if others are available. Casey, can you weigh in? I think we need perhaps another few days

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Wednesday, May 11, 2022 11:23 AM
**To:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** Re: Communications plan for NTP SoS monograph -- internal deliberative communication

Karen,
Our Comms staff are available today
1-2 pm and 3:30-4 pm

please let me know if either time would work and i'll send a zoom link.
Mary


Mary S. Wolfe, Ph.D.

Acting Deputy Division Director for Policy and Communication

Director, Office of Policy, Review, and Outreach

Division of the National Toxicology Program

National Institute of Environmental Health Sciences

111 T.W. Alexander Drive

Research Triangle Park, NC 27709

Phone: 984-287-3209

Email: wolfe@niehs.nih.gov

---

**From:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Sent:** Wednesday, May 11, 2022 11:16 AM
**To:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>; Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** RE: Communications plan for NTP SoS monograph -- internal deliberative communication

Thank you

---

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Wednesday, May 11, 2022 11:16 AM
**To:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>; Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** Re: Communications plan for NTP SoS monograph -- internal deliberative communication

yes. i will find when our comms staff are available.


Mary S. Wolfe, Ph.D.

Acting Deputy Division Director for Policy and Communication

Director, Office of Policy, Review, and Outreach

Division of the National Toxicology Program

National Institute of Environmental Health Sciences

111 T.W. Alexander Drive

Research Triangle Park, NC 27709

Phone: 984-287-3209

Email: wolfe@niehs.nih.gov

---

**From:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Sent:** Wednesday, May 11, 2022 11:14 AM
**To:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>; Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>; Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD) <era6@cdc.gov>
**Subject:** RE: Communications plan for NTP SoS monograph -- internal deliberative communication

Hi Mary,
As we discussed we need to meet with you to discuss the rollout and messaging. Can we set that up as soon as possible?

---

**From:** Wolfe, Mary (NIH/NIEHS) [E] <wolfe@niehs.nih.gov>
**Sent:** Wednesday, May 11, 2022 11:12 AM
**To:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Cc:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Berridge, Brian (NIH/NIEHS) [E] <brian.berridge@nih.gov>; Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>; Mackar, Robin (NIH/NIEHS) [E] <robin.mackar@nih.gov>; Flowers, Christine B (NIH/NIEHS) [E] <bruskec@niehs.nih.gov>
**Subject:** Communications plan for NTP SoS monograph -- internal deliberative communication

Good morning,
On April 28, I shared the prepublication draft of the NTP Monograph on the State of the Science on Fluoride. We have set May 18, 2022, for publication of the monograph. The monograph will be posted to the NTP website, and we will email a notice of the posting to NTP listserv subscribers.

(b)(5)

Please let us know if you have any questions,
Mary


Mary S. Wolfe, Ph.D.

Acting Deputy Division Director for Policy and Communication

Director, Office of Policy, Review, and Outreach

Division of the National Toxicology Program

National Institute of Environmental Health Sciences

111 T.W. Alexander Drive

Research Triangle Park, NC 27709

Phone: 984-287-3209

Email: wolfe@niehs.nih.gov

**From:**          Johnson, Nicole (CDC/DDNID/NCCDPHP/DOH)
**Sent:**          Thu, 12 May 2022 15:57:42 +0000
**To:**            Promoff, Gabbi (CDC/DDNID/NCCDPHP/OD); London, Joel
(CDC/DDNID/NCCDPHP/OD); Smalls, Donnica (CDC/DDNID/NCCDPHP/OD)
**Subject:**       FW: update from NTP BSC 10am meeting


Plz see update below. Greg sent me a first draft of talking points/Q&A just a bit ago, I am about to start
reviewing them now

---

**From:** Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Sent:** Thursday, May 12, 2022 11:55 AM
**To:** Espinoza, Lorena (CDC/DDNID/NCCDPHP/DOH) <lee6@cdc.gov>; Johnson, Nicole
(CDC/DDNID/NCCDPHP/DOH) <nbg5@cdc.gov>; Holder, Gregory (CDC/DDNID/NCCDPHP/DOH)
<LHN5@cdc.gov>
**Subject:** update from NTP BSC 10am meeting

Here are my takeaways:

The May 18th release date for SoS report is almost certainly not going to happen
OASH and NIH OD are pretty clearly going to get more involved

Found out from Renee after this call there's a meeting on Monday morning with ADM Levine, leadership
from NIEHS, NIDCR, NIH OD, and OASH senior staff

Not yet confirmed for 9am call tomorrow with NTP comms staff. Will keep you posted.

Even though the 5/18 release is not likely, we still need to provide a first draft of talking points today for
NCCDPHP OD, policy & comms.


**Casey J. Hannan, MPH**
***Director**, Division of Oral Health*
*Centers for Disease Control and Prevention*
channan@cdc.gov
*770.488.6054 (office)*   (b)(6)   *(mobile)*
http://www.cdc.gov/oralhealth/

**From:**        Johnson, Nicole (CDC/DDNID/NCCDPHP/DOH)
**Sent:**        Fri, 3 Jun 2022 18:33:42 +0000
**To:**        Greaser, Jennifer (CDC/OD/CDCWO); Cucchi, Sean (CDC/DDNID/NCCDPHP/OD)
**Subject:**        RE: monograph

Hi – thanks so much for reaching out. The latest we heard (yesterday) is that ASH Levine has put the report on hold until further notice. Happy to chat and tell you more about it.

---

**From:** Greaser, Jennifer (CDC/OD/CDCWO) <cbx5@cdc.gov>
**Sent:** Friday, June 3, 2022 2:32 PM
**To:** Cucchi, Sean (CDC/DDNID/NCCDPHP/OD) <axz7@cdc.gov>; Johnson, Nicole (CDC/DDNID/NCCDPHP/DOH) <nbg5@cdc.gov>
**Subject:** monograph

We got a heads up from NIH leg affairs about National Toxicology Program monograph coming out soon on fluoride and IQ.  Assume you are aware.  Do we need to chat?

Jennifer Greaser
CDC Washington Office
www.cdc.gov/washington
202-245-0600

**From:** Chris Wood <cwood@astdd.org>
**Sent:** Friday, June 3, 2022 12:13 PM
**To:** Jayanth Kumar <jayanth.kumar@cdph.ca.gov>; Judy Feinstein <jafme52@gmail.com>
**Subject:** FYI re NTP report

On a call with CDC leadership this morning they told me that at the request of the Assistant Secretary for Health, the NTP State of the Science report is "on hold."



ASTDD Associate Membership is open to anyone interested in dental public health.

Christine Wood
Executive Director
Association of State and Territorial Dental Directors
3858 Cashill Blvd.
Reno, NV  89509
██████████
cwood@astdd.org
www.astdd.org

Proud member of OPEN (Oral Health Progress and Equity Network)



# Exhibit C

| From: | Michael Connett |
|---|---|
| To: | Adkins, Brandon (ENRD) |
| Subject: | [EXTERNAL] Re: Food & Water Watch v EPA - Attorney Work Product Doctrine |
| Date: | Monday, November 20, 2023 3:30:33 PM |
| Attachments: | image001.jpg |
| | image713202.jpg |

Brandon –

In double-checking my files this evening, I came across a <mark>brief text exchange I had with Dr. Berridge</mark> on February 8, 2023 regarding the scheduling of a phone call. This text exchange is protected by the Attorney Work Product doctrine. With that clarification, none of the other withheld communications involved communications with Dr. Berridge.

Michael

**PLEASE NOTE NEW ADDRESS FOR THE LOS ANGELES OFFICE**



## Michael Connett  | Partner
11601 Wilshire Boulevard, Suite 1900 | Los Angeles, CA 90025
Toll Free 800-226-9880  | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Michael Connett <mconnett@waterskraus.com>

**Date:** Monday, November 20, 2023 at 6:03 PM

**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>

**Subject:** Re: Food & Water Watch v EPA - Attorney Work Product Doctrine

No.

**PLEASE NOTE NEW ADDRESS FOR THE LOS ANGELES OFFICE**



## Michael Connett  | Partner
11601 Wilshire Boulevard, Suite 1900 | Los Angeles, CA 90025
Toll Free 800-226-9880  | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>

**Date:** Monday, November 20, 2023 at 6:02 PM

**To:** Michael Connett <mconnett@waterskraus.com>

**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

[CAUTION]: External Email

Michael,

Were any of the withheld communications that were responsive to EPA's Request No. 9 with

Brian Berridge?

Best,
Brandon

_____
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Tuesday, May 23, 2023 4:24 PM
**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Cc:** Kay Reeves <kreeves@waterskraus.com>; Andrew Waters <waters@waterskraus.com>; Ong, Emmet (USACAN) <EOng@usa.doj.gov>; Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** [EXTERNAL] Re: Food & Water Watch v EPA - Attorney Work Product Doctrine

Hi Brandon –

I appreciate the update regarding EPA's position.

<mark>I can confirm that all of the withheld communications relate to the political interference issue at NTP, and are only responsive to EPA Doc Request No. 9.</mark>

I'll look to speak further about the scheduling issues tomorrow.

Best,
Michael



**Michael Connett  | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880  | Phone 310-414-8146
Fax 310 414 8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Date:** Monday, May 22, 2023 at 4:19 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Kay Reeves <kreeves@waterskraus.com>, Andrew Waters <waters@waterskraus.com>, Ong, Emmet (USACAN) <Emmet.Ong@usdoj.gov>, Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

[CAUTION]: External Email

Michael,

Thank you for conferring with us over a potential resolution of Plaintiffs' work-product claim. We have considered Plaintiffs' latest proposal and cannot accept. We have given this issue further consideration more generally and, subject to receiving written confirmation from you about the subject of the withheld materials as I explain below, believe further discussions on this topic are not necessary.

After we served EPA's post-trial requests for production, the Court held at the April 11, 2023, status conference that the second trial in this case will concern the merits of scientific studies that have become available since the first trial and ruled that alleged "political influence" concerning the National Toxicology Program's fluoride monograph or meta-analysis is not relevant to that inquiry.

We have not received a privilege log from Plaintiffs for the withheld materials. Based on our conferences and email correspondence with you, however, we understand that the withheld materials are emails that relate to Plaintiffs' claim of alleged "political influence." Because the Court has now held that this issue is not relevant—and upon receiving written confirmation from Plaintiffs that the withheld materials solely relate to the issue of alleged "political influence" and are not otherwise responsive to EPA's post-trial requests for production—we will not insist that Plaintiffs prepare a privilege log or produce the withheld materials. We reserve the right to demand a privilege log and production of the withheld materials and to request additional time to take discovery on the issue if the Court reverses its relevancy decision later in the case.

Please confirm at your earliest convenience that the withheld materials relate solely to the issue of alleged "political influence" concerning publication of the NTP monograph or meta-analysis and are not otherwise responsive to EPA's post-trial requests for production. Upon your written confirmation, that should resolve this issue.

With respect to Plaintiffs' request to schedule depositions with certain EPA employees, let's plan to confer after you and Emmet complete your attorney conference this Wednesday regarding the FOIA litigation. Paul and I will join the line after you and Emmet wrap up.

Thanks again.

Best,
Brandon

---

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

---

**From:** Adkins, Brandon (ENRD)
**Sent:** Monday, May 15, 2023 3:00 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Kay Reeves <kreeves@waterskraus.com>; Andrew Waters <waters@waterskraus.com>; Ong, Emmet (USACAN) <EOng@usa.doj.gov>; Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

Michael,

Thanks for your email. We don't understand what you mean by "these communications," because Plaintiffs have not satisfied their obligation under Rule 26(b)(5). Upon receiving Plaintiffs' privilege log, we will of course confer with you over any materials we believe should be produced.

Best,
Brandon

**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Monday, May 15, 2023 2:38 PM
**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Cc:** Kay Reeves <kreeves@waterskraus.com>; Andrew Waters <waters@waterskraus.com>; Ong, Emmet (USACAN) <EOng@usa.doj.gov>; Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** [EXTERNAL] Re: Food & Water Watch v EPA - Attorney Work Product Doctrine

Brandon – Based on your response, EPA does not yet know whether it has a "substantial need" for these communications. Further, EPA will explain whether it has a "substantial need" upon obtaining the privilege log as part of the meet and confer process. Please confirm if this correct.

Thanks,
Michael



**Michael Connett | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Date:** Monday, May 15, 2023 at 2:24 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Kay Reeves <kreeves@waterskraus.com>, Andrew Waters <waters@waterskraus.com>, Ong, Emmet (USACAN) <Emmet.Ong@usdoj.gov>, Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

[CAUTION]: External Email

Thanks, Michael. Plaintiffs must first establish the basis for withholding the documents, as set

out in the Federal Rule and case law cited in my email. But Plaintiffs have not produced a privilege log that would enable us to assess their claims. For the same reason, it is impossible for us to assess whether there is a substantial need for the materials that Plaintiffs are withholding.

———
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Monday, May 15, 2023 11:19 AM
**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Cc:** Kay Reeves <kreeves@waterskraus.com>; Andrew Waters <waters@waterskraus.com>; Ong, Emmet (USACAN) <EOng@usa.doj.gov>; Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** [EXTERNAL] Re: Food & Water Watch v EPA - Attorney Work Product Doctrine

Brandon –

I will confer with my team on the issues you have raised. One thing that would be helpful for us to understand is why EPA has a "substantial need" for these communications. Can you please explain that for me?

Thanks,
Michael



**Michael Connett | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Date:** Monday, May 15, 2023 at 10:01 AM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Kay Reeves <kreeves@waterskraus.com>, Andrew Waters <waters@waterskraus.com>, Ong, Emmet (USACAN) <Emmet.Ong@usdoj.gov>, Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

[CAUTION]: External Email

Michael,

Thank you for sending the case law. Your analysis, however, did not address whether Plaintiffs may claim work-product protection for communications sent *from* third parties to counsel and whether Plaintiffs' disclosure to third parties constitutes a waiver. *See, e.g.,*

*United States v. Sanmina Corp.*, 968 F.3d 1107, 1121 (9th Cir. 2020) ("[D]isclosure of work product to a third party does not waive the protection unless such disclosure is made to an adversary in litigation or has substantially increased the opportunities for potential adversaries to obtain the information.").

Further, Plaintiffs have not provided adequate information for us to evaluate their assertions of work-product protection. *See* Fed. R. Civ. P. 26(b)(5). For example, we cannot tell from your email whether claimed work product materials were shared with current federal employees, whether Plaintiffs are withholding materials that were prepared or sent by third parties, how broadly any materials were shared, and whether any efforts to maintain the confidentiality of the materials were taken. Relatedly, because Plaintiffs have not explained the nature of any of the withheld materials as required under the rules, it is impossible for us to evaluate whether Plaintiffs have provided the "substantial equivalent" of the materials via their FOIA production, as you stated in your email. This deficiency stems from Plaintiffs not having provided a privilege log for the withheld materials.

Plaintiffs must produce a privilege log. *See, e.g., In re CV Therapeutics, Inc. Secs. Litig.*, No. 03-3709, 2006 WL 1699536, at *2 (N.D. Cal. June 16, 2006) (Chen, J.) ("Again the burden of proof lies with the proponent of the privilege and each document must be tested against the adequacy of Defendants' privilege log and supporting material."); Fed. R. Civ. P. 26(b)(5). Plaintiffs' privilege log should contain: "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated." *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992).

As I mentioned on our call, we're happy to agree for purposes of this second phase of discovery that the parties do not have to log the following categories of communications that are withheld on claims of privilege or work product: (1) communications solely between a party and its counsel; (2) work product material that has not been disclosed other than between a party or its representative; and (3) communications and documents that predate June 18, 2020 (the day after the last day of trial).

Finally, you are correct that our position is that alleged "political pressure" exerted on NTP is irrelevant. Judge Chen held the same at our last status conference. But Plaintiffs have stated that they may re-raise this issue later in the case. Plaintiffs' initial disclosures evince an intent to continue to pursue the issue in discovery. In fact, *three of the four topics* that Plaintiffs identified individuals who have information that Plaintiffs may use to support their claims or defenses concern Plaintiffs' allegations of "political pressure." Plaintiffs cannot expect the United States to forego its right to take discovery on an issue that Plaintiffs have disclosed and expressed an intent to pursue.

We proposed during our last attorney conference to stipulate that the "political pressure" issue is not relevant. We think a stipulation that no party would take discovery, or seek to introduce evidence or make argument at trial, regarding the alleged "political pressure" issue could resolve this issue. And given that the Court has already held that the parties should focus on the science, we think such a stipulation would be a reasonable way forward. We would like to know Plaintiffs' position on that proposal. If Plaintiffs are open to the idea of stipulating, please let us know and we will prepare some language for your consideration.

Best,
Brandon

_____
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

---

**From:** Michael Connett <mconnett@waterskraus.com>
**Sent:** Wednesday, May 10, 2023 7:35 AM
**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>; Ong, Emmet (USACAN) <EOng@usa.doj.gov>; Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Cc:** Kay Reeves <kreeves@waterskraus.com>; Andrew Waters <waters@waterskraus.com>
**Subject:** [EXTERNAL] Food & Water Watch v EPA - Attorney Work Product Doctrine

Brandon, Emmet & Paul -

During our meet and confer on Monday, you asked me to provide legal authority for Plaintiffs' assertion of attorney work product protection over the attorney emails that EPA is seeking to discover. Pursuant to your request, here is a summary of the relevant law and how it applies to the communications at issue.

**Summary of the Attorney Work Product Doctrine**

The attorney work product doctrine, first articulated by the US Supreme Court in 1947, is codified in the Federal Rules of Civil Procedure.

As set forth in FRCP 26(b)(3), "documents . . . prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney)" are "ordinarily" not discoverable. FRCP 26(b)(3)(A). "To qualify for work-product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011).

As the Ninth Circuit has explained, **"The primary purpose of the work product rule is to 'prevent exploitation of a party's efforts in preparing for litigation.'"** *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992). As noted by Judge Chen, "The purpose of the privilege is 'to give parties freedom and incentive to develop their own cases,' and to 'prevent exploitation of a party's efforts in preparing for litigation.'" *Moreno v. Autozone, Inc.*, No. C-05-4432 CRB (EMC), 2008 WL 906510, at *1 (N.D. Cal. Apr. 1, 2008) (quoting *United States v. Fort*, 472 F.3d 1106, 1130 (9th Cir.2007) & *United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir.2000)).

Notably, documents do not need to reveal an attorney's mental impressions or opinions to receive the protections afforded by FRCP 26(b)(3). So long as the documents are made in

anticipation of trial by/for counsel, they may only be discovered if (A) they are otherwise discoverable, (B) there is a **"substantial need"** for them, and (C) **the requesting party cannot obtain the "substantial equivalent" without "undue hardship."** FRCP 26(b)(3).

While documents do not *need* to reveal an attorney's impressions/opinions to be protected, where such impressions/opinions *are* revealed, the prohibition on discovery is *more* stringent. Specifically, the requesting party must demonstrate a **"compelling" need**, not just a substantial one, and **the attorney's mental impressions must be at issue in the case.** *See Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("A party seeking opinion work product must make a showing beyond the substantial need/undue hardship test required under Rule 26(b)(3) for non-opinion work product."); *McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc.*, 333 F.R.D. 638, 641 (D. Or. 2019) ("[T]he work-product doctrine affords special or heightened protection to materials that reveal an attorney's mental impressions or opinions. Such materials are generally referred to as 'opinion' or 'core' work product and are distinguished from 'fact' work product. . . . Opinion or core work product . . . is discoverable only 'when mental impressions are at issue in a case and the need for the material is compelling.'").

**Application of the Attorney Work Product Doctrine to the Communications at Issue Here**

Based on the aforementioned rules of law, the attorney emails that EPA is seeking are not discoverable.

As I explained during our call, the emails at issue were (1) prepared in anticipation of the Phase Two trial in this case, and (2) were written to/from myself in my capacity as attorney for the Plaintiffs in this matter. Further, some of the communications reveal my opinions/impressions of the case.

Accordingly, EPA must be able to demonstrate, at a minimum, that (A) the communications are relevant, (B) EPA has a "substantial need" for these communications, and (C) EPA will suffer an "undue hardship" in obtaining "substantially equivalent" information. FRCP 26(b)(3).

None of these 3 requisite factors are present here, especially now that Plaintiffs have produced all of the documents that Plaintiffs received under the Freedom of Information Act (FOIA), as these FOIA documents contain "substantially equivalent" information to what can be found in the withheld emails. Further, as you reiterated during our call on Monday, it is EPA's position that the political pressure exerted on NTP is irrelevant to this case. As such, it is hard to understand why you consider these communications to be relevant, let alone why EPA has a "substantial need" for them.

Since EPA cannot make a showing of substantial need for these materials, it is not necessary to discuss those communications that present opinions/impressions other than saying that, since attorney opinions/impressions are not at issue in this case, said communications are clearly not discoverable.

While I am hopeful this will resolve the matter, to the extent EPA decides to file a motion to compel these communications, Plaintiffs will ask the Court to conduct an in camera review.

If, for some reason, you believe it would be helpful to further confer on this issue, please let me know.

Thanks,
Michael

**Michael Connett  |  Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880  |  Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

This electronic message contains information from WATERS & KRAUS, LLP that may be privileged and confidential attorney work product or attorney/client communication. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you received this message in error, please notify the sender immediately.

Malicious phishing attempts continue to increase. Please be aware that scammers target firms by spoofing email domains and

other sophisticated tactics. Our banking information rarely changes. If you receive a request to change wiring information associated with our firm, we request that you independently verify by calling a known contact within our firm or independently emailing a member of our firm before taking any action. Thank you

# Exhibit D

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY GUNDERSON REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
222 N. Pacific Coast Hwy, Suite 1900
El Segundo, CA 90245
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) Civ. No. 17-CV-02162-EMC |
| | ) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al. | ) **PLAINTIFFS' INITIAL** |
| | ) **DISCLOSURES** |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiffs hereby submit the following disclosures in accordance with Fed. R. Civ. P. 26 ("Rule 26").

### Rule 26(a)(1)(A)(i)

Pursuant to Rule 26(a)(1)(A)(i), Plaintiffs identify the following individuals:

- The **EPA managers and staff scientists involved with making unreasonable risk determinations** in EPA's first 10 risk evaluations under the Amended Toxic Substances Control Act. These EPA managers and staff scientists include Stan Barone, Yvette Selby-Mohamadu, Nikki Bass, Jafrul Hasan, Seema Schappelle, Susanna Wegner, Sharon Oxendine, Nhan Nguyen, Katherine Anitole, Ariel Hou, Kevin Vuilleumier, and Sarah Gallagher. These EPA managers and staff scientists have knowledge of EPA's methods for making unreasonable risk determinations under the Amended TSCA. Plaintiffs do not yet have contact information for these individuals, but upon information and belief, EPA already has their respective contact information as they are each employed by EPA.

- **Current and former NTP scientists who have knowledge of the Monograph**, including the history of its development, the peer review processes and scientific methodologies that it has employed, and the political pressures that it has been subjected to by officials and agencies with strong policy interests on fluoride. These scientists include, but are not necessarily limited to, Kristina Thayer, John Bucher, Brian Berridge, Kyla Taylor, Linda Birnbaum, Mary Wolfe, and Richard Woychik. Upon information and belief, EPA is already well aware of these individuals, has their respective contact information, and/or has the means to obtain their contact information. By way of further response, Plaintiffs are aware of the following contact information for these individuals:

  - Kristina Thayer: thayer.kris@epa.gov
  - John Bucher: bucher@niehs.nih.gov
  - Brian Berridge: brian.berridge@nih.gov
  - Kyla Taylor: kyla.taylor@nih.gov
  - Linda Birnbaum: birnbaum.tox@outlook.com
  - Mary Wolfe: wolfe@niehs.nih.gov
  - Richard Woychik: rick.woychik@nih.gov

- **The federal officials who worked to prevent the National Toxicology Program (NTP) from releasing its completed Monograph** on fluoride's neurodevelopmental toxicity in May 2022 due to their concern about its impact on community water fluoridation, and who have worked to shape the wording of the Monograph to be as compatible with water fluoridation as possible. These officials include, but are not necessarily limited to: Rachel Levine (OASH), Michael Iademarco (OASH), Lawrence Tabak (NIH OD), Tara Schwetz (NIH OD), Casey Hannan (CDC), Nicole Johnson (CDC), Joanna Stettner (CDC), Greg Holder (CDC), Tracy Boehmer (CDC), Lorena Espinoza (CDC), Karen Hacker (CDC), Rena D'Souza (NIDCR), Jonathan Horsford (NIDCR), Timothy Iafolla (NIDCR), and Tim Ricks (PHS). Upon information and belief, EPA is already well aware of these individuals, has their respective contact information, and/or has the means to obtain their contact information. By way of further response, Plaintiffs are aware of the following contact information for these individuals:

- o Rachel Levine: Rachel.Levine@hhs.gov
- o Michael Iademarco: Michael.Iademarco@hhs.gov
- o Lawrence Tabak: lawrence.tabak@nih.gov
- o Tara Schwetz: Tara.Schwetz@nih.gov
- o Casey Hannan: clh8@cdc.gov
- o Nicole Johnson: nbg5@cdc.gov
- o Joanna Stettner: czl8@cdc.gov
- o Greg Holder: LHN5@cdc.gov
- o Tracy Boehmer: opm9@cdc.gov
- o Lorena Espinoza: lee6@cdc.gov
- o Karen Hacker: pju3@cdc.gov
- o Rena D'Souza: rena.d'souza@nih.gov
- o Jonathan Horsford: horsforj@nidcr.nih.gov
- o Timothy Iafolla: iafollat@nidcr.nih.gov
- o Tim Ricks: tim.ricks@ihs.gov

- **Fluoridation advocates and lobbyists in the private sector** who have, with encouragement and support from one or more of the aforementioned federal officials, been working to discredit the NTP, its scientists, and the Monograph, and/or working to discredit and defame the scientists conducting the NIEHS-funded studies on fluoride/IQ that the NTP has relied upon. These advocates/lobbyists include, but are not necessarily limited to: Jayanth Kumar (ADA/ASTDD), Matt Jacob (ADA), Bob Burns (ADA), Howard Pollick (ADA), Chris Wood (ASTDD), Chris Fox (AADR), Eugenio Beltran, Mark Macek, and Mark Moss. Upon information and belief, EPA is already well aware of these individuals, has their respective contact information, and/or consults with individuals (e.g., Howard Pollick) who can readily provide their contact information. By way of further response, Plaintiffs are aware of the following contact information for these individuals:

  - o Jayanth Kumar: Jayanth.Kumar@cdph.ca.gov
  - o Matt Jacob: mattlivesindc@gmail.com

- Bob Burns: burnsr@ada.org
- Howard Pollick: Howard.Pollick@ucsf.edu
- Chris Wood: cwood@astdd.org
- Chris Fox: cfox@iadr.org
- Eugenio Beltran: edb4@cdc.gov
- Mark Macek: wzm2@cdc.gov
- Mark Moss: mossm17@ecu.edu

### Rule 26(a)(1)(A)(ii)

Pursuant to Rule 26(a)(1)(A)(ii), Plaintiffs identify the documents that they produced to EPA on April 21, 2023. These documents include:

- Studies and scientific reviews that have become available since the June 2020 trial, including the NTP's May 2022 monograph and July 2022 meta-analysis. *See* FWW_PT_000001-001738.
- Records relating to the political pressures that have been exerted on both the NTP and scientists conducting NIH-funded studies on fluoride/IQ. *See* FWW_PT_001739-002476.
- Documents related to EPA's Risk Evaluations under the Amended TSCA. *See* FWW_PT_002477-008232.

Dated:   May 8, 2023

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5 and the mutual consent of the parties that email to counsel will constitute proper service of discovery, I served a copy of the foregoing *Plaintiffs' Initial Disclosures* upon Defendants on May 8, 2023 via email to the following counsel:

Brandon Adkins
Paul Caintic
Emmet Ong
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC. 20044-7611
brandon.adkins@usdoj.gov
paul.caintic@usdoj.gov
emmet.ong@usdoj.gov

*Attorneys for Defendants*

Dated:   May 8, 2023

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

PLAINTIFFS' INITIAL DISCLOSURES

# Plaintiffs' Opposition to Defendants' Motion in Limine to Exclude the Testimony of Brian Berridge

C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
11601 Wilshire Blvd, Suite 1900
Los Angeles, CA 90025
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | ) Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | ) |
| | ) **PLAINTIFFS' OPPOSITION TO** |
| vs. | ) **DEFENDANTS' MOTION IN LIMINE** |
| | ) **TO EXCLUDE THE TESTIMONY OF** |
| U.S. ENVIRONMENTAL PROTECTION | ) **BRIAN BERRIDGE** |
| AGENCY, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## INTRODUCTION

"The American people and government agencies, at state and federal levels, rely on NTP to provide a strong scientific basis for decisions aimed at protecting public health."[1] In the instant litigation, this Court has recognized that NTP's May 2022 monograph on fluoride will be "the *centerpiece of the dispute*" in the second phase of trial. ECF No. 347 at 2 (emphasis added). Indeed, one of the primary reasons this case was placed in abeyance for two years was so that the Court could consider NTP's findings. ECF No. 262 at 4.

Despite the centrality of NTP's assessment to the second phase of trial, EPA seeks to prevent this Court from hearing testimony from Dr. Brian Berridge, *NTP's Scientific Director*, regarding the NTP generally, and NTP's fluoride assessment specifically. EPA contends that because *some* of Dr. Berridge's testimony will reveal political pressures that prevented the NTP from publishing the monograph, *all* of his testimony must be pre-emptively stricken, even testimony which does *not* address political interference or testimony which also goes to the *weight* to give the May 2022 monograph. The motion should be denied.

## SUMMARY OF THE FACTS

### A.  Dr. Berridge's Role at NTP and Involvement with the Fluoride Monograph

Dr. Brian Berridge served as NTP's Scientific Director from 2018 to 2023, a fact that EPA managed to omit from its motion. Connett Decl., Exhibit 1. According to NTP's website, the Scientific Director is the person at NTP charged with making the "final decision" about whether a monograph should be published. Connett Decl., Exhibit 2.

While Dr. Berridge was not a formal author of NTP's May 2022 monograph, he was closely involved in overseeing its development and completion.[2] Given his involvement and knowledge, Dr. Berridge was routinely selected by NTP's Director to address specific questions and concerns about the

---

[1]   NTP ANNUAL REPORT FOR FISCAL YEAR 2018, p. 28, available at https://tinyurl.com/about-ntp.
[2]   In its motion, EPA interprets Dr. Berridge's statement that he "has no real skin in the game" as showing he was not meaningfully involved with the fluoride monograph. Mot. at 1:14-17. To the contrary, Dr. Berridge appears to be conveying that he has no personal or partisan interests on the fluoride issue.

monograph raised by other HHS offices and agencies, including the Office of the Assistant Secretary of Health (OASH), the Office of the Surgeon General (OSG), the Centers for Disease Control (CDC), and the National Institute of Dental and Craniofacial Research (NIDCR). Connett Decl., Exhibit 3.

**B.  The Anticipated Scope of Dr. Berridge's Testimony**

As Plaintiffs have disclosed, Dr. Berridge's testimony has multiple components to it, all of which go to the weight that the Court should give the NTP's assessment. Adkins Decl. at 2:2-9. First, Dr. Berridge will address the "purposes and procedures" of NTP. *Id.* at 2:3-4. Dr. Berridge will testify, for example, that NTP conducts *hazard* evaluations, not *risk* evaluations. According to Dr. Berridge, "[n]ot everyone who has reviewed, critiqued or commented on [NTP's] analyses recognizes that distinction [between hazard and risk] which has contributed to the challenges" that NTP scientists have "experienced in progressing their work." Connett Decl., Exhibit 1.

Second, Dr. Berridge will address the "extensive review process that the NTP's monograph and meta-analysis on fluoride neurotoxicity underwent." Adkins Decl. at 2:4-5. Dr. Berridge will explain how the review process for the fluoride monograph was more extensive than any previous NTP monograph and constituted an "unprecedented challenge" to NTP's conclusions. Connett Decl., Exhibit 1 & Exhibit 4.

Third, Dr. Berridge will explain why he, as the Scientific Director, made the decision to publish the May 2022 monograph, which—in the normal course of events—would be the final and dispositive step for publishing an NTP monograph. Adkins Decl. at 2:5-7; Connett Decl., Exhibit 2. Dr. Berridge will further explain that NTP was blocked from publishing the monograph due to concerns expressed by agencies with policy interests on fluoride—an "obstructive" act that Dr. Berridge criticized as violative of NTP's "independence" and principles of "scientific integrity." Connett Decl., Exhibit 1 & Exhibit 5.

**C.  The Court's Discovery Rulings Regarding Political Pressures on NTP**

Earlier this year, the Court issued two orders on two separate discovery disputes regarding the political pressures on NTP. In the first order, the Court denied EPA's motion to quash two depositions of

2

private lobbyists who had worked with HHS officials to attack NTP's work. ECF No. 347. In its March 8, 2023 order, the Court agreed that "the testimony of these witnesses may shed light on EPA's defenses regarding the draft status and industry criticisms of the NTP monograph." *Id.* at 2. The Court further agreed that "[t]aking these depositions will help advance the case towards trial." *Id.*

After these two witnesses were deposed pursuant to the Court's order, the Plaintiffs had reached their presumptive limit of 10 fact witness depositions. ECF No. 350 at 3. Plaintiffs intended, at that point, to seek the Court's leave to depose CDC, NIDCR, and OASH officials on the political interference issue, but, prior to filing a motion, the Court ruled out this possibility at the April 11 status conference.

Importantly, in neither of the two aforementioned discovery rulings was the Court confronted with the relevance of trial evidence regarding (1) NTP's purposes and procedures, (2) background information regarding the extensive review processes that NTP's monograph was subjected to, or (3) why NTP's scientists deemed the May 2022 monograph to be complete and ready for publication.

**D. The Parties' Meet & Confer Regarding the Privilege Log, Including the Context**

On March 13, 2023, EPA served an expansive set of discovery requests for all documents that Plaintiffs have regarding the NTP, including (1) all documents that Plaintiffs have received pursuant to federal and state public record requests, and (2) all communications that any Plaintiff has ever had with current or former NTP officials. Connett Decl, Exhibit 7. Plaintiffs did not use the Court's ruling on April 11, 2023 to shield themselves from producing these materials. To the contrary, ten days *after* the Court's ruling, Plaintiffs produced *over 30,000 pages* of documents, including all emails Plaintiffs have received under FOIA regarding efforts by HHS agencies to alter the wording and conclusions of NTP's fluoride assessment, as well as stall its publication. Connett Decl. ¶ 1.

In its motion, EPA focuses on a small subset of documents that Plaintiffs withheld from the 30,000+ page production. This small subset of documents was not withheld because of anything the Court stated at the April 11, 2023 hearing. Rather, Plaintiffs withheld these documents on the grounds that they were

*privileged* under the attorney work product doctrine. Connett Decl. ¶ 2. Since the attorney work product doctrine can only be overcome by a showing of "substantial need" (as opposed to mere relevance), Plaintiffs sought clarification from EPA on what "substantial need" the EPA had for attorney work product given *EPA's* assertion that political interference was irrelevant to the case. Connett Decl. ¶¶ 3-4; EPA Mot at 6:6-9.

On May 19, 2023, as part of the parties' meet and confer on the privilege issue, Plaintiffs proposed a course of action that would limit the scope of evidence on political interference that could be introduced at trial. Connett Decl., Exhibit 8. Specifically, if EPA agreed to forego authenticity/hearsay objections to certain specified emails obtained under the FOIA, "Plaintiffs would agree to forego putting up any fact witnesses at trial—including, but not limited to, current/former NTP employees—regarding the past political pressures on NTP." *Id.* Plaintiffs had served their Initial Disclosures prior to making this proposal, and, as such, EPA knew that Dr. Berridge was one of the NTP officials that Plaintiffs might call as a witness at trial absent an agreement to the contrary.

On May 22, 2023, EPA declined Plaintiffs' proposal and decided *on its own accord* to drop its request for the privilege log in exchange for one condition: that Plaintiffs confirm that all of the attorney communications related to the political interference issue. Connett Decl., Exhibit 9. Plaintiffs confirmed this was the case, and EPA dropped the matter. *Id.*

**E. EPA Never Sought a Deposition of Dr. Berridge**

At no point during the fact discovery period did EPA seek to depose any of the NTP scientists identified in Plaintiffs' Initial Disclosures, including Dr. Berridge. Connett Decl. ¶ 4. EPA's tactical decision to forego a deposition of Dr. Berridge was not compelled by any court order. Nor can EPA claim surprise that Plaintiffs are calling Dr. Berridge as a witness because Plaintiffs made clear that Plaintiffs may call an NTP scientist as a witness at trial, absent an agreement. Connett Decl., Exhibit 8.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE
THE TESTIMONY OF BRIAN BERRIDGE

**ARGUMENT**

**A. Dr. Berridge's Testimony Is Clearly Relevant**

The Court placed this litigation on hold for over two years to consider the NTP's monograph, and has described it as "the centerpiece" to the case. ECF No. 347 at 2; ECF No. 262 at 4. Given the centrality of NTP's monograph to this litigation, Dr. Berridge's testimony about the monograph's background, purpose (e.g., hazard vs. risk), review processes, and publication-worthy status *easily* passes the liberal standard for relevancy under the federal rules. *United States v. Wells*, 879 F.3d 900, 925 (9th Cir. 2018) (explaining that relevancy "typically presents a rather low barrier to admissibility").

EPA itself concedes that testimony about NTP's review process is relevant, but argues "Plaintiffs cannot reframe Dr. Berridge's testimony as relating to something other than the political influence issue." Mot. at 5:21-22. The premise of this argument appears to be that Plaintiffs never disclosed Dr. Berridge's knowledge on other matters besides political interference. But that premise is incorrect. In their disclosures, Plaintiffs identified Dr. Berridge's knowledge about the monograph, including the history of its development and peer review processes. Adkins Decl,. Exhibit D at 2; Adkins Decl. at 2:1-9.

Nor is EPA correct in its sweeping assertion that any testimony which implicates political interference—even if it is relevant for other purposes—is barred by the Court's discovery ruling at the April 11, 2023 status conference.[3] At that status conference, the Court was presented with the limited question of whether Plaintiffs could exceed the 10-deposition limit by deposing HHS officials for the purpose of further exploring the extent of political interference. The Court was not presented with, and did not comment on, whether Plaintiffs could elicit trial testimony from an NTP Director about why NTP considered the May 2022 monograph to be ready for publication. While the latter testimony does implicate political pressures, *its relevance does not depend on them*, as the testimony also speaks to the high quality of the monograph—a factor that goes to the weight the Court should place on this "draft" document. *See*

---

[3]   For this same reason, Plaintiffs were under no obligation to file a motion for reconsideration.

*Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value and reject any improper inferences.").

**B. Dr. Berridge's Testimony Will Be Based on His Own Percipient Knowledge in a Similar Manner as the NTP Scientist Whom EPA Called as a Fact Witness at the First Trial**

Plaintiffs intend to elicit testimony from Dr. Berridge that comes squarely within the scope of his own percipient knowledge as a scientist at NTP. Fed. R. Evid. 602. EPA counters by arguing that Dr. Berridge will be providing impermissible expert testimony if he discusses NTP's methodologies or conclusions. Mot. at 4:23-5:12. EPA, however, elicited precisely this type of testimony from an NTP fact witness during the first phase of trial. EPA's first witness was Dr. Kristina Thayer, a former NTP scientist who worked on NTP's review of animal studies on fluoride neurotoxicity that was published in 2016. ECF No. 242 at 594:3-7; 596:14-21; 614:2-10. Dr. Thayer, who was a fact witness, *id.* at 594:7-8, provided *extensive* testimony about the methodologies and findings of the 2016 review, *id.* at 615:4-641:18. It would be unfair for EPA to elicit such testimony, and then bar Plaintiffs from doing so. Further, if Dr. Berridge's testimony ever does veer into impermissible expert terrain, a timely objection will cure the issue.

**C. Rule 403 Has Little, if Any, Applicability to Bench Trials, but, in Any Event, Does Not Provide a Basis to Exclude Dr. Berridge's Testimony**

EPA offers several arguments for why Dr. Berridge's testimony should be stricken under Federal Rule of Evidence 403. But nowhere in EPA's discussion does it acknowledge or grapple with the limited applicability of Rule 403 to bench trials. The Ninth Circuit has stated that Rule 403 has little to no applicability in bench trials. *United States v. Preston*, 706 F.3d 1106, 1117 (9th Cir. 2013) ("Rule 403 is inapplicable to bench trials."); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) ("[I]n a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial.").

Assuming *arguendo* that Rule 403 has applicability to the bench trial in this case, the three arguments that EPA marshals for excluding testimony pursuant to this Rule are meritless. First, EPA states

that the testimony will waste the Court's time because "the parties have informed the Court of the draft monograph's historical development throughout this case." Mot. at 4:7-9. EPA supports this statement by referencing various motions and briefs written by counsel, *id.* at 4:9-14, but motions and briefs are no substitute for competent trial evidence. Second, EPA argues Dr. Berridge's testimony is a waste of time because the parties' experts could provide similar testimony. *Id.* at 4:15-16. But no witness is as uniquely qualified to address these issues as Dr. Berridge. Further, Plaintiffs have no intention of wasting the Court's time by introducing needlessly cumulative testimony, particularly given the limited number of days allotted for trial. In any event, rulings on whether testimony is cumulative are best reserved for trial, when the testimony can be viewed in a specific factual context. Third, EPA speculates that allowing Dr. Berridge to testify could "sidetrack[] this trial" because EPA "would likely offer one or more rebuttal witnesses." Mot. at 5:13-14. This nebulous argument appears to contradict EPA's other contention that Dr. Berridge's testimony will be cumulative to what the experts (including EPA's experts) are prepared to address.

**D. There Is No Undue Prejudice to EPA**

There is no merit to EPA's argument that it will be unduly prejudiced if the Court permits Dr. Berridge to testify. EPA claims it "forewent certain discovery," including deposing Dr. Berridge, because of "the Court's relevancy determination." Mot at 5:27-28. Yet, as explained earlier, there was nothing about the Court's "relevancy determination" that barred EPA from deposing Dr. Berridge. EPA's decision to forego the deposition was a tactical decision, not a court mandate. Plaintiffs should not bear its price.

EPA claims that "Plaintiffs used the Court's relevancy determination as a shield to avoid producing a privilege log of withheld documents," but this too is incorrect. Mot at 6:11-13. After producing over 30,000 pages of FOIA materials, Plaintiffs simply sought clarification on why *EPA* had a "substantial need" for *attorney work product* when EPA was simultaneously taking the position that political interference was wholly irrelevant. Connett Decl. ¶ 3; EPA Mot. at 6:6-9.

EPA's motion should be denied.

7

December 16, 2023

Respectfully submitted,

*/s/ Michael Connett*
MICHAEL CONNETT
Attorney for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE
THE TESTIMONY OF BRIAN BERRIDGE

# Declaration of Michael Connett

1   C. ANDREW WATERS, ESQ., CA Bar No. 147259
    MICHAEL CONNETT, ESQ., CA Bar No. 300314
2   KAY REEVES, ESQ., *Pro Hac Vice*
    WATERS, KRAUS & PAUL
3   222 N. Pacific Coast Hwy, Suite 1900
    El Segundo, CA 90245
4   310-414-8146 Telephone
    310-414-8156 Facsimile
5
    *Attorneys for Plaintiffs*
6

7                    UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                          AT SAN FRANCISCO

9   FOOD & WATER WATCH, et al.,              )
                                             )   Civ. No. 17-CV-02162-EMC
10                          Plaintiffs,      )
                                             )   **DECLARATION OF MICHAEL**
11         vs.                               )   **CONNETT IN SUPPORT OF**
                                             )   **PLAINTIFFS' OPPOSITION TO**
12  U.S. ENVIRONMENTAL PROTECTION            )   **DEFENDANTS' MOTION TO**
    AGENCY, et al.                           )   **EXCLUDE THE TESTIMONY OF**
13                                           )   **BRIAN BERRIDGE**
                            Defendants.      )
14                                           )
                                             )
15                                           )

16         I am the lead attorney for Plaintiffs in the above-captioned case.  I make this statement based on

17  personal knowledge and I am competent to testify to the matters stated herein.

18         1.      On April 21, 2023, the Plaintiffs produced over 30,000 pages of documents to EPA in

19  response to EPA's document requests, including all of the documents Plaintiffs had obtained under the

20  Freedom of Information Act regarding HHS's efforts to both alter the wording/conclusions of NTP's

21  fluoride assessment and stall its publication.

22

23         2.      As part of the Plaintiffs' document production on April 21, 2023, Plaintiffs produced all

24  communications between Plaintiffs and former/current NTP officials, with the exception of a small subset

25  of communications that were to, or from, Plaintiffs' counsel that Plaintiffs asserted were protected under

26  the Attorney Work Product doctrine.

27         3.      I was the only attorney for Plaintiffs who met and conferred with EPA regarding the

28

                                            1

privilege issue. At no point during our discussions did I represent that Plaintiffs agreed with EPA that the political interference issue was irrelevant, or that any evidence which implicated political interference must necessarily be excluded from trial. Instead, I sought to clarify how EPA could claim, on one hand, that political interference is irrelevant while maintaining, on the other hand, that it had "substantial need" for Plaintiffs' attorney work product on this issue.

4.      At no point in this litigation has EPA's counsel ever asked to depose any of the NTP scientists, including Dr. Berridge, whom Plaintiffs disclosed in their Initial Disclosures on May 8, 2023.

5.      Attached as **Exhibit 1** is a true and correct copy of a letter that I downloaded from the National Institute of Environmental Health Sciences' (NIEHS) website.

6.      Attached as **Exhibit 2** is a true and correct copy of a webpage on the NIEHS's website that I accessed on December 10, 2023.

7.      Attached as **Exhibit 3** is a true and correct excerpt of documents produced by the National Institutes of Health in response to a Freedom of Information Act request.

8.      Attached as **Exhibit 4** is a true and correct copy of an email produced by the National Institutes of Health in response to a Freedom of Information Act request.

9.      Attached as **Exhibit 5** is a true and correct copy of an email produced by the National Institutes of Health in response to a Freedom of Information Act request.

10.     Attached as **Exhibit 6** is a true and correct copy of the document requests that EPA served on March 13, 2023.

11.     Attached as **Exhibit 7** is a true and correct copy of an email I sent to EPA on May 19, 2023. The exhibits to this email are attached to Exhibit B to Brandon Adkins' declaration.

12.     Attached as **Exhibit 8** is a true and correct excerpt of an email exchange I had with EPA's counsel in May 2023. The full email thread is attached as Exhibit C to Brandon Adkins' declaration.

I declare under penalty of perjury that the foregoing is true and correct.

DECLARATION OF MICHAEL CONNETT

Executed on December 16, 2023 in Seattle, Washington.

/s/ Michael Connett
MICHAEL CONNETT
Attorney for Plaintiffs

# Exhibit 1

28 April 2023


Kathleen M. Gray, PhD
Chair, NTP Board of Scientific Counselors
National Institute of Environmental Health Sciences


Dear Dr. Gray,

Thank you for the opportunity to provide comment on the outcomes of the recent National Toxicology Program's (NTP) Board of Scientific Counselors (BSC) Working Group Report on the Draft State of the Science Monograph and the Draft Meta-Analysis Manuscript on Fluoride.

As the former Scientific Director of the Division of Translational Toxicology (formerly, Division of the National Toxicology Program) at the National Institute of Environmental Health Sciences (NIEHS), I had the great privilege to work with the dedicated scientists who conducted the analyses and produced the reports that were the focus of this review.  These reports provide an important addition to our developing understanding of the potential for human health effects from exposure to fluoride.  The delay in their publication has been unfortunate and has prevented many from applying these analyses for personal, policy and regulatory decision-making.

I have been incredibly impressed with the commitment of the NIEHS scientists who conducted this work to ensure its scientific rigor, balanced representation and clear communication.  They have, from its inception, recognized the importance of these analyses, concerns about the validity of the data supporting them and the public health implications of them being misinterpreted or misused.  Those contextual challenges have been considered in the products that they have produced.  Additionally, they have recognized and represented that this work is a scientific hazard assessment rather than a risk assessment and have been careful to remain true to that important and discrete role.  Not everyone who has reviewed, critiqued or commented on these analyses recognizes that distinction which has contributed to the challenges they've experienced in progressing their work.

An important representation of these scientist's commitment to a scientifically rigorous product is reflected in their self-initiated review by the National Academies of Science, Engineering and Medicine (NASEM) of a systematic review that proposed a 'hazard classification' for fluoride as a neurodevelopmental toxin.  NASEM reviewers rightly challenged whether the existing evidence was sufficient to support the generalization of a hazard classification.  NIEHS scientists considered the useful feedback from the NASEM reviewers, applied their suggestions and narrowed their hazard assessment to where the data was strongest resulting in the current products.  The NASEM reviewers are to be commended for their thoughtful input.

I would also like to commend the members of the NTP BSC Working Group who reviewed the responses of the NIEHS scientists to additional reviews for their time, dedication and effort.  Dr. David Eaton, former Chair of the NTP BSC and Chair of this Working Group, and Dr. Mary Wolfe, DTT Deputy Director for Policy, Review and Outreach, are to be particularly commended for their tireless efforts in supporting the timely execution of this review.  The efforts and input of this Working Group will certainly improve the final products.

B2 Pathology Solutions LLC

Despite the rigor and transparency applied to the analyses represented in these scientific products, they are imperfect as are all scientific products.  Are they consistent with current standards of scientific practice.  Absolutely.  Can they be incrementally improved with additional review?  Likely.  Can they inform important decisions?  Absolutely.  Does a delay in their publication impact public health? Yes.

The inordinate and unprecedented challenge and review that have been applied to these products have, in my opinion, been obstructive.  Likewise, I don't believe that they are consistent with the White House Office of Science, Technology and Policy's (OSTP) policy aimed at protecting the integrity and independence of science (01-22 Protecting_the_Integrity_of_Government_Science.pdf (whitehouse.gov)).  Accordingly, the people who are most exposed to fluoride in their environment and most likely to be harmed by those exposures have been prevented from applying the learnings from these analyses because of concerns about the strength of the evidence for those that are less exposed. That doesn't particularly serve the most vulnerable very well.

Most unfortunate in the current debate is that we've known for over a decade that we needed more data to better understand the potential for harm to those who are exposed to levels of fluoride most common in the United States.  It is regrettable that we haven't put the effort into generating the data that would have better informed these analyses for those citizens.  Rather than continuing to challenge this work, the public health policy and research communities should focus on how best to communicate the certainties and uncertainties of this data, inform concerned citizens about possible responses and conduct the studies that would support more certainty.  This past year would have been better spent doing those things.

I've not seen anyone argue that there are people in this world (and even in the United States) that are exposed to levels of fluoride that could have health effects.  I don't personally know whether levels of exposure in the U.S. that are lower and more common are without potential for health effects and I expect no one else does either.  I think our commitment to our fellow citizens should be to do everything we can to generate the data to know whether there are potential harms and to manage our exposures to prevent them.  In the interim, we should inform those for whom the evidence is more certain.  Our science must certainly be rigorous but it must also be protected from inordinate challenge and obstruction when the outcomes challenge current beliefs.

Again, I appreciate the opportunity to comment.  I'm looking forward to the final publication of these important analyses.

Regards,



Brian R. Berridge, DVM, PhD, DACVP
Principal Consultant
B2 Pathology Solutions LLC

B2 Pathology Solutions LLC

# Exhibit 2

**National Toxicology Program**
U.S. Department of Health and Human Services

https://ntp.niehs.nih.gov/go/Publication_standards

# NTP Publication Aims and Scope

A primary aim of the National Toxicology Program (NTP) is to publish high-quality research that advances our understanding of the environmental causes and contributions to human disease. We are dedicated to advancing scientific knowledge about environmental health by making our publications, databases, and tools freely available.

Our readership includes, but is not limited to, state, federal, and international agencies, policy makers, nongovernmental organizations, health care professionals, educators, and others interested in environmental public health.

Our research products include reports and monograph that present results for toxicological studies as well as literature-based health hazard assessments and state of the science reports on environmental exposures of concern and health.

Our reports and monographs are developed by the NTP partners (FDA, NIOSH, NIEHS). All collaborators and contributors are listed in the "About this Report" section, including their roles in the research and development of each report or monograph.

## Peer Review Process

The NIEHS/Division of Translational Toxicology (NIEHS/DTT) provides technical support and manages the process for timely peer review and publication of NTP reports and monographs. Publication policies are established and upheld by the governing body including:

- Associate Director, NTP and Scientific Director, NIEHS/DTT
- Director, NIEHS/DTT Office of Policy, Review, and Outreach (OPRO)
- Lead, NIEHS/DTT/OPRO/Peer Review Unit
- Lead, Pathology Coordinator
- Series Coordinator, Report on Carcinogens
- Series Coordinator, NTP Technical Reports
- Series Coordinator, NTP Developmental & Reproductive Toxicity Reports
- Series Coordinator, NTP Immunotoxicity Reports

- Series Coordinator, NTP Monographs
- Series Coordinator, NTP Research Reports
- Director, NIEHS Ethics Office (as needed)

NTP reports and monographs are developed by a team of subject matter experts from NTP partner agencies and undergo rigorous "open" peer review where the governing body and reviewers know the identity of the collaborators and contributors of the draft documents. Based on the reviewers' comments and appraisals of the draft report, the Series Coordinator recommends a decision (reject, revise, accept) to the Associate Director, NTP-Scientific Director, NIEHS/DTT. The Peer Review Unit may also seek feedback from additional reviewers if needed. Based on the totality of these recommendations, the Associate Director, NTP and Scientific Director, NIEHS/DTT makes a final decision. Multiple rounds of revisions to documents may be necessary before a final decision can be reached.

The NIEHS/DTT Office of Policy, Review, and Outreach oversees the peer review process. An experts directory with self-identified areas of expertise is maintained and used to identify potential reviewers for reports and monographs.

NTP Reports and Monographs series are published by the National Toxicology Program, Research Triangle Park, NC, and are freely available to the public.

NTP publication policies are established, maintained, and upheld by the governing body. Questions concerning the governing body should be directed to the Office of Policy, Review, and Outreach, Division of Translational Toxicology, NIEHS.

# Publication Ethics

▶ **Copyright and Licensing**
▶ **Authorship and Contributorship**
▶ **Collaborators and Contributors**
▶ **Reviewers**
▶ **Data Sharing and Reproducibilitys**
▶ **Ethical Oversight**
▶ **Post-publication Discussion and Corrections**
▶ **Conflicts of Interest**
▶ **Continuous Publication**
▶ **Open Access**

▶ **Archiving**

▶ **Electronic Publication ISSNs**

---

Web page last updated on March 7, 2023

NTP is headquartered administratively at the National Institute of Environmental Health Sciences, part of the National Institutes of Health

# Exhibit 3





# Briefing to OASH and OSG on Revised NTP Monograph on Fluoride

Brian R. Berridge, DVM, PhD, DACVP

NTP Associate Director and Scientific Director, Division of the National
Toxicology Program, National Institute of Environmental Health Sciences

September 18, 2020

FWW_PT_0001864

# National Toxicology Program
## NIDCR Briefing

Brian R. Berridge, DVM, PhD
Associate Director, NTP
Scientific Director, Division of NTP, NIEHS
November 13, 2020

FWW_PT_0019655



NTP
National Toxicology Program

Restricted Use/Recipients Only

**From:** Briss, Peter (CDC/DDNID/NCCDPHP/OD) <pxb5@cdc.gov>
**Sent:** Wednesday, March 2, 2022 11:20 AM
**To:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>; Philip, Celeste M. (CDC/DDNID/OD) <fhd7@cdc.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Subject:** RE: A chance to meet

probably

**From:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Sent:** Wednesday, March 2, 2022 11:13 AM
**To:** Philip, Celeste M. (CDC/DDNID/OD) <fhd7@cdc.gov>; Briss, Peter (CDC/DDNID/NCCDPHP/OD) <pxb5@cdc.gov>; Hannan, Casey J. (CDC/DDNID/NCCDPHP/DOH) <clh8@cdc.gov>
**Subject:** FW: A chance to meet

Here is some info
Brian R. Berridge, D.V.M., Ph.D., D.A.C.V.P.
Scientific Director, Division of the National Toxicology Program;
Associate Director, National Toxicology Program

I don't think it is an issue to have him there but I worry that this will get very specific and neither Celeste nor I will have that level of detail. Do we want to say yes and also invite Peter?

**From:** Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>
**Sent:** Tuesday, March 1, 2022 6:32 PM
**To:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Cc:** Philip, Celeste M. (CDC/DDNID/OD) <fhd7@cdc.gov>
**Subject:** RE: A chance to meet

Dear Karen,

I'm happy to meet with you.  Would you mind if I included Brian Berridge in our conversation—he needs to hear directly from you what your concerns are.

Thanks,
Rick

**From:** Hacker, Karen (CDC/DDNID/NCCDPHP/OD) <pju3@cdc.gov>
**Sent:** Tuesday, March 1, 2022 5:47 PM
**To:** Woychik, Rick (NIH/NIEHS) [E] <rick.woychik@nih.gov>
**Cc:** Philip, Celeste M. (CDC/DDNID/OD) <fhd7@cdc.gov>
**Subject:** A chance to meet

FWW_PT_002200

Dear Dr. Woychik,

I am reaching out to you in my capacity as Director of CDC's National Center for Chronic Disease Prevention and Health Promotion. As you may be aware, NIEHS and NTP staff have been corresponding and sharing draft documents about the recent fluoride monograph, the state of the science report, meta-analysis, and timeline for publication with our Center's Medical Director, Dr. Peter Briss, and Division of Oral Health Director, Mr. Casey Hannan. We have been providing feedback and appreciate efforts to apprise us of the progress.

However, as things have progressed, we have some concerns we'd like to discuss and would welcome the opportunity to connect with you directly. I would like to include Dr. Celeste Philip, the CDC Deputy Director for Non-Infectious Diseases (and my supervisor).

I hope we can schedule a virtual meeting soon. Please let me know if you have someone who handles your calendar.

Thank you and I look forward to hearing from you.

Sincerely,

Karen Hacker, MD, MPH


Karen Hacker, MD MPH
Director, National Center for Chronic Disease Prevention and Health Promotion (NCCDPHP)
Centers for Disease Control and Prevention
Phone: 770.488.5401
E-Mail: khacker@cdc.gov
Executive Assistant: Shantelle Graham
E-Mail: sln3@cdc.gov
On the web @ www.cdc.gov/chronicdisease/index.htm
Follow NCCDPHP on Twitter



Join the conversation!

NATIONAL CENTER FOR CHRONIC DISEASE
PREVENTION AND HEALTH PROMOTION
www.cdc.gov

This e-mail message is intended for the exclusive use of the recipient(s) named above. It may contain information that is deliberative or confidential, and it should not be disseminated, distributed, or copied to persons not authorized to receive such information. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think you have received this e-mail message in error, please notify the sender immediately.

**To:** Woychik, Rick (NIH/NIEHS) [E] (b)(6) Schwetz, Tara (NIH/OD) [E]
(b)(6)
**Cc:** Wolfe, Mary (NIH/NIEHS) [E] (b)(6)
**Subject:** Slides for briefing with ASH

Rick, Tara,

Attached are a draft set of slides to support the ASH briefing next week. Mary has done the bulk of the work here with a few refinements from me.

We developed these slides with the presumption that the aim of this briefing is to update the ASH from our last briefing with her (12.21.2022) reminding her of the evolution of these reports, their outcomes, the process of interagency and peer review and a timeline for publication (mostly TBD) and communication.

Mary is out of the office for the duration of the holiday weekend. I will be out starting tomorrow. We will both be monitoring email and will respond to suggestions for improvement.

As an aside to this, we've been going through significant iterations of the text for communications related to the SoS document. Since that document won't be published until after we get feedback from the ASH, we propose to suspend those iterations until we get additional feedback. Do you have any issues with that?

Brian


Brian R. Berridge, DVM, PhD, DACVP
Scientific Director, National Toxicology Program Division
Associate Director, NTP
National Institute of Environmental Health Sciences
National Institutes of Health
Research Triangle Park, NC
Office: (b)(6)
Mobile: (b)(6)

# Exhibit 4

**From:** Berridge, Brian (NIH/NIEHS) [E] (b)(6)
**Sent:** Wednesday, May 25, 2022 10:25 AM
**To:** Woychik, Rick (NIH/NIEHS) [E] (b)(6)                          Schwetz, Tara (NIH/OD) [E]
(b)(6)
**Cc:** Wolfe, Mary (NIH/NIEHS) [E] (b)(6)
**Subject:** Re: Slides for briefing with ASH

It is indeed my understanding that NIDCR has been engaged throughout this process providing feedback most of the time with that first review of the SoS being an exception. If memory serves, Rena shared that it was a time when they were shorthanded and had a lot going on.

We can make this more concise in either/or its content or its presentation. The detail could be available as pre-read with a very concise overview allowing for more discussion than didactic presentation.

We can certainly provide an overview of peer reviewer responses for usual products (some of that occurred here) with insights into the uniqueness of the reviews and responses for these products. As I've shared, this experience is unprecedented.

We've not been privy to the actual invitation so we're shooting in the dark. We're happy to include whatever you think is most appropriate given the ASH's aims for this discussion.

Brian

**From:** "Woychik, Rick (NIH/NIEHS) [E]" (b)(6)
**Date:** Wednesday, May 25, 2022 at 10:06 AM
**To:** "Berridge, Brian (NIH/NIEHS) [E]" (b)(6)                          "Schwetz, Tara (NIH/OD) [E]"
(b)(6)
**Cc:** "Wolfe, Mary (NIH/NIEHS) [E]" (b)(6)
**Subject:** RE: Slides for briefing with ASH

Tara,

Were you looking for a more concise presentation since we have only 30 minutes, or is this what you were looking for?

This clearly shows that the SoS was shared with NIDCR, but apparently there were never any responses that were received back. Brian, is that indeed the case?

Also, I think it would be useful to have a slide to describe how input from the peer reviewers, and from other agencies, is managed, i.e. how is a decision made to accept the comments coming in from the reviewers?

Rick

**From:** Berridge, Brian (NIH/NIEHS) [E] (b)(6)
**Sent:** Wednesday, May 25, 2022 8:57 AM

# Exhibit 5

**To:** Tara Schwetz < [(b) (6)] >, "Woychik, Rick (NIH/NIEHS) [E]" < [(b) (6)] >, Larry Tabak < [(b) (6)] >
**Cc:** "Wolfe, Mary (NIH/NIEHS) [E]" < [(b) (6)] >
**Subject:** Re: NTP monograph on the state of the science

Hi Tara,

Thanks for your input and I'm sorry that you had to take your time to review these documents.  I've looked very briefly at your input and am not seeing anything that we haven't considered and adjudicated previously (with no intent to undermine the value of your input).

I will confess that I inherited this work and have no real skin in the game other than supporting the scientists in my Division who have produced it including ensuring that they are adhering to all relevant policies and standards of practice but also have the freedom to operate as independent scientists.

I have significant concerns that the level of engagement on this scientific product has crossed the line from rigorous peer review to ensure balance and accuracy to one that could be construed as attempting to influence the outcomes.  No doubt that this is a sensitive issue but I would like to think that much of what NIH produces has the potential for significant public health impact or we should be questioning why we're doing it.  We don't put all our products through this level of review.  After 17 years in industry, I've seen efforts to modify messages to fit commercial interests.  I wasn't party to that there and I'm not game to do that here.

I would like for a few key principals to get together and have a frank conversation about this.  I would like to feel more comfortable that we're still within the bounds of protecting scientific integrity with this.  It could be the discussion that Tara suggests below.

Brian


Brian R. Berridge, DVM, PhD, DACVP
Scientific Director, National Toxicology Program Division
Associate Director, NTP
National Institute of Environmental Health Sciences
National Institutes of Health
Research Triangle Park, NC
Office: [(b) (6)]
Mobile: [(b) (6)]


**From:** "Schwetz, Tara (NIH/OD) [E]" < [(b) (6)] >
**Date:** Thursday, May 12, 2022 at 8:01 AM
**To:** "Woychik, Rick (NIH/NIEHS) [E]" < [(b) (6)] >, "Tabak, Lawrence (NIH/OD) [E]"
< [(b) (6)] >
**Cc:** "Berridge, Brian (NIH/NIEHS) [E]" < [(b) (6)] >, "Wolfe, Mary (NIH/NIEHS) [E]"
< [(b) (6)] >
**Subject:** Re: NTP monograph on the state of the science

Rick,

FWW_PT_002302

# Exhibit 6

TODD KIM
Assistant Attorney General

BRANDON N. ADKINS
PAUL A. CAINTIC
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov

(Additional counsel listed with signature)

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 17-CV-02162 EMC <br><br> **EPA'S POST-TRIAL REQUESTS FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION** |

Pursuant to Federal Rule of Civil Procedure 34, Defendants request that Plaintiffs produce to the United States the following documents and electronically stored information ("ESI") in their possession, custody, or control within thirty days after service.

## GENERAL INSTRUCTIONS

"Documents" throughout these requests includes all items within the scope of Federal Rule of Civil Procedure 34.

The documents requested shall be produced in a searchable PDF form, where possible. Where not possible, the parties will meet and confer regarding the appropriate, proportional, and reasonable format of production.

## REQUESTS FOR PRODUCTION

1.      All documents that Plaintiffs may use to support their claims or defenses.

2.      All documents supporting the allegations in the complaint.

3.      All communications with any person likely to have discoverable information.

4.      All documents pertaining to or evidencing the identity of persons having knowledge of relevant facts or discoverable matters concerning any claims or defenses that have been asserted in this action.

5.      All written or recorded statements or affidavits from any person who is a non-party, whether or not signed, regarding any matters that are relevant to claims or defenses in this action.

6.      All documents regarding any funding by Plaintiffs of any report, study, or document that Plaintiffs may use to support their claims.

7.      All documents interpreting any report, study, or document Plaintiffs may use to support their claims that was originally written in a non-English language.

8.      All documents that relate to the National Toxicology Program's Systematic Review and Meta-analysis on fluoride exposure and neurodevelopmental and cognitive health effects, including any drafts thereof.

9.      All communications between any of the Plaintiffs, including any members of any of the Plaintiff organizations or their counsel, and former or current employees of or that are or

1

were affiliated with the National Institute of Environmental Health Sciences or the National Toxicology Program.

10.     All documents that relate to the National Toxicology Program's Systematic Review and Meta-analysis on fluoride exposure and neurodevelopmental and cognitive health effects, and any drafts thereof, including, but not limited to, any that came into Plaintiffs' possession, custody, or control directly or indirectly from any request under the federal Freedom of Information Act, or any other federal public records laws.

11.     All documents that relate to the National Toxicology Program's Systematic Review and Meta-analysis on fluoride exposure and neurodevelopmental and cognitive health effects, and any drafts thereof, including, but not limited to, any that came into Plaintiffs' possession, custody, or control directly or indirectly from any request under the California Public Records Act, or any public records law of any state.

Date: March 13, 2023                                   Respectfully Submitted,
Washington, D.C.

                                                      TODD KIM
                                                      Assistant Attorney General

                                                      /s/ Brandon N. Adkins
                                                      BRANDON N. ADKINS
                                                      PAUL CAINTIC
                                                      U.S. Department of Justice
                                                      Environment & Natural Resources Division
                                                      Environmental Defense Section
                                                      P.O. Box 7611
                                                      Washington, DC. 20044-7611
                                                      (202) 616-9174 (phone)
                                                      (202) 514-8865 (fax)
                                                      Brandon.Adkins@usdoj.gov

                                                      STEPHANIE M. HINDS
                                                      U.S. Attorney

                                                      EMMET P. ONG
                                                      Assistant United States Attorney
                                                      Northern District of California
                                                      1301 Clay Street, Suite 340S
                                                      Oakland, CA 94612-5217

                                                      *Attorneys for Defendants*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of March, 2023, a true and correct copy of EPA's Post-Trial Requests for Production of Documents and Electronically Stored Information was served on counsel for Plaintiffs via email.

_/s/ Brandon N. Adkins_
Brandon N. Adkins
United States Department of Justice

**Exhibit 7**

| **Subject:** | Re: [EXTERNAL] FWW v EPA - Discovery Dispute/Stipulation |
|---|---|
| **Date:** | Friday, May 19, 2023 at 9:08:50 AM Pacific Daylight Time |
| **From:** | Michael Connett |
| **To:** | Adkins, Brandon (ENRD) |
| **Attachments:** | image483654.jpg, image144580.jpg, 2022_04_28.pdf, 2022_05_11a.pdf, 2022_05_11b.pdf, 2022_05_11c.pdf, 2022_05_12a.pdf, 2022_05_12b.pdf, 2022_05_12c.pdf, 2022_06_03a.pdf, 2022_06_03b.pdf |

Under our proposal, Plaintiffs would agree to forego all further discovery on past political interference with the NTP. Plaintiffs would also agree to forego introducing any evidence at trial, other than the attached emails, of past political interference with NTP. For example, Plaintiffs would agree to forego putting up any fact witnesses at trial—including, but not limited to, current/former NTP employees—regarding the past political pressures on NTP. This agreement would be reflected in, inter alia, an amended Initial Disclosure by Plaintiffs.

In exchange, EPA would agree to (1) withdraw its request for attorney emails, and (2) forego any authenticity or hearsay objections to the attached emails at trial. That said,  EPA would reserve all rights to move the Court to exclude the attached emails on relevance or any other grounds besides authenticity/hearsay.

Please let me know if EPA would like to move forward with this.

Thanks,
Michael

**waterskraus**paul

**Michael Connett  | Partner**
222 N Pacific Coast Highway, Suite 1900 **|** El Segundo, CA 90245
Toll Free 800-226-9880 **|** Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com **|** www.waterskrauspaul.com

**From:** Michael Connett <mconnett@waterskraus.com>
**Date:** Thursday, May 18, 2023 at 2:33 PM
**To:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Subject:** Re: [EXTERNAL] FWW v EPA - Discovery Dispute/Stipulation

Yes, that works. I'll look for your call.

**waterskraus**paul

**Michael Connett  | Partner**
222 N Pacific Coast Highway, Suite 1900 **|** El Segundo, CA 90245
Toll Free 800-226-9880 **|** Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com **|** www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Sent:** Thursday, May 18, 2023 1:47:34 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Subject:** Re: [EXTERNAL] FWW v EPA - Discovery Dispute/Stipulation

# Exhibit 8

| | |
|---|---|
| **Subject:** | Re: Food & Water Watch v EPA - Attorney Work Product Doctrine |
| **Date:** | Tuesday, May 23, 2023 at 1:23:35 PM Pacific Daylight Time |
| **From:** | Michael Connett |
| **To:** | Adkins, Brandon (ENRD) |
| **CC:** | Kay Reeves, Andrew Waters, Ong, Emmet (USACAN), Caintic, Paul (ENRD) |
| **Attachments:** | image001.jpg, image692984.jpg |

I appreciate the update regarding EPA's position.

I can confirm that all of the withheld communications relate to the political interference issue at NTP, and are only responsive to EPA Doc Request No. 9.

I'll look to speak further about the scheduling issues tomorrow.

Best,
Michael

**waters**kraus**paul**

**Michael Connett  | Partner**
222 N Pacific Coast Highway, Suite 1900 | El Segundo, CA 90245
Toll Free 800-226-9880 | Phone 310-414-8146
Fax 310-414-8156
mconnett@waterskraus.com | www.waterskrauspaul.com

**From:** Adkins, Brandon (ENRD) <Brandon.Adkins@usdoj.gov>
**Date:** Monday, May 22, 2023 at 4:19 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Kay Reeves <kreeves@waterskraus.com>, Andrew Waters <waters@waterskraus.com>, Ong, Emmet (USACAN) <Emmet.Ong@usdoj.gov>, Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

[CAUTION]: External Email

Michael,

Thank you for conferring with us over a potential resolution of Plaintiffs' work-product claim. We have considered Plaintiffs' latest proposal and cannot accept. We have given this issue further consideration more generally and, subject to receiving written confirmation from you about the subject of the withheld materials as I explain below, believe further discussions on this topic are not necessary.

After we served EPA's post-trial requests for production, the Court held at the April 11, 2023, status conference that the second trial in this case will concern the merits of scientific studies that have become available since the first trial and ruled that alleged "political influence" concerning the National Toxicology Program's fluoride monograph or meta-analysis is not relevant to that inquiry.

We have not received a privilege log from Plaintiffs for the withheld materials. Based on our conferences and email correspondence with you, however, we understand that the withheld materials

are emails that relate to Plaintiffs' claim of alleged "political influence." Because the Court has now held that this issue is not relevant—and upon receiving written confirmation from Plaintiffs that the withheld materials solely relate to the issue of alleged "political influence" and are not otherwise responsive to EPA's post-trial requests for production—we will not insist that Plaintiffs prepare a privilege log or produce the withheld materials. We reserve the right to demand a privilege log and production of the withheld materials and to request additional time to take discovery on the issue if the Court reverses its relevancy decision later in the case.

Please confirm at your earliest convenience that the withheld materials relate solely to the issue of alleged "political influence" concerning publication of the NTP monograph or meta-analysis and are not otherwise responsive to EPA's post-trial requests for production. Upon your written confirmation, that should resolve this issue.

With respect to Plaintiffs' request to schedule depositions with certain EPA employees, let's plan to confer after you and Emmet complete your attorney conference this Wednesday regarding the FOIA litigation. Paul and I will join the line after you and Emmet wrap up.

Thanks again.

Best,
Brandon

‾‾‾‾‾
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov

**From:** Adkins, Brandon (ENRD)
**Sent:** Monday, May 15, 2023 3:00 PM
**To:** Michael Connett <mconnett@waterskraus.com>
**Cc:** Kay Reeves <kreeves@waterskraus.com>; Andrew Waters <waters@waterskraus.com>; Ong, Emmet (USACAN) <EOng@usa.doj.gov>; Caintic, Paul (ENRD) <Paul.Caintic@usdoj.gov>
**Subject:** RE: Food & Water Watch v EPA - Attorney Work Product Doctrine

Michael,

Thanks for your email. We don't understand what you mean by "these communications," because Plaintiffs have not satisfied their obligation under Rule 26(b)(5). Upon receiving Plaintiffs' privilege log, we will of course confer with you over any materials we believe should be produced.

Best,
Brandon

‾‾‾‾‾
**Brandon N. Adkins**
United States Department of Justice
Environment and Natural Resources Division
(202) 616-9174 | brandon.adkins@usdoj.gov