TODD KIM
Assistant Attorney General

BRANDON N. ADKINS
PAUL A. CAINTIC
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174 (Adkins)
Tel: (202) 514-2593 (Caintic)
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Paul.Caintic@usdoj.gov

ISMAIL J. RAMSEY
United States Attorney
MICHELLE LO
Chief, Civil Division
EMMET P. ONG
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 17-CV-02162-EMC <br><br> **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR SECOND PHASE OF TRIAL** |

Defendants' Proposed Findings of Fact and
Conclusions of Law for Second Phase of Trial
Case No. 17-cv-02162 EMC

In July 2020, Defendants filed their Post-Trial Proposed Findings of Fact and Conclusions of Law. ECF No. 255. EPA does not repeat its post-trial proposed findings of fact here. The following Findings of Fact are focused on EPA's presentation at the second phase of trial.

**FINDINGS OF FACT FOR SECOND PHASE OF TRIAL**

**I.    NTP DRAFT MONOGRAPH AND META-ANALYSIS MANUSCRIPT**

1. In 2016, the National Toxicology Program ("NTP") initiated a systematic review to evaluate neurobehavioral health effects from exposure to fluoride during development through examination of human studies, experimental animal studies, and mechanistic data.

2. In 2019, NTP submitted a draft of its systematic review (what the parties have referred to as the draft monograph) for peer review by the National Academies of Science, Engineering, and Medicine ("NASEM").

3. In 2020, the NASEM committee released its review, which concluded that the draft monograph was not adequately supported.

4. The NTP authors revised the draft, including by adding a meta-analysis, and submitted a second draft to NASEM for review.

5. In 2021, the NASEM committee released its second review, which stated that the monograph's assessment was not adequately supported.

6. The NASEM committee's second report cautioned that the NTP monograph "needs to emphasize that much of the evidence presented comes from studies that involve relatively high fluoride concentrations and that the monograph cannot be used to draw conclusions regarding low fluoride exposure concentrations (less than 1.5 mg/L), including those typically associated with drinking water fluoridation."

7. NTP subsequently revised the monograph and split the document into a State of the Science Monograph and a separate meta-analysis manuscript.

8. The documents underwent internal review by various Department of Health and Human Services entities and external peer review.

9. The NTP Director charged the Board of Scientific Counselors ("BSC") to adjudicate the peer and agency reviewers' concerns and the NTP authors' responses regarding the monograph and meta-analysis manuscript.

10. In May 2023, a BSC Working Group finalized a report on the documents. The BSC report includes interagency review comments, the NTP authors' responses to those comments, and the BSC Working Group's assessment of the NTP authors' responses.

11. In response to the interagency review comments, the NTP authors repeatedly stated that the scientific literature about fluoride's potential effects at low doses is inconsistent. For example, the NTP authors "tend to agree" that studies of fluoride exposures relevant to U.S. drinking water are "inconclusive" and that "more studies at lower exposure levels are needed to fully understand potential associations at fluoride levels in drinking water typically found in the United States (< 1.5 mg/L)."

12. The draft monograph and meta-analysis manuscript have been finalized or published but interim drafts have been made public.

13. In drafts of the monograph dated May and September 2022, the NTP authors state unequivocally that the evidence of potential effects of low doses of fluoride on children's intelligence is "unclear."

14. The draft provides in relevant part (emphasis added):

> Associations between lower total fluoride exposure [e.g., represented by populations whose total fluoride exposure was lower than the WHO Guidelines for Drinking-Water Quality of 1.5 mg/L of fluoride (WHO 2017)] and children's IQ remain unclear. More studies are needed to fully understand potential associations in ranges typically found in the United States (i.e., < 1.5 mg/L in water).

15. In the May 2022 draft monograph, the NTP authors conclude there is "low confidence" that fluoride exposure is associated with non-IQ neurodevelopmental and cognitive effects.

16. The NTP authors also conclude that there is "low confidence" that fluoride exposure is associated with adverse effects on adult cognition.

17. Finally, the NTP authors conclude, "Existing animal studies provide little insight into the question of whether fluoride exposure affects IQ."

## II.   PRIMARY RESEARCH SINCE THE FIRST TRIAL

18. Several studies published since the June 2020 trial raise further doubt that water fluoridation at 0.7 mg/L poses an unreasonable risk of human neurotoxicity.

19. Since the first trial a prospective cohort study of the association of low doses of fluoride on children's IQ from Spain published in 2022 in the peer-reviewed journal Environmental Research. The lead author is Dr. Jesús Ibarluzea

20. The parties refer to the cohort has "INMA," which is short for Infancia y Medio Ambiente.

21. The study focuses on a sub-cohort in the province of Gipuzkoa, which is the area that had an active community drinking water fluoridation program in place.

22. The INMA IQ study examined the relationship between mothers' urinary fluoride concentration, adjusted for dilution, and their offsprings' intelligence scores. The study had a large sample size and controlled for relevant confounders, including maternal IQ.

23. The INMA IQ study is of equal quality to the Canada and Mexico City cohort studies that were the focus of the first trial.

24. The INMA IQ study found no statistically significant adverse effect of fluoride on the IQ of boys, girls, or boys and girls combined.

25. The INMA IQ study found a statistically significant beneficial association between maternal urinary fluoride and IQ outcomes by some measures.

26. Since the first trial, another fluoride study from the INMA cohort was published in the journal Environmental Research considering potential associations between prenatal maternal urinary fluoride and systems associated with attention-deficit/hyperactivity disorder ("ADHD") in the offspring.

27. The INMA ADHD study found no statistically significant adverse relationship between fluoride exposure and ADHD symptoms.

28. Another high-quality prospective cohort study of fluoride and children's IQ was published in the Odense Child Cohort ("OCC") from Denmark.

29. The OCC study also examined the relationship between a mother's urinary fluoride concentration, adjusted for dilution, and their offsprings' IQ scores.

30. The OCC study had a large sample size and controlled for relevant confounders.

31. The OCC study found no statistically significant adverse effect of fluoride on the IQ of boys, girls, or boys and girls combined.

32. The INMA and OCC cohort studies are of equal quality to the MIREC and ELEMENT studies presented at the first trial.

33. The NTP draft monograph does not include the INMA or OCC studies because they were published after the monograph's literature cut-off date.

34. Another study was conducted in the Programming Research in Obesity, Growth, Environment, and Social Stress ("PROGRESS") Cohort. While technically a prospective cohort study, the PROGRESS Cohort looked at participants' self-reported answers to food and drink frequency questionnaires to estimate fluoride exposure instead of using a urinary biomarker. Maternal fluoride intake was not associated with any statistically significant IQ decrements on boys and girls combined. When stratified by sex, maternal fluoride intake had no statistically significant association with IQ decrements in girls. Further, maternal fluoride intake had no statistically significant association with IQ decrements in boys at 12 months of age. Maternal fluoride intake was significantly associated with *cognitive* IQ decrements in boys at 24 months of age, but statistically significant *language* and *motor* IQ decrements in 24-month-old boys were not observed. Overall, this study indicates a lack of effect of fluoride on children's cognitive ability.

35. Several cross-sectional studies have been published since the first trial. Those that look at low-fluoride exposures (< 1.5 mg/L) cast further doubt on fluoride being a developmental neurotoxicant at doses associated with U.S. water fluoridation.

36. Dewey et. al. (2023) was a natural experiment conducted in Calgary, Canada when the city stopped fluoridating its drinking water—a change that occurred in 2011. The authors identified infants who were prenatally exposed to fluoridated water throughout the pregnancy, exposed for part of the pregnancy, or exposed for none of their pregnancy, depending on when in relation to 2011 the mother became pregnant. The drinking water fluoride level was 0.7 mg/L. The authors found no association between exposure to fluoridated drinking water and IQ, with null findings for IQ subtests and for boys and girls analyzed separately. No association was found between fluoride exposure and working memory or cognitive flexibility. This study provides meaningful evidence against an adverse effect of water fluoridation.

37. Do et al. (2022) measured fluoride exposure based on children's place of residence and whether that area fluoridated its drinking water. Over 2,600 children aged 5-10 were included in the analysis and assigned fluoridation status based on where they lived at ages 0-5. The exposure index was "lifetime exposure to fluoridated water," and classified as 0% if there was no exposure to fluoridated water, >0-<100% if there was some but not complete exposure to fluoridated water, or 100% if always exposed to fluoridated water. Overall, there were no indications that greater exposure to fluoridated water was associated with poorer behavioral outcomes.

38. In addition to the INMA study of fluoride and ADHD, several other studies have been published since the first trial on fluoride exposure and neurobehavioral outcomes. On balance, there is little corroboration or consistency between the findings of these studies.

39. On the whole, the scientific literature about low-dose fluoride exposures does not support the conclusion that water fluoridation at 0.7 mg/L poses a risk of neurodevelopmental harm.

III.   **NO UNREASONABLE RISK UNDER THE CONDITION OF USE**

40. The scientific evidence for evaluating the risk of developmental neurotoxic effects from exposure to fluoride, especially considering the more recent scientific studies published after the first trial, is insufficient to reach an informed risk determination under TSCA.

41. Under TSCA section 6(b), EPA undertakes a risk evaluation process to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment.

42. Prior to the 2016 amendments to TSCA, chemical substance risk assessments did not include a determination of unreasonable risk. Instead, the determination of "unreasonable risk" was made as part of the risk management rulemaking process.

43. The amended statute now requires that a risk evaluation include a risk assessment as well as the EPA's determination of unreasonable risk.

44. Risk assessment is the process by which scientific judgments are made concerning the potential for toxicity in humans.

45. Risk assessment involves a hazard assessment (which includes a hazard identification and dose-response assessment), exposure assessment, and risk characterization.

46. The risk assessment and the risk determination make up the risk evaluation.

47. Most significantly, the risk evaluation requires that this determination be independent of consideration of cost or other non-risk factors.

48. Plaintiffs did not complete a TSCA risk evaluation or any scientifically sound risk assessment.

49. <u>Hazard Assessment</u>. A hazard assessment includes two components: hazard identification and dose-response assessment. Hazard identification is the determination of whether a particular chemical is or is not causally linked to a particular health effect. Dose-response assessment is the determination of the relation between the magnitude of exposure and the probability of occurrence of the health effects in question.

50. This step requires identification, evaluation, and synthesis of information to describe the health effects of individual chemical substances or mixtures. In the dose-response assessment, the relationship between the exposure or dose of a contaminant and the occurrence of health or environmental effects or outcomes is assessed. The response assessed might be incidence of some endpoint or outcome or it might describe the magnitude of a response. The

approaches employed for these components, including, for example, the level of detail and complexity of quantitative aspects, may vary across different risk assessments. Thus, TSCA subsections 26(h) and (i) require that all information used in TSCA section 6 risk evaluation be reviewed consistent with reliance on the best available science and a weight of the scientific evidence approach.

51. The existing scientific studies do not provide sufficient evidence that low-dose fluoride exposure is associated with community water fluoridation in the United States for purposes of supporting a hazard assessment in a TSCA risk evaluation.

52. The evidence of adverse neurological effects is conflicting and not coherent across the critical prospective cohort studies, which prevent a conclusion regarding the presence or absence of an effect.

53. The dose-response data are deficient and thus insufficient for risk assessment.

54. Plaintiffs' proffered dose-response evidence of developmental neurotoxicity has several critically deficient issues that prohibit its use in a risk estimate, including a lack of rationale for linear extrapolation at low doses, which was a concern raised by the NTP BSC Working Group when reviewing the draft NTP monograph and meta-analysis manuscript.

55. In addition, there remain issues with extrapolation from urinary biomarkers of fluoride to intake and intake concentrations affecting all the epidemiological prospective cohort studies of fluoride. Urinary biomarkers are not the same as intake concentration measures, and it is currently impossible to extrapolate that information with any precision.

56. <u>Exposure Assessment</u>. TSCA requires that EPA "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use" when conducting a risk evaluation, which EPA implements through an exposure assessment. 15 U.S.C. § 2605(b)(4)(F)(iv).

57. An exposure assessment includes information on chemical-specific factors, including, but not limited to, physical-chemical properties and environmental fate and transport parameters. An exposure assessment, where relevant, includes some discussion of the magnitude,

nature, duration, intensity, frequency, pattern, and number of exposures under the conditions of use. It should also include types of individuals or populations exposed to the agent, as well as discussion of the uncertainties in this information. Using reasonably available information, exposures will be estimated (usually quantitatively) for the identified conditions of use.

58. Plaintiffs failed to conduct an exposure assessment of fluoride in public drinking water (including artificially fluoridated and naturally occurring fluoride) and other fluoride source contributions.

59. <u>Risk Characterization</u>. When examining developmental neurotoxicity, risk characterization requires that the hazard assessment, including hazard identification and dose-response analysis, and exposure assessment for given populations be combined to estimate the risk for a particular endpoint (e.g., developmental neurotoxicity).

60. The goal of risk characterization is to compare toxicity levels with exposure doses to determine if risk may occur under a specific scenario or condition of use.

61. To estimate noncancer risks under TSCA, EPA uses a margin of exposure ("MOE") approach. The MOE is the point of departure ("POD") (an approximation of the no-observed adverse effect level ("NOAEL") or benchmark dose level ("BMDL")) for a specific health endpoint divided by the exposure concentration for the specific scenario of concern. The POD (numerator) and relevant exposure concentration (denominator) must be in the same units (for example, mg/kg/day).

62. The resulting MOEs are then compared to a benchmark MOE. The benchmark MOE accounts for the total uncertainty in a POD, including, as appropriate: (1) the variation in sensitivity among the members of the human population (i.e., intra-human/intra-species variability); (2) the uncertainty in extrapolating animal data to humans (i.e., interspecies variability); (3) the uncertainty in extrapolating from data obtained in a study with less-than-lifetime exposure to lifetime exposure (i.e., extrapolating from subchronic to chronic exposure); and (4) the uncertainty in extrapolating from a lowest observed adverse effect level ("LOAEL") rather than from a NOAEL.

63. A lower benchmark MOE (e.g., 30) indicates greater certainty in the data (because fewer of the default uncertainty factors relevant to a given POD as described above were applied). A higher benchmark MOE (e.g., 1000) would indicate more uncertainty for specific endpoints and scenarios. However, these are often not the only uncertainties in a risk evaluation.

64. Dr. Kathleen Thiessen's purported MOE analysis is flawed. Dr. Thiessen confuses a hazard approach that considers fluoride exposure from <u>all sources</u> with a risk-based MOE approach that would be appropriate under TSCA for <u>a specific condition of use</u> like community water fluoridation. Neither Dr. Thiessen nor Dr. Grandjean convert urinary fluoride concentrations from study results to approximate fluoride intake from community water fluoridation.

65. Because Plaintiffs have not conducted an exposure assessment, they cannot perform a risk characterization.

66. <u>Risk Determination</u>. Plaintiffs failed to conduct sufficient analysis to support a risk determination for the relevant condition of use.

67. EPA may weigh a variety of factors in determining whether a risk is unreasonable. In making this determination, EPA considers relevant risk-related factors, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the effects of the chemical substance on the environment and environmental exposure under the conditions of use; the population exposed (including any potentially exposed or susceptible subpopulations, magnitude, nature, duration, intensity, frequency, pattern, and number of exposures under the conditions of use in an exposure assessment); the severity of hazard (including the nature of the hazard, the irreversibility of the hazard); and uncertainties.

68. EPA takes into consideration the Agency's confidence in the data used in the risk estimate for both exposure and hazard. This includes an evaluation of the strengths, limitations

and uncertainties associated with the information used to inform the risk estimate and the risk characterization.

69. Plaintiffs fail to set forth the strengths and limitations of each of the studies in the overall database of available studies or any criteria or rationale for identifying a developmental neurotoxic hazard of fluoride. Thus, Plaintiffs have not provided a scientifically defensible basis to conclude that developmental neurotoxicity is a hazard of fluoride exposure under the conditions of use—at concentrations below 1.5 mg/L.

70. Uncertainty in the hazard assessment and variability in response between the most reliable and robust studies at this time makes a risk estimation highly uncertain. The strength of the evidence is too weak to make a reliable risk determination based upon risk factors alone.

## CONCLUSIONS OF LAW

1. Under TSCA section 21(a), 15 U.S.C. § 2620(a), any person can petition EPA to initiate a rulemaking proceeding for the issuance, amendment, or repeal of a rule under TSCA section 6, 15 U.S.C. § 2605.

2. Under TSCA section 21(b)(1), 15 U.S.C. § 2620(b)(1), the petition must set forth the facts which it is claimed establish that it is necessary to issue a rule under section 6.

3. If EPA denies a petition filed under TSCA section 21(a), the petitioner may commence a civil action in a district court of the United States to compel the Administrator to initiate a rulemaking proceeding; any such order may not prescribe the content of a rule or the outcome of such a proceeding.

4. TSCA section 21(b)(4)(B)(ii) requires Plaintiffs to demonstrate by a preponderance of the evidence that "the chemical substance" that was the subject of their petition "presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use." 15 U.S.C. § 2620(b)(4)(B)(ii).

5. To initiate a rule under TSCA section 6(a), a determination must be made "in accordance with subsection [6](b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture . . . presents an unreasonable risk.'' 15 U.S.C. § 2605(a).

6. TSCA section 6(b)(4)(A) requires a risk evaluation process to "determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation . . . under the conditions of use." 15 U.S.C. § 2605(b)(4)(A).

7. TSCA establishes the minimum criteria that must be considered as part of a risk evaluation. 15 U.S.C. § 2605(b)(4)(F).

8. Decisions about risk of injury to health must be based on application of a "weight of the scientific evidence" approach, 15 U.S.C. § 2625(i), and must meet TSCA's scientific standards for identifying and characterizing the "best available science" for its intended purpose, 15 U.S.C. § 2625(h).

9. The petition sought to regulate fluoridation chemicals under only one condition of use: the use of fluoride chemicals to adjust the fluoride concentration in public water systems to an optimal concentration for reducing tooth decay of 0.7 mg/L. Thus, Plaintiffs must demonstrate that use of fluoridation chemicals to reach a concentration of 0.7 mg/L presents an unreasonable risk of neurotoxic effects.

10. Decisions about unreasonable risk of injury to health must consider effects from an inadequate exposure (or health benefits of the chemical substance) as well as from an excess exposure (or adverse health effects).[1]

11. An integrated systematic review of the available scientific evidence is necessary to meet the statutory requirements of TSCA for determining whether fluoridation chemicals pose an unreasonable risk of injury to health or the environment when used to increase water fluoride concentrations to 0.7 mg/L.

12. A scientifically defensible risk assessment is necessary for determining whether fluoridation chemicals pose an unreasonable risk of injury to health or the environment when used to increase water fluoride concentrations to 0.7 mg/L.

13. Plaintiffs have not set forth a scientifically defensible basis to demonstrate by a preponderance of the evidence that fluoridation chemicals pose an unreasonable risk of injury to health or the environment when used to increase water fluoride concentrations to 0.7 mg/L in the United States.

---

[1] Before the first trial, the Court ordered that evidence of the health benefits of fluoride would not be permitted. ECF No. 197. EPA maintains that a TSCA risk determination in this situation entails some weighing of health benefits as a risk factor of the chemical substances but does not seek to relitigate that question at the second phase of trial.

Date: December 22, 2023

Respectfully Submitted,

TODD KIM
Assistant Attorney General

*Paul A. Caintic*
PAUL A. CAINTIC
BRANDON N. ADKINS
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2593 (Caintic)
Tel: (202) 616-9174 (Adkins)
Fax: (202) 514-8865
Paul.Caintic@usdoj.gov
Brandon.Adkins@usdoj.gov

ISMAIL J. RAMSEY
United States Attorney

MICHELLE LO
Chief, Civil Division

EMMET P. ONG
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of December 2023, a true and correct copy of the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law was filed electronically with the Clerk of the Court using CM/ECF. I also certify that the foregoing document was served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

                                                */s/ Paul A. Caintic*
                                                Paul A. Caintic
                                                United States Department of Justice