C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
11601 Wilshire Blvd., Suite 1900
Los Angeles, CA 90025
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

*Additional counsel listed in signature pages*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL., et al.,<br><br>*Defendants*. | Case No.: 17-cv-02162-EMC<br><br>**JOINT PRE-TRIAL CONFERENCE STATEMENT** |

In accordance with the Court's June 6, 2023, Scheduling Order (ECF No. 355), the undersigned counsel of record respectfully submit the following Joint Pretrial Conference Statement:

**1. The Action.**

    a. <u>Substance of the Action</u>: Plaintiffs have brought this case under Section 21 of the Toxic Substances Control Act (15 U.S.C. § 2620), on the grounds that the addition of fluoridation chemicals to drinking water presents an unreasonable risk of neurologic harm. Plaintiffs contend that the recent NIH-funded prospective cohort studies, taken together with the findings of the National Toxicology Program (NTP) and the many studies of fluoride neurotoxicity in both animals and humans, demonstrate that

fluoridation chemicals pose an unreasonable risk when assessed under the risk evaluation framework that EPA uses under the Amended TSCA.

EPA contends that the scientific evidence for evaluating the risk of neurotoxic effects from low-dose exposure to fluoride (e.g., from drinking water with a fluoride concentration of 0.7 mg/L), especially considering the more recent scientific studies published after the first trial, is insufficient to reach an informed risk determination under TSCA. EPA contends that Plaintiffs cannot set forth a scientifically defensible basis to conclude that there is an unreasonable risk of neurotoxic harm as a result of exposure to fluoride in the U.S. through the addition of fluoridation chemicals to drinking water.

b.   Relief Prayed: Pursuant to 15 U.S.C. § 2620(b)(4)(B), Plaintiffs seek injunctive relief in the form of an Order requiring EPA to initiate the rulemaking proceeding requested by Plaintiffs in their Petition to EPA. The remedy provided for in Section 21(b)(4)(B)(ii) is an order that EPA "initiate a proceeding for the issuance of a rule," 15 U.S.C. § 2620(a), which order may not prescribe the content of a rule or the outcome of such a proceeding. Further, pursuant to 15 U.S.C. § 2620(b)(4)(C), Plaintiffs seek recovery of their costs of suit and reasonable fees for attorneys and expert witnesses. Finally, Plaintiffs seek such further relief as the Court may deem just and proper. Defendants deny that Plaintiffs are entitled to relief.

**2.  Factual Basis of the Action.**

a.   **Undisputed Facts from First Trial**:

1.      According to the United States Centers for Disease Control and Prevention (CDC), as of 2014, approximately 200,000,000 people in the United States live in communities that add fluoridation chemicals to the drinking water.

2.      Plaintiffs' Citizen Petition sought to prohibit the addition of fluoridation chemicals to water on the grounds that this condition of use presents an unreasonable risk of neurologic harm.

3.      Fluoridation chemicals are added to drinking water to prevent tooth decay (i.e., dental caries). In addition to being added to water, fluoride is added to

1  dental products and certain pesticides.

2          4.      In epidemiology, a cross-sectional study is a comparison of the

3  prevalence of a specific health outcome across levels of a specific exposure in study

4  subjects (or vice versa), with the exposure and outcome both measured at a given time,

5  providing a "snapshot" of the association between the exposure and the health outcome at

6  one time.

7          5.      In epidemiology, a cohort study is a comparison of incidence rates

8  of a specific health outcome between study subjects with various levels of a specific

9  exposure who are observed over time.

10         6.      A person's individual response to fluoride exposure depends on

11  factors such as age, kidney function, body weight, activity level, nutrition, and other

12  factors.

13         7.      Human urine fluoride concentrations (biomonitoring) measure an

14  internal dose.

15         8.      Various factors can affect the concentration of fluoride in a urine

16  sample, such as an individual's metabolism, when a urine sample is collected, and the

17  time since the last void of the individual who provided the sample.

18         9.      Historically, most studies to investigate the impact of fluoride on

19  IQ in humans have used cross-sectional study designs. Most of these cross-sectional

20  studies have been conducted in China, and other countries with elevated levels (>1.5

21  mg/L) of naturally occurring fluoride in water. By contrast, fluoride is added to water in

22  the United States to reach a concentration of 0.7 mg/L.

23         10.     Prospective cohort studies have been conducted in Mexico City

24  (ELEMENT cohort), where fluoride is added to salt, and Canada (MIREC cohort), where

25  fluoride is added to water. These studies are the most methodologically reliable human

26

27

28

1  studies to date on the impact of fluoride on neurodevelopment.[1]

2        11.    Risk assessment is the process by which scientific judgments are

3  made concerning the potential for toxicity in humans.

4        12.    The National Research Council (NRC, 1983) has defined risk

5  assessment as including the following components: hazard identification, dose-response

6  assessment, exposure assessment, and risk characterization.

7        13.    The term "risk evaluation" is a specialized term under TSCA.

8        14.    Together, the components of EPA's risk assessment process,

9  coupled with the ultimate risk determination, constitute a "risk evaluation" under TSCA.

10        15.    The final step of a risk evaluation is to weigh a variety of factors to

11  determine whether the chemical substance, under the conditions of use, presents an

12  unreasonable risk of injury to health or the environment, referred to as the "risk

13  determination" step in the TSCA risk-evaluation process.

14        16.    EPA does not require that human exposure levels exceed a known

15  adverse effect level to make an unreasonable risk determination under TSCA.[2]

16        17.    In the ideal world, all risk assessments would be based on a very

17  strong knowledge base (i.e., reliable and complete data on the nature and extent of

18  contamination, fate and transport processes, the magnitude and frequency of human and

19  ecological exposure, and the inherent toxicity of all of the chemicals). However, in real

20  life, information is usually limited on one or more of these key data needed for risk

21  assessment calculations. This means that risk assessors often have to make estimates and

22  use judgment when performing risk calculations, and consequently all risk estimates are

23  uncertain to some degree. For this reason, a key part of all good risk assessments is a fair

24  and open presentation of the uncertainties in the calculations and a characterization of

25

26  ───────────────

   [1]    EPA's position is that this fact, as drafted, is no longer undisputed given the

27  publication of the Spanish (INMA) and Danish cohort studies.

   [2]    The parties have omitted the second sentence from this undisputed fact because

28  they have agreed that it was vague, and redundant to undisputed facts 26 & 27.

1 how reliable (or how unreliable) the resulting risk estimates really are.

2          18.    EPA's *Guidelines for Neurotoxicity Risk Assessment* were

3 designed in 1998 to guide EPA's evaluation of substances that are suspected to cause

4 neurotoxicity, in line with substantive standards established in the statutes administered

5 by the Agency.

6          19.    EPA's *Guidelines for Neurotoxicity Risk Assessment* preceded the

7 2016 TSCA amendments.

8          20.    The current non-enforceable health goal for fluoride under the Safe

9 Drinking Water Act ("SDWA"), or Maximum Contaminant Level Goal (MCLG), of 4.0

10 mg/L was promulgated in 1985 to protect against a condition known as crippling skeletal

11 fluorosis (i.e., "stage III skeletal fluorosis"). Crippling fluorosis is the final, and most

12 severe, stage of skeletal fluorosis.

13          21.    Based on its 2006 review, the National Research Council (NRC) of

14 the National Academies of Science (NAS) recommended that the MCLG of 4 mg/L be

15 lowered to prevent children from developing severe dental fluorosis and reduce the

16 lifetime accumulation of fluoride into bone that the majority of the committee concluded

17 is likely to put individuals at increased risk of bone fracture and possibly skeletal

18 fluorosis.

19          22.    Based on the NRC's recommendation, in 2010, EPA's Office of

20 Water completed a dose-response analysis using available data between 2000 and 2010 to

21 calculate a reference dose ("RfD")—an estimate of the fluoride dose protective against

22 severe dental fluorosis, stage II skeletal fluorosis, and increased risk of bone fractures—

23 of 0.08 milligrams per kilograms per day (mg/kg/day), a measure of daily intake by body

24 weight.

25          23.    In addition to the tooth and bone effects, the NRC also evaluated

26 neurotoxicity as an effect of fluoride exposure, among other health effects. The NRC

27 concluded that the available data were inadequate to demonstrate a risk for neurotoxicity

28 at 4.0 mg/L and made recommendations for additional research. Since that time,

1    additional research has been conducted and the scientific database for studies that have

2    examined neurotoxicity as an effect of fluoride exposure has grown.

3           24.     In determining whether adding fluoridation chemicals to drinking

4    water presents an unreasonable risk of neurotoxic effects under TSCA, EPA's Office of

5    Pollution Prevention and Toxics would not rely on the 2010 RfD, but would instead

6    apply a weight of the scientific evidence approach for identifying and characterizing the

7    best available science from the most up-to-date scientific database of studies that have

8    examined neurotoxicity as an effect of fluoride exposure.

9           25.     In conducting TSCA risk evaluations, EPA generally uses the

10   Margin-of Exposure (MOE) approach to characterize the risk as a step in the risk

11   assessment process. Using this approach, an MOE is calculated by comparing (dividing)

12   the point-of departure directly to the expected exposure level. The MOE is then compared

13   to a benchmark MOE, which is the product of all relevant uncertainty factors.

14          26.     EPA considers the MOE, relative to the benchmark MOE, in

15   addition to other factors, in determining whether risks are unreasonable under TSCA.

16          27.     The National Research Council has stated that "the inference that

17   results from animal experiments are applicable to humans is fundamental to toxicologic

18   research."

19          28.     EPA agrees that effects observed in animals are relevant to humans

20   unless human data counterindicate.

21          29.      The developing brain is distinguished by the absence of a blood-

22   brain barrier. The development of this barrier is a gradual process, beginning in utero and

23   complete at approximately 6 months of age.

24          30.     Fluoride passes through the placenta and gets into the fetal brain.

25          31.     Whether harm would actually occur depends on the dose and

26   nature of exposure.

27        b.   **Additional Undisputed Facts for the Second Phase of Trial**

28          32.     In addition to the ELEMENT and MIREC studies, prospective

CASE NO. 17-CV-02162-EMC
JOINT PRE-TRIAL CONFERENCE STATEMENT

6

1   cohort studies on fluoride and IQ have now been conducted in Denmark (OCC cohort),

2   Mexico (PROGRESS cohort), and Spain (INMA cohort).

3           33.     Subsequent to the first phase of the trial, two pooled benchmark

4   dose analyses have been published on the relationship between maternal urinary fluoride

5   levels and childhood IQ. Plaintiffs' expert Dr. Philippe Grandjean is the lead author of

6   both studies. One of the analyses, published in 2022, pooled the data from the

7   ELEMENT and MIREC studies. The other analysis, published in 2023, pooled the data

8   from the ELEMENT, MIREC and OCC cohorts.

9           34.     The National Toxicology Program (NTP) has released two updated

10   drafts of its State of the Science Monograph of fluoride neurotoxicity: one dated

11   May 2022, and the other dated September 2022.

12           35.     The NTP has released an updated draft of its meta-analysis

13   manuscript of fluoride and IQ, dated July 2022.

14           36.     The NTP has released its Board of Scientific Counselors Working

15   Group Report on the Draft State of the Science Monograph and the Draft Meta-Analysis

16   Manuscript on Fluoride, May 16, 2023. The report includes interagency review

17   comments, the NTP authors' responses to those comments, and the BSC Working

18   Group's assessment of the NTP authors' responses.

19           37.     Subsequent to the first trial, EPA published its first ten risk

20   evaluations of existing chemicals under the Amended TSCA.

21           38.     Under the Amended TSCA, EPA has made Unreasonable Risk

22   determinations where it did not have high confidence in the hazard data.

23           39.     In its first 10 risk evaluations under the Amended TSCA, EPA

24   made Unreasonable Risk determinations where it had medium confidence in the hazard

25   data.

26           40.     Under the Amended TSCA, EPA has made Unreasonable Risk

27   determinations where it did not have high confidence in the exposure data.

28           41.     In its first 10 finalized risk evaluations under the Amended TSCA,

1   EPA made Unreasonable Risk determinations where it had medium confidence in the

2   exposure data.

3          42.     EPA has made Unreasonable Risk determinations for conditions of

4   use where average exposures did not present a risk, but highly exposed individuals (e.g.,

5   95th percentile) had exposures of concern.

6          43.     EPA has made Unreasonable Risk determinations for conditions of

7   use that involve fewer than 500 people.

8          c.   **Disputed Factual Issues**:

9          1.     Plaintiffs contend that fluoridation chemicals pose an unreasonable

10  risk of neurotoxicity when added to drinking water because:

11         (A) neurotoxicity is a *hazard of* fluoride exposure when the scientific

12  literature is assessed according to the framework that EPA uses for hazard identification

13  under the Amended TSCA;

14         (B) neurotoxicity is a *risk* at the exposure levels produced by fluoridation

15  chemicals when assessed according to the framework for risk characterization that EPA

16  uses under the Amended TSCA; and

17         (C) the risk of neurotoxicity posed by fluoridation chemicals is

18  *unreasonable* when assessed according to the framework that EPA uses for risk

19  determinations under the Amended TSCA.

20         2.     EPA contends that the following disputed facts for the second

21  phase of trial are material to Plaintiffs claim:

22              i.      The scientific evidence for evaluating the risk of neurotoxic

23  effects from low-dose exposure to fluoride, especially considering the more recent

24  scientific studies published after the first trial, is insufficient to reach an informed risk

25  determination under TSCA.

26              ii.     The existing scientific studies do not provide sufficient

27  evidence to support a hazard assessment in a TSCA risk evaluation for low-dose fluoride

28  exposure associated with community water fluoridation in the United States.

1        iii.      Plaintiffs have not provided any way to convert a urinary-

2 fluoride-based dose response to total intake levels, which is critical to making a risk

3 calculation and subsequent determination. Assuming a one-to-one linear relationship of

4 biomarkers based on dose-response data with intake levels is not supported by limited

5 existing low-exposure data.

6        iv.      Plaintiffs did not conduct an exposure assessment.

7        v.      Uncertainty in the hazard assessment and variability in

8 response between the most reliable and robust studies at this time makes a risk estimation

9 highly uncertain.

10        vi.      Plaintiffs have not set forth a scientifically defensible basis

11 to conclude that there is an unreasonable risk of neurotoxic harm as a result of exposure

12 to fluoride in the United States through the addition of fluoridation chemicals to

13 drinking water.

14 **3. Disputed Legal Issues for Second Phase of Trial:[3]**

15     1.    The parties have a dispute regarding how to handle impeachment materials

16 for EPA's expert, Dr. Jesus Ibarluzea. At the time Plaintiffs took Dr. Ibarluzea's

17 deposition, there was an understanding by the parties that Dr. Ibarluzea would be

18 appearing live at trial through Zoom. Based on this understanding, Plaintiffs forewent a

19 trial preservation examination and thus did not show Dr. Ibarluzea several impeachment

20 materials (i.e., documents that Dr. Ibarluzea has written) that are probative to his

21 credibility. Subsequent to the deposition, Dr. Ibarluzea informed EPA that he is no longer

22 available to testify live at trial. Given this development, the parties have a dispute about if

23 and how Plaintiffs can introduce materials that impeach Dr. Ibarluzea's credibility. The

24 parties will continue meeting and conferring on this issue, but anticipate that the Court's

25 guidance will be helpful at the Pretrial Hearing on January 16.

26

27

28

[3] The parties identify here only disputed legal issues for the second phase of trial and expressly reserve their rights regarding legal issues that have already been decided.

CASE NO. 17-CV-02162-EMC
JOINT PRE-TRIAL CONFERENCE STATEMENT

9

1    2.    EPA contends that for the reasons set forth in Defendants' Motion in

2    Limine (ECF No. 374) testimony by Brian Berridge should be excluded.

3    **4.   Estimated of Trial Time:**

4    Plaintiffs' position is that the fact-finding mission of the Court will be enhanced

5    by utilizing all 8 days of the 8-day trial schedule, or at least, not eliminating days from

6    the calendar prior to the commencement of trial. Plaintiffs will be calling 6 witnesses in

7    their case-in-chief, for which they expect to need at least 4 trial days. The fact that EPA

8    believes it can present its case in less time than Plaintiffs is not a proper basis for

9    shortening the trial. First, Plaintiffs anticipate the cross-examination of EPA's experts

10   will likely yield some of the most probative and clarifying information for the Court's

11   determination. Second, it is appropriate for Plaintiffs to have more total trial time than

12   EPA given that the Plaintiffs bear the ultimate burden of proof. While it is possible the

13   trial may be completed in less than 8 days, Plaintiffs ask that the full two-week trial

14   calendar be reserved in order to ensure that the disputed factual issues receive the full and

15   proper vetting they deserve.

16   Defendants believe trial should be limited to six trial days (assuming about five

17   hours per day), with each side having up to fifteen hours to use to present opening and

18   closing argument (if they wish), direct examination of the party's witnesses, and cross-

19   examination of the opposing party's witnesses. One day would remain available at the

20   end of the second trial week in case additional time is needed due to technical or

21   logistical issues that might arise. The Court is already familiar with the general issues in

22   the case, and the second trial will be limited to new scientific studies published since the

23   first trial. The parties disclosed a total of seven expert witnesses (four experts by

24   Plaintiffs and three experts by Defendants, one of whom was EPA's Rule 30(b)(6)

25   designee during fact discovery). Plaintiffs also disclosed a former NTP official to testify

26   about irrelevant political interference with publication of a previous draft of the NTP

27   State of the Science Monograph. That testimony should be excluded for the reasons

28   stated in EPA's motion in limine. The Court will be familiar with all the expert witnesses

1   Plaintiffs disclosed because each testified at the first trial. Assuming the parties call every

2   expert witness, they should comfortably complete testimony and any argument within

3   fifteen hours per side.

4          To the extent that the Court allocates a specific number of hours of trial time for

5   each party, *the parties agree* that the time for each witness should be allocated to the

6   parties based on the time of each party's respective examinations – i.e., in Plaintiffs'

7   case-in-chief, the time of Defendants' cross examinations would be allocated against the

8   Defendants, while in Defendants' case, the time of Plaintiffs' cross-examinations would

9   be allocated against the Plaintiffs.

10      **5.   Trial Alternatives and Options.**

11          a.   <u>Settlement Discussion</u>: The parties agree that there are no possible

12   grounds for settlement in this matter.

13          b.   <u>Consent to Trial Before a Magistrate Judge</u>: The parties do not consent to

14   having this case conducted by a Magistrate Judge.

15          c.   <u>Amendments or Dismissals</u>: There are no amendments or dismissals.

16   Plaintiffs recently filed their Supplemental Complaint. EPA will respond to the

17   supplemental pleadings in due course. The parties agree that this filing will have no

18   impact on the trial schedule.

19          d.   <u>Bifurcation of Separate Trial of Issues:</u> The Court has previously ruled

20   that, should Plaintiffs prevail on the merits, a separate proceeding may be held if EPA

21   seeks a deferral in rulemaking pursuant to Section 21(b)(4)(B)(ii). 15 U.S.C.

22   § 2620(b)(4)(B)(ii).

23      **6.   Witnesses.**

24          a.   See attached Appendix A. The parties' time allocations in Appendix A are

25   based on the current 8-day trial schedule.

26      **7.   Exhibits:**

27          a.   See attached Appendix B.

28      **8.   Use of Discovery Responses.**

1      a.  EPA now anticipates that Dr. Jesus Ibarluzea will not be available for trial.

2  The parties have designated parts of a transcript of a deposition that Plaintiffs took of

3  Dr. Ibarluzea during expert discovery in this case. See attached Appendix C.

4

5  Dated:  December 22, 2023                   Respectfully submitted,

6                                              /s/ *Michael Connett*

7                                              MICHAEL CONNETT
                                               KAY REEVES

8                                              C. ANDREW WATERS
                                               WATERS, KRAUS & PAUL

9                                              11601 Wilshire Blvd., Suite 1900

10                                             Los Angeles, CA 90025

11                                             *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TODD KIM
Assistant Attorney General

*/s/ Brandon N. Adkins*
BRANDON N. ADKINS
PAUL A. CAINTIC
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174 (Adkins)
Tel: (202) 514-2593 (Caintic)
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Paul.Caintic@usdoj.gov

ISMAIL J. RAMSEY
United States Attorney

MICHELLE LO
Chief, Civil Division

EMMET P. ONG
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that a true and correct copy of the foregoing Joint Pre-Trial

3   Conference Statement was served by Notice of Electronic Filing this 22nd day of

4   December, 2023, upon all ECF registered counsel of record using the Court's CM/ECF

5   system.

6

7                                       /s/ *Michael Connett*

8                                       Michael Connett

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28