C. ANDREW WATERS, ESQ., CA Bar No. 147259
MICHAEL CONNETT, ESQ., CA Bar No. 300314
KAY REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
11601 Wilshire Blvd, Suite 1900
Los Angeles, CA 90025
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al.,<br><br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.<br><br>　　　　　　　Defendants. | Civ. No. 17-CV-02162-EMC<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge: Hon. Edward M. Chen<br>Date:　Jan 16, 2023 (Pretrial Conference)<br>Time: 2:30 p.m.<br>Courtroom: 5 - 17th Floor |

# HAZARD

1. **Neurotoxicity is a <u>hazard</u> of fluoride exposure.**

2. Under EPA's risk assessment framework, a hazard is an adverse effect that is credibly associated with a chemical. As set forth in EPA's *Guidelines for Neurotoxicity Risk Assessment*, the EPA specifically distinguishes the requirement of an *association* with the requirement of *causation*, with the latter being a more onerous and exacting standard of proof. Trial Ex. 17, at 53.

3. EPA's first final 10 risk evaluations of existing chemicals under the Amended TSCA plainly show that the EPA does not exclude "high dose" studies from its assessment of chemical hazards. Nor does EPA provide different hazard determinations for "high doses" and "low doses" of a chemical. Instead, the EPA considers the entire body of the available toxicological and epidemiological data to assess whether some dose of the chemical is reliably associated with an adverse effect, taking into account factors such as (A) the quality of the studies; (B) the consistency of the results; and (C) the existence of common biases or flaws that could explain away the association.

4. The question of whether the hazardous level of a chemical is relevant to human exposures under a particular condition of use is the province of *risk characterization*, which is a separate and distinct step in the risk assessment framework.

5. The neurotoxicity of fluoride is supported by the following admissions from EPA's risk assessment and developmental neurotoxicology expert, Dr. Stanley Barone, Jr.:

   A. Fluoride interferes with the functions of the brain in laboratory animals;

   B. Fluoride has been demonstrated to be a developmental neurotoxicant in animal studies;

   C. The animal studies support the "biological plausibility" of fluoride causing neurotoxic effects in humans;

   D. The "vast majority" of epidemiological studies on fluoride and IQ, as of April 2021, had found that fluoride is associated with reduced IQ, without any apparent bias that can explain away this association;

   E. The human epidemiological data on fluoride and IQ satisfies the "sufficient evidence" for hazard identification under *EPA's Guidelines for Neurotoxicity Risk Assessment*.

6. The neurotoxicity of fluoride is also supported by the findings in the National Toxicology Program's *Monograph on the State of the Science Concerning Fluoride Exposure and Neurodevelopmental and Cognitive Health Effects: A Systematic Review*:

   A. The **"vast majority"** of the 72 epidemiological studies on fluoride and IQ that had been published by April 2021 found an association between fluoride and reduced IQ, including 18 of the 19 "high quality" studies that were at "low risk of bias." The NTP agreed that this is a "large body of evidence." Trial Ex. 67 at xii-xiii; Trial Ex. 69 at I-95.

   B. "[T]he **high-quality studies** (i.e., studies with low potential for bias) consistently demonstrate lower IQ scores with higher fluoride exposure [e.g., represented by populations whose total fluoride exposure approximates or exceeds the WHO Guidelines for Drinking-water Quality of 1.5 mg/L of fluoride (WHO 2017)]. . . . Although some studies that conducted multiple analyses observed within-study variations in results (e.g., differences between subsets of IQ tests), these variations were unique to individual studies and did not detract from the overall consistency in the findings that higher fluoride is associated with lower IQ scores." Trial Ex. 67 at 47.

   C. "Taken together and considering the consistency in the results despite the variability across studies in which covariates were accounted for, bias due to **confounding is not considered to be a concern** in the body of evidence. The potential for the consistency in results to be attributable to bias due to confounding in the 19 low risk-of-bias studies is considered low." Trial Ex. 67 at 49

   D. "In general, there were **few, if any, risk-of-bias concerns regarding exposure characterization** in the low risk-of-bias studies. These studies mainly had individual exposure data based on urine or water measures with appropriate analyses. Although there are concerns related to using urine samples (see the Risk-of-bias Considerations for Human Studies section for details), the evidence suggests that urinary fluoride is a reasonable measure of exposure." Trial Ex. 67 at 51.

   E. "The low risk-of-bias studies have **few concerns regarding outcome assessment**. All 19 low risk of- bias studies used appropriate methods for measuring IQ in the study population

being assessed, and blinding of outcome assessors was not a concern in 18 of the 19 studies . . . ." Trial Ex. 67 at 51.

    F. "Although the high risk-of-bias studies may have more potential for bias due to confounding compared with the low risk-of-bias studies, the **consistent IQ findings across high and low risk-of-bias studies** indicate that the results cannot be explained solely by potential bias due to confounding." Trial Ex. 67 at 51

    G. "There is **consistency in results across prospective and cross sectional study designs**. There is also consistency in results across studies using different fluoride exposure measures, including urinary and drinking water fluoride." Trial Ex. 67 at 54.

7. The NTP's systematic review warrants substantial weight in the hazard assessment given the NTP's authoritative stature in the fields of systematic review and environmental health. Further, even EPA's experts agree that NTP's assessment of fluoride is a "high quality" review with a "thorough" and "rigorous approach to assembling the evidence," "clearly defined rules for identifying and evaluating studies" and a "well defined protocol for drawing inferences from studies."

8. The neurotoxicity of fluoride is also supported by three North American prospective cohort studies (ELEMENT and MIREC), which both parties agree are high-quality studies (Bashash 2017, Green 2019, Till 2020). According to the NTP, "Taken together, the three prospective cohort studies (based on two North American study populations) indicate consistency in results across different types of analysis and across two study populations that higher fluoride exposure during development is associated with lower IQ scores." Trial Ex. 67 at 41.

9. The neurotoxicity of fluoride is supported by accumulating evidence that fluoride has a dose-response relationship with reduced IQ. It is well recognized that a dose-response relationship between a chemical and a health effect strengthens the causal inferences that can be drawn from epidemiological data.

10. A dose-response relationship between fluoride and reduced IQ is supported by the prospective studies of prenatal fluoride and IQ in the ELEMENT and MIREC birth cohorts (Bashash 2017; Green 2019). As Dr. Howard Hu and Dr. Bruce Lanphear detailed in their trial declarations, these studies

found evidence of a linear dose response relationship after interrogating the data with both linear and non-linear models. ECF No. 198-1; ECF No. 198-2.

11. A linear dose-response relationship between fluoride and reduced IQ is also supported by the dose-response analyses that the NTP conducted as part of its July 2022 meta-analysis on fluoride and IQ. Trial Ex. 68 at 2. As with the ELEMENT and MIREC studies, the NTP utilized both non-linear, and linear models, and found that "the linear model was the best fit" for the dose-response relationship between urinary fluoride and IQ.

12. The neurotoxicity of fluoride is supported by the pooled Benchmark Concentration Level (BMCL) analyses of the ELEMENT, MIREC, and Danish birth cohorts (Grandjean et al. 2022; Grandjean et al 2023). These analyses, which benefit from the heightened statistical power and precision that comes from larger sample sizes, further corroborate the inverse relationship between prenatal fluoride and reduced IQ.

13. The neurotoxicity of fluoride is supported by additional analyses of the ELEMENT and MIREC cohorts, including a study that found a significant association between water fluoride levels and maternal hypothyroidism (Hall 2023). It is undisputed that maternal hypothyroidism reduces the IQ of offspring, sometimes severely. Dr. Barone is in agreement that a fluoride-hypothyroidism link, which is supported by previous research, provides a "plausible hypothesis" by which fluoride can reduce IQ.

14. The neurotoxicity of fluoride is supported by certain undisputed facts of biology.

   A. It is undisputed that fluoride crosses through the placenta.
   B. It is undisputed that the blood brain barrier does not finish forming until approximately 6 months after birth, and that the fluoride which gets through the placenta has access to the fetal brain.
   C. It is undisputed that the developing brain during the *in utero* period is more vulnerable to the effects of toxicants. Fluoride thus has access to the brain at a period of high susceptibility, which adds plausibility to the findings of the ELEMENT and MIREC cohorts.

15. The findings from the Basque subcohort of the INMA project (Ibarluzea 2022) do not support a neurotoxic effect from prenatal fluoride exposure. However, this study is a unique outlier and is

rightfully treated with caution given the implausible and unexplained discrepancies in its findings, as well as its failure to control for a critical potential confounder in this population (seafood).

# RISK CHARACTERIZATION

16. **Fluorinated Water Presents a <u>Risk</u> of Neurotoxicity.**

17. In its risk evaluations under TSCA, the EPA does *not* require evidence of harm at the human exposure level, let alone proof of harm. There is no need, therefore, to prove causation at the human exposure level, or even an association, to demonstrate a risk.

18. If EPA required proof of causation or association at the human exposure level, most of the 10 priority chemicals that EPA evaluated in its first risk evaluations under the Amended TSCA would have been deemed to present no risk to human health, yet all of them were determined by EPA to pose unreasonable risks under multiple conditions of use.

19. Rather than require evidence of harm at the human exposure level, EPA uses a "Margin of Exposure" framework to assess risk, or what a lay person might call a "Margin of Safety" approach.

20. Under the Margin of Exposure framework, EPA compares the Hazard Level (e.g., BMCL) of the chemical with the Human Exposure Level under the condition of use to see if the margin is acceptably large (no risk) or unacceptably small (a risk).

21. EPA calculates the Margin of Exposure by dividing the Hazard Level by the Exposure Level (Hazard Level ÷ Exposure Level). For example, if the Hazard Level is 10 and the Exposure Level is 1, the Margin of Exposure is 10.

22. The adequacy of the margin between hazard and exposure is determined by comparing it against the "Benchmark MOE," which is the product[1] of all uncertainty factors. A risk is presumed to exist if the Margin of Exposure is less than the Benchmark MOE.

23. The following example highlights how EPA has applied the Margin of Exposure framework to risk characterization under the Amended TSCA:

---

[1] For example, if the EPA applies an uncertainty factor of 10 to account for intraspecies variability, and an uncertainty factor of 10 to account for interspecies variability, then the Benchmark MOE would be 100 (=10x10).

      A.    In the PCE risk evaluation, the EPA derived a Hazard Level for neurotoxicity by calculating the Lowest Observed Adverse Effect Level (LOAEL) in human epidemiology studies. This Hazard Level was **89 times higher** than the Human Exposure Level among bystanders in the dry/spot cleaning industry. EPA judged this bystander exposure to be a risk because the margin between the hazard level and human exposure level (=89) was less than the Benchmark MOE of 100. Trial Ex. 92.

24.    In the aforementioned example from the PCE evaluation, there was no direct evidence of hazard at the human exposure level. For example, there were *no* epidemiological studies associating the human exposure level with the hazard, let alone epidemiological studies demonstrating a causal relationship at the human exposure level. The absence of such studies is irrelevant to the Margin of Exposure framework.

25.    The PCE scenario outline above is not unique. The overwhelming majority of risk determinations that EPA has made under the Amended TSCA involve scenarios where the human exposure level is less than the Hazard Level, often by a factor of 10 or more. *See, e.g.*, Trial Ex. 90, Trial Ex. 91.

26.    Turning to fluoride, it is irrelevant to the risk characterization if, as EPA's experts contend, the epidemiological studies have not yet proven a causal or likely causal relationship between fluoride and IQ at the 0.7 mg F/L exposure level. This onerous, and *non-health protective*, standard is foreign to EPA's risk characterization framework under TSCA, and has not been used in any EPA's first ten risk evaluations.

27.    Several Hazard Levels are available to choose from for the fluoride risk characterization. These Hazard Levels include:

      A.    A BMCL of <0.3 mg F/L from the pooled analyses of the ELEMENT, MIREC and Danish cohorts. This BMCL refers to the level of fluoride in maternal urine that is associated with 1-point drop in childhood IQ (Grandjean 2022; Grandjean 2023).

      B.    A water fluoride level of ~0.7 mg F/L (or its associated fluoride intake level), which is the level of fluoride in the water associated with reduced IQ in the MIREC cohort study (Green 2019).

      C.  A water fluoride level of 1.5 mg F/L (or its associated fluoride intake level), which is the level of fluoride for which NTP expressed moderate confidence in the association between fluoride and reduced IQ (NTP 2022).

28. The question of which Hazard Level to choose is ultimately an academic one because none of the three Hazard Levels would provide an adequate Margin of Exposure. This becomes quickly apparent when considering the implications of Dr. Barone's testimony that **the Benchmark MOE for fluoride should be at least 10.** An uncertainty factor of 10 reduces the risk threshold by a factor of 10. Thus, if 1.5 mg/L of fluoride in water was selected as the Hazard Level,[2] a *risk* of this hazard would exist for humans drinking water with >0.15 mg F/L. By extension, a risk of the neurotoxicity hazard would exist for humans drinking "optimally" fluoridated water (0.7 mg/L) if the Hazard Level is less than 7.0 mg/L.

29. The lack of an adequate margin of exposure becomes further apparent when comparing the BMCL with the maternal urinary fluoride levels among pregnant women in fluoridated areas. As the following figure shows, the human exposure level is not just *too close* to the Hazard Level, but is greatly *in excess* of the Hazard Level.



---

[2] A hazard level, otherwise known as the "Point of Departure," can be a Benchmark Concentration Level (BMCL), No Observed Adverse Effect Level (NOAEL), or Lowest Observed Adverse Effect Level (LOAEL).

30. Even if one were to discard the BMCL, and focus only on the hazard level identified by the NTP (i.e., 1.5 mg F/L) a risk would still be evident at 0.7 mg F/L. <u>First</u>, the Margin of Exposure is only a factor of 2, which is well below the Benchmark MOE of 10. <u>Second</u>, as the following figure shows, women with 95th percentile water intakes in 0.7 mg F/L areas will drink more fluoride from water than the majority of people living in 1.5 mg F/L areas.



31. The National Toxicology Program has called attention to the heightened risks faced by highly-exposed individuals in fluoridated areas. To quote:

> "Several of the highest quality studies showing lower IQs in children were done in optimally fluoridated (0.7 mg/L) areas in Canada, but the individual exposure information in those studies, as documented by repeated urinary measurements, suggests widely varying total fluoride exposure from drinking water combined with exposures from other sources. For example, **many urinary fluoride measurements exceed those that would be expected from consuming water that contains fluoride at 1.5 mg/L.**" Trial Ex. 69 at 82-83.

32. If fluoride is to be analyzed according to the same standards as other existing chemicals under TSCA, there is little doubt that the condition of use of water fluoridation presents a risk.

**RISK DETERMINATION**

33. **The risk presented by water fluoridation is an unreasonable one.**

34. To determine whether a risk is "unreasonable," EPA considers various "risk-related factors," including (A) the severity of the hazard, (B) the extent of human exposure (e.g., the number of people exposed), (C) whether susceptible subpopulations are being exposed, (D) uncertainties in the data, and (E) the overall confidence in the hazard and exposure data.

35. Each of these risk-related factors supports an unreasonable risk determination for fluoridation. ECF No. 378-5 at 72-76.

**CONCLUSION OF LAW**

36. The preponderance of evidence in this Citizen Petition litigation has demonstrated that the addition of fluoridation chemicals to drinking water presents an unreasonable risk to human health. Accordingly, pursuant to 15 U.S.C. § 2620(b)(4)(ii), the EPA shall initiate a proceeding for the issuance of a rule to address this risk.

December 22, 2023                            Respectfully submitted,

                                             */s/ Michael Connett*
                                             MICHAEL CONNETT
                                             Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Proposed Findings of Fact and Law was served by Notice of Electronic Filing this 22nd day of December, 2023, upon all ECF registered counsel of record using the Court's CM/ECF system.

                                                  */s/ Michael Connett*
                                                  MICHAEL CONNETT