UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH, et al., | ) |
| | ) |
| Plaintiffs, | ) Civ. No. 17-CV-02162-EMC |
| | ) |
| vs. | ) **JOINT SUBMISSION REGARDING** |
| | ) **THE PARTIES' PROPOSED FINDINGS** |
| U.S. ENVIRONMENTAL PROTECTION | ) **OF FACT** |
| AGENCY, et al. | ) |
| | ) Judge: Hon. Edward M. Chen |
| Defendants. | ) Trial Date: Jan 31, 2024 |
| | ) Time:         8:30 am |
| | ) Courtroom: 5 - 17th Floor |

**TABLE OF CONTENTS**

I.      FRAMEWORK FOR EPA RISK EVALUATIONS UNDER TSCA ...................................1

II.     HAZARD ASSESSMENT – HAZARD IDENTIFICATION .........................................1

        A.      Framework for Hazard Identification – <u>Plaintiffs' Proposed Facts</u>....................1

        B.      Framework for Hazard Identification – <u>EPA's Proposed Facts</u> ........................2

        C.      Key Evidence Supporting Neurotoxicity as a Hazard of Fluoride –
                <u>Plaintiffs' Proposed Facts</u>........................................................................2

        D.      Key Evidence Refuting Neurotoxicity as a Hazard of Fluoride – <u>EPA's
                Proposed Facts</u>........................................................................................9

III.    HAZARD ASSESSMENT – QUANTITATIVE DOSE RESPONSE
        ANALYSIS ....................................................................................................14

        A.      Framework for the Quantitative Dose-Response Analysis – <u>Plaintiffs'
                Proposed Facts</u>......................................................................................14

        B.      Framework for Quantitative Dose-Response Analysis – <u>EPA's Proposed
                Facts</u>....................................................................................................14

        C.      Key Evidence Supporting Quantitative Dose Response Analysis for
                Fluoride – <u>Plaintiffs' Proposed Facts</u> ...................................................15

        D.      Key Evidence Refuting Fluoride Dose Response Analysis – <u>EPA's
                Proposed Facts</u>......................................................................................15

IV.     EXPOSURE ASSESSMENT ............................................................................17

        A.      Framework for Exposure Assessment – <u>Plaintiffs' Proposed Facts</u>.............17

        B.      Framework for Exposure Assessment – <u>EPA's Proposed Facts</u> .................17

        C.      Key Evidence Regarding Fluoride Exposure – <u>Plaintiffs' Proposed Facts</u>.....18

        D.      Key Evidence Regarding Fluoride Exposure – <u>EPA's Proposed Facts</u> ..........20

V.      RISK CHARACTERIZATION ..........................................................................20

        A.      Framework for Risk Characterization – <u>Plaintiffs' Proposed Facts</u>................20

        B.      Framework for Risk Characterization – <u>EPA's Proposed Facts</u> .................22

        C.      Key Evidence Regarding Fluoride Risk Characterization – <u>Plaintiffs'
                Proposed Facts</u>......................................................................................23

        D.      Key Evidence Regarding Fluoride Risk Characterization – <u>EPA's
                Proposed Facts</u>......................................................................................23

VI.    RISK DETERMINATION ................................................................................... 24

    A.    Framework for Risk Determination – <u>Plaintiffs' Proposed Facts</u> ..................... 24

    B.    Framework for Risk Determination – <u>EPA's Proposed Facts</u> ......................... 24

    C.    Key Evidence Regarding Fluoride Risk Determination– <u>Plaintiffs' Proposed Facts</u> ................................................................................................. 25

    D.    Key Evidence Regarding Fluoride Risk Determination – <u>EPA's Proposed Facts</u> ................................................................................................................ 31

## I.     FRAMEWORK FOR EPA RISK EVALUATIONS UNDER TSCA

1.      Risk assessment is the process by which scientific judgments are made concerning the potential for toxicity in humans. *Undisputed Fact # 11.*

2.      The National Research Council (NRC, 1983) has defined risk assessment as including the following components: hazard assessment (including hazard identification & quantitative dose response analysis), exposure assessment, and risk characterization. *Undisputed Fact # 12.*

3.      A risk evaluation under the Amended TSCA includes the three aforementioned steps of a risk assessment, as well a fourth and final step: a risk determination. Thus, the steps of a risk evaluation under Amended TSCA are as follows:

    1.  Hazard Assessment
        a.   Hazard Identification
        b.   Quantitative Dose-Response Analysis
    2.  Exposure Assessment
    3.  Risk Characterization
    4.  Risk Determination

## II.     HAZARD ASSESSMENT – HAZARD IDENTIFICATION

### A.  Framework for Hazard Identification – <u>Plaintiffs' Proposed Facts</u>

4.      EPA uses its *Guidelines for Neurotoxicity Risk Assessment* to determine whether neurotoxicity is a hazard of a chemical under the Amended TSCA.

5.      Under the *Guidelines for Neurotoxicity Risk Assessment*, there is "sufficient evidence" to identify neurotoxicity as a hazard if the human epidemiological evidence "show an *association* between the chemical and neurotoxic effects." Trial Ex. 17, at 53 (emphasis added).

6.      The *Guidelines for Neurotoxicity Risk Assessment* specifically distinguish the requirement of an *association* from the requirement of *causation*, with the latter being a more onerous and exacting standard of proof. Trial Ex. 17, at 53.

7.      In the hazard inquiry, the EPA considers the entire body of available toxicological and epidemiological data to determine whether some dose of the chemical is reliably associated with an adverse

effect, taking into account factors such as (A) the quality of the studies; (B) the consistency of the results; and (C) the existence of common biases or flaws that could explain away the association.

8.     EPA does not exclude "high-dose" studies from its hazard inquiry. For example, in EPA's first 10 risk evaluations of existing chemicals under the Amended TSCA, the EPA never excluded high-dose studies from its assessment of hazards.

9.     EPA does not make separate hazard determinations for "high dose" and "low dose" studies. For example, in EPA's first 10 risk evaluations of existing chemicals under the Amended TSCA, the EPA never made separate hazard conclusions for "high-dose" and "low-dose" studies.

10.     The question of whether human exposures under a particular condition of use present a *risk* of the hazard is the province of *risk characterization* and is not part of the hazard inquiry.

### B.   Framework for Hazard Identification – <u>EPA's Proposed Facts</u>

11.     Hazard identification is one of the two components of a hazard assessment.

12.     Hazard identification is the determination of whether a particular chemical is or is not causally linked to a particular health effect. This step requires identification, evaluation, and synthesis of information to describe the health effects of individual chemical substances or mixtures. The approaches employed for hazard identification, as with dose-response assessments, including, for example, the level of detail and complexity of quantitative aspects, may vary across different risk assessments.  Thus, TSCA subsections 26(h) and (i) require that all information used in TSCA section 6 risk evaluation be reviewed consistent with reliance on the best available science and a weight of the scientific evidence approach.

### C.   Key Evidence Supporting Neurotoxicity as a Hazard of Fluoride – <u>Plaintiffs' Proposed Facts</u>

13.     Fluoride passes through the placenta and gets into the fetal brain. *Undisputed Fact No. 30.*

14.     The developing brain during the in utero and neonatal period has a heightened vulnerability to the effects of chemical toxicants. *Grandjean Trial Decl. (ECF No 198-3) ¶¶ 38-40; Thiessen Trial Decl. (ECF No. 202-1) ¶ 159; Grandjean Trial Testimony (ECF No. 240) at 150:15-22 & 151:24-152:13; Lanphear Trial Testimony (ECF No. 241) at 349:5-8; Thayer Trial Testimony (ECF No. 241) at 440:18-441:1, 442:22-443.*

**Animal Data:**

15.     EPA agrees that effects observed in animals are relevant to humans unless human data counterindicate. *Undisputed Fact No. 28.*

16.     The National Research Council (NRC) of the National Academies of Science has concluded that fluoride interferes with the functions of the brain in animal studies. *Trial Ex. 13 at 221-222.* Dr. Stanley Barone, an EPA developmental neurotoxicologist, agrees with NRC's conclusion.

17.     According to the National Toxicology Program's 2022 *Monograph on the State of the Science Concerning Fluoride Exposure and Neurodevelopmental and Cognitive Health Effects: A Systematic Review* [hereafter *May 2022 Monograph*]:

A.  "the majority of the low-risk of bias (11 of 14 drinking water studies [in amimals]) found some histological changes in the brain at or below 10 ppm." *Trial Ex. 67 at F5.*

B.  "the majority of the [animal] studies (13 of 15) found evidence of oxidative stress in the brains of rats treated with fluoride at concentrations at or below 20 ppm, of which 10 studies reported oxidative stress in the brain below 10 ppm fluoride." *Trial Ex. 67 at F6.*

18.     According to NTP's 2016 systematic review of the animal literature on fluoride, the research "suggests adverse effects on learning and memory in animal[s] exposed to fluoride." *Trial Ex. 553, p. vii.* The NTP characterized its confidence in the learning/memory studies as "moderate" for adult studies, and "low" for the (fewer) developmental studies. *Trial Ex. 553, p. vii.*

19.     Dr. Kristina Thayer, the lead author of NTP's 2016 review, testified that "moderate" is "typically a descriptor that you would use when, yes, there is some – some hazard there." *Thayer Trial Testimony (ECF No. 241) at 449:7-20.*

20.     Dr. Thayer, who is now the Director of EPA's Chemical and Pollutant Division, testified that the animal data on fluoride "supports the biological plausibility of fluoride causing neurotoxic effects in humans." *Thayer Trial Testimony (ECF No. 241) at 450:9-13.* Dr. Barone agrees with Dr. Thayer's assessment.

**Human Data**:

*NTP Assessment*

21.     The neurotoxicity of fluoride is supported by the findings in NTP's May 2022 Monograph, and NTP's comments related thereto. According to the NTP:

A.  The **"vast majority"** of the 72 epidemiological studies on fluoride and IQ that had been published by April 2021 found an association between fluoride and reduced IQ, including 18 of the 19 "high quality" studies that were at "low risk of bias." The NTP agreed that this is a "large body of evidence." *Trial Ex. 67 at xii-xiii; Trial Ex. 69 at 65.*

B.  "[T]he **high-quality studies** (i.e., studies with low potential for bias) consistently demonstrate lower IQ scores with higher fluoride exposure [e.g., represented by populations whose total fluoride exposure approximates or exceeds the WHO Guidelines for Drinking-water Quality of 1.5 mg/L of fluoride] . . . . Although some studies that conducted multiple analyses observed within-study variations in results (e.g., differences between subsets of IQ tests), these variations were unique to individual studies and did not detract from the overall consistency in the findings that higher fluoride is associated with lower IQ scores." *Trial Ex. 67 at 47.*

C.  "Taken together and considering the consistency in the results despite the variability across studies in which covariates were accounted for, bias due to **confounding is not considered to be a concern** in the body of evidence." *Trial Ex. 67 at 49*

D.  "In general, there were **few, if any, risk-of-bias concerns regarding exposure characterization** in the low risk-of-bias studies. These studies mainly had individual exposure data based on urine or water measures with appropriate analyses. Although there are concerns related to using urine samples . . ., the evidence suggests that urinary fluoride is a reasonable measure of exposure." *Trial Ex. 67 at 51.*

E.  "The low risk-of-bias studies have **few concerns regarding outcome assessment**. All 19 low risk of- bias studies used appropriate methods for measuring IQ in the study population being assessed, and blinding of outcome assessors was not a concern in 18 of the 19 studies . . . ." *Trial Ex. 67 at 51.*

4

F. "Although the high risk-of-bias studies may have more potential for bias due to confounding compared with the low risk-of-bias studies, the **consistent IQ findings across high and low risk-of-bias studies** indicate that the results cannot be explained solely by potential bias due to confounding." *Trial Ex. 67 at 51.*

G. "There is **consistency in results across prospective and cross sectional study designs**. There is also consistency in results across studies using different fluoride exposure measures, including urinary and drinking water fluoride." *Trial Ex. 67 at 54.*

22.     Dr. Barone, from the EPA, agrees that NTP's monograph is a "high quality" systematic review with a "thorough" and "rigorous approach to assembling the evidence," "clearly defined rules for identifying and evaluating studies" and a "well defined protocol for drawing inferences from studies."

23.     According to Dr. Barone, the human data on fluoride and IQ that the NTP reviewed satisfies the "sufficient evidence" standard for hazard identification under *EPA's Guidelines for Neurotoxicity Risk Assessment.*

*Meta-Analyses*

24.     In addition to the aforementioned systematic review, the NTP also conducted a meta-analysis of the fluoride/IQ studies. Trial Ex. 68. According to the NTP, the meta-analysis "demonstrate[s] that the direction of the association [between fluoride and IQ] is robust to stratifications by risk of bias, sex, age group, outcome assessment, study location, exposure timing, and exposure measurement (including both drinking water and urinary fluoride). Therefore, the consistency of the data supports an inverse association between fluoride exposure and children's IQ." Trial Ex. 68 at 15.

25.     Another meta-analysis, published by a team of EPA scientists, examined the relative effect of various stressors on IQ, including both chemical stressors and non-chemical stressors (Nilsen 2020). Fluoride was found to have the largest effect on cognitive ability of all the "toxic elements" (i.e., arsenic, cadmium, lead, manganese, and mercury) that the EPA scientists considered.

*Qualitative Dose-Response Assessment*

26.     According to EPA, "[a] dose response relationship is an extremely important measure of a chemical's effect." Trial Ex. 17 at 46-47. Dose-response evaluation is thus "a critical part of the *qualitative* characterization of a chemical's potential to produce neurotoxicity." Trial Ex. 17 at 2 (emphasis added).

27.     The *qualitative* assessment of dose-response data informs whether neurotoxicity is a hazard of the chemical. *Trial Ex. 17 at 50.* This is not to be confused with the *quantitative* dose response analysis(discussed separately below) which EPA only conducts if it is satisfied that neurotoxicity is a hazard of the chemical. In short, the qualitative assessment of the dose response data informs whether neurotoxicity is a hazard, whereas the quantitative assessment determines the Hazard Level.

28.     A dose-response relationship between fluoride and reduced IQ is supported by several lines of evidence, including the prospective studies of prenatal fluoride and IQ in the ELEMENT and MIREC birth cohorts (Bashash 2017; Green 2019). Importantly, these studies found evidence of a linear dose response relationship after interrogating the data with both non-linear and linear models. *Hu Trial Decl. (ECF No. 198-1) ¶ 22; Lanphear Trial Decl. (ECF No. 198-2) ¶ 43; Hu Trial Testimony (ECF No. 239) at 56:17-57:14 & 73:14-74:3; Lanphear Trial Testimony (ECF No. 241) at 354:14-22.*

29.     A dose-response relationship between fluoride and reduced IQ is also supported by the dose-response analyses that the NTP conducted as part of its July 2022 meta-analysis. *Trial Ex. 68 at 2.* As with the ELEMENT and MIREC studies, the NTP utilized both non-linear, and linear models, and found that "the linear model was the best fit" for the dose-response relationship between urinary fluoride and IQ. *Trial Ex. 68 at 10.*

30.     The dose-response relationship between fluoride and IQ gains additional support from the pooled analyses of the ELEMENT, MIREC, and Danish birth cohorts (Grandjean 2022; Grandjean 2023). These analyses, which benefit from the heightened statistical power and precision that comes from larger sample sizes, further support an inverse linear relationship between prenatal fluoride and reduced IQ.

*Studies Published After NTP's Literature Date Cut-Off*

31.     NTP's May 2022 Monograph considered all studies published up through April 2021. Most studies published since that time have continued to report associations between fluoride and adverse neurodevelopmental effects, and further support NTP's conclusions.

32.     The neurotoxicity of fluoride is supported by a recent expanded analysis of the ELEMENT cohort by Dr. Howard Hu and his team (Goodman 2022a). In the expanded analysis, Dr. Hu included a substantial number of additional mother-child pairs from the cohort, thus augmenting the power and robustness of the study. Dr. Hu controlled for the same extensive set of covariates as he did in the first

6

study (Bashash 2017), and found essentially the same results: i.e., a large inverse association between maternal urinary fluoride and childhood IQ. The association between fluoride and IQ persisted from age 4 through ages 6 to 12 (thus further indicating that the effect is permanent) and was most apparent in the non-verbal domains, which is consistent with the findings from the MIREC cohort.

33.     The neurotoxicity of fluoride is also supported by additional analyses of the MIREC cohort by Dr. Bruce Lanphear and his team (Goodman 2022b; Hall 2023). In one analysis, Dr. Lanphear's team found that iodine deficiency in the mother magnified the inverse association between fluoride and IQ in boys, which provides further support for the concern that children born to women with iodine deficiencies are a particularly susceptible population vis-à-vis fluoride neurotoxicity (Goodman 2022b).

34.     Another analysis by Dr. Lanphear's team found that water fluoride levels are significantly associated with maternal *hypothyroidism* in the MIREC cohort (Hall 2023). This finding has important implications for neurotoxicity because it is undisputed that maternal hypothyroidism reduces the IQ of offspring, sometimes severely. According to the EPA, "thyroid hormones are essential for normal brain development in humans and hypothyroidism during fetal and early neonatal life may have profound effects on the developing brain." Trial Ex. 18 at 40.

35.     The neurotoxicity of fluoride is further supported by other recent studies, including:

A.  A *prospective* study of the PROGRESS birth cohort in Mexico which found a significant, sex-specific association between maternal dietary intake of fluoride and impaired cognitive function among 2-year-old boys (Cantoral 2021).

B.  A neurodevelopmental study by Tulane and Duke scientists of an area in Ethiopia with high levels of fluoride in drinking water. Although the study only included 75 children, it was able to detect impairments in the children's ability to perform complex or challenging tasks as a function of fluoride exposure (Godebo 2023).

C.  Two studies, including a study conducted in the United States, which found significant associations between childhood exposure to fluoride and internalizing symptoms (e.g., anxiety and depression) (Adkins 2022; Wang 2020). The US-based study, of a cohort in Cincinnati, found the association between fluoride and internalizing symptoms to be

most prominent in boys, thus further supporting sex-specific vulnerabilities, at least for certain outcomes in certain contexts.

36.     Several studies have been published since April 2021 which have failed to detect significant associations between low doses of fluoride and neurodevelopmental outcomes (Aggeborn 2021; Dewey 2023; Do 2022; Grandjean 2023). The null findings in these studies can be explained by (A) the general difficulty of detecting effects among populations with limited contrasts in exposure, particularly for health outcomes, like IQ, which are affected by many other factors; and (B) limitations in some of the study designs that reduced the power to detect an effect (e.g., lack of individual biomarkers of exposure and lack of information on non-water sources of fluoride exposure).

37.     Lastly, one outlier study published since April 2021 has reported unusual results that appear implausible on their face (Ibarluzea 2022). The study, which was conducted in one of the seven cohorts from the Spanish INMA study, reported a 15-point increase in IQ with each milligram of fluoride in the mothers' urine. Although this study has several methodological strengths (e.g., a prospective cohort design, individual measurements of maternal urine, and adjustments for a large number of covariates), there are major issues with the study that warrant giving it significantly less weight in the hazard assessment. These problems include:

A.   The study never controlled for seafood, which contains elevated fluoride and is known to increase IQ, despite having extensive and detailed data on the mothers' seafood intake. It is well established that failing to control for seafood intake can create spurious impressions that a chemical that is contained in seafood (e.g., mercury) is increasing IQ. The Ibarluzea study's failure to control for seafood intake was particularly problematic because coastal areas of Spain had the **highest intake of seafood in the world** at the time the pregnant mothers in the study were recruited.

B.   The association between fluoride and IQ in the Ibarluzea study was strongly influenced by several other factors, including toxic elements (mercury and lead), fluoridation status, quality of the home environment, and adjustment for creatinine in the urine. These factors caused large swings in the magnitude of effect (by 5 to 20+ IQ points per

factor), yet they were never analyzed together in the same model to see what impact their collective influence has on the fluoride/IQ association.

C.  The significant association between fluoride and IQ in boys was driven by the results in the *non*-fluoridated areas, where maternal fluoride was associated with a 28-point increase in IQ. It is not plausible that fluoride increases IQ in such a dramatic way.

D.  The very large beneficial association between maternal fluoride and IQ in boys disappeared entirely when the authors used a different metric of urinary fluoride content (i.e., milligrams of fluoride per liter of urine as opposed to milligrams of fluoride per gram of creatinine). While it is preferable to use creatinine-adjusted urinary levels, no plausible reason has been identified for why creatinine adjustment should have had such a dramatic effect on the results.

38.     As a general principle, implausible findings are given lesser weight than plausible findings in a hazard assessment. It is appropriate therefore to give the Ibarluzea study less weight unless, and until, plausible explanations can be provided for its unusual findings.

### D.  Key Evidence Refuting Neurotoxicity as a Hazard of Fluoride – <u>EPA's Proposed Facts</u>

39.     The existing scientific studies do not provide sufficient, consistent, or coherent evidence to support a hazard identification that low-dose fluoride exposure typically associated with community water fluoridation in the United States (0.7 mg/L) has an adverse effect on neurodevelopment.

40.     Rather, the evidence of adverse neurological effects from low-dose fluoride exposure (i.e., 0.7 mg/L in drinking water) is conflicting and not coherent across the scientific literature, especially between the critical prospective cohort studies.  This prevents a conclusion regarding the presence or absence of an effect at concentrations that are relevant to community water fluoridation.

### The NTP Draft Monograph and Meta-Analysis[1]

---

[1] The history of the NTP monograph is well-documented in the NTP materials pre-admitted into evidence. In particular, the NASEM 2020 review and NTP BSC Working Group report provide comprehensive summaries of the monograph's development—starting from Plaintiff Fluoride Action Network's request that NTP conduct the systematic review, to the first draft, the two NASEM reviews, the deletion of the monograph's hazard conclusion, and the decision to split the monograph into a State of

Continued on the next page

41.     The two latest drafts of the NTP State of the Science Monograph both acknowledge that the science about potential effects of lower-dose fluoride exposure and children's IQ remains "<u>unclear</u>."  The NTP authors define lower-dose fluoride exposure as < 1.5 mg/L, or less than double what is in the United States' water supply. Trial Ex. 67, at 92[2] (May 2022 draft); Trial Ex. 69, at 421 (September 2022 draft).

42.     The May 2022 and September 2022 drafts provide, in relevant part (emphasis added):

> Associations between lower total fluoride exposure [e.g., represented by populations whose total fluoride exposure was lower than the WHO Guidelines for Drinking-Water Quality of 1.5 mg/L of fluoride (WHO 2017)] and children's IQ <u>remain unclear.</u> More studies at lower exposure levels are needed to fully understand potential associations in ranges typically found in the United States (i.e., < 1.5 mg/L in water).

> *Id.*; Trial Ex. 67, at 92.

43.     In response to interagency review comments on the Monograph drafts, the NTP authors consistently repeated that the scientific literature about fluoride's potential effects below 1.5 mg/L is unclear.  For example, the NTP authors wrote that they "tend to agree that studies of fluoride exposure at levels typically found in drinking water in the United States are inconclusive," and therefore that "more studies [at lower exposure levels] are needed to fully understand the potential associations at fluoride levels in drinking water typically found in the United States (< 1.5 mg/L)." Trial Ex. 69, at 23, 421.

44.     The National Academy of Science, Engineering, and Medicine ("NASEM") Committee that reviewed two earlier versions of the NTP monograph reached a similar conclusion, stating that the NTP "needs to emphasize that much of the evidence presented comes from studies that involve relatively high fluoride concentrations and that the monograph cannot be used to draw conclusions regarding low fluoride exposure concentrations (less than 1.5 mg/L), including those typically associated with drinking water fluoridation." Trial Ex. 654, at 1-2 (2021 NASEM Review). In its earlier review, NASEM also noted that "Although NTP did not conduct a formal dose-response assessment, it noted that effects on cognitive neurodevelopment were inconsistent at concentrations of about 0.03 – 1.5 ppm" in children. Trial Ex. 653 at 8 (2020 NASEM Review).

45.     The NTP Monograph drafts also conclude there is "low confidence" that fluoride exposure

---

the Science Monograph and a separate meta-analysis manuscript. Trial Ex. 653, at 12; Trial Ex. 69, at 3. EPA has also summarized this history in its Proposed Findings of Fact and Conclusions of Law, ECF No. 377 at 2-3.

[2] For this filing, EPA uses the PDF page numbers for the various NTP monograph materials, as the documents' own page numbers are inconsistent given their several cover pages and appendices.

10

is associated with non-IQ, neurobehavioral and cognitive effects like ADHD. Trial Ex. 67, at 95; Trial Ex. 69, at 425.

46.    The NTP Monograph drafts also conclude that there is "low confidence" that fluoride exposure is associated with adverse effects on adult cognition. *Id.*; Trial Ex. 67, at 95.

47.    The NTP Monograph drafts also conclude that "Existing animal studies provide little insight into the question of whether fluoride exposure affects IQ." *Id.*; Trial Ex. 69, at 425.

48.    The NTP Monograph drafts also conclude that the "Human mechanistic studies were too heterogeneous and limited in number to make any determination on biological plausibility." *Id.*; Trial Ex. 67, at 95.

**New Primary Research**

49.    The NTP State of the Science Monograph drafts only analyzed fluoride literature published up to April 2021. Trial Ex. 69, at 355. Among NTP's conclusions were that "More studies are needed" to understand the effects of low-level fluoride exposure (i.e., < 1.5 mg/L) on neurodevelopment. *Id.* at 425; Trial Ex. 67 at 95.

50.    Several studies published after that literature cut-off date and after the June 2020 trial cast further doubt that water fluoridation at 0.7 mg/L poses an unreasonable risk of neurotoxicity.

51.    A prospective cohort study on the association between low-doses of fluoride and children's IQ was conducted in Spain and published in 2022 in the peer-reviewed journal Environmental Research. The lead author is Jesús Ibarluzea.

52.    The parties refer to the Spanish cohort as "INMA," which is short for Infacio y Medio Ambiente.

53.    The study focuses on an INMA sub-cohort in the province of Gipuzkoa, which is the area of Spain that had an active community drinking water fluoridation program in place.

54.    The INMA IQ study examined the relationship between mothers' urinary fluoride concentrations (adjusted for dilution) and their offsprings' intelligence scores. The study had a large sample size and controlled for relevant confounders, including maternal IQ.

55.    The INMA IQ study is of equal quality to the Canada and Mexico City cohort studies that were the focus of the first trial.

56.     The INMA IQ study found no statistically significant adverse effect of fluoride on the IQ of boys, girls, or boys and girls combined.

57.     The INMA IQ study found a statistically significant beneficial association between maternal urinary fluoride and IQ outcomes in some measures.

58.     The INMA cohort also published a second fluoride study in the journal Environmental Research that considered potential associations between prenatal maternal urinary fluoride and symptoms associated with attention deficit/hyperactivity disorder ("ADHD") in the offspring.

59.     The INMA ADHD study found no statistically significant adverse association between fluoride and ADHD symptoms.

60.     Another high-quality prospective cohort study of fluoride and children's IQ was published in the Odense Child Cohort ("OCC") from Denmark.

61.     Like MIREC, ELEMENT, and INMA, the OCC study examined the relationship between a mother's urinary fluoride concentration (adjusted for dilution) and their offsprings' IQ scores in an area with water fluoride concentrations < 1.5 mg/L.

62.     The OCC study had the largest sample size of the four cohorts and controlled for relevant confounders.

63.     The OCC study found no statistically significant adverse effect of fluoride on the IQ of boys, girls, or boys and girls combined.

64.     The INMA and OCC cohort studies are of equal quality to the MIREC and ELEMENT studies presented at the first trial.

65.     The OCC study was published in October of 2023 and therefore, like the INMA study, did not make the NTP Monograph's April 2021 literature cut-off date.

66.     Another study was conducted in the Programming Research in Obesity, Growth, Environment, and Social Stress ("PROGRESS") Cohort. While technically a prospective cohort study, the PROGRESS Cohort looked at participants' self-reported answers to food and drink frequency questionnaires to estimate fluoride exposure instead of using a urinary biomarker. The authors then looked at whether the questionnaire-based fluoride exposure estimates they calculated were associated with cognitive, language, or motor IQ decrements at boys and girls at 12 and 24 months of age. Maternal fluoride intake was not associated with any statistically significant IQ decrements on boys and girls combined.

When stratified by sex, maternal fluoride intake again had no statistically significant association with any IQ decrements in girls. Further, maternal fluoride intake had no statistically significant association with cognitive, language, or motor IQ decrements in boys at 12 months of age. Maternal fluoride intake was significantly associated with *cognitive* IQ decrements in boys at 24 months of age, but no statistically significant associations with *language* or *motor* IQ decrements in 24-month-old boys were observed. Overall, these findings indicate a lack of effect of fluoride on children's cognitive ability.

67.     Several other cross-sectional studies have been published since the first trial and missed the NTP's literature cut-off date. Those that look at low-fluoride exposures (< 1.5 mg/L) cast further doubt on fluoride being a developmental neurotoxicant at doses associated with U.S. water fluoridation.

68.     Dewey et al. (2023) was a natural experiment conducted in Calgary, Canada when the city stopped fluoridating its drinking water in 2011. The authors identified infants who were prenatally exposed to fluoridated water throughout their entire pregnancy, exposed for part of their pregnancy, or exposed for none of their pregnancy, depending on when in relation to 2011 the mother became pregnant. The drinking water fluoride level was 0.7 mg/L. The authors found no association between exposure to fluoridated drinking water and IQ, with null findings for IQ subtests and for boys and girls analyzed separately. No association was found between fluoride exposure and working memory or cognitive flexibility. This study provides meaningful evidence against an adverse effect of water fluoridation.

69.     Do et al. (2022) measured fluoride exposure based on children's place of residence and whether that area fluoridated its drinking water. Over 2,600 children aged 5-10 were included in the analysis and assigned fluoridation status based on where they lived at ages 0-5. The exposure index was "lifetime exposure to fluoridated water," and classified as 0% if there was no exposure to fluoridated water, >0-<100% if there was some but not complete exposure to fluoridated water, or 100% if always exposed to fluoridated water. Overall, there were no indications that greater exposure to fluoridated water was associated with poorer behavioral outcomes.

70.     In addition to the INMA study of fluoride and ADHD, several other studies have been published since the first trial on fluoride exposure and neurobehavioral outcomes. In keeping with NTP's conclusion, there is little corroboration, confidence, or consistency between the findings of these studies.

71.     On the whole, the scientific literature about low-dose fluoride exposures does not support the conclusion that water fluoridation at 0.7 mg/L poses a risk of neurodevelopmental harm.

### III.    HAZARD ASSESSMENT – QUANTITATIVE DOSE RESPONSE ANALYSIS

#### A.  Framework for the Quantitative Dose-Response Analysis – <u>Plaintiffs' Proposed Facts</u>

72.     If EPA identifies neurotoxicity as a hazard of a chemical, it proceeds to identify a "Point of Departure" (POD), which is more generally referred to as a **Hazard Level.**

73.     EPA identifies the Hazard Level by conducting a "quantitative dose-response analysis" of a study, or studies, that it finds to be of sufficiently good quality.

74.     According to EPA, the Hazard Level "should represent the maximum exposure level at which there is no appreciable risk for an adverse effect in the study population under study conditions." *Trial Ex. 92 at 351.*

75.     EPA uses three types of Hazard Levels for risk assessment: a Benchmark Dose Level/Benchmark Concentration Level (BMDL/BMCL), a No Observable Adverse Effect Level (NOAEL), and a Lowest Observed Adverse Effect Level (LOAEL).

76.     If the data permits, EPA's preference is to use a BMDL/BMCL. Where a BMDL/BMCL cannot be calculated, EPA's next preference is to use a NOAEL. If neither a BMDL/BMCL and NOAEL can reliably be determined, EPA will use a LOAEL.

#### B.  Framework for Quantitative Dose-Response Analysis – <u>EPA's Proposed Facts</u>

77.     Dose-response assessment is the second of the two components of a hazard assessment.

78.     A dose-response assessment is the determination of the relationship between the exposure or dose of a substance and the occurrence of the health effects in question. The response assessed might be incidence of some endpoint or outcome, and it may describe the magnitude of a response. The approaches employed for dose-response, as with hazard identification, including, for example, the level of detail and complexity of quantitative aspects, may vary across different risk assessments. Thus, TSCA subsections 26(h) and (i) require that all information used in TSCA section 6 risk evaluation be reviewed consistent with reliance on the best available science and a weight of the scientific evidence approach.

**C. Key Evidence Supporting Quantitative Dose Response Analysis for Fluoride – <u>Plaintiffs'</u> <u>Proposed Facts</u>**

79.      EPA's *Guidelines for Neurotoxicity Risk Assessment* recognize that prospective cohort studies allow "the direct estimate of risk attributed to a particular exposure." *Trial Ex. 17 at 17; Thiessen Trial Decl. (ECF No. 202-1) ¶ 45.*

80.      It is undisputed that the NIH-funded ELEMENT and MIREC birth cohort studies are high quality studies of fluoride neurotoxicity. It is also undisputed that the Danish OCC birth cohort study is a high-quality study. *Undisputed Fact No. 10.*

81.      A pooled BMCL analysis has been conducted of the ELEMENT and MIREC cohorts (Grandjean 2022), as well as of the ELEMENT, MIREC, and OCC cohorts (Grandjean 2023). The authors of these pooled analyses are leaders in the field of benchmark dose analysis, as evident by EPA's recent decision to select Grandjean et al.'s BMCL analysis of PFAS as the critical study upon which to derive a reference dose for this high priority environmental toxicant.

82.      The pooled BMCL analyses of the ELEMENT, MIREC, and OCC cohorts sought to determine the level of fluoride in maternal urine that is associated with a 1-point drop in the IQ of the mothers' offspring. The studies concluded that the BMCL is less than **0.3 mg/L**.

83.      Several other Hazard Levels for fluoride are available to choose from, including:

    A.  A water fluoride level of **~0.7 mg F/L** (or its associated fluoride intake level), which is the level of fluoride in water associated with reduced IQ in the MIREC cohort study (Green 2019).

    B.  A water fluoride level of **1.5 mg F/L** (or its associated fluoride intake level), which is the level of fluoride for which NTP expressed moderate confidence in the association between fluoride and reduced IQ (NTP 2022).

**D. Key Evidence Refuting Fluoride Dose Response Analysis – <u>EPA's Proposed Facts</u>**

84.      The dose-response data are deficient and thus insufficient for risk assessment.

85.      Dr. Grandjean's proffered dose-response evidence of developmental neurotoxicity has several critical deficiencies that prohibit its use in a risk evaluation.

86.     A fundamental predicate of conducting a dose-response analysis is confidence in the underlying scientific literature that some effect is present.  For example, when creating a "benchmark concentration level" or "BMCL" calculation, the author must assume that (1) there is a likely or causal relationship between the chemical exposure and the effect (e.g., between fluoride and IQ), and (2) that the data relied on accurately quantifies the relationship between the dose and response.

87.     Dr. Grandjean's BMCL calculations thus rest on the assumptions that (1) the MIREC and ELEMENT studies have conclusively established that there is a likely or causal relationship between low-level fluoride exposure and IQ decrements; and (2) that the effect sizes found in MIREC and ELEMENT accurately quantify the magnitude of those IQ decrements. In other words, they assume low-level fluoride neurotoxicity is a foregone conclusion.

88.     These assumptions also mask the intra- and inter-study inconsistencies of and between the key studies used in the BMCL calculations (e.g., MIREC finding an effect only on boys, but not girls or boys and girls combined).

89.     As stated above, the NTP concluded that the effects of low-level fluoride exposure (< 1.5 mg/L) on IQ "remain unclear."  New publications like the INMA, OCC, and PROGRESS studies also cast doubt on whether low-level fluoride exposure affects IQ.

90.     Dr. Grandjean's BMCL calculations are therefore premature given the highly uncertain nature of the literature.  The current scientific literature on low-dose fluoride exposure's association with community water fluoridation is too unclear and therefore insufficient for a dose-response assessment.

91.     Dr. Grandjean's BMCL calculations also do not include data from the INMA study, which would likely change the calculations significantly.

92.     Dr. Grandjean's BMCL calculations further assume a linear dose-response relationship between fluoride and IQ.  Meanwhile, several studies and other forms of data modeling indicate that a linear model may be inappropriate, and that a fluoride dose-response relationship may be curved with little-to-no effects occurring at low doses.  The NTP BSC Working Group also raised concerns about assuming linearity in the dose-response modeling of fluoride.

93.     In addition, there remain issues with extrapolation from urinary biomarkers of fluoride to intake and intake concentrations affecting all the epidemiological prospective cohort studies of fluoride. Urinary biomarkers are not the same as intake concentration measures, and it is currently impossible to

extrapolate that information with any precision to a point of departure estimate comparable to an exposure assessment.

94.     Following the hazard identification and dose-response assessment steps, EPA conducts a hazard characterization. EPA integrates the evidence and conducts a weight of the scientific evidence analysis based on Bradford Hill considerations, including but not limited to consistency, coherence, plausibility, and temporality. Hazard characterization describes the strength of the evidence and tis likely relationship between exposure and outcome.

95.     As with the hazard identification and dose-response assessments, the scientific literature about fluoride exposures below 1.5 mg/L, and specifically at 0.7 mg/L, is too inconsistent and unclear to reach an informed hazard characterization.

## IV.     EXPOSURE ASSESSMENT

### A.  Framework for Exposure Assessment – <u>Plaintiffs' Proposed Facts</u>

96.     An exposure assessment under TSCA addresses how much of a chemical people are being exposed to under a specific Condition of Use.

97.     In its risk evaluations, EPA estimates both average and "high end" exposures under the Condition of Use. Where the data permits, EPA generally selects the 95th percentile exposure group (but sometimes may select the 99th percentile group) to represent high end exposure.

98.     A person with a 95th percentile exposure has more exposure to the chemical than 94.99% of the population.

99.     The TSCA statute specifically permits EPA to consider "aggregate exposure" to a chemical when evaluating the risk posed by a condition of use. Aggregate exposure refers to total exposure to all uses of a chemical, not just the specific Condition of Use at issue.

### B.  Framework for Exposure Assessment – <u>EPA's Proposed Facts</u>

100.    TSCA requires that EPA "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use" when conducting a risk evaluation. 15 U.S.C. § 2605(b)(4)(F)(iv). EPA implements this requirement through an exposure assessment.

101.    An exposure assessment includes information on chemical-specific factors, including, but

17

not limited to, physical-chemical properties and environmental fate and transport parameters.

102.    An exposure assessment, where relevant, includes some discussion of the magnitude, nature, duration, intensity, frequency, pattern, and number of exposures under the conditions of use.

103.    An exposure assessment should also include types of individuals or populations exposed to the agent, as well as discussion of the uncertainties in this information.

104.    Using reasonably available information, exposures will be estimated (usually quantitatively) for the identified condition of use.

**C.  Key Evidence Regarding Fluoride Exposure – <u>Plaintiffs' Proposed Facts</u>**

105.    Urinary fluoride is a metric of the total absorbed dose of fluoride exposure and is thus a measure of aggregate fluoride exposure. *Hu Trial Decl. (ECF No. 198-1) ¶ 38; Hu Trial Testimony (ECF 239)* 75:2-16; *Lanphear Trial Testimony (ECF No. 241) at 423:1-424:1.* Based on the totality of available evidence, the NTP has determined that "urinary fluoride is a reasonable measure of exposure." *Trial Ex. 67 at 51-52.*

106.    Published data is now available on the urinary fluoride levels in cohorts of pregnant women consuming "optimal" fluoride levels in Canada, Mexico, and the United States.

107.    The studies from Canada and the US have measured urinary fluoride levels in pregnant mothers living in communities with fluoridated water, whereas the study from Mexico measured urinary fluoride levels in pregnant mothers consuming fluoridated salt. (Water fluoridation and salt fluoridation are policies that are implemented to provide an "optimal" daily dose of fluoride for cavity prevention, and thus the daily fluoride intakes in water- and salt-fluoridated areas should be similar. *Hu Trial Testimony (ECF 239)* at 119:5-25.)

108.    The studies from Canada, Mexico and United States have found similar urinary fluoride levels across the three cohorts of pregnant mothers. *Trial Ex. 69 at 32; Hu Trial. Decl. (ECF No. 198-1) ¶¶ 41-42; Lanphear Trial. Decl. (ECF No. 198-2) ¶¶ 33-34; Grandjean Trial Testimony (ECF No. 240) at 187:5-188:23.*

109.    Pregnant mothers living in Los Angeles, California (a fluoridated city) were found to have a median (specific gravity-adjusted) urinary fluoride level of **0.8 mg/L**, and a 95th percentile level of **1.89**

**mg/L**, in the third trimester (Malin 2023). These values are almost identical to the (specific-gravity adjusted) urinary fluoride levels found in fluoridated areas of Canada (i.e., median = **0.77 mg/L** and 95th percentile = **1.89 mg/L**) (Till 2018).

110. The urinary fluoride levels in *highly exposed* women in fluoridated areas approximates the urinary fluoride levels found in areas with 1.5 mg/L fluoride in the drinking water. According to the NTP, "some urinary fluoride measurements" from areas with fluoridated drinking water "exceed those that would be expected from consuming water that contains fluoride at 1.5 mg/L." *Trial Ex. 69 at 41.*

111. A single urinary fluoride sample does not permit a determination of "source allocation" (i.e. what percentage of the urinary fluoride came from fluoridated water). However, a reasonable estimate of the contribution from fluoridated water can be obtained by comparing urinary fluoride levels among populations living in fluoridated vs. non-fluoridated areas.

112. The study by Till (2018) is the most extensive analysis of urinary fluoride levels among pregnant women that is currently available in the scientific literature. The study was funded by the NIH and was published in the NIH-funded journal *Environmental Health Perspectives*. The study measured the urinary fluoride levels in over 1,500 pregnant women living in fluoridated and non-fluoridated areas of Canada.

113. The Till study found that fluoridated water was the most significant source of fluoride in a pregnant woman's urine. In the third trimester, the 95th percentile (creatinine-adjusted) urinary fluoride level in fluoridated areas was **2.41 mg/L**, versus 1.04 mg/L in non-fluoridated areas, for **a difference of 1.37 mg/L between women in the two areas.**

114. The high levels of fluoride found in the urine of highly exposed pregnant women in fluoridated areas is consistent with estimates of fluoride intake that have been derived from EPA's nationally representative tap water intake data.

115. According to EPA's tap water intake data, a pregnant woman with *95th percentile* tap water intake will consume over 2.5x more tap water than pregnant women with 50th percentile intake. A consequence of this fact is that a pregnant mother with 95th percentile water intake who lives in a fluoridated area (0.7 mg/L) will consume more fluoride from her water then over 50% of pregnant woman living in areas with 1.5 mg/L fluoride in water.

19

**D.  Key Evidence Regarding Fluoride Exposure – <u>EPA's Proposed Facts</u>**

116.     Plaintiffs failed to conduct a rigorous exposure assessment of fluoride in public drinking water (including artificially fluoridated and naturally occurring fluoride) and other fluoride contributions.

## V.     RISK CHARACTERIZATION

**A.  Framework for Risk Characterization – <u>Plaintiffs' Proposed Facts</u>**

117.     In its risk evaluations under TSCA, the EPA does not require direct evidence of harm under the condition of use. Instead, EPA assesses risk by using a "Margin of Exposure" framework, or what a lay person might call a "Margin of Safety" approach.

118.     The fundamental premise of the Margin of Exposure framework is that, in order to prevent the hazard, there needs to be a sufficient buffer (i.e., safety margin) between the hazardous level of the chemical and the level to which humans are exposed. EPA requires this buffer, in part, because decades of scientific research has shown that susceptibility to a chemical's toxic effects varies greatly across the human population (i.e., "intraspecies variability") and this variability is rarely captured in the hazard and toxicokinetic data on a given chemical.

119.     The <u>first</u> step of the risk analysis is to determine how close the human exposure level is to the hazard level. To do so, EPA divides the Hazard Level by the Exposure Level (Hazard Level ÷ Exposure Level). For example, if the Hazard Level is 10 mg/day and the exposure level is 1 mg/day, the Margin of Exposure is 10. (A Margin of Exposure of 10 represents a situation where the Exposure Level is $1/10^{th}$ of the Hazard Level.)

120.     The <u>second</u> step of the risk analysis is to compare the Margin of Exposure against the "Benchmark MOE." The Benchmark MOE is the buffer, or safety margin, that EPA considers necessary in order to adequately protect against the hazard. If the margin between the hazard and exposure level is *less* than the Benchmark MOE (safety margin), a risk is presumed to exist because there is an insufficient buffer to protect against the hazard. Trial Ex. 97, at 411.

121.     EPA calculates the Benchmark MOE (safety margin) by multiplying all of the uncertainty factors that are applicable to the assessment.

122.     Uncertainty factors are used to account, *inter alia*, for the fact that human susceptibility to a chemical's toxicity varies substantially across the human population. The difference in susceptibility to a chemical's toxicity is a result of differences in genetics, nutrition, life stage, health status, and other factors that affect toxicokinetics (how much of the chemical reaches the target organ/cell), and toxicodynamics (how much of the chemical at the target organ/cell is necessary to induce an effect). *Tsuji Trial Testimony (ECF No. 243) at 762:13-763:6; Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 133-34.*

123.     EPA uses a default uncertainty factor of 10 to account for intraspecies differences in both toxicokinetics and toxicodynamics ("intraspecies variability"). EPA will only depart from its default factor of 10 in the rare instances where it has adequate data (e.g., a PBPK model) to quantitatively determine the range of toxicokinetic or toxicodynamic variability within the human population. *Thiessen Trial Decl. (ECF No. 202-1) ¶ 135.*

124.     In addition to an uncertainty factor for intraspecies variability, EPA will use an additional uncertainty factor when the Hazard Level is derived from animal studies, as well as in situations where it uses a LOAEL as the Hazard Level. *Thiessen Trial Decl. (ECF No. 202-1) ¶ 144.*

125.     To help appreciate how the Margin of Exposure analysis works in practice, an example from EPA's risk evaluation of perchloroethylene (PCE) is instructive. In the PCE risk evaluation, EPA identified neurotoxicity as a hazard, and selected the Hazard Level based on the lowest observed adverse effect level (LOAEL) in epidemiological studies. *Trial Ex. 92.* One of the conditions of PCE use that EPA considered in this evaluation was PCE's use in the dry cleaning industry. EPA determined that the Hazard Level was 89 times higher than the exposure level for bystanders in this industry (i.e., the exposure was 1/89th of the Hazard Level). *Trial Ex. 92.* EPA judged that the bystanders' exposure presented a risk of neurotoxicity because the margin of 89 between hazard and exposure was less than the Benchmark MOE (safety margin) of 100. The Benchmark MOE was based on two uncertainty factors: the default factor of 10 for intraspecies variability, and the default factor of 10 for using a LOAEL as the Hazard Level (i.e., 10 x 10 = 100).

126.     The aforementioned PCE example is not unique. The vast bulk of risk determinations that EPA has made under the Amended TSCA have involved scenarios where the exposure level was less than the Hazard Level, often by a factor of 10 or more. *See, e.g., Trial Ex. 90, Trial Ex. 91.*

127.    Finally, when comparing the Hazard Level against the Exposure Level, EPA considers *both* the average exposure as well as the high-end exposure (e.g., 95th percentile). If high-end exposures are unacceptably close to the Hazard Level (i.e., less than the safety margin), the condition of use will be judged to present a risk *even if average exposures are not of concern*.

**B.  Framework for Risk Characterization – EPA's Proposed Facts**

128.    The goal of risk characterization is to compare toxicity levels with exposure intake levels to determine if a risk may occur under a specific scenario or condition of use.

129.    When examining developmental neurotoxicity, risk characterization requires that a hazard assessment, including hazard identification and dose-response analysis, and exposure assessment for given populations be combined to estimate the risk for a particular endpoint (e.g., developmental neurotoxicity).

130.    To estimate noncancer risks under TSCA, EPA uses a margin of exposure ("MOE") approach.  The MOE is the point of departure ("POD") (an approximation of the no-observed adverse effect level ("NOAEL") or benchmark dose level ("BMDL")) for a specific health endpoint divided by the exposure concentration for the specific scenario of concern for the relevant TSCA condition of use. The POD (numerator) and relevant exposure concentration (denominator) must be in the same units (e.g., mg/kg/day).

131.    The resulting MOEs are a unitless number representing risk and are then compared to a benchmark MOE. The benchmark MOE accounts for the total uncertainty in a POD, including, as appropriate: (1) the variation in sensitivity among members of the human population (i.e., intra-human/intra-species variability); (2) the uncertainty in extrapolating animal data to humans (i.e., interspecies variability); (3) the uncertainty in extrapolating from data obtained in a study with less-than-lifetime exposure to lifetime exposure (i.e., extrapolating from subchronic to chronic exposure); and (4) the uncertainty in extrapolating from a lowest observed adverse effect level ("LOAEL") rather than from a NOAEL.

132.    A lower benchmark MOE (e.g., 30) indicates greater certainty in the data (because fewer of the default uncertainty factors relevant to a given POD as described above were applied). A higher benchmark MOE (e.g., 1000) would indicate less certainty for specific hazard endpoints for respective scenarios. However, these are often not the only uncertainties in a risk evaluation.

**C.  Key Evidence Regarding Fluoride Risk Characterization – <u>Plaintiffs' Proposed Facts</u>**

133.    Whatever Hazard Level one chooses for fluoride (e.g., the BMCL of <0.3 mg F/L in urine, or the dose associated with 1.5 mg F/L in water), the result is the same: an unacceptably precarious (or non-existent) margin between the Hazard Level and the Exposure Level.

134.    EPA's risk assessment expert, Dr. Barone, agrees that the Benchmark MOE for fluoride should be at least 10 to account for intraspecies variability. Under the Margin of Exposure framework, therefore, water fluoridation will present a risk of neurotoxicity if the average *or* high-end exposure is >1/10th of the Hazard Level.

135.    A risk of neurotoxicity from water fluoridation is obvious if the BMCL of 0.3 mg F/L in urine is used as the Hazard Level. This is because the Exposure Level (for both high-end and average exposures) *exceeds* the Hazard Level. A risk is thus apparent even without using a single uncertainty factor.

136.    A risk of neurotoxicity is also apparent if the 1.5 mg/L water fluoride level (or the associated dose) from the NTP report is used. This Hazard Level is only about 2 times greater than the *average* exposure in fluoridated areas. This equates to a Margin of Exposure of 2, which is less than the Benchmark MOE of 10. The situation is even more precarious for high-end consumers. As the NTP has observed, "many urinary fluoride measurements" in fluoridated areas "exceed those that would be expected from consuming water that contains fluoride at 1.5 mg/L." *Trial Ex. 69 at 82-83.*

137.    Under EPA's risk characterization framework, a risk exists if the Margin of Exposure is less than the Benchmark MOE (safety margin). Fluoridation chemicals thus present a risk of neurotoxicity if analyzed according to the risk paradigm that EPA uses for other existing chemicals under TSCA. Whether the risk from fluoridation chemicals is *unreasonable* is the subject of the fourth and final part of a TSCA risk evaluation: the risk determination (as discussed below).

**D.  Key Evidence Regarding Fluoride Risk Characterization – <u>EPA's Proposed Facts</u>**

138.    Dr. Kathleen Thiessen's purported MOE analysis is flawed. Dr. Thiessen confuses a hazard assessment approach that considers fluoride exposure from <u>all sources</u> with a risk-based, MOE approach that would be appropriate under TSCA for a <u>specific condition of use</u> like community water fluoridation.

139.    Neither Dr. Thiessen nor Dr. Grandjean convert urinary fluoride concentrations from study

results to approximate fluoride intake from community water fluoridation.

140.　　Urinary fluoride measures reflect not just water fluoridation use, but also food, industrial emissions, and fluoride-containing pharmaceuticals.

141.　　Dr. Grandjean's BMCL is not a point of departure for a MOE analysis for any condition of use because it does not clearly discern a source of exposure and is based in units of urinary fluoride (an internal exposure biomarker unit).

142.　　Dr. Grandjean's BMCL is not reliable because it excludes results from the INMA IQ study.

143.　　For short half-life chemicals, like fluoride, urinary concentration is extremely sensitive to the timing of exposure sampling.

144.　　Intake data for the participants in the leading birth cohort studies is not available.

145.　　In the absence of such intake data, a physiologically based pharmacokinetic model applicable to human pregnancy can be used to estimate intake exposure.

146.　　Plaintiffs have proffered no such model to estimate exposure.

147.　　Because Plaintiffs have not conducted an exposure assessment, they cannot perform a risk characterization.

## VI.　　RISK DETERMINATION

### A.  Framework for Risk Determination – <u>Plaintiffs' Proposed Facts</u>

148.　　To determine whether a risk is "unreasonable," EPA may consider "risk-related factors," including (A) the severity of the hazard; (B) the known extent of human exposure (e.g., the magnitude, frequency, duration of exposure, as well as the number of people exposed); (C) whether susceptible subpopulations are being exposed; (D) the overall confidence in the hazard and exposure data; and (E) uncertainties.

### B.  Framework for Risk Determination – <u>EPA's Proposed Facts</u>

149.　　Risk determination asks whether a risk, if present, is unreasonable.

150.　　EPA may weigh a variety of relevant risk-related factors in determining whether a risk is unreasonable.  Those factors include, but are not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the effects of the chemical substance on the environment and environmental exposure under the conditions of use; the population exposed

(including any potentially exposed or susceptible subpopulations, magnitude, nature, duration, intensity, frequency, pattern, and number of exposures under the conditions of use in an exposure assessment); the severity of the hazard (including the nature of the hazard, the irreversibility of the hazard); and uncertainties.

151.    EPA takes into consideration the Agency's confidence in the data used in the risk estimate for both the hazard and exposure assessments. This includes an evaluation of the strengths, limitations, and uncertainties associated with the information used to inform the risk estimate and risk characterization.

### C. Key Evidence Regarding Fluoride Risk Determination– **Plaintiffs' Proposed Facts**

#### Severity of the Hazard

152.    One of the risk-related factors that EPA considers for the risk determination is whether the hazard is sufficiently severe to warrant the need for protective measures.

153.    EPA recognizes that chemical-induced IQ loss is an adverse effect that warrants regulatory action, as evident by its regulations of lead and perchlorate. *Trial Ex. 42 at 67000 & 43.* EPA enacted its regulations for airborne lead and waterborne perchlorate to prevent the loss of 2 IQ points in *susceptible* populations. *Trial Ex. 42 at 67005; Trial Ex. 43 at 30536.*

154.    According to EPA, "Cognitive effects are thought to strongly relate to a child's future productivity and earning potential." *Trial Ex. 34 at ES-7.* Based on available data, EPA has estimated that a 1-point drop in IQ will reduce earnings by approximately 2 percent. *Trial Ex. 34 at 33.*

155.    In the case of water fluoridation, the *average* maternal urinary fluoride level in fluoridated areas is approximately two times higher than the BMCL for a 1-point loss in IQ. Among the 95th percentile, maternal urinary fluoride levels are approximately *8 times higher* than the BMCL.

156.    Even if the exposure assessment is limited to the estimated contribution from fluoridated water (as opposed to the aggregate measure of exposure), the contribution from fluoridated water alone exceeds the BMCL. Among the 95th percentile, the contribution from fluoridated water is approximately *4 times higher* than the BMCL.

The Known Extent of Human Exposure

157.    Another risk-related factor that EPA considers for the risk determination relates to the certainty and extent of human exposure under the condition of use, including the duration, frequency, magnitude, and pattern of exposure, as well as the number of people exposed.

158.    One of the reasons the EPA considers the "duration, frequency, magnitude, and pattern" of exposures is that EPA is often confronted with obscure ("data-poor") manufacturing processes for which no quantitative exposure data is available.  In this context, qualitative information on the duration, frequency, magnitude and/or pattern of exposures is "critically important" to guiding extrapolations from other conditions of use and to informing the strength of the evidence.

159.    In contrast to the data-poor manufacturing processes that EPA has considered under TSCA, there is little uncertainty about the "duration, frequency, magnitude, and pattern" of exposure to fluoridated water. There can be little dispute, for example, that a chemical added to tap water will result in long-term (duration) and daily (frequency) exposures to said chemical. Further, the doses (magnitude) and age/health-related predictors of water consumption (patterns) are well characterized by nationally representative water intake data that EPA has compiled for the express purpose of exposure assessment.

160.    Substantial published data also exists on an internalized measure of fluoride exposure (urinary fluoride) in fluoridated areas. This data, which includes studies of pregnant mothers living in fluoridated and non-fluoridated areas of Canada and the United States, presents a relatively clear and consistent picture: the average maternal urinary fluoride level approximates 0.7 mg/L, and the 95th percentile level exceeds 1.5 mg/L.

161.    In addition to considering the "duration, frequency, magnitude, and pattern" of exposure, EPA also considers the number of people that are potentially exposed to a condition of use. EPA considers the number of people who are potentially exposed because it helps to inform the extent of potential risk.

162.    The number of people exposed to the condition of use of water fluoridation exceeds, by many orders of magnitude, the number of people potentially exposed to conditions of use for which EPA has found unreasonable risks under TSCA.

163.    EPA has found unreasonable risks for conditions of use impacting less than 500 people, and as few as 56 people. By contrast, approximately 200 million Americans live in areas where fluoridation

chemicals are added to water, and many more ingest fluoridated water indirectly through processed beverages and food.

164.    One consequence of having so many people exposed to fluoridated water is that even small risks can amount to widespread harm. For example, if water fluoridation caused IQ loss in only one in a million people who are exposed, it would still harm more people than the entire populations involved with some of the conditions of use for which EPA has found unreasonable risk.

Whether Susceptible Populations Are Exposed

165.    The TSCA statute specifically mandates that EPA consider "susceptible populations" in its evaluation of risk.  Accordingly, an important consideration for the risk determination is whether there are any known susceptible populations being exposed under the condition of use.

166.    In the case of water fluoridation, it is undisputed that large numbers of susceptible individuals are being exposed each year to fluoride through fluoridation, including approximately 2 million pregnant women, and approximately 400,000 exclusively formula-fed babies. *Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 162 & 180.*

167.    The number of *susceptible people* exposed to water fluoridation exceeds the *entire populations* exposed to conditions of use for which EPA has found unreasonable risk, and not just by a small amount, but by *orders of magnitude.*

Confidence in the Hazard & Exposure Data

168.    Another risk-related factor that EPA considers in its unreasonable risk analysis is the confidence it has in the hazard and exposure data that underlie the Margin of Exposure estimates.

169.    The greater the confidence in the hazard and exposure data, the stronger the basis there is for an unreasonable risk determination. EPA does not, however, require high confidence in either the hazard or exposure data, and has repeatedly made unreasonable risk determinations where it lacks high confidence in both. *Trial Ex. 88 at 5 & 6; Undisputed Fact Nos. 38-42.* In its PV29 risk evaluation, for example, EPA made unreasonable risk determinations where it had low confidence in both the hazard and exposure data, including for conditions of use that impacted only 56 people. *Trial Ex. 88 at 6.*

*Confidence in Hazard Data*

170.     EPA does not make separate confidence determinations for "high dose" and "low dose" studies. Instead, EPA provides a single confidence determination for the whole body of hazard data.

171.     With fluoride, EPA's own experts have conceded that high doses of fluoride are neurotoxic. Dr. Barone, for example, agrees with the National Research Council's conclusion that fluoride interferes with the functions of the brain. Dr. Barone further agrees that the animal data support the biological plausibility of fluoride causing neurotoxic effects in humans, and that the epidemiological evidence analyzed by the NTP constitutes "sufficient evidence" for a hazard identification under *EPA's Guidelines for Neurotoxicity Risk Assessment*.

172.     While Dr. Barone and EPA's other experts point to discrepant findings among low-dose studies, discrepant findings in low dose studies are to be expected given the challenges of detecting effects in populations with lower exposure contrasts. The more compelling fact is that, despite these challenges, some studies have been able to detect associations between fluoride and IQ loss at the average human exposure level under the condition of use—a rare and troubling situation for an environmental toxicant as widespread as fluoride.

173.     Even if the Court were to credit Dr. Barone and EPA's other experts that there is not yet sufficient confidence of a hazard at *low doses* of fluoride, this would not negate the confidence in the overall hazard data reviewed by the NTP, which remains essentially undisputed. Further, to condition a *risk* determination based on whether there is sufficient confidence of a *hazard at the human exposure level*, would effectively eliminate the distinction between the hazard and risk inquiries.

*Confidence in Exposure Data*

174.     The exposure data for warrant fluoridation warrant a strong confidence ranking under the considerations that EPA has identified.

175.     First, there is no dispute that adding fluoridation chemicals to water will result in daily and long-term exposures to fluoride. The "frequency" and "duration" elements of EPA's exposure inquiry are thus readily met. Further, the magnitude of this fluoride exposure can be reliably estimated through EPA's tap water intake data, which the EPA has described as the "the most up-to-date and scientifically sound" data on tap water intake in the scientific literature. Trial Ex. 26 at 3-1.

176.   A second strength of the exposure data is that there is published data of internalized exposure metrics *under the condition of use at issue* (water fluoridation). There is no need, therefore, to extrapolate from other conditions of use, which EPA has often had to do when assessing exposures from data-poor manufacturing processes.

177.   A third strength of the exposure data is that published data is also available, *under the condition of use*, for three susceptible populations: pregnant women, bottle-fed infants, and high-end water consumers (e.g., 95th percentile). This data confirms that susceptible populations are being exposed to fluoride from the condition of use, including at levels of exposure that are of concern.

178.   A fourth strength of the exposure data is that the water intake data and urinary fluoride data are convergent in showing that 95th percentile exposures in fluoridated areas will approximate the levels of exposure for which the NTP has moderate confidence of a neurotoxic hazard (i.e., 1.5 mg/L fluoride).

Uncertainties

179.   Uncertainties are pervasive to risk assessment.

180.   The parties agree that "In the ideal world, all risk assessments would be based on a very strong knowledge base (i.e., reliable and complete data on the nature and extent of contamination, fate and transport processes, the magnitude and frequency of human and ecological exposure, and the inherent toxicity of all of the chemicals)." *Undisputed Fact No. 17.*

181.   The parties further agree that "in real life, information is usually limited on one or more of these key data needed for risk assessment calculations." Consequently, "all risk estimates are uncertain to some degree." *Undisputed Fact No. 17.*

182.   Since data gaps and the uncertainties that arise from data gaps are pervasive to risk assessment, it is to be expected that uncertainties exist in the assessment of fluoride.

183.   One of the data gaps that currently exists with fluoride is how to determine a pregnant mother's total fluoride intake based on her urinary fluoride level. There is currently no Physiologically Based Pharmacokinetic Model (PBPK) to enable this calculation. While this is certainly an area worthy of future research, the absence of a PBPK model does not provide a consequential degree of uncertainty to the fluoride assessment. The NTP, for example, has determined that urinary fluoride is a reasonable measure of individual fluoride exposure. *Trial Ex. 67 at 51.*

184.   A second uncertainty stems from limitations in EPA's own tap water intake data. For example, EPA's water intake data is based on questionnaires that capture only two days of water consumption per person. Nevertheless, EPA has judged that this is the "the most up-to-date and scientifically sound" data on tap water intake in the scientific literature. EPA has thus expressly compiled the data "for use by exposure and risk assessors both within and outside the U.S. EPA as a reference tool and primary source of exposure factor information." *ECF No. 202-1 (Thiessen Trial Decl.) ¶ 150.*

185.   A third uncertainty that exists in the fluoride assessment is why a sex-specific association between prenatal fluoride and IQ has been detected in some studies, but not others.  This, again, is a subject that warrants further research, but it does not provide a consequential basis to forego a risk determination given the overall consistency of the association between higher fluoride exposure and reduced IQ in human populations, and the biological plausibility in support of this association. Further, it is well established that neurotoxicants can have sex-specific effects at different doses, or in different circumstances, and that different mechanisms of neurotoxicity may be triggered in different environmental contexts.

186.   A fourth uncertainty that exists is why the Basque study from Spain (Ibarluzea 2022) found such dramatically different results than the ELEMENT, MIREC, and PROGRESS cohorts. While this too is the appropriate subject of further research, the implausible findings and unexplained discrepancies within the Ibarluzea study do not warrant the extreme step of using a single outlier study to override disregarding an entire body of scientific literature.

187.   Finally, the fact that some low-dose fluoride studies have failed to detect a significant association between fluoride and IQ does not present a consequential source of uncertainty for purposes of a TSCA risk evaluation. This is so for multiple reasons, including:

A.  There is no meaningful dispute that higher fluoride exposures (>1.5 mg/L) are associated with neurotoxicity.

B.  It is inherently harder for epidemiological studies to detect hazards when investigating populations with lower "exposure contrasts" (i.e., smaller differences in exposures), particularly for health outcomes like IQ which are influenced by many other factors. Even when investigating chemicals with *known* causal effects, epidemiological studies will sometimes fail

to detect associations. The failure of a study to detect an association, therefore, can be less a reflection of reality, and more a reflection of the limitations and lack of sensitivity of the study.

C.   The margin between the "high dose" fluoride studies and the exposures ingested in fluoridated areas is far less than the margins that EPA has found to be unacceptably small in other risk evaluations. For example, in EPA's evaluation of the neurotoxicity hazard posed by PCE, EPA found an unreasonable risk for bystanders in the dry-cleaning industry who were exposed to 1/89th of the Hazard Level. It requires less extrapolation, and less uncertainty, to infer a risk from studies that detect a hazard at ~2 times the exposure level (fluoride) than it does to infer a risk from studies that detect a hazard at 89 times the exposure level (PCE).

**D.   Key Evidence Regarding Fluoride Risk Determination – <u>EPA's Proposed Facts</u>**

188.   Plaintiffs failed to conduct sufficient analysis to support a risk determination for the relevant condition of use.

189.   Plaintiffs fail to set forth the strengths and limitations of each of the studies in the overall database of available studies or any criteria or rationale for identifying a developmental neurotoxic hazard of fluoride. Thus, Plaintiffs have not provided a scientifically defensible basis to conclude that developmental neurotoxicity is a hazard of fluoride exposure under the conditions of use—at concentrations of 0.7 mg/L.

190.   Uncertainty in the hazard assessment and variability in response between the most reliable and robust studies at this time makes a risk estimation highly uncertain. The scientific evidence is too weak and too unclear to make a reliable risk determination based upon risk factors alone.

191.   The scientific evidence for evaluating the risk of neurotoxic effects from exposure to fluoride, especially in light of evidence published after trial, is insufficient to reach an informed risk determination under TSCA.

January 24, 2024

Respectfully submitted,

*Michael Connett*
MICHAEL CONNETT
C. ANDREW WATERS
WATERS, KRAUS & PAUL
11601 Wilshire Blvd., Suite 1900
Los Angeles, CA 90025
Tel: (310) 414-8146

*Attorneys for Plaintiffs*

TODD KIM
Assistant Attorney General

*Paul Caintic*
PAUL A. CAINTIC
BRANDON N. ADKINS
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174 (Adkins)
Tel: (202) 514-2593 (Caintic)
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Paul.Caintic@usdoj.gov

ISMAIL J. RAMSEY
United States Attorney

MICHELLE LO
Chief, Civil Division

EMMET P. ONG
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Attorneys for Defendants*