Volume 1

Pages  1 - 184

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

FOOD & WATER WATCH, INC., ET     )
AL.,                             )
                                 )
         Plaintiffs,             )
                                 )
  VS.                            )     NO. 17-CV-2162
                                 )
UNITED STATES ENVIRONMENTAL      )
PROTECTION AGENCY, an agency     )
of the United States, ET AL.,    )
                                 )
         Defendants.             )
_____)

                         San Francisco, California
                         Wednesday, January 31, 2024

               **TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**


**APPEARANCES**:


For Plaintiffs:
                    WATERS KRAUS & PAUL, LLP
                    222 N. Pacific Coast Highway, Suite 1900
                    El Segundo, California  90245
               **BY:  MICHAEL P. CONNETT**
                    **CHARLES ANDREW WATERS**
                    **ATTORNEYS AT LAW**

                    NIDEL & NACE, PLLC
                    5335 Wisconsin Ave., NW, Suite 440
                    Washington, DC 20015
               **BY:  CHRISTOPHER THOMAS NIDEL**
                    **ATTORNEY AT LAW**

         **(Appearances continued next page.)**

REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
              Official U.S. District Court Stenographer

**JENNIFER COULTHARD, RMR, CRR, CRC - (530)537-9312**

**APPEARANCES (Continued):**

For Defendants:

                UNITED STATES DEPARTMENT OF JUSTICE
                Environmental Defense Division
                601 D Street, NW, Room 8814
                Washington, DC  20004
      BY:  **BRANDON N. ADKINS, ATTORNEY AT LAW**

                UNITED STATES DEPARTMENT OF JUSTICE
                1301 Clay Street, Suite 340-S
                Oakland, California  94612
      BY:  **EMMET P. ONG, ATTORNEY AT LAW**

                UNITED STATES DEPARTMENT OF JUSTICE
                Environmental Defense Division
                150 M Street, N.E.
                Washington, D.C.  2002
      BY:  **PAUL CAINTIC, ATTORNEY AT LAW**


**ALSO PRESENT:**         DANIEL DePASQUALE, EPA


--oOo--

# **I N D E X**

Wednesday, January 31, 2024 - Volume 1

|  | **PAGE** | **VOL.** |
|---|---|---|
| Opening Statement by Mr. Connett | 7 | 1 |
| Opening Statement by Mr. Caintic | 54 | 1 |

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

**HU, HOWARD**
(SWORN)

| | | |
|---|---|---|
| Direct Examination By Mr. Connett: | 82 | 1 |
| Cross-Examination By Mr. Ong: | 126 | 1 |
| Redirect Examination By Mr. Connett: | 175 | 1 |
| Recross-Examination by By Mr. Ong: | 182 | 1 |

--oOo--

| | |
|---|---|
| 1 | <u>**Wednesday - January 31, 2024**</u>                    <u>**8:11 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **--oOo--** |
| 4 | **THE CLERK:**  Court is now calling the case Food & Water |
| 5 | Watch versus EPA, Case No. 17-2162. |
| 6 | Counsel, please state your appearance for the record, |
| 7 | beginning with the plaintiff. |
| 8 | **MR. CONNETT:**  Good morning, Your Honor; Michael |
| 9 | Connett on behalf of the plaintiffs. |
| 10 | **THE CLERK:**  If you can please speak into the |
| 11 | microphones so the court reporter is able to hear you. |
| 12 | **THE COURT:**  And when you speak, you can remove your |
| 13 | mask. |
| 14 | **MR. WATERS:**  Andy Waters, also for the plaintiffs. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. NIDEL:**  Good morning, Your Honor; Chris Nidel on |
| 17 | behalf of the plaintiff. |
| 18 | **THE COURT:**  Thank you, Mr. Nidel. |
| 19 | **MR. ADKINS:**  Good morning, Your Honor; Brandon Adkins, |
| 20 | the United States Department of Justice for defendant EPA. |
| 21 | **THE COURT:**  All right. |
| 22 | **MR. ADKINS:**  We have with us today and throughout the |
| 23 | trial Danny Pasquale from the Office of General Counsel at the |
| 24 | Environmental Protection Agency. |
| 25 | **THE COURT:**  Great.  Thank you.  Good morning. |

**PROCEEDINGS**

1          **MR. ONG:**  Good morning, Your Honor, AUSA Emmet Ong on

2     behalf of the EPA.

3          **MR. CAINTIC:**  Good morning, Your Honor; Paul Caintic

4     on behalf of the EPA.

5          **THE COURT:**  All right.  Thank you, Mr. Caintic.

6          All right.  Welcome, everyone.

7          We are broadcasting on Zoom, I believe.

8          Has that been running, Vicky?

9          **THE CLERK:**  It's running, Your Honor.

10         **THE COURT:**  And we have the capacity up to -- I don't

11    know which license do we have; do you know?

12         **THE CLERK:**  A thousand.

13         **THE COURT:**  All right.  So -- and, of course, this

14    matter is being held in open court here because as I understand

15    the current rules, we are able to broadcast consistent with the

16    applicable broadcast rules, at least as governs the Ninth

17    Circuit and this court, so we are proceeding in open court with

18    a public view.

19         And as you know, this is a bench trial, sort of, bench

20    trial No. 2 in this case.  I think we've stipulated

21    correctly -- correct -- that all the evidence that came in, in

22    the first trial, will be incorporated as part of the record in

23    this trial.  Is that the understanding?

24         **MR. CONNETT:**  Yes, Your Honor.

25         **MR. ADKINS:**  That's correct.

1          **THE COURT:**  Okay.  And the plaintiff will -- who are

2   going to be your first witnesses today?

3          **MR. CONNETT:**  Your Honor, our first witnesses will be

4   Dr. Howard Hu and Dr. Bruce Lanphear.

5          **THE COURT:**  Okay.  And I assume that you will want to

6   make an opening statement?

7          **MR. CONNETT:**  Yes, Your Honor.

8          **THE COURT:**  Okay.

9          **MR. ADKINS:**  That's correct.

10         **THE COURT:**  All right.  Then let's go ahead and start.

11  If you're ready, I'm ready.

12         **MR. CONNETT:**  The one thing, Your Honor, is we just

13  need to have the computer hooked into the audiovisual.

14         **THE COURT:**  Okay.

15         **MR. ONG:**  Your Honor, the parties did want to address

16  one thing with the Court before openings started.

17         **THE COURT:**  Okay.

18         **MR. ONG:**  Counsel and I spoke before trial, and with

19  Your Honor's permission, we would like to publish documents

20  that are used to refresh recollection of the witness on the

21  screen as opposed to just having the witness just read them,

22  just to expedite the trial.

23         **THE COURT:**  All right.  Since it's not a jury trial, I

24  don't have a problem with that.  If it was a jury trial,

25  obviously we wouldn't engage in that practice, but --

1          **MR. ONG:**  Of course.

2          **THE COURT:**  That's fine.  Good.  Thank you.  Any other

3     procedural matters that we need to clear up?

4          **MR. CONNETT:**  Not at this time, Your Honor.

5          **MR. ADKINS:**  None from the government.

6          **THE COURT:**  All right.  And I will warn you, when you

7     give your opening statements, I probably have some basic

8     questions that I may ask, and it will tip you to some of the

9     issues and make sure that I have an understanding and maybe

10    give you some indication what might be useful to the Court.

11         So unlike an opening statement before a jury, there may be

12    some -- a little bit of interactive process here.

13         Okay.  You may commence, Mr. Connett.

14                         <u>**OPENING STATEMENT**</u>

15         **MR. CONNETT:**  Good morning, Your Honor.  May it please

16    the Court.

17         The Court here is faced with a question of national

18    importance, whether the widespread addition of fluoridation

19    chemicals to water in this country presents a risk of

20    neurodevelopmental harm in children, including IQ loss.

21         This question that the Court confronts is similar to what

22    the EPA confronted back in the 1970s, when the agency was

23    tasked with deciding whether to ban the addition of another

24    neurotoxicant, lead to gasoline.  The addition of lead to

25    gasoline was even more widespread than the addition of

1    fluoridation chemicals is today.  It was also a practice that,

2    like water fluoridation, had been in place for decades.

3         The quandary that the EPA faced in the 1970s is, there was

4    no direct evidence that lead was causing harm at the specific

5    exposure levels generated by leaded gasoline.  There was,

6    however, strong evidence that lead at higher exposure levels

7    damages the brain and other problems.

8         Ultimately, EPA decided that the margin, the margin

9    between the hazard level and the exposure level was too

10   precarious.  It was too small.  And so EPA decided to end that

11   long-standing practice.

12        The lead industry vigorously challenged EPA's action in

13   court, which resulted in a D.C. Court of Appeals decision

14   that -- although under a different statute than TSCA -- lends

15   valuable guidance for some of the issues that the Court faces

16   here, issues like the distinction between hazard and risk, the

17   distinction between direct evidence of harm and indirect

18   evidence of harm, the distinction between causal analysis and

19   risk assessment.

20        The case is *Ethyl Corporation v EPA* and the pin cite is

21   541 F.3d 1.  The Court upheld EPA's decision and one of the

22   most consequential and beneficial environmental health actions

23   ever taken by any government agency anywhere in the world went

24   into effect.

25        Your Honor, my opening today is organized into three

**OPENING STATEMENT / PLAINTIFF**

1    parts.  First, I will address the unreasonable risk standard

2    under TSCA.  Second, I will address the evidence showing that

3    fluoridation chemicals, when added to drinking water, meet this

4    standard.

5        Third, I will briefly address the experts who the Court

6    will be hearing from on both sides of this dispute.  Let's

7    start with the standard.

8        As Your Honor knows, courts are used to dealing with

9    standards every day when assessing the sufficiency of evidence.

10   The same is true for EPA in its risk evaluation under TSCA.

11       Standards give us clear, objective benchmarks by which to

12   judge a constellation of facts.  In doing so, they reign in

13   subjectivity. Without a standard to judge facts against, things

14   become arbitrary quite quickly.  What is sufficient; what is

15   insufficient if you don't have a standard?  What is a risk;

16   what is not a risk if you don't have a standard?

17       As the Court will recall, the EPA used the wrong standard

18   for assessing the evidence during the first trial in this

19   matter.  As quoted here in EPA's denial of plaintiff's

20   petition, EPA held plaintiffs to the burden of proving that the

21   addition of fluoridation chemicals to drinking water has caused

22   neurotoxic harm.

23       At the first trial, EPA's expert, Dr. Tala Henry agreed

24   that EPA held plaintiffs to a burden of proof that EPA has

25   never once held any other chemical under TSCA.

**OPENING STATEMENT / PLAINTIFF**

1      At the end of the first trial, this Court recognized that

2   EPA had used an improper standard, as the Court noted at the

3   close of evidence, quote, "EPA appears to have applied a

4   standard of causation, which, from my read of TSCA, is not

5   accurate.  It's not a proper application.  It's not the proper

6   standard."

7      The Court also implored EPA to take another look at the

8   evidence and, in doing so, to apply the proper standard.

9      So let's look now at what the proper standard is and how

10  EPA has, once again, deviated from this standard in Phase 2 of

11  this case.

12     First, Your Honor, the good news, and that is both parties

13  agree that this framework that you see here is the correct

14  framework for a risk evaluation under TSCA.

15     As set forth in the parties' joint submission last week,

16  this framework presents the various steps that EPA uses to

17  evaluate risk under TSCA, and it is undisputed that this

18  framework applies to the assessment of fluoride.  Now, the risk

19  evaluation framework sets out to answer three fundamental

20  questions, which I will call the ABCs of a risk evaluation.

21     So let's start with A.  Is neurotoxicity a hazard of

22  fluoride exposure?  That's the first question.

23     The second question, if it is a hazard of fluoride, does

24  water fluoridation present a risk of this standard?  And C, the

25  third question, is the risk unreasonable?

OPENING STATEMENT / PLAINTIFF

1        So let's start with the first question.  What is the

2     standard for determining if neurotoxicity is a hazard of

3     fluoride exposure?  What is that standard?

4        Well, Your Honor, that standard is located in the hazard

5     identification prong of the risk evaluation sometimes referred

6     to as "hazard ID" for short.

7        I will start by laying out the approach that EPA has taken

8     to hazard ID in each of its first ten risk evaluations under

9     the amended TSCA with the exception of asbestos, because there

10    was no assessment of chronic non-cancer risk for asbestos.  So

11    really, when we talk about the first ten evaluations, we're

12    talking about all ten except for asbestos.

13       First, and importantly, Your Honor, EPA, when doing hazard

14    identification analysis under TSCA, considers all of the data,

15    including what some might call high-dose studies and what some

16    might call low-dose studies.

17       What qualifies as high-dose or low-dose is often in the

18    eyes of the beholder.  Wisely, therefore, EPA avoids using the

19    terminology of high-dose and low-dose in its hazard

20    identification assessments under TSCA.

21       So that's the scope.  The scope of a hazard identification

22    is all data.  What about the standard that EPA uses for

23    assessing sufficiency?  Well, EPA's own documents show that the

24    standard is association, that the chemical must be associated

25    with neurotoxicity.

**OPENING STATEMENT / PLAINTIFF**

 1     And notably, EPA's guidelines on neurotoxicity risk

 2  assessment specifically distinguish association from causation,

 3  which is a more onerous standard of proof.

 4     But to be clear, just because one random paper has found

 5  an association between a chemical and neurotoxicity does not

 6  mean you have sufficient evidence for a hazard ID.  You need to

 7  have confidence in the association.  And you have confidence in

 8  the association if it is based on reasonably high-quality data,

 9  if the studies are consistent in showing the association, and

10  if there are no common flaws in the studies that can explain

11  away the association.

12     Now, if this standard, Your Honor, were applied to

13  fluoride, as it should be, the hazard ID prong is easily met.

14  Indeed, EPA's risk assessment expert in this case, Dr. Stanley

15  Barone, agreed with this critical fact during his deposition.

16     You can see here an excerpt from Dr. Barone's deposition.

17  I asked Dr. Barone whether the evidence on fluoride

18  neurotoxicity presented and synthesized by the NTP meets the

19  sufficient evidence standard for hazard identification.

20     And he said yes, it does.  Quote, "It meets the sufficient

21  evidence standard."  Quote, "It meets the sufficient evidence

22  standard."

23     So that is EPA's own expert agreeing that fluoride

24  qualifies as a neurotoxicant under EPA's own guidelines for

25  assessing neurotoxicity.

**OPENING STATEMENT / PLAINTIFF**

1    So given that fact, what did the EPA do here, Your Honor?

2    The first crucial, I would say, deficiency of EPA's assessment

3    in this case is that it did not consider all data.  It

4    considered some data.  Specifically, it eliminated all of the,

5    quote, "high-dose studies," which EPA defined as any study over

6    1.5 parts per million fluoride in the water.  It eliminated all

7    of those studies from its consideration and limited its

8    focus --

9         **THE CLERK:**  Excuse me, counsel.  Please make sure to

10   turn off all cell phones.  Thank you.

11        **MR. CONNETT:**  EPA limited its consideration to only

12   the low-dose studies, which are studies generally done at or

13   around .7 parts per million in the water.  That's the first

14   definitive deficiency of EPA's assessment.

15        The second deficiency is, they are not using an

16   association standard.  They're using a causation standard.

17        Now, I want to be clear about one thing, though, for the

18   hazard ID inquiry in this case for fluoride, the distinction

19   between association and causation is mostly an academic point

20   at this juncture because, I believe, the evidence is rather

21   clear and overwhelming that even if you use a causation

22   standard for hazard, fluoride meets it.

23        Indeed, Dr. Barone agreed in his deposition in this case,

24   Dr. Barone did not dispute that fluoride causes

25   neurodevelopmental effects.  Here, Your Honor, you can see an

 1   excerpt from Dr. Barone's deposition.  I asked him:

 2       **"QUESTION:**  Do you dispute that high doses of fluoride

 3       cause neurodevelopmental effects?"  Cause

 4       neurodevelopmental effects.

 5       And he said:

 6       **"ANSWER:**  No, I don't dispute that."

 7       So the key deficiency in this case for EPA's assessment of

 8   hazard is not the causation versus association prong.  It is

 9   the fact that EPA only considered some of the data, not all of

10   the data.  And it only considered the studies at .7 parts per

11   million.  That's the key deficiency with EPA's hazard

12   assessment.

13       Now let's turn to the risk standard.

14       **THE COURT:**  Let me ask you about hazard

15   identification.  Is it generally appropriate not to put any

16   upper limit on what studies to be considered or what exposure

17   levels to be considered in order to determine whether there is

18   a hazard because, I mean, at some extreme point everything is a

19   hazard.  I mean, water can be a hazard.  You can -- you know,

20   people die from drinking too much water, whatever the element

21   is.  So how do you determine what's an upper -- is there some

22   upper bound limit to making that threshold determination where

23   there's been a hazard identification knowing that, you know, if

24   you go to the extreme, almost everything is a hazard?

25       **MR. CONNETT:**  Right.  Well, I did ask Dr. Barone that

**OPENING STATEMENT / PLAINTIFF**

 1    question, and first I would say that in EPA's risk evaluations

 2    under TSCA, they do not eliminate -- there's no discussion of

 3    eliminating high-dose data.  They don't eliminate high-dose

 4    data.  Certainly there's no discussion of that in their

 5    evaluations.  But I did ask Dr. Barone that very question, and

 6    he had mentioned that maybe when you get around two orders of

 7    magnitude above the point of departure, which is the hazard

 8    level, that the data above that point may either be discarded

 9    or not given as much attention.

10         Now, in this case, Your Honor, with fluoride, we have the

11    benefit of the fact that the hazard data for fluoride is not as

12    astronomically high.  It's not orders of magnitude higher than

13    the exposure level.  It's a very narrow margin, which is one of

14    the very troubling facts about the fluoride data.

15         But again, to answer your question, the EPA does not

16    exclude high-dose data in its hazard evaluations.  It certainly

17    doesn't have discussion of doing so.  And the testimony on that

18    point so far is that maybe when you get to about two orders of

19    magnitude above the point of departure, you might consider

20    discarding that.

21         THE COURT:  And remind me the studies that went into

22    the monograph draft NTP.  Were those so-called high-dose

23    studies within that two time range?  There weren't any at,

24    like, ten milligrams or --

25         MR. CONNETT:  There are a few, a handful of studies

1    above the ten-fold factor, which would be 7 parts per million

2    or above.  There are a handful of those studies.

3        The overwhelming bulk of the data, Your Honor, when you're

4    not looking at fluoridated water specifically is, you're

5    looking at concentrations in the about 1.5 to 4 parts per

6    million, 5 parts per million.  In that range is where you see

7    the bulk of the data.  So that's less than a factor of 10 from

8    the human exposure level, the average human exposure level to

9    fluoridation.

10            **THE COURT:**  Okay. Thank you.

11            **MR. CONNETT:**  Shall I proceed?

12            **THE COURT:**  Yes.

13            **MR. CONNETT:**  So let's turn now to the risk question.

14   How does EPA define a risk?

15       Well, to assess risk, EPA starts by identifying the dose

16   of a chemical that is hazardous.  EPA -- this term, Your Honor,

17   is -- the technical term is "point of departure."

18       Now, I'm not going to use "point of departure" today,

19   because sometimes it's confusing to people.  I'm going to use

20   "hazard level," which is sort of the lay terminology for a

21   point of departure.

22       So EPA determines the hazard level through the

23   quantitative dose-response step of the risk evaluation.  That's

24   the first point.  You got to start -- you got to start by what

25   is the hazard level.

**OPENING STATEMENT / PLAINTIFF**

 1        Second is, you got to determine what is the exposure

 2    level, the human exposure level to the chemical under the

 3    condition of use.  Here the condition of use is water

 4    fluoridation.  So we want to find out what is -- what are the

 5    human exposures to fluoride in communities that add fluoride to

 6    their water?  That's the exposure assessment piece.

 7        And the third and final piece of the risk characterization

 8    is -- the risk characterization step where EPA looks at the

 9    margin, the difference between the hazard level and the

10    exposure level.

11        So what then constitutes a risk?  How do we know an

12    exposure presents a risk?

13        For purposes of this case, Your Honor, I would say that

14    there are two types of risk, two types.  One type is where the

15    human exposure level exceeds the level that we know is

16    hazardous or that we have strong confidence is hazardous, the

17    observed hazard level.

18        In this scenario, the risk is obvious because the exposure

19    level is in the zone that has been observed with confidence to

20    cause the hazard.  This type of risk, easy to identify.  You

21    know it when you see it.

22        But the challenge with risk assessment is, this type of

23    risk is also very rare.  When EPA decided to ban the addition

24    of leaded gasoline, it did not have any data in the hazard

25    zone.  And more on point to this case, in EPA's first ten risk

 1   evaluations under the amended TSCA, the vast majority, vast

 2   majority of risk determinations that EPA made were for

 3   conditions of use where the human exposure was less than the

 4   hazard level, often by a factor of 10 or more.  So observed

 5   risk -- observed hazard is the rarity.

 6        So lets talk about the other type of risk.  And Your

 7   Honor, I'm going to use the term "inferred risk" for this

 8   scenario.

 9        Inferred risk refers to a situation where the exposure

10   level is below the observed hazard level.  Again, this is not

11   unusual.  This is the typical scenario.  Exposures are less

12   than the hazard level.  This is the situation that the EPA

13   confronted with leaded gasoline.  It's the situation that the

14   EPA confronts with it's risk evaluations.

15        In this scenario, the inferred risk scenario that focuses

16   on whether there is enough of a margin between the observed

17   hazard level and the human exposure level to be comfortable

18   that people, including the most susceptible, including the most

19   susceptible, which the statute commands, the statute commands

20   that we protect the most vulnerable.  You need to look at the

21   margin and find out if there's enough of a margin to protect

22   the vulnerable.

23        And in EPA's risk determinations under TSCA, EPA has

24   typically required a margin of at least 30 fold between the

25   hazard level and the exposure level to be comfortable that

**OPENING STATEMENT / PLAINTIFF**

 1    their exposures will not pose a risk.

 2         Here, Your Honor, as you can see in this slide, EPA found

 3    a risk of neurotoxicity from the chemical PCE, where the

 4    exposure level was 89 times lower, 89 times lower than the

 5    observed hazard level in humans.

 6         In the methylene chloride risk evaluation, EPA found a

 7    risk of neurotoxicity where the exposure level was 27 times

 8    lower than the observed hazard in humans.  And to be clear,

 9    Your Honor, not all exposures to a chemical, including to

10    fluoride, are going to present a risk.  Plaintiffs do not

11    dispute that.  Plaintiffs do not dispute that there are de

12    minimis exposures to a chemical, de minimis exposures that do

13    not pose a risk.  There is no dispute about that in this case.

14         But the key point and the indisputable point is that just

15    because the human exposure level is less than the observed

16    hazard level does not mean there is no risk.  The inquiry does

17    not stop there.

18         So let's go to the key deviation that EPA has had in its

19    risk evaluation for the risk component.  The key deviation,

20    Your Honor, is that rather than being prepared to infer risk,

21    EPA is requiring evidence of observed hazard at the .7 ppm

22    level.

23         You're going to hear Dr. Savitz come in, and he's going to

24    explain, in exquisite detail, all of the reasons why we are not

25    yet able to say that there is a definite defined hazard at .7.

 1  But even if the Court were convinced by Dr. Savitz on that

 2  point, it doesn't answer the question that this Court

 3  confronts.

 4      So lastly, Your Honor, the last part of the standard is

 5  the unreasonable -- the unreasonable component.  What does EPA

 6  consider when it looks at whether a risk is unreasonable?

 7      In doing so, Your Honor, EPA may -- it may not, but it may

 8  consider various risk-related factors.  These factors include

 9  is the effect -- in this case IQ loss, is it adverse.  Is it

10  adverse to human health?

11      Second factor is, what is the known extent of exposure to

12  the chemical under the condition of use?

13      Are susceptible populations being exposed?  That's a

14  critical point in the unreasonable risk analysis.

15      Fourth, what is our confidence in the hazard data?  What

16  is our confidence in the exposure data?

17      And lastly, EPA looks at the uncertainties.  Are there any

18  consequential uncertainties that really prevent us from drawing

19  conclusions?

20      And, Your Honor, in this case I would submit that EPA's

21  key deficiency, a key deviation in how it normally conducts its

22  analyses is that EPA did not focus on the confidence in the

23  overall hazard data.  It focused on the confidence it has in

24  the .7 ppm studies, but that's not the way EPA does it under

25  its risk evaluations.  It looks at the whole hazard data to see

OPENING STATEMENT / PLAINTIFF

 1    if it's confident that this chemical does pose a hazard.

 2         So now, Your Honor, after going through the standard, I'm

 3    going to present the key evidence that the plaintiff will

 4    present in this case on the neurotoxicity of fluoride.

 5         First, the evidence in this case will show that

 6    neurotoxicity is a hazard of fluoride exposure.

 7         As already noted, this question of hazard is addressed and

 8    answered in the hazard ID part of the analysis.

 9         So what evidence do we have on hazard?  First, Your Honor,

10    there is no dispute in this case.  It's an undisputed fact,

11    fact No. 30, that fluoride passes through the placenta and gets

12    into the fetal brain.  No dispute.

13         Second, we know that in the prenatal or in utero stage of

14    life, as well as in early infancy, we know that the blood-brain

15    barrier is not fully formed and so that chemicals that enter

16    the body have greater ability to enter the brain, including

17    during infancy.

18         And we also know, Your Honor, as you can see here in this

19    EPA document, Exhibit 18, that, quote, "The neonatal stage is a

20    period of rapid development of the nervous system and is

21    considered a critical window of development."

22         And you will hear again testimony in this case about how

23    when the brain is rapidly developing, that is when there is a

24    heightened vulnerability to the insult from an intoxicant.

25         So fluoride has access.  It has access at the moment in

1    time that we would be concerned about.

2        Second, we have animal data, quite a bit of animal data,

3    in fact.  And as Your Honor may recall, the National Research

4    Council in 2006 concluded quote, "It is apparent that fluorides

5    have the ability to interfere with the functions of the brain."

6    I do not believe there is going to be any dispute about that

7    point in this case.

8        Dr. Barone, who is a risk assessment scientist as well as

9    a neurodevelopmental toxicologist, testified in this case that

10   he does not dispute that fluoride has been demonstrated to

11   cause developmental neurotoxicity in animals.  He does not

12   dispute that point.

13       In the last trial we had the honor and privilege to be

14   able to call Dr. Kristina Thayer, who is the scientist at EPA

15   who runs EPA's Chemical and Pollutant Assessment Division.  She

16   had previously been with the National Toxicology Program, and

17   Dr. Thayer testified that she agrees that the animal data

18   supports the biological plausibility of fluoride causing

19   neurotoxic effects in humans.  That's Dr. Thayer.  That's EPA's

20   own scientist.  That's a scientist who worked at the NTP for

21   years.  So I think the animal data --

22       Now, there's some question, Your Honor, about how much you

23   can infer from learning memory studies in rodents, how much

24   does that directly speak to the IQ loss that we see in humans.

25   And I accept and agree that there is a -- differing opinions on

**OPENING STATEMENT / PLAINTIFF**

1    that, but at the end of the day, we know that if you give

2    laboratory animals fluoride in controlled conditions, it will

3    impact the brain and cause harm to the brain.

4         So let's now look, Your Honor, at the human studies.

5         Now, one of the reasons this case was placed into abeyance

6    was so that the Court could consider the findings of the

7    National Toxicology Program or NTP.  The Court's interest in

8    considering the NTP's findings was a reasonable one, given that

9    the scientists at the NTP are subject matter experts that our

10   nation turns to, to understand the potential toxic effects of

11   chemicals in our environment.

12        In May of 2022, the NTP completed a prepublication version

13   of its Monograph on Fluoride.  The monograph sets forth the

14   NTP's comprehensive systematic review of the human

15   epidemiological literature on the fluoride and IQ and other

16   potential neurodevelopmental effects.

17        The Court will hear from Dr. Brian Berridge, who was the

18   scientific director at the NTP who oversaw the monographs

19   revision and completion.  Dr. Berridge will explain the

20   hazard-based focus of NTP's work, including its review of

21   fluoride, and why that distinction matters when considering the

22   NTP's findings for purposes of risk assessment.

23        Dr. Berridge will also explain the extensive multi-round

24   peer review process that the monograph underwent.

25        Okay.  So what did the NTP conclude about fluoride and IQ?

 1   What did it conclude?

 2       Let's take a look.  First, the NTP found that a large

 3   number of studies have been published on fluoride and IQ in

 4   human populations.  According to the NTP, as you can see here,

 5   Your Honor, there is a, quote, large body of evidence on IQ

 6   effects in children from fluoride exposure.

 7       In total, the NTP identified 72 IQ studies with 64 of

 8   those studies finding an association between fluoride exposure

 9   and reduced IQ.

10       The NTP judged 19 of these studies to be high-quality

11   studies.  And of these high-quality studies, 18 found an

12   association between fluoride and IQ deficits, which amounts to

13   about 95 percent of the high-quality studies.

14       So first finding is that there's a large body of evidence.

15   Second finding, Your Honor, is that there is a consistent

16   association in this body of literature between fluoride and

17   lower IQ.

18       I'll read a few quotes here from the NTP.  Quote,

19   "Reported associations between higher fluoride exposure and

20   lower children's IQ are consistent in the vast majority of

21   studies of both high and low quality."

22       NTP also states, quote, "In summary, the high quality

23   studies, i.e., studies with low potential for bias,

24   consistently demonstrate lower IQ scores with higher fluoride

25   exposure."

1          Next finding, Your Honor -- and this is an important one,

2     given some of the analyses in the first trial -- is, NTP

3     concluded that confounding is unlikely to explain this

4     consistent association.

5          As the NTP notes here, quote, "Bias due to confounding is

6     not considered to be a concern in the body of evidence."

7          Fourth, NTP --

8          **THE COURT:**  Before you go further, let me ask you, the

9     association, was there -- remind me, is there a magnitude of

10    order in terms of the decrements that seem to be consistent in

11    terms of the diminution in IQ?

12         **MR. CONNETT:**  Yes, Your Honor.

13         NTP made -- attempted to make that determination in the

14    meta analysis component of its assessment where it did a

15    quantitative means effect analysis of 55 IQ studies that met

16    the criteria.  And in that quantitative meta analysis, it found

17    that the average decrement in IQ in the high-exposure groups

18    was about 7 IQ points less than the control groups.  To be

19    clear, though, Your Honor, the high-exposure groups in that

20    analysis would go up, as you were asking before, would go up

21    into that, you know, 5, 6, 7 parts per million range, but a lot

22    of it is in the middle, 1.5, 2 or 3.

23         **THE COURT:**  Well, that's sort of in the aggregate

24    including all of those very high exposures, the means -- the

25    analysis shows 7 -- several points?

1           MR. CONNETT:  7 IQ point difference, Your Honor, on

2      average.

3           THE COURT:  And there wasn't, sort of, a sub study of

4      those that were closer to the 1.5 level and what is associated

5      with that lower range?

6           MR. CONNETT:  Actually, Your Honor, the NTP did do

7      that analysis in the meta analysis.

8           What they did is, they did a dose-response assessment

9      where they looked at all of the data, including the high-dose

10     studies, to see if there was a dose-response relationship, and

11     they found one.  They found one.  And then to assess that that

12     relationship is observable at lower levels, they cut off the

13     top.  They started by cutting it off over 4 parts per million,

14     and they could still observe the dose-response relationship.

15     Then they cut it off over two parts per million, and they still

16     observed a dose-response relationship.  And then they went so

17     far, Your Honor, as to cut it off over 1.5 parts per million,

18     and they still observed a dose-response relationship.

19          Now, to be clear, the significance of that relationship

20     started to decline at that lower level, and there was -- when

21     you started looking at some of the analysis, you see some noise

22     in there.  It's not always statistically significant, but a

23     key -- a key finding in that whole analysis, Your Honor, is

24     that they used linear and nonlinear models.  And even when

25     they -- and the linear model was a good fit.  For urine

1  fluoride it was the best fit, the linear model, which, I think,

2  as you'll hear in this case, is a meaningful -- a meaningful

3  fact.

4         THE COURT:  But that -- that model begins to get fuzzy

5  as you get down to the lower levels closer to 1.5.

6         MR. CONNETT:  It gets fuzzier, yes.  Now, granted, the

7  dose-response analysis is based on average group-level

8  exposures, and so there's more noise in that data to begin

9  with.  It becomes harder to, sort of, identify with precision

10 that dose-response relationship, but they did find below 1.5,

11 they did find a significant relationship between urinary

12 fluoride and IQ loss.

13        THE COURT:  When you say below 1.5.  Do you mean at

14 1.5?

15        MR. CONNETT:  No.  Below.

16        THE COURT:  Below.

17        MR. CONNETT:  Below.

18        THE COURT:  And at the 1.5, the entire study,

19 including the upper range of exposures, found a 7 point

20 decrement associated?

21        MR. CONNETT:  Correct.

22        THE COURT:  What about was there an attempt to

23 quantify the size of the decrement when you get into that

24 smaller range closer to 1.5?

25        MR. CONNETT:  I would have to go back and look.  I

1    don't know -- I don't believe NTP attempted to make a

2    quantification as to the magnitude of a fact.  They used a

3    different type of statistical analysis for that, which was --

4    which doesn't -- which doesn't directly correlate into an --

5    the magnitude of effect, to my understanding, Your Honor.

6            **THE COURT:**  Okay.  Thank you.

7            **MR. CONNETT:**  So the fourth, I think, significant

8    finding from the NTP is that exposure characterization.  How do

9    we identify the exposure, by urine, by water, whatnot, is

10   unlikely to explain this association between fluoride and

11   reduced IQ.

12       As you can see here, Your Honor, the NTP writes in general

13   there were few, if any, risks of bias concerns regarding

14   exposure characterization in the low-risk-of-bias studies.

15       Fifth, NTP determined that outcome measurement, things

16   like blinding of the examiners or the type of cognitive test

17   performed is unlikely, again, to explain this association.

18   Here you see NTP's comment that the, quote, "Low-risk-of-bias

19   studies have few concerns regarding outcome measurement."

20       And lastly, Your Honor -- and this comes through if you

21   look at also NTP's comments in response to some of the agency

22   concerns -- NTP basically concluded that what is the most

23   likely outcome of this association?  Fluoride neurotoxicity.

24       And I'll point the Court to a few, I think, important

25   statements on this point.  NTP writes that, you know:  Given

 1  the consistency of the association and the various types of

 2  covariates that have been controlled for that in NTP's words,

 3  this consistency, quote, "All serve to rule out the possibility

 4  that there is a common factor other than fluoride exposure that

 5  can account for this outcome."  All serve to rule out the

 6  possibility that there is a common factor other than fluoride.

 7       NTP also stated, Your Honor, that "A spurious association

 8  is unlikely."

 9       So let's move on to another -- other evidence that the

10  Court will hear, and the Court is going to hear testimony today

11  from Dr. Howard Hu.

12       **THE COURT:**  Okay.  Before you get to that let me ask

13  you:  So the ruling out of common factors or confounding

14  factors, is that done generally through some form of regression

15  analysis, or what is the -- tell me again what the methodology

16  is for them to be able to reach that conclusion of lack of

17  bias.

18       **MR. CONNETT:**  So the way that NTP did it, which is not

19  necessarily the same the way the EPA would do it, but the way

20  that NTP did it is, they did a separate -- for each study that

21  they looked at, they were assessing the degree to which

22  exposure error, exposure imprecision may bias the results or

23  the extent to which confounding may bias the results, the

24  extent to which outcome measurement may bias the results.  And

25  they had a qualitative discussion regarding that in the

1  monograph where they concluded that they did not find that

2  likely that any of those factors could explain the consistent

3  association.

4      Then in the meta analysis what NTP did to further

5  corroborate that is they did a more quantitative assessment

6  where they would, sort of, have different bins of studies that

7  they would meta analyze.  And they found that when they did so,

8  if they only looked at studies from certain countries, or if

9  they only looked at studies that, you know, with various

10 characteristics, they did not see a meaningful change in the

11 association between fluoride and IQ.

12     And I should say, Your Honor, that the way that the NTP

13 did this assessment is far more thorough than what you will see

14 in EPA's risk evaluations.  Not to say that EPA does not do a

15 good job, we don't dispute that, but the NTP's assessment is

16 more thorough in that analysis.

17     **THE COURT:**  And so if confounding factors are

18 essentially ruled out as a likely risk bias affecting the

19 result, what's the difference, then, between an association

20 found after excluding those biases and causation?  Aren't you

21 pretty close to that point?

22     **MR. CONNETT:**  That's why I said, Your Honor, at the

23 beginning of my opening that I think it's an academic point at

24 this point whether you use association or causation for the

25 hazard inquiry, because I do believe, based on NTP's analysis

 1  and other factors, that we have causation now for hazard.

 2      I think where the causation component, Your Honor, becomes

 3  very problematic in this case is not at the hazard level.  It's

 4  at the risk level.  And I think that EPA's analysis, sort of,

 5  wants to impose a causation requirement when you get down to

 6  the question of does water fluoridation present a risk.  That's

 7  where I think the causation issue becomes problematic in this

 8  litigation.

 9          **THE COURT:**  Okay.  Thank you.

10          **MR. CONNETT:**  So the Court will hear testimony from

11  Dr. Howard Hu, the principal investigator of the ELEMENT birth

12  cohort as well as Dr. Bruce Lanphear the co-principal

13  investigator of the MIREC cohort.

14      And as I'm sure Your Honor remembers, their studies in the

15  ELEMENT cohort and the MIREC cohort were funded by the National

16  Institute of Health, received extensive vetting from the NIH

17  before doing the studies.  After finishing the studies they

18  received extensive peer review.  These studies controlled

19  extensively for potential confounders.  The studies used

20  individual measurements of fluoride, and they had blinded

21  examination.  So there was no dispute in this case, and still

22  is no dispute in this case that these are high-quality,

23  state-of-the-art birth cohort studies.

24      And the Court will also hear from Dr. Hu and Dr. Lanphear

25  that -- they have done additional analysis on the ELEMENT

1    cohort and the MIREC cohort, and these additional analyses

2    provide further support for fluoride being a developmental

3    neurotoxicant at the levels used for oral health purposes, such

4    as for water fluoridation.

5         Now, the Court will also hear a lot of testimony in this

6    case about some recent studies that have failed to detect

7    effects from fluoride at low levels of exposure.  One of these

8    studies from Australia was published in the Journal of Dental

9    Research and was conducted by a dentist who has been actively

10   promoting fluoridation for decades.  But conflicts of interest

11   aside, there are clear, identifiable reasons why these low-dose

12   studies were not able to detect an effect, including there is

13   an inherent challenge, Your Honor, of detecting effects when

14   you are investigating populations with low-exposure contrasts,

15   low-exposure contrasts.

16        An example:  When we banned leaded gasoline, we had a

17   whole lot of lead exposure in our population.  It was difficult

18   to find meaningful differences in lead exposure, and so they

19   weren't able to detect the facts from low levels of exposure.

20        But once those levels started to come down and they had

21   exposure contrasts, they could see that the effects were

22   occurring even at low levels.

23        A second limitation -- a second reason why some of these

24   low-dose studies may not be finding these associations is that

25   they do have, some of them, as you will hear, have important

 1    limitations in their study design that limit their power to

 2    identify an association.

 3         So I now turn to what is sometimes referred to as the

 4    Spanish Study by Dr. Ibarluzea.  The Spanish Study, Your Honor,

 5    is of one location of seven locations in the INMA Cohort.  It

 6    is in the Basque in coastal Northern Spain.  There is a lot to

 7    say about this study, but I will just flag for Your Honor a few

 8    points here.

 9         First and foremost, the findings of this study are, on

10    their face, implausible.  First the study purports to show that

11    maternal fluoride exposure increases, increases the IQ of boys

12    by 15 points.  There is no precedent for this.  There is no

13    biological plausibility for this.

14         As EPA's experts concede in this case -- you will hear it

15    in this case -- there is no other substance known to man which

16    increases the IQ of human beings by 15 points.  And of the 50

17    plus IQ studies that have been done -- of the 70 plus IQ

18    studies that have been done on fluoride, not a single one has

19    found a significant beneficial effect of fluoride on IQ, let

20    alone one of this magnitude.

21         A second implausible finding, Your Honor, is that when you

22    look at the effect of maternal fluoride on IQ in the children

23    from the nonfluoridated part of the cohort -- because this

24    area, Your Honor, had both fluoridated areas and nonfluoridated

25    areas, but when you look at the effect of fluoride on IQ in the

 1   nonfluoridated areas -- so this is the area with less

 2   exposure -- the study found a 28-point increase in IQ from

 3   maternal fluoride exposure.

 4       Now, this increase is so astronomically large that it

 5   would turn an average IQ boy into a genius because the

 6   difference between average IQ and being a genius is typically

 7   considered 100 for average and 130, thereabouts, for being a

 8   genius.

 9       A third implausible finding from this study is that the

10   dramatic beneficial association between fluoride and IQ

11   evaporates, evaporates, goes away, disappears when you remove

12   creatinine adjustment from the exposure metric.

13       And you can see this right here, Your Honor.  The green

14   bar, the big green bar that you see there is the published

15   result, 15 IQ point benefit for boys.

16       When you remove the creatinine adjustment, 15 points

17   evaporates, and it becomes a null effect of .11.  Completely

18   disappears.

19       For the girls the finding goes from a null effect to a

20   drop of IQ of negative 3.75, although that was not

21   statistically significant.

22       But you can see there's a significant change in results

23   when you control -- when you take away the creatinine

24   adjustment.  And to be clear -- to be clear, there's nothing

25   wrong with controlling for creatinine.  Indeed, it's the

**OPENING STATEMENT / PLAINTIFF**

 1   preferred approach, either that or specific gravity, to adjust

 2   for urinary dilution.  We're not going to criticize the Spanish

 3   Study for that.  That was appropriate.

 4       But the problem is, there's no plausible reason why

 5   adjusting for creatinine should change the results in such a

 6   dramatic fashion.  Nor will the Court hear a single explanation

 7   in this case as to why it did so.

 8       Dr. Ibarluzea testified that he's not interested.  In his

 9   words, I have, quote, "No interest whatsoever," unquote, in

10   finding the answer to that question.

11       **THE COURT:**  And is the creatinine adjustment done to,

12   sort of standardize the -- I don't know if you call it the

13   density or the -- because you mentioned specific gravity, which

14   I sort of understand.  What is the purpose?  What does

15   creatinine adjustment do?

16       **MR. CONNETT:**  Same thing, Your Honor.  Different

17   approach, same goal.  Because if you just drank, like, a beer,

18   you just drank, like, a big glass of water and you pee, your

19   urine is going to be diluted; and thus, it can artificially

20   create the impression that you have less fluoride in your

21   system.  Whereas, if you've been fasting or not drinking for 24

22   hours, your urine levels may create the artificial impression

23   that you have more fluoride in your system.  So you really need

24   to, sort of, adjust for the dilution to get a better, more

25   accurate sense of what the exposure actually is.

1          So again, perfectly reasonable and appropriate for the

2     Spanish Study to use creatinine adjustment.

3          What remains a quandary is why does it affect the results

4     so dramatically?  No one has an explanation for that.

5          Now, the problem with the Spanish Study is not just that

6     the results are implausible.  You know, you might hear the EPA

7     in this case say, well, the plaintiffs, they just don't like

8     the Spanish study because they don't like the results; it's an

9     outcome driven analysis, let's look at the methodology.

10          Okay.  Let's look at the methodology.

11          I encourage the Court to pay close attention to the

12     discussion of seafood in this case.  Seafood.  Who would have

13     thought it comes into a case on fluoride, but it does.

14          Coastal Spain, including the Basque region where this

15     study was conducted, had the highest intake of seafood in the

16     world, according to Dr. Ibarluzea at the time the pregnant

17     mothers were recruited.

18          Why is seafood important?  It's important because seafood

19     has fatty acids that are known to improve neurodevelopment,

20     known to increase IQ.  This creates a dilemma when you're

21     studying the IQ effects of toxicants like mercury, toxicants

22     like fluoride that are contained within the seafood because if

23     you don't carefully disentangle the beneficial effect of

24     seafood, you can easily be led to think that there's an

25     association, a beneficial association, between the toxicant

**OPENING STATEMENT / PLAINTIFF**

1   within the seafood and increased IQ.  So you've got to control

2   for seafood very carefully when you have a meaningful intake of

3   seafood in the population.

4         And this is precisely why the Spanish study collected

5   very, very, very detailed information about each mother's

6   consumption of seafood.  They knew from the outset of this

7   study that seafood is a very important factor to consider for

8   neurodevelopment, for any study assessing the

9   neurodevelopmental effects of chemicals within seafood.  And

10  yet, despite collecting that data, the Spanish study never

11  bothered to control for seafood in its analysis.  They never

12  controlled for it.

13        Now, you might hear that it said that, well, the MIREC

14  study didn't control for it, the element study didn't control

15  for it, but the fact is that those cohorts have much less

16  seafood intake.  And if they did control for seafood, Your

17  Honor, it would have had the practical effect, if anything, of

18  accentuating the association between fluoride and reduced IQ.

19        So now, Your Honor, I'm going to turn to the risk

20  component of the analysis for fluoride.  And I believe the

21  evidence will show that neurotoxicity is a risk of water

22  fluoridation.

23        And, again, for the risk inquiry, you start with the --

24  identifying the hazard level, which you do through qualitative

25  dose-response analysis.

OPENING STATEMENT / PLAINTIFF

1          I'm going to keep this relatively brief here, but in this

2     case we do have hazard levels for the Court.  The first one has

3     been identified by Dr. Philippe Grandjean, who has done

4     benchmark-dose analyses, Your Honor, on the pooled analyses of

5     the ELEMENT cohort and the MIREC Cohort as well as a pooled

6     analysis of the ELEMENT cohort, the MIREC Cohort and a new

7     cohort from Denmark called the Odense Cohort, sometimes called

8     the OCC Cohort.

9          And I would point Your Honor to the fact that

10    Dr. Grandjean's BMCL work -- he and his team have done BMCL

11    analyses of other chemicals, including PFAS.  Just recently, in

12    2018, they published a BMCL analysis on PFAS, which is the

13    highest priority environmental toxicant today in this country.

14    Very actively investigated, the EPA is very concerned about it.

15         The EPA has selected Dr. Grandjean's BMCL analysis as the

16    critical study for deriving the reference dose for PFAS.  I

17    think that's a reflection, Your Honor, of the fact that

18    Dr. Grandjean's BMCL analysis is, you know, something that

19    needs to be taken very seriously.

20         And EPA's own guidance document on how to do

21    benchmark-dose analyses specifically identifies Dr. Grandjean's

22    BMCL analysis on mercury and IQ as an example, as an exemplar

23    of how to do BMCL analyses in human data.

24         So what did Dr. Grandjean find for fluoride when he did

25    the full pooled analysis of the three cohorts?  The BMCL, the

1  hazard level is identified as .28 parts per million in the

2  urine of the mother, and that is the level that the lower

3  confidence limit of the level that causes a reduction in IQ of

4  1 point in the offspring.

5       So that's one hazard level for the Court to consider in

6  this case.

7       And the other hazard level is the NTP.  The NTP, as the

8  Court has seen, the NTP has, in its words, moderate confidence

9  that fluoride levels above 1.5 parts per million or the

10  exposures associated with fluoride levels above 1.5 is

11  consistently associated with neurotoxicity.

12       So those are the hazard levels.  What, then, is the

13  exposure levels?

14       And here, Your Honor, I will start by talking about

15  something very basic, human thirst.  Human thirst is not

16  something we need to speculate much about.  It's the year 2024.

17  We know how much water people drink.  What you see on this page

18  is based on EPA's own data, which the EPA considers the most

19  up-to-date data on water intake.  And as this data on this

20  figure shows, the 95th percentile pregnant mother in the top 5

21  percent exposed pregnant mother, consumes about three times

22  more tap water than the average.  That's an important factor,

23  Your Honor, because the EPA needs to protect the 95th

24  percentile.

25       And because we add fluoride to water at a known

1    concentration, it's very easy to take a water consumption data

2    point and convert it into the fluoride dose.  Very easy.  Just

3    basic arithmetic.

4         And so we know right now, Your Honor, that the 95th

5    percentile pregnant mother in the fluorinated area, .7 parts

6    per million, she will ingest more fluoride from water than the

7    average person living in the 1.5 ppm area, the hazard level

8    from the NTP.  There's an overlap in exposure.

9         And this water fluoride data is convergent.  It aligns

10   with the urinary fluoride data that is now available.  This

11   figure on the screen shows the distribution of urinary fluoride

12   in the MIREC Cohort in Canada.

13        And as you can see, the urinary fluoride levels among the

14   95th percentile women are approximately three times higher than

15   the median, than the 50th percentile.  So the urinary fluoride

16   data and the water fluoride data are convergent.  They align.

17   They make sense.  There is little meaningful uncertainty about

18   this.

19        And, importantly, this figure shows another very important

20   fact, which is, even if we wanted to limit our consideration of

21   exposure to just the exposure caused by fluoridation of water,

22   when you look at the differences in urinary fluoride levels

23   between the fluoridated communities and the nonfluoridated

24   communities, you see a major difference in urinary fluoride

25   levels between the two.

OPENING STATEMENT / PLAINTIFF

1          Fluoridated water is a major contributor to urinary

2     fluoride levels in North America.

3          THE COURT:  So the green is nonfluoridated areas, and

4     this is the urinary fluoride measured.  And so if you're in the

5     50th percentile, the difference between fluoridated and

6     nonfluoridated water is about double?

7          MR. CONNETT:  Correct.

8          THE COURT:  So that suggests, in a very crude sense,

9     that in nonfluoridated areas, there are other sources of

10    fluoride that would account for .39 urinary output?

11         MR. CONNETT:  That is correct, with one important

12    caveat.  The levels that you see in the nonfluoridated areas

13    are, themselves, influenced by fluoridated water that is

14    consumed in Coca Cola, in juices, in beers, because we have so

15    much fluoridated water that it gets into the processed food

16    chain, so it's hard to quantify that, Your Honor.  It's hard to

17    know how much of that is coming from the, sort of, what they

18    call the "halo effect."  But we know that some of that urinary

19    fluoride in the nonfluoridated area is coming from water

20    fluoridation, which serves to understate the difference between

21    the two.

22         THE COURT:  Okay.  And what about cooking with tap

23    water?  What happens to fluoride?

24         MR. CONNETT:  When you boil the water, the

25    concentration increases.  It increases.

 1              **THE COURT:**  It doesn't boil off.

 2              **MR. CONNETT:**  It does not boil off.  It increases.

 3              **THE COURT:**  Okay.  Thank you.

 4              **MR. CONNETT:**  So -- and, Your Honor, I should point

 5       out that the NTP, in its comments to the federal agencies, has

 6       expressed concern about this very point.  As you can see here,

 7       the NTP has said even in the optimally fluoridated areas, some

 8       urinary fluoride measurements exceed those that would be

 9       expected from consuming water that contains fluoride at 1.5.

10              So the NTP has recognized this troubling problem that we

11       have with an overlap in exposure between .7 and 1.5.

12              So now let's turn to the risk characterization component,

13       and I might keep my comments here briefer than I had

14       anticipated.  We'll probably have plenty of time to talk about

15       it further, but basically, Your Honor, one of the striking

16       facts that we have of the fluoride data is that you actually

17       have in one of the hazard scenarios human exposure exceeding

18       the observed hazard level.  And that's where -- you can see

19       that, Your Honor, where you compare urinary fluoride levels in

20       fluoridated areas against the BMCL that Dr. Grandjean

21       calculated, and you see that the human exposure level is

22       exceeding that BMCL.  In fact, for the 95th percentile pregnant

23       mother, it's exceeding it by almost a factor of 8.  So that's a

24       very troubling and rare circumstance.

25              But, again, even let's just say, Your Honor,

**OPENING STATEMENT / PLAINTIFF**

 1   hypothetically, let's say hypothetically that Dr.  Grandjean's

 2   BMCL is actually three parts per million, ten times higher.

 3   You still would not have -- as you can see in this figure, you

 4   would still have very little margin between the hazard level

 5   and the human exposure level.

 6       So this brings us to what's called the "MOE approach," the

 7   margin-of-exposure approach, which is how EPA identifies a risk

 8   in the inferred risk scenario when the exposure level is below

 9   the hazard level.  This is how EPA determines if that exposure

10   is too close to the hazard level to be comfortable with.

11       And this analysis, Your Honor, brings in what I call the

12   "science of uncertainty."  The science of uncertainty.

13       What we mean by this is, it is well established

14   scientifically, through decades of experience and research,

15   that human beings do not respond one and the same to a single

16   dose of fluoride or to any toxicant.  Humans' vulnerability

17   varies quite substantially based on innate factors like genetic

18   predisposition, kidney disease or health conditions, life

19   stage, things like that.

20       So what EPA does is, it seeks to determine an uncertainty

21   factor which becomes the margin, the acceptable margin, between

22   the hazard level and the exposure level.  Again, the point is

23   to protect the most susceptible in our population.

24       Now, I'm going to say, Your Honor, I'm going to predict

25   that through the course of this litigation, this trial, we're

 1    all going to get confused when we start talking about the

 2    margin of exposure framework.  We are.

 3        Every person I've spoke with about this gets confused

 4    because you typically think that the more you have, the more

 5    risk you have, and it kind of -- this approach kind of flips

 6    everything on its head.  I just want to flag that for the

 7    Court.  It gets confusing.

 8        The EPA has recognized the confusing nature of the MOE

 9    framework in its own public comments, but I'm not going to go

10    through it much today.  We'll talk about that more in closing,

11    but I just want to go to the key facts in this case about the

12    uncertainty factor, about the -- and that is, Dr. Barone in

13    this case, to his credit -- to his credit -- as a risk

14    assessment scientist at the EPA testified that there should be

15    an uncertainty factor for fluoride.  We need to protect the

16    vulnerable.  We need an uncertainty factor for what is called

17    "intraspecies variability."  Intraspecies variability.

18        Dr. Barone testified that in his estimation, we should

19    have an uncertainty factor of at least ten.

20        Now, uncertainty factor, Your Honor, is -- when you hear

21    the term "benchmark MOE," that's what you're hearing.  It's

22    uncertainty factor.  It's the same thing.  The benchmark MOE is

23    just the agregation of all uncertainty factors.  It's your

24    total uncertainty factor.  Okay?

25        So this here -- this figure here, Your Honor, shows you

**OPENING STATEMENT / PLAINTIFF**

1    the margin of exposure between the hazard levels for fluoride

2    and the exposure level.  And it compares it against the

3    uncertainty factor of ten.  And you can see that the human --

4    that the margins for fluoride are well below the adequate

5    margin, well below.  We do not have enough of a margin to

6    protect society.  We don't have enough buffer between the

7    hazard level and the exposure level.

8         And Dr. Barone was not at all being -- I mean, his

9    estimate of ten is actually quite low in the context of EPA

10   uncertainty factors for other chemicals.

11        Here you can see that for PCE, EPA found a risk where the

12   exposure level was 89 times less than the hazard level, 89

13   times less.

14        For fluoride, the margin is on the factor of 1 to 2.  So

15   it's -- the margin with fluoride is much more precarious, much

16   more slender than with these other chemicals that EPA has

17   evaluated.

18        **THE COURT:**  What does average and high mean?

19        **MR. CONNETT:**  In this -- Your Honor, under "EPA risk

20   evaluations," the average, which the EPA will characterize as

21   typical, the EPA strives, if the data permits, to get the 50th

22   percentile, right in the middle of the distribution, okay?

23   That's what you aim for.  The data does not always permit that

24   level of precision, so it will be called an average exposure, a

25   typical exposure, but you're looking for the middle of the

 1    distribution curve.

 2         With the high exposure, again, data permitting, EPA will

 3    aim to use the 95th percentile for the human exposure and --

 4    but sometimes EPA, if the data permits, will even use the 99th

 5    percentile.

 6         Now, plaintiffs in this case will be presenting evidence

 7    on the 95th.  We're not going to go up to the 99th.  But a key

 8    point that I cannot emphasize enough, EPA, when it looks at a

 9    condition of use -- and this is in the undisputed facts

10    section, Your Honor -- when it looks at a condition of use,

11    even where the average exposure does not present a risk, EPA

12    will find a risk for the condition of use if the 95th

13    percentile has an exposure of concern.

14         So again, TSCA commands us to protect the susceptible, to

15    protect those with sentinel exposures.  EPA is following that

16    command.  EPA is making risk determinations where you only have

17    the top 5 percent of the exposed population at risk.

18         So in this case, Your Honor, as applied here, even if

19    average exposures to fluoridation chemicals did not pose a

20    risk, even if that was the case and the Court came to that

21    conclusion, the inquiry would not stop there because you have

22    to look at the potential risk for the 95th percentile.

23         **THE COURT:**  And you will present evidence that shows

24    that the top 5 percent, 95th percentile, is exposed to

25    concentrations of 1.5 parts per million in drinking water?

1          **MR. CONNETT:**  They are exposed to total exposures as

2     reflected through the urinary fluoride that exceed the

3     exposures associated with 1.5 parts per million fluoride in the

4     water.  That's one thing that plaintiffs will show.

5          The second thing that plaintiffs will show is that, again,

6     going back to the water intake data from EPA, pregnant mothers,

7     the 95th percentile of water intake will consume more fluoride

8     from drinking water than a mother living in a 1.5 ppm area, so

9     there's an overlap of waterborne exposure.

10          **THE COURT:**  All right.  I guess there's the argument

11     about whether you should look at the aggregate, which includes

12     a substantial effect of drinking water, evidently, from -- or

13     whether you're supposed to look only at the condition of the

14     water, and that's something you all will address, I take it?

15          **MR. CONNETT:**  That's what -- the statute, the TSCA

16     statute specifically permits the EPA to consider aggregate

17     exposure.  Specifically says it right in the statute.  EPA,

18     Your Honor, will consider aggregate exposure if the data

19     permits.  And the data here, in our view, does permit the

20     aggregate exposure assessment.

21          **THE COURT:**  And I take it you're going to address the

22     criticism that looking at urinary concentrations is not the

23     proper measure.  You can't derive point of departure,

24     et cetera, et cetera, without actually looking at intake?

25          **MR. CONNETT:**  We will address that point, Your Honor.

**OPENING STATEMENT / PLAINTIFF**

 1          **THE COURT:**  Okay.

 2          **MR. CONNETT:**  So finally, and wrapping it up -- I

 3    guess -- finally.  Sorry.

 4          We're going to look at the third inquiry, which is, is the

 5    risk posed by water fluoridation an unreasonable risk.

 6          And I'm just quickly going to go through the risk-related

 7    factors here first.  Is the effect of IQ loss adverse to human

 8    health?  Clearly, Your Honor, it is, and the EPA will not

 9    dispute that in this case.

10          The second factor is, what is the known extent of human

11    exposure?  This is not subject to dispute; it's just basic

12    information.  What's the duration of exposure to fluoridation?

13    Lifetime.  What is the frequency of exposure to fluoridation

14    chemicals?  Daily.  What is the magnitude of exposure to

15    fluoridation chemicals?  The average exposure exceeds the BMCL.

16          What are patterns of exposure to water fluoridation?

17    Bottle-fed babies have the highest exposure of all age groups

18    in the population.  That's a critical vulnerable group being

19    exposed to the highest dose of fluoride of any age group in the

20    population.  That is a major cause for concern.

21          If EPA had any other chemical in its risk evaluations

22    under TSCA and it had a formula-fed baby receiving the highest

23    dose of that chemical that's linked to neurotoxicity, I don't

24    think we need to speculate about what EPA would do with that

25    scenario.

 1       And then the number of people that are exposed to water

 2  fluoridation is nothing short of massive, 200 million people,

 3  which far exceeds the number of people exposed to the

 4  conditions of use that EPA has considered under TSCA.

 5       Next question:  Are susceptible populations being exposed?

 6  Yes.  We've discussed that.  Two million pregnant mothers live

 7  each year in fluoridated areas.  400,000 exclusively

 8  formula-fed babies in fluoridated areas.  Exclusively formula

 9  fed.  No breast milk.  All formula made with fluoridated water.

10       Fourth question --

11       **THE COURT:**  Let me ask you on that question:  Will

12  there be evidence about -- does that evidence about bottle-fed

13  infants factor out bottled water or non-tap water?

14       **MR. CONNETT:**  That is a great question, Your Honor,

15  and I was looking at that in preparing for this.

16       I believe that -- I need to confirm that, but I believe

17  that 425,000 figure is for -- is not specific to tap water

18  versus bottled water and that -- so that would need to, sort

19  of, be assessed.

20       But even, Your Honor, let's just say -- let's just say 50

21  percent is all bottled water, right?  You're looking at 200,000

22  exclusively formula-fed babies, and that's still -- that's

23  more -- that's more humans by orders of magnitude than the

24  entire populations affected by the chemicals that EPA has

25  regulated thus far under TSCA.

**OPENING STATEMENT / PLAINTIFF**

 1      This fourth factor here for unreasonable risk is, I

 2   think -- and the fourth and fifth factors, Your Honor -- is

 3   where you're going to see probably the most dispute in analysis

 4   in this case.  It's the confidence issue, and it's the

 5   uncertainty issue.

 6      And as I mentioned earlier, I think the key problem with

 7   EPA's argument in this case is that they are repeating the

 8   confidence assessment analysis to the -- to water fluoridation

 9   as opposed to the hazard level in general.

10      Dr. Kathleen Thiessen, who is a risk-assessment expert,

11   will discuss this issue about confidence for the Court in this

12   case.

13      And lastly is the question of uncertainties.  And I would

14   say, Your Honor, that there will always be uncertainties in

15   risk assessment.  Dr. Barone will explain that to you.  There

16   is -- uncertainty is pervasive to risk assessment.  So the fact

17   that there is uncertainties in the fluoride assessment is not a

18   surprise.  It's to be expected.  You will never have all the

19   pieces of the puzzle complete.  And that D.C. Court Of Appeals

20   decision that I cited for the Court at the beginning of this

21   case specifically has an extended discussion on that very

22   point.  You can't wait for the last puzzle piece to fit in

23   before you take action because that would, sort of, be

24   defeating the purpose of risk assessment, where you are dealing

25   with uncertainty and making the wisest, most prudent decision

OPENING STATEMENT / PLAINTIFF

1    in the face of that uncertainty.

2        So we do not dispute that there will be uncertainties when

3    you look at the data, things that we don't yet fully

4    understand, but if we are held to the burden of answering every

5    question about fluoride, toxicokinetics, fluoride neurotoxicity

6    and fluoride exposure, that's not the standard that the EPA

7    holds itself to under TSCA, nor, for that matter, any

8    regulatory body.

9        Lastly, Your Honor, I will briefly address the experts in

10   this case.  As you know, plaintiff's experts, Dr. Grandjean,

11   Dr. Hu and Dr. Lanphear, have published studies on lead and

12   mercury that the EPA has relied upon for establishing safety

13   standards to protect our country from those chemicals.

14       Dr. Lanphear, Dr. Grandjean and Dr. Hu have all served on

15   advisory boards.  They advise the EPA on chemical risk

16   assessment matters.

17       Dr. Hu and Lanphear are currently advising the EPA on lead

18   issues.

19       Dr. Kathy Thiessen was contracted by the EPA to write

20   health assessments on fluoride and mercury compounds, and so

21   there's no question that EPA relies upon plaintiffs' experts

22   for advising the agency on important and critical environmental

23   health matters.

24       And in addition to that, plaintiffs' experts are also

25   subject matter experts on fluoride, and that's important.  They

```
 1   have all studied this issue outside of this courtroom, outside
 2   of this case.
 3        And EPA's experts, Dr. Jesus Ibarluzea, unfortunately he
 4   will not be appearing here live, but he will be appearing by
 5   deposition.  He will be discussing the Spanish study.
 6        Dr. Barone will -- I think -- we're certainly --
 7   Dr. Barone and plaintiffs' experts have plenty of
 8   disagreements, and I'm sure you're going to hear about the
 9   disagreements.  We respect that.  But I do think, Your Honor,
10   that you're going to find that there's actually quite a bit of
11   things that the -- Dr. Barone agrees with that the plaintiffs'
12   experts -- there's a lot of common ground, I think, there, I
13   think.
14        And then lastly, you're going to hear from Dr. Savitz.
15   And I just -- the last point I'm going to make, Your Honor, on
16   this is Dr. Savitz is a very accomplished epidemiologist.  I
17   would never dispute that in a million years.  The problem with
18   his analysis is, he recognizes in his textbook that the
19   sufficiency of evidence for epidemiology is always dependent on
20   the context.  What is the sufficient evidence standard?  And
21   because you don't know if the evidence is sufficient unless you
22   know the standard and Dr. Savitz, by his own admission, does
23   not know the standard that EPA uses -- he's never read EPA's
24   guidelines on risk assessment; he doesn't know how EPA defines
25   hazard; he doesn't know how EPA defines risk; he doesn't know
```

1  if EPA uses uncertainty factors; he doesn't know why EPA would

2  use uncertainty factors; he doesn't know if EPA uses health

3  protected assumptions.

4       So what you're going to hear from Dr. Savitz is a very

5  scrutinizing, exacting analysis of the .7 ppm studies.  And

6  he's probably going to point you to every possible divergent

7  finding imaginable.  And I think the conclusion will be we just

8  don't have enough information yet that at .7 to reach a

9  confident conclusion of harm at .7.

10      That takes us back to leaded gasoline.  That takes us back

11 to the difference between observed hazard and inferred risk.

12 Observed hazard and inferred risk.  Our burden in this case is

13 not to meet Dr. Savitz's threshold.  EPA doesn't meet that

14 threshold in its risk evaluations and the plaintiff should not

15 be held to that standard here either.

16      And, Your Honor, with that, I will close my remarks.

17           **THE COURT:**  Okay.  Why don't we go ahead and take a

18 break.  We've been going at it for an hour and 20 minutes or so

19 and then we'll come back and hear opening statements from the

20 government --

21           **MR. CONNETT:**  Thank you.

22           **THE COURT:**  -- and after that, we'll start our

23 testimony.

24           **THE CLERK:**  Court is in recess.

25      (Recess taken at 9:35 a.m.)

1          (Proceedings resumed at 9:54 a.m.)

2          **THE CLERK:**  Please remain seated and come to order.

3    Court is back in session.

4          **THE COURT:**  All right.  The Government may -- the

5    Government may present your opening.  Just a reminder that the

6    clock does run any time you're up, so just make sure people

7    don't forget.

8          **MR. CAINTIC:**  Of course, Your Honor.

9          I think as the attorney, I know Mr. Connett's opening

10   statement was, I think, close to an hour 10, hour 20.  I don't

11   plan on going for that long.  I'm confident that our scientists

12   over the next two weeks will address many of the points that

13   Mr. Connett raised; but otherwise, I expect 25 minutes,

14   depending on the Court's questioning.

15         **THE COURT:**  All right.  Great.

16                       <u>**OPENING STATEMENT**</u>

17         **MR. CAINTIC:**  The dose makes the poison.

18   Mr. Connett's opening focused on one step, one sub step of a

19   hazard assessment, the hazard identification, but it failed to

20   emphasize the importance of dose response.

21         As this Court acknowledged, almost anything in excess can

22   be harmful.  Too much calcium can cause kidney problems; we

23   don't ban people from drinking milk.  And too much water can

24   cause water poisoning; but we, of course, don't stop people

25   from drinking water.

1          In our country, many states and communities make the local

2    decision to fluoridate their drinking water to a concentration

3    of .7 milligrams per liter.  But seven years ago, plaintiffs

4    petitioned EPA to ban states and communities from making that

5    choice.  They argued that drinking water with a fluoride

6    concentration of .7 milligrams per liter is neurotoxic.

7    Respectfully, EPA disagreed, and we had a trial.

8          It's been three and a half years since that trial, and

9    during that time the science has progressed, and a few key

10   scientific documents have been released.  Among them is the

11   National Toxicology Program or NTP's monograph on Fluoride and

12   Neurodevelopment.  I know we had all hoped that the monograph

13   would be final by this point, but we now have the most recent

14   drafts of the monograph as well as several scientific reviews

15   of those drafts.  All of those materials will be before this

16   Court, and the Court will hear a lot of testimony in the next

17   two weeks about those materials, but nothing can replace simply

18   reading the NTP Monograph.  This Court just saw several quotes

19   that plaintiff selected from the NTP Monograph, but when the

20   Court reads the NTP Monograph, itself, and, in particular, when

21   it reads the NTP author's overall conclusions, here is what it

22   will see:

23         When analyzing fluoride's effects on IQ, the NTP author

24   separated out what are the effects at high-fluoride doses

25   versus low-fluoride doses?

 1        High-fluoridated doses they defined as exceeding 175

 2   milligrams per liter in the water, a/k/a exceeding double

 3   what's in the United States.

 4        Low fluoride doses NTP defined as less than 1.5 milligrams

 5   per liter in the water, a/k/a less than double what's in the

 6   United States' water supply.

 7        And after the authors analyzed the fluoride and child's IQ

 8   scientific literature, they concluded this:  That the

 9   associations between lower fluoride exposure in children's IQ

10   remain unclear.

11        **THE COURT:**  But at the 1.5 and above, there was

12   moderate confidence that there was an association, correct?

13        **MR. CAINTIC:**  That's an important point.  Moderate

14   confidence at these higher fluoride exposures.  I think at this

15   time there was one point that Mr. Connett raised that I think

16   bears some clarification.

17        So first, the studies that fell within this

18   high-fluoride-dose bucket, they are, oftentimes, not at 1.5 or

19   1.5 or 2.  They're at 3, 4, 5, sometimes 10 or even 15

20   milligrams per liter.

21        You know, the study that immediately comes to mind is this

22   Valdez Jimenez study out of 2017 that looked at average water

23   concentrations in Mexico, and had exposures that were in the 3

24   to 4 range.  So when the NTP used 1.5 as a cutoff, it's a

25   little bit confusing because there's not really a lot of

 1   studies that are in that 1.5 to 2 range or, frankly, Your

 2   Honor, even in the 1.2, let's say, to 1.75 range.

 3         **THE COURT:**  That's where I thought I heard your

 4   opponents suggest that there were a lot of studies in that, I

 5   don't know, 1.5 to 2.5 to 3 or certainly below the 3 and 4

 6   level.  Do you have a different view of the -- if you did a dot

 7   graph, you'd look at the distribution of those studies, what

 8   would it look like?

 9         **MR. CAINTIC:**  That's right, Your Honor.  And that's

10   one of the reasons that we're so happy that the NTP

11   Monograph -- the parties have agreed just to put that into

12   evidence.  It's one of the reasons why I think when -- if this

13   Court is inclined to order posttrial briefing, it will be

14   really beneficial because we can cite directly to the NTP

15   Monograph, and the Court can see those cites.

16         But in terms of those studies that are falling within this

17   high-dose bucket, there's really not a lot that are falling

18   within that actual, kind of, cutoff point.  And, in fact, I

19   can't think of any off the top of my head that are precisely at

20   that 1.5 realm.

21         At this point too, Your Honor, Mr. Connett raised some

22   points about the meta analysis -- and he was right -- that the

23   NTP authors did a cutoff of what are the fluoride studies

24   saying that are analyzing 2 milligrams per liter, 1.5

25   milligrams per liter or lower, 4 milligrams per liter or lower?

 1   And then they try to run a statistical model on those to see if
 2   they can find statistically significant adverse effects.
 3        And Mr. Connett is right, they found in one of those
 4   models a statically significant adverse effect below 1.5
 5   milligrams per liter when using urinary fluoride as the
 6   exposure metric.
 7        When they used water concentration, the actual water
 8   concentration, the water fluoride concentration, below 2, below
 9   1.5, no statistically significant effect.  And the Court can
10   find this, I believe, on pages 76 to 82 of the NTP's July 2022
11   meta analysis which, I believe, is Exhibit 68.
12        When they looked at urinary fluoride levels, they looked
13   at what are the effects -- can we get statistical significance
14   if we just looked at the urinary fluoride studies below 2, and
15   can we get statistical significance if we just look at the
16   urinary and fluoride studies below 1.5.  Below 1.5 Mr. Connett
17   is correct.  They found a statistically significant adverse
18   effect.  But below 2 they found no statistically significant
19   adverse effect, which kind of has a puzzle there.  Why is this
20   suggesting that 2 milligrams per liter of fluoride in your
21   urine is safe but 1.5 isn't?
22        And, Your Honor, over the next few weeks what this Court
23   will hear from our side is that is reflective of the highly
24   uncertain, variable and inconsistent literature in this 1.5
25   range.

 1          **THE COURT:**  Where would you say -- where would you

 2    agree with the plaintiff that there are -- is there a

 3    statistically significant association that's enough to make, at

 4    least, a hazard determination?

 5          **MR. CAINTIC:**  Right.  So I think --

 6          **THE COURT:**  At some level it does?

 7          **MR. CAINTIC:**  Right.  So I think there's no dispute

 8    that there seems to be a high -- a picture -- some kind of

 9    effect going on at very high levels.

10      Now, I think our scientists generally agree that the NTP

11    Monograph was a high-quality review.  Dr. Barone, in

12    particular, would agree with that fact.  But a little bit of

13    the confusion is, well, you established 1.5 as the cutoff

14    because that was a WHO recommendation, which I believe was

15    based on dental fluorosis, but is that 1.5 really indicative of

16    where we're actually seeing the adverse effects?  I'd think no.

17      And what the Court will see when it reads the NTP

18    Monograph is, it's more often those studies are looking at 3,

19    4, 5 milligrams per liter.

20          **THE COURT:**  So you take issue with the NTP's

21    conclusion at the -- because it says at 1.5 or above.  It

22    didn't say at 4 and above or 3 and above.  It --

23          **MR. CAINTIC:**  I don't disagree that that conclusion is

24    technically correct.  I have a little bit of issue with the

25    communication of it, but, nonetheless, I don't think we're

 1    fighting the NTP Monograph on that point.

 2           **THE COURT:**  Okay.

 3           **MR. CAINTIC:**  So, Your Honor, NTP didn't stop with

 4    just analyzing the fluoride and IQ literature.  They also

 5    investigated whether fluoride was linked to any other

 6    neurological symptoms, and here's what they found:  They had

 7    low confidence that fluoride was associated with

 8    neurobehavioral effects in children, like ADHD.  Low confidence

 9    that fluoride is associated with adverse effects on adult

10    cognition.  They reviewed the animal studies and concluded,

11    quote, "Existing animals studies provide little insight into

12    the question of whether fluoride exposure affects IQ."

13           And they tried to figure out if it was at all biologically

14    plausible that fluoride impairs IQ but concluded that the human

15    mechanistic literature was simply too heterogenous and too

16    limited to make any determination on biological plausibility.

17           Plaintiff sued EPA under section 21 of the Toxic

18    Substances Control Act, and section 21 of TSCA says that

19    "Plaintiffs must demonstrate, by a preponderance of the

20    evidence that .7 milligrams per liter of fluoride in our water

21    presents an unreasonable risk," not "could present," not "may

22    present," like in section 4 of TSCA, "presents."

23           And the question for this case is whether plaintiffs can

24    demonstrate, by a preponderance of the evidence, that .7

25    milligrams per liter of fluoride in our drinking water presents

1    an unreasonable risk in light of science which NTP has

2    classified as unclear, having low confidence, providing little

3    insight and being too heterogenous and limited.

4         If this Court wished, it could look no further than the

5    NTP Monograph to see if the preponderance of the evidence has

6    been met.  Plaintiffs have not met that burden of proof.

7         Now, to be sure, as this Court pointed out, the NTP did

8    say it had moderate confidence that higher fluoride exposure,

9    i.e., greater than 1.5 milligrams per liter appears associated

10   with lower IQ in children.  But what this Court will see when

11   it reads the NTP Monograph is that the studies that fall within

12   that high-dose bucket are not precisely at 1.5; they're often

13   at 3, 4, 5, sometimes 10 milligrams per liter.

14        And NTP's final call in it's Summary of Findings was this

15   last sentence here, "More studies are needed to fully

16   understand the potential for lower fluoride exposure to affect

17   children's IQ."

18        Now, the NTP's literature cutoff date was April 2021.  NTP

19   reviewed the studies that it had, but it wanted more studies,

20   and now we have more studies.

21        During the first trial, if this Court will recall, we had

22   only two prospective cohort studies that looked at low-level

23   fluoride exposure below 1.5, that followed expecting mothers

24   and their children, took urine samples from those mothers and

25   figured out that urine's fluoride concentration, adjusted that

1   for dilution and then tried to figure out if those urine

2   fluoride concentrations were at all associated with the

3   children's eventual IQs.  Only two studies that because of that

4   kind of prospective cohort design, the parties agreed were the

5   most methodologically reliable human studies to date on

6   fluoride and neurodevelopment.

7        Well, now we don't just have two studies with that kind of

8   design, we have four.

9        First, we have the element cohort out of Mexico City,

10  Bashash, 2017.  That study found a statistically significant

11  adverse effect of maternal urinary fluoride concentrations on

12  boys' IQ, girls' IQ and boys and girls combined.

13       Then we had a second cohort, MIREC out of Canada, Green

14  2019.  And here's what MIREC found:  A statistically

15  significant adverse effect of fluoride on boys but no

16  statistically significant adverse effect of fluoride on girls

17  and no statistically significant adverse effect on boys and

18  girls combined.

19       And now the new cohorts.  We now have the INMA cohort out

20  of Spain.  Ibarluzea, 2022.  Using the same study design as

21  MIREC and ELEMENT, here's what the INMA authors found:  No

22  statistically significant adverse effect of fluoride on boys,

23  no statistically significant adverse effect of fluoride on

24  girls and no statistically adverse effect on boys and girls

25  combined.

 1          And finally, coming out just a few months ago, a new

 2     cohort, the Odense Child Cohort out of Denmark, a paper by one

 3     of plaintiff's experts, Philippe Grandjean.  As this Court will

 4     hear, this study also looked at maternal urinary fluoride

 5     concentrations and child's IQ, and here's what it found:  No

 6     statistically significant adverse effect of fluoride on boys,

 7     no statistically adverse effect of fluoride on girls, and no

 8     statistically significant adverse effect of fluoride on boys

 9     and girls combined.

10          Since the last trial, we have gone from two to four

11     prospective cohorts all using urinary biomarkers of fluoride

12     exposure, all looking at low levels of fluoride exposure.  One

13     finds an effect in boys and girls, the next finds an effect

14     just in boys and the final two find no statistically

15     significant adverse effect whatsoever.

16          Comparing like to like our experts will explain that this

17     is not a demonstration of unreasonable risk; rather, these four

18     cohorts combined with the NTP Monograph and the multiple other

19     cross-sectional studies and other studies of low-dose fluoride

20     exposure on IQ that have come out in the last few years present

21     a picture that is simply too inconsistent and too unclear to

22     conclude that there's been a demonstration that low-level

23     fluoride exposure presents an unreasonable risk of

24     neurodevelopmental harm.

25          In other words while NTP's literature cutoff date was

**OPENING STATEMENT / PLAINTIFF**

 1   April 2021, and while they called for more research, our

 2   experts will explain that NTP's conclusion holds true that the

 3   research about low-level fluoride exposure below 1.5 milligrams

 4   per liter in children's IQ remains unclear.

 5        I also want to take a moment to address --

 6            **THE COURT:**  Let me ask you something.

 7            **MR. CAINTIC:**  Yes.

 8            **THE COURT:**  In view of NTP's Monograph, if the issue

 9   had been framed not at 0.7 but at 1.5 and claimed that there's

10   an unreasonable risk of hazard at that level, what would the

11   Government's position be then?

12            **MR. CAINTIC:**  I think the Government's position is

13   that certainly at that double what's present in the United

14   States water supply, it seems like there is more credible

15   evidence.

16        I want to be clear that when NTP said 1.5, I've been, kind

17   of, using a shorthand.  They said "exceeds or approximates

18   1.5."

19        And what you'll often see in the studies and what we're

20   happy to put to this Court if the Court orders post-trial

21   briefing is that really in those studies it's exposures as low

22   as 1.5, not that the bulk of the data from those studies is at

23   1.5.

24        Again, I'm reminded of the Valdez Jimenez study where the

25   averages were more in the 3 to 4 range.

1        **THE COURT:**  But presumably the NTP considered what the

2   proper range was, and they included within that range 1.5 and

3   there's -- even if that also includes -- their conclusion

4   includes higher levels than that --

5        **MR. CAINTIC:**  Right.

6        **THE COURT:**  -- there's some significance, I assume, to

7   their decision to use 1.5.

8        **MR. CAINTIC:**  Well, I actually think this might be a

9   scenario where plaintiffs' experts and our experts kind of

10  agree that 1.5 is somewhat of an arbitrary number.  I think

11  Dr. Philippe Grandjean would testify to that point that 1.5 is

12  just, sort of, a number that was convenient because the World

13  Health Organization picked that for dental fluorosis, and it is

14  a convenient number in the sense that we can easily identify

15  what exactly we're talking about with high versus low-fluoride

16  exposures.  But it is important to understand that where the

17  bulk of the data is, is still above 1.5.

18       I don't think the NTP is getting it wrong when they say

19  that these studies approximate or exceed in the fact that,

20  sure, some of the participants in those particular studies

21  might have urinary fluoride levels as low as 1.5.  It's kind of

22  the same as what this Court will hear eventually in the Odense

23  Child Cohort in Denmark.  That's a municipality that doesn't

24  fluoridate its water.  It's water fluoride concentrations are

25  around .2, .3; and yet, you still have ranges because of the,

 1    kind of, trickiness of a urinary fluoride biomarker.  You still

 2    have some people in that study that have urinary fluoride

 3    concentrations at 3.  And the range goes all the way up to

 4    there.

 5        But what this Court will hear from our experts is that the

 6    real critical analysis in all of these studies is the bulk of

 7    the data that you have.  You know, urinary fluoride can be a

 8    finicky marker in the sense that it can be affected by what the

 9    person has ingested in that given day.

10        And what this Court will see is that the bulk of the data

11    in these studies, the bulk of the urinary fluoride data is

12    often more closely related in, say, with the low-dose fluoride

13    studies all around that, kind of, .5 to .8 or .9 kind of mark

14    as opposed to in these studies which are in that high-fluoride

15    bucket that might be more in the 3 to 4 range.

16        **THE COURT:**  And if the petition had, for whatever

17    reason, said the level of not .7 not even 1.5 but let's say up

18    to 3, I would assume you would agree there would be great

19    evidence and greater confidence that there is some association

20    at that level?

21        **MR. CAINTIC:**  Likely so, Your Honor.  I will point out

22    that under TSCA, the goal is to regulate chemicals that are in

23    commerce.  And in terms of fluoridation in the United States,

24    when states, municipalities make the decision to fluoridate

25    their water, they fluoridate it to .7.  So I am not personally

1  aware of any municipality that is fluoridating their water all

2  the way to 3.  If there was, then I think this could be a

3  different story.

4       **THE COURT:**  I mean, I asked that question for the

5  obvious -- and I'm sure this will be a subject for this

6  trial -- the question about the margin of error.

7       **MR. CAINTIC:**  Right.

8       **THE COURT:**  That is if the data becomes pretty clear

9  at a certain level, whether it's 1.5 or it's above, you get

10  into the 3 or 4 range, then the question about margin of error,

11  which I know you have a response to about using urinary as

12  opposed to intake, but it does seem to me to suggest that if

13  there is a margin of error, even if the studies -- the

14  reliability studies begins to kind of diminish at some level,

15  like 2, 3, 4.  You're still within an order of magnitude.  If

16  you use 10 as a margin of error, obviously that's something you

17  will want to address, but that's something that's, I think,

18  upfront here.

19       **MR. CAINTIC:**  Right.  So those steps of a risk

20  evaluation and the risk assessment process is all very

21  technical, and I think this Court will get a lot of clarity

22  when Dr. Barone testifies.

23      There is one important point on that topic that I want to

24  make sure I emphasize, because there was a bit of

25  characterization during plaintiffs' opening.  This is not a

 1    situation where we have a bunch of data above 1.5 milligrams

 2    per liter that's saying there's an adverse effect and then we

 3    have no data at below 1.5 or we have some data at 1.5 that is

 4    saying there's an adverse effect.

 5         This is a situation where, sure, at the 3, 5, 10, 15

 6    milligrams per liter, it seems like there's some consistent

 7    data that there's an adverse effect.  But below 1.5 it's not

 8    just that we have less studies.  It's that the studies that we

 9    do have are pointing in different directions.

10         So, for example, in these four cohorts they're pointing in

11    different directions.

12         This Court will also see a lot of the non-prospective

13    cohort studies that have come out in the last few years from

14    our presentation, at least, and we'll see that those are,

15    again, consistently not finding an adverse effect.

16         So that seems to be indicative of the fact that there's a

17    differential effect here.  Sure, there might be something

18    happening at high, high levels.  Like this Court pointed out,

19    anything in excess can be harmful, like water, but we have a

20    different picture of what's going on at these low levels than

21    what's going on at the high, and we haven't figured out exactly

22    what that is.

23         It may be the case, and what the Court will hear from our

24    experts, is that it seems like that literature below 1.5 and in

25    particular at .7 seems to suggest -- be more indicative of

 1   there being no effect at that level.

 2          THE COURT:  And wouldn't that -- and this is -- I'm

 3   sure we're going to have arguments about this, but isn't the

 4   place to -- where that really sort of informs the discussion is

 5   in the risk assessment, that the whole question about

 6   whether -- this maybe relates to the dose response -- whether

 7   there's a linear relationship or not, but you've got in this

 8   region, you know, pretty good evidence that there's something

 9   going on.  As you get lower it gets more and more fuzzy, and by

10   the time you get to the actual levels for which there's

11   exposure here, it goes both ways.

12          But what I'm hearing from the plaintiffs is that, yeah,

13   even if there's not certainty, because now you have two very

14   well, apparently, designed peer-reviewed studies that go both

15   ways, but you also have evidence that not too far in the

16   neighborhood above, there's a problem, shouldn't that factor

17   into the risk assessment?

18          So, for instance, if the risk was not just lower IQ but

19   cancer or death, might not tie -- you know, even though the

20   studies are mixed 50/50, you might take a different view about

21   whether that's an unreasonable -- you know, there's enough

22   certainty to create unreasonable risk.  So you factor all of

23   those things, the amount, the actual hazard, what's the chances

24   of that hazard, et cetera, et cetera.  Isn't that --

25   wouldn't -- isn't that where it should come in, in the risk

1  assessment?

2      **MR. CAINTIC:**  Well, it comes in, in dose response,

3  because you're trying to figure out what is the actual shape of

4  the curve.  And the Court will hear testimony that the outcome

5  of the BMCL or I think what plaintiffs were calling the "hazard

6  level" is completely dependent on the assumption of the curve

7  shape.

8      So sometimes, you know, you calculate a BMCL using a

9  linear model, you might have a number as low as .2.  But if you

10  used a model that assumes a curved shape, you might have a BMCL

11  that's as high as .8 or .9 or a BMC that's as high as 1.  It's

12  all dependent on what is the actual assumption that's

13  underlying that model.  And what you need to actually do to

14  understand that is have data on all parts of that exposure

15  realm.

16      **THE COURT:**  But it just seems logical that the closer

17  you are in terms of the exposure level, if that's established

18  and whatever you call it, point of departure or whatever it is,

19  that there are observable effects or at least some association,

20  the closer you are, the less extrapolation you need to do, the

21  less dependent what exactly that dose-response curve looks

22  like, whether it's linear, whether -- whether it's -- you know,

23  falls off to some extent exponentially or something.

24      The further you get from it, the more important -- the

25  more of a premium on that dose-response curve that you're

1    assuming.  But if you're right next to it, you're just outside

2    the range, then unless you assume a cliff effect where it

3    completely falls off -- and that's what we're dealing with

4    here.

5         You know, their argument is that -- I don't know exactly

6    what their argument is, I guess I'll hear it -- besides that

7    it's okay to use a linear model, but if you're within a

8    magnitude of double, 2X, you know, unless you assume a very

9    steep dropoff once you get below 1.5, so there's no effect,

10   really, at half that, doesn't the fact that you have studies

11   going both ways, I mean, you know, suggest there's some

12   uncertainty in that range, it's certainly possible.  And the

13   fact that you're fairly close to a range that you do have some

14   confidence in, does that lead to a fair inference that there is

15   a risk?

16             MR. CAINTIC:  Right.

17        So I think this kind of goes back to the point of when NTP

18   defined that 1.5.  What we believe the Court will see when it

19   reads the NTP Monograph itself is that several of those studies

20   are far above that.

21        And I think Mr. Connett recognized that there were several

22   above 10, right?  And so what's driving the shape of that curve

23   could very well be the studies that are looking not at double

24   what's in the U.S. water supply but 10, 15 times, 20 times.

25             THE COURT:  So the force of the study depends on much

 1   higher ranges.  So when we're talking about .7, we really are

 2   far from the mainstream or, you know, the heartland?

 3         MR. CAINTIC:  Exactly.  So you might have -- if we

 4   assume a completely linear model, you might have no data at the

 5   zero or even below 1, and you have a bunch of data that's all

 6   above 10.

 7         I can draw a straight line from zero to 10 even though I

 8   don't have any data in that below 1, and it's going to show an

 9   extreme relationship.  And that's kind of the issue with it.

10         Now, we think that in terms of communicating the results

11   of the NTP Monograph, and especially communicating it to a lay

12   reader, that 1.5 milligrams per liter mark can be useful

13   because it's a helpful heuristic.

14         But really when you look at the bulk of the data and what

15   this Court will hear, specifically from Dr. Savitz, is that the

16   literature that's looking at that closer to 1.5 range is

17   really, really not there.

18         THE COURT:  Okay.

19         MR. CAINTIC:  So we've mentioned Dr. Savitz.  This

20   Court will first hear from Dr. David Savitz, the Professor of

21   Epidemiology at Brown University.  He's also a Professor of

22   Pediatrics, Obstetrics and Gynecology at the Brown University

23   Medical School.

24         And at Brown he has served as both the Associate Dean for

25   Research and the Vice President for Research for the entire

**OPENING STATEMENT / PLAINTIFF**

 1   university.

 2        His research focuses on two themes, environmental

 3   exposures and reproductive outcomes.

 4        Dr. Savitz was elected to the prestigious National Economy

 5   of Science, Engineering and Medicine or NASEM.  He has served

 6   on dozens of NASEM committees where his charge was to

 7   investigate whether the epidemiological literature surrounding

 8   a chemical supported the inference that that chemical was

 9   harmful; in other words, a task very similar to the one before

10   this Court.

11        He chaired over a dozen of those kinds of committees but,

12   most critically for our purposes, Dr. Savitz chaired the NASEM

13   committee that twice reviewed the NTP's Monograph on fluoride

14   and neurodevelopment.

15        In other words, Dr. Savitz is the person that NASEM

16   entrusted to provide an unbiased perspective on the fluoride

17   science, and he's the person, Your Honor, that EPA has

18   entrusted to provide this Court with an unbiased accounting of

19   the epidemiological literature on fluoride published since the

20   last trial.

21        Dr. Savitz will explain that the weight of the scientific

22   literature today does not support the conclusion that fluoride

23   exposure below 1.5 milligrams per liter has an adverse effect

24   or even in that closer realm of 1.5 to, say, 2.

25        He will inform this Court that the most influential

1    studies on this topic, the prospective cohorts that we

2    discussed, are all inconsistent and tend to lean to there not

3    being an adverse effect below 1.5.

4        He'll also inform this Court that the other recently

5    published studies on low-level fluoride exposure and IQ that

6    have come out in the last few years similarly don't support

7    there being an adverse association between fluoride and

8    neurodevelopment.

9        In other words, Dr. Savitz's opinions are consistent with

10   NTP's.  The scientific literature about fluoride exposure below

11   1.5 milligrams per liter remains unclear.

12       Second, this Court will hear from Dr. Jesus Ibarluzea,

13   lead author of the INMA study on low-dose fluoride on IQ and

14   ADHD.  He's the principal investigator for the INMA cohort's

15   Gipuzkoa region, which we can call the Basque country.

16       He will testify that using the same study design as MIREC

17   and ELEMENT, the INMA cohort found no effect of low-level

18   fluoride exposure on IQ or ADHD.

19       He will testify that those larger positive effect sizes in

20   the INMA study are the result of using a different exposure

21   unit and a symptom of the statistical model extrapolating

22   beyond the bulk of the data that the INMA authors had.

23       He will explain that seafood isn't a confounder in his

24   study because fluoride is not related to seafood.  And even if

25   it was, seafood consumption is heavily correlated with mercury

 1    and the INMA studies control for mercury in the mother's cord

 2    blood, in effect, controls for seafood.

 3         Dr. Ibarluzea will explain that while people who oppose

 4    fluoridation may scrutinize every nook and cranny of his study,

 5    every one of the 25 separate sub analyses and supplementary

 6    tables that he provided, the key takeaway is that across all of

 7    those 25 tables, all of that data and all of those analyses,

 8    the INMA authors never found an adverse effect of fluoride on

 9    IQ or ADHD.

10         Finally, this Court will hear from Dr. Stanley Barone, Jr.

11         Dr. Barone has served at EPA for over 30 years.  He's

12    currently the Senior Science Policy Adviser and Deputy Science

13    Integrity Official at EPA's Office of Chemical Safety and

14    Pollution Prevention.  He's a developmental neurotoxicologist,

15    and he is a coauthor of the first ten risk evaluations ever

16    conducted under amended TSCA.

17         In other words Dr. Barone is one of the Government's most

18    experienced experts in the science of risk assessment.

19         Dr. Barone will explain TSCA's risk evaluation standards

20    and processes.  He'll describe for this Court the four steps of

21    a risk evaluation and he'll identify in each of these steps, as

22    we've gone over this morning, where there are open questions

23    the plaintiffs have not answered.

24         For hazard assessment some of the open questions are:

25    What are the effects of fluoride exposure below 1.5 or even at

1   2 or, even better, at .7?

2       Can we just assume that the dose-response relationship is

3   linear, which would allow you to extrapolate from what's going

4   on at high doses where we have more data to low doses where we

5   have limited data, or is it curved with no effect at low doses

6   whatsoever?

7       And for risk characterization so many of our studies are

8   based on evaluating a mother's urine fluoride concentration,

9   but how do we extrapolate from a urine fluoride concentration

10  which reflects a mother's fluoride exposure from all sources to

11  figure out how much of that urine fluoride concentration is

12  attributable to drinking fluoridated water?

13      And then finally, risk determination.  If there even is a

14  risk at low doses, is it unreasonable?

15      These steps and the science of risk assessment are all

16  very technical.  Dr. Barone will guide us through these steps.

17  He'll explain why, among other things, we can't just assume

18  that the shape of the dose-response curve is linear.  But

19  critically, each of these steps rests on the foundation that

20  there's a good picture from the scientific literature about

21  what the relationship between fluoride and neurotoxicity really

22  is.

23          THE COURT:  Let me ask you, this discussion, which I'm

24  sure we'll hear about, about the utility and appropriateness of

25  using urinary fluoride concentrations as opposed to -- I don't

 1   know whether correlate or extrapolate or infer from that

 2   intake, which is complicated by the fact that there are other

 3   sources of fluoride other than drinking water, does it matter

 4   if what I'm told by the plaintiffs that under TSCA that the EPA

 5   is to look at the aggregate, that you don't ignore -- in other

 6   words, if the marginal -- if the incremental difference that

 7   drinking water makes is, say, half of the amount, if that half

 8   gets you into that risk zone, does it matter that you're

 9   already starting with a noise level that's above zero?

10          MR. CAINTIC:  Yeah.  Well, I want to be very clear, so

11   TSCA doesn't require that EPA considers a chemical's risk in

12   the aggregate.  EPA does do that often.

13          What's critical for this case is that plaintiffs sued EPA

14   and petitioned EPA under a particular condition of use, and

15   that was that .7 milligrams per liter is harmful, not whether

16   fluoride generally, extreme levels of fluoride is harmful, but

17   whether .7 milligrams per liter presents an unreasonable risk.

18          THE COURT:  But can't -- can the argument be made that

19   it is an unreasonable risk in context?

20          For instance, you know, maybe .7 alone might not do it,

21   but if there's a general background whether it's from seafood

22   or whatever it is that people are exposed to and it's the .7

23   concentration in the drinking water that puts it over the top,

24   the straw that breaks the camel's back, the incremental

25   difference that gets you over the goal line, whatever it is,

 1   whatever you want to call it, is that an appropriate analysis

 2   under TSCA?

 3        MR. CAINTIC:  Well, I guess the issue is if we cannot

 4   extrapolate out how much of that fluoride intake is really

 5   related to drinking fluoridated water, then we can't really say

 6   what the additional effect of fluoridated water really is.

 7        THE COURT:  Aren't there some studies though?  I

 8   thought I saw some charts.  If you look at unfluoridated

 9   urinary flows in unfluoridated areas to fluoridated areas you

10   see largely a doubling, as I recall, a mean from .39 to .7 or

11   something like that.  I would assume there is going to be some

12   evidence that suggests that it does make a difference and a

13   difference of a magnitude of something, of some nature.

14        MR. CAINTIC:  Well, I will say that the EPA will put

15   on evidence that tends to undermine the chart that plaintiffs

16   just provided.

17        My understanding is the chart plaintiffs provided was

18   based on a Till 2018 study from the MIREC cohort.  There are

19   other studies which say different things, that say that, okay,

20   well, if someone is drinking 1 milligram per liter of

21   fluoridated water, their urine fluoride concentration tends to

22   be below what's in the water concentration.

23        So I don't have all the facts on hand for you, Your Honor,

24   but what I can promise is that we will be presenting contrary

25   evidence to that fact.

1        **THE COURT:**  Okay.  Thank you.  Good.

2        **MR. CAINTIC:**  Your Honor, Dr. Barone will tell this

3   Court that he's in agreement with NTP, that the scientific

4   evidence about fluoride neurotoxicity in exposure ranges below

5   1.5 milligrams per liter is simply too inconsistent and too

6   unclear for EPA to reach an informed-risk determination.

7        Over the next two weeks, EPA hopes to provide an unbiased

8   accounting of the scientific evidence on fluoride and

9   neurodevelopment with a particular focus on the studies to have

10  come out in the last few years.

11       We won't spend our time making personal attacks or trying

12  to drag scientists' names through the mud, because we believe

13  the science speaks for itself.  But as for --

14       **THE COURT:**  But Dr. Barone also agrees with the NTP's

15  conclusion about 1.5 and above, there being median confidence.

16  I mean, you can interpret that -- I mean, that's with the

17  explanation that that is heavily weighted towards a very high

18  confidence, but he does agree with that conclusion, medium

19  confidence level at that range of 1.5 and above.

20       **MR. CAINTIC:**  Dr. Barone certainly didn't do his own

21  systematic review, but from what I recall from his deposition

22  testimony, he is -- he is in no place to dispute that 1.5 or

23  higher, again with the caveat that what's really driving that

24  is this, you know, exposures at 10 or 15.  And this Court will

25  see that when it reviews the NTP Monograph.

**OPENING STATEMENT / PLAINTIFF**

 1      Your Honor, as we go through the science, our experts will

 2   explain that we should keep a few things in mind.

 3      First, as we'll see here, it's critical to focus not just

 4   on what a study found but to also pay attention to what the

 5   study didn't find.  As our experts will explain, a study might

 6   have twelve different ways of analyzing fluoride's effects on

 7   IQ, and it would be a mistake to emphasize the one sub analysis

 8   from that study that finds an adverse effect than to ignore the

 9   twelve sub analyses that found nothing.  A given scientific

10   study should be read in the array of the results that it gives.

11   That kind of cherrypicking is not the right way to assess

12   science.

13      Second, Your Honor, the way -- we should not judge the

14   quality of a study based solely on its results.  As our experts

15   will explain, neutral scientists don't perform their research

16   with the hope of finding some result over another.  The weight

17   of a scientific study should be based on the strength of its

18   methods and not denigrate it because someone found the results

19   surprising or unexpected.

20      And finally, as we've discussed a lot this morning, we

21   believe the Court should focus on the evidence relevant to

22   exposures in the United States.  It's critical that we don't

23   confuse the question, that we don't spend our time focusing on

24   those studies with fluoride exposure levels 3, 4, 5, sometimes

25   10 or even 20 times the levels present in the United States.

OPENING STATEMENT / PLAINTIFF

1    Because the question for this Court is whether community water

2    fluoridation is harmful, is whether .7 milligrams per liter is

3    harmful because the dose makes the poison.

4        This Court has an important decision to make.  This is an

5    important case that could have important effects on the health

6    of our nation's children.

7        And under section 21 of TSCA, the question for this Court

8    is whether plaintiffs, by a preponderance of the evidence, have

9    demonstrated that .7 milligrams per liter of fluoride in our

10   water supply presents an unreasonable risk in light of science,

11   which our experts will explain, as NTP has explained is

12   inconsistent, unclear and, in fact, often pointing in different

13   directions.  EPA submits that they have not, and at the end of

14   trial we will respectfully request that the Court deny

15   plaintiffs' requested relief and issue a determination that

16   given the current state of science, the Court cannot conclude

17   that community water fluoridation presents an unreasonable

18   risk.

19       Thank you, Your Honor.

20       **THE COURT:**  All right.  Thank you, counsel.

21       Okay.  We are at the phase now where we can start taking

22   evidence and plaintiffs, you have your case-in-chief to

23   present.  You may present your first witness.

24       **MR. ADKINS:**  Thank you, Your Honor.  At this time the

25   plaintiffs call Dr. Howard Hu.

HU - DIRECT / CONNETT

```
 1            THE CLERK:  Please remain standing.  You may remove
 2     your mask.  Please raise your right hand.
 3        (Witness sworn.)
 4            THE WITNESS:  I do.
 5            THE CLERK:  Thank you.  Please have a seat.  Please
 6     speak clearly into the microphone, state and spell your first
 7     and last name for the record.
 8            THE WITNESS:  Howard Hu.  Last name spelled H-U.
 9            THE COURT:  Thank you, Dr. Hu.  You may proceed,
10     Mr. Connett.
11            MR. ADKINS:  And Your Honor, just a side note.  Given
12     that Dr. Hu has set forth his qualifications in some detail in
13     his trial declaration, which is at ECF 198-1, I'm going to
14     limit my questions regarding Dr. Hu's qualifications today.
15            THE COURT:  All right.
16                         HOWARD HU,
17     called as a witness for the Plaintiff, having been duly sworn,
18     testified as follows:
19                      DIRECT EXAMINATION
20     BY MR. CONNETT:
21     Q.   Good morning, Dr. Hu.
22     A.   Good morning.
23     Q.   Can you state where you currently work?
24     A.   In the Department of Population and Public Health Sciences
25     of the Keck School of Medicine, University of Southern
```

JENNIFER COULTHARD, RMR, CRR, CRC - (530)537-9312

1   California.

2   **Q.**   And what is your position at the USC School of Medicine?

3   **A.**   I'm the Flora L. Thornton chair of the department and

4   professor.

5   **Q.**   Sir, are you the chair of medicine at the USC school?

6   **A.**   Chair of the Department of Population and Public Health

7   Sciences.

8   **Q.**   At the last trial, we talked about some of your work that

9   you have done advising EPA on matters related to chemical

10  toxicity.

11      Since the trial, have you served on any more EPA science

12  advisory boards?

13  **A.**   I have.

14  **Q.**   Can you tell the Court what science advisory board you

15  have worked on for the EPA since trial?

16  **A.**   I was recruited onto the lead panel of the Clean Air

17  Scientific Advisory Committee that's doing the mandated review

18  of the National Ambient Air Quality Standards.  This is related

19  to lead toxicity.

20      And I'm collaborating with scientists in the IRIS office,

21  the Integrated Risk Information Systems Office of the

22  Environmental Protection Agency on a systematic review and a

23  meta analysis of the literature related to lead exposure and

24  antisocial behavior.

25  **Q.**   Dr. Hu, are you being paid for your work in this case?

1    **A.**   I think, technically, I'm a non-retained expert witness

2    but I am -- will be submitting an invoice for travel and for

3    just time.

4    **Q.**   Are you submitting any invoice for your hourly work that

5    you've done?

6    **A.**   That's correct.

7    **Q.**   Are you or are you not?  For your -- are you charging a

8    fee for your expert work in this case?

9    **A.**   Yes.

10   **Q.**   As in just -- I think we might have a miscommunication

11   here.

12        You're charging for your travel expenses, right?

13   **A.**   Correct.

14   **Q.**   But are you charging an expert fee for your work?

15   **A.**   I am.

16   **Q.**   Okay.  For appearing at the deposition --

17            **MR. ONG:**  Objection, asked and answered.

18            **MR. CONNETT:**  Okay.  Okay.  That's okay.

19   **BY MR. CONNETT:**

20   **Q.**   So Dr. Hu, I want to turn and talk about your research on

21   fluoride and IQ.  At the first trial, you testified about a

22   study on fluoride and IQ that you published in 2017, which is

23   sometimes referred to as the Bashash 2017 paper, right?

24   **A.**   Yes.

25   **Q.**   And that study was funded by the National Institutes of

1   Health?

2   **A.**   Yes.

3   **Q.**   It was conducted at the birth cohort down in Mexico City?

4   **A.**   Correct.

5   **Q.**   Did the NIH vet the methodology of the study before

6   agreeing to fund it?

7   **A.**   Yes.

8   **Q.**   Would you describe that as a rigorous vetting process?

9   **A.**   Yes.  We applied for what's known as an R1 grant, it's a

10  five-year grant to support the research with a very clear study

11  design methodology, et cetera, and it was reviewed in the

12  standard scientific -- scientific review process that's

13  conducted by NIH, by a study section of expert peer reviewers.

14  They rated it highly.  NIH funded it based on that review.

15  **Q.**   And after conducting the study but before publishing the

16  results, was the methodology scrutinized again during the peer

17  review process?

18  **A.**   Yes.

19  **Q.**   And how would you describe the nature of the peer review

20  process of that study?

21  **A.**   Well, this was reviewed by the "Environmental Health

22  Perspectives," which is a journal actually within the National

23  Institute for Environmental Health Sciences.

24       We got back four expert anonymous peer reviewer comments.

25  We had to respond to each one of those comments with revisions

1    or responses that addressed the concerns that were made.

2         We went through three rounds of revisions and then they

3    agreed to publish the paper with a link that was about twice as

4    long as the usual research papers there because they wanted to

5    make absolutely sure we could show all the results that any

6    outside reviewer or reader would want to see.

7    **Q.**   You've published a lot of papers in the course of your

8    career, fair?

9    **A.**   I have.

10   **Q.**   Dr. Hu, how would you compare the peer review process that

11   your fluoride IQ study underwent with the peer review process

12   for other papers you've published?

13   **A.**   Well, of the over 350 papers we've published, that's

14   probably the second most extensive peer review paper I've been

15   an author on has ever gone through.

16   **Q.**   And can you remind the Court about the primary findings of

17   the Bashash 2017 study?

18   **A.**   Sure.  In the Bashash study, we found that prenatal levels

19   of creatinine-corrected fluoride that appeared in maternal

20   urine predicted offspring intelligence scores at four years of

21   age and at six to twelve years of age and the outcome basically

22   was that the IQ levels were lower, given incremental increases

23   in maternal urinary fluoride, and we saw the same effect in

24   boys and girls.

25   **Q.**   You have studied lead and its effects on IQ; is that

 1   correct, Dr. Hu?

 2   **A.**    That's correct, for decades.

 3   **Q.**    The CDC has relied upon your research on lead and IQ?

 4   **A.**    They've incorporated it in their analyses of the evidence,

 5   correct.

 6   **Q.**    How would you compare the magnitude of the effect that you

 7   observed in the ELEMENT cohort with respect to fluoride and IQ

 8   loss with the magnitude of effect that you have seen with lead?

 9            **MR. ONG:**  Objection, relevance.

10            **THE COURT:**  Overruled.

11            **THE WITNESS:**  Sure.  Certainly they use different

12   metrics of exposure, but one way to try to make it an

13   apples-to-apples comparison rather than an apples-to-oranges

14   comparison is to express the increases in levels of exposure by

15   standard deviations.  So if you look at the increase in

16   exposure of one standard deviation in blood lead and compare

17   that to the impact on IQ of one standard deviation increase in

18   urinary fluoride, they're not far apart.  They're within an

19   order of magnitude.

20   **BY MR. CONNETT:**

21   **Q.**    Now, in counsel's opening today, he mentioned that we

22   can't just assume there is a linear dose-response relationship

23   between fluoride and IQ and that it's conceivable that there's

24   no effect until you get to 1.5 ppm and then -- then you see the

25   effect.

1      Dr. Hu, on that point, did you do anything in your study

2  to assess or evaluate the dose-response relationship between

3  fluoride and IQ?

4  **A.**   Yes.

5  **Q.**   What did you do?  And did you assume a linear

6  dose-response relationship?

7  **A.**   We did not.

8  **Q.**   So how did you interrogating the dose-response

9  relationship to assess whether a linear fit was appropriate?

10 **A.**   As part of our analysis, which is supervised by our

11 biostatistician, we looked at the shape of the dose-response

12 curve using general additive models and smoothing curves and

13 then we tested whether, in fact, those relationships were --

14 had significant enough deviation from linearity to assume that

15 the relationship was nonlinear.  And then we also compared the

16 results, you know, using a linear regression model with other

17 models.

18 **Q.**   And after doing those analyses, what did you find with

19 respect to the linearity, or lack thereof, of the dose-response

20 relationship between maternal fluoride and IQ at age 4?

21 **A.**   Looked like it was pretty linear.

22 **Q.**   And then with respect to your analysis of the 6- to

23 12-year-old can, children you explain for the Court what you

24 found there?

25 **A.**   We found some evidence that there might be a curvilinear

 1   relationship there with an inflection point of 0.8 milligrams

 2   per liter of creatinine-corrected fluoride.  But, you know, we

 3   weren't sure.

 4   **Q.**   Okay.  And to the extent that there was some kind of

 5   inflection point around .7 or .8, can you describe the nature

 6   of the dose-response relationship that you found above that

 7   level?

 8   **A.**   Seemed to be pretty linear with a direction going

 9   downwards.

10   **Q.**   So when you say linear with a direction going downwards,

11   does that mean that as you increase the fluoride exposure, the

12   IQ of the offspring decreases?

13   **A.**   Correct.

14         **MR. ONG:**  Objection, leading.

15         **THE COURT:**  Watch leading questions.

16   **BY MR. ADKINS:**

17   **Q.**   Can you just explain, Dr. Hu, without me putting words in

18   your mouth, can you just explain in a little bit maybe more

19   lay-friendly terms what you just said about the nature of the

20   dose-response relationship above that potential inflection

21   point?

22   **A.**   Sure.  So at levels of urinary fluoride

23   creatinine-corrected above 0.7, 0.8 it seemed there to be a

24   linear downward relationship between increasing levels of

25   urinary fluoride and IQ.

HU - DIRECT / CONNETT

1   Q.   Now, at the first trial in this case --

2        THE COURT:  Hold on.  Let me ask a question.  I'm

3   curious.  You mentioned an inflection point above which you

4   found a somewhat linear relationship.  Below that what did you

5   find, below .8, .7?

6        THE WITNESS:  Below that it seemed like it might be

7   flattening out.  We don't -- we didn't have a lot of data

8   points there to have any certainty over it, but that's, you

9   know, what we could perceive just by looking at the curves.

10       THE COURT:  So when you say "flattening out," that

11  there was no downward relationship, that is, the -- with higher

12  versus lower amounts of fluoride exposure or concentrations

13  found that it didn't seem to have an association with IQ?

14       THE WITNESS:  There was a lot of noise in the

15  relationship between the points of urinary fluoride and IQ.

16       THE COURT:  Yeah.

17       THE WITNESS:  And the best statistical approaches we

18  can levy to it did not allow us to see any relationship that

19  was either up or down.

20       THE COURT:  Okay.  Thank you.

21  BY MR. ADKINS:

22  Q.   And then just to be clear, Dr. Hu, what you've just

23  described is specific to the 6- to 12-year-old group, and you

24  didn't see the same thing with the 4-year-olds; is that right?

25  A.   That's correct.

1    **Q.**   With the 4-year-olds can you describe for the Court the

2    nature of what you observed below .8?

3    **A.**   Yeah.  So from what we could see in the 4-year-old data,

4    their relationship between the cloud of points of urinary

5    fluoride and IQ was this consistent linear relationship going

6    from the lowest levels of urinary fluoride that we had to the

7    highest levels, continuous downward trend.

8            **THE COURT:**  And what was the range?  When you say the

9    lowest levels and highest levels, what was the lowest level?

10           **THE WITNESS:**  Yeah.  I think -- well, I don't have the

11   data in front of me, but I think our lowest urinary fluoride

12   levels were in the 0.1 range, 0.1, 0.2.

13           **THE COURT:**  Thank you.

14   **BY MR. CONNETT:**

15   **Q.**   At the first trial, Dr. Hu, you testified that the results

16   of the Bashash study support and are consistent with fluoride

17   being a developmental neurotoxicant at the levels associated

18   with water fluoridation.  Would you stand by that opinion

19   today?

20   **A.**   Yes.

21           **MR. CONNETT:**  At this time, Your Honor, I would like

22   to show the witness Exhibit 67, which is the National

23   Toxicology Program's Monograph.

24           **THE COURT:**  All right.  Go ahead.

25   \\\

 1  BY MR. CONNETT:

 2  Q.   Well --

 3          MR. ONG:   Your Honor, before --

 4          THE COURT:   Yeah.

 5          MR. ONG:   -- counsel starts with questions regarding

 6  the monograph, I would note that in plaintiff's disclosures,

 7  Dr. Hu was testifying about the two studies that he has -- that

 8  he has issued or that have been published since the last trial,

 9  and neither of those two studies depend on the findings from

10  the monograph.

11          MR. CONNETT:   Your Honor, if I could, I'm asking about

12  one statement from the NTP about Dr. Hu's study.

13          THE COURT:   All right.   I'll allow the question.   If

14  you think -- after hearing the question and the line of inquiry

15  you think it's objectionable, you can go ahead and restate your

16  objection.

17  BY MR. CONNETT:

18  Q.   Dr. Hu, I'll just go ahead and read the statement from the

19  NTP -- okay? -- and it was regarding your study and the MIREC

20  birth cohort study.   It's from page 40 of the monograph.

21      The NTP wrote, "In summary, although not every analysis in

22  the two cohorts found a statistically significant association,

23  together, the three studies provided consistent evidence that

24  increasing maternal fluoride levels were associated with lower

25  IQ scores in children."

**HU - DIRECT / CONNETT**

1      Do you agree with the NTP in that assessment?

2           **MR. ONG:**  Objection.  During Dr. Hu's testimony, he

3    testified -- I asked Dr. Hu, if he had any basis to agree or

4    disagree with the NTP's conclusions, and Dr. Hu testified that

5    he had no basis to agree or disagree.  That's the first

6    objection -- part of the objection.

7           The second part is, again, Dr. Hu's studies that were

8    published since the last trial do not rely at all on the

9    conclusions of the NTP Monograph.

10          **THE COURT:**  All right.  So I'm not seeing the

11   relevance unless he was retained to assess the monograph I

12   don't think that's an appropriate area of inquiry.

13          **MR. CONNETT:**  That's fine, Your Honor.  I'll move on.

14          **THE COURT:**  All right.  Thank you.

15   **BY MR. CONNETT:**

16   **Q.**  Dr. Hu, you have conducted any additional studies on

17   fluoride and IQ since the last trial?

18   **A.**  Yes.

19   **Q.**  Can you explain -- and have you conducted studies on the

20   ELEMENT cohort?

21   **A.**  Yes.

22   **Q.**  Can you explain for the Court what you have done for your

23   recent study of fluoride and IQ in the ELEMENT cohort?

24   **A.**  Sure.  In the next round of research that was published

25   with the first author being Goodman, we were able to increase

**HU - DIRECT / CONNETT**

1  the sample size by obtaining more archived urines, assessing

2  the fluoride concentrations and then adding that to the

3  database of creatinine -- I'm sorry -- measuring fluoride and

4  creatinine, adding that to the database to increase our sample

5  size by almost a hundred.  Then we also took a more in depth

6  look at the cognitive data to try to look at different domains

7  of function that constitute what is considered cognition.

8      And then we also looked at and expressed how those

9  relationships -- how -- what they look like at different age

10  groups.

11  Q.   I want to start with the first point you made there, which

12  is that you looked at a larger sample size with approximately

13  100 additional mother-child pairs.

14      What is the value or importance of having a larger sample

15  size for your assessment?

16  A.   Well, from an epilogic perspective, it increases the power

17  of the study so that you can see signals above the noise, so to

18  speak.

19  Q.   And --

20          THE COURT:  What was the original -- 100 -- above --

21  what was the original sample size?

22          THE WITNESS:  The original sample size, depending on

23  whether you're looking at the 4-year-olds or the 6- to

24  12-year-olds, was in the 200, 250 range.

25          THE COURT:  Thank you.

1    BY MR. CONNETT:

2    Q.    And can you explain for the Court what covariates you

3    controlled for in this analysis?

4    A.    Well, the ELEMENT cohort to begin with had eligibility

5    criteria, and so we excluded women who gave birth to premature

6    babies, who had kidney dysfunction, had other pathologies that

7    we felt were -- could interfere with the exposure outcome

8    relationships of interest.

9          And then in order to enter these analyses, of course they

10   had to have the fluoride urinary data, they had to have the

11   cognitive data and they had to have the covariate data, the

12   covariates being all sorts of things related to family, marital

13   status, age of the mother, education of the mother, smoking,

14   the age of the child when they were examined in the cognitive

15   assessments, medications, nutritional.

16         And we also ensured that we could look at other

17   covariates, even if we didn't have a full set of data on them

18   like lead levels, mercury levels, home score and things like

19   that.

20   Q.    How would you compare the degree of covariate adjustment

21   that you had in this new study from ELEMENT with what you would

22   want to see in the sort of gold standard birth cohort study on

23   neurodevelopment?

24   A.    Well, I think we believe we have one of the best

25   environmental birth cohort studies in the world.  I think

1    that's why we've been able to fund it continuously by NIH since

2    1993.  It continues to yield really important information

3    beginning with lead but now also in pesticides and not only

4    fluoride but other metals, so we feel quite confident in our

5    ability to control for confounders.

6    **Q.**    Now, you had mentioned that as part of your methodology,

7    you would exclude pregnant mothers who had certain health

8    conditions like kidney disease that might make the off -- the

9    offspring more vulnerable to certain harms; is that correct?

10   **A.**    Well, I didn't say that specifically, but, in reality, by

11   those exclusions, we may have excluded some people who are

12   particularly vulnerable.

13   **Q.**    And so would that potentially limit the -- so let me --

14   let me put it -- let me ask it this way:  Would your study

15   speak to the extent of vulnerability or suseptibility that we

16   may have in the population to fluoride exposure?

17   **A.**    Not that much.  May I explain a bit more?

18   **Q.**    Please.  Please.

19   **A.**    Yeah, sure.  So it's not just the fact that we didn't --

20   that we excluded some folks with morbid -- comorbidities, but

21   also, you know, we couldn't control for subpopulations of folks

22   who may be genetically susceptible, for instance, or who may

23   have other things like nutritional aspects that might make them

24   more susceptible.  So they all get folded into the analysis,

25   but we didn't have the means in these papers to disentangle

1   whether there was subpopulations of vulnerable people.

2   **Q.**   Now, that you've summarized the methodology of your study,

3   can you explain for the Court your findings with respect to

4   fluoride and IQ?

5   **A.**   Yeah.  So I assume you're referring to the second study?

6   **Q.**   Yes.

7   **A.**   Which is the Goodman, et al. paper that recently came out.

8        And basically, we found that, consistent with the first

9   study, the urinary creatinine-adjusted fluoride levels

10  predicted lower intelligence, measures of intelligence in the

11  offspring.  Those relationships are seen at each of the ages

12  that we interrogated.

13       And when we looked at the domain-specific results, it

14  seems like the strongest effects were in the so-called

15  nonverbal domains of intelligence that relate to things like

16  memory, visuospatial function, et cetera.  And we did not see

17  sex differences between the girls and the boys.

18  **Q.**   I want to start with the first finding that you mentioned

19  there, which is that you were able to observe the association

20  between maternal fluoride exposure and IQ at the each of the

21  three age groups that you tested; is that correct?

22  **A.**   Yes.

23  **Q.**   What relevance or importance does that have to you?

24  **A.**   Well, it shows the consistency of the effect, if you will,

25  in that it's not just localized to one particular age of

1    observation, but we can see it through all of them.  And it

2    bolsters the confidence of the underlying, I guess you could

3    say, biological relationship between the fluoride exposure and

4    the cognition.

5        And, you know, it allows us to appreciate how we might do

6    this research in the future looking at different age groups and

7    understanding that we might be able to see these kinds of

8    effects throughout this entire childhood-age spectrum of

9    observation.

10   **Q.**  And I want to now talk about your finding with respect to

11   nonverbal IQ.

12       First, have other neurotoxicants been found to impact one

13   type of cognitive domain more than the other?

14   **A.**  Yes.

15   **Q.**  And what about lead, can you speak to whether lead may

16   have some differential impacts on verbal or nonverbal IQ?

17   **A.**  Yes.  In fact, lead is a comparative toxicant and very

18   similarly.  Many of the epidemiology studies have shown that

19   the effects are strongest in the nonverbal domain versus the

20   verbal.

21   **Q.**  And is there any sort of explanations or theories that

22   have been, you know, discussed in the literature as to why a

23   neurotoxicant like lead or fluoride may impact nonverbal IQ

24   more than verbal IQ?

25   **A.**  Yes.

1  Q.   Can you explain that for the Court?

2  A.   Sure.

3      The leading theories, if you will, are that verbal

4  abilities are more amenable to fixes, that is, education,

5  special education, the kinds of influences you find in the

6  family home that come from parental coaching; whereas,

7  nonverbal skills are more biologic, if you will.  It's not

8  something that is easily amenable to those kinds of educational

9  supports.

10      And interestingly, in the lead literature, some of those

11  theories are supported by the finding that the impacts of lead

12  on IQ seem to be less amenable to improvement among lower

13  socioeconomic status groups which are well known to also have

14  less access to the parental -- the educational supports that

15  are typically available to children.

16  Q.   Now let me ask you, in your analysis here, did you control

17  for seafood intake?

18      And I'll broaden the question.  In your Bashash 2017

19  analysis or the Goodman 2022 paper did you control for seafood?

20  A.   We did not in the paper, no.

21  Q.   Okay.  And -- well, why is that?

22  A.   Well, the seafood consumption in Mexico is relatively low,

23  particularly for those species of fish that are, you know, high

24  in Omega 3 fatty acids and fluoride, for that matter.

25  Q.   And does seafood contain elevated levels of fluoride?

1   **A.**   They do.

2   **Q.**   And based on what you know about the relationship between

3   seafood and neurodevelopment and IQ, what impact, if any, would

4   controlling for seafood in the ELEMENT cohort have had on the

5   results?

6        **MR. ONG:**   Objection, foundation, calls for speculation

7   and also none of the testimony being elicited is contained in

8   any of the two studies that are -- that have been published

9   since the last trial.

10       **THE COURT:**   Is there any pretrial disclosure of this

11   topic?

12       **MR. CONNETT:**   Your Honor, counsel asked Dr. Hu

13   questions at length about seafood at his deposition.   I am

14   following up on those questions.

15       **THE COURT:**   All right.   Overruled.

16       **THE WITNESS:**   Can you repeat the question, please?

17   BY MR. CONNETT:

18   **Q.**   Yes.   Based on your knowledge and understanding about how

19   seafood is related to neurodevelopment, what impact, if any,

20   would controlling for seafood in the ELEMENT studies have had

21   on the association between fluoride and reduced IQ?

22   **A.**   Okay.   The fact that seafood contains fluoride and Omega 3

23   fatty acids is an interesting example of the potential for

24   negative confounding and it's very similar to what's happened

25   with -- you look at studies of mercury.   And I've been involved

1    in research on mercury where we're looking at the effects of

2    mercury and if you did not control for seafood, they would kind

3    of disappear; but once you controlled for seafood, then you can

4    disentangle them and find that mercury does have an independent

5    effect.

6        So if we control for seafood and if there was substantial

7    seafood consumption, our expectation is that the effect of

8    fluoride would probably be even greater than what we perceived.

9    **Q.**   Now, does the extent to which your studied population,

10   your birth cohort, consumes seafood, whether it's a high

11   seafood-consuming population or a low seafood-consuming

12   population, does that have any bearing on the importance of

13   controlling for seafood in your study?

14   **A.**   Sure, it does.

15   **Q.**   And can you explain why?

16   **A.**   Well, if they're not consuming seafood very much, then it

17   becomes less of an issue of whether it's a confounder, which is

18   one reason we didn't control for it in our analysis.

19   **Q.**   Now, you mentioned earlier that you did not observe a

20   sex-specific difference in the relationship between maternal

21   fluoride and offspring IQ; is that correct?

22   **A.**   Yes.

23   **Q.**   Now, in your study you do note that the MIREC study up if

24   Canada, at least with respect to the urinary fluoride

25   measurement, found a sex-specific association, correct?

 1   **A.**    Yes.

 2   **Q.**    Now, Dr. Hu, in your view, can the results of both of

 3   those studies be true, or are they incompatible with each

 4   other?

 5   **A.**    They can certainly be true.

 6   **Q.**    And can you explain why that is for the Court?

 7   **A.**    First of all, they're different populations.  And it being

 8   different populations, one in Mexico relatively middle- and

 9   lower-class Mexicans and in Canada, they have very different

10   life experiences.  And the impact of toxicants on whatever

11   outcome you're studying is often modified by things that are

12   gender specific.  It could be things like things that they eat.

13   It could be parenting influences.  It could be hormonal

14   instances.

15         This is well known in the environmental health literature

16   and it's even seen in the animal studies that we perform, which

17   is why there's a growing commitment in the environmental

18   epidemiology world to make sure that when we do these studies,

19   we examine for gender differences or sex differences, if you

20   will.  But there's no expectation that the two sexes will have

21   the same experience in any particular study.

22   **Q.**    So based on what you've just explained, would you expect

23   that a neurotoxicant, like fluoride, could have different

24   manifestations of neurotoxicity in a given population based on

25   the presence of other chemical or nonchemical stressors?

**HU - DIRECT / CONNETT**

1    **A.**   Yes.

2    **Q.**   And can you explain that a little bit more, if it goes

3    beyond what you've already stated?

4    **A.**   Well, we haven't tried to work with our colleagues in

5    Canada to try to understand what the kind of differences might

6    be that could explain that there's sex differences in Canada

7    and not sex differences in the United States, but as I

8    explained before, there's a whole set of factors that we now

9    understand can be at play to explain differences between

10   populations, and those are the ones that we would hypothesize

11   to explain those differences.

12   **Q.**   Now, are there reasons to believe that a child, born to a

13   healthy and well nourished mother may be less susceptible to

14   the prenatal effects of a neurotoxicant?

15   **A.**   Yes.

16   **Q.**   Can you explain that?

17   **A.**   Well, a healthy child in a well-resourced family would

18   have experiences of, I would expect, optimal nutrition during

19   the prenatal period.

20        We all read the news.  The Internet has made nutritional

21   information and the latest nutritional research available,

22   particularly for families that have access to that information.

23   And also your socioeconomic status will determine whether you

24   have not only access to the information but the ability to

25   purchase the foods that are now known to enhance

1  neurodevelopment, those that are -- for instance, those that do

2  contain Omega 3 fatty acids.  Fish, in general, tends to be

3  more expensive, at least in the United States, than, let's say,

4  beef.

5       Buying organic is something that high-income families tend

6  to do.  And now there's quite good research showing that even

7  though the organic food industry is not, I guess, as rigorously

8  regulated, but it's very clear from the exposure assessment

9  research that's been done is that the pesticide load in those

10 who eat organic is lower than the pesticide load in those who

11 do not eat organic.

12      And the literature on the influence of pesticides on

13 neurodevelopment is also quite extensive now.  So I think you

14 pull all that together, there's many reasons to believe that

15 children of different families, of different means, can have

16 different experiences in terms of their neurodevelopment.

17          THE COURT:  Dr. Hu, if you could, we're getting a

18 message that the listeners on the audio are having trouble

19 hearing you.  You may be a little too close to the mic, so

20 that's a conflict.  We need to hear you, but our mics tend to

21 kind of distort when you get too close.  If you could maybe

22 move the mic away another couple of inches.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25 \\\

1  BY MR. CONNETT:

2  Q.   In your view, Dr. Hu, do the findings of the Goodman 2022

3  analysis provide further support for fluoride being a

4  developmental neurotoxicant at the levels of exposure seen in

5  fluoridated communities?

6  A.   Yes.

7  Q.   Now, was your study, was the Goodman study, published in

8  time to be considered by the NTP's Monograph?

9  A.   No.

10  Q.   So let's talk more about the exposure metric that you used

11  in your ELEMENT studies, which is urinary fluoride, correct?

12  A.   Yes.

13  Q.   What are the benefits, Dr. Hu, of using urinary fluoride

14  as the metric of fluoride exposure?

15  A.   Well, the primary benefit is that you're integrating

16  fluoride exposure from whatever exposure source there is.  So

17  if it's dietary, if it's in the water, it's in the food, it's

18  in the food that was cooked with the fluoridated water; if you

19  happen to swallow toothpaste or if you're using other sources

20  of fluoride, it will integrate all of it and express it in

21  terms of what is the level of fluoride that's circulating in

22  your blood and then gets filtered out into the kidneys.  And

23  that ultimately is the component of fluoride in the body that's

24  available to cross the blood-brain barrier to the brain and

25  also to go to other target organs in the body.

1  Q.   Now you, as an environmental epidemiologist, are you able

2  to identify hazards based on using a urinary measure of

3  exposure if you don't know the exact amount that the mother is

4  actually ingesting?

5  A.   Yes, because, like I said, it takes into account whatever

6  they're ingesting and expresses it as the level that's

7  circulating in the body.

8  Q.   Now, does urinary fluoride have its limitations as a

9  measure of exposure in some situations?

10  A.   Of course.

11  Q.   And is it common for exposure metrics in environmental

12  epidemiology to have limitations?

13  A.   Of course.

14  Q.   One of the limitations, is it fair to say in your ELEMENT

15  studies is that, for most of the mothers, you did not have

16  urinary fluoride samples for every trimester; is that fair?

17  A.   Correct.

18  Q.   What impact, Dr. Hu, would that limitation have when you

19  don't have urinary fluoride levels across the three trimesters?

20  A.   Well, it means that you don't really know the full

21  experience of the fluoride exposures throughout pregnancy.

22       So for some of the subjects, you only have one measure or

23  maybe two measures, and that introduces noise in your

24  understanding of their fluoride exposure experience.

25  Q.   And what impact does that noise have?  Does it mean you're

1  more likely to find a spurious association or less likely?

2  **A.**   In epidemiology, we would basically classify that as

3  nondifferential misclassification, that is, you know, could be

4  higher, could be lower, but, in general, it's just noise.

5       In general, when we look at the methodology of

6  environmental epidemiology, when you have noise in an exposure

7  measure and you're relating that to an outcome, the magnitude

8  of the impact of that measured outcome with noise is decreased.

9  We call that misclassification bias towards the null.

10       So you're less likely to see a relationship at all, but if

11  you do see a relationship, the magnitude of that relationship

12  tends to be decreased.

13  **Q.**   Would it be a fair way to characterize what you just said

14  that the more noise you have, the harder it is to hear the

15  signal?

16  **A.**   Correct.

17  **Q.**   Now, would it have been a more methodologically rigorous

18  approach in your studies to give the pregnant mothers a

19  specific dose of fluoride so that you could know precisely how

20  much fluoride they're ingesting and then study their children's

21  IQ?  Would that have been a more rigorous approach, Dr. Hu?

22  **A.**   I suppose, especially if there's a control population that

23  would be a randomized trial.

24  **Q.**   Why do you as an environmental epidemiologist not take

25  that approach?

1  **A.**   Well, if the hypothesis is that the substance is a

2  neurotoxicant, that would never get through the human subjects

3  review committee of a university.

4  **Q.**   Is that because you can't experiment on people to see the

5  toxicological effects that the chemical may have?

6  **A.**   That's correct.

7  **Q.**   Now, in your studies for the ELEMENT cohort you have, as

8  you mentioned, controlled for urinary dilution using creatinine

9  adjustment, right?

10  **A.**   Yes.

11  **Q.**   Now, would you expect adjusting the urinary fluoride

12  levels for creatinine to have any kind of dramatic effect on

13  the association between fluoride and a neurodevelopmental

14  outcome?

15  **A.**   Well, I would expect to sharpen the findings.  Without

16  correction for urinary dilution that introduces more noise

17  because now you've introduced this unpredictable factor, some

18  people drinking a lot before the measure and some people

19  fasting in the morning before the measure, but I would not

20  expect it to dramatically change the directionality of the

21  results.  It would simply increase the power of the study and

22  sharpen the results.

23  **Q.**   Okay.  Now, at your deposition you were asked by counsel a

24  number of questions regarding the INMA study by Dr. Ibarluzea

25  and colleagues.  Do you recall some of those questions?

1    **A.**    Yes.

2    **Q.**    Now, are you aware, Dr. Hu, of the impact that creatinine

3    adjustment had in the INMA study?

4    **A.**    I saw some of that evidence.

5    **Q.**    And can you describe for the Court what you have seen on

6    that matter?

7    **A.**    Well, they published the results of the

8    creatinine-adjusted urinary fluoride, but when I looked at the

9    results of not adjusting for creatinine, the large beneficial

10   effect of fluoride disappeared completely, and it was a

11   completely null finding.  I mean, it was zero, which was very

12   surprising.

13   **Q.**    Do you find it plausible that creatinine adjustment would

14   have that kind of dramatic effect on the association?

15   **A.**    I've never seen anything like that.

16   **Q.**    Do you have any experience on that with lead or any other

17   chemicals where you have had the opportunity to compare the

18   nonadjusted analysis with the adjusted analysis with respect to

19   creatinine or specific gravity?

20   **A.**    Yes.

21   **Q.**    Can you explain?

22   **A.**    Well, it's just like I said, if you look at the

23   nonadjusted urinary toxicant levels, you'll see a relationship,

24   it will tend to be noisy, but it wouldn't be that dramatically

25   different.

1        In fact, we looked at it with the urinary fluoride in our

2   own ELEMENT study and we still saw signs of a negative

3   relationship, it just wasn't statistically significant but it

4   was negative.  And then you adjusted for the urinary creatinine

5   and then it became not only negative but a stronger negative

6   relationship and statistically significant.  So that's more in

7   line with what we would expect.

8   Q.   Now, I was asking you some questions earlier about

9   seafood, and now I want to ask you questions related to seafood

10  in the context of the Spanish study by Dr. Ibarluzea.  Okay?

11  A.   Sure.

12  Q.   Do you have any understanding as to whether the seafood

13  consumption in coastal Spain is high or low?

14  A.   My understanding is that it's very high.

15  Q.   And does that, in your view, have any bearing on whether

16  the INMA study should have controlled for seafood in its

17  analysis?

18  A.   Yes.

19  Q.   And can you explain that for the Court?

20  A.   Well, earlier in this deposition I explained that because

21  seafood both has high fluoride content and high Omega 3 fatty

22  acid content, it poses a serious problem with regards to the

23  potential for negative confounding; negative confounding being

24  now you're unable to see the toxic effect of fluoride because

25  it's overwhelmed by the beneficial effect of Omega 3 fatty

 1   acids.  So in a population like theirs, with one of the highest

 2   seafood ingestion rates, it would seem important to try to

 3   control for that.

 4   **Q.**  By the way, Dr. Hu, are you familiar with any substance

 5   that increases the IQ of human beings by 15 points?

 6   **A.**  No.

 7   **Q.**  I'd like to shift gears now and ask you a few questions

 8   about a -- the pooled BMCL analysis that you co-authored.

 9        The Court will hear later in this case testimony from

10   Dr. Grandjean talking about the BMCL component.  I don't want

11   to ask you about that component of the analysis, but I do want

12   to ask you a little bit about the Danish cohort.  Okay?

13   **A.**  Sure.

14   **Q.**  And so in this study can you just explain in general terms

15   what you did in terms of the pooled analysis versus the

16   separate analyses?

17   **A.**  So this was an opportunity for us to essentially create

18   one large epidemiology study that covers a pretty wide range of

19   fluoride exposure, if you will, and use that data to estimate

20   the so-called benchmark concentration, which is basically the

21   concentration at what you would expect a particular outcome, in

22   this case a 1 point change in IQ.

23        And the pooling is because the investigators decided to

24   collaborate and they do their best to try to control for the

25   same set of confounders and to use a very rigorous statistical

 1   approach to the analysis of the data so that it can function,

 2   essentially, as one large epidemiology study.

 3   **Q.**   And would you say that a pooled analysis is a more robust

 4   analysis of a single cohort?

 5   **A.**   I think you can say that because the sample size is so

 6   large it just depends -- it assumes that the studies that

 7   you're pooling are, each of them, themselves, rigorous, in

 8   which case they were.

 9   **Q.**   So if you had three rigorous studies, as you did, ELEMENT,

10   MIREC and the Danish cohort, what would you give more weight

11   to, the findings from any given specific cohort, like ELEMENT

12   or MIREC, or the findings of the pooled analysis?

13   **A.**   Well, particularly for the purposes of what we're trying

14   to do, I think the findings of the pooled analysis were more

15   rigorous and strong than the findings for any particular one of

16   those studies.

17   **Q.**   Now, the Danish cohort, sometimes referred to as the

18   "Odense cohort"?

19   **A.**   Right.

20   **Q.**   Okay.  That is a cohort where fluoride is not added to the

21   water; is that right?

22   **A.**   That's my understanding, yes.

23   **Q.**   And is it fair to say that the fluoride exposure levels in

24   that cohort are less than the exposures that people receive

25   when they drink fluoridated water?

1   **A.**   I -- yes.

2   **Q.**   And is it harder to detect the effects of a chemical when

3   you are investigating populations with relatively exposure

4   contrasts to a chemical?

5   **A.**   Yes.

6   **Q.**   Can you explain for the Court why that is?

7   **A.**   Sure.  First of all, if you're looking at a population

8   with a relatively low and restricted range of exposures,

9   statistically it's harder to see what the -- to tease out the

10   ultimate impact of that exposure because you need --

11   statistically a wider range of exposures strengthens the power

12   of a study to find a relationship.

13       Second of all, when you're at a really low level of

14   exposure, then you're competing for all other sorts of risk

15   factors for whatever the outcome you're looking at, whether

16   it's IQ loss or behavior or something else.

17       So you're this -- you're -- it's harder to see the signal

18   above the noise of everything else.  So that's, you know, two

19   of the principal reasons why the Odense cohort had, I guess you

20   could say, a less ability to examine the fluoride outcome

21   relationship.

22   **Q.**   Now, you're an environmental epidemiologist.  Is it fair

23   to say that in your field it is considered a strength of a

24   study to have a high exposure contrast?

25   **A.**   Yes.

1  Q.   And is that because the study has greater power to detect

2  the effect?

3       MR. ONG:   Objection, leading.

4       MR. CONNETT:   Let me --

5       THE COURT:   Rephrase.

6       MR. CONNETT:   I'll rephrase, Your Honor.

7  BY MR. CONNETT:

8  Q.   Can you explain why that's a methodological strength to

9  have a larger exposure contrast?

10 A.   It's a biostatistical phenomenon, basically.  You just

11 have an ability to see contrasts, if you will.

12      It's sort of like looking at, you know, a picture and

13 trying to determine whether this shade is different from that

14 shade.  If you increase the contrast, it's easier to see.

15 Q.   Now, does the history of research on lead and IQ offer any

16 insights into this very point about the need of having exposure

17 contrast to identify effects at low levels of exposure?

18 A.   Yes.

19 Q.   Can you explain that?

20 A.   Well, when the EPA standard for lead first came out, as

21 you said in your opening statement, there wasn't much research

22 at the really low levels, and there just weren't that many

23 people with low levels.

24      Now, as the lead levels have come down, luckily, we've all

25 been able to do better research looking at the lower levels of

**HU - DIRECT / CONNETT**

1  exposure and trying to understand, well, just where is that

2  threshold.  And we haven't been able to find one.  That's a

3  whole separate environmental health topic.  But now we can see

4  it based on the -- you know, having a range of exposures that

5  is lower, but also we can detect lots of folks in the low range

6  and plenty of folks in the mid range.

7  **Q.**   Now, EPA, I believe in their opening today, characterized

8  the Danish cohort as contradicting, refuting the ELEMENT study

9  or the MIREC study.  Do you agree with that characterization,

10  or do you have a different view?

11  **A.**   You know, I think in general epidemiologists really hate

12  to be that black and white.  You know, in particular, in fact,

13  one of the things that came up during the testimony today is,

14  this study showed nothing.  This study was positive.  This

15  study was negative.

16      In fact, epidemiology is moving away from a simple

17  reliance on just P values and saying "this is significant, this

18  is not significant."

19      It's really important to also look at the so-called

20  directionality of the relationships, look at the beta

21  coefficients, which is the quantitative relationship that we

22  see, even if it's not statistically significant, so when we

23  look at a range of outcomes or we want to try to look at what

24  the whole picture is showing, not just whether one is

25  significant or not.

 1        And so that's why, you know, we tend not to just, you

 2   know, dismiss the studies from Odense as being negative but,

 3   rather, try to dig into the evidence and see what it really

 4   shows.

 5   Q.   And you talked earlier about how different populations can

 6   have differing characteristics of chemical stressors and

 7   nonchemical stressors and how that can impact -- how a

 8   neurotoxicant may manifest toxic outcomes; is that fair?

 9   A.   Right.

10   Q.   And you've also talked about how it's harder to detect

11   associations when you have lower contrast of exposure; is that

12   correct?

13   A.   Correct.

14   Q.   So when you're looking at different populations like

15   Denmark, Mexico and Canada and you're looking at lower

16   exposures in Denmark vis-á-vis ELEMENT and MIREC, would you

17   consider the Danish studies inconsistent with ELEMENT or MIREC,

18   or would you consider them as just offering additional guidance

19   but not contradicting MIREC and ELEMENT?

20             MR. ONG:   Objection, leading.

21             THE COURT:   Sustained.  Rephrase.

22             MR. CONNETT:   Okay.  Yeah.

23   BY MR. CONNETT:

24   Q.   Given, you know, these principles that you've discussed,

25   would you consider the findings from Denmark, where you're

1    looking at lower exposures and a different population, to be

2    inconsistent or contradictory to the findings in your cohort?

3    **A.**    I would just say that they didn't find the same thing.  I

4    wouldn't put it as contradictory, per se.

5    **Q.**    So now Dr. Hu, I want to shift gears and I want to talk

6    about the study that you have begun working on here in the

7    United States.  Can you tell the judge about the cohort that

8    you're now working with?

9    **A.**    Sure.

10        So I was recruited to the University of Southern

11   California in 2020 and one of the great assets of our

12   department is a birth cohort study called Madres, which is a

13   birth cohort also funded by the National Institute of

14   Environmental Health Sciences created and led by my colleagues

15   Carrie Breton and Tracy Bastain.

16        It's primarily looking at Los Angeles County residents,

17   highly Latino in origin and a very rigorous design intended to

18   understand environmental impacts during the prenatal period.

19   They also had archived urinary samples.  They also were

20   starting to measure neurobehavioral outcomes and that allowed

21   us to essentially impose the same study approach as we did in

22   ELEMENT, that is, take the archived urine samples, measure

23   fluoride, measure -- in this case we used specific gravity to

24   account for dilution and to report these results, and that was

25   just published recently and now we're -- we have a paper under

1  review for neurobehavioral effects.

2  **Q.**   And Los Angeles County is an area that adds fluoride to

3  its water; is that right?

4  **A.**   Correct.

5  **Q.**   About how many pregnant women were included in your

6  recently published study looking at urinary fluoride levels?

7  **A.**   Somewhere above 200.  I can't remember the exact number.

8  **Q.**   Okay.  And you controlled for urinary dilution using

9  specific gravity?

10  **A.**   Yes.

11  **Q.**   And you mentioned that the majority of the women in the

12  cohort are Hispanic; is that right?

13  **A.**   Yes.

14  **Q.**   Does that fact have any bearing, potential bearing, on the

15  representativeness of the Madres cohort to the U.S. as a whole

16  when we're dealing with urinary fluoride levels?

17  **A.**   Well, we found that the urinary fluoride levels were very

18  comparable to what they were in Canada and the U.S.  So the

19  bottom line is that they were exposed to very similar amounts

20  of fluoride.

21  **Q.**   Is there any data to indicate that Hispanic communities

22  have a greater distrust of tap water?

23  **A.**   Yes.

24  **Q.**   And what does that data indicate?

25  **A.**   Well, a lot of the women had immigrated from Mexico where

 1  there is quite a bit of distrust of tap water, which is

 2  precisely why the Mexican government put fluoride in salt

 3  instead of water.  So I think some of those attitudes were

 4  imported among the women we studied in Los Angeles.

 5  **Q.**  So would it be plausible to conclude that the urinary

 6  fluoride levels in the Hispanic population that you studied may

 7  actually be a little bit lower than in other communities in the

 8  United States?

 9  **A.**  It's possible.  We just don't have evidence of that.

10          **MR. CONNETT:**  Okay.  At this point, Your Honor, I

11  would like to show the witness several demonstrative exhibits.

12          **THE COURT:**  Okay.

13          **MR. ONG:**  No objection.

14          **MR. CONNETT:**  And Jay, if you could put up

15  Demonstrative Exhibit No. 1.  Demonstrative Exhibit No. 1 Your

16  Honor is what this is marked.

17          **THE COURT:**  Okay.  This is marked as a demonstrative?

18          **MR. CONNETT:**  Yes, it is.

19          **THE COURT:**  No. 1?

20          **MR. CONNETT:**  Yes, Demonstrative Exhibit No. 1.

21          **THE COURT:**  Okay.

22      Dr. Hu, can you see that on your screen?

23          **THE WITNESS:**  Yes.

24          **MR. CONNETT:**  Your Honor, can you see that on your

25  screen?

1        THE WITNESS:  Yes.

2    BY MR. CONNETT:

3    Q.   Dr. Hu, what do we see in this figure?

4    A.   This is a bar graph depicting the 5th percentile, 50th

5    percentile and 95th percentile levels of specific

6    gravity-corrected urinary fluoride in the Madres cohort with

7    separate bars for the first trimester values and the third

8    trimester values and I can't tell if that's the mean or the

9    median, but I'm sure it's some measure of central --

10   centrality.

11        MR. ONG:  Your honor, lead counsel said he was putting

12   up Demonstrative No. 1 but this appears to be demonstrative

13   No. 2.  Is there --

14        MR. CONNETT:  Just for housekeeping purposes the

15   reason is I didn't show the one that I had been marked as

16   No. 1, so I figured I would use this as No. 1.

17        MR. ONG:  I withdraw my objection.  That's fine.

18        THE COURT:  So it's marked No. 2 but you're calling it

19   No. 1?

20        MR. CONNETT:  Yes.

21        THE COURT:  Okay.

22        MR. CONNETT:  So I -- we can -- Your Honor, what we'll

23   do is, we're going to change the marking on this document to

24   Demonstrative No. 1 --

25        THE COURT:  Okay.

1              MR. CONNETT:  -- for clarity of the record.

2              THE COURT:  All right.  Thank you.

3   BY MR. CONNETT:

4   Q.    So, Dr. Hu, this figure here showing your urinary fluoride

5   data from the Madres cohort seems to show an increase in

6   urinary fluoride in the third trimester over the first

7   trimesters; is that correct?

8   A.    That's correct.

9         And I just noticed that these are median values, right.

10  Q.    So does that make sense to see fluoride levels in the

11  urine increasing during the course of the pregnancy?

12  A.    Yes.  And we see this as being very reminiscent of what we

13  saw with lead, in which case there was an increase in the third

14  trimester in lead coming out of the bones of women where it had

15  been stored because of the maternal skeletal's physiologic

16  phenomenon of essentially dissolving itself to provide calcium

17  to the growing fetal skeleton.

18        Fluoride is incorporated into the hydroxy appetite

19  structure of bone just like lead, so our suspicion is that

20  we're seeing something very akin to what happens with lead.

21              MR. CONNETT:  At this point, Your Honor, I would like

22  to show the witness Demonstrative Exhibit No. 2, which is

23  currently marked as No. 3, but we will correct that for the

24  record.

25              THE COURT:  All right.  Before you do that, maybe you

1   can explain.  There was a lot of science there about the

2   skeletal reaction of mothers.  Maybe you can break that down a

3   little bit more for me?

4           THE WITNESS:  Sure.  Yeah.

5       So when a fetus goes there fetal development, different

6   organs form and grow at different rates during gestation.  The

7   brain actually forms very early on, but then the skeleton forms

8   somewhat later and then it accelerates its growth in the second

9   and third trimester.

10      Skeletal growth in a fetus demands calcium.  Where is it

11  going to get it?  Some of it can come from whatever a mother is

12  eating or ingesting, but there are hormonal factors that then

13  start increasing the demineralization of mom's bones in order

14  to provide calcium to the growing fetal skeleton, calcium being

15  the major -- I'm sorry, not -- I'm using jargon -- the major

16  chemical constituent of bone.  But whatever is in bone then

17  gets liberated along with calcium and goes into circulation.

18      That's precisely what happens with lead.  The research on

19  that is extremely good.  But we suspect that's also what's

20  happening with fluoride.  So we do -- that's what we believe

21  would explain the spike in urinary fluoride that occurs in the

22  third trimester because that's when skeletal growth in the

23  fetus really starts to pick up and accelerates.

24          THE COURT:  So what you're picking up is the transfer

25  process from the mother's bones to the fetus as it goes through

 1    the body, whether it's by blood or by urine outputs --

 2              **THE WITNESS:**  That's right.

 3              **THE COURT:**  -- as it accelerate, you're picking that

 4    up?

 5              **THE WITNESS:**  Yeah.  It's coming out of mom's bone

 6    into blood.  Some of that then goes to the fetus, some of it

 7    gets excreted through the kidneys into urine, and that's why

 8    you see a spike.

 9              **THE COURT:**  Thank you.

10    **BY MR. CONNETT:**

11    **Q.**   Okay.  Dr. Hu, we have Demonstrative Exhibit No. 2 on the

12    screen.  Can you see that?

13    **A.**   Yes.

14    **Q.**   Can you explain for the Court what this figure shows us?

15    **A.**   So this is a comparison of the MIREC and Madres cohorts in

16    terms of the mean levels of urinary fluoride corrected for

17    dilution that we're seeing in the third trimester.

18    **Q.**   And how would you compare the urinary fluoride levels that

19    you see in your Madres cohort in Los Angeles with the urinary

20    fluoride levels that were observed in the MIREC study?

21    **A.**   They're very close.  They're within 10 percent of each

22    other.

23    **Q.**   The Madres cohort had slightly higher urinary fluoride

24    levels; is that fair to say?

25    **A.**   Yes.

 1              **MR. CONNETT:**  And at this point, Your Honor, I would

 2    like to show the witness Demonstrative Exhibit No. 3.

 3              **THE COURT:**  Okay.

 4    **BY MR. CONNETT:**

 5    **Q.**   Dr. Hu, can you see this figure on your screen?

 6    **A.**   Yes.

 7    **Q.**   Can you explain what this figure tells us?

 8    **A.**   This is, essentially, the same data as the previous

 9    figure, but now broken down in terms of the percentiles, not

10    just comparing the mean but comparing the 5th, 50th and 95th

11    percentiles of the urinary data of fluoride and looking at

12    medians instead of the means.

13    **Q.**   Now, in the Madres cohort, did the 95th percentile

14    pregnant women have more than 1.5 parts per million of fluoride

15    in their urine?

16    **A.**   Yes.

17    **Q.**   Now, Dr. Hu, you mentioned earlier that you have completed

18    now a study in the Madres cohort of fluoride and

19    neurodevelopment; is that correct?

20    **A.**   Correct.

21    **Q.**   Now, are the results of your --

22              **MR. ONG:**  Objection.  Your Honor, that study was

23    withdrawn from the expert disclosures prior to trial.  It has

24    not been the subject and was not the subject of any testimony

25    during the deposition.

**THE COURT:** All right. Well --

**MR. CONNETT:** Your Honor, I was just going to ask one basic question about it, but, you know, we're not going to go into detail with it, we're not going to go in but if -- I can withdraw the question.

**THE COURT:** I think you should withdraw the question if it's not been properly disclosed previously.

**MR. CONNETT:** Just a clarifying comment, Your Honor, I'm not going to get into the content of the study.

**THE COURT:** Okay.

**BY MR. CONNETT:**

**Q.** But, Dr. Hu, you have completed the study?

**A.** Yes.

**Q.** Have you admitted it for publication?

**A.** We have.

**Q.** Is it currently undergoing peer review?

**A.** Yes.

**THE COURT:** Thank you.

**MR. CONNETT:** Your Honor, I have no further questions at this time.

**THE COURT:** All right. Thank you.

Cross-examination?

**MR. ADKINS:** Your Honor, may I request a brief recess?

**THE COURT:** You want a recess?

**MR. ADKINS:** Yeah, just for a restroom break.

1      **THE COURT:**  Okay.  Well, why don't we go ahead and

2   take our break and then the next session we'll go a little over

3   an hour.  So why don't we go ahead and take our 15-minute

4   break.

5      **THE CLERK:**  Court is in recess.

6      (Recess taken at 11:50 a.m.)

7      (Proceedings resumed at 12:13 p.m.)

8      **THE CLERK:**  Please remain seated and come to order.

9   Court is back in session.

10      **THE COURT:**  All right.  Prepared to move forward with

11   cross-examination?

12      **MR. ONG:**  Yes, Your Honor.

13      **THE COURT:**  All right.

14                      <u>**CROSS-EXAMINATION**</u>

15   BY MR. ONG:

16   **Q.**   Good afternoon, Dr. Hu.  As you know, my name is Emmet

17   Ong, and I represent the Government in this matter.

18      Now, during your direct examination, you testified about a

19   study called Goodman 2022, right?

20   **A.**   Correct.

21   **Q.**   And just so we're specific about it, Goodman 2022 refers

22   to a manuscript published in August 2022 entitled "Domain

23   Specific Effects of Prenatal Fluoride Exposure on Child IQ at

24   4, 5 and 6 to 12 years old in the ELEMENT cohort," right?

25   **A.**   Correct.

**HU - CROSS / ONG**

1  **Q.**   And Goodman 2022 studied the ELEMENT cohort, which is the

2  same cohort that was studied in Bashash 2017, correct?

3  **A.**   It's the same group of individuals as the source of

4  subjects.  We just had more subjects involved.

5  **Q.**   It was just you thawed more urine samples, correct?

6  **A.**   Yes.

7        (Court reporter seeks clarification.)

8          **MR. CONNETT:**  Object on vague and ambiguous.

9          **THE COURT:**  I'm still -- what was the question again?

10 Could you repeat that?

11 **BY MR. ONG:**

12 **Q.**   You thawed more urine samples.

13         **THE COURT:**  Thawed?

14         **MR. ONG:**  Unfroze.

15         **THE COURT:**  Oh.

16 **BY MR. ONG:**

17 **Q.**   You unfroze more urine samples?

18         **THE COURT:**  Unfroze more urine samples.

19 **BY MR. ONG:**

20 **Q.**   At the June 2020 trial in this case you testified in

21 detail about Bashash 2017 study of the ELEMENT cohort, right?

22 **A.**   Yes.

23 **Q.**   Right.  Bashash 2017, Goodman 2022 measured prenatal

24 fluoride exposure in the ELEMENT cohort by looking at the

25 fluoride concentration in the mother's urine, right?

HU - CROSS / ONG

1  **A.**    Yes.

2  **Q.**    And by unfreezing additional urine samples, that allowed

3  you to study a greater number of urine samples from the ELEMENT

4  cohort than were examined in Bashash 2017, correct?

5  **A.**    Correct.

6  **Q.**    The women who provided the additional urine samples had

7  their urine collected in the same way as Bashash 2017, right?

8  **A.**    Yes.

9  **Q.**    The women who provided the additional urine samples were

10 screened using the same questions about the medical history as

11 the women in Bashash 2017, correct?

12 **A.**    Yes.

13 **Q.**    And for these additional urine samples, you adjusted for

14 urinary dilution by correcting for creatinine, correct?

15 **A.**    Yes.

16 **Q.**    And that correction was done in the same way as Bashash

17 2017, correct?

18 **A.**    More or less, yes.

19 **Q.**    And child IQ in Goodman 2022 was assessed using the same

20 intelligence tests as Bashash 2017, correct?

21 **A.**    Yes.

22 **Q.**    Goodman 2022 and Bashash 2017 also used the same

23 covariates when examining the association between prenatal

24 fluoride exposure and child IQ, correct?

25 **A.**    Yes.

1    Q.   Now, I want to talk about Goodman 2022 and its objectives,

2    and I believe there are two of them.  The first objective of

3    Goodman 2022 was to examine the longitudinal and

4    domain-specific effects of prenatal exposure -- prenatal

5    fluoride exposure on child IQ, correct?

6    A.   Yes.

7    Q.   And to provide context, when you looked at IQ in Bashash

8    2017, you only used a full-scale IQ score to measure the effect

9    of increases in maternal urinary fluoride levels, correct?

10   A.   Correct.

11   Q.   And just to explain for the Court or to provide additional

12   context for the Court, the full scale IQ measure, in a

13   nutshell, is a summary of sub scores that relate to different

14   domain intelligence, correct?

15   A.   That's correct.

16   Q.   And breaking it down into its simplest terms, there are

17   two broad cognitive domains that are baked into a full-scale IQ

18   measure, verbal IQ and nonverbal IQ, correct?

19   A.   Yes.

20   Q.   So Goodman 2022 was trying to expand on the analysis in

21   Bashash 2017 by examining whether particular cognitive domains,

22   in this case verbal and nonverbal intelligence, are more

23   sensitive to fluoride exposure, correct?

24   A.   Correct.

25   Q.   And what you found in Goodman 2022 is that higher maternal

1  urinary fluoride levels were significantly associated with

2  deficits in nonverbal intelligence in the ELEMENT cohort,

3  correct?

4  **A.**   Correct.

5  **Q.**   However, you did not find a statistically significant

6  association between higher maternal urinary fluoride levels and

7  deficits in verbal intelligence in the ELEMENT cohort, correct?

8           **MR. CONNETT:**  Overbroad.

9           **THE WITNESS:**  Well, like I said earlier --

10           **THE COURT:**  You may answer.

11           **THE WITNESS:**  -- it was not statistically significant,

12  but it was in that direction.

13  **BY MR. ONG:**

14  **Q.**   So the answer is yes, you did not find a statistically

15  significant association?

16  **A.**   Correct.

17  **Q.**   Now, I want to discuss the results you found in Goodman

18  2022 regarding the ELEMENT cohort and compare them to another

19  study that was cited in that manuscript, but before we talk

20  about that particular study, I want to touch on something you

21  testified about in your deposition this past October, and

22  specifically I want to discuss your definition of what makes

23  for a high-quality epidemiological study, okay?

24  **A.**   Okay.

25  **Q.**   And I want to discuss that definition in the context of

1  this litigation, examining the association between prenatal

2  fluoride exposure and child IQ, okay?

3  **A.**   Okay.

4  **Q.**   And now, you testified that a high-quality study in that

5  context has the following characteristics.  The study should be

6  longitudinal in nature so that the exposure that's being

7  measured occurs prior to the neurobehavioral outcomes that are

8  of interest, correct?

9  **A.**   Yes.

10  **Q.**   That's one characteristic.

11        Next, to minimize the risk of bias, the people who are

12  measuring the neurobehavioral outcomes should be blind to the

13  fluoride exposure measurements of the subjects they're

14  evaluating, correct?

15  **A.**   Correct.

16  **Q.**   Another characteristic of a high-quality study is, in this

17  context, is that it uses urinary biomarkers, which provide a

18  more accurate picture of fluoride exposure than concentrations

19  of fluoride in community-level drinking water, correct?

20  **A.**   I missed the last few words.  Can you repeat that?

21  **Q.**   Sure.  I'll repeat the question.

22        Another characteristic of a high-quality study is that it

23  uses urinary biomarkers, which provide a more accurate picture

24  of fluoride exposure than concentrations of fluoride in

25  community-level drinking water, correct?

 1   **A.**   Yes, because it integrates exposure from all sources.

 2   **Q.**   The study should also use individual estimates of fluoride

 3   exposure rather than geographic or nonindividually-based

 4   measures of fluoride exposure, correct?

 5   **A.**   Yes.

 6   **Q.**   The urinary fluoride measurement should be corrected for

 7   urinary dilution either correcting for urinary creatinine or

 8   urine specific gravity, correct?

 9   **A.**   Yes.

10   **Q.**   Another characteristic is that the urinary fluoride

11   measurements should be done by an experienced laboratory using

12   standardized procedures and protocols, correct?

13   **A.**   Yes.

14   **Q.**   A high-quality study of the relationship between fluoride

15   and neurodevelopment should control for important potential

16   confounders, such as sociodemographic status, home environment,

17   premature birth and maternal smoking, alcohol ingestion,

18   intelligence and age, correct?

19   **A.**   Yes.

20   **Q.**   Another characteristic is that the study should employ

21   statistical methods that can give an accurate understanding of

22   the statistical significance of the results, correct?

23   **A.**   Yes.

24   **Q.**   Okay.  And finally, the study should provide a fulsome

25   interpretation of the results that is based on the data, a good

1   comparison with like studies an acknowledgment of the strengths

2   and limitations of the study, correct?

3   A.   Yes.

4   Q.   That's quite a few characteristics we just list there.

5        And all of the characteristics you just testified about

6   are hallmarks of a high-quality study in the context of

7   prenatal fluoride exposure and its association with child IQ,

8   correct?

9   A.   I mean, they are attributes of what I believe an optimal

10  high-quality study are.  It doesn't mean that if you're missing

11  one of them it's a low-quality study.  It just means these are

12  the factors we consider when we try to judge the quality of a

13  study.

14  Q.   In Goodman 2022, you discussed and compared your results

15  with the results published for the INMA study, correct?

16  A.   Yes.  I can't remember.  You mean in the discussion

17  section?

18  Q.   Yes.

19  A.   I think we did.  I'd have to refresh my memory on that.

20  Q.   Well, why don't we do that.

21  A.   Okay.

22  Q.   If you could turn to Goodman 2022 -- which should be tab 2

23  in your binder -- and if you look at -- and again, I'm not sure

24  if this is in the discussion section or not, but it's in the

25  study.  And if you could look at page 3 of Goodman 2022.

 1          THE COURT:  This is the one that says tab or

 2  Exhibit 2?

 3          MR. ONG:  Yeah.  It says Exhibit 2.

 4          THE WITNESS:  What page?  I'm sorry.

 5  BY MR. ONG:

 6  Q.   I'm sorry.  It's exhibit -- it's Exhibit 2, and it's at

 7  page 3 of the Goodman study and that's the second tab that

 8  says, "Hu Exhibit 1."

 9  A.   Oh.

10          MR. ONG:  Yeah.  I apologize, Your Honor, Hu

11  Exhibit 1.

12          THE COURT:  Hu Exhibit 1?

13          MR. ONG:  Yes.

14          THE COURT:  Page 3?

15          MR. ONG:  Page 3.

16          THE COURT:  And you're making a reference in that

17  first paragraph to the Ibarluzea 2021?

18          MR. ONG:  That's correct, Your Honor.  And with your

19  permission, I'd like to publish that --

20          THE COURT:  Go ahead.

21          MR. ONG:  -- that portion.

22          THE COURT:  Go ahead.

23          THE WITNESS:  I see I -- we just mentioned that study

24  in part of one sentence.

25  \\\

1    BY MR. ONG:

2    Q.    That's correct.  And then if you also turn to page 9 of

3    the Goodman study.

4    A.    Okay.

5    Q.    And this is a section there that reads "In contrast, a

6    study conducted in Spain found that higher maternal urinary

7    fluoride was positively associated with IQ in boys at age 4."

8    Do you see that?

9    A.    Yes.

10   Q.    Okay.  So, to repeat the question, does that refresh your

11   recollection, sir?

12   A.    Yes.

13   Q.    So in Goodman 2022, you discussed and compared your

14   results with the results published in Ibarluzea 2021, correct?

15   A.    Yes.

16   Q.    Now, just to make sure I'm on the same page, "Ibarluzea

17   2021" is how we refer to it in deposition because that's when

18   it was published online, and sometimes you'll see it referred

19   to as "Ibarluzea 2022," because that's when it was published in

20   a journal, but you understand that I'm referring to the same

21   manuscript, right?

22   A.    Yes.

23   Q.    Now, Ibarluzea 2021 made findings regarding fluoride and

24   neurodevelopment in the INMA birth cohort, correct?

25   A.    Yes.

```
 1   Q.   And the INMA cohort is based in the Basque region of

 2   Spain, correct?

 3   A.   Yes.

 4   Q.   Now, using the definition of high quality we just

 5   discussed, Ibarluzea 2021 is a high-quality study, correct?

 6   A.   Well, I think I mentioned earlier in my testimony that I

 7   had some reservations about the lack of control for fish

 8   consumption.

 9   Q.   Okay.  If I could read a portion from your testimony.

10   A.   Sure.

11   Q.   Okay.

12        MR. CONNETT:  Is this being offered for impeachment?

13        MR. ONG:  Yes.

14        MR. CONNETT:  What lines?

15        MR. ONG:  I'm going to offer him the report in a

16   second, okay?

17        And just for the record, I am referring to the October

18   13th, 2023, deposition of the witness in this matter.  And

19   counsel who was asking questions was me.

20        THE COURT:  Page?

21        MR. ONG:  And page number?  I'm sorry.  I just lost

22   track of it.  Page 43, line 4 through 7.

23        MR. CONNETT:  Your Honor, I'm going to object that

24   this is not impeachment.  It does not contradict what the

25   witness just said.
```

1          THE COURT:  Well, all right.  You can read it since

2     it's a bench trial.  I'll give it whatever weight I think it

3     deserves.  Go ahead.

4     BY MR. ONG:

5          "QUESTION:  Using the criteria previously discussed,

6          Ibarluzea 2021 is a high-quality study, correct?

7          "ANSWER:  Well, I have some reservations about it, but in

8          general, it's a pretty high-quality study."

9          Were you asked that question and did you give that answer?

10    A.   Yes.

11    Q.   Ibarluzea 2021 was published in a journal called

12    "Environmental Research," correct?

13    A.   Correct.

14    Q.   And "Environmental Research" is a well-regarded

15    peer-reviewed journal, correct?

16    A.   I'd agree with that.

17    Q.   And some of your studies have been published in

18    environmental research, correct?

19    A.   Yes.

20    Q.   And it's fair to say the IQ results of Goodman 2022 were

21    not consistent with the INMA study, correct?

22    A.   Correct.

23    Q.   Unlike Goodman 2022's results, the INMA study found no

24    statistically significant negative association between the

25    higher maternal urinary fluoride levels and verbal or nonverbal

1    IQ in preschool-aged children, correct?

2    A.    Correct.

3    Q.    And now you mentioned that you had some reservations about

4    Ibarluzea 2021, correct?

5    A.    Yes.

6    Q.    Okay.  And I believe at your deposition they fell into

7    four buckets.  The first reservation is that you are generally

8    surprised that the INMA study did not show negative

9    associations between urinary fluoride and neurodevelopment

10   outcomes, correct?

11   A.    I'm not sure I said that.  I think the two reservations

12   were that they would have such huge differences in the results

13   when they corrected for creatinine, and the second reservation

14   was about the lack of control for fish consumption.

15   Q.    If I showed you your deposition transcript, might that

16   refresh your recollection?

17   A.    Yeah.

18   Q.    And I would direct your back to your deposition

19   transcript, which is tab 1.

20   A.    Yep.

21   Q.    Or if you'd like, I can just put it on the screen.

22   A.    Sure.

23   Q.    At in particular -- and this is page 45 at lines 14

24   through 22.  Do you see that?  And I believe it's on the screen

25   in front of you too, sir?

```
 1              MR. CONNETT:  Your Honor, I would just make the
 2   observation that this is not impeachment testimony.
 3              THE COURT:  Well, I'll allow it.
 4              MR. ONG:  Your Honor, it's -- okay.
 5   BY MR. ONG:
 6   Q.   Now, at the deposition you were asked the following
 7   question:
 8        "QUESTION:  And you said you were surprised at the results
 9        of the INMA study; right?
10        "ANSWER:  Yes.
11        "QUESTION:  Is that because the study did not show
12        negative associations between urinary fluoride and
13        neurodevelopmental outcomes?
14        "ANSWER:  Well, that was certainly a bit of surprise,
15        given the preponderance of studies showing the opposite."
16        Do you see that?
17   A.   Yes.
18   Q.   Does that refresh your recollection about what one of your
19   reservations were?
20   A.   I guess it depends, you know, what do you -- what aspect
21   of it is surprising?  I mean, the fact that it was a well --
22   fairly well-designed study, you know, it shows what it shows,
23   so that's not surprising, but in this context when I compare it
24   with all the other studies, yeah, I did find that a bit
25   surprising.
```

1  Q.   Another reservation is that you were surprised that the

2  study found a positive relationship between fluoride and

3  neurodevelopment in the nonfluoridated water areas but not in

4  the fluoridated areas, correct?

5  A.   Right.

6  Q.   The third is that you were surprised at the change in the

7  positive results when the urinary fluoride levels were

8  unadjusted for creatinine, correct?

9  A.   Correct.

10  Q.   And the fourth reservation was that you were also

11  surprised that the INMA study authors did not try to control

12  for fish consumption, correct?

13  A.   Correct.

14  Q.   And you recall counsel asking you questions about that

15  issue, correct?

16  A.   Yes.

17  Q.   Now, the INMA study authors did control for cord blood

18  mercury levels, correct?

19  A.   Correct.

20  Q.   And controlling for mercury can act as a proxy for

21  controlling for fish consumption, correct?

22  A.   Partially.  It depends because there's certain fish

23  species that are very high in mercury content.  Those tend to

24  be the ones at the top of the pelagic fish ecosystem.  That

25  would be things like shark, tuna, king fish, et cetera.

1    But my understanding is that the Spanish are eating fish

2    that are lower on that same ecosystem.  Less mercury is a issue

3    where -- but fluoride still remains an issue, and they're also

4    very high in Omega 3 fatty acids.

5    So I'm not sure controlling for mercury adequately

6    controls for the potential confounding effect of fish

7    consumption.

8    Q.   But as a general matter you would agree that mercury is a

9    biomarker of fish intake, correct?

10   A.   It has some relationship to fish consumption, yes.

11        THE COURT:  If you could, again, back away from the

12   mic, we're still getting -- you can push the mic up too.

13        THE WITNESS:  Sorry, your Honor.

14        THE COURT:  No problem.

15        THE WITNESS:  There we go.

16   BY MR. ONG:

17   Q.   And when the researchers of the INMA study control for

18   mercury, they still did not find any statistically significant

19   association between fluoride and an adverse neurodevelopmental

20   outcome, correct?

21   A.   Correct.

22   Q.   Now, you remember counsel asking you questions before

23   about the change -- the change in the positive results when the

24   urinary fluoride levels were unadjusted for creatinine.  Do you

25   recall those questions?

1  A.   Yes.

2  Q.   When the researchers of -- researchers of the INMA study

3  control for mercury, that decreased the magnitude of the

4  positive correlation between urinary fluoride and IQ in boys in

5  that study, correct?

6  A.   I don't specifically recall that, but I have no reason to

7  disagree with you, counsel.

8  Q.   Staying on the subject of fish intake, you are not aware

9  of any fluoride study that has adjusted for fish consumption,

10  correct?

11  A.   Not as I sit here in front of you today.

12  Q.   And in Goodman 2022 itself, you did not identify any flaws

13  in the methodology used in Ibarluzea 2021, correct?

14  A.   You mean did we discuss that in the paper?

15  Q.   That's right.

16  A.   We did not, no.

17  Q.   There are relatively few studies that have assessed

18  fluoride's potential neurotoxicity at level with drinking water

19  fluoridated to 0.7 milligrams per liter, correct?

20  A.   Correct.

21  Q.   And that is particularly true for studies regarding

22  pregnant women and young infants, correct?

23  A.   Yes.

24  Q.   Among those few studies are the MIREC study?

25  A.   Correct.

1   Q.   And even though ELEMENT looked at fluoridated salt as one

2   source, you would want that in there with one of those studies

3   that looks -- that has looked at neurotoxicity at levels found

4   in fluoridated areas, correct?

5   A.   Yes.

6   Q.   The INMA study is now also one of those studies, correct?

7   A.   I guess so, yes.

8   Q.   And not withstanding your reservations about Ibarluzea --

9   Ibarluzea 2021, it is a pretty high-quality study that was

10  relevant to the assessment of fluoride's potential

11  neurotoxicity for pregnant women and young infants at levels

12  found in fluoridated areas in the United States, correct?

13  A.   I'm not in the business of risk assessment for fluoride.

14  I'm in the business of doing the research on fluoride.  So I

15  can give you my opinions about, you know, the quality of the

16  study and some of the limitations, but I hadn't considered the

17  relative weight it would be given in our risk assessment, so

18  I'm not sure I can answer your question.

19  Q.   Okay.  Well, the findings of Ibarluzea 2021 need to be

20  interpreted in the sum of the literature, yes?

21  A.   Yes.

22  Q.   You mentioned before that Goodman 2022 had two primary

23  objectives.  The second primary objective of Goodman 2022 was

24  to examine the potential for sex-specific effects based on

25  finding in the other studies that boys may be more susceptible

 1   to prenatal fluoride exposure than girls, correct?

 2   A.   Yes.

 3   Q.   And one of the studies that Goodman 2022 cites for the

 4   proposition that boys may be more susceptible to prenatal

 5   fluoride exposure than girls is Green 2019, correct?

 6   A.   Correct.

 7   Q.   And Green 2019 refers to the manuscript first authored by

 8   Rivka Green entitled "Association Between Maternal Fluoride

 9   Exposure During Pregnancy and IQ Scores in Offspring in

10   Canada," correct?

11   A.   Correct.

12   Q.   And Dr. Bruce Lanphear was a coauthor of Green 2019,

13   correct?

14   A.   Yes.

15   Q.   And the population studied in Green 2019 was the MIREC

16   cohort, correct?

17   A.   Yes.

18   Q.   Unlike Green 2019, Goodman 2022 did not find boys to be

19   more vulnerable to fluoride exposure than girls, correct?

20   A.   We did not see that, correct.

21   Q.   I want to talk about replication, and we discussed this at

22   your deposition and what your definition of "replication"

23   means.  And you understand replication to mean following up on

24   a body of research or even a single study's findings to

25   determine whether the same findings are found in a different

1  population using pretty much the same methodology, correct?

2  A.   Yes.

3  Q.   And replication is a key consideration in the

4  interpretation of epidemiological -- epidemiologic research,

5  correct?

6  A.   Yes.

7  Q.   Outcomes consistent with a prior claim would increase

8  confidence in that claim, correct?

9  A.   Yes.

10  Q.   And outcomes inconsistent with a prior claim would

11  decrease confidence in that claim, correct?

12  A.   Somewhat.

13  Q.   And even though you didn't use the term "replication" in

14  Goodman 2022, Goodman 2022 was more or less trying to see if

15  the sex-specific effects that Green 2019 found in the MIREC

16  cohort were replicated in the ELEMENT cohort, correct?

17  A.   Yes.

18  Q.   However, Goodman 2022 was unable to replicate the

19  sex-specific results of Green 2019, correct?

20  A.   Correct.

21  Q.   And while we're talking about replication, Goodman 2022 is

22  not an effort to replicate the results of Bashash 2017,

23  correct?

24  A.   Correct.

25  Q.   Now, you testified earlier about the Danish study.  Do you

HU - CROSS / ONG

 1   recall that?

 2   A.   Yes.

 3   Q.   And the results of the Danish study were published in a

 4   manuscript in October 2023 entitled "Dose Dependence of

 5   Prenatal Fluoride Exposure Associations With Cognitive

 6   Performance at School Age in Three Prospective Studies,"

 7   correct?

 8   A.   Correct.

 9   Q.   Dr. Philippe Grandjean was the first author of that

10   manuscript, correct?

11   A.   Yes.

12   Q.   And so if I refer to that study as either the "Danish

13   study" or "Grandjean's study of 2023," you'll know what I mean,

14   right?

15   A.   Yes.

16   Q.   You were a co-author of Grandjean 2023, right?

17   A.   Yes.

18   Q.   And in that role you contributed data from the ELEMENT

19   cohort and participated in reviewing various drafts of the

20   manuscript, including the final version that was submitted for

21   publication, correct?

22   A.   Correct.

23   Q.   The three prospective studies mentioned in the title of

24   Grandjean 2023 were the ELEMENT cohort, the MIREC cohort, and

25   the cohort in Odense, Denmark, correct?

1   **A.**   Yes.

2   **Q.**   Although it wasn't the original objective of the Danish

3   study, there was sufficient archived urine samples, covariate

4   data and outcome data to examine the associations between

5   prenatal fluoride exposure and child IQ, correct?

6   **A.**   Yes.

7   **Q.**   And then Grandjean 2023 then pooled the fluoride exposure

8   and child IQ results of the Danish study with the results of

9   the ELEMENT and MIREC studies to conduct a joint benchmark

10  concentration analysis, correct?

11  **A.**   Yes.

12  **Q.**   Now, the findings of the Danish study regarding prenatal

13  fluoride exposure and child IQ had not been made public until

14  they were published in Grandjean 2023, correct?

15  **A.**   I think that's correct.

16  **Q.**   Now, just to get our bearings, the Danish study cohort was

17  comprised of 837 mother-child parings, correct?

18  **A.**   Yes.

19  **Q.**   And the urine samples collected from the mothers were a

20  combination of spot fasting and 4-hour urine samples, correct?

21  **A.**   I believe so.

22  **Q.**   Now, generally speaking, the 24-hour urine sample is

23  preferred over a spot sample, right?

24  **A.**   If you can get it, yes.

25  **Q.**   And that's because a 24-hour sample reduces the

 1  variability that can occur throughout a day, right?

 2  A.   Correct.

 3  Q.   However spot samples are still very useful when looking at

 4  urinary fluoride levels, right?

 5  A.   Yes.

 6  Q.   And the study you discussed earlier about the Madres

 7  cohort used spot samples, right?

 8  A.   That's correct.

 9  Q.   Now, do you recall -- now, in Odense, Denmark, the

10  fluoride concentration in drinking water is .2 to .3 milligrams

11  per liter, correct?

12  A.   I don't recall that specifically, but I have no reason to

13  disagree with you.

14  Q.   And the maternal urinary fluoride concentrations in the

15  Danish study after adjusting for creatinine averaged 0.58

16  milligrams per liter, correct?

17  A.   I think so, yes.

18  Q.   Now, the ranges of maternal urinary fluoride levels in the

19  Danish study overlapped with those fluoridated in the ELEMENT

20  and MIREC studies, correct?

21  A.   Correct.

22  Q.   And even though there were differences in the urinary

23  fluoride levels found across the three studies, the levels were

24  similar enough that you found it appropriate to pool them

25  together for a joint analysis, correct?

1   **A.**   Yes.

2   **Q.**   In examining the association between fluoride exposure and

3   child IQ, the Danish study controlled for covariates that are

4   similar to those in the ELEMENT and MIREC studies, correct?

5   **A.**   More or less, yes.

6   **Q.**   Let's talk about the results of the Danish study and

7   compare those to Goodman 2022.  So, in other words, the Danish

8   study results versus the ELEMENT results.

9       Now, in Goodman 2022, you found a statistically

10   significant negative association between prenatal fluoride

11   exposure and child IQ in the ELEMENT cohort, correct?

12   **A.**   Yes.

13   **Q.**   However, unlike Goodman 2022, Grandjean 2023 did not see a

14   statistically significant negative association between prenatal

15   fluoride exposure and child IQ in the Danish cohort, correct?

16   **A.**   Correct.

17   **Q.**   Now, in Grandjean 2023, you also tried to predict the

18   difference in child IQ for the Danish cohort if you doubled the

19   fluoride concentration in the mother's urine during pregnancy,

20   correct?

21   **A.**   I believe so.

22   **Q.**   And doubling the maternal urinary fluoride concentration

23   in the Danish study means going from an average of .58

24   milligrams per liter to an average of 1.1 of milligrams per

25   liter, correct?

 1   **A.**   Correct.

 2   **Q.**   Now, to provide context, the creatinine-adjusted maternal

 3   urinary fluoride concentrations in the ELEMENT study averaged

 4   .89 milligrams per liter, correct?

 5   **A.**   Yes.

 6   **Q.**   And as published in Green 2019, the mean specific

 7   gravity-adjusted urinary fluoride concentration in the MIREC

 8   cohort was .69 milligrams per liter in the fluoridated studies,

 9   correct?

10           **MR. CONNETT:**  Vague.

11           **THE COURT:**  Overruled.

12           **THE WITNESS:**  I don't specifically recall that.

13   **BY MR. ONG:**

14   **Q.**   Well, is there -- if I showed you the Green 2019 study,

15   would that -- would that refresh your recollection?

16   **A.**   Of course.

17   **Q.**   Okay.  And if you could flip to -- it's the ninth tab in

18   the binder labeled Green 2019.

19       And if I could take you to -- it's page 944.  It's not 944

20   pages long, it's just how the page numbers go.

21           **THE COURT:**  Which tab are we talking about now?

22           **MR. ONG:**  It's roughly the fifth page in the document.

23           **THE COURT:**  Oh, I see.  Green 2019, correct?

24           **MR. ONG:**  Correct.

25           **THE COURT:**  Tab?

1              MR. ONG:  Yes.

2              THE COURT:  What page?

3              MR. ONG:  It's page 944.

4         It's roughly the fifth page in the document, Your Honor.

5              THE COURT:  I don't see it.  I'm looking at it, and

6    there's a page of the actual exhibit itself that starts with E,

7    E1, 2, 3, 4, 5.  Maybe you can refer to it with the internal

8    page.  This is a JAMA pediatricians -- right? -- Green,

9    Lanphear, et cetera?

10             MR. ONG:  Okay.

11             THE COURT:  Okay?  Part starts at page E1 in my

12   binder.  Do you see at the bottom right?

13             MR. ONG:  Just give me one second.

14             THE WITNESS:  I think it's page E5, Your Honor.

15             THE COURT:  E5?

16             THE WITNESS:  Page E5, yeah.

17             MR. ONG:  Sorry, Your Honor.  E5.  I was looking at a

18   different version.

19             THE COURT:  Okay.

20             MR. ONG:  But there is a paragraph that is titled

21   "Fluoride measurements."  It's on the right-hand column of page

22   E5 of Green 2019.

23             THE COURT:  So the question is confirming that the

24   concentration among women who lived in fluoridated drinking

25   water was .69; is that your question?

1          MR. ONG:  That's correct.  And I was asking the

2     witness if that refreshed his recollection.

3          THE WITNESS:  Okay.  Can you repeat the question?

4     BY MR. ONG:

5     Q.   Yes.  As published in Green 2019, the mean specific

6     gravity-adjusted urinary fluoride concentration in the MIREC

7     cohort was 6.9 milligrams per liter in the fluoridated studies,

8     correct?

9     A.   Correct.

10    Q.   Now, adjusting for specific gravity is an appropriate way

11    to adjust for dilution, correct?

12    A.   Yes.  It's an appropriate approach for adjusting for

13    urinary dilution.

14    Q.   And at least one study has looked at the correlation

15    between specific gravity-adjusted and creatinine-adjusted urine

16    fluoride concentrations and found they are highly equivalent,

17    correct?

18    A.   Yes.

19    Q.   And that study was conducted by Christine Till, correct?

20    A.   I think she was one of the authors.  I -- but I -- I'm not

21    absolutely sure.

22    Q.   Well, Christine Till is a co-author of Green 2019,

23    correct?

24    A.   That's true.

25    Q.   So if you double the maternal urinary fluoride

1    concentration in the Danish study, the average concentration is

2    higher than the average concentrations found in both the

3    ELEMENT and MIREC cohort, correct?

4    **A.**    That's correct.

5    **Q.**    Now, when predicting what would happen when doubling the

6    maternal urinary fluoride concentration in the Danish study,

7    you ran a simple model and a comprehensive model, correct?

8    **A.**    Yes.

9    **Q.**    The main difference between the two is that the

10   comprehensive model looked only at the mother-child parents for

11   which you had a complete set of covariate data, correct?

12   **A.**    I believe that's true.

13   **Q.**    Now, looking at the full set -- data set of urine samples,

14   both spot and 24-hour samples, okay?  The comprehensive model

15   found that doubling, doubling the maternal fluoride

16   concentration still did not predict a statistically significant

17   decrease in IQ in the Danish cohort, correct?

18   **A.**    That sounds familiar, but can we --

19   **Q.**    Yeah.

20   **A.**    -- pull up the paper --

21   **Q.**    Sure, sure.

22   **A.**    -- because you're starting to stretch my memory.

23   **Q.**    Okay.  So we're looking at Grandjean 2023, which is

24   labeled Hu Exhibit 3, which is the fourth tab in the cross

25   binder.

 1   **A.**   Okay.  Tell me where to go.

 2   **Q.**   Okay.  And I would refer you to page 4 of Grandjean 2023

 3   and specifically Table 2.

 4          **THE COURT:**  Page 5?  Maybe I've got the wrong -- we're

 5   looking at mean 2019?

 6          **MR. ONG:**  No.  Sorry.  It's Grandjean 2023, Your

 7   Honor.

 8          **THE COURT:**  Grandjean --

 9          **MR. ONG:**  And that is the tab labeled as Hu Exhibit 3.

10   We're looking at the fourth page.

11          **THE COURT:**  Oh.  Okay.

12          **MR. ONG:**  And that's in the cross binder.

13          **THE COURT:**  This is the -- this is Grandjean 2023?

14   Grandjean 2023?

15          **MR. ONG:**  Yes.

16          **THE COURT:**  And you're on page?

17          **MR. ONG:**  Page 4 of 7 at the top.

18          **THE COURT:**  Page 4.  I see.  Okay.

19          **MR. ONG:**  And we're looking at Table 2.

20          **THE COURT:**  Okay.

21   **BY MR. ONG:**

22   **Q.**   And the question for the witness is, does that refresh

23   your recollection about the results of the study doubling the

24   amount of maternal urinary fluoride concentration?

25   **A.**   Yes.

1    **Q.**   Okay.  Shall I repeat the question?

2    **A.**   Yes, please.

3    **Q.**   Okay.  Looking at the full data set of urine samples, in

4    other words, both the spot and 24-hour urine samples, the

5    comprehensive model found that doubling the maternal urinary

6    fluoride concentration did not predict a statistically

7    significant decrease in IQ in the Danish cohort, correct?

8    **A.**   Correct.

9    **Q.**   In fact, doubling the maternal fluoride concentration in

10   the Danish study actually predicted a slight increase in IQ for

11   boys as well as boys and girls combined, albeit one that was

12   not statistically significant, correct?

13   **A.**   Correct.

14   **Q.**   Now, focusing on just the spot urine samples, the

15   comprehensive model again predicted that doubling the maternal

16   urinary fluoride concentration would be associated with an

17   increase in IQ for boys as well as boys and girls combined,

18   albeit one that was not statistically significant, correct?

19   **A.**   Correct.

20   **Q.**   And, in fact, that model predicted a 2.14 increase in

21   boys' IQ, correct?

22   **A.**   Where are you?

23   **Q.**   If you look at the spot samples for boys on the

24   comprehensive model, I believe it's highlighted for you on your

25   screen, if you want to try.

1    A.    Yeah.  Okay.  Got it.  Uh-huh.

2    Q.    And then shall I repeat the question?

3    A.    No, you don't have to.  I would agree with what your

4    proposition is.

5    Q.    The confidence interval for boys' IQ was mostly in the

6    positive, correct?

7    A.    Correct.

8    Q.    Now, even looking at just the more accurate 24-hour

9    samples -- and again, doubling the maternal urinary fluoride

10   concentration, the comprehensive model analysis still predicted

11   no statistically significant negative association between

12   maternal urinary fluoride and child IQ of the Danish cohort,

13   correct?

14   A.    Correct.

15   Q.    And the 24-hour sample analysis also did not find any

16   statistically significant interactions by sex, correct?

17   A.    Correct.

18   Q.    Whether you look at all the samples, spot samples or

19   24-hour samples, Grandjean 2023's comprehensive model, even

20   after doubling the urinary fluoride concentration, did not

21   predict a statistically significant association between

22   maternal urinary fluoride and child IQ, correct?

23   A.    I mean, basically they did not find a statistically

24   significant association.  The fact that they doubled is just a

25   metric used to try to express the relationship.  There's no

 1   hidden additional significance with the fact whether they used

 2   doubling or tripling or quadrupling.  It's just a measure of

 3   increase.

 4          MR. ONG:  Your Honor, I'd just ask the witness to

 5   answer the questions that were asked.

 6          THE COURT:  Well, he can explain.  We're in a bench

 7   trial.

 8   BY MR. ONG:

 9   Q.   That lack of association is not consistent with what you

10   found in Goodman 2022, correct.

11   A.   True.

12   Q.   Now, using the definition of high-quality study we talked

13   about before, you would consider the Danish study, as set forth

14   in Grandjean 2023, to be a high-quality study, correct?

15   A.   It has its limitations, but it's a high-quality study.

16   And, as we discussed before, it's also looking at a lower

17   exposed community.

18   Q.   You don't have any major reservations about the Danish

19   study, correct?

20   A.   Not as we sit here today, no.

21   Q.   Now, I want to talk about how you got involved in

22   Grandjean 2023.  Dr. Grandjean approached you about

23   collaborating on the pooling analysis because he needed access

24   to the ELEMENT data, correct?

25   A.   Because he needed access to what?

1   Q.   The ELEMENT data.

2   A.   Yes.  I mean, it was the general proposition of trying to

3   pool all the data to see if we could do a benchmark analysis.

4   Q.   And so based on your discussions with Dr. Grandjean about

5   the paper and about the study, the idea of pooling the three

6   studies came from Dr. Grandjean and his team, correct?

7   A.   Yes, and we were in favor.

8   Q.   And based on those conversations, Dr. Grandjean already --

9   Dr. Grandjean already knew that the Danish study failed to show

10  a significant association between fluoride exposure and IQ when

11  he approached you about pooling the data, correct?

12  A.   I believe he did, yes.

13  Q.   To your -- to your knowledge, the Danish study's null

14  results were published for the first time in Grandjean 2023,

15  correct?

16  A.   I believe so.

17  Q.   And as far as you know, there have been no efforts to

18  publish the results of the Danish study as a stand-alone paper,

19  correct?

20  A.   As far as I'm sitting here today, no.

21  Q.   Now, you have reservations about the INMA study, but you

22  would agree it's a pretty high-quality study, correct?

23       MR. CONNETT:  Asked and answered.

24       THE WITNESS:  I have major -- I would call those major

25  reservations, frankly, which is, you know, precisely why I

1  wouldn't include the INMA study in the pooling analysis we did

2  with Grandjean.

3  **BY MR. ONG:**

4  **Q.**   You testified at your deposition that you considered it a

5  pretty high-quality study, not withstanding those reservations,

6  correct?

7  **A.**   Correct.

8  **Q.**   You were under oath, correct?

9  **A.**   Of course.

10  **Q.**   However, not withstanding that deposition testimony

11  about -- no.  Let me back up.

12      You and your collaborators on Grandjean 2023 also

13  considered the possibility of merging the results of the INMA

14  study as well, correct?

15  **A.**   We discussed them, but we rejected them.

16  **Q.**   Okay.  You made a conscious decision to exclude the INMA

17  study from the pooling analysis, correct?

18  **A.**   Correct.

19  **Q.**   I want to talk a little bit more about the pooling of the

20  data.

21      And specifically, the pool findings were used to calculate

22  a joint benchmark concentration and the benchmark concentration

23  lower confidence limit, correct?

24  **A.**   Correct.

25  **Q.**   And the benchmark concentration lower confidence limit is

1   often referred to as a BMCL for short, correct?

2   **A.**   Yes.

3   **Q.**   Now, you conducted the BMCL analysis in Grandjean 2023

4   using a linear model as well as a piece-wise model, correct?

5   **A.**   I believe so.

6            **THE COURT:**  As well as a what?

7            **MR. ONG:**  Piece-wise, P-I-E-C-E - W-I-S-E.

8            **THE WITNESS:**  And there's usually a hyphen between

9   those two words.

10  **BY MR. ONG:**

11  **Q.**   Grandjean 2023's joint analysis, which, again,

12  incorporated data from the ELEMENT cohort found a BMCL of .28

13  milligrams per liter based on the linear model, correct?

14  **A.**   Correct.

15  **Q.**   However, Grandjean 2023 did not report any results based

16  on a squared model, correct?

17  **A.**   On a what?

18  **Q.**   Squared model.

19  **A.**   Squared model.  I don't recall whether it was reported or

20  not, but I have no reason to disagree with you.

21  **Q.**   A squared model is a type of nonlinear model, correct?

22  **A.**   Correct.

23  **Q.**   And in very simple terms, a squared model assumes that the

24  shape of the relationship between the things you're studying is

25  curved, correct?

**HU - CROSS / ONG**

1    **A.**   Correct.

2    **Q.**   Now, when you and your collaborators on the ELEMENT

3    studies analyzed the associations between prenatal fluoride

4    exposure and child IQ, you ran both linear and nonlinear

5    models, correct?

6    **A.**   Yes.

7    **Q.**   And I believe you testified before when plaintiff's

8    counsel was asking you, when you ran the -- your nonlinear

9    model on the ELEMENT data, the results suggested there was no

10   clear association between IQ scores for children ages 6 to 12

11   and maternal urinary fluoride levels below .8 milligrams per

12   liter, correct?

13   **A.**   We just didn't have much data down there, so correct.

14   **Q.**   However, you did find a clear negative association between

15   IQ and urinary fluoride above .8 milligrams per liter, correct?

16   **A.**   That was for 6 to 12, but we saw it going all the way down

17   to the lower levels in the 4-year-olds.

18   **Q.**   Okay.  So we're just going to talk about the 6 to 12,

19   okay?

20        For the 6- through 12-year-olds, when you plotted the data

21   on a graph, it showed that the relationship was not straight

22   lined but curved, correct?

23   **A.**   Seemed to show a curve, yes.

24   **Q.**   Put another way, your analysis of the ELEMENT data for 6-

25   to 12-year-olds suggested that there might -- suggested that

1  there might be a nonlinear relationship between increases in

2  prenatal fluoride exposure and a negative association of a

3  child IQ, correct?

4  **A.**    That was the suggestion, yes.

5  **Q.**    When a quadratic term was added to the linear model, there

6  was an improvement in the fit of the model, correct?

7  **A.**    I can't remember specifically, but -- I can't remember

8  specifically.  That's all I can say.  We'll have to go back to

9  the paper.

10  **Q.**    Well, Bashash 2017 can be found in your binder at --

11  under -- well, it's labeled "Bashash 2017," and it is the

12  eighth tab in the binder.

13  **A.**    What tab?

14  **Q.**    It's the eighth tab in the binder.

15  **A.**    I found it.

16  **Q.**    And I would direct your attention to -- let me make sure I

17  get the page numbers right this time.

18       It is page 9, so if the numbers at the bottom of the page,

19  dash 1, dash 2, it's dash 9.

20  **A.**    Got it.

21  **Q.**    And you see the section, sir -- sorry.  Is everybody with

22  me?

23  **A.**    Yes.

24  **Q.**    Okay.

25  **A.**    And I believe the sentence reads literally, quote, "There

 1 | was a nonsignificant improvement in the fit of the model when a
 2 | quadratic term was added to the linear model."
 3 | **Q.**   So when the quadratic term was added to the linear model,
 4 | there was an improvement in the fit of the model, correct?
 5 | **A.**   There was a nonsignificant improvement in the fit.
 6 | **Q.**   So correct?  Correct?
 7 | **A.**   Yes.
 8 | **Q.**   In other words, there was an improvement in the fit of the
 9 | model when you went from assuming a straight line to a curved
10 | line, correct?
11 | **A.**   Well, we said "nonsignificant" and we put that in there
12 | for a reason.  I mean, it's --
13 | **Q.**   Okay.  I can rephrase the question.
14 |         In other words, there was an improvement, albeit a
15 | nonstatistically significant one --
16 | **A.**   Yeah.
17 | **Q.**   -- in the fit of the model when you went from a straight
18 | line to a curved line, correct?
19 | **A.**   Correct.
20 | **Q.**   Now, you also ran sensitivity analyses to see how these
21 | results would change if you included additional covariates,
22 | correct?
23 | **A.**   Correct.
24 | **Q.**   And one of those covariates was a home score?
25 | **A.**   Correct.

HU - CROSS / ONG

 1  **Q.**   Correct?

 2  **A.**   Yes.

 3  **Q.**   And home score measures the overall quality of a child's

 4  environment, correct?

 5  **A.**   Correct.

 6  **Q.**   Another covariate was adjusting for the children's

 7  contemporaneous urinary fluoride, correct?

 8  **A.**   Correct.

 9  **Q.**   After adding these additional covariates, your sensitivity

10  analysis found no clear evidence of an association between IQ

11  scores for children ages 6 to 12 and maternal urinary fluoride

12  levels below 1.0 milligrams per liter, correct?

13  **A.**   Correct.

14  **Q.**   In fact, you found that the evidence of nonlinearity

15  actually became more pronounced under your sensitivity

16  analysis, correct?

17  **A.**   That's in the sub analysis where we control for children's

18  urinary fluoride.

19  **Q.**   Correct.

20  **A.**   Yes.

21  **Q.**   You also found there was a significant improvement,

22  statistically significant, in the model fit when you added a

23  quadratic term to the regression model, correct?

24  **A.**   In the sub analysis with the children's urinary fluoride,

25  yes.

1          **THE COURT:**  Hold on for a second.  Can you explain

2     what this covariant is, the children's?

3          **THE WITNESS:**  Yes.  So we were trying to see whether

4     the apparent relationship between prenatal fluoride exposure

5     might actually, because it's a proxy for child childhood

6     fluoride exposure -- because there may be tracking of fluoride

7     exposure during the child's lifetime -- in other words, maybe

8     prenatal fluoride doesn't harm you and it's really child's

9     fluoride that harms you when you're a child and the only reason

10    we saw the relationship with prenatal fluoride is because it's

11    really a proxy for -- it's really kind of a stand-in for

12    children's fluoride.

13          So then we did the sub analysis where we included

14    children's fluoride measures and the prenatal fluoride

15    measures, and we still saw the impact of prenatal fluoride on

16    lower IQ, building our confidence that this was a prenatal

17    effect.

18          **THE COURT:**  So you added it as a variant, you didn't

19    substitute prenatal but you added this as another covariate?

20          **THE WITNESS:**  Yes, uh-huh.

21          **THE COURT:**  Okay.  Thank you.

22    BY MR. ONG:

23    Q.   You also added home score as a covariate too, right?

24    A.   Yes.

25    Q.   So going back to the sensitivity analysis and adding the

1    quadratic term, in other words, when you assumed a curved line,

2    the data fit the model better, correct?

3    **A.**   Yes.

4    **Q.**   Now, before we leave Grandjean 2023, I want to touch on

5    one more issue raised in that manuscript, specifically the

6    amount of fluoride that reaches the fetal brain during

7    pregnancy.

8          **THE COURT:**  Before we get to that subject, let me ask

9    another question.

10         So when you say that the curved line fits better -- and

11   I'm looking at the graphs on page 9 -- does that suggest that

12   the -- it appears that the impact on IQ sort of plateaus, at

13   least under some of these, under one of these at around, I

14   don't know, concentration of 1.0 or --

15         The slope certainly changes, the degree of the slope.

16   It's going up.  IQ begins to go up as the concentration goes

17   down and it seems to sort of flatten under the nonlinear.  I'm

18   trying to read it.  Can you explain that, Dr. Hu?

19         **THE WITNESS:**  Yeah.  So the fact that the quadratic

20   model fit the data better suggests that a curvilinear

21   relationship is a truer -- a truer descriptor of the actual

22   quantitative relationship, dose-response relationship.  And

23   yes, it does suggest that there's that flattening of the curve

24   if you compare Figure 3B with Figure 2 is a true flattening as

25   opposed to figure 2, that was a pretty clear linear

 1    relationship even when we -- you know? -- did a smooth plot and

 2    were trying to see whether there might be any curve to that,

 3    but there didn't.  It seemed to be pretty straight line.

 4        Of course that Figure 2 is about the 4-year-old outcomes;

 5    whereas, Figures 3A and B are about the 6- to 12-year-old

 6    outcomes, so we're -- we're really comparing two different

 7    cognitive outcomes.

 8        So there seems to be a curvilinear relationship in the 6-

 9    to 12-year-olds but a straight line, linear relationship in the

10    4-year-olds.

11            THE COURT:  And the difference between 3A and B is?

12            THE WITNESS:  3A is not including the children's

13    fluoride levels, and 3B is when we added the children's

14    fluoride levels to the regression model.

15            THE COURT:  So you had archived samples of children's

16    fluoride level in order --

17            THE WITNESS:  Yeah.  I mean, we didn't have that

18    measure for everybody, but we had enough so that we could do a

19    regression model and draw that graph.

20            THE COURT:  Thank you.

21        Okay.  Thank you.

22    BY MR. ONG:

23    Q.  Grandjean 2023 you remarked that although maternal urinary

24    fluoride seems to correlate with fluoride concentrations in

25    serum that may pass the placenta, the amount of fluoride that

1   reaches the fetal brain is unknown, correct?

2   **A.**   Correct.

3   **Q.**   And this is because the brain is different than any other

4   organ in the body in that it has a special protective mechanism

5   called the blood-brain barrier, correct?

6   **A.**   Correct.

7   **Q.**   Now, for something to be toxic to the brain, typically you

8   expect it to be able to cross the blood-brain barrier and

9   directly affect the brain, correct?

10   **A.**   Not necessarily.  In fact, one of the pathogenic

11   mechanisms that is theorized regarding fluoride and brain

12   development, its impact on thyroid function.  And thyroid

13   function is critical to the development of the brain, but

14   that's a potential indirect mechanism by which fluoride can

15   affect neurodevelopment without directly impacting the brain.

16   **Q.**   Typically but not in all cases, correct, you would expect

17   the substance to cross the blood-brain barrier to directly

18   affect the brain, correct?

19   **A.**   That's certainly an attribute we'd be looking for.

20   **Q.**   But as far as you know, there's no research establishing

21   how much fluoride reaches the fetus' brain during human

22   pregnancy, correct?

23   **A.**   I'm not aware of it, as I sit here today.

24   **Q.**   Okay.  Let's turn to a different subject.

25          You testified earlier about the Madres cohort, correct?

HU - CROSS / ONG

1    A.    Yes.

2    Q.    And just so that we're all on the same page and it's

3    clear, the specific study you're referring to in your testimony

4    was a manuscript published -- a manuscript entitled "Urinary

5    Fluoride Levels and Metal Co-exposures Among Pregnant Women in

6    Los Angeles California," correct?

7    A.    Yes.

8    Q.    And the first author of that manuscript is Ashley Malin,

9    right?

10   A.    Correct.

11   Q.    So if I refer to it as the "Madres study" or "Malin 2023,"

12   you'll know what I'm talking about, right?

13   A.    Yes.

14   Q.    Now, one of the primary objectives of Malin 2023 was to

15   understand the urinary fluoride levels during the first and

16   third trimesters of pregnancy in the Madres cohort, correct?

17   A.    Yes.

18   Q.    And that cohort is comprised of pregnant women residing in

19   urban Los Angeles, correct?

20   A.    Yes.

21   Q.    And just to be clear, the specific manuscript we're

22   talking about, Malin2023 did not try to examine the association

23   between maternal urinary fluoride levels and neurodevelopmental

24   outcomes, correct?

25   A.    Correct.

1  **Q.**   Now, regarding the first trimester, the study found that

2  the cohort's mean specific gravity-adjusted urinary fluoride

3  was .81 milligrams per liter, correct?

4  **A.**   I think that's basically true.

5  **Q.**   Would it help to pull up the manuscript?

6  **A.**   Yes, please.  Thank you.

7  **Q.**   And it's Hu Exhibit 4 and that's tab -- the fifth tab in

8  the binder.  And I apologize that they're not in the binder,

9  but it's Hu Exhibit 4?

10          **MR. CONNETT:**  Your Honor --

11          **THE COURT:**  Yeah.

12          **MR. CONNETT:**  -- could I just raise a scheduling issue

13  that's relevant to this right now?

14          **THE COURT:**  Okay.

15          **MR. CONNETT:**  Dr. Hu is leaving today, and I just

16  want -- I know we're getting close to the end of the day.  I

17  had a few questions for redirect, but I wasn't sure how Your

18  Honor would want to approach the situation, given that we're

19  coming to the end of the day.

20          **THE COURT:**  Well, how much longer do you have on

21  cross?

22          **MR. ONG:**  I'm almost done, maybe near 10 minutes at

23  most.

24          **THE COURT:**  I mean, I can go over a short time, but

25  I've got another hearing, so --

```
 1              MR. CONNETT:  I only have five to ten minutes, max.

 2              THE COURT:  All right.  Let's move it along.

 3   BY MR. ONG:

 4   Q.   Okay.  Did you find the document, sir?

 5   A.   Yes, I did.

 6   Q.   I will direct your attention to page 5, Table 2.

 7   A.   The exhibit in my binder is the -- is the submitted

 8   manuscript, not the published paper.

 9        Are you looking at something else, or you want me to just

10   go to a table?

11   Q.   Yeah, if you could just find the table.

12   A.   Okay.

13   Q.   I'm sorry.  It's on page -- it's on page 14 of the

14   submitted manuscript and it's the table at the top.

15   A.   Table what?  I mean page what?

16   Q.   Page 14.

17   A.   14?

18   Q.   I apologize.  I gave you the wrong page number.

19   A.   Oh, there he go.

20   Q.   Okay.  Do you see that Table 2?

21   A.   Yep.

22   Q.   Okay.  So does that refresh your recollection?

23   A.   Yes.

24   Q.   Okay.  And so the first trimester or regarding the first

25   trimester, the cohort's urinary fluoride was .81 milligrams per
```

1   liter, correct?  That's the average?

2   **A.**   Yes, correct.

3   **Q.**   As for the third trimester, you found that the mean

4   specific gravity-adjusted urinary fluoride was .92 milligrams

5   per liter, correct?

6   **A.**   Correct.

7   **Q.**   So you found higher urinary fluoride levels in trimester 3

8   than trimester 1, correct?

9   **A.**   Correct.

10  **Q.**   The higher urinary fluoride levels found in trimester 3

11  could reflect changes in fluoride intake or differences in how

12  pregnant women metabolize fluoride over time, correct?

13  **A.**   Correct.

14  **Q.**   But that is not something that has been addressed

15  thoroughly by the scientific literature, correct?

16  **A.**   Correct.

17  **Q.**   Now, one of the reasons that you're conducting the study

18  is because data on biomarkers and patterns of fluoride exposure

19  among pregnant women in the United States are scarce, correct?

20  **A.**   It's sparse, yes.

21  **Q.**   To your knowledge, there are only one or two other studies

22  that cover this topic, correct?

23  **A.**   Correct.

24  **Q.**   And one of those studies is Abduweli 2020, correct?

25  **A.**   I haven't seen that in a long time, but yes.

 1  Q.   It's cited in the papers, sir --

 2  A.   Yes.

 3  Q.   -- correct?

 4       Now, Abduweli 2020 studied a cohort of women in Northern

 5  and Central California, correct?

 6  A.   I don't recall, frankly, but I have no reason to disagree

 7  with you.

 8  Q.   Would you like me to refresh your recollection?

 9  A.   You have the paper?  Do you want to --

10  Q.   I don't have the paper, but I can show you your deposition

11  transcript.

12  A.   Okay.

13       I'll accept your --

14  Q.   Well, why don't we just move on.

15  A.   -- position.

16  Q.   Why don't we just move on.

17       But you would agree it's a study of a cohort in the United

18  States, correct?

19  A.   Yes.

20  Q.   Okay.  And the study found that the mean specific

21  gravity-adjusted maternal urinary fluoride level of that cohort

22  during the second trimester of the pregnancy was .63

23  milliliters -- excuse me -- milligrams per liter, correct?

24  A.   Oh, I have no reason to disagree with you.

25  Q.   And that's obviously lower than the average levels you

1  found in Malin 2023, correct?

2  A.   Correct.

3  Q.   I want to talk a little bit more about the women in the

4  Madres cohort and we're almost done?

5  A.   Okay.

6  Q.   I just have a few questions left.

7       The Madres cohort was predominantly comprised of

8  low-income Hispanic women residing in Los Angeles, correct?

9  A.   Yes.

10  Q.   In fact, approximately 80 percent of the participants in

11  the study identified as Hispanic or Latina, correct?

12  A.   Correct.

13  Q.   In contrast, approximately 58 percent of the women in the

14  broader United States are white non-Hispanic, correct?

15  A.   Correct.

16  Q.   Approximately 14 percent of the women in the broader

17  United States are black, correct?

18  A.   Correct.

19  Q.   In other words, roughly 72 percent of the women in the

20  United States are white non-Hispanic or black, correct?

21  A.   Correct.

22  Q.   And if you included Asians and other non-Hispanic women,

23  that number would only go up, correct?

24  A.   Correct.

25  Q.   So from a race and ethnicity standpoint, the population

1  studied in Malin 2023 is not representative of the population

2  of the United States as a whole, correct?

3  **A.**   Well, it's certainly representative of Latinas in Southern

4  California, and it probably has some relevance to the general

5  population in the United States, but obviously it's not -- it

6  can't be seen as being reflective of the entire population.

7  **Q.**   While it still may be relevant, you would agree that the

8  difference in racial and ethnic make up, that difference,

9  limits the ability to generalize the results of Malin 2023 to

10  the greater U.S. population, correct?

11  **A.**   I'd agree with that.

12       **MR. ONG:**   I have no further questions at this time.

13       **THE COURT:**   Okay.   Thank you.

14  Redirect?

15                    <u>**REDIRECT EXAMINATION**</u>

16  **BY MR. CONNETT:**

17  **Q.**   Just a few more questions here, Dr. Hu, before we call it

18  a day.

19       You were asked some questions about the urinary fluoride

20  content in the Danish cohort as it compares to the MIREC

21  cohort.   Do you recall that line of questioning?

22  **A.**   Yes.

23  **Q.**   The Danish cohort adjusted the urine using creatinine,

24  correct?

25  **A.**   Correct.

1   **Q.**   And you were shown data from the MIREC cohort that was

2   adjusting the urine for -- using specific gravity; is that

3   right?

4   **A.**   Correct.

5   **Q.**   Now, when you're comparing urinary fluoride levels across

6   studies, is it important to compare specific gravity to

7   specific gravity and creatinine to creatinine?

8   **A.**   That would be ideal.

9   **Q.**   Counsel didn't show you what the creatinine-adjusted

10  levels in the MIREC cohort were, correct?

11  **A.**   Correct.

12  **Q.**   Counsel asked you some questions regarding the Danish

13  cohort that -- about why the study on the Danish cohort itself

14  wasn't published separately from the BMCL.  Do you recall that

15  question?

16  **A.**   Yes.

17  **Q.**   Is there anything, in your view, anything inappropriate,

18  anything improper, anything less than optimal about publishing

19  the analysis of a cohort together with a BMCL analysis?

20  **A.**   No.

21  **Q.**   Can you explain your thoughts on that as to why it may

22  actually be beneficial and be helpful to publish the Danish

23  results in the context of a pooled analysis?

24          **MR. ONG:**  Objection, leading.

25          **THE COURT:**  Sustained.

1   BY MR. CONNETT:

2   Q.   Well, can you explain your thoughts, Dr. Hu, on the

3   merits -- or lack thereof -- of publishing an analysis of the

4   Danish cohort together with a pooled BMCL analysis?

5   A.   Well, in my view, I'm glad we did it, and I'm glad

6   Dr. Grandjean approached us because the public health

7   implications of fluoride, in our view, are important and doing

8   a pooled analysis increases the power and the ability to draw

9   some conclusions about the dose-response relationship, which we

10  felt are really important public health, you know, estimates to

11  make.  So, you know, I thought that was fine.

12       And in the course of doing that, we published a pretty

13  fulsome explanation of the Danish cohort results by themselves,

14  which I think, you know, addresses the question of what the

15  Danish cohort specifically shows.  So no one's hiding anything,

16  but we got to address the public health questions quickly.

17       MR. CONNETT:  If I could, could we call up Table 2

18  from the Grandjean 2022 paper?

19  BY MR. CONNETT:

20  Q.   And Dr. Hu, just to sort of set the foundation for the

21  questions I'm about to ask you, do you recall that counsel was

22  asking you questions about the association between fluoride and

23  IQ in the Danish cohort when you were looking at the various

24  models that were used?

25  A.   Yes.

 1              THE CLERK:  It's switched.

 2              THE COURT:  To the defense?

 3              THE CLERK:  Oh, I'm sorry.

 4   BY MR. CONNETT:

 5   Q.   So Dr. Hu, do you see Table 2 here in front of you?

 6   A.   Yes.

 7   Q.   Now, counsel focused their questions on the all sample

 8   analysis and the spot sample analysis.  Do you recall that?

 9   A.   Yes.

10   Q.   Now, in your view, of all of the analyses identified in

11   this table, what would be the most methodologically reliable

12   analysis?

13   A.   Well, as somewhat discussed during the testimony, the

14   24-hour samples, if you can get them, are perhaps

15   methodologically more rigorous because it does capture more

16   precisely what the overall fluoride intake is rather than a

17   spot sample that could be more influenced by what was recently

18   ingested.

19   Q.   And then, so the 24-hour sample is ultimately preferable

20   to the spot sample, correct?

21   A.   Yes.

22   Q.   And then this Table also brings in another factor, which

23   is an analysis using the comprehensive set of covariates versus

24   the simple set of covariates, correct?

25   A.   Yes.

1  Q.   And this table then combines -- you know, sorry.  Strike

2  that.

3       This table shows an analysis where you use only the

4  24-hour samples and only the comprehensive set of covariates,

5  correct?

6  A.   Correct.

7  Q.   If I call that the comprehensive plus 24-hour analysis,

8  would that make sense to you?

9  A.   Yes.

10 Q.   And of all the analyses in this table, which analysis

11 found the strongest inverse association, albeit not

12 statistically significant, between fluoride exposure and IQ?

13 A.   It's that one you just referred to, the 24-hour sample

14 comprehensive model.

15 Q.   And that's the analysis that, in your view, would be the

16 most methodologically rigorous analysis?

17 A.   Correct.

18 Q.   And just to be clear, counsel asked you questions about

19 whether the Danish cohort's findings are consistent with the

20 ELEMENT findings.

21      The ELEMENT cohort dealt with a population that was

22 receiving so-called optimally elevated levels of fluoride

23 exposure for oral health purposes, correct?

24 A.   Correct.

25 Q.   This population here in Denmark is not receiving elevated

1    exposures to achieve oral health -- sorry.  Strike that.

2        The population here in Denmark is not a fluoridated

3    population, correct?

4    **A.**   Correct.

5    **Q.**   And given what we talked about earlier where it is more

6    difficult to detect an association when you have lower exposure

7    contrasts, could that explain, in part, why the Danish study

8    did not find a statistically significant relationship; whereas,

9    the ELEMENT study did?

10           **MR. ONG:**  Objection, leading.

11           **THE COURT:**  Overruled.

12           **THE WITNESS:**  It could.

13           **MR. CONNETT:**  Now, counsel --

14       Thank you.  You can take that table down.

15   **BY MR. CONNETT:**

16   **Q.**   Counsel asked you questions about fluoride getting into

17   the fetal brain.  The EPA in this case has agreed, as a matter

18   of undisputed fact, that fluoride gets into the fetal brain.

19       Dr. Hu, do you have any reason to disagree with the EPA on

20   that point?

21   **A.**   No.

22           **MR. CONNETT:**  And finally, if we could call up Table 2

23   from the Madres study.

24   **BY MR. CONNETT:**

25   **Q.**   And Doctor, I just want to follow up because I asked you

**HU - REDIRECT / CONNETT**

1  earlier about the numbers of people involved with the Madres

2  cohort, so I just figured it would be helpful to get that clear

3  for the record.

4      Can you tell us, in looking at this table, how many

5  pregnant mothers you sampled the urine of in the third

6  trimester?

7  **A.**   490.

8  **Q.**   And how many mothers did you sample the urine of in the

9  first trimester?

10  **A.**   293.

11         **MR. CONNETT:**  And thank you, Dr. Hu.  Those are all

12  the questions I have.

13         **THE COURT:**  All right.  Anything further?

14         **MR. ONG:**  Just a few additional questions.

15         **THE COURT:**  Okay.  Do it very quickly.

16         **MR. ONG:**  Very, very brief.

17         **THE COURT:**  While you're coming up, let me ask a

18  question, Doctor.

19      I'm a little -- I'm puzzled.  In the Danish study, there's

20  no fluoridation of water -- correct? -- in Denmark?

21         **THE WITNESS:**  Correct.

22         **THE COURT:**  So what are the sources?  You have lower

23  levels, obviously, but what are the sources of fluoride then?

24         **THE WITNESS:**  Yeah.  So what we know is that certain

25  forms of tea are sources of fluoride, fish, as we described in

1  this testimony, is a source of fluoride.  Of course people who

2  might swallow their toothpaste or the fluoride wash that they

3  get from the dentist, they will be exposed to fluoride.  And

4  there's some other dietary sources.  And if you happen to have

5  naturally fluoridated tap water, you'll also get that as a

6  fluoride source, but I don't know if that's a geologic reality

7  in Denmark.

8          **THE COURT:**  Okay.  Thank you.

9                  <u>**RECROSS-EXAMINATION**</u>

10  **BY MR. ONG:**

11  **Q.**   Just a few short questions, Dr. Hu.

12          **MR. ONG:**  Could we pull up Table 2 of Grandjean 2022,

13  please.

14  **BY MR. ONG:**

15  **Q.**   And Dr. Hu, is that in front of you?

16  **A.**   Yes.

17  **Q.**   Okay.  Now, looking at the 2024-hour analysis, I want you

18  to look at the confidence intervals.  They are almost as

19  positive as they are negative, correct?

20  **A.**   Well, except for the first row.

21  **Q.**   In the comprehensive model?

22  **A.**   Yes.  I'm looking at the comprehensive model 24-hour

23  samples.  It looks like it's more negative than positive for

24  both the girls and the all.

25  **Q.**   There is quite a large positive confidence interval,

1    correct?

2    **A.**   Well, I mean, just comparing them in the all, it's minus

3    3.24 versus 1.8.  And for the girls it's minus 4.27 versus the

4    positive 2.45.  So I would stick to my characterization that it

5    looks more negative than positive.

6    **Q.**   Restricting the analysis to 24-hour samples shrunk the

7    sample size from 837 to 237, correct?

8    **A.**   Correct.

9    **Q.**   And reducing sample size reduces statistical power,

10   correct?

11   **A.**   Well, yeah.  But, you know, as we discussed, there's the

12   tradeoff of increasing the precision of the measurement by

13   using 24-hour samples, so it's, you know, whether the power is

14   greater or less, it's hard to say.

15          **MR. ONG:**  I have no further questions.

16          **THE COURT:**  Okay.  Anything else?

17          **MR. CONNETT:**  Not from plaintiffs, Your Honor.

18          **THE COURT:**  All right.  All right.  Thank you, Dr. Hu.

19   You may step down.  You're excused as a witness.  Appreciate

20   your cooperation.

21       (Witness excused.)

22          **THE COURT:**  That will bring us to the end of the day.

23   Tomorrow we will start at 8:30.  Okay?

24          **MR. CONNETT:**  Thank you, Your Honor.

25          **THE COURT:**  Okay.  Thank you.

1          **THE CLERK:**  Court is adjourned.

2       (Adjourned at 1:40 p.m.)

3                          --oOo--

4

5

6              **CERTIFICATE OF REPORTER**

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10

11                                    February 1, 2024

     JENNIFER L. COULTHARD, RMR, CRR              DATE
12   Official Court Reporter
     CA CSR#14457
13

14

15

16

17

18

19

20

21

22

23

24

25