```
 1                          Volume 4

 2                          Pages 507 - 685

 3                UNITED STATES DISTRICT COURT

 4               NORTHERN DISTRICT OF CALIFORNIA

 5   Before The Honorable Edward M. Chen, Judge

 6   FOOD & WATER WATCH, INC., ET  )
     AL.,                          )
 7                                 )
              Plaintiffs,          )
 8                                 )
       VS.                         )     NO. 17-CV-2162
 9                                 )
     UNITED STATES ENVIRONMENTAL   )
10   PROTECTION AGENCY, an agency  )
     of the United States, ET AL., )
11                                 )
              Defendants.          )
12   _____)

13                        San Francisco, California
                          Monday, February 5, 2024
14
          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
15
     APPEARANCES:
16
     For Plaintiffs:
17                       WATERS KRAUS & PAUL, LLP
                         222 N. Pacific Coast Highway, Suite 1900
18                       El Segundo, California  90245
                    BY:  MICHAEL P. CONNETT
19                       CHARLES ANDREW WATERS
                         ATTORNEYS AT LAW
20
                         NIDEL & NACE, PLLC
21                       5335 Wisconsin Ave., NW, Suite 440
                         Washington, DC 20015
22                  BY:  CHRISTOPHER THOMAS NIDEL
                         ATTORNEY AT LAW
23

24        (Appearances continued next page.)

25   REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                   Official U.S. District Court Stenographer
```

**APPEARANCES (Continued):**

For Defendants:

                    UNITED STATES DEPARTMENT OF JUSTICE
                    Environmental Defense Division
                    601 D Street, NW, Room 8814
                    Washington, DC  20004
              BY:   **BRANDON N. ADKINS, ATTORNEY AT LAW**

                    UNITED STATES DEPARTMENT OF JUSTICE
                    1301 Clay Street, Suite 340-S
                    Oakland, California  94612
              BY:   **EMMET P. ONG, ATTORNEY AT LAW**

                    UNITED STATES DEPARTMENT OF JUSTICE
                    Environmental Defense Division
                    150 M Street, N.E.
                    Washington, D.C.  2002
              BY:   **PAUL CAINTIC, ATTORNEY AT LAW**


**ALSO PRESENT:**        DANIEL DePASQUALE, EPA
                    JAY SANDERS (trial tech)
                    DANNY HAMBRICK (trial tech)


                    --oOo--

1

2  Monday, February 5, 2024 - Volume 4

3

**PLAINTIFFS' WITNESSES**                                **PAGE**   **VOL.**

4

**BERRIDGE, BRIAN**

5  (SWORN)                                                  514     4

6  Direct Examination By Mr. Connett:                       515     4
   Cross-Examination By Mr. Adkins:                         542     4
7  Redirect Examination By Mr. Connett:                     557     4

8  **BARONE, STANLEY**
   (PREVIOUSLY SWORN)                                       562     4
9
   Direct Examination (Resumed) By Mr. Connett:            562     4
10 Cross-Examination By Mr. Adkins:                         641     4

11                         **E X H I B I T S**

12 **TRIAL EXHIBITS**                          **IDEN**   **EVID**   **VOL.**

13    105                                                  513       4

14    106                                                  513       4

15    107                                                  513       4

16    108                                                  513       4

17    109                                                  513       4

18    110                                                  513       4

19    111                                                  513       4

20    112                                                  513       4

21    113                                                  513       4

22    114                                                  513       4

23

24

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 115 | | 513 | 4 |
| 116 | | 513 | 4 |
| 117 | | 513 | 4 |
| 118 | | 513 | 4 |
| 119 | | 513 | 4 |
| 120 | | 513 | 4 |
| 121 | | 513 | 4 |
| 122 | | 513 | 4 |
| 123 | | 513 | 4 |
| 124 | | 513 | 4 |

```
 1   Monday - February 5, 2024                              8:27 a.m.

 2                        P R O C E E D I N G S

 3                             --oOo--

 4        THE CLERK:  Court is calling the case Food & Water

 5   Watch versus EPA, Case No. 17-2162.

 6        Counsel, please state your appearance for the record

 7   beginning with plaintiff.

 8        MR. CONNETT:  Good morning, Your Honor; Michael

 9   Connett on behalf of the plaintiffs.

10        THE COURT:  All right.  Good morning, Mr. Connett.

11        MR. WATERS:  Good morning, Judge, Andy Waters also for

12   the plaintiffs.

13        THE COURT:  Mr. waters.

14        MR. NIDEL:  Good morning, Your Honor; Chris Nidel of

15   the plaintiffs.

16        THE COURT:  All right.  Thank you, Mr. Nidel.

17        MR. ADKINS:  Good morning, Brandon Adkins for the

18   defendants.

19        THE COURT:  Mr. Adkins.

20        MR. ONG:  Good morning, Your Honor, Emmet Ong on

21   behalf of the defendants.

22        THE COURT:  Thank you, Mr. Ong.

23        MR. CAINTIC:  Good morning, Your Honor; Paul Caintic

24   on behalf of defendants.

25        THE COURT:  All right.  Thank you, Mr. Caintic.
```

PROCEEDINGS

1          MR. CONNETT:  Your Honor, we have a few housekeeping

2    matters.

3          THE COURT:  Okay.

4          MR. CONNETT:  First, pursuant to your request, the

5    parties have agreed to admit into evidence certain studies that

6    are being discussed at trial --

7          THE COURT:  Okay.

8          MR. CONNETT:  -- and I have the exhibit numbers as

9    well as the study names, if you would like me to identify them

10   for the record.

11         THE COURT:  Okay.  Let's make sure Vicky is ready and

12   I'm ready.  One second.

13         THE CLERK:  I am, Your Honor.

14         THE COURT:  Okay.

15         MR. CONNETT:  Exhibit -- shall I start?

16         THE COURT:  Yeah.

17         MR. CONNETT:  Exhibit 105 is the Julvez 2016 study;

18   Exhibit 106 is Bashash 2017; Exhibit 107 is Bashash 2018;

19   Exhibit 108 is Till 2018; Exhibit 109 is Green 2019;

20   Exhibit 110 is Canterol 2021; Exhibit 111 is Thippeswamy 2021;

21   Exhibit 112 is Adkins 2022; Exhibit 113 is Doe 2022;

22   Exhibit 114 is Ibarluzea 2022; Exhibit 115 is Goodman 2022A --

23   and this is the Goodman study regarding the ELEMENT cohort --

24   Exhibit 116 is Goodman 2022B -- this is the study regarding the

25   MIREC cohort -- Exhibit 117 is Dewey 2023; Exhibit 118 is

**PROCEEDINGS**

1    Godebo 2023; Exhibit 119 is Grandjean 2023; Exhibit 120 is Hall

2    2023; Exhibit 121 is Ibarluzea 2023; Exhibit 122 is Malin 2023;

3    Exhibit 123 is Till 2020; and lastly, Exhibit 124 is Grandjean

4    2022.

5              **THE COURT:**  Okay.  All right.  And these are all

6    exhibits that are in the record at this point?

7              **MR. CONNETT:**  Well, we move at this point, Your Honor,

8    to admit them into evidence.

9              **THE COURT:**  Okay.

10             **MR. ADKINS:**  No objections.

11             **THE COURT:**  All right.  Then they will all be admitted

12   as evidence in this matter.  Thank you.

13        (Trial Exhibits 105-124 received in evidence.)

14             **MR. CONNETT:**  And just briefly, the parties did submit

15   their first joint iterative proposed findings of fact.  For

16   this submission, Your Honor, the parties have focused on the

17   hazard assessment prong of the evaluation, and we anticipate in

18   Thursday's submission to go, obviously, further into the risk

19   evaluation framework with some additional facts, of course, for

20   the hazard identification prong or hazard assessment prong.

21             **THE COURT:**  Okay.

22             **MR. CONNETT:**  Secondly, the parties have agreed that

23   Dr. Berridge, who is here with us today, just to make sure that

24   he is able to complete his testimony today, that we are going

25   to take him out of turn and start with Dr. Berridge before

PROCEEDINGS

 1   resuming with Dr. Barone.

 2          **THE COURT:**  Okay.  All right.  So we're going to start

 3   off then this morning with Dr. Berridge.

 4          All right.  Good.  Anything else?

 5          **MR. ADKINS:**  Nothing from us.

 6          **THE COURT:**  Okay.  Then why don't we proceed?

 7          **MR. CONNETT:**  At this time, Your Honor, plaintiffs

 8   call their next witness, Dr. Brian Berridge.

 9          **THE CLERK:**  You can take the stand.  Just remain

10   standing, please.  You may remove your mask.

11          Please raise your right hand.

12      (Witness sworn.)

13          **THE WITNESS:**  I do.

14          **THE CLERK:**  Thank you.  Please have a seat.  Please

15   speak clearly into the mic, state and spell your first and last

16   name for the record.

17          **THE WITNESS:**  Name is Brian Berridge, first name

18   B-R-I-A-N, last name B-E-R-R-I-D-G-E.

19          **THE COURT:**  Dr. Berridge, good morning.

20          You may proceed, Mr. Connett.

21   \\\

22   \\\

23   \\\

24   \\\

25   \\\

1                          **BRIAN BERRIDGE**,

2   called as a witness for the Plaintiffs, having been duly sworn,

3   testified as follows:

4                        **DIRECT EXAMINATION**

5   **BY MR. CONNETT:**

6   **Q.**   Good morning, Dr. Berridge.

7   **A.**   Good morning.

8   **Q.**   Dr. Berridge, where did you fly from to join us here

9   today?

10  **A.**   Raleigh, Durham.

11  **Q.**   Are you receiving any kind of a fee to appear here today?

12  **A.**   I am not.

13  **Q.**   Did you ask to receive any kind of fee?

14  **A.**   I did not.

15  **Q.**   Dr. Berridge, what type of scientist are you?

16  **A.**   I'm a toxicologic pathologist.

17  **Q.**   We are here today to talk about your work at the National

18  Toxicology Program.  Do you understand that?

19  **A.**   I do.

20  **Q.**   What years did you work at the NTP?

21  **A.**   2018 to 2023.

22  **Q.**   What was your position at the NTP?

23  **A.**   I was the scientific director of what was, when I started,

24  the Division of the National Toxicology Program, is currently

25  known as the Division of Translational Toxicology.  And by

1  virtue of having that role, I was also the associate director

2  of the Interagency National Toxicology Program.

3  **Q.**  So the division -- when you started at the NTP, you were

4  working in what was called the division of the -- sorry.

5  Strike that.

6     When you started at the NTP, you were working for a

7  division called DNTP; is that correct?

8  **A.**  Correct.

9  **Q.**  And that division became DTT?

10 **A.**  Correct.  Just a name change.

11 **Q.**  Did the functions of that office change when the name

12 changed?

13 **A.**  No.

14 **Q.**  The NTP is headquartered at the NIEHS; is that correct?

15 **A.**  That is correct.

16 **Q.**  And what does the acronym NIEHS stand for?

17 **A.**  It's the National Institute of Environmental Health

18 Sciences, which is one of the institutes of the National

19 Institutes of Health.

20 **Q.**  Are all institutes at the National Institutes of Health

21 considered part of the NTP?

22 **A.**  No.

23 **Q.**  For example, is the National Institute of Dental and

24 Craniofacial Research -- sometimes referred to as NIDCR -- is

25 that a part of the NTP?

1  A.   No.

2  Q.   NTP is a collaboration with two other government entities;

3  is that correct?

4  A.   Correct.

5  Q.   Can you tell us what those other entities are?

6  A.   The National Toxicology Program was established in 1978 as

7  an interagency collaboration between three organizations

8  within, what was then, the Health and Education Welfare

9  Department, and they are the FDA and, in particular, the

10  National Center for Translational or Toxicological Research at

11  Jefferson, Arkansas, so NCTR; the NIOSH, National Institute of

12  Occupational Safety and Health as part of CDC; and NIHS; and at

13  that time when it was established, the National Cancer Statute

14  as the contributions from NIH.

15  Q.   And as an aside, Dr. Berridge, could you maybe move a

16  little closer to your mic, because I think the sound might be a

17  little soft.

18       So initially National Cancer Institute was part of the

19  collaboration, but then it no longer was?

20  A.   Correct. at that time the National Cancer Institute was

21  where the rodent carcinogenicity assay was run.  It

22  subsequently moved to NIHS and where it's performed today.

23  Q.   So the two entities that collaborate with NIEHS for the

24  NTP program is NIOSH and FDA's National Center for Toxicologic

25  Research?

1  **A.**   Correct.

2  **Q.**   NIOSH -- Strike that.

3        Is NIOSH part of the CDC?

4  **A.**   Correct, yes.

5  **Q.**   Now, are all parts of the CDC then part of the NTP or only

6  NIOSH?

7  **A.**   Only NIOSH.

8  **Q.**   So is the CDC's Division of Oral Health a part of the NTP?

9  **A.**   No.

10  **Q.**   What is it about NIOSH and FDA's National Center for

11  Toxicologic Research that made them good fits for the NTP

12  program?

13  **A.**   They are the research-based and non-regulatory components

14  of each of those agencies.

15  **Q.**   And what is important about them being non-regulatory

16  components of the government?

17  **A.**   It maintains the independence of the science that's

18  ultimately generated by those organizations that support

19  regulatory policy decision-making.

20  **Q.**   Historically, how have NIEHS, NIOSH and FDA's NCTR

21  contributed to NTP's efforts?

22  **A.**   The NTP is part of the NIHS; whereas, the NTP's

23  headquarters has been historically the primary operational

24  support for the National Toxicology Program.  Those other

25  agencies provided in-kind support for collaborative efforts.

 1   They also were funded by the DNTP, NIHS, to perform some of the

 2   work on behalf of the National Toxicology Program.

 3         They also performed independent research that they would

 4   submit as part of the overall NTP portfolio that would be

 5   published in an annual report.

 6         So that's a lot of words to say that the DNTP was the

 7   primary operational engine for the National Toxicology Program,

 8   but there were collaborations and contributions by those other

 9   organizations.

10   Q.   What is NTP's mission?

11   A.   The mission of the NTP was to enhance the toxicological

12   testing that was taking place within the government,

13   particularly within the HEW, which is now HHS organization, and

14   also support the development of novel testing methods.

15   Q.   Does NTP conduct hazard assessments, risk assessments or

16   both?

17   A.   Hazard assessments very specifically and very

18   intentionally.

19   Q.   Why very specifically and intentionally?

20   A.   The same --

21         MR. ADKINS:   Objection, foundation, calls for opinion

22   testimony.

23         THE COURT:   Overruled.

24         THE WITNESS:   For the same reasons that the partnering

25   organizations were very distinctly identified, and that is to

1    maintain a separation between the regulatory and policy

2    decision-making and where the science was generated and the

3    evidence that supported that decision-making.

4    **BY MR. CONNETT:**

5    **Q.**   And what do you understand to be the difference between an

6    assessment of hazard and an assessment of risk?

7    **A.**   So hazard assessments are primarily done to identify the

8    potential for, for lack of a better word, bad things to happen,

9    in particular in people, because we do human hazard

10   assessments.

11         That information is ultimately contextualized by the level

12   of exposure and the susceptibility of populations.  There's

13   considerations for whether there are any benefits that come

14   from those exposures, and ultimately that is part of an overall

15   risk assessment.

16         So the hazard is really about understanding whether there

17   is the potential for something adverse to happen and at what

18   exposures that adverse event might happen to inform the risk

19   assessment.

20   **Q.**   Now, given that NTP focuses on hazard assessment, if we

21   look at an NTP Monograph, will we see discussions of

22   uncertainty factors or safety factors that would be needed to

23   protect susceptible populations from the hazard?

24   **A.**   No.  That's a risk assessment.

25   **Q.**   Does that mean if NTP does not discuss uncertainty factors

 1  or safety factors, does that mean that no such factors would be

 2  needed in a risk assessment?

 3          MR. ADKINS:  Objection, calls for speculation.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  No.

 6  BY MR. CONNETT:

 7  Q.   So what types of reports does NTP produce?  We're familiar

 8  in this court with monographs, but are there any other types of

 9  publications?

10  A.   There are.  So the hazard assessments that we do use a

11  full set of traditional tools.  We do animal studies, and those

12  animal studies are reported in the context of technical reports

13  and research reports, toxicology reports.

14       We also do mechanistic assessments, laboratory-based,

15  in vitro, in silico kinds of things.  Those are also reported

16  in research reports and -- primarily research reports.

17       And then there's the literature-based health assessments,

18  which are typically reported out in monographs.

19       In addition to that, we also publish in the peer-review

20  scientific literature just like any other intramural program

21  would do.

22  Q.   Now, if a monograph is an assessment of hazard, does that

23  in any way mean that regulators and other interested persons

24  cannot use the monograph to assess risk?

25          MR. ADKINS:  Objection, foundation.

1              **THE COURT:**  Overruled.

2              **THE WITNESS:**  No.  That's their intent.

3              The intent of the hazard assessments that are done by

4       the National Toxicology Program, regardless of which

5       organization is doing them, is to inform those kinds of

6       decisions.

7       **BY MR. CONNETT:**

8       **Q.**   What are some of the regulatory or government bodies that

9       rely upon NTP's scientific research?

10      **A.**   So it depends on the agent that's being studied, but in

11      the -- from the U.S. perspective, it's predominantly the EPA,

12      the FDA, OSHA.

13             But the reports that we generate are actually used on an

14      international scale, so the European Chemicals Association, the

15      European Medicines Association, Japan -- they're used

16      worldwide.

17      **Q.**   Are you familiar at all with the World Health Organization

18      or any of its component entities relying upon the NTP?

19      **A.**   Yes.  And, in particular, IARC, which is the International

20      Agency for Reporting Carcinogens or Research on Carcinogens.

21      Our report on carcinogens monographs and the carcinogenicity

22      testing that we do on rodents is a large part of informing the

23      IARC assessments for carcinogenicity.

24      **Q.**   In assessing hazard in the literature reviews that NTP

25      performs, does NTP generally consider all hazard data, or does

1    it generally limit its consideration to only low-dose data?

2    **A.**   Considers all hazard data that meet the criteria that are

3    established for whatever review.

4    **Q.**   Do you have an understanding as to why NTP does not limit

5    its consideration to just low-dose hazard data?

6    **A.**   Yeah.  It's a standard practice in toxicology whether

7    you're talking about drug safety assessment or chemical hazard

8    assessment, and it is usual to examine data at the full ranges

9    of exposures.  And, in particular, the high-dose exposures give

10   you much clearer indications of the potential for hazard, so it

11   is a common toxicological practice.

12   **Q.**   Can you explain that last point a little bit more?  You

13   just said that the high-dose data can give you a clearer

14   indication of the hazard.  What do you mean by that?

15   **A.**   So as you might imagine without going into the gory

16   details of the biology, there's a continuum of biological

17   response to any agent.  And for those agents that have the

18   potential to be hazardous or toxic, that the higher the

19   exposure, the more likely there is to be an adverse effect.

20   And the higher the -- or the more serious the magnitude of the

21   effect that you would see.  And so high-dose exposures give you

22   a much clearer indication that a factor is an association

23   between the exposure, the agent, and the effect that you're

24   interested in.

25        **MR. ADKINS:**  Your Honor, I just object and move to

 1  strike that response.  I mean, we are now clearly going into

 2  expert testimony with this witness.  He was not disclosed as an

 3  expert.  He's here as a fact witness, and we're talking about

 4  the details of risk assessment and in scientific topics that

 5  should have been disclosed under Rules 701 through 3.

 6         **THE COURT:**  Why don't you elicit whether this is --

 7  his testimony is based on his direct experience and then I'll

 8  rule.  Go ahead.

 9  **BY MR. CONNETT:**

10  **Q.**   Dr. Berridge, your testimony just now, is that informed by

11  your experience working on reports for the NTP and working with

12  scientists at the NTP?

13  **A.**   It is informed by my entire career, yes.

14  **Q.**   Including?

15  **A.**   Including my time at the National Toxicology Program.

16         **THE COURT:**  Objection overruled.

17  **BY MR. CONNETT:**

18  **Q.**   Based on the knowledge that you obtained through your work

19  at NTP, did you get an understanding as to whether high-dose

20  hazard data can help shed light on the impacts of lower doses

21  of a chemical?

22  **A.**   The short answer is yes, and for the reasons that I

23  mentioned previously in that, again, the typical response is on

24  a continuum and the higher exposure, the higher the magnitude

25  of the effect and the clearer the signal is in demonstrating an

 1  association between the exposure and the health effect.

 2  **Q.**   Based on the work that you've done at NTP and your

 3  communications with scientists at NTP, have you formed an

 4  understanding as to whether the NTP considers large exposure

 5  contrasts in an epidemiological study to be a strength or a

 6  weakness?

 7  **A.**   Clearly a strength, again, for providing clarity between

 8  an association and a health effect.

 9  **Q.**   During your time at NTP, did you form an understanding as

10  to whether studies that are looking at low doses with lower

11  exposure contrasts, whether those studies may have less power

12  or limitations in the ability to detect an association?

13  **A.**   Generally yes, but it depends on the agent and the health

14  effect and your ability to measure that health effect.

15      But, I mean, again, a basic premise of toxicology is that

16  dose makes the poison, and so the higher the exposure, the

17  higher the magnitude of the effect, the clearer the

18  association.  And the lower you go into those -- that range of

19  exposure, there is the potential -- and it often happens --

20  that the health effect -- the health effect is less clear.

21  **Q.**   And when we're dealing with epidemiology and human

22  populations.  Are there any other factors that you became aware

23  of through your work at NTP that can make it harder to detect

24  an association where you have low exposure contrasts?

25  **A.**   The value of epidemiological studies is that they are --

**BERRIDGE - DIRECT / CONNETT**

 1  they are the real world.  They are the human exposures, which

 2  makes them why they're important.

 3      The challenge with epidemiological studies is that the

 4  human condition is a very complicated one, and there are

 5  co-exposures.  There are co-morbidities.  There are much --

 6  there's significant variability -- much more greater

 7  variability amongst exposed people than there are, like, in an

 8  animal study where we control the conditions.  So there are,

 9  what we call, "confounders" that you have to consider in the

10  analysis that you do.

11  **Q.**   And can some of those co-factors make it harder to detect

12  an association even if it's present in the population?

13  **A.**   They can.

14  **Q.**   So let's turn now to the review process or review

15  processes that the NTP uses for its scientific publications,

16  okay?

17  **A.**   Yes.

18  **Q.**   Does NTP use a peer-review process for its scientific

19  reports?

20  **A.**   Yes.

21  **Q.**   Let's focus on the monographs.  Can you describe briefly

22  the normal peer-review process that NTP uses for its

23  monographs?

24  **A.**   Yes.  It's very much like a peer-review process that would

25  be applied to a peer-reviewed journal, scientific journal

1  publication.

2      Once we have completed a draft of whatever the analysis is

3  and we identify external experts that our expert in the area of

4  science that we've done the analysis for, there is a rigorous

5  conflict-of-interest screening that's done to ensure that the

6  reviewers that we have are not biased in any way and then those

7  reviewers are independently given access to and some very

8  specific questions asked of those reviewers, and they provide

9  their feedback and ultimately the response to the questions

10  that are asked.

11  **Q.**   Is this peer-review process always conducted by NASEM?

12  **A.**   No.  In fact, that's very unusual.

13  **Q.**   Do peer reviewers have to agree with every single

14  statement in an NTP Monograph for the monograph to clear peer

15  review?

16  **A.**   No.  In general, they do, but no.

17  **Q.**   And so what is NTP looking for when it sends its report

18  out for peer review?  Is it looking for -- can you just

19  describe that?  What is the sort of threshold --

20  **A.**   Yeah.

21  **Q.**   -- that you're looking at?

22  **A.**   We're looking for two things.  One is, they're asked very

23  specifically whether they believe that the evidence presented

24  supports the conclusion that was made.  That's a very

25  fundamental question.

1        In addition to that, they are asked for feedback and

2    comments on how to improve the work, anything that should be

3    addressed, clarified, those kinds of things.

4    **Q.**   Now, when a monograph clears peer review, who at NTP makes

5    the decision on whether the monograph should be published?

6    **A.**   It was my job, or whoever happens to be sitting in that

7    chair, and that was me.

8    **Q.**   And you were the scientific director?

9    **A.**   Correct.

10   **Q.**   Was that also the case with other types of NTP reports,

11   the studies on carcinogens and the technical reports?

12   **A.**   Yes.  The scientific director has the ultimate approval

13   for moving to publication.

14   **Q.**   And is this sort of decision-making tree formally

15   reflected in any type of written materials from NTP?

16   **A.**   Reflected on our website.

17   **Q.**   Prior to the fluoride monograph, which we'll talk about in

18   a little bit --

19   **A.**   All right.

20   **Q.**   -- had you ever made the decision to publish a monograph

21   during your tenure at the NTP?

22   **A.**   Yes.

23   **Q.**   And had you ever made the decision to publish other types

24   of NTP reports?

25   **A.**   Yes.

1   Q.   Prior to the fluoride monograph, when you, the scientific

2   director, determined that the report was final and complete,

3   was the report always published?

4   A.   Yes.

5   Q.   Prior to the fluoride monograph, when you, the scientific

6   director, determined that the report was final and complete,

7   was the report ever subjected to additional peer-review

8   processes?

9   A.   No.

10  Q.   Prior to the fluoride monograph, when you, the scientific

11  director, determined that the report was final and complete,

12  was the report ever subjected to additional review by federal

13  agency stakeholders?

14  A.   No.

15  Q.   So let's turn now to the fluoride monograph.  When did NTP

16  first begin working on this systematic review of fluoride

17  neurotoxicity?

18  A.   That work was initiated before I joined the organization,

19  around 2016.

20  Q.   When did NTP -- sorry.  Strike that.

21       When did NTP complete the first draft of the monograph?

22  A.   2019.

23  Q.   And who was the peer reviewer for that first draft?

24  A.   We contracted the National Academies to do the peer review

25  on that draft.

BERRIDGE - DIRECT / CONNETT

1   Q.   And did you say that that was the rare occurrence for NTP

2   to have NASEM serve as the peer reviewer?

3   A.   It was.

4   Q.   Why did NTP select NASEM as the peer reviewer?

5   A.   We recognized the importance and the sensitivity of this

6   particular analysis, and we wanted to have the strength of the

7   National Academies behind that review process.

8   Q.   When did NASEM complete the peer review of the first NTP

9   draft?

10  A.   The following spring, March, April, somewhere around

11  there.

12  Q.   2020?

13  A.   2020.

14  Q.   And did NTP then make changes to the monograph to

15  incorporate NASEM's recommendations?

16  A.   They did, in addition to adding a meta-analysis that was

17  actually suggested by that first review, the National

18  Academies.

19  Q.   And when did NTP complete its second draft of the NTP

20  Monograph?

21  A.   It would have been that same fall of 2020.

22  Q.   And who then was selected as the peer reviewer for the

23  second monograph?

24  A.   National Academies.

25  Q.   And when did NASEM complete its second peer review?

1    A.    That following February.

2    Q.    2021?

3    A.    2021.

4    Q.    How would you describe the nature of NASEM's comments

5    regarding NTP's monograph?

6    A.    They were rigorous.  They readily recognized the evidence

7    and the conclusions that were made from that evidence.  There

8    was a significant and important feedback that was offered to

9    improve the quality and the clarity, but there was no

10   disagreement with the evidence, and there never has been

11   throughout this entire process.

12   Q.    When you say there's no disagreement about the evidence,

13   can you explain that a bit more?  I mean, you talked about --

14   was the NASEM review focused on the underlying substance of the

15   science that NTP was reviewing, or was NASEM focused on how NTP

16   was communicating its analysis?

17   A.    It was the latter.  The National Academies, as is typical

18   in a peer-review process, was not asked to redo the analysis.

19   They were asked to support or refute the clarity of the way the

20   evidence was presented and the conclusions that were being

21   made.

22   Q.    So at any time during NASEM's peer-review process, did

23   NASEM come out and say that it does not think fluoride is a

24   neurotoxicant?

25   A.    No.

1  Q.   Did NTP make any changes to its monograph to reflect the

2  recommendations from the second NASEM peer review?

3  A.   Yes.

4  Q.   And did -- as part of those changes that NTP made, did NTP

5  decide to forego making a formal hazard classification for

6  fluoride?

7  A.   It did.

8  Q.   Can you explain why NTP did that, to your understanding?

9  A.   So after two reviews of the National Academies, it was

10  clear that the -- our ability to clearly communicate how the

11  evidence supported that level of conclusion was challenging.

12  And so the decision made -- was made to ultimately publish it

13  as what is now called the "State of the Science monograph,"

14  that would allow decision-makers, policy-makers, risk

15  assessors, to ultimately come to their own conclusion about

16  whether, in fact, fluoride exposure was a developmental

17  neurotoxin.

18  Q.   Did that decision to forego making a formal hazard

19  conclusion, was that in any way a reflection of what you talked

20  about earlier of the sensitivity of the subject?

21  A.   I think it is.  Again, recognizing the sensitivity of the

22  issue and the challenges in ultimately making a hard conclusion

23  or statement.  It was much more fair to the evidence and to the

24  decision-makers to ultimately present this in the way that it's

25  being presented, as a state-of-the-science monograph.

1   Q.   So after making changes to the second draft to reflect

2   some of NASEM's recommendations, what did NTP do next?

3   A.   The NTP incorporated the suggestions from the National

4   Academies review, separated out the meta-analysis and was going

5   to submit that as a peer-review publication because that was

6   not a part of the original analysis, that actually was a

7   suggestion, a good suggestion by the National Academies.

8        Ultimately, stood up another peer-review process.  We

9   identified external experts, put it through that peer-review

10  process, asked them the same kinds of questions, whether the

11  conclusions that were being made were supported by the clarity

12  of the evidence that was being presented, and then ultimately

13  that process played out the way it normally did.

14  Q.   Okay.  So and that external peer-review process, when did

15  that start?

16  A.   That started in late 2021.

17  Q.   Okay.  Now, that -- that process that started in late

18  2021, is it fair to say that that would be the standard

19  peer-review process that an NTP Monograph would undergo?

20  A.   Yes.

21  Q.   And for that external peer review was there any conflict

22  of interest checking or vetting of the reviewers to make sure

23  there were no potential biases?

24  A.   Yes.  That's a usual part of the process.  Our external

25  peer reviewers are always vetted for conflicts of interest.

1   **Q.**   And when did this external peer review -- strike that.

2        When did the external independent peer reviewers complete

3   their review of NTP's monograph?

4   **A.**   Early 2022, February, something like that.

5   **Q.**   Did the peer reviewers concur with NTP's conclusions?

6   **A.**   They did.  They were asked three questions.  One is, is

7   whether they did not concur.  Another was, did they concur

8   that -- and the concurrence was that the evidence that was

9   presented supported the conclusion that was made.

10       A third option was to concur with comment.  And so all

11  five of the external peer reviews concurred -- I think there

12  were two that concurred with comment, and then those comments

13  were addressed.

14  **Q.**   So upon receiving the input from the -- well, strike that.

15       So based on what you've just testified, is it correct to

16  say that the NTP Monograph cleared external peer review at that

17  point?

18  **A.**   Yes.

19  **Q.**   Based on the input that you received from the external

20  peer reviewers, did NTP make any revisions to incorporate some

21  of the comments made?

22  **A.**   Yes.

23  **Q.**   And then what happened next?

24  **A.**   So at the conclusion of the peer-review process, the

25  documents are typically shared with agency partners,

1    particularly those agencies that would have a particular

2    interest, and they're allowed the opportunity to comment.

3    That's not a peer-review process, that's just giving agencies a

4    heads-up that there's a scientific analysis that's about to be

5    published.

6         I review all of those things.  I actually approve the

7    external peer reviewer panel before it's ever put out for peer

8    review.  I review the comments that are received from the peer

9    reviewers.  I look at the changes that were made to the

10   product, whatever the product is, the monograph in this

11   particular case, to ensure that, in fact, we have addressed

12   what the peer reviewers have told us, that we've adhered to our

13   practice, and then I make a final decision about whether it

14   should move to publication or not.

15   **Q.**   So when did NTP finish incorporating changes to reflect

16   the external peer-review process in 2022?

17   **A.**   It would have been March or April, 2022.

18   **Q.**   After these revisions were made, did you, as the

19   scientific director of NTP, make a determination as to whether

20   the monograph was complete and ready for publication?

21   **A.**   I did.

22        **MR. ADKINS:**  Objection.  Your Honor, our motion in

23   limine was specific that issues of publication should not be

24   testified about, and the Court granted our motion in limine on

25   that issue.

 1          The scope of this witness's testimony is limited to

 2   NTP's hazard-focused nature of the monograph, not the

 3   risk-based nature, and the peer-review process.  Issues of

 4   publication should not be within the scope of this witness's

 5   testimony.

 6          **THE COURT:**  I did rule that.

 7          **MR. CONNETT:**  Well, Your Honor, I think there might be

 8   a miscommunication here because we're not going to get into

 9   what the Court was discussing at our hearing.

10          I just want to establish one thing, which is not about

11   politics.  It's just about completing the peer-review process

12   in terms of a decision -- whether Dr. Berridge determined, in

13   his own capacity, not -- not the NTP making a final decision,

14   but in his own capacity as a scientific director, whether he

15   made a determination that the report was finally complete.

16          **THE COURT:**  All right.  I'll allow that fact but not

17   any further explanation about what happened and why.

18          **MR. CONNETT:**  Your Honor, will you -- will you allow a

19   question related to whether he asked the scientific staff

20   working on the report whether they thought it was complete

21   already?

22          **THE COURT:**  Well, I mean, if that was part of his

23   decision-making process but not as a -- to start getting into

24   the topic of whether politics intervened or not.

25          **MR. ADKINS:**  Your Honor, may I be heard?

1      THE COURT:  Yeah.

2      MR. ADKINS:  The issue of publication is clear in your

3  order that this is not to come in, and there's no way to

4  separate out issues of publication from this political

5  interference issue.

6      THE COURT:  Well, it's a given fact it wasn't

7  published.  I mean, that's not in dispute -- right? -- and it's

8  still not published as we sit here today.

9      MR. ADKINS:  That may be so, but there was a

10  disclosure issue motivating our motion in limine, and this

11  witness should not be testifying about the publication issue.

12      THE COURT:  I will allow testimony up to the point of

13  whether or not it was published or not, but I'm not going to

14  get into what the communications were and the speculation as to

15  why and who intervened and that sort of thing.

16      MR. CONNETT:  Absolutely.

17      THE COURT:  So my ruling stands.

18  BY MR. CONNETT:

19  Q.    In forming your decision as to whether you thought the

20  monograph was final and complete and ready for publication, did

21  you consult with the scientific staff at NTP who had worked on

22  and written the monograph?

23  A.    Yes.

24  Q.    Based on your consulting with the NTP scientific staff and

25  your own assessment overseeing the peer-review process, what

1  was your determination as the scientific director as to whether

2  the monograph was complete, ready and final -- complete and

3  ready?

4  **A.**   As was our usual practice, I made a decision about whether

5  those products, based on the peer-review outcomes, were fit for

6  publication, and I did and they were.

7          **MR. CONNETT:**  Thank you, Dr. Berridge.  Those are all

8  the questions I have at this time.

9          **THE COURT:**  All right.  I have a couple of just

10 clarifying questions for you, Doctor.  The decision -- I just

11 want to make sure I understand the difference between a

12 decision to publish the monograph as a state-of-the-science

13 versus -- what's the alternative?  What do you call something

14 that's more --

15         **THE WITNESS:**  Systematic review of.

16         **THE COURT:**  All right.  And a systematic review.  So

17 what we see now, which is the last draft, is a state of

18 science?

19         **THE WITNESS:**  Right.  It is a systematic review --

20         **THE COURT:**  Right.

21         **THE WITNESS:**  -- but it is a state of the science.

22         **THE COURT:**  All right.  So does that -- that's short

23 of some furthermore determinative conclusion?  In other words,

24 what's the kind of conclusion you would have seen if it was

25 more than just the state of the science?

 1         THE WITNESS:  It would have been the hazard

 2    classification, which is the proposal that went to the National

 3    Academies.

 4         THE COURT:  And what would a hazard classification, in

 5    your experience with other things, what does it say?  Does it

 6    say something is hazard or something is a hazard at certain

 7    levels?

 8         THE WITNESS:  So a hazard classification is unique in

 9    that it, sort of, removes a bit of the exposure context, and it

10    just puts a label.  It's like calling something a carcinogen,

11    which has, ultimately, implications from a regulatory and a

12    policy perspective if something is deemed to be whatever kind

13    of a toxin.

14         And so, as I said earlier, to allow risk assessors,

15    policy-makers, maximum latitude in making their determination

16    with all the appropriate context, we backed away from making a

17    hazard classification and ultimately published -- completed the

18    review as a state-of-the-science with the observations that

19    were made based on the evidence that was presented.

20         THE COURT:  All right.  So rather than saying, for

21    instance, fluoride is a neurotoxin --

22         THE WITNESS:  Right.

23         THE COURT:  -- it says that the evidence shows with

24    the confidence an assoc -- you know, that kind of language?

25         THE WITNESS:  There's an association between a

```
 1   neurological effect, and ultimately if you decide whether

 2   that's means that it's a neurotoxin then --

 3           THE COURT:  I see.

 4           THE WITNESS:  Yeah.

 5           THE COURT:  But sort of the bottom-line question is it

 6   a neurotoxin, that's what is not included in there?

 7           THE WITNESS:  Right.

 8           THE COURT:  And that's what your agency felt, after

 9   all the peer review, was the appropriate?

10           THE WITNESS:  Yes.

11           THE COURT:  And that was because of the, sort of, the

12   strength of the studies overall, the science?

13           THE WITNESS:  The ability to clearly articulate how

14   the evidence supported that level of conclusion.  There's never

15   any question about the evidence and the validity of the

16   evidence in the peer-review comments that we received.

17           THE COURT:  So what does that -- I guess I'm trying to

18   understand what does it mean to say the clarity of the ability

19   to -- or the communication of that.

20           If the evidence is clear and the science is accepted,

21   what is the step that's sort of --

22           THE WITNESS:  It has a lot to do with the breadth of

23   the evidence.

24           As an example, in the -- in a determination of calling

25   something a carcinogen, sort of the holy grail of evidence is
```

1    that your animal studies say it's a carcinogen, your human

2    analyses say it's a carcinogen and your mechanistic studies.

3         In this particular case the evidence that was most

4    clear was the human evidence, and so it was -- it's a matter of

5    the breadth of the body of evidence and how far you can go with

6    your conclusions.

7         And again, to allow the risk assessors to be able to

8    put, you know, appropriate context and consider all the

9    possibilities, we backed away from going that far in the

10   conclusions.

11        **THE COURT:**  I see.  So in this instance you didn't

12   have the same breadth as did you in certain carcinogen-type

13   studies where you have animal studies, human studies, and

14   mechan --

15        **THE WITNESS:**  Right.  In the specific context of the

16   end point, the health effect that was being examined.

17        **THE COURT:**  Right.

18        **ATTY EUFPLTGS:**  So this was not an examination of all

19   possible neurological --

20        **THE COURT:**  Right.  This is about IQ decrement --

21        **THE WITNESS:**  Correct.

22        **THE COURT:**  -- in specific?

23        **THE WITNESS:**  Yes.

24        **THE COURT:**  Okay.  Thank you.

25

<u>**CROSS-EXAMINATION**</u>

**BY MR. ADKINS:**

**Q.**   Good morning, Dr. Berridge.

**A.**   Good morning.

**Q.**   So some questions for you.  Around January 2018, you said you were appointed as the Associate Director of the National Toxicology Program and the Scientific Director of the National Institute of Environmental Health Sciences Division of Translational Toxicology; is that right?

**A.**   Correct.  Historically those two roles went together.

**Q.**   And National Toxicology Program, that's the NTP that we've been referring to?

**A.**   Right.

**Q.**   You served in that role until 2023?

**A.**   Correct.

**Q.**   And you're no longer in that role today, correct?

**A.**   Correct.

**Q.**   Now, the National Toxicology Program is an interagency collaboration, right?

**A.**   Correct.

**Q.**   And that interagency collaboration involves other agencies within the public health service of the U.S. Department of Health and Human Services; isn't that right?

**A.**   Within the scope that it was defined in the founding language, but yes.

1  Q.    The NTP's activities are carried out through a partnership

2  with those partnered federal agencies, correct?

3          MR. CONNETT:  Vague, overbroad.

4          THE COURT:  Why don't you rephrase that.

5  BY MR. ADKINS:

6  Q.    The National Toxicology Program's activities are carried

7  out through a partnership with agencies of the U.S. Department

8  of Health and Human Services?

9          MR. CONNETT:  Vague and overbroad, same objections.

10          THE COURT:  Overruled.

11          THE WITNESS:  Am I answering it?

12          THE COURT:  Yeah.  You can answer.

13          THE WITNESS:  Okay.

14          It depends on what you mean by partnership.

15          So all of the work that was done by the NTP was not

16  necessarily done by all three -- with contributions from all

17  three organizations, but the overall program, the portfolio

18  was, in fact, a partnership between those three organizations.

19  BY MR. ADKINS:

20  Q.    Fair enough.

21          And among the agencies that NTP partners with or that make

22  up this partnership are NIOSH, which is the National Institute

23  of Occupational Safety and Health, that's one?

24  A.    Correct.

25  Q.    The FDA?

1    **A.**    NCTR and FDA, yes.

2    **Q.**    And the National Institute of Environmental Health

3    Sciences or NIEHS?

4    **A.**    Correct.

5    **Q.**    Okay.  And NIOSH, that's part of the CDC, correct?

6    **A.**    Correct.

7    **Q.**    Okay.  Now the authors of the fluoride monograph and

8    meta-analysis are all from NIEHS, right?

9    **A.**    Correct.  That was the organization that did that

10    analysis.

11    **Q.**    So let me shift a little bit to the timeline of the

12    monograph so I can make sure I understand this correctly.

13        In 2016, NTP initiated a systematic review to evaluate

14    neurobehavioral health effects from exposure to fluoride during

15    development; is that right?

16    **A.**    Correct.

17    **Q.**    Okay.  And the staff at NIEHS conducted the systematic

18    review on behalf of NTP, correct?

19    **A.**    Correct.

20    **Q.**    The first draft of this systematic review proposed a

21    hazard classification, right?

22    **A.**    Correct.

23    **Q.**    That hazard classification was that fluoride is presumed

24    to be a cognitive neurodevelopmental hazard to humans?

25    **A.**    Correct.

 1   **Q.**   This presumed hazard classification was based on studies

 2   showing that higher fluoride exposure is associated with

 3   decreased IQ in children, correct?

 4   **A.**   Correct.

 5   **Q.**   The NIEHS authors knew that the systematic review was

 6   wading into a controversial subject area, right?

 7   **A.**   Correct.

 8   **Q.**   That's one of the reasons why they selected NASEM to do a

 9   peer review of that first draft?

10   **A.**   Correct.

11   **Q.**   And you testified that it was unusual for NTP to use NASEM

12   to conduct a peer review of one of its monographs?

13   **A.**   Correct.

14   **Q.**   In fact, NTP has never used NASEM to review any of the

15   monographs that it's published, correct?

16   **A.**   I don't know if that's true or not.  It certainly didn't

17   while I was there.  There may be an experience in the past.  I

18   honestly couldn't tell you that.

19   **Q.**   So sitting here today, you couldn't name for us a single

20   monograph that NTP published that NASEM had peer reviewed?

21   **A.**   I can't tell you that --

22   **Q.**   Okay.

23   **A.**   -- because I don't know it.  Not because it didn't happen,

24   because I don't know if it happened or not.  I haven't reviewed

25   all the past.

1    Q.   Just asking what you know as a fact today, you're not

2    aware of any such --

3    A.   Correct.

4    Q.   -- peer reviews?

5         Okay.  So the National Academy has reviewed two drafts of

6    the monograph I heard, right?

7         And each time the National Academies returned critical

8    feedback of the NIEHS author's conclusions in the monograph,

9    right?

10   A.   Depends on how you define "critical."

11   Q.   How would you define critical?

12   A.   Well, if you're -- if you say critical in that it was not

13   supportive of the evidence, I wouldn't say that that's true.  I

14   think that they provide -- if you use critical to say that they

15   look very closely at the clarity of the evidence for the

16   conclusion that was being made as a hazard classification, I

17   think that is true.

18   Q.   Okay.

19   A.   I think it was scientifically critical.  I don't think it

20   was critical as in negative.

21   Q.   Sure.  So the National Academies' feedback to each

22   monograph was that the conclusions were not supported by the

23   underlying evidence, correct?

24   A.   That's a particular conclusion, the hazard classification,

25   that is true.

1  Q.   And it's in that sense the NASEM peer review was critical

2  of the NTP draft monographs?

3  A.   No.  I don't -- I wouldn't concur with that

4  characterization.  I think that the -- NASEM's review did not

5  support that the evidence was presented clearly enough to

6  support the level of interpretation that was being made.

7  Q.   Sure.  So --

8  A.   Which is not to say that the evidence didn't support the

9  fact that there's a health effect.

10  Q.   Why don't we just focus in on what the National Academy

11  said with respect to this presumed hazard conclusion.

12       So the National Academies' report on the 2019 draft -- so

13  that's the first draft that was submitted for peer review --

14  found that the presumed hazard conclusion was not adequately

15  supported, correct?

16            MR. CONNETT:  Objection, Your Honor.  It's -- well,

17  objection, Your Honor, assumes facts.

18            THE COURT:  Overruled.

19            THE WITNESS:  I can't tell you exactly what it said.

20  I haven't -- I'm not sitting here reading it, so I don't know

21  that.

22  BY MR. ADKINS:

23  Q.   You reviewed the NASEM report of the 2019 monograph?

24  A.   I reviewed all of those reports.

25  Q.   Would it refresh your recollection if we showed you a

1    snippet of the NASEM review of the 2019 monograph?

2    **A.**    If we could do that, that would.  I didn't read that

3    recently.

4          **MR. ADKINS:**  Okay.  Mr. Hambrick, could you please

5    pull up Exhibit 653 and take us to page 16.  If you could focus

6    in on the paragraph under "NTP Conclusion."

7    **BY MR. ADKINS:**

8    **Q.**    So Dr. Berridge, take a moment and please review this, and

9    I'll ask the question again when you're finished.

10   **A.**    Okay.

11         **MR. ADKINS:**  Okay.  Mr. Hambrick, can you take that

12   down.

13   **BY MR. ADKINS:**

14   **Q.**    So Dr. Berridge, the National Academies' report on the

15   2019 draft monograph found that the presumed hazard conclusion

16   was not adequately supported, correct?

17   **A.**    The NTP had not supported it in the way that it presented

18   the evidence.  It also said that that did not mean that the

19   conclusion was incorrect.

20   **Q.**    After receiving this feedback from the National Academies,

21   the NIEHS authors revised the draft monograph and added the

22   meta-analysis manuscript; is that correct?

23   **A.**    At that time it was not a manuscript, but yes, added the

24   meta-analysis.

25   **Q.**    Okay.  And the NIEHS authors submitted a revised 2020

1  draft to the National Academies again for peer review?

2  **A.**   Correct.

3  **Q.**   So this was the second time the National Academies was

4  asked to peer review the monograph?

5  **A.**   Correct.

6  **Q.**   Okay.  And the National Academies released its review of

7  the revised monograph in February of 2021?

8  **A.**   Right.

9  **Q.**   The National Academies' assessment was that the NIEHS

10  authors revised monograph was still not adequately supported,

11  correct?

12  **A.**   Did not support a hazard classification as it was stated,

13  that is correct.

14  **Q.**   The National Academy stated that the revised monograph

15  continued to fall short of supporting its conclusions?

16  **A.**   The evidence, the way it was presented, did not support

17  the hazard classification; that is true.

18  **Q.**   The authors then revised the draft again to respond to the

19  National Academies' critical feedback, correct?

20  **A.**   Correct.

21  **Q.**   And one of the ways that the authors responded to the

22  National Academies' feedback was by removing that hazard

23  classification that fluoride is a presumed neurotoxicant,

24  correct?

25  **A.**   Correct.

1  Q.   And another way that the NIEHS scientists responded to the

2  National Academies' feedback was by narrowing their hazard

3  assessment to where the data was the strongest?

4  A.   Right.

5  Q.   Finally, the authors split that document into two pieces,

6  the state-of-the-science monograph and the meta-analysis

7  manuscript, correct?

8  A.   Correct.

9  Q.   Okay.  So now we're at two documents at this stage in the

10  timeline?

11  A.   Right.

12  Q.   The draft state-of-the-science monograph underwent

13  external peer review by, I think you testified, five scientific

14  peer reviewers?

15  A.   Correct.

16  Q.   And you selected those peer reviewers, correct?

17  A.   Not me personally.  "We" as a division selected those peer

18  reviewers, yes.

19  Q.   You were involved in the selection of those five expert

20  peer reviewers?

21  A.   I approved the panel peer reviewers, yes.

22  Q.   And both the State-of-the-Science Monograph and the

23  Meta-analysis Manuscript were also reviewed internally by

24  various Department of Health and Human Services entities,

25  correct?

1    **A.**   Reviewed -- yes.  Not peer reviewed.  There's a difference

2    between a peer-review and an interagency review.

3    **Q.**   The entities included NTP collaborators at the CDC and the

4    FDA, right?

5            **MR. CONNETT:**  Vague and ambiguous.

6            **THE COURT:**  Why don't you be more specific?

7    **BY MR. ADKINS:**

8    **Q.**   The peer reviewers that -- excuse me.

9         The reviewers at Department of Health and Human Services

10   entities that reviewed the draft State-of-the-Science Monograph

11   and Meta-analysis Manuscript were from the CDC and the FDA?

12   **A.**   Yes.  We provided -- yes.

13   **Q.**   And the interagency reviewers at the CDC and FDA submitted

14   nearly 500 comments to the draft documents, didn't they?

15   **A.**   There were hundreds of comments made to those documents

16   collectively, yes.

17   **Q.**   There were nearly 500 comments to those documents?

18   **A.**   Okay.

19   **Q.**   The interagency reviewers had concerns with how the NIEHS

20   authors handled their comments; isn't that true?

21   **A.**   I can't tell you whether that's true or not.  I'm not

22   surprised by that, but I don't remember a specific report of

23   that.

24   **Q.**   So you have no knowledge today on whether the reviewers at

25   the CDC and the FDA had concerns with how the NIEHS authors

BERRIDGE - CROSS / ADKINS

 1  handled their comments?

 2  **A.**    There were concerns about the way the comments were

 3  handled and -- you're talking about the final draft that we're

 4  discussing here, the March 2022 draft or one of those earlier

 5  drafts?

 6  **Q.**    I think we're in the early 2022 phase now.

 7  **A.**    Okay.

 8  **Q.**    So we're talking about the interagency review process --

 9  **A.**    Yes.

10  **Q.**    -- and the comments that reviewers at FDA and CDC

11  submitted to that May 2022 draft.

12  **A.**    There were multiple rounds of comments and feedback from

13  those agencies, yes.

14  **Q.**    And the --

15  **A.**    And there were concerns, yes.

16  **Q.**    There were concerns with how the NIEHS authors were

17  handling comments by FDA and CDC, right?

18  **A.**    By some of those reviewers, yes.

19  **Q.**    And given the gravity of the comments and concerns from

20  the NTP reviewers at FDA and CDC, the comments from the five

21  independent peer reviewers, and to ensure NTP got the science

22  right, the director of the NTP enlisted the Board of Scientific

23  Counselors to adjudicate the responses to those comments and

24  concerns; is that true?

25          **MR. CONNETT:**  Compound.  Compound and it assumes

1    facts.

2            THE COURT:  Why don't you break it down.

3    BY MR. ADKINS:

4    Q.    You're aware that the director of the NTP enlisted the

5    Board of Scientific Counselors to adjudicate the responses to

6    the comments and concerns that the CDC and FDA reviewers

7    submitted?

8    A.    That was a process that was initiated before I left.

9    Q.    And it's true that that process was initiated by the

10   director of the NTP?

11   A.    Correct.

12   Q.    And among the reasons that that process was initiated was

13   also that there were comments and concerns from five

14   independent peer reviewers that needed to be adjudicated,

15   correct?

16   A.    No, that's not correct.

17   Q.    Okay.  And among the reasons that process was commenced

18   was to adjudicate comments and concerns from FDA and CDC

19   comments; is that correct?

20   A.    So that process was initiated without any involvement with

21   the -- I was aware that the process had been initiated, and I

22   knew that the process was going on, but I was not included in

23   the discussions or the decisions, so I can't speak to that.

24   Q.    And at no point did you learn the reasons for that process

25   after?

 1   **A.**   I was not a part of that process.

 2   **Q.**   Okay.  So Dr. Berridge, you have no expertise in the

 3   science underlying the fluoride monograph?

 4   **A.**   If you're asking if I'm an epidemiologist, the answer to

 5   that is no.

 6   **Q.**   And you're not --

 7   **A.**   If you're asking me if I have expertise in hazard

 8   assessments using the kinds of evidence that we use for those

 9   kinds of things, I would say that I am.

10   **Q.**   And you have no expertise in the science of fluoride's

11   potential effects on IQ, correct?

12   **A.**   That's a fair statement.  Yes.  The answer is yes.

13   **Q.**   Your role in the monograph was to support the scientists

14   at NIEHS who prepared these documents, correct?

15          **MR. CONNETT:**  Vague and ambiguous.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  Can you repeat the question?

18   **BY MR. ADKINS:**

19   **Q.**   Your role with respect to the monograph was to support the

20   NIEHS authors who prepared those documents?

21   **A.**   My role at the NIEHS was to ensure that we applied the

22   standards, the best standards of science, that we followed the

23   process that we had defined, that we did a rigorous and

24   independent peer review.

25          In the end that did support the scientists, but it was

1  much more about me making sure that they were doing what we

2  said we were doing.

3  **Q.**   Dr. Berridge, do you believe the State-of-the-Science

4  Monograph and the meta-analysis are consistent with current

5  standards of scientific practice, correct?

6  **A.**   They exceed current standards of practice.

7  **Q.**   And you don't personally know whether levels of exposure

8  in the United States that are lower and more common are without

9  potential for health effects; is that correct?

10 **A.**   I can't comment on that one way or the other.

11 **Q.**   Okay.

12       Now, Dr. Berridge, we talked about the Board of Scientific

13 Counselors' review of the monograph and meta-analysis, right?

14 **A.**   Correct.

15 **Q.**   And last year a working group of the Board of Scientific

16 Counselors reviewed those interagency and peer-review comments

17 to the monograph and the meta-analysis and the NIEHS authors'

18 responses, right?

19          **MR. CONNETT:**   Your Honor, I'm going to object at this

20 point as both beyond the scope and lacking foundation since it

21 occurred after his tenure.

22          **MR. ADKINS:**   Well, Your Honor, I'm actually trying to

23 lay foundation for impeachment purposes here.

24          **THE COURT:**   I'll allow some.  Go ahead.

25 \\\

```
 1   BY MR. ADKINS:
 2   Q.   You wrote a letter to the chair of the BSC on April 28,
 3   2023, commenting on the working group report?
 4   A.   I did.
 5   Q.   In that letter, Dr. Berridge, you wrote --
 6            THE COURT:  This is a letter to whom again?
 7            THE WITNESS:  Public comment in response to the BSC
 8   review, BSC Working Group Review.
 9   BY MR. ADKINS:
10   Q.   And so this letter was written during the process that the
11   BSC instituted to review and adjudicate the comments to the
12   draft monograph?
13   A.   Written at the conclusion of that process because I wasn't
14   there as that process was playing out.
15   Q.   Okay.  And in that letter you wrote, "I don't personally
16   know whether levels of exposure in the U.S. that are lower and
17   more common are without potential for health effects, and I
18   expect no one else does either."
19   A.   I did say that.
20   Q.   Do you stand by that statement?
21   A.   I do stand by that statement.
22            MR. ADKINS:  No further questions, Your Honor.
23            THE COURT:  All right.  Thank you.  Redirect?
24            MR. CONNETT:  Yes, Your Honor.
25   \\\
```

1          <u>**REDIRECT EXAMINATION**</u>

2   **BY MR. CONNETT:**

3   **Q.**   Dr. Berridge, Counsel just asked you a number of questions

4   about interagency comments that NTP received from the CDC.

5   **A.**   Yes.

6   **Q.**   Do you recall those questions?

7   **A.**   Yes.

8   **Q.**   Now, there's one part of the CDC that is a part of the

9   NTP, correct?

10  **A.**   Correct.

11  **Q.**   That part of the CDC is called NIOSH; is that right?

12  **A.**   Right.

13  **Q.**   All the comments from CDC that counsel was talking

14  about --

15  **A.**   Yes.

16  **Q.**   -- what part of the CDC did those comments come from?

17  **A.**   Much of those comments came from the Division of World

18  Health.

19  **Q.**   Now, you talked earlier about the importance of

20  independence in conducting research on the hazards of chemicals

21  at the federal level.  You mentioned that NIOSH and the NCTR

22  and FDA are examples of government agencies that have that type

23  of independence.

24          Would you consider THAT the CDC's Division of Oral Health

25  to be a similar type of independent body?

 1          MR. ADKINS:  Objection, calls for opinion testimony.

 2          THE COURT:  Sustained.

 3  BY MR. CONNETT:

 4  Q.   So you were asked some questions by counsel about how you

 5  would define the word "critical."  Do you recall that?

 6  A.   Yes, I do.

 7          MR. CONNETT:  At this point, Your Honor, I'd like to

 8  show Dr. Berridge Trial Exhibit 95, which has been admitted

 9  into evidence.

10          THE COURT:  Okay.

11          MR. ADKINS:  Your Honor, objection.  I'm not sure how

12  this exhibit is to be used.

13          THE COURT:  Well, let me go back.  Remind me when

14  we're talking about critical, what was the context of that?

15          MR. CONNETT:  Whether Dr. Berridge felt that NASEM's

16  comments about NTP's monograph were critical.

17          THE COURT:  Oh.  And what is Exhibit 95?

18          MR. CONNETT:  This is NASEM, the same body, their

19  comments about EPA's systematic reviews under TSCA because

20  they're much more critical of EPA's systematic reviews than

21  NTP's.  So I think it's fair to ask whether NASEM's criticisms

22  of the systematic reviews that underlie risk determinations

23  under TSCA, whether those are more or less critical than what

24  was provided for the NTP.

25          THE COURT:  So in a relative way is what you're

BERRIDGE - REDIRECT / CONNETT

 1  saying?

 2          **MR. CONNETT:**  (Indicating.)

 3          **THE COURT:**  Okay.  I'll admit it.

 4          **MR. ADKINS:**  Your Honor, may I be heard?

 5          **THE COURT:**  Briefly.

 6          **MR. ADKINS:**  Thank you.

 7          This document will be and has been the subject of

 8  testimony by expert witnesses in this case.  Plaintiff's

 9  proffer is asking this witness to opine on the meaning of this

10  document and how it relates, so the import of this document on

11  the NTP Monograph.  That's exactly what Your Honor said is not

12  allowed by this witness in your ruling on our motion in limine.

13          And further, this is outside of the scope of cross.

14          **MR. CONNETT:**  Well, it becomes -- it's within the

15  scope, Your Honor, of the cross because they were specifically

16  asking Dr. Berridge:  Do you consider NASEM's comments of NTP

17  critical.

18          And you can't judge quality in a vacuum.

19          **THE COURT:**  No, but he explained what was meant by

20  critical, and now you're talking about NASEM's comments in an

21  entirely different work --

22          **MR. CONNETT:**  Right.

23          **THE COURT:**  -- in comparing whether that was -- I

24  mean, that does seem amorphous to me and far afield.

25          **MR. CONNETT:**  I would just submit, Your Honor, that

1  quality is -- you can't judge quality in a vacuum.  And if

2  EPA's position in this case is that there's critical comments

3  from NASEM --

4          THE COURT:  Yeah, but you're putting -- you all are

5  putting such a premium on an interrogation word used in

6  examination, "critical."

7          I'm more interested in what was actually criticized

8  than what was the extent -- so you know, this is not a

9  construction of what counsel meant by critical and what the

10 witness -- you know, we're getting far afield, so I'm going to

11 exclude this under 403.

12         MR. CONNETT:  I'll move on, Your Honor.

13         THE COURT:  Please.

14 BY MR. CONNETT:

15 Q.   So let's -- I just want to clarify on this point of

16 NASEM's criticisms.  I want to see if you could explain is

17 there a difference between how evidence is communicated in a

18 review with what the underlying evidence says or means?  Is

19 there a difference between those two things?

20         MR. ADKINS:  Objection, Your Honor, same grounds.

21         THE COURT:  Overruled.

22         THE WITNESS:  I think there is a difference, and I

23 think it's represented in the two parts of the text that was

24 shared with me, which was that the National Academies didn't

25 feel like the NTP had sufficiently supported the level of

1  conclusion that was being made but then followed that sentence

2  with saying that it didn't mean that it wasn't accurate or

3  right or --

4  **BY MR. CONNETT:**

5  **Q.**   So is it fair to say, then, that NASEM's criticisms was

6  more about the communication of the data than the underlying

7  data itself?

8  **A.**   I think that's a fair -- I think that's a fair statement.

9  So I mean, we -- you gather a body of evidence, you evaluate

10  that evidence and then you support a conclusion based on that

11  body of evidence.  And it's the support of the conclusion that

12  NASEM didn't feel like that we had done a sufficient enough

13  job.

14  **Q.**   Okay.

15       So if someone was to point to the NTP Monograph and say

16  the removal of the hazard classification means that fluoride is

17  not a neurotoxicant, what would you say to that?

18            **MR. ADKINS:**  Objection, calls for opinion testimony.

19            **THE COURT:**  Sustained.

20            **MR. CONNETT:**  Your Honor, no further questions.

21            **THE COURT:**  All right.  Thank you.  Anything further?

22            **MR. ADKINS:**  Nothing further, Your Honor.  Thank you.

23            **THE COURT:**  All right.  Well, that will conclude your

24  testimony, Dr. Berridge.  Thank you for appearing.  You're

25  excused as a witness.

```
 1        (Witness excused.)

 2            THE COURT:  Do you want to resume with the prior

 3   witness?

 4            MR. CONNETT:  Yes, unless it would be a good time for

 5   a break.

 6            THE COURT:  Well, we're a little early, so let's

 7   continue.

 8            MR. CONNETT:  That's fine.  Okay.

 9            DR. BARONE:  Testing.

10            THE COURT:  Working.

11            THE WITNESS:  I just wanted to make sure.

12            THE COURT:  All right.  Welcome back, Dr. Barone.

13            DR. BARONE:  Thank you.

14            MR. CONNETT:  May I proceed, Your Honor?

15            THE COURT:  Yes, you may.

16                         STANLEY BARONE,

17   called as a witness for the Plaintiffs, having been duly sworn,

18   testified as follows:

19                    DIRECT EXAMINATION (Resumed)

20   BY MR. CONNETT:

21   Q.   Good morning, Dr. Barone.

22   A.   Good morning.

23   Q.   Okay.  I just want to kind of recap where we were on

24   Friday.  And do you recall that we were talking about the

25   hazard identification component of a risk evaluation under
```

1   TSCA?

2   **A.**   I did.  I talked about hazard identification, I talked

3   about evidence integration to some extent and a little bit

4   about dose response.

5   **Q.**   Okay.  So let's start with hazard identification.

6        Just to recap, here's what we know so far, that you do not

7   need to prove a causation to identify a hazard under TSCA,

8   correct?

9   **A.**   That is correct.  Hazard identification is not part of the

10  evidence integration or the weight of the scientific evidence.

11  **Q.**   Okay.  You need to be able to show under the hazard

12  identification analysis that there is an association for which

13  you have a reasonable degree of confidence, correct?

14  **A.**   We need to be able to search and find and evaluate the

15  specific studies, the specific findings for quality under

16  hazard ID.

17  **Q.**   Right.

18       And after you've done all that searching and evaluating,

19  if you have a reasonable amount of confidence that that

20  association -- that there is an association, that that meets

21  the standard for hazard ID?

22  **A.**   That's actually part of the evidence integration and

23  weight of the scientific evidence.  What we're doing under

24  Hazard ID is identifying the studies based upon the quality and

25  the range of end points that the study identifies that are of

 1  medium to high quality.

 2  **Q.**   So just so we're clear, this evidence integration stuff

 3  that you're talking about, where does it fit within this

 4  framework that we see on the screen?

 5  **A.**   It's actually not identified on the screen here.

 6  **Q.**   So there's a new -- there's a new prong?

 7  **A.**   No.  It's actually -- it's a consistent part of hazard

 8  evaluation that wasn't identified previously in your -- in your

 9  facts.

10  **Q.**   In the undisputed facts of the parties?  Okay.

11          **THE COURT:**  Before you go any further, let me make

12  sure I understand.

13          What is -- could you define what evidence integration

14  is, so I know what you all are talking about?

15          **THE WITNESS:**  So evidence integration and the weight

16  of the scientific evidence is part of the systematic review

17  process.  Evidence integration is part of the systematic review

18  process that we describe, same as the NTP's systematic review,

19  very similar.  There's an evidence integration portion, and

20  some of that has already been reviewed in prior testimony with

21  the forest plots and so on, so that's part of the evidence

22  integration step.  That's not hazard ID.

23  **BY MR. CONNETT:**

24  **Q.**   Okay.  So --

25          **THE COURT:**  But what is evidence integration?  What

1   does it mean?

2          THE WITNESS:  Evidence integration is where we

3   actually look at the different lines of evidence, whether we're

4   talking about epidemiological evidence and different

5   epidemiological studies and animal evidence and mechanistic

6   evidence.

7          So we take those different lines of evidence and

8   integrate them to come up with the

9   weight-of-the-scientific-evidence conclusions, so strength of

10  the evidence.  It's sort of the beginning of the strength of

11  the evidence argument.

12         THE COURT:  So essentially there's three stands, it

13  sounds like, as we just heard; animal studies, human studies

14  and then mechanistic --

15         THE WITNESS:  All inform -- all inform the weight of

16  the scientific evidence.

17         THE COURT:  And that is part or not part of the hazard

18  assessment?

19         THE WITNESS:  It is part of the hazard assessment.

20  It's a third piece of the hazard assessment.

21  BY MR. CONNETT:

22  Q.   And does that third piece come before the quantitative

23  dose-response analysis?

24  A.   It actually -- it informs the quantitative dose-response

25  analysis.  Hazard ID and the weight of the scientific evidence

BARONE - DIRECT / CONNETT

1    integration both inform dose response.

2    **Q.**    Okay.  So as you testified on Friday, if you have med --

3    oh, sorry.  Strike that.

4        As you testified on Friday, if the hazard ID analysis

5    identifies an association with neurotoxicity, EPA -- and you

6    have medium confidence --

7    **A.**    Medium quality --

8    **Q.**    Medium quality studies support that, then EPA moves to the

9    quantitative dose-response analysis?

10   **A.**    Generally speaking.

11   **Q.**    And as you testified at your deposition, the quantitative

12   dose-response analysis is designed to identify the point of

13   departure, right?

14   **A.**    It is designed to -- there are several ways to derive a

15   point of departure, which we discussed on Friday; but yes, that

16   is what the dose response is designed for.

17   **Q.**    And a common way of saying "point of departure" is hazard

18   level?

19   **A.**    That's what you've asserted.  Some people use that term.

20   Generally people stay to point of departure or the specific

21   types of point of departure and use that specifically.

22   **Q.**    Right.  The three types of point of departure, just so we

23   can refresh our memory, is BMCL/BMDL, NOAEL and LOAEL?

24   **A.**    So the NOAEL/LOAEL approach comes directly from the data,

25   does not consider the actual full dose-response curve.

**BARONE - DIRECT / CONNETT**

1   The benchmark dose-response analysis does actually include

2   analysis -- dose-response analysis of all the dose response

3   data.  There are other types of dose-response functions,

4   categorical regressions that can also be used, but for this --

5   generally speaking, BMD analysis is, sort of, a higher tier of

6   dose-response analysis because it takes into account all the

7   dose-response data.

8   **Q.**   Okay.  So when we're done with the quantitative

9   dose-response analysis, we have a hazard level that we can

10  incorporate later as part of the risk characterization,

11  correct?

12  **A.**   Correct.  The hazard level that you're speaking to, the

13  point of departure, is part of the risk calculation, and the

14  risk calculation is part of the risk characterization.

15  **Q.**   Okay.  So let's now turn to the next step of the risk

16  evaluation, which is the exposure assessment.  Okay?

17  **A.**   Okay.

18  **Q.**   And the point of the exposure assessment is to identify

19  what the human exposure level is under the specific conditions

20  of use of the chemical being evaluated, right?

21  **A.**   It is -- it is condition-of-use specific.

22  **Q.**   Now, it is condition-of-use specific, but TSCA

23  specifically permits EPA to consider aggregate exposures to the

24  chemical, correct?

25  **A.**   TSCA specifically allows for consideration of aggregate

 1   exposures.  It doesn't require us to quantify based upon

 2   aggregate exposures.

 3   **Q.**   And aggregate exposure to a chemical is the basic

 4   aggregation of all conditions of use for that chemical, right?

 5   **A.**   Actually, it's not necessarily.  The way we have looked at

 6   aggregation is within condition of use, generally speaking, in

 7   the first ten risk evaluations.  And we did it in several cases

 8   where we actually had the data and the capabilities to do

 9   aggregation, and we aggregated by pathways, not conditions of

10   use.

11   **Q.**   Well, Dr. Barone --

12   **A.**   Air, water and -- you know, and dermal pathways.

13   **Q.**   Aggregate exposures to a chemical may include estimates of

14   exposure from multiple uses and sources of the chemical,

15   correct?

16   **A.**   It may.

17   **Q.**   Now, EPA also considers sentinel exposures in its risk

18   calculations, correct?

19   **A.**   It does include consideration of sentinel exposures.

20   Oftentimes sentinel exposures are workers who are highly

21   exposed, are a general example of sentinel exposures.

22   **Q.**   A sentinel exposure is a high-end exposure to the

23   chemical; fair?

24   **A.**   The statute does not define a sentinel exposure, but,

25   generally speaking, that's what we consider a sentinel

BARONE - DIRECT / CONNETT

1  exposure.

2  **Q.**   And EPA has used the terms "The plausible upper-bound

3  exposure to the chemical"; fair?

4  **A.**   We consider upper bounds to the exposure high end in a

5  number of contexts, but that's not necessarily sentinel

6  exposure.

7  **Q.**   Okay.  Dr. Barone, I'm going to show you a statement from

8  the EPA risk evaluation of PCE, which is Exhibit 96, and you're

9  certainly familiar with this risk evaluation, correct?

10  **A.**   I am familiar with perchloroethylene and

11  tetrachlorethylene as it's also called.

12  **Q.**   You helped write and review this document, correct?

13  **A.**   Yes, I did.

14  **Q.**   So I'd like to go to page 449 of the evaluation, and EPA

15  states here, quote, "Where statistical data are reasonably

16  available, EPA typically uses the 95th percentile value of the

17  reasonably available data set to characterize high-end exposure

18  for a given condition of use."  Did I read that correctly?

19  **A.**   You did read it correctly.  There's more there.

20      And, again, it goes on to speak to in other instances when

21  we can't derive the high-end value at the 95th percentile,

22  we'll use the 90th percentile.

23      In some cases we had information and enough information

24  about the exposures to actually estimate the 99th percentile.

25      So for high end, again, general use is 90th, 95th or 99th

 1   percentile.  For most cases, we're talking at either the 90th

 2   or 95th more often.

 3   **Q.**   Now, I'm going to turn now to some of the undisputed facts

 4   in the case.  Can you see these on your screen?

 5   **A.**   I do.

 6   **Q.**   And Undisputed Fact No. 40 states, "Under the amended

 7   TSCA, EPA has made Unreasonable Risk determinations where it

 8   did not have high confidence in the exposure data."  Is that a

 9   correct statement, Dr. Barone?

10   **A.**   That is true.

11   **Q.**   The next undisputed fact 41 states, "In its first 10

12   finalized risk evaluations under the amended TSCA, EPA made

13   Unreasonable Risk determinations where it had medium confidence

14   in the exposure data."  And that, too, is a correct statement,

15   right?

16   **A.**   That is true.

17   **Q.**   In fact, for some exposure scenarios, EPA has made

18   unreasonable risk determinations for that exposure scenario

19   when it had less than medium confidence in the exposure data?

20   **A.**   That is also true in the context of low-medium confidence,

21   range of low-medium confidence for some scenarios ala in the

22   dermal exposure route, which is part of the condition of use,

23   not the entire condition of use.  EPA considered other exposure

24   evidence for inhalation as well.

25   **Q.**   So now that we talk about the exposure piece of the risk

1  evaluation, let's turn now to the third step, the risk

2  characterization.  Okay?

3  **A.**    Okay.

4  **Q.**    And in the exposure -- sorry.  In the risk

5  characterization, what we're doing is, we're kind of bringing

6  together the hazard data and the exposure data to see if there

7  may be a risk; is that fair?

8  **A.**    In general parlance, we are looking at the hazard divided

9  by the exposure.  We look at -- which is a risk, a margin of

10  exposure of risk.

11  **Q.**    Okay.  So I'm going to start here by turning to another

12  undisputed fact in the case, No. 16, which states, "EPA does

13  not require that human exposure levels exceed a known adverse

14  effect level to make an Unreasonable Risk determination under

15  TSCA."

16      And that's a correct statement, right, Dr. Barone?

17  **A.**    That is true.  And generally, we are hoping not to have

18  exposures exceed the hazard level.

19  **Q.**    And it's fair, Dr. Barone, that at least in the first ten

20  risk evaluations under the amended TSCA, most of the exposure

21  scenarios for which EPA found a risk, the exposures were less

22  than the hazard level, correct?

23  **A.**    Generally speaking, yes.

24  **Q.**    So, Dr. Barone, do you remember during your deposition

25  last summer, I showed you some true/false questions and asked

 1   you about them.  Do you recall that?

 2   **A.**   I do.

 3   **Q.**   Okay.  So let's just look at a couple.

 4        This is from Trial Exhibit 89, and it's the true/false

 5   Question No. 9.  The question is, quote, "EPA Did Not Require

 6   Evidence that the Chemical Causes the Hazard Under the

 7   Condition of Use Before Making an Unreasonable Risk

 8   Determination."  Do you see that?

 9   **A.**   I do.

10   **Q.**   And you checked "true," correct?

11   **A.**   I did, and again with the discussion that we had around

12   EPA does not require proof of causality to make an unreasonable

13   risk determination.

14   **Q.**   And when you say, "Proof of causality," that is both at

15   the hazard ID level and at the risk characterization level?

16   **A.**   No.  The -- again, this is the part that I kept trying to

17   emphasize.  The evidence integration feeds into the weight of

18   the scientific evidence, and the weight of the scientific

19   evidence considers a multitude of considerations, essentially

20   like cancer and non-cancer, Hill criteria, that specifically

21   are outlined in the cancer guidelines but also used in

22   non-cancer in our weight of evidence analysis, so the strengths

23   of the data, the plausibility of the findings, the biological

24   gradient of the findings, the coherence of the findings -- did

25   I say consistency -- temporality of the findings, the exposure

1  with the hazard, experimental evidence, including animal

2  evidence or mechanistic data, and then read across analogies,

3  like, similarities to other chemicals or similarities to other

4  biological processes, pharmaceutics and otherwise.

5  **Q.**   Okay.  And what you've just described there, that whole

6  analysis, that's not part of the risk characterization

7  analysis.  That's part of the weight-of-the-evidence component

8  of the Hazard Assessment?

9  **A.**   It's brought forward into the risk characterization, but

10 it is part of that hazard characterization because we need to

11 do that in order to identify the weight we give to the dose

12 response and what is in the dose response as well as describing

13 the strengths and weaknesses coming up with the strengths and

14 weaknesses for the hazard findings.

15 **Q.**   Okay.  So let's move on because we're in risk

16 characterization step now.  I want to keep the focus on the

17 risk part.  Let's look at this other true/false question.  And

18 I asked you, quote, "EPA Did Not Require that There Be Human

19 Studies Associating the Hazard with the Condition of Use Before

20 Making an Unreasonable Risk Determination."  And to that

21 question you answered true?

22 **A.**   And that is also generally true.  In the first ten risk

23 evaluations and many of our risk assessments, we're looking at

24 animal data.

25     We review the human evidence, but we may not have

```
 1   associations or clear associations between the human evidence,

 2   the exposure -- as Dr. Berridge talked about before.  There's a

 3   confounding of exposures, but there's also a lot of biological

 4   variability in the population; whereas, animal studies

 5   oftentimes we're talking about inbred strains or specific

 6   strains of animals that are more susceptible or designed to

 7   pick up an effect for specific types of tests.

 8   Q.   Now, just to be clear --

 9            THE COURT:  Can I ask what is meant by "Human studies

10   associating the hazard with the condition of use"?  I guess I'm

11   not sure.  You all know what that means, but maybe that could

12   be explained to me.

13            THE WITNESS:  So it's a little bit of misdirection.

14   The hazard data, the evaluation of the hazard data, Judge, is

15   really condition-of-use-free.  We're talking about the

16   association of the chemical's concentration response to the

17   hazard, whatever that hazard has -- might be.  And we're

18   looking at multiple hazards.  We don't look at just one

19   critical effect, we look at all critical effects and what the

20   range is -- range of critical effects might be.

21            So I think the counsel was trying to get at the

22   issue -- and we discussed this back and forth a good bit during

23   my deposition -- the relationship.  Do we have to have human

24   data to make that hazard finding, that hazard characterization?

25   In many cases we don't have human data, or we don't have very
```

 1   clear findings in the human data, but we have clear findings in

 2   the animal data.  So we assume from the animal data, and

 3   possibly mechanistic studies, whether that association is

 4   strong enough to go forward and do dose response and to do risk

 5   estimation.

 6          THE COURT:  Thank you.

 7   BY MR. CONNETT:

 8   Q.   So you've used this term "margin of exposure," and that is

 9   sometimes referred to as "MOE," correct?

10   A.   It is.

11   Q.   Okay.  The margin of exposure is the margin between the

12   hazard level and the exposure level, correct?

13   A.   It is the product of dividing the exposure level in

14   milligrams per kilogram per day, generally, into the hazard

15   level in milligrams per kilogram per day, so units need to

16   match.

17   Q.   So in order to judge whether the margin between the hazard

18   level and the exposure level, in order to determine whether

19   that margin is adequate, whether there is going to be a risk or

20   not, we compare that margin to something called a "benchmark

21   MOE," correct?

22   A.   Correct.  And the benchmark MOE is the appropriate

23   comparison because that comparator takes into account what you

24   identified for that particular critical effect, for that

25   particular POD, what the uncertainty factors are that you need

 1   to consider.

 2        So for different risk numbers or different points of

 3   departure of risk, you have different benchmarks, different

 4   benchmark MOEs.  And that's an unbiased way to look across

 5   critical effects and compare MOEs and the relationship between

 6   the hazard and the exposure.

 7   **Q.**   So you beat me to it because the benchmark MOE is

 8   sometimes what we call the "total uncertainty factor," right?

 9   **A.**   It's not the total uncertainty factor for all risk.  It's

10   the total uncertainty factor for that specific risk, that

11   specific critical effect.

12   **Q.**   And one uncertainty factor that EPA uses that informs the

13   benchmark MOE is something called the "intraspecies variability

14   uncertainty factor," correct?

15   **A.**   It's actually more specifically intraspecies variability

16   and uncertainty factor.  So variability and uncertainty are

17   almost uncollapsible in most cases.

18   **Q.**   Now, I'm using the term that EPA uses in its documents.

19   Is that appropriate?  Should I be -- is that fair for me to say

20   "intraspecies variability"?

21   **A.**   Intraspecies variability specifically is about the

22   variability, but it's an uncertainty factor, so it takes into

23   account both variability, biological variability and

24   uncertainty.

25   **Q.**   Right.  I get that.

BARONE - DIRECT / CONNETT

What's the word that EPA uses when we look at the risk

evaluations for that uncertainty factor?

**A.**   Generally you'll see intraspecies, or you'll see human

uncertainty factor.

**Q.**   Okay.  So --

**A.**   A lot of shorthand oftentimes.

**Q.**   The EPA uses an uncertainty factor for intraspecies

variability, uncertainty, in order to protect humans who have

heightened sensitivity to the chemical, correct?

**A.**   Heightened sensitivity and vulnerability.

**Q.**   And EPA uses an uncertainty factor for intraspecies

variability to account for variations and uncertainty in both

toxicokinetics and toxicodynamics, correct?

**A.**   That is correct.

**Q.**   Toxicokinetics refers to the amount of a chemical that

reaches the target organ or cell where it has its biological

impact, correct?

**A.**   That's a simple way of explaining it, yes.

**Q.**   Toxicokinetics can vary across the population.  Some

people may have more of the chemical getting to the target cell

or organ than others, correct?

**A.**   That is generally true.

**Q.**   Okay.  Toxicodynamics refers to the dose at which the cell

or organ suffers an adverse response, as well as any

compensatory mechanisms that might be in effect, correct?

BARONE - DIRECT / CONNETT

1   **A.**   Generally speaking.

2   **Q.**   Okay.

3   **A.**   It's more complicated, but that's a simplified version.

4   **Q.**   Toxicodynamics, as with toxicokinetics, may vary across

5   the population as in the biological sensitivity to a chemical

6   may differ across the population, correct?

7   **A.**   That is correct too.

8   **Q.**   So the default uncertainty factor that EPA uses to account

9   for intraspecies variability and uncertainty is 10, correct?

10  **A.**   That is the default.

11  **Q.**   And in EPA's 10 risk evaluations under TSCA, EPA has only

12  departed from using the default uncertainty factor of 10 for

13  intraspecies variability when it had an acceptable

14  physiologically-based pharmacokinetic model for the chemical,

15  correct?

16  **A.**   In the first ten that is a true statement.  There were

17  other occasions where we'll default with other data-derived

18  uncertainty factors or data-derived factors, but generally

19  speaking for the first ten it's when we had a PBPK model that

20  we would actually reduce the pharmacokinetic component

21  generally to -- which is 3, oftentimes to one because the PBPK

22  model would account for the pharmacokinetics either in the

23  animal data or in the human population.

24  **Q.**   Well, and just so we're clear, pharmacokinetic,

25  toxicokinetic, they're the same thing, right?

BARONE - DIRECT / CONNETT

1  A.   Pharmacokinetics actually takes in a little bit more --
2  you know, if you're trying to -- toxicokinetics generally
3  implies that there's a toxicity.  Pharmacokinetics is a little
4  bit more -- less pejorative because it's used in pharmaceutics
5  as well as in toxicology.
6  Q.   Understood.  So at your deposition this summer, the last
7  summer, you agreed that in the EPA's first ten risk
8  evaluations, in the few instances where EPA had a PBPK model,
9  that EPA still used an uncertainty factor to account for
10  intraspecies variability, correct?
11  A.   We still used for the five cases where we had a PBPK
12  model, we still used a factor of three for pharmacodynamics for
13  the intraspecies variability and uncertainty.
14  Q.   So let's move to another type of uncertainty factor that
15  EPA uses, and that is an uncertainty factor in the situations
16  where your hazard level is based on a lowest observed adverse
17  effect level or LOAEL, correct?
18  A.   That is true.  We oftentimes will include a uncertainty
19  factor when we're looking at a LOAEL and cannot identify a no
20  observed adverse effect level.
21  Q.   And can you just explain briefly why EPA does that, why it
22  adds an uncertainty factor when you can't identify the NOAEL
23  but you have a LOAEL?
24  A.   So, generally speaking, we're trying to observe or we're
25  trying to get to the no observed adverse effect level with our

1  benchmark dose modeling.  That's an approximation, quantal

2  approximation of what the no observed adverse effect level.

3      In some animal studies where we can't model or in human

4  studies where we can't model, we will actually have an

5  observation of a concentration or a dose that's associated with

6  a lowest observed adverse-effect level, and we'll use that

7  level and use an uncertainty factor -- an additional

8  uncertainty factor of 10 to account for that extrapolation to a

9  NOAEL.

10  Q.  Now, the benchmark MOE is the product of all uncertainty

11  factors that are found to be applicable to a given -- to a

12  given hazard, correct?

13  A.  To a given hazard, that's correct.

14  Q.  Now, for those of us who haven't taken math for some time,

15  okay, the term "product" refers to multiplication as opposed to

16  addition, right?

17  A.  Well, actually, the term "product" can come from addition,

18  it can come from subtraction, and it can come from division.

19  That's arithmetic.

20  Q.  Right.  So you got me on that one.  So now - but will you

21  agree that when we're talking about uncertainty factors that

22  form the benchmark -- right? -- we multiply the uncertainty

23  factors together, correct?

24  A.  Yes, we do.  We don't add them.  We multiply -- if the

25  uncertainty factor is the default 10 for human variability,

1  then we use that and multiply it by any other uncertainty

2  factors.  One, if there's -- it would be one for interspecies

3  or, excuse me, intraspecies if it's based upon human data.  We

4  wouldn't include an uncertainty factor if it was based upon

5  only human data.

6  Q.   Right.  Just to be clear, when you see a uncertainty

7  factor of 1, that's the equivalent of no uncertainty factor

8  being applied, correct?

9  A.   That's going through the process, you've considered all

10 the uncertainty factors and generally what you'll see is 1 is

11 defined when we're not applying an uncertainty factor.

12 Q.   Okay.  So let's just take a hypothetical example.  Say you

13 have an uncertainty factor of 10 for intraspecies variability

14 and an uncertainty factor of 10 to adjust for having a LOAEL as

15 your hazard level.  In that situation it would be 10 times 10

16 equals a hundred for the benchmark MOE, correct?

17 A.   In the cases where you're using the full 10 from LOAEL to

18 NOAEL, it would be.  That's correct.  In some cases it's not a

19 full ten.

20 Q.   In some cases we might use an uncertainty factor of 3 to

21 account for having a hazard level based on a LOAEL, correct?

22 A.   In some cases.

23      In some cases you would also have a 1 for the LOAEL to

24 NOAEL if you had enough information to say that particular

25 biological effect is plateaued.  So even though a LOAEL is

 1    observed and no NOAEL is observed in a study, you may have

 2    biological information and context to not use the uncertainty

 3    factor.

 4    Q.   Okay.  So just one more math question just to make it just

 5    extra clear.

 6         Let's take the situation, hypothetical, where you have an

 7    uncertainty factor of 10 for intraspecies variability and a

 8    factor of 3 for adjusting for having a LOAEL as your hazard

 9    level.  In that context it's 10 times 3 equals a benchmark MOE

10    of 30, correct?

11    A.   That would be correct.

12    Q.   Now, as part of the margin-of-exposure framework and

13    analysis that EPA does under TSCA, EPA will separately consider

14    the high-end exposure group under the condition of use,

15    correct?

16    A.   So generally speaking, we do look at high-end exposures

17    and central tendency as a way to bound the risk estimates and

18    to provide some degree of sensitivity analysis when we're

19    looking at risks for specific conditions of use.

20    Q.   Now, I've just put on the screen a document that I -- we

21    discussed at your deposition, and you see there's your

22    handwriting there?

23    A.   I see that.

24    Q.   Okay.  I'm going to go ahead and read the statement and

25    just to make sure that we're on the same page.  It says quote,

1    "A risk is indicated if the Margin of Exposure for Highly

2    Exposed Persons (for example, those at the 95th percentile) is

3    less than the Benchmark MOE, even if average/typical (e.g.,

4    central tendency) exposures are acceptable."

5         And that's a correct statement, right?

6    **A.**   It is a correct statement.  And there are variations, but

7    generally it's a correct statement.

8    **Q.**   So in this situation, say we had a benchmark MOE of 100 --

9    okay? -- and the margin of exposure between the hazard level

10   and the exposure level for the 95th percentile group was less

11   than 100.  That would be a risk, correct?

12   **A.**   If the benchmark -- if the risk of the MOE was less than

13   the benchmark, which was 100, yes.

14   **Q.**   Now, I'm going to show you here undisputed fact No. 42 in

15   the case, which states, "EPA has made Unreasonable Risk

16   determinations for conditions of use where average exposures

17   did not present a risk, but highly exposed individuals (for

18   example, the 95th percentile) had exposures of concern."

19        And that's a correct statement too, right?

20   **A.**   Generally speaking, it's a correct statement.

21   **Q.**   So now let's go --

22            **THE COURT:**  Actually, if you're going to change

23   subjects, we probably are at our break point, so we'll go ahead

24   and take our break this morning.  Thank you.

25            **THE CLERK:**  Court is in recess.

 1            (Recess taken at 10: 13 a.m.)

 2            (Proceedings resumed at 10:32 a.m.)

 3                THE CLERK:  You may remain seated.  Court is back in

 4       session.

 5                THE COURT:  All right.  Welcome back, everyone.  You

 6       may resume.

 7       BY MR. CONNETT:

 8       Q.   Dr. Barone, I want to go back to that hypothetical I was

 9       asking you about margin of exposure to the benchmark MOE.

10       Okay?  I'm going to give you a slightly different hypothetical,

11       okay?

12       A.   Okay.

13       Q.   Say you have a benchmark MOE of 100, okay?  Are you with

14       me so far?

15       A.   I am.

16       Q.   Say you have -- for the average exposure, okay, you have a

17       benchmark -- sorry.  For the average exposure, you have -- the

18       average exposure margin is 150.  Are you with me so far?

19       A.   With the product for the MOE, yes.

20       Q.   And by that I mean human exposure level for the average

21       exposed person is 150 times less than the hazard level.  Are

22       you with me?

23       A.   That would be the product, yes.

24       Q.   Now let's add to that hypothetical that the 95th

25       percentile exposed group has a margin of exposure of 50.  Are

1  you with me?

2  **A.**   I am.

3  **Q.**   Okay.  Under that scenario, this condition of use presents

4  a risk, correct?

5  **A.**   If the product -- again, if the product MOE is compared to

6  the benchmark and 50 is less than 100, yes.  That would present

7  a risk.  And if the other risk estimate was above 100, then it

8  would not be considered a risk.

9       That's generally speaking.  Again, we have to have a

10  description that goes with those risk estimates and what's the

11  certainty around those risk estimates.

12  **Q.**   Right.  But it clearly -- for the average exposed person

13  with the margin of exposure of 150, they're not at risk,

14  correct?

15  **A.**   Generally not at risk.  But, again, there are exceptions

16  that come into consideration when we're talking about the

17  narrative from that weight of the scientific evidence.

18  **Q.**   Okay.  But under that same condition of use, if the 95th

19  percentile exposure was 50 times less than the benchmark MOE,

20  then EPA would find that condition of use to present a risk.

21  Now, whether it's unreasonable is another question, but it

22  would find it to be a risk, correct?

23  **A.**   That is correct.  There's -- we show risks with multiple

24  considerations and multiple subpopulations considered within

25  our risk evaluations.

1   Q.   So let's turn to the risk determination phase of the

2   analysis.   And first, under the risk determination prong, EPA

3   may consider various risk-related factors, right?

4   A.   There are numerous risk-related factors that are

5   considered in the risk determination.

6   Q.   EPA does not need to consider each and every one of them

7   for every risk determination; is that fair?

8   A.   We don't, but we generally go through and consider every

9   permutation to try to support the risk determination.

10  Q.   Okay.   So let's start with one of the risk-related

11  factors, which is the adversity of the effect -- right? --

12  that's one of the risk-related factors?

13  A.   That's one characterization, magnitude of effect.

14  Q.   And EPA generally considers cognitive deficits resulting

15  from a chemical exposure to be an adverse health effect, right?

16  A.   Generally speaking, yes.

17  Q.   EPA has selected IQ deficits as the critical health effect

18  in a number of risk assessments, right?

19  A.   In a number of hazard assessments that went into risk

20  assessments, yes, IQ was the critical effect.

21  Q.   For example, EPA selected IQ deficits as the critical

22  effect to support regulatory decisions for both lead and methyl

23  mercury?

24  A.   Both of those are hazard assessments that fed into risk

25  assessments in other offices, not in TSCA, per se, but yes.

1  Q.   Yes as in IQ deficits were the critical effect for both of

2  those regulatory decisions?

3  A.   They were the regulatory effect for both of those

4  programs, both the Office of Air and the NAAQS Determination

5  for Lead and for Office of Water's Determination for Drinking

6  Water --

7  Q.   And under the lead --

8  A.   -- for mercury.

9  Q.   -- standard, the NAAQS standard, N-A-A-Q-S, EPA set out to

10 prevent IQ loss of 1 to 2 points in the most susceptible part

11 of the population, correct?

12 A.   That was basically the BMR that was set for the

13 population. Benchmark Response Rate.

14 Q.   Okay.  And specifically, EPA does -- tried to set the

15 level at an exposure level where the most susceptible

16 population will not suffer more than a 1 to 2 point loss in IQ,

17 correct?

18 A.   That's -- that was the attempt.  That was what was done.

19 Q.   So another factor that EPA will consider as part of the

20 risk determination is the number of people who are exposed to

21 the chemical under the condition of use or potentially exposed,

22 right?

23 A.   The number of potentially exposed individuals is part of

24 the consideration.

25 Q.   And one of the reasons why that is relevant is, it helps

1    to understand the extent of potential risk, right?

2    **A.**   It helps to understand, yes, the population at risk, the

3    size of the option at risk.

4    **Q.**   And in general, the larger and more diverse the population

5    is that is exposed to the chemical under the condition of use,

6    there is greater potential for variability in response to that

7    chemical, right?

8    **A.**   Generally speaking, a larger population means there

9    generally is going to be more population variability.  The

10   human population is diverse in its responses.

11   **Q.**   Now, under EPA's risk evaluations under TSCA, EPA has made

12   unreasonable risk determinations for conditions of use that

13   involve less than 500 people, correct?

14   **A.**   For an individual condition of use, many are less than 500

15   people.

16   **Q.**   Some of them are in the ballpark of 50 or 60 or 70?

17   **A.**   Could be.

18   **Q.**   Now, another factor that EPA considers as part of the

19   unreasonable risk component, the risk determination component,

20   is whether the condition of use exposes susceptible members of

21   the population, right?

22   **A.**   Yes.

23   **Q.**   TSCA, as amended in 2016, specifically commands that EPA

24   protect susceptible populations when doing risk evaluations,

25   correct?

 1   **A.**   Actually, the language is "consider potentially exposed

 2   and susceptible populations."

 3        The calculations of risk are intended to protect

 4   susceptible populations.  Oftentimes our risk estimates are

 5   based upon susceptible populations.

 6   **Q.**   Okay.  So the statute commands that EPA consider

 7   susceptible populations, and EPA does, in fact, do so, right?

 8   **A.**   We do that based upon the risk estimation and what the

 9   critical effects are.  We also do that in the consideration of

10   the uncertainty factors.

11   **Q.**   Now, if susceptible members of the population are being

12   exposed to the chemical under the condition of use, that would

13   certainly be something that would -- EPA would take seriously

14   in the risk determination phase, right?

15   **A.**   Always.  It's part of the considerations.

16   **Q.**   And if you have good reliable exposure data to show that

17   susceptible members of the population are being exposed to the

18   chemical under the condition of use, that would weigh in favor

19   of an unreasonable risk determination, but it wouldn't decide

20   it entirely, correct?

21   **A.**   It would have an impact on the determination, yes.

22   **Q.**   So let's turn to another factor that EPA considers under

23   the risk determination, which is uncertainties, right?

24        And Dr. Barone, just as an aside, I apologize.  I just

25   moved that screen, and it had nothing to do with the question

 1  I'm about to ask you -- okay? -- so I don't mean to confuse

 2  you.

 3  **A.**   You distracted me.

 4  **Q.**   Yeah.  Okay.  There we go.  Okay.

 5       So another risk-related factor that EPA considers under

 6  the risk determination prong is uncertainties, right?

 7  **A.**   It is.  But how much uncertainty we have in the risk

 8  estimation, whether it's the hazard or in the exposure, both

 9  aspects have to be characterized.

10  **Q.**   And you would agree that in risk assessment, there is

11  always uncertainties, right?

12  **A.**   There are uncertainties, but risk assessment is a

13  process -- scientific process by which we try to define those

14  uncertainties, either quantitatively or qualitatively, in order

15  to make a decision.

16  **Q.**   You would agree that all risk estimates include

17  uncertainty?

18  **A.**   All risk estimates have some degree of uncertainty.

19  **Q.**   In its risk evaluations under the amended TSCA, EPA did

20  not require an absence of uncertainties in the hazard and

21  exposure data before making an unreasonable risk determination?

22  **A.**   No, we did not.

23  **Q.**   You have testified that risk assessment is, quote, laden

24  with uncertainties, correct?

25  **A.**   Both quantified and unquantified.

BARONE - DIRECT / CONNETT

1  Q.   And one final question on uncertainty.  It's probably

2  obvious, but you would agree that certainty is not required

3  under TSCA for a risk determination?

4  A.   100 percent certainty is not required under the risk

5  determination process under TSCA.

6       We have to be able to describe the strength of the

7  evidence, and generally our strength of the evidence, when

8  we're talking about certainty, is likely or causal, as far as

9  the association between the exposure and the critical effect,

10 the outcome of the risk that we are quantifying for that

11 particular condition of use.

12 Q.   Now, I just want to break what you just said down a little

13 bit.  Okay?

14      When you're talking about causal, likely causal, you are

15 talking about the hazard assessment inquiry, correct?

16 A.   Actually, not just.  It includes the considerations in the

17 exposure.  Again, we have to be also understanding the

18 particular condition of use and what the exposure is.

19 Q.   Well, I asked you about this at your deposition.  I asked

20 you what does EPA mean in the risk determination prong when it

21 says it considers the effects of the chemical under the

22 conditions of use.  Do you recall those questions?

23 A.   I do.  And I talked to you about the considerations, the

24 exposure considerations that we have to consider as well.

25 Q.   You told me, correct me if I'm wrong, that when we're

1    talking about the effects of the chemical under the conditions

2    of use, we are not meaning that we have to show that the

3    condition of use is causal or associated with the hazard,

4    correct?

5    **A.**    No, that's not -- that's not quite what I said or

6    intended.  Again, we're trying to make the case that the

7    strength of the evidence between the hazard and exposure is

8    likely or causal, and the strength of the evidence is strong

9    enough for us to make that determination.  Hazard is a

10   significant part of it, but the exposure is also an important

11   part of it.  And I talked about the magnitude of the exposure,

12   the duration of the exposure, the pattern of exposure.  All of

13   those are important considerations in the risk determination

14   and the certainty and the strength of the evidence that we have

15   in the risk determination.

16        **MR. CONNETT:**  At this point I'd like to show

17   deposition testimony, Your Honor.

18        **THE COURT:**  Okay.

19        **MR. CONNETT:**  It is from Dr. Barone's expert

20   deposition, page 297, lines 3 to 9.

21        **MR. ADKINS:**  So can you say the date?

22        **MR. CONNETT:**  It's October 30th, 2023.

23        **MR. ADKINS:**  Okay.  So this -- that deposition was

24   given in the capacity as an expert.  Dr. Barone is currently

25   testifying on behalf of EPA and was deposed in that capacity,

 1   so I don't see how this has anything to do with this his

 2   testimony right now.

 3          MR. CONNETT:  The question here, Your Honor, that I

 4   asked him was not about fluoride, it was about risk evaluation

 5   procedures under TSCA.  Clearly Dr. Barone is an expert in that

 6   domain.  And the fact that it was testimony within an expert

 7   deposition doesn't detract from the probative value.

 8          THE COURT:  Well, this is for impeachment purposes?

 9          MR. CONNETT:  Yes.

10          THE COURT:  I'll allow it.  Objection overruled.

11   BY MR. CONNETT:

12       "QUESTION:  Quote, when you say that EPA --

13          MR. CONNETT:  Can we get the --

14          MR. SANDERS:  What lines?

15          MR. CONNETT:  The full answer if you have it.

16   BY MR. CONNETT:

17       "QUESTION:  When you say that EPA looks at the effects of

18       the chemical substance under the conditions of use, you're

19       not saying that EPA is requiring that there be human or

20       animal studies that have found effects of the chemical

21       under the condition of use, correct?

22       "ANSWER:  No.  That's correct.  We don't necessarily

23       require a point of departure by condition of use.  You

24       require exposure and exposure estimation by condition of

25       use."

**BARONE - DIRECT / CONNETT**

1  **A.**   So again, this question was asked and --

2  **Q.**   Dr. Barone, there's no question pending, I'll have to ask

3  it.

4  **A.**   Okay.

5  **Q.**   Now, one of the chemicals that EPA evaluated under the

6  amended TSCA is HBCD, correct?

7  **A.**   It is correct.   Hexabromocyclododecane.

8  **Q.**   The chronic health issue or the chronic health outcome at

9  issue in that risk evaluation was HBCD's impact on thyroid

10  hormones, correct?

11  **A.**   One of the most sensitive, critical effects was thyroid

12  hormone disruption in the mom during development, which

13  impacted growth and development of the offspring.

14  **Q.**   And one of the few conditions of use in that risk

15  evaluation that EPA found to present an unreasonable risk was

16  the use of HBCD containing flux and solder paste, right?

17  **A.**   It's one of the conditions of use where there was

18  unreasonable risk.   There were several, many others.

19  **Q.**   Now, for that unreasonable risk determination, EPA did not

20  require evidence or prove that HBCD actually caused or was

21  associated with thyroid effects in any of the 6,800 workers

22  using that product, right?

23  **A.**   So, again, when we're developing a point of departure, we

24  develop that point of departure for hazard, and we develop the

25  exposure estimates for the condition of use.   So we develop the

 1  risks that are condition-of-use specific, but the hazard is not

 2  necessarily specific to that condition of use.  It's generally

 3  applied.

 4  **Q.**   Okay.  But I'm not sure you answered my question, so I'm

 5  just going to ask it again, which is, EPA did not require

 6  evidence or proof that -- well, let me just ask it -- let me

 7  just ask it as a yes or no.

 8       Did EPA require evidence or proof that HBCD causes or is

 9  associated with thyroid effects in any of the 6,800 workers

10  involved with the solder flux condition of use?

11  **A.**   No.  That's not the way the margin of exposure works.

12  **Q.**   Okay.

13  **A.**   There's not a causal -- there does not have to be proof of

14  causation for the condition of use.

15  **Q.**   Now, EPA did not have any epidemiological study that

16  looked at workers who were using the flux or solder paste,

17  which investigated the relationship between HBCD and thyroid

18  hormones, correct?

19  **A.**   I don't believe we had epidemiological studies specific to

20  flux and solder paste.  We had other epidemiological evidence

21  that was not that strong.

22  **Q.**   The epidemiological evidence on HBCD and thyroid effects

23  was, in your words, inconclusive correct?

24  **A.**   It was inconclusive.  It was up, down.  It was not

25  consistent.

1  Q.   In fact, none of the epidemiological studies on HBCD and

2  thyroid hormones found any significant association between HBCD

3  and thyroid hormone alteration?

4  A.   I'd have to refresh my memory, but I do not remember any

5  good study showing a clear association between HBCD exposure

6  and thyroid hormone disruption.

7  Q.   Well, the only epidemiological study that EPA cited for

8  some type of association between HBD and thyroid hormone

9  alteration, the effect was not statistically significant,

10  correct?

11  A.   I think that's correct.

12  Q.   So let's talk about another risk evaluation, and that is

13  for 1,4-dioxane, okay?

14  A.   All right.

15  Q.   Now, the critical health effect that EPA selected for its

16  assessment of 1,4-dioxane's acute exposures was liver toxicity,

17  correct?

18  A.   I believe it was.

19  Q.   In that evaluation, EPA did not have any direct data

20  showing that 1,4-dioxane causes liver toxicity or is associated

21  with liver toxicity at the exposure level that workers had

22  under the conditions of use.

23  A.   I don't believe the epidemiological evidence was strong

24  for liver toxicity.

25  Q.   In humans?

 1   **A.**    Yeah.

 2   **Q.**    In fact, EPA did not have epidemiological studies linking

 3   1,4-dioxane to liver effects at any exposure level?

 4   **A.**    I don't believe so.

 5   **Q.**    So let's turn now to another chemical that EPA has

 6   evaluated, which is PCE or perchloroethylene, okay?

 7   **A.**    Yes.

 8   **Q.**    PCE -- sorry.  Strike that.

 9         EPA selected neurotoxicity in the form of cognitive

10   deficits as the critical health effect for chronic exposures to

11   PCE, right?

12   **A.**    Cognitive deficits as defined by other types of tests, not

13   IQ.

14   **Q.**    Now, PCE is the only chemical in EPA's first ten risk

15   evaluations for which EPA selected neurotoxicity as the

16   critical effect for chronic exposure, correct?

17   **A.**    I think it's the critical effect that was driving the risk

18   for that particular chemical.  There were neurotoxicity --

19   other types of neurotoxicity in the chronic assessment for

20   other chemicals, but this was the one, I believe, that had the

21   lowest -- or the highest risk, the lowest point of departure.

22   **Q.**    Fair point.  So if we look at some of the other risk

23   evaluations, we will see EPA evaluating neurotoxicity of those

24   compounds, but in none of the other risk evaluations for

25   chronic effects did EPA select neurotoxicity as the critical

1  outcome for chronic toxicity?

2  **A.**   The critical effect for the chronic non-cancer toxicity.

3  **Q.**   Now, PCE is also the only chemical in EPA's first ten risk

4  evaluations for which EPA derived the hazard level for the

5  chronic effect from human data, correct?

6  **A.**   There were other studies where we did develop chronic

7  toxicity values, but for this one it was the lowest point of

8  departure and the highest risk that was present that was used

9  in the determination.

10       (Reporter seeks clarification.)

11       **THE WITNESS:**  It was the lowest risk -- excuse me.  It

12  was the lowest point of departure and thus the highest risk

13  that was used in the determination, risk determination.

14  **BY MR. CONNETT:**

15  **Q.**  So just to be clear -- I thank you for that explanation

16  and the context -- for all of the other evaluations of chronic

17  health effects under TSCA so far, there were no other

18  evaluations where the critical effect was based on human data?

19  **A.**   No.  The critical effect was not based on human data to my

20  recollection.  The critical -- the risk determination, of

21  course, was supported, and the risks for neurotoxicity were

22  calculated in a number of the risk evaluations.

23  **Q.**   Right.  But I just want to just establish what I think is

24  a basic factual point that for none of the other risk

25  evaluations, other than PCE, was neurotoxicity -- was there a

 1  critical health effect for chronic exposure based on human

 2  data?

 3  **A.**   Right.  For chronic.  There were several others where

 4  acute neurotoxicity was the driver.

 5  **Q.**   On the acute side?

 6  **A.**   On the acute side.

 7  **Q.**   Okay.

 8          **THE COURT:**  You're going to have to go over that

 9  again.  You all have lost me.

10          **THE WITNESS:**  It's easy, Judge.

11          **THE COURT:**  You're talking shop here.

12          **THE WITNESS:**  Yeah.

13          **THE COURT:**  And now I don't know what you're talking

14  about.

15  **BY MR. CONNETT:**

16  **Q.**   Well, so, Dr. Barone, maybe you can just explain for the

17  Court how there's two --

18          **MR. CONNETT:**  Your Honor, if I could, I think I can

19  lay a foundation for this.

20          **THE COURT:**  Okay.

21  **BY MR. CONNETT:**

22  **Q.**   Dr. Barone, I'm not going to -- we have the cancer side of

23  the evaluations.  We're not interested in that -- right? -- for

24  our purposes today, right?

25  **A.**   That's what we agreed to.

1   Q.   Okay.  We're looking at the non-cancer effects and among

2   the non-cancer effects you have -- the EPA will identify the

3   critical effects for acute chemical exposures, and EPA will

4   identify the critical effect for chronic exposures, correct?

5   A.   We will and, Your Honor, we look at all the -- all the

6   effects, all the critical effects and the biological gradient

7   of those critical effects.  So we want to know within a range

8   what kind of outcomes would we expect based upon exposure.

9       And as counsel has pointed out, it's focused on what is

10  the lowest number or the highest risk.  We will actually say

11  what is the risk driver?  Which critical effect is driving the

12  risk?

13      But in our determination, we look at those other risks as

14  well as a constellation to help describe what are we protecting

15  against for public health, or what are we protecting for.

16  Q.   Now, acute exposures to a chemical are the kinds of

17  exposures -- they're like a bolus dose.  It's like a high-peak

18  exposure that has a kind of distinct toxicity profile than

19  chronic long-term exposures to lower levels, correct?

20  A.   Not necessarily.  Again, acute exposures can be one day of

21  exposure, it could be during in-utero development. It could be

22  one day of exposure in a working environment.  It could be

23  inhalation, it could be oral, it could be dermal.

24  Q.   Okay.  But generally, an acute exposure is more of an

25  intense, shorter-term exposure; whereas, a chronic exposure is

**BARONE - DIRECT / CONNETT**

1    a more longer-term, lower-level exposure; fair?

2    **A.**   Generally speaking, chronic exposures are greater than 90

3    days or going beyond a three-month kind of period, usually it's

4    10 percent of the lifetime is the definition for chronic.

5    **Q.**   Okay.  Now, I want to go back to PCE.

6         The hazard level that EPA derived for chronic PCE

7    neurotoxicity was a LOAEL, correct?

8    **A.**   I believe it was a LOAEL.  It was an average between two

9    key studies, key epidemiological studies of workers.

10   **Q.**   Okay.  So EPA took two epidemiological studies on PCE

11   neurotoxicity and then calculated, based on the average

12   exposures in those two studies, a LOAEL for PCE neurotoxicity?

13   **A.**   You sort of had me, but you said "exposure."

14        They calculated on -- based upon the point of departure

15   the exposure response -- not exposure, but the exposure

16   response -- what the mean value was between the effects in

17   those two different kinds of epidemiological studies of

18   workers.

19   **Q.**   Okay.  So from those two studies, EPA calculates the

20   lowest observed adverse-effect level for PCE neurotoxicity in

21   humans, right?

22   **A.**   Yes.

23   **Q.**   Now, the two studies --

24        **THE COURT:**  How is that -- just give me a little

25   primer here.  How is that done in terms of the lowest observed

1   effect?  How do you know when you're at the lowest observed

2   effect?  I mean, you observe an effect.  How do you determine

3   whether that's the lowest?

4           THE WITNESS:  So for the findings of the study and the

5   study population, they were not able to define a NOAEL or a no

6   observed adverse-effect level.  And looking across the two

7   studies, there were different measures, different types of

8   cognitive measures.  So it wasn't easy to actually convert the

9   scales to the same scale.  So taking the overall effect level,

10  what was the lowest observed effect level, and using that

11  between the two studies.  They were actually fairly close,

12  fairly close in the concentration response range.

13          THE COURT:  I guess I'm asking an even more elementary

14  question.

15          How do you know where the lowest observed effect is?

16  I understand when there's no observed effect, in your urine

17  level you're not seeing anything, but how do you know you're

18  not at the mid-level or the low middle -- how do you know

19  you're at the lowest observed effect?

20          THE WITNESS:  So, again, for the concentration

21  response, the function for each of the tests that they did, the

22  lowest-observed effect level was defined in their concentration

23  response function for the test -- a multitude of tests that

24  they did.

25          THE COURT:  So is there data that indicates below the

1   lowest-observed effect where there was no effect, or that was

2   not observed.

3          THE WITNESS:  There was no -- they could not define in

4   their particular population a NOAEL.

5          THE COURT:  So there could theoretically be even a

6   lower level of observed effects, it's just that that's as low

7   as the study went?

8          THE WITNESS:  So I think what counsel is getting at is

9   in those -- in that case, in order to get to what we believe

10  would be a no observed adverse-effect level we add --

11         THE COURT:  Uncertainty factor?

12         THE WITNESS:  -- an additional uncertainty factor of

13  10 to account for not being able to calculate a NOAEL.

14         THE COURT:  Okay.  And there's no -- when you're

15  trying to calculate the LOAEL, you're not using a dose-response

16  curve and, sort of, seeing it at the end of that curve or, I

17  mean, it's just based on observation?

18         THE WITNESS:  It's based upon the observations and

19  statistical significance, oftentimes, of what that

20  concentration response does.

21         THE COURT:  Uh-huh.

22         THE WITNESS:  So it's not just animal studies where we

23  use a LOAEL/NOAEL approach.  It's also sometimes

24  epidemiological studies.

25         THE COURT:  Okay.  Go ahead.

1    BY MR. CONNETT:

2    Q.   And just to clarify something on that further, when we're

3    talking about the lowest observed effect level, or we're

4    talking about the no observed effect level, that is specific to

5    the specific study upon -- or studies upon which that hazard

6    level is being derived, correct?

7    A.   It's based upon the specific studies.  It's also based

8    upon the specific outcome that's being measured.

9         So in one case, you may have from that specific study

10   something that you -- a critical effect that you can do

11   benchmark dose analysis on; but for another effect, you can't

12   do benchmark dose analysis on, and you have to use a NOAEL or

13   LOAEL approach.

14   Q.   But it is -- but this derivation of the hazard level is

15   coming from a specific study or studies, right?  It's not like

16   an attempt to define in the entire universe what the lowest

17   observed adverse-effect level ever reported is, right?

18   A.   No, it is not.  And that's actually part of the -- part of

19   the evidence integration when we look across studies and look

20   at the calculations across studies.  What is the human

21   equivalent concentration for an effect, a NOAEL, LOAEL, BMD,

22   whatever, across studies.  So that's part of the evidence

23   integration where we're looking at the preponderance of the

24   evidence, what do we have in our weight of the scientific

25   evidence evaluation for hazard.

1    **Q.**   Okay.

2         So for the PCE risk evaluation, EPA used a benchmark MOE

3    of 100, right?

4    **A.**   I believe it was a benchmark MOE of 100 for the Cavalleri

5    Gobba studies.

6    **Q.**   Right.  So you use a uncertainty factor of 10 for

7    intraspecies variability, correct?

8    **A.**   I believe it was.

9    **Q.**   And then you use another uncertainty factor of 10 to

10   account for the fact that you're using a LOAEL as to hazard

11   level?

12   **A.**   I think that's correct.

13   **Q.**   Okay.  10 times 10 equals 100?

14   **A.**   That's right.

15   **Q.**   Okay.  And one of the conditions of use -- sorry.  Strike

16   that.

17        Yeah.  One of the conditions of use that EPA evaluated in

18   the PCE risk evaluations was the use of PCE in the spot and

19   dry-cleaning industry, right?

20   **A.**   It's actually one/two conditions of use, but yes, out of

21   70.

22   **Q.**   Now, within that condition of use, EPA considered various,

23   specific types of exposure scenarios, right?

24   **A.**   We did various types of exposure scenarios and various

25   subpopulations.

BARONE - DIRECT / CONNETT

1  Q.   Okay.  One of the exposure scenarios that EPA considered

2  was a category called occupational non-users or ONUs, correct?

3  A.   That is one of the subpopulations in that condition of use

4  that we tried to quantify risk for.

5  Q.   And ONU is, for sort of a lay-friendly way of saying it is

6  a bystander; fair?

7  A.   Bystander in that particular constellation meant something

8  else, so we distinguished bystanders -- actual customers,

9  potential customers, from the person who would be working at

10  the front -- at the front desk taking in and receiving clothes

11  and passing out clothes, being exposed not at the spotting

12  table, not at the dry-cleaning machine.

13  Q.   Okay.

14       Thank you for that clarification.

15       So with ONUs in this context, we're talking about people

16  like the cashiers, people who are not specifically using the

17  PCE but may be in the same facility as someone who is using it?

18  A.   That's correct.

19  Q.   Okay.  Now, EPA found when it did the margin of exposure

20  assessment that the ONUs, the cashiers and the others in the

21  spot and dry-cleaning industry, were exposed to 1/89th of the

22  hazard level?

23  A.   Again, the product of dividing the exposure into the POD

24  was 89.

25  Q.   Okay.  And that number 89 translates to an exposure level

1  that is 1/89th of the hazard level mathematically?

2  **A.**   Mathematically.

3  **Q.**   Okay.

4  **A.**   It's the comparison of that MOE to the uncertainty, which

5  is what matters.

6  **Q.**   Right.  And when EPA made the comparison between that

7  margin of exposure of 89 and they compared it to the benchmark

8  MOE of 100, EPA determined that that was a risk of

9  neurotoxicity, correct?

10  **A.**   That is correct because it was less than the benchmark

11  uncertainty factors that were derived.

12  **Q.**   And for that particular exposure scenario, okay? -- and I

13  know that EPA makes a big unreasonable risk determination for

14  the full constellation of a condition of use -- but for that

15  specific exposure scenario of the ONUs, EPA determined that

16  that was an unreasonable risk, correct?

17  **A.**   Again, that fed into the unreasonable risk determination.

18  It's part of it, but yes.

19  **Q.**   So I just want to be clear on this.  Would it be helpful

20  for me to show you the language from the EPA risk evaluation

21  or -- or not?

22  **A.**   Again, I know what's in the risk evaluation.  The

23  condition of use is for spot cleaning, dry cleaning.  The

24  different subpopulations that we calculate risk for -- and it

25  may be less artfully explained, but we say that -- it says

BARONE - DIRECT / CONNETT

1   something to the effect if you look at the sentence, EPA found

2   unreasonable risk for ONUs, but it's really ONUs, bystanders,

3   and the workers, all of those had unreasonable risk.

4   **Q.**   So -- understood.

5        So you would agree that in the PCE risk evaluations, there

6   were conditions of use where only one exposure scenario

7   presented a risk, correct?

8   **A.**   I believe there -- there are cases where when you divide

9   up the subpopulations and you look at central tendency versus

10  high end, the different combinations, you will find that there

11  may be a subpopulation where there's risk and where there are

12  other subpopulations were there's no risk.

13       **MR. CONNETT:**   Okay.  So let's go ahead and look at the

14  PCE risk evaluation.

15  **BY MR. CONNETT:**

16  **Q.**   Oh.  And before we move on, for the ONUs, Dr. Barone, in

17  the spot and dry-cleaning industry, there were a total of

18  14,000 of them in the United States, correct?

19  **A.**   It's hard to estimate ONUs, but I think that was our

20  best -- that was our best guess.

21  **Q.**   Great.  Okay.  So let's move on to another condition of

22  use.

23       You see here this is table 4-125 from the PCE risk

24  evaluation?

25  **A.**   I do.  And we're talking about which one, manufacturer

1  domestic, manufacturer --

2  **Q.**  We'll get there.  We'll get there.  I just want to

3  establish for the record what we're looking at.

4  **A.**  Okay.

5          **MR. CONNETT:**  And this is -- Your Honor, this is trial

6  Exhibit 96, and the page number is 475.

7  **BY MR. CONNETT:**

8  **Q.**  Now, Dr. Barone, this table here is the table where EPA

9  provides all of the risk estimates for all of the conditions of

10  use in all of the exposure scenarios for PCE, right?

11  **A.**  It's our attempt to describe the major risk drivers and

12  the different permutations for the condition of use.

13  **Q.**  Okay.  So the first condition of use that is identified in

14  this table is a condition of use that EPA calls "domestic

15  manufacture."  Do you see that?

16  **A.**  I do.

17  **Q.**  Okay.  And EPA considers in this evaluation both workers

18  and ONUs, correct?

19  **A.**  We do.

20  **Q.**  None of the ONUs were found to have any risk of PCE

21  neurotoxicity, correct?

22  **A.**  In this particular permutation, no there's no risk.

23  Again, risk is highlighted for this particular condition of

24  use.  Where there is risk is highlighted in those boxes.  And

25  where it's not exceeding the benchmark, it's not highlighted.

BARONE - DIRECT / CONNETT

1  Q.   Okay.  Now, in EPA's first ten risk evaluations -- and

2  this -- I should back up.

3       This table here shows us risk estimates for people -- for

4  workers and ONUs who wear personal protective equipment and

5  those who don't, correct?

6  A.   It attempts to describe the impacts of personal protective

7  equipment on both acute, chronic, non-cancer and cancer.

8  Q.   Okay.  And personal protective equipment is things like

9  gloves and respirators and masks and stuff like that, right?

10 A.   Again -- yes.  The masks would be for inhalation, and the

11 gloves would be for the dermal.

12 Q.   Now, EPA's first ten risk evaluations, including the one

13 we see here for PCE, EPA did -- would only find unreasonable

14 risk where there was a risk that was still present when using

15 PPE, correct?

16 A.   So in the original risk determinations that were published

17 with the assessment in 2020, that was the case.

18      There were new risk determinations calculated under the

19 new administration when the policy shifted where PPE was not

20 assumed, and the worker protection clause was not assumed to be

21 operative under TSCA.

22 Q.   Right.  And let's take that -- that happened in the

23 future, that was part of this evaluation, I want to put that

24 aside, okay?  Can you do that?  Let's just look at this risk

25 evaluation as EPA determined it when it published the document,

1   okay?

2   **A.**     For 2020.

3   **Q.**     Yeah.   Okay.

4        Now, in this risk evaluation, EPA found only one exposure

5   scenario presented an unreasonable risk for this condition of

6   use, correct?

7   **A.**     I don't see how you get that.   Again, there are -- for

8   inhalation, the high end there was acute, chronic and cancer

9   risk for inhalation -- that's an 8-hour shift.   For a 12-hour

10  shift there is non-cancer chronic risk.

11  **Q.**     All of the risks that you just identified are for people

12  who are not wearing PPE, correct?

13  **A.**     For no PPE, yes.

14  **Q.**     And as we've just discussed, when EPA was actually doing

15  this evaluation and was actually considering this information,

16  it would not consider any risks that were present without

17  wearing PPE as unreasonable, correct?

18  **A.**     There were stipulations during the past administrations

19  for how we interpreted the unreasonable risk for PPE.

20  **Q.**     And so the only -- you know what, let's just skip to the

21  chase.   I'm just going to show you what EPA said.

22       Okay.   This is from page 5 of 5, okay?   And this is where

23  EPA provides its determination of unreasonable risk for the

24  domestic manufacture condition of use, correct?

25  **A.**     So I think the summary below is EPA found that there was

BARONE - DIRECT / CONNETT

 1  unreasonable risk for non-cancer effects, neurotoxicity for

 2  chronic dermal exposures at the high-end when assuming use of

 3  PPE.

 4  **Q.**  Okay.

 5  **A.**  And for ONUs, EPA found no unreasonable risk for

 6  non-cancer for acute and chronic inhalation exposures.

 7  **Q.**  So the only exposure scenario for which EPA found an

 8  unreasonable risk for domestic manufacture were workers who had

 9  high-end dermal exposure to PCE, correct?

10  **A.**  In this particular case.  And again, I've said before,

11  this has been revisited.

12          **MR. CONNETT:**  Right.

13          And, Your Honor, I'll move to strike as nonresponsive

14  to a document that's not part of this evaluation.

15          **THE COURT:**  Okay.  So stricken.

16  **BY MR. CONNETT:**

17  **Q.**  So this exposure scenario for which -- so based on this

18  one exposure scenario, the high-end dermal exposure for

19  workers, EPA found the condition of use to be unreasonable,

20  correct?

21  **A.**  Correct.

22  **Q.**  Now, the margin of exposure for these highly-exposed

23  workers was 51, correct?

24  **A.**  The high end would be 51.

25  **Q.**  So what this means is, the highest exposed workers, the

 1    95th percentile workers, had 1/51st the hazard level -- let me

 2    ask that again.  I'll strike it and ask it again.

 3         What that means is the highest exposed workers, the 95th

 4    percentile exposed workers had an exposure level that was

 5    1/51 -- one divided by 51 -- of the hazard level?

 6    A.    The margin of exposure was 51, considering the PPE was

 7    used for dermal high end.

 8    Q.    And people don't wear PPE when they drink tap water,

 9    correct?

10    A.    No.  There is -- personal protective equipment is used in

11    a manufacturing type of situation, condition of use --

12    Q.    Okay.

13    A.    -- not in a consumer, residential setting.

14    Q.    So just to wrap this up, this high-end worker population

15    was exposed to PCE at a level that was 51 times less than what

16    EPA estimated to be the lowest observed adverse-effect level in

17    human epidemiological studies?

18    A.    Again, that's the -- that's the margin of exposure

19    compared to the benchmark of 100.

20    Q.    And there are other -- if we go through this table,

21    Dr. Barone, we will see other conditions of use where there was

22    only one exposure scenario that presented a risk, correct?

23    A.    Actually, there are lots of conditions -- lots of

24    instances where there are risk.

25         Again, we're talking about risk and whether you're talking

1   about unreasonable risk, they're two different things.  But in

2   this context you'll see multiple permutations of risk that fed

3   into the narrative around unreasonable risk.

4   **Q.**   Let's go look at another -- oh.  Before we move on, for

5   this condition of use, domestic manufacture of PCE, EPA

6   estimated that there were a total of 970 workers, right?

7   **A.**   I believe that's correct.

8   **Q.**   And the workers that were at risk is about 5 percent of

9   that total, right?

10  **A.**   I'm not sure, but I'd have to check.

11  **Q.**   Roughly?

12  **A.**   It would be less than the 970 total.

13  **Q.**   Because the workers that were identified as being at risk

14  were the workers with the 95th percentile distribution of

15  exposure?

16  **A.**   Again, I'd have to check.

17  **Q.**   Okay.  So let's look now at another condition of use from

18  the PCE risk evaluation.  This is from page 478.  And you see

19  here EPA discusses the processing recycling condition of use

20  for PCE?  Do you see that?

21  **A.**   I do.

22  **Q.**   Okay.  And this is another scenario where there was only

23  one exposure scenario with a risk identified for people wearing

24  PPE.

25  **A.**   Again, there are other risks that are identified for

 1  cancer and non-cancer, chronic, that factored into our overall

 2  determination.

 3  **Q.**   And based on this data here, EPA determined that the

 4  high-end, dermally-exposed workers had an unreasonable risk of

 5  neurotoxicity; is that a yes?

 6  **A.**   That is a yes.

 7  **Q.**   And these high-end, dermally-exposed workers were exposed

 8  to a level of PCE that was 51 times less than the hazard level,

 9  right?

10  **A.**   Yeah, and that was the MOE that was calculated.

11  **Q.**   So I want to close now, and you know these PCE -- you know

12  the risk evaluations for EPA pretty much better than anyone who

13  works at the agency, right?

14  **A.**   I know them pretty well.

15  **Q.**   Okay.  I've looked through these documents, and never once

16  have I seen the EPA make a different confidence determination

17  for high-dose hazard data and low-dose hazard data.  Have I

18  missed something?  Is there somewhere in those documents where

19  there will be some discussion where EPA says, "Well, the

20  high-dose data we have high confidence in, but the low-dose

21  data, don't have enough to have confidence"?

22  **A.**   So, again, this gets back to when we're characterizing

23  risk and what is the critical effect, what's the risk driver,

24  oftentimes that's the lower dose.  We calculate risks for other

25  outcomes -- and this is what I've talked to you about

BARONE - DIRECT / CONNETT

1    previously in my deposition -- possibly within two orders of

2    magnitude to characterize the constellation of risks for later

3    characterization, risk characterization.

4         So we want to know not just what's driving the risk at the

5    lowest number, but what are we protecting against?  What other

6    kind of effects could occur within that population that's

7    potentially exposed?

8    Q.   Okay.  Dr. Barone, here's the entire 751-page risk

9    evaluation for PCE.  If I was to hand this to you, would you be

10   able to point the Court to anywhere in this document where the

11   EPA provides separate confidence determinations based on

12   condition of use for the hazard?

13        THE COURT:  A separate confidence determination as to

14   the risk determination or as to -- let's be specific.

15   BY MR. CONNETT:

16   Q.   I want to break it down to a couple parts.

17        First, I'll start with the confidence for high-dose hazard

18   and low-dose hazard data, okay?  Let me start with that first.

19        Is there -- can you point us to anywhere in this document

20   where, for the critical effects, neurotoxicity, EPA says:  We

21   have high confidence in the high-dose data, medium confidence

22   in the low-dose data or some type of -- some type of discussion

23   like that?  Could you point to us that?

24        THE COURT:  High confidence in what is what I'm

25   asking, in terms of the hazard identification or the

 1  association or the risk determination?  I'm confused.  You're

 2  just using confidence.  At what phase?

 3          **MR. CONNETT:**  Thank you, Your Honor.  I want to go

 4  through each of those three steps.

 5          **THE COURT:**  Well, then do it.

 6  **BY MR. CONNETT:**

 7  **Q.**  Okay.  Let's go through step by step.

 8          Can you point us for the hazard assessment -- okay? -- can

 9  you point us to anywhere in this document where we will see a

10  distinction in the confidence determination for high-dose data,

11  mid-dose data or low-dose data?

12          **THE WITNESS:**  As I said before, it's not listed or

13  arranged by high dose, low dose and so on.  It's arranged by

14  what is our confidence in the critical effects, whether it's

15  neurotoxicity, liver toxicity, reproductive toxicity or cancer.

16          So we speak to it in that context for acute and

17  chronic scenarios, our confidence in the hazard.  So that's

18  part of the hazard characterization from the weight of evidence

19  analysis that I was speaking to earlier.

20  **BY MR. CONNETT:**

21  **Q.**  Right.  So when we're looking at one particular -- let me

22  just back up.

23          I think what I understood you to say is, we're going to

24  have different confidence for different endpoints, like we

25  might have more confidence for neurotoxicity than we might have

 1  for liver toxicity, right?

 2  **A.**    That is correct.

 3  **Q.**    Okay.  Let's look at it from within the same outcome,

 4  within the neurotoxicity domain.

 5      Will there be any distinction in the hazard assessment

 6  where EPA says:  We have high confidence in the high-dose data

 7  on neurotoxicity but not so much confidence in the low-dose

 8  data?

 9  **A.**    We don't really break it out by high confidence in the low

10  dose or the high dose.  We talk about it in the context of the

11  study and the data quality metrics for the studies and the

12  different endpoints within a study.

13      So I'll go back to the PCE example.  We had high

14  confidence in the cognitive testing that was done and from the

15  epidemiological studies, but for the testing that was done on

16  visual function deficits by Schreiber, et al., there were lower

17  dose effects -- you know? -- lower dose effects, but we didn't

18  have the same confidence in that series of studies, that

19  epidemiological evaluation, so we didn't base our point of

20  departure on that type of study for visual contrast sensitivity

21  and color vision.

22      We had other studies where we had more confidence, and we

23  described that in our narrative.

24  **Q.**    Right.  So now let's go to the risk characterization

25  phase.  This is the phase when you're comparing the hazard

1  level to the exposure level.

2      Will you be able to point us to anywhere, anywhere in this

3  document where EPA says:  Well, this margin 51 times less than

4  the hazard level; we only have X amount of confidence in that

5  margin versus we'd have more confidence if the margin was, you

6  know, 10 or 20?

7  **A.**   So again, we've had this discussion before.  We don't look

8  at it as what is the factor or full difference between exposure

9  and hazard.  We look at uncertainty and confidence in our

10  narrative as it relates to:  Here's the MOE and here's how it

11  relates to the uncertainties that are assessed for the hazard

12  for that benchmark MOE.  What's the uncertainty, what's the

13  strength of the evidence for the exposure, and what's the

14  overall strength of the evidence for that condition of use.

15  **Q.**   Okay.

16  **A.**   We don't break it out by low or high dose.

17  **Q.**   Okay.  So maybe I'm not fully understanding, so I'm going

18  to kind of try to clarify this a little bit.

19  **A.**   Okay.

20  **Q.**   So when we look at all of those risk estimates where you

21  see some workers are exposed to 20 times less than the hazard

22  level, some workers are exposed to 50 times less than the

23  hazard level and other workers are exposed to 80 times less

24  than the hazard level, okay?

25      In all of this discussion in this 751-page document is

BARONE - DIRECT / CONNETT

1   there a single example of where EPA says:  We have confidence

2   in that 20-fold margin; we don't have confidence in that -- we

3   have a little bit less confidence in the 50-fold margin and we

4   have very low confidence in the 80-fold margin?  Is there any

5   discussion like that?

6   A.   There is discussion like that when we talk about which

7   condition of use and what we're talking about as far as the

8   exposure.

9        Again, one of the areas where -- and I think one of the

10  areas where we have uncertainty in exposure or highest

11  uncertainty in exposure is in dermal -- in our dermal

12  assessment methodologies, so we have low-to-medium confidence

13  in our dermal estimates, and that's one of the areas where we

14  talk about actually our uncertainty evaluation, but not in a

15  quantal -- excuse me -- in a quantification, being able to

16  quantify it.

17  Q.   Now, are you talking about the confidence that you have in

18  the actual exposure data piece of it?

19  A.   Yes.

20  Q.   Okay.

21  A.   Yes.

22  Q.   I'm asking now a separate thing, which is your confidence

23  that the margin between the hazard level and the exposure level

24  presents a risk of the hazard.  Okay?

25  A.   Again, it's influenced by the confidence that we have in

1  exposure.  We have to consider the strength of the evidence

2  that we have for exposure and the strength of the evidence that

3  we have for hazard together for the strength of the evidence

4  for risk.

5  **Q.**  And that's what you need to do, right?  You need to do a

6  separate assessment of your confidence in the hazard data, you

7  do a separate assessment of your confidence in the exposure

8  data and that's the focus.  The focus is not on your confidence

9  of whether the margin of 20 or the margin of 50 or the margin

10  of 80 presents the risk, right?

11  **A.**  Again, we talked about this before.  What that number

12  actually is, is not the appropriate comparator.  It's that

13  number, MOE, compared to the uncertainty benchmark.  That is

14  what we consider is it a risk or not a risk.

15  **Q.**  Right.  So the key paradigm here is if the margin of

16  exposure between hazard level and exposure level is less than

17  the benchmark, that's a risk?

18  **A.**  For non-cancer.

19  **Q.**  Right.  And --

20         **THE COURT:**  Let me ask you something, make sure I

21  understand something.  If you have a point of departure and --

22  whether you're using a benchmark dose response or some other

23  method, is it -- do I have it right that the sort of more

24  uncertain you are about precisely what that curve looks like or

25  precisely where the lowest non-effect level, the lowest effect

BARONE - DIRECT / CONNETT

 1    level is, that would tend to increase the benchmark MOE because

 2    of that uncertainty?

 3              THE WITNESS:  That is the generality.

 4              THE COURT:  Is there a bit of a paradox here, and that

 5    is, the weaker the association -- let's say you don't have a

 6    clear benchmark dose response, you're debating whether it's

 7    linear or whether it's curvilinear or whatever, and you have

 8    some uncertainty as to exactly what it looks like, that

 9    suggests a -- you need a bigger margin of error?

10              THE WITNESS:  Not necessarily.

11              So again, if you're talking about -- you're sort of

12    getting into comparing apples to oranges in a way for different

13    PODs.

14              THE COURT:  Yeah.

15              THE WITNESS:  The real issue is, do you have a

16    reliable and coherent point of departure, something that you

17    have faith in that's defensible, whether it's a NOAEL/LOAEL

18    approach or whether it's a BMD approach.

19              You look at the hazard endpoint and you're looking

20    globally at that hazard endpoint and saying this is an endpoint

21    that I have some certainty about and I've gotten a NOAEL or

22    LOAEL or a BMD and I'm going to say for a human population,

23    even if I have a BMD or a NOAEL in children for the human

24    population I'm going to use an uncertainty factor of 10.

25              THE COURT:  Right.

1          THE WITNESS:  So it's not really inflating.  The

2     modeling is not inflating or having an effect on the benchmark.

3     The modeling uncertainty has an effect on the point of

4     departure determination and where that POD falls.  So that's

5     the numerator in the MOE.  It's not the benchmark.

6          Does that make sense to you?

7          THE COURT:  I think so.  I mean, once -- because

8     there's a struggle, obviously, in trying to find that point of

9     departure --

10         THE WITNESS:  Absolutely.

11         THE COURT:  -- which is a big deal, right?

12         THE WITNESS:  Absolutely.

13         There's a lot of debate and there's going to be a lot

14    of uncertainty in did you derive a point of departure.  And we

15    will have -- the agency has to defend that point of departure

16    and how they derived it and where was that BMR; was that BMR

17    appropriately described?  Was that model appropriately

18    supported?  Did you do the appropriate sensitivity analysis for

19    the fit of that model?

20         THE COURT:  And at some point you determined that you

21    have enough confidence that you've got a valid point of

22    departure, correct?

23         THE WITNESS:  Generally speaking, you have to -- you

24    have to say, okay, this is where I'm going to land with this

25    kind of confidence interval for that POD.

1          THE COURT:  Okay.  So you have a confidence interval

2    for a POD.  Is there a relationship between the size of that

3    confidence interval and the uncertainty margin that you would

4    apply?  No?  That's a separate --

5          THE WITNESS:  It's a separate thing.

6          THE COURT:  Okay.

7          THE WITNESS:  Don't conflate those two things.

8          THE COURT:  Yeah, because otherwise you almost feel

9    like you're -- I don't know if you're double counting or

10   you're --

11         THE WITNESS:  Right.  And that's the reason we use a

12   MOE, because we don't want to conflate not an RFC or a hazard

13   approach.  We don't want to conflate the uncertainty factors

14   for the benchmark with the uncertainty we actually have in the

15   point estimate.  That's a whole another aspect to our

16   uncertainty analysis, which we have to describe in the risk

17   characterization.  We have to describe the strength of that

18   POD.

19         THE COURT:  But you mentioned there's a confidence

20   interval, of course, around the POD.  So how do you deal with

21   that when you -- I mean, you're assuming the mean or the -- I

22   mean, you're taking the POD knowing there's some confidence

23   interval, but you're taking that -- I don't know if you call it

24   the mean --

25         THE WITNESS:  Generally it's a mean.  It's

BARONE - DIRECT / CONNETT

1  generally --

2            **THE COURT:**  You take the mean --

3            **THE WITNESS:**  -- an estimate.

4            **THE COURT:**  -- and that's as we apply the margin of

5  error and all of that?

6            **THE WITNESS:**  Yes, sir.

7            **THE COURT:**  Knowing there's still a confidence

8  interval, so it could go down or up, which would shift the

9  entire scale, depending on where in the confidence interval you

10  are.

11            **THE WITNESS:**  Again, this is all about where is the

12  truth?  The truth is somewhere in between those confidence

13  intervals.

14            **THE COURT:**  Okay.  Thank you.  That helps me clarify

15  some things.  Thanks.

16  **BY MR. CONNETT:**

17  **Q.**   On a somewhat related note, EPA recognized, in its risk

18  evaluation rule under TSCA, that risk estimates do not need to

19  be quantitative to establish a risk, correct?

20  **A.**   Are you talking about the first risk evaluation rule or

21  most recent proposal?

22  **Q.**   The one that's published, Final Agency Action.

23  **A.**   Okay.  So the 2018, I think.  Okay.

24        I believe that's correct.  In some cases we're not

25  actually going through the full quantification of risk for

1    every condition of use but qualitative assessment of risk

2    can -- can suffice and show that there's no exposure.

3         In cases where there's -- there's no or de minimus

4    exposure, then there's no hazard.

5    **Q.**   The EPA specifically states in the risk evaluation rule

6    that it can use qualitative estimates of risk?

7    **A.**   It has.

8    **Q.**   Now, I want to now go back to something you testified to

9    earlier, okay?  I want to go back to the hazard assessment.

10   And you testified earlier that EPA does a Bradford Hill

11   causation analysis as part of the weight-of-evidence component,

12   correct?

13   **A.**   Bradford Hill considerations are nominally considered

14   during our non-cancer weight-of-evidence analysis and

15   considered in our -- all of our cancer analyses.

16   **Q.**   Could you point me to where they discuss Bradford Hill in

17   the PCE risk evaluation?

18   **A.**   I don't think we actually call it "Bradford Hill

19   considerations."  I think if you do a word search, which I'm

20   sure you probably already have, you won't see Bradford Hill

21   specifically called out.  But if you look for plausibility, if

22   you look for coherence, consistency, temporality, you'll see

23   the terms described in our strength-of-the-evidence and

24   weight-of-evidence considerations.

25   **Q.**   Will we see the terms causal and likely causal in the

1  weight-of-evidence analysis here?

2  **A.**   In the first ten we did not use likely causal or causal.

3  We used high confidence, medium confidence.

4      One of the considerations and critiques that we got wasn't

5  from our NASEM review but from the SACC review, the SACC review

6  of the first ten risk evaluations.  They asked us for more

7  clarity.  And so one of the things that we've done with the

8  TSCA systematic review protocol is actually adopt, according to

9  NASEM's recommendation, what has been practiced in the IRIS

10 handbook, which is finalized, and so we've incorporated that

11 into our TSCA draft systematic review protocol, and you'll see

12 that incorporated into the recently published TSEP risk

13 evaluation.

14 **Q.**   So just to be clear, when you testified earlier that this

15 is assessment of causal or likely causal, you're referring to

16 draft assessments that have not yet been published, not yet

17 been finalized?

18 **A.**   TSEP has been published.  The asbestos part 2 has been

19 published for the subsequent risk evaluation for the first ten,

20 and so has 1,4-dioxane, but both of those -- all three of those

21 have been published and are undergoing revision based upon

22 public comment.

23 **Q.**   Okay.  But the first ten risk evaluations under TSCA, EPA

24 did not use the terminology of "causal" or "likely causal" in

25 the hazard assessment component for non-cancer risk?

1   **A.**   We described the strength of the evidence as high

2   confidence, medium confidence or low confidence.

3          **THE COURT:**  You made reference to the Bradford Hill

4   considerations, so I'll be eliciting what those were.  I

5   remember seeing it, but I don't remember any more, so it may be

6   helpful instead of talking shop maybe to --

7   **BY MR. CONNETT:**

8   **Q.**   Dr. Barone, could you remind us of the factors under

9   Bradford Hill?

10  **A.**   Strength of the evidence, strength of the magnitude of the

11  effects, one of the considerations; temporality, does the

12  exposure occur before the outcome.  If the exposure occurred

13  after the outcome, how do you associate that as being likely?

14  The coherence, coherence of the data.  Again, multiple studies,

15  looking at multiple studies of the same kind of exposure and

16  outcome.  Consistency within the study.  Is the -- if you're

17  looking at studies of the same cohort, do you find the same

18  thing occurring at the same cohort?  Do you find the same thing

19  happening at different ages for consistency?

20          Then experimental evidence, do you have experimental

21  evidence from animals or other species that -- wildlife that

22  are similar in findings to what you might find in the human

23  population.

24          By analogy, do you have a read-across or a similar

25  kind of finding with a related chemical or a by-product of the

1   same chemical?  Do they have a common mechanism or do you have

2   a mechanistic argument or mechanistic data to support the

3   likelihood of exposure causing the outcome.  That's not all of

4   them, but that's -- those are -- those are -- there's nine.  I

5   think I got six of them.

6          THE COURT:  Okay.  Well, that -- no that helps.  That

7   does ring a bell talking about that in the first trial.

8          Let me just -- now that you mentioned -- you mentioned

9   mechanistic argument or data.  Obviously data would be better

10  than just an argument, but if you have a theory --

11         THE WITNESS:  Right.

12         THE COURT:  -- but there's no -- thus far no study

13  that demonstrates that, is that worth anything?

14         THE WITNESS:  So this gets at counsel's inference

15  argument under TSCA.  I have to make risk estimates and I have

16  to support hypotheses with actual data.  I need to have a

17  narrative that supports the hypothesis with data, and so

18  inferences are not supportable unless they have data, so I

19  don't make risks based upon inferences or hypotheses.

20         THE COURT:  Thank you.

21  BY MR. CONNETT:

22  Q.  So let's talk about -- well, first off, you would

23  certainly agree, Dr. Barone, that by no stretch of the

24  imagination do you need to establish every one of those

25  Bradford Hill factors to be satisfied that you have a hazard

BARONE - DIRECT / CONNETT

1   under TSCA?

2   **A.**   No.  In fact, we really want to look at qualitatively, you

3   know, what is our best description, and in some cases we may

4   have no experimental evidence.  It may be all based on

5   epidemiological findings.  In some cases, we -- you know, it's

6   been mentioned this week several times.  We may have no idea

7   what the mechanism is or the mode of action and the mechanistic

8   data, you know, isn't well defined, but we have clearly defined

9   a hazard based on the other considerations.  So it's really not

10  a one -- it's not a check-the-box exercise.  It's really an

11  exercise to help provide structure and what the standard is for

12  the proof of the hazard.

13  **Q.**   And when it comes to the mechanistic side of things, you

14  have a lot of experience on that point and understanding how

15  common it is or uncommon to have a mechanistic explanation of

16  how a chemical causes a non-cancer hazard, right?

17  **A.**   I do.  I have a research background as part of my

18  background particularly in developmental neurotoxicity, so I do

19  understand those mechanistic arguments.  I also have a -- you

20  know, a background in endocrinology, and I understand those

21  mechanistic arguments.  But to support a hypothesis, you really

22  have to have a pretty solid characterization to say:  This is

23  the mechanism.

24        And I think Dr. Lanphear pointed out this week in his

25  testimony -- excuse me -- last week.  It's all a blur now --

 1   last week that, indeed, you don't -- you don't necessarily have

 2   to have one mechanism.  Chemicals can -- oftentimes, unlike

 3   drugs that are targeted, chemicals have more than one mechanism

 4   and they may have more than one mechanism at different dose

 5   transitions.  So the dose -- low dose may have one kind of

 6   mechanism and at a higher dose another kind of mechanism, so

 7   that affects what you see in the dose-response curve.  You can

 8   see an inflection in the dose-response curves quite often based

 9   upon what he was talking about for lead, a super linear

10   response in the low-dose region and then a flattening in the

11   high-dose region.

12        There are other kinds of responses, Michealis-Menton kinds

13   of responses where --

14        (Reporter seeks clarification.)

15        THE WITNESS:  Michaelis-Menton is another kind of

16   response, biological response function where basically at the

17   low doses it's flat.

18   BY MR. CONNETT:

19   Q.   So at your deposition you testified that it's very rare to

20   know the mechanism by which a chemical causes a non-cancer

21   effect.  Do you stand by that testimony today or not?

22   A.   I think for industrial chemicals it's fairly rare.  Again,

23   I also oversee our pesticide programs, and oftentimes we have a

24   very good idea for the non-cancer mechanisms for our pesticide

25   program, just to put it in context.

**BARONE - DIRECT / CONNETT**

1  **Q.**   Do you still agree that even for the most well-established

2  neurotoxicants, like lead and methyl mercury, we still do not

3  know the mechanism?

4  **A.**   We know a lot of mechanisms, a lot about mechanistic

5  information, but we do not -- we have not defined a mechanism

6  or a constellation of mechanisms that fully explain the

7  toxicity, neurotoxicity of those compounds.

8  **Q.**   And the absence of that mechanistic sort of conclusion

9  does not prevent EPA from making a hazard determination or risk

10  determination for those two chemicals?

11  **A.**   It has not prevented us from making a hazard -- a hazard

12  assessment and, subsequently, a risk determination for those --

13  risk assessment for those two chemicals.

14        **MR. CONNETT:**   Your Honor, at this point I was

15  intending to ask a few questions about NASEM's peer review of

16  EPA's systematic review protocol.  Given the Court's order

17  earlier today, I just wanted to clarify if that's something

18  that I should forego, or does the Court permit those questions?

19        **THE COURT:**   Well, maybe you can explain.  What is it

20  precisely that you intend to inquire into?

21        **MR. CONNETT:**   Just the -- some of the criticisms that

22  NASEM offered for EPA's systematic review procedures for hazard

23  assessment under TSCA.

24        **THE COURT:**   Okay.  I don't know why our earlier

25  discussion pertained to that particular subject.

```
 1              I'll hear a response from the other side, but --
 2          MR. ADKINS:  I think this is within the scope of the
 3   30(b)(6) topic, so we don't -- we don't have an objection.
 4          THE COURT:  Yeah.  It seems a little different, but go
 5   ahead.
 6          MR. CONNETT:  Okay.
 7   BY MR. CONNETT:
 8   Q.  Dr. Barone, NASEM, which we heard a lot today about, did a
 9   peer-review of the systematic review processes that EPA has
10   used under TSCA correct?
11   A.  That is correct.
12       So NASEM's charge was to review an application's document
13   for hazard ID in the first part -- first part of the systematic
14   review process.  It was not a full protocol, it was not a
15   guideline for systematic review or full methodology, and they
16   made -- we had a series of workshops to describe the process
17   that we were considering because we were building the plane as
18   we were flying it for our first ten risk evaluations.  So that
19   applications document was not complete and the NASEM made some
20   significant suggestions on -- to fuller characterize the
21   process for TSCA, to help us.
22   Q.  And EPA specifically asked NASEM to review the systematic
23   review procedures to determine whether they are
24   comprehensible -- sorry.  I'll start again.
25       EPA asked NASEM to look at the systematic review
```

BARONE - DIRECT / CONNETT

1  procedures being used under TSCA to determine if they are

2  comprehensive, workable, objective and transparent, correct?

3  A.   That was the charge to NASEM, and we knew at the time that

4  the applications document did not cover all of the elements of

5  the systematic review process.

6  Q.   And for each and every one of those four questions, NASEM

7  determined in the negative, correct?

8  A.   For each of those for the overall framework, because it

9  was lacking two-thirds of the characterization and systematic

10 review process, they called us out and made specific

11 suggestions for how we should do or adopt additional procedures

12 for evidence integration and synthesis, data synthesis, as well

13 as clarifications on how we did weight of evidence -- weight of

14 the scientific evidence analysis.

15 Q.   Just to be clear, NASEM's conclusions were that EPA's

16 systematic review procedures for the hazard component were not

17 comprehensive, unworkable, not objective and not transparent,

18 correct?

19 A.   Again, looking at the overall process, because it only

20 focused on searching, screening and data evaluation, they said

21 you're missing evidence integration and data synthesis and

22 weight-of-the-scientific evidence.  You haven't documented in

23 your particular applications document how you do that.  It's

24 not a full protocol, as per the systematic review community, so

25 they called us out and made specific recommendations to each of

BARONE - DIRECT / CONNETT

1   those factors of how we should work to make our assessment

2   process more transparent.

3   Q.   And as part of that evaluation, EPA gave to NASEM what EPA

4   considered to be the most robust evaluation that EPA had done

5   in its first ten risk evaluations, correct?

6   A.   EP -- we provided in the series of workshops examples from

7   our first ten risk evaluations of how we were envisioning doing

8   data synthesis, evidence integration and the weight of the

9   scientific evidence analysis, and they came back with some

10  great suggestions and recommendations about each of those four

11  quadrants within the systematic review area.

12  Q.   One of the risk evaluations that EPA gave to NASEM to

13  solicit NASEM's critical input was the TCE risk evaluation,

14  correct?

15  A.   It was.

16  Q.   And at that point in time, EPA considered the TCE risk

17  evaluation to be its strongest assessment of hazard, correct?

18  A.   It was one of our stronger, more -- as far as systematic

19  review of the eco human health hazard and exposure, both

20  consumer as well as manufacturing exposures.

21  Q.   Okay.  So let's go ahead and look at what NASEM said about

22  the TCE review.  I'm going to put Exhibit 95 on the screen.

23       Dr. Barone, do you see Exhibit 95 on your screen?

24  A.   I do.

25  Q.   This is the NASEM peer review we've been discussing of the

 1  EPA systematic review procedures?  Is that a yes?

 2  **A.**   Yes.

 3  **Q.**   I'm going to go -- so --

 4        **THE WITNESS:**  I'm sorry.  Can we have a break soon?

 5        **THE COURT:**  Yeah.

 6        **MR. CONNETT:**  I'm -- I'm -- two or three questions and

 7  I'm done.

 8        **THE COURT:**  Okay.  Can you last two or three

 9  questions?

10        **THE WITNESS:**  I'm close.

11        **THE COURT:**  Why don't we go ahead and take the break

12  and two or three questions on your direct?

13        **MR. CONNETT:**  And then I'm done.

14        **THE COURT:**  And then we'll just go into --

15        **THE WITNESS:**  Yeah, if you don't mind.

16        **THE COURT:**  We'll take a break.

17        **THE WITNESS:**  A bio break would be very helpful.

18        **THE CLERK:**  Court is in recess.

19      (Recess taken at 11:58 a.m.)

20      (Proceedings resumed at 12:15 p.m.)

21        **THE CLERK:**  Remain seated.  Come to order.  Court is

22  back in session.

23        **THE COURT:**  Okay.  You may resume.

24  **BY MR. CONNETT:**

25  **Q.**   Dr. Barone, we have here on the screen an excerpt from

 1    page 17 of Exhibit 95, which is NASEM's peer review of EPA's

 2    systematic review procedures under TSCA.  Do you see that on

 3    your screen?

 4    A.    I do.

 5    Q.    And this comment here pertains to NASEM's evaluation of

 6    EPA's evaluation of TCE, correct?

 7    A.    It does.  The NASEM used the AMSTAR tool, which is a tool

 8    for describing the completeness and validity of a systematic

 9    review protocol.

10    Q.    And NASEM states here, quote, "The overall confidence in

11    the results of the TCE hazard review would be considered

12    critically low, indicating that the review should not be relied

13    on to provide an accurate and comprehensive summary of the

14    available studies."  Is that what NASEM said?

15    A.    That's what they said.  That's an excerpt of what they

16    said.  But, again, I put it in context of what the tool is

17    assessing.  It's not assessing the actual hazard, it's

18    assessing the transparency of the systematic review and the

19    protocol for a systematic review.

20          Since we didn't have a protocol, what NASEM was trying to

21    do was use the AMSTAR tool to say what they can ferret out from

22    the assessment and what they had from the applications document

23    together, what -- what transparency did we have in addressing

24    the charge questions and providing us recommendations for

25    future systematic review protocol.

1   Q.   Now, following NASEM's peer review, there were calls by

2   some members of industry groups for EPA to start over or redo

3   its risk evaluations under TSCA, correct?

4   A.   There were some calls for:  Oh, let's start the process

5   over and start from scratch and reevaluate every chemical.  We

6   did not take that approach.

7   Q.   And instead of taking that approach, EPA, while

8   acknowledging some of the criticisms, maintained that the TCE

9   risk evaluation and all the other risk evaluations under the

10  first ten satisfied TSCA's scientific requirements under

11  Section 26 of the statute, correct?

12  A.   That is correct.  We decided that there were no fatal

13  flaws that were identified.  There were definitely things that

14  we could be more transparent about and took those

15  recommendations, folded them into a systematic review protocol,

16  a generic approach for our TSCA methodology and created some

17  additional tools; again, adopted additional tools for

18  systematic review based upon recommendations from NASEM and

19  from the SACC to adopt procedures from NTP and from the IRIS

20  program.

21  Q.   And that reminds me that one of the recommendations that

22  NASEM made to EPA was to incorporate more of the elements from

23  NTP's systematic review protocol correct?

24  A.   We had a number of elements already incorporated from

25  NTP's approach.  The OHAT approach we incorporated more, but on

 1  balance we aligned more specifically with the IRIS handbook,

 2  again, to try to develop, based on recommendations from public

 3  comments and SACC, the Science Advisory Committee on Chemicals

 4  or THACA Committee for TSCA and the NASEM's workshop

 5  recommendations to incorporate more of the IRIS handbook

 6  approach into our overall approach.

 7          THE COURT:  Can you remind me what the IRIS handbook

 8  again is?

 9          THE WITNESS:  IRIS is the EPA's Integrated Risk

10  Information System.  It's focused only on hazard, Judge.  It's

11  not extended to ecological hazards, just on human hazard.  It

12  doesn't cover exposure or environmental exposures.  So, you

13  know, one of the -- if you read at the high level the

14  recommendations from NASEM or others, just adopt the IRIS

15  approach or just adopt the OHAT approach from NTP.  Well,

16  that's fine for human health hazard, but neither of them

17  actually have an approach for ecological hazards or exposure.

18  So we've gone further into those other important areas that are

19  required by TSCA to apply a systematic approach, systematic

20  review approach to those other elements of the risk assessment.

21  BY MR. CONNETT:

22  Q.   Now, Section 26 of TSCA sets forth the requirement that

23  EPA rely upon the best available science and use a

24  weight-of-evidence assessment of the science, correct?

25  A.   It does.

1  **Q.**   And so despite NASEM's criticisms or comments, EPA

2  maintains that the first ten risk evaluations satisfy that

3  standard under TSCA?

4  **A.**   Again, the statute requires us to maintain our objectivity

5  and describe the biases and try to be as unbiased as possible

6  in our evaluation.  So the strength of the evidence needs to be

7  described in those -- in those contexts under TSCA.

8  **Q.**   And despite NASEM's criticisms, EPA is proceeding forward

9  with rule making proceedings where it will protect the public

10  from the risks that it identified in those first ten risk

11  evaluations, correct?

12  **A.**   There are rule-makings already out for public comment and

13  in the process of being finalized.

14  **Q.**   Is there any such thing as a perfect systematic review?

15  **A.**   Well, I mean, you heard earlier today about the systematic

16  review that NTP had.  I wouldn't call their NASEM review

17  perfect.  They did revise it in response to comments.

18      Many systematic review protocols or systematic reviews get

19  comments and recommendations from the -- from the peer

20  community.  That's part of the process, it's part of the

21  learning process.

22      The main thing is to provide transparency and an objective

23  criteria for considerations.  People may not agree with your

24  decisions or evaluation, but at least they know how you got

25  there.  That's the point of a systematic review is to provide

1   transparency; how did you get to that decision.

2           MR. CONNETT:  No further questions, Your Honor.

3           THE COURT:  All right.  Thank you.

4                    **CROSS-EXAMINATION**

5   BY MR. ADKINS:

6   Q.    Dr. Barone, good afternoon.  How are you?

7   A.    Good afternoon.

8   Q.    So before we begin with the merits and the substance of

9   your testimony, I want to go back, talk a little bit about your

10  work history at EPA, your credentials and your experience.

11  A.    Very good.

12  Q.    So Dr. Barone, you are currently the senior science policy

13  adviser at EPA?

14  A.    I am in the Office of Chemical Safety and Pollution

15  Prevention.

16  Q.    What are your responsibilities as the senior science

17  policy adviser?

18  A.    So I am actually, as the senior science policy adviser,

19  the reviewer for the immediate office of our risk evaluations

20  of our guidance documents, SOPs.  I'm also the Deputy Science

21  Integrity Official for the AA-ship, which includes our Office

22  of Chemical -- or the whole Office of Chemical Safety and

23  Pollution Prevention, which includes toxics and our -- our

24  pesticide program.

25  Q.    Just so we're all clear, what is a science integrity

 1   officer?

 2   **A.**    A science integrity officer -- so we have science

 3   integrity officers in each of our AA-ships.  So as the Deputy

 4   science integrity officer, I'm the person who helps to

 5   adjudicate or investigate claims of -- or infractions in

 6   science integrity.

 7        I'm the person that's, you know, principally responsible

 8   for training and education of our managers and our staff about

 9   science integrity and the science integrity policy within EPA

10   and Government-wide for our particular AA-ship.

11   **Q.**    How far did you go in school?

12   **A.**    I have a Ph.D. in neurobiology, specializing in

13   developmental neurotoxicology.  I have a -- so I have a

14   master's also, a master's in endocrinology and a bachelor's in

15   biology.

16   **Q.**    And what year did you finish your Ph.D. work?

17   **A.**    1990.

18   **Q.**    For how long have you worked at EPA?

19   **A.**    Since 1990.

20   **Q.**    So let's -- let's walk back and talk about a little bit of

21   your work history at EPA.

22        What was your first position when you joined the agency in

23   1990?

24   **A.**    When I came to the EPA, I actually started out as a

25   contract scientist for five years, basically a principal

1   investigator in a research laboratory.  And as a contract

2   scientist, I was also responsible for supervising other

3   employees, technicians in other laboratories, but I had my own

4   lab as well to oversee.

5   **Q.**   What was the next position you were in at EPA?

6   **A.**   Then in 1995, I became a government scientist in a federal

7   position.  And from 1990 to 2004, I was a principal

8   investigator with my own laboratory and at times was -- I was a

9   team leader and an acting branch chief for a while.

10      From 2004 -- in 2004, I basically moved, got an offer to

11   move to Washington as a risk assessor and moved to

12   Washington -- was moved to Washington to the National Center --

13   well, National Center for Environmental Assessment at that time

14   and, you know, was working on different hazard assessments.

15      Within about a year and a half, two years, 2006, I

16   actually was -- applied for a detail and a position as the

17   national program director for human health risk assessment, so

18   I oversaw the IRIS program, I over saw the NAAQS program, the

19   National Ambient Air Quality Assessment program, and the

20   peer-reviewed provisional toxicity values, which are the hazard

21   assessment for our Superfund support program as well as methods

22   development and guidance development like the benchmark dose

23   guidance document was one of the products that came out of our

24   program at that time.

25   **Q.**   And you testified a moment ago that IRIS assessments are

1    hazard assessments.  Could you distinguish that from an

2    assessment or a risk evaluation that's conducted under TSCA --

3    **A.**    Sure.

4    **Q.**    -- just in general terms?

5    **A.**    So hazard assessments -- and like the IRIS assessment

6    program in particular -- are generic evaluations of the hazard

7    and can cover cancer and non-cancer or both.

8         They're generally descriptions of the hazard and

9    descriptions of the dose response, like we heard in

10   conversations with Dr. Berridge this morning.  They do --

11   because they include -- dose response do include a narrative

12   around and the use of uncertainty factors, in the IRIS program

13   they generally develop reference concentrations, reference dose

14   for non-cancer and then a cancer slope factor or a cancer IUR

15   for inhalation.  That is not specific to conditions of use,

16   it's not specific to particular regulatory applications where

17   the exposure is required, so the hazard assessment does not

18   include an exposure assessment in those particular cases.

19   **Q.**    Okay.  And where did you move to next?

20   **A.**    So from my stint as a national program director, I moved

21   over to Office of Pollution Prevention and Toxics as a branch

22   chief for a short time, took a detail to get some experience in

23   the program office.  And from there, within a year I was

24   basically asked to apply for the deputy division director of

25   the risk assessment division.  I applied and I got that job in

1  2013.  And then from 2013 to 2016, we were doing risk

2  assessments for TSCA chemicals.  I was also overseeing the new

3  chemicals assessment program as well at that time and methods

4  development in our -- in our toxics office.  So from there --

5  **Q.**   Well, hold on for a second.  Let's see if we can pause

6  on --

7  **A.**   Sure.

8  **Q.**   -- your responsibilities as the deputy director for the

9  risk assessment division.  So I have you were involved in risk

10  assessments under TSCA before the amendments?

11  **A.**   I was.

12  **Q.**   And then you were involved in the new chemicals program.

13  Does that have anything to do with the work plan?

14  **A.**   No.  The work plan was actually -- the work plan was a

15  separate activity to look at the highest priority chemicals

16  that were in commerce to evaluate based upon hazard criteria

17  and exposure criteria from secondary sources what would we

18  prioritize our risk assessments on.

19      This was a technical assistance activity to actual -- the

20  TSCA reform.  So we had identified about a hundred chemicals in

21  2012, late 2012 and then -- based upon exposure and hazard and

22  then revised that, updated that in 2014 prior to Lautenberg,

23  the Lautenberg reauthorization bill.  So that was actually the

24  basis for the first list of chemicals that we would assess

25  under TSCA, in the course that the first ten came from that

1    list of work plan chemicals.

2    **Q.**    So if I can recap here, you were involved in the work --

3    in preparing a work plan of chemicals that was eventually used

4    for the prioritization of risk evaluations under amended TSCA?

5    **A.**    That's correct.

6    **Q.**    Okay.  And so what happened next in terms of your

7    employment history?

8    **A.**    In 2016, I was asked to assume the duties of the acting

9    office director for the Office of Science Coordination Policy.

10   The Office of Science Coordination Policy was a small office

11   that bridged, again, coordination and science advisory roles

12   between our pesticide program and our toxics program.

13       Also, I oversaw the endocrine disrupter screening program

14   and its development and validation of tests and approaches for

15   evaluating endocrine disrupters and the peer-reviewed program.

16   I developed the THACA committee for TSCA, the new TSCA program

17   following authorization of the science advisory committee on

18   chemicals and also oversaw the science advisory panel for the

19   pesticide program.

20   **Q.**    Okay.  So I think that takes us to 2019.

21   **A.**    2019 -- at the end of 2019 I was -- excuse me.  It was

22   March 2019 I was not hired as the office director for the

23   office I was acting in for almost years, so I went back to my

24   position of record as the deputy director for the risk

25   assessment division, walked in and basically was responsible

1  for -- primarily responsible for the risk evaluations under new

2  TSCA.

3       And as you can imagine, we were -- had a lot of new staff,

4  we had a lot to do under TSCA, as far as the new chemicals

5  program responsibilities and the existing chemicals program

6  responsibilities, so we had to get the ten risk evaluations

7  done in under -- under -- drafts done in under a year, get them

8  into peer review and get them finalized in response to peer

9  review while we were developing workshops on systematic review,

10 while we were also developing the prioritization for the next

11 20 chemicals and the scopes, follow-on scoping documents for

12 the next 20 plus chemicals and --

13 Q.   So when you say you managed the first ten risk

14 evaluations, what exactly do you mean by that, Dr. Barone?

15 A.   So, again, manage and -- I think counsel already pointed

16 out I was a coauthor on those first ten risk evaluations --

17 developing procedures, developing guidance, mentoring staff at

18 the same time, dealing with public comments, dealing with

19 interagency comments and trying to develop, you know, standard

20 operating procedures for the risk evaluations as we were

21 conducting them.

22 Q.   Okay.  And what was your next position at EPA?

23 A.   So after -- in 2020, we had a reorganization, so we had

24 already gone through the peer review, the first ten risk

25 evaluations.  We were in the throes of responding to comments

1  and revising the comments and I was moved from the risk

2  assessment division, my leadership position, to a branch chief

3  position in the data gathering and analysis division.  And

4  while I was told -- I was still responsible for finishing the

5  risk evaluations that were for the first ten, simultaneously I

6  was standing up a data analysis group that was focused on test

7  orders and systematic review for TSCA and the next 20

8  chemicals.

9  **Q.**   And does that take us up to your current position as

10 senior science policy adviser?

11 **A.**   It does.  So from the acting branch chief -- from the

12 branch chief position from my reassignment I applied for the

13 senior science policy adviser position, which is outside the GS

14 scale, so it was a promotion, and that's the position that I've

15 been in since March of '22, I believe.  No.  March of 2021.

16 **Q.**   In the 30 plus year career you've had at EPA, is it safe

17 to say you've always had some involvement in conducting risk

18 assessment at the agency?

19 **A.**   Even when I was a bench scientist, researcher, I was

20 actively engaged with consultations with the program.  I

21 actively engaged in testing guidelines, risk assessment

22 guidelines and actively consulted with the program offices on

23 numerous risk assessments because of my expertise primarily in

24 neurotoxicology.  There was a need and a desire to bring me in

25 as a consultant.

1  Q.   Okay.  So let's turn to the first ten risk evaluations

2  that EPA's now completed under amended TSCA and could you

3  explain for us, in general terms, how EPA goes about making a

4  determination whether a chemical substance presents

5  unreasonable risk under amended TSCA?

6  A.   So again, the tables that were presented earlier are part

7  of the tools, are part of the evidence that we look at in the

8  risk determination process.  We look at the risks for central

9  tendency and high end for each -- for each exposure scenario

10  under the condition of use.  We're looking at susceptible

11  populations.  And depending upon the condition of use, there

12  may be several ways to parse the population.  So within that,

13  you know, matrix, we look at the risk across that matrix and

14  how many of the different scenarios, whether central tendency

15  or high-end, whether risk is presented.

16       THE COURT:  What do you mean by "central tendency" and

17  high risk?  Could you --

18       THE WITNESS:  Sure.

19       THE COURT:  -- define those?

20       THE WITNESS:  Sure.  Let me back up.

21       Central tendency -- generally what we're talking about

22  when we say "central tendency estimates," it's of the exposure

23  for that scenario.

24       So counsel showed earlier today in the exhibit the

25  50th percentile is oftentimes used as the central tendency of

1   exposure so that that's the denominator that the numerator, the

2   POD, the numerator stays the same.  We may present more than

3   one MOE, but basically that numerator stays the same and we

4   vary the exposure from central tendency to high end.

5           THE COURT:  And high end meaning?

6           THE WITNESS:  High end meaning possibly 90th

7   percentile, possibly 95th percentile.  In some cases we're

8   actually looking at the 99th percentile in the population for

9   exposure.

10          THE COURT:  Okay.

11  BY MR. ADKINS:

12  Q.   I want to try to pull us out of the weeds here.

13  A.   Yeah.

14  Q.   And we're going to get to the details of the risk

15  evaluation process, so just at a high level the agency has a

16  process for considering whether a chemical substance presents

17  unreasonable risk?

18  A.   Yeah.  There's a number of factors, actually, described in

19  the -- in the statute, the considerations in the statute and

20  considerations in the risk evaluation rule.

21          And again, we need to be able to describe the strength of

22  the evidence.  We need to be able to do that in an unbiased and

23  objective manner.  We need to be able to describe the -- you

24  know, whether potentially susceptible populations or sentinel

25  exposures are apparent for the conditions of use or all

 1  conditions of use, depending.

 2      We need to be able to describe the magnitude of the

 3  effect, the adversity of the risk that's being described.  We

 4  need to be able to also look at and describe the magnitude or

 5  expected magnitude of the impact on the -- from the risk.

 6  Q.   That's right.  You were testifying to those scientific

 7  standards, I think you said, or scientific requirements during

 8  your time with plaintiffs' counsel.  Can you just list for us

 9  what are the scientific requirements that the agency must abide

10  by when doing risk evaluation under TSCA?

11  A.   So we need to be able to describe the uncertainty, the

12  strengths and weaknesses in the exposure and the strengths and

13  weaknesses in the hazard estimation process and how that

14  impacts the overall strength of the evidence in the risk.

15      That strength of the evidence narrative informs the risk

16  determination process.  So it's not a one-size-fits-all or one

17  factor is greater than another factor, but we need to be able

18  to describe, in a narrative, how those different considerations

19  come together to support an unreasonable risk determination.

20  Q.   And you've heard the term "Weight of the scientific

21  evidence"?

22  A.   Absolutely.  And that's part of the statute, it's part of

23  26 -- Section 26 under TSCA.

24      So weight of the scientific evidence is supported by our

25  systematic review approaches.  It's supported by the

1  peer-review process and it's also supported by additional

2  systematic analysis of related information.  Do we have other

3  assessments or analogue assessments, similar chemicals where we

4  can support our findings and the strength of the evidence from

5  previous -- previous assessment work.

6  **Q.**   And the statute also refers to best available science,

7  right?

8  **A.**   It does.

9  **Q.**   What does that mean?

10 **A.**   And again, best available science, how we -- you know.

11 The statute says the science that we consider under TSCA needs

12 to be unbiased and objective, and the methodologies that are

13 employed need to be transparent and reproducible and generally

14 peer reviewed.  So all of that is captured under systematic

15 review approaches and explained how we describe best available,

16 in that context.

17 **Q.**   Okay.  So I want to turn to the actual process of the risk

18 evaluation now.  And I understand you prepared some graphics to

19 help explain that process that EPA uses or used for the first

20 ten risk evaluations.

21 **A.**   Yes, I did.

22 **Q.**   Okay.  And those graphics are U.S. Demonstrative 2 through

23 7; is that right?

24 **A.**   I believe so.  And, in fact, I was speaking to them

25 earlier in my -- in the queries about those graphics without

BARONE - CROSS / ADKINS

```
 1  the graphics, so it would be great to actually --

 2  Q.   Sure.

 3  A.   -- show -- show the charts.

 4  Q.   Let's take a look at the first graphic here, which is US

 5  Demonstrative 2.

 6        MR. ADKINS:  And Your Honor shall, I understand from

 7  your court staff that we can place this on the easel over here?

 8  Okay.

 9        THE COURT:  You can.  And what's up on the easel is

10  also on the screen?

11        MR. ADKINS:  That's correct.

12        THE COURT:  Okay.

13  BY MR. ADKINS:

14  Q.   Okay.  So Dr. Barone, we're going to put US demonstrative

15  2 up on the easel here?

16  A.   Sure.

17  Q.   And you've seen this graphic before, right?

18  A.   Yes.

19  Q.   Can you walk us through this, please?

20  A.   Sure can.  And you'll see a similar kind of graphic on our

21  web page, you know, on our TSCA website.

22        So there are measure components of a risk assessment and

23  the components that go into a risk evaluation is what's

24  described here.  So a hazard assessment, an exposure assessment

25  feeds into the risk characterization.  The risk
```

**BARONE - CROSS / ADKINS**

1  characterization informs the risk determination.  The risk

2  determination and the risk assessment together form the basis

3  of the risk evaluation under TSCA.  It's a -- it's kind of a

4  new thing.  Risk assessment, risk determination, putting them

5  together.  This risk evaluation animal is new to TSCA

6  reauthorization.

7  **Q.**   Okay.  That's a lot of terminology, but we see -- we have

8  four things on this -- on this demonstrative, the hazard

9  assessment, the exposure assessment, the risk characterization,

10  the risk determination.

11  **A.**   Right.

12  **Q.**   And you used the phrase "risk assessment"?

13  **A.**   So risk assessment --

14  **Q.**   Can you explain what that is?

15      (Reporter seeks clarification.)

16  **BY MR. ADKINS:**

17  **Q.**   Can you explain what the risk assessment is?

18  **A.**   Sorry.  I'm too eager.

19      So the risk assessment is the first three parts, which

20  includes hazard assessment, exposure assessment, risk

21  characterization.  So that's the scientific technical

22  evaluation.

23      That scientific technical basis is the support for making

24  a risk determination, that unbiased, transparent, reproducible

25  description of the risk needs to inform the risk determination.

1   Q.   And you said the risk determination is a new -- something

2   that's new?  What do you mean by that?

3   A.   Risk determination -- coming up with the risk

4   determination is sort of like the presage or the preamble to

5   rule making.  It's basically looking at the specific conditions

6   of use.  It's the finding document.  It's what we, in different

7   programs, say is:  Here's our findings, you know, what are we

8   going to do, at least under TSCA for the conditions of use.

9   Where do we say we have no unreasonable risk?  Where do we say

10  we have unreasonable risk?  So it's basically a summary of

11  findings.

12  Q.   And this process that we see in U.S. Demonstrative 2,

13  these four steps --

14  A.   Correct.

15  Q.   -- this is the process that EPA used for all ten risk

16  evaluations under amended TSCA so far, correct?

17  A.   It is.  It is.  And what we're using for the updates as

18  well as the next twenty.

19  Q.   So what I want to do now is, we'll drill down into each

20  step of this process to make sure that we understand what the

21  agency was doing.

22  A.   Sure.

23  Q.   So I'm going to show U.S. Demonstrative 3.

24       So Dr. Barone you see U.S. Demonstrative 3 on your screen

25  and at this board here?

BARONE - CROSS / ADKINS

 1    **A.**    I do.

 2    **Q.**    And this graphic is entitled "Hazard Assessment"; do you

 3    see that?

 4    **A.**    It is.

 5    **Q.**    So now we are at the first step of the four-step process

 6    that we saw in U.S. Demonstrative 2?  Okay.

 7    **A.**    We are.

 8    **Q.**    So could you explain to us what the process is that EPA is

 9    undergoing with the hazard assessment?

10    **A.**    Sure.  So hazard identification is fairly conscribed.

11    It's finding and confirming the potential hazards by reviewing

12    the best available science.  It's trying to identify the

13    science that supports the hazard part of the risk assessment.

14         So searching, coming up with an unbiased, comprehensive

15    way of searching the literature, searching all of our

16    databases, screening what you've found and then evaluating the

17    data for the confidence that you have in the studies, the

18    quality of those particular data.  And that's sort of the first

19    elements of a systematic review process.  That part was

20    previously described in our applications of systematic review

21    document, but that's not all of the systematic review efforts.

22    **Q.**    So everything you just described, we're in the hazard

23    identification box, right?

24    **A.**    Correct.  Correct.

25    **Q.**    Okay.

1   **A.**   No -- we're not integrating studies, we're not evaluating

2   them for dose response, we're not looking at low and high.

3   We're identifying all the studies, all the different endpoints

4   and studies that identify toxicity, whether they're epi studies

5   or mechanistic studies or animal studies at that point and

6   ranking them high, medium and low.

7   **Q.**   When you say "Endpoints," just so we're all clear, what do

8   you mean by that, Dr. Barone?

9   **A.**   Yeah.  So there's been a lot of discussion about hazard

10  levels.  Generally we're talking about endpoints, specific

11  endpoints, not just neurotoxicity but liver toxicity,

12  reproductive toxicity, cancer and so on.  So we're trying to

13  identify for a particular chemical whatever kind of exposure

14  for environmental or human mental health, what are the critical

15  effects that we are concerned about in this hazard ID box.

16  **Q.**   It's the bad thing that can happen to you from chemical

17  exposure?

18  **A.**   What kind of bad things -- what kind of bad things can

19  happen.  We're trying to identify the range of the biological

20  response.  We're not -- we're identifying studies, tagging

21  studies at this step that can go into the dose response, but

22  we're not doing dose response in this box.

23  **Q.**   At the hazard identification level is EPA looking at

24  high-dose studies, low-dose studies, medium-dose studies,

25  anything like that?

1   **A.**    We're not.  We're looking at all the data and trying to

2   determine what's of high quality, medium quality, as far as the

3   actual conduct, methodology of the studies, interpretation of

4   the studies at that particular hazard ID step.

5   **Q.**    Okay.  So in the middle box we see the term "Weight of The

6   Scientific Evidence," which is one of those scientific

7   standardized set in TSCA, right?

8   **A.**    Correct.

9   **Q.**    Could you explain what is the agency doing when it's

10  considering the weight of the scientific evidence during the

11  hazard assessment?

12  **A.**    Yeah.  So in the data synthesis evidence integration for

13  the weight of the scientific evidence -- those are sort of

14  pieces of the scientific evidence steps underneath that -- we

15  look at the animal evidence, the human evidence and the

16  mechanistic evidence.  Those are three lines of evidence that

17  we have for any particular chemical for any particular critical

18  effect.  We look at that and we consider -- use the Bradford

19  Hill considerations -- to help us describe the weight of the

20  scientific evidence.

21       We use that as a framework for both our cancer and

22  non-cancer outcomes to help systematize that evaluation

23  process, the weight of the scientific evidence process.

24       From that we identify studies and key endpoints to carry

25  forward to the dose-response analysis.  And again, we're

BARONE - CROSS / ADKINS

1   looking at, well, do we have multiple studies for the same

2   endpoint?  Do they have good dose-response data?  Do they --

3   are they amenable to BMDS, benchmark dose modeling?  Are they

4   amenable to a LOAEL/NOAEL approach?  Should we use some other

5   type of approach?  And I mentioned earlier, you know,

6   categorical regressions -- you know? -- if we have a number of

7   similar outcomes but they're not quantifiable with benchmark

8   dose modeling, we can look at them in a sort of categorical or

9   quantal way to see what kind of pattern of risk we have for

10  those particular outcomes.

11       THE COURT:  When you say "endpoints," what are you

12  referring to?  Is that the critical health effects, or is that

13  the trying to determine the point of departure?  What's the

14  endpoint?

15       THE WITNESS:  Good question.  So the endpoints can be

16  something that's very derivative, so it could be clinical

17  chemistry, it could be kidney weight, it could be body weight

18  in a developmental reproductive study.  It could be IQ.  Those

19  are the endpoints.  Those are all endpoints.  We look at those

20  endpoints within different outcome domains and try to array

21  those endpoints in an effect -- in a biological gradient.

22  Again, that's one of the Hill criteria, biological

23  consideration, you know, what's the -- where is that -- where

24  does that particular kind of endpoint fall within a domain and

25  what's more sensitive and what's more robust is part of the

 1   evidence integration and weight of the scientific evidence.

 2          THE COURT:  But the endpoint then is the -- is the

 3   effect?

 4          THE WITNESS:  It's the effect.  It's what you're

 5   measuring.  And you may be measuring multiple things within the

 6   same kind of domain.

 7          THE COURT:  Thank you.

 8   BY MR. ADKINS:

 9   Q.   So if we could pause at the Bradford Hill criteria just

10   for a second here, we heard at the first trial these criteria

11   referred to in terms of causation.  Is the agency doing a

12   causal analysis at this stage of the hazard assessment,

13   Dr. Barone?

14   A.   We're not dependent upon causation, but, again, the

15   Bradford Hill considerations have been used in epidemiology and

16   toxicology to help arrive at likelihood, not necessarily

17   causation.  We're not trying to prove causation for a risk, but

18   we would like to be able to say do we have confidence in, you

19   know, likely, suggestive or not, in order to help inform the

20   strength of the evidence.

21          THE COURT:  Confidence in the existence of causation

22   or confidence in what?

23          THE WITNESS:  Confidence in the endpoints that are

24   being associated with the exposure.

25          THE COURT:  Confidence in the association between the

1  exposure and the endpoint?

2       **THE WITNESS:**  Correct.  Correct.  So it's a way to get

3  at -- it's a systematic way to get at that association, the

4  confidence that we have in that association between exposure

5  and outcome.

6       **THE COURT:**  So if you have causation evidence, that

7  strengthens your confidence that there is an association, but

8  you can have -- you can be fairly confident in association even

9  without proof of causation?

10      **THE WITNESS:**  That is correct.  That is correct.

11      So we used -- and counsel pointed out earlier --

12  numerous cases in the first ten risk evaluations where we used

13  animal evidence was the principal data stream that was used to

14  evaluate the quality and strength of the evidence based upon

15  these considerations and our weight of evidence analysis.

16      **THE COURT:**  Okay.  Thank you.

17  **BY MR. ADKINS:**

18  **Q.**   When you say the studies are selected to carry forward --

19  I think was the term you used -- to the dose response, can

20  you -- can you explain what -- what EPA is doing when it's

21  caring forward studies for dose response from the weight of the

22  scientific evidence?

23  **A.**   So -- exactly.  So a study isn't considered just in a

24  vacuum.  We're not just throwing it into the dose-response box

25  generally speaking.  We're trying to consider it in context.

1          And I mentioned sensitivity and robustness.  In other

2     words, in this -- in this weight of the scientific evidence

3     evaluation, we're looking at how sensitive is that particular

4     outcome on the -- you know, on the concentration response

5     realm.  But, you know, we're not all -- we're not focused on

6     just trying to derive the lowest point of departure in our dose

7     response, we're looking at trying to look at a range.  And

8     robustness really gets at, well, how much from the strength of

9     the evidence of the strength considerations, how much data do

10    we actually have for that particular endpoint or that

11    particular outcome, and are there a series of outcomes that are

12    related to neurotoxicity that we should consider as an example

13    or reproductive toxicity.  So we may have multiple endpoints to

14    consider and multiple studies within that, that can be carried

15    forward to dose response.  And from that we might determine

16    that we do benchmark dose analysis on a single study or we do

17    meta-analysis on a series of studies or categorical regression

18    on a series of studies, so it sort of depends.  It's

19    situational dependent.

20    **Q.**   At this stage of the analysis, are we thinking about

21    exposure ranges yet, or is that still not part of the equation?

22    **A.**   It's not really about exposure ranges.  This is separate

23    from the exposure ranges.  Exposure assessment is going on sort

24    of in parallel.

25         What we are concerned about is sort of the biological

1    gradient.  You know, are we talking about concentration effect

2    functions that are within a certain range, whether we're

3    talking about animal studies or human studies.  We're looking

4    at the sort of biological range of response in the -- and how

5    that relates to exposure, the concentrations that are used in

6    the studies, but we're not looking at exposure per se.

7    **Q.**    So I may have introduced a term that we haven't defined

8    yet, and we'll get to the exposure assessment shortly.

9    **A.**    Uh-huh.

10   **Q.**    In terms of the dose that participants receive in the

11   studies that the agency is considering, the weight of the

12   scientific evidence analysis, is dose or the dose range at all

13   a factor in determining what studies to bring down for dose

14   response assessment?

15   **A.**    Yeah.  Good question.

16       So dose is a term that has different meanings to different

17   people and, you know, in the toxicology realm it's a common

18   term that's used to associate with here's the intake level.

19       In epi studies, the intake level or concentration or

20   exposure, external exposure, is a similar term to "dose" that's

21   oftentimes used in toxicology.  So they're generally applicable

22   and interchangeable, but, again, depending upon whether

23   we're -- we're generally focused on external dose in this

24   weight-of-the-scientific-evidence analysis, not internal dose

25   or calculations of internal dose or so on, because that's in

 1   the dose-response box.

 2   **Q.**   How is it that the agency selects a study that it will

 3   take forward for dose-response analysis?

 4   **A.**   Again, good question.  So there are multiple factors that

 5   we are considering.  We are trying to consider a range of

 6   studies that cover the sort of panoply of, you know, effects

 7   that might be seen with that chemical from the hazard ID.

 8        So we're trying to say we see kidney toxicity or lung

 9   toxicity, neurotoxicity.  We're looking for high-quality

10   studies to medium-quality studies that are suitable for dose

11   response that have multiple concentrations, more than one

12   concentration generally, measured or evaluated in the effect

13   concentration narrative.  That and -- the quality of those

14   studies and then how that fits together with the other

15   considerations and the weight of evidence will help inform what

16   goes forward to dose response because you can't do -- I mean,

17   there's sort of a logistical issue of, you know, how many

18   studies can you do dose response on in a given assessment, so

19   you want to marshal your resources on the higher quality

20   studies and cover the outcome domain to your best ability based

21   upon the quality of those studies.

22   **Q.**   And when you -- you testified earlier that a study can't

23   be considered in a vacuum.  What did you mean by that,

24   Dr. Barone?

25   **A.**   So, again, one of the challenges we have is, you know,

 1   when we look at outcomes, this is the first time that anybody's

 2   published on this particular effect.  Is there other supporting

 3   evidence?  Has it been replicated?

 4       Those are considerations for dose response and the

 5   strength of what we actually carry forward for dose response.

 6   If we have conflicting evidence, we need to be able to explain

 7   what conflicting evidence -- what impact that might have on

 8   dose response.

 9       If we have inconsistencies in the evidence we may or may

10   not go forward with something for dose response.  So that

11   coherence and that consistency are key factors in making the

12   decision do we have enough to go forward for dose response.

13   **Q.**   In the dose-response assessment box of U.S. Demonstrative

14   3, the last sub bullet is identifying points of departure.  Do

15   you see that?

16   **A.**   I do.

17   **Q.**   Can you define for us what a point of departure is?

18   **A.**   Yes.  And as we said before, you know, points of

19   departure -- points of departure or PODs are generally

20   quantal -- quantification.  They have a quantification context

21   of what that level is in the concentration response function,

22   whether it be a NOAEL, a LOAEL, no observed adverse effect

23   level, or a benchmark dose, a BMCL, a BMDL.  So those are the

24   actual points of departure that can be derived from studies.

25       And as I said, too, you can also get it from categorical

1  regressions or other types of regressions as well.

2  **Q.**   Is it possible to derive a point of departure from a study

3  for which you have low confidence?

4  **A.**   It is absolutely possible, but it's not advised.

5       And again, deriving a point of departure from a

6  low-quality study or -- is very difficult for the agency to

7  defend, and it's very difficult to carry forward for risk

8  determination.

9  **Q.**   So as I understand this, I'm envisioning two tracks, a

10  quantitative track where the agency is doing a quantitative

11  measurement, deriving a point of departure, and a qualitative

12  track where it's assessing whether that evidence is appropriate

13  for that purpose.

14  **A.**   Exactly.

15  **Q.**   Is that --

16  **A.**   And so this is -- this is the box -- now you've moved into

17  the hazard characterization box because in the hazard

18  characterization we're actually trying to describe in a

19  narrative both a quantitative -- what we chose for points of

20  departure to represent that constellation of adverse outcomes

21  that are associated with that particular chemical exposure and

22  what is the qualitative strength of the evidence that's related

23  to those hazards.  Do we have high confidence in that

24  particular, you know, outcome or medium confidence or low

25  confidence?

BARONE - CROSS / ADKINS

 1        And this is where the beginning -- the discussion about

 2   causation or likely or causal or suggestive comes up for

 3   particular endpoints for cancer and non-cancer, acute and

 4   chronic.

 5   **Q.**   Let me pull you back to the dose-response assessment --

 6   **A.**   Sure.

 7   **Q.**   -- before we get to hazard characterization.  We'll get

 8   there, I promise.

 9        So in the dose-response assessment we've been talking

10   about points of departure, we've defined what those are.  How

11   does the agency calculate a point of departure?

12   **A.**   So we've talked about this.  Other -- other witnesses have

13   talked about PODs and benchmark dose analysis previously, so

14   with our modeling approaches, benchmark dose modeling, it's

15   critical to look at what model fit -- excuse me.  Let me back

16   up.

17        First thing we had to do -- if you go through the

18   benchmark dose guidance, the first thing you have to decide

19   before you start modeling anything is determine what your

20   benchmark response rate is.  Are you going to use a 10 percent

21   effect level as a benchmark response, are you going to use one

22   standard deviation, are you going to use something else, some

23   other biological determinant, or are you going to use sort of a

24   default approach to do that sort of extrapolation.  So it's not

25   an after-the-fact consideration, it's an apriori consideration

1    of what the BMR is.

2         And it's important to be able to provide that

3    rationalization and justification for that benchmark response

4    rate upfront.  And if it's biologically informed, all the

5    better.  Oftentimes, we don't have a -- necessarily have a

6    biological -- great biological rationale and we use statistical

7    cutoffs or statistical ways to inform the BMR.

8         From the -- from the BMR, then we get into the actual data

9    and the data analysis, the modeling of the data with benchmark

10   dose software and regression approaches.  And so for the actual

11   modeling, we want to make sure that the fit is appropriate.

12   Whether it's linear model types or nonlinear model types, we

13   want to be able to interrogate that dose-response data and

14   those intervals as well as we can.

15        I mentioned, you know, AIC scores are part of that, but

16   that's only one part of model fitting or assessing the fit of

17   models.  There's other aspects to model fitting.  And

18   goodness-of-fit tests -- there's a multitude of

19   fitness-of-tests; it's not just Chi-squared, it's not just F

20   statistics, but other ways to assess goodness of fit.

21        And some of that we've heard about in the previous papers

22   on spline testing and other ways to interrogate the data and

23   its appropriate fit to particular modeling approaches or

24   modeling approaches fit to the data.

25             Another important aspect and it's come up but it

 1   hasn't really been emphasized very much, it's been also listed

 2   in the benchmark dose software is actually plotting the data,

 3   plotting the dispersion of the data via the curves that it's

 4   fitted to and its confidence intervals of the model that's

 5   being applied and saying does this accurately describe, you

 6   know, or not.

 7          And so, again, an AIC metric can be very similar

 8   for -- for a range of models, very close.  But when you plot

 9   the data and look at the data via the BMCL estimate and the

10   confidence intervals, it can look totally different between

11   models.  Very different.  Different fits optically.

12          So we actually advise that you look at it in -- look

13   at the model fit in multiple ways.  We actually advise that you

14   look at multiple models.  Someone stated that -- I think

15   Dr. Grandjean -- stated that our first approach is a linear

16   approach for non-cancer.  In fact, there is no first model for

17   benchmark dose modeling.

18          For cancer, a threshold multistage model is generally

19   the first approach for our modeling approaches; but for

20   non-cancer, we look at all suitable models and interrogate all

21   the suitable models possible within our BMD analysis and

22   regression analysis.

23          And that may be -- the data may limit the number of

24   models to just a linear family of models, but, again, we want

25   to be able to describe that interrogation as clearly as

1    possible.  We need to be able to show our work.  And you will

2    look at appendices of the first ten risk evaluations and you'll

3    see all the different model outputs and all the different

4    statistics and different kind of approaches that were employed,

5    and we have to describe, in narrative terms, why we chose one

6    model over another model, not because, you know, a linear model

7    is the most parsimonious explanation.  We have to describe the

8    fit, not just based upon:  That was the easiest thing to do.

9    **BY MR. ADKINS:**

10   **Q.**   Okay.  For the non-statisticians in the room, let me see

11   if I unpack some of this for us.

12   **A.**   Sure.

13   **Q.**   So what you've just testified to is the benchmark dose

14   level, and that's one of the three types of points of departure

15   that EPA uses in its risk evaluations; is that correct?

16   **A.**   That's correct.

17   **Q.**   Okay.

18   **A.**   And there are multiple models within -- in that particular

19   benchmark dose modeling approach is what I --

20   **Q.**   And you refer to an AIC score, which is a test, a

21   statistical test, of how well a model fits the data that's

22   being analyzed?

23   **A.**   Right.

24   **Q.**   Okay.  And so just at a high level here, when I ask how

25   does the agency derive a point of departure, this for -- with

1  respect to a BMCL or a BMDL, the agency is generally looking at

2  the quality of the study --

3  **A.**   Yes.

4  **Q.**   -- and the statistical analysis; is that --

5  **A.**   Yes.

6  **Q.**   Okay.

7       Now, I want to -- I want to unpack what you said about

8  Dr. Grandjean's testimony.  So I believe you're referring to

9  testimony by Dr. Grandjean earlier in this trial --

10 **A.**   I am.

11 **Q.**   -- where he said EPA told him the default to use is the

12 linear model.  Is that what you're referring to?

13 **A.**   That's what I was referring to.  And he may have been told

14 by somebody that, but that's not -- that is not our -- that's

15 not the guidance or the directive for non-cancer.

16 **Q.**   Has EPA defaulted to a linear model in any of the first

17 ten risk evaluations under amended TSCA?

18 **A.**   No.  And we use -- we look at the linear multistage model,

19 we look at other linear model forms, but we -- generally

20 speaking, we've chosen the model based upon best fit and -- for

21 non-cancer.  In many cases it was not a linear model or a

22 linear model form.  It was some other form.

23 **Q.**   Okay.  So let's get back to the question that I posed to

24 you.  How does the agency calculate a point of departure?

25 **A.**   Okay.

1   **Q.**   We heard about BMDL.  Now, can you explain to us how does

2   the agency calculate a point of departure for a NOAEL or a

3   LOAEL?

4   **A.**   So generally a NOAEL or LOAEL, as we described earlier,

5   comes directly from what is the observed concentration for an

6   effect or no effect.  So it's directly coming from the study of

7   where that threshold for non-cancer -- generally gets a

8   threshold -- where does that concentration occur.  And that's

9   describing, generally speaking, a single dose.  It's within the

10  dose continuum of how many doses were employed in the study,

11  what concentration did they measure an effect.

12  **Q.**   And when you say "dose" and the measured effect, what

13  units are we talking about, Dr. Barone?

14  **A.**   Good question.  So it could be in multiple units.  It

15  could be internal dose metric, it could be external dose

16  metric.  And again, that's part and parcel of the dose-response

17  is to make that comparison.  We need to be able to convert

18  that -- whatever that dose is to an external dose, a human

19  equivalent concentration or human equivalent dose.

20  **Q.**   And what units would the converted human equivalent

21  external dose look like?

22  **A.**   Yeah.  And I mentioned this earlier.  So, generally

23  speaking, we're talking about a milligram per kilogram per day

24  for the point of departure.  And the reason we want it in those

25  units is, we want to be able to compare it to the exposure

1   concentration.  Exposure concentration in the denominator has

2   to be in the same units as the hazard point of departure or

3   hazard level in the numerator.  They have to match up.  The

4   units have to match.

5   **Q.**   And we're going to talk about the risk characterization

6   where we'll look at the margin of exposure analysis and we'll

7   get to the unit issue here --

8   **A.**   Uh-huh.

9   **Q.**   -- but just for purposes of deriving a point of departure

10  based on a hazard study, the agency is looking to convert the

11  concentration used or the internal dose to an external dose in

12  milligram per kilogram per day; is that right?

13  **A.**   Generally speaking.  In the first -- first ten risk

14  evaluations we used PBPK models to convert -- we got to an

15  accurate internal dose metric for a particular outcome, whether

16  it was liver toxicity or cancer, based upon modeling and used

17  that as our best approximate -- approximation of -- on an

18  internal dose metric.

19      Once we determined our BMDL, our BMCL, then we convert

20  that back through the model through an intake level.  So

21  basically you're running the model in reverse to get to what is

22  that internal dose metric back to what is that external dose

23  metric for that particular critical effect.

24  **Q.**   You described a PBPK model during your questioning with

25  plaintiff's counsel.  Just so I remember, what is a PBPK model?

1   **A.**    Sure.  So a PBPK model is an attempt to describe the

2   physiological, quantified basis of what are the major

3   considerations for that particular chemical's toxicokinetic

4   distribution.

5        So once it's -- once the chemical comes into the body,

6   you're looking at the physiologically based pharmacokinetic

7   pathway.  And depending upon the chemical, whether it's limited

8   by the flow in distribution or whether it's limited by the

9   excretion, those are important kinds of parameters that you

10  need to be able to define.

11       The target of the chemical, sort of where -- what is the

12  toxicodynamic target, also needs to be considered in your

13  physiologically-based pharmacokinetic model.

14       So if the target is the brain, the adult brain, then you

15  have to have a brain compartment and you need to be able to

16  track, you know, how does the chemical go through the liver,

17  how does it go through the kidney, what's the excretion rate,

18  clearance rate, those kind of things.

19       If it's pregnancy, if it's more complicated and includes a

20  gestational component, then you need to be able to have growth

21  of the mom and gestational growth, growth of the fetus or at

22  least the fetal compartment accounted for in your model, and

23  you need to have all the other things, the kidney, the liver

24  and those kinds of distributions and the metabolism,

25  appropriate metabolism.

1      Some models also have to include bone demineralization.

2  That was already mentioned this week with lead and with other

3  metals.

4      So you have to be able to say during pregnancy there's not

5  a static, there's a very dynamic process that's going on, and

6  you need to be able to account for that background in the

7  mother's system, because that's affecting -- potentially

8  affecting the fetus, either positively or negatively.

9  Q.   In any of the first ten risk evaluations, Dr. Barone, did

10  EPA use a PBPK model?

11  A.   Yes, we did.  We used PBPK models in five of the first

12  risk evaluations.  And to varying degrees, in some cases we

13  were using them from internal dose metric to external dose

14  metric.  In some cases we were using it for interspecies

15  extrapolation.

16      In some cases we actually used them for -- by

17  "interspecies" I mean from rodents to humans, to approximate

18  the human dose.

19      In some cases we actually had the ability to go route to

20  route, so we were able to look at studies and incorporate

21  studies that included oral exposures, inhalation exposures and

22  dermal exposures, to put them all on the same -- same metric,

23  internal dose metric, so we could look at a wider range of

24  exposures and to do that aggregation of exposures across

25  routes.

 1         That's not always available to us, we don't always have
 2    those kinds of models available to us, but at least in one
 3    particular case we did that.  We -- we identified that we had
 4    valid models, we identified that we had a need to actually look
 5    at that aggregation because of the number of conditions of use
 6    that were being investigated in that particular chemical
 7    assessment.  N-methylpyrrolidone was the assessment.
 8         THE COURT:  So is point of departure always measured
 9    in terms of external concentration exposure as opposed to
10    internal?
11         THE WITNESS:  I'm sorry, Judge?
12         THE COURT:  Is the point of departure always expressed
13    in terms of external exposure or consumption, never in terms
14    of, well, urine content, for instance?
15         THE WITNESS:  Good question.  So if you were doing a
16    reference concentration, a hazard value, you could focus just
17    on the internal concentration and compare that to uncertainty
18    factors; but for risk, we need to be able to back-calculate
19    what the external intake concentration is to be able to
20    estimate that point of departure for that concentration at
21    intake to that concomitant exposure in the denominator.
22         THE COURT:  But that's in the risk assessment?
23         THE WITNESS:  That's in the risk assessment.  It's
24    required for the risk assessment.
25         THE COURT:  And how do you account for -- if you take

 1  the aggregate approach, that is, there are other multiple

 2  sources, let's say, of that chemical, how do you -- how do you

 3  factor that in, in your formulas here?

 4          **THE WITNESS:**  So I actually think this will come to

 5  the next demonstrative if you --

 6          **THE COURT:**  Okay.

 7          **MR. ADKINS:**  Please answer.  Please answer and we can

 8  cover it again.

 9          **THE WITNESS:**  So the issue there is, when we're

10  looking at exposure, we want to be able to say what the source

11  is and what media are driving the exposure.  If it's drinking

12  water, we want to be able to account for what component is

13  coming from drinking water.  We want to be able to account for

14  what component is coming from food or what component -- what

15  contribution there is from pharmaceutics/over-the-counter kinds

16  of applications.  We also want to be able to account for

17  background.

18          So in many cases, and particularly with metals,

19  there's a background level in the -- in the human body and,

20  again, PCBs is another example.  There's a background level in

21  the human body, but during pregnancy it changes dramatically.

22  During lactation it changes dramatically.

23          So you want to -- depending upon the life stage and

24  the critical period that we've been discussing, you want to be

25  able to account for what those other sources are and whether

1  those other sources are important exposure components that you

2  have to be worried about in your exposure assessment.  So

3  that's in the exposure input analysis.

4          So you want to -- you want to do that so you can

5  compare it to the right units in the -- in the hazard.

6          **THE COURT:**  Okay.  But if you have a situation where

7  the source in question, the condition of use, is additive to

8  other background sources or other sources, you have to do a --

9  some kind of modeling --

10          **THE WITNESS:**  You do.

11          **THE COURT:**  -- to calculate?

12          **THE WITNESS:**  You do.  And you want to be able to

13  understand, well, what's the background, be able to subtract

14  the background; you want to be able to say what's the dietary

15  component and what is the actual water intake component.

16          And then if you have information on the other sources,

17  potential sources, whether it's pharmaceutics or other inhaled

18  or overly ingested pollutants having a similar kind of

19  exposure, additive exposures, you want to be able to capture

20  that to the best of your ability.

21          **THE COURT:**  Okay.  Thank you.

22  **BY MR. ADKINS:**

23  **Q.**   Now, Dr. Barone, when you refer to a reference dose in a

24  hazard calculation versus a risk calculation, can you -- can

25  you differentiate those two contents for us?

 1    **A.**    Sure.   Sure.

 2         So a reference concentration or reference dose is

 3    basically the hazard divided by uncertainty factors and it's a

 4    convenient -- it's a convenient approach because it's a bright

 5    line -- here's where we're concerned about a hazard.  It is not

 6    a risk estimate.  So it's not taking the -- putting it in

 7    context hazard with exposure and saying, okay, now I have a

 8    product that I can compare to some uncertainty factors as a

 9    benchmark.

10    **Q.**    And that former -- that reference dose, is that something

11    the agency has used in the first ten risk evaluations?

12    **A.**    No, it is not.

13    **Q.**    Why is that?

14    **A.**    Well, so again, what we're trying to do is -- because we

15    have multiple critical effects and we're going to have multiple

16    scenarios and multiple conditions of use, we're trying to

17    develop risk estimates that are portable, flexible enough to be

18    used for many different conditions of use.

19         So we want to be able to describe that, we want to be able

20    to describe the range of potential outcomes.  So we look at an

21    MOE approach for those different critical effects and we don't

22    include -- you know, we don't have a bias of putting in

23    uncertainty factors like reference doses or reference

24    concentrations into that process.  We keep the uncertainty

25    factors for the hazard separate and outside of that process.

1      So you can look at multiple points of departure, multiple

2   risk estimates with those different scenarios and keep track

3   of, well, which ones have the highest uncertainty in the hazard

4   POD.

5   **Q.**   You said in five of the risk evaluations the agency used a

6   PBPK model.  What did the agency do in the other five?

7   **A.**   In the other five we essentially used a combination of

8   benchmark dose modeling, straight up benchmark dose modeling

9   for the dose response or a LOAEL/NOAEL approach.

10  **Q.**   Well, how is the agency able to identify this external

11  dose that you've described?

12  **A.**   Generally they were animal studies and we had the intake

13  levels.

14  **Q.**   Okay.  So you knew the dose that the animals received?

15  **A.**   Absolutely.

16  **Q.**   And that's how you were able to convert or to derive a

17  point of departure that could be used later on in a risk

18  characterization?

19  **A.**   Correct.

20  **Q.**   Okay.

21  **A.**   Correct.

22  **Q.**   Now, Dr. Barone, we heard during plaintiff's opening that

23  EPA has just thrown out the high-dose studies in favor of

24  low-dose studies -- and we're going to get to your opinions on

25  how all of this evidence applies in context of the risk

1   assessment process and the risk determination, but before we

2   do, just speaking in general and to the process that the agency

3   uses, does the agency ever throw out high dose studies in favor

4   of low dose studies or vice versa?

5   **A.**   So we don't throw out studies.  We don't throw away data.

6   We put it in context in our description when we're talking

7   about biological gradient under, you know, our

8   weight-of-the-scientific-evidence analysis.

9        We do tend to focus on lower dose or the lower dose region

10  for concentration response for the sake of developing risk

11  estimates that are the most relevant and most robust.

12       It doesn't always work out that the lowest dose studies

13  are -- which are generally, you know, looking at sensitive

14  effects, are the most robust and highest quality.  So

15  oftentimes we don't necessarily choose that in our final

16  risk -- excuse me -- hazard characterization of the risk as

17  what we use to represent risk, you know, based upon the POD

18  part of the risk estimate.

19  **Q.**   Earlier today counsel had asked you about confidence in

20  low-dose data, and you referred to a color contrast sensitivity

21  analysis in the Schreiber study.  That was in the context of

22  the PCE risk evaluation, right?

23  **A.**   I did.

24  **Q.**   Okay.  And so how does the agency's treatment of the

25  Schreiber study and the PCE risk evaluation relate to this

 1  consideration of high-dose versus low-dose studies?

 2  **A.**   So the example I mentioned there -- I'll go into a little

 3  bit more detail -- the Schreiber study found a fairly low point

 4  of departure.  I think it was around .2 ppm when the data was

 5  modeled for the visual contrast sensitivity effects, and that

 6  was a really important finding.

 7      A sensitive population was identified because we were

 8  talking about, you know, children in a daycare center and

 9  employees in a daycare center that were living adjacent to a

10  dry cleaner.  But as we looked at the study more closely, we

11  started looking at how the study was described and what they

12  controlled for and the covariates.

13      It was like, well, there were other developmental

14  disorders in some of the children that were tested, there was

15  other lack of -- lack of covariate analysis, other confounding

16  that were identified for the study, so we didn't have the

17  confidence -- enough confidence in using that study by itself.

18  So when we backed up and looked at the occupational studies

19  which we had many more of -- and again, at an order of

20  magnitude higher level -- we could actually feel more confident

21  about similar kinds of effects on visual contrast sensitivity,

22  color confusion and cognitive abilities.  So we had more of a

23  constellation of effects and more certainty and confidence in

24  the neurotoxicity of those particular populations.

25  **Q.**   So going back to U.S. Demonstrative 3, the Schreiber study

1  was part of the weight-of-the-evidence analysis that the agency

2  engaged in; is that correct?

3  **A.**   Yes.

4  **Q.**   And but the agency didn't pull down that study for

5  dose-response assessment; is that what you were explaining?

6  **A.**   We didn't -- we didn't look at it for the margin of

7  exposure.  We looked at the POD, what would come out of it from

8  a POD in the context that there was a previous IRIS assessment

9  that had calculated that.  But given the strength of the

10  confidence in the study and what we were trying to devise was

11  the strength of the evidence, medium to high, that wasn't --

12  that wasn't a main -- a main piece of the puzzle.

13       **THE COURT:**  But the weight you gave that study and the

14  discount of that was based on the quality of the study, not the

15  fact that it involved low-dose exposure it sounds like?

16       **THE WITNESS:**  That's correct.  I mean, it had the --

17  it had the characteristics of being a low-dose study, but it --

18  because of the concerns about quality --

19       **THE COURT:**  Right.

20       **THE WITNESS:**  -- and confidence in the study, it did

21  not receive as great of weight as it would have, just based

22  upon it's the most sensitive endpoint.

23       **THE COURT:**  So you look at the quality of the studies,

24  not necessarily the exposure levels?  And that's taken into

25  account at some other point, I mean, when you do the

 1   dose-response analysis, I guess, or --

 2          **THE WITNESS:**  In the evidence integration we're

 3   looking at this array, you know, what is the biological

 4   gradient for the different outcomes within domains.

 5          And again, this domain was defined as neurotoxicity,

 6   and we're looking at, you know, all the different kinds of

 7   things that were occurring with PCE, and visual contrast

 8   sensitivity was a sensitive measure in multiple populations,

 9   but this particular study, which had the lowest POD, had low

10   confidence.

11   **BY MR. ADKINS:**

12   **Q.**   Is the agency able to derive a point of departure from a

13   high-dose study, Dr. Barone?

14   **A.**   Oftentimes.  Oftentimes we will devise or come up with a

15   point of departure for a high-dose study.  And again, it's

16   useful for us later on when we're trying to characterize, you

17   know, what are we expecting for, from a public health

18   perspective.  You know, if we were trying to protect for -- or

19   limit cancer, we could be using chronic or acute non-cancer

20   endpoints that would protect against ever having the same kind

21   of exposure for cancer to occur.  So it's, again, part of the

22   overall continuum of our risk characterization process.

23   **Q.**   So to wrap up with the exposure assessment, the end result

24   of this stage in the risk evaluation is a qualitative

25   assessment of the data and, if you can, some sort of point of

1    departure or hazard level, a quantified hazard for a particular

2    point of departure; is that right?

3    **A.**    For the hazard characterization, yes.

4    **Q.**    Okay.

5              **MR. ADKINS:**  Your Honor, I'm happy to move on.  I am

6    at a breaking point here and I see that we're at 1:30, so . . .

7              **THE COURT:**  We're at 1:30, so this is an appropriate

8    point.  We'll break for today and resume tomorrow.  Thank you.

9         (Adjourned at 1:34 p.m.)

10                            --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          **CERTIFICATE OF REPORTER**

4              I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7

8      _____              February 6, 2024
       JENNIFER L. COULTHARD, RMR, CRR                DATE
9      Official Court Reporter
       CA CSR#14457
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25