```
 1                              Volume 5

 2                              Pages 686 - 856

 3                  UNITED STATES DISTRICT COURT

 4                NORTHERN DISTRICT OF CALIFORNIA

 5   Before The Honorable Edward M. Chen, Judge

 6   FOOD & WATER WATCH, INC., ET     )
     AL.,                             )
 7                                    )
                 Plaintiffs,          )
 8                                    )
       VS.                            )      NO. 17-CV-2162
 9                                    )
     UNITED STATES ENVIRONMENTAL      )
10   PROTECTION AGENCY, an agency     )
     of the United States, ET AL.,    )
11                                    )
                 Defendants.          )
12   _____  )

13                         San Francisco, California
                           Tuesday, February 6, 2024
14
15        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS

     APPEARANCES:
16
     For Plaintiffs:
17                         WATERS KRAUS & PAUL, LLP
                           222 N. Pacific Coast Highway, Suite 1900
18                         El Segundo, California  90245
                      BY:  MICHAEL P. CONNETT
19                         CHARLES ANDREW WATERS
                           ATTORNEYS AT LAW
20
                           NIDEL & NACE, PLLC
21                         5335 Wisconsin Ave., NW, Suite 440
                           Washington, DC 20015
22                    BY:  CHRISTOPHER THOMAS NIDEL
                           ATTORNEY AT LAW
23

24        (Appearances continued next page.)

25   REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                    Official U.S. District Court Stenographer
```

1  **APPEARANCES (Continued):**

2  For Defendants:

3                          UNITED STATES DEPARTMENT OF JUSTICE
                           Environmental Defense Division
                           601 D Street, NW, Room 8814
4                          Washington, DC  20004
                      BY:  **BRANDON N. ADKINS, ATTORNEY AT LAW**

5
                           UNITED STATES DEPARTMENT OF JUSTICE
6                          1301 Clay Street, Suite 340-S
                           Oakland, California  94612
7                     BY:  **EMMET P. ONG, ATTORNEY AT LAW**

8                          UNITED STATES DEPARTMENT OF JUSTICE
                           Environmental Defense Division
9                          150 M Street, N.E.
                           Washington, D.C.  2002
10                    BY:  **PAUL CAINTIC, ATTORNEY AT LAW**

11
   **ALSO PRESENT:**             DANIEL DePASQUALE, EPA
12                          JAY SANDERS (trial tech)
                           DANNY HAMBRICK (trial tech)
13

14                         --oOo--

15

16

17

18

19

20

21

22

23

24

25

Tuesday, February 6, 2024 - Volume 5

**I N D E X**

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **BARONE, STANLEY** | | |
| (PREVIOUSLY SWORN) | 693 | 5 |
| Cross-Examination resumed By Mr. Adkins: | 693 | 5 |
| Redirect Examination By Mr. Connett: | 742 | 5 |
| Recross-Examination by Mr. Adkins: | 750 | 5 |
| **THEISSEN, KATHLEEN** | | |
| (SWORN) | 751 | 5 |
| Direct Examination By Mr. Connett: | 752 | 5 |
| Cross-Examination By Mr. Adkins: | 824 | 5 |

<u>**Tuesday - February 6, 2024**</u>                               <u>**8:31 a.m.**</u>

**P R O C E E D I N G S**

--oOo--

    (In open court.)

        **THE CLERK:**  Court is calling the case Food & Water

Watch, Inc. et al. versus Environmental Protection Agency,

et al., Case No. 17-2162.

        Counsel, please state your appearance for the record

beginning with plaintiff.

        **MR. CONNETT:**  Good morning, Your Honor, Michael

Connett on behalf of plaintiffs.

        **THE COURT:**  All right.  Good morning, Mr. Connett.

        **MR. WATERS:**  Good morning, Your Honor, also for

plaintiffs.

        **THE COURT:**  Good morning.

        **MR. NIDEL:**  Good morning, Your Honor, Chris Nidel on

behalf of plaintiffs.

        **THE COURT:**  Good morning, Mr. Nidel.

        **MR. ADKINS:**  Good morning, Your Honor, Brandon Adkins

for the defendants.

        **THE COURT:**  All right.  Good morning.

        **MR. ONG:**  Good morning, Your Honor; Emmet Ong on

behalf of the defendants.

        **THE COURT:**  Good morning.

        **MR. CAINTIC:**  Good morning, Your Honor; Paul Caintic

 1    on behalf of defendants.

 2        **THE COURT:**  All right.  Good morning, Mr. Caintic.

 3    Get my computer fired up here.

 4        Unless there's anything to discuss, we should just

 5    pick up where we left off.

 6        **MR. ADKINS:**  Your Honor, defendants call back to the

 7    stand Dr. Barone.

 8        **THE COURT:**  Great.  As he's approaching the stand, let

 9    me confirm what's in the record with respect to the monographs,

10    the drafts and the peer-review comments that was referred to

11    yesterday.

12        I take it, obviously, the 2022 version I have.  Are

13    all of the prior versions, drafts of the NTP Monograph

14    exhibits, are they in the record, or what's the status?  I

15    can't remember whether we --

16        **MR. ADKINS:**  The 2019 and the 2020 drafts, I believe,

17    are not.

18        **MR. CONNETT:**  Yes.  The 2019 and 2020 drafts are not

19    part of the current exhibits.  What we have -- I can identify

20    for Your Honor what we have in the record, and that is

21    Exhibit 67 is the May 2022 Monograph.  Exhibit 68 is the July

22    2022 Meta-analysis.  Exhibit 69 is the BSC Working Group

23    Report.  And in that report, Your Honor, you have two -- you

24    have two things.  You have NTP's responses to agency comments

25    as well as the BSC's comments on NTP's comments, and then you

```
 1    have, at the end of that document, you have the September 2022
 2    version of the Monograph.  That version, though, Your Honor, is
 3    largely identical.  It has basically some comments in the
 4    margins.
 5              So we have -- in the record there is the September
 6    2022 Monograph.  That's towards the end of Exhibit 69.  There's
 7    the May 2022 Monograph that's Exhibit 67, and there may be the
 8    November 2021 version of the Monograph at the end of
 9    Exhibit 69.
10         THE COURT:  Well, I ask because there was testimony
11    elicited yesterday, and there may be more on direct or cross,
12    about the initial draft, the National Academy comments and the
13    whole dispute about whether they're -- the tag line was going
14    to be a finding of a toxicant or whether it eventually moved to
15    a state-of-the-science thing.
16              And it seems to me, since we've got testimony on it,
17    without me seeing it, it's hearsay.  I mean, I -- don't I need
18    to see what the back and forth was and the comments from the
19    National Academy and then the response of the NTP and then the
20    further review?  I think there were two series of reviews.
21         MR. ADKINS:  So what you have, Your Honor -- we do
22    have, as exhibits, they are admitted exhibits in evidence, the
23    two NASEM reviews of the 2019 and the 2020 draft Monographs.
24         THE COURT:  Well, what exhibits are those?
25         MR. ADKINS:  You know, I was scrambling to get my
```

 1   exhibit list now and let you know it.

 2           **MR. CONNETT:**  I think it's 543 and 544 or 542 and 543,

 3   but it's right --

 4           **THE COURT:**  Okay.

 5           **MR. CONNETT:**  562 and 563.

 6           **MR. ADKINS:**  We can get the right numbers for you.

 7           **THE COURT:**  We'll figure that out.  So those are the

 8   reviews of the initial 2019 and then the 2020 drafts?

 9           **MR. ADKINS:**  That's right.  That's right.  And so then

10   what you have -- the next public version after those reviews

11   is, essentially, the May 2022 draft --

12           **THE COURT:**  Right.

13           **MR. ADKINS:**  -- the prepublication draft.  So you do

14   see the revisions after the NASEM reviews.

15           **THE COURT:**  Right.  What I don't see is what they were

16   reviewing.

17           **MR. CONNETT:**  Your Honor, from plaintiffs --

18   plaintiffs certainly have no objection to introducing the

19   September 2019 draft and the September 2020 draft of the NTP

20   reports.  We have no objection to that.

21           **MR. ADKINS:**  We have no objection -- I think we've

22   attached them to filings already --

23           **THE COURT:**  All right.

24           **MR. ADKINS:**  -- in this case.

25           **THE COURT:**  But why don't we formally -- you know,

```
 1  they may or may not be useful, but it's like seeing one side of
 2  correspondence almost.
 3          MR. ADKINS:  Sure.
 4          THE COURT:  So if you could, maybe, stipulate and give
 5  those exhibit numbers.  At least they're available if I need to
 6  look at them.  Thank you.
 7          MR. ADKINS:  Will do.
 8          THE COURT:  Okay.  Good morning.
 9          THE WITNESS:  Good morning.
10          THE COURT:  You may -- wait.  Wait, wait.  I Got to
11  get my -- one more thing here, everything working.
12          THE WITNESS:  Testing.
13          THE COURT:  Okay.  We are now in day five, right?
14          THE CLERK:  Yes.
15          MR. ADKINS:  Day five of a three-hour tour.
16          THE COURT:  Yeah, it seems like it.  I hope the same
17  thing doesn't end up -- we get in a ruin somewhere here, but
18  all right.
19       (Witness previously sworn.)
20             CROSS-EXAMINATION    (resumed)
21  BY MR. ADKINS:
22  Q.   Okay.  Dr. Barone, yesterday, just to get our bearings
23  here, yesterday we talked about the four steps of the
24  risk-evaluation process, correct?
25  A.   We did.
```

1   Q.   And we went into detail on the hazard assessment, the

2   first step of that process, right?

3   A.   We did.

4   Q.   So today I want to pick up with the next step, the

5   exposure assessment, all right?

6   A.   Okay.

7   Q.   Now, I understand you prepared U.S. Demonstrative 4, which

8   is a graphical explanation of what the agency does during the

9   exposure assessment phase.  And do you see that on your screen?

10  A.   I do.

11  Q.   Could you -- could please explain for us each of the boxes

12  represented on U.S. Demonstrative 4, please?

13  A.   Sure.  So overall this is the exposure assessment

14  procedures and general outline.

15       So we try to define, first off, the sources and pathways.

16  Sources include food, water, soil intake, air intake, medicines

17  that might contain the compound, non-TSCA uses, other fluoride

18  products.  Again, they could be non-TSCA uses, and they could

19  be including pesticides.  Again, non-TSCA uses.

20  Q.   When you say "non-TSCA uses," what do you mean by that?

21  A.   Other conditions of use that are not covered by the Toxic

22  Substance Control Act.  So if it's a food, cosmetic or drug, it

23  would not be covered by the -- by TSCA.

24  Q.   And moving to the next box, intake level.

25  A.   So once we identify the sources, we try to estimate,

1   through monitoring data or through modeling, what the media

2   intake level would be.  And an example would be water -- what

3   the water intake level would be, what the food intake would be

4   and then what populations are the focus for the intake levels.

5   Are we talking about a particular segment of the population, or

6   are we talking about the general population lifetime exposure?

7        So we try to make sure that we understand and characterize

8   and identify which population we're focused on.

9        And in some cases, we're focused on multiple segments of

10  the population.  And from there we go on to calculate an

11  exposure level.

12  Q.   Well, before you do that, let me just follow up on a

13  couple terms that you used.  You said "modeling" and

14  "monitoring."  Can you differentiate those terms for us?

15  A.   Sure.  Sure.  So oftentimes we have media monitoring data

16  ala what is the concentration of the chemical substance either

17  in surface water or finished water.  That would be for water

18  media monitoring.  In some cases, we don't have that

19  information or we have limited information, so we can also use

20  modeled estimates of what would be in that media, and that

21  gives us a more probabilistic way, oftentimes, of what those

22  levels might be over time.

23  Q.   Okay.  Now, you can continue, please, to the exposure

24  level for condition of use.

25  A.   So from the intake level and, sort of, concentration in

 1   media, we want to get to an exposure level.  But by "exposure

 2   level," I mean actually, as referred to previously, the dose at

 3   the portal of entry.  And so for oral exposures, we're really

 4   talking about a milligram per kilogram per day.  For inhalation

 5   exposures, we're generally talking about ppm per kilogram per

 6   day for inhalation.  But in a lot of cases, we focus on oral

 7   intake, and oral intake is -- either from animal studies or

 8   from human studies would be in milligrams per kilogram per day,

 9   and that would be media intake or total intake.

10       We try to, if we can, do the source apportionment for the

11   specific media and for the specific -- some specificity for the

12   condition of use.  So again --

13           THE COURT:  When you say "media," you're talking about

14   the source that's the condition of use or what do you mean by

15   media?

16           THE WITNESS:  Media generally applies to water, air,

17   soil.  That's the media that measurements are made in, that the

18   monitoring data is generally made in.

19           We try to parse that media into what would be from

20   food or water or soil if we're talking about dermal exposures

21   and oral exposures.  So media can be subdivided for that

22   oral -- for that intake level.

23   BY MR. ADKINS:

24   Q.   And I understand there's an equation that you use to

25   calculate the exposure level; is that right?

1  **A.**    There is.   There is an exposure equation for calculating

2  intake level standardized.   It's on our websites.

3      Again, the information is really pulled from national

4  representative samples for -- for the liters per day for

5  different subpopulations and for standard tables for body

6  weight and what those happen to be for the subpopulation of the

7  study.

8  **Q.**    Okay.   And we're going to look at that equation next, so

9  we can put a pin in that for now.

10 **A.**    Sure.

11 **Q.**    And could you just explain for us this last box, the

12 exposure characterization?

13 **A.**    So some of this has come up in previous conversations

14 before the Court.

15      We want to estimate the range of exposure levels for a

16 condition of use, and the range of exposure levels we bracket

17 usually from a central tendency measure, oftentimes the 50th

18 percentile mean or median level of exposure for that particular

19 condition of use to a high-end exposure level.   And the

20 high-end exposure level may be characterized at the 90th

21 percentile, 95th or 99th percentile.   It really depends upon

22 the veracity of the data that we have and the modeling

23 abilities that we have to estimate exposures at that high end.

24      And then, just like the hazard, we need to provide a

25 summary of the -- a qualitative summary of the strength of the

 1   evidence, again, trying to characterize what do we believe is

 2   the strength of the evidence at the 50th percentile, what do we

 3   believe is the strength of the evidence at the high end.

 4        In some cases we don't have as much confidence at the high

 5   end, and we don't use the high-end estimates.  But generally at

 6   the 50th percentile that's reasonably strong evidence.

 7        **THE COURT:**  I'll ask a question.  When you look at the

 8   exposure level for condition of use, are you looking at the

 9   exposure level attributable solely to that condition, or do you

10   also look at it in the aggregate from the other background

11   stuff?

12        **THE WITNESS:**  Good question.  So we want to be able to

13   try to estimate the background, what is the background

14   exposure, if there's endogenous levels of a particular

15   substance.  And in some cases there are endogenous levels or

16   background levels in the environment.  In some cases there's

17   geologic sources of background.  We want to be able to estimate

18   that.

19        In all cases we can't, and so sometimes we have to

20   accept that and describe that in the uncertainty, that there is

21   this background, and then we have exposure for the condition of

22   use on top of that background.

23        **THE COURT:**  Ideally, you would break that out, and you

24   could segment that from condition of use versus --

25        **THE WITNESS:**  Yes, sir.  The source apportionment is

1    one of the more difficult parts of the exposure assessment and

2    one of the important parts of characterizing -- characterizing

3    the strength of the evidence and the uncertainty that we have

4    in the evidence.

5            In some cases we can do source apportionment and, like

6    I said, in some cases we cannot, and we have to recognize that

7    we're looking at the exposure that is actually inclusive of

8    that background or inclusive of other conditions of use in some

9    cases that may not even be TSCA conditions of use.

10   **BY MR. ADKINS:**

11   **Q.**   So Dr. Barone, just so I can get straight with some of

12   these terms, the intake level and the media concentration, are

13   those synonymous, or are they distinct?

14   **A.**   The intake level -- there's several media under -- under

15   intake level, so we are trying to look at multiple estimates

16   there.  And it really -- you know, it really helps inform the

17   exposure level.

18           There was some discussion of aggregate, so we want to be

19   able to look at aggregate -- aggregation oftentimes across

20   routes and media, so oral, inhalation, dermal is desirable.

21   It's not always doable to aggregate across those different

22   media and those different intake levels.

23   **Q.**   And can you differentiate for us the intake level or media

24   concentration and the exposure level?

25   **A.**   So on the -- going from intake level to exposure level,

1  which really moving for that specific media to an exposure

2  level, which is what is -- what is received by the organism at

3  the portal of entry --

4  **Q.**  Okay.

5  **A.**  -- whether it's inhalation, whether it's oral, whether

6  it's dermal.

7  **Q.**  So similar to what we saw with the hazard assessment,

8  there is a quantitative result of the exposure assessment and a

9  qualitative exposure characterization.  That is the result of

10  the exposure assessment; is that a fair summary?

11  **A.**  That's correct.  And to -- really it's fit for purpose.

12  It depends upon the dataset; it depends upon the chemical.  It

13  also depends upon the condition of use.  So some conditions of

14  use we have more information than others.

15  **Q.**  Okay.  So let me show you the next demonstrative here.

16      Dr. Barone, do you see U.S. Demonstrative 5?

17  **A.**  I do.

18  **Q.**  So you described in your testimony that there's a

19  calculation that the agency uses for the exposure level.  Is

20  that represented on U.S. Demonstrative 5?

21  **A.**  It is.  It is.  This is sort of a generic equation for

22  calculating the administered dose, the average daily dose, with

23  concentration C, concentration of the contaminants.  Usually if

24  we're talking about oral contaminant levels in water, we're

25  talking milligrams per liter is usually the measurement or the

 1   units of measure.

 2        If we're talking IR, IR is the intake rate, so we want to

 3   be able to understand or estimate the intake rate.  And, again,

 4   as I suggested before, there's fairly good evidence for intake

 5   rate for different portions of the population, whether you're

 6   talking about adults, whether you're talking about children,

 7   whether you're talking about formula-fed children or whether

 8   you're talking about pregnant women.  There are very different

 9   intake rates across the population.

10        In pregnant women, of course, in the third trimester have

11   the highest mean and highest intake rates other than -- other

12   than newborns.

13        And then the last -- the last factor is body weight.  So

14   you want to have your concentration and intake rate adjusted

15   for the size of the body of the particular organism or person.

16   So mean body weight is also an important part of the equation

17   for estimating the average daily dose.

18        So there's a dilution factor by the size of the body, how

19   large or small the person might be.  And so for estimation of

20   body weight population -- distributions of body weight, we have

21   also that information to obtain from the exposure factors

22   handbook.

23        So intake rate, body weights come from the exposure

24   factors handbook which is peer reviewed and updated

25   periodically based upon NHANES surveys and other published

BARONE - CROSS / ADKINS

 1   surveys.

 2        And then concentration either comes from modeled or

 3   measured concentrations that are available in the literature or

 4   available in national sample databases.

 5   **Q.**   The concentration, is that the media concentration, or is

 6   it an intake rate?

 7   **A.**   That's the media concentration.  So what we're calculating

 8   here is, you know, the intake rate.  The average daily dose is

 9   the total equation here.

10   **Q.**   Okay.  So I see you have the units indicated under

11   "Average Daily Dose."  Do you see that?

12   **A.**   I do.

13   **Q.**   What are the units, Dr. Barone?

14   **A.**   So the units are milligram per kilogram per liter.

15   Actually, I think, maybe another demonstrative shows how the --

16   how the units cancel out liters per day for concentration and

17   intake level actually cancel out in the mathematical equation,

18   and you're left with milligrams on the first line day but on

19   the second line and kilograms on the third line.

20   **Q.**   Okay.  You lost me a little bit there.  So I see on your

21   demonstrative the under "Average Daily Dose" milligram per

22   kilogram per day, not per liter; is that correct?

23   **A.**   Milligrams per liter is concentration, liters per day for

24   drinking water intake rate, and body weight in kilograms.

25   **Q.**   Right.  So you're explaining how you get to the ultimate

**BARONE - CROSS / ADKINS**

1   unit, which is --

2   **A.**   Correct.

3   **Q.**   What is the ultimate unit, Dr. Barone?

4   **A.**   The ultimate unit is milligrams per kilogram per day.

5   **Q.**   Okay.  Very good.

6        So if we have milligram per liter in the concentration of

7   the contaminant multiplied by the drinking water intake rate,

8   which is in the units of liter per day, you're saying the

9   liters in those two components of this equation cancel out?

10  **A.**   Yes.

11  **Q.**   Okay.  And we're left with milligram per day just for the

12  numerator of this equation, right?

13  **A.**   Correct.

14  **Q.**   That's then divided by the body weight, which is in units

15  of kilogram, correct?

16  **A.**   Correct.

17  **Q.**   And that's how we get milligram per kilogram per day?

18  **A.**   Correct.

19  **Q.**   Okay.  Dr. Barone, is this exposure level formula

20  represented on U.S. Demonstrative 5 a formula that the Agency

21  used in any of the first ten risk evaluations?

22  **A.**   We actually used this in all of the first ten risk

23  evaluations.  In some cases, we have extra correction factors

24  to go from ppm to milligram.  In some cases we have corrections

25  from micrograms to milligrams.  Again, those are just unit

1  corrections, additional factors that can be incorporated into

2  the equation.

3       Another -- so we can also, for chronic, calculate lifetime

4  average daily dose.  And again, it's just entering another unit

5  into the day, how many days.  So, for the most part, if you're

6  looking at day -- the number of days of exposure, the numerator

7  and the denominator generally cancel out.  The only times they

8  don't cancel out is if you're looking at shift work for

9  occupational exposures.

10       THE COURT:  And if there are multiple sources, you

11  would have additional factors in the numerator?

12       THE WITNESS:  We could.  We could if we were looking

13  at aggregate.  If we had con -- if we actually had the media

14  concentration for food, water, we could look at the average

15  daily doses and aggregate.

16       Oftentimes we don't.  Oftentimes we may have a total

17  concentration and not be able to parse those out; but

18  generally, we try to parse those.

19       THE COURT:  Thank you.

20  BY MR. ADKINS:

21  Q.   Let's turn to the risk characterization.  So this is --

22  the risk characterization is the third step in the risk

23  evaluation process?

24  A.   Yes, sir.

25  Q.   And you have a demonstrative here that explains the risk

 1  characterization, correct?

 2  **A.**    Correct.  So for risk characterization --

 3  **Q.**    Well, just -- Dr. Barone, that demonstrative is U.S.

 4  Demonstrative 6 for the record; is that correct?

 5  **A.**    Sure.  Yes.

 6  **Q.**    Please go ahead and explain this.

 7  **A.**    Yeah.  So for the risk characterization, there's two

 8  parts.  There's the quantitative part, and there's the

 9  qualitative part.  This is where we actually calculate risk.

10  So the point of departure from the hazard characterization and

11  the exposure intake level is carried forward.  So the margin of

12  exposure, the equation is hazard point of departure divided by

13  the exposure level in milligrams per kilogram per day.  So

14  those units need to match in the numerator and the denominator

15  in order to come up with a unitless measure of risk for that

16  particular condition of use.

17       As I said, there's a qualitative evaluation of the

18  strength of the evidence from hazard and a qualitative

19  evaluation of the strength of the evidence for exposure, so

20  that exposure characterization informs that and the hazard

21  characterization informs that qualitative evaluation.

22       And we discuss the overall strength of the evidence for

23  the risk, and we discuss the uncertainties in the assumptions.

24       Now, those uncertainties may be -- they may extend beyond

25  just the calculations of the benchmark MOE.  The benchmark MOE,

1    as we discussed earlier yesterday, was predicated on the

2    uncertainties in the hazard as it relates to the general

3    default assumptions of uncertainty in extrapolating from

4    animals to humans or from LOAEL to NOAEL or from intrahuman

5    variability and uncertainty.

6         There are other potential uncertainties, and there are

7    other potential assumptions that we need to be able to

8    characterize, particularly as it relates to the exposure

9    assessment, but also other potential uncertainties that we need

10   to characterize as it relates to the dose-response assessment

11   and the hazard.

12   **Q.**   Very good.  So I heard you testify yesterday that the risk

13   characterization is where the hazard assessment and the

14   exposure assessment come together --

15   **A.**   Correct.

16   **Q.**   -- is that accurate?

17   **A.**   Correct.

18   **Q.**   Okay.  And we -- we saw with the hazard assessment and the

19   exposure assessment that there was a quantitative component and

20   a qualitative component, right?

21   **A.**   Yes, sir.

22   **Q.**   Now, this risk characterization is where the quantitative

23   components come together and the qualitative components come

24   together; is that a fair summary?

25   **A.**   Exactly.

 1   **Q.**   Okay.  So we have one more demonstrative to show you.

 2        Dr. Barone, do you see U.S. Demonstrative 7?

 3   **A.**   I do.

 4   **Q.**   Now, this -- this is entitled "Margin of Exposure."  Do

 5   you see that?

 6   **A.**   I do see it.

 7   **Q.**   Is this the margin-of-exposure calculation that you

 8   described on the last demonstrative concerning risk

 9   characterization?

10   **A.**   Yes, it is.

11   **Q.**   Can you explain that for us?

12   **A.**   I sure can.

13        Again, this relates to what's coming in quantitatively

14   from the hazard assessment in the point of departure.

15        So we have to have reasonable certainty -- again, we want

16   to have something that's defensible as a point of departure.

17   We want to have an exposure level that we feel confident in.

18   Both of these generally have medium to high confidence,

19   generally speaking, to provide a risk estimate.

20        So the hazard level in milligrams per kilogram per day is

21   divided by the exposure level in milligrams per kilogram per

22   day.  That gives you a unitless measure, and you compare that

23   unitless measure against the uncertainty factors for the hazard

24   point of departure that you've identified from your hazard

25   characterization.

1         And if the -- if the -- and again, depending -- it depends

2    upon the point of departure that was chosen what that benchmark

3    MOE is going to be.  If the unitless calculated product of the

4    MOE is less than that benchmark uncertainty factor, then

5    there's -- that's an indication of risk.  If it's greater than

6    the benchmark MOE, then that's generally presumed to be no

7    risk.

8         Again, these are not bright lines and hard and fast, but

9    that's a general -- that's the general approach with an MOE.

10   **Q.**   The numerator that you describe in the MOE equation, that

11   comes from the hazard assessment, correct?

12   **A.**   It comes from the hazard assessment.

13   **Q.**   Okay.  And the denominator, in that same equation, comes

14   from the exposure assessment, right?

15   **A.**   It does come from the exposure assessment.  It does not

16   come from the concentration from the hazard assessment.  It's

17   not the exposure that the hazard occurred at.  It's the

18   exposure of the condition of use at the 50th percentile or 95th

19   percentile, for example.

20   **Q.**   We looked at the average daily --

21        **THE COURT:**  But the concentration of the media will

22   affect that number.  I mean, the higher the concentration, the

23   higher the total intake and the higher the exposure.  I mean,

24   there's a relationship between the concentration in the media

25   and what is absorbed or exposed to the body, obviously.

1           THE WITNESS:  So the concentration in the media for

2      the exposure level is definitely -- those are related to one

3      another.

4           THE COURT:  Yeah.

5           THE WITNESS:  The exposure concentration for the

6      hazard may or may not be related to the media.  It's more

7      related to the experimental or observations.  So oftentimes --

8      and there's been some discussion of high dose or low dose or

9      the range of concentrations.  That's really experimentally

10     driven.  And what you can describe are the exposure levels, the

11     exposure response levels for the hazard.  It's not the exposure

12     concentration, per se.

13          THE COURT:  But there's a relationship?

14          THE WITNESS:  There's a relationship.  But what we're

15     trying to define is, what is the margin of exposure between the

16     media concentration and where we see an effect concentration.

17          Do you remember our conversation about NOAELs and

18     LOAELs?

19          THE COURT:  Yep.

20          THE WITNESS:  So that's -- you can have an exposure

21     concentration in the media that's way below the hazard, and

22     hopefully that's the world we live in, but it's not always the

23     case, and that's why we're doing this calculation of risk is

24     how close is the media concentration, the environmental media

25     concentration and the intake level to that effect level that

 1   we're measuring for the hazard.

 2          THE COURT:  The effect level as indexed to or measured

 3   by the intake exposure level?

 4          THE WITNESS:  By some exposure metric.  And again,

 5   we've talked about intake level metrics, we've talked about

 6   internal concentration levels with different biomarkers,

 7   whether it's blood, whether it's hair, whether it's nails or

 8   whether it's urinary biomarkers.  We have to be able to take

 9   those different biomarkers internal metrics and convert them

10   back to an intake level in order to calculate risk.

11          THE COURT:  Okay.  I assume we're going to get into

12   that.

13          MR. ADKINS:  Yes, Your Honor.  We expect to proffer

14   testimony about how the evidence stacks up with each of these

15   equations that we're going through.  But for purposes of

16   Dr. Barone's redirect, so to speak, right now, he's speaking on

17   behalf of the agency just limited to how the agency conducts

18   risk evaluation.

19          THE COURT:  Okay.

20   BY MR. ADKINS:

21   Q.   So, Dr. Barone, continuing on, the numerator -- excuse

22   me -- the denominator in this equation -- it's been awhile

23   since algebra for me -- the exposure level, that is the

24   equation that we looked at, the average daily dose, correct?

25   A.   That is correct.

1  Q.   Okay.  So when you do that division, you come up with a

2  unitless number, and the number is unitless because milligram

3  per kilogram per day cancels out milligram per kilogram per day

4  in the numerator and the denominator?

5  A.   That is correct.

6  Q.   Okay.  And you said if the margin of exposure exceeds the

7  benchmark margin of exposure, there is not risk shown; is that

8  correct?

9  A.   That is correct.

10 Q.   What does EPA do if there's not risk shown at that point

11 in the process?

12 A.   If there's no risk for that particular condition of use --

13 and again, we are looking at an array of estimates of risk --

14 if there's no risk for any of those array, whether 50th

15 percentile or high-end estimates, we basically say there's no

16 unreasonable risk that goes into the consideration of no

17 unreasonable risk for that condition of use.

18 Q.   Does the agency weigh the risk-related factors that we

19 heard you discuss in the risk determination step that comes

20 after risk characterization?

21 A.   Yes.  Yes.  And that's where we -- that's where we

22 consider all these risk-related factors, when we have a risk

23 that's below the benchmark.

24 Q.   Right.  So let me be more precise.

25      If the margin of exposure exceeds the benchmark, so you've

1  shown no risk during the risk characterization, does the agency

2  move forward to risk determination for that particular

3  condition of use?

4  **A.**  We do not.

5  **Q.**  And if the agency shows there may be a risk because the

6  margin of exposure is lower than the benchmark margin of

7  exposure, then does the agency move on to risk determination?

8  **A.**  We do.

9  **Q.**  Okay.  So -- I was going to say let's move on to risk

10  determination, but there are a couple of points I want to make

11  sure we get out.

12  **A.**  Okay.

13  **Q.**  The benchmark margin of exposure, how does the agency

14  calculate a benchmark margin of exposure?

15  **A.**  So the benchmark margin of exposure is based upon what is

16  the point of departure, what's the nature of the point of

17  departure.  Are we talking about human data or animal data?

18  Are we talking about a NOAEL or LOAEL, or are we talking about

19  a BMCL?  There are different aspects to the fit-for-purpose

20  context of the dose response of the point of departure, what

21  the nature of that point of departure is, and whether we have

22  default uncertainty factors or whether we have data derived

23  uncertain factors going into what is the benchmark.

24       Generally speaking, we've talked about an intraspecies.

25  That's the human variability uncertainty factor of 10 is

 1   generally considered unless we have PBPK modeling for humans

 2   and we can reduce the uncertainty factor for intrahuman

 3   variability based upon the toxicokinetics factors.  That's one

 4   way we reduce the uncertainty factor for -- from 10 to

 5   something else, to 3 usually.

 6        If it was animal data, if the point of departure was based

 7   upon animal data, we would consider an interspecies uncertainty

 8   factor, and that default is ten, ten-fold as well.  If we have

 9   body weight to the three-quarters adjustment, allometric

10   scaling is oftentimes used.

11        If we believe that it's appropriate to allometrically

12   scale, we can reduce that uncertainty factor to 3 for

13   pharmacodynamic variability in the cross-species extrapolation.

14        And the other instance is where we use PBPK modeling to

15   extrapolate from animals to humans.  We can also reduce that

16   uncertainty factor for the toxicokinetic component to 1 and

17   retain the pharmacodynamic factor.

18        In certain cases, very data-rich chemicals, we can

19   actually reduce both the pharmacokinetic and pharmacodynamic

20   component if we have a biologically-based dose-response model,

21   but there's fewer cases of that in the body of the

22   toxicological literature.

23   **Q.**  The benchmark margin of exposure that the agency

24   calculated -- well, let me back up.

25        Has the agency used the margin-of-exposure analysis in any

 1  of the first ten risk evaluations?

 2  **A.**   We used the MOE approach in all of the first ten risk

 3  evaluations.

 4  **Q.**   So there aren't any -- in none of the first ten risk

 5  evaluations did EPA not use the margin-of-exposure analysis?

 6  **A.**   For human health hazard we used exclusively a

 7  margin-of-exposure analysis for non-cancer.

 8  **Q.**   The lower the benchmark margin of exposure, the more

 9  uncertainty or -- excuse me, the less uncertainty the agency

10  has in the data; is that right?

11  **A.**   That's correct.  Generally speaking, again, from a

12  quantitative perspective, a lower benchmark MOE is an

13  indication of lower uncertainty.

14       As I said before, there might be other qualitative

15  concerns about uncertainty and variability that can be

16  described, but not quantitated generally, and so you have to

17  look at both the qualitative and the quantitative.

18       But, in general, we consider risk estimates with a lower

19  benchmark uncertainty factor as having lower uncertainty.

20  **Q.**   And the agency's determination of what the appropriate

21  benchmark margin of exposure is for a particular chemical

22  substance is based on a review and analysis of the data for

23  that particular chemical substance; isn't that right?

24  **A.**   It is.  It's based upon review and analysis of that

25  particular chemical substance, and its relevance to the

 1   conditions of use that it's being applied to.

 2        And, oftentimes, this is the focus of our peer-review

 3   evaluations as well.  Our peer reviews generally comment on and

 4   public comments generally address our description and

 5   quantitation and use of default uncertainty factors or

 6   data-derived uncertainty factors.

 7   **Q.**   Does the agency ever apply a benchmark margin of exposure

 8   because it did that in a different risk evaluation for a

 9   different chemical substance?

10          **MR. CONNETT:**  Overbroad, vague.

11          **THE COURT:**  Rephrase that, please.

12   **BY MR. ADKINS:**

13   **Q.**   Has the agency ever looked across different chemical

14   substances for which it completed a risk evaluation to

15   determine what the benchmark margin of exposure should be for

16   the chemical substance for which it is doing the risk

17   evaluation?

18          **THE COURT:**  I'm sorry.  I don't understand the

19   question.

20          **MR. ADKINS:**  Sure.

21   **BY MR. ADKINS:**

22   **Q.**   So does the agency ever look to other benchmark margins of

23   exposure that it applied for different chemical substances when

24   doing a risk evaluation?

25   **A.**   The short answer is no.

1          The benchmark uncertainty factor is really focused on the

2    specific POD, point of departure, for that particular margin of

3    exposure.

4          We're not looking at points of departure from other

5    chemicals, per se.  For benchmark response rates, we may

6    consider, if we're doing BMDS analysis -- this is back in dose

7    response -- what we've done --

8          (Reporter seeks clarification.)

9              THE WITNESS:  We consider benchmark response rates,

10   which is the BMR that was discussed earlier.  We consider what

11   we have used for other chemicals for the outcome.  Again, it's

12   outcome-based.  But this particular -- when we're talking about

13   this subject of benchmark MOEs, we're talking specifically

14   about this POD, not PODs that were derived for other -- other

15   chemical assessments.

16   BY MR. ADKINS:

17   Q.   And you've said a couple of times that the margin of

18   exposure is a unitless number.

19   A.   I have.

20   Q.   Do you know why it's important that that be a unitless

21   number?

22   A.   Yeah.  It's -- the general concept is to be able to have

23   something to compare.  So you have MOEs -- again, under TSCA

24   we're looking at different critical effects, as I described,

25   that might be within the acute scenario or chronic scenario.

 1   We have different acute effects and chronic effects.  We want

 2   to be able to look at that in a unitless way and be able to say

 3   what's the range, the biological gradient from one outcome to

 4   another outcome.

 5        And, again, it's very helpful for us to be able to

 6   characterize those risk estimates.  Those risk estimates are

 7   later considered in our rule-making in our benefits analysis.

 8        So having that peer reviewed and having an understanding

 9   of what the biological gradient is, is very important for later

10   evaluation and provides for a more defensible, stronger

11   evidentiary assessment.

12        THE COURT:  And just to reiterate what we talked about

13   yesterday, just so I'm clear, any uncertainty in choosing the

14   point of departure, that's -- there's some estimate of that as

15   well, right?  It's not whether it's -- assuming you're using a

16   dose-response, you know, curve and all that, that does not

17   factor into the benchmark MOE.

18        You just choose -- once you've chosen your POD, you're

19   sort of committed to that.  And even though there may be some

20   uncertainty as to what the confidence range is for that POD,

21   that's a separate matter.  That doesn't get into the BMOE,

22   right?

23        THE WITNESS:  You're spot on.  Do you want to do some

24   risk assessment?

25        THE COURT:  I just want to make sure because I could

1  see a scenario where one might say, well, there's some

2  uncertainty exactly where that -- you know, where the departure

3  level should be; and therefore, we should build in a bigger

4  margin in the MOE, but I guess --

5          **THE WITNESS:**  No.

6          **THE COURT:**  -- you don't do that?

7          **THE WITNESS:**  No.  We're not trying to confound --

8  again, that's a very difficult -- that's a difficult concept

9  that you're bringing up.

10          We're keeping the uncertainty in the modeling or the

11  uncertainty in the POD separate, and we describe that -- we

12  actually try to describe that in the qualitative terms.  So if

13  we -- again, we try to provide the evidence for different model

14  fits and how those different model fits provide a range of

15  estimates for the POD.

16          We try to provide, in some cases, the NOAEL/LOAEL

17  approach as a comparator for the POD uncertainty.  That's

18  separate, separate from the benchmark MOE aspects for the --

19  for the risk estimation.

20          So qualitative versus quantitative aspects to the

21  uncertainty are important for us to describe.

22          **THE COURT:**  Thank you.

23  **BY MR. ADKINS:**

24  **Q.**   Before we move on to the last step in the risk-evaluation

25  process, I want to take a look at some of the slides that

```
 1   plaintiff showed during their opening statement and ask you if
 2   they're consistent with how the agency, in fact, does risk
 3   evaluation, okay?
 4          MR. ADKINS:  So, Mr. Hamburg, if you could please pull
 5   up slide 35 from plaintiff's opening.
 6          THE WITNESS:  I see slide 36.
 7   BY MR. ADKINS:
 8   Q.   Okay.  So this is PDF page 35.  This is slide 36.  This is
 9   exactly where we want to be right here.
10   A.   Okay.
11   Q.   So this is great.  Thank you.
12        Now, you see in this slide that the plaintiffs grouped the
13   risk-evaluation process into a second step that consists of
14   quantitative dose response, exposure assessment and risk
15   characterization.  Do you see that?
16   A.   I do.
17   Q.   Is this how EPA does risk assessment, Dr. Barone?
18   A.   No.  And as we were describing earlier, hazard assessment
19   includes the hazard identification, the dose response and the
20   hazard characterization, which includes the weight of the
21   scientific evidence, the evidence integration across data
22   streams and the characterization of the hazard, both
23   qualitatively.  So that's one unit of the activities under the
24   hazard assessment.
25        The red highlighting of dose response with exposure
```

 1   assessment with risk characterization gives the impression

 2   you're lumping together dose response with exposure assessment.

 3   Exposure assessment is separate.  And as we just went through

 4   the MOE calculation, it's a parallel activity that's separate

 5   in quantitative and qualitative characterization.  And so we

 6   want to be able to describe the exposure at the media level for

 7   the conditions of use, and that's specific to the conditions of

 8   use under TSCA.

 9        The risk characterization is bringing together step 1 and

10   step 2, all the elements from step 1 and step 2, into risk

11   characterizations, those result into the risk characterization.

12   What is the point of departure that you have confidence in or

13   points of departure that you have the most confidence in for

14   either acute or chronic scenarios or for non-cancer and chronic

15   scenarios generally for cancer.

16        MR. ADKINS:  Mr. Hamburg, could you please turn to PDF

17   page 38?

18   BY MR. ADKINS:

19   Q.   So, Dr. Barone, you see that plaintiffs stated here that

20   EPA inferred risk during step B, what they've characterized as

21   step B.  Is this consistent with how EPA performs risk

22   evaluation?

23   A.   No.  We don't infer risk.  We calculate risk.  Step B --

24   again, I was confused by this, frankly.  There's no inferences.

25   We have to be able to provide fairly significant

1  characterization of what the risk might be and the risk range,

2  so that's through our calculations and estimation process.

3  It's not an inference process.  It's not a hypothesis or

4  hypothesis testing.  It is really an estimation and calculation

5  of risk.

6  **Q.**   Dr. Barone, what would happen if EPA inferred risk under

7  TSCA?

8  **A.**   Inferred risk would be a different standard.  And in our

9  new chemicals program under section 5 we have an actual

10 different standard where it's a "may present" finding, so we

11 can infer risk.  But under section 6, we really have to be able

12 to make a "will present" finding of risk.  So it's a

13 significant -- it's a different standard for us for the

14 evidence and for the risk estimation.

15 **Q.**   Now, you heard plaintiffs describe in their opening that

16 dividing a hazard level by uncertainty factors can allow one to

17 infer risk.  Do you recall that?

18 **A.**   I did hear that.  Again, that is not risk.  That is a

19 hazard, and that's a hazard approach common to the IRIS

20 assessments where a reference concentration or a reference dose

21 is calculated.  It's an important screening level aspect to

22 characterizing the potential hazard, but it's not a risk

23 estimate.

24 **Q.**   Is it similar to anything that EPA has done under amended

25 TSCA under section 6?

 1   **A.**   No, because we don't -- we don't use an RFC or an RFD,

 2   per se.  We are focused on risks -- calculating risk for

 3   conditions of use.  So we have to include in our estimation, in

 4   our risk calculation, the actual exposure that's related to

 5   that condition of use.  So just focusing on hazard alone does

 6   not get the job done.

 7   **Q.**   "Condition of use," that's a term that's in the statute,

 8   correct?

 9   **A.**   "Condition of use" is a term -- a statutory term, and we

10   have to lay out condition of use -- what we consider conditions

11   of use in both the prioritization phase of the risk

12   evaluation -- of TSCA and in the risk evaluation phase and the

13   scoping of the risk evaluation, the problem formulation in the

14   risk evaluation.  We have to lay out the conditions of use that

15   are going to be assessed in the risk evaluation, and that is

16   statutorily required and defined for preemption possibilities

17   for other -- other bodies, state assessments and other

18   assessments.

19         **MR. ADKINS:**  Mr. Hamburg, could you please turn to PDF

20   page 113?

21   **BY MR. ADKINS:**

22   **Q.**   Okay.  Do you see what's labeled slide 114 on your screen,

23   Dr. Barone?

24   **A.**   I do.

25   **Q.**   Does this accurately represent how EPA conducts risk

1  evaluation under TSCA?

2  **A.**   No.   I -- I'm actually a little befuddled by this

3  presentation because it doesn't relate to how we evaluate risk

4  in the context of margin of exposure.   Talking about hazard

5  level and exposure level in this context, the way this is

6  presented I'm -- I'm not sure what this means.

7          **MR. ADKINS:**   And Mr. Hamburg, could you please turn to

8  PDF 115?

9  **BY MR. ADKINS:**

10  **Q.**   Dr. Barone, do you see what's labeled slide 116 on your

11  screen?

12  **A.**   I do.

13  **Q.**   Does this slide accurately depict how EPA performs risk

14  evaluation under TSCA?

15  **A.**   Again, this reference to "inferred risk," maybe it's the

16  word "inferred," but it really throws me because we're not

17  inferring risk, we're estimating risk, calculating the risk

18  based upon the exposure concentration and the point of

19  departure.

20          **MR. ADKINS:**   Mr. Hamburg, could you please turn to PDF

21  117.

22  **BY MR. ADKINS:**

23  **Q.**   And Dr. Barone, do you see what's labeled slide 118 on

24  your screen?

25  **A.**   I do.

1  **Q.**   And this is referring to the MOE approach.  Do you see

2  that?

3  **A.**   I do.

4  **Q.**   And so I'll withdraw that question.

5           **MR. ADKINS:**  Mr. Hamburg, could you move to PDF 121?

6  Okay.  Thank you.  This is where we want to be.

7  **BY MR. ADKINS:**

8  **Q.**   So, Dr. Barone, do you see the slide showing exposure

9  condition of use, average, high, average, high on the top?

10 **A.**   Average for dry cleaning and high for lithographic

11 printing?

12 **Q.**   Yes, that's right.

13          And on the Y axis there's "Margin of exposure."  Do you

14 see that?

15 **A.**   I do see the Y axis says "Margin of exposure."

16 **Q.**   There are four bars, two red bars and two blue bars.  Do

17 you see that?

18 **A.**   So I see the two red bars on the left with 89X for PCE

19 column and 27X for methylene chloride.

20 **Q.**   Okay.  I'm just trying to explain this for the record when

21 we go back and read what we were talking about.  We can

22 understand where we are, because there's no page designation on

23 this.

24 **A.**   Sure.

25 **Q.**   So Dr. Barone, does this accurately depict how EPA does

1  risk evaluation under amended TSCA?

2  **A.**   So this suggests -- and I -- this is what I believe I'm

3  understanding from the graphic, at least for -- the margin of

4  exposure was the product, unitless products was 89 for the

5  average exposure for dry cleaning.

6       And I think this is -- I'm not sure, it doesn't say.  I

7  think this is for -- for workers.  Again, it doesn't say which

8  particular subpopulation risk estimate it's for, but that's,

9  again, for a subpopulation for that condition of use.

10      Under the high, I believe that is for lithographic

11 printing.  In the high exposure estimate, the product of the

12 MOE was 27.

13      Comparing across average and high-exposure estimates for

14 risk for different conditions of use is really not an

15 appropriate comparison, kind of not done -- not kind of not

16 done; not done.

17      We do look, oftentimes, across particular conditions of

18 use and say:  Do we have similar kinds of MOEs across

19 conditions, the same condition of use for different chemicals

20 when we're looking at relative risk, and we're talking about

21 relative risk post risk evaluation.  But that's a different --

22 that's a different thing, and that's the reason why we like to

23 have the unitless measure and not have a confounded risk

24 estimate with uncertainty.  And again, we can compare the

25 uncertainty in a separate column for MOEs, so that's an

1   important distinction.

2       When we get to the right, the far right two columns, it

3   talks about average water fluoridation and high water

4   fluoridation.  And I believe we're talking about water

5   concentrations of .7 mgs per liter and -- which is the CDC

6   recommendation for fluoridation and 1.5.  Those are water

7   concentrations, those are not intake concentrations.

8       So what the -- what the estimates here are -- it says,

9   "NTP hazard level," so I'm thinking that NTP 1.5 mgs per liter

10  was a basic benchmark in their systematic review evaluation

11  where they were evaluating.  They had confidence -- moderate

12  confidence above 1.5 for the hazard in their systematic review.

13      It seems to me that they're pointing to that as a point of

14  departure.  It seems to me that they're pointing to the water

15  concentration level of .7 mgs per liter and 1.5 mgs per liter

16  in the 2X column and the 1X column.  But, again, I'm unsure of

17  what the derivation is based upon, but that's my best guess.

18          **MR. CONNETT:**  Your Honor, at this point I would move

19  to exclude everything the witness just said in terms of

20  speculating about something he doesn't know about.

21          **THE COURT:**  Well, all right.  I'm not going to exclude

22  it, but I'll give it whatever weight it deserves.

23          Let me clarify a couple things.  The NTP Monograph,

24  when it refers to the 1.5 milligrams per liter, that was

25  referencing drinking water, wasn't it, drinking water

 1   concentrations, not necessarily urine concentrations?

 2          THE WITNESS:  It was referencing fluoride

 3   concentrations from multiple studies, both drinking water and

 4   urine was my understanding from the systematic review.

 5          And again, that's looking back at their forest plot.

 6   What I understood from reviewing the NTP's report in their

 7   evidence integration, they were looking across a range of

 8   exposures and different types of exposures, dietary versus

 9   water versus different biomarkers.  There was a -- there was

10   really a clustering and a break point in the overall data and

11   the confidence in the data above 1.5 mgs per liter, and that's

12   what they spoke to in their confidence level for their overall

13   hazard evaluation of the data that they reviewed in their

14   systematic review.

15          THE COURT:  But it was based on total fluoride

16   exposure levels.

17          THE WITNESS:  Total fluoride exposure levels from

18   different types of measures, many different types of measures.

19          THE COURT:  And some of those measures could include

20   urine concentration?

21          THE WITNESS:  Some of the -- some of them did include

22   urine concentration.

23          THE COURT:  And I assume there's some inference that

24   that somehow is related or reflects intake exposure?

25          THE WITNESS:  There were inferences that it related to

 1    intake, and there were inferences that it related to the water

 2    concentration.

 3          What wasn't provided in the NTP report was any

 4    means -- they did not attempt to convert any of those metrics

 5    back to an intake level from urine concentration, maternal

 6    urine creatinine-corrected urine concentrations back to intake

 7    level.  They didn't provide that.  They didn't attempt to

 8    provide that.  And recognize that there was a good bit of

 9    uncertainty there.

10          **THE COURT:**  That's something that must be done fairly

11    often, I would assume, in this sort of analysis, that is,

12    sometimes you have biological markers, as you say, whether it's

13    blood, urine or something else, and you've got to then, as you

14    put it, sort of, work backwards or forwards to the intake

15    level.  That's not an unknown endeavor.  That must be a common

16    endeavor in this area.

17          **THE WITNESS:**  It is a common endeavor, Judge, and

18    actually an important one.

19          So if earlier you've heard testimony about our

20    estimation of risk for lead and methyl mercury and PCBs.  In

21    all of these cases, we've actually struggled to get back to

22    intake level and particular media concentrations.  The way we

23    have been able to address that is through PBPK modeling.  We

24    have had to use PBPK modeling for our lead analysis of risk.

25    We've used PBPK modeling in our methylmercury analysis of risk.

1           For PCBs, we've had to use a NOAEL/LOAEL approach

2    oftentimes to actually get at what is the appropriate units in

3    milligrams per kilogram per liter or milligrams per kilogram

4    per day.

5           So it's a -- it's a challenge.  It's a real challenge

6    and without -- if you're using internal dose metrics, it's one

7    of the things that you have to accomplish, is how am I going to

8    get back to that intake level?

9           **THE COURT:**  Yeah.  When something is done with oral

10   intake of drinking water as opposed to breathing ambient air or

11   lead dust on -- from paint and that sort of thing, which is

12   very hard to measure, I would imagine, and goes through more

13   complicated biological processing, one would think, as a

14   layperson, that whatever the formula is, it would seem less

15   complicated to infer intake of drinking water with a certain

16   chemical and what is found in the urine.

17          I know there are variables, but it would seem like

18   that would be a simpler formula; am I wrong?

19          **THE WITNESS:**  It can be simpler.  The quandary we have

20   is when we're looking at life stage.  And you've already heard

21   some testimony about the importance of life stage.  When we're

22   talking about developmental exposures, particularly prenatal

23   exposures, we're talking about growth and development of the

24   fetus, we're talking about growth of the mother, we're talking

25   about a very unusual metabolic capacity.

**BARONE - CROSS / ADKINS**

 1          Women, during pregnancy, their body weight increases

 2    significantly over time, so that size -- that proportionality

 3    is a part of it, but the metabolism changes dramatically.  And

 4    we've heard about bone mobilization and the importance of bone

 5    mobilization.  We've also heard about the importance of kidney

 6    function.  We've heard about the -- you know, the

 7    transplacental transfer.  It may be one to one, it may not be

 8    one to one.  In some cases it's -- like in methylmercury,

 9    there's actually a greater proportion that concentrates in the

10    fetus.

11          So we have to be able to estimate or provide estimates

12    or at least describe the uncertainty in those different

13    pathways, and we need to be able to understand.  And generally

14    the way we understand that is back to the physiologically-based

15    pharmacokinetic model that describes those different

16    compartments and what the contribution of those different

17    compartments are to that circulating level that admit -- to

18    that administered dose.

19          **THE COURT:**  All right, but if you're simply measuring

20    not absorption by the fetus and blood-brain barrier issues and

21    all that, if you get past the biological mechanism stuff, just

22    looking at the urine output of a pregnant woman, one would

23    think -- and given the metabolism and everything else and the

24    stored, you know, fluoride and the release and the constant

25    dynamics of the bone structure and all that, over time you

 1    would think that -- unless it disappears -- that fluoride

 2    that's measured in certain concentration in the urine has some

 3    fairly predictable relationship to intake.

 4         **THE WITNESS:**  It has a relationship.  The issue,

 5    again -- and this is an important one -- it may be, depending

 6    upon the concentration, may be more linear in relationship and

 7    may be super-linear or sublinear.  Again, it depends upon where

 8    are you in the dose transition and the saturation of those

 9    particular compartments.

10         Kidney is very important.  So when we're talking about

11    a short half-life chemical like fluoride, that makes things

12    much harder and less precise when you're talking about that

13    biomarker, urinary biomarker.

14         If we're talking about hair, mercury levels, we

15    actually have an integrated measure over a longer period of

16    time, so you're able to relate back to a longer period during

17    gestation.

18         So it's a challenge when we're looking at these

19    different biomarkers in relating that back to what is the

20    period of exposure, what is the -- what is the degree of

21    constancy in that measure as you relate it back to both

22    internal concentration that the fetus would see, but also what

23    is that intake level.

24         **THE COURT:**  And are studies that look at, sort of,

25    cross-sectional -- we've seen some of this -- cross-sectional

1   data on women in fluoridated water areas and nonfluoridated

2   areas and you see the difference in concentration of urine

3   sometimes by double, sometimes by 50 percent depending, you

4   know, when you go from nonfluoride.  Can -- is that something

5   that can be used in modeling trying to figure out what the

6   relationship between intake and output is?

7            THE WITNESS:  It's an important aspect.  And looking

8   at that measure over time is important and helpful in

9   parameterizing the model predictions.  But, again, you want to

10  be able to look at what is that background level.  You want to

11  understand what that background level of -- of the particular

12  compound -- I'm not speaking to fluoride per se, but what that

13  background level of the compound is in your biomarker.

14           And when you're looking at your point of departure,

15  what you described as a -- describe as a BMCL or BMDL, if you

16  have an estimate that's below, below what your background is

17  normally, you've got a high degree of uncertainty in that

18  particular estimate.  It -- it -- biologically, something's not

19  being captured accurately if your BMDL or BMCL is below

20  background.

21           THE COURT:  All right.  But assume it's above

22  background in most cases.  How do you count for background

23  levels in doing the risk assessment?  I mean, I saw the formula

24  and you look at the exposure based on the media that's being

25  consumed, et cetera, et cetera, but if you start with a

 1   background level, let's say, that's halfway there to the point

 2   of departure or 60 percent of the way there, then how do you --

 3   how do you account for that?  Do you look at the total in doing

 4   risk assessment?  Are you saying with condition of use that

 5   adds an extra -- do you add that to -- how do you account for

 6   the background exposure?

 7             THE WITNESS:  We look at both.  We look at -- we try

 8   to source a portion and look at -- for the condition of use

 9   that we can actually regulate how much of that is contributing

10   to the risk, overall risk.  That's important, number one, for

11   TSCA.

12             Then we try to contextualize that risk with non-TSCA

13   uses and non -- or background and try to characterize the

14   overall risk.  And that's a difficult, difficult but important

15   part of the discussion in the risk determination.

16             THE COURT:  So if the sum of the non-TSCA exposure

17   plus the condition-of-use exposure gets you into that margin of

18   error, exceeds the benchmark or whatever, I don't know if it

19   exceeds, gets you closer to the point of departure, that --

20   that would be -- if you're in that margin -- benchmark margin

21   of error, that would be deemed a risk, even though some of that

22   risk is due to background?

23             THE WITNESS:  Potentially.  I will say in the first

24   ten risk evaluations, they were so clear cut.  We really didn't

25   consider background and the aggregation of background exposures

 1   in those particular risk evaluations as being significant.

 2         THE COURT:  But if it were, theoretically, you would

 3   take the aggregate of any significant background plus the

 4   condition-of-use contribution and see if that exceeds or gets

 5   you into that risk zone; is that correct?

 6         THE WITNESS:  We would look at the condition of use by

 7   itself, and we'd look at the total risk and compare the two.

 8   But, again, it's sort of situational dependent for the

 9   condition of use whether we would actually make a declaration

10   of unreasonable risk.  And since we haven't done that yet, I

11   can't say exactly how -- what -- what that would be because we

12   haven't done it yet.

13         THE COURT:  So you don't know what the agency position

14   would be if, for instance, if you have a point of departure and

15   the background is fairly high, gets you, like, 50 percent of

16   that point of departure and then the evidence suggests that the

17   condition of use adds another 50, 60, 70 percent, the EPA

18   hasn't decided how that -- whether that would -- they would

19   consider that a risk?

20         THE WITNESS:  An unreasonable risk.  Again, the -- not

21   just a risk.  We can calculate whether it's a risk or not, but

22   making that determination for that condition of use that it's

23   unreasonable risk in the context of background exposure or in

24   the context of a overall risk cup with other conditions of use

25   that are not TSCA.  We have not performed that particular --

```
 1   haven't crossed that bridge yet.
 2            THE COURT:  Okay.  So that's in the ultimate decision
 3   whether it's unreasonable risk.
 4            THE WITNESS:  Absolutely.
 5            THE COURT:  But would you find there's a risk, so long
 6   as the aggregate gets you within the margin of error?
 7            THE WITNESS:  We could -- we could look at the risk
 8   for TSCA and non-TSCA uses.
 9            THE COURT:  Okay.
10   BY MR. ADKINS:
11   Q.   Okay.  So let's turn to the last step in the
12   risk-evaluation process, the risk determination.
13            So, Dr. Barone, could you just summarize for us what is
14   the agency doing in the risk-determination phase of the
15   risk-evaluation process?
16   A.   Sure.  So in the risk determination, you know, not all
17   risks are unreasonable, so we're trying to characterize with
18   the strength of the evidence and the reasonableness of the risk
19   estimation what is unreasonable.
20            So we're describing in narrative, based upon the
21   considerations in the statute, what the magnitude of the
22   exposure is, what the adversity is, what is the size of the
23   population, affected population, what are the variabilities in
24   exposure, uncertainties in the exposure estimates, the
25   magnitude and pattern of exposures and the particular
```

1    potentially exposed and susceptible populations that might be

2    impacted in our discussion and discernment of unreasonable

3    risk.  So it's really a gestalt.  It's really a compilation of

4    the strengths -- of the strengths of the evidence and the

5    uncertainties and what assumptions we included that help us

6    derive what is an unreasonable risk.

7    **Q.**   And with respect to application of the risk-related

8    factors, the agency doesn't get to apply those factors before

9    actually determining there's risk; is that right?

10   **A.**   Those factors are considered when we're characterizing the

11   risk in the risk characterization, but we're not -- we're

12   not -- we're using those factors for our unreasonable risk

13   determination.  We're looking at that systematically to make an

14   unreasonable risk determination and have to provide a narrative

15   that describes that so that the actual unreasonable risk

16   determination or no unreasonable risk determination is

17   defensible because those are reviewable.  Those are reviewable,

18   you know, for the follow-on.  If no unreasonable risk is

19   determined, that's a reviewable discernment finding.

20        If we find unreasonable risk, then we go immediately to

21   rule making to reduce or mitigate the exposures that caused

22   that unreasonable risk.

23   **Q.**   And Dr. Barone, you testified some -- you testified

24   yesterday about the NASEM review of certain aspects of EPA's

25   systematic review procedures.  Do you remember that testimony?

1   **A.**   Yes, I do.

2   **Q.**   And I believe you testified that NASEM provided critical

3   feedback to those procedures; is that right?

4   **A.**   They did.

5   **Q.**   And made certain recommendations to how EPA performs

6   systematic review; is that right?

7   **A.**   They did.

8   **Q.**   What is -- what, if anything, has the agency done since

9   receiving that feedback from the National Academies?

10  **A.**   So -- thank you.

11      A number of things.  One of the biggest things was, we

12  actually drafted a TSCA-specific systematic review protocol,

13  generic protocol.  And included in that were appendices and

14  descriptions, sub-protocols for the 20-plus chemicals that are

15  currently high-priority substance or manufacturer requested

16  risk evaluations for the next phase of TSCA risk evaluations.

17  So that was greatly informed.

18      Some of the critical feedback that we received was --

19  which was not part of the applications document from 2018 was a

20  description of procedures and process for data integration and

21  data -- excuse me -- data synthesis for the different streams

22  of evidence, both mechanistic, animal evidence and human

23  evidence.  And we adopted much of the procedures that were

24  already proofed in the IRIS handbook for hazard, for human

25  health hazard in our approach.

 1          We also defined the differences between our evidence

 2     integration and our weight-of-the-scientific-evidence process,

 3     which was an important distinction that the NASEM called out as

 4     how do we get from evidence integration to weight of the

 5     scientific evidence and how does systematic review fit into

 6     that?  So we provided a significant amount of narrative and

 7     description about how that process worked and how weight of the

 8     scientific evidence can also include other information besides

 9     information coming from just systematic review.

10          So all of that is captured in the draft systematic review

11     protocol, which we received -- we peer reviewed and received

12     public comments on.  In the interim we've now adapted that and

13     used that in both the ongoing assessments for -- supplemental

14     assessment for 1,4-dioxane, the supplemental assessment part 2

15     for asbestos looking at the conditions of use and the aspects

16     of the asbestos assessment that was not evaluated in chrysotile

17     in part 1 and then subsequently the TCEP flame retardant

18     assessment that was just recently released for public comment

19     and peer review, also has updates that reflect our revisions in

20     response to NASEM and the SACC review of the -- Scientific

21     Advisory Committee on Chemicals, sorry, review of our draft

22     systematic review protocol.  So those responses are

23     incorporated into the TCEP assessment.

24          **MR. ADKINS:**  Mr. Hamburg, could you please pull up

25     slide -- or excuse me, PDF page 121 from plaintiff's opening

 1  statement?  Okay.  Thank you.

 2  BY MR. ADKINS:

 3  Q.   So, Dr. Barone, just one last question for you here:  The

 4  89 times and the 27 times represented in this figure, does that

 5  matter at all to risk evaluation under TSCA?

 6          MR. CONNETT:  Overbroad, vague.

 7          THE COURT:  Hold on.  Sustained.  You need to make

 8  that more specific.

 9  BY MR. ADKINS:

10  Q.   Sure.  Does the 89 times and the 27 times, is that how --

11  are those factors that EPA has ever used when performing risk

12  evaluation under TSCA?

13          MR. CONNETT:  Same objections.

14          THE COURT:  I'm still not sure I understand the

15  question.

16          MR. ADKINS:  Okay.

17  BY MR. ADKINS:

18  Q.   Dr. Barone, the 89 times and the 27 times, are those

19  hazard quotients?

20          MR. CONNETT:  Same objection -- I mean still vague and

21  ambiguous.

22          THE COURT:  Hazard quotients?

23          MR. ADKINS:  Quotients.

24          THE COURT:  I'm not sure what that means.

25  \\\

1    BY MR. ADKINS:

2    Q.   Dr. Barone, do you understand the term "hazard quotient"?

3    A.   I do understand the term "hazard quotient."  These are not

4    hazard quotients.  A hazard quotient is looking at, really, a

5    reference concentration, and so these aren't hazard quotients.

6         The 89 is essentially if -- it could be matched to the

7    unitless MOE of the -- of the particular condition of use, the

8    particular estimate of risk.

9    Q.   And is that the same for the 27 times?

10   A.   The 27 also matches up with the high lithographic printing

11   MOE of 27.  It's a unitless measure.  It's compared to the

12   benchmark.  It's not compared back to the point of departure.

13   There's -- there's no comparison back to the point of

14   departure.  That's not the relative comparison.  It makes --

15   it's not -- it's not used.

16   Q.   And when EPA is characterizing risk for a particular

17   chemical substance, would it look to values like this across

18   other risk evaluations?

19   A.   You know, again, it makes no sense to compare lithographic

20   printing -- an MOE of lithographic printing high-exposure

21   levels to average dry cleaning levels.  Those are apples and

22   oranges.  We don't do that.

23        We do, again as I said, look at MOEs as part of our

24   risk-risk evaluations when we're talking about substitution or

25   potential substitutions.  For relative risk we will look at the

 1   MOEs, at least partly, to inform that effort, but that's --
 2   this comparison here is not used, and it doesn't make any
 3   sense.
 4        **MR. ADKINS:**  Okay.  No further questions at this time.
 5   Thank you.
 6        **THE COURT:**  All right.  Can I ask one related
 7   question.
 8        I understand that the benchmark MOEs for one chemical
 9   is unrelated, you look at each -- each study, but I'm just sort
10   of curious, in the first ten studies that were done, the
11   analyses, was a -- did the EPA ever apply a benchmark MOE lower
12   than 10?  Has it always exceeded a factor of 10 or something
13   like that?
14        **THE WITNESS:**  So for the first ten risk evaluations,
15   to my recollection, the lowest MOE, benchmark MOE was ten.  I
16   don't think we ever -- I don't think there was a POD where we
17   used a benchmark less than 10.  There were a couple -- a number
18   of times where we had the benchmark of 10.
19        **THE COURT:**  Right.
20        **THE WITNESS:**  Generally they were between 10 and 100,
21   in some cases higher, but generally speaking, our benchmark MOE
22   and our uncertainty was allocated to somewhere between 10 and a
23   hundred.  There was a couple cases it was 300.
24        **THE COURT:**  Okay.  And did any of those studies
25   involve the exercise of having to look at urine concentrations

CONNETT - REDIRECT / BARONE

```
 1  as opposed to blood or other biomarkers?
 2         THE WITNESS:  Actually, in the first ten risk
 3  evaluations, we looked at a number of internal dose metrics.  I
 4  don't believe we actually used blood biomarkers, and we did not
 5  use urinary biomarkers in the first ten risk evaluations.
 6         The -- there were, of course, blood, urine, serum
 7  concentrations used in the validation of the PBPK models, but
 8  we weren't actually using those, per se, as the dose metric for
 9  the POD.
10         THE COURT:  But did the agent have to convert
11  biomarkers to intake exposure?
12         THE WITNESS:  We did, yes, sir.  We did.  And it was
13  generally an internal metabolic biomarker, serum biomarker, not
14  a urinary biomarker, per se.
15         THE COURT:  Okay.  So you haven't gone through that
16  exercise yet of urine?
17         THE WITNESS:  In the first ten risk evaluations we
18  have not gone through that exercise.  We did not have that type
19  of data presented to us in the literature.
20         THE COURT:  Okay.  Thank you.
21         All right.  Anything further on redirect?
22         MR. CONNETT:  Yes, Your Honor.
23                    REDIRECT EXAMINATION
24  BY MR. CONNETT:
25  Q.  Dr. Barone, just to dovetail from this discussion about
```

1  comparing benchmark MOEs across risk evaluations, I just want

2  to ask you sort of a related question, which is, you agree, as

3  you testified at your deposition, that fluoride should not be

4  held to a higher evidentiary burden for hazard and risk than

5  other industrial chemicals, correct?

6  **A.**   Generally speaking, yes, I agree that the standard of

7  evidence is going to be the same for all our chemical

8  assessments.

9  **Q.**   Now, you testified this morning that EPA does not infer

10  risk, correct?

11  **A.**   I did.

12  **Q.**   Okay.

13       **MR. CONNETT:**  Your Honor, at this time I'd like to

14  read deposition testimony.

15       **THE COURT:**  Okay.  Why don't you identify it.

16       **MR. CONNETT:**  I'm going to start with page 150 --

17       Jay, can we start with 158?

18       **MR. SANDERS:**  Yeah.  Just one moment.

19       **MR. ADKINS:**  What page?

20       **MR. CONNETT:**  158, 19 to 159, 2.

21       **MR. ADKINS:**  Which deposition?

22       **MR. CONNETT:**  This was his 30(b)(6) deposition from

23  July 24th, 2023.

24  **BY MR. CONNETT:**

25  **Q.**   So Dr. Barone, remember how you were the representative

 1  for the Environmental Protection Agency in the deposition last

 2  summer to talk about how EPA does risk evaluations under TSCA?

 3  **A.**   Yes, I remember.

 4  **Q.**   Remember you took an oath to tell the truth just like you

 5  took today?

 6  **A.**   Yes, I did.

 7          **MR. CONNETT:**  Okay.  Your Honor, at this time subject

 8  without objection I'm going to read the deposition testimony.

 9          **THE COURT:**  Okay.

10          **MR. ADKINS:**  No objection.

11  **BY MR. CONNETT:**

12      **"QUESTION:**  So EPA for this condition of use was prepared

13      to extrapolate from high-dose animal studies to infer that

14      the lower doses that these manufacturing workers were

15      exposed to presents an unreasonable risk, right?

16      **"ANSWER:**  So you could make that assumption from the

17      narrative here."

18      Next deposition testimony is page 192, line 25 to line

19  193, 8.

20          **MR. ADKINS:**  No objection.

21          **THE COURT:**  Okay.  Go ahead.

22  **BY MR. CONNETT:**

23  **Q.**   And despite the -- sorry.  Strike that.

24      **"QUESTION:**  Despite the fact that there were no

25      epidemiological studies linking the PCE exposures among

1    ONUs with neurotoxicity, EPA inferred there to be a risk

2    for that population, correct?

3    "ANSWER:  Again, yes, based upon the calculation of the

4    margin of exposure.  The point of departures are based

5    upon epidemiological studies, and those studies are

6    referenced here."

7    Next deposition transcript, 194, lines 3 to 13.

8        MR. ADKINS:  No objection.

9  BY MR. CONNETT:

10    "QUESTION:  At no point in that analysis is there any

11    requirement whatsoever to have an epidemiological study

12    linking the human exposure level at the condition of use

13    with the hazard endpoint, correct?

14    "ANSWER:  I think in general we are looking at our

15    inferences between the exposure studies -- human exposure

16    studies and the condition -- the exposure for that

17    condition of use."

18    Now, moving beyond semantics, I wanted to ask you about

19  your testimony about benchmark dose, okay?

20    You made comments in your testimony about Dr. Grandean's

21  BMCL analysis, correct?

22  A.   Yes, I did.

23  Q.   You based your comments on EPA's BMD guidance technical

24  manual, correct?

25  A.   Yes, I did.

1    Q.   Dr. Barone, you know that that technical manual does not

2    even apply to human data?

3    A.   Actually, that's not true.

4    Q.   Okay.  Let's go ahead and look at it.

5         Would you agree with what's written in that manual, or do

6    you disagree with what's written in that manual?

7    A.   I do agree with what's written in the benchmark dose

8    guidance.

9              MR. CONNETT:  Great.  Jay, put it on the screen, the

10   BMD, the PowerPoints.

11             MR. SANDERS:  Yeah.

12   BY MR. CONNETT:

13   Q.   Okay.  Dr. Barone, you see the EPA benchmark dose

14   technical guidance on your screen?

15   A.   I do.

16   Q.   Okay.  Let's look at the table of contents.  You see this

17   report is 65 pages long before the glossary?

18   A.   I do.

19   Q.   Okay.  What's the -- what page of this report does the

20   discussion of human data begin?

21   A.   The table of contents -- this appendix is on human data

22   and specific considerations for human data.  Does not mean that

23   the rest of the report is not relevant to human data.

24   Q.   Well, we'll look at that in about -- about a minute.

25   A.   Okay.

1   **Q.**   My question was more specific.   What page of this 65-page

2   main body of the report -- what page does the discussion of

3   human data begin?

4   **A.**   It begins on page 64 in the appendix.   This is the

5   appendix specifically for human data considerations.

6   **Q.**   So let's look at page 64, okay?   And you see how the

7   discussion of human data starts on page 64 and goes about a

8   quarter of the way up to page 65 and then ends?   Do you see

9   that?

10  **A.**   I do.

11  **Q.**   Okay.   So the total discussion of human data in the BMD

12  guidance is less than a page?

13  **A.**   That's not an accurate presentation of the benchmark dose

14  analysis guidance, because there's many instances that are

15  applicable in the body of the document that relate to human and

16  animal data and, generically, to benchmark dose analysis.

17  **Q.**   Okay.   So let's look at what your employer, the EPA, has

18  to say about that.   Let's look at page 65.   I'm going to read

19  this for you.   "Note that sometimes human toxicological data

20  are reported in ways that are similar to the reporting of

21  toxicological data for laboratory animals (for example, grouped

22  data for a sub-chronic effect, without covariates, and with

23  average exposures provided for the dose groups) and, in these

24  cases, this guidance document would be applicable."

25         Did I read that correctly?

1   **A.**   You did read that correctly.

2   **Q.**   Now, you would certainly agree that Dr. Grandean's BMCL

3   analysis of continuous individualized human urinary fluoride

4   data with control for covariates does not come within the scope

5   of what that statement that we just read says?

6   **A.**   So again, when you talk about model fitting and you talk

7   about verification of your model fitting, in that particular

8   chapter of the benchmark dose analysis doesn't call out

9   differences of human data and animal data.  It's applicable to

10  all data.

11         There are general procedures described and there is no

12  preference for a linear model, there's no directive for linear

13  modeling being preferred for lung cancer data.

14         **MR. CONNETT:**  Your Honor, I'll move to strike the

15  nonresponsive portion at the end.  I was not talking there

16  about linear modeling.

17         **THE COURT:**  Overruled.

18  **BY MR. CONNETT:**

19  **Q.**   So let's turn to page 64 of this document.  And on this

20  page EPA provides several exemplar models of how to do human

21  BMD analyses, correct?

22  **A.**   It does.

23  **Q.**   And one of the exemplar models of how to do a human BMD

24  analysis is Dr. Grandean and Dr. Budtz-Jørgenson's BMD analysis

25  of mercury and IQ, correct?

 1   **A.**    It is.

 2   **Q.**    Nowhere in this document does EPA criticize Dr. Grandean

 3   and his team for not doing a Chi-square analysis, right?

 4   **A.**    No.

 5   **Q.**    Nowhere in this document does EPA criticize Dr. Grandean

 6   for not doing, I think you mentioned, a Fischer -- a Fischer

 7   test?

 8   **A.**    Fischer exact test, no.

 9   **Q.**    Nowhere in this document does EPA criticize Dr. Grandean

10   for not using the Fischer test?

11   **A.**    This is not -- this document is not impugning anybody for

12   anybody's benchmark dose analysis.  This document is providing

13   guidance for best practices of what should be included for your

14   benchmark dose analysis and selection of BMR, selection of

15   factors and curve-fitting characterization.

16   **Q.**    Just to be clear, when EPA tells the scientific community

17   about how to do a human BMCL analysis, it doesn't tell them,

18   hey, look at Dr. Grandean's BMCL analysis but make sure you do

19   a Chi-squared or a Fischer test, right?

20   **A.**    What's being stated here is -- here are several examples,

21   occupational exposure for workers for carbon disulfide in the

22   IRIS assessment.  That's one approach that's been applied.

23        There's another approach from Budtz-Jørgenson in 2000.

24        There's another approach from the Wijngaarden analysis in

25   2006.  It goes on to talk about another approach in the next

1  sentence.

2      There are multiple approaches, there's not one approach,

3  but all of the characteristics that are described above in the

4  different aspects of the hierarchy for BMD analysis are

5  applicable to animal and human data.  The general procedures

6  are applicable.

7  **Q.**  And EPA recognizes in this document that when you're doing

8  human BMCL analyses like Dr. Grandean does, not of lab rats,

9  but of humans with continuous data, that those analyses are to

10  be done on a case-by-case basis, correct?

11  **A.**  Epidemiological data with covariates and regression

12  analysis of epidemiological data has unique statistical

13  strengths and properties.  But, again, the basic principles of

14  curve fitting, whether we're talking about the linear family of

15  models or nonlinear family of models, need to be described

16  adequately for them to be defensible for EPA's use.

17          **MR. CONNETT:**  Okay.  No further questions.

18          **THE COURT:**  Thank you.  Anything further?

19          **MR. ADKINS:**  Yes, Your Honor.

20          Now, Mr. Hamburg, could you please pull up

21  Dr. Barone's July 2023 deposition and take us to page 159,

22  lines 21 through 22.

23                  <u>**RECROSS-EXAMINATION**</u>

24  BY MR. ADKINS:

25  **Q.**  Dr. Barone, you were asked at your deposition:

1          "**QUESTION:**  And EPA inferred a risk and at that --"

2          And you answered --

3          "**ANSWER:**  EPA calculated a risk of that exposure"; is that

4          right?

5     **A.**   I did.

6               **MR. ADKINS:**  Okay.  Nothing further, Your Honor.

7               **THE COURT:**  Okay.  Anything further?

8               **MR. CONNETT:**  Nothing further, Your Honor.

9               **THE COURT:**  All right.  Thank you Dr. Barone, you may

10    step down, you're excused as a witness and that brings us I

11    think to our next break, all -- right? -- so we'll see you in

12    15.

13              **THE CLERK:**  Court is in recess.

14         (Recess taken at 10:09 a.m.)

15         (Proceedings resumed at 10:29 a.m.)

16              **THE CLERK:**  Please remain seated come to order.  Court

17    is back in session.

18              **THE COURT:**  All right.  Let's move on to the next

19    witness.

20              **MR. CONNETT:**  At this time, Your Honor, plaintiffs

21    call Dr. Kathleen Thiessen.

22              **THE COURT:**  Okay.

23              **THE CLERK:**  Remain standing, please.  Please raise

24    your right hand.

25         (Witness sworn.)

1          THE CLERK:  Thank you please have a seat, speak

2    clearly into the microphone, state and spell your first and

3    last name for the record.

4          THE WITNESS:  My name is Kathleen Thiessen.  My first

5    name is spelled K-A-T-H-L-E-E-N.  My last name is spelled T, as

6    in "Tom," H-I-E-S-S-E-N.

7          THE COURT:  All right.  Thank you, Dr. Thiessen.  You

8    may proceed, Mr. Connett.

9          MR. CONNETT:  And Your Honor, just as an aside, I

10   refer the Court to Dr. Thiessen's trial declaration, which is

11   at ECF 202-1 where a more -- a fuller discussion of

12   Dr. Thiessen's qualifications are provided.

13         THE WITNESS:  All right.

14                    **KATHLEEN THIESSEN**,

15   called as a witness for the Plaintiffs, having been duly sworn,

16   testified as follows:

17                    **DIRECT EXAMINATION**

18   BY MR. CONNETT:

19   Q.   Dr. Thiessen, where do you work?

20   A.   I work at Oak Ridge Center for Risk Analysis in Tennessee.

21   Q.   What's your position at the firm?

22   A.   I'm a senior scientist and currently also the president of

23   the company.

24   Q.   What scientist are you, Dr. Thiessen?

25   A.   I'm a risk assessment scientist.

 1   Q.   Since the trial in June of 2020, have you had any

 2   discussions with the DOJ about serving as an expert for the DOJ

 3   in other litigation?

 4   A.   A member of the DOJ contacted my company about the

 5   possibility of helping them in a totally unrelated case.

 6   Q.   And have you ever written any documents on the health

 7   effects of chemicals for the EPA?

 8   A.   I wrote two reports that were published by EPA on chemical

 9   toxicity.  There were also several smaller drafts of other

10   things I don't think were ever published.

11   Q.   What are the two chemicals that you've written health

12   assessments for the EPA on?

13   A.   One was on "Hydrogen Fluoride and Other Fluorides-related

14   Compounds" is I believe the title that was published in 1988.

15   There was another report that was written right after the

16   fluoride report on mercuric chloride.  And again, with the

17   related chemicals that was published in the early 1990s.

18   Q.   Dr. Thiessen, what do we see here on the screen?

19   A.   We see the cover of the National Research Council's 2006

20   Report on Fluoride in Drinking Water.

21        MR. CONNETT:  And I'll note, Your Honor, this is Trial

22   Exhibit 13.

23        THE COURT:  Okay.

24   BY MR. CONNETT:

25   Q.   Dr. Thiessen, were you involved in any way in the National

 1  research council's report in 2006?

 2  **A.**   Yes.  I was a member of the committee that authored that

 3  report.  I, myself, wrote a considerable fraction of it.

 4  **Q.**   The National Research Council, is it part of the National

 5  Academies of science?

 6  **A.**   Yes.

 7  **Q.**   And the National Academies of Science, at least back then,

 8  was often referred to as NAS?

 9  **A.**   Yes.

10  **Q.**   And is NAS today now called NASEM, N-A-S-E-M?

11  **A.**   Yes.

12  **Q.**   Have you been invited by the National Academies of

13  science, to help the NAS write any other reviews on fluoride

14  compounds?

15  **A.**   I was a member of a committee that authored a report on

16  certain air contaminants in submarines.  One of those

17  contaminants was hydrogen fluoride.  So yes, I've served on

18  that National Research Council committee also.

19  **Q.**   Were you the only member of the 2006 national research

20  council review that also served as a member on the 2009 review?

21  **A.**   No.  I'm the only one.

22  **Q.**   Does the research that you did as part of the NRC review

23  from 2006, does it inform the opinions that you have to offer

24  in this case?

25  **A.**   Yes.

1  **Q.**   So let's turn to the evidence in this case and how it fits

2  within the risk evaluation framework that EPA uses, starting

3  with the hazard identification step, okay?

4  **A.**   Okay.

5  **Q.**   Does the NRC's 2006 review on fluoride help to inform the

6  hazard ID step of the risk evaluation?

7  **A.**   Yes.  In fact, a lot of the research that has been done

8  since then was -- has been done because it was recommended in

9  the 2006 report.

10 **Q.**   Last week, the Court heard testimony from Dr. Lanphear

11 about his recent findings on fluoride, iodine deficiency and

12 hypothyroidism in the MIREC cohort.  Did the NRC make any

13 findings on these points that are relevant to an assessment of

14 Dr. Lanphear's recent research?

15 **A.**   Yes.

16 **Q.**   Can you explain?

17 **A.**   The NRC report identified neurotoxicity as a hazard of

18 fluoride and recommended additional research.

19      The NRC report described fluoride as a neurotoxic chemical

20 that could damage the brain.  It also described fluoride as an

21 endocrine disrupter, especially disrupting thyroid function and

22 especially in the presence of an iodine deficiency.

23      Turning, Dr. Thiessen, to page 263 of the NRC report and

24 I'm going to read the statement here, quote, "In humans,

25 effects on thyroid function were associated with fluoride

1   exposures of .05 to .13 milligrams per kilogram per day when

2   iodine intake was adequate and 0.01 to 0.03 milligrams per

3   kilogram per day when iodine intake was inadequate."

4   Did I read that correctly?

5   **A.**   Yes.

6   **Q.**   And was that the consensus view of the National Research

7   Council panel that iodine deficiency exacerbates the impact of

8   fluoride?

9   **A.**   Yes.

10  **Q.**   I'm going to turn to page -- another quote from page 263.

11  And the NRC writes here, quote, "The recent decline in iodine

12  intake in the United States could contribute to increased

13  toxicity of fluoride for some individuals."  Did I read that

14  correctly?

15  **A.**   Yes.

16  **Q.**   Dr. Thiessen, do you happen to know one way or the other

17  whether iodine deficiency is a common problem for pregnant

18  women here in the United States?

19  **A.**   It is.  I believe roughly a third of pregnant women are

20  low in iodine.

21  **Q.**   Now, you had mentioned earlier that the NRC did make some

22  findings with respect to fluoride and the brain; is that right?

23  **A.**   Yes.

24  **Q.**   And I'm reading here from page 222, quote, "It is apparent

25  that fluorides have the ability to interfere with the functions

1   of the brain."  Was that also a consensus finding of the NRC

2   panel?

3   A.   Yes.

4   Q.   Now, do you recall in the first trial hearing testimony

5   from Dr. Kristina Thayer, a scientist that works at EPA?

6   A.   Yes.

7   Q.   I'm going to read something she stated when I asked her:

8       "QUESTION:  Based on the animal studies on fluoride

9       neurotoxicity that you have reviewed, you agree that the

10      animal data supports the biological plausibility of

11      fluoride causing neurotoxic effects in humans, correct?"

12      And her answer was:

13      "ANSWER:  Yes."

14      Do you see that?

15  A.   Yes.

16  Q.   Do you agree with Dr. Thayer on that point?

17  A.   Yes.

18  Q.   Do you think NRC's findings from 2006 support Dr. Thayer's

19  testimony on that point?

20  A.   Yes.

21  Q.   So let's turn to the National Toxicology Program

22  assessment.  I want to ask you first, is there anything about

23  NTP's assessment that contradicts NRC's findings that fluoride

24  interferes with the functions of the brain?

25  A.   No.  Nothing has contradicted the NRC report.

1  Q.   Now, to be clear, in NTP's Monograph, NTP ultimately chose

2  to not include studies regarding learning and memory in

3  animals; is that right?

4  A.   Yes.

5  Q.   Okay.  Did NTP include in its monograph a review of

6  studies that were looking at, effects on the brain itself?

7  A.   There are a few discussed there, yes.

8  Q.   Let's go ahead and look at some of what NTP had to say on

9  this.  And Dr. Theissen, can you see page F.4 from the NTP

10  Monograph on your screen?

11  A.   Yes.

12        MR. CONNETT:  Your Honor, this is from Trial Exhibit

13  67.

14  BY MR. CONNETT:

15  Q.   And there is a section here called histopathology.  Do you

16  see that?

17  A.   Yes.

18  Q.   Okay.  Let's turn and see what the NTP says about these

19  studies.  I'm going to read it, quote, "The majority of the low

20  risk-of-bias studies (11 of 14 drinking water studies) found

21  some histological change in the brain of rats or mice treated

22  with fluoride at concentrations at or below 20ppm, of which

23  eight studies reported histological changes in the brain at or

24  below 10 ppm."

25        Did I read that correctly?

1   **A.**   Yes.

2   **Q.**   So the NTP is reporting here only the low risk-of-bias

3   studies; is that right?

4   **A.**   Right.

5   **Q.**   And Dr. Thiessen, how would you describe a concentration

6   of 20 ppm and 10 ppm fluoride in the water of rats or mice?

7   **A.**   Rats and mice have consistently required 5 to 10 times as

8   much fluoride exposure, perhaps more, to have the same effects

9   as in humans or the same concentrations in blood or bone as in

10  humans.  So mice and rats are much less sensitive.  Humans are

11  much more sensitive to fluoride than the laboratory animals.

12  **Q.**   Now, this finding here from the NTP that the 11 of 14 low

13  risk-of bias studies found histopathological changes in the

14  brains of fluoridated animals, is that consistent with the

15  finding from the NRC in 2006?

16  **A.**   Yes.

17  **Q.**   So I want to turn now to the NTP Meta-analysis.

18          **THE COURT:**   Before you get a there, maybe someone

19  should define for me what are histo -- whatever that word is.

20  What are these changes in the brain?  What does it mean?

21  **BY MR. CONNETT:**

22  **Q.**   Dr. Thiessen, can you explain some of what we're referring

23  to when we talk about histopathological changes?

24  **A.**   Right.  Well, pathology refers to changes that are

25  harmful.  Histology is when you look at the brain or some other

THEISSEN - DIRECT / CONNETT

1   organ microscopically, look at the tissue itself.

2       So when they're talking about histopathology, they're

3   talking about visible damage to the brain or whatever other

4   organ that can be --

5           THE COURT:  At the cellular level or --

6           THE WITNESS:  At -- most commonly at a level that you

7   can see with a light microscope.  And so yes, you can see

8   cells, you can see tissue structure, you can see changes in

9   organization of the cells.

10          THE COURT:  And that shows visible damage, but that --

11   the next step in terms of what the effect is in the operation

12   of the brain, that wasn't the subject of these studies?

13          THE WITNESS:  Many of these studies looked at some

14   kind of neurotoxicity in terms of a behavioral change or a

15   functional change in the animal that would imply damage to the

16   nervous system.

17       And when they were done with these tests, they

18   sacrificed the animal and looked at the brain tissue itself.

19          THE COURT:  So was there a relationship found between

20   functional aspects of these animals and the histopathology

21   found?

22          THE WITNESS:  Yes.  Although, in some cases the

23   histopathology is -- it shows up before the behavioral changes,

24   so it's actually a more sensitive endpoint, generally.

25          THE COURT:  Okay.  So just because you see some

1    visible damage or changes to the brain doesn't necessarily

2    translate into impairment of function or there's some delay or

3    what's the experience there?

4          THE WITNESS:  It's -- it's probably a matter -- some

5    of it would be delay.  If you continue the exposure long

6    enough, the effects are going to show up, but it's kind of --

7    there has to be enough damage to the brain before it's going to

8    show up in something -- in some of these laboratory tests of

9    behavior or learning.

10         THE COURT:  And apart from the histopathology of the

11   brain that was linked to fluoride, remind me what these studies

12   show in terms of functional effect on the animals.

13         THE WITNESS:  There are functional effects.

14         The NRC described a few of the earlier studies.  The

15   NTP, in 2016, described a considerable number of animal studies

16   on -- in some cases they were not able to be certain whether

17   the results were because of an effect on learning and memory or

18   an effect on motor function; but in either case, it's showing

19   damage, neurological damage.

20         THE COURT:  Okay.  Thank you.

21         MR. CONNETT:  May I proceed?

22         THE COURT:  Yep.

23   BY MR. CONNETT:

24   Q.   So Dr. Thiessen, have you read NTP's July 2022

25   meta-analysis on fluoride and IQ?

1    **A.**    Yes.

2    **Q.**    So let's turn to that, which is Trial Exhibit 68.

3        On Friday last week, counsel for EPA showed Dr. Grandean

4    this figure from the meta-analysis, which is eFigure 7 from

5    page 30 of the supplemental materials to the meta-analysis.  Do

6    you see that on your screen?

7    **A.**    Yes.

8    **Q.**    Does this -- do you see how I've highlighted the Bashash

9    and Green studies down below?  Do you see that?

10   **A.**    Yes.

11   **Q.**    And just to be clear, this figure is the forest plot; is

12   that correct?

13   **A.**    Yes.

14   **Q.**    Okay.  Does the data that are displayed here for Bashash

15   and Green, do they tell us the whole story about those studies?

16   **A.**    They do not.

17   **Q.**    And what do these data points that we see here, what do

18   they show us?

19   **A.**    They are showing differences between groups.  This is a

20   group analysis and not an individual analysis.  And in the case

21   of the Bashash study, it's actually with respect to urinary

22   fluoride in children, not to the maternal urinary fluoride.

23   **Q.**    And I'm just going to turn here to page 19 of the

24   supplemental materials, which shows part of eTable 2.  Do you

25   see this on your screen, Dr. Theissen?

 1    **A.**    Yes.

 2    **Q.**    And I've highlighted here data from the column titled

 3    "Mean Effects Meta-analysis."  Do you see that?

 4    **A.**    Yes.

 5    **Q.**    And do you see that this is referring to the Bashash 2017

 6    study?

 7    **A.**    Yes.

 8    **Q.**    So what does this data show us, the highlighted data show

 9    us here?

10    **A.**    That's showing the mean and standard deviation on the IQs

11    for the children based on classified or, I should say, grouped

12    on the basis of the children's urinary fluoride, either above

13    or below a reference level of .8 milligrams per liter.

14    **Q.**    Now, in the Bashash study, this -- these data points that

15    we see here, was there any control for covariates for these

16    kids?

17    **A.**    No.  There was no control for covariates, covariates in

18    these kids for this study, nor was there for the Green study

19    that was also in that forest plot.

20    **Q.**    Okay.  So let's look at the other column here that we see.

21    Do you see it's regression slopes meta-analysis on the right?

22    **A.**    Yes.

23    **Q.**    And what data do we see identified there for the Bashash

24    study?

25    **A.**    This was based on the maternal urinary fluoride over the

THEISSEN - DIRECT / CONNETT

1  whole range of exposures?

2  **Q.**   Now, did you hear Dr. Hu's testimony last week?

3  **A.**   So some of it, most of it.

4  **Q.**   When Dr. Hu was talking about the -- the results of his

5  findings with respect to maternal fluoride in childhood IQ,

6  would he have been referring to the data that we see

7  highlighted there?

8  **A.**   Yes.

9  **Q.**   And did the NTP ever plot out or do an analysis on this

10  regression data?

11  **A.**   I believe there is a -- yes.  There is an analysis of the

12  regression data also, right.

13  **Q.**   So Dr. Theissen, I've just turned to page 50 of the

14  supplemental materials for the meta-analysis.  And you see here

15  it's eFigure 19?

16  **A.**   Yes.

17  **Q.**   And what does this figure show us?

18  **A.**   This figure is showing the regressions on urinary

19  fluoride, either child urinary fluoride or in -- for Bashash

20  and Green, the maternal urinary fluoride in the regression of

21  the IQ scores in the children.

22  **Q.**   And is this figure doing analysis of individual fluoride

23  exposures as opposed to group-level averages?

24  **A.**   Yes.  These are individual analyses.

25  **Q.**   Okay.  And what's the overall effect here, and is it

THEISSEN - DIRECT / CONNETT

1    statistically significant?

2    **A.**    The overall effect is a reduction of 1.8 points in an IQ

3    score in children with increased fluoride content and, yes,

4    that is statistically significant.

5    **Q.**    Dr. Theissen, what do you place more weight on, the group

6    average exposure for childhood urinary fluoride content in the

7    Bashash study without any control for covariates or the

8    individualized maternal urinary fluoride levels with adjustment

9    for covariates?  What do you place more weight on?

10   **A.**    I place more weight on this one, the individual urinary

11   fluoride.

12   **Q.**    And --

13            **THE COURT:**  Just so I understand, the minus 1.81 is a

14   standard deviation measure, or is that an IQ?

15            **THE WITNESS:**  That's an IQ score.

16            **THE COURT:**  IQ score.  1.81 IQ?

17            **THE WITNESS:**  Right.

18            **THE COURT:**  And that's based on what exposure?  Is

19   that per .5 or per -- what is it?

20            **THE WITNESS:**  I believe it's per one gram per liter

21   difference in the maternal -- well, difference in the urinary

22   fluoride, either the maternal or the child.

23        (Reporter seeks clarification.)

24            **THE WITNESS:**  It's -- a minus 1.81, it's a change

25   of -- a downward change of 1.81 IQ points per 1 milligram per

```
 1    liter of fluoride in urine, either child's urine or maternal

 2    urine in two studies.

 3              THE COURT:  In maternal or --

 4              THE WITNESS:  Right.  For Bashash and for Green it's

 5    per 1 milligram per liter maternal urinary fluoride.

 6              THE COURT:  Okay.

 7              THE WITNESS:  For the other studies it's per 1

 8    milligram per liter urinary fluoride of the children.

 9              THE COURT:  I see.  The exposure is right there in the

10    column.

11              THE WITNESS:  Right.  It is.

12              THE COURT:  Thank you.  Right.  Got it.

13    BY MR. CONNETT:

14    Q.   So Dr. Thiessen, I just put on the screen page 20 of the

15    supplemental materials from Trial Exhibit 68 and you see --

16    what do we see here?

17    A.   This one is highlighting the mean effects analysis for the

18    Green, et al., study.

19    Q.   And in this table, the mean effects data that we see here,

20    is this for mothers living in fluoridated areas versus mothers

21    living in nonfluoridated areas?

22    A.   Yes.

23    Q.   And for that data, was there any adjustment for covariates

24    or not?

25    A.   This -- that particular mean effects analysis does not
```

THEISSEN - DIRECT / CONNETT

 1  have adjustment for covariates.

 2  **Q.**   Okay.  So would your testimony be the same if I asked you

 3  if you put more weight on the regression slopes meta-analysis

 4  than the mean effects meta-analysis for the Green study?

 5  **A.**   Yes.

 6  **Q.**   So I have put on the screen one of the slides from

 7  Dr. Barone's testimony earlier.  Do you see that?

 8  **A.**   Yes.

 9  **Q.**   It's EPA Demonstrative No. 3.  And as Dr. Barone

10  testified, the hazard assessment involves a

11  weight-of-the-evidence sort of analysis, right?

12  **A.**   Yes.

13  **Q.**   I want to ask you a little bit about your

14  weight-of-the-evidence analysis, okay?

15  **A.**   Okay.

16  **Q.**   Dr. Theissen, have you considered, in forming your

17  opinions, toxicokinetic data in terms of how it might apply to

18  early life fluoride exposures?

19  **A.**   Yes.

20  **Q.**   Can you explain?

21  **A.**   Basically, when the mother ingests fluoride from whatever

22  source, the fluoride crosses the placenta.  Many studies show

23  that essentially all of it crosses the placenta.  A few studies

24  show that it's a bit less, but the majority, if not all of the

25  fluoride in the mother's circulatory system does cross the

1    placenta.

2        The cord blood fluoride concentrations are going to be

3    similar to the maternal blood fluoride concentrations.

4    **Q.**   And what relevance does that have to you for your

5    assessment of the weight of the evidence?

6    **A.**   Basically, anything -- any fluoride that the mother

7    ingests is going to go to the fetus, and so the fetus is

8    receiving an exposure comparable to the mother's exposure.

9    **Q.**   In forming your opinions on the hazard of fluoride, have

10   you considered and relied upon the animal toxicology data?

11   **A.**   Those data very definitely support my opinion, yes.

12   **Q.**   And does the NTP's systematic review and meta-analysis

13   also inform your opinion on the hazard of fluoride?

14   **A.**   Yes.

15   **Q.**   Can you explain a little bit on that?

16   **A.**   Well, the NTP reported a consistent association between

17   fluoride exposure and reduced IQ in children.

18       The NTP found evidence of a dose response even at low

19   levels of exposure, even below 1.5 milligrams per liter

20   fluoride in drinking water and the NTP recognized that some of

21   the highest-quality studies that we have available were done in

22   areas with fluoridated water at .7 milligrams per liter.

23   **Q.**   And in your opinion, based on the totality of evidence

24   you've reviewed, the toxicokinetics data, the animal toxicology

25   data and the epidemiology data that the NTP has summarized, is

 1  there any reasonable scientific doubt as to whether

 2  neurotoxicity is a hazard of fluoride exposure?

 3  **A.**    Neurotoxicity is a hazard of fluoride exposure.  There's

 4  very definitely an abundance of evidence for that.

 5  **Q.**    So the Court heard yesterday that NASEM, the institute

 6  that you have done work for, has offered some critical comments

 7  about how both the EPA and NTP have communicated some of their

 8  analyses.

 9  **A.**    Right.

10  **Q.**    And you heard that testimony yesterday, right?

11  **A.**    Yes.

12  **Q.**    You have read NTP's Monograph, right?

13  **A.**    Yes.

14  **Q.**    You've also read EPA's risk evaluations under TSCA, right?

15  **A.**    Yes.

16  **Q.**    Okay.

17      How would you describe the relative quality of NTP's

18  communication of its assessment of fluoride neurotoxicity with

19  EPA's communication of its hazard assessments under TSCA?

20  **A.**    The NTP's assessment has been considerably more detailed

21  and more transparent.

22  **Q.**    Who -- between the NTP and EPA, who provides more

23  discussion and more analysis of the potential biases in the

24  studies that may influence the results?

25  **A.**    NTP.

1  Q.    Between EPA and NTP, who provides more discussion and

2  analysis for how they reach confidence determinations on the

3  hazard data?

4  A.    NTP.

5  Q.    Okay.

6        So I'm going to turn now to one of the risk evaluations,

7  which is Trial Exhibit 96.  Do you see that on your screen?

8  A.    Yes.

9  Q.    This is the risk evaluation for PCE?

10  A.   Yes.

11  Q.   And you've read this document?

12  A.   Yes.

13  Q.   I'm going to turn to the table of contents, which is page

14  8.  Do you see, Dr. Theissen, there is a section in the

15  document titled "Weight of the Scientific Evidence"?

16  A.   Yes.

17  Q.   And do you see that one subsection is titled

18  "Neurotoxicity"?

19  A.   Yes.

20  Q.   And is neurotoxicity the critical health effect upon which

21  EPA based its risk calculations?

22  A.   For PCE, yes.

23  Q.   And it says here that the weight of the scientific

24  evidence evaluation is on page 326?

25  A.   Yes.

 1   Q.   Okay.  Let's go to page 326.  Do you see page 326 on your

 2   screen?

 3   A.   Yes.

 4   Q.   Okay.  And I'm going to zoom in on that paragraph in the

 5   middle.

 6        Dr. Theissen, in that paragraph that we see on page 326,

 7   is that the entire weight-of-evidence analysis that EPA

 8   provided for PCE and neurotoxicity in its risk evaluation?

 9   A.   Yes.

10   Q.   Now, this is a -- to be fair to EPA, this is a 714-page

11   report, correct?

12   A.   Yes.

13   Q.   So of this 714-page risk evaluation, one paragraph was

14   used to summarize EPA's weight-of-the-evidence analysis; is

15   that correct?

16   A.   Yes.

17   Q.   Now, they do have one or two pages of a general discussion

18   of the neurotoxicity literature earlier on in the hazard ID

19   section; is that right?

20   A.   Yes.

21   Q.   But this is the weight-of-the-evidence analysis?

22   A.   Yes.

23   Q.   Let's turn to another risk evaluation that EPA has

24   performed, and this is for methylene chloride.  Do you see

25   that?

1    **A.**    Yes.

2    **Q.**    This is Trial Exhibit 102.

3         Now, Dr. Theissen, what is -- is there any -- is there

4    anything about PCE and methylene chloride that are of

5    particular relevance to this case?

6    **A.**    These are two of the ten chemicals for which EPA has

7    completed risk evaluations under TSCA.   These are the only two

8    for which the critical endpoint is some form of neurotoxicity.

9    **Q.**    And are both of these risk evaluations basing the critical

10   endpoint on human data?

11   **A.**    Both are basing their findings on human data, yes.

12   **Q.**    Okay.   So let's look at the weight-of-evidence analysis

13   that EPA did for methylene chloride.

14        Do you see page 5, the table of contents on the screen?

15   **A.**    Yes.

16   **Q.**    And you see here that EPA identifies the

17   weight-of-scientific-evidence analysis as being on pages 288 to

18   289?

19   **A.**    Yes.

20   **Q.**    So let's go to page 288.   Do you have page 288 on your

21   screen?

22   **A.**    Yes.

23   **Q.**    And this section is discussing CNS depression in

24   spontaneous activity.   Do you see that?

25   **A.**    Yes.

1  Q.   And that's a critical health effect that EPA made risk

2  calculations on, right?

3  A.   Yes.

4  Q.   Okay.  Now, how -- is this -- is it fair to say that this

5  is actually less than one page of the document, the

6  weight-of-evidence evaluation?

7  A.   Probably less, but at most approximately one.

8  Q.   And how does the length of these two

9  weight-of-the-evidence analyses compare to NTP's

10  weight-of-the-evidence analysis?

11  A.   NTP has a longer discussion and, in fact, much of their

12  report can be considered a discussion of the weight of

13  evidence.

14  Q.   Now --

15  A.   And plus, there is also the meta-analysis with the dose

16  response.

17  Q.   Now, just looking at one of the sentences from the

18  weight-of-evidence analysis here -- and I'll read it -- EPA

19  writes, "Although the MOA, 'Mechanism of action,' is not

20  clearly delineated, multiple human and animal studies indicate

21  that methylene chloride is associated with nervous system

22  effects."

23       "Based on this evidence, EPA determined that methylene

24  chloride should be brought forward for dose-response modeling."

25  Did I read that correctly?

 1    A.    Yes.

 2    Q.    And so when they say "dose-response modeling," are they

 3    talking about the quantitative dose-response analysis?

 4    A.    Probably, yes.

 5    Q.    And is this conclusion here consistent with what you see

 6    in other EPA risk evaluations that EPA would go to

 7    dose-response modeling if they had evidence of an association?

 8    A.    If they had evidence of an association and if they have a

 9    dataset that's -- that could be used for dose-response

10    modeling.

11    Q.    So let's now -- oh.  And Dr. Barone was also talking about

12    how, as part of the hazard assessment, there is sort of an

13    analysis or evaluation on the confidence or the strength of the

14    evidence for the hazard.  Do you recall that testimony?

15    A.    Yes.

16    Q.    Okay.  So I want to look at what kind of analysis EPA had

17    on -- to explain its confidence in PCE neurotoxicity, okay?

18    A.    Yeah.

19    Q.    So let's go back to the table of contents.  And do you see

20    page 9 of the table of contents for the PCE evaluation?

21    A.    Yes.

22    Q.    And EPA identifies here its a section for confidence

23    ratings for endpoints and selected PODs?

24    A.    Yes.

25    Q.    And that is on page 353?

1   **A.**   Yes.

2   **Q.**   Let's turn to page 353.

3         How long is EPA's evaluation on the confidence assessment

4   for the PCE hazard data?

5   **A.**   One paragraph.

6   **Q.**   So let's turn now to the second step in a risk evaluation,

7   the exposure assessment.   Okay?

8         Dr. Theissen, how would you characterize our understanding

9   today of how much water humans drink?

10  **A.**   Well, we have a very good characterization of how much

11  water humans drink.   EPA has a fairly recently updated chapter

12  of their Exposure Factors Handbook which provides recommended

13  central tendency and upper-end values but also a distribution,

14  and they say in this chapter of the Exposure Factors Handbook

15  that these data are suited for risk assessment, which is what

16  we're doing.

17  **Q.**   So when we're talking about, like, how much water -- how

18  much tap water humans drink in the United States, do we have to

19  speculate very much about that?

20  **A.**   No, we don't.   We have that information for total water

21  consumption, we have that information for consumption of

22  municipal tap water and community water, which is what we're

23  dealing with here, and we have that for the U.S. population by

24  various age groups and sex and for pregnant women, lactating

25  women.   We have it for infants consuming formula, how much

1   water they're consuming with their formula.  So we have pretty

2   detailed information for many, if not most, subsets of the

3   American population.

4   **Q.**   Now, how would you compare the body of data that we have

5   on tap water consumption in the United States with the kinds of

6   exposure data that EPA is often dealing with, when looking at

7   obscure manufacturing processes?

8   **A.**   As you say, EPA is often dealing with obscure

9   manufacturing processes or industrial or occupational

10  situations where the exposures are not well characterized,

11  especially probably when they're air borne exposures or they're

12  dermal exposures, there just is not much information.

13      But for ingestion of water by members of the public, we

14  have a very useful and a very large body of information that's

15  useful for a lot of types of risk assessments.

16  **Q.**   Has EPA made risk determinations under TSCA where it had

17  absolutely no monitoring data for the condition of use?

18  **A.**   Yes.

19  **Q.**   Now, if there are, say, imprecisions or some remaining

20  uncertainties in EPA's most up-to-date tap water data, is that

21  a Dr. Theissen problem, or is that an EPA problem?

22          **MR. ADKINS:**  Objection, vague.

23          **THE COURT:**  Rephrase, please.

24          **MR. CONNETT:**  I'll move on, Your Honor.

25  \\\

1  BY MR. CONNETT:

2  Q.   So I put on the screen here Demonstrative No. 1 from EPA,

3  and it's a slide that was used during opening by EPA counsel.

4  And you see there it provides -- it says, "0.7 milligrams per

5  liter"?

6  A.   Yes.

7  Q.   Now, when counsel was talking about the slide in opening,

8  he said, quote, "the dose is the poison," okay?

9       Dr. Thiessen, is this number that we see here on the

10  screen, is that a dose?

11  A.   No.  That's a concentration.

12  Q.   Now, what is more important to predicting the toxic

13  effects of fluoride, the concentration of fluoride in the water

14  or the dose of fluoride that someone ingests from the water?

15  A.   The dose is what matters for risk estimation.  That

16  requires the concentration and the amount of water consumed.

17  Q.   And let's turn to the next slide, which is from exhibit --

18  Trial Exhibit 88.

19       Dr. Thiessen, what do we see here?

20  A.   We see a graph of fluoride intake from community water by

21  pregnant women, assuming two different levels of fluoride in

22  the drinking water.

23       This is based on EPA's distribution, published

24  distribution of drinking water from community sources by

25  pregnant women.  And in the one case with the solid line,

 1    that's multiplied by the concentration of .7 milligrams per

 2    liter to get to the fluoride intake in terms of milligrams per

 3    kilogram -- milligrams of fluoride per kilogram of body weight

 4    per day.

 5         The dotted line is the same thing, except using a fluoride

 6    concentration of 1.5 milligrams per liter.  That's

 7    approximately twice the concentration, so the fluoride intake

 8    or dose, if you will, is approximately twice.

 9         The one important thing from this graph is that given a

10    factor of 2 difference in the fluoride concentration and the

11    very wide range of water intakes, there is a tremendous amount

12    of overlap in these two distributions.  It's extremely hard to

13    separate these two populations.

14    Q.   So if we just look at this from a vantage point of how

15    much fluoride are people ingesting from the water, how would

16    you characterize the difference between .7 ppm fluoride in the

17    water and 1.5 ppm fluoride in the water?

18    A.   There's a factor of 2 difference in the concentration, but

19    the high-end consumers of water at .7 milligrams per liter are

20    going to exceed the average consumers of water at 1.5.

21         The upper end of that solid line on the graph, yeah, it's

22    right in there with the middle of the distribution of the

23    dotted line.  So only at the very high levels of water

24    consumption do you have a clear difference where only the

25    people with the higher water consumption are -- are different

THEISSEN - DIRECT / CONNETT

1  from the rest of the group with the lower fluoride

2  concentration.

3  **Q.**   So what does this figure here show us, Plaintiff's

4  Demonstrative No. 6?

5  **A.**   This shows water intake by pregnant women by liters per

6  day for a mean or average consumer of tap water that's 1.2

7  liters per day.  For a woman at the 95th percentile of water

8  intake that's 2.9-liter per day, so almost a factor of 3

9  higher, two and a half.

10  **Q.**   Is it difficult to convert this water intake data into a

11  fluoride dose?

12  **A.**   No.  It's very simple.  You multiply the intake by -- the

13  intake in liter per day by the concentration in milligrams per

14  liter and you get milligrams per day of fluoride intake and

15  then you can normalize that for body weight as you see fit.

16      **THE COURT:**  Can you go back to that last graph of the

17  two?  What -- so that's fluoride intake along the horizontal

18  axis --

19      **THE WITNESS:**  Yes.

20      **THE COURT:**  -- per kilogram of weight of the person

21  per day, is that --

22      **THE WITNESS:**  Yes.  Per kilogram of body weight.

23      **THE COURT:**  And that's -- I see.  That's just based on

24  the intake?  That's not --

25      **THE WITNESS:**  Right.

1          THE COURT:  -- based on any urinary sample, that's

2     just the intake?

3          THE WITNESS:  This is the intake because EPA in the

4     Exposure Factors Handbook provides water intake in terms of

5     liter per day or milliliters per day and also liters per

6     kilogram per day or milliliters per kilogram.  So they have

7     already accounted for the individual body weight in those

8     distributions in their report.

9          THE COURT:  But it's measured by intake?

10         THE WITNESS:  Right.  This is the water -- the liters

11    of water intake per kilogram of body weight per day for

12    pregnant women multiplied by the fluoride concentration in that

13    water to get the fluoride intake.

14         THE COURT:  All right.  Thank you.

15         THE WITNESS:  You're welcome.

16         MR. CONNETT:  And I don't think I identified this

17    before, but this is figure 5 from Exhibit 88 that Your Honor

18    was just asking about.

19         THE COURT:  Okay.

20    BY MR. CONNETT:

21    Q.   So going back to Demonstrative No. 6, what do we now see

22    here, Dr. Theissen?

23    A.   This is water intake converted into fluoride intake for

24    pregnant women.  So this is taking the mean consumption of tap

25    water of 1.2-liters per day times 1.5 milligrams per liter to

1  get 1.7 milligrams per day.  So that's -- that would be the

2  mean fluoride intake by a pregnant woman at a fluoride

3  concentration of 1.5 milligrams per liter.

4      The one on the right where it says 2.1 milligrams per day,

5  that's the top of the red bar, that's the 95th percentile

6  consumer of water, the 2.9 liters per day at .7 milligrams per

7  liter, so roughly three liters a day times .7 milligrams per

8  liter.  So the 95th percentile, the high-end consumer at .7

9  milligrams per liter exceeds the average consumer of 1.5

10 milligrams per liter.

11 **Q.**   Now, Dr. Theissen, have you reviewed data on the urinary

12 fluoride levels in women, pregnant women, who live in

13 fluoridated communities?

14 **A.**   Yes.

15 **Q.**   Does the available urinary fluoride data that you've

16 reviewed support what you just said, namely that 95th

17 percentile-exposed women in fluoridated areas will have

18 exposures that exceed the typical exposures you would expect in

19 areas with 1.5 ppm?

20 **A.**   Yes.  And you see that in the published data.  There's an

21 association between the fluoride concentration in the urine and

22 the fluoride intake by the women.  And in a fluoridated area,

23 the high-end urinary fluoride corresponding most likely in most

24 cases to the upper end drinking water intake in the fluoridated

25 areas will exceed the typical or average level of urinary

1  fluoride expected at 1.5 milligrams per liter in the water.

2  **Q.**   In that sense, would you say that the available water

3  intake data that we have and the available urinary fluoride

4  data that we have, do you think that they are compatible with

5  each other are they in alignment with each other?  What would

6  you say about that?

7  **A.**   Right.  They're consistent with each other.  As the

8  fluoride intake increases, so does the urinary fluoride

9  concentration.

10  **Q.**   Now, on Friday EPA counsel showed Dr. Grandean the figure

11  on the top right of this page, which comes from the Green 2019

12  study.  Do you see that?

13  **A.**   Yes.

14          **MR. CONNETT:**  Green 2019, Your Honor, is Trial Exhibit

15  109.

16  **BY MR. CONNETT:**

17  **Q.**   And I've put on the screen here as well Table S4 from the

18  Till 2018 study, which is from Trial Exhibit 108.

19          Can you see these on your screen?

20  **A.**   Yes.

21  **Q.**   Now, of these two studies of the MIREC cohort, which one

22  was bigger, in terms of the number of women that were being

23  studied?

24  **A.**   The one on the left, Till 2018, had approximately 1,600

25  women.  Green 2019 had approximately 500.

1  Q.   And table S4 of the Till study, does it provide for us

2  detailed data on the distribution of urinary fluoride in the

3  MIREC cohort?

4  A.   Yes.

5  Q.   So if you wanted to find out the 95th percentile value for

6  urinary fluoride in the MIREC cohort, what would you rely upon

7  more, the table S4 from Till 2018 or the figure from Green

8  2019?

9  A.   The table from 2018 -- I mean -- right, 2018.

10 Q.   Now, did you hear Dr. Hu's testimony on Wednesday of last

11 week that he has found that in the Madres cohort in

12 Los Angeles, the women in the cohort, the 95th percentile, had

13 more than 1.5 parts per million fluoride in their urine?

14 A.   Yes.

15 Q.   Does that give you further confidence that, in fact, 95th

16 percentile exposures in fluoridated areas are exceeding the

17 exposures typically associated with 1.5 ppm in the water?

18 A.   Yes.

19 Q.   So let's turn -- oh.

20      Dr. Theissen, I've just put Demonstrative 4 on the screen.

21 Do you see that?

22 A.   Yes.

23 Q.   This is Plaintiff's Demonstrative No. 4.

24      And this data is from the Till 2018 study, correct?

25 A.   Yes.

 1   Q.   And can you just explain -- well, we've already -- I guess

 2   I'll back up.

 3        We've already talked about this figure in the case, but

 4   one of the questions in the case is, what explains the

 5   difference in urinary fluoride levels between the women living

 6   in the fluoridated communities and the nonfluoridated

 7   communities?  Dr. Theissen, what's your opinion on that matter?

 8   A.   The primary difference and the only main group difference

 9   that we're aware of is that one group is fluoridated and one is

10   not.  So a difference in the urinary fluoride would be

11   attributable to the fluoride in the drinking water.

12   Q.   Have you heard anyone in this case, any testimony in this

13   case, or are you aware of anything in the scientific

14   literature, that can plausibly explain why women in the

15   fluoridated areas have more fluoride in their urine than women

16   in the nonfluoridated areas?

17   A.   The only thing it could be due to would be the difference

18   in the -- in the fluoride concentration of the drinking water.

19   Q.   So let's turn now to the risk characterization step of the

20   risk evaluation.  And I want to -- you know, some of the

21   language in the discussion of risk characterization from the

22   EPA can get pretty complicated pretty quickly and, in fact, may

23   be intimidating to some, so I want to kind of break it down a

24   little bit, okay?

25        So are you familiar with this concept called "fit for

 1  purpose"?

 2  A.   Yes.

 3  Q.   Do you recall hearing testimony from Dr. Tala Henry, EPA's

 4  risk assessment scientist at the first trial is this?

 5  A.   Yes.

 6  Q.   I'm going to read this testimony from Dr. Henry, which is

 7  from ECF No. 244, pages 973 to 974.  I asked Dr. Henry:

 8       "QUESTION:  EPA recognizes that if it has evidence that

 9       allows the agency to conduct the comparison of exposure to

10       toxicity based on a fairly straightforward and simple

11       method, it can stop there and need not do further

12       refinement, correct?"

13       And her answer was:

14       "ANSWER:  Correct."

15       Although, to be clear, Dr. Henry then stated that she did

16  not believe that was the situation for fluoride.

17       Do you see that testimony, Dr. Theissen?

18  A.   Yes.

19  Q.   And Dr. Henry was this EPA scientist who stated that

20  plaintiffs needed to prove causation at the water fluoridation

21  level in order to show risk.  Do you recall that?

22  A.   Yes.

23  Q.   In your view, Dr. Theissen, do we have enough data right

24  now on fluoride toxicity and fluoride exposure to permit the

25  type of straightforward and simple analysis that Dr. Henry was

THEISSEN - DIRECT / CONNETT

1  talking about here?

2  **A.**   Yes.

3  **Q.**   So turning now to EPA Exhibit 544, which is the EPA risk

4  evaluation rule -- and this is the regulation that EPA enacted

5  into law in 2017.  Are you familiar with this regulation?

6  **A.**   Yes.

7  **Q.**   And you see it says here that "EPA will," do you see those

8  words, "EPA will"?

9  **A.**   Yes.

10  **Q.**   And it says, "Integrate the hazard and exposure

11  assessments into quantitative and/or qualitative assessments."

12  Do you see that?

13  **A.**   Yes.

14  **Q.**   And is that consistent, what we see here with the

15  fit-for-purpose concept that Dr. Henry was talking about?

16  **A.**   Yes.

17  **Q.**   So let's turn to some of the hazard data on fluoride.

18  Turning to Plaintiff's Demonstrative No. 5.

19       And what do we see here, Dr. Theissen?

20  **A.**   I see here a graph of the 50th, 75th and 95 percentiles of

21  fluoride concentration in maternal urine for the first, second

22  and third trimesters.  This would be, I believe, the MIREC

23  study.

24  **Q.**   And how does Dr. Grandean's BMCL of .3 milligrams per

25  liter in the mother's urine, how does that compare with the

THEISSEN - DIRECT / CONNETT

1  urinary fluoride levels that we're seeing in the fluoridated

2  areas?

3  **A.**    The maternal urinary fluoride, especially for that third

4  trimester, the 95th percentiles are well above what's seen for

5  average consumption in a 1.5 milligram per liter fluoride area,

6  and this is the MIREC and the ELEMENT cohorts both.

7  **Q.**    So do we really even need to get into the whole margin of

8  exposure framework, benchmark MOE and all that stuff to know

9  that the exposures that we see here exceed or are placing women

10  at risk of the hazard?

11  **A.**    No.  Even at the 50th percentile, so even at, roughly, the

12  average levels of maternal urinary fluoride for the group, the

13  concentrations are above a concentration associated with a

14  deficit in IQ, a reduction in IQ.

15  **Q.**    Now, there was discussion earlier today about can we

16  consider the aggregate exposure or do we have to consider just

17  the contribution from water fluoridation.

18      Do you recall that testimony?

19  **A.**    Yes.

20  **Q.**    So let's look at -- let's go back to that figure you were

21  talking about earlier, Plaintiff's Demonstrative No. 4, and I

22  want to focus your attention on the 95th percentile values

23  there, okay?

24      This is the 95th percentile values of women in the

25  fluoridated areas of MIREC versus the women in the

 1  unfluoridated areas of MIREC, correct?

 2  **A.**   Correct.

 3  **Q.**   If we just focus in on the difference in urinary fluoride

 4  content between those two groups, how does that difference

 5  compare to Dr. Grandean's BMCL?

 6  **A.**   That's considerably higher.  It's about -- well, for the

 7  highest group, it's about four times higher, four and a half

 8  times higher than his BMCL.

 9  **Q.**  So let's turn now --

10       **THE COURT:**  Before you do that, let me ask, the MIREC

11  study, those numbers that we saw on those two charts are based

12  on 1.5 milligrams per liter fluoridation levels?

13       **MR. CONNETT:**  This data here, Your Honor, is based on

14  actually a little bit less than .7 parts per million in the

15  water in Canada.

16       **THE WITNESS:**  In the fluoridated area, which is .7 or

17  a little under.

18       **THE COURT:**  Okay.  So this is from the MIREC study

19  Canada --

20       **MR. CONNETT:**  Correct.

21       **THE COURT:**  -- at .7?

22       **MR. CONNETT:**  Correct.

23       **THE COURT:**  What about the chart that you showed just

24  before this, the other one, could you flip back to it?  That

25  one.  I thought -- I thought Dr. Theissen said that was

 1  assuming a 1.5 concentration.  Was I wrong?  That's --

 2          MR. CONNETT:  Yes.

 3  BY MR. CONNETT:

 4  Q.   Dr. Theissen, can you just clarify for the Court the

 5  source of this data from the Till study?

 6  A.   Right.  These -- these are not from an area with 1.5

 7  milligrams per liter.  The idea is that many of these fluoride

 8  concentrations in urine exceed what you would expect to find

 9  for an average fluoride concentration in urine in a 1.5

10  milligram per liter area, but these -- these are actually -- I

11  think the highest fluoride in the water in this group would

12  have been .7 milligrams per liter.  But the fluoride -- urinary

13  fluoride goes as high as 2.4.

14          THE COURT:  All right.  But the intake for the folks

15  who are on -- make up these graphs were either at .7 drinking

16  water concentration or less?

17          THE WITNESS:  Yes.

18          THE COURT:  Not -- and did not include those in the

19  1.5 range?

20          THE WITNESS:  No.  There were not -- there were not

21  any mothers in the 1.5 range.

22          THE COURT:  Well, that begs the question that we've

23  been talking about in a conversation with Dr. Barone that the

24  point of departure and the MOE, as I understand it, are based

25  on exposure at the intake level, and these are measuring at the

 1   urine content of fluoride.

 2          I'd love your comments about the critique that you

 3   just can't equate one to the other, there is -- there are

 4   differences between the intake of water and how you measure

 5   concentration and what you're measuring at the output because

 6   of metabolic differences and all sorts of things.  So what's

 7   your comment to that?

 8          **THE WITNESS:**  Okay.  Well, there's -- there's a

 9   consistent association between urinary fluoride and drinking

10   water fluoride concentrations.  As the concentration of

11   fluoride in the drinking water increases, the fluoride

12   concentration in the urine will increase.

13          It is not a nice, neat, simple calculation.  However,

14   the important thing here is a comparison of an exposure level

15   at which a hazard is observed and comparison of exposure levels

16   to which people are exposed.  And Dr. Barone said those -- the

17   hazard level divided by the exposure level, those need to be in

18   the same units.  And most commonly, those are in units of

19   milligrams per kilogram per day.  But there's no scientific

20   reason why they have to be milligrams per kilogram per day.

21   They could also be milligrams per liter in the drinking water,

22   they could also be milligrams per liter in the urine.

23          So if you have a hazard associated with a level of

24   fluoride in the urine and you have exposure levels, as

25   demonstrated by fluoride concentrations in the urine, you can

 1   compare the level of fluoride in the urine at which a hazard is

 2   observed to a level of fluoride in the urine at which people

 3   are exposed.  And in many cases what we see in this country

 4   would be urinary fluoride levels in excess of fluoride levels

 5   associated with a hazard.

 6       THE COURT:  So you take issue with the testimony that

 7   I heard that the EPA rightly requires sort of conversion into

 8   whatever the output was in terms of the urine, you have to kind

 9   of work backwards and figure out the intake levels in order to

10   derive the point of departure and hazard level and all that.

11   You feel that you don't have to -- you could measure everything

12   in terms of urinary concentration?

13       THE WITNESS:  Yes.  That's -- there's no scientific

14   reason why milligrams per kilogram per day is the only way to

15   do it.  What matters is comparison of a hazard level and an

16   exposure level that are in the same units.

17       THE COURT:  No, I understand the units, but into

18   what -- what are you measuring, as the intake-level exposures

19   or the urinary levels, or do you just use urinary to infer what

20   the exposure intake was?

21       THE WITNESS:  Generally, you have to go with the data

22   that are available.  If you're designing the study, you have

23   your options, but what we have with the MIREC study and with

24   some others is exposure information in terms of maternal

25   urinary fluoride.  That's an individual one.  It's adjusted for

1  various covariates.  But we've also got the water fluoride

2  concentrations that could be compared, milligrams per liter of

3  fluoride in the drinking water.

4       We also in some of the studies have maternal intake

5  estimated in terms of milligrams per kilogram per day, at least

6  from the drinking water and some other sources.  It might not

7  be the total fluoride intake.  So we have all three measures in

8  many cases for the same set of individuals.

9       **THE COURT:**  But so far I have not seen any -- any

10  formula that sort of determines how intake concentrations

11  relate to urinary concentrations.

12       **THE WITNESS:**  There's not a nice, neat, simple

13  formula.  That's where to do it would need a model, a computer

14  model, ideally a probabilistic model that was able to handle

15  several of the variables like absorption from the digestive

16  tract, mobilization to the urine, mobilization to the bones,

17  distribution around the body.  And some of those things depend

18  on other things.

19       But the main thing -- and this is a consistent finding

20  in several decades of literature -- is that the urinary

21  fluoride concentration is going to be consistently related to

22  the drinking water fluoride in -- it's going to be related to

23  the intake of fluoride from all sources, which, in most cases

24  in this country, is going to be drinking water fluoride.  There

25  are some older occupational studies.

1          So the urinary fluoride is associated with the

2   fluoride intake.  As the fluoride intake goes up, the urinary

3   fluoride goes up, whether you're talking an individual or a

4   group of individuals.

5          But the comparison of hazard to exposure can be made

6   for any of several sets of units, provided that you have the

7   same set of units for the hazard level and the exposure level.

8          So you could compare a hazard in terms of urinary

9   fluoride level to exposures in terms of urinary fluoride level

10  or you can compare the hazard in the exposure in terms of the

11  fluoride intake, milligrams per kilogram per day, or you can

12  compare it in terms of the fluoride concentration in the

13  drinking water, milligrams per liter, since that is, in most

14  cases, the primary driver of the total fluoride intake.

15         So you can still make that hazard-to-exposure

16  comparison.

17         As I said, in some of these studies, we have all three

18  of these exposure comparisons that could be made.

19         **THE COURT:**  How do we know that the primary source of

20  intake of fluoride is from drinking water in fluoridated areas

21  as opposed to background or other sources?

22         **THE WITNESS:**  The 2006 NRC report looked at this in

23  great detail.  So we looked at the background sources of

24  exposure from food, fluoridated toothpaste and other sources,

25  and we looked at the drinking water in great amount of detail.

1              THE COURT:  And what -- what was the conclusion?

2              THE WITNESS:  Right.  So for most -- for most

3    individuals in an area with fluoridated drinking water, the

4    fluoride intake is going to be driven by the fluoridated

5    drinking water.

6              THE COURT:  Is that the primary source then?

7              THE WITNESS:  That's the primary source.

8              THE COURT:  And so would it be your analysis that even

9    if you measured hazard level or point of departure and exposure

10   level all in terms of urinary fluoride, the fact that if you

11   found that those hazard levels are exceeded or the margin of

12   error is exceeded, you can fairly infer, in terms of regulating

13   conditions of use, that the primary source of that is a

14   problem?

15             THE WITNESS:  Yes.  And, in fact, in this case the

16   condition of use -- in the first ten risk evaluations by --

17   under TSCA by EPA, most of those conditions of use involve

18   industrial or commercial settings.

19             THE COURT:  Yeah.

20             THE WITNESS:  In this situation, this involves the

21   general public.  In those situations, exposure is -- it's

22   coincident with somebody doing his job or it's accidental to a

23   customer that comes into the dry-cleaning shop.

24             With fluoridated water, the condition of use, the

25   whole purpose of the condition of use is for people to ingest

 1   the water and ingest the fluoride in that water.

 2           So the -- having a fluoride intake by human beings is

 3   the whole goal of the condition of use and that's -- that's in

 4   the federal register in about 2015.

 5           THE COURT:  Well, that I understand, but in -- and

 6   maybe we'll get to this point, but in assessing risk and

 7   whether something is an unreasonable risk, it would seem like

 8   you'd want to know how much that condition of use is

 9   contributing to the toxicity problem.

10           THE WITNESS:  Right.

11           THE COURT:  Because if it only contributed, you know,

12   .5 percent, maybe we're in a toxic zone just because other

13   ambient and other things and it may not be reasonable to

14   declare that an unreasonable risk.

15           On the other hand, if it accounts for 60 percent of

16   what we find in urine ultimately or in the body, then you know

17   that it's -- and I guess your response is the 2006 study shows

18   that?

19           THE WITNESS:  Right.  We looked at the exposure from a

20   variety of sources and from -- and total exposure in

21   fluoridated and unfluoridated areas, and at the time the

22   fluoridation level could vary between .7 and 1.2 milligrams per

23   liter.  Most of it was around 1.  But we ran the results for

24   the whole range, so we have results in there for .7 milligrams

25   per liter.

1          **THE COURT:**  So specific to that level?

2          **THE WITNESS:**  Specific that what apply to the current

3     situation where fluoridation is at .7 milligrams per liter.

4          But we also have in there that the -- well, two

5     things.  One is that part of the background exposure is an

6     indirect exposure from fluoridated water because of the use of

7     fluoridated tap water to make commercial beverages and such.

8          So even people in nonfluoridated areas are probably

9     getting some fluoride in their grocery store products that have

10    come from fluoridated areas.

11         But secondly, the four -- total fluoride -- of total

12    fluoride intake in fluoridated areas, at least 50 percent and

13    sometimes closer to 90 percent will be coming from fluoridated

14    water directly.

15         **THE COURT:**  So the bottom line is, you think it is not

16    improper that it's okay to do a risk analysis that is based off

17    of measurement of fluoride concentration in urine as opposed to

18    the actual intake of water?

19         **THE WITNESS:**  You can do it either way and it -- and

20    actually, since the data exists both ways, it should be done

21    both ways, but then they -- they will be consistent.

22         **THE COURT:**  Are there any other risk analyses that

23    have been performed on other chemicals that are not based on

24    trying to figure out the intake but actually based on either

25    blood or urine levels or other biomarkers?

1          THE WITNESS:  I don't know about risk -- about EPA

2    risk evaluation specifically, but in -- in the general

3    literature, yes, certainly there are things that are based

4    on -- well, lead, for instance.  The goal now is to keep blood

5    lead levels in children as close as possible to zero, but that

6    has -- for drinking water, that translates to a standard -- a

7    maximum contaminant level goal, I believe, of zero lead in the

8    drinking water, that the maximum -- the ideal maximum amount of

9    lead in drinking water is zero.  There's an enforceable maximum

10   that's a little bit higher than that because of practical

11   considerations, but that -- the lead standardized in general

12   are based on blood lead levels, to keep that as close to zero

13   as possible.  And that's on the assumption of no threshold for

14   neurotoxicity of lead, so there's not -- not trying to be a

15   dose we keep it below but an assumption that any amount of

16   exposure, regardless of source, could contribute to toxicity.

17         THE COURT:  Okay.  But fluoride may be different

18   because there -- somewhere there appears to be a point of

19   departure above zero, right?

20         THE WITNESS:  That might or might not be.  Fluoride is

21   a neurotoxin.  For other neurotoxins we know that there's no

22   threshold.  It's -- it would be hard to define it.  And

23   besides, with respect to drinking water, there's -- the effect

24   is going to be due to all fluoride intake, regardless of

25   source.

1          Even if you eliminate one source totally, yes, there

2     would still be others.  But the flip-side of that is that if

3     you have some background fluoride exposure from tea or

4     medicine, adding fluoride from drinking water adds to that, so

5     it makes it more likely that there will be an effect or it

6     makes it -- makes any effect potentially more severe, so it

7     adds to whatever background we do have.

8          THE COURT:  So the chart, the one right after this

9     that shows the difference between fluoridated and

10    nonfluoridated areas, is that something from which one could

11    infer what the background levels are versus the drinking water

12    contributions?  Could you compare the Green and the red, or

13    what does that tell you?

14         THE WITNESS:  To some extent, yes, but the -- in a

15    nonfluoridated area, there is still some fluoride naturally in

16    some of the water; it's a much lower level, and that -- that

17    can vary with location, maybe .2, .3 milligrams per liter in

18    the drinking water, could be less.

19         That also -- and so some of that difference in the

20    size of the green columns could be due to different amounts of

21    consumption of drinking water with low levels of natural

22    fluoride.  Other things that contribute to that would be tea,

23    some kinds of food, some drugs and pharmaceuticals.

24         THE COURT:  So even at the 50th percentile in a

25    nonfluoridated area at .39 milligrams per liter, that already

1  sort of exceeds Dr. Grandean's point of departure, doesn't it?

2         **THE WITNESS:**  Yes.

3         **MR. CONNETT:**  Your Honor, could I ask a question on

4  that point?

5         **THE COURT:**  Yeah.

6  BY MR. CONNETT:

7  **Q.**  Dr. Theissen, you talked earlier about how in

8  nonfluoridated communities, people can be exposed to

9  fluoridated water, the condition of use in this case.  Can you

10  explain the relevance of that point to the urinary fluoride

11  levels that we see in the nonfluoridated areas here?

12  **A.**  Sure.  The indirect exposure of -- to fluoridated water

13  can come because of commercial beverages and foods that come

14  from a fluoridated area, so they're being manufactured or

15  processed in a fluoridated area, they go out to -- and are sold

16  and consumed in nonfluoridated areas, so that -- that indirect

17  exposure to water fluoridation is -- is also part of these --

18  what appear to be background exposures.

19  **Q.**  Dr. Theissen, is that phenomenon that you just described

20  well documented and well published -- sorry.  Strike that.

21      Is that phenomenon that you just described where people in

22  nonfluoridated areas are ingesting fluoridated water in

23  commercial beverages and foods, is that a well-documented fact

24  in scientific literature?

25  **A.**  Yes.  It's sometimes called a halo effect referring to

1    distribution of fluoride from fluoridated water outside the

2    areas that actually receive the fluoridated water.  But that's

3    discussed in the NRC report of 2006.  It's discussed actually

4    in a lot of dental literature, but that is a well-known

5    situation.

6    **Q.**    And have there been studies of sodas, Coca Cola, Pepsi,

7    ginger ale and juices like orange juice --

8    **A.**    Yes.

9    **Q.**    -- and apple juice, have there been studies to identify

10   the amount of fluoride in those products as a result of being

11   made with fluoridated water?

12   **A.**    Right.  There are studies showing these kinds of things,

13   also for beer and wine in some cases.

14   **Q.**    And in the United States fluoridation -- is it fair to say

15   that fluoridation is a more prevalent practice as the size of

16   the community increases?

17   **A.**    The -- approximately two thirds of people in the United

18   States who are on municipal water systems get fluoridated water

19   in their municipal water.  And certainly as a community grows

20   in population, more people would be supplied with fluoridated

21   water, assuming that the local source is fluoridated.

22   **Q.**    But large cities in the United States, would you agree

23   that the vast majority of large cities like San Francisco,

24   Los Angeles, New York, Chicago, Philadelphia, Boston,

25   Baltimore, Seattle, Atlanta, Houston, Dallas, would you agree

1    that the big, large cities in our country are fluoridated?

2            MR. ADKINS:  Objection, foundation.

3            THE COURT:  Lay a foundation if she knows with that

4    level of specificity.

5    BY MR. CONNETT:

6    Q.   Dr. Theissen, as part of your work reviewing scientific

7    literature on fluoride for the NRC and as part of your work

8    researching fluoride for the past 30 years, have you become

9    familiar with the fluoridation status in our country in large

10   metropolitan areas?

11   A.   Yes.  Most -- most but not all of our large metropolitan

12   areas do fluoridate.  A few states mandate that communities

13   over a certain size be fluoridated.

14           THE COURT:  Go ahead.

15           MR. CONNETT:  Okay.

16   BY MR. CONNETT:

17   Q.   So I want to -- oh.  Dr. Theissen, just to be clear, when

18   we're looking at the urinary another fluoride levels here in

19   the red column, the -- are those G urinary fluoride

20   concentrations that have been empirically documented and

21   observed in women living in fluoridated areas, .7 ppm?

22   A.   Yes.

23   Q.   So let's talk now in the context of risk characterization,

24   let's talk about the NTP Monograph and Meta-analysis, okay?

25   A.   Okay.

1    Q.   There's been a lot of discussion in this case about the

2    1.5 ppm level that the NTP identifies.  Do you consider that,

3    Dr. Theissen, to be the LOAEL, the lowest observed adverse

4    effect level?

5    A.   No.  1.5 milligrams per liter fluoride in drinking water

6    is an observed hazard level.  It's not the lowest observed

7    hazard level and it's definitely not a null effect level.

8    Q.   And in the NTP Meta-analysis, is there any data in that

9    meta-analysis, that would support the existence of an

10   association between fluoride and IQ at levels lower than 1.5?

11   A.   Yes.

12   Q.   Can you explain that for the Court?

13   A.   In the course of the meta-analysis, they did their

14   meta-analysis with a whole set of studies.  They repeated it

15   with studies limiting it to fluoride content in water of 4

16   milligrams per liter, they did it again under 2 milligrams per

17   liter, they did it under 1.5 milligrams per liter and they

18   found a dose response even down in the lowest levels.

19   Q.   And Dr. Theissen, I've just turned to page 38 of the

20   supplemental materials to the meta-analysis and I'm going to

21   read a statement here.  Quote, "When analyses were further

22   restricted to low risk-of-bias publications at less than 4

23   milligrams per liter, less than 2 milligrams per liter and less

24   than 1.5 milligrams per liter, the associations remained in the

25   same direction and were larger in magnitude compared to when

 1  data from both low and high risk-of-bias studies were

 2  combined."

 3       Did I read that correctly?

 4  **A.**   Yes.

 5  **Q.**   And here they're talking about the urinary fluoride

 6  analysis, right?

 7  **A.**   Yes.

 8  **Q.**   And so is it fair to say, then, that the dose-response

 9  relationship below 1.5 ppm was actually more apparent when the

10  NTP looked at the low risk-of-bias studies versus the high

11  risk-of-bias studies?

12  **A.**   Yes.

13  **Q.**   Now, turning now to Trial Exhibit 69, which is the BSC

14  working group report, I want to turn to one of the statements

15  made by NTP here.

16       **THE COURT:**  Before -- before you do that, let me make

17  sure I understand that those concentrations were urinary

18  concentrations, not water, not intake consumption of water

19  concentration; is that right?

20       **THE WITNESS:**  I think they're drinking water

21  concentrations, but I can't tell without the whole paper in

22  front of me.

23  **BY MR. CONNETT:**

24  **Q.**   Well, Dr. Theissen, did NTP do a separate analysis,

25  dose-response analysis for water fluoride levels?

THEISSEN - DIRECT / CONNETT

 1  **A.**   For water?

 2  **Q.**   Fluoride levels.

 3  **A.**   Yes.

 4  **Q.**   And did they do another analysis on urinary fluoride

 5  levels?

 6  **A.**   I think so, yes.

 7  **Q.**   And in both cases was the metric expressed in terms of the

 8  concentration milligrams per liter?

 9  **A.**   Yes.

10  **Q.**   So going to Trial Exhibit 69, I'm turning to page 83 of

11  the report and I'm going to read a statement from NTP here,

12  which is, quote, "Several of the highest-quality studies

13  showing lower IQs in children were done in optimally

14  fluoridated, .7 milligrams per liter areas, in Canada."  Did I

15  read that correctly?

16  **A.**   Yes.

17  **Q.**   Would you agree with the NTP on that point that several of

18  the highest-quality studies that we have today are actually

19  from communities with fluoridated water?

20  **A.**   Yes.

21  **Q.**   And those studies include the ELEMENT study and the MIREC

22  study?

23  **A.**   Yes.

24  **Q.**   Now, does this statement here by the NTP support what you

25  just said a few minutes ago, that the 1.5 ppm level is not

1  actually a LOAEL?

2  **A.**   Yes.

3  **Q.**   So what if we -- Dr. Theissen, what if we treat 1.5 ppm as

4  a LOAEL?  What if we say, you know, that's where most of the

5  confidence is from the NTP, so let's treat that as a LOAEL,

6  okay?  With that assumption, would there still be a risk from

7  fluoridation at .7?

8  **A.**   Yes.

9  **Q.**   And why is that?

10  **A.**   The average consumers of drinking water at .7 milligrams

11  per liter would have a margin of exposure of 2, which is

12  unacceptably close to the hazard level.

13     The high-end consumers of drinking water at .7 milligrams

14  per liter will have margins of exposure much less than 2, and

15  they could even exceed the hazard level.

16  **Q.**   Now I'm going to turn to another statement from the NTP

17  from Trial Exhibit 69, which, again, is the BSC working group

18  report.  And this is a statement from page 41.  And NTP states

19  here in part, quote, "Even in the optimally fluoridated cities,

20  some urinary fluoride measurements exceed those that would be

21  expected from consuming water that contains fluoride at 1.5

22  milligrams per liter."

23     Do you see that?

24  **A.**   Yes.

25  **Q.**   And does that point by the NTP, does that support what you

1  were just saying about the overlap in exposure between .7 and

2  1.5?

3  **A.**   Yes.

4  **Q.**   So now, what if we -- what if we don't even treat the

5  1.5 ppm as a LOAEL?  What if someone comes here into the

6  courtroom and convinces us that it's actually a NOAEL?  Let's

7  just say that we're convinced that 1.5 ppm is not even a LOAEL,

8  it's a NOAEL, a no observed adverse effect level.  Under that

9  assumption, would there still be a risk from water

10 fluoridation?

11 **A.**   Yes, because the observed exposures are unacceptably close

12 to the hazard level or for the higher exposures will exceed the

13 hazard level.

14 **Q.**   And is that standard fair for EPA risk evaluations to

15 treat the NOAEL as the point of departure?

16 **A.**   In the absence of a benchmark dose analysis, right, the

17 NOAEL would be the preferred point of departure.

18 **Q.**   And even when we're using a NOAEL as the point of

19 departure, we still apply the uncertainty factors, right?

20 **A.**   Yes.  There's still the benchmark margin of exposure,

21 which is the uncertainty factors because there would still be a

22 benchmark MOE of at least 10 for the intrahuman variability.

23 **Q.**   Now, what if we -- going back to that figure we looked at

24 before, we're looking at -- we're not going to look at

25 aggregate exposure now.  We're going to forget about the

THEISSEN - DIRECT / CONNETT

1  background, we're going to forget about the dental products

2  that the moms are using, we're going to forget about the tea

3  that the mom is drinking, we're going to forget about the sodas

4  that the mom is drinking, the juices that mom is drinking,

5  we're going to forget about the pharmaceuticals that mom's

6  taking, we're just going to look at the fluoridated water that

7  mom is drinking, okay?  If we just look at that contribution,

8  would that contribution present a risk using NTP's 1.5 ppm

9  figure?

10  **A.**   Yes.

11  **Q.**   So I want to go back to that slide I asked you about

12  earlier, which is a slide from EPA's opening, where EPA talked

13  about the dose is the poison.

14      Dr. Theissen, does the poisonous dose vary across the

15  population when it comes to fluoride?

16  **A.**   Yes.

17  **Q.**   So when we're talking about the poisonous dose, it's not a

18  one-size-fits-all; is that right?

19  **A.**   That is correct.

20  **Q.**   Now, in the course of your career, Dr. Theissen, have you

21  had the occasion to research the scientific literature that has

22  specifically investigated what makes people or some of the

23  factors that make people more vulnerable to fluoride toxicity?

24  **A.**   Yes.

25  **Q.**   Can you explain for the Court some of what the science

THEISSEN - DIRECT / CONNETT

1   says on susceptibility to fluoride toxicity?

2   **A.**   We describe a lot of this in the 2006 NRC report.  We know

3   that, for instance, people with kidney problems are going to

4   retain more fluoride, so that means they'll have more fluoride

5   circulating in their blood and reaching various organs.  So

6   they will, in effect, have a higher level of fluoride for the

7   same intake than people with normal kidney function, so they're

8   more at risk.

9        People with nutrient deficiencies, particularly iodine

10  deficiency and calcium deficiency are going to be more at risk

11  for -- in terms of the effect from a given amount of fluoride.

12       People in minority groups, people of color, people of --

13  in low socioeconomic groups, because they are more likely to

14  have poor diets, are going to be more at risk.  And some of

15  those groups don't drink much milk, so they are more likely to

16  have calcium deficiencies.

17       Iodine deficiency is fairly widespread in this country,

18  especially with a push to limit salt intake that results in

19  lower iodine for many people.

20       There are some genetic polymorphisms that have been

21  described in the literature where some people are more

22  susceptible to fluoride effects than others.  There are also

23  certainly differences in exposure.

24       We have not really discussed certain sets of the

25  population that have a very high water intake, but those would

THEISSEN - DIRECT / CONNETT

 1  obviously be at higher risk from a given concentration of
 2  fluoride in the water.
 3  **Q.**   Are there medical conditions that can increase a person's
 4  thirst?
 5  **A.**   Yes.
 6  **Q.**   Can you explain?
 7  **A.**   Diabetes mellitus, which is the common kind of diabetes,
 8  sugar diabetes, that is typically associated with increased
 9  thirst and increased water consumption, especially when it's
10  not adequately controlled.
11       Diabetes incipits, there are several forms of that, but
12  the main characteristic of that disease is a high or extremely
13  high water intake.  For those individuals, water is considered
14  therapeutic, so if they're not treated for one reason or
15  another, they have to drink a lot of water, and that can be an
16  enormous fluoride intake.  Also athletes, people who work
17  outdoors especially in high climates, these are going to have
18  high water intakes and potentially correspondingly high
19  fluoride intakes.
20  **Q.**   I want to just go back to patients with renal disease or
21  kidney disease.
22       Dr. Theissen, is there any dispute, whatsoever, in the
23  scientific literature that people with kidney disease are at
24  heightened risk of fluoride toxicity?
25  **A.**   There's no dispute.

1    **Q.**  What about for people with nutrient deficiencies, is there

2    any dispute, whatsoever, in the scientific literature that

3    nutrient deficiencies can exacerbate the toxicity of fluoride?

4    **A.**  There's no dispute.  They -- they can exacerbate the

5    toxicity of fluoride and also with respect to iodine

6    deficiency.  If that occurs in pregnant women, that compromises

7    the fetus because the fetus is totally dependent on the

8    mother's thyroid hormones during much of the pregnancy and if

9    she's iodine deficient, the baby is in trouble.

10         **THE COURT:**  You had over the last several minutes

11   talked about susceptibility to toxicity from fluoride, but that

12   toxicity is not necessarily brain development toxicity.  There

13   are other types of toxicities that you're referring to?

14         **THE WITNESS:**  Right.  The iodine deficiency, the main

15   concern is the impact on neurological development of the child,

16   but there are other toxicological -- other toxic effects of

17   fluoride.

18         **THE COURT:**  Right.  So the main mechanism in terms of

19   risk and vulnerability would be those that would affect

20   development, which would pertain to those who have high -- who

21   are pregnant, for instance, but have high water intake needs if

22   they're diabetic or something like that --

23         **THE WITNESS:**  Right.

24         **THE COURT:**  -- and those that have an iodine

25   deficiency, which could result in thyroid disruption?

1          THE WITNESS:  Right.  And any mothers who had kidney

2   problems or calcium deficiency would also impact --

3          THE COURT:  But you reference those in lower

4   socioeconomic or communities of color having poor diets and not

5   enough, for instance, calcium.  Would that affect pregnant

6   mothers and development of their fetuses and young children?

7          THE WITNESS:  It could, yes, certainly.

8          THE COURT:  How would it do that?

9          THE WITNESS:  The -- again, this is in the 2006 NRC

10  report.

11         The calcium deficiency results in a higher -- let's

12  phrase it the other way.

13         If there's enough calcium, that reduces the toxicity

14  of the fluoride.  It reduces fluoride uptake, it reduces

15  fluoride toxicity.  So if the calcium is deficient, then

16  there's probably going to be more fluoride taken in that could

17  thereby be more toxic within the -- more of it in the body to

18  be toxic than if the calcium intake had been sufficient.

19         THE COURT:  So it affects the calcium uptake effect?

20         THE WITNESS:  Primarily.  That might not be the only

21  thing, but it affects what happens to the fluoride whether or

22  not the calcium is sufficient.

23         THE COURT:  Thank you.

24  BY MR. CONNETT:

25  Q.   And Dr. Thiessen, on that same point, kidney disease is --

THEISSEN - DIRECT / CONNETT

1    the problem with kidney disease, you can't clear the fluoride

2    out of your body as efficiently?

3    **A.**    Right.

4    **Q.**    So the fluoride starts to build up more in your body?

5    **A.**    Correct.

6    **Q.**    Now, with the impact of the heightened buildup of fluoride

7    in the body be relevant to each and every form of toxicity that

8    fluoride can cause?

9    **A.**    Yes.  Certainly.

10   **Q.**    So is there any reason to think that the heightened risk

11   that kidney disease causes for fluoride, is there any reason to

12   believe that would not relate to neurotoxicity?

13   **A.**    I would expect it to relate to neurotoxicity.

14   **Q.**    And what about -- and just -- by the way, is kidney

15   disease in the United States, for example, dialysis, is that

16   known to be at higher prevalence in low-income communities or

17   communities of color?

18   **A.**    I believe it is.  Our research didn't detail, but there

19   are groups of the population more prone to things like kidney

20   problems and high blood pressure, some of those things that

21   often go together.

22   **Q.**    You also mentioned genetic polymorphisms or -- has there

23   been any research in the scientific literature to -- that have

24   found that the association between fluoride and reduced IQ is

25   magnified in the presence of some genetic polymorphisms?

THEISSEN - DIRECT / CONNETT

1    A.    Yes.   There are at least one or two papers describing

2    that.

3    Q.    So let's turn now to some of the factors that we looked to

4    in the risk determination phase.   And I'm only going to discuss

5    a couple with you, since we've already addressed some of them

6    elsewhere.

7          Let's talk about the exposure to fluoridation in the more

8    qualitative sense.

9          And Dr. Theissen, is it correct that when EPA is

10   evaluating in the risk determination phase the confidence or

11   certainty that it has in exposure that it looks to these

12   factors that we see on the screen here?

13   A.    Yes.   These are listed.

14   Q.    And these factors are the duration of exposure, the

15   frequency of exposure, the magnitude of exposure, the patterns

16   of exposure and the number of people exposed, right?

17   A.    Yes.

18   Q.    Okay.   What is the duration of exposure to water

19   fluoridation?

20   A.    It's intended to be lifelong starting at conception.

21   Q.    What is the frequency of exposure to fluoridated water?

22   A.    For most individuals, that would be expected to be several

23   times daily.   For an in-utero infant, it would be constant.

24   Q.    What about the magnitude of exposure for a susceptible

25   population like formula-fed infants?

1   A.   Formula-fed infants have the highest individual exposure

2   to fluoride of anybody in the population if their formula is

3   prepared with fluoridated water.

4   Q.   How does that compare to a situation where the baby is

5   actually breast fed exclusively as opposed to formula fed?

6   A.   Breast milk of humans or most other species that have been

7   looked at -- human breast milk has extremely low concentrations

8   of fluoride.  So the difference between the fluoride exposures

9   is easily a factor of 100 or more.

10  Q.   And in terms of the number of people directly exposed to

11  water fluoridation in the United States, about how many people

12  are we talking about?

13  A.   Approximately 210 million.  More than half of the

14  population in the United States.

15  Q.   And would it be fair to say that the rest of the

16  population is indirectly exposed to fluoridated water?

17  A.   Much of the rest of the population is indirectly exposed

18  certainly.

19  Q.   So let's -- in your review of EPA's risk evaluations, have

20  you taken note of the number of people exposed or potentially

21  exposed to conditions of use for which EPA has found

22  unreasonable risk?

23  A.   Yes.

24  Q.   And what do we see here, Dr. Theissen, on this slide?

25  A.   This is showing people exposed by specific conditions of

1   use, the number of people exposed to individual conditions of

2   use.  So these are not all conditions of use for PV29 or

3   Dioxane but selective ones.  But those are probably industrial

4   situations where it's a few thousand, a few hundred, in one

5   case less than a hundred.

6   Q.   Now, is this slide here comparing everyone exposed to

7   fluoridated water against those conditions of use, or what is

8   it showing?

9   A.   No.  This -- the bar on the right-hand side of the graph

10  is showing only formula-fed infants.  And of these formula-fed

11  infants living in a fluoridated area and of these, about three

12  quarters of them would be exposed to fluoridated drinking water

13  in their formula.  The rest are on ready-to-feed formula or

14  perhaps their formula is prepared with bottled water, so

15  roughly 300,000 -- 300,000 infants at a time, at any given time

16  are being exposed to fluoridated water in their formula.

17       And people don't stay in infancy, you know, for very long,

18  obviously, it's a defined period of time.  So that means over

19  time you've got many, many people being exposed because that's

20  a constantly renewed set of people in that group.

21  Q.   So these -- the 400,000 number, is that -- is that

22  referring to infants who are exclusively formula fed?

23  A.   Yes.

24  Q.   And then of the -- and there's about 400,000 exclusively

25  formula-fed babies that live in fluoridated areas in the United

THEISSEN - DIRECT / CONNETT

1   States?

2   **A.**    Yes.

3   **Q.**    And then of the 400,000, about 75 percent or so are

4   actually being fed with the fluoridated water?

5   **A.**    Right.

6   **Q.**    And I'll just put on the screen Trial Exhibit 18.  And I'm

7   going to read this.  This A report from the EPA.  I'm going to

8   read it?

9         **THE COURT:**  Before you do that, where is this from,

10   this figure of the 75 percent of 400,000 exclusively formula

11   fed?

12         **THE WITNESS:**  That I believe is in -- I forget which

13   of my reports in this case, but it is in some of my reports

14   from this case.  It's largely data from the CDC on the number

15   of infants or the percentage of infants who are formula fed,

16   breast fed exclusively one or the other or some of each at

17   different ages.

18         **THE COURT:**  So the data is from the CDC?

19         **THE WITNESS:**  Right.

20         **THE COURT:**  Thank you.

21         **MR. CONNETT:**  And Your Honor, the reference to that is

22   identified in the trial declaration for Dr. Theissen.

23         **THE COURT:**  Okay.

24   **BY MR. CONNETT:**

25   **Q.**    So Dr. Theissen, I'm going to go back to Trial Exhibit 18,

 1   which is an EPA report, I'm going to read this statement from

 2   the EPA.  Quote, "The neonatal stage is a period of rapid

 3   development of the nervous system and is considered a critical

 4   window of development."

 5        Do you agree with EPA on that point?

 6   **A.**   Yes.

 7   **Q.**   Is that a generally recognized fact?

 8   **A.**   Yes.

 9   **Q.**   So I just put on the screen, Dr. Theissen, the study by

10   Till 2020, which is an exhibit in this case.  I believe it's

11   Exhibit 123.  And it's titled "Fluoride exposure from infant

12   formula and child IQ in a Canadian birth cohort."

13        Do you see that?

14   **A.**   Yes.

15   **Q.**   Did this study find an association between formula feeding

16   a baby with fluoride and IQ?

17   **A.**   Yes.

18   **Q.**   Did it find IQ deficits to be associated with that

19   exposure?

20   **A.**   Yes.

21   **Q.**   Are there any studies in the published literature which

22   contradict that finding?

23   **A.**   Not that I'm aware of.

24   **Q.**   So let's turn now to some of the tables that you put

25   together as part of your expert report in this case.  I'm

1  referring here to Table 2 from Trial Exhibit 88, okay?

2      And Dr. Theissen, in this table you have -- you identify

3  the highest margins of exposure that have been associated --

4  that have been considered to be an unreasonable risk in EPA

5  risk evaluations; is that correct?

6  **A.**   Yes.

7  **Q.**   Okay.  And for the PCE risk evaluation, the highest margin

8  of exposure in that evaluation that was found to be an

9  unreasonable risk for at least a subset of the population was

10  89, right?

11  **A.**   Yes.

12  **Q.**   And that means that the human exposure level for that

13  condition of use for those workers was 1/89th of the point of

14  departure or the hazard level, right?

15  **A.**   Yes.

16  **Q.**   And in that risk evaluation, the point of departure was

17  the lowest observed adverse effect level from human

18  epidemiological data?

19  **A.**   Yes.

20  **Q.**   Okay.  And then just to -- just to go back to something we

21  talked about earlier, the weight-of-the-evidence analysis that

22  EPA did for PCE neurotoxicity, that was the one paragraph that

23  we see here on page 326, right?

24  **A.**   Yes.

25  **Q.**   Okay.  And I'm now turning to Table 1 of your expert

THEISSEN - DIRECT / CONNETT

1  report, which is Trial Exhibit 88, and you identify a margin of

2  exposure for methylene chloride, right?

3  A.   Yes.

4  Q.   And methylene chloride was the other risk evaluation where

5  human epidemiology data was used to derive a point of departure

6  for neurotoxicity?

7  A.   Yes.

8  Q.   Okay.  And in this condition of use, the human exposure

9  level was 1/27 of the point of departure for neurotoxicity?

10  A.   Yes.

11  Q.   And again, the point of departure for neurotoxicity in

12  this risk evaluation was a lowest observed adverse effect

13  concentration, right?

14  A.   Yes.

15  Q.   So not a BMCL, right?

16  A.   Right.

17  Q.   Not a BMDL, right?

18  A.   Yeah.

19  Q.   Okay.  And what -- what -- how did EPA describe the

20  quality of the study from which the point of departure was

21  derived?

22  A.   Medium.

23  Q.   How did EPA describe the confidence that it had in the

24  overall hazard data on this neurotoxicant?

25  A.   Medium.

1  **Q.**   How did EPA describe the confidence that it had in the

2  exposure data that underlied this particular risk determination

3  for that exposure?

4  **A.**   Low.

5  **Q.**   Now, we heard Dr. Barone talking earlier about, you know,

6  you don't -- you shouldn't be looking at the margins of

7  exposure that was used -- that was found to be a risk for this

8  chemical and that chemical and then automatically assume that

9  we should be -- that that's a relevant metric for a risk

10  evaluation here.  Did you hear that testimony?

11  **A.**   Yes.

12  **Q.**   Okay.  Now, with that said, is there any relevance to you,

13  as a risk assessment scientist, to see that EPA made risk

14  determinations for those chemicals with margins of exposure of

15  89 and 27?  Is there any relevance to you of those facts?

16  **A.**   Yes.

17  **Q.**   And can you explain to the Court?

18  **A.**   It gives me an idea of what EPA considers an unreasonable

19  risk in their assessments, and it gives a comparison, I guess,

20  of reasonableness or validity or something when looking at what

21  margin of exposures -- margins of exposure we have for

22  fluoride.

23  **Q.**   Now, in your view, Dr. Theissen -- and by the way, have

24  you read the critical studies, the two critical studies that

25  EPA relied upon for its risk determination for PCE neurotox?

1   **A.**   Yes.

2   **Q.**   Okay.  About how many people were in those two studies?

3   **A.**   They were small.  They were both under a hundred, I

4   believe.

5   **Q.**   Did every single analysis that those studies did for

6   neurotoxicity show a significant effect?

7   **A.**   No.

8   **Q.**   In fact, the majority -- is it -- sorry.  Strike that.

9        How would you characterize the percentage of neurotoxicity

10  outcomes in the Echeverria study for PCE that actually found

11  statistically significant associations between PCE and

12  neurotox?

13  **A.**   I don't remember for certain.  Perhaps half of them showed

14  effects and half not.

15  **Q.**   Okay.  Now, in your view, Dr. Theissen, does -- what

16  requires more extrapolation?  What requires more inference to

17  get to a risk determination, a situation like with PCE where

18  the hazard level is 89 times higher than the exposure level or

19  a situation like we have with fluoride where the hazard level

20  is, at most, about a factor of 2?

21  **A.**   Right.  It's at most a factor of 2.  Basically, the

22  exposure level and the hazard level are extremely close

23  together, and in some cases the exposure level exceeds the

24  hazard level.

25  **Q.**   And does that give you -- does the narrow nature of the

1  margin between the observed adverse effect level and the human

2  exposure level, does that give you -- does that affect the

3  confidence that you have in the risk?

4  **A.**   Certainly, yes.

5  **Q.**   And I probably asked this, but would you agree that

6  there's a greater need to extrapolate the risk with the PCE

7  risk evaluation?

8  **A.**   Right.  That -- one of those studies looked at people in

9  dry cleaning -- well, I guess they both looked at people in

10 dry-cleaning establishments.  Exposures were estimated for the

11 individuals in the studies.  Exposures are estimated for people

12 in general, the ones who would be protected by any regulations,

13 but the -- with a benchmark MOE of 100 for PCE or 30 for

14 methylene chloride, you're talking looking at exposures

15 considerably lower than the hazard level.

16 **Q.**   Dr. Theissen, do you think the EPA is holding fluoride to

17 a double standard when it comes to the identification of hazard

18 and the identification of risk?

19 **A.**   Yes.

20        **MR. ADKINS:**  Objection, foundation.

21        **THE COURT:**  Overruled.

22 **BY MR. CONNETT:**

23 **Q.**   And lastly, Dr. Theissen, just a quick question on this

24 issue of uncertainties.

25        When you, as a risk assessment scientist, have a plausible

1  finding on one hand and an implausible finding on the other and

2  they are at odds with each other, does the implausibility of

3  one of those findings affect the weight that you give to that

4  data?

5  **A.**   Yes.  An implausible finding would be given little or no

6  weight.

7  **Q.**   And did you say implausible finding?

8  **A.**   Implausible finding would be given little or no weight.

9  **Q.**   Would you -- is that something that is kind of a general

10 sort of -- a general practice or a general belief within risk

11 assessment?

12 **A.**   Certainly.

13       **MR. CONNETT:**  I have no further questions, Your Honor.

14       **THE COURT:**  All right.  We should take our break.

15 We're past the -- past the hour, so we'll return with

16 cross-examination.  Thank you.

17       **THE CLERK:**  Court is in recess.

18    (Recess taken at 12:25 p.m.)

19    (Proceedings resumed at 12:47 p.m.)

20       **THE CLERK:**  Please remain seated, come to order, court

21 is back in session.

22       **THE COURT:**  Okay.  If we could have Dr. Theissen

23 return to the stand.  Okay.  Go ahead.

24                    <u>**CROSS-EXAMINATION**</u>

25 \\\

1   BY MR. ADKINS:

2   **Q.**   Good afternoon, Dr. Theissen.  Let's start by talking

3   about the NTP Monograph and that moderate confidence finding

4   within the monograph.

5        The State-of-the-Science Monograph by the NTP finds that

6   with moderate confidence, higher exposure is consistently --

7   higher fluoride exposure is consistently associated with lower

8   IQ in children; isn't that right?

9   **A.**   Yes.

10  **Q.**   Yes.

11       And by "higher fluoride exposure," the NTP authors mean

12  represented by populations whose total fluoride exposure

13  approximates or exceeds the World Health Organization

14  guidelines for drinking water quality of 1.5 milligrams per

15  liter of fluoride, correct?

16  **A.**   That is a definition that was added in there in a later --

17  it was not in the earlier draft of the NTP report.  What they

18  had in mind in the initial report was that in any comparison of

19  two groups with different fluoride intakes, the one with the

20  higher intake had lower IQ.  Many of those are in excess of

21  1.5, but the same things we're seeing below 1.5.

22  **Q.**   Not asking about what was going on in the underlying

23  studies, but when the NTP authors defined what they meant by

24  higher fluoride exposure, they used the World Health

25  Organization's 1.5-milligram per liter guideline; is that

THEISSEN - CROSS / ADKINS

1   correct?

2   **A.**   Yes.

3   **Q.**   Okay.  So you've offered an opinion that the NTP authors

4   could have been more confident in their moderate confidence

5   conclusion; isn't that right?

6   **A.**   Yes.

7   **Q.**   And you believe that the dose-response analysis and the

8   meta-analysis manuscript that the NTP prepared is supportive of

9   your view that the NTP authors could have been more confident,

10  correct?

11  **A.**   Yes.

12  **Q.**   You believe that the animal and the mechanistic studies

13  support your view that the NTP authors could have been more

14  confident; isn't that right?

15  **A.**   Yes.

16  **Q.**   And at least in your view, the only reason that the NTP

17  authors had for limiting their conclusion to moderate

18  confidence is, quote, fear of starting major conflict, end

19  quote, by challenging one of the top ten public health

20  achievements of the 20th century; is that correct?

21  **A.**   That's what I said in September, yes.

22  **Q.**   In fact, in your view, there's no scientific reason why

23  NTP's moderate confidence finding shouldn't be higher; isn't

24  that right?

25  **A.**   Correct.

1   Q.   The State-of-the-Science Monograph also finds that

2   associations between lower total fluoride exposure and

3   children's IQ remain unclear; is that right?

4   A.   That gets into the noise region.  The contrasts are harder

5   to see, but that doesn't mean that there's no effect.

6   Q.   Do you disagree that the State-of-the-Science Monograph

7   states that associations between lower total fluoride exposure

8   in children's IQ remain unclear?

9           MR. CONNETT:  Vague and ambiguous.

10          THE WITNESS:  I would have said "less clear."

11          THE COURT:  Overruled.  Go ahead.

12          THE WITNESS:  But I think that is what they say.

13  BY MR. ADKINS:

14  Q.   You would have said less clear, but you agree that they

15  say unclear?

16  A.   I'm not looking at the document, but that's what I think

17  it says.

18          MR. ADKINS:  Mr. Hambrick, could you please pull up

19  Exhibit 67, PDF page 92?  And if you could focus in on the last

20  bullet of this page, please.

21  BY MR. ADKINS:

22  Q.   Dr. Theissen, do you see the NTP Monograph on your screen?

23  A.   Yes.

24  Q.   And I'll just read this bullet for you.  "Associations

25  between lower total fluoride exposure, for example, represented

1    by populations whose total fluoride exposure was lower than the

2    WHO guidelines for drinking water quality of 1.5 milligrams per

3    liter fluoride (WHO 2017) and children's IQ remain unclear."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   "The State-of-the-Science Monograph" --

7         MR. ADKINS:  You can put that down, Mr. Hambrick.

8    Thank you.

9    BY MR. ADKINS:

10   Q.   "The State-of-the-Science Monograph also finds that more

11   studies at lower exposure levels are needed to fully under the

12   potential associations and ranges typically found in the United

13   States, i.e., less than 1.5 milligrams per liter in water."

14        Did I read -- is that your understanding, Dr. Theissen?

15   A.   I believe that's what's in their report, yes.  But again,

16   I don't have it in front of me.

17   Q.   And again, by "lower fluoride exposure," the NTP authors

18   mean fluoride exposure associated with less than 1.5 milligrams

19   per liter in water, correct?

20   A.   Yes, I think so.

21   Q.   You disagree with the NTP authors that the associations

22   between lower total fluoride exposure and children's IQ remain

23   unclear, right?

24   A.   I don't think it's as unclear as their statement.

25   Q.   And you disagree with the authors on that point?

1  **A.**    In addition, there are a few more studies since that

2  report was drafted.

3  **Q.**    So you disagree with the authors that those associations

4  remain unclear, correct?

5  **A.**    Certainly we can always use more research, but there's

6  more than enough evidence already.

7  **Q.**    In fact, you believe the low-dose studies of fluoride in

8  humans, without exception, are not as unclear as NTP makes out,

9  correct?

10         **MR. CONNETT:**  Vague and ambiguous.

11         **THE WITNESS:**  Right.  What do you mean "Without

12  exception"?

13         **THE COURT:**  Why don't you rephrase that.  I mean

14  frankly, we're getting into a rhetorical "or" here, and I'm not

15  finding this line of inquiry particularly helpful.

16         **MR. ADKINS:**  We can certainly move on, Your Honor.

17         **THE COURT:**  She's saying it's less unclear than is

18  implied in the report and that's her opinion, so I understand

19  that.

20  **BY MR. ADKINS:**

21  **Q.**    Dr. Theissen, you believe we already have enough

22  information to protect human health, right?

23  **A.**    Yes.

24  **Q.**    The NTP authors' moderate confidence assessment is based

25  primarily on studies with total exposures that are higher than

1   those generally associated with consumption of optimally

2   fluoridated water in the United States, correct?

3   **A.**   Yes, but there are studies that are more directly

4   relevant, so those have to be -- they can't just be dismissed

5   as most studies are too high.

6   **Q.**   The NTP authors included statements that their conclusion,

7   one, applied to high fluoride exposure; and two, that more

8   low-exposure studies are needed to provide context for their --

9   for their conclusions, correct?

10  **A.**   If that's what they said, but we can always use more

11  studies.   There's, again, enough information now to -- to

12  determine that there is a hazard.

13  **Q.**   Do you agree that the NTP -- excuse me.   I'll rephrase the

14  question.

15      The NTP authors have stressed that their conclusions apply

16  to total fluoride exposures rather than to exposures

17  exclusively through drinking water, correct?

18  **A.**   Yes.

19  **Q.**   Total fluoride exposure includes fluoride from drinking

20  water plus other sources like food, toothpaste, tea, bottled

21  beverages and medicine, right?

22  **A.**   Yes.

23  **Q.**   The MIREC IQ study, Green 2019, you're familiar with that

24  study, correct?

25  **A.**   Yes.

1   Q.   The MIREC IQ study was the only high-quality prospective

2   study included in the NTP Monograph that evaluated a population

3   exposed to fluoride in drinking water at levels typically found

4   in the United States, correct?

5   A.   No.   The Bashash study, the ELEMENT cohort also had

6   fluoride exposures that are comparable to fluoride exposures in

7   the U.S.

8   Q.   Very good I think I heard you testify to that when

9   plaintiff's counsel were asking you questions.

10      The Bashash study didn't -- the source of fluoride

11  exposure in the Bashash study was through fluoridated salt,

12  correct?

13  A.   Yes, but the exposures are -- the total exposures are at

14  similar levels to what would be experienced with fluoridated

15  water.   And that's the intent of fluoridated salt is to provide

16  similar exposure levels.

17  Q.   So my question is slightly different.

18      I'm asking about high-quality prospective studies that the

19  monograph considered, considering fluoridated water.   Are you

20  with me on that?

21  A.   Yes.

22  Q.   Okay.   So the MIREC 2019 study is the only high-quality

23  prospective study in the Monograph that evaluated a population

24  exposed to fluoride in drinking water at levels typically found

25  in the United States, right?

1           MR. CONNETT:  Vague and ambiguous.

2           THE COURT:  Overruled.

3           THE WITNESS:  I believe that's correct, but it's not

4    the only study that has exposures comparable to those in the

5    U.S.

6    BY MR. ADKINS:

7    Q.   Fair enough.

8         You believe the MIREC IQ study, on its own, is sufficient

9    to extrapolate results for the United States population, right?

10   A.   You do not have that study up alone.  You have it in the

11   context of many, many other studies.

12   Q.   Could you say that again?  I didn't hear that answer?

13   A.   You have that study in the context of many, many other

14   studies.  You don't have that study alone.

15   Q.   But in your view, that study, on its own, is sufficient to

16   extrapolate results in the United States, correct?

17           MR. CONNETT:  Asked and answered, vague and ambiguous.

18           THE COURT:  Overruled.

19           THE WITNESS:  That study alone is sufficient to say we

20   have a potential hazard, we need to look at it some more.

21   BY MR. ADKINS:

22   Q.   In fact, you believe one high-quality epidemiology study,

23   like Green 2019, would be sufficient for that purpose, correct?

24   A.   I believe that's what it says in EPA's guidelines for

25   neurotoxicity risk assessment, that one -- one good study, one

 1 | good human epidemiological study is enough.

 2 | **Q.**   I'm asking in your opinion, Dr. Theissen, one good study,

 3 | like the Green study, would be sufficient to extrapolate

 4 | results to the United States population?

 5 |           **MR. CONNETT:**  Asked and answered.

 6 |           **THE COURT:**  Sustained.

 7 | **BY MR. ADKINS:**

 8 | **Q.**   The NTP authors tend to agree that studies of fluoride

 9 | exposure at levels typically found in drinking water in the

10 | United States are inconclusive, correct?

11 | **A.**   I have to see that in front of me.

12 |           **MR. ADKINS:**  Sure.  Why don't we turn to Exhibit 69,

13 | PDF page 23.

14 |           And Mr. Hambrick, if you could please highlight the

15 | sentence starting "Although."  Thank you.

16 | **BY MR. ADKINS:**

17 | **Q.**   So Dr. Theissen, we'll read from what the NTP authors said

18 | about their monograph here.  "Although we tend to agree that,

19 | quote, 'studies of fluoride exposure at levels typically found

20 | in drinking water in the United States are inconclusive,' end

21 | quote, Green, et al. (2019) was the only high-quality

22 | prospective study included in prepublication 2022 NTP Monograph

23 | that evaluated a population exposed to fluoride in drinking

24 | water at levels typically found in drinking water in the United

25 | States."

1        Do you see that, Dr. Theissen?

2   **A.**    Yes.

3   **Q.**    And you agree that the authors of the NTP agree that

4   studies of fluoride exposure typically found -- at levels

5   typically found in drinking water in the United States are

6   inconclusive?

7   **A.**    Whoever wrote that piece, and I can't see all of it from

8   here, said that, yes.

9           **THE COURT:**  Who is this?  Now I'm confused.  I would

10  like to see the rest of it, too, but I'm confused.  "Although

11  we tend."  Who is the "we"?

12          **MR. ADKINS:**  Sure.  I can lay a foundation for this,

13  Your Honor.

14  **BY MR. ADKINS:**

15  **Q.**    So we're clear, the draft State-of-the-Science and the

16  Meta-analysis received interagency comments by federal

17  agencies, correct?

18  **A.**    Right.

19  **Q.**    And the NTP authors of those documents responded to the

20  interagency review comments, correct?

21  **A.**    Right.

22  **Q.**    The NTP's Board of Scientific Counselors working group

23  assessed whether the NTP authors' responses to the comments

24  were adequate or not, correct?

25  **A.**    Correct.

1    Q.   The BSC working group then published a final report that

2    packages together the comments, the NTP authors' responses and

3    the BSC working group's evaluation of those responses, correct?

4    A.   Yes.

5         MR. ADKINS:   Mr. Hambrick, could you please turn to

6    page 1 of Exhibit 69?

7    BY MR. ADKINS:

8    Q.   So Dr. Theissen, do you see page 1 of Trial Exhibit 69?

9    A.   Yes.

10   Q.   Is this the working group report of the BSC that addressed

11   the interagency review comments on the fluoride monograph and

12   meta-analysis?

13   A.   That's what it says, yes.

14        MR. ADKINS:   And Mr. Hambrick, if you could please

15   turn back to the prior page we were on.

16   BY MR. ADKINS:

17   Q.   The blue text in this document, Dr. Theissen, that's --

18   those are responses by NTP authors to interagency review

19   comments to the Monograph, correct?

20   A.   Again, I worked from a black-and-white copy.  Without

21   seeing the previous page or two I think that's correct, but I'm

22   not certain.

23        MR. ADKINS:   Sure.  Mr. Hambrick, could you turn to

24   the prior page, please?  In fact, why don't you go to one page

25   prior.  Would you go to 19, please.

```
1    BY MR. ADKINS:
2    Q.   Okay.  So Dr. Theissen, I'll bring you down to the bottom
3    of this page that says -- it starts with A2.1.  Do you see
4    that?
5    A.   Right.  Yes.
6    Q.   That's the beginning of a comment to the Monograph,
7    correct?
8    A.   Right.
9         MR. ADKINS:  Okay.  And then if you can close this out
10   Mr. Hambrick and turn to page 20 for us.  Very good.
11   BY MR. ADKINS:
12   Q.   On the bottom of this page you see "Response, disagree, no
13   change"?
14   A.   Right.
15   Q.   That's the NTP author's response to the comment, correct?
16   A.   Okay.
17        MR. ADKINS:  Okay.  Mr. Hambrick, if you could please
18   turn to page 21.
19   BY MR. ADKINS:
20   Q.   And you'll see in the middle of this page, Dr. Theissen,
21   "BSC WG assessment"?
22   A.   Yes.
23   Q.   That's the BSC working group's assessment of the NTP
24   authors' response to the interagency review comment, correct?
25   A.   Yes.
```

1  Q.   Now, Dr. Theissen, the NTP authors have also stressed that

2  their conclusions apply to total fluoride exposures rather than

3  to exposures exclusively through drinking water; is that

4  correct?

5  A.   That might be.

6          THE COURT:   What happened?  Did mine just cut off?

7          COURT REPORTER:   I'm sorry?

8          THE COURT:   Okay.  It got cut off.  I was looking at

9  it.

10          MR. ADKINS:   Oh.  Very sorry.

11          THE COURT:   You were reading from it, right?

12          MR. ADKINS:   No, I was not reading from it.  I had

13  moved on to another --

14          THE COURT:   What you were saying was almost identical

15  to what was on the screen, so I'd like to see what's on that

16  screen.

17          MR. ADKINS:   Maybe we'll get to that then.

18          So Dr. Theissen --

19          THE COURT:   No.  Don't take it off.  I want you to

20  keep it on.  I'm the finder of fact, so please respect what I

21  have to say.

22          In fact, could you blow up the blue?  Could you

23  enlarge the blue?

24          Okay.  Thank you.

25          MR. ADKINS:   Thank you.

THEISSEN - CROSS / ADKINS

1   BY MR. ADKINS:

2   Q.   Dr. Theissen, total fluoride exposure includes fluoride

3   from drinking water plus other sources like food, toothpaste,

4   tea, bottled beverages and medicine, correct?

5   A.   Yes.

6   Q.   Okay.  So you offered an opinion in this case that NTP's

7   findings demonstrate a risk of adverse cognitive effects at

8   exposures that are similar to those resulting from fluoridated

9   water in the United States without any apparent threshold,

10  correct?

11  A.   I believe that "without any apparent threshold" comes from

12  the NTP Monograph.  That's probably -- I don't remember if

13  that's exactly what I said or not.

14          MR. ADKINS:  Okay.  Mr. Hambrick, could you please

15  pull up Dr. Theissen's third supplemental report and take us to

16  page 9, PDF page 10.  And if you could please blow up the first

17  sentence under section II.

18          Sorry.  II -- the main heading II.

19          THE WITNESS:  Okay.

20  BY MR. ADKINS:

21  Q.   Okay.  So Dr. Theissen we're looking at a copy of the

22  third supplemental report that discloses opinions you intended

23  to offer at this trial, correct?

24  A.   Yes.

25  Q.   And in your third supplemental report, you stated that

1   "NTP's findings demonstrate a risk of adverse cognitive effects

2   at exposures similar to those resulting from fluoridated

3   drinking water in the United States without any apparent

4   threshold," correct?

5   **A.**   Yes.

6   **Q.**   And that opinion is based on NTP's assessment in the

7   context of what EPA does for its risk evaluation under amended

8   TSCA, correct?

9   **A.**   I'm sorry?

10  **Q.**   Your opinion is based on NTP's assessment, correct?

11  **A.**   Yes.

12  **Q.**   And you are using NTP's assessment in context of what EPA

13  does for a risk evaluation under TSCA, correct?

14  **A.**   Yes.

15  **Q.**   Specifically you reviewed EPA's initial risk evaluations

16  under TSCA to determine how EPA selected hazard, exposure and

17  levels of confidence in hazard and exposure in determining

18  whether there was an unreasonable risk, correct?

19  **A.**   Yes.

20  **Q.**   But you did not apply any specific methodology in reaching

21  an opinion that NTP's findings demonstrate risk, correct?

22  **A.**   Didn't have a formula set out.  NTP's findings demonstrate

23  risk.  I mean, they say that.

24  **Q.**   In considering NTP's findings, you didn't apply any

25  specific methodology to come to your opinion that those

 1  findings demonstrate risk in context of community water

 2  fluoridation?

 3          MR. CONNETT:  Vague and ambiguous and overbroad.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  I looked at NTP's report in the context

 6  of many other studies on fluoride, and NTP's report supports

 7  that a risk exists from fluoridation of drinking water.

 8  BY MR. ADKINS:

 9  Q.  Dr. Theissen, do you recall I took your deposition in

10  September 2023?

11  A.  Yes.

12  Q.  And you are -- you took an oath to tell the truth at that

13  deposition, correct?

14  A.  Yes.

15          MR. ADKINS:  Your Honor, I'd like to read from

16  Dr. Theissen's deposition, page 32, line 21 --

17          MR. CONNETT:  I can just --

18          MR. ADKINS:  -- through 33, 7.

19          MR. CONNETT:  Give me a second here.

20          Brandon, I'm sorry, can you just give me a number

21  again?

22              (Discussion held off the record.)

23          MR. CONNETT:  No objections, Your Honor.

24          THE COURT:  Go ahead.

25  \\\

1  BY MR. ADKINS:

2      "**QUESTION:**  Okay.  So I want to talk about that.  Are

3      there any other methodologies that you employed as part of

4      your opinion that NTP's findings demonstrate a risk of

5      adverse cognitive effects at exposures similar to those

6      resulting from fluoridated drinking water in the United

7      States without any apparent threshold?

8      "**ANSWER:**  No specific methodologies, not that somebody has

9      said, 'Here is a methodology for reviewing NTP's studies,'

10     but just a general background in this sort of field, in

11     reviewing assessments of this sort and putting them into

12     context of exposures and this sort."

13     So Dr. Theissen, I want to focus for a minute on your

14 opinion that NTP's findings demonstrate risk without any

15 apparent threshold, okay?

16     By "apparent threshold," you mean a level of intake below

17 which there's not an adverse effect and above which there could

18 be an adverse effect, correct?

19 **A.**  That's the usual definition of a threshold.

20 **Q.**  And when you say "apparent," you mean the threshold is

21 obvious from the data, correct?

22 **A.**  Yes.

23 **Q.**  Your opinion regarding no apparent threshold is based on

24 the NTP author's responses to interagency comments to the

25 Monograph and the Meta-analysis; isn't that right?

 1  **A.**    That is -- I was -- I believe I was quoting them on the

 2  meta-analysis.  I realize there are a couple of graphs where

 3  it's possible to say, hey, there might be a threshold, but, in

 4  general -- in general, there is no obvious threshold for

 5  neurotoxicity, as you see with lead, with arsenic and to the

 6  extent that we're able to look at data for fluoride, that's

 7  what's seen.

 8       **MR. ADKINS:**  Mr. Hambrick, could you please pull up

 9  Dr. Theissen's third supplemental report, page 9, PDF page 10.

10  **BY MR. ADKINS:**

11  **Q.**   So Dr. Theissen, we're looking at your third supplemental

12  report, and under section 2.1, you have a couple of block

13  quotes?

14  **A.**    Yes.

15  **Q.**    Do you see that?

16  **A.**    Yes.

17  **Q.**    Those block quotes are the NTP author's responses to

18  comments that are reflected in the BSC working group report?

19  **A.**    Yes.

20  **Q.**    So I want to focus in on some of those comments.  And you

21  cited those comments in support of your opinion --

22  **A.**    Yes.

23  **Q.**    -- that there's no apparent threshold, correct?

24  **A.**    Yes.

25       **MR. ADKINS:**  So Mr. Hambrick, could you please take us

 1  to Exhibit 69?  We're at page 324, PDF page 326.

 2  **BY MR. ADKINS:**

 3  **Q.**   So Dr. Theissen, I want to walk through the agency

 4  comment, NTP's response and the BSC working group assessment of

 5  that response with you.  Let's start with comment 8R, which is

 6  towards the bottom of the page on 324.

 7       Now, comment 8R relates to a statement in the

 8  Meta-analysis manuscript that there's evidence of a

 9  dose-response relationship between high fluoride exposure and

10  lower children's IQ, correct?

11  **A.**   Yes.

12  **Q.**   The interagency review comment here is, "Was a threshold

13  for such relationship considered," correct?

14  **A.**   Yes.

15  **Q.**   The NTP authors' response is in blue below that text,

16  right?

17  **A.**   Yes.

18  **Q.**   And the first paragraph of that response says, "As

19  previously mentioned, results for the dose-response

20  relationship restricted to lower fluoride exposure levels

21  (i.e., less than 4 milligram per liter and 2 milligram per

22  liter, less than" -- excuse me.  I'm going to restate that --

23  "less than 4 milligram per liter and less than 2 milligram per

24  liter, less than 1.5 milligram per liter in both drinking water

25  and urine are reported in the supplemental materials."

 1        Do you see that?

 2   **A.**   Yes.

 3   **Q.**   The second paragraph states, "The restricted cubic splines

 4   model for water fit slightly better than the linear model,

 5   however, there was no obvious threshold as illustrated by the

 6   figure at either of the modeled knots."

 7        Do you see that?

 8   **A.**   Yes.

 9   **Q.**   Now, you relied on this explanation by the NTP authors to

10   form your opinion that there was no obvious threshold for

11   adverse effects for children's IQ in the data correct?

12           **MR. CONNETT:**  Overbroad.

13           **THE WITNESS:**  Right.

14           **THE COURT:**  Overruled.

15   **BY MR. ADKINS:**

16   **Q.**   When a linear model fits the data, that would suggest that

17   there is no threshold above or below which the exposure outcome

18   is or is not observed, correct?

19   **A.**   Yes.

20   **Q.**   And the BSC working group's assessment of the NTP response

21   here follows on the next page.

22           **MR. ADKINS:**  So Mr. Hambrick, could you please take us

23   to page 325 of the BSC working group report?

24   **BY MR. ADKINS:**

25   **Q.**   The BSC working group's assessment is that the NTP

 1  authors' response is inadequate; isn't that right?

 2  **A.**   That's what it says.

 3  **Q.**   The BSC working group recommended, quote "that the authors

 4  better describe and discuss in the draft Meta-analysis

 5  manuscript the adequacy of evidence at low fluoride levels and

 6  dose-response mean effects analysis."

 7      Do you see that?

 8  **A.**   Yes.

 9  **Q.**   So let's look at the comment before this one.  I want to

10  take you to comment 8 IQ.

11          **MR. ADKINS:**  Mr. Hambrick, could you please flip us

12  back to page 324?

13  **BY MR. ADKINS:**

14  **Q.**   The NTP authors received an interagency comment to the

15  meta-analysis manuscript that asks whether there was a

16  threshold for the negative association between individual level

17  measures of fluoride and children's IQ, correct?

18  **A.**   Yes.

19  **Q.**   The NTP authors' response was that because they used a

20  linear model, no threshold was observed, correct?

21  **A.**   Yes.

22  **Q.**   The BSC working group found this response inadequate,

23  correct?

24  **A.**   Yes.

25  **Q.**   In fact, the BSC working group explained, and I'll read

1  from their explanation, "Because the authors fit a linear term,

2  a threshold was not assessed.  Although the authors examined

3  non-linear exposure forms and determined the linear term to be

4  optimal, there are very few data points from studies in the

5  low-dose range, reducing confidence in this range of exposure."

6      Do you see that?

7  A.   Yes.

8  Q.   Now, you think that the BSC working group was being a

9  little bit hard on NTP here, don't you?

10  A.   I think they were, but also on -- that was NTP's

11  assessment of what they had.

12      The BSC is -- in their answers -- when they consider

13  something inadequate, they sometimes consider it inadequately

14  supported in the text, not that they believe it to be wrong.

15  But there's also the situation for us where even if we say that

16  there's reduced confidence in this range of exposure, that

17  means there's more uncertainty and that means there's a greater

18  burden to protect the public.

19      MR. ADKINS:  Mr. Hambrick, could you take us to page

20  131 of Exhibit 69?

21  BY MR. ADKINS:

22  Q.   So Dr. Theissen, I want to talk about comment No. 4 on

23  page 131.  Comment 4 notes that the discussion section of the

24  Monograph now, does not address the evidence regarding dose

25  effect or threshold, correct?

1    **A.**    I'm not sure where you are.

2              **THE COURT:**  Is it at the top of the page there?

3              **MR. ADKINS:**  At the top of the page, yes.

4    **BY MR. ADKINS:**

5    **Q.**    So we're looking at the black text which is the reviewer

6    comment to the Monograph.

7         Do you see that highlighted text, Dr. Theissen, on your

8    screen?

9    **A.**    Okay.

10   **Q.**    Okay.

11        So this comment notes that the discussion section of the

12   Monograph doesn't address the evidence regarding dose effect or

13   threshold, right?

14   **A.**    That's what the comment says.

15   **Q.**    And in response to this comment, the NTP authors

16   explained -- and this is at the bottom of their explanation --

17   they, quote, address the concept of thresholds by applying

18   several data modeling approaches to the children's IQ data in a

19   meta-analysis manuscript to be published separately."

20        Do you see that?

21   **A.**    Yes.

22   **Q.**    Now let's move on to the BSC working group assessment.

23        The BSC working group assessed that this response was not

24   inadequate, correct?

25   **A.**    That's what it says.

1  Q.   The BSC working group authors explained, and now I'll read

2  from the second paragraph in the assessment towards the end,

3  "The BSC working group does not necessarily agree with the

4  authors that evidence of an association is independent from

5  dose response.

6       "Additionally, the BSC working group notes that authors

7  did not explicitly consider the potential nonlinearity of the

8  exposure outcome association.

9       "For example, about there is a nonlinear association

10 between exposure and outcome, it could be masked in an analysis

11 that does not examine dose response."

12      Do you see that?

13 A.   Yes.

14 Q.   So let's spend a little time with the meta-analysis

15 results by exposure group.

16      Do you remember when we saw in one of the NTP authors'

17 explanations a reference to restricting the results of the

18 meta-analysis into three different exposure groups, less than 4

19 milligram per liter, less than 2 milligram per liter, and less

20 than 1.5 milligram per liter.  Do you recall that?

21 A.   Yes.

22 Q.   The authors presented information using those cutoffs

23 because they represent various regulatory not biological

24 thresholds, correct?

25 A.   Those are regulatory concerns.

1   Q.   And they are not biological thresholds that the NTP

2   authors identified, right?

3   A.   They relate to fluoride in the drinking water, which would

4   not be a biological thing anyway.

5           MR. ADKINS:   Mr. Hambrick, could you take us to

6   Exhibit 69, page 119, which is PDF page 121?

7   BY MR. ADKINS:

8   Q.   So at the top of the page here we see in blue one of the

9   NTP authors' responses that begins "In addition, it is useful

10  to point out that."

11          Do you see that on your screen, Dr. Theissen?

12  A.   Yes.

13  Q.   About midway through this paragraph, the NTP authors write

14  "These cut-off points were described as being selected because

15  they represent various regulatory rather than biological

16  thresholds."

17          Do you see that?

18  A.   Yes.

19  Q.   And the thresholds they're referring to are the 4 parts

20  per million, 2 parts per million and 1.5 parts per million,

21  correct?

22  A.   Yes, and that's in drinking water, and so that would not

23  be a biological threshold anyway.  That's a -- that's a

24  question of what there is, and that's independent of who's

25  drinking it, so those are regulatory numbers.

1  **Q.**  Just for clarity, Dr. Theissen, ppm is equivalent to

2  milligram per liter?

3  **A.**  In this context, yes.

4       **MR. ADKINS:**  Mr. Hambrick, could you take us to page

5  Roman II-43 of Exhibit 69, which is PDF page of 662, please?

6  **BY MR. ADKINS:**

7  **Q.**  So Dr. Theissen, attached to the working group report was

8  a copy of the Meta-analysis manuscript, right?

9  **A.**  Yes.

10 **Q.**  And that copy of the Meta-analysis manuscript appears as

11 Appendix 2, correct?

12 **A.**  I believe that's correct.

13 **Q.**  So when we look at the bottom, the page identifiers of

14 this document, we see a Roman II-42.  That's a reference to

15 appendix 2 of the BSC working group report?

16 **A.**  Yes.

17      **MR. ADKINS:**  So Mr. Hambrick, if you could focus us in

18 on the paragraph just above "Results" on this page, please.

19 **BY MR. ADKINS:**

20 **Q.**  Dr. Theissen, I'll read from the Meta-analysis manuscript.

21 "Analyses were restricted to less than 4 milligram per liter,

22 the EPA's current enforceable drinking water standard for

23 fluoride, less than 2 milligram per liter, the EPA's

24 enforceable secondary standard for fluoride in drinking water

25 and less than 1.5 milligrams per liter, the WHO's guideline for

1  fluoride in drinking water"; is that right?

2  A.   Yes.

3  Q.   And this, again, is referring to the subgroup analyses

4  that the Meta-analysis authors conducted for water fluoride

5  concentration and urinary fluoride concentration, correct?

6  A.   Here it says drinking water and urinary.  In the other

7  place it said drinking water.  But where the numbers come from

8  is drinking water.

9  Q.   And, in fact, what the authors did was to analyze --

10  analyze the data based on those cutoff points, 4, 2 and 1.5, in

11  both urinary data and water fluoride data, correct?

12  A.   Yes.

13  Q.   In your view, there's no obvious inconsistency between the

14  low-exposure range and the overall exposure range in the data

15  that NTP analyzed in its meta-analysis, right?

16  A.   It's clearer in the analyses with water concentrations

17  than it is with fluoride, but overall the body of data supports

18  a hazard conclusion for fluoride.

19  Q.   So Dr. Theissen, let's talk in more detail about NTP's

20  dose-response meta-analysis results.

21       NTP reported results using two different modeling methods,

22  a restricted maximum likelihood estimation method and a maximum

23  likelihood method, correct?

24  A.   I believe that's correct.

25  Q.   The names, not so much important.  There are two methods

THEISSEN - CROSS / ADKINS

 1  that they used, correct?

 2  A.   Yes.

 3  Q.   NTP reported the results in two tables, eTable 4 and

 4  eTable 5, correct?

 5  A.   I don't remember the numbers, but there are two tables.

 6  Q.   Okay.  I can -- I can help refresh your recollection as we

 7  work through this.

 8        MR. ADKINS:  So Mr. Hambrick, could you turn to page

 9  Roman II-78 of Exhibit 69.

10  BY MR. ADKINS:

11  Q.   So Dr. Theissen, we're looking at eTable 4, the

12  meta-analysis manuscript, right?

13  A.   Yes.

14  Q.   And this is the first -- this table reports the results of

15  that first method that we described, the model selection

16  method, right?

17  A.   Yes.

18  Q.   So I want to look at the data reported or the results

19  reported for water fluoride, all studies.  Do you see that at

20  the top of the table here?

21  A.   Yes.

22  Q.   And you see there are columns for all data, less than

23  4 milligram per liter, less than 2 milligram per liter and less

24  than 1.5 milligram per liter.  Do you see that?

25  A.   Yes.

1    Q.   And those are the subdivisions that we talked about

2    earlier in your testimony, right?

3    A.   Yes.

4    Q.   So let's start with the results by water fluoride

5    concentration in all of the studies.

6         The right most column reports the results in the exposure

7    group of less than 1.5 milligram per liter fluoride in drinking

8    water, right?

9    A.   Yes.

10   Q.   And if you look at the results for the linear model, they

11   are not statistically significant for an adverse effect,

12   correct?

13   A.   Correct.

14   Q.   Is that correct?

15   A.   Yes.

16   Q.   If you look at the results for less than 2 milligrams per

17   liter, again, using the linear model, the results are not

18   statistically significant, correct?

19   A.   Correct.

20   Q.   So Dr. Theissen, you see there are abbreviations for AIC

21   within this table?

22   A.   Yes.

23   Q.   The AIC score in the results for less than 1.5 milligram

24   per liter linear model is 8.2?

25   A.   That's what it says.

THEISSEN - CROSS / ADKINS

1    **Q.**    The AIC score is a goodness-of-fit measurement, correct?

2    **A.**    I believe that's correct.

3    **Q.**    And the lower the AIC score -- the lower AIC values

4    indicate a better-fitting model, correct?

5    **A.**    That's not what it looks like, but I -- I'm not a

6    statistician, so I don't know these things in detail.

7    **Q.**    Okay.  Well, why don't we look at what -- how the NTP

8    authors described the AIC values.  So page 2-43, PDF page 662.

9           **MR. ADKINS:**  Mr. Hambrick could you take us to that

10   page, please?  And if you could focus in on the second to last

11   paragraph under dose-response meta-analysis, towards the bottom

12   of that paragraph, please.

13   **BY MR. ADKINS:**

14   **Q.**    So Dr. Theissen, if you look at the bottom of this

15   paragraph it says, "The AIC is a goodness-of-fit measure that

16   adjusts for the number of parameters in the model and lower AIC

17   values indicate better-fitting models."

18        Do you see that?

19   **A.**    Yes.

20   **Q.**    Okay.  So at least in the way that the NTP authors

21   intended to represent these AIC scores, a lower score

22   represents a better-fitting model, correct?

23   **A.**    Yes.

24   **Q.**    So the AIC score --

25           **MR. ADKINS:**  Mr. Hambrick, if you could go back to

 1  page 2-78, Table e -- eTable 4.

 2  **BY MR. ADKINS:**

 3  **Q.**   The AIC score for the linear model, for the quadratic

 4  model and the restricted cubic spline model in the exposure

 5  group of less than 1.5 milligrams per liter are comparable,

 6  correct?

 7  **A.**   They appear to be, yes.  They appear to be comparable,

 8  yes.

 9  **Q.**   So let's look at the results -- when we just restrict this

10  analysis to the low risk-of-bias studies, at the bottom of this

11  eTable 4, we see that the NTP authors reported results using

12  just the linear model and limited to the low risk-of-bias

13  studies.  Do you see that?

14  **A.**   Yes.

15  **Q.**   And again, in the exposure groups of less than 2 milligram

16  per liter and less than 1.5 milligram per liter, there are no

17  statistically significant adverse effects using the linear

18  model, correct?

19  **A.**   That's correct, but they are -- they are, nevertheless,

20  very close and they are in a situation indicating lower IQ with

21  higher exposure.

22  **Q.**   And what do you mean when you say, "They're very close"?

23  **A.**   They don't lack much from being statistically significant,

24  especially the one less than 2.  And there's not a nice, neat

25  cutoff line for -- as you've heard earlier in this case,

**THEISSEN - CROSS / ADKINS**

 1  there's not a nice, neat cutoff line for statistical

 2  significance, even though it tends to be used that way, but

 3  both of those are in the direction of a negative dose response.

 4  **Q.**   So if we look at the confidence interval for, I think you

 5  said, the less than 2-milligram per liter linear model --

 6  **A.**   Yes.

 7  **Q.**   -- the lower bound is negative .72 and the upper bound is

 8  .03?

 9  **A.**   Yes.

10  **Q.**   So because that confidence interval crosses zero, there's

11  no statistical significance in a strict sense, correct?

12  **A.**   In the strict sense.

13  **Q.**   And when you say they are very close, are you referring to

14  .03 being very close to less than zero?

15  **A.**   Yes.

16  **Q.**   Okay.  So let's turn to --

17       **THE COURT:**  Those numbers, when you look at 0.34, is

18  that -- again, is that IQ points or standard deviation or what

19  is that?

20       **THE WITNESS:**  These are -- these are standard

21  deviations, mean effects.  So it would be .34 of a standard

22  deviation, I believe.  I'd have to see the text to be certain.

23       **MR. ADKINS:**  Your Honor, I'm happy to go on, I'm about

24  to move to eTable 5.

25       **THE COURT:**  We are actually at our 1:30 break.

1        **MR. ADKINS:**  Okay.

2        **THE COURT:**  So if you're moving on to something else,

3   why don't we go ahead and take our break, okay, so we'll break

4   until tomorrow morning, 8:30.  Okay?

5        **MR. ADKINS:**  Thank you.

6        **THE COURT:**  Okay.

7        **THE CLERK:**  Court is adjourned.

8     (Adjourned at 1:33 p.m.)

9                         --oOo--

10

11

12                   **CERTIFICATE OF REPORTER**

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16

17   _____              February 7, 2024
     JENNIFER L. COULTHARD, RMR, CRR              DATE
18   Official Court Reporter
     CA CSR#14457
19

20

21

22

23

24

25