1                              **Volume 6**

2                           **Pages 857 - 1040**

3                  UNITED STATES DISTRICT COURT

4                NORTHERN DISTRICT OF CALIFORNIA

5   Before The Honorable Edward M. Chen, Judge

6   FOOD & WATER WATCH, INC., ET    )
    AL.,                            )
7                                   )
                 Plaintiffs,        )
8                                   )
      VS.                           )      **NO. 17-CV-2162**
9                                   )
    UNITED STATES ENVIRONMENTAL     )
10  PROTECTION AGENCY, an agency    )
    of the United States, ET AL.,   )
11                                  )
                 Defendants.        )
12  _____)

13                          San Francisco, California
                            Wednesday, February 7, 2024
14
                    **TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
15
    **APPEARANCES**:
16
    For Plaintiffs:
17                          WATERS KRAUS & PAUL, LLP
                            222 N. Pacific Coast Highway, Suite 1900
18                          El Segundo, California  90245
                      BY:   **MICHAEL P. CONNETT**
19                          **CHARLES ANDREW WATERS**
                            **ATTORNEYS AT LAW**
20
                            NIDEL & NACE, PLLC
21                          5335 Wisconsin Ave., NW, Suite 440
                            Washington, DC 20015
22                    BY:   **CHRISTOPHER THOMAS NIDEL**
                            **ATTORNEY AT LAW**
23

24       **(Appearances continued next page.)**

25  REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                  Official U.S. District Court Stenographer

**APPEARANCES (Continued):**

For Defendants:

                      UNITED STATES DEPARTMENT OF JUSTICE
                      Environmental Defense Division
                      601 D Street, NW, Room 8814
                      Washington, DC  20004
              BY:   **BRANDON N. ADKINS, ATTORNEY AT LAW**

                      UNITED STATES DEPARTMENT OF JUSTICE
                      1301 Clay Street, Suite 340-S
                      Oakland, California  94612
              BY:   **EMMET P. ONG, ATTORNEY AT LAW**

                      UNITED STATES DEPARTMENT OF JUSTICE
                      Environmental Defense Division
                      150 M Street, N.E.
                      Washington, D.C.  2002
              BY:   **PAUL CAINTIC, ATTORNEY AT LAW**


**ALSO PRESENT:**        DANIEL DePASQUALE, EPA
                      JAY SANDERS (trial tech)
                      DANNY HAMBRICK (trial tech)


                      --oOo--

Wednesday, February 7, 2024 - Volume 6

# I N D E X

**PLAINTIFFS' WITNESSES**                                    **PAGE**   **VOL.**

**THEISSEN, KATHLEEN**
(PREVIOUSLY SWORN)                                            875      6

Cross-Examination Resumed By Mr. Adkins:                      875      6
Redirect Examination By Mr. Connett:                         949      6

**DEFENDANT'S WITNESSES**                                    **PAGE**   **VOL.**

**SAVITZ, DAVID**
(SWORN)                                                       967      6

Direct Examination By Mr. Caintic:                           968      6

# E X H I B I T S

**TRIAL EXHIBITS**                              **IDEN**   **EVID**   **VOL.**

  128                                                     995      6

  129                                                     997      6

PROCEEDINGS

```
1   Wednesday - February 7, 2024                          8:32 a.m.

2                      P R O C E E D I N G S

3          THE CLERK:  Court is calling the case Food & Water

4   Watch, et al. versus EPA, et al., Case No. 17-2162.

5          Counsel, please state your appearance for the record

6   beginning with the plaintiff.

7          MR. CONNETT:  Good morning, Your Honor; Michael

8   Connett on behalf of the plaintiffs.

9          THE COURT:  All right.  Good morning.

10          MR. WATERS:  Also Andy Waters for the plaintiff.

11          THE COURT:  Mr. Waters, good morning.

12          MR. NIDEL:  Good morning, Your Honor; Chris Nidel on

13   behalf of the plaintiffs.

14          THE COURT:  Thank you, Mr. Nidel.

15          MR. ADKINS:  Good morning, Your Honor; Brandon Adkins

16   for the defendants.

17          THE COURT:  All right.  Good morning.

18          MR. ONG:  Good morning, Your Honor; Emmet Ong for the

19   defendants.

20          THE COURT:  Mr. Ong.

21          MR. CAINTIC:  Good morning, Your Honor; Paul Caintic

22   for defendants.

23          THE COURT:  Mr. Caintic.

24          MR. CONNETT:  Your Honor, we -- the parties do have

25   two issues to raise for the Court.
```

PROCEEDINGS

1          **THE COURT:**  Okay.

2          **MR. CONNETT:**  The first issue is yesterday, late

3  afternoon, a new study was published.  It was funded by and

4  contracted by Health Canada.

5          **THE COURT:**  By?

6          **MR. CONNETT:**  Health Canada.

7          **THE COURT:**  Health Canada.  Okay.

8          **MR. CONNETT:**  And the scientists for this study, at

9  the request of Health Canada, conducted a BMCL analysis of

10  fluoride and IQ, and they calculated a urinary-based BMCL,

11  which they then converted into a milligram per day value and a

12  milligram per liter of water value.

13          **THE COURT:**  Of intake -- equating what we were talking

14  about yesterday about the relationship between urine flow and

15  water intake?

16          **MR. CONNETT:**  Exactly.

17          Their urinary BMCL is basically identical to

18  Dr. Grandean's using the MIREC and ELEMENT cohort.  There it

19  was .18 parts per million in the urine, which they then

20  converted into a milligram per day value of .27 milligrams per

21  day of total fluoride intake, which they then converted into a

22  water fluoride concentration.

23          Now, we had no idea about the existence -- well, we

24  did know that Health Canada had been working on a study, but we

25  had not seen a draft in any form whatsoever, and it was

**PROCEEDINGS**

 1  certainly a surprise to us to see it released yesterday.

 2          Dr. Savitz had served as a peer reviewer of this

 3  report.  I had asked him about it at his deposition.  He was

 4  not yet in a position at that time to discuss it, due to

 5  confidentiality concerns.

 6          We -- Dr. Savitz's panel -- and he was serving as a

 7  litigation expert for EPA at the time of this peer review --

 8  that panel, which included a member of the American Dental

 9  Association, recommended to Health Canada to not publish the

10  report.

11          So what has happened is, the scientist who did the

12  report at the request of Health Canada went ahead and published

13  it in the peer-reviewed literature, but it does not have the

14  Health Canada seal of approval on it.

15          So that is the landscape.  And we wanted to raise this

16  with the Court because there are a few questions we would like

17  to ask Dr. Savitz about it, and we think it might be a study

18  that the Court may want to have in evidence.  So we just wanted

19  to raise it.

20          **THE COURT:**  So the study was peer reviewed --

21          **MR. CONNETT:**  Correct.

22          **THE COURT:**  -- and are those reviews -- were taking

23  into account in any way in terms of the study revisions or

24  construct?

25          **MR. CONNETT:**  Yes.  And so the expert panel that

**PROCEEDINGS**

1    Dr. Savitz was on, which, again, had a member of the American

2    Dental Association, they said don't go forward with it, it's

3    not enough evidence.  But these scientists did go ahead with

4    it, and they did publish it in critical reviews in Toxicology,

5    which is a high-quality, peer-reviewed scientific publication.

6         **THE COURT:**  All right.  But it doesn't have the stamp

7    of approval from Health Canada?

8         **MR. CONNETT:**  It does not.

9         **MR. ADKINS:**  Your Honor, if I --

10        **THE COURT:**  Yep.

11        **MR. CAINTIC:**  -- could be heard.

12        There are several misrepresentations that plaintiffs

13   just made about that document.  We are lucky that Dr. Savitz

14   is, in fact, here, and I clarified exactly what the landscape

15   is for this document.  So if I could describe what our view of

16   the document is.

17        **THE COURT:**  Yep.

18        **MR. CAINTIC:**  So Health Canada convened an expert

19   panel of, I believe, about five to six epidemiologists,

20   toxicologists and subject matter experts on fluoride to advise

21   them on developing recommendations for their new fluoride water

22   concentration guidelines.

23        And as part of that, they commissioned this -- they

24   contracted with this company to do its own systematic review of

25   the fluoride literature.

PROCEEDINGS

```
 1            THE COURT:  When you say, "this company," who is this

 2    company?

 3            MR. CAINTIC:  I don't remember, but it's a contractor.

 4    It's not -- it's a contractor; it has academics on it, so I'm

 5    not being pejorative when I say "a company."

 6            THE COURT:  Okay.

 7            MR. CAINTIC:  So they contracted with them to do their

 8    own systematic review of the literature.  They came out and

 9    provided the panel with a fairly lengthy and comprehensive

10    discussion of their view on the literature on a variety of

11    different endpoints, so dental fluorosis, kidney dysfunction,

12    thyroid dysfunction.

13            THE COURT:  And this is a review, systematic review of

14    literature, not their own study?

15            MR. CAINTIC:  Not their own study.  So this is a

16    review of the fluoride literature that they conducted

17    themselves, and then they provided a longer, earlier

18    iteration -- not even really an "iteration," but an earlier,

19    longer, systematic review to the panel.

20            The panel reviewed that in connection with the NTP

21    Monograph, several other studies as well, the four prospective

22    cohorts.  And the panel ended up coming up with the conclusion

23    that the fluoride in neurodevelopmental literature does not

24    support the construction of a point of departure, a hazard

25    level, as plaintiffs have been calling it.
```

1           **THE COURT:**  When you say, "The panel," these were the

2    five or so experts appointed by Health Canada?

3           **MR. CAINTIC:**  Appointed by Health Canada, so

4    Dr. Savitz --

5           **THE COURT:**  Dr. Savitz was one.

6           **MR. CAINTIC:**  Dr. Savitz was one of them.  David

7    Bellinger, a professor at Harvard was another one.  Steve Levy,

8    who I think is the one that Mr. Connett keeps referring to, a

9    dental epidemiologist, a toxicologist as well.  So they relied

10   on a systematic review commissioned by Health Canada to come to

11   their own conclusion.

12          If I could clarify one thing about what Mr. Connett

13   just said about deriving a BMCL calculation; that is not what

14   that systematic review did.

15          So that systematic review said if we took Grandjean's

16   2022 BMCL that combined the MIREC and ELEMENT studies together,

17   if we took that as true and we made six assumptions, then we

18   could try to derive, based on all those assumptions, a fluoride

19   intake level.  But here's the fluoride intake level we'd

20   calculate from that, but the literature is still so

21   inconsistent that we don't think it's appropriate right now to

22   develop a point of departure based on neurocognitive effects.

23   Instead, we will derive a point of departure on the basis of

24   dental fluorosis.  So that's the conclusion they came to.

25          So in terms of the documents that -- the document that

1   plaintiffs want to introduce today, that is not the document

2   that Dr. Savitz or the expert panel relied on.  That is a

3   pared-down version that Dr. Savitz has never seen before and

4   had never relied on, the panel had not relied on.

5        I think if there's a document that should come in on

6   the basis of, at least some expert relied on it, it's the

7   expert panel's conclusions and the report that Dr. Savitz

8   actually signed off on, not this other document that, frankly,

9   nobody saw until about 7:00 last night.

10       **THE COURT:**  And this other document is what was in --

11  what is being represented to me as something independently

12  published by the -- whoever the authors were under contract --

13       **MR. CAINTIC:**  Right.

14       **THE COURT:**  -- not withstanding the limitations or

15  critical reviews of the panel, they took their product,

16  essentially, and some version of it and got it published in a

17  peer-reviewed journal?

18       **MR. CAINTIC:**  Right.  And I wouldn't even say that the

19  panel was necessarily critical of it.  What the panel did is,

20  they took that report, they took the NTP Monograph, they took

21  several other studies --

22       **THE COURT:**  And reached a conclusion.

23       **MR. CAINTIC:**  -- and reached a conclusion from looking

24  at all of that literature.

25       But, again, the systematic review that came out last

PROCEEDINGS

1   evening that plaintiffs sent to us at 7:00 at night was the --

2   was a different version than the one that Dr. Savitz has relied

3   on.  And that's the only reason why we're really concerned

4   about it is because if plaintiffs are going to get up and

5   cross-examine Dr. Savitz on this document he had not seen,

6   honestly, I don't think -- if Dr. Savitz's cross-examination

7   starts on Friday, I don't think that, what is it, two days to

8   digest that document and be able to respond to

9   cross-examination would be sufficient.

10          THE COURT:  Well, let me ask with respect to the --

11  there was some work product that came out of the Canadian

12  panel, right? --

13          MR. CAINTIC:  Yes.

14          THE COURT:  -- after their systematic review of the

15  NTP and this report and everything else.

16          MR. CAINTIC:  Yes.

17          THE COURT:  Is that in this record, in our record?

18          MR. CAINTIC:  It is not in our record.  That expert

19  panel -- so it's what is called the Health Canada Expert Panel

20  Report came out, I want to say, either a week or two weeks ago,

21  mid -- mid-January, I think a little bit after the final

22  pretrial conference.  So that had come out -- that is, in fact,

23  something that Dr. Savitz has signed off on that he can say,

24  you know, that's part -- that's part of what's forming his

25  opinions.  But this brand-new thing, I mean --

PROCEEDINGS

 1            THE COURT:  All right.  Let's take it one step at a

 2    time.

 3            Is there any reason why that shouldn't -- I shouldn't

 4    have access to that?

 5            MR. CAINTIC:  I have no objection to including that,

 6    Your Honor.

 7            THE COURT:  It's the latest thing.  You may or may not

 8    disagree with it, it may have limited value, but it is looking

 9    at some of the issues we're looking at coming from an

10    established panel sanctioned by the Canadian government, right?

11            MR. CONNETT:  Your Honor, are you referring there to

12    the expert panel report, or are you referring to the published

13    peer-reviewed study?

14            THE COURT:  Well, first I'm talking about the expert

15    panel report that came out two weeks ago.  Seems like that's --

16    whether you agree with it, disagree with it, it seems like

17    that's relevant.

18            MR. CAINTIC:  We have no objection to including that

19    because Dr. Savitz -- I think there's no, kind of, surprise

20    issue with Dr. Savitz on that because he relied on it or he

21    signed off on it.

22            THE COURT:  He's familiar with it?

23            MR. CONNETT:  Well, there is -- there is a disclosure

24    issue there, though, Your Honor, which is counsel has just

25    stated that that report came out one to two weeks ago.  The

1    first that we received it was last night from counsel who sent

2    it to us in response to our email regarding this new study.

3        We had no -- we had no idea that there was even such

4    an expert panel report.  It's short, 12 pages, one page on

5    neurotoxicity, but we would have no objection to having that

6    report be considered by this Court so long as, in the interest

7    of completeness, this peer-reviewed, published study -- that

8    expert panel report is not peer reviewed, it has conflict of

9    interest issues, but I think if we had both documents in the

10   record --

11       **THE COURT:**  All right.  Well, that was going to be my

12   next question.

13       It seems to me I don't see any reason why that should

14   not be part of the record.  It's recent analysis, some analysis

15   of many things we've been talking about.  But why not also

16   admit -- this is something that was peer reviewed and

17   published.

18       Putting aside, for a moment, the disclosure and the

19   preparation of the -- just from a relevance and the interest of

20   science, shouldn't this Court have that too, have both?

21       **MR. CAINTIC:**  Right.  I think in terms of relevance

22   and science, certainly this is something, we think, that the

23   Court would benefit from reviewing in the sense that it's

24   almost deciding that one of the precise questions before this

25   Court.

PROCEEDINGS

```
 1            I think what we'd ask for, though, is that we have a
 2   carve-out for Dr. Savitz.  He's probably going to start his
 3   testimony today, in which case, you know, traditional rules are
 4   that we cannot, you know, talk about him -- talk with him about
 5   the substance of his testimony.  Again, I don't know to what
 6   extent he will be able to fully digest this document in a
 7   two-day period, so, you know, I put that on notice for how well
 8   he's going to be able to respond to cross-examination
 9   questions.  But I think in terms of the overall conclusion of
10   that systematic review, it's in line with our position in the
11   case, and we don't think that -- for relevance purposes --
12            THE COURT:  All right.  Well, I'm going to admit both.
13            In terms of Dr. Savitz's preparation, I mean, counsel
14   should be able to talk with his witness about that, since it
15   just came out, and prepare his testimony.
16            Given the fact that he reviewed the -- whatever was
17   originally published, and this is not unrelated to that.  I'm
18   sure this is -- it's not like he's seeing something brand-new
19   off the shelf for the first time.  And I would assume he has
20   the ability to absorb that and comment on that on
21   cross-examination.
22            MR. CAINTIC:  My understanding is that the version
23   that the Health Canada panel reviewed -- I don't have a
24   number -- number of pages, but was, you know, about this thick,
25   and then the systematic review that came out is thinner than
```

1    that.  I this they pared it down for purposes of publication in

2    a journal, but I would have to talk to Dr. Savitz to

3    understand --

4              **THE COURT:**  Sure.

5              **MR. CAINTIC:**  -- to what extent they're different.

6              **THE COURT:**  All right.  But I assume that since he's

7    very familiar with the larger version, this condensed version

8    is something he would be able to access --

9              **MR. CAINTIC:**  It's been, I believe, eight months since

10   he's looked at it, at minimum.  So, again, getting up to speed

11   in two days -- I just -- I'm putting the Court and the parties

12   on notice that his ability to respond to, you know, vigorous

13   cross-examination questions about a particular sentence or

14   footnote in there might be limited, but I'm sure he could

15   testify about what is the overall conclusion that the

16   systematic reviewers drew and that the Health Canada expert

17   panel reported.

18             **THE COURT:**  All right.

19             **MR. CONNETT:**  Your Honor, just one thing to add to

20   that.  We have no objection to counsel discussing this with

21   Dr. Savitz, but I -- we would be interested, so that we can

22   fully develop our cross, to receive a copy of what Dr. Savitz

23   and Dr. Levy last summer reviewed.

24             **MR. CAINTIC:**  I -- I do not know where that is.  I --

25             **THE COURT:**  Oh, you mean the larger --

 1        **MR. CAINTIC:**  Right.  I don't know where that is.  I
 2   don't know if it's subject to confidentiality concerns.  I
 3   don't know what the laws are in Canada.  That seems like
 4   somewhat of a distraction at this point.  I mean, are we going
 5   to get into a discovery battle in the middle of trial?

 6        **THE COURT:**  Well, I mean, this is all arising, you
 7   know.  Obviously if this kind of thing -- if we had more time,
 8   if the time were different, we'd like to.

 9        **MR. CAINTIC:**  Right.

10        **THE COURT:**  But it is a fair request, putting aside
11   Canadian laws on confidentiality and that, and so I think it's
12   a fair request, and I'm going to put the burden on the
13   Government to try to get a copy of that.  I think that's a fair
14   request.  So use whatever diligence you can to obtain that.

15        **MR. CAINTIC:**  Okay.

16        **THE COURT:**  You know, I assume your witness has it
17   somewhere, since he was on the review panel.

18        If there are confidentiality issues with the Canadian
19   government then, you know, if a court order would help, I'm
20   willing to sign a court order in that regard.  If a protective
21   order helps, I'm willing to sign off on a protective order or
22   whatever, but I do think it's relevant.

23        **MR. CAINTIC:**  Okay.  Well, we'll do our best to try to
24   find a copy, and we will think through those confidentiality
25   concerns and --

PROCEEDINGS

```
1            THE COURT:  All right.  But officially I am ordering
2    that to be produced.
3            MR. CAINTIC:  Okay.
4            THE COURT:  Okay?
5            MR. CONNETT:  Your Honor, one other matter that
6    Mr. Waters would like to address.
7            THE COURT:  Okay.
8            MR. WATERS:  Your Honor, may it please the Court.
9            I spoke with counsel a little earlier in the day, and
10   I couldn't reach an agreement on this.  We find ourself under
11   the circumstances needing to ask the Court for a modification
12   of the time schedule; and not a huge modification, but perhaps
13   an extra hour and a quarter.  I'm mindful of the fact that the
14   Court, obviously, appropriately used much of our time over the
15   last several days, and we would just ask for an additional, as
16   I say, modification of the schedule.
17           I think it's also warranted, given this new discovery
18   as of yesterday, which is going to require some extended
19   cross-examination presumably on our part.
20           THE COURT:  Well, if it weren't for this new matter,
21   why do you need more time?
22           MR. WATERS:  Well, Your Honor, we have parsed out the
23   time that we anticipated, and I think the examinations have
24   gone longer than we anticipated.  And, again, the Court was
25   obviously active in questioning the witnesses, which
```

 1   detracted -- that didn't detract but took some of our time, I

 2   should say.

 3       **MR. ADKINS:**  The same is true of the defense

 4   witnesses, Your Honor.  The Court built in an extra day for

 5   logistical issues.  There's no logistical issues here.

 6   Plaintiffs didn't have to give an hour-and-a-half opening

 7   statement; they did.  Plaintiffs didn't have to call

 8   Dr. Berridge; they did.  So they've used their time as they

 9   wished, and I don't think the Court should extend time just for

10   this -- I'm not really hearing any reason for this.

11       **THE COURT:**  All right.  I'm going to give an hour of

12   extra time, number one, because I took some of the time in

13   questioning the witness; and number two, that's to include

14   these new issues, so cross-examination of Dr. Savitz on this

15   question I think that's fair, but I'm not revising this in a

16   more generic way.  There are specific reasons why I'm going to

17   do this.

18       I will say that I thought there could have been more

19   efficiency.  There's time spent on matters that seemed obvious

20   to me that weren't particularly helpful, but I didn't

21   intervene, and so I'll just remind the parties this is not a

22   jury trial.  I don't need all sorts of stuff, you know,

23   repeated ten times and dramatics and Perry Mason moments.  I

24   just want to get to the issue, so I would use the rest of your

25   time wisely.

1          MR. WATERS:  Very well, Your Honor.

2          THE COURT:  Okay?

3          MR. ADKINS:  Understood.

4          THE COURT:  Okay.  So doctor -- we're still in

5   Dr. Thiessen, right?  Is that where we're at?

6          THE CLERK:  Yes.

7          THE COURT:  Okay.  If we could have Dr. Thiessen

8   return.

9          Good morning, Dr. Thiessen.  You may pick up where you

10  left off, counsel.

11      (Witness previously sworn.)

12          MR. ADKINS:  Thank you.

13          Okay.  Dr. Thiessen, where we left off, I believe we

14  were looking at Exhibit 69 Table e4.

15          Mr. Hambrick, could you put that on the screen,

16  please.

17                    <u>CROSS-EXAMINATION</u>    (resumed)

18  BY MR. ADKINS:

19  **Q.**   Okay.  So yesterday we discussed the water fluoride all

20  studies in low risk-of-bias results in the NTP Meta-analysis,

21  correct?

22  **A.**   Yes.

23  **Q.**   I'd like to turn to the next page of Table e4, which

24  reports urinary fluoride results in the NTP Meta-analysis.

25          Do you see that table on your screen, Dr. Theissen?

THEISSEN - CROSS / ADKINS

1    **A.**   Yes.

2    **Q.**   Now, in the first line, the NTP researchers report results

3    using the linear model.  Do you see that?

4    **A.**   Yes.

5    **Q.**   And again, this table is broken out by groupings, 1.5

6    milligrams per liter, 2 milligrams per liter and 4 milligrams

7    per liter.  Do you see that?

8    **A.**   Yes.

9    **Q.**   The result using the linear model in the less than

10   1.5-milligram per liter column is statistically significant for

11   an adverse effect on IQ, correct?

12   **A.**   Yes.

13   **Q.**   But then when you look over at the results for less than 2

14   milligrams per liter, the result is no longer statistically

15   significant; isn't that right?

16   **A.**   Marginally.

17   **Q.**   Marginally it's not statistically significant?

18   **A.**   Yes, but not by very much.

19         **MR. ADKINS:**  So Mr. Hambrick, if you could turn to

20   page II-80, the next page of this table.

21   BY MR. ADKINS:

22   **Q.**   This is the section of the table that reports urinary

23   fluoride results for the low risk-of-bias studies.

24         Do you see that, Dr. Theissen?

25   **A.**   Yes.

1   Q.   And again, under -- within the column for less than 1.5

2   milligrams per liter, the results are statistically significant

3   for an adverse effect on IQ, correct?

4   A.   Yes.

5   Q.   Would you characterize those results as marginally

6   statistically significant?

7   A.   They -- by the definition of statistically significant

8   that has been used in this, these are statistically

9   significant.

10  Q.   Okay.  If you look at the column for all data, the results

11  are not statistically significant for an adverse effect,

12  correct?

13  A.   Yes.  But, again, it's very marginal.  And the overall

14  findings of the meta-analysis are that fluoride intake --

15  fluoride exposure is associated with reduced IQ.

16          THE COURT:  Could you speak up?  I'm sorry.  I'm

17  having trouble hearing.  Maybe you can bring the microphone a

18  little closer to you.

19          THE WITNESS:  The overall conclusion of the

20  meta-analysis is that fluoride exposure is consistently

21  associated with reduced IQ.

22          THE COURT:  At less than 1.5?

23          THE WITNESS:  At the whole range.

24          THE COURT:  The whole range?

25          THE WITNESS:  That's in the -- the end of the abstract

 1   for the meta-analysis.

 2          THE COURT:  All right.  But this breaks -- this table

 3   breaks it up into these different --

 4          THE WITNESS:  Right.

 5          THE COURT:  -- concentrations and -- and so -- so I --

 6   I don't know if you were going to ask this question, but how is

 7   it -- and I'm not a statistician -- how is it that you could

 8   have statistical significance for concentrations below 1.5; but

 9   when you go below 2, it's not?

10          THE WITNESS:  It's primarily a sample-size thing.  And

11   probably the one -- the one or two that are most affecting this

12   are in -- between 1.5 and 2 milligrams per liter.  They just

13   happen to fall into that bracket.  But that's -- that's my best

14   guess without trying to look into it in detail.

15          THE COURT:  So could it be that the -- I don't know if

16   I'm using the right word, but the fit or the variation between

17   1.5 and 2 is somehow greater and is causing more of a cloud

18   and, therefore, not as strong a statistical association than if

19   you look --

20          THE WITNESS:  That's -- that's probably what's going

21   on with the --

22          THE COURT:  And yet, that seems counterintuitive

23   because I think part of the idea that I'm hearing is that as

24   you get to the lower concentrations, you get more dispersion,

25   less of a cloud, but here this seems to be a counterexample.

 1           **THE WITNESS:**  Probably.   It depends on where they have

 2   those cutoffs in relation to the set of studies that they have.

 3           **THE COURT:**  Okay.   Thank you.

 4   **BY MR. ADKINS:**

 5   **Q.**   So, Dr. Theissen, just so we're clear in this table, for

 6   all data the linear model no statistical significance for

 7   adverse effects, but in the less than 1.5-milligram per liter

 8   column there is statistical significance, right?

 9   **A.**   Yes.

10   **Q.**   And in the less than 2-milligram per liter, there's no

11   statistical significance again, right?

12   **A.**   Yes.

13   **Q.**   Now, let's look at the less than 4-milligram per liter.

14   You see that there are nine studies that were underlying this

15   result, Dr. Theissen?

16   **A.**   Yes.

17   **Q.**   And that's the same for the "all data," right?   There were

18   nine studies that the NTP researchers considered when looking

19   at low risk-of-bias, all data?

20   **A.**   Yes.

21   **Q.**   So the less than 4-milligram per liter in the all data,

22   they were looking at the same grouping of studies for these

23   results, right?

24   **A.**   Yes.

25   **Q.**   Now, if you look at this table, there is a confidence

1    interval for less than 4-milligram per liter of negative .21

2    and an upper bound of negative .01.  Do you see that?

3    **A.**    Yes.

4    **Q.**    That's an error, correct?  That should be positive .01?

5    **A.**    Well, I don't know that, but it looks like that is,

6    perhaps, the case.

7    **Q.**    We know that's an error because the p value is .082 here?

8    **A.**    We don't know -- we know that one says plus 0.01, and one

9    says minus 0.01.  But without referring back to the authors or

10   somebody, I cannot say which is correct and which is not.

11   **Q.**    A p value of .082 is greater than a p value of .05?

12   **A.**    Yes.

13   **Q.**    And a p value of .05 would generally indicate there's

14   statistical significance, correct?

15   **A.**    That's the commonly used cutoff, but there's nothing magic

16   about that.

17   **Q.**    Okay.  So let's turn to eTable 5, which is on the next

18   page, Roman Numeral II-81.

19        So remember yesterday we talked about how the NTP

20   researchers used two different statistical methodologies to

21   analyze the data for water concentration in urine, and they

22   reported the result in two tables, table e5 and table e4, for

23   each of those methodologies, right?

24   **A.**    Yes.

25   **Q.**    So we just went through Table e4.  That was the first

 1  methodology that the NTP researchers used, correct?

 2  **A.**    Yes.

 3  **Q.**    And now we'll go through table e5, which is the second

 4  methodology, the maximum likelihood models, correct?

 5  **A.**    Yes.

 6  **Q.**    So we're looking -- let's first look at the water fluoride

 7  all studies data that's reported here.  And we'll start with

 8  the linear model.

 9          Using the linear model in the category of less than

10  1.5-milligram per liter in the water, there was no statistical

11  significance for an adverse effect, correct?

12  **A.**    Yes.

13  **Q.**    And the same is true for less than 2 milligrams per liter

14  in the water; no statistical significance, right?

15  **A.**    Yes.

16  **Q.**    Within the column for 1.5-milligram per liter, looking at

17  each of the models that the researchers considered, there

18  wasn't statistical significance for any of those models,

19  correct?

20  **A.**    That's correct.

21  **Q.**    And the fit for each of those models is comparable in the

22  less than 1.5 milligram per liter group, right?

23  **A.**    Probably, yes.

24  **Q.**    Probably yes or it is comparable?

25  **A.**    They appear to be comparable.

1    **Q.**   And Dr. Theissen, let's look at the low risk-of-bias

2    studies results.  In the linear model for less than 1.5

3    milligrams per liter, again, the NTP researchers report there

4    was no statistical significance association, right?

5    **A.**   Yes.

6    **Q.**   On the next page, 2-82, this is the section of the table

7    that reports results by urine fluoride.  Using the linear

8    model, the NTP researchers again report results for the less

9    than 2 milligram per liter group and the less than 1.5

10   milligram per liter group, fluoride in urine; no statistical

11   significance, correct?

12   **A.**   Yes.

13          **THE COURT:**  Can I get an explanation what these two

14   different methodologies mean, the Table 4 and Table 5?  One is

15   maximum likelihood model.  Can that be explained in plain

16   English, or is that too difficult for someone like me to

17   understand?

18          **THE WITNESS:**  Those are two different methods of

19   curve-fitting in which I am not an expert.  But the bigger

20   point to the meta-analysis is that there is a consistent

21   association between fluoride exposure and reduced IQ, whether

22   or not the curve fits are always nice.

23          **THE COURT:**  In other words, there -- they all are in

24   the same trend, same direction; some are statistically

25   significant and some are not?

1          THE WITNESS:  Right.

2          THE COURT:  And your view that if you look at it or

3    maybe your view or the NTP's views that if you look at it in

4    the aggregate, that tells you something even if there's not

5    statistic -- in other words, if you had ten studies that showed

6    a direction, but they weren't -- each one was not statically

7    significant, that still has value in determining whether

8    there's an association?

9          THE WITNESS:  Yes.  And there are other tables in this

10   meta-analysis that -- where that is seen much better than in

11   this -- where the association between fluoride exposure and

12   reduced IQ is seen better in the other tables and figures than

13   in these tables where they have attempted to fit dose-response

14   equations or curves.

15         THE COURT:  Okay.  But go back to my original

16   question.  The two models have to do with curve-fitting

17   methodologies?

18         THE WITNESS:  Right.

19   BY MR. ADKINS:

20   Q.   Now, Dr. Theissen, the Court asked you a question about

21   what was explaining the difference in the "all data" versus the

22   1.5 milligrams per liter or the 2 milligrams per liter.  I

23   heard you say that you think it was primarily due to a

24   sample-size issue, right?

25   A.   Oh.  Because there's only a handful of studies.  If you

1   had more studies, some things would be more clear.

2   **Q.**   And when you say there's only a handful of studies,

3   there's only a handful of studies and thus a lack of data in

4   the low-exposure range, correct?

5   **A.**   The low-exposure range is where it's tougher to see

6   effects because of background exposures, as that's been

7   discussed earlier last week and this week, but the -- we're

8   talking ultimately about protecting the health of the

9   population.  So where you have uncertainty, you need to take

10  more effort to protect the population.  You do not wait for

11  absolute certainty.

12  **Q.**   You would agree that the lack of data in the low exposure

13  range makes it more difficult to see effects in that range,

14  correct?

15  **A.**   It's not a lack of data.  It's simply the data in the

16  low -- low-dose range are going to be a little fuzzier because

17  there is background exposure, because the exposures -- when

18  these are separated by -- by populations, there are overlapping

19  exposures often in the low-dose range especially.  It's

20  simply -- it's harder to see an effect that's real.  That does

21  not mean that there's no effect.

22  **Q.**   So let's talk about what the NTP researchers said on this

23  topic.

24       The authors of the NTP meta-analysis concluded generally

25  that the inconsistency in which model is the best fit at

1  lower -- there is inconsistency in which model is the best fit

2  at those lower exposure ranges, correct?

3  **A.**   Yes.

4  **Q.**   And that inconsistency led to uncertainty in the shape of

5  the dose-response curve at those lower levels, right?

6  **A.**   There's uncertainty in the analyses that go in.  There's

7  uncertainty in the attempts to fit curves.

8         **MR. ADKINS:**  So, Mr. Hambrick, could you please go to

9  page II-15 of Exhibit 69?

10        And if you could zoom in on the first two sentences of

11 the last paragraph.

12        **THE COURT:**  Which page are we on?

13        **MR. ADKINS:**  Your Honor, this is page Roman II-15 of

14 Exhibit 69.  And if you're looking at an electronic version, it

15 would be on page 634 of the PDF.

16        May I proceed?

17        **THE COURT:**  Yes.

18        **MR. ADKINS:**  Okay.  Thank you.

19 **BY MR. ADKINS:**

20 **Q.**   So, Dr. Theissen, the NTP researchers wrote "There is

21 inconsistency in which model is the best fit at lower exposure

22 levels (eTable 4 and eTable 5) leading to uncertainty in the

23 shape the dose-response curve at these levels."

24        Do you see that?

25 **A.**   Yes.

1   Q.    Okay.  So the NTP researchers believed that the

2   inconsistency in that model fit led to uncertainty in the shape

3   of the dose-response curve, correct?

4   A.    Yes.

5   Q.    The NTP researchers went on to state "More

6   individual-level data would increase our certainty in the shape

7   of the dose-response curve at these lower exposure levels."

8         Do you see that?

9   A.    Yes.

10  Q.    And so, again, the NTP researchers were saying more data

11  is needed to understand the shape of the dose-response curve at

12  the low exposure levels?

13  A.    Yes.

14  Q.    So let's turn to --

15            THE COURT:  And just to be clear, again, low-dose

16  level is defined by the WHO convention of 1.5, is that what

17  they're --

18            THE WITNESS:  Not in this meta-analysis.  They do not

19  give that definition in the meta-analysis.

20            THE COURT:  Oh.  So do they have a definition of what

21  low dose means?

22            THE WITNESS:  That's within any given study.  One dose

23  is higher than another dose.  But they are dealing with a range

24  of doses, a range of water fluoride concentrations or urine

25  fluoride concentrations.  Their cutoffs are based on the

1    concentrations in water or in urine, but when they talk about

2    higher or lower in the meta-analysis, they are talking

3    relatively within a given study.

4           They do not use the -- I mean, the cutoffs for the

5    categories of 4 and 2 and 1.5 milligrams per liter, those are

6    drawn from regulatory contexts, but they do not define higher

7    in terms of 1.5.  They determine -- they define higher as a

8    bigger magnitude than the lower for the same study.

9           **THE COURT:**  So that's just a relative concept?  So

10   when they say at the lower levels of exposure, I mean, the

11   obverse statement is that there is consistency in the shape of

12   the fit at higher exposure levels.  I mean, maybe that's not a

13   fair statement.  But, I mean, that's what I infer.  Lower-dose

14   levels, the fit is not so clear yet; and higher doses, they

15   certainly didn't disavow that there is a better fit.

16          **THE WITNESS:**  Okay.  I'm sorry.  In -- in these two

17   tables when they say "Lower," they are talking about these

18   categories of below 4, below 2, below 1.5.  But they do not

19   necessarily, throughout the meta-analysis, they have not used

20   the definition of higher versus lower with respect to 1.5 in

21   terms of what people are exposed to.  They -- they show a

22   consistent reduction in IQ with fluoride exposure any time that

23   there's a comparison of two groups.

24          **THE COURT:**  Well, is there consistency -- if you look

25   at tables 4 and 5 at, let's say, below 4 --

 1             THE WITNESS:  Right.

 2             THE COURT:  -- milligrams cut off.  My recollection is

 3    that virtually every one of those did show a statically

 4    significant --

 5             THE WITNESS:  Right.

 6             THE COURT:  -- result.

 7             THE WITNESS:  Right.

 8             THE COURT:  Correct?

 9             THE WITNESS:  Yes.

10             THE COURT:  But that doesn't necessarily show you the

11    shape of the curve; is that the issue?

12             THE WITNESS:  No.  And the shape of the curve is not

13    so important as that there is a consistent decrease in IQ with

14    an increase in exposure.  We -- even if we don't know the shape

15    precisely, we do know the overall tendency, which is if the

16    fluoride exposure is increased, the IQ is decreased.  That is

17    consistent.

18             THE COURT:  Is one way of looking at it, based on

19    these tables, that at least at point -- at 4 milligrams per

20    liter, that could constitute a LOAEL?  I mean, you're seeing

21    observed effects there and that's --

22             THE WITNESS:  Right.  That would not be a LOAEL, but

23    it would be an observed effect level -- observed effect level.

24             THE COURT:  May not be the lowest, but it is an

25    observed effect?

```
 1            THE WITNESS:  Right.  Basically all of these are
 2    observed effect levels, even the 1.5.
 3            THE COURT:  All right.  But when you get into those
 4    lower categories where the results are less -- you have some
 5    statistically significant, some are not, then it is --
 6            THE WITNESS:  Right.
 7            THE COURT:  -- harder to say there's an observed
 8    effect at that point?
 9            THE WITNESS:  The trend is consistent.  There's a
10    consistent association, and it says this in the end of the
11    abstract for -- this was written as a journal manuscript.
12            THE COURT:  Right.  No, I get that and I know I'm
13    taking you offline here, but since we're on the subject, what
14    needs to be observed in order to constitute some idea of a
15    LOAEL, or if there's no observation, where -- how do you draw a
16    distinction between when you observe something and when you
17    don't observe something if you're talking about point of
18    departure?  Can you use studies like this if you show
19    consistent, statistically significant decrements to state we
20    are observing something here?
21            THE WITNESS:  Right.
22            THE COURT:  But at some point, the studies get so
23    mixed and inconsistent.  How do you draw a line?  At what point
24    do you say, well, I'm not sure I'm seeing an observed effect?
25            THE WITNESS:  It gets harder to distinguish the effect
```

 1    from the noise.  But my -- my personal professional opinion is

 2    that we do not have a threshold; that any exposure carries with

 3    some risk of reduced IQ.

 4             THE COURT:  All right.  I understand your view on

 5    that.

 6             THE WITNESS:  But that -- that means that it's going

 7    to be tough to find a lowest-effect level or a no-effect level

 8    because we're basically dealing with observed-effect levels

 9    in --

10             THE COURT:  Okay.

11             THE WITNESS:  -- in each of the studies.

12             THE COURT:  So I know it's your view that there is no

13    particular threshold, that it's a continuum, but even apart

14    from that is it clear from these studies, from these meta

15    studies, that there is an observed effect at least at .4?  Is

16    there any doubt about that?

17             THE WITNESS:  At .4?

18             THE COURT:  I mean at 4.  At 4.

19             THE WITNESS:  There's no doubt that there's an effect

20    at 4, and there's an effect at 2, and there's an effect at 1.5.

21             THE COURT:  But the confidence in seeing that effect

22    is higher at 4 than it is at 2 than it is at 1.5?

23             THE WITNESS:  Right.  And some of the -- some of the

24    analyses in the meta-analysis are more definitive than others.

25    These are the least definitive analyses that council has been

THEISSEN - CROSS / ADKINS

1   asking me about.

2          **THE COURT:**  Okay.  Sorry to take you off track,

3   Mr. Adkins.  You may continue.

4          **MR. ADKINS:**  Not at all.  Thank you, Your Honor.

5   **BY MR. ADKINS:**

6   **Q.**   So let's just go back to page II-15, the sentence that we

7   were reading.

8          So, Dr. Theissen, you were saying that the lower exposure

9   levels in this sentence you believe is referring to lower

10  exposure levels in the studies versus higher exposure levels in

11  the studies?

12  **A.**   No.  And I clarified that with the Judge that in -- when

13  it's referring to these tables, it is talking about the lower

14  levels of water fluoride that -- that are used to categorize

15  information for the tables.

16  **Q.**   The lowest level they considered was 1.5 milligrams per

17  liter, right?

18  **A.**   Yes.

19  **Q.**   Okay.  So let's turn back to Table e4 and Table e5,

20  because I want to reflect on something the Court asked about

21  here.

22          **MR. ADKINS:**  So Mr. Hambrick, could you please take us

23  to page Roman Numeral II-80?  Okay.

24  **BY MR. ADKINS:**

25  **Q.**   Okay.  So we're back at the bottom of the urinary fluoride

 1   portion of Table e4.  Okay?  And we're just looking at the low

 2   risk-of-bias studies here.

 3        Now, didn't we establish that below 4-milligram per liter

 4   urinary fluoride, low risk-of-bias studies, the NTP researchers

 5   are reporting no statistically significant result?

 6   **A.**   They're reporting a lack of significance in the result

 7   with respect to the curve fitting of the model, not with

 8   respect to whether there's an association between fluoride

 9   exposure and reduced IQ.

10   **Q.**   And let's go to page II-81.  This is Table e5.  And we can

11   just look at the results for less than 4-milligram per liter

12   water fluoride concentration.  Linear model, statistically

13   significant adverse effect, correct?

14   **A.**   Yes.

15   **Q.**   Quadratic model, no statistically significant adverse

16   effect, correct?

17   **A.**   Yes.

18   **Q.**   Restricted cubic splines model, no statistically

19   significant adverse effect, right?

20   **A.**   Yes.

21   **Q.**   And each of those models has comparable fit; isn't that

22   right, Dr. Theissen?

23   **A.**   Yes.

24        **MR. ADKINS:**  Mr. Hambrick, could you go to page II-82.

25   This is the urinary fluoride studies reports.

 1   BY MR. ADKINS:

 2   **Q.**   And let's look again just at the less than 4-milligram per

 3   liter column.  Linear model, statistically significant adverse

 4   effects, right?

 5   **A.**   Yes.

 6   **Q.**   Quadratic and restricted cubic splines models, no

 7   statistically significant adverse effects, right?

 8   **A.**   Yes.

 9   **Q.**   And each of those models is also a comparable fit, right?

10   **A.**   Yes.

11   **Q.**   Okay.  So we can set this aside.

12           **MR. ADKINS:**  Excuse me.  Your Honor, are you done

13   looking at this table?

14           **THE COURT:**  Well, now you said something that I guess

15   I need clarification on.

16           What -- what is being measured here in terms of

17   statistical significance you say is the fit and not the

18   association between IQ decrement and exposure to fluoride at

19   those levels?

20           **THE WITNESS:**  That's correct.  They're attempting

21   several different equations for fitting -- for describing the

22   dose response and these statistical associations or lack of

23   refer to the fit of the model, the fit of the equation.

24           **THE COURT:**  Can you have a statistically significant

25   association and still not have a statically significant fit?

1          THE WITNESS:  Right.  If you have not yet identified

2    the equation -- an equation that fits it well.  Sometimes

3    there's not a nice, clear equation, and that's why they've

4    tried several equations, some of which fit better than others.

5          THE COURT:  But without an equation can you determine

6    whether there is a demonstrable association between --

7          THE WITNESS:  Yes.

8          THE COURT:  You can?

9          THE WITNESS:  Yes.

10         THE COURT:  How do you do that without some curve or

11   some model?

12         THE WITNESS:  There's -- if I had the meta-analysis, I

13   could show you other parts of their results.

14         There's a consistent association between increased

15   fluoride exposure measured any of several different ways and

16   reduced IQ.

17         It's not been possible -- well, they have some -- they

18   have various equations that they have tried, some of which do

19   show statistically significant acceptable curve fits and some

20   of which don't, but certainly they're not all going to fit

21   well.  One typically would fit better than another.  The ones

22   that counsel was just asking about, the linear model on the

23   page that's still up --

24         THE COURT:  Yeah.

25         THE WITNESS:  -- the linear model at the top and down

 1   below does fit well with a statically significant fit.  It's

 2   the quadratic that's less so.  The second one there under

 3   quadratic does fit well.  And, again, with the restricted cubic

 4   splines models, one -- one doesn't fit; the lower one does.

 5   But there -- there are -- these are attempts to describe in

 6   terms of an equation.  It's not essential to have that equation

 7   to say we do have consistent, statistically significant

 8   associations between increased exposure and reduced IQ.

 9            THE COURT:  So this is all an attempt to derive a

10   dose-response curve?

11            THE WITNESS:  Right.

12            THE COURT:  And you can have a clear association, but

13   maybe the curve is not so well defined?

14            THE WITNESS:  Yes.

15            THE COURT:  And no one model captures everything

16   really, really well?

17            THE WITNESS:  Yes.

18            THE COURT:  What are the two -- if you look at this

19   table, I couldn't figure it out, like quadratic model.  There

20   are two values there.  There's a beta at 95 percent, and then

21   there's another beta at 95 percent with different numbers.

22            THE WITNESS:  Right.

23            THE COURT:  And same with the restricted cubic splines

24   model.  What are those two different, do you know?

25            THE WITNESS:  Not in detail right off.  I think they

1   are two slightly different ways to do this.  The footnotes

2   might give that information or the text might.

3            THE COURT:  Read the footnote I guess, huh?

4            THE WITNESS:  I don't have the footnote in front of

5   me.

6            THE COURT:  Okay.  All right.  Thank you.

7            MR. ADKINS:  Your Honor, may we take Table e4 off the

8   screen?

9            THE COURT:  Yes.

10           MR. ADKINS:  Okay.  Thank you.

11  BY MR. ADKINS:

12  Q.   So, Dr. Theissen, let's move on to the experimental animal

13  and the mechanistic studies.

14       With respect to the experimental animal and mechanistic

15  studies, the NTP authors concluded that the body of the

16  evidence does not provide clarity on the association between

17  fluoride exposure and neurodevelopmental human health effects,

18  correct?

19  A.   I believe they say between animal experiments and learning

20  and memory results, but, again, I don't have that in front of

21  me.

22  Q.   Okay.  Would it help to take a look at what the NTP

23  researchers said on this point?

24  A.   Sure.

25           MR. ADKINS:  Mr. Hambrick, could you please pull up

 1   Exhibit 67, Roman -- small Roman xii, PDF page 12.

 2            In fact, Mr. Hambrick, could you actually go to page 1

 3   first, the title page?

 4   **BY MR. ADKINS:**

 5   **Q.**   Okay.  So, Dr. Theissen, we're looking at Exhibit 67,

 6   which is the May 2022 prepublication version of the NTP

 7   Monograph?

 8   **A.**   Yes.

 9            **MR. ADKINS:**  And Mr. Hambrick, could you please take

10   us to small Roman xii?

11            And Your Honor, if you're looking at a PDF version,

12   this is on page 12.

13   **BY MR. ADKINS:**

14   **Q.**   So, Dr. Theissen, this is the abstract for the

15   prepublication draft monograph?

16   **A.**   Yes.

17   **Q.**   If you look under results, the NTP researchers state "The

18   current bodies of experimental animal studies in human

19   mechanistic evidence do not provide clarity on the association

20   between fluoride exposure and noncognitive or

21   neurodevelopmental human health effects."

22            Do you see that?

23   **A.**   Yes.

24   **Q.**   And you agree that the authors of the draft NTP Monograph

25   were not able to draw any conclusions about the mechanisms by

1  which fluoride causes IQ loss, correct?

2  **A.**   They, in fact, discuss a little bit about mechanisms; for

3  instance, the iodine deficiency and thyroid effects of

4  fluoride.  Again, they have not put as much -- they have not

5  given as much attention to the animal studies and the

6  mechanistic studies as they could have.

7       The earlier NTP report on animal studies did find an

8  important relationship between fluoride exposure and

9  neurotoxicity.

10      Some of the uncertainty comes in how the animal results

11 compare to IQ and things like that in humans because we don't

12 have IQ tests for rats.  But to -- to totally eliminate the

13 animal studies for fluoride, which is a vast body of

14 information, that calls into question animal studies for an

15 awful lot of contaminants, an awful lot of psychological and

16 toxicological studies.  And I don't really think they intended

17 to say animal studies are useless, but they could have drawn

18 conclusions about neurotoxicity and even some mechanistic

19 information from the available animal studies.

20 **Q.**   So, Dr. Theissen, we'll come to the NTP study that you

21 just described, but before we do, I just want to make sure

22 we're clear, you agree that the authors of the NTP Monograph

23 were not able to draw any conclusions about the mechanisms by

24 which fluoride causes IQ loss, correct?

25 **A.**   I don't know that they were not able to, so much as they

1   chose not to.

2   Q.   And, in fact, they didn't draw any conclusions in their

3   report on that issue, right?

4   A.   I don't think they did.

5   Q.   So you had testified yesterday about histological changes,

6   and you just referred to what I believe is the McPherson 2018

7   study by the NTP researchers; is that right?

8   A.   I did not specifically refer to that.  There are others.

9   I didn't refer to any specific studies yesterday.

10  Q.   Okay.  And in your testimony just a moment ago when you

11  referred to a study by NTP researchers, were you referring to

12  the McPherson 2018 study?

13  A.   No.  I was referring to the 2016 -- 2015 and 2016 NTP

14  reports.

15  Q.   Okay.  And that's the NTP systematic review on the animal

16  literature?

17  A.   Correct.

18  Q.   Okay.

19       So I want to talk about McPherson 2018 just for a moment.

20  That's a study that NTP researchers conducted on rats, correct?

21  A.   Yes.

22  Q.   It's an experimental animal toxicology study?

23  A.   Yes.

24  Q.   And we heard a lot of testimony from you and others at the

25  first trial about that study, right?

1   **A.**   Yes.

2   **Q.**   The McPherson 2018 study did not observe any histological

3   changes in their reports, right?

4   **A.**   I'm not certain about that, and it's been a long time

5   since I looked at it.  I think there was a little -- there was

6   increased pain sensitivity.  I think there was some

7   histological -- histologically apparent damage, but I do not

8   remember for certain.

9           **MR. ADKINS:**  Mr. Hambrick, could you pull up

10   Exhibit 67, PDF page 285?  And if you could please blow up the

11   sentence that starts "McPherson et al. 2018, halfway through

12   the first complete paragraph on this page.

13   **BY MR. ADKINS:**

14   **Q.**   Okay.  So, Dr. Thiessen, we're looking now at the May 2022

15   prepublication monograph.  And the NTP researchers wrote,

16   "Although there are too few studies to definitively explain the

17   inconsistency in results, McPherson, et al. (2018) also did not

18   observe any associations between fluoride exposure and

19   impairments to learning and memory, which is consistent [sic]

20   with the majority of developmental exposure studies that

21   observed learning and impairments associated with fluoride

22   exposure for other strains of rats."  Do you see that?

23   **A.**   Yes.

24           **MR. CONNETT:**  Your Honor, I think that might have been

25   read incorrectly.  I just want to clarify for the record.  I'm

1   not sure if you stated "consistent" or "inconsistent."

2            MR. ADKINS:  Well, let's read it again just to make

3   sure.

4            THE COURT:  Why don't you read it again.

5            MR. ADKINS:  That could be an important point.

6   BY MR. ADKINS:

7   Q.   "Although there are too few studies to definitively

8   explain the inconsistency in results, McPherson, et al. (2018)

9   also did not observe any associations between fluoride exposure

10  and impairments to learning and memory, which is inconsistent

11  with the majority of developmental exposure studies that

12  observed learning and impairments -- observed learning and

13  impairments associated with fluoride exposure for other strains

14  of rats."  Do you see that?

15  A.   Yes.

16            MR. ADKINS:  And Mr. Hambrick, could you zoom out of

17  this, please.

18            Okay.  And Mr. Hambrick, if you could zoom in on the

19  sentence that begins "McPherson, et al. (2018) was the only."

20            Mr. Hambrick, could you zoom in on the sentence that

21  begins "McPherson, et al. (2018) was the only drinking."

22  BY MR. ADKINS:

23  Q.   Okay.  So I'll read this too.  "McPherson, et al. (2018)

24  was the only drinking water study (with higher confidence in

25  histopathology outcome assessment) that did not observe any

1  histological changes in hippocampus at 10 or 20 ppm fluoride in

2  male Long-Evans hooded rats exposed in utero through adulthood

3  (Greater than PND80)."

4       Do you see that?

5  A.   Yes.

6  Q.   Okay.  And so the McPherson 2018 study did not report or

7  observe any histological changes; is that right?

8  A.   That's what it says there.  I -- I don't remember.  As I

9  told you, I don't remember for certain.  They did report

10  increased pain sensitivity.  But also, as we discussed several

11  years ago, the Long-Evans strain of rat has consistently shown

12  a higher resistance to fluoride effects than the other strains

13  used in the vast majority of experiments with fluoride.

14  Q.   That's the reason why you discounted at the first trial

15  the battery of studies that NTP researchers conducted and

16  reported in McPherson 2018, right?

17  A.   That has to be given consideration that this is a strain

18  of rats that has not shown any particular sensitivity to

19  fluoride and, therefore, is not really a good strain of rats to

20  be using for these sorts of tests.

21           MR. ADKINS:  Your Honor, may we remove this from the

22  screen?

23           THE COURT:  Yeah.

24           MR. ADKINS:  Okay.

25  \\\

 1   BY MR. ADKINS:

 2   Q.   So, Dr. Theissen, "Prospective cohort studies are

 3   generally methodologically superior to cross-sectional studies

 4   for purposes of determining an association between fluoride

 5   exposure and IQ."  Do you agree with that statement?

 6   A.   In principle, yes.

 7   Q.   And you're aware of the study by Jesus Ibarluzea and

 8   others from Spain that reported positive associations between

 9   maternal fluoride and IQ, right?

10   A.   Yes.

11   Q.   And the parties have generally referred to that as the

12   "INMA study" or the "INMA IQ study"?

13   A.   Yes.

14   Q.   The parties -- excuse me.

15        A detailed review of the INMA study was beyond the scope

16   of the analysis that you performed for this case, right?

17   A.   Yes.

18   Q.   And, in fact, the INMA study didn't factor into your

19   opinions at all for this case, right?

20   A.   Correct.

21   Q.   Okay.  So let's turn to margin-of-exposure analysis.

22        In the first ten risk evaluations that EPA conducted under

23   amended TSCA, EPA used a margin-of-exposure analysis to

24   estimate non-cancer risk, right?

25   A.   Yes.

1  Q.   And I want to make sure we're on the same page about what

2  a margin-of-exposure analysis means in the context of what EPA

3  did for the first ten risk evaluations, so I'm just going to

4  cover a little bit of ground to make sure we're consistent on

5  our terminology.

6       In the analyses that EPA performed under amended TSCA, EPA

7  first divided a point of departure by an exposure

8  concentration, correct?

9  A.   Yes.

10 Q.   Excuse me.  I stated that wrong.

11      The analyses that EPA conducted, EPA divided the point of

12 departure by an exposure level, not a concentration, right?

13 A.   In most cases, right.  An exposure level of some sort.

14 Q.   And that point of departure can be a BMD, a NOAEL,

15 N-O-A-E-L or a LOAEL, an L-O-A-E-L, right?

16 A.   Yes.

17 Q.   The result is a unitless product, correct?

18 A.   Yes.

19 Q.   That unitless product isn't compared to a benchmark margin

20 of exposure, right?

21 A.   Yes.

22 Q.   And the benchmark margin of exposure is the product of the

23 uncertainty factors that apply for that particular analysis,

24 right?

25 A.   Yes.

1    Q.    If there's a risk -- excuse me.

2         If the calculated of margin of exposure is below the

3    benchmark, EPA would make a determination that there is risk

4    shown for that condition of use, right?

5    A.    Yes.

6    Q.    And if the margin -- calculated margin of exposure is

7    above the benchmark, EPA would find that there is no risk

8    shown, right?

9    A.    I don't think you can say categorically that it's no risk,

10   but at least it's not a risk of concern.

11   Q.    That the margin-of-exposure analysis didn't show that

12   there's a risk of concern, right?

13   A.    Yes.

14   Q.    If there is a risk shown, EPA then moves on to the risk

15   determination step to determine if that risk is unreasonable.

16   Do you agree with that?

17   A.    Yes.

18   Q.    Now, you prepared an expert report in this case dated

19   August 4, 2023, that disclosed the opinions that you intended

20   to offer at this trial, right?

21   A.    Yes.

22   Q.    And the title of that report is the Third Supplemental

23   Report on Fluoride in Drinking Water, correct?

24   A.    Yes.

25   Q.    I may refer to that throughout this line of questioning as

THEISSEN - CROSS / ADKINS

1  your "third supplemental report."  Will you understand that?

2  **A.**   Uh-huh.

3  **Q.**   Now, in your third supplemental report, you did not

4  actually perform a margin-of-exposure analysis; isn't that

5  right?

6  **A.**   I showed examples of what a margin of exposure would be

7  with some example points of departure.

8  **Q.**   But you agree what you provided in your report was not a

9  margin-of-exposure analysis, correct?

10  **A.**   Those are examples of what a margin-of-exposure analysis

11  would give.

12  **Q.**   Okay.  So why don't we look at what you said in your

13  deposition.

14       **MR. ADKINS:**  Mr. Hambrick, could you please go to page

15  108, line 18.  108, line 18 through 109, line 3.

16       **MR. CONNETT:**  Your Honor, I would like to see what the

17  initial question was leading up to this.

18       **THE COURT:**  Well --

19       **MR. ADKINS:**  That's fair.

20       **THE COURT:**  You can go ahead and read it, and I'll

21  determine whether it's of value.

22       **MR. ADKINS:**  You know, Your Honor, I'm happy to read

23  108 line 8, which I think would give the appropriate context --

24       **THE COURT:**  Go ahead.

25       **MR. ADKINS:**  -- for the question.

1    BY MR. ADKINS:

2         "QUESTION:  And because you haven't attempted to assess

3    the margins of exposure, is it fair to say that you didn't

4    do a margin-of-exposure analysis in the third supplemental

5    report?

6         "ANSWER:  A margin-of-exposure analysis would require --

7         "QUESTION:  I'm not asking what it would require.  Did you

8    do it or did you not?

9         "ANSWER:  I didn't specifically do an MOE analysis in this

10   report like I did in the other one because this one

11   would -- would require some points of departure that were

12   defended for that purpose, and it would require more

13   evaluation of the uncertainty factors.  This is simply a

14   for instance.

15        "QUESTION:  And when you say you didn't do it in this

16   report, you're reporting (as read) to the third

17   supplemental report?

18        "ANSWER:  Yes."

19        Now, Dr. Theissen, to perform a margin-of-exposure

20   analysis using human epidemiological studies, you would have

21   had to calculate points of departure that could be used for a

22   margin-of-exposure analysis, correct?

23   A.   Yes.

24   Q.   And you didn't do that, right?

25   A.   In this report we took -- I took examples of points of

 1   departure.  For instance, if you took 1.5 milligrams per liter

 2   fluoride in water as a point of departure, this is the margin

 3   of exposure you could expect to see.

 4   **Q.**   But Dr. Theissen, you stated at your deposition, correct,

 5   that you didn't calculate a point of departure that could be

 6   used for a margin-of-exposure analysis like what EPA does for

 7   its first ten risk evaluations?

 8   **A.**   A point of departure for definitive purposes in this

 9   context would be considerably lower than 1.5 milligrams per

10   liter.

11       I gave examples of what a margin-of-exposure analysis

12   would show for some example points of departure that would

13   still give -- would still show that fluoride exposure presents

14   an unacceptable risk.  A real definitive point of departure

15   would be something even lower.

16   **Q.**   I'm not asking if it would be lower or higher.  I'm just

17   asking in your report you did not do a margin of exposure -- a

18   point-of-departure calculation that could be used for a

19   margin-of-exposure analysis, right?

20            **MR. CONNETT:**  Your Honor, this has been asked and

21   answered.

22            **THE COURT:**  This is not helpful --

23            **MR. ADKINS:**  Fair enough.

24            **THE COURT:**  -- so let's move on.

25            **MR. ADKINS:**  We can move on.

 1              THE COURT:  I get what she's saying.  She's not ready

 2   to commit to any point of departure.  She used some as an

 3   example.  Her view is there is no point of departure because

 4   there's a continuum that goes all the way to zero.  So I

 5   understand her testimony, her view and your exception that, so

 6   I get it.  Let's move on.

 7              MR. ADKINS:  Happy to move on.  Thank you.

 8   BY MR. ADKINS:

 9   Q.   So, Dr. Theissen, you've offered an opinion that even if

10   there was no harm at a fluoride concentration of .7-milligrams

11   per liter, and evidence of harm only at a fluoride

12   concentration of 1.5-milligram per liter in the water, a margin

13   of exposure of 2 is unacceptable; isn't that right?

14   A.   That's true.

15              MR. CONNETT:  Vague and ambiguous, compound.

16              THE COURT:  Overruled.

17   BY MR. ADKINS:

18   Q.   And that's an opinion that you stated in your third

19   supplemental report, correct?

20   A.   Yes.

21   Q.   Now, to reach what you refer to as a margin of exposure of

22   2, you divided 1.5 milligrams per liter by 0.7 milligrams per

23   liter fluoride concentration in drinking water, right?

24   A.   Yes.

25   Q.   And you identified possible or example points of departure

1   in your third supplemental report?

2   A.   Yes.

3   Q.   Those possible points of departure were listed in Table 4

4   of your report, correct?

5   A.   I believe that's correct.

6   Q.   So why don't we look at Table 4 of your supplemental

7   report.

8           MR. ADKINS:   So, Your Honor, we're looking at page 21

9   of Dr. Theissen's Third Supplemental Report.   This is on PDF

10  page 22.

11  BY MR. ADKINS:

12  Q.   So the possible points of departure, the examples that you

13  refer to, are in the column "POD" of this table?

14  A.   Yes.

15  Q.   And you have two rows in this table that refer to NTP

16  2022.   Do you see that?

17  A.   Yes.

18  Q.   Those rows are referring to the NTP Monograph?

19  A.   Yes.

20  Q.   And the PODs that you're referring to in the rows dealing

21  with NTP 2022, that's a water concentration, right?

22  A.   Yes.

23  Q.   Now, you listed NTP -- the NTP Monograph in the study

24  column of this table because the monograph uses the World

25  Health Organization guideline of 1.5 milligrams per liter to

1  draw a line, correct?

2  **A.**   They distinguish between below and above 1.5 milligrams

3  per liter.

4  **Q.**   And your table reflects that the 1.5-milligram per liter

5  could be a NOAEL, N-O-A-E-L, or a LOAEL, L-O-A-E-L.  Do you see

6  that?

7  **A.**   Yes.  That's -- these are examples of if you treated 1.5

8  milligrams per liter as a NOAEL or a LOAEL.  As I've said

9  earlier in this case yesterday, 1.5 is an observed adverse

10 effect level, it is not the lowest observed adverse effect

11 level, and it is definitely not a no observed adverse effect

12 level.

13 **Q.**   When you say they were not -- you're treating them as

14 examples --

15 **A.**   I'm treating them as examples.

16 **Q.**   You're not relying on any findings in the NTP Monograph

17 when you listed 1.5 milligrams per liter, correct?

18 **A.**   That's correct.

19 **Q.**   That was what you referred to in your deposition as a "for

20 instance," correct?

21 **A.**   Yes.

22 **Q.**   Now, in the next row you listed Green 2019, which is the

23 MIREC IQ study, right?

24 **A.**   Yes.

25 **Q.**   Now, the 0.7-milligram per liter is a concentration of

1  fluoride in water in your table?

2  **A.**   Yes.

3  **Q.**   And that's because the fluoride concentration of

4  fluoridated water that the study participants in Green 2019

5  were exposed to was about .7 milligrams per liter?

6  **A.**   That's the nominal fluoridation level in Canada, yes.

7  **Q.**   Okay.  And the last row of your table is Grandjean 2022.

8  Do you see that?

9  **A.**   Yes.

10  **Q.**   .2 milligram per liter is the urine fluoride concentration

11  from Dr. Grandean's 2022 BMCL?

12  **A.**   Yes.

13  **Q.**   Okay.  Now, in the right-most column, Dr. Theissen, you

14  have a data that -- under the heading "Corresponding Level with

15  No Appreciable Risk."  Do you see that?

16  **A.**   Yes.

17  **Q.**   And to arrive at the results at the end of this table,

18  you've taken the -- what you've described as a point of

19  departure and divided it by a benchmark MOE.  Do you see that?

20  **A.**   Yes.

21  **Q.**   And you believe this methodology, taking a point of

22  departure and dividing it by the benchmark MOE, is consistent

23  with a reference-dose approach?

24  **A.**   It uses the same information as a reference-dose approach.

25  This is -- this is showing what the -- if you -- if you use the

1  benchmark MOE with the point of departure, this gives you the

2  corresponding concentration below which you would have an MOE

3  greater than the benchmark MOE.

4  **Q.**   So I'm clear on the term, a "reference dose approach"

5  would typically divide a NOAEL or LOAEL by collective

6  uncertainty factors, right?

7  **A.**   It would start with the point of departure and divide by

8  the uncertainty factors to reach the reference dose.

9       So in this case what I've said is labeled a corresponding

10  level with no appreciable risk, that would correspond to a

11  reference dose. But it is, in this context of an MOE analysis,

12  this is the level below which you would expect an MOE that is

13  greater than the benchmark MOE.  At or above that level in the

14  last column you would have an MOE that is less than the

15  benchmark MOE and, therefore, corresponding to a risk that

16  would need to be considered further.

17  **Q.**   So to arrive at the reference dose, you would typically

18  divide a point of departure, BMDL and NOAEL or a LOAEL, by the

19  uncertainty factors, right?

20  **A.**   That's how a reference dose is reached, yes.

21  **Q.**   And then to determine whether there is a concern, you

22  compare that reference dose -- you check whether the reference

23  dose exceeds the exposure level, correct?

24  **A.**   The -- you have to keep the exposure level below the

25  reference dose.  But, again, we are using a MOE approach here,

1  which looks at it -- which looks at the same information in the

2  other direction, basically.

3  **Q.**   And this methodology that you've used in table 4 was

4  intended to show what would be a safe or potentially safe level

5  of exposure to fluoride?

6  **A.**   If the point of departure were a real point of departure.

7  These are example points of departure and the -- what one can

8  see from this is that a level of fluoride in drinking water or

9  in urine has to be considerably lower than the current values

10  in order to correspond to no appreciable risk, according to an

11  MOE analysis.

12  **Q.**   And nowhere in your report did you calculate a real point

13  of departure, correct?

14  **A.**   I did not attempt to provide a real point of departure.

15  **Q.**   Now, Dr. Theissen, you believe the calculations you

16  offered in table 4 use the same information that EPA would use

17  for a margin-of-exposure analysis?

18  **A.**   The EPA would first have to derive a point of departure

19  other than one for actual use as a point -- as opposed to an

20  example of a point of departure.

21      And EPA would consider the uncertainty factors in a little

22  more detail.  But all of these for fluoride and water have a

23  minimum uncertainty factor of 10 to account for intraspecies

24  variation, you know, variation within the human population.

25  It's variation in susceptibility like we talked about

1   yesterday, people with iodine deficiency or calcium deficiency

2   or kidney disease.

3   **Q.**   A reference dose analysis in principle is an assessment of

4   total exposure for a chemical substance, correct?

5   **A.**   Any of these should be a consideration of total exposure,

6   a reference dose approach or an MOE approach, because exposure,

7   even an exposure for one identified condition of use is in a

8   background of potential exposure from other sources.

9          And with this condition of use, the background exposure

10  includes indirect exposure to fluoride from the condition of

11  use.  So the body's effects will be due to whatever the total

12  exposure is.  And adding an exposure from a given condition of

13  use, you have to allow that that will add to the individual's

14  risk, given whatever exposure already exists.

15  **Q.**   Fair enough.

16         And you believe that the results of your work in Table 4

17  that we're looking at here, this reflects risk for all

18  exposures to fluoride, not just fluoride from water, but it

19  could also include tea, dental products and any other source of

20  fluoride; is that right?

21  **A.**   This is -- the top three in the table are specifically

22  derived -- they specifically refer to the condition of use of

23  water fluoride, and these specifically refer to the fluoride

24  concentration in water, in drinking water.  But the actual risk

25  is going to be due to total exposure.

1          But for individuals in fluoridated areas and even, to an

2     extent, in nonfluoridated areas, the total exposure is driven

3     by the fluoride concentration in the drinking water.

4     **Q.**   And so just so I'm clear, at least with respect to

5     Dr. Grandean's BMCL, you agree that the analysis you offered

6     here would show risk not just for community water fluoridation,

7     but any exposure to fluoride that's represented in the urine

8     samples used, right?

9     **A.**   Right.

10    **Q.**   And those other sources, so we're clear, could include

11    pharmaceuticals, air pollution, tea, seafood, toothpaste,

12    dental products, fluoride tablets; do you agree with that?

13    **A.**   Right.  But again, for most individuals in a fluoridated

14    area, that exposure is driven by the fluoridated water.

15    **Q.**   Now, you don't actually know the dose of fluoride for any

16    of the participants in these studies that you listed in Table

17    4, correct?

18    **A.**   No, I do not.

19    **Q.**   And none of the values reflected in Table 4 take into

20    account an intake rate of fluoride, correct?

21    **A.**   These are not developed in terms of an intake rate for

22    water -- for fluoride in drinking water, it's very easy to

23    derive an intake rate.  We looked at some of that yesterday.

24    **Q.**   But that's not what you're offering here in Table 4,

25    correct?

1    **A.**   This table does not refer to intake rates.

2    **Q.**   And none of the values in Table 4 take into account the

3    body weight of the participants in these studies, correct?

4    **A.**   That's correct.

5    **Q.**   And so we're clear on this, it's your opinion that the

6    points of departure examples that you've listed in this table

7    are not appropriate to be used for a point of departure for a

8    margin-of-exposure analysis under amended TSCA, right?

9              **MR. CONNETT:**  Vague and ambiguous, overbroad.

10             **THE COURT:**  Rephrase that.

11             Hold on.

12             Why don't you rephrase that.

13   **BY MR. ADKINS:**

14   **Q.**   So just looking at the points of departure that you listed

15   in Table 4, Dr. Theissen, you agree that these are not

16   appropriate to use for a margin-of-exposure analysis; isn't

17   that right?

18             **MR. CONNETT:**  Vague and ambiguous, argumentative,

19   overbroad.

20             **THE WITNESS:**  These are reasonable.

21             **THE COURT:**  Hold on.  Hold on.

22             I'm not sure what your question is yet.  Are you

23   saying because she doesn't believe there is a point of

24   departure, is that the point that you're trying to get?

25             **MR. ADKINS:**  That the examples that she offered here

1  are not appropriate for points of -- are not values that can be

2  used as a point of departure for a margin of exposure.

3         THE COURT:  Because her view is that there is no point

4  of departure, is that the point?

5         MR. ADKINS:  I think I understand the issue now, and I

6  think I could rephrase it.

7         THE COURT:  Then why don't you rephrase it.

8         MR. ADKINS:  Thank you, Your Honor.

9  BY MR. ADKINS:

10 Q.  So, Dr. Theissen, the values that you listed in the

11 point-of-departure column of Table 4, whether they're

12 appropriate or not, these values cannot be used mathematically

13 to calculate a margin of exposure; isn't that right?

14 A.  That's not right.  They can be used.

15      Dr. Barone testified that the point of departure and the

16 exposure need to be in the same units.

17      EPA ordinarily, and maybe most or all of the time does

18 them in terms of intake, milligrams per kilogram per day.  But

19 it is certainly reasonable to -- and scientifically defensible

20 to look at points of departure and exposure levels in terms of

21 other units, in this case milligrams per liter in the drinking

22 water; in the lowest one, milligrams per liter in the urine.

23 So those -- again, you would have the same units in -- for the

24 point of departure and for the exposure level, and so it's in

25 the numerator and the denominator, and you get a unitless

1    margin of exposure.  So it's scientifically defensible whether

2    or not it's EPA's regular practice.

3    **Q.**   That's not what you did in your report, though, correct,

4    Dr. Theissen?

5    **A.**   What's not what I did in my report?

6    **Q.**   You didn't do that calculation that you refer to that

7    Dr. Barone said he could do?

8    **A.**   That's -- it's -- I believe it's discussed in the report

9    that you would get -- for instance, an exposure level of .7

10   milligrams per liter in the drinking water, the ordinary

11   fluoridation level in the United States with a point of

12   departure of 1.5 milligrams per liter, that gives a margin of

13   exposure of 2, which is considerably less than 10.

14   **Q.**   Nowhere in your report have you attempted to calculate a

15   point of departure in the value of milligram per kilogram per

16   day?

17   **A.**   I did not try to calculate a point of departure in

18   milligrams per kilogram per day.

19   **Q.**   So I want to focus a little bit on Dr. Grandean's BMCL,

20   which you relied on in your report, right?

21   **A.**   Yes.

22   **Q.**   And just to clarify, this is what we've been referring to

23   as "Grandjean 2022."  This was the first BMCL that Dr. Grandean

24   performed.

25            **THE COURT:**  Before you go on to Dr. Grandean, I just

1    had a couple questions.

2           If the normal or the way that the EPA does it is you

3    look at -- if you're using water, you want to know the intake

4    which takes into account how much water is actually consumed --

5           **THE WITNESS:**  Right.

6           **THE COURT:**  -- not just the concentration; the size of

7    the person, et cetera, et cetera.  Can you -- if you don't use

8    that, can you still have a valid POD and MOE analysis, because

9    you're missing some variables; or is it the idea that the law

10   of averages these things kind of cancel out or --

11          **THE WITNESS:**  Well, it's a matter of having a point of

12   departure in terms of exposure, however that's defined,

13   milligrams per liter in the water, milligrams per liter in the

14   urine, milligrams per kilogram per day.

15          So you've got a point of departure in terms of an

16   exposure characterization of some sort, and you have an

17   exposure level that people are actually exposed to in the same

18   units.

19          So if you have a point of departure in milligrams per

20   liter, as I have here in this table, if you're looking at the

21   exposure level, the population is exposed to .7 milligrams per

22   liter.

23          You can divide that point of departure of 1.5

24   milligrams per liter by the exposure level of 0.7 milligrams

25   per liter, and you have a margin of exposure of approximately

1    2.

2           You could go to intake in terms of milligram per

3    kilogram per day.  Then you have to do that for each section of

4    the population, because the water intake varies by age and sex

5    and activity level and disease state.

6           But, for instance, the -- you could take -- basically,

7    if you take the same group of individuals, if you take newborn

8    babies who are being fed formula made with tap water, they, on

9    average, would have an intake of one tenth of a liter per

10   kilogram of body weight per day.  So .1 liters per kilogram per

11   day times -- if the point of departure is 1.5 milligrams per

12   liter in the water, that would be 1.5 milligrams per liter

13   times .1 milligrams per -- .1 liters per kilogram per day.  So

14   1.5 times .1 and you've got 0.15 milligrams per kilogram per

15   day.  That's the point of departure, an example point of

16   departure.

17          THE COURT:  Right.

18          THE WITNESS:  Okay.  On fluoridated water, you still

19   have .1 liters per kilogram per day water intake.  You have .7

20   milligrams per liter fluoride in the drinking water, so that

21   baby's total intake is going to be .1 times .7 or .07

22   milligrams per kilogram per day.

23          And to get the margin of exposure, you take .15 from

24   the point of departure divided by .7 for the exposure level and

25   that's approximately -- it's a margin of exposure of

 1   approximately 2, which is less than the minimum benchmark

 2   margin of exposure, which would need to be at least 10 to allow

 3   for --

 4              THE COURT:  Yeah.  I understand that.

 5              I guess what I'm trying to understand is that when you

 6   use a POD in an exposure that's just based on concentration,

 7   that doesn't account for water intake by different subgroups;

 8   different size of the body, et cetera, et cetera, it seems like

 9   you're -- it's more of a generalization.  You're -- it's -- I

10   don't know if it's like the law of averages, but if you wanted

11   to be more granular and more precise, it seems like you'd want

12   to know what the ultimate point of departure is in terms of

13   intake of actual fluoride, which is a function of both the

14   concentration and the intake amount.  Some populations may

15   drink very little water; some people drink a lot of water, and

16   so it varies, and you would get a more granular level; maybe

17   it's by subpopulations we can look at.  But I understand the

18   mathematical relationship is the same, but the degree of

19   specificity or the granularity seems to be better if you had

20   account of water intake and measured milligrams per kilograms

21   per day, ultimate intake of the substance, not just the

22   concentration levels.

23              THE WITNESS:  Right.

24              What that comes down to -- excuse me -- is, you've

25   got -- you're going to have a different -- a different value

1    for every subset of the population.  But for any given subset

2    of the population, you've got the -- you've got the same --

3    same subset of the population in the numerator and the

4    denominator, so the margin of exposure is going to come out the

5    same.

6            If you remember a graph I showed yesterday that had

7    the distribution of water intake and it had the distribution of

8    fluoride intake from drinking water for -- it was either the

9    very youngest babies or the pregnant woman -- both are in the

10   report -- but that's -- that's a very wide distribution of

11   exposures.  That's more than a factor of 100 between the lowest

12   and the highest.

13           So that -- for any -- any piece of that distribution,

14   you've got the same -- you've got a point of departure in terms

15   of what that individual's exposure would be at the point of

16   departure, and you've got a hazard level.  But you've got the

17   same intake rate with respect to the point of departure and

18   with respect to the exposure level for that person or that

19   group of people.

20           **THE COURT:**  So the numerator and the denominator

21   cancel out, is that what you're saying?

22           **THE WITNESS:**  The intake rates -- the water intake

23   rates cancel out, so you're left with a difference in the

24   fluoride concentration at the point of departure and at the

25   current exposure level or the exposure level of interest.

1        But because this is a point of departure and an

2   exposure level both dealing with the same source of water --

3   same source of fluoride, it would -- it would be different if

4   you were looking at a point of departure derived from studies

5   of fluoride tablets or something and an exposure level in terms

6   of drinking water, then you would have to -- you would have two

7   different ways of calculating intake that would have to be

8   considered.

9        But since the point of departure and the exposure

10  level are both in terms of drinking water intake, that

11  essentially cancels out and the difference is the fluoride

12  concentration in the drinking water.

13       **THE COURT:**  But just looking back at this chart, if

14  you have a -- the first column here, if you assume point of

15  departure of 1.5 concentration in water -- and that's a

16  NOAEL --

17       **THE WITNESS:**  Yes.

18       **THE COURT:**  -- and you use a benchmark of 10, that

19  means, you know, if the concentration level is below .15, it's

20  deemed no risk, but if it's above 1.5 --

21       (Reporter seeks clarification.)

22       **THE COURT:**  If it's above 1.5, then it's considered a

23  risk, but how does that account for, let's say, some part of

24  the population that drinks much less water?  I mean, even with

25  a concentration level that's presumptively, sort of, we'll call

1  it hazardous at .15 -- within the zone of hazard -- if certain

2  parts of the population drink one tenth of the amount of water

3  that the average person drinks, they wouldn't -- they wouldn't

4  really face that risk even though there is a reference dose --

5  or whatever you want to call it -- that's defined by

6  concentration.  It's still, in the end, how much water one

7  drinks.

8          And if one drinks a lot of water, even if the

9  concentration level were half that, .07, they could be

10  accumulating all sorts of fluoride, so . . .

11          **THE WITNESS:**  Right.  Okay.  So the -- you could --

12  you could calculate a point of departure in terms of an average

13  water intake level, that would have been the .1 liters per

14  kilogram per day for a newborn infant.  It would be more like

15  one liter per day divided by 70 kilograms for an adult,

16  about -- try to calculate it -- about .07, something like that,

17  milligrams per kilogram per day.  And then you could use that.

18  But that assumes a point of departure based on the average of

19  a -- average exposure of the group in which the adverse

20  observed -- in which the adverse effect is observed.

21          But then the -- so that -- if -- that would be about a

22  .7 milligrams per kilogram per liter -- milligrams per kilogram

23  per day -- sorry -- intake rate at 1.5 milligrams per liter.  A

24  highly-exposed individual at .7 milligrams per liter would

25  exceed that, but the average -- average exposure at .7 would be

 1   that factor of 2.

 2        **THE COURT:**  So I guess that goes back to my original

 3   question that is when you only look at concentration levels and

 4   not break it down by actual intake of milligrams per kilograms

 5   per day, this still works because it really is, sort of,

 6   averages.  It's kind of the law of averages here that you're

 7   talking about what the appreciable risk is, making assumptions

 8   about constancy and intake, for instance.

 9        **THE WITNESS:**  Right.  There has to be an assumption

10   of -- in order to turn it into an intake level, there has to be

11   an assumption -- an assumption of an intake rate, and you have

12   to define that for average consumers or --

13        It's -- because these are based on population studies,

14   you're dealing with -- we see an effect at a population exposed

15   at this level.  What you can't tell in that kind of study is

16   whether it's the average exposure or if you've got a handful of

17   high-end exposures in that group, that's not always apparent

18   from the study.

19        But anyway, the -- I think the bottom line is that

20   it's -- it is straightforward to convert from the fluoride

21   concentration in water to an intake level.  Then you have to

22   define that based on whether you're dealing with average

23   consumers or high-end consumers in order to handle the

24   variation of water consumption within -- within a population.

25   But it's certainly all doable with all the pieces explained

 1  clearly.

 2          THE COURT:  Okay.  Sorry to sidetrack you, but go on.

 3          MR. ADKINS:  May we remove Table 4?

 4          THE COURT:  Yeah.

 5          MR. ADKINS:  Okay.

 6          THE COURT:  And actually, this -- we're at our break

 7  point I think, so if you were going to move on to the next one,

 8  this is a good point.

 9          MR. ADKINS:  We were about to start Dr. Grandean's

10  BMCL, so this would sense.

11          THE COURT:  Good.  Thank you.

12          THE CLERK:  Court is in recess.

13      (Recess taken at 10:12 a.m.)

14      (Proceedings resumed at 10:33 a.m.)

15          THE CLERK:  Please be seated, come to order.  Court is

16  back in session.

17          MR. CONNETT:  Your Honor, we just have one scheduling

18  issue.  Dr. Thiessen has her flight scheduled for 2:00 p.m.

19  today, she has a rental car she needs to return first.

20          Talked with counsel.  She can comfortably go to 11:30,

21  I think, and then get to her flight on time, but we just want

22  to raise that for the Court, whether the Court prefers for her

23  to finish her testimony today or come back through Zoom on

24  Friday.

25          MR. ADKINS:  Your Honor, I hate to be the bad guy

```
 1    here, but I'm in the middle of my cross-examination of

 2    plaintiffs' -- one of plaintiffs' most important experts.  I

 3    mean, we deserve an opportunity to cross her before plaintiffs

 4    rest and we put on our defense.  This scheduling issue is --

 5            THE COURT:  How much longer do you expect on cross?

 6            MR. ADKINS:  About an hour, maybe an hour and 15.

 7            MR. CONNETT:  I may have five or ten minutes, Your

 8    Honor.

 9            MR. ADKINS:  There's no way we're going to finish by

10    11:30 though.

11            THE COURT:  So what are you proposing?

12            MR. CONNETT:  The proposal would be, if the Court

13    would entertain it, would be for Dr. Theissen to complete her

14    exam on Friday through Zoom --

15            THE COURT:  Or come back here?

16            MR. CONNETT:  -- or come back here, if that's the

17    Court's preference.

18            THE COURT:  You know, I had already ruled that I want

19    everybody here live, and I think that rule should apply.

20            I mean, I hate to impose a hardship, but we're all

21    here.  We're investing a lot into this, she is an important

22    witness, and I don't think I can, sort of, bend the rules at

23    this point --

24            MR. CONNETT:  Okay.

25            THE COURT:  -- you know, unless somebody has a health
```

 1  problem or something like that.

 2          **MR. CONNETT:**  We'll complete the examination today.

 3          **THE COURT:**  If we can.  I mean, unless she can change

 4  her flight maybe.

 5          **MR. CONNETT:**  There's no later flights for today.

 6  She's flying back East.

 7          **THE COURT:**  Oh.  Given the weather, she may have a

 8  built-in dispensation, I don't know.  You might check the

 9  schedules.  I got a feeling they're late.  Is she leaving from

10  San Francisco?

11          **MR. CONNETT:**  Yeah.

12          **THE COURT:**  I'll put a side bet on that one that that

13  one's not on time.  But -- yeah, I'm sorry.  Let's just -- why

14  don't we get going and see how quickly we can go, and I will

15  minimize my questions.  If I had known that, I would have --

16          **MR. ADKINS:**  Well, no.  Please don't, Your Honor,

17  please.

18          **THE COURT:**  Okay.

19          Okay, Dr. Theissen.  Thank you.

20  **BY MR. ADKINS:**

21  **Q.**   Okay.  Dr. Theissen, we're just about to dive into

22  Dr. Grandean's BMCL.  Now, you relied on the 2022 BMCL by

23  Dr. Grandean, correct?

24  **A.**   Yes.

25  **Q.**   That's the BMCL that was based on the ELEMENT and the

1   MIREC IQ study data?

2   **A.**   Yes.

3   **Q.**   So we're talking about Bashash 2017 and Green 2019, right?

4   **A.**   Yes.

5   **Q.**   The BMCL that Dr. Grandean performed does not use data

6   from the INMA IQ study, correct?

7   **A.**   That's correct.  That was not available at that time

8   anyway.

9   **Q.**   And we saw in your expert report that you identified a

10  BMCL of 0.2 milligrams per liter urinary fluoride based on

11  Dr. Grandean's work, correct?

12  **A.**   Yes.

13  **Q.**   The value 0.2 milligrams per liter is the lowest or the

14  lower 95 percent confidence limit, which is on the more

15  protective side of the confidence interval for the BMCL

16  correct?

17  **A.**   Yes.

18  **Q.**   The BMCL that Dr. Grandean performed is based on maternal

19  urinary data, correct?

20  **A.**   Yes.

21  **Q.**   So the BMCL reflects fluoride exposure from various

22  sources, right?

23  **A.**   Yes.

24  **Q.**   And Dr. Grandean's -- excuse me.

25       You offered an opinion that fluoride intake, so fluoride

1  intake from community water fluoridation is related to the

2  concentration of fluoride found in urine, right?

3  **A.**   Yes.

4  **Q.**   And you believe that you can approximate fluoride intake

5  from community water fluoridation from a urine sample, right?

6  **A.**   In principle, it could be done.  In practice some of the

7  information is probably not available.

8       The preferred way to calculate intake would be to start

9  with the drinking water consumption and any other sources of

10  fluoride intake.  But the -- I realize that it doesn't

11  specifically apply to the benchmark dose analysis, but the

12  MIREC cohort was, in fact, analyzed in terms of intake as well

13  as urinary -- maternal urinary fluoride.

14  **Q.**   The fluoridated areas in the United States have about .7

15  milligrams liter of fluoride in the water, right?

16  **A.**   .7 milligrams per liter of -- right.

17  **Q.**   Water fluoridation -- water fluoridated at a concentration

18  of 0.7 milligrams per liter can produce a wide range of

19  exposures to fluoride depending on individual water intake,

20  correct?

21  **A.**   Yes.

22  **Q.**   Individuals are exposed to fluoride from other sources

23  other than water fluoridation, right?

24  **A.**   Yes.

25  **Q.**   There are many potential sources of fluoride exposure

1   other than community water fluoridation in the United States,

2   right?

3   **A.**   Yes.  Some of those --

4   **Q.**   Fluoride --

5   **A.**   Sorry.  Some of those are indirect exposures from water

6   fluoridation in other cities.

7   **Q.**   Fluoride absorption and retention in the body can also be

8   affected by things like calcium intake and kidney function,

9   correct?

10  **A.**   Yes.

11  **Q.**   The amount of water -- the amount of fluoride observed in

12  a urine sample is also dependent on the body weight of -- and

13  metabolism of the individual providing that urine sample,

14  correct?

15  **A.**   Yes.

16  **Q.**   For example, if an individual's fluoride intake stops

17  completely for some reason, there would still be some fluoride

18  in the urine due to the release of fluoride from the bones,

19  right?

20  **A.**   For a while, yes.

21  **Q.**   Fluoride concentration in urine depends on recent fluoride

22  intake and also on fluoride coming out of the bones, correct?

23  **A.**   Yes.

24  **Q.**   And you cannot say what an individual -- an individual's

25  fluoride intake from community water fluoridation is, just from

1  looking at a urine sample, right?

2  **A.**   No.  You could make some reasonable approximations, but it

3  would be much simpler to take the water fluoride concentration

4  and an estimate of intake.

5  **Q.**   In your view, the best you can do is to approximate intake

6  from a urine sample, correct?

7  **A.**   Yes.

8  **Q.**   You believe a quick and dirty approximation is that urine

9  fluoride concentrations are approximately equal to water

10  fluoride concentrations, right?

11  **A.**   That is a quick-and-dirty approximation that has been used

12  in some contexts.

13      We know clearly from the studies that have been looked at

14  in this case that the urine fluoride can be lower or higher

15  than the water fluoride concentration.

16  **Q.**   That quick-and-dirty approximation isn't something that

17  you attempted to apply in your opinions in this case, right?

18  **A.**   No, I did not.

19  **Q.**   And if one wanted to estimate an individual's fluoride

20  intake, one would estimate the individual's intake from various

21  sources and compare that to urine -- the urinary fluoride

22  measure, right?

23  **A.**   I don't know exactly how you -- what you mean in terms of

24  comparing it to the urine fluoride, but if you wanted the

25  intake, like the better approach at this point in time would be

1   to start with the fluoride concentrations in water and other

2   sources and estimate the intake from that direction.

3   **Q.**   Fair enough.

4        So we've established that fluoride observed in urine can

5   be caused by various sources of fluoride exposure, water

6   fluoridation being one of those exposures, correct?

7   **A.**   Yes.

8   **Q.**   And if you wanted to estimate how much urinary fluoride is

9   observed and attributable to intake from water fluoridation,

10  you would also need to know approximately what the other

11  sources of exposure were for that particular individual, right?

12              **MR. CONNETT:**   Vague and ambiguous.

13              **THE WITNESS:**   You would want --

14              **THE COURT:**   Overruled.

15              **THE WITNESS:**   You would want the intake from the water

16  as a fraction of the entire intake.  There are ways to get at

17  that.

18              But it is also important to remember that at -- that

19  for most individuals in fluoridated areas, the intake is driven

20  by the fluoridated water and, therefore, the fluoride content

21  of the urine will be driven by the fluoride content of the

22  water.

23  **BY MR. ADKINS:**

24  **Q.**   At no point in this case, Dr. Theissen, you have tried to

25  convert maternal urinary fluoride values to a fluoride intake

1  value, correct?

2  **A.**    Correct.

3  **Q.**    So let's talk more about this relationship between water

4  fluoride concentration and urinary fluoride concentration.  In

5  your opinion, Dr. Theissen, there's a substantial -- there is

6  substantial published data on this relationship, the

7  relationship between water fluoride concentration and urinary

8  fluoride concentration, correct?

9  **A.**    I don't know whether it would be considered substantial.

10  We -- in the NRC report in 2006, we looked at what was

11  available in terms of urinary fluoride for a given water

12  fluoride concentration.  And there's been -- there have been

13  some papers since then, but whether that constitutes

14  substantial.  I mean, there is definitely information

15  correlating urinary fluoride with water fluoride, because the

16  water fluoride, in most cases, drives the total exposure and

17  therefore drives the urine fluoride.

18  **Q.**    In your third supplemental expert report you said, "There

19  is also substantial published data on the relationship between

20  water fluoride and urinary fluoride, particularly among

21  pregnant women," right?

22  **A.**    Okay.  Substantial -- there have been a handful of recent

23  papers, which are good in that direction.

24  **Q.**    And you cited two of those studies in your expert report,

25  correct?

1    **A.**   I don't remember, but it --

2    **Q.**   So you cited Till 2018 and a study called Thippeswamy

3    2021, right?

4    **A.**   Okay.  Yes.

5    **Q.**   Okay.  So I want to talk about both of those studies in

6    context of this issue, converting urinary fluoride to total

7    intake.

8         Till 2018 this is the MIREC study, right?

9    **A.**   Right.

10   **Q.**   That study divided the participants living in fluoridated

11   and nonfluoridated areas based on a water fluoride

12   concentration of less than .3 milligrams per liter, right?

13   **A.**   That sounds right.

14   **Q.**   So if an individual was living in an area with a water

15   fluoride concentration of less than .3 milligrams per liter,

16   Till put that individual in the category of a nonfluoridated --

17   nonfluoridated area, right?

18   **A.**   I believe that's right.

19   **Q.**   And in the fluoridated areas, the average fluoride

20   concentration in the water was .61 milligrams per liter, right?

21   **A.**   That sounds right.

22   **Q.**   In the same fluoridated areas the average adjusted urinary

23   fluoride concentration was .87 milligrams per liter, correct?

24   **A.**   That sounds correct.  They did several different

25   adjustments and they -- they gave slightly different answers.

1  **Q.**  So in the fluoridated areas in Till 2018, the average

2  adjusted maternal urinary fluoride value was higher than the

3  average reported tap water concentration, correct?

4  **A.**  .87 is higher than .61, yes.

5  **Q.**  In fact, the average urinary fluoride value was over 40

6  percent higher than the average tap water concentration, right?

7  **A.**  Yes.

8  **Q.**  And we don't have data for what the MIREC study

9  participants' fluoride intake from community water fluoridation

10  was, right?

11  **A.**  We could estimate it and in Till, et al., may have done

12  so.  Well, in some of the studies that were published about the

13  MIREC cohort, they did estimate the fluoride intake from the

14  drinking water.

15  **Q.**  We don't have detailed estimates of the intake, the

16  fluoride intake for the participants in the MIREC study,

17  correct?

18          **MR. CONNETT:**  Vague and ambiguous.

19          **THE COURT:**  Could you rephrase that?  I'm not sure how

20  that squares with what we just heard.

21          **MR. ADKINS:**  I can move on, Your Honor.

22  **BY MR. ADKINS:**

23  **Q.**  So let's move on to the Thippeswamy 2021 study, okay?

24      Now, Thippeswamy looked at correlations of drinking water

25  fluoride, internal cord blood fluoride, and urinary fluoride,

1    right?

2    **A.**    Yes.

3    **Q.**    So there were three metrics used, those three that I just

4    described, okay?

5    **A.**    Yes.

6    **Q.**    And Thippeswamy, again, divided the participants into two

7    groups, similar to what Till 2018 did, right?

8    **A.**    Yes.

9    **Q.**    The two groups in the Thippeswamy study were a low/optimum

10   fluoride group and a high fluoride group, correct?

11   **A.**    Yes.

12   **Q.**    And those are the termin -- that's the terminology that

13   the study used?

14   **A.**    Right, in its context.

15   **Q.**    The low/optimum fluoride group had a fluoride

16   concentration in drinking water of less than or equal to 1

17   milligram per liter, right?

18   **A.**    I believe that's right.

19   **Q.**    So the dividing line that the researchers used in that

20   study is actually higher than the recommendation of .7

21   milligrams per liter of fluoride in the United States?

22   **A.**    Right; although, I believe the average for that was around

23   .5.

24   **Q.**    The researchers in Thippeswamy analyzed the water fluoride

25   exposure of the participants based on the drinking water

1  consumed by the women during the course of their pregnancy,

2  correct?

3  A.   Yes.

4  Q.   And just before delivery, the pregnant mothers' serum and

5  urine fluoride levels were assessed, right?

6  A.   Yes.

7  Q.   The urine samples were collected from the pregnant women

8  after they were fasting, correct?

9  A.   Yes.

10 Q.   The mean drinking water, so not urinary fluoride, drinking

11 water fluoride concentration in at that low/optimum group was

12 .5 milligrams per liter; is that right?

13 A.   I believe that's right.

14 Q.   And the mean urinary fluoride concentration in that same

15 low/optimum fluoride group was just .2 milligrams per liter,

16 right?

17 A.   I don't remember exactly, but that sounds about right.

18 Q.   Well, let's -- let's get it exactly, because I think this

19 is important.

20       MR. ADKINS:   Mr. Hambrick, could you please put on the

21 screen Thippeswamy 2021.

22       So Your Honor, since we prepared our binder for this

23 cross-examination we've now admitted this study into evidence

24 and it's Exhibit 111.

25       THE COURT:   Okay.

1           MR. ADKINS:  And Mr. Hambrick, could you please turn

2    to page 1 for us.

3    BY MR. ADKINS:

4    Q.   So Dr. Theissen, if you could just take a second to look

5    at Table 1, and I'll ask the question again, and this is

6    whether the mean urinary fluoride concentration in the low

7    fluoride group was .2 milligrams per liter?

8    A.   Yes.

9    Q.   Okay.  Now, the mean drinking water fluoride concentration

10   in the high fluoride group was 2.65 milligrams per liter,

11   correct?

12   A.   Yes.

13   Q.   The mean urinary fluoride concentration in that same high

14   fluoride group was 1.92 milligrams per liter, correct?

15   A.   Yes.

16   Q.   So the researchers in this study, Dr. Theissen, they found

17   a stronger correlation between fluoride in drinking water and

18   the maternal urinary fluoride in that high fluoride exposure

19   group compared to the low fluoride exposure group, right?

20   A.   That's correct, but it's important to note that they did

21   find a correlation with the drinking water concentration even

22   in the low fluoride group.

23   Q.   Very good, so -- but neither group -- in neither group did

24   the researchers find a one-to-one correlation, that

25   quick-and-dirty correlation that you described in the pregnant

1    women's urine and fluoride in the water that those women

2    consumed, right?

3    A.   That's correct.

4    Q.   And you've heard of the term "Beta coefficient" before?

5    A.   Yes.

6    Q.   A beta coefficient represents the increase or the decrease

7    in the outcome for every one unit increase in the exposure

8    variable, correct?

9    A.   Yes.

10   Q.   In this Thippeswamy study, Exhibit 111, the beta

11   coefficient for the urine in the slow/optimal group was 0.247,

12   right?

13   A.   That's on the next page with the graphs.

14          MR. ADKINS:   Mr. Hambrick, could you take us to Table

15   2 of Exhibit 111?

16          And Your Honor, this appears on the page that's been

17   stamped 111.004.

18   BY MR. ADKINS:

19   Q.   So Dr. Theissen, looking at Table 2 of Thippeswamy 2021,

20   the study found a beta coefficient for the urine in the

21   low/optimal group that was 0.247, right?

22   A.   Yes.

23   Q.   And the beta coefficient for urine in the high fluoride

24   group was .773, right?

25   A.   Yes.

THEISSEN - CROSS / ADKINS

1   Q.   So the beta coefficient in that low fluoride group of

2   2.47, that's nowhere near a one-to-one ratio, correct?

3   A.   Correct.

4   Q.   The average maternal urinary fluoride values were actually

5   lower than the average fluoride concentration in the mothers'

6   drinking water, correct?

7   A.   Yes.

8   Q.   And this finding in Thippeswamy 2021 is actually in

9   conflict with the data from Till 2018 where the maternal

10  urinary fluoride values were higher than what was reported in

11  the drinking water for those participants, right?

12  A.   Right, but it's not that important a detail.

13  Q.   When the data for both of these groups were combined --

14  and we're talking about Thippeswamy 2021 -- the researchers

15  still did not find a one-to-one correlation between the urinary

16  fluoride and the water fluoride values, right?

17  A.   That's correct.

18  Q.   And the researchers concluded that once one gets above the

19  1 point -- the 1 milligram per liter of fluoride in drinking

20  water concentration, the transfer of fluoride to urine

21  increases, right?

22  A.   That was their conclusion.  I don't know that -- I don't

23  know enough on what the transfer from the water to the urine is

24  and whether -- how much that's dose dependent.  That's the

25  finding of one study, but I don't know how general that is.

1   **Q.**   Are you familiar with the term "physiologically-based

2   pharmacokinetic" or PBPK model?

3   **A.**   Yes.

4   **Q.**   A PBPK model is a computer model that estimates

5   concentrations of a substance in other parts of the body based

6   on physiological parameters like absorption, right?

7   **A.**   Yes.

8   **Q.**   And you're not aware, Dr. Theissen, of any PBPK models

9   that can predict maternal urinary fluoride concentrations based

10  on drinking water exposures, right?

11  **A.**   I'm not aware that anybody has attempted to put one

12  together.

13  **Q.**   And similarly, you're not aware of any PBPK models that

14  assess fluoride exposure in maternal urinary fluoride values

15  for pregnant women, right?

16  **A.**   I'm not aware of it.

17       **MR. ADKINS:**   So now I'd like to turn to Exhibit 88,

18  unless Your Honor has questions.

19       **THE COURT:**   No.

20       **MR. ADKINS:**   Okay.

21       Mr. Hambrick could you please put Exhibit 88 and take

22  us to PDF page 4, which is figure 4 -- and zoom in on figure 4.

23  Thank you.

24       I'm sorry.  Figure 8.  Mr. Hambrick has the right

25  figure on the screen.

1    BY MR. ADKINS:

2    Q.    So Dr. Theissen, this exhibit shows some of the graphics

3    that you included in your third supplemental report?

4    A.    Yes.

5    Q.    And among those graphics is Figure 8, which we see on the

6    screen here?

7    A.    Yes.

8    Q.    Figure 8 is a bar graph that -- excuse me.

9          Figure 8 is based on data from the MIREC study, Till 2018,

10   that we've been discussing?

11   A.    Yes.

12   Q.    Thank you.

13         The bars in this figure, Dr. Theissen, reflect adjusted

14   urinary fluoride values for pregnant women living in the

15   fluoridated areas, not the nonfluoridated areas in the Till

16   study, right?

17   A.    I believe that's right, yes.

18   Q.    That red line -- the red dotted line on the bottom of this

19   graph, do you see that?

20   A.    Yes.

21   Q.    That represents the BMCL that Dr. Grandean calculated?

22   A.    Yes.

23         MR. ADKINS:  So Mr. Hambrick, could you please show

24   figure 4?

25         Now, Your Honor, this figure has since been marked

 1  Plaintiffs' Demonstrative 4.

 2  **BY MR. ADKINS:**

 3  **Q.**   So Dr. Theissen, do you see Plaintiffs' Demonstrative 4 on

 4  your screen?

 5  **A.**   Yes.

 6  **Q.**   This is a figure that you prepared before your deposition

 7  in September '23 -- 2023, right?

 8  **A.**   I believe so.

 9  **Q.**   And the bars in this figure are based on data in the Till

10  2018 study?

11  **A.**   Yes.

12  **Q.**   The Green bars are based on data in the nonfluoridated

13  areas of Green, correct? --

14  **A.**   Yes.

15  **Q.**   -- or of Till 2018?

16  **A.**   Yes.

17  **Q.**   So just so I can get this clear because I made a mistake

18  in my question, the Green bars are based on data in the

19  nonfluoridated areas from Till 2018, right?

20  **A.**   Yes.

21  **Q.**   And the red bars are based on data in the fluoridated

22  areas of Till 2018?

23  **A.**   Yes.

24  **Q.**   And we -- if we want to check the data underlying this

25  graph, we could go to Supplemental Table 4 of Till 2018, right?

1    A.    Yes.

2    Q.    Now, this graph, in your view, Dr. Theissen, purports to

3    compare total fluoride exposure versus fluoride exposure solely

4    attributable to drinking fluoridated water, right?

5    A.    The difference between the nonfluoridated and the

6    fluoridated would be reasonably attributed to the additional

7    fluoride in the drinking water.

8    Q.    And you --

9    A.    But the fluoride in the drinking water in the -- even in

10   the low fluoride areas would be contributing to the total

11   concentration -- I mean, the -- yeah, the total fluoride in the

12   urine.

13   Q.    Total fluoride in the urine, not the fluoride

14   concentration in the water?

15   A.    Right.  The -- even in the northern fluoridated areas --

16   even in the nonfluoridated areas, there is still a contribution

17   from whatever fluoride is in that water and also an indirect

18   contribution from any fluoridated -- any beverages and so forth

19   coming from fluoridated areas.  So it's not a matter of the

20   nonfluoridated area having fluoride only from non-water

21   sources.

22   Q.    So in your view, Dr. Theissen, if one were to subtract out

23   fluoride exposures that might be attributable to sources other

24   than community water fluoridation, one still has considerably

25   fluoride intake just from drinking water in fluoridated areas,

1   right?

2   **A.**   Yes.

3   **Q.**   And that graph purports to show that?

4   **A.**   Yes.

5   **Q.**   So with that understanding, you would consider those Green

6   bars to essentially represent background exposure to fluoride,

7   correct?

8   **A.**   It could be interpreted that way, yes.

9   **Q.**   Now, if we were to draw a line on this graph showing

10  Dr. Grandean's BMCL of .2 milligrams per liter, that line would

11  be somewhere below the .39 in the 50th percentile of women in

12  the fluoridated zone based on data until 2018, right?

13  **A.**   That's correct.

14  **Q.**   In fact, that line would be below every single bar on this

15  graph, right?

16  **A.**   Yes.

17  **Q.**   And essentially, Dr. Grandean's BMCL of .2 milligrams per

18  liter is lower than what you would consider to be the

19  background fluoride exposure in the nonfluoridated areas of

20  this study, right?

21  **A.**   Right.

22       But remember that the nonfluoridated areas are getting

23  some fluoridated from fluoridated areas indirectly, but it also

24  means that half of the population at least is exceeding a

25  dose -- an amount of fluoride in the urine, maternal urine,

1    that has been associated with a decrement in IQ.

2           THE COURT:  What -- are these by trimester or this is

3    all during the full term or what's the trimester?

4           THE WITNESS:  This is probably an average over all

5    trimesters.  I'd have to look back at the table.

6           THE COURT:  Because we see a pretty big difference

7    between first, second and third.

8           THE WITNESS:  Right.

9           THE COURT:  There's a pretty big progression.

10          THE WITNESS:  Right.

11          THE COURT:  And you think this is the average?

12          THE WITNESS:  This is probably the average.  I'd have

13   to look back at the table.  I don't remember for certain.

14          THE COURT:  Thank you.

15          MR. ADKINS:  Your Honor, if it would be helpful, I'm

16   happy to go to Table S4.

17          THE WITNESS:  Oh, okay.  It says it on there third

18   trimester, so it is at the maximum --

19          THE COURT:  Oh.  So if you look -- if you did a

20   similar graph for first trimester, presumably everything would

21   be a lot smaller.

22          THE WITNESS:  Right.

23          THE COURT:  Did you do an analysis?  Is there an

24   analysis done looking at the different fluoridated versus

25   nonfluoridated for first and second trimesters?

1           THE WITNESS:  I did not try that, no.  It would be

2    straightforward to do though.

3           THE COURT:  Okay.  I'm just wondering.  Thank you.

4           MR. ADKINS:  May I have the Court's indulgence for 30

5    seconds?

6           THE COURT:  Yeah.

7           MR. ADKINS:  Okay.  Dr. Theissen, that wraps my

8    questions for now.  Perhaps you can make your flight.  We'll

9    see how things go.  Thank you very much.

10          THE COURT:  All right.  Thank you.

11          Redirect?

12          MR. CONNETT:  Yes, Your Honor.

13          If Your Honor could just indulge me for one minute.

14          THE COURT:  Okay.

15          MR. CONNETT:  I'm just getting one slide together.

16                      **REDIRECT EXAMINATION**

17   BY MR. CONNETT:

18   Q.   Dr. Theissen, I'd like to start first -- I'd like to start

19   first by revisiting the discussion about the NTP's

20   dose-response analysis in the meta-analysis, okay?

21   A.   Okay.

22   Q.   Now, the dose response analysis is looking at studies

23   where the NTP is characterizing the exposure in each study as

24   the average high level and then the average for the control,

25   correct?

```
 1   A.    Yes.

 2   Q.    So when we're looking at the studies that come within the

 3   less than 1.5 ppm category, those are studies where the

 4   high-exposure group had an average exposure level of less than

 5   1.5 ppm in the water or less than 1.5 ppm in the urine; is that

 6   correct?

 7   A.    Yes.

 8   Q.    Now, so those studies would include studies with large

 9   exposure contrasts, like 1.4 ppm in the high versus .1 in the

10   low, as well as studies with .7 ppm in the high and .2 ppm in

11   the low; is that correct?

12   A.    Yes.

13         THE COURT:  Maybe before you get too far, I'm already

14   lost.

15         MR. CONNETT:  Okay.  Your Honor, I'm going to put the

16   slides up, which I think is going to help us walk through it a

17   little bit.

18         THE COURT:  Yeah.  I got lost when you started talking

19   about looking at studies that come within the exposure group of

20   less in studies with high exposure and then something about the

21   average and that's where you lost me.

22         MR. CONNETT:  Okay.  So let's -- Your Honor, I think

23   if we get some numbers in front of us --

24         THE COURT:  Yeah.

25         MR. CONNETT:  -- it might make more sense.
```

```
1              THE COURT:  Yeah.
2   BY MR. CONNETT:
3   Q.   So I'm going to go back -- we were talking earlier --
4   counsel was asking you question about eTable 4, which is pages
5   39 to 41 of the supplemental materials, correct?
6   A.   Yes.
7   Q.   And counsel was also asking you about eTable 5, which is
8   on pages 42 to 44 of the supplemental materials to the
9   meta-analysis, correct?
10  A.   Yes.
11             MR. CONNETT:  Okay.  And, Your Honor, for the record,
12  that's Trial Exhibit 68.
13             THE COURT:  Yep.
14  BY MR. CONNETT:
15  Q.   And you were being asked questions about the various
16  exposure groups, less than 4 ppm less than 2 ppm and less than
17  1.5 ppm.  Do you recall that?
18  A.   Yes.
19  Q.   So I want to go and look at -- so the Bashash study, from
20  the ELEMENT cohort, and the Green study, from the MIREC cohort,
21  those studies would come within the less than 1.5 ppm category;
22  is that right?
23  A.   Yes.
24  Q.   And that's because the high average exposure for the high
25  group was less than 1.5 ppm?
```

THEISSEN - REDIRECT / CONNETT

1    **A.**   Yes.

2    **Q.**   So Dr. Theissen, I'm turning now to table -- to eTable 2

3    of the meta-analysis, which is on page 19 of the supplemental

4    materials.

5        Do you have that in front of you?

6    **A.**   Yes.

7    **Q.**   And Dr. Theissen, remember yesterday we were talking about

8    the data that the NTP used for the forest plot, the mean

9    effects analysis?  Do you recall that discussion?

10   **A.**   Yes.

11   **Q.**   Dr. Theissen, can you explain for the Court what data the

12   NTP used for the dose-response analysis for the Bashash study?

13   **A.**   Okay.  These were the -- the main analysis in the Bashash

14   was by individual urinary fluoride concentration.  But for the

15   mean effects analysis, these were means of two groups divided

16   by above and below .8 milligrams per liter fluoride in the

17   urine, fluoride of the children.

18           **THE COURT:**  Of the children?

19           **THE WITNESS:**  Of the children and not the mothers.

20           And these were not -- not adjusted for any of the

21   covariates in the analysis.

22           The later analysis -- NTP later in this has an

23   analysis of the individual data, and those were adjusted for

24   the covariates, but the group-level data were not.

25   \\\

```
 1   BY MR. CONNETT:

 2   Q.    So Dr. Theissen, is it correct that --

 3              THE COURT:  Well, wait a minute.  When you say "later

 4   analysis," what later analysis?  What are you referring to?

 5              THE WITNESS:  The meta-analysis has basically two sets

 6   of analyses, one on group-level data, mean data, and then

 7   another for the -- that the -- where they compared -- where

 8   they calculated a dose response from the studies that had

 9   individual data and individual level dose responses.

10              THE COURT:  All right.  So there were two

11   meta-analyses done by NTP?

12              THE WITNESS:  Right, essentially, in the same paper.

13              THE COURT:  Okay.  All right.  Thank you.

14   BY MR. CONNETT:

15   Q.    And that individual-based analysis that you just talked

16   about, that is found in the regression slopes meta-analysis in

17   this document, correct?

18   A.    Yes.

19   Q.    And that was eFigure 19 that we looked at yesterday that

20   shows the results of that analysis, right?

21   A.    Yes.

22   Q.    Okay.  So in the dose-response analysis that counsel was

23   asking you about before, the Bashash study comes within the

24   less than 1.5 ppm group, correct?

25   A.    Yes.
```

THEISSEN - REDIRECT / CONNETT

1   **Q.**   But the data that NTP is including for Bashash is the data

2   that is based on childhood urine levels, not the mother's urine

3   levels; is that correct?

4   **A.**   Yes.

5   **Q.**   And the data that is being included in the dose-response

6   analysis from Bashash is not adjusting for covariates; is that

7   correct?

8   **A.**   That's correct.

9   **Q.**   Okay.  And the difference in concentration between the

10  high-level kids in the Bashash group and the low-level kids is

11  basically a binary of -- you're either above .8 ppm fluoride in

12  your urine or below .8 ppm fluoride in urine; is that correct?

13  **A.**   Yes.

14         **MR. ADKINS:**  Objection, leading, compound.

15         **THE COURT:**  Overruled.

16         **COURT REPORTER:**  I'm sorry, I didn't hear your answer.

17         **THE COURT:**  Overruled.

18  **BY MR. CONNETT:**

19  **Q.**   And Dr. Theissen, your answer?

20  **A.**   Yes.

21  **Q.**   So what effect, if any, would that have of including the

22  childhood group average exposures without adjustment for

23  covariates, what effect would that have on NTP's analysis of

24  the dose-response trend under 1.5 parts per million?

25  **A.**   That would bias it toward the null.  It would make it

1  harder to see an effect.

2  **Q.**  And would it also make it harder to see an effect below 2

3  parts per million?

4  **A.**  Yes.

5  **Q.**  And what we just discussed about how the Bashash group

6  average data was used for the dose-response analysis, does that

7  apply as well to how the NTP used the Green 2019 study in the

8  dose-response analysis?

9       **MR. ADKINS:**  Objection, vague.

10       **THE COURT:**  Overruled.  If you understand it.

11       **THE WITNESS:**  That one -- that one did not have the

12  same application with the urine, the child's urine fluoride,

13  but it is a comparison of means that I believe were not

14  adjusted for the other covariates.

15  **BY MR. CONNETT:**

16  **Q.**  Dr. Theissen, I've just turned to page 20 of the

17  supplemental materials to the NTP meta-analysis.  It's still

18  part of eTable 2.  Do you see that in front of you?

19  **A.**  Yes.

20  **Q.**  And what does this table show us as to the type of data

21  that NTP used from Green for the dose-response analysis?

22  **A.**  It shows the mean and standard deviation of the IQs for

23  the groups of fluoridated and nonfluoridated areas.

24  **Q.**  So does that mean that for the dose-response analysis for

25  the Green study NTP took the average IQ of pregnant women in

1  the fluoridated areas and compared that against the average IQ

2  of the children born to women in the nonfluoridated areas?

3  **A.**   Yes.  And that -- that does not account for the

4  overlapping exposures in those two groups.

5  **Q.**   And when we're talking about this concept of exposure

6  contrasts, which analysis in these studies is going to have a

7  greater exposure contrast, the analysis which looks at maternal

8  urinary fluoride on an individual level or the analysis that

9  looks at average group exposures in a binary fashion?

10  **A.**   Clearly the analysis that looks at individual fluoride

11  exposures.

12  **Q.**   So I want to turn now to the discussion on the McPherson

13  study.  And just briefly, Dr. Theissen, yesterday --

14          **THE COURT:**  Before you leave that --

15          **MR. CONNETT:**  Yeah.

16          **THE COURT:**  -- the two groups in -- in the Green

17  study, employment of the Green study in the meta-analysis that

18  we were just talking about, you said there were two groups.

19          In the other study Bashash -- or the other study that

20  used the .8 cutoff above and below, there's a binary.

21          **THE WITNESS:**  Right.

22          **THE COURT:**  What was that binary cutoff?  How was that

23  used in this -- the Green study?

24          **THE WITNESS:**  In the Green study they already had a

25  binary distinction between the fluoridated --

 1              THE COURT:  Fluoridated and nonfluoridated areas?

 2              THE WITNESS:  -- fluoridated and nonfluoridated areas.

 3         But, in practice, those two exposure groups overlap,

 4    and that's why there's an advantage to doing that analysis with

 5    respect to individual fluoride exposures or individual maternal

 6    urinary fluoride concentrations rather than the two groups that

 7    overlap.

 8              THE COURT:  When you say they overlap, how do they

 9    overlap?  How do the two groups overlap?

10              THE WITNESS:  The range of exposures in the

11    nonfluoridated group and the range of exposures in the

12    fluoridated group overlap.  So the higher exposures in the

13    nonfluoridated group will be in the same range as the lower

14    fluoride exposures in the fluoridated area.

15              THE COURT:  And that's due to background stuff, or how

16    could that be?

17              THE WITNESS:  Differences in water consumption,

18    individual differences in water consumption would be the main

19    thing.  But because of the -- they don't have the water

20    fluoride -- yeah.  Water fluoride .3 -- .13 milligrams per

21    liter in the nonfluoridated -- nonfluoridated area and .59

22    milligrams per liter in the fluoridated area, that's a factor

23    of about 4 difference.  But the range of intake of water varies

24    over about a factor of 100, so it's not really possible to

25    distinguish those two groups if all you look at is the fluoride

 1  exposure.

 2          **THE COURT:**  And the .13 and .15 -- .59 is the mean or

 3  median?

 4          **THE WITNESS:**  Those are -- would be the mean.

 5          **THE COURT:**  The mean?

 6          **THE WITNESS:**  Water -- mean concentrations of fluoride

 7  in the drinking water.

 8          **THE COURT:**  But there's -- you're saying there's

 9  substantial overlap within each group.  If you look at the

10  curve distribution --

11          **THE WITNESS:**  If you look at the exposures.

12          **THE COURT:**  -- there would be an overlap?

13          **THE WITNESS:**  Right.

14          **THE COURT:**  And that tends to bias towards the null?

15          **THE WITNESS:**  Right, because you can't -- you can't

16  distinguish the two groups in terms of exposure.

17          And that's why the analysis with the individual

18  measures of exposure is better.  That combines the two groups

19  into one group and spreads them out over the distribution of

20  exposure, whichever source their exposure came from.

21          **THE COURT:**  Okay.  All right.  Thank you.

22  **BY MR. CONNETT:**

23  **Q.**  Dr. Theissen, wasn't that the whole point of the MIREC and

24  ELEMENT birth cohort studies, to do analyses of individualized

25  exposures so that we can get away from the problems that come

1   with group average exposures?

2   A.   Yes.

3          MR. ADKINS:  Objection, foundation.

4          THE COURT:  Overruled.

5   BY MR. CONNETT:

6   Q.   So I want to turn now back to the McPherson study.

7        And Dr. Theissen, in your testimony yesterday, you were

8   explaining for the Court how infants who are fed formula --

9   fluoridated water in their formula, that that's a susceptible

10  subset of the population.  Do you recall that?

11  A.   Yes.

12  Q.   And we talked about the statement from the EPA, which is

13  in Exhibit 18, where the EPA stated, quote, "The neonatal stage

14  is a period of rapid development of the nervous system and is

15  considered a critical window of development."

16        Do you recall that discussion?

17  A.   Yes.

18  Q.   Okay.  Now, for the McPherson study, was there any

19  exposure given to the newborn rats that would replicate the

20  situation we have in the human population of formula feeding

21  the child with fluoridated water?

22  A.   No.  The McPherson study had no comparable fluoride

23  exposure during the early post-natal period of the babies --

24  baby animals.

25        And there's very little fluoride in milk, so even though

 1    the mothers continued to have fluoridated water or water with

 2    the experimental concentration of fluoride in it, the babies

 3    would have had minimal exposure to the fluoride.

 4         Also, in that study the fluoride exposure did not start

 5    until something like gestational day six, so the very earliest

 6    part of gestation was not included.

 7    Q.   Going back to the infancy part of the study, the weaning

 8    pups, were they -- they were being breastfed for the whole time

 9    of that -- of their development?

10    A.   Right.  They were with the mother rats until -- until

11    weaning.  It took a few weeks.  I'm not sure exactly how long.

12    Q.   Now, I want to move on to a statement that counsel had

13    asked you, and maybe I was unclear about it, but I just want to

14    maybe clarify something.

15         I think the question that counsel asked you was, quote,

16    "Even if there was no harm at .7 ppm, there would still be a

17    risk if there was harm observed at 1.5 or 2 ppm."  Okay?  I

18    want to just go back and ask you a little bit more about that,

19    okay?

20         For that statement did you mean, as an objective reality,

21    there is no harm at .7, or did you mean to say that at .7 ppm

22    we have not yet observed the harm for that hypothetical?

23              MR. ADKINS:  Objection, leading, compound.

24              THE COURT:  Overruled.

25              THE WITNESS:  There has been observed harm at .7

1   because there's been observed harm in, for instance, the MIREC

2   study where the fluoridation level is actually .6 on average in

3   principle, .7 with the fluoridation level, but there has been a

4   harm observed.

5          The -- given the range of exposures, the range of

6   water intake, it's -- the only way to say that a given level --

7   a given concentration of fluoride in the water has no effect is

8   if the high consumers of water at that level show no effect,

9   and if you have enough in them -- enough of them in the study

10  to see that.

11  **BY MR. CONNETT:**

12  **Q.**   So moving on, the Court asked you some questions regarding

13  the use of a point of departure that is expressed in terms of a

14  milligram per liter as opposed to a point of departure where

15  you do the additional calculation of the milligrams per

16  kilogram per day dose.  Do you recall that discussion?

17  **A.**   Yes.

18  **Q.**   If you do that extra calculation -- okay? -- of turning

19  the water fluoride level into a dose, would the proportion or

20  the margin between the point of departure and the exposure

21  level, would it materially change in any meaningful way?

22          **MR. ADKINS:**  Objection.  Your Honor, this is outside

23  the scope of disclosed opinion.  And the witness even testified

24  that she didn't, in fact, do this calculation.

25          **MR. CONNETT:**  Your Honor, I think this was actually

 1    the subject of --

 2              **THE COURT:**  Overruled.

 3              **THE WITNESS:**  The intake range of water is very broad,

 4    so you'd have to be very careful.

 5              If your -- if your point of departure starts with a

 6    concentration, then that has to be defined in terms of an

 7    intake level.  If that point of departure was defined for a

 8    group at a given water concentration, you've got to define that

 9    group's intake in terms of an average, for instance, but

10    realizing that a lot of the group will have higher exposures;

11    or you can look at the high-end exposure, but the range of

12    intake has to be taken into account somehow.

13              My first example to the Court was the baby being fed

14    bottle -- being fed fluoridated water in the formula,

15    bottle-fed baby.  And you could -- you could put that average

16    intake of water from bottle feeding in the numerator to

17    calculate that baby's exposure at the point of departure.  And

18    you would also put it in the denominator to calculate that

19    baby's exposure at the exposure level of interest, in which

20    case they cancel out.

21    **BY MR. CONNETT:**

22    **Q.**  So if you know the average exposure at 1.5 ppm, you have

23    it in terms of a water fluoride concentration, will the margin

24    between that average exposure for the hazard, will that margin

25    be any different with respect to the exposure level whether you

1  use -- whether you express it in terms of milligrams per liter

2  or milligrams per kilogram per day?

3  **A.**   For the same defined intake, it would be the same.

4  **Q.**   So let's turn now to the Thippeswamy study and -- which is

5  Trial Exhibit 111.

6        **THE COURT:**  Hold on for a second.

7        So you just said for the same defined intake it would

8  be the same because it applies to the numerator and the

9  denominator.

10       **THE WITNESS:**  Right.

11       If you defined the point of departure in terms of an

12 average intake, that is not going to -- it's going to be less

13 protective of somebody with an above-average or high intake.

14       **THE COURT:**  Right.  But it is permissible to define a

15 POD based on an average --

16       **THE WITNESS:**  Certainly you could do that.

17       **THE COURT:**  -- and calculate your margin of exposure,

18 your MOE also really kind of as an average.  I mean, you're

19 looking at average at that point?

20       **THE WITNESS:**  Right.  But if you take a point of

21 departure defined for an average intake and then you look at

22 the group of people with high-end intakes, that reduces

23 whatever margin of exposure there was.

24       **THE COURT:**  Right.  I mean, you would account for that

25 in calculating your benchmark MOE I presume, that knowing that

1   you're using averages, but there are subgroups --

2          **THE WITNESS:**  There are subgroups --

3          **THE COURT:**  -- that are going to be more

4   susceptible --

5          **THE WITNESS:**  Right.

6          **THE COURT:**  -- that might inform the size of the BMOE?

7          **THE WITNESS:**  Right.  Well, the size of the MOE.

8          **THE COURT:**  The size of the MOE.

9          **THE WITNESS:**  That would reduce the margin of

10  exposure.

11         **THE COURT:**  Okay.

12  **BY MR. CONNETT:**

13  **Q.**   Dr. Theissen, on that very point, just to kind of go back

14  just to explain that concept a little bit, in the critical

15  studies that EPA used to derive the LOAEL for PCE

16  neurotoxicity, did EPA look at the average exposures amongst

17  the impacted groups in those studies?

18  **A.**   I believe that was average exposures -- average -- the

19  point of departure came from workplace exposures that were at

20  least partly based on measurements, but I believe they went

21  with an average exposure.

22  **Q.**   So turning back to the Thippeswamy study, I don't know if

23  counsel asked you what the size of that study was, but you see

24  here in the exhibit it was a total of 90 pregnant women for

25  each group?

 1    A.    Right.

 2    Q.    And the Till 2018 study had how many women in that study?

 3    A.    Almost 1,600.

 4    Q.    And the Thippeswamy study, where was it conducted?

 5    A.    In India.

 6    Q.    And the women in the Thippeswamy study were fasting; is

 7    that right?

 8    A.    They were fasting urine samples, yes.

 9    Q.    And that's not -- the Till study did not have fasting

10    samples?

11    A.    Not necessarily.

12    Q.    And what -- in terms of why there may have been a lower

13    correlation between water fluoride and urine fluoride in the

14    Thippeswamy study than Till, could you explain what relevance,

15    if any, the low fluoride -- the low-water fluoride

16    concentration in that study could have had on that?

17          Maybe Dr. Theissen -- I'm sorry.  That was a poorly

18    phrased question.  I'm going to ask it again.

19          Is it -- is it harder sometimes to detect the sort of

20    one-to-one correlation between urine fluoride and water

21    fluoride when you're getting -- when you're getting closer to

22    the bottom of the exposure range?

23    A.    Right.  It's going to be more difficult --

24          MR. ADKINS:  Objection, leading, Your Honor.

25          THE COURT:  Overruled.  I'm allowing leading questions

 1  because of the time, but I'd like you to harness that a bit.

 2          **THE WITNESS:**  It's always going to be harder at the

 3  lower end of an exposure range to detect whatever effect you're

 4  looking at.

 5          In this case, these were fasting samples, so there --

 6  there likely was a contribution from bone fluoride, stored

 7  fluoride, which might not be as nicely related to current water

 8  fluoride concentrations.  But the one important point is if

 9  their urine fluoride -- the serum fluoride to cord-blood

10  fluoridated from all correlated with the drinking water

11  fluoride even at the low end of the fluoride concentration

12  range.

13  **BY MR. CONNETT:**

14  **Q.**  And what does it mean when the -- when you said the water

15  fluoride level, even at that low range, it was correlated with

16  the cord-blood level?

17  **A.**  The cord-blood level -- the cord-blood fluoride was

18  correlated with water fluoride.

19  **Q.**  And we've talked -- we've talked in this case about

20  placental transfer.  Does that fact have any relevance to that

21  point?

22  **A.**  Oh, yes.  The -- the cord-blood fluoride was very close to

23  the maternal serum fluoride.  Basically, whatever was in the

24  mother's fluid blood was going across the placenta to the

25  fetus, and that was producing a similar exposure to the fetus

 1   as the mother had.

 2          MR. CONNETT:  Thank you, Dr. Theissen.

 3          Those are all the questions I have for right now, Your

 4   Honor.

 5          THE COURT:  All right.  Thank you.

 6          Any recross?

 7          MR. ADKINS:  Nothing further, Your Honor.  Thank you.

 8          THE COURT:  All right.  Thank you.  Dr. Theissen,

 9   thanks for your testimony.  You may step down --

10          THE WITNESS:  Thank you.

11          THE COURT:  -- and you're excused and catch your

12   plane.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  Any other witnesses?

15          MR. CONNETT:  At this point, Your Honor, the

16   plaintiffs rest their case.

17          THE COURT:  All right.  Thank you.

18          Then we have time to start with the defense case.

19   Defense may call their first witness.

20          MR. CAINTIC:  Your Honor, at this time I'd like to

21   call Dr. David Savitz to the stand.

22          THE COURT:  All right.

23          THE CLERK:  Please raise your right hand.

24      (Witness sworn.)

25          THE WITNESS:  Yes, I do.

 1          THE CLERK:  Thank you.  Please have a seat.  Please

 2    speak clearly into the microphone, state and spell your first

 3    and last name for the record.

 4          THE WITNESS:  My name is David Savitz, D-A-V-I-D,

 5    S-A-V-I-T-Z.

 6          THE COURT:  Thank you, Dr. Savitz.  You may proceed

 7    Mr. Caintic.

 8                        __DAVID SAVITZ__,

 9    called as a witness for the Defendant having been duly sworn,

10    testified as follows:

11                      __DIRECT EXAMINATION__

12    BY MR. CAINTIC:

13    Q.   Good morning, Dr. Savitz.  Why are you here today?

14    A.   It's a complicated question, but obviously I was invited

15    to evaluate evidence on -- by the attorneys representing the

16    Environmental Protection Agency.  And the decision I think

17    is -- again, there's a lot of factors that go into that.

18          I know it's an important issue.  I am a -- I am really

19    motivated where there's opportunities to apply epidemiology to

20    important issues, and I think this is -- clearly qualifies as

21    a -- excuse me -- an important issue where epidemiology is

22    really quite central and -- yeah, again, it's -- I've been

23    increasingly interested in my career in venturing a little bit

24    out of the ivory tower into the real world.

25    Q.   Do you have an opinion on the question of whether the

1  epidemiological literature on fluoride supports there being an

2  adverse effect on IQ?

3      **MR. CONNETT:**  Your Honor, I'm going to object to this

4  and in that the scope of Dr. Savitz's opinion in this case was

5  expressly limited to a concentration range and not to the

6  general question of hazard in general.  So to the extent that

7  the opinion is limited in such a way, I won't object, but if

8  it's asking the broader question, it's an undisclosed opinion.

9      **MR. CAINTIC:**  Your Honor, I think we're going to get,

10  while we go through his opinions, that he didn't totally ignore

11  everything in the high-dose region.  He certainly is aware of

12  that literature.  He certainly was aware of that literature

13  when he was part of the NASEM review.

14      He said the most relevant, question, though, is what's

15  going on below 1.5 milligrams per liter.  That's the one before

16  this Court.

17      **MR. CONNETT:**  Your Honor, there's deposition testimony

18  directly on point here expressly stating that Dr. Savitz has no

19  opinion on the levels above 1.5 ppm because he did not consider

20  that data, is not here to dispute the effects above 1.5 ppm.

21  And if Your Honor would like, I could show the Court that

22  testimony right now.

23      **THE COURT:**  Well, so are you going to ask questions

24  along the lines that Mr. Connett has just indicated was already

25  sort of put off limits?

 1          **MR. CAINTIC:**  Well, Dr. Savitz did disclose an

 2    opinion -- he was asked frequently, and he said this in his

 3    rebuttal report to Dr. Grandean's report, "There's not a lot of

 4    literature below 1.5, there's even less in the 1.5 and 2 range

 5    and really what's driving a lot of the effects found are

 6    fluoride concentrations found in the -- what's driving a lot of

 7    the effects found is what's happening in the endemic ranges

 8    that are in the 3, 4, 5 milligrams per liter range.  I don't

 9    think that is at all news to plaintiffs.  I believe that's in

10    both of his reports, and I think that's something that he

11    certainly considered when he was on the NASEM committee.

12          **MR. CONNETT:**  Your Honor, if I -- I was -- plaintiffs

13    would ask that we show the Court the testimony right up front

14    so that we're all clear on the scope so that --

15          **THE COURT:**  What's the prejudice?  There's not a

16    surprise element, is there?

17          **MR. CONNETT:**  There is, because once Dr. Savitz told

18    me at the deposition that he is not going to testify about

19    fluoride above 1.5 ppm, he's not disputing anything the NTP has

20    said about anything above 1.5 ppm, I had no motive or interest

21    to inquire into his testimony and opinions about concentrations

22    in that range.

23          **THE COURT:**  All right.  Then show me -- I'm going to

24    have to look at these disclosure reports and the burden is on

25    the government to show me where there's disclosure of testimony

SAVITZ - DIRECT / CAINTIC

```
 1   regarding studies above 1.5 ppm.
 2             MR. CONNETT:  Your Honor, if I could, I will show the
 3   Court deposition testimony.
 4             THE COURT:  Well, is it based on deposition testimony,
 5   or is it based on disclosures in his report?
 6             MR. CONNETT:  Both.  The report -- the report -- the
 7   scope of the report --
 8             Dr. Savitz testified that his scope was expressly
 9   limited to concentrations below 1.5 ppm, and his report focuses
10   on that.
11             THE COURT:  Let me see the report.  Do you have an
12   exhibit number or, where are we --
13             MR. CONNETT:  The report is not an exhibit, Your
14   Honor.
15             THE COURT:  Hold on.
16                  (Discussion held off the record.)
17             MR. CONNETT:  There isn't as fine a point that I can
18   immediately point to from the report, Your Honor, but the
19   deposition testimony is very clear on this.
20             The report only addresses studies below 1.5 ppm.
21             At the deposition I then asked Dr. Savitz about
22   opinions related to concentration ranges above 1.5 ppm, and
23   that's where I think you will find the clarity of the record
24   here.
25             THE COURT:  Well, I'm going to put the burden on the
```

 1  government to show me where.  I mean, I have various things.  I

 2  have the CV, I have assessment of 8/4/23, which is docket

 3  378-7.  Is that what we're talking about?  Is it the --

 4          **MR. CAINTIC:**  Your Honor, I don't think that this

 5  should all be a surprise.  I mean, I have here -- so this is

 6  not in evidence, so I don't -- I don't know exactly how I'm

 7  going to refer to it, but when -- for example, in the rebuttal

 8  report, Dr. Savitz is referring to or rebutting opinions by

 9  Dr. Grandean.  He says, "In most of the research, the results

10  are examined to estimate a linear trend across the range of

11  exposure experienced by the study participants.  The

12  statistical methods yield an overall estimate of the shape of

13  the dose-response gradient, but the estimate is based on the

14  range of exposures included in that study" and then discusses

15  these -- you know.  "If a hypothetical study examines fluoride

16  exposure between 3 and 10 milligrams per liter can be

17  generated" -- let's see where else.

18          There's another part that says, "The information value

19  of the studies is determined by several factors for addressing

20  the potential health impact and the exposure range of water

21  fluoridation.  A key determinant is whether the exposure range

22  in the study corresponds to fluoride levels of interest less

23  than 1.5 milligrams and closer to .7 and, in fact, to address

24  the potential health impact of water fluoridation, the most

25  informed studies are those that directly examine exposure

1   differences resulting from fluoridation both using biomarkers

2   and those comparing populations served by fluoridated versus

3   nonfluoridated water."

4          "The meta-analysis" -- so it's referring to the NTP

5   meta-analysis -- "glosses over those distinctions and is

6   dominated by studies of endemic fluoride exposure in low' and

7   middle-income countries."

8          I mean, I think that this theme is laden throughout

9   his report.

10         THE COURT:  I still haven't heard anything about the

11  specific point if you're talking -- your point is about low --

12  you know, the geography, not to the -- not to the exposure

13  levels, so I'm still not hearing anything where that was

14  discussed, where there's been some discussion of the

15  dose-response curve being driven by upper-end exposure.

16         MR. CONNETT:  Your Honor --

17         THE COURT:  Hold on.  Hold on.

18         MR. CONNETT:  Excuse me.

19         THE COURT:  Let him finish.

20         MR. CAINTIC:  So for example, here's another instance.

21  "The NTP review fails to account for the studies' notably

22  different contributions to the question of whether fluoride

23  exposure at relatively low levels may cause adverse

24  neurodevelopmental outcomes.  The 19 studies judged to be high

25  quality include many from the study of endemic fluoride in

1    China, n = 10; India, n = 3; or Iran, n = 1, that have very

2    little applicability to the U.S. population given the exposure

3    source, levels and socioeconomic differences.

4           "To weigh this equally with the results of the ELEMENT

5    and MIREC studies reflects a failure to recognize that

6    prospective longitudinal cohort studies are superior

7    cross-sectional studies and that there is a loss of relevance

8    in the extrapolation from epidemic fluoride to water

9    fluoridation and extrapolation from lower- and middle-income

10   settings in Asia to a high-income setting in North America."

11          I think throughout the report, the idea is he -- he

12   did a broader review of these studies above 1.5, but that

13   wasn't a focus of his report.  I don't think that keeps out any

14   statement that he can say about the studies that are above 1.5.

15   He clearly had expressed an opinion about that.

16          **THE COURT:**  All right.  Let me hear about the

17   deposition question.

18          **MR. CONNETT:**  Your Honor, I'm going to quote from page

19   29, line 13 to 30, line 5:

20          "**QUESTION:**  The question that I was asked to address and

21          tried to address is whether exposures to fluoride in the

22          range of under 1.5 milligrams per liter have adverse

23          health effects.  Obviously that is of interest in part

24          because that is where community water fluoridation falls."

25          So that's -- that's him --

 1              THE COURT:  Well, but that's saying whether exposures

 2      below that range have an adverse effect.

 3              The answer to that may be informed by studies above

 4      that effect.  That doesn't say he's not going to talk about

 5      anything about above that.

 6              MR. CONNETT:  I will quote further.

 7              THE COURT:  Okay.

 8              MR. CONNETT:  Page 94.

 9          "ANSWER:  I did not attempt to examine the literature on

10          exposures in a higher range to form an independent

11          opinion.  It may be totally aligned with the NTP, it may

12          be at odds with the NTP, but I did not undertake the task

13          of looking at those studies individually to make my own

14          assessment."

15          I asked Dr. Savitz do you disagree with a bunch of NTP

16      conclusions on confounding and bias and he says, "I have no

17      opinion on that, I did not attempt to assess that."

18              MR. CAINTIC:  Your Honor, if I may, I think there may

19      be a distinction here that's being lost.  I think there's a

20      difference in eliciting testimony from Dr. Savitz that is going

21      to be going through every single one of these high-dose

22      studies -- right? -- and commenting on all of those.  But the

23      general proposition that there are -- there's a group of

24      studies above 1.5 that seem to show a consistent -- a more

25      consistent pattern of effects but that are outside the range of

 1   relevance, that's going to be the primary subject of

 2   Dr. Savitz's testimony.

 3          But what I don't think is fair is this insinuation

 4   from plaintiff's counsel that he therefore cannot comment on

 5   the literature above 1.5 at all.

 6          THE COURT:  Well, it may be a question of degree, that

 7   he's not prohibited from making any reference to that in a

 8   larger context, but if he attempts to go into the power of any

 9   of those or the effect, there it does seem that you were -- you

10   were essentially deterred from getting into that level.

11          So essentially, to put it bluntly, I mean, a very

12   surface level, I'll take evidence on that; but if it starts to

13   get into justifying and trying to give weight and power to some

14   of these studies relative to others, that -- that gets you into

15   a world that I think is problematic.

16          MR. CAINTIC:  And I think, Your Honor, over the course

17   of the direct examination you will see that Dr. Savitz's

18   testimony about really the nitty-gritty of each study will be

19   focused on what we think are the relevant exposure ranges below

20   1.5.

21          THE COURT:  Well, and that's the main thing that

22   we're -- why he's here, and that's what I wanted to hear.

23          But I'll allow this contextualization, if you will,

24   okay?

25          MR. CAINTIC:  Thank you, Your Honor.

SAVITZ - DIRECT / CAINTIC

1    BY MR. CAINTIC:

2    Q.   Dr. Savitz, how about before we get to that question we

3    learn a little bit about your background.

4         What is your profession?

5    A.   I'm an epidemiologist.

6    Q.   And what degrees do you hold?

7    A.   I have a Ph.D. degree in epidemiology, a Master of Science

8    in preventive medicine.

9    Q.   And where do you currently work?

10   A.   I'm professor of epidemiology at Brown University School

11   of Public Health.

12   Q.   Do you hold professorships at any other universities?

13   A.   I should say I also have affiliations at Brown in the

14   medical school with the Department of Obstetrics and Gynecology

15   and Pediatrics and I have adjunct professor appointments at

16   Dartmouth University, Boston University and the University of

17   Pittsburgh.

18   Q.   Do you -- have you held any academic leadership positions

19   while at Brown University?

20   A.   I've had a number of senior leadership positions over the

21   course of my career there.  The peak, I would say, was vice

22   president for research for the university from 2013 to 2017,

23   but then also associate dean for research in the school of

24   public health and two rounds of being department chair, a brief

25   period as interim dean, so I've had a number of positions.

1    Q.    And what were your responsibilities as the vice president

2    of research for Brown University?

3    A.    I was considered the senior research officer in terms of

4    working directly with the provost, occasionally with the

5    president, in crafting the strategy for advancing the research

6    mission of Brown.  This would involve working with deans.  We

7    had a certain amount of funds to allocate to invest in areas

8    that seemed like promising avenues for the university where we

9    thought we could make a contribution to important issues and

10   really excel in advancing knowledge.

11   Q.    And you said you were the department chair of epidemiology

12   at Brown University?

13   A.    That's correct, yes.

14   Q.    What were your duties and responsibilities in that role?

15   A.    In that role, again, for academics, the usual sorts of

16   things, but it's involving hiring and mentoring faculty,

17   overseeing the educational program, the graduate program,

18   making sure the courses are taught, you know, troubleshooting

19   but really trying to sort of guide and lead the department,

20   trying to be sort of a source of cohesion for the enterprise.

21   Q.    And what did you do before your time at Brown?

22   A.    Just prior to that I was at Mount Sinai School of Medicine

23   and where I directed the Center for Disease Promotion --

24   Disease Promotion.  Let me clarify that.  Health -- Disease

25   Prevention and Health Promotion and was professor in the

1  Department of Preventive Medicine.

2  **Q.**   What was your role as director of the Disease Prevention

3  and Public Health Institute?

4  **A.**   That -- again, working in a medical school environment

5  really trying to coalesce the epidemiology activity and

6  integrate epidemiology into a much broader biomedical research

7  enterprise.

8  **Q.**   And before your time at Mount Sinai where were you?

9  **A.**   I was at the University of North Carolina for almost 20

10  years where the last ten of which I was chair of the Department

11  of Epidemiology there.

12  **Q.**   And before that where were you?

13  **A.**   Going back aways the Department of Preventive Medicine at

14  the University of Colorado School of Medicine was my first

15  faculty position when I graduated.

16  **Q.**   And what are you research interests?

17  **A.**   The two themes of my research are environmental

18  epidemiology and perinatal reproductive epidemiology.

19  **Q.**   Can you explain more what you mean by environmental

20  epidemiology?

21  **A.**   Sure.

22      Really, the study of the influence of environmental agents

23  on health, disease risk; a variety of diseases including

24  reproductive health but also cancer and other -- other

25  conditions and trying to sort of inform regulation, inform

1    individual decision-making but trying to advance knowledge

2    about the potential and real impact of the environment on

3    health.

4    **Q.**   Have you done any research into drinking water exposures?

5    **A.**   I've done a number of studies related to drinking water, a

6    study of drinking water chlorination byproducts, disinfection

7    byproducts and reproductive health outcomes focusing on

8    miscarriage but also other -- other pregnancy outcomes and also

9    work with perfluoroalkyl substances, PFAS as they're called, in

10   relation to reproductive health outcomes.

11        I've had incidental involvement with others, but those

12   were major large-scale data-gathering projects focusing on

13   drinking water.

14   **Q.**   Have you developed any particular research focus in the

15   last 10 to 12 years?

16   **A.**   I've been increasingly interested in the application of

17   epidemiology, the integration of information from the research

18   and really trying to transmit it into -- in forums where there

19   would be a value in integrating and explaining what we've

20   discovered.

21        I've written a number of papers on it, I wrote a book on

22   interpreting epidemiologic evidence and so it really has

23   become -- I would call it "applied methods" as a theme.

24   **Q.**   Applied methods, does that mean the ability to draw causal

25   inferences or associative inferences from research?

1   **A.**    It's basically -- I mean, there's a unifying theme there,

2   and it's examining evidence from epidemiologic studies to make

3   an informed assessment of the extent to which the research is

4   accurately assessing the potential causal effect.

5        I would hesitate a little bit.  It's not to show their

6   causal effects, it's to use the evidence to make an informed

7   judgment about the extent to which there is evidence that would

8   be consistent with a causal effect.

9   **Q.**    And your CV is in evidence, it's 58 pages long, so for

10  everyone's benefit I'm not going to go through all of it.

11       How many epidemiological studies have you published?

12  **A.**    It's something over 450 papers, I believe now.

13  **Q.**    Do you have an estimate of how many of those studies

14  relate to pregnancy?

15  **A.**    I -- again, I haven't gone through the exact counting, but

16  I would estimate probably 120 -- 100 to 150, I would say.

17  **Q.**    Do you have an estimate of how many of those studies are

18  about environmental exposures to pregnant women and then the

19  children's health outcomes?

20  **A.**    Maybe, again, 30 or 40, I would say.

21  **Q.**    And have you ever published studies on child

22  neurodevelopment?

23  **A.**    I have several studies, yeah.  I did some papers on PFAS

24  and neurodevelopment.  Some years ago I did some other work

25  related to neurodevelopment.

1    Q.   And are you involved with any scientific journals?

2    A.   I am.  I've -- in the past, I've been an editor at two of

3    the major journals, *Epidemiology* and the *American Journal of*

4    *Epidemiology*.

5         I continue to be on the editorial board of the American

6    Journal of epidemiology.

7         I do an awful lot of reviews -- peer review of manuscripts

8    is -- I would say one every two weeks the way things are going

9    lately, but -- so I'm still involved not as in as sort of an

10   ongoing day-to-day position as I have been in the past.

11   Q.   And can you describe the difference between being on an

12   editorial board versus being an editor of a journal?

13   A.   Editorial board usually implies a commit to provide

14   service, to review a certain number of manuscripts a year, be

15   available to consult with the editor if needed.  When you're an

16   editor, you have the full responsibility for handling a

17   manuscript, of identifying and assigning reviewers,

18   incorporating those reviews and making a decision about the

19   acceptance of the manuscript.  It's more of a direct authority

20   over the journal as compared to simply advising from the

21   outside.

22   Q.   And when you say the editor selects reviewers, you mean

23   peer reviewers?

24   A.   Yes.

25   Q.   Okay.

SAVITZ - DIRECT / CAINTIC

1   **A.**   They identify people who would provide an informed review

2   and then have to decide at the end what to make of it.

3   **Q.**   And are you an editor at any journals?

4   **A.**   I am -- at present, as I said, I'm an editor -- I'm not an

5   editor in the demanding sense, more of an editorial board, and

6   so I do a lot of reviews, as I said, but I'm not currently

7   reviewing for any major journals.

8   **Q.**   Had you been an editor for any major journals?

9   **A.**   I had been, again, for these two, *Epidemiology* and the

10  *American Journal of Epidemiology*, and occasionally I'm brought

11  in as sort of a pinch-hitter on *American Journal of*

12  *Epidemiology* because I have that history.

13  **Q.**   Are you a member of any professional societies?

14  **A.**   I am.  The Society for Epidemiologic Research and the

15  Society for Pediatric and Perinatal Epidemiologic Research and

16  the International Society for Environmental Epidemiology.

17  **Q.**   And have you held any leadership positions in any of those

18  societies?

19  **A.**   I have.  I served as President of the Society for

20  Epidemiologic Research and a President of the Society for

21  Pediatric and Perinatal Epidemiologic Research.  I was regional

22  counselor to the International Epidemiology Association and

23  also to the International Society for Environmental

24  Epidemiology.

25  **Q.**   What is the National Academies of Science, Engineering and

1   Medicine?

2   **A.**   The National Academies is an independent organization that

3   was created quite awhile ago I think under Abraham Lincoln, if

4   I'm not mistaken, to provide advice to the government on issues

5   where science was pertinent to their decision-making, sort of

6   an advisory group with a broad -- a broad nature but funneling

7   the scientific evidence into policy.

8   **Q.**   And are you an elected member of NASEM?

9   **A.**   I am.  I was elected in 2007 as a member of the National

10  Academy of Medicine.

11  **Q.**   What does it take to become an elected member of NASEM?

12  **A.**   I mean, you have to be nominated by two current members

13  and then there's a vote of the entire membership to select new

14  members each year.

15  **Q.**   And what are your responsibilities as an elected member of

16  NASEM?

17  **A.**   You know, again, it's not laid out in fine detail, but the

18  expectation is that you will be willing to provide service when

19  called upon where your expertise is needed, and sort of a more

20  informal commitment to serve the organization.

21  **Q.**   As part of your responsibilities as an elected member of

22  NASEM, do you serve on committees?

23  **A.**   I've served on quite a few committees, yes.

24  **Q.**   And what does a NASEM committee do?

25  **A.**   In the broadest sense, they are given a charge.  There's

```
 1   somebody that has a question and is basically funding the
 2   agency to seek an answer, and they are asked to weigh in, offer
 3   an expert assessment of a topic that is considered important,
 4   to deliberate and provide a report that summarizes their
 5   assessment of the issue that's been presented to them.
 6   Q.   And what kind of issues does NASEM typically address?
 7   A.   Even just the -- as an organization it's everything under
 8   the sun, everything you could imagine.  Even just within my
 9   scope, it's ranged from looking at health effects of
10   ecigarettes.  I just finished a committee report on advising on
11   complimentary feeding of infants under age 2 for -- the CDC was
12   interested.  I've done quite a few reports on veterans' health.
13   That's been a theme that has come up several times of
14   evaluating an issue of concern to veterans where there's a
15   desire to have independent scientific assessment to inform the
16   Veterans Administration about how to be -- how to best respond
17   to that issue.
18   Q.   And how many NASEM committees have you served on?
19   A.   I would guess it's 20 by now over the years.
20   Q.   How many NASEM committees have you chaired?
21   A.   I think, at last count, it was 12.
22   Q.   You received any honors for your work on NASEM committees?
23   A.   I did.  A couple of years ago I was genuinely quite
24   honored I received the David Rall Medal, which is named for I
25   believe the founding director of the National Institutes of
```

1  Health Sciences.  And I think the phrasing is "For exceptional

2  service as a committee chair."  That was the theme.

3  **Q.**   Were there any particular committees that were singled out

4  for why you got the David Rall medal?

5  **A.**   The one that was mentioned was, I had been on a committee

6  evaluating the research into potential health effects from

7  veterans who served at Camp Lejeune in relation to the water

8  contamination that had occurred there, which is actually back

9  in the news -- I don't know if it ever left in the news, but

10  it's certainly back in the news quite prominently these days.

11  **Q.**   Before EPA approached you to serve as an expert in this

12  case, what was your experience with the epidemiological

13  literature on fluoride?

14  **A.**   I had had really very little knowledge of the issue.

15     A long time ago I do remember there was some concern about

16  a potential carcinogen effect of fluoride and I was on the

17  Board of Scientific Counselors at the National Cancer Statute.

18  It wasn't a major issue or a major theme, but I do remember a

19  little bit of information on it then, but I had actually not

20  been following the literature that we're talking about here.  I

21  hadn't been aware of this occurring until the National

22  Academies approached me for the -- to serve as the chair of

23  that committee.

24  **Q.**   And what particular committee are you talking about?

25  **A.**   I'm sorry.  The -- I was asked -- asked to serve as the

 1  chair of a committee to review the draft monograph of the

 2  National Toxicology Program addressing neurodevelopment --

 3  neurodevelopmental health in relation to fluoride exposure.

 4  **Q.**    And how many times did that NASEM committee review the NTP

 5  Monograph?

 6  **A.**    We had two rounds of review.  The first one I believe is

 7  2020 and then one in 2021.

 8         So we reviewed a draft, offered comments, received another

 9  draft which we reviewed and then provided comments, and that

10  ended the process.

11  **Q.**    And what was the NASEM committee's charge?

12  **A.**    The charge was actually quite narrow in a sense.  We were

13  not asked to independently evaluate the evidence.  We were

14  asked to review a document and assess whether the document had

15  followed the guidelines for doing systematic reviews -- they

16  have their own internal rulebook for that -- and also then to

17  assess more broadly whether the research -- the activity they

18  had done, the synthesis they had done supported their

19  conclusions at the end.  Was the document sort of

20  self-contained to help you -- to make a convincing case, given

21  what they reviewed that they came to a conclusion that was

22  justified by the evidence.

23  **Q.**    And we'll get to the NASEM committee's conclusions --

24  **A.**    Okay.

25  **Q.**    -- later on in your testimony.  But just so we're clear on

 1  your background, were you aware of the controversy surrounding

 2  fluoridated water before your time on the NASEM committee?

 3  **A.**   Again, I had not been aware of this current or most recent

 4  round of controversy.  I was aware of some level of controversy

 5  a long, long time ago.

 6  **Q.**   Were you aware of this litigation?

 7  **A.**   No, I was not.

 8  **Q.**   Had you ever researched fluoride before your time on the

 9  NASEM committee?

10  **A.**   I had not done any work that was specifically focused on

11  that, no.

12  **Q.**   Had you ever conducted any original research on fluoride?

13  **A.**   No, I had not.

14  **Q.**   You served as the NASEM committee's chair.

15       Did any of the other members of the NASEM committee, to

16  your knowledge, conduct original research on fluoride?

17  **A.**   You know, it's possible that there -- again, they're very

18  productive scientists on the committee.  It's possible they had

19  some activity related to fluoride, but it certainly was not a

20  major theme with which any of them would have been identified

21  as a primary research focus.

22  **Q.**   So based on your experience serving and chairing NASEM

23  committees, why would the NASEM committee on NTP's fluoride

24  monograph be comprised of scientists who had not conducted

25  original research on fluoride?

**A.**   It's really -- it isn't just for this committee.  It's a

very consistent theme there that when they are constituting a

committee, they need certain kinds of disciplinary expertise,

there's no question.  We needed, in our case, toxicology and

epidemiology, experts in systematic reviews and so on.  But

they're also very careful not have people who have a vested

interest in the outset in what the report will ultimately say.

     We have a fairly formal assessment of bias, and it's

largely but not exclusively around financial matters.  It can

be issues of have you taken a public stance, have you been an

advocate.

     And so at the end they do this vetting to try to get a

committee that can truly approach it with an open mind.  And

that may be harder than it sounds.  With academics and

researchers, as they engage in a research topic, they often

form a tentative even opinion about where it's headed.  And the

goal here is to have people who can truly suspend all judgment

and approach it fresh.

     And I think, again, they do a very good job with that, in

my view.

**Q.**   After this trial do you plan to conduct your own original

research on fluoride?

**A.**   You know, it's a very interesting topic.  I would be

attempted, as an academician, but I certainly recognize, having

been involved in this way, it would be inadvisable for me to

 1    pursue this as my own personal research agenda.

 2        And I say that because I think that even if I were truly

 3    able to approach it in an unbiased manner -- and I would like

 4    to believe I can -- I think there would be a perception that

 5    because I had been engaged on behalf of EPA that I might

 6    somehow be reluctant to do research that is somehow counter to

 7    EPA policy, let's say.  And it's -- on controversial issues, it

 8    is -- it is quite important not just to do good work but to do

 9    credible work that will be accepted at the end based on its

10    merits and not considered to be tainted somehow by the -- by

11    the predilections of the researcher.

12    Q.   Dr. Savitz, besides serving on this case and chairing the

13    NASEM committee, do you have any other experience reviewing the

14    fluoride epidemiological literature?

15    A.   I was invited by Health Canada to serve on a panel to

16    advise them regarding fluoride in water.  I can't remember when

17    the initial invitation came, I think it was early in calendar

18    year 2023, but there was a panel meeting that met in June of

19    2023 in Ottawa to, again, offer advice from a collection of

20    people with expertise to help inform their decision-making

21    process.

22    Q.   Who else was on that panel?

23    A.   The -- it was chaired by Rita Schoeny -- I think spelled

24    S-C-H-O-E-N-Y -- a former EPA risk assessor who is a

25    consultant, she chaired it; it included Steven Levy, who's a

 1  dental epidemiologist at Iowa; David Bellinger, a developmental

 2  psychologist and epidemiologist at Harvard.  Oh, boy now

 3  there's a toxicologist from Cincinnati whose name I cannot

 4  recall off the top of my head, but I believe that was the

 5  group.

 6  Q.   And Dr. Savitz, this is the expert panel that -- well, let

 7  me just say first:  Dr. Savitz, you were seated in the gallery

 8  of this courtroom at the beginning of the trial day today,

 9  right?

10  A.   Yes, I was.

11  Q.   And this is the Health Canada panel that the attorneys

12  were discussing?

13  A.   That's correct.

14  Q.   Okay.  What was Health Canada trying to accomplish in

15  convening the expert panel?

16  A.   I think, again, it's a little bit parallel to the National

17  Academies in that they wanted what they saw as an independent

18  source of information sort of separated from those who actually

19  have to make decisions and implement -- implement policy.

20       In other words, to have this airing of views having the

21  just extended discussion so that at the end they would go back

22  and make the decisions, which will -- I guess is in progress,

23  but seeking the independent input from outsiders.

24  Q.   And what were the health endpoints that you were examining

25  as part of that Health Canada expert panel?

SAVITZ - DIRECT / CAINTIC

1  **A.**   Well, it started off really, I mean, at the broadest

2  sense, of any possible health concern related to fluoride, but

3  it quickly zeroed in on the ones that had the most evidence and

4  the most relevance and it ended up in the focus on adverse

5  effects of looking at dental fluorosis and noncognitive

6  development.

7  **Q.**   And what did the Health Canada expert panel review in

8  coming to its opinions on the fluoride and I guess various

9  endpoint literature?

10  **A.**   We were provided with a number of fairly large documents,

11  including the version of the NTP systematic review and the

12  meta-analysis that was available at that time.

13       The Risk Sciences Institute had been commissioned to

14  develop a monograph of sorts on providing background

15  information.  There were several other Canadian agencies that

16  had performed reviews at various points in time.  I don't

17  remember the names of those agencies, but we were provided with

18  that.  And of course those of us who had been more involved

19  with the issue had done our own reading independent of that and

20  had familiarity with some of the relevant studies.

21  **Q.**   And when did the Health Canada panel meet again?

22  **A.**   It was early -- I think the first week in June of 2023.

23  **Q.**   And when did you file your first expert report in this

24  case?

25  **A.**   It was in the -- in the fall, I believe, I think Sept --

 1  again, I don't -- I'm sorry, I don't know for sure, but I think

 2  I'm going to say September and hopefully that's close.

 3  Q.   In the June meeting was it just the expert panel members

 4  or were other folks there as well?

 5  A.   There were a number of people there from Health Canada, of

 6  course the ones who had commissioned it.  And also there were a

 7  number of members of the team affiliated with this

 8  organization, Risk Sciences Institute, that had developed the

 9  document that we were provided with at that time.

10  Q.   And what were -- strike that.  Let me start again.

11       Did the Health Canada expert panel memorialize their

12  conclusions in any document?

13  A.   They -- we did.  We just -- again, it was just released

14  recently, as was discussed before we started.

15       A couple of weeks ago, I don't remember the exact date,

16  the final report came out.

17       We had been provided with drafts earlier so that the

18  entire panel had to agree with the wording and the way that the

19  information was presented, but a recent relatively brief

20  synopsis of the panel's assessment was distributed, it was

21  released.

22  Q.   And what was the Health Canada expert panel's conclusions

23  regarding fluoride and various endpoints?

24  A.   The assessment was, again, I think we said at the

25  beginning that really the focus very quickly turns to the two

1    endpoints that were developed in a little more detail, dental

2    fluorosis and neurocognitive development, and the

3    recommendation ultimately was to focus -- to predicate the

4    decision-making -- the risk assessment on dental fluorosis

5    using fairly standard evidence for that and that our assessment

6    of the neurocognitive disorders was that it is potentially

7    important but not advanced and convincing enough to be used as

8    the basis for a risk assessment.

9              MR. CAINTIC:  And Mr. Hambrick, if we could go to --

10   this is internal number SV6.  And Your Honor, given the Court's

11   ruling this morning, this is the expert panel report that was

12   discussed.  We will have it stamped and admitted into evidence.

13             I believe that when we stamp, the page number stamps

14   should be the same as the PDF page numbers.

15             THE COURT:  All right.  So right now we're identifying

16   as SV6 but it will be given an exhibit number?

17             MR. CAINTIC:  It will be given an exhibit number, yes.

18             THE COURT:  Okay.  Well, why don't you formally move

19   to admit at this point so the record is clear.  Is there some

20   reason --

21             MR. CAINTIC:  Your Honor, at this time I move to

22   admit -- well, I don't have an exhibit number right now.

23             THE COURT:  Well, it's been identified as SV6.

24             MR. CAINTIC:  Right.

25             Your Honor, at this time I would like to move to admit

 1   what has been identified as SV6, the expert panel's -- "Expert

 2   Panel Meeting on the Health Effects of fluoride in Drinking

 3   Water:  Summary Report" dated June 8 to 9, 2023.

 4          THE COURT:  All right.  It's admitted as for reasons I

 5   previously stated.

 6          (Trial Exhibit 128 received in evidence)

 7          MR. CAINTIC:  And Mr. Hambrick, if we could turn to

 8   page PDF 11.  And if we could blow up -- it doesn't have to be

 9   the whole paragraph, just -- but zoom in on the selection of

10   point-of-departure paragraph.

11   BY MR. CAINTIC:

12   Q.   Okay.  And Dr. Savitz, I'm just going to read the second

13   sentence here.  "The point of departure for noncognitive

14   effects (i.e., IQ reduction) is not yet well defined because of

15   uncertainties, including the shape of the exposure-response

16   curve at low concentrations of fluoride in drinking water.

17   Therefore, moderate dental fluorosis was selected as the key

18   endpoint of concern with a point of departure of 1.56

19   milligrams per liter in drinking water."

20          Can you explain what that means?

21          MR. CONNETT:  Your Honor, I'm going to object just so

22   that we're clear on the scope in terms of this is testimony

23   regarding this panel as exposed to expert opinion in this case.

24          MR. ADKINS:  Well, I mean, this is a late-breaking

25   development, and I think it's something the Court should

 1    consider and I've ruled I need to consider.  And although this

 2    wasn't disclosed in advance under Rule 702, I think there are

 3    extenuating circumstances here, so I am going to allow

 4    testimony on that, so objection overruled.

 5    **BY MR. CAINTIC:**

 6    **Q.**   Dr. Savitz, I just read two sentences from this paragraph.

 7    Can you explain for the Court what the panel meant by this?

 8    **A.**   This was the result of the collection of us, the

 9    epidemiologists, toxicologist, risk assessor, to make a

10    judgment that integrates our expertise and perspective.  So it

11    is an indication that the evidence available at that time is

12    worthy of attention, and we gave it a great deal of attention,

13    but that it is, as said there -- these words were chosen

14    carefully -- there are sufficient uncertainties to make it in

15    our judgment -- and I'm part of that consensus -- premature to

16    be committing to assumptions about the shape of the

17    dose-response curve and the low-end and that, therefore, the

18    recommendation was to focus on moderate dental fluorosis as an

19    endpoint that is unquestionably related to fluoride where

20    there's no doubt about the causality of that until the research

21    on neurocognitive development is better defined, whichever way

22    that goes.

23    **Q.**   And the authors or I guess the panel wrote that there was

24    a point of departure of 1.56 milligrams of fluoride per liter.

25    Can you explain where that point of departure came from?

1  **A.**   Again, I can explain it in broad terms, but it was based

2  on the evidence and it's -- it was surprising but true that

3  there's a 1942 study by an author named Dean that is still

4  thought to be some of the clearest evidence on dose-response

5  relationships of water fluoride and risk of developing dental

6  fluorosis.  And that material was used to derive this point of

7  departure.

8  **Q.**   So that 1.56 point of departure is based on the endpoint

9  of dental fluorosis?

10 **A.**   That's correct.

11 **Q.**   Okay.  And you heard some discussion this morning about a

12 systematic review that came out last evening or maybe tomorrow,

13 you received it last evening.  How much time have you had to

14 review that systematic review?

15 **A.**   I've read the abstract but not a lot more.

16 **Q.**   Okay.

17      **MR. CAINTIC:**  Well, Mr. Hambrick, if we could turn to

18 what I'll identify in the record as an internal No. SB7.

19      And Your Honor, this is the systematic review that was

20 the subject of the discussion earlier this morning.  I can move

21 to admit it now.

22      **THE COURT:**  Okay.  It's admitted.  And we'll assign an

23 exhibit number.

24      (Trial Exhibit 129 received in evidence)

25      **MR. CAINTIC:**  Right.

1   BY MR. CAINTIC:

2   Q.   Dr. Savitz, is this the systematic review that we were

3   discussing this morning?

4   A.   Yes.

5        MR. CAINTIC:   If we could turn to the next page, which

6   should have the abstract.

7   BY MR. CAINTIC:

8   Q.   And so this is as much as you've been able to read so far,

9   right?

10  A.   Yes, that's correct.

11       MR. CAINTIC:   Okay.   If we could zoom in on the

12  conclusion.

13  BY MR. CAINTIC:

14  Q.   And I'm going to read from the -- starting the second

15  sentence.   Oh, actually, I'll read from the start.

16       "The current review identified moderate dental fluorosis

17  and reduction in IQ scores in children as the most relevant

18  endpoints for establishing an HBV" -- which is a health-based

19  value -- "for fluoride in drinking water.   PODs were derived

20  for these two endpoints.   Although there is still some

21  uncertainty in the causal weight of evidence for causality, for

22  reducing IQ scores in children and considerable uncertainty in

23  the derivation of its POD, given our evaluation of the overall

24  weight of evidence, moderate dental fluorosis is suggested as

25  the key endpoint until more evidence is accumulated on possible

SAVITZ - DIRECT / CAINTIC

1  reduction of IQ score effects.  A POD of 1.56 milligrams of

2  fluoride per liter for moderate dental fluorosis may be

3  preferred as a starting point for setting an HBV for fluoride

4  in drinking water to protect against moderate and severe dental

5  fluorosis."

6      Dr. Savitz, did I read that correctly?

7  **A.**  Yes, you did.

8  **Q.**  Can you explain what this --

9      **MR. ADKINS:**  Before we go on, Your Honor, may I

10  request a brief bathroom break?

11      **THE COURT:**  Yeah.  All right.  Let's go ahead and take

12  a break.  It's time anyway.

13      **MR. ADKINS:**  Sorry to interrupt.

14      **THE COURT:**  Okay.  We'll take our afternoon break and

15  return.

16      **THE CLERK:**  Court is in recess.

17      (Recess taken at 12:19 p.m.)

18      (Proceedings resumed at 12:41 p.m.)

19      **THE COURT:**  Go ahead.  You may proceed.

20  **BY MR. CAINTIC:**

21  **Q.**  Dr. Savitz, before the break we just read over this

22  sentence here or this conclusion here.  Can you explain for the

23  Court what this conclusion means?

24  **A.**  Again, this is obviously not a report that I authored, and

25  it's related to but not a part, exactly, of what we were

1    involved with.  But with those caveats, I think I can interpret

2    where they -- why they said this or where this came from,

3    because it was consistent with the discussions we had as part

4    of the panel meeting.

5         MR. CONNETT:  Your Honor, at this point I would

6    object, given counsel's comments earlier today and the doctor's

7    comments about only having read the abstract of this paper that

8    he is not yet in a position to explain what a conclusion in an

9    abstract means.

10        THE COURT:  Well, I will allow him to explain his

11   understanding and not purport to be based on his assertion as

12   to what the authors may have intended.  I will allow him to

13   speak to his interpretation of what this means.

14   BY MR. CAINTIC:

15   Q.   Dr. Savitz, what is your assessment of what this

16   conclusion from the systematic review means?

17   A.   I think it conveys the sense that if you go through the

18   exercise of calculating a point of departure, not that it

19   should be done and they say it shouldn't be -- we're not ready

20   yet for neurocognitive, it would -- it would be a concern, and

21   that's -- they've recognized that.

22        Nonetheless, the decision or recommendation from them,

23   which is consistent with the panel's recommendation, was to

24   focus on moderate dental fluorosis based on the research that

25   is available at this time.

1  Q.   And is this statement here consistent with what the Health

2  Canada expert panel concluded?

3  A.   In my opinion, it is -- it is consistent.  When we -- I

4  can't remember the exact wording in the section on

5  neurocognitive disorders, but we certainly acknowledge that if

6  that research were to reach a point that was supportive of

7  adverse effects at very low levels, it would require additional

8  attention if it reached that point.  And so -- but it's saying,

9  again, they and we as the panel, reached the judgment that it

10  was not yet appropriate or ready in terms of the level of

11  certainty to be used in that manner.  And until that time, we

12  needed to look at dental fluorosis as the endpoint to focus on.

13  Q.   And Dr. Savitz, are you a risk assessor?

14  A.   I'm sorry.  The fan is on.  A little louder?

15  Q.   Are you a risk assessor?

16  A.   I am not a risk assessor.

17  Q.   So what was your role on the Health Canada panel?

18  A.   As -- as an epidemiologist, as one of the epidemiologists

19  on the panel, it was to try to convey in an informative way

20  just where the evidence stands regarding -- the epidemiologic

21  evidence specifically -- where -- how certain it is, the --

22  what evidence exists, what's missing, what's not known, and

23  trying to articulate that in a way that I think of it as

24  feeding it to those who do the risk assessment.

25       So the advantage of a panel, of course, is we go back and

```
 1    forth.  And they may have queries that would be particularly
 2    relevant to the risk assessment process and with
 3    epidemiologists, several of us in the room, there was a chance
 4    to air those views and provide clear information, which is
 5    challenging, I acknowledge that, but to be able to articulate
 6    it in a way that we believe does justice to the evidence and is
 7    presented in a way that they can interpret it as relevant to
 8    the process of risk assessment.
 9    Q.   And Dr. Savitz, you testified earlier about who was on
10    that panel.  Do you remember that testimony?
11    A.   Yes.
12    Q.   And you struggled to remember some of those members,
13    right?
14    A.   That's correct.
15    Q.   Would it refresh your recollection to see the list from
16    the expert panel report of who was on that panel?
17    A.   Yes, it would.
18    Q.   Okay.
19              MR. CAINTIC:  Mr. Ham --
20              Oh.  And, Your Honor, we have gone ahead and stamped
21    the expert panel report which was previously identified as SB6
22    we have stamped as Exhibit 128.
23              THE COURT:  Okay.
24              MR. CAINTIC:  And then the systematic review, which
25    was identified as SB7, has been stamped as Exhibit 129.
```

SAVITZ - DIRECT / CAINTIC

```
 1              THE COURT:  All right.  Thank you.

 2              MR. CAINTIC:  And going forward, I'll refer to them by

 3    their exhibit numbers.

 4              THE COURT:  Great.  Thank you.

 5              MR. CAINTIC:  So Mr. Hambrick, can we go back to

 6    Exhibit 128 at page 5?  And if we could zoom in on the expert

 7    panel members.

 8    BY MR. CAINTIC:

 9    Q.   And Dr. Savitz, please review this and let me know if it

10    refreshes your recollection about who was on the panel?

11    A.   It does, yes.

12    Q.   Okay.  So you had referenced David Bellinger, right?

13    A.   Yes.

14    Q.   Who is David Bellinger?

15    A.   David Bellinger is a neuroepidemiologist at Harvard, a

16    very distinguished one, and a developmental psychologist as

17    well.

18    Q.   Who is John Fawell?

19    A.   He is an expert on fluoride.  I'm not sure of exactly his

20    disciplinary background, but he -- I think of him as an

21    environmental health expert with particular expertise on

22    fluoride.  He I believe is the author of the book from the

23    World Health Organization on that topic.

24    Q.   Who is Lynne Haber?

25    A.   She is a toxicologist from the University of Cincinnati
```

1    and, again, obviously was there to speak to the toxicology

2    evidence that would bear on the committee's deliberations.

3    **Q.**    And then who is Steven Levy?

4    **A.**    Steven -- Steve Levy I believe is pronounced.

5          He's a dental epidemiologist.  He's affiliated both in the

6    College of Dentistry, as indicated there, and in the Department

7    of Epidemiology and has done work related to, among other

8    things, dental fluorosis.

9    **Q.**    And the next is you?

10   **A.**    Correct.

11   **Q.**    And the last one is Rita --

12   **A.**    Schoeny.

13   **Q.**    -- Schoeny?

14   **A.**    Yes.

15   **Q.**    And who is she?

16   **A.**    She, again, as indicated there, she is formerly with the

17   EPA and at least in functioning of the panel, I thought of as

18   the person who was most sort of immersed in the technology of

19   risk assessment.  I think that Lynne Haber contributed as well

20   to that, but Dr. Schoeny is really experienced in risk

21   assessment, as indicated.

22          **MR. CAINTIC:**  Okay, Dr. Savitz, that's all my

23   questions for now about the Health Canada report.  But before

24   we leave, is there anything that the attorneys said about your

25   participation in the Health Canada panel that you should

1    clarify for the Court?

2         **THE WITNESS:**  I think this interface between the risk

3    sciences work and the panel, I can see where it would be

4    confusing and, again, the -- Health Canada commissioned this

5    report and provided it to us to considered and they were

6    present in the room.  We were not reporting to each other or

7    needed to convince each other.  We had -- the panel did its

8    work, we might have questions, we might have discussion, but we

9    went away then and wrote our report.  We didn't need to

10   reconcile it with what they were going to do.

11        And in turn, they obviously went back and continued to

12   work on their document that ultimately, with several steps

13   involved, led to this publication.

14        And so they -- we touched on each other.  I'm not

15   saying there's no relationship, but I think it would be a

16   misinterpretation to see this as something either that was

17   dictated to the panel, "You must use this."  It was material

18   for us in the same way the panel report was not going back to

19   them and saying, "You must adjust your report."

20        So the -- and we were not, certainly, involved in any

21   way with anything after the panel meeting.  There's no -- there

22   was a whole -- obviously I did skim the acknowledgments where

23   they talked about the many steps between the initial work and

24   this publication, including, of course, peer review and other

25   processes involved.  We had no contact or engagement once that

 1   panel meeting ended in early June.

 2   BY MR. CAINTIC:

 3   Q.   So Dr. Savitz, I want to turn now to some epidemiology and

 4   statistical principles terms that we've heard used during the

 5   course of this trial.  What is non-differential

 6   misclassification error?

 7   A.   Non-differential misclassification usually, not always, it

 8   can refer to either the exposure or the health outcome, and it

 9   refers to mismeasurement in one form or another.  It can come

10   about for a variety of reasons, but it's an imperfect

11   reflection of what we would really like for it to capture.

12        And the reason I emphasize that, it can be as simple as

13   just the laboratory error, but it can also be looking in the

14   wrong time window.  That would be a mistake.  If it reflects a

15   week and we wanted a year, that's a form as well.

16        The non-differential part is that the nature of the error

17   is not affected by the other factors.  So if you're looking at

18   exposure, the error pattern is the same regardless of what your

19   health status is and vice versa.  If it's an error in

20   non-differential outcome misclassification, it's not different

21   as a function of your exposure.

22   Q.   And does non-differential misclassification error usually

23   biased towards the null?

24   A.   In general under -- again, always under some assumptions,

25   it certainly does -- there's -- there's some more subtle sort

1   of exceptions to the rule.  But for most practical purposes,

2   that's a -- that's a sort of a reasonable default inference.

3   **Q.**   Over your years as an epidemiologist have you ever seen

4   researchers sort of inappropriately characterize the role of

5   nondifferential misclassification error in their studies?

6   **A.**   You know, it can be used as a means of making null studies

7   be positive or studies with a very small effect look like they

8   have a big effect.

9        In other words, it's -- it's a hypothetical.  If we had

10  the right measurements, of course we would use those in the

11  study.

12       What it's saying is, we acknowledge we didn't do it

13  perfectly, but if we did -- again, hypothetical -- here's what

14  we would have seen.

15       In the nutrition literature there's a lot of reliance on

16  food frequency questionnaires, which people report how much

17  they eat on average of hundreds of foods, and they recognize

18  error and they accept the fact that it's flawed and so they

19  sometimes back-calculate what the association would have been

20  had it been accurate.

21       So you see things like they calculated a relative risk of,

22  you know, 1.2 for a given disease and they say:  But if we

23  measured it well, it would have been 2.3.

24       And it's sort of -- again, I would distinguish between

25  what the data say and what they might mean under a set of

1    assumptions.  The data are the data.  That's the anchor.

2    That's what we start with.  And so it's -- it's acknowledged as

3    a source of uncertainty and source of error in the measurement

4    of the association, but it doesn't make the problem go away to

5    label it and do a calculation.  It's still a problem if -- the

6    best solution, of course, is to fix the problem.

7    **Q.**   We've also heard some statements like "We didn't find an

8    adverse effect because the study lacked sufficient power."

9    What do you think about a statement like that?

10   **A.**   The power of the study is to examine exposure within the

11   range that this population experiences.  And so if a population

12   has a low or narrow range, that's -- that's what the study is

13   capable of addressing.

14        If it has a higher range, that's what that study can

15   address.

16        And so it isn't -- to me, at least, it doesn't make sense

17   to say that a study in the low-exposure range has inadequate

18   power.  It may have perfectly fine power for detecting adverse

19   effects within the range that population experienced.  Of

20   course it doesn't have power to detect effects in -- outside of

21   its range.  So if you're interested in the question is any

22   level of the exposure -- doesn't -- you know, however high it

23   could be, is that a problem, you could say that a study in a

24   low-exposure range is inherently incapable of addressing high

25   exposure, but it isn't -- but, again, null results are null

SAVITZ - DIRECT / CAINTIC

1   results.  There's no -- it's not, well, they're null but if we

2   had more power it would have been positive.  It's a speculation

3   again.  Maybe if exposure were higher, it would have been, but

4   it's that -- just being conscious, I guess, when you're going

5   from the data to what might have been under other

6   circumstances.

7   **Q.**   So we've heard the term "exposure contrast" being used.

8   What is meant by that?

9   **A.**   Generally, it would be the range of exposure that's

10  available in your study.

11       I mean, you could think of the worst cases, if we all had

12  the exact same value, everybody in the population had the same

13  exposure, you could not do an informative study of the

14  association of exposure with a disease.

15       And if it's very narrow, of course, you're only able to

16  study -- if you're only able to study, let's say, the contrast

17  of, you know, .4 and .5 milligrams per liter fluoride, you're

18  going to have a tough time, even if there were an effect, it's

19  going to be difficult to find because you have a very limited

20  contrast.

21       As you spread that out more, of course, you are -- you

22  have a larger contrast and you're able to address a more

23  informative range of exposure.

24  **Q.**   We've heard some statements like, "Well, the studies

25  looking at exposure levels below 1.5 milligrams per liter have

```
 1   low-exposure contrasts and that's why we weren't able to pick
 2   up an effect."  What do you think about a statement like that?
 3           MR. CONNETT:  Overbroad, vague and ambiguous.
 4           THE COURT:  I'm going to sustain that.  You need to
 5   narrow that question.
 6   BY MR. CAINTIC:
 7   Q.   If I had a study with an exposure contrast of zero to 1.5
 8   milligrams per liter, would it be able to pick up the -- any
 9   adverse effects seen within that exposure range?
10   A.   So long as it was of adequate size, again, assuming that
11   you've measured things well and the population is spread over
12   that range, what it can tell you is whether there's an
13   observable change in the outcome across the range of exposure
14   that's available, so between zero and 1.5.  Can't tell you
15   whether there is a 2 or 3 or 4, and vice versa.
16   Q.   What about a study that has exposure ranges from zero to
17   15 milligrams per liter, would that be able to tell you
18   precisely what the effect is between zero and 1.5?
19   A.   The only way it would is if you restricted the population
20   to those who fell in that range.  There's a -- as has been
21   discussed, the research tends to look at either linear or some
22   other form of relationship across the whole spectrum, and it
23   has a number of positive features.  But what you lose is
24   anything specific about what's going on in a given range.
25       There are other ways that data could be analyzed.  You
```

1    could say let's -- let's create a reference group of under .5.

2    But let's look now at the IQ of .5 to 1 and 1 to 1.5 and

3    et cetera.  Well, we don't have to make any assumptions then.

4    We can actually contrast -- we could see a threshold if it

5    existed or a ceiling.  We could prove there's a dose-response

6    relationship in a clearer way in some sense than simply

7    plugging in a linear term.

8         When we do that, we're saying how linear is it.  We're not

9    saying what's the shape.  We're saying how linear is it?  And

10   that's where I think you can -- I find in my own research I

11   tend to do both for that reason.

12   **Q.**   Dr. Savitz, we've heard some differing testimony last week

13   about whether urinary fluoride or water fluoride concentration

14   is a better way of measuring fluoride exposure.  What are your

15   opinions on that question?

16        **THE COURT:**  Before you go on to that, let me just get

17   a clarification.

18        When you say if you break it up into subgroups, .5 to

19   1, 1 to 1.5 and you ask the question how linear is it but not

20   trying to derive a shape, what does that -- what does linear

21   mean when you have these different subgroups?  What are you

22   referring to?

23        **THE WITNESS:**  Well, what I mean is if you look across

24   the whole spectrum, you can statistically derive a curve.  It

25   could be a straight line if it's linear, it could be, you know,

1    a different-shaped curve.  But what you're not getting is a

2    question of does that curve apply across the whole range, is it

3    driven by certain subsets of the data.  And then it's more

4    agnostic, in a sense, to look at categories because that let's

5    anything happen.

6         The curve -- you're fitting a curve to the data versus

7    simply looking across the range of data that you have available

8    with the other advantage being it clarifies the actual exposure

9    levels that are being assessed.

10         Once you generate the curve, you kind of lose track

11   of -- it doesn't tell you where it was -- the range you

12   measured.  It simply says here's the relationship; this much

13   fluoride is associated with this many IQ points, as opposed to

14   the categories which tell you in a direct way what's happening

15   at .5, 1, 1.5.

16         **THE COURT:**  I think I understand that point, but I

17   think you made a statement that you look at how linear it is

18   once you've done the category, and that's where I got lost --

19         **THE WITNESS:**  Oh, okay.

20         **THE COURT:**  -- I understand linear if you're doing the

21   whole range and doing and trying to do a regression analysis.

22         **THE WITNESS:**  Right.  I'm sorry.  I meant that as a

23   contrast of -- you can look at categories or you can fit a

24   curve.

25         **THE COURT:**  Oh, oh, oh.

SAVITZ - DIRECT / CAINTIC

```
 1            THE WITNESS:  And fitting a curve has some attractive
 2    features.  It's -- you know, you could -- it's certainly sort
 3    of more tolerant of small amount of data.  You can fit a curve
 4    because you're using equal points, but it has some
 5    disadvantages too.  There are assumptions involved and you're
 6    not able to -- there's some discussion, you know, is there a
 7    threshold.  Well, you can't see it with a curve.  You could see
 8    it if you looked at categories, if everything stayed the same
 9    until you got to 2 or 3 or whatever the number is, if you had
10    the range available you could ask directly at what point is
11    there an increase in risk.
12            THE COURT:  So this is an alternative to curve fitting
13    the entire population?
14            THE WITNESS:  That's correct.  That's correct.
15            THE COURT:  Okay.  Thank you.
16    BY MR. CAINTIC:
17    Q.   And Dr. Savitz, just to clarify, when you were saying
18    "curve" in that scenario, that could mean a linear
19    relationship, a nonlinear?  You didn't necessarily mean a
20    curved line, right?
21    A.   No.  It could be a flat line.
22    Q.   Right.
23    A.   It's sort of the statistics fit -- the model fits the data
24    wherever the data go.
25            And I did see there are some more flexible ways, but
```

 1   they're -- as I said, it's this sort of tradeoff of a little

 2   more, I don't know, I'd say complexity when you fit curves.

 3   It's kind of easier to explain when you look at groups.  I'm

 4   sorry.  If I could -- actually, I -- I'm sorry, I may have

 5   digressed a little bit from the issue of urine versus -- versus

 6   water.

 7   **Q.**   I can ask the question again.

 8   **A.**   Okay.

 9   **Q.**   So what are your thoughts on the strengths and weaknesses

10   between using urinary fluoride and water fluoride

11   concentration?

12        **MR. CONNETT:**  Your Honor, at this point I am concerned

13   that we may be getting into undisclosed opinions.

14        **THE COURT:**  And was this discussed in the report?

15        **MR. CAINTIC:**  This was -- this was definitely

16   discussed in the deposition.  Dr. Savitz was asked do you think

17   a urinary -- well, I don't exactly recall what the question

18   was, but Dr. Savitz definitely said he has become more

19   impressed by a water fluoride concentration variable as opposed

20   to a urinary fluoride, given some of the issues with urinary

21   fluoride.

22        **THE COURT:**  This was discussed in the deposition

23   you're saying?

24        **MR. CAINTIC:**  Yes.

25        **MR. CONNETT:**  On that -- on that limited point I

SAVITZ - DIRECT / CAINTIC

1   accept that that testimony was there, but if --

2            THE COURT:  Well, let's go on and you think this is

3   clearly getting into an area where he's opining on things that

4   were not disclosed such that it would not be fair for you to be

5   able to conduct a cross-examination, and you can raise an

6   objection.

7            MR. CONNETT:  Thank you.

8   BY MR. CAINTIC:

9   Q.   Dr. Savitz, what are your thoughts on the strengths and

10  weaknesses between using a urinary fluoride measure and a water

11  fluoride concentration measure for fluoride exposure?

12  A.   I think you have to start with the underlying question.

13  And if it is focused on the biological effects of fluoride, it

14  may lead to a different answer than if you're asking the

15  question what, if any, would be the health impact of water

16  fluoridation.

17       So the urinary fluoride has a number of positive features.

18  For the biological assessment it integrates across these

19  different sources.  It has also some negative features.  We're

20  interested in long-term exposure.  It's a short-term measure.

21       When we go it apply that knowledge to questions of water

22  fluoridation, we lose something in that translation because

23  it's a form of extrapolation at that point.  We have to work

24  backwards and say:  Given what we've observed with urinary

25  fluoride, let's think about what would happen with and without

SAVITZ - DIRECT / CAINTIC

1    fluoridation.

2         It also I think has -- biomarkers have their appeal, but

3    they also -- they often reflect physiology, if there are

4    kidneys problems.  There are a lot of -- they incorporate some

5    things you probably would rather not.

6         Water fluoridation, which I -- you know, again, has not

7    been used extensively as a basis for contrast, is a very clean

8    comparison.  It's -- it recog -- it's not to deny that within

9    each of those two populations -- the population that consumes

10   fluoridated water, the one that doesn't -- of course there's

11   variations.  Some people drink bottled water, some people drink

12   a lot of tea that has fluoride, some people drink none and so

13   on.  But ultimately you're getting a sharp contrast.

14        When I did the study of chlorination by-products, we tried

15   to refine that.  We were going to get down to exact levels of

16   intake and we asked about, you know, consuming water at work

17   and how many glasses a day.  We had to see how long your

18   showers lasted because you absorb it there.

19        We went through this whole process and at the end the

20   contrast that was meaningful was simply is your water

21   chlorinated or not.

22        Noise within them, but it's a clean comparison.  And I

23   think there's -- they're complimentary.  I'm not saying one or

24   the other.  But I think there's probably been an

25   underappreciation of the value of well-done studies of

1  populations that do and do not drink fluoridated water.

2  **Q.**   So Dr. Savitz, you said earlier that you're here to help

3  the Court assess whether the epidemiological literature

4  supports there being adverse effect of fluoride on

5  neurodevelopment at exposure levels in the United States.

6      What is your opinion on that question?

7          **THE COURT:**  Well, again, let me stop you for a second.

8          So just -- I'm curious.  You said you had gone through

9  a very elaborate study looking at consumption of how many -- a

10 glass of water or shower absorption.  This is in connection

11 with which study did you do?

12         **THE WITNESS:**  This is a study of chlorination

13 byproducts in reproductive health outcomes.  It was

14 particularly a concern with miscarriage.

15         And as I said, we -- we tried to get the exact

16 measurement incorporating all the complexity and quirks of

17 individuals and it was a -- it had some particular challenges.

18 Heating the water changes the composition.  Filtering the

19 water; if you get it at home versus work.  And we, of course,

20 as epidemiologists tend to do, said we should do the maximum we

21 can, 20-page questionnaire and so on.  And then at the end we

22 finally came around to realize that we had three different

23 communities with contrasts in the tap water composition and

24 comparing across those communities was -- came to be seen as

25 the most informative analysis we could do because it wasn't

```
 1   dependent on recall or -- it's just people turn on the tap and

 2   whatever comes comes.

 3           And I think you could say in the water analogy here,

 4   there's a lot of variation in the biological dose -- we've

 5   heard about that -- but there's also a pretty clear separation

 6   of what happens when you, you know, turn on the tap if that

 7   water is fluoridated or nonfluoridated, and that can be very

 8   valuable for epidemiology to sort of side-step all the other

 9   complexity and zero in on the simple contrast, which I said has

10   been done very -- to a very limited degree.

11           THE COURT:  So do I understand it that the level of --

12   it is chloride, I guess, and that situation in the water was,

13   as maybe Dr. Theissen put it, sort of the driving force.  I

14   mean, not withstanding all the other variables, that was the

15   main determinant or whatever the terminology?

16           THE WITNESS:  The concern was with -- there's an array

17   of chemicals that's produced when you chlorinate drinking

18   water, including, interestingly, some known carcinogens and

19   they're very low levels and there's some communities that have

20   the good fortune of having groundwater supplies, which,

21   assuming there's no other contamination, are completely free of

22   chlorination -- chlorination b-products because there's no

23   organic matter in it.

24           And so when we had these, we chose the communities

25   intentionally to be -- to provide a contrast that way that --
```

1  as I said -- and I'm not saying that all the other effort was a

2  waste, but I think we kind of overreached a bit.  There can be

3  a tendency to -- we want exactly what people are getting.  And

4  epidemiology often does better in a sharp contrast and accepts

5  what really can't be done well.  And I'm not saying it's quite

6  as extreme but using urinary biomarkers is very ambitious.

7  We're going to get everything and we're going to get it

8  precisely on this individual at this point in time.  And I

9  understand the interest.  There's value in that.

10           But if the question is more about long-term exposure,

11  a question about fluoridation of water, that extra refinement

12  comes at a price.  It can get noisier, it can be harder to

13  interpret, it -- it -- I think, again, I don't -- I'm not

14  saying dismiss those.  That's the studies that are there and

15  those are the best studies, but I think that they are -- it's

16  also good to remember they're a step -- they're one step

17  removed from studying the effects of fluoridated water.

18  They're relevant to it but they're not studying fluoridated

19  water.  And one of epidemiology's strength is sometimes we can

20  study exactly what we're interested in, fluoridated water.  And

21  that, to me, is a underutilized sort of strategy.

22           THE COURT:  In the study that you did, you didn't, by

23  chance, measure urine content for --

24           THE WITNESS:  We did -- one small part of it looked at

25  biomarkers, but with disinfection byproducts, it's much worse

SAVITZ - DIRECT / CAINTIC

1    than fluoride.

2          These are affected by whether you had a glass of water

3    a half hour ago.  They're extremely short-lived, and so there's

4    just not a lot of -- biomarkers are not terribly useful for

5    that purpose, that -- you know, it's specific to the chemical

6    as to how long of a period they would reflect.

7          I've done work on PFAS where it's not necessarily a

8    good thing, but they're very long-lasting, so biomarkers can

9    reflect not just what's there today, but that probably is a

10   good measure of what was there six months or a year ago.

11         **THE COURT:**  So you did consider biomarkers in the PFAS

12   studies?

13         **THE WITNESS:**  Yes.  Yes.

14         **THE COURT:**  Thank you.

15   **BY MR. CAINTIC:**

16   **Q.**  So Dr. Savitz, what is your opinion about whether the

17   fluoride and neurodevelopmental epidemiological literature

18   supports there being an adverse effect of fluoride on

19   neurodevelopment at exposure levels in the United States?

20         **MR. CONNETT:**  Your Honor, at this point I'm going to

21   object as beyond the scope.  The fluoride levels in the United

22   States can exceed well above 4 parts per million.  That's not

23   the opinions Dr. Savitz offered.

24         **THE COURT:**  Why don't you replace that.  Instead of

25   saying the United States, put a number on it.

SAVITZ - DIRECT / CAINTIC

```
 1            MR. CAINTIC:  Right, right.  Okay.
 2   BY MR. CAINTIC:
 3   Q.   Dr. Savitz, what is your opinion about whether the
 4   fluoride epidemiological literature on neurodevelopment
 5   supports there being an adverse effect of fluoride -- of
 6   fluoride on neurodevelopment at water fluoridation of .7
 7   milligrams per liter in the United States?
 8   A.   In my review of the literature focusing on what I consider
 9   to be the most informative studies, they do not, in my view, in
10   the aggregate, support there being an association present.
11   Q.   And how did you come to that opinion?
12   A.   I looked at the literature, first of all, to identify the
13   most methodologically sound and relevant studies that have been
14   done, and that led me to focus on a series of cohort studies
15   that had very specific methodologic strengths and were
16   examining exposures in the range of interest.
17            And so in examining the methods and reviewing the results,
18   what I found is that simply there is not, at this time, a
19   consistent indication of there being an association present,
20   let alone a causal association.
21   BY MR. CAINTIC:
22   Q.   What were those prospective cohort studies?
23   A.   Well, the four of them are the -- I'll use the acronyms --
24   the ELEMENT study in Mexico, the MIREC study in Canada, the
25   INMA study in Spain and the OCC, the Danish birth cohort study.
```

SAVITZ - DIRECT / CAINTIC

1  **Q.**   And what was your assessment of how many studies are below

2  the 1.5 milligrams per liter range?

3  **A.**   Well, those are all addressing exposures in that range.

4  It's not to say there's not some individuals probably in all

5  those studies who exceed that, but that's where the bulk of

6  their population was.  And so when they measure the

7  association, that's essentially what they're measuring is

8  within that range.

9       There are a few others that are addressing exposures in at

10  that range in different designs though.  The Dewey study in

11  Calgary was looking at consumption of fluoridated or

12  nonfluoridated water.

13       And I should say, too, I'm only focusing on those that

14  were able to look at cognitive development, IQ.

15       There's another set of related studies that have looked at

16  behavioral outcomes.

17  **Q.**   Okay.  And so Dr. Savitz, when you were assessing the

18  weight to afford each study, were you focused on the study's

19  methodologies or the results they found?

20  **A.**   I was strictly focused on the methodology.  I mean, in

21  principle, I don't need to even see the introduction to the

22  paper or the discussion, I need to see the methods.  And once

23  I've examined the methods and made an assessment of the

24  informativeness of the study, then I can look at the results

25  and see how those relate to one another.

1    In this case the methods were unusually similar.  Usually
2  we're comparing apples and oranges.  Well, these are apples and
3  apples.  These are -- these are quite clear in the basic
4  structure, a prenatal measurement of, you know, urinary
5  fluoride on through to the development of, you know, the child
6  development IQ, the confounders.  And so based on that
7  similarity and the relevance, the quality, I was focused
8  strictly on the methods and -- until it's a question then "And
9  what does it mean."  But the quality of it is not based on the
10  results.  The quality is driven by the methods.
11         MR. CAINTIC:  And Mr. Hambrick, can we pull up U.S.
12  Demonstrative No. 10?
13  BY MR. CAINTIC:
14  Q.   Dr. Savitz do you see U.S. Demonstrative No. 10?
15  A.   I do.
16  Q.   And does U.S. Demonstrative No. 10 accurately summarize
17  the results and methods from the four prospective cohort
18  studies you identified?
19  A.   I believe it does, yes.
20         My only question, actually, I don't remember what CSG
21  stands for under MIREC, but other than that I think.
22  Q.   I believe specific gravity.
23  A.   Thank you.
24  Q.   Why are these the four -- why are these four prospective
25  cohort studies the most informative studies for this case?

**A.**    There are several reasons.  I mean, you can start with the

top row.  We're working in the range that is most directly

relevant to the issue of water fluoridation.  It's not to say

that the other studies aren't providing useful context, but

this is zeroing in on the question just based on the exposure

ranges they were able to study.

      There was high-quality -- these are all part of

high-quality cohorts.  None of these were initiated to study

fluoride.  These are long-standing, high-quality epidemiologic

studies, and so they get all the benefits of that in terms of

the blinded assessment of the -- of IQ at the end, the array of

available confounders.  They had -- as I said, this is, in the

best sense, exploiting data resources to answer a question that

arose that they hadn't thought about before and, again, they

built off of excellent cohorts.

**Q.**    Is this approach of comparing like-to-like studies

something that NASEM recommended to the NTP?

**A.**    We did, and it was more than -- it was -- again, it was

certainly comparing like-to-like in terms of methodologic

compatibility.

      If I threw a study on this list and it was from two

villages in China, one with dental fluorosis and one without,

we're getting into some -- I mean, the exposures may be

different and we're in a range where it's quite an

extrapolation.  It's not irrelevant but it's a reach.

1    The other issue for the like-to-like issue was in this

2    the -- the sort of the -- this definition of consistency

3    that -- it came up in I think both of the reports of NASEM of

4    specifying what's meant by that.  Does that mean there's some

5    indication within the study of a positive association, or are

6    we comparing like to like?  Are we comparing the whole

7    population or are we comparing one scale of IQ to another scale

8    of IQ?

9    And we did not do an audit, as I said, but there was a

10   sense that it was a pretty generous definition of "consistent."

11   **Q.**   How would you compare the results of these four

12   prospective cohort studies?

13   **A.**   The ELEMENT study is clearly positive.  I mean, I think

14   there's often -- it's indicated there, but that's expressed in

15   units per half a milligram per liter.

16   MIREC, in my view, is mixed.  It's -- it -- you know, in

17   the aggregate results, which is I think where one starts, it's

18   very limited in indicating a potential adverse effect with the

19   caveat that they found these notable sex differences.

20   INMA is, you know, flatly negative.  It is not -- again,

21   I'm asking the question of it not is fluoride beneficial, I'm

22   asking is fluoride harmful.  And in looking at that, you look

23   at the data and it says no, within our population that's not

24   what we're observing.

25   And similarly, in the Danish cohort, again, indicating

1   there's not an association.  And so in looking at them

2   individually and then in the aggregate, you can say I'm not

3   dismissing the ELEMENT study, it's a high-quality study, I have

4   a lot of respect for the -- for really all of the authors,

5   investigators, the quality of the populations; but, in looking

6   at this, I just don't see the -- a degree of consistency to say

7   we're -- an association has been established, which is the

8   starting point.  Whether it's Bradford Hill criteria or other

9   uses you start with an established association.  I don't see

10  the association here.

11  Q.   And Dr. Savitz, when you analyzed the epidemiological

12  literature on fluoride, did you put more weight on the

13  boys-plus-girls results or the boys-versus-girls results?

14  A.   I start with the most -- again, the most obvious is the

15  aggregate results for the population.  The study was designed

16  to look for that.  That was the first thing that I'm sure would

17  have been done.

18       And I'm not opposed to digging deeper.  And I think all of

19  the studies, to varying degrees, have dug deeper; not just

20  necessarily by sex, they may have looked at other ways of

21  cutting up the data.  INMA, in particular, looked at a lot of

22  ways of cutting up the data.  But I think it's important not to

23  lose sight of the primary summary result.

24       Again, it's tempting to glom onto the quote/unquote

25  interesting piece of the story, but I think sometimes that

1  comes at the cost of looking at the obvious.  First, saying

2  whatever you can about it and then maybe saying, well, but

3  maybe not, maybe we'll see, let's dig deeper.

4      I just feel like there's been, in some cases, this sort

5  of -- the sort of strained digging deeper and losing sight of

6  the most fundamental result the study generated, which is this

7  top line of the bottom three section there.  That's -- that's

8  what the studies mostly tell us.

9  **Q.**  Do you think there's generally consensus about

10  sex-specific effects in neurodevelopment -- prenatal

11  neurodevelopment?

12      **MR. CONNETT:**  Sorry, Your Honor, could I have that

13  question asked again?

14      **THE COURT:**  Yeah.  That seems overbroad.

15  **BY MR. CAINTIC:**

16  **Q.**  In your experience and reading these fluoride

17  epidemiological studies, do you think that there is a

18  convincing reason to separate out boys versus girls?

19  **A.**  In my view, there is -- in my experience, there is not for

20  these outcomes.

21      There are other kinds of outcomes -- it's been looked

22  at -- for example, fetal growth differs for boys and girls;

23  boys tend to grow a little more and so it maybe, you know, more

24  of an argument that we should look at boys and girls separately

25  as well as together.

1        If you're looking at, you know, hormonal effects on

2   reproductive organ development or something of that sort, of

3   course.

4        We're talking about prenatal exposure in brain

5   development.  And there are -- there may be some very subtle

6   ways in which that differs, but it certainly is not something

7   that would be considered obligatory, that you must do this or

8   it's routine to do it even.  And I think if you say empirically

9   look at the set of studies and say -- put aside the hypothesis

10  about fluoride and IQ, do these studies suggest sex-specific

11  effect, looking at the aggregate?  Well, one of them does, I

12  acknowledge that.

13       You know, there's -- there's some movement around in the

14  INMA study; no sign of it in OCC; no sign of it in ELEMENT.

15  Well, given it's not something that is routinely done or

16  established for cognitive development, for neurodevelopment, I

17  think that it's -- I don't want to just say that you shouldn't

18  analyze your data and, you know, mine it for all it's worth,

19  but the default of the most informative result remains for the

20  total population.

21  **Q.**   And Dr. Savitz, can you clarify a confusion here?  You

22  testified earlier that water fluoride concentration might be a

23  more elegant measure of fluoride exposure.  Here we're focusing

24  on comparing four studies with a urinary fluoride biomarker.

25  How do you square those two views?

**A.**    The -- again, the urinary biomarkers have their virtues
and shortcomings.  They have been clearly demonstrated in the
two studies that look -- that included a look at fluoridation,
MIREC and INMA.  There were clear contrasts, as you would
expect.

    And so it -- it is relevant.  These are -- these are -- I
said the -- in the extrapolation back to the question of what
is the impact of fluoridation, these studies clearly have
relevance to that, including the ones that did not study
populations drinking fluoridated water, namely ELEMENT and the
Odense child cohort.

    So this is part of the challenge in making use of
epidemiology is we're always extrapolating to some degree.  We
are always interested in a generalized result.  What about
people in general, perhaps what about people in the United
States or people in California?  Well, we're not really
interested in people in a few cities in Canada for this
purpose.  Of course we're concerned about their health.  These
are means to an end.  This is information to help inform a
judgment, and that judgment requires extrapolating from what we
know to what we think we can say, what we can generalize to.

    So I think these studies are well within the range of
relevance.  I think that the exposure contrasts are meaningful
in relation to water fluoridation, and the quality of the
studies makes them all worthy of very focused attention, not to

1    mention they're the best we've got.  I mean, if we were here

2    ten years from now, there may be another set of studies that's

3    so much better that it puts these to rest, but in my opinion

4    and I think that of most others, this is the body of the most

5    informative research.

6            THE COURT:  Okay.  We're at the 1:30, but because my

7    memory is so short, I'd like to ask the doctor just a couple

8    questions since we're on this topic.

9            MR. CAINTIC:  I might have a few points of

10   clarification or requests for guidance from the Court for the

11   ruling this morning, but can I ask those after.

12           THE COURT:  Okay.

13           MR. CAINTIC:  Yeah.

14           THE COURT:  All right.

15           I'm curious, on the topic of sex-specific, you know --

16   in fact, I'm just looking at this chart and it does seem like

17   everyone, except for the ELEMENT study, reported seemingly

18   significant different results for boys, one very positive,

19   other very negative.  And even the OCC showed something

20   different than the boys and girls population.  Does that

21   suggest to you as a scientist that there's something going on

22   here?  Is that enough to suggest -- or is that just a

23   statistical fluke?

24           THE WITNESS:  I honestly think that it's the latter.

25           I mean, I think that in the OCC study, that really is

SAVITZ - DIRECT / CAINTIC

 1    a negligible difference.  That's really just -- you look at the

 2    confidence intervals and there's just -- that's effectively the

 3    same with just a little bit of noise injected.

 4              **THE COURT:**  Yeah.

 5              **THE WITNESS:**  In the INMA study it's more peculiar,

 6    but, again, these are wide confidence intervals.  This is --

 7    this is all over the place.  Not to say they aren't different,

 8    but if you're going to -- if you have a hypothesis, it would be

 9    strange to say the hypothesis is, they'll be different, I just

10    don't know which is going to be affected.

11              You would want a hypothesis that says boys are more

12    vulnerable or girls are more vulnerable, but to look across two

13    studies that kind of go in different directions, yes, they are

14    suggesting differences between boys and girls, but if there's

15    not a -- again, the -- they're going -- if anything, it's

16    exactly in the opposite, as you noted, which to me makes the

17    most parsimonious explanation; quirks, noise, whatever you want

18    to call it.  But certainly I would be very careful about

19    invoking a causal explanation based on a profile of this

20    nature, of overinterpreting the meaning of what's been found in

21    that respect.

22              **THE COURT:**  Okay.  And let me ask you this, maybe this

23    is the ultimately question you all may be asking, but I just

24    want to get a sense from you:  You're looking at this and

25    opining that there's just not enough consistency there to reach

 1    any kind of, you know, conclusion at least based on confidence.

 2           I'm sort of curious, I mean, you've probably looked at

 3    other studies and other ranges of studies in other areas.  At

 4    what point -- what is it that tips -- what's the tipping point

 5    for you?  If there were two more studies and they were Green or

 6    if the MIREC study had shown for boys and girls and girls, how

 7    do you judge that?  How do you determine what would be the

 8    tipping point?

 9           **THE WITNESS:**  I know.  It's a challenging issue

10    because, you know, the -- as the researchers always say, more

11    studies are needed, which is kind of meaningless, there's

12    always more studies needed.

13           What I would say is that either the methodologic

14    issues -- something emerges where we understand better why

15    they're showing different patterns and then we can reconcile it

16    that way; that's probably the more optimistic view.

17           More realistically, it tends to be by weight of

18    evidence, that at some point if there's two or three more

19    studies of equal quality and they're all red, well, that's kind

20    of -- now we're kind of zeroing in on an answer.

21           Two or three more studies and they're bright green,

22    well, okay, maybe we're getting a different answer.

23           But what happens is, when the volume is small, each

24    study has a -- has this outsized impact.

25           Think about when you went from, you know, the

1    timeline, ELEMENT to ELEMENT plus MIREC.

2           Well, maybe we're getting somewhere, there may be

3    something there.  Now INMA comes along, oh, wait a minute, this

4    is what's going on.  And I think that my colleague once

5    described as like a balloon blowing in the wind.  Oh, now we

6    have a problem; oh, now we don't have a problem.

7           Well, with sheer volume, you zero in on some common

8    ground.  It may not be elegant, but I think it's often how we

9    reach closure or sufficient closure.

10          We may never explain the outliers.  That is, I've done

11   outlier studies that generate the results that the next five

12   studies say were wrong.  Well, I must have -- you know, I have

13   ways of -- you know, I must have gone awry.  So I wouldn't look

14   for the intellectual conclusion like, ah-ha, now I've seen it.

15   It's more just by the weight of evidence that concept is really

16   applicable here.

17          THE COURT:  And so I take it, then, in your experience

18   it's not that unusual to see -- you call outliers or studies

19   that seem to be well designed methodologically that reach

20   opposite results or different results --

21          THE WITNESS:  Oh, yeah.

22          THE COURT:  -- but at some point you're saying that

23   the weight of evidence -- it's like a trial.  The weight of the

24   evidence moves you in one direction and another.

25          THE WITNESS:  One of the areas I worked in was

 1    non-ionizing radiation, power lines.

 2          (Reporter seeks clarification.)

 3          **THE WITNESS:**  Power lines, electromagnetic fields and

 4    we found an association with childhood cancer.  And there was

 5    another study in Los Angeles that hinted at it, so it was

 6    almost maybe not quite the ELEMENT and MIREC story.  Well, then

 7    that got a lot of interest and so there was some really big,

 8    really high-quality study done by the National Cancer Statute,

 9    done in the United Kingdom.  And the better the studies got,

10    the more null they were.

11          And it isn't that we could definitively say I have --

12    there's ideas on where we may have gone wrong.  This is where

13    at present -- ideally there won't just be more studies exactly

14    like these.  There will be studies that are complimentary, that

15    have different strengths and limitations or maybe are better

16    across the board, but I think that it's that incremental

17    evidence that is needed to sort of settle on an, okay, this

18    is -- we've got an anchor now.  We may -- you know, time may

19    change, that's true of everything, but -- but we've zeroed in

20    on an answer, and this is -- this doesn't say that to me, in my

21    interpretation.

22          **THE COURT:**  All right.  Thank you.  Appreciate it.

23    Yes?

24          **MR. CAINTIC:**  Your Honor, just a few questions --

25          **THE COURT:**  Yes.

1          MR. CAINTIC:  -- guidance on what we discussed this

2   morning.

3          THE COURT:  Yes.

4          MR. CAINTIC:  So, you know, we're -- we have three

5   trial days left.  I'm just trying to work out logistically how

6   quickly we can try to get the version of the systematic review

7   that the panel actually had.  So, you know, we're going to

8   search and see if we can find it ourselves, but if this turns

9   into something where, you know, we have to ask Health Canada

10  and then Health Canada says no or says "show me the subpoena,"

11  I mean, we're going to get into a situation of, right, like

12  Hague Convention, we've got to get a letter rogatory.

13         So I was curious, so Dr. Savitz is going to review the

14  systematic review that just came out.  If he concludes that

15  it's substantially the same as what the Health Canada panel

16  reviewed, would that be -- you know, we could state that on the

17  record, would that be fine in lieu of trying to dig up this

18  document?

19         THE COURT:  Response?  Mr. Connett?

20         MR. CONNETT:  That sounds a little different than what

21  I heard today, that there was potentially vast changes, which

22  is the reason we wanted to get that report, but I guess I don't

23  have -- personally, Your Honor, I don't have enough information

24  to make an intelligent decision on that.

25         MR. CAINTIC:  It's mostly a logistical concern at this

```
 1   point, Your Honor.  I mean, we've got three trial days left.

 2        I -- I think the difference is, you know, one was

 3   longer and one was shorter, but if the overall conclusion is

 4   sort of the same and the analyses are relatively the same and

 5   Dr. Savitz adopts that, then I think, you know, we're fine with

 6   that being used on a cross-examination.

 7        But just logistically, I mean, we could have kind of a

 8   discovery nightmare on our hands of international discovery.

 9        THE COURT:  Well, all right.  Well, so when we started

10   off today it was the plaintiffs wanted to get the peer-reviewed

11   systematic study in and then you wanted to compliment that, and

12   now you're suggesting maybe you might relent if you can't get

13   it?

14        MR. CAINTIC:  Right.  I mean, it's been about, what,

15   less than 24 hours of us thinking about it.  The more I thought

16   about that proposition, the more I thought, man, we don't have

17   a whole lot of time left and I don't know if I want to, you

18   know, spend our trial time trying to find this in terms of

19   preparation time.

20        THE COURT:  You have a big team over there.

21        MR. CAINTIC:  I know.

22        MR. CONNETT:  And Your Honor, to be clear, we did make

23   the request this morning for the earlier version just so that

24   we could compare the two.

25        THE COURT:  Right.
```

SAVITZ - DIRECT / CAINTIC

```
 1            MR. CONNETT:  But -- so as Your Honor noted probably
 2   Dr. Savitz has a copy.  Now, there may be issues with Health
 3   Canada.  I understand if Health Canada ultimately doesn't allow
 4   this then that's -- there's nothing we can do about it.
 5            THE COURT:  Okay.
 6            MR. CONNETT:  So I appreciate the Court's comments
 7   earlier that due diligence should be provided.
 8            THE COURT:  Well, let's do this:  I mean, let's
 9   continue the due diligence, see what kind of permission you can
10   get or what is needed.  You can indicate that I'm ready to
11   issue, if necessary, some kind of subpoena, order or protective
12   order if that has any weight internationally I don't know, I
13   don't know what our treaty obligations are.
14            If we can't get it, then maybe can you elicit from the
15   witness, you know, the comparison and establish the fact
16   that --
17            MR. CAINTIC:  Right.
18            THE COURT:  -- they're essentially substantively close
19   and then I can make a decision and I'll hear your views on that
20   and then I'll make a decision whether or not we can proceed
21   without it.
22            MR. CONNETT:  Well, from plaintiff's vantage point we
23   certainly think that we can -- we can proceed without the
24   summer version because we do have a published version.
25            Our interest in the unpublished version was
```

 1   potentially it could be relevant based upon whatever the

 2   testimony is.  If there's representations made about

 3   differences, I would like to be able to inquire.  But I don't

 4   think, Your Honor, that we need it in order to have -- have a

 5   thorough examination.

 6        THE COURT:  Okay.  Well, I think we just cross that

 7   bridge when we get there.  It sounds like it may not a --

 8        MR. CAINTIC:  I was going to say realistically, Your

 9   Honor, I highly doubt that Dr. Savitz is going to be able to

10   cross-reference the two -- even if we were able to get it

11   tonight that he'd be able to cross-reference the two that

12   quickly.  I think when he reviews it this evening or tomorrow

13   if we come to the conclusion, yeah, this is pretty much the

14   same, I think it could obviate the need of, one, both parties

15   devoting their resources to trying to square the two systematic

16   reviews.

17        THE COURT:  So I take it Dr. Savitz does have the

18   original submission?

19        MR. CAINTIC:  So I don't -- we -- he doesn't -- he

20   didn't bring any materials with him today --

21        THE COURT:  Oh.

22        MR. CAINTIC:  -- he didn't bring his laptop with him

23   today, so we don't know yet.

24        THE COURT:  Okay.

25        MR. CAINTIC:  That's part of the issue.

1    **MR. CONNETT:** I would -- I would add to this mix, Your

2    Honor, that where I would be most concerned is if I'm in a

3    situation where testimony is being provided about the contents

4    of a report that was not provided to us, then I'm prejudiced

5    because then I can't engage that.

6         **THE COURT:** Right.

7         **MR. CONNETT:** So that's -- that's my biggest concern

8    right now is that.

9         **MR. CAINTIC:** I will say, Your Honor, so in terms of

10   the affirmative testimony that I was going to elicit out of the

11   systematic review, counsel pretty much saw it.  I'm not going

12   into super in depth about that systematic review.  To us, you

13   know, the top line conclusion is what matters.  And so if

14   that's any, you know, consolation in this scenario I think --

15        **THE COURT:** All right.  So maybe it takes less

16   importance -- lesser because we're --

17        **MR. CONNETT:** It does take less importance, but I

18   do -- I do think -- I stand by that due diligence to obtain the

19   report would be beneficial for all concerned and if Health

20   Canada will provide it, I think we would all benefit from

21   having it.

22        **THE COURT:** Well, and my order stands in that regard.

23   I understand you've got a lot of things to prepare for, but you

24   do have more than one person --

25        **MR. CAINTIC:** Right.

```
 1              THE COURT:  -- and I'm asking that you do exercise

 2     that due diligence to try to get it and just report back and

 3     let's see where it's at.

 4              MR. CAINTIC:  Right.

 5              THE COURT:  It may be that it assumes a degree of --

 6     lesser degree of importance than we originally thought, so it's

 7     not going to take this trial off track I don't think, but I

 8     would still like the -- I'm going to direct the government to

 9     continue to exercise due diligence.

10              MR. CAINTIC:  Of course, Your Honor.

11              THE COURT:  Okay?

12              MR. CONNETT:  Thank you, Your Honor.

13              THE COURT:  All right.  So today is what, Tuesday?  Is

14     today Tuesday?  I'm losing track.

15              THE CLERK:  Wednesday.

16              THE COURT:  Oh, it's Wednesday.  So that means Friday?

17              MR. CAINTIC:  Yes.

18              THE COURT:  That gives you an extra day.  Excellent.

19              All right.  So we'll see you on Friday.

20              Thank you.

21              THE CLERK:  Court is adjourned.

22          (Adjourned at 1:44 p.m.)

23                            --oOo--

24

25
```

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7

8    _____        <u>February 8, 2024</u>
     JENNIFER L. COULTHARD, RMR, CRR              DATE
9    Official Court Reporter
     CA CSR#14457
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25