1                                    **Volume 7**

2                                **Pages 1041 - 1218**

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5    Before The Honorable Edward M. Chen, Judge

6    FOOD & WATER WATCH, INC., ET    )
     AL.,                           )
7                                   )
                Plaintiffs,         )
8                                   )
       VS.                          )     NO. 17-CV-2162
9                                   )
     UNITED STATES ENVIRONMENTAL    )
10   PROTECTION AGENCY, an agency   )
     of the United States, ET AL.,  )
11                                  )
                Defendants.         )
12   _____)

13                           San Francisco, California
                             Friday, February 9, 2024

14

15            **TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

     **APPEARANCES**:

16

     For Plaintiffs:
17                           WATERS KRAUS & PAUL, LLP
                             222 N. Pacific Coast Highway, Suite 1900
18                           El Segundo, California  90245
                        BY:  **MICHAEL P. CONNETT**
19                           **CHARLES ANDREW WATERS**
                             **ATTORNEYS AT LAW**
20

21

22        **(Appearances continued next page.)**

23   REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                   Official U.S. District Court Stenographer
24

25

**APPEARANCES (Continued):**

For Defendants:

                    UNITED STATES DEPARTMENT OF JUSTICE
                    Environmental Defense Division
                    601 D Street, NW, Room 8814
                    Washington, DC  20004
              BY:  **BRANDON N. ADKINS, ATTORNEY AT LAW**

                    UNITED STATES DEPARTMENT OF JUSTICE
                    1301 Clay Street, Suite 340-S
                    Oakland, California  94612
              BY:  **EMMET P. ONG, ATTORNEY AT LAW**

                    UNITED STATES DEPARTMENT OF JUSTICE
                    Environmental Defense Division
                    150 M Street, N.E.
                    Washington, D.C.  2002
              BY:  **PAUL CAINTIC, ATTORNEY AT LAW**


**ALSO PRESENT:**          DANIEL DePASQUALE, EPA
                          JAY SANDERS (trial tech)
                          DANNY HAMBRICK (trial tech)


                    --oOo--

Friday, February 9, 2024 - Volume 7

**I N D E X**

**DEFENDANT'S WITNESSES** **PAGE** **VOL.**

**SAVITZ, DAVID**
(PREVIOUSLY SWORN)                                          1054    7

Direct Examination (Resumed) By Mr. Caintic:               1054    7
Cross-Examination By Mr. Connett:                          1171    7

**E X H I B I T S**

**TRIAL EXHIBITS**                       **IDEN**  **EVID**  **VOL.**

  125                                              1046    7

  126                                              1046    7

  130                                              1046    7

  131                                              1046    7

  132                                              1046    7

  133                                              1046    7

PROCEEDINGS

```
 1   Friday - February 9, 2024                          8:29 a.m.

 2                    P R O C E E D I N G S

 3        (In open court:)

 4            THE COURT:  Good morning everyone, have a seat.

 5            THE CLERK:  Calling civil action C17-2162, Food &

 6   Water Watch, Inc., et al. versus Environmental Protection

 7   Agency, et al.

 8            THE COURT:  All right, Counsel.  Make your

 9   appearances, please.

10            MR. CONNETT:  Good morning, Your Honor; Michael

11   Connett on behalf of the plaintiffs.

12            MR. WATERS:  Andy Waters for the plaintiffs, Your

13   Honor.

14            THE COURT:  All right.  Thank you.

15            MR. ADKINS:  Good morning, Your Honor; Brandon Adkins

16   for the defendants.

17            THE COURT:  Good morning, Mr. Adkins.

18            MR. ONG:  Good morning, Your Honor; Emmet Ong for the

19   defendants.

20            THE COURT:  Thank you.

21            MR. CAINTIC:  Good morning, Your Honor; Paul Caintic

22   for the defendants.

23            THE COURT:  All right.  Mr. Caintic.

24            MR. CAINTIC:  Your Honor, we have a few matters to

25   address before we begin examination.
```

1       THE COURT:  Okay.

2       MR. CAINTIC:  May I begin?

3       THE COURT:  Okay.  Yes.

4       MR. CAINTIC:  So I am happy to report that Health

5  Canada was happy to provide the Court with the versions of the

6  Risk Sciences International Systematic Review that was actually

7  provided to the Health Canada expert panel.

8       THE COURT:  Okay.

9       MR. CAINTIC:  We have assigned those exhibit numbers,

10 and we are going to jointly move those into evidence now.

11      THE COURT:  Excellent.  Thank you.

12      MR. CAINTIC:  I'll also say we realized that on

13 Wednesday, we had not moved to admit the supplementary

14 materials from the published version of the systematic review,

15 and we've agreed to admit those as well.

16      THE COURT:  Okay.

17      MR. CONNETT:  No objections, Your Honor.

18      THE COURT:  Good.

19      MR. CAINTIC:  And I will -- the Court also asked for

20 the NTP 2019 and 2020 drafts.  I have the exhibit numbers for

21 those as well.

22      THE COURT:  Oh, excellent.

23      MR. CAINTIC:  And we can move those also.

24      THE COURT:  Why don't we go ahead -- I don't know if

25 you have those numbers.  We can formally put them on the

PROCEEDINGS

1    record.

2              MR. CAINTIC:  Yes.

3              THE COURT:  Would be great.

4              MR. CAINTIC:  So at this time, Your Honor, I would

5    move to admit Exhibit No. 125, which is the NTP's 2019 draft;

6    Exhibit No. 126, which is the NTP 2020 draft; Exhibit No. 130,

7    which is the Taher 2024 published systematic review's

8    supplementary material No 1; Exhibit No. 131, which is the

9    Taher 2024 published systematic review supplementary material

10   No. 2; Exhibit No. 132, which is the Risk Sciences

11   International report titled "Critical Review of Potential

12   Adverse Effects of Fluoride in Drinking Water" dated April 24,

13   2023 -- and that's the version that was provided to the Health

14   Canada expert panel --

15             THE COURT:  Okay.

16             MR. CAINTIC:  -- and then Exhibit No. 133, which is

17   the Risk Sciences International report's supplementary material

18   dated March 25, 2023.  And that was also provided to the Health

19   Canada expert panel.

20             THE COURT:  Great.  Thank you.

21        (Trial Exhibits 125, 126 and 130-133 received in

22   evidence.)

23             MR. CAINTIC:  And then the second issue to raise is

24   yesterday plaintiffs disclosed an abstract of a paper that they

25   wanted to use in Dr. Savitz's cross-examination.  A dispute

 1   arose about whether that was appropriate for cross-examination

 2   given that Dr. Savitz did not consider it in coming to his

 3   opinions.

 4        There's, sort of, a complicated disclosure history

 5   that happened with that document.  I'm happy to provide that to

 6   this Court.

 7        **THE COURT:**  Okay.

 8        **MR. CAINTIC:**  The sum total -- well, I'll describe

 9   what happened there with the Court first.

10        So when Dr. Hu -- when plaintiffs disclosed Dr. Hu's

11   expert disclosure back in August of 2023, they said he would

12   testify about three things, and one of those was this abstract

13   of a paper called "Malin 2023."  We had asked plaintiffs if

14   they would provide a copy of the underlying manuscript for that

15   abstract.  Our position was, in order for us to assess the

16   weight of that abstract, we would have to actually see the

17   underlying manuscript.

18        Plaintiffs said they couldn't provide it.  We asked

19   why.  They said that Dr. Hu did not want to provide it.

20        We offered to take it under a protective order in

21   which only the parties and the Court would see it.  Dr. Hu was

22   still not comfortable with that.

23        We tried to contact Dr. Hu directly.  We sent him an

24   email saying that we were willing -- we understood his

25   confidentiality concerns, but we were willing to enter into a

1    protective order.  He still wasn't comfortable with that.

2         THE COURT:  And this is a manuscript of the published

3    piece?

4         MR. CAINTIC:  It is not published yet.  I think at

5    that time the authors were still working on it.  It sounds like

6    now they have submitted it to a journal, but it has not been

7    published yet.

8         THE COURT:  And the manuscript is some earlier draft,

9    or what is the manuscript?

10         MR. CAINTIC:  Well, so to be clear, so we were

11    requesting the manuscript.  All we were provided from

12    plaintiffs was the abstract for that manuscript.  And our

13    position was, well, can we see the manuscript so we can assess

14    its weight and understand its methodologies.

15         We went through a series of requests with Dr. Hu.  He

16    didn't want to provide it.  We ended up filing or issuing a

17    third-party subpoena on Dr. Hu for that manuscript.  The date

18    of compliance for that subpoena came and went.  Dr. Hu did not

19    provide it.

20         We eventually said we're going to have to move to

21    compel because if you're going to testify about this, then we

22    need to see it, in which case Dr. Hu and plaintiffs did not

23    provide the manuscript; instead, they withdrew their opinions

24    about that abstract.  So they actually amended their expert

25    disclosures to strike that abstract from the disclosure.

PROCEEDINGS

```
 1              Now, that whole process took about two months, from
 2    August 4 to September 29.  And right in the middle of that was
 3    Dr. Savitz' rebuttal disclosure deadline.  And Dr. Savitz
 4    mentioned the Malin abstract that plaintiffs had provided, but
 5    I can read for the Court the extent to which --
 6         (Technical interruption.)
 7              MR. CAINTIC:  It's actually okay.  It gave me a moment
 8    to find --
 9              THE COURT:  I see you planned that, huh?
10              MR. CAINTIC:  So the sum total of Dr. Savitz's
11    consideration of that abstract was, quote, "The two
12    prepublication abstracts, Malin, et al. 2023.  And Malin,
13    et al. 2023 lack sufficient information for me to assess at
14    this point and are not yet published or impressed for
15    publication to the best of my knowledge, thus it is unclear
16    what, if any, contribution these papers will make to the
17    current literature."
18              So in our view the idea that this abstract can now be
19    used as cross-examination material on Dr. Savitz is a bit
20    confusing to us.
21              THE COURT:  So the most that Dr. Savitz said is
22    that -- well, he had access to the abstract but that was it?
23              MR. CAINTIC:  He had the abstract.  Plaintiffs --
24         (Brief interruption.)
25              MR. CAINTIC:  Plaintiffs gave us the abstract.
```

 1          Dr. Savitz looked at the abstract but ultimately

 2    assessed:  I can't give any weight to this yet because it's

 3    just in abstract form.  And that was before plaintiffs had

 4    pulled the opinion.

 5          So, you know what, in our view, it does not seem

 6    right, from a process perspective, that plaintiffs could

 7    disclose or mention a document in their disclosures, could then

 8    refuse to provide it, defy a subpoena to provide it, bait

 9    Dr. Savitz into just mentioning it and then essentially say,

10    oh, well because you mentioned it now, even though we pulled

11    it, it's perfectly fine cross-examination material.

12          **THE COURT:**  Well, I got to hear what -- how is this

13    abstract going to be used in cross?

14          **MR. CONNETT:**  Well, first off, I think it's important

15    to recall EPA's position in the first trial where, as Your

16    Honor may remember, on -- it was June 15th and it's ECF No. 243

17    for the transcript.  We spent several hours of trial testimony

18    with EPA having their epidemiologist, Dr. Chang, opine on an

19    abstract that had not yet been published, was never disclosed

20    at any point in the litigation until the trial was occurring.

21          EPA asked the Court to permit it to introduce

22    testimony on an unpublished abstract and there began several

23    hours of testimony on that.

24          And Dr. Chang testified to this Court that it is

25    perfectly appropriate for a scientist to rely on an abstract

PROCEEDINGS

1    when you're dealing with a cohort that is well characterized

2    and described in the literature.

3            Now, our experts, to be clear, Your Honor, don't rely

4    on abstracts, okay?  But EPA's experts did.  And so for the

5    purposes of this abstract -- which is an abstract that was

6    published for a conference proceeding last year -- this

7    pertains to the first U.S. birth cohort study ever done on

8    fluoride and neurodevelopment.

9            Dr. Savitz has read the abstract, and I think we are

10   permitted -- we do not intend, Your Honor, to ask many

11   questions about this.  It would be very limited in scope.  But

12   Your Honor had asked some questions yesterday to Dr. Savitz

13   about this question of tipping point and at what point, when

14   you start seeing new evidence come in, do you start to -- when

15   you're doing this kind of strict causal analysis that

16   Dr. Savitz does, at what point do you start to sort of -- the

17   weight of evidence tips one way or the other, and I think it's

18   relevant to be aware of and for the Court to be aware of, of a

19   finding that is to be published imminently in the scientific

20   literature.

21           That's, Your Honor, what we intend to do, and

22   that's --

23           **THE COURT:**  So you would ask him, essentially, whether

24   he's familiar with this abstract, whether he's read it, and

25   whether he thinks that contributes to the weight of the

PROCEEDINGS

1   evidence one way or the other?

2           **MR. CONNETT:**  That's exactly it.

3           **THE COURT:**  And he's likely to repeat what he said in

4   his declaration, that is -- not to feed him any testimony, but

5   I can anticipate what he's going to say and I can't give it any

6   weight because it's only an abstract, I haven't seen the rest.

7           **MR. CAINTIC:**  Right.  That's precisely right, Your

8   Honor.  Well, one, I think there's confusion of the issues

9   here.

10          The INMA abstract, when it was brought up in the first

11  trial, that was a surprise, I think, to all of the parties, but

12  this is something that they have -- they had affirmatively

13  withdrawn, their experts did not rely on.  They failed to

14  provide it to us, and so I think that's a confusion of the

15  issue.

16          What I'm worried about is that this is their attempt

17  to try to get the abstract into evidence or try to get

18  testimony --

19          **THE COURT:**  Well, then you can object.  I mean, if he

20  moves --

21          **MR. CAINTIC:**  Right.

22          **THE COURT:**  -- to admit it in evidence then you have

23  other grounds.

24          In terms of the surprise to the witness, it's not a

25  surprise because he's seen -- he's going to be asked about the

1    very thing he saw and, from that, we'll probably ascertain the

2    limits of his view relative to that.

3          And I don't know how much that advances things, but it

4    seems to me that's not a surprise, that's proper.

5          But if this is a side door to get in an abstract that

6    otherwise would be hearsay or not admissible because it's not

7    been the subject of peer review and published and this sort of

8    thing, then you can object if that comes to that.

9          **MR. CAINTIC:**  Yeah.  That's the concern, Your Honor,

10   that this will turn into an exercise of reading a sentence from

11   the abstract and saying, "Do you agree or disagree with it."

12   At that point -- we would -- we would feel prejudiced at that

13   point.

14         **THE COURT:**  Well, like I said, this is a bench trial,

15   so I'm not going to be swayed by hearing results of some

16   evidence that is not admissible, so --

17         **MR. CAINTIC:**  Okay.

18         **THE COURT:**  -- so we'll treat it on that basis, okay?

19         **MR. CONNETT:**  And one other housekeeping note, Your

20   Honor.  I think there was probably too many moving pieces

21   between the parties last night, and speaking on behalf of both

22   of us, I think I could say -- maybe, Brandon, you could speak

23   to this too -- we were not able to get the convergence of the

24   parties' iterative statement of facts together.  We have them

25   complete, but we need to now merge them.

SAVITZ - DIRECT / CAINTIC

```
 1              THE COURT:  Okay.
 2              MR. CONNETT:  So we could -- if Your Honor wished, we
 3    could find a time during the proceeding today to do that or do
 4    it promptly after today's --
 5              THE COURT:  Why don't you do it promptly after today
 6    so I can get it by the end of the day and I'll have something
 7    over the weekend to mull over.
 8              MR. CONNETT:  Yep.  Certainly.
 9              THE COURT:  Okay.  Thank you.
10              MR. CAINTIC:  Thank you.
11              THE COURT:  All right.  I guess we can proceed.
12              MR. CAINTIC:  Your Honor, I'd like to call Dr. David
13    Savitz back to the stand.
14              THE COURT:  All right.
15                   (Discussion held off the record.)
16              THE COURT:  Okay.  I'm ready to go.
17         (Witness previously sworn.)
18                           DAVID SAVITZ,
19    called as a witness for the Defendants, having been duly sworn,
20    testified as follows:
21                DIRECT EXAMINATION    (resumed)
22    BY MR. CAINTIC:
23    Q.   Good morning, Dr. Savitz.
24    A.   Good morning.
25    Q.   Before we turn back to the four prospective cohorts, I
```

1  have a couple of questions for you now that we've all wrapped

2  our head around this Health Canada material.

3      Dr. Savitz, the Risk Sciences Institute's Systematic

4  Review was one of several documents that were provided to the

5  Health Canada expert panel, right?

6  **A.**   That's correct, yes.

7  **Q.**   How did you personally use the Risk Sciences Institute

8  Systematic Review?

9  **A.**   I did not make use of it with respect to the

10 neurocognitive outcomes, given that I knew that I needed to dig

11 deeper than I could glean from someone else's report.

12     It was useful in providing a quick overview of the,

13 perhaps, dozens of other health outcomes that had been raised

14 or at least of some interest and -- but for the one that I was

15 most focused on, I can -- I think I can say -- and I don't mean

16 to be insulting to the document, but I didn't make any use of

17 it at all.

18 **Q.**   So did you pay more attention to the original research?

19 **A.**   My focus in these -- again, there's a very different

20 strategy and a systematic review and a deep dive.

21     I am -- on this issue, I approached it as a deep dive kind

22 of epidemiologist.

23     And what I mean by that is that in my surveying the

24 literature, I'm looking for the key studies and especially to

25 make an assessment of whether those key studies are going to

1    carry so much weight in answering a question that they need to

2    be examined in fine detail.

3        There can be other studies that provide context or a

4    broader orientation, but I was already oriented enough to the

5    topic to know where I needed to focus my attention.

6        A systematic review is a broader -- its purpose is to be

7    comprehensive, highly inclusive and methodical -- I use the

8    word "algorithm" sometimes -- their approach to the literature.

9        So I knew as I -- again, it's similar to the assessment

10   related to the NTP report.  There are some strengths to that

11   approach and some limitations.  But, as an epidemiologist

12   interested in focusing on these issues, I took a rather

13   different strategy.

14       I mean, it's interesting at the end as I read the

15   publication, which, again, I -- honestly, I read that in more

16   detail than I ever would have looked at the -- the other

17   version we were given.  I was asked to look at it, and I did

18   look at the publication.  But it's interesting that using very

19   different strategies, we come around to the same place.  The

20   path may differ, but the steps we took, the sequence of

21   reasoning behind it.  But at the end, we end up saying very

22   similar things about the evidence in the range of exposure of

23   interest with respect to water fluoridation, namely that it's

24   not yet there to provide a basis for making regulatory

25   decisions.

1  **Q.**  Thank you.

2       Let's turn back to the four prospective cohorts.

3            **MR. CAINTIC:**  And Mr. Hambrick, if you could publish

4  U.S. Demonstrative No. 10.

5  **BY MR. CAINTIC:**

6  **Q.**  Dr. Savitz, do you see U.S. Demonstrative No. 10 on your

7  screen?

8  **A.**  Yes, I do.

9  **Q.**  And this was the topic of discussion on last Wednesday?

10 **A.**  Yes, it was.

11 **Q.**  Dr. Savitz, we heard some testimony earlier in this trial

12 that despite the divergent results of the four prospective

13 cohorts, they may actually be perfectly consistent with each

14 other.  What do you think about that opinion?

15 **A.**  I mean, the -- again, as I was saying on Wednesday, you

16 start with the obvious observation.  And by that -- what I mean

17 by that is that we have, again, a study -- the ELEMENT study,

18 which is clearly positive.  We have two studies that are

19 clearly negative, and we have one study that has mixed

20 findings, MIREC.

21      And is it theoretically possible that there are some --

22 you know, they're compatible in some way.  It's really -- I

23 suppose if measurement error were in one direction -- you would

24 have to invent a very contrived scenario to say that they are

25 all saying the same thing or that they tell a cohesive or

 1  consistent story.

 2      You know, you have to -- would have to say, well, maybe

 3  the random error pushed this study that way, but it also had to

 4  push the other study another way and really develop a whole

 5  complex scenario.  And at some point it's sort of -- you know,

 6  is it theoretically possible versus is it likely?  It's -- in

 7  my view, these are -- these are giving different results that

 8  don't line up with each other, simply.

 9  **Q.**  What if we took the INMA cohort out of this chart, do you

10  think you could read the ELEMENT MIREC and OCC studies as

11  consistent with each other?

12  **A.**  Well, there would be one less study that produced clearly

13  null or negative results, I should say, negative results with

14  regard to an adverse effect, so the volume would be further

15  reduced.  Now we have three studies in that scenario instead of

16  two.  There's -- you know, again, it's -- in the weighting,

17  ELEMENT would be -- it is, as I said, a clearly --

18          **THE CLERK:**  I'm sorry --

19          **THE WITNESS:**  -- clearly positive study.

20          You know, there is more compatibility if you want to

21  think of it that way between MIREC and ELEMENT simply because

22  the magnitude of divergence of their results is somewhat less

23  than it is with the other studies.

24          But there still is not, you know, a clear story of sex

25  differences, let's say, which is really so fundamental to MIREC

 1   being a positive study.  Well, that's not changing with regard

 2   to that.

 3         So it's sort of -- again, as an exercise -- again, I

 4   haven't asked why one would want to take out a study that's

 5   essentially identical in design to the others, but putting that

 6   aside, of course if you eliminate certain studies, it becomes

 7   more positive.  If you eliminate INMA and OCC, well, now

 8   you're -- now you've got a cleaner story.  It's just not an

 9   accurate story anymore.

10   **BY MR. CAINTIC:**

11   **Q.**   Dr. Savitz, are you familiar with the Goodman 2022 study

12   of the ELEMENT cohort?

13   **A.**   Yes, I am.

14   **Q.**   And what did Goodman 2022 do?

15   **A.**   The Goodman follow-up publication, as I recall, did

16   several things.  They expanded the cohort somewhat.  They

17   looked at I believe -- again, I'm sorry if I'm confusing this,

18   but I believe there was a longer period of follow up, and they

19   were looking at subsets of the -- subscales of the IQ

20   assessment in a more detailed manner.

21   **Q.**   How did the results of Goodman 2022 compare with those of

22   Bashash 2017?

23   **A.**   Well, they were very compatible, as they would have to be.

24   When there's --

25         Remember, it's the same children, the same exposure and

SAVITZ - DIRECT / CAINTIC

1  it's an -- it's a -- it's a somewhat different analysis, it's

2  an expanded analysis, but it's certainly not an independent

3  analysis.  It would be very strange for those kinds of

4  modifications to fundamentally change the results.

5      The way I think of it is, there's a basic story that the

6  Bashash study told, and this is trying to sort of elucidate

7  more of the fine points or more of the subtleties that may

8  be -- it's the same story, it's just sort of a more --

9  exploring more aspects of the evidence.

10 Q.  And would you consider Goodman 2022 as a replication of

11 Bashash 2017?

12 A.  It's not a replication; it's an extension.  And I -- the

13 difference I would draw from that -- and again, the argument

14 can be made that if you're going to look at one product of the

15 MIREC study, perhaps the Goodman study provides additional

16 information; but, under no circumstances, would you look at the

17 two studies and say now we have replicated evidence of an

18 adverse effect of urinary fluoride.  You would say that we have

19 one study that has that -- that has that outcome, and there are

20 different features of that outcome when you explore more

21 deeply.

22      THE COURT:  The -- but you mentioned the cohort size

23 was expanded?

24      THE WITNESS:  I believe that is the case, yes.  I

25 don't know how substantially, I don't recall that off the top

1   of my head, but it was -- it was a bit bigger, but not

2   profoundly so.

3           THE COURT:  Okay.

4           THE WITNESS:  That's the category I put it in, in my

5   mind.

6           THE COURT:  But that gives you some additional

7   information; the larger the cohort, it's something a little bit

8   new compared to the first, right?

9           THE WITNESS:  That's right.  That -- this comes up a

10  lot in epidemiologic studies, where there often is a series of

11  papers over time.  And when you're integrating the evidence,

12  you typically would focus on the one that is the most complete,

13  the most extensive, the largest numbers and -- but then you --

14  you wouldn't include that and the earlier versions, especially

15  and certainly not treat them as, you know, independent

16  replications of evidence.  You would tend to zero in on the

17  most complete one and make that the focus of the -- of your use

18  of that information.

19          THE COURT:  And you also mentioned the longevity.  The

20  longevity of the longitudinal study was also expanded?

21          THE WITNESS:  Well, again, this is where in this case

22  the more extended follow-up there's an interest in the -- in

23  sort of the follow-up at certain time periods.  And so you

24  could say longer is, in a sense, more informative, but at some

25  point it becomes just different.

SAVITZ - DIRECT / CAINTIC

1        If you're assessing it at age 1 and 4 and 6 and so on,

2   it's -- they're, you know, all potentially relevant, but it

3   isn't necessarily that the 6-year follow-up, let's say, would

4   be better than a 4-year follow-up.

5        **THE COURT:**  Thank you.

6   **BY MR. CAINTIC:**

7   **Q.**   And so, Dr. Savitz, following up on that discussion, would

8   you say that we should focus on the results of Goodman 2022 and

9   not double count that with Bashash 2017?

10  **A.**   If you're -- I think -- again, I think there's need to

11  focus on the ELEMENT study and what it tells us about the

12  relationship between fluoride and neurodevelopment.

13       And for most purposes, I think, the most complete one -- I

14  don't recall that there was anything that was unique in the

15  Bashash report that was not subsumed in the Goodman report, and

16  that's what I'm trying to -- again, there's a lot of parts to

17  that story, but my sense is that Goodman subsumes Bashash in

18  this case.

19  **Q.**   So Dr. Savitz, the Court heard a lot of testimony about

20  Green and Bashash in the first trial.  The INMA study wasn't

21  out yet.  How does the INMA study impact the overall body of

22  epidemiological literature regarding fluoride's potential

23  neurotoxic effects?

24  **A.**   Well, I mean, it -- there are several fairly important

25  consequences.

 1          Again, you can think of the thought experiment.  If we

 2    have the two studies, now we have three studies.  Well, one of

 3    the -- one of the, I think, messages is a reminder of how

 4    fragile -- how fragile the research remained and how tentative

 5    any conclusions would be.

 6          Again, even with high-quality studies, in general in

 7    epidemiology you really need an accumulation of evidence.  And

 8    so it was simply a reminder, hold on a minute.  That I think is

 9    a clear message.

10          Moreover, though, the fact that it had findings that were

11    not in any way supportive of an adverse effect using a very,

12    very similar design, I -- in my view absolutely equal in

13    quality; superior in some ways, maybe some limitations in other

14    ways, but I think that an assessment of the quality of the,

15    let's say, the three studies now -- holding off on OCC -- you

16    would say you have three studies of very similar quality and

17    they are not consistent with one another.

18    Q.   So, Dr. Savitz, we heard testimony this week and last week

19    about several concerns about the INMA study raised by

20    plaintiff's experts, so let's go through a couple of those.

21          MR. CAINTIC:  And Mr. Hambrick, if you could pull up

22    Trial Exhibit 114, Page 6, Table 2.

23    BY MR. CAINTIC:

24    Q.   And this is the Ibarluzea 2022 study of fluoride exposure

25    and IQ.  Dr. Savitz, do you see Trial Exhibit 114 in front of

SAVITZ - DIRECT / CAINTIC

1  you?

2  **A.**  Yes, I do.

3  **Q.**  So one of the criticisms we've heard was that the INMA

4  study's beta coefficients, the positive effect sizes, are

5  larger than the sizes you see in the Green and Bashash studies.

6  What are your opinions about that criticism?

7  **A.**  Well, I mean, again, starting with the obvious, which is

8  where I always start, it is -- is and was surprising to see any

9  favorable association.  There were not a lot of precedents for

10  it.

11       On the other hand, they are imprecise.  I mean, you can

12  look at the confidence intervals and there's a fair amount of

13  random error.  But I think also, there are actually some

14  technical reasons that -- I should say, technical factors that

15  may make these elevated positive coefficients not as credible

16  as they seem as first glance.

17       I mean, first of all, they presented results in milligrams

18  of fluoride per gram of creatinine.  All the other studies

19  presented results in milligrams of fluoride per liter of urine.

20  And from the one table in the report, one of the supplementary

21  tables, there was an opportunity to see what implications that

22  had -- and this may not be exact, but roughly that inflates it

23  by 25 percent relative -- just because of the different way of

24  characterizing the fluoride concentration in the urine.

25            **THE COURT:**  Inflates it by 25 percent relative to

1    what?

2         **THE WITNESS:**  Relative to what would have been seen

3    had they done it the way everybody else did, which seems to be

4    more common, milligrams of fluoride per liter of urine so that

5    if we changed on the left column there from milligrams per gram

6    to milligrams per liter, one could, again, approximately reduce

7    all the other coefficients by 25 percent.

8         **THE COURT:**  But using just milligrams per liter

9    doesn't take into account specific gravity or the --

10        **THE WITNESS:**  Well --

11        **THE COURT:**  -- density of the sample; isn't that

12   correct?

13        **THE WITNESS:**  I'm sorry.  The milligrams of liter with

14   creatinine adjustment.  You're absolutely right.  That's a

15   critical part of that.

16        In both cases, it's creatinine adjusted, you know,

17   concentration adjusted.  But the way that they presented it was

18   milligrams of fluoride per gram of creatinine.  The other

19   studies and the other way they could have presented it is

20   milligrams of fluoride per liter of urine with creatinine

21   adjustment.  So that -- that's just kind of a -- it's a

22   technical issue, but it would predictably inflate the

23   coefficients.

24        I mean, the other issue that, again, I think, is

25   relevant here is the extent to which presenting it -- we're

1    always presenting a -- an estimate of the quantitative

2    relationship between IQ in relation to some unit change in

3    fluoride concentration.

4           And the bigger that unit is, the bigger the

5    coefficients are going to look if they are either positive or

6    negative.  So it's saying per 1 milligram of fluoride per gram

7    of creatinine, this is what we would predict.

8           One gram of creatinine is -- in this population may

9    be -- I'm sorry.  One -- again, the units are confusing -- 1

10   milligram of fluoride per gram of creatinine spread over their

11   population, that may cover a very large fraction of their

12   population.  That may reflect a wide range of exposure, perhaps

13   even wider than most of the people would have -- would have

14   had.

15          So, again, I don't -- I don't deny that that is not

16   the numbers -- I'm sure the investigators didn't expect that.

17   I think that perhaps one of the reasons that they -- you know,

18   they dug so deeply into the data with their many supplementary

19   analyses and so on was to address what was an unexpected

20   finding.  But, in having done so, there was nothing revealed

21   that indicated a methodologic problem.

22          Again, it may not be satisfying, we can't explain why

23   they got it, but we certainly can dismiss the usual potential

24   artifactual explanations for it.  And so there it is then, an

25   unexpected but credible result based on the absence of

 1   methodologic error.

 2       **THE COURT:**  But is it a -- in your review of the

 3   literature, is this result a plausible result that you would

 4   have this -- even if you reduce it by 25 percent, given the --

 5   what you just said, the artificial inflation due to the use of

 6   grams -- milligrams of creatinine rather than liters with

 7   creatinine adjustment, you still have this rather tremendous

 8   not just positive association but the magnitude of it even

 9   adjusted down 25 percent seems --

10       **THE WITNESS:**  Again, based on what I know, I would

11   doubt that that is an accurate reflection of the causal impact

12   of fluoride on IQ.

13       The question I would ask, though, is, is this study

14   indicative -- the question being asked -- that they asked

15   originally and that I would ask is, is this study indicative of

16   an adverse effect.  It would be a whole different sort of

17   process to say, okay, now we're looking for a benefit, let's

18   see what evidence we find.  Well, this would be kind of an

19   outlier.  This is -- there are hints, maybe, in other studies,

20   but I don't think there's much evidence that would support the

21   contention that fluoride is good for you.

22       And so it's -- so the issue of credible, it's saying

23   this is their measured association, this is what the numbers

24   reflected.  I can't explain why they got it, but I certainly

25   wouldn't argue that it's demonstrating in any meaningful way

 1    that fluoride is beneficial.  It's saying fluoride is not

 2    harmful.  That I believe it can be interpreted with much more

 3    confidence to indicate that.

 4         **THE COURT:**  I guess the question -- you're going to

 5    hear this on cross-examination, obviously -- is does this not

 6    raise some question about whether there's something wrong with

 7    this study?  To result -- applying all the normal tools, looks

 8    like high-quality tools and all precautions, you get this

 9    result that seems completely counterintuitive and not

10    consistent with any other literature.  Does it suggest there's

11    something -- I don't know whether it's a covariate or

12    something -- going on here?

13         **THE WITNESS:**  Absolutely.  It raises the question; and

14    yet, in going over the methods that were presented and looking

15    at every aspect of the study, I don't know -- you know, when

16    you get unexpected or even improbable -- we could call it

17    "implausible," I would call it improbable results, what it does

18    is, it motivates you to go back and say did we go wrong

19    somewhere.  This doesn't -- this is not what we expected; let's

20    look at the methods and see if there's something that would

21    have artificially made fluoride look beneficial.  That's --

22    that would be what you would be looking for, a particular type

23    of error that would be generating spurious results indicative

24    of a beneficial effect of fluoride.

25         And in looking at that across a variety of factors

```
 1   with adjustment for a variety of confounders and stratifying on
 2   different factors and so on, they looked pretty exhaustively
 3   and did not find it.  So I can't disprove the hypothesis that
 4   something's wrong, but a hypothesis that general may be
 5   impossible to disprove.
 6          I need to have a specific scenario of how it may have
 7   gone wrong in order to examine data and say, okay, that's --
 8   let's check that hypothesis out.  The hypothesis that something
 9   is wrong, I don't know what it is, obviously, is not testable.
10   It sort of sits there as an unexpected finding that can't be
11   explained away.
12          THE COURT:  So you've looked at this study closely,
13   and you, yourself, have not been able to find any --
14          THE WITNESS:  That's --
15          THE COURT:  -- obvious or even some candidate for
16   explanation that --
17          THE WITNESS:  Right.
18          THE COURT:  -- you think hasn't already been explored?
19          THE WITNESS:  I really -- again, and this is one where
20   I think it was between the tables and the figures something
21   like 25 supplementary tables to dig as deeply as they could
22   into various aspects of the data.
23          And in looking at that, I -- I did not see -- they did
24   not see, nor did I see something that would have generated this
25   spurious or artifactual indication of a favorable effect.
```

1          What you'd be looking for is some other factor

2     correlated with fluoride that is very beneficial.  That would

3     be the scenario that would generate a spurious, you know,

4     favorable -- beneficial effect.  And there is nothing that -- I

5     haven't seen any convincing contenders even for that.

6          THE COURT:  There was testimony, I don't know if you

7     were here earlier, about the fish in that part of Spain being

8     very high in Omega.  So you have both the fluoride levels that

9     may be contributed by the fish, but then you have the

10    beneficial side of fish, and there's -- there's, I guess, a

11    hypothesis that that may be one of the confounders here.

12         THE WITNESS:  You know, that -- again, I am aware of

13    that, and it's a reasonable hypothesis in the sense that there

14    are certain kinds of fish consumption that are commonly

15    associated with more favorable neurodevelopmental outcomes. But

16    in order to affect the fluoride results, there would also have

17    to be a rather strong relationship between the fluoride and the

18    fish consumption.

19         If I could borrow the analogy with mercury is quite

20    different.  Mercury, it's a recognized problem that for most

21    people who are not, you know, near an industrial pollution

22    site, mercury is largely a reflection of fish consumption.

23    It's -- it's -- and so now we have a problem where fish

24    consumption is providing apparent benefit based on the nutrient

25    content and harm, potentially, based on the mercury content,

SAVITZ - DIRECT / CAINTIC

 1   and it's extremely difficult to extricate those.

 2          But the key difference between studying mercury and

 3   studying fluoride is that fluoride is not linked to fish

 4   consumption.  There's not evidence -- anything, you know,

 5   analogous to the evidence that mercury is very tightly linked

 6   to fish consumption.

 7          **THE COURT:**  Are you saying there's an absence of

 8   evidence or there's evidence that shows there's not that

 9   relationship?

10          **THE WITNESS:**  I don't -- you know, there's very --

11   there's very limited research on fluoride and fish consumption,

12   but I've not seen evidence that it's a significant contributor.

13   The World Health Organization report, I can't remember the

14   exact figure, but their assessment of it was that it was, at

15   most, a very limited contributor to fluoride.

16          Again, they may have quantified that; I can't recall.

17   But they did entertain the idea and, based on the knowledge

18   available, said there's not -- it's -- I can't say it's

19   impossible.  I can't say it's been investigated so thoroughly

20   that it can absolutely be put aside, but I'm not aware of

21   affirmative evidence that it's a problem.

22          **THE COURT:**  And do you know if the -- the WHO study --

23   first of all, when was it and did it look at different regions

24   or just looked at it as a worldwide study?

25          **THE WITNESS:**  It was kind of a global assessment.

```
 1   This is where -- I think I can interpret your question that,
 2   you know, perhaps the fish types in the Basque region are
 3   somehow different.  And again, it's -- it's not that I have
 4   persuasive evidence to say it's not there, but it's quite
 5   speculative.  There's really not an empirical foundation to say
 6   that it is there.  That, you know, sort of the --
 7             THE COURT:  Okay.
 8             THE WITNESS:  -- whatever they say -- I don't know --
 9   the absence of evidence is not evidence of absence --
10             THE COURT:  Right.
11             THE WITNESS:  -- but it remains speculation without
12   data in this case.
13             THE COURT:  Okay.
14   BY MR. CAINTIC:
15   Q.   And Dr. Savitz, let's flesh out more of that seafood
16   consumption as a confounder issue --
17   A.   Okay.
18   Q.   -- because it was the subject of a lot of testimony
19   earlier in this trial.
20        So you mentioned earlier that mercury is tightly
21   correlated with fish intake.  Can you describe that a bit more?
22   A.   The -- mercury, again, in regions that are free of
23   substantial sources of environmental mercury pollution, which
24   is, you know, true of the Basque region, mercury is,
25   essentially, a biomarker of fish consumption.  It's -- it
```

1   accumulates, it's stable, it's very closely linked to fish

2   consumption.

3       The other way, of course, you can address fish consumption

4   is, you can ask people about their fish consumption.  And

5   although that sounds appealing, how many times a week do you

6   eat this kind of fish and that kind of fish, obviously that

7   suffers from the inherent challenges of recall and reporting.

8       And so with mercury actually functioning -- it may sound

9   counterintuitive for this toxic metal to be used as a marker of

10  a nutrient, but, in fact, it is.  It's a pretty good marker of

11  chronic long-term fish consumption.  Well, actually, this --

12  I'm not sure if this is the table that --

13  **Q.**   Right.  I can -- yes.

14  **A.**   There's a table that addresses what happens when you

15  adjust for mercury, and that is effectively saying we are

16  adjusting for long-term fish consumption.

17          **MR. CAINTIC:**  Well, Mr. Hambrick, if we could pull up

18  Trial Exhibit 114, page 7, Table 3.

19  **BY MR. CAINTIC:**

20  **Q.**   And so, Dr. Savitz, can you explain this table for the

21  Court?

22  **A.**   What they did, as the title indicates, they adjusted for

23  cord blood mercury levels.  And so, in essence, they're

24  adjusting for fish consumption -- at least a marker, let's say,

25  of fish consumption -- and they do find a number of the

1 coefficients become somewhat smaller. They are reduced in

2 magnitude, again, subject -- you know, I don't want to dismiss

3 the imprecision, you know, when you see these wide confidence

4 intervals, but under that -- with that additional adjustment,

5 again, the study continues to not provide evidence of adverse

6 effects of fluoride on neurodevelopment.

7      It may have tempered the apparent positive effects, but it

8 remains a study that even with that adjustment --

9      And that's the spirit of what we do in epidemiology. We

10 challenge the results. We make an assessment and we say, "What

11 if you took this into account, then what happens?" That's what

12 all the supplementary tables did. And this table 3 does that

13 in adjusting for mercury and, again, finds, in a sense, smaller

14 but still nonnegative coefficients.

15 **Q.** Are there any statistically significant adverse effects in

16 Table 3 when the authors adjusted for mercury in the cord

17 blood?

18 **A.** Let me make sure I look at the whole table. No, there are

19 not.

20 **Q.** Are you familiar with the Julvez 2016 study?

21 **A.** Yes, I am.

22 **Q.** Can you describe for the Court what that study did?

23 **A.** Yes. That was a study of the INMA cohort looking at the

24 relationship between self-reported consumption of a variety of

25 types of fish in relation -- during pregnancy in relation to

1    neurodevelopment in the offspring.

2    **Q.**   And did they find that all kinds of fish in Julvez 2016

3    had a positive effect on IQ?

4    **A.**   No.  As I recall, they -- they -- one of the strengths of

5    the study is they looked at a much more refined classification

6    of fish consumption.

7         I don't recall them all, but there were small fatty fish

8    and large fatty fish, and there were a whole series of those.

9    Some of them manifested this apparent, you know, pos -- I'll

10   call it "positive" -- favorable association of fish consumption

11   with IQ.  Not all of them did though.  I think there were --

12   again, I don't remember the exact dividing, but if they looked

13   at -- roughly half of the kinds of fish they looked at, as I

14   recall, were associated with a favorable effect, and the other

15   half were not.

16   **Q.**   And so there was some insinuation over the course of this

17   trial that because the authors had this food frequency

18   questionnaire for fish consumption, they should have used that

19   to control for fish consumption in the INMA study.

20        Do you have an opinion as to what measure would be better

21   to control for fish intake, a biomarker of mercury or fish

22   consumption questionnaire?

23   **A.**   You know, again, on an intuitive level, as I said, it may

24   sound like what people do is the most important thing.  But if

25   you're interested in steady-state, long-term, average sort of

SAVITZ - DIRECT / CAINTIC

1    exposure, mercury is a very attractive biomarker of fish

2    consumption.  As I said, it's stable.  It's not subject to

3    recall issues.  And if I only had one, I would probably prefer

4    that one over self-report.

5            **THE COURT:**  Let me ask, you said that the Julvez?

6            **MR. CAINTIC:**  Yeah.  J-U-L-V-E-Z 2016.

7            **THE COURT:**  Okay.  That the Julvez study did find a

8    positive association for some types of fish but not others.  Do

9    you know if those were statistically significant findings?

10           **THE WITNESS:**  I believe they were.  Again, I just

11   don't remember which types of fish, but there were I believe

12   statistically significant positive -- what positive? -- yeah,

13   positive associations, you know, more favorable outcomes.

14           But that's, again, it's particularly relevant because

15   it's the INMA study, but that's, by no means, the only evidence

16   that fish consumption has -- during pregnancy, has benefits

17   even with the toxic chemicals, you know, not withstanding,

18   which is mercury and PCBs and their -- but the net effect of

19   fish consumption in many, maybe most studies, is beneficial.

20           **THE COURT:**  And do you know in terms of mercury

21   content in fish, is that something that -- I don't know if you

22   know this or not -- varies considerably from region to region?

23   Are some areas -- the fish have a higher content of mercury; in

24   other words, do some fish have higher content than others or

25   what's the variability here?

1          THE WITNESS:  Definitely the latter.

2          There's -- I believe it's one of the -- one of those

3   bio-accumulating chemicals.  As the, you know, bigger fish eat

4   the little fish on up through the chain I believe there's a

5   concentration -- you know, there's an enhanced -- there's a

6   concentration of these persistent chemicals.

7          With regard to region, I am not as familiar with that.

8   I mean, I could speculate, but I really don't have a clear

9   sense.  I'm more confident that the type of fish and where it

10  is in the hierarchy of fish is more influential.

11         THE COURT:  So the bigger the fish, the more likely

12  you're going to have the accumulation of mercury --

13         THE WITNESS:  Yes.

14         THE COURT:  -- because of the ecology of things?

15         THE WITNESS:  There's -- there's -- the guidance, and

16  it changes over time for fish consumption during pregnancy, you

17  know, there are -- there are various sorts of advisories.  And

18  I know that there has been some effort to sort of identify the

19  better and worse fish because if you -- again, the goal is to

20  get all the nutrients with minimal or no pollutants, and

21  there's some fish that may do that better than others.

22         THE COURT:  Sardines or anchovies?

23         THE WITNESS:  I'm not sure whether they -- I don't

24  know the fish consumption hierarchy, but I know that as you get

25  towards things like tuna, you're getting into more trouble I

believe, sword fish, tuna you're, I think, in the -- as I

recall, again, without absolute certainty but that the more

expensive fish tend to be the higher mercury fish.

     **THE COURT:**  Right.  Right.  Right.

     And finally, do you know in terms of the fatty acids,

Omega 3s or like -- I've always heard some have more higher

content than others, and that's why you hear that typical

advice of eating the small fish with lower mercury, but some

have high omega three content?

     **THE WITNESS:**  This is, again, the -- I was involved

with this many years ago.  I'm sure there's somewhere on my CV

of a -- sort of a risk evaluation related to fish consumption

that I participated in a panel, and I recall that it -- both

the pollutant concentrations and the -- I think, it's

long-chain fatty acids was the category they used -- vary

across types of fish but that in making recommendations, it --

there was a concern that it would be too complex.  They were

looking for simple, you know, take-away messages that the

public could make use of, and I just -- as I said, I suspect

it's advanced since I was looking at those issues.

     But, again, that would be the goal is to direct people

to the types of fish that have as much of the good things and

as few of the bad things as possible.

     **THE COURT:**  Thank you.

\\\

SAVITZ - DIRECT / CAINTIC

1   BY MR. CAINTIC:

2   Q.   And, Dr. Savitz, let's turn now to another criticism we

3   heard about the INMA study.

4          MR. CAINTIC:  Mr. Hambrick, if you could pull up Trial

5   Exhibit 114, page 35, supplementary Table 21.

6          And for the record, I think all the parties know

7   there's a typo on this.  They've labeled it as a Table 2, but

8   it is numerically or chronologically Table 21.

9   BY MR. CAINTIC:

10  Q.   And Dr. Savitz, can you explain this table for the Court?

11  A.   This is looking, again, at the relationship between

12  urinary fluoride at different times in pregnancy in this case

13  and looking at it in subsets based on the fluoridation status

14  of the water supply in the different communities.

15  Q.   How many times has the data been sliced at this point?

16  A.   At a minimum we're, you know, in the low 20s of looking at

17  different factors, just based on the supplementary tables.  I

18  haven't actually gone through and added up all the tables in

19  the manuscript.

20         And then -- and remember, each table is not just one

21  slice.  We're looking at different, you know, timing of

22  outcome.  In many cases, we're looking at, you know, boys and

23  girls, looking at subsets.  And so it proliferates a lot of

24  results that -- that's clear.  So it's one among many, and,

25  again, it's -- it's published as a supplement.

SAVITZ - DIRECT / CAINTIC

1  Q.   So in this particular table, how many times has the data
2  been sliced?
3  A.   That depends how you define a slice, I guess.
4       You know, if you ask -- one way to do it would be to say:
5  How many coefficients have been generated that are addressing
6  the relationship between urinary fluoride and cognitive
7  development.  And so now -- I mean, it's hundreds at this point
8  you can see in this table once you look at all the different,
9  sort of, factors.
10      It's -- yes.  I can't give you the exact count, but
11 there's a lot of coefficients in this table, and there's a lot
12 in the other tables as well.
13 Q.   What happened to the sample sizes in this table?
14 A.   Well, as you -- as you subdivide it, of course, the
15 numbers get smaller and smaller.  And this is where -- again,
16 that's why I say I pay attention to the confidence intervals
17 because that's reflecting the diminishing sample size.
18      So when I see numbers for this kind of an assessment, the
19 upper left Bayley n = 70, it's not a big study anymore.  It
20 started off as a big study, respectably large, not
21 overwhelmingly so.  And now as we narrow the focus on subsets,
22 it becomes smaller and smaller.  And by that alone more
23 aberrant findings are certain to arise as the study size gets
24 smaller.
25 Q.   And have you experienced that in your own research?

A.   My -- again, I've -- as we discuss everything that can go
wrong in epidemiologic studies, I'm afraid I could come up with
personal examples.  But in studying an early study of childhood
cancer where I was interested in -- I said -- I mentioned this,
I think, Wednesday looking at power lines, I thought it would
be conscientious to subdivide on everything I could think of.
And this was especially problematic.  We had childhood leukemia
and childhood brain cancer, childhood lymphoma, which are
fortunately rare diseases, so the numbers are already small.

     And then I started looking at the results stratified by
everything I could think of.  And I remember this, sort of,
terror of what do I do now; the numbers are bouncing all over
the place.

     And I was reminded by a colleague, and it's a nice way to
think of it, that what you get when you look at these overall
results -- yes, there may be heterogeneity.  Maybe there's
subsets that have a big effect, other subsets that don't,
always possible, but you're getting a meaningful average across
the attributes.

     And epidemiology is better at getting the average than at
identifying the nooks and crannies of subtlety.  We sometimes,
maybe, need to be hit over the head a bit.  And one of the ways
that you can be more comfortable with the evidence, it may be
that you're glossing over important things.  That theoretical
possibility exists, but you are using the data to the best of

SAVITZ - DIRECT / CAINTIC

1    what it can offer.

2        And so every time you subdivide, it's at a price.  It's at

3    a price in terms of sample size, and it's also at a price in

4    terms of potential distraction.

5    **Q.**   And you had -- you had discussed earlier the -- what might

6    happen when you begin extrapolating beyond the bulk of the data

7    you have.  How do you apply that to this table?

8    **A.**   Well, when you're looking at the unfluoridated zone, the

9    top section of that table with the rather astounding

10   coefficients, you're asking about what would the effect be of a

11   change in fluoride of a given magnitude.  That's the

12   denominator of the, you know, the coefficient, the estimated

13   change in IQ per, in this case, I guess one milligram fluoride

14   per gram of creatinine.

15       Well, that may be a -- for a population of low exposure,

16   that one unit change may be huge.  And maybe the population,

17   say, is between .3 and .6 mostly.  That's not an unrealistic

18   ballpark for this.

19       Well, now we're saying what would happen if you went from

20   0 to 1 or .2 to 1.2?  Well, you don't in this population.

21   You're saying, well, if we take that coefficient that's

22   measured for a small segment of the dose-response curve and we

23   stretch it out way beyond where the people are, you get these

24   very big numbers.

25       So it's sort of -- again, I would temper it in several

 1  ways and not -- not -- I'm not saying ignore it, but I would

 2  temper the -- I wouldn't overinterpret the meaning of isolated

 3  findings in a subset, given these other considerations.

 4  **Q.**  Do you -- can you provide the Court with -- for the

 5  nonscientists in the room -- a layman's analogy of the concept

 6  you just described?

 7  **A.**  You know, it's partially just the downside of these --

 8  let's call them "linear coefficients," but these -- these

 9  coefficients that relate, sort of, a unit change in exposure to

10  the outcome without specifying where we are on the exposure

11  range.

12      And so I thought about this.  One of the examples is if

13  we're looking at, you know, exercise and we might find

14  something, you know, for each extra mile you walk a day on

15  average, you weigh 2 pounds less.  And, again, this is

16  hypothetical, but not totally unrealistic.  Active people tend

17  to do better.

18      Well, you could say what would happen if I walked four

19  miles a day, and you'll get an answer or ten miles day or

20  twenty miles day?  And you can take this relationship and

21  spread it out beyond where the population is.

22      I think it's more informative when you, well, first of

23  all, acknowledge that it applies with some confidence to the

24  range you've studied.  Sometimes we use the inter-quartile

25  range.  What happens between the 25th and 75th percentile of my

 1    distribution?  It sort of acknowledges that's where my

 2    knowledge is.  That's where the data are.  That's where I can

 3    be confident and accurate.

 4         As you stretch beyond that, it becomes much more of a

 5    hypothetical what-if exercise; what if it applied more broadly.

 6         And so that's -- you know, the studies vary in that regard

 7    and sub analyses vary in that regard, but I always try to

 8    distinguish between the sort of:  What have you observed and

 9    then where or, you know, at what point are you using what you

10    observed to speculate about what might be?

11         It -- it -- we do it all the time, of course, but it's

12    important, I think, to keep in mind what the anchor is, and the

13    anchor is where your people are.

14    **Q.**   And Dr. Savitz --

15              **THE COURT:**  Let me -- let me --

16              **MR. CAINTIC:**  Go ahead.

17              **THE COURT:**  I'm sorry.

18              So I understand small numbers results in more

19    potential variability, but that factors into your confidence

20    interval, right?  Your confidence interval is larger, and so

21    you still have the concept of statistical significance.  You

22    can't -- maybe it's harder to derive statistical significance

23    when you have smaller numbers --

24              **THE WITNESS:**  Yes.

25              **THE COURT:**  -- but can you do it.

1          And I take it here, although they don't say but I see

2     all the bolded figures are statistically significant because

3     the intervals are all in one direction.

4          **THE WITNESS:**  That's correct, yes.

5          **THE COURT:**  It's wide -- if you look at that general

6     cognitive on the upper right, it's a wide confidence range from

7     13 to 41 --

8          **THE WITNESS:**  Yeah.

9          **THE COURT:**  -- but it is statistically significant at

10    27 even with the small numbers of 58.

11         Doesn't -- I'm not sure what to make of it because now

12    we have an even bigger number.

13         **THE WITNESS:**  Yeah, right.

14         **THE COURT:**  And I notice that the effect in the no

15    fluoride zones is higher, a higher coefficient than the

16    lower -- the lower ones or than the fluoride -- fluoridated

17    areas.

18         Can you think of an explanation why that is?

19         **THE WITNESS:**  I mean, again, the -- the main reason I

20    would -- could imagine, and it's not, by any means, a complete

21    explanation, but the exposure range that this is based on is a

22    much -- in a lower range of fluoride exposure.

23         As I said, I -- you know, I can't give you the exact

24    figures, but let's say most of the people are between, I don't

25    know, .3 and .6.  Well, in the other population, the

1    fluoridated area, they're in a higher range.

2         And so when you say change per unit change in

3    fluoride, it's being exaggerated more, perhaps, in the upper

4    section.  And again, I don't want to pretend that I can, you

5    know, explain, you know, this away.  It's -- these are

6    unexpected.  Even with all the adjustments, they're

7    unexpectedly large numbers, but --

8         THE COURT:  Would they be exaggerated in the lower or

9    the higher range?  In the lower range it's a smaller range.

10        THE WITNESS:  Correct.  And so when you look at the --

11   again, the coefficients are expressing the change in IQ per 1

12   milligram per gram of creatinine, 1 milligram fluoride per gram

13   of creatinine.  That 1 milligram is huge in the upper

14   relative-to-the-population spread in the nonfluoridated zone.

15   It is less of a -- less of a leap in the fluoridated zone

16   because the levels tend to be higher.

17        The only other thing I can say is that, again -- I

18   mean, this would require a very, very close look at the data

19   that is beyond anything that I've -- that -- you would need the

20   raw data to do this, but sometimes you get into these small

21   number issues and you realize it's two aberrant people, you

22   know, are driving it.  And if they're aberrant enough -- you

23   know, when you're fitting a line, you think of the -- I'm sure

24   you've seen the scatters plots and you fit a line.  You get a

25   few people on the tail that are really deviant, and it is

 1   striking how big of an effect they can have.

 2          So -- and again, I don't have the data and I can't say

 3   this is what happened, but it's something that I have seen when

 4   you get aberrant results, and it's one of the things to look

 5   for is, is this a handful of people who are peculiar.

 6          **THE COURT:**  And I've seen some techniques where you

 7   just lop off the extreme.  And you don't know if that was done

 8   here?

 9          **THE WITNESS:**  I don't.  And that's where I say that,

10   again, this is, you know, hindsight and the -- I think there

11   can be value in presenting results restricted to at least,

12   let's say, the 10th to the 90th percentile, even, potentially,

13   the 25th to 75th, because then you avoid, as exactly you're

14   describing.

15          When you get into the tails, you can really put curve

16   up or down with undue influence in the small numbers and

17   that -- again, that's -- I can't say that's what happened here,

18   but it generated some peculiar results that are not -- you

19   know, not -- not dismissible but, again, would require a deep

20   look to see where did these things come from.

21          But again, back to the question, and it's -- it's

22   always interesting, this is -- again, to delve deeper and

23   deeper into the data and we can look at this, and this was

24   typical of how epidemiologists kind of think, but to not lose

25   sight of the big picture:  Is there evidence of harm?  Well,

SAVITZ - DIRECT / CAINTIC

```
 1   no.
 2          Is there evidence that they've made a serious
 3   methodologic error?  Well, not that either.
 4          And then it sort of -- the other questions, at least
 5   in my interpretation, are secondary.
 6   BY MR. CAINTIC:
 7   Q.   And Dr. Savitz, do you recall how many supplementary
 8   tables the Green 2019 study reported?
 9   A.   I think it was three or four, four, I think.
10   Q.   Do you recall how many supplementary tables the Bashash
11   study reported?
12   A.   I think one.
13   Q.   And how many supplementary tables did the INMA study
14   provide?
15   A.   I think is it 23 tables and 2 figures.
16   Q.   And Dr. Savitz, did the INMA authors find any significant
17   adverse effects of fluoride exposure across any of the 25
18   supplementary tables they provided?
19   A.   Not to the best of my recollection.  The magnitude of the
20   positive coefficients varied, as it does in this table, but
21   I -- and there may have been some that marginally dipped below
22   zero, but there was certainly no hint that somewhere lurking in
23   there is a positive study in the sense of if we, you know,
24   scrutinize it enough and we'll find the evidence that fluoride
25   is harmful in this population.  I think it's -- I'm pretty
```

 1    comfortable with the interpretation that in this population,

 2    based on this study, there is not evidence that supports an

 3    adverse effect of fluoride on neurodevelopment, no matter how

 4    hard you look.

 5    **Q.**   And Dr. Savitz, let's turn to another issue that was

 6    raised by Dr. Grandean, creatinine adjustment.

 7         So plaintiffs had raised some concerns about how the

 8    results seem to differ depending on whether or not the results

 9    were adjusted for creatinine.  What's your opinion about that

10    concern?

11    **A.**   Well, I mean, again, the -- creatinine adjustment is

12    routine.  It's -- you know, it's normal.  It's -- we do it all

13    the time, the way we adjust for age.  When we're looking at a

14    urinary biomarker, we would typically and routinely adjust for

15    the concentration because, of course, the more dilute the

16    urine, the more dilute or lower the concentration of the

17    chemical of interest would be.

18         So again, in trying to reconstruct, sort of, that part of

19    the analysis story, my -- my interpretation was that they had

20    not -- until they were asked, they had not generated any

21    results that were not creatinine adjusted.

22         Well, by definition, they were using units of milligrams

23    fluoride per gram of creatinine.  That was the basis of their

24    results so that they then, in response to a request -- which

25    was misinterpreted -- provided results without creatinine

 1    adjustment.

 2         And I honestly don't know what other studies would show.

 3    I've not seen data on what would have happened in ELEMENT or --

 4    or MIREC any of the others, you know, so I can't really say

 5    much about if there's a general predictive -- predictable

 6    impact of failure to adjust for creatinine.

 7    **Q.**   And do you recall how, if at all, the INMA study results

 8    differed when adjusting for creatinine and when not adjusting

 9    for creatinine?

10    **A.**   My recollection is that -- again, they were closer to the

11    null without creatinine adjustment.  But, again, I don't recall

12    the exact figures.  It was a -- you know, it was a sort of a --

13    you know, a footnote in NTP and it was -- kind of took a little

14    bit of digging even to find that.  It wasn't something that was

15    generated and presented in manuscript form to make the

16    comparisons and the assessment easy.

17    **Q.**   And do you recall if they found any statistically

18    significant adverse effects when they failed to adjust for

19    creatinine?

20    **A.**   My recollection is that they were much closer to the null,

21    that the magnitude of positive coefficients was markedly

22    reduced but that there was not an indication of adverse effect

23    under that analysis method.

24    **Q.**   And when assessing a study, would you focus on the results

25    adjusted or unadjusted for creatinine?

 1   **A.**   As I said, adjustment is routine, and those are thought to

 2   be the more informative reliable results.

 3   **Q.**   Dr. Savitz, I want to show you a chart that plaintiffs

 4   showed earlier in this trial.

 5         **MR. CAINTIC:**  Mr. Hambrick, if we could pull up what

 6   is internal document No. SB2, which is figure 1.

 7   **BY MR. CAINTIC:**

 8   **Q.**   Dr. Savitz, do you see figure 1 in front of you?

 9   **A.**   Yes.

10   **Q.**   And Dr. Savitz, this is the data for adjustment and

11   unadjustment for creatinine for particular subgroups, right?

12   **A.**   Yes.

13   **Q.**   But what else is different between these two charts?

14   **A.**   Well, we changed units.  The Green is -- I'm looking at

15   the footnote -- IQ per milligrams fluoride per gram of

16   creatinine, and the other one it's IQ per milligrams of

17   fluoride per liter.

18   **Q.**   And so these two charts -- can you directly compare them?

19   **A.**   Well, no.  The -- the -- right.  I mean, based on the

20   units, as I said before, we could take that 15 and at least --

21   you know, if we were going to convert them all to -- well, it's

22   actually tricky, though, because the conversion I cited before

23   was milligrams fluoride per gram of creatinine converted to

24   milligrams of fluoride per liter of urine with creatinine

25   adjustment.

SAVITZ - DIRECT / CAINTIC

1   So this is per milligrams -- yeah, milligrams of fluoride

2   per liter without creatinine adjustment, so I'm actually not

3   sure what effect that would have on the comparability.

4       They're not the same units, that I know, and so it's kind

5   of an unknown whether -- what impact that unit change alone

6   would have.

7       You're trying -- what's happening is, you're

8   simultaneously -- there's two things happening as you compare.

9       In one you're going from the left being creatinine

10  adjusted to the right not being creatinine adjusted, but you're

11  also going -- you're changing the units at the same time and

12  that's where I'm a little bit unsure about what -- what one

13  learns from the chart, how to interpret that.

14          THE COURT:  Let me ask, now that I've looked at this

15  chart, it reminds me, putting aside the comparison of with or

16  without adjustment for creatinine, big sex differential.

17          THE WITNESS:  Huge.

18          THE COURT:  Do you have an explanation for that?

19          THE WITNESS:  Again, the -- I mean, this is -- this is

20  certainly more pronounced than most of their data are.  There's

21  a tendency across the data for higher positive coefficients in

22  boys than girls.

23          And as I've said even with the -- and I'd say the same

24  thing with the MIREC study -- I wouldn't have thought or

25  expected, based on this -- you know, the phenomenon of concern,

```
 1   to see sex differences at all.  And so I would still tend to

 2   focus on the aggregate.

 3            I don't know that they or anyone I've talked to would

 4   have a -- or read, I should say materials I've read -- would

 5   have a clear explanation.  I agree, it looks peculiar.  It

 6   looks more peculiar on the left than on the right.  They're

 7   trimmed.  But no, I don't have an explanation for the sex

 8   disparity.

 9   BY MR. CAINTIC:

10   Q.   So, Dr. Savitz, let's grapple with another one of

11   Dr. Grandean's concerns.

12        So last week Dr. Grandean expressed concern that an

13   abstract and a poster version of the INMA paper looked at four

14   regions of Spain while the published INMA study only looked at

15   the Gipuzkoa or the Basque country.  What are your opinions

16   about that concern?

17   A.   The -- again, you know, I did review the abstract, I

18   reviewed the manuscript and actually did have the opportunity

19   to get some of the perspective from Dr. Ibarluzea.

20        And basically my understanding, and it certainly makes

21   sense, is that in the abstract they had included just sort of a

22   smattering of people from other parts of Spain outside the

23   Basque region, you know, 30 here and 30 there.

24        And so what they were -- in essence, their population

25   consisted of a subset of the residents in the Basque region who
```

 1   were consuming fluoridated water, another subset of residents

 2   in the Basque region who were not and, kind of, a mix of other

 3   parts of Spain.  And they chose to focus and narrow the study

 4   to the Basque region, I think wisely.  They eliminate that --

 5   Spain has a lot of cultural variation -- a lot of places do,

 6   and I know Spain does -- and so this enabled them to contrast

 7   fluoride exposures within a more homogeneous population.

 8        And because the other regions did not have, to my

 9   knowledge, at least, any -- any participants consuming

10   fluoridated water, there was really not much loss.  There was

11   no -- you can say, you know, why would you get rid of numbers.

12   Well, if that enables you to refine the comparison you make,

13   it's beneficial, and I think in this case it was beneficial.

14        Again, the -- as I recall the abstract, it had, again,

15   results that were not supportive of an adverse effect.  I

16   believe they were -- they were less elevated, but they were not

17   negative.  That was my sense in reading those.

18             MR. CAINTIC:  And Mr. Hambrick, can we pull up what is

19   internal No. SB3?  This is the INMA poster that Dr. Grandean

20   was referring to, page 2, Table 1.

21   BY MR. CAINTIC:

22   Q.   Dr. Savitz, do you see Table 1 in front of you?

23   A.   Yes, I do.

24   Q.   And can you explain the results here for the Court?

25   A.   Well, again, this is the similar layout to what we had

SAVITZ - DIRECT / CAINTIC

1    looked at before.  This is looking at the relationship between

2    urinary fluoride, whole pregnancy or the specific points in

3    time, in relation to IQ at two different ages and looking at

4    the subscale of the McCarthy, as indicated on the right.

5         And again, the -- let's see.  The boys and girls

6    stratification -- this is where I have to digest this -- is

7    only for the week 32 of pregnancy, not for the other times of

8    assessment.

9    Q.   When the INMA authors looked at four sub-cohorts instead

10   of just the Basque country sub-cohort, did they find any

11   statistically significant adverse effect of fluoride exposure

12   on IQ?

13   A.   They did not.

14   Q.   And you mentioned that there were some advantages of just

15   focusing on the Gipuzkoa region, could you describe more what

16   you meant by that?

17   A.   I mean the ideal epidemiologic study is where you have a

18   contrast in fluoride exposure and -- otherwise people are

19   identical.  That's the -- sort of the goal.  That's what we

20   aspire to.

21        And it's actually one of the factors that challenges all

22   of the studies that are based on two or more very distinct

23   geographic areas.  Whether they're cities in Canada or

24   communities in China, there's this challenge that, you know,

25   what you're attributing to fluoride may be due to other subtle

1    aspects of the differences.  You know, communities vary a lot,

2    and they vary in many subtle ways.  Even after you've adjusted,

3    you know, you have a challenge.

4        When you can restrict it to a more homogenous region, like

5    the Basque region, and compare, you know, IQ in relation to

6    fluoride exposure, there are fewer ways that you can get the

7    wrong answer.  There are fewer -- you know, there's more

8    homogeneity in diet and in, you know, educational opportunity

9    and all of these other factors that can really be very

10   influential on IQ.  It's closer to what we aspire to, this

11   natural experiment.  Otherwise, identical individuals who are

12   exposed to different degrees, and so that we can isolate the

13   effect of that exposure from the many other determinants of the

14   outcome.

15           MR. CAINTIC:  And, Your Honor, I can either move on to

16   a new topic if the Court doesn't have any further questions?

17           THE COURT:  I don't have any more questions.

18           MR. CAINTIC:  Okay.

19   BY MR. CAINTIC:

20   Q.   Dr. Savitz, let's now turn to the INMA and ADHD paper.

21       First, I should ask, Dr. Savitz, did you review the INMA

22   and ADHD paper in coming to your opinions in this case?

23   A.   Yes, I did.

24           MR. CAINTIC:  Mr. Hambrick, if we could pull up U.S.

25   Demonstrative No. 11.

1           And for the benefit of the Court, the information

2    provided in this table is in Trial Exhibit 121, page 6,

3    Table 3.

4    **BY MR. CAINTIC:**

5    **Q.**   Dr. Savitz, does U.S. Demonstrative No. 11 accurately

6    portray the results from the INMA and ADHD paper?

7    **A.**   Yes, I believe it does.

8    **Q.**   Can you describe for the Court the study design of the

9    INMA and ADHD paper?

10   **A.**   Well, it's basically building off of the same cohort with

11   the same exposure information, a longer follow-up and looking

12   at behavioral as opposed to cognitive outcomes.

13   **Q.**   And can you describe the results?

14   **A.**   In a word, null.

15           This is, again, showing coefficients that are consistently

16   very close to the null, the -- across several dimensions of,

17   you know, behavioral assessments both at 8 and 11 years old.

18   **Q.**   And Dr. Savitz, in your opinion, do the findings of the

19   INMA ADHD paper support there being an adverse effect of

20   fluoride exposure on neurobehavior?

21   **A.**   No, they do not.

22   **Q.**   And do you know how many sub-analyses are in this table?

23   **A.**   Well, again, there -- obviously there's the probability

24   values and the beta values so that -- and then there are the

25   three pregnancy measures and the two ages, and you can multiply

SAVITZ - DIRECT / CAINTIC

1    those through.

2        Again, I would focus on -- this is one of the challenges

3    in evaluating the behavioral literature is, people really are

4    looking at somewhat different things.  They use different

5    scales, you know, I -- I'm not a developmental psychologist,

6    but I could imagine that, you know, cognitive problems --

7    inattention is not the same as hyperactivity/impulsivity, and

8    so I can't really sort of -- you know, they're presumably

9    different -- I don't know -- dimensions or ways of trying to

10   assess ADHD-like behaviors.

11   **Q.**   And Dr. Savitz, was there any finding of any adverse

12   effect in the INMA ADHD paper?

13   **A.**   No, there was not.

14       **THE COURT:**  What is the -- can you explain probability

15   values on the left and beta value?

16       **THE WITNESS:**  I'm assuming that the -- the beta value,

17   I assume, is the usual coefficient.

18       I'm trying to remember exactly how they defined the

19   probability values.  I'm sorry.  I can't -- that's not a

20   commonly used descriptor of -- in relating, you know, a

21   continuous exposure to the scales.  I honestly don't remember.

22   **BY MR. CAINTIC:**

23   **Q.**   So Dr. Savitz, let's turn to another paper that has come

24   out in the last three and a half years.

25       Dr. Savitz, do you know the Cantoral study of the Progress

SAVITZ - DIRECT / CAINTIC

1  cohort in Mexico?

2  **A.**   Yes, I do.

3  **Q.**   And did you rely on the Cantoral study when coming to your

4  opinions in this case?

5  **A.**   It was one of the contributing studies.  I didn't give it

6  as much weight as the four large cohort studies that we've been

7  talking about, but certainly it was -- I'm aware of it, and it

8  was a component of my assessment.

9         **MR. CAINTIC:**  And Mr. Hambrick, can we pull up U.S.

10  Demonstrative No. 12, which is the Cantoral 2021 Summary of

11  Findings demonstrative.

12         And for the benefit of the Court, the information

13  provided in this table is in Trial Exhibit 110, Cantoral 2021,

14  page 5, Table 3.

15  **BY MR. CAINTIC:**

16  **Q.**   Dr. Savitz, does U.S. Demonstrative No. 12 accurately

17  portray the results of Cantoral 2021?

18  **A.**   Yes, it does.

19  **Q.**   Can you tell us the study design of Cantoral 2021?

20  **A.**   This is one where it's a Mexican cohort, again, the

21  Progress cohort.  And what they -- it was a -- it is a

22  prospective study.  And rather than measuring urinary fluoride

23  or water fluoride, as I recall, they assess diet and use the

24  dietary information to construct an index of dietary fluoride

25  exposure.

1  Q.    Is that a food-frequency questionnaire?

2  A.    That's a food-frequency questionnaire, yes.

3  Q.    And we had talked about food-frequency questionnaires a

4  little bit earlier.

5       Could you give us your thoughts on food-frequency

6  questionnaires as an exposure metric?

7  A.    Their effectiveness really depends on the nutrient of

8  interest.  They -- I recall, for example, they do a bit better

9  with dairy foods.  Those are more easily defined than they

10  might do with certain kinds of, you know, fiber in the diet or

11  something of that sort.

12      What I don't know is how well they do for fluoride

13  specifically.

14      I mean, it seems, especially in Mexico where the salt is

15  fluoridated, it's not clear to me how accurately they would

16  have been able to measure fluoride, and so it's hard to, sort

17  of, know how much weight to put on their null findings.  But,

18  nonetheless, you know, null findings overall --

19      Obviously the color coding here shows that in one sex at

20  one time on one scale, they had -- you know, there was a

21  statistically significant adverse effect.  But the overall

22  array of results is not supportive of an adverse effect.

23  Q.    So Dr. Savitz, Dr. Lanphear last week testified that the

24  Cantoral study is supportive of there being an adverse effect.

25  Do you agree with that testimony?

 1   **A.**   I do not.  I mean, it's -- I don't want to overstate how

 2   persuasively, you know, definitively null it is.  It's null.

 3   It's a small study -- it's smaller than the others -- there's

 4   questions about the dietary intake, but I don't have

 5   uncertainty that there's a positive study lurking in there.

 6   There's a null study of, perhaps, more limited influence, but

 7   it's a null study.

 8   **Q.**   Dr. Savitz, do you know of the Dewey 2023 study?

 9   **A.**   Yes, I do.

10   **Q.**   And did you rely on Dewey 2023 in reaching your opinions

11   in this case?

12   **A.**   Yes, I did.

13          **MR. CAINTIC:**  Mr. Hambrick, can we pull up U.S.

14   Demonstrative No. 13, which is the Dewey 2023 Summary of

15   Findings.

16          And for the benefit of the Court, the information in

17   this table can be found in Trial Exhibit 117, Dewey 2023, page

18   5, Table 2.

19   **BY MR. CAINTIC:**

20   **Q.**   Dr. Savitz, does U.S. Demonstrative No. 13 accurately

21   summarize the findings of Dewey 2023?

22   **A.**   Yes, it does.

23   **Q.**   Can you tell us about the study design of Dewey 2023?

24   **A.**   It's a very different approach to the question, you know,

25   compared to the other studies we've been talking about.  But

 1   what they did is they looked at the impact or measured the

 2   potential impact of a change in the Calgary water system from

 3   providing fluoridated to nonfluoridated water.  And it just

 4   happened that they were recruiting women for a pregnancy cohort

 5   study during the period before and after the change.

 6       And so it enabled them, within the same community, same

 7   study design, same clinics, everything was the same, but

 8   depending on the timing of when they enrolled in the study,

 9   they were exposed either to all fluoridated water through their

10   pregnancy, no fluoridated water or mixed over the course of

11   their pregnancy.

12       And so it's -- in a way, it's kind of -- in epidemiology

13   we're always looking for complimentary designs.  We would like

14   one study, of course, to get everything right, but it's much

15   more informative when you can have different studies of the

16   same issue with different strengths and weaknesses, and this

17   is, kind of, a novel design to get at very directly and simply

18   drinking fluoridated water, drinking nonfluoridated water and

19   what the experience is when that occurs during pregnancy.

20   Q.  And how much strength and weight do you give on the Dewey

21   2023 study?

22   A.  I take it very seriously.  I've noted over time I've

23   become -- as I come to appreciate more the complexity and

24   nuances of urinary fluoride with all of its virtues, this is

25   kind of, in a way, you could argue doing the obvious.

SAVITZ - DIRECT / CAINTIC

 1    Populations that are extremely indistinguishable other than,

 2    you know, one group was exposed to fluoridated water and one

 3    group was not.

 4         It would be -- again, it would have been nice if it was a

 5    bigger study, there's other features like that, but that's

 6    about as close as you get to a true natural experiment.

 7    Nothing else changed.  They turned on the tap and drank the

 8    water in one pregnancy, and they were doing the same thing in

 9    the other.

10         And to the best of my knowledge, it wouldn't have been

11    with an awareness or a focus on what was going on in the water

12    supply.  It would certainly -- it's hard to imagine a bias that

13    would have made -- you know, that would cause those two

14    sub groups -- let's just take the extremes, fully exposed,

15    fully unexposed -- what other things would be different about

16    them, other than their fluoride exposure?  I think it's a

17    pretty clean comparison.

18    Q.   And what was the fluoride water concentration for the

19    populations that were consuming fluoridated water?

20    A.   I believe it was the usual .7 milligrams per liter.  That

21    was the target that was used.

22    Q.   And did the Dewey 2023 authors find any adverse effect of

23    exposure to fluoridated water and IQ?

24    A.   No.

25              THE COURT:  Is there a further table that has

 1  nonexposed?  This is comparing fully exposed and nonexposed.

 2          MR. CAINTIC:  So I think, if I'm recalling correctly,

 3  the nonexposed was a reference group?

 4          THE WITNESS:  That's correct.  That's the --

 5          THE COURT:  Oh, I'm sorry.

 6          THE WITNESS:  These were the two being compared to --

 7          THE COURT:  I see.

 8          MR. CAINTIC:  Right.  But I believe that's in a

 9  separate table or the table actually says, "Reference Group,"

10  but I'd have to go back and look at it.

11          THE WITNESS:  Well, for this purpose it would just

12  show a bunch of zeros.

13          THE COURT:  Yeah, yeah, I got it.  It's the base --

14  it's the control number.

15          THE WITNESS:  Yeah.  The denominator, right.

16  BY MR. CAINTIC:

17  Q.   So Dr. Grandean raised a concern that the exposure groups

18  in Dewey 2023 might not be different enough because the women

19  might have been exposed -- even if they'd go to a

20  nonfluoridated zone, they might have been exposed to a lifetime

21  of water fluoride exposure.  What do you think about that

22  criticism?

23          MR. CONNETT:  At this point, Your Honor, I will object

24  as going beyond the scope of Dr. Savitz's knowledge based on --

25  and an undisclosed opinion as well.

1      THE COURT:  So this particular aspect of the Dewey

2   study had not been previously either disclosed or inquired into

3   in deposition?

4      MR. CAINTIC:  I don't think it was inquired into in a

5   deposition, Your Honor.  I was offering this as a rebuttal and

6   hopefully it would be helpful to the Court to understand where

7   some of these issues are.

8      MR. CONNETT:  And based on deposition testimony,

9   Dr. Savitz doesn't have a familiarity with the literature

10  regarding fluoride in bone, which would be necessary to opine

11  on that matter.  And his expert report does not discuss this

12  issue.

13     THE COURT:  All right.  Then I'm going to sustain the

14  objection.

15     MR. CAINTIC:  Okay.

16  BY MR. CAINTIC:

17  Q.   And Dr. Savitz, are you aware of the Do study from 2022

18  out of Australia?

19  A.   Yes, I am.

20  Q.   And did you rely on the Do study when coming to your

21  opinions in this case?

22  A.   Again, I was much more focused on the IQ studies than on

23  the behavioral outcome studies, and the Do study's behavioral

24  outcome.

25     Within that subpart of my assessment on the behavioral

1   outcomes, it was one of several studies that I did rely on.

2          MR. CAINTIC:  And Mr. Hambrick, can we pull up U.S.

3   Demonstrative No. 14.

4          And for the benefit of the Court, this is -- this

5   information is from Trial Exhibit 113, page 6, Table 3.

6   BY MR. CAINTIC:

7   Q.   And, Dr. Savitz, does U.S. Demonstrative No. 14 accurately

8   upon portray the findings of Do 2022?

9   A.   Yes, it does.

10  Q.   And again, the hundred percent exposed was the reference?

11  A.   That -- that's right.  They did it sort of the opposite of

12  the way we often do it, but they were -- right, the reference

13  group are those who had a -- the children who had a lifetime of

14  having been in communities served by fluoridated water.

15  Q.   And can you tell us about the study design of Do 2022?

16  A.   Well, they were, I think, taking advantage of a large

17  national survey and able to identify communities among, you

18  know, the survey participants and classify those communities

19  with respect to the water fluoridation status.  And I don't

20  know if it was across the entire country of Australia, but it

21  was a broad geographic area.

22          And what they did then is to simply look at the

23  relationship of the scores on these behavioral measures

24  indicated there in relation to the fluoridation status of the

25  communities in which the child lived.

1  Q.  And how much weight do you assign this study?

2  A.  It's -- again, on the behavioral outcomes, I think that

3  this is where I would very much agree with the NTP report.

4  It's really not -- it does not provide much of a -- sort of a

5  consistent or solid basis for any sort of assessment in part,

6  again, because the specific outcomes vary.  This is one of the,

7  you know, handful of studies that makes a contribution -- I'm

8  not dismissing it -- but it doesn't stand out as definitive or

9  more persuasive than maybe, you know, three or four or five

10 others.

11 Q.  What are the strengths of this study?

12 A.  Well, the study size is vast.  That's -- I mean, we're in

13 the thousands range, which is certainly advantageous.

14     I think it's safe to say that the assessment would not

15 have been biased by the assessors focusing on whether the

16 community was fluoridated or not.  It was not a major concern.

17     And the -- I suppose it's an advantage that there's,

18 again, a clean separation.  If you -- you know, from ages I

19 think zero to five, zero including pregnancy presumably, if

20 there was a lifetime of fluoridated water, you were getting

21 fluoridated water; lifetime of nonfluoridated water, it's

22 clear.  So there's not ambiguity about is there an exposure

23 contrast.  There is an exposure contrast.

24     And I think you could be, you know, pretty confident

25 that -- you can be very confident that the intake and the

SAVITZ - DIRECT / CAINTIC

```
 1  exposure levels across those groups were different from one
 2  another.
 3          THE COURT:  Did the study take into account any
 4  mobility, people moving from one region to another?
 5          THE WITNESS:  As I recall, they were able to classify
 6  those who were a hundred -- you know, lifetime -- short
 7  lifetime, admittedly, five years, but I believe the middle ones
 8  are the ones where either -- I can't recall if it was a
 9  combination of either they moved or the fluoridation status
10  changed.
11          THE COURT:  So there was a middle status?  It wasn't
12  just lifetime or no?  It was a --
13          THE WITNESS:  Well, the zero and hundred percent on
14  this chart correspond to the extremes of lifetime all
15  fluoridated, lifetime no fluoridated.  And then that middle
16  bar --
17          THE COURT:  I see.
18          THE WITNESS:  -- would pertain to the ones who had a
19  mixed experience.
20          THE COURT:  I see.  Okay.  Thank you.
21  BY MR. CAINTIC:
22  Q.  And did the Do 2022 authors find any adverse effect of
23  fluoride exposure on neurobehavioral symptoms?
24  A.  No, they did not.
25          MR. CAINTIC:  Your Honor, I'm happy to move on to
```

```
 1   another topic.  It's going to be the NTP Monograph, so it's a

 2   large topic.

 3            THE COURT:  Yeah, and I think we're at our break

 4   point --

 5            MR. CAINTIC:  Yeah.

 6            THE COURT:  -- so let's go ahead and take that.  Thank

 7   you.

 8        (Recess taken at 10:15 a.m.)

 9        (Proceedings resumed at 10:33 a.m.)

10            THE CLERK:  Remain seated.  Court is back in session.

11            THE COURT:  Okay.  We're ready to resume.

12            MR. CAINTIC:  Yes, Your Honor.

13   BY MR. CAINTIC:

14   Q.   Okay.  Dr. Savitz, let's move on from the new primary

15   research that's come out in the last three and a half years and

16   turn to the NTP Monograph.

17        So, Dr. Savitz, both in connection with your testimony in

18   this case and your time at NASEM, you reviewed multiple drafts

19   of the NTP Monograph, right?

20   A.   That's correct, yes.

21   Q.   And which drafts have you reviewed?

22   A.   I think the original one was 2019, and then there was a

23   2020 revision, and then there was I think a 2022 version

24   that -- again, I -- 2022 or 2023 when I was preparing my

25   report.  And, of course, it may well have evolved a bit more
```

SAVITZ - DIRECT / CAINTIC

 1   even since then.

 2   **Q.**   I'm sorry, Dr. Savitz, I should have started -- the Court

 3   asked you a question about the World Health Organization report

 4   on fluoride.  I want to turn back to that for just a moment --

 5   **A.**   Okay.

 6   **Q.**   -- before we launch into the NTP Monograph.

 7   **A.**   Okay.

 8        **MR. CAINTIC:**  Mr. Hambrick, can we pull up the World

 9   Health Organization 2006 report?

10   **BY MR. CAINTIC:**

11   **Q.**   And the Court had asked you some questions about what the

12   intake of fish was and how the World Health Organization

13   characterized that.

14        Can you read the last paragraph going into the next page

15   and see if that refreshes your recollection?

16   **A.**   "In general the levels of fluoride in meat, 0.2 to 1.0

17   milligrams per kilogram and fish, 2 to 5 milligrams per

18   kilogram are relatively low.  However, fluoride accumulates in

19   bone in the bones of canned finish, such as salmon and

20   sardines, which are also eaten.  Fish protein concentrates may

21   contain up to 370 milligrams per kilogram fluoride; however,

22   even with a relatively high fish consumption and a mixed diet,

23   the fluoride intake from fish alone would seldom exceed 0.2

24   milligrams fluoride per day."

25   **Q.**   Is this what you were talking about earlier?

**SAVITZ - DIRECT / CAINTIC**

1  **A.**   That was the -- where I had gotten my perspective on

2  fluoride in fish was from that source.

3  **Q.**   Okay.

4        **MR. CAINTIC:**  And, Your Honor, is this fine to take

5  down?

6        **THE COURT:**  Yes.

7        **MR. CAINTIC:**  Okay.  Mr. Hambrick.

8  **BY MR. CAINTIC:**

9  **Q.**   Okay.  Now let's turn to the NTP Monograph.

10  **A.**   Yes.

11  **Q.**   So you just said you reviewed the 2019 and 2022 -- and

12  2020 version.  Did you review any other versions of the NTP

13  Monograph?

14  **A.**   I've looked at several subsequently in preparation for

15  this case, but, again, I'm -- broadly, but I would not want to

16  claim that I've read every page of the extensive document.

17  **Q.**   And your NASEM reviews, what drafts of the NTP Monograph

18  was NASEM reviewing?

19  **A.**   Again, the first one we reviewed was from 2019, and then

20  we issued our report, I believe, in 2020, and then they had a

21  revision, which we reviewed.  I can't remember, I think our

22  second report may have come out in 2021.

23  **Q.**   And Dr. Savitz, we heard testimony from Dr. Berridge that

24  the NASEM review was not critical of the earlier versions of

25  the NTP Monograph.  Do you agree with that characterization?

1          **MR. CONNETT:**  Your Honor, I'm going to object to just

2    mischaracterizing Dr. Berridge's testimony.

3          **THE COURT:**  All right.  Let's rephrase that.  Just ask

4    it straight out.

5          **MR. CAINTIC:**  I'll ask it straight out.

6    **BY MR. CAINTIC:**

7    **Q.**   Was the NASEM review critical of the earlier versions of

8    the NTP Monograph?

9    **A.**   It was.  We had -- I can start with, sort of, our bottom

10   line assessment is -- you know, is this document -- you know,

11   and our charge was to ask whether it had provided a --

12   documentation to support its conclusions.  And we came to

13   believe that it did not.

14         Now, underlying that were a series of more specific issues

15   about compliance with the guidelines for developing systematic

16   reviews, some concerns with inconsistency in the handling of

17   risk-of-bias assessment, confounding, some what we thought

18   were, sort of, not well-documented assessments of evidence and

19   ultimately also this issue of communicating the results and

20   clarifying what the result -- what their monograph could and

21   could not be used for.

22   **Q.**   And what was the conclusion that the NASEM committee was

23   reviewing in the NTP Monograph?

24   **A.**   Well, this was, again -- I'm trying to remember the exact

25   phrasing in the first round, but it was the -- they were doing

 1  a hazard assessment, and it was describing or characterizing

 2  their -- their judgment about whether, in fact, fluoride posed

 3  a hazard to development.

 4         MR. CAINTIC:  Mr. Hambrick, could we pull up trial

 5  Exhibit 654, page 17.  And we will particularly focus in on the

 6  paragraph that says, "NTP Conclusion."

 7         THE COURT:  And this is which draft?

 8         MR. CAINTIC:  So this is the 2021 NASEM --

 9         THE COURT:  2021?

10         MR. CAINTIC:  2021 NASEM review, which is Trial

11  Exhibit 654.

12         THE COURT:  Okay.

13  BY MR. CAINTIC:

14  Q.  And so this is the second review -- right? -- Dr. Savitz?

15  A.  That's correct, yes.

16  Q.  And I'm just going to read this portion here and ask you

17  if you can explain more about it.

18         So quote, "As noted above, the committee focused on

19  determining whether the evidence as presented in the revised

20  monograph supported NTP's main conclusion that fluoride is

21  presumed to be a cognitive neurodevelopmental hazard to humans.

22  The revised monograph is much improved from the initial draft

23  that the committee reviewed.  The addition of the meta-analysis

24  substantially increases the support for NTP's main conclusion.

25  However, the committee is still concerned about the

SAVITZ - DIRECT / CAINTIC

1  presentation of the data, the methods and the analyses in the

2  revised monograph and finds that the monograph falls short of

3  providing a clear and convincing argument that supports its

4  assessment."

5       So there's a lot baked in there.  Can you explain more

6  what the NASEM committee meant?

7  **A.**  Yes.  Again, we -- we were really scrutinizing the

8  document, obviously, looking at it in detail as we were charged

9  to do.  And we remained concerned about some of the decisions.

10 Again, I don't know that I could, you know, recall them all,

11 but, for example, this issue of, in some cases, double counting

12 publications that are -- with overlapping populations and

13 treating them as independent, the -- basically, the statements

14 about the patterns of association across varying levels of

15 fluoride.  They generated a lot of technical material, but

16 they're -- the way I think of it at least is, there was, in

17 broad terms, a bit of a disconnect between substantial

18 technical detail and then the inferences, the ultimate

19 inferences made.

20      There was -- you couldn't follow the trail of, yes, I see

21 how they got from A to B to C.  It was more documented -- I

22 mean, it was well documented as is obligatory, but then there

23 was -- it became somewhat informal.

24      So for issues like consistency, again, it was never clear

25 in my view, at least, exactly what they meant by what does it

1   take to be consistent?  When does that qualify?

2        And the -- they would -- and again, they -- instead of,

3   sort of, providing a formal definition and which results led

4   them to it and so on, it was more by anecdote at the end of,

5   okay, well, here's an example; for example, this study found

6   this and that study found that.

7        And so it's not to say that they were doing -- you know,

8   that their conclusions were wrong, but that trail from raw

9   evidence to their assessment had some gaps and concerns.

10       Again, we didn't do a complete audit.  We did not go over

11  every study.  That was not our charge.  But even an

12  illustrative examination of selected studies, we would -- you

13  know, we did the exercise of do we agree with the components of

14  the risk-of-bias assessment.  And it wasn't infrequent to have

15  those, in our view, be questionable in the application of the

16  rules.  And so it -- again, it -- there wasn't like a, if you

17  will, you know, a smoking gun that said:  This is it, this is

18  what's wrong.  It was a series of issues that might seem modest

19  individually but, cumulatively, led us to be concerned that it

20  was not -- it was not making its own case well.

21       Whether we agreed with it, again, that was not the issue.

22  It was -- the story that gets to the punchline at the end we

23  did not find persuasive.

24       **MR. CONNETT:**  Your Honor, just a technical note, I've

25  received word that the recording is not on -- is not live right

SAVITZ - DIRECT / CAINTIC

```
 1  now for the Zoom.
 2            THE COURT:  Okay.  Let's see if we can fix that.
 3            THE CLERK:  What do you mean, the recording?
 4            THE COURT:  You mean the streaming is not working?
 5            MR. SANDERS:  She has to press record.
 6            MR. CONNETT:  The recording of the Zoom?  So I guess
 7  it's not being recorded.
 8            THE COURT:  Oh.  We have to press record.
 9            THE CLERK:  Didn't we?  I did that before I came and
10  got you, but I'm happy to do it again.
11            THE COURT:  Try it again.
12            It was on.  I don't know what happened.  Should be on
13  now for sure.
14            THE CLERK:  There we go.
15  BY MR. CAINTIC:
16  Q.  Dr. Savitz, you raised or you mentioned that you also had
17  some issues with the communication of the NTP Monograph.
18       What did you mean by that?
19            MR. CONNETT:  Your Honor, I just want to be clear,
20  are we talking -- just so that I can determine whether I have
21  an objection on undisclosed opinion, which monograph are we
22  talking about?
23            THE COURT:  Yeah.  Make it clear.  I'm getting a
24  little confused myself.
25  \\\
```

JENNIFER COULTHARD, CSR, RMR, CRR          (530)537-9312
OFFICIAL UNITED STATES DISTRICT COURT STENOGRAPHER

BY MR. CAINTIC:

Q.   Yeah.  Let me -- so in the monographs that the NASEM committee reviewed, so both the 2019 and 2020 version, you said NASEM had some issues with communication of the authors' findings.  What did you mean by that?

A.   What we realized in looking at it is, again, they were undertaking a hazard evaluation, and they have a fairly formal definition of what that means.  And what we came to realize was that there was a lot of interest and concern about water fluoridation and we felt that they were not being -- sort of taking that sensitivity or that issue into account and, sort of, underestimating the extent to which there -- there work may be misused as a resource for making the assessment about the health issues around water fluoridation.

And so it was encouraging them -- again, it's not surprising when a report on fluoride and neurodevelopment is developed.  Whatever the purpose is, it's going to be in the face of a controversy of this nature, it's going to be drawn upon in ways that the authors may well not have intended.

We weren't accusing them of misrepresenting it.  We were more concerned that they were not clarifying to the degree that would have been helpful to the process, the separation of their report from the -- from the issues around water fluoridation.

MR. CAINTIC:  Mr. Hambrick, if we could pull up Trial Exhibit 654 -- so this is the NASEM 2021 review -- and pages 4

  1   to 5.  It starts on the last sentence of 4.

  2   **BY MR. CAINTIC:**

  3   **Q.**   So, Dr. Savitz, I'm just going to read this and have you

  4   explain.  Quote -- so this is talking about the monograph.

  5   Quote, "It also needs to emphasize that much of the evidence

  6   that's presented comes from studies that involve relatively

  7   high fluoride concentrations, and that the monograph cannot be

  8   used to draw conclusions regarding low fluoride exposure

  9   concentrations (less than 1.5 milligrams per liter) including

 10   those typically associated with drinking water fluoridation."

 11        Dr. Savitz, what was meant by that?

 12   **A.**   Well, again, the monograph was developed for a particular

 13   purpose, and its purpose was not to draw conclusions about low

 14   fluoride concentrations.  That was not in its mandate.  They

 15   were looking more broadly at the relationship between fluoride

 16   intake and neurodevelopmental outcomes.

 17        And so we -- as I said, it isn't that we were saying they

 18   were misrepresenting it.  They weren't making assertions that

 19   were unwarranted, but they were not taking measures that we

 20   thought would be beneficial for having the report be, sort of,

 21   used appropriately, interpreted appropriately.  They were --

 22   they were not being as direct as we would have wanted them to

 23   be in -- in explaining where their report leaves off and where

 24   these other issues pick up.

 25   **Q.**   So, Dr. Savitz, following the 2020 and 2021 NASEM reviews,

```
 1   what did NTP do to its statement that fluoride is a presumed
 2   cognitive neurodevelopmental hazard to humans?
 3   A.    I recall the -- again, the wording changed to -- I think
 4   it was "moderate confidence," and there was more of a -- again,
 5   in the communication, which I thought was, you know, a
 6   significant improvement of clarifying that with respect to the
 7   levels below 1.5 milligrams per liter that it was less clear.
 8   And so it was tempered is the way I would describe it at least.
 9         And I think -- again, I think more consistent with what
10   they were initially trying to do and what they were able to do.
11   I think that it brought that in better balance.
12   Q.    And so, Dr. Savitz, you have reviewed the most recent
13   drafts of the NTP Monograph in coming to your opinions for this
14   case, right?
15   A.    Yes, I have.
16   Q.    You reviewed the July 2022 meta-analysis?
17   A.    Yes.
18   Q.    And you reviewed the Board of Scientific Counselor Working
19   Group report?
20   A.    Yes.
21   Q.    And that included the September 2022 version of the NTP
22   Monograph, right?
23   A.    Yes.
24   Q.    Okay.  How would you compare the 2022 monograph that is
25   most recent to the NASEM committee -- the versions of the NTP
```

SAVITZ - DIRECT / CAINTIC

```
 1   Monograph that the NASEM committee reviewed?
 2        MR. CONNETT:  Your Honor, at this point I have an
 3   objection for an undisclosed opinion.  Dr. Savitz testified at
 4   his deposition explicitly that he made no attempt to evaluate
 5   the 2022 monograph to assess whether NTP had adequately
 6   incorporated the recommendations from NASEM, nor did he do
 7   anything to evaluate whether the NTP's conclusions are
 8   supported by the studies it's citing.
 9        So any -- I would -- I would say any testimony here
10   regarding an evaluation of the merits, or lack thereof, of the
11   NTP's 2022 Monograph goes beyond the scope of his disclosed
12   opinions.
13        THE COURT:  All right.  Response?
14        MR. CAINTIC:  Your Honor, I mean, I think this is the
15   same issue that was brought up yesterday.  I would want to hear
16   precisely where from the deposition he said that, but I have
17   his reports now.  I can try to find the several instances where
18   he's talking about the 2022 NTP Monograph.  I don't exactly
19   know what the objection is here; he can't talk about it all.
20        THE COURT:  Well, the objection, as I understand it,
21   is a disclosure-related objection.
22        MR. CONNETT:  Correct.
23        THE COURT:  And I hate to take the time to do this,
24   but I can't assess that without seeing what was in the report,
25   what was examined at the deposition.
```

 1          MR. CONNETT:  Your Honor, we could put deposition

 2   testimony on the screen for you.

 3          THE COURT:  Well, if that's what you're going to do,

 4   but you also have the report.  Maybe there's something in the

 5   report?

 6          MR. CAINTIC:  Well, I don't know exactly what I'm

 7   responding to.  I mean, there's -- there's so much about the

 8   NTP Monograph in Dr. Savitz's report.  I mean --

 9          THE COURT:  Well, I think particularly we're looking

10   about his now current views about the adequacy of the

11   post-NASEM --

12          MR. CAINTIC:  Right.

13          THE COURT:  -- the 2022 drafts and how it compares,

14   you know, and that kind of stuff.  I don't know if that was

15   disclosed in your report or not.

16          MR. CAINTIC:  Right.  I mean, so here.  This is in his

17   rebuttal report, which is -- this is ECF No. 378-7, page 68.

18   And at the bottom it says, "Interpretation of NASEM and BSC

19   reviews."  You know, at the very bottom -- this is in response

20   to Dr. Grandean -- "The NASEM committees that reviewed the

21   report, which I chaired, had a clear and rather narrow charge.

22   The committee was asked to review the monograph and ultimately

23   to assess whether NTP's conclusions are supported by the

24   evidence provided in it.  We were not asked to reach an

25   independent judgment regarding fluoride and neurodevelopment."

 1          **THE COURT:**  Yeah, that's about the review.  The

 2    question is, is there anything in there about his comments --

 3    this is post-NASEM.  We're talking about --

 4          **MR. CAINTIC:**  Right.

 5          **THE COURT:**  -- his current assessment of the

 6    subsequent 2022 draft.

 7          **MR. CAINTIC:**  Right.

 8          **THE COURT:**  Is there any opinion in there about that?

 9          **MR. CAINTIC:**  So I can turn now to his evaluation of

10    the Board of Scientific Counselors Working Group Report, which

11    kind of -- that's the document which had everything in it,

12    essentially.

13          So he writes, "The BSC was charged with providing an

14    evaluation, for the NTP director."

15          It goes on.  Let's see.  "As summarized in the BSC

16    report, there were 325 reviewer comments in the systematic

17    review with 232 responses rated as adequate, 51 responses rated

18    as adequate with suggested edits and 42 rated as inadequate

19    with further revisions recommended."

20          So, I mean, I think that there's all of this

21    discussion about how this process was, and it seems like we're

22    getting a little bit too much into an overly formalistic land.

23          **THE COURT:**  Well, what you just read is sort of his

24    summary of the BSC report, but I'm not hearing sort of his own

25    now current assessment of the ultimate product, which is the

1    most recent draft of the -- of the monograph.  Is there

2    anything in there about that?

3             MR. CAINTIC:  I mean, I'm sure there is, Your Honor.

4    I'm a little caught off-guard by this objection given how, in

5    my view, this whole report is talking about the NTP Monograph.

6    I can look now -- this is the rebuttal report.  I can look now

7    to the August --

8             THE COURT:  While you're looking at that, let me

9    hear --

10            MR. CONNETT:  Yes, Your Honor.  I think it would be

11   clarifying to bring on to the screen page 66 of Dr. Savitz's

12   deposition, starting with line 1.

13            Could we get the monitor on this side?

14            THE COURT:  All right.  Can you see it?

15            MR. CONNETT:  And I'll read this, Your Honor.  I asked

16   Dr. Savitz:

17       "QUESTION:  And you would agree, Dr. Savitz, that we can't

18       look at NASEM's criticisms of the 2019 and 2020 drafts and

19       assume that those criticisms still apply to the 2022

20       Monograph, correct?

21       "ANSWER:  Again, they reviewed it after the NASEM" --

22            THE COURT:  Revised it.

23            MR. CONNETT:  "-- committee had completed its work,

24       and so we -- I personally, obviously -- there was no NASEM

25       committee to look at it -- have not assessed whether the

 1    current version of the draft is fully responsive to the

 2    concerns that had been raised.

 3    **"QUESTION:**  So you didn't do that as part of your

 4    assessment in this case, fair?

 5    **"ANSWER:**  I did not."

 6         **THE COURT:**  Go on.

 7         **MR. CONNETT:**  "The only part -- again, there were a

 8    lot of very detailed and sort of more mechanical

 9    criticisms that the NASEM committee had raised.  And one

10    of the ones that was of a somewhat broader nature was in

11    the way it was communicated, the way they interpreted and

12    described it.  I know it is something that continued to be

13    a point of some, I will say maybe contention, but a point

14    of contention with the Board of Scientific Counselors

15    about the application of the review to the lower range of

16    fluoride that we are discussing."

17         So in that testimony, Your Honor, you see that there

18    wasn't -- Dr. Savitz did not attempt to evaluate, himself,

19    whether that NTP had adequately incorporated NASEM's

20    recommendations, which is -- so can -- if counsel wants to

21    elicit just observation of what the BSC Scientific Board said,

22    I have no -- I have no objection to that.

23         But if it's to go beyond that to elicit expert

24    testimony from Dr. Savitz about his assessment of whether or

25    not NTP has adequately incorporated NASEM's recommendations, I

 1    would object to that as a non-disclosed opinion, particularly

 2    given other testimony where Dr. Savitz stated very explicitly

 3    that he did not review any of the underlying studies upon which

 4    NTP relied, and thus could not comment on whether NTP's

 5    conclusions were justified or not.

 6         **MR. CAINTIC:**  Your Honor, Dr. Savitz has an entire

 7    section in his initial expert report titled "Contribution Of

 8    National Toxicology Program Draft Monograph" where he discusses

 9    in detail the most recent versions of the NTP Monograph.

10         Now, maybe the distinction here is Dr. Savitz should

11    disclose his own opinion about whether he thinks that his

12    criticisms of the NTP Monograph, when he was on the NASEM

13    committee, were adequately addressed instead of attributing

14    that to well, let's say, NASEM.

15         What I read from that is that NASEM has not gone

16    forward and rereviewed the Monograph since the 2021 report.

17    But this idea that he cannot discuss his own criticisms of the

18    NTP Monograph, which I think that that is going too far.

19         I mean, there's -- for example, what Dr. Savitz just

20    identified now, he says, quote, "The emphasis" -- so this is

21    about the NTP Monograph -- quote, "The emphasis is on

22    consistency, simply tallying the number of studies that point

23    in one direction or another with limited effort to examine the

24    variation in methods and how the different methods might

25    produce bias in one direction or the other."

SAVITZ - DIRECT / CAINTIC

```
 1          And then it goes on, "Their tally by NTP is likely to
 2    be accurate in those terms but glosses over important variation
 3    across the studies."
 4          So the substance of the criticisms is discussed in
 5    this.  And I think we're getting into the realm of --
 6          THE COURT:  Substance of the criticisms from NASEM or
 7    his criticisms?
 8          MR. CAINTIC:  His criticisms.
 9          MR. CONNETT:  I would add deposition testimony page
10    82:
11        "ANSWER:  I have not done the work necessary to figure out
12        if I would 'agree or disagree,' with NTP's conclusions."
13          From page 85:
14        "ANSWER:  I have not independently evaluated NTP's
15        conclusions.
16          "I don't have a basis for saying that NTP is wrong in
17        reporting the pattern of a consistent association.  I
18        haven't done the work to verify that."
19          THE COURT:  So the question is if he now testifies
20    that he's done more work since that deposition and has now some
21    conclusions and some additional observations, in your argument
22    that wasn't disclosed in a deposition?
23          MR. CONNETT:  Correct.
24          MR. CAINTIC:  Again, I -- this -- all of that
25    testimony, I think, is about -- it goes to did Dr. Savitz
```

 1    conduct a thorough review of all of that high-dose literature.

 2    And that's not what Dr. Savitz was focused on, I think he's

 3    been pretty clear about that.

 4            But he has an understanding of what the effects are

 5    above 1.5.  So with the benefit of time, I've been able to go

 6    through his report and identify several instances where he

 7    discusses, right, quote, "The studies that provide the basis

 8    for this assessment" -- this is about the NTP Monograph.

 9            **THE COURT:**  Now, you're reading from what?

10            **MR. CAINTIC:**  Oh, sorry.  This is his August 4, 2023,

11    report, which is ECF 378 at page 22.

12            So he's talking about the NTP Monograph's discussion

13    of consistency and he says, "The studies that provide the basis

14    for this assessment are largely addressing fluoride in the

15    range at or above 3 to 4 milligrams per liter."

16            So I don't understand what the criticism is here.  He

17    cannot discuss at all that the studies above -- the studies

18    above 1.5 are well above that range?

19            **MR. CONNETT:**  I have no objection, Your Honor, on that

20    limited point.  Like, the NTP relied on higher-level exposures.

21    That's fair.  That's fine.

22            My concern is if we go past that general observation,

23    which, frankly, is not in dispute, but if we go past that sort

24    of general observation into anything resembling a critique of

25    NTP's evaluation in terms of the substance, then that's not a

```
 1   disclosed opinion.

 2           MR. CAINTIC:  Your Honor, that is precisely the

 3   disclosed opinion.  That is precisely what I just read.  I

 4   mean, the --

 5           THE COURT:  All right.

 6           MR. CAINTIC:  -- what I just read, the emphasis on

 7   consistency.

 8           THE COURT:  Given counsel's and the parties'

 9   familiarity with the issues, this is not like such a surprise

10   that you don't have any basis or ability to cross-examine, and

11   so it seems to me that what he's disclosed in his report is, it

12   seems to me, close.

13           If there's something that he's going to rely on that I

14   find is not a fair subject in the absence of a former

15   cross-examination on a deposition, then I reserve the right to

16   strike it or exclude that testimony, but I'm not going to

17   exclude it categorically, so go ahead.

18           MR. CAINTIC:  Okay.  Thank you, Your Honor.

19   BY MR. CAINTIC:

20   Q.   So, Dr. Savitz, you reviewed the most recent drafts of the

21   NTP Monograph, right?

22   A.   Yes, I did.

23   Q.   What have you identified as the strengths of those drafts?

24   A.   I think in some ways, in many ways, it's the strengths

25   that have always been there in a very exhaustive search of the
```

SAVITZ - DIRECT / CAINTIC

 1  literature identifying studies that might not have otherwise

 2  been identified in some cases in somewhat obscure locations.

 3  They organized that material, they -- they followed, again, the

 4  protocols for systematic reviews with, you know, the whole

 5  sequence of activities that are required to conduct that.  I

 6  think, this is maybe a broader contribution.  They put the

 7  issue on the table.  They've raised attention to an issue that

 8  I believe is -- has generated research and should and will

 9  generate more research.  I think that's -- you could say that

10  that's a contribution.

11       The --again, and I -- I've already said, I approach the

12  evidence on the low -- the effects of fluoride at the levels in

13  the range of interest, I approached that differently.  I did

14  not undertake a systematic review of the nature they did, but I

15  can see there is value in someone having done that -- their

16  approach to the issue, again, distinct from my approach to the

17  issue.

18  **Q.**  What are the weaknesses you identified in the most recent

19  drafts of the NTP Monograph?

20  **A.**  Well, again, I was focusing on its value with respect to

21  the inferences regarding lower levels of fluoride exposure, and

22  I thought that there was still an insufficient appreciation

23  that some studies are much more valuable than others for that

24  question.  And it isn't just the exposure ranges, of course

25  that's obvious -- the studies at very high levels are of lesser

1    contribution -- but it's partially just the algorithms they
2    use.
3         When they say low risk-of-bias, that's a big bin, and
4    there are a lot of things in that bin.  And once it's in the
5    bin, there's not a "most informative study" versus the others.
6    There's a certain set of rules they operate under.
7         The -- even the very classification, there's -- there's a
8    standardization to the way these things are done so that they
9    look at risk-of-bias across several criteria.  But they don't
10   dissect in depth each one of those components.
11        And again, I don't know if it's fair to criticize them for
12   doing systematic reviews the standard way.  I'm more concerned
13   with whether that process elucidates the evidence, sort of, in
14   the most effective way.
15        Interestingly, again, we come around to the same bottom
16   line, and I'm very aware of, you know, the bottom line
17   assessments that they derived, and I think that in that sense I
18   can say that I compared and it is improved in the clarity of
19   the degree of -- the inferences regarding the lower exposures.
20        That -- on that particular issue, I am well aware of what
21   it looked like several years ago and the -- I think a much
22   improved explanation of their work.  They've obviously done a
23   huge amount of additional work over the intervening years, and
24   it's more, I would say, comprehensive and more detailed.
25        That doesn't mean that I -- again, I'm not claiming that I

 1   reviewed every page of it, but on the key issues of the lower

 2   range of exposures, I believe I did follow what they did in the

 3   more recent versions, and it's better.

 4          THE COURT:  Can I -- let me see if I understand

 5   something.

 6          You talked about the NTP's approach to risk-of-bias

 7   analysis.  You're not taking issue with doing that exercise,

 8   correct?

 9          THE WITNESS:  No, no.  It's a matter -- no.

10   Absolutely.  That's -- that's essential.  But it's the way it's

11   done.  And there's -- again, there's a way that it's done in

12   systematic reviews where there's multiple axes, and you score

13   them on a series of points.  And it's more designed, the way I

14   think of it, for sort of application to a very large body of

15   literature.  You know, I think they had something like 55

16   studies at the end.  And what it doesn't do, though --

17          Well, first of all, it's risk-of-bias, but there's not

18   a corresponding effort to assess relevance to the question.

19   And again, they were asking a different question than I asked.

20   They were asking about fluoride in general and

21   neurodevelopmental outcomes.  I was zeroing in on fluoride in

22   the range of 1.5 milligrams per liter or less.

23          THE COURT:  I understand that.  I'm just looking at

24   a -- one discrete issue --

25          THE WITNESS:  Okay.

SAVITZ - DIRECT / CAINTIC

1    **THE COURT:**  -- which I thought was your critique about

2    the way the NTP handled risk-of-bias.  I understand the

3    relevant range and the high and the low and all of that, but is

4    there something that was done methodologically that wasn't --

5    that you disagree with?  I thought they listed, you know, the

6    factors of bias that they were looking for, and they obviously

7    reached some conclusion at the end; you don't always have to

8    score it one way or another.

9        Is there something about the methodology and their

10   categorization of the risk-of-bias to high or low that you

11   fundamentally disagree with?

12   **THE WITNESS:**  You know, I think that they have the

13   right considerations.  I mean, there's only -- the menu is the

14   same always.  You know, it's confounding, it's measurement

15   error, you know, selection bias.  Those are the standard sort

16   of considerations.

17       I -- and relative to my own assessment of -- I may not

18   use the same terminology, but I'm, of course, assessing

19   risk-of-bias in the generic sense, not in the formal scaling

20   sense, but I'm looking at the extent to which studies may have

21   derived measures of association that are not accurately

22   reflecting causality -- causal or possible causal effect.

23       And so there -- what it -- what it doesn't do, though,

24   when you do the algorithm is, it doesn't let you zero in on

25   particular issues and particular studies.  It's got -- it's a

```
 1    more standardized approach that doesn't -- doesn't sort of

 2    support a more in-depth analysis of individual issues.  It's a

 3    broader-brush look, and it puts them ultimately -- as I said,

 4    the low risk-of-bias studies doesn't single out ELEMENT or

 5    MIREC as exceptionally useful; it's lumped in with other

 6    studies and other settings that I would not personally say are

 7    as informative.

 8         So it's -- maybe you could say it's not, in my view,

 9    fine-grained enough.  It's sort of the -- you're putting them

10    in bins and I would -- I would probably want to see it

11    dissected further out and more specific.

12         Again, I've written on this, but there are studies

13    that do and do not address for certain confounders.  And rather

14    than, sort of, feeding that into a final score, I would ask the

15    question:  Does it suggest that adjusting for that confounder

16    is important; do the results suggest that those two classes of

17    studies are giving different results and that we should pay

18    more attention to it?  That's sort of a counter -- it's another

19    approach to assessing risk-of-bias, but I would say it's more

20    tailored than generic.  So I -- but I don't disagree with the

21    need to assess risk-of-bias, and I can see the merits in their

22    standardized approach, but there is also --

23         THE COURT:  Is it unusual to create a category of low

24    risk and high risk-of-bias?

25         THE WITNESS:  In systematic reviews it's always done.
```

1        **THE COURT:**  So there is an inherent problem with that

2   process as you -- because you're not getting very fine grained.

3   You're scoring at the end.

4        **THE WITNESS:**  That's right.

5        **THE COURT:**  And perhaps you give -- I would assume

6   when you do that categorization, you might decide to give --

7   put more weight on major factors such as confounding

8   variables --

9        **THE WITNESS:**  Right.

10       **THE COURT:**  -- or, you know.  But in the end if a

11   systematic review requires some axes on risk-of-bias, it seems

12   like at the end it's typically a binary process even though

13   it's cutting it with a rather blunt tool?

14       **THE WITNESS:**  I agree entirely.  Again, I'm not saying

15   the committee felt this, but when I was assigned to the NASEM

16   committee, I said:  Do we just have to act on the assumption

17   that the approach that they're taking is a good one?

18       And it was very clear, we're not there to critique the

19   approach; we're there to see whether they implemented that

20   approach effectively.

21       And so this is really more me.  This is not the NASEM

22   committee.  It's just the -- and there are times that this

23   integration of evidence has more and less value.

24       In this instance, I ended up not being as persuaded by

25   that strategy.  And I say that in part because in my own

 1   assessment for the question of interest, there's a small subset

 2   of studies that carry so much more weight than the others that

 3   the volume of the others is of less importance to me than the

 4   quality of that small subset that really I -- in my view, in my

 5   opinion, drives the -- they just carry so much more weight than

 6   other studies that have been done so far.

 7        THE COURT:  Did you find -- did you or the committee

 8   find yourself in disagreement with any of the risk-of-bias

 9   scoring in any particular instance, like you saw some study

10   that you thought should have been high bias but it wasn't or

11   vice versa?

12        THE WITNESS:  Yeah.  When we did a -- and it wasn't a

13   comprehensive audit, but we did actually assign individual

14   committee members, you know, look at these three papers, see

15   what they did with them.  And there were some -- again, there

16   were some disagreements or different interpretations or

17   questions about their assignments.  Maybe that's inevitable.

18        Even with a rule book, we look at the rules and come

19   to something different than they came to, but it was not a

20   trivial sort of -- again, and this is in the first review.  It

21   was not a small discrepancy in finding -- again, it sounds like

22   nitpicking, I suppose you can say it is, but when we looked in

23   great detail at what they had done, there were some troubling

24   issues.

25        This is an example in the risk-of-bias issue, just one

 1   that I do recall where they -- this question of blinding, which

 2   is actually quite important, that administering these IQ tests,

 3   it's -- it's rigorous, but it's not without influence from the

 4   assessor.

 5          Well, we figured out at some point that when nothing

 6   was said about it, the default was to assume it was blinded.

 7   We took exception to that, so that they may have given

 8   something a pass on that score on risk-of-bias when it didn't

 9   deserve it.  That's just an example of, you know, digging down

10   into the details where we might come to -- where we did find

11   some things of concern.

12          **THE COURT:**  All right.  But I take it with the four

13   studies we keep talking about, you or the committee didn't find

14   major methodological errors that you think --

15          **THE WITNESS:**  Yeah, no.  I -- I know that -- again,

16   I'd have to see.  I'm -- I believe at least that -- well, they

17   didn't have all four of them at the time, but that they -- they

18   would have classified the three that would have been available,

19   including the INMA study as low risk-of-bias, but not --see, I

20   would call them, for the purposes of this, very low

21   risk-of-bias relative, again, to others in that bin.

22          And so you're right, though, that there's -- it's --

23   the question is, did they implement their strategy effectively,

24   not is it the best strategy.  That was something that they

25   didn't -- you know, that's a different argument or my expert

SAVITZ - DIRECT / CAINTIC

```
 1    opinion versus those who decided to go about it that way.
 2            So I don't want to be critical in that sense.  I think
 3    they -- the NASEM committee and even now if there's criticism,
 4    it's criticism within the structure of the way -- the project
 5    the way they went about it, how they pursued this issue.
 6            THE COURT:  Okay.
 7    BY MR. CAINTIC:
 8    Q.   And Dr. Savitz, you discussed how the INMA or how the NTP
 9    authors treated the prospective cohort studies.  Can you
10    explain a bit more about did they differentiate them in the low
11    risk-of-bias group?
12    A.   I mean, my concern was -- and again, to be fair, they were
13    not embarking on writing a monograph to assess the question of
14    what is the epidemiologic evidence pertinent to exposures in
15    the range under 1.5.  They were asking a broader question, and
16    so -- and even more specifically, you could say, applicable to
17    the United States.
18            So in my review of it with that question in mind, I
19    applied some different criteria that led me to focus on those
20    studies and a few others that we've talked about as the most
21    informative.
22            The studies that were at higher levels in low-income
23    settings, lower/middle-income settings, that were of endemic
24    fluoride versus other types of fluoride exposure, it was sort
25    of that I was, I think -- I was combining relevance and rigor,
```

SAVITZ - DIRECT / CAINTIC

1  scientific quality, and that's what -- the combination of those

2  is what led me to the focus that I took.  But, again, I had a

3  different question than they did.

4  **Q.**  So what contribution does the NTP Monograph, the most

5  recent drafts, have about the effect of water fluoridation to

6  .7 milligrams per liter on neurodevelopment?

7  **A.**  Well, at the end after going, sort of, full circle with

8  the body of literature and examining it and some of the tables

9  that were presented on Wednesday of stratifying their array of

10  studies in different ways and so on, what I think it comes back

11  around to -- through a very different path than I followed --

12  is that the evidence is quite mixed and uncertain at the end.

13      That's -- again, as I said, it's a different path and a

14  different set of considerations.  But it's to me, at least -- I

15  won't say reassuring, but it's a bit of a corroboration.

16      When you can follow a different path and you get to the

17  same endpoint, it may be more meaningful than if we had both

18  done systematic reviews and gotten to the same endpoint; or if

19  they had done it my way and gotten to the same endpoint.  It's

20  following a different path and it's, if you will, a little

21  bit -- however you start out and whichever way you make your

22  way, you kind of end up at the same place.  I would say the

23  same thing with the Risk Sciences International systematic

24  review.

25  **Q.**  So, Dr. Savitz, can you remind us what is NTP's conclusion

SAVITZ - DIRECT / CAINTIC

1   about fluoride's effects at or below 1.5 milligrams per liter?

2   **A.**   That it's unresolved, that it's -- more research is needed

3   to resolve that.  It's not a -- it's inconclusive.

4   **Q.**   And, Dr. Savitz, is that conclusion consistent with your

5   own conclusion about the fluoride literature?

6   **A.**   Yes, it is.

7   **Q.**   And the NTP authors couch their conclusions in this above

8   or below 1.5 milligrams per liter marker.  But, to be clear,

9   what is your assessment of the literature in, say, the 1.5 to

10  2-milligram per liter range?

11  **A.**   I think that the -- again, I understand that for

12  communication purposes, they have to demarcate it sharply.

13      If you look at the research, though, it doesn't, sort of,

14  lead you to making that sharp demarcation that it's -- you

15  know, if you will, it's a picture.  It's blurry below 1.5 and

16  then everything is clear.

17      I think that there's a tendency for the associations

18  to become somewhat greater as the exposure levels become

19  somewhat greater, but there's very little in the 1.5 to 2

20  range.  There's also very little -- again, and this is another

21  aspect of that -- crossing that divide, but we don't have

22  studies I'm aware of in settings more similar to the United

23  States that extend in the higher range.

24      So if there was -- it would be still higher exposure a

25  little bit, but it would be more relevant.  You get into this

1   discontinuity where the research on endemic fluoride in various

2   parts of the world -- there's a gap between the cohort studies

3   and those other studies in part based on exposure levels but

4   it's also very much based on setting, study design, mostly

5   cross-sectional studies and so on.  And so it kind of -- it

6   would be great if there's opportunity to do high-quality

7   research that maybe fills in that gap a bit.

8   **Q.**   And so, Dr. Savitz, I want to turn now to some questions

9   that EPA received from the Court during the opening statements?

10          **THE COURT:**  Before you do that, let me ask a couple

11  questions.

12          Do you take issue with the NTP's conclusion that, with

13  moderate confidence, there is an association or appears to be

14  an association between neurological decrements in

15  concentrations above 1.5?

16          **THE WITNESS:**  That's where I really feel like I -- I

17  don't have any reason to challenge it, but I haven't

18  corroborated it by going through the dozens of studies

19  one-by-one to make my own assessment.

20          In other words, I haven't done a parallel assessment

21  the way they did of that body of literature.  And so I think I

22  had written in my report, and I would stay with -- you know,

23  stand by that, that that is their tabulation and inference and

24  that, again, they've described what they did, I'm not

25  suggesting they didn't do it or -- you know, but, again, in

 1  order to make that evaluation myself, I would have to go one

 2  study at a time and see is this -- you know, is this study of

 3  the quality and so on.

 4       So I think the systematic review approach is

 5  appropriate for that, but it's -- as I said, it's -- you know,

 6  I recognize I'm hedging a bit, but just because I haven't

 7  scrutinized that literature myself.

 8       I'm always -- again, I do tend to be skeptical of

 9  drawing strong inferences from what others say.  I want to see

10  the data myself, and I want to look at it.  And so there's a

11  little bit of a sort of being careful about saying "yes, it is

12  true."  Yes, it's true that's what they did -- I have no reason

13  to think it's not true -- but I don't want to sort of push, you

14  know, beyond that to say that, yes, I verified it, I get

15  exactly the same conclusion.

16       **THE COURT:**  In NASEM's review, I assume that NASEM

17  just didn't confine itself to the studies below, I think it was

18  a tempering saying, well, as you get down there, it's getting

19  fuzzy, you better watch what you say, essentially, especially

20  if it's going to be used in this big debate.

21       But was there -- and I'm sure I can look at the

22  exhibit again -- any particular criticism with respect to the

23  work that the NTP had done for the higher-exposure range, above

24  1.5?

25       **THE WITNESS:**  We -- you know, again, I haven't looked

 1    at the exact wording lately, but there was something that --

 2    along the lines of we -- it does appear that those studies

 3    follow the patterns that were described.

 4            We were trying to be careful.  Again, we had many

 5    disclaimers that we did not audit it, but it appears that there

 6    is this pattern of association between higher fluoride levels

 7    and decrements in IQ in the -- you know, across these -- across

 8    these studies.

 9            And, again, in the -- the question of whether the fine

10    points of criticism cumulatively call that into question, that

11    I don't think is a judgment we had to make.

12            We raised concerns about the -- you know, suggesting

13    ways they should refine or clean up their systematic review,

14    but I don't think that -- again, I can't speak for the whole

15    committee -- I don't think we suspected that in doing so it

16    would have a profound impact.  In other words, we weren't

17    saying they went completely off base, not at all.  We're saying

18    it sounds like they probably have got it right, but it's --

19    it's -- there are some real concerns with refining that, their

20    description of the process and the details.

21            THE COURT:  Okay.  Thank you.

22    BY MR. CAINTIC:

23    Q.   So, Dr. Savitz, let's explore that a little more.

24            We received some questions from the Court during EPA's

25    opening statement about where the studies lie on the exposure

SAVITZ - DIRECT / CAINTIC

```
 1    spectrum.  I want to go through that for the benefit of the
 2    Court.
 3            MR. CAINTIC:  Mr. Hambrick, if we could pull up
 4    internal document SB4, which is eTable 4 from the
 5    Meta-analysis.
 6            And for the benefit of the record, this is Trial
 7    Exhibit 68, the July 2022 Meta-analysis at PDF page 77 or Bates
 8    stamped NIEHS_000456.
 9    BY MR. CAINTIC:
10    Q.   So, Dr. Savitz, in broad terms can you explain what this
11    table says?
12            MR. CONNETT:  Your Honor, I have a particular
13    objection to this line of questions because at the deposition,
14    Dr. Savitz testified that he was unaware of whether NTP had
15    done a dose-response analysis in the meta-analysis and could
16    not comment on it.
17            I asked Dr. Savitz if he was aware that NTP had done a
18    dose-response analysis of studies below 2 parts per million and
19    1.5 parts per million, and he said no, I don't know whether
20    they did that or not.
21            So how was I supposed to be able to depose Dr. Savitz
22    if he's telling me he's unaware of the analysis existing?  So
23    now counsel wants to elicit questions on something that
24    Dr. Savitz told me he was unaware of.
25            MR. CAINTIC:  Your Honor, everything that I'm going to
```

SAVITZ - DIRECT / CAINTIC

1    elicit from Dr. Savitz is not going to be opinion testimony.

2            We're going to walk through how -- the number of

3    studies that fit within each of these exposure categories.

4    That, to me, is not opinion, that's just fact that we're going

5    through.

6            THE COURT:  You're just going to ask him to recite

7    facts from the table and not ask for an opinion?

8            MR. CAINTIC:  For the benefit of the Court, because

9    this Court wanted -- I think, wanted to know the answer to this

10   question on day one.

11           THE COURT:  Right.  You could have done that with any

12   witness --

13           MR. CAINTIC:  Right.

14           THE COURT:  -- because he could just show it to me, or

15   you could do it through the witness to explain what's on the

16   table.  And if he's not rendering an opinion, then I'm going to

17   allow it, so go ahead.

18           MR. CAINTIC:  Thank you, Your Honor.

19   BY MR. CAINTIC:

20   Q.   So, Dr. Savitz, in broad terms, without giving any

21   opinions, what is this table doing?

22   A.   It's looking at the tally of the number of studies using

23   various cut points for inclusion, cut points in terms of the

24   fluoride exposure.  And it is for both all studies and all low

25   risk-of-bias, and then it's presenting some measures of the

SAVITZ - DIRECT / CAINTIC

1    relationship of the fluoride to IQ in each of those cells.

2    Q.   And the four categories that they're stratifying the

3    studies into are less than 1.5 milligrams per liter, less than

4    2 milligrams per liter, less than 4 milligrams per liter and

5    then all data, right?

6    A.   That's correct.

7    Q.   Okay.  And then on the left-hand column, this one says,

8    "Water Fluoride All Studies."  Do you see that?

9    A.   Yes.

10   Q.   And then underneath that it says, "Number of

11   studies/number of observations," right?

12   A.   Yes.

13   Q.   And so underneath -- in that same column underneath each

14   of the 1.5, 2 and 4 ranges, it provides two numbers separated

15   by a slash, right?

16   A.   Correct.

17   Q.   So we could infer that the number on the left is the

18   number of studies, and the number on the right is the number of

19   observations?

20   A.   That's correct.

21   Q.   Dr. Savitz, do you know what they meant by "number of

22   observations"?

23        MR. CONNETT:  And, Your Honor, at this point I will

24   object again because this requires a foundation of

25   understanding what NTP did to do this analysis.  And without

```
 1   that understanding, then we're basically guessing as to the
 2   methodology leading to these numbers.
 3           THE COURT:  Well, I'm going to allow him to lay a
 4   foundation.
 5           Lay a foundation before he answers that question.
 6   BY MR. CAINTIC:
 7   Q.   Dr. Savitz, do you understand how they stratified those
 8   studies into different exposure groups?
 9   A.   My -- again, my assumption is that they -- is exactly as
10   indicated there, that they were looking at studies that had a
11   different, I assume -- yeah -- I assume mean exposure, average
12   exposure.
13   Q.   And so, Dr. Savitz, how -- let's just go over the number
14   of studies.  How many studies are in the less than 1.5
15   milligrams per liter range?
16   A.   At the top there for the "all studies" category there are
17   7.
18   Q.   And this is water fluoride all studies, right?
19   A.   Correct.
20   Q.   How many water fluoride studies are there in the less than
21   2 milligrams per liter group?
22   A.   Seven.
23   Q.   So we can infer how many study -- water fluoride studies
24   fall within the 1.5 to 2-milligram-per-liter range?
25   A.   Zero.
```

1  **Q.**   Okay.  How many water fluoride studies are in the less

2  than 4-milligram-per-liter range?

3  **A.**   Twenty-one.

4  **Q.**   So we can infer how many studies -- how many water

5  fluoride studies are between 2 and 4 milligrams per liter?

6  **A.**   Twenty-one minus 7 or 14.

7  **Q.**   How many studies fall within the "all data" group for

8  water fluoride studies?

9  **A.**   Twenty-nine.

10  **Q.**   So we can infer that how many studies are above -- how

11  many water fluoride studies are above 4 milligrams per liter?

12  **A.**   Eight.

13       **MR. CAINTIC:**  Okay.  Mr. Hambrick if we can go to the

14  water fluoride low risk-of-bias studies.  And this is on the

15  same page I identified earlier.

16  **BY MR. CAINTIC:**

17  **Q.**   So, Dr. Savitz, how many low risk-of-bias water fluoride

18  studies are there in the less than 1.5-milligram-per-liter

19  range?

20  **A.**   Three.

21  **Q.**   How many low risk-of-bias water fluoride studies are there

22  in the less than 2-milligrams-per-liter range?

23  **A.**   Three.

24  **Q.**   So how many low risk-of-bias water fluoride studies are in

25  the 1.5-milligram-per-liter to 2-milligram-per-liter range?

SAVITZ - DIRECT / CAINTIC

1   **A.**   Zero.

2   **Q.**   How many low risk-of-bias water fluoride studies are below

3   4 milligrams per liter?

4   **A.**   Six.

5   **Q.**   So how many low risk-of-bias water fluoride studies are in

6   the 2-milligram-per-liter to 4-milligram-per-liter range?

7   **A.**   Three.

8   **Q.**   And then finally, Dr. Savitz, how many low risk-of-bias

9   water fluoride studies are in the above 4-milligram per liter

10  range?

11  **A.**   Zero.

12  **Q.**   And in total, how many low risk-of-bias water fluoridation

13  studies are there?

14  **A.**   Six.

15          **MR. CAINTIC:**   Okay.  Mr. Hambrick, if we could go to

16  the next page, which is the urinary fluoride "all studies."

17  **BY MR. CAINTIC:**

18  **Q.**   Dr. Savitz, how many urinary fluoride studies are in the

19  less than 1.5-milligram-per-liter range?

20  **A.**   Five.

21  **Q.**   How many urinary fluoride studies are in the less than

22  2-milligram-per-liter range?

23  **A.**   Seven.

24  **Q.**   So how many urinary fluoride studies are in the

25  1.5-milligram-per-liter to 2-milligram-per-liter range?

SAVITZ - DIRECT / CAINTIC

```
 1   A.    Two.
 2   Q.    Okay.  How many urinary fluoride studies are in the less
 3   than 4-milligram-per-liter group?
 4   A.    Thirteen.
 5   Q.    So how many urinary fluoride studies fall in the
 6   2-milligram per liter to 4-milligram per liter range?
 7   A.    Six.
 8   Q.    And finally, how many urinary fluoride studies are in the
 9   greater than 4-milligram-per-liter group?
10   A.    Five.
11   Q.    Yes.
12         Now, like last time, let's go to the urinary fluoride low
13   risk-of-bias studies.
14         Dr. Savitz, how many low risk-of-bias urinary fluoride
15   studies are in the less than 1.5-milligram-per-liter group?
16   A.    Four.
17   Q.    How many low risk-of-bias urinary fluoride studies are in
18   the less than 2-milligram-per-liter group?
19   A.    Five.
20   Q.    So how many low risk-of-bias urinary fluoride studies fall
21   within the 1.5- to 2-milligram-per-liter range?
22   A.    One.
23   Q.    How many low risk-of-bias urinary fluoride studies are in
24   the less than 4-milligram-per-liter range?
25   A.    Nine.
```

 1   Q.   So how many low risk-of-bias urinary fluoride studies fall

 2   within the 2- to 4-milligram-per-liter range?

 3   A.   Four.

 4   Q.   And then finally, Dr. Savitz, how many low risk-of-bias

 5   urinary fluoride studies fall within the greater than

 6   4-milligram-per-liter range?

 7   A.   None.

 8   Q.   Okay.

 9          THE COURT:   I know he was asked this, and there's no

10   foundation for it, but I don't know, did the parties

11   stipulate -- is there a common understanding of what "number of

12   observations" means versus "number of studies"?  Do the parties

13   disagree on this point?  Is that a common nomenclature, or is

14   it --

15          MR. CAINTIC:   I can elicit some testimony out of

16   Dr. Savitz where he tried to figure that out but --

17          THE COURT:   Well, the problem there is you have no

18   foundation, so I'm asking -- unless you lay a foundation, I'm

19   asking whether the parties have an understanding.

20          MR. CAINTIC:   I can lay a foundation, though I will

21   say this was after the disclosure Dr. Savitz looked into this.

22          THE COURT:   Well, all right.  This is not quite rocket

23   science --

24          MR. CAINTIC:   Right.

25          THE COURT:   -- so I'll allow you to --

SAVITZ - DIRECT / CAINTIC

```
 1            MR. CAINTIC:  Okay.

 2            THE COURT:  -- although something close to it, but

 3   I'll allow you to elicit the foundation, and I'll tell you if

 4   it's an adequate foundation.

 5            MR. CAINTIC:  Okay.

 6   BY MR. CAINTIC:

 7   Q.   Dr. Savitz, did you try to figure out what number of

 8   observations means?

 9   A.   I did, but unsuccessfully, so I'm afraid there's not a

10   satisfying punchline.  I -- in this vast report, I just did

11   a -- it seemed logical to do a word search on the word

12   "observations."

13        First I thought it would be a footnote, that would be the

14   standard way for describing things that are not otherwise

15   clear.  No footnote, no mention in the -- anywhere I could find

16   of what that signified, but it -- clearly it involves

17   expansion.  There are more people when there's more

18   observations, even where there aren't more studies, so I'm not

19   able to interpret it.

20            THE COURT:  Okay.  Well, I guess --

21            MR. CAINTIC:  Right.

22            THE COURT:  I guess we don't have a stipulation, do

23   we?

24            MR. CAINTIC:  Right, right, right, right.

25   \\\
```

SAVITZ - DIRECT / CAINTIC

```
 1   BY MR. CAINTIC:
 2   Q.   Now, Dr. Savitz, let's look at what the models just
 3   reported that they found.
 4        MR. CAINTIC:  If we could go to the water fluoride
 5   "all studies" group.
 6   BY MR. CAINTIC:
 7   Q.   And for brevity --
 8        MR. CONNETT:  Your Honor -- sorry, sorry.
 9        This is another situation where this is now getting
10   into more of the substance of the dose-response analysis and, I
11   mean, if Dr. Savitz is just going to read the numbers on the
12   page, I have no problem.  But if we're going to start dealing
13   with the actual substance of the analysis, I have concerns.
14        MR. CAINTIC:  That's -- it's going to be the earlier.
15   The most that I'm going to ask is did they find a statistically
16   significant adverse effect.  You can divine that just from
17   reading this.
18        THE COURT:  Yes.
19        MR. CAINTIC:  My hope is to just -- we just began our
20   case-in-chief, and I know Your Honor has had several questions
21   for EPA in the opening statement on day one.
22        I just want to be able to clarify that the
23   representations that I made in answering your questions were,
24   in fact, true.
25        THE COURT:  Okay.  Well, if what you're relying on is
```

```
 1   the chart, I can read the chart.  I think I know what it means.
 2   And I can see where there's statistical significance and where
 3   there's not.
 4           MR. CAINTIC:  Right.
 5           THE COURT:  If you have some overlap over zero, it's
 6   not statistically significant.
 7           MR. CAINTIC:  If it -- if it would not be helpful to
 8   this Court or it would be duplicative, I'm fine moving on.
 9           THE COURT:  I think I don't need it because I see the
10   distribution.  It's helpful to see where the number of studies
11   are -- would like to know what the number of observations are,
12   but we also have the number of children involved, which is also
13   a relevant index.
14           MR. CAINTIC:  Right.
15           THE COURT:  You can see where it's spread through the
16   minus below 1.5, between 1 and 2 and 2 and 4 and then above, so
17   that's helpful.
18           MR. CAINTIC:  Right.
19           THE COURT:  And I can see that each model derives a
20   certain beta value, et cetera --
21           MR. CAINTIC:  Right.
22           THE COURT:  -- so I'm familiar with that.
23           MR. CAINTIC:  Okay.  The point of this was not to
24   elicit any opinion but just to clarify some stuff for the
25   Court.
```

SAVITZ - DIRECT / CAINTIC

1      **THE COURT:**  I got it.  I got it.  But now that you've

2  identified the charts, I'll know exactly where to look.

3      **MR. CAINTIC:**  Okay.  Great.

4      **THE COURT:**  Thank you.

5      **MR. CAINTIC:**  I'll move on then.

6      **THE COURT:**  Okay.  Good.

7  BY MR. CAINTIC:

8  **Q.**  Dr. Savitz, in your opinion, why is it important to

9  separately assess the findings of high- versus low-dose

10  studies?

11  **A.**  Again, the -- when the interest or the question is focused

12  on, you know, judgments about the potential health issues

13  around the range of water fluoridation, that the most directly

14  relevant information comes from studies in that range.

15      That's not to discount the other studies, but there's an

16  assumption when you go from evidence outside the range where

17  the decisions are being made, it's an extrapolation.  And I've

18  said in other -- you know, in other issues there's the data and

19  then there's the extrapolation from the data.  And so I think

20  in the issue of -- I've said I've tried to weight the studies

21  based on relevance and quality.  This is one of the

22  considerations in relevance.

23  **Q.**  And, Dr. Savitz, if someone said that the NTP Monograph is

24  supportive of community water fluoridation at a concentration

25  of .7 milligrams per liter being associated with IQ decrements,

SAVITZ - DIRECT / CAINTIC

1  how would you respond?

2  **A.**   Again, I would look to their own document and their own

3  wording as to their recognition -- quite clear in the most

4  recent versions that the findings in that range are

5  inconclusive, that -- as I said, the path by which they get

6  there, it's a long document with many, many bits and pieces of

7  other -- other implications, but when they came to their bottom

8  line, that is the bottom line, and I would take them at their

9  word that that is their final judgment on that issue.

10  **Q.**   And Dr. Savitz, how did the NTP authors consider the INMA

11  study in their Monograph or Meta-analysis, if at all?

12  **A.**   At least in the most recent version that I've seen,

13  there's -- it was incorporated into a sensitivity analysis, but

14  it was not part of the primary analysis -- primary analysis

15  that they had done.

16      So it -- it was not fully incorporated.  They were aware

17  of it, obviously, but it was not part of their primary evidence

18  base.

19  **Q.**   And were there any issues with the figures that NTP used

20  when incorporating the INMA study into the meta-analysis?

21  **A.**   This is where, again, it's -- as I was able to understand

22  it from the footnotes and the email communications and so on

23  that I saw, this is where it was incorporated the estimates

24  that were not creatinine adjusted.  It was this erroneous --

25  again, a miscommunication that led to them being provided with

SAVITZ - DIRECT / CAINTIC

```
 1   estimates that were not creatinine adjusted.

 2   Q.   So the NTP authors used creatinine unadjusted figures from

 3   the INMA study in their meta-analysis?

 4   A.   That's my understanding is that they needed to convert

 5   them to milligrams fluoride per liter of urine and they did --

 6   you know, the INMA authors did generate those findings; but,

 7   through a misunderstanding, they generated them without

 8   creatinine adjustment.

 9   Q.   And Dr. Savitz --

10        THE COURT:  Let me just see if I understand this.

11   There was a request from the NTP authors for this information,

12   and then what they got back from the INMA authors was, sort of,

13   the wrong thing?

14        THE WITNESS:  I mean, I think it was literally a

15   problem in translation --

16        THE COURT:  Right.

17        THE WITNESS:  -- that they were --

18        THE COURT:  In the end.

19        THE WITNESS:  In the end.

20        They were interested in -- you know, again,

21   appropriately, you need to compare results on the same scale,

22   and everything else was in milligrams of fluoride per liter of

23   urine, creatinine adjusted, and the INMA results were

24   milligrams of fluoride per gram of creatinine.  So they asked

25   them for milligrams of fluoride per liter of urine, and somehow
```

JENNIFER COULTHARD, CSR, RMR, CRR          (530)537-9312
OFFICIAL UNITED STATES DISTRICT COURT STENOGRAPHER

```
 1   this issue of creatinine adjustment, I don't know where it was
 2   lost in that exchange, but the end result was, they got the
 3   ones that were not creatinine adjusted.
 4        THE COURT:  And so what use was made -- what happened
 5   with that non-adjusted data?
 6        THE WITNESS:  Again, it was a sensitivity analysis, so
 7   they were looking at the overall impact, if they included it,
 8   what would happen.
 9        Again, I don't recall the details of that exercise,
10   but it was -- you know, again, one among several studies that
11   would have contributed.  It's -- it's of adequate size, but
12   it's not the largest.  So I'm not sure that it had a profound
13   impact on the overall pattern, other than to further -- make it
14   more inconclusive than it was before, let me put it that way.
15   That's the direction it would go.
16        I don't recall how far it moved things, but there's no
17   question it would have moved it away from providing clear
18   evidence of an adverse effect by the nature of its findings.
19        THE COURT:  But the fact that what -- what NTP got was
20   non-creatinine adjusted, would that have -- how would that
21   have -- or what's your best guess of how that would have
22   affected the sensitivity analysis?
23        THE WITNESS:  Well, you can predict, as we talked
24   about before, the non-creatinine adjusted results were less
25   positive, less of a favorable effect, closer to the null.
```

**SAVITZ - DIRECT / CAINTIC**

1              And so if you had used the creatinine adjusted

2     results, it would have weighed in more strongly against there

3     being an adverse effect when they were integrated in.

4              **THE COURT:**  Okay.  But that wasn't done?

5              **THE WITNESS:**  No.  No.  That was -- and it was not --

6     as I said, it was -- I won't say an afterthought, but it was a

7     side issue not incorporated centrally into the analysis.

8              **THE COURT:**  Okay.  Thank you.

9     **BY MR. CAINTIC:**

10    **Q.**   Let's move on to another topic.

11         Dr. Savitz, you reviewed Grandjean's -- Dr. Grandean's

12    2022 BMCL calculation in coming to your opinions in this case,

13    right?

14    **A.**   I did review that, yes.

15    **Q.**   And I want to be clear.  You are not a risk assessor,

16    right?

17    **A.**   I am not.

18    **Q.**   So what is your experience with benchmark dose

19    calculations?

20    **A.**   It's really only on that handoff between the epidemiology

21    and the risk assessor.  My role has been, including in the

22    Canada -- you know, the advisory panel, to try to articulate

23    and describe the nature, the level of certainty of the

24    epidemiologic evidence, to inform those who are going to feed

25    that into a risk assessment process.

SAVITZ - DIRECT / CAINTIC

1   Q.   Dr. Savitz, what is a BMCL calculation?

2   A.   This is -- again, I should know the acronym by now, but as

3   I said, maybe I just need to keep repeating that I'm not a risk

4   assessor, so that's not where I was able to contribute.

5   Q.   A benchmark concentration level calculation?

6   A.   Okay.

7   Q.   And what is your opinion about Dr. Grandean's BMCL

8   calculations?

9   A.   Again, I have no basis for challenging the technical side

10  of it, the calculations, the -- the arithmetic.  The issue

11  really is, you could take any epidemiologic finding, no matter

12  how fragile, how -- you know, it's sort of -- the question I

13  would ask is, is the evidence ready to be interpreted so

14  literally.  That's I think -- I do appreciate enough about risk

15  assessment to know that they're taking these numbers seriously,

16  the quantification and the certainty, and so -- and I recognize

17  that there's, you know, no -- it does not require absolute

18  certainty of causality or that everything has to be air tight,

19  but there has to be a sufficient level of confidence that it is

20  leaning in a pretty substantial way towards there being an

21  adverse effect, and it seemed premature to pursue that based on

22  the epidemiology that is available as of right now.

23  Q.   And what are some of the assumptions that are baked into a

24  BMC calculation?

25  A.   Well, again, it's trying to -- it's taking the

 1   epidemiologic findings literally where the observed association

 2   is presumed to be applicable to regulatory decision-making.

 3         Again, I can't speak to the rest of the quantitative

 4   assumptions, but it's a -- it's a -- again, it has to be an

 5   extrapolation from the observed epidemiologic data to a

 6   hypothetical calculation, which, again, is what you need to do,

 7   but it feeds into that algorithm.

 8   **Q.**   And Dr. Savitz, when you have uncertain data, do you know

 9   what happens to the BMCL calculations?

10   **A.**   This is the one part where I, in one experience with

11   participating in a process of doing risk assessment, again, as

12   the epidemiologist, I came to realize that the more uncertain

13   you are, the lower the limit you recommend.  And that always

14   seemed -- I understand sort of a little bit on a conceptual

15   level, but it's really kind of -- on an intuitive level, it's

16   kind of odd that the more ignorant we are, the more restrictive

17   we should be.  And I think it's in the spirit of avoiding

18   making mistakes, but it's kind of a strange connection between

19   the research -- you know, if we had done less or done it less

20   well, we would set the -- we would set the threshold even

21   lower.

22         And again, it's -- that's -- I leave that to the risk

23   assessors to explain or make sense of that.  But as I said, as

24   an epidemiologist, it always struck me as kind of peculiar.

25   **Q.**   So, Dr. Savitz, as an epidemiologist, how do you think the

SAVITZ - DIRECT / CAINTIC

1  Court should interpret the BMCLs?

2  **A.**   It's a -- I think it's, again, in its favor.  It's a

3  useful what-if exercise.  What if the research over time were

4  to reach a point where, in fact, that was established.

5       Let's at least be aware what might, you know, transpire

6  from that.  That, I think, is -- again, in the Canadian panel,

7  there was this issue -- and I think our reported indicated

8  that -- that, you know, the -- the judgment was that dental

9  fluorosis is the appropriate endpoint; but if these studies

10  were to reach a point where they were identifying an adverse

11  effect at lower level, this is where the exercise, I think, can

12  be helpful and say this would be quite different.  And so the

13  research -- it's -- again, maybe it's predictable as a

14  researcher -- it's saying this is an issue we really need to

15  get into and we really need to -- we need to work this out

16  because it has potential importance, and that's what I think

17  the exercise, you know, confirms.

18  **Q.**   And Dr. Savitz, finally, do you recall what the literature

19  cutoff date was for the NTP Monograph?

20  **A.**   Oh, boy, the last one certainly -- I'm sure it preceded

21  the Danish study results, which just came out -- my gosh, three

22  months ago, maybe, something like that.  I don't recall.  I

23  think it was sometime in the summer or early fall of 2023.

24  **Q.**   So the NTP Monograph did not consider the Danish OCC

25  cohort?

SAVITZ - DIRECT / CAINTIC

 1   **A.**   That's correct.

 2   **Q.**   Okay.  So, Dr. Savitz, there's been a lot of -- in both

 3   this trial and the last trial -- analogizing fluoride to lead.

 4       Do you think the story of fluoride here is the same as the

 5   story of lead?

 6           **MR. CONNETT:**  Your Honor, this sounds like an

 7   undisclosed opinion.

 8           **THE COURT:**  Well, has this been -- is this in the

 9   report?

10           **MR. CAINTIC:**  This was not in the report.  This was

11   just a pure rebuttal point.  It came up when the judge -- when

12   Your Honor asked the ultimate question yesterday, and I just

13   wanted to highlight that again.

14           **THE COURT:**  I don't remember what the ultimate

15   question was.

16           **MR. CAINTIC:**  It was what do you do when you have

17   high-quality good studies on both sides and someone just has to

18   make a decision, and Dr. Savitz gave a personal anecdote.

19           **THE COURT:**  All right.  Well, since I asked it, I'll

20   allow it, but I -- even at the risk of this is an undisclosed

21   opinion, I'll allow it.

22           **MR. CAINTIC:**  Okay.

23   **BY MR. CAINTIC:**

24   **Q.**   Dr. Savitz, there's been a lot of analogizing the story of

25   fluoride to lead.  Do you think the story of fluoride here is

SAVITZ - DIRECT / CAINTIC

1    the same as the story of lead?

2    **A.**   I mean, I think that, again, you know, you have to sort of

3    step back and say where -- where the lead story was in its

4    early days.

5         I think one of the key differences is, there was no

6    ambiguity about the adverse effects at higher levels.  It

7    wasn't moderate confidence.  It was airtight.  And in the

8    ratcheting down of which levels were of concern, there was

9    sequential studies that had the high-dose anchor, and the

10   definition of "high" progressively came lower and lower so that

11   you weren't way out on a limb as you went the next wrung down

12   the ladder of exposure levels.  You weren't taking a leap when

13   you pushed it further and further into that direction.

14        And so it's very different from where we stand today with

15   fluoride even in regard to the higher level of exposure.  If

16   you can imagine, we had, you know, everything is clear at 3,

17   and now we've got some studies coming in at 2, and 1 and a half

18   things are still pretty strong.  We'd be in a very different

19   situation when we try to go further than that.

20        It takes -- it really -- when you're looking at what are

21   really modest low-level effects -- and I say "modest," not that

22   we're -- loss of an IQ point is important, I don't disagree, on

23   a population level.  That's a tiny change that we're talking

24   about.  It takes very good studies to be able to detect that

25   kind of a shift and it takes a -- again, I don't want to make

```
 1    it sound like, you know, we need 20 studies or something, but
 2    it's a challenging issue and it requires, as it did with lead,
 3    increasingly high-quality studies.
 4        There was a series where every study was better than the
 5    ones that came before, and that took awhile.  And every time we
 6    looked at a lower level, they had to be better than the ones
 7    that came before.  And so it was a progression from a base.
 8    And, again, the future will hopefully tell the fluoride story,
 9    but it's -- it's -- I would not presume that it will follow the
10    path of other established neurotoxicants.  Each one has got to
11    be looked at on its own merits.
12        MR. CONNETT:  Your Honor, if I could just be heard
13    briefly on that, in that -- just to flag for the Court that
14    that testimony right there -- I understand the Court's ruling
15    in terms of the general analogy of lead and fluoride, but the
16    problem I see there is it ultimately relied upon an opinion
17    about high-dose fluoride that Dr. Savitz is not in a position
18    to offer.
19        So I would just note that for the Court, for the Court
20    to give it the weight that it deserves.
21        THE COURT:  So noted.  Thank you.
22    BY MR. CAINTIC:
23    Q.   Dr. Savitz, how would you assess how the last three years
24    of science has impacted the overall body of the fluoride
25    epidemiological literature?
```

1  **A.**  Well, in some ways when you have more studies, you have

2  more material and more -- in this case more complexity I think.

3  I try to step back in time and where were we after the ELEMENT

4  when ELEMENT was the only study.  And, you know, you might have

5  said, well, that's interesting, but, you know, that's -- gosh,

6  never would have expected that, that's kind of a novel idea.

7        MIREC, again, I think it was a bit generous in the

8  interpretation, but it's fair to say if those are the only two

9  studies, maybe there really is something there, that MIREC had

10  enough glimmers at least to -- there I can say you can make an

11  argument they're not inconsistent.  One shows a much stronger

12  effect, but --

13        And then with INMA and the Odense child cohort, it puts it

14  into a greater level of uncertainty.  And I would add Dewey.  I

15  know that that's not, you know, always placed in the top-most

16  tier, but I think it's an informative study of prenatal

17  exposure in this range and IQ.  So I think it is less

18  convincing of there being an adverse effect in this exposure

19  range than it would have been, let's say, if you'd stopped

20  after MIREC.

21        **MR. CAINTIC:**  No further questions.  Thank you,

22  Dr. Savitz.

23        **THE COURT:**  All right.  We should go ahead and take

24  our break, but I got a couple follow-up questions, of course.

25        Hearing what you've been saying, what you've just

SAVITZ - DIRECT / CAINTIC

 1  said, that now there's sort of mixed studies and unclear, I

 2  take it the converse would apply, and that is, given it's

 3  mixed, you could not foreclose a possibility that there is an

 4  adverse effect at these what we call "low levels," let's say

 5  U.S. drinking water levels?

 6          THE WITNESS:  I think that's correct.  I mean, it

 7  hasn't -- as we were discussing yesterday, you know, to reach a

 8  point where you're ready to, sort of, relegate the positive

 9  results of ELEMENT in particular, MIREC to a lesser degree, to

10  put those aside with confidence, you'd want some -- you'd want

11  some more evidence, or to -- or to promote them with

12  confidence, you'd want some more evidence.

13          So I am certainly agreeing that, you know, again, that

14  differentiation between, you know, absence of effect and

15  evidence of absence, sometimes there's the cliché you can't

16  prove a negative, but I -- you can't -- you know, you can reach

17  a point where there is a sufficient volume of negative studies

18  to say very unlikely or undetectably low or, you know, that you

19  can hedge a bit, but you can reach a point of pretty high level

20  of confidence.  I use the example that, again -- and not

21  everybody would agree with me, necessarily, but the area I had

22  worked in, electromagnetic fields and childhood cancer -- for

23  the most part, there's still a little glimmer of uncertainty,

24  but over time it sort of tamped down the assessment of it to

25  the point where there's not a lot of discussion of, you know,

1   regulation or changing things based on the epidemiologic

2   evidence.  And as an epidemiologist, I think that's the right

3   interpretation.

4        It's -- it's -- you know, again, science is always in

5   flux, and there's always new things to be discovered, but at

6   some point, when there's sufficient weight, you --

7   understandably, you come down to a position and that position

8   certainly can be that there just isn't -- there isn't some --

9   it isn't getting traction, there isn't something there to get

10  ahold of.  But once a high-quality positive study is done, it

11  may take a bit more to get there.  If that hadn't been done, if

12  you subtracted ELEMENT from the equation, I don't -- honestly,

13  I don't know the legal issues, I don't think we'd be here.

14       And so, I think, it's a -- again, it's there, and it's

15  got the results it has and, therefore, we -- you know, it just

16  calls for more complete evidence to be conclusive in any

17  direction, in my view.

18       THE COURT:  All right.  But we're not at that point.

19  We're not at a point of reaching a conclusion one way or the

20  other, in your view?

21       THE WITNESS:  That's my opinion.

22       THE COURT:  All right.

23       And if you were in sort of that uncertain zone as the

24  NTP Monograph sort of concludes -- and I know you're not a risk

25  assessor, but if you -- if there seemed to be, at least with

```
 1   moderate confidence, adverse effect at higher levels and
 2   knowing there is such a thing as dose-response curves and that
 3   sort of thing, in determining the ultimate question whether
 4   there is a risk -- an unreasonable risk or some kind of risk at
 5   the lower levels, that would seem to put some premium on
 6   whether -- how well you can extrapolate.
 7        THE WITNESS:  I think I said in my report, and I
 8   certainly believe this, that to the extent there is evidence of
 9   increased risk at higher levels -- and again, I might be a
10   little more moderated in my views than NTP is -- it makes it
11   more plausible, okay?  If the -- if the higher exposure studies
12   had never been done, the findings would even be less conclusive
13   in the lower range.  But there's -- again, and I do want to
14   emphasize that I think is underappreciated, it's not just an
15   extrapolation from across levels.  It's an extrapolation --
16        When I've looked at samples of those higher exposure
17   studies, two small villages in China or India that one of which
18   has a history of dental fluorosis known to have contaminated
19   water and comparing it to another village nearby, well, there's
20   a few issues that come up in addition to the exposure levels of
21   whether it's really blinded, if people know this village as a
22   reputation, of whether -- you know, it's the extrapolation
23   across very, very different settings and different exposure
24   ranges.  So it doesn't -- I would never dismiss it.  If it's
25   a -- if it's a well-done study, it's a well-done study and
```

SAVITZ - DIRECT / CAINTIC

 1    deserves our attention.  But then when you go to apply any

 2    evidence, epidemiologic evidence specifically, you're

 3    extrapolating from something that was observed in one setting

 4    and making a judgment about what would happen here that

 5    you're -- again, you're never just interested in the people you

 6    study.  You're studying them so that you can make the most

 7    informed judgment possible going forward, which, by definition,

 8    is -- we haven't studied it yet.  And so I think that it's

 9    that -- it's that relevance issue that led me to narrow my

10    focus as much as I did; not dismiss the other studies, but

11    really to zero in on the most directly relevant high-quality

12    studies.

13            THE COURT:  And in NASEM's review of the draft

14    monographs, you're familiar -- I know you didn't dig deeply

15    into the higher-exposure studies, but as I recall, there were

16    some high-quality low risk-of-bias studies at the higher

17    levels, at 2 or 4?

18            THE WITNESS:  Yes.  And their classification -- again,

19    I haven't looked at those, but yes, there was -- there were a

20    number of high-quality studies -- low risk-of-bias studies, to

21    use their terminology.  It wasn't by any means limited.  My

22    gosh at that time the first report would have been -- there had

23    only been two studies then, the Bashash and the Green.  And so

24    they certainly had others that were from the higher dose and

25    essentially all of those in -- you know, they were, again,

 1   China, India, Iran -- there may have been another setting --

 2   where there was endemic fluoride.  And again, as I said,

 3   endemic fluoride, it can be informative, it's still fluoride,

 4   but it has other covariates, arsenic, lead, that wouldn't come

 5   up in other settings.

 6        It's just whatever goes along with the geological, I

 7   guess, source of the high fluoride is where the -- you know,

 8   it's coming from in the water.

 9        That's not to dismiss them, again, but it's to at

10   least keep that in mind, that we're making a bit of a leap

11   across these --

12        THE COURT:  All right.  But presumably the

13   high-quality studies would consider those obvious covariates.

14        THE WITNESS:  Yeah.  There were certainly a number of

15   studies that adjusted for those other factors, and it was part

16   of their risk-of-bias scaling, in fact, to do so, that's

17   correct.

18        THE COURT:  Okay.  And not being a risk assessor, you

19   don't have -- you didn't render an opinion on margin of

20   analysis and that whole other topic, I take it?

21        THE WITNESS:  I did not.

22        And again, I think at the time of the NASEM review of

23   the NTP report, neither they nor we were primarily focused on

24   exposures in the lower range.  That's why we said you're not --

25   you didn't -- in so many words, this isn't what you embarked

```
 1    on, you can't do it well the way you've done it.  Just get the
 2    disclaimer in and focus on what you did and presumably did
 3    well, but to distance yourself from overinterpretation about
 4    the relevance in this lower range.  I don't think that's very
 5    different from what the BSC was saying as well.
 6             THE COURT:  All right.  Thank you.
 7             THE WITNESS:  Okay.
 8             MR. CAINTIC:  Thank you, Doctor.
 9             THE COURT:  Let's take our break.
10        (Recess taken at 12:06 p.m.)
11        (Proceedings resumed at 12:23 p.m.)
12             THE COURT:  All right.  Have a seat everyone.  Ready
13    for cross?
14             Make sure we have everything working properly here.
15                  (Discussion held off the record.)
16             THE COURT:  Okay.  I think we're good.
17             MR. CONNETT:  Ready, Your Honor?
18             THE COURT:  You may proceed.
19                        CROSS-EXAMINATION
20    BY MR. CONNETT:
21    Q.   Good afternoon, Dr. Savitz.
22    A.   Good afternoon.
23    Q.   I'd like to start by discussing some of the things that I
24    think we both agree on, okay?
25    A.   Okay.
```

SAVITZ - CROSS / CONNETT

1    Q.   You have written a textbook on epidemiology, correct?

2    A.   That's correct, yes.

3    Q.   We see that, the cover of a textbook here, right,

4    "Interpreting Epidemiologic Evidence"?

5    A.   Yes.

6    Q.   In your textbook you wrote, quote, "The argument that

7    decisions be suspended altogether until the evidence is

8    conclusive is impractical because no action is just another

9    course of action and reflects a decision," correct?

10   A.   That's correct, yes.

11   Q.   You have also written that, quote, "To claim that we have

12   insufficient evidence to act does not resolve the problem for

13   those who must make public health policy decisions because

14   inaction is, itself, a decision," correct?

15   A.   That's right.

16        Again, if I can -- sort of the intent is to recognize that

17   there's a spectrum of causality.  We're never at zero almost,

18   we're never at 100 percent.  And the goal of an epidemiologist

19   in explaining where we are, which is what this book is about,

20   is to try to give a sense of where we are on that spectrum and

21   not just say, "We don't know for sure."

22        Well, of course we don't know for sure.  What do we know?

23   Q.   Dr. Savitz, you agree that, quote, "In reality,

24   epidemiologic studies, like other areas of science, often yield

25   inconsistent results," right?

SAVITZ - CROSS / CONNETT

1   **A.**   Yes, that's correct.

2   **Q.**   And at your deposition in this case, you testified that,

3   quote, "Even if there is a real phenomenon, pick anything you

4   want, we don't find it in every single study," correct?

5   **A.**   Again, as a generic statement, yes, which obviously the

6   text is generic rather than specific.

7   **Q.**   And on a separate note, Dr. Savitz, you have written that,

8   quote, "The demand for clear and defined thresholds for adverse

9   health effects is unrealistic for epidemiologic studies and

10  unnecessary for inferring causal effects," correct?

11  **A.**   Again, if the bar is set high enough of certainty and

12  precision, we just don't have the same ability that

13  toxicologists do to fine tune the dosage.

14      I don't want to make it -- again, I hope it didn't come

15  across as, sort of, nihilistic that we can't do anything well.

16  We need -- you know, again, as a field, as a discipline, we

17  make these successive refinements, we interpret it with

18  appropriate caution, but we keep plowing forward.

19  **Q.**   And Dr. Savitz, that statement that I just read --

20  **A.**   Yes.

21  **Q.**   -- that's a statement that you wrote, correct?

22  **A.**   That's right, yes.

23  **Q.**   You've also written, quote, "The precise quantitative

24  levels of exposure that cause a given effect are almost never

25  known.  It is an unrealistic standard to say that a chemical is

 1   a problem at 7 parts per million but not at 5 parts per

 2   million.  Epidemiologic studies have a very difficult time

 3   achieving that level of precision."  That's a correct

 4   statement, right?

 5          MR. CAINTIC:  Objection, Your Honor.  These are fairly

 6   long quotes.  If we're going to be asking Dr. Savitz if he

 7   wrote that, I would suggest we show it to him.

 8   BY MR. CONNETT:

 9   Q.   Well, let me just start -- Dr. Savitz, you agree with that

10   statement, right?

11   A.   Well, again, it's -- obviously if it's written in my

12   textbook, then it's something that I agree with, but it's --

13   the whole, sort of, point of the text is to make a -- sort of

14   a -- I don't know, say an accurate or an even-handed appraisal

15   of evidence, that it's -- that idea is, you generate a measure

16   of association, and then you have to make a judgment about

17   that.  And it's suggesting specific ways to, sort of, flesh

18   that out, to challenge it, to examine it, to use the evidence.

19   I mean, you know, there are certainly challenges, absolutely.

20   Q.   Okay.  And so in light of counsel's concern, and I think

21   it's reasonable; that was a long quote, okay?  I'm just going

22   to break it down to the first part, and I'm going to ask you if

23   you, in fact, agree with it.  The quote is, "The precise

24   quantitative levels of exposure that cause a given effect are

25   almost never known."

SAVITZ - CROSS / CONNETT

```
1        Do you agree with that, Dr. Savitz?
2   A.   With the caveats of "precise" and "known," yes.
3   Q.   And Dr. Savitz, when it comes to detecting associations
4   between a chemical and an effect, you agree that it is
5   beneficial for epidemiological studies to study populations
6   with, quote, "Large exposure contrasts," correct?
7   A.   If you're asking the fundamental question is this chemical
8   capable of causing disease in humans, yes, that would be true.
9   The higher the better.  That's why we use occupational studies,
10  for example, a lot of times.
11  Q.   And in your own causal analyses of PFAS chemicals, you
12  have relied upon studies of highly exposed occupational
13  workers, correct?
14  A.   That's correct.
15  Q.   You agree, Dr. Savitz, that studies with large exposure
16  contrasts overcome the noisiness and measurement errors that
17  can reduce our ability to detect an effect even when one
18  exists, correct?
19  A.   Again, at a price.  There's tradeoffs so that if the --
20  if, in fact, there were a linear relationship across the whole
21  range and you're able to study a wide range of contrasts, it
22  will be more accurately able to identify it.  But then when you
23  go to apply it to a particular range, you have to extrapolate.
24  That's always the problem from high-dose studies to low-dose
25  studies is that we use them and we take advantage of those
```

1   opportunities, but then we have a judgment to make when we go

2   to a different part of the dose-response spectrum that's not

3   been examined.  True for PFAS and other chemicals.

4   **Q.**   In your textbook on epidemiology you wrote, quote, "In

5   general, nondifferential exposure misclassification tends to

6   produce bias towards the null," correct?

7   **A.**   Yes, that's correct.

8   **Q.**   A few years ago you submitted a declaration to a federal

9   court which stated, quote, "Studies that do not measure

10  exposure accurately are more likely to fail to detect a true

11  association that may be present with the error in exposure

12  estimation tending to shift measures of association towards the

13  null value."  You wrote that, right, Dr. Savitz?

14  **A.**   Again, that's sort of an embellishment of the first point

15  that when there is error in exposure measurement that's not

16  related to the disease outcome, the -- on average, it tends to

17  bias results towards the null.

18  **Q.**   Now, Dr. Savitz, you have written that causal evaluations

19  and subsequent policy decisions call for a comprehensive

20  assessment of all relevant evidence, including epidemiology,

21  toxicological research, and other relevant lines of

22  investigation, correct?

23  **A.**   That's correct, yes.

24  **Q.**   You have written that epidemiology is never sufficient

25  alone for fully assessing human health risks, right?

1   **A.**   I don't know that I would have said never.  That --

2   that -- I'm usually not that committal because we, every now

3   and then, run into something like tobacco and lung cancer where

4   epidemiology is and it isn't common that effects are so obvious

5   that they just -- they're unarguable, based on the

6   epidemiology, without any other lines of evidence.

7   **Q.**   So I know there's always room for editing in a textbook.

8   **A.**   Next edition.

9   **Q.**   You wouldn't dispute that in your textbook we would see

10  that word "alone" when we read that question?

11  **A.**   Yes.  It was the "never" I was surprised at, but so be it.

12  **Q.**   Thank you.

13       But you did write that, correct?

14  **A.**   Again, I have to see the quote.  I don't have that.

15  **Q.**   And, Dr. Savitz, you agree that biological plausibility is

16  an important component to the overall causation analysis,

17  right?

18  **A.**   I would -- again, it's standard, sort of, mantra that that

19  is so.  And the only thing that I -- again, biological

20  plausibility or a well-defined biological mechanism.  There are

21  degrees of it, and plausibility may be a bit generous that --

22  it's rare that something happens you couldn't find some way it

23  could have.  And, again, I'm not a biologist, so I'm not able

24  to refine that distinction of it's not impossible is one thing,

25  and it's another thing to say here is the exact pathway by

SAVITZ - CROSS / CONNETT

1    which it would operate.

2              **MR. CONNETT:**  Your Honor, at this time we would like

3    to read deposition testimony.

4              **THE COURT:**  Okay.

5              **MR. CONNETT:**  It's 176, lines 2 to 5.

6              **THE COURT:**  I see it.

7    **BY MR. CONNETT:**

8        "QUESTION:  First, you certainly agree that biological

9         plausibility is an important component to the overall

10        causation analysis.  Correct?

11       "ANSWER:  Yes.

12       Dr. Savitz, you have also written that, quote, "Assessment

13   of study validity is a complex undertaking requiring

14   methodologic and substantive expertise," correct?

15   **A.**   That's correct.  Yes.

16   **Q.**   And when you use the term "substantive expertise," you

17   mean subject matter expertise on the particular topic being

18   examined, correct?

19   **A.**   That's right, yes.

20   **Q.**   So in this case we are dealing with the topic of fluoride

21   neurotoxicity, right?

22   **A.**   That's right, at both the exposure end and the outcome end

23   and then the potential, you know, covariates of concern being

24   oriented to the topic in that way.

25   **Q.**   And you agree that when assessing the validity of a

SAVITZ - CROSS / CONNETT

1  particular epidemiological study on fluoride and neurotoxicity,

2  an expert needs, one, expertise on general epidemiological

3  methods; and two, expertise on the epidemiology of fluoride

4  neurotoxicity specifically, correct?

5  A.  Again, yes, the exposure and outcome.

6      As I said, it's not generic anymore.  It's about a

7  particular exposure encountered in a particular way and an

8  outcome that -- you know, again, the measurements of it and so

9  on that you need to take into account.

10 Q.  Now, Dr. Savitz, no one in this courtroom is going to

11 question your qualifications as an epidemiologist, certainly

12 not me.

13 A.  Thank you.

14 Q.  So let's focus, instead, on your background on the topic

15 that we're here for today, fluoride.  Okay?

16 A.  Okay.

17 Q.  Dr. Savitz, you have never conducted or published study of

18 any aspect of -- sorry.  Strike that.  Start again.

19     Dr. Savitz, you have never published or conducted a study

20 on any aspect of fluoride and human health, correct?

21 A.  I believe that is correct, yes.

22 Q.  When you joined the NASEM committee back in 2019, you

23 were, in your own words, quote, "A newcomer to the field of

24 fluoride," right?

25 A.  That's right, that I had the relevant background but not

 1  the experience studying fluoride.

 2  **Q.**   Prior to joining the NASEM committee, you had not read any

 3  of the fluoride neurotoxicity literature, including any of the

 4  IQ studies, right?

 5  **A.**   I believe that is correct, yes.

 6  **Q.**   During your time on the NASEM review, you personally read

 7  and reviewed only about four to five studies on fluoride,

 8  right?

 9  **A.**   I would put the number a bit higher, but, you know, not --

10  not the -- you know, the 55 that NTP had.  I would guess maybe,

11  over the course of things maybe, 8 to 10 in total.

12          **MR. CONNETT:**  Your Honor, we would like to read

13  deposition testimony.

14          **THE COURT:**  Okay.

15          **MR. CONNETT:**  It's page 19, line 21 to page 20, line

16  13.

17          **MR. CAINTIC:**  No objection.

18  **BY MR. CONNETT:**

19      **"QUESTION:**  And how many example studies did you

20      personally read and review as part of the NASEM process?

21      **"ANSWER:**  Again, it has been awhile, but I would say four

22      or five papers.

23      **"QUESTION:**  Were they all epidemiological studies, or did

24      they also include some of the toxicological literature?

25      **"ANSWER:**  No, they were all epidemiologic studies.

 1        "QUESTION:  Do you happen to recall which studies you

 2    reviewed?

 3        "ANSWER:  The one I do remember was, I believe, Barberio.

 4    For whatever reason, the name has stuck with me.

 5            "There was at least one other one that had Chinese

 6    authors.  I just remember it in the category of the study

 7    in China by Chinese authors.  I don't recall the other

 8    study."

 9        Dr. Savitz, you were retained by EPA in this case in about

10    February of 2023, right?

11    A.    That's correct, yes.

12    Q.    When EPA retained you for your services in this case, you

13    did not consider yourself to be a subject matter expert on

14    fluoride, right?

15    A.    I think that through the NASEM work, I would say I was

16    oriented to the issues from having -- you know, been serving on

17    the committee, in part from my reading but also just in part

18    from, you know, however many days of discussion with others

19    about the NTP Monograph and in reading the NTP Monograph.

20        So, again, I don't think there's a sharp line of

21    expertise, but I certainly was familiar with the -- how the

22    research was done and the measurement issues and so on from

23    that NASEM work.

24        MR. CONNETT:  Your Honor, we'd like to read deposition

25    testimony, page 16, lines 5 to 12.

 1              THE COURT:  Okay.

 2              MR. CONNETT:  Well, I'll just start, actually, in the

 3      middle there.

 4      BY MR. CONNETT:

 5          "QUESTION:  Prior to getting involved in this case, did

 6          you consider yourself to be a subject matter expert on

 7          fluoride?

 8          "ANSWER:  Again, because of the work with the National

 9          Academies Committee, I was conversant with, but I would

10          not say that, at that time, I had done the necessary work

11          to become an expert in the epidemiology of fluoride."

12          So let's talk now about your knowledge of fluoride

13      research, okay?

14      A.   Okay.

15      Q.   When I took your deposition this fall or last fall, you

16      did not know who Kaj Roholm is, correct?

17      A.   That's correct.

18      Q.   At the time of your deposition, you had not yet read any

19      of the toxicokinetic studies that have investigated where

20      fluoride goes in the body after it is ingested, correct?

21      A.   Right.  Again, that wasn't the focus of my assessment.

22      Q.   And those were studies that you had not yet read at the

23      time of your deposition?

24      A.   That is correct.

25      Q.   At the time of your deposition you had not yet read any of

1  the studies that have investigated whether fluoride gets

2  through the placental barrier, correct?

3  A.   That's correct.

4  Q.   At the time of your deposition you did not yet know

5  whether fluoridated water increases the fluoride levels in

6  bone, right?

7  A.   Again, I didn't read papers that were focused on that.  I

8  had looked at some broadly work.  I can't remember, it was a

9  chapter or something sort of a broad orientation, but not

10  in depth by any means.

11  Q.   At the time of your deposition, you had not yet read the

12  National Research Council's 2006 review on fluoride, right?

13  A.   That's correct.

14  Q.   And at the time of your deposition, you did not yet know

15  what the National Research Council's 2006 review had concluded

16  with respect to fluoride neurotoxicity, right?

17  A.   Except for what was paraphrased or cited in the NTP

18  report, I would not have known, because I did not go back to

19  the earlier report.

20  Q.   And when I asked you what was NRC's conclusion in 2006 on

21  neurotoxicity, you stated that you did not know, right?

22  A.   That's correct.

23  Q.   At the time of your deposition, you had not yet read any

24  of the animal toxicology studies on fluoride in the brain,

25  including fluoride's histopathological effects, right?

SAVITZ - CROSS / CONNETT

1   A.   That's correct.

2   Q.   At the time of your deposition, you stated that you had no

3   idea how many animal studies had been published on fluoride

4   neurotoxicity, correct?

5   A.   That's correct.

6   Q.   At the time of your deposition, you had never yet read any

7   of the animal studies investigating fluoride's impacts on the

8   thyroid gland?

9   A.   That's correct.

10  Q.   At the time of your deposition, you did not yet know that

11  fluoride had been used as a medication to reduce thyroid

12  function in patients with hyperthyroidism?

13  A.   That's correct.

14  Q.   At the time of your deposition, you had not yet read any

15  of the occupational studies of fluoride neurotoxicity?

16  A.   Again, the -- the NTP report had a small section on

17  adults' cognitive effects.  That was not the primary focus

18  though.

19  Q.   So at the time of your deposition, you personally had not

20  read any of the occupational studies?

21  A.   The original studies, no, that's correct.

22  Q.   At the time of your deposition, you had not yet read any

23  of the studies on fluoride and aborted fetal tissue in humans?

24  A.   No, I had not.

25  Q.   You were not aware if any such studies existed, correct?

SAVITZ - CROSS / CONNETT

1   A.   That's correct.

2   Q.   And lastly, with respect to the epidemiological literature

3   on fluoride and IQ, you had limited your consideration of the

4   epidemiological literature on fluoride to studies that looked

5   at less than 1.5 parts per million fluoride in the water,

6   right?

7   A.   Again, the -- for the studies in that range, I tried to be

8   exhaustive in seeing all of them.

9        The sample of other studies was quite scattered and

10  admittedly incomplete.  But again, as part of the NASEM work,

11  we at least looked at a sample of the other studies.

12  Q.   You testified at your deposition that, quote, "I did not

13  attempt to examine the literature on exposures in a higher

14  range to form an independent opinion on.  It may be totally

15  aligned with NTP, it may be at odds with NTP, but I did not

16  undertake the task of looking at those studies individually to

17  make my own assessment," correct?

18  A.   That's correct.

19  Q.   And you also testified that you had not undertaken the

20  process to see if there are common flaws that can explain the

21  consistent association between fluoride and IQ that the NTP

22  identified, correct?

23  A.   Again, I can't recall the exact wording.  It may have been

24  more that I had not identified -- I didn't have a hypothesis

25  that they had all erred in a particular direction, that I had

SAVITZ - CROSS / CONNETT

 1  not examined them to that level to formulate an assessment of
 2  whether they were -- you know, first of all, whether they were
 3  consistent, whether they were all right, whether they were all
 4  wrong, but that was -- again, I had not done the work necessary
 5  to conclude that.
 6  **Q.**   And you testified that you were not in a position and had
 7  no opinion on whether NTP was correct when it said that
 8  confounding is unlikely to explain the consistent association
 9  between fluoride and IQ, right?
10  **A.**   That's correct.
11  **Q.**   Going back to your textbook, Dr. Savitz, you wrote, quote,
12  "A given amount of epidemiologic evidence may be sufficient for
13  some purposes and insufficient for others.  The same absolute
14  quality of epidemiologic information may be insufficient,
15  adequate, or excessive for guiding policy in different
16  contexts," right?
17  **A.**   That's right.
18       And again, I think as an epidemiologist, not a
19  decision-maker, I see our job as epidemiologists is to convey
20  that information with sufficient accuracy that those who face
21  decisions are -- have the information they need.  It's trying
22  to separate out the evaluation of the epidemiology from the
23  decision-making process and recognize -- again, it's maybe
24  indirectly a message to epidemiologists of don't -- don't go
25  out of your lane; you're not the decision-maker, you're the

SAVITZ - CROSS / CONNETT

1    informer.

2    **Q.**    And you testified consistent with that, that, quote, "An

3    action level of evidence depends on a lot of other factors.

4    You can't really say the epidemiology is compelling or not

5    compelling, independent of the basis for decision, the other

6    lines of evidence and it all has to be assembled together,"

7    right?

8    **A.**    That's right.

9    **Q.**    Now, in assessing the sufficiency of evidence on fluoride

10   neurotoxicity in this case, you did not read EPA's "Guidelines

11   for Neurotoxicity Risk Assessment," correct?

12   **A.**    That's right.  I'm not a risk assessor, so it's -- I

13   recognize it feeds into that, but I am not the recipient in

14   the -- you know, I don't go forward from there.

15   **Q.**    Right.  And when you were assessing the sufficiency of the

16   epidemiologic evidence in this case, you were unaware of how

17   EPA's guidelines for neurotoxicity risk assessment define

18   sufficiency of human evidence for neurotoxicity, correct?

19   **A.**    Again, I don't think I was assessing the sufficiency.  I

20   think I was assessing the conclusions it supports.  You know,

21   sufficiency is in the eye of the beholder, of course.  And at

22   least trying not to say the final judgment, it's enough for you

23   to act on, it's not enough for you to act on, but trying to

24   characterize where we are with a level of certainty.

25   **Q.**    And I appreciate that clarification, but I just want to

SAVITZ - CROSS / CONNETT

1    get the underlying factual predicate correct just so that I'm

2    not misinterpreting or miscommunicating, okay?

3    **A.**    Okay.

4    **Q.**    But you would agree that when you were assessing the

5    evidence in this case, you did not know how EPA defines

6    sufficiency of human evidence for purposes of neurotoxicity

7    risk assessment?

8    **A.**    That's correct.

9    **Q.**    When you were evaluating the evidence in this case, you

10   did not know how EPA defines "hazard," right?

11   **A.**    Again, that's -- you know, it's -- I was trying to focus

12   as, if you will, neutrally or agnostically as much as possible

13   on the epidemiologic evidence and not be, if you will,

14   distracted by the thresholds and the definitions of those who

15   might put it to use.

16        I think it wouldn't be helpful in maintaining the kind of

17   objectivity that you need if you're sort of tilting it -- you

18   know, you're overly focused on what are they going to do with

19   it.

20   **Q.**    Okay.  But just to get that underlying factual predicate,

21   correct, you would agree that when you were evaluating the

22   epidemiological literature, you did not know how EPA defines

23   hazard?

24   **A.**    That's correct.

25   **Q.**    And you did not know how EPA defines risk?

SAVITZ - CROSS / CONNETT

**A.**   Not for the -- again, I can -- not how EPA defines it.   I know how -- you know, the standard definition but not the formal one.

**Q.**   In evaluating the evidence in this case, you did not look at any EPA's risk evaluations under the amended TSCA, right?

**A.**   That's correct.

**Q.**   For instance, you did not look to see how EPA uses the word "consistency" when evaluating scientific literature?

**A.**   That's right.   I did not look at their definition of that.

**Q.**   And you didn't look at how they apply that in practice when they're -- when they are describing whether a body of research is consistent or inconsistent, fair?

**A.**   That's correct.

**Q.**   At the time of your deposition, you were unaware of why EPA would make health-protective assumptions in the evaluation of risk, correct?

**A.**   I mean, as a philosophy, I understand the -- again, I don't understand the technology of risk assessment and regulation.   I recognize that there's a well-justified desire to ensure safety and build some margin in to ensure safety.

**Q.**   But when I asked you do you know why EPA would use health protective assumptions, you testified no you didn't, correct?

**A.**   Again, when you say "health protective assumptions," this is part of the modeling process you're referring to?

**Q.**   Part of the risk assessment.

 1   **A.**   Okay.  The -- again, I understand in a broad,

 2   philosophical sense, but I'm not sure the "why" part would

 3   be -- again, they have the, I'm sure, reasons for the -- the

 4   way they approach these issues, and I'm not familiar with how

 5   they came to that strategy of risk assessment.

 6   **Q.**   At the time of your deposition, you did not know if and

 7   why EPA uses uncertainty factors to account for intraspecies

 8   variability, correct?

 9   **A.**   I am, again, broadly aware of the sources of uncertainty

10   and the general way that those are quantified.  I'm not sure in

11   terms of the -- maybe I'm not understanding the question of --

12   you know, I know they come up with different numbers, and I

13   don't know the -- you know, algorithms for that.

14        **MR. CONNETT:**  Well, just for clarity of the record,

15   why don't we look at the deposition 168, 21 to 169, 2.

16        **MR. CAINTIC:**  No objection.

17   BY MR. CONNETT:

18        "**QUESTION:**  Do you know if EPA uses an uncertainty factor

19        to account for intraspecies variability?

20        "**ANSWER:**  I do not know.

21        "**QUESTION:**  Do you know why EPA would use an uncertainty

22        factor to account for intraspecies variability?

23        "**ANSWER:**  I do not."

24        At the time of your deposition, you were not aware that

25   this Court had determined in the first trial that EPA had used

SAVITZ - CROSS / CONNETT

 1  the wrong standard to assess risk, correct?

 2  **A.**   I was not aware of that, no.

 3  **Q.**   Now, Dr. Savitz, in addition to the textbook that we were

 4  looking at a few minutes ago, you've also written a book on

 5  epidemiology in law, right?

 6  **A.**   That's correct.

 7  **Q.**   And you have personally served as a retained expert by

 8  private parties in litigation, correct?

 9  **A.**   That's correct, yes.

10  **Q.**   You understand the meaning of the terms "specific

11  causation" and "general causation" as they are used in

12  litigation, right?

13  **A.**   Yes, I think so.

14  **Q.**   You understand that a general causation inquiry seeks to

15  determine, quote, "Whether a given agent is generally capable

16  of causing a particular form of harm," right?

17  **A.**   That's correct.  Although, again, I've come to appreciate

18  the nuances of -- sort of the -- some of the ambiguity

19  sometimes that can come in where, you know, to use a trivial

20  example, we know that radio frequency fields can cook things in

21  your microwave, we don't know if they can hurt you.  And so if

22  we're asking about, you know, Wi-Fi hurting people or so on,

23  we've got to be in the -- broadly in the ballpark.

24        So that's why I said there's a little bit of a

25  quantification, not precise, but I've come to appreciate there

SAVITZ - CROSS / CONNETT

1    are gradations in that.

2    **Q.**   Now, for your analysis in this case, you performed a

3    general causation analysis, right?

4            **MR. CAINTIC:**  Objection.

5            **THE COURT:**  Overruled.

6            **THE WITNESS:**  It's -- again, well, this is a good

7    example of where that's specified.

8            I was assessing the evidence bearing on a possible

9    causal relationship in a particular range.  That is somewhat

10   different than if it were a different range other if it was

11   unspecified by range.

12   **BY MR. CONNETT:**

13   **Q.**   And at your deposition, you testified that you understood

14   your scope and your role as assessing the general causation of

15   fluoride and neurotoxicity at those lower levels?

16   **A.**   That's correct, yes.

17   **Q.**   So let's -- while causation is not quite the standard that

18   we use for risk assessment, let's talk about causal analysis,

19   okay?

20   **A.**   Sure.

21   **Q.**   First, Dr. Savitz, you agree that when assessing

22   causality, it's critical to consider all relevant evidence that

23   bears on the issue?

24   **A.**   I -- again, there -- I think of these as sort of separate

25   steps.  There's the assessment of the epidemiologic evidence

SAVITZ - CROSS / CONNETT

1  and the extent to which it has generated associations and

2  whether those associations may or may not -- you know, are

3  likely to be causal or not likely and then, as a separate step,

4  integrating that with other expert assessment of the toxicology

5  and mechanism and so on and then assembling all those pieces

6  together.  But I -- I do -- maybe not everybody would agree,

7  but I do tend to see those as separate steps because I -- I

8  can't judge the toxicology as an expert.  I can judge the

9  epidemiology as an expert.

10 Q.   And when you did your assessment in this case, you were

11 not aware of studies that looked at fluoride levels in the 1.5

12 to 2.5 ppm range, right?

13 A.   I did not look comprehensively for such studies, so --

14 Q.   And you did not read any of those studies -- correct? --

15 if they exist?  If there's a study between 1.5 and 2.5 ppm, you

16 did not read them for your analysis?

17 A.   That's correct.

18 Q.   Now, at the time your deposition, you were not aware that

19 the NTP had performed a dose-response analysis in the

20 meta-analysis where they looked at the dose-response

21 relationship below two parts per million and below 1.5 parts

22 per million, correct?

23 A.   Again, I was not -- it's a little bit of a terminology

24 issue.  It is a sort of dose response estimate, but it's not --

25 it's not looking at a curve and, you know, identifying

SAVITZ - CROSS / CONNETT

1  thresholds and so on.

2      I had not seen that -- I think it was eTable 4 at that

3  time.  I had not identified that.

4  Q.   ETable -- eTable 4 and eTable 5?

5  A.   That's correct, yes.

6  Q.   When I deposed you in this case, you were unaware that the

7  Bashash 2017 study had used nonlinear models to assess the

8  dose-response relationship between fluoride and IQ in the

9  ELEMENT cohort, correct?

10  A.   Again, I'm sorry, that -- can you --

11  Q.   Yeah.

12  A.   -- clarify that?

13  Q.   Yeah.

14      When I deposed you in this case, you were unaware that the

15  Bashash study had used nonlinear models to assess the

16  dose-response relationship, correct?

17  A.   Again, I hadn't -- I hadn't been aware of which modeling

18  assumptions were made.  I was aware of the association they had

19  found, but not whether it had come from a linear or quadratic

20  or cubic or other models.

21  Q.   You testified at your deposition that you believed they

22  only used linear models, right?

23  A.   I'm sorry, what's that?

24  Q.   You testified at your deposition that you believed the

25  Bashash study only used a linear model?

 1   **A.**   Again, I don't recall -- I don't recall that, but I didn't

 2   know otherwise.   I may have defaulted to assuming that that

 3   would be the most commonly used model.

 4   **Q.**   Okay.  And then, likewise, at your deposition, you did not

 5   believe that the Green 2019 study had used a nonlinear model to

 6   assess the dose-response relationship?

 7   **A.**   Again, in the absence of other information, I assumed that

 8   the default was linear.

 9   **Q.**   Now, switching gears here, you were asked some questions

10   earlier about the NASEM committee, right?  And you agreed at

11   your deposition that we cannot assume that NASEM's criticisms

12   of the 2019 and 2020 drafts remain applicable to the May 2022

13   Monograph that is at issue in this case, correct?

14   **A.**   Not in detail.  Again, the report was not just the broad

15   issues.   There were a number of very specific technical issues,

16   which I did not go back to verify the way we did going from the

17   first to the second draft, we scrutinized it.  There was no

18   committee, and I did not personally scrutinize it for the final

19   recommendations.

20          **MR. CONNETT:**  And, Your Honor, I'd like to read

21   deposition testimony at 66, 1 to 10.

22          **THE COURT:**  Okay.

23          **MR. CAINTIC:**  No objection.

24   BY MR. CONNETT:

25          "QUESTION:  And you would agree, Dr. Savitz, that we can't

 1          look at NASEM's criticisms of the 2019 and 2020 drafts and

 2          assume that those criticisms still apply to the 2022

 3          Monograph, correct?

 4          "ANSWER:  Again, they revised it after the NASEM committee

 5          had completed its work, and so we -- I personally -- and

 6          obviously there's no NASEM committee to look at it -- have

 7          not assessed whether the current version of the draft is

 8          fully responsive to the concerns that had been raised."

 9          And, as I believe you just testified, you did not, in this

10   case, endeavor to do that type of analysis to look at whether

11   the 2022 Monograph has adequately responded to NASEM's

12   criticisms?

13   A.   Again, only the broad issues of the communication and

14   the -- sort of the clarification of the relevance.  And, again,

15   reading -- you know, not the details, though.  Not the

16   technical details of the process they went through.

17   Q.   Okay.  And when forming your opinions in this case, you

18   were unaware of NASEM's criticisms of EPA's systematic review

19   procedures under TSCA, correct?

20   A.   That is not something I had looked at, no.

21   Q.   You were unaware that NASEM had concluded that EPA used an

22   unworkable, nonobjective, noncomprehensive procedure for

23   evaluating hazards, correct?

24   A.   Again, I had not -- didn't have familiarity with that

25   report.

SAVITZ - CROSS / CONNETT

1    Q.   So let's turn to the NTP report, just a few points on it.

2         You agree that NTP is, quote, "Likely to have identified.

3    essentially, all relevant studies published before the closing

4    date of April 2021," correct?

5    A.   Again, yes.  I would trust their literature search

6    strategy.  Again, I'm not an expert in that, but I would trust

7    that they do it well.

8    Q.   And you are aware -- without saying that you agree with

9    their tabulations, you agree that NTP found that 64 of the 72

10   IQ studies they identified found an association between

11   fluoride and reduced IQ, correct?

12   A.   Again, I don't recall their exact tabulation and where --

13   the numbers that were there.  I certainly am aware that they

14   identified the vast majority of studies as having identified an

15   association.

16   Q.   And you're aware that NTP reached the conclusion that

17   confounding is unlikely to explain that consistent association,

18   right?

19   A.   Again, I'm aware of their conclusion.

20   Q.   And now, in your own writings, Dr. Savitz, including your

21   textbook, you have recognized that when epidemiological studies

22   consistently show an association and there are no common flaws

23   that can explain away this association, then a causal inference

24   is justified, correct?

25   A.   Again, the process I described in the book and that I

SAVITZ - CROSS / CONNETT

1   still believe is appropriate is to examine the array of

2   evidence and to challenge it with -- if you see an association

3   consistently, to challenge it with various potential -- about

4   potential sources of bias.  And to the extent it withstands

5   those, you're more confident that the causal relationship is

6   likely to be present.

7        So I think what -- what NTP -- their reasoning I have no

8   problem with, let's see if there's a consistent pattern, let's

9   see if there's some error that can explain it.  The logic is

10  unarguable.  I just -- I don't know -- I didn't delve into it,

11  as I've acknowledged, to see how well they did that.  Is it

12  really consistent?  Is it really free of confounding?  That's

13  something that I can't make an independent judgment on.

14  Q.   Fair.

15       But you would agree with the principle, leaving aside

16  fluoride for a moment, you would agree with the principle that

17  if someone looks at a body of epidemiological evidence, finds a

18  consistent association and is unable, after interrogating the

19  data, to identify any common flaws or biases that could explain

20  the consistent association, then the causal inference is

21  justified?

22  A.   That's right, yes.

23  Q.   Now, at the time of your deposition, you had worked, in

24  your estimate, about 175 to 250 hours on the case, right?

25  A.   That's right.

SAVITZ - CROSS / CONNETT

 1  Q.   And how many hours approximately have you worked on the

 2  case since your rebuttal report?

 3  A.   Oh, boy.  That's -- I don't have the numbers in front of

 4  me, but I'm going to guess of all the different activities of

 5  maybe another 80 to 100 hours, possibly, something in that

 6  range.

 7  Q.   And your hourly rate in this case is $500 an hour?

 8  A.   That's correct, yes.

 9  Q.   Now, let's talk a little bit about the review that was

10  conducted for Health Canada, okay?

11  A.   Okay.

12  Q.   So I just turned Dr. Savitz to Exhibit 129, which is the

13  published systematic review that just came out this week.

14       Can you see that?

15  A.   Yes, I can.

16  Q.   And there were about ten scientists who authored this

17  review, correct?

18  A.   That's correct, yes.

19  Q.   And they work with or are affiliated with Risk Sciences

20  International?

21  A.   That's my understanding, yes.

22  Q.   And I'm going to turn now to Exhibit 132 and a statement

23  from page 320.

24       But first, can you see here, Dr. Savitz, this is the draft

25  report from Risk Sciences International that they finished in

SAVITZ - CROSS / CONNETT

1    April of 2023.  Can you see that?

2    A.   Yes, I do.

3    Q.   And this is the report that you and the expert panel

4    reviewed, right?

5    A.   We were given.  We had access to it, yes.

6    Q.   Okay.  And the Risk Sciences International scientists

7    state here, quote, "The overall evidence identified to date

8    strongly suggests that fluoride can affect cognitive outcomes

9    in children (specifically, reduction in IQ scores), at levels

10   close to those currently seen in Canadian drinking water."

11        Did I read that correctly?

12   A.   Yes, you did.

13   Q.   And that's -- well, I take it you disagree with RSI on

14   that?

15   A.   Yes, I would.

16   Q.   So let's go to the -- let's go to the expert panel that

17   you were a part of.  And you see Exhibit -- this should be 128.

18   This is Exhibit 128.  Can you see that on your screen?

19   A.   Yes, I do.

20   Q.   I just want to ask you a few questions about the members

21   on the panel.  There were six members on the panel, right?

22   A.   That's correct, yes.

23   Q.   And you were one of them?

24   A.   That's correct.

25   Q.   Now, I'm looking -- you see here, this is the page of the

**SAVITZ - CROSS / CONNETT**

1  document which identifies each member's background?

2  **A.**   Yes.

3  **Q.**   Now, at the time that you were on this panel, Dr. Savitz,

4  you were serving as a litigation expert for the EPA in this

5  case, right?

6  **A.**   That's right.  I had -- when they invited me, I was very

7  clear.  I honestly thought they would probably not include me,

8  given my role with EPA, representing EPA, and they chose to

9  invite me nonetheless, so they were aware of my other

10  activities.

11  **Q.**   And were you provided a copy of this report before it was

12  published online?

13  **A.**   We all had to agree -- sign off, basically, as an accurate

14  representation of our assessment.

15  **Q.**   And when you -- when you received a copy of this, did you

16  ask them to identify, just for purposes of full disclosure,

17  that you were a litigation expert at this time?

18  **A.**   You mean to put that into the report?

19  **Q.**   Just to put it with your identification here on this page.

20  **A.**   No.  I mean, this was just looking at our affiliations, I

21  would say, not our activities.

22  **Q.**   Okay.  Another member on the expert panel is Steven Levy,

23  correct?

24  **A.**   That's correct, yes.

25  **Q.**   Steven Levy is a dentist?

1    **A.**   That's correct.

2    **Q.**   Steven Levy works on the American Dental Association's

3    National Fluoridation Advisory Committee?

4    **A.**   I wasn't aware of that, but . . .

5    **Q.**   Are you aware that Dr. Levy has been actively promoting

6    water fluoridation for over 30 years?

7            **MR. CAINTIC:**  Objection, foundation.

8            **THE COURT:**  Sustained.

9    BY MR. CONNETT:

10   **Q.**   Are you aware that Dr. Levy is a very vocal advocate of

11   water fluoridation?

12           **MR. CAINTIC:**  Same objection.

13           **THE COURT:**  Sustained unless there's a basis for this

14   witness to know that.

15   BY MR. CONNETT:

16   **Q.**   Well, do you know Dr. Levy?

17   **A.**   I had not met him before the meeting, no.

18   **Q.**   Okay. so you don't know about his background?

19   **A.**   Again, I don't know about his background in terms of other

20   activities other than his input into the meeting itself.

21   **Q.**   Okay.  And another member on the expert panel was John

22   Fawell?

23   **A.**   I'm not sure myself how to pronounce it.

24   **Q.**   Okay.  Are you aware that Mr. Fawell has promoted water

25   fluoridation programs in England?

1           MR. CAINTIC:  Objection, foundation.

2           THE COURT:  Rephrase the question.  You're assuming a

3  fact.  You can ask it -- you can ask it without being so

4  leading because your question assumes facts not in evidence.

5  BY MR. CONNETT:

6  Q.   Do you know whether -- do you know anything about

7  Mr. Fawell's background with respect to advocacy for water

8  fluoridation?

9  A.   I do not.

10 Q.   Okay.  So let's move to the published documents that Risk

11 Sciences -- sorry.  Strike that.

12      Let's look at some of the published materials from this

13 week related to Risk Science International's systematic review.

14 Okay?

15 A.   Okay.

16         THE COURT:  Before you go there let me just ask a

17 question.  You may not know the answer to this, Doctor, but do

18 you know how people were selected for this panel?

19         THE WITNESS:  No, I don't -- you know, again, the -- I

20 don't know their sort of reasoning and their process.

21         By discipline, they were clearly looking for the range

22 of people that could address the range of outcomes of interest.

23 So, you know, again, I can take Dr. Levy that we knew dental

24 fluorosis was going to be one of the issues, and that's not

25 something that I could address very effectively, so we had a

 1   toxicologist and we had a different mix of expertise.  I don't

 2   know how they chose the specific individuals who was -- again,

 3   what the reasoning process was.

 4          **THE COURT:**  Do you know if the people who invited you

 5   were aware that you were involved in this case as an expert?

 6          **THE WITNESS:**  I made sure that they were aware right

 7   from the very first invitation.

 8          **THE COURT:**  I guess I meant when they invited you were

 9   they aware or did you have to inform them?

10          **THE WITNESS:**  Yes.  They were -- oh, I'm sorry.  You

11   mean before they invited me?

12          **THE COURT:**  Yes.

13          **THE WITNESS:**  Not to my knowledge.  They didn't say

14   anything about that.

15          **THE COURT:**  Okay.

16          **THE WITNESS:**  So no.  I'm -- yeah, I understand your

17   question.  No, I don't think so.

18          **THE COURT:**  And are you aware, from your discussions

19   with the other members of the panel, what their involvement --

20   have they been involved on one side or the other in advocating

21   on the issue of fluoridation of water?

22          **THE WITNESS:**  I was not aware.  I mean, the only one I

23   knew and know well on the panel was David Bellinger.  He's an

24   expert in the epidemiology.  I mean, I can't think of anybody

25   more knowledgeable about neurodevelopment than Dr. Bellinger.

 1   And I know he was aware of this issue.  He had, I think,

 2   written a commentary on the -- I believe on the Green paper,

 3   and so I knew he was familiar with the issues, but I did not

 4   know the others on the committee one way or the other.

 5            THE COURT:  He wrote a commentary on the Green study?

 6            THE WITNESS:  I believe it was on the Green paper.

 7            THE COURT:  Do you recall what he said or --

 8            THE WITNESS:  You know, he said this is interesting,

 9   we need to see what -- you know, again, it was a short piece.

10   It's in the open literature, but I don't -- I don't recall in

11   detail what he said in assessing the evidence.  And really I

12   think, if anything, what I do recall is, it was more saying

13   this deserves a closer look.

14            THE COURT:  Okay.  Thank you.

15   BY MR. CONNETT:

16   Q.   So turning to Exhibit 131 and page 1516 in it, can you see

17   this on your screen?

18   A.   Yes, I do.

19   Q.   And this is the -- this is the published supplemental

20   mental material from this week.  Do you understand that?

21   A.   Yes, I do.

22   Q.   And the ten Risk Sciences International scientists state

23   here, quote, "The overall evidence identified to date strongly

24   suggests that fluoride can affect cognitive outcomes in

25   children (specifically, reduction in IQ scores) at levels close

1  to those currently seen in North American drinking water.

2       "Hence, the selection of the most appropriate endpoint

3  requires a comparison of the point of departure for moderate

4  dental fluorosis and the point of departure for IQ deficits.

5  [sic]."  Did I read that correctly?

6  **A.**   Yes, you did.

7  **Q.**   And I take it you disagree with the RSA scientists on this

8  point?

9  **A.**   Well, the -- again, the first statement, which is the

10  same, I think, as the one you had shown before makes a

11  different -- has a different level of certainty; strongly

12  suggests -- we could quibble about the adjectives.

13       The second one is really more of an issue, now we're

14  delving -- we're moving into the risk assessment area where I'm

15  not as comfortable sort of reacting to their interpretation,

16  but it's, again, interesting that even with statements like

17  this they come around at the end; again, a different path than

18  I would have taken or did take, but a convergence at the end

19  that it's not ready for action.

20  **Q.**   But Dr. Savitz, your expert panel actually recommended

21  that a uncertainty factory for database uncertainty be applied

22  to the point of departure for fluorosis in order to protect

23  against the potential for neurocognitive effects correct?

24  **A.**   My interpretation of that issue was that we don't know

25  enough to recommend an -- we're uncertain about the uncertainty

SAVITZ - CROSS / CONNETT

1    at this point in time.

2    **Q.**   Are you familiar with the EPA's use of a database

3    uncertainty factor?

4    **A.**   Only in the most general sense of the database presumably

5    is the evidence.

6    **Q.**   And are you aware that the EPA uses an uncertainty factor

7    of 10 where there is meaningful uncertainty about the potential

8    for a health endpoint that is not the subject of the point of

9    departure but for which there's substantial concern?

10           **MR. CAINTIC:**   Objection, foundation.

11           **THE COURT:**   Well, he's asking if he's aware of that.

12   **BY MR. CONNETT:**

13   **Q.**   Are you aware of that, Dr. Savitz?

14   **A.**   No.   Again, this is -- I would -- this is very much in the

15   realm of risk assessment where, as I said, I'm not really

16   expert.

17   **Q.**   Okay.   So let's turn to page -- let's turn back to the

18   published main document, which is Exhibit 129.   And you see

19   here the statement from page 9?

20   **A.**   Yes, I do.

21   **Q.**   So as part of the RSI analysis, they did a Bradford Hill

22   causation analysis, right?

23   **A.**   That's correct.

24   **Q.**   And based on their Bradford Hill causation analysis, they

25   concluded that, quoted, "The available evidence demonstrated a

**SAVITZ - CROSS / CONNETT**

1  moderate to strong magnitude (strength) of association between

2  fluoride and neurocognitive effects with consistent evidence

3  across studies for the impact on childhood IQ at fluoride

4  exposures relevant to current North American drinking water

5  levels," correct?

6  **A.**   That's what they said, yes.

7  **Q.**   They also state and they also concluded, quote,

8  "Significant increasing exposure response relationships between

9  fluoride and drinking water and reduction in IQ scores were

10  noted in seven epidemiologic studies."  Did I read that

11  correctly?

12  **A.**   You read that correctly, yes.

13  **Q.**   Do you know which seven epidemiological studies they're

14  referring to?

15  **A.**   I do not.

16  **Q.**   Have you read those seven epidemiological studies?

17  **A.**   I -- again, we're into a realm of someone else's

18  assessment of the literature.  I've read -- I read the paper,

19  not the long version, and have not tried to reconstruct their

20  assessment.  In other words, it's not my assessment, it's their

21  assessment, and I have not tried to trace back and, again, see

22  where I agree, where I diverge.  As I said, I knew that there

23  were some assessments along the way, including this one that I

24  would not agree with.  But at the end, as I said, we end up in

25  a similar place.

SAVITZ - CROSS / CONNETT

1  **Q.**   So let's move on.

2      Dr. Savitz, you agree that one should never cherry-pick

3  results from studies, right?

4  **A.**   That's fair, yes.

5  **Q.**   When you are living up to your own very high standard of

6  practice.  You do not cherry-pick the results of studies just

7  because they support your -- your conclusion?

8  **A.**   I very much try to avoid any -- doing that, yes.

9  **Q.**   And given the problems that come from cherry-picking,

10  you -- you would question the credibility of any review that

11  cherry-picks the findings, right?

12  **A.**   Again, the cherry-picking is obviously a pejorative term,

13  and it -- in referring to a very selective emphasis based on

14  the results, that's sort of the category I would put that in.

15  **Q.**   So I just put the Government's Demonstrative No. 10 on the

16  screen, and this shows the four prospective cohort studies that

17  you have placed most weight on and consider the most

18  informative for your analysis, right?

19  **A.**   That's correct, yes.

20  **Q.**   All right.  And this figure shows results from the MIREC

21  cohort, right?

22  **A.**   That's right, yes.

23  **Q.**   And for girls there's only one result identified, right?

24  **A.**   That's correct, yes.

25  **Q.**   And that result shows no significant effect?

SAVITZ - CROSS / CONNETT

1  **A.**   That's correct.

2  **Q.**   But Dr. Savitz, the MIREC cohort found significant

3  associations between maternal fluoride exposure and reduction

4  in IQ when using two other measures of exposure, right?

5  **A.**   Again, I'd have to see what other measures you're

6  referring to.  This was the primary, if you will, measure.

7  **Q.**   Are you aware, Dr. Savitz, that in the MIREC cohort they

8  found a statistically significant reduction in IQ among girls

9  when they looked at the total fluoride intake from beverages in

10 the mom?

11 **A.**   Again, that was not the primary emphasis of their results

12 in the study.  I'm not saying it's not of value, but it's a --

13 I didn't -- I wouldn't claim that there's not a single finding

14 in the study that suggests an effect among girls or that every

15 single finding in the study does suggest an effect among boys.

16 **Q.**   But certainly you do not disclose any adverse associations

17 between fluoride and IQ in the MIREC cohort here?

18 **A.**   In this -- that's right.  That's correct, in this sort of

19 summary evaluation.

20 **Q.**   And Dr. Savitz, today you testified that you have a

21 growing appreciation for the value of water fluoride as a means

22 of assessing fluoride's neurodevelopmental effects, right?

23 **A.**   That's right.

24 **Q.**   Dr. Savitz, are you aware that in the MIREC cohort, the

25 authors found a statistically significant relationship between

SAVITZ - CROSS / CONNETT

1  water fluoride levels for the mom and reduced IQ in the girls?

2  **A.**   Again, I have to see that results to refresh -- those

3  results to refresh my memory, but the reason to juxtapose these

4  is because they are pertaining -- these are -- this is

5  comparing like to like across this table.  Each of the studies

6  has generated other results, and there's a -- again, it's not

7  to say there is nothing in there that -- in the negative

8  studies that is positive or in the positive studies that is

9  unsupportive.  It's giving a summary assessment of that, and I

10 think this is an accurate summary evaluation, not saying

11 nothing in there suggests otherwise.

12 **Q.**   Now, in your testimony yesterday, you talked about how if

13 there were two or three more prospective cohort studies that

14 found adverse associations with fluoride, that that could tip

15 the balance towards a likely causal determination, right?

16 **A.**   It would certainly move it in that direction

17 substantially.

18 **Q.**   But as we sit here today we already have two additional

19 prospective cohort studies that have found adverse associations

20 between maternal fluoride and IQ loss in the children, right?

21 **A.**   I'm sorry.  I'm not sure what you're referring to.

22 **Q.**   Well, let's go step by step.

23      Are you familiar with the Till 2020 cohort study in

24 Canada?

25 **A.**   That is the MIREC-based study?

SAVITZ - CROSS / CONNETT

```
 1   Q.   Yes?

 2   A.   Yes.

 3   Q.   And that study looked at whether fluoride exposure amongst

 4   formula-fed infants is associated with IQ loss, right?

 5   A.   That's right, but that's not an independent study.  It's

 6   the same children, the same IQs, the same water sources.

 7   It's -- it's an extension.  It's not a separate -- I would not

 8   consider that a separate study.

 9   Q.   And the NTP disagrees with you on that point?

10   A.   That's apparently the case, yeah.

11   Q.   Because the NTP considers the Till 2020 study to be a

12   separate and distinct cohort study from Green?

13   A.   Again, it's also not examining prenatal exposure anymore,

14   correct?

15   Q.   Right.  It's examining the impact of --

16   A.   Post-natal.

17   Q.   Post-natal exposure to infant formula made with

18   fluoridated water, right?

19   A.   And I would -- again, if I was going to create a set -- a

20   table corresponding to that earlier table, I would want to see

21   a table of all of those who have looked at post-natal childhood

22   exposure.

23        It's, again, they're -- it's different -- you know, it's a

24   different -- different exposure measure and a different

25   analysis of the same data source.
```

SAVITZ - CROSS / CONNETT

1  Q.   But the Till study on formula-fed babies found a large,

2  statistically significant loss in IQ among the babies formula

3  fed with fluoridated water?

4  A.   I mean, again, I'm familiar with the results and they did

5  find a positive association in that group.

6  Q.   And the National Toxicology Program, when they looked at

7  these cohort studies, Bashash, Green and Till, the NTP

8  concluded, quote, "In summary, although not every analysis

9  found a statistically significant association, together the

10  three studies provided consistent evidence that increasing

11  maternal fluoride levels were associated with lower IQ scores

12  in children," correct?

13  A.   That is their assessment, yes.

14       MR. CONNETT:   And for the record that's page 40 of

15  Exhibit 67.

16  BY MR. CONNETT:

17  Q.   And let's go back to your -- to your table of four

18  studies.  Another prospective cohort study that's not included

19  here is the Cantoral study, right?

20  A.   That's correct, yes.  That's not -- that's a very

21  different study.  Again, I'm trying to keep -- keep them

22  homogeneous.  The Cantoral study was looking at a different

23  source of fluoride.

24  Q.   And in your expert report, you considered the Cantoral

25  study to be, quote, high quality and, quote, "Provides valuable

SAVITZ - CROSS / CONNETT

1  information contributing to the overall assessment of potential

2  neurodevelopmental effects of fluoride in drinking water,"

3  correct?

4  **A.**   Again, subject to the accuracy of their exposure

5  assessment method based on diet.

6  **Q.**   But that's what you wrote in your expert report.

7  **A.**   Okay.

8  **Q.**   Do you agree with that?

9  **A.**   Yeah.

10 **Q.**   Now, in your expert report, you never once disclosed that

11 the Cantoral study found any significant associations with loss

12 of cognitive ability, right?

13 **A.**   Again, I've said before that these studies generate a wide

14 array of results, and there is a need to begin, at least, with

15 the overall assessment of what message they're sending.  And

16 it's -- I don't object to them digging deeper and looking in

17 more detail, but every negative result that they generate is as

18 informative as any positive result.  You can't -- it's

19 cherry-picking to say did -- is there anything in there

20 suggestive of a positive finding.

21 **Q.**   Dr. Savitz, if we look at your expert report and we look

22 at the summary that you provided for that study, we will not

23 see any reference, any disclosure of any statistically

24 significant adverse associations in that study, correct?

25 **A.**    If there's an isolated finding, I would have considered it

SAVITZ - CROSS / CONNETT

1  uninformative if it's in a particular sub analysis and there's

2  one or two or three that pop up, I'm still giving what my

3  opinion is of what the overall research says.

4  **Q.**   But why not disclose that to the reader?  Why not disclose

5  to the reader, hey, I disagree, I disagree with the finding,

6  but I have to report to you that they have found this adverse

7  association?

8  **A.**   I don't -- again, I'm not sure I understand the reasoning.

9  I'm -- it's impossible in a report to summarize studies that

10  generate many tables of data and to -- it requires a judgment

11  about the overall message.  And I think that it doesn't need to

12  agree with the emphasis of their message.

13  **Q.**   Right.  I just put the Cantoral abstract or the Cantoral

14  paper on the screen.  This is Exhibit 110.

15      Do you see that in front of you?

16  **A.**   Yes, I do.

17  **Q.**   And I'm reading from the Conclusion section of the

18  abstract.  The authors write, quote, "Averaging across the

19  12-and 24-month cognitive outcomes using mixed-effects models

20  revealed a similar association:  A .5-milligram-per-day

21  increase in overall dietary fluoride intake was associated with

22  a 3.46 point lower cognitive outcome in boys."

23      Did I read that correctly?

24  **A.**   You did, yes.

25  **Q.**   And when you were describing to the Court earlier today

SAVITZ - CROSS / CONNETT

1  the findings from Cantoral, you never disclosed this finding,

2  did you?

3  **A.**   Again, the -- my examination of the array of data, if you

4  divide it enough ways, it's not surprising that there will be

5  some findings emerge that are deviant from the overall

6  evidence.

7       I don't know -- I wasn't looking at it and saying:  Is

8  there something in there that suggests an adverse effect.  I

9  was asking what is the overall message from the study.

10  **Q.**   So Dr. Savitz, I'm looking at on the screen here EPA

11  Demonstrative No. 12.

12  **A.**   Right.

13  **Q.**   This is the summary of findings that you discussed earlier

14  today, right?

15  **A.**   That's correct, yes.

16  **Q.**   And in the summary of findings, you only present the

17  isolated findings by 12-months of age and 24-months of age,

18  correct?

19  **A.**   That's what's on the table, yes.

20  **Q.**   And that's from Table 3 of the study, right?

21  **A.**   Yes.

22  **Q.**   But there's a Table 4 to the study, right?

23  **A.**   There may be more than that.  I mean, there's often more.

24  **Q.**   And Table 4 presents the aggregate results, right?

25  **A.**   I'd have to see that.

 1   Q.   Are you aware that in Table 4, they take the 12-month

 2   results and the 24-month results, average them together to see

 3   if fluoride is associated with reduced cognitive ability

 4   amongst the two age ranges combined?

 5           MR. CAINTIC:  Objection, foundation, argumentative.

 6           THE COURT:  Overruled.

 7           THE WITNESS:  I'd have to see the table and could

 8   respond to that.  It's a choice, again.  We're -- every time

 9   you do more analyses, you increase the chances of finding

10   something, let's say, deviant.  I mean, it could be a positive

11   finding, could be a negative finding, but as you stratify by

12   time, by sex, by the IQ scale, again, it's -- it's -- you

13   increase the potential for spurious results.

14           And I'm not saying I know for a fact that the one

15   Green one is wrong, but I have no reason to put more faith in

16   that than all the red ones.  The red ones are saying no, the

17   Green one is saying yes.  Well, what Dewey make of it?

18   BY MR. CONNETT:

19   Q.   And just going back to your expert report, you wrote in

20   your expert report, quote, "Analyses indicated no association

21   between estimated dietary fluoride intake during pregnancy and

22   cognitive ability in infants at ages 1 or 2."  That's what you

23   wrote, right?

24   A.   That's correct, yes.

25   Q.   So --

1       **MR. CONNETT:**  Your Honor, I think we're -- we might be

2  at time.

3       **THE COURT:**  Okay.  All right.  Then we're going to

4  continue on Monday.  So have a nice weekend everyone.

5       **MR. CONNETT:**  Thank you, Your Honor, you too.

6     (Adjourned at 1:36 p.m.)

7                          --oOo--

8

9

10                **CERTIFICATE OF REPORTER**

11     I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14

15  _____        February 10, 2024
    JENNIFER L. COULTHARD, RMR, CRR              DATE
16  Official Court Reporter
    CA CSR#14457
17

18

19

20

21

22

23

24

25