```
 1                                  Volume 8

 2                                  Pages 1219 - 1387

 3                    UNITED STATES DISTRICT COURT

 4                   NORTHERN DISTRICT OF CALIFORNIA

 5    Before The Honorable Edward M. Chen, Judge

 6    FOOD & WATER WATCH, INC., ET    )
      AL.,                           )
 7                                    )
                   Plaintiffs,        )
 8                                    )
        VS.                           )     NO. 17-CV-2162
 9                                    )
      UNITED STATES ENVIRONMENTAL     )
10    PROTECTION AGENCY, an agency    )
      of the United States, ET AL.,   )
11                                    )
                   Defendants.        )
12    _____)

13                              San Francisco, California
                                Monday, February 12, 2024
14
                       TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
15
      APPEARANCES:
16
      For Plaintiffs:
17                              WATERS KRAUS & PAUL, LLP
                                222 N. Pacific Coast Highway, Suite 1900
18                              El Segundo, California  90245
                           BY:  MICHAEL P. CONNETT
19                              CHARLES ANDREW WATERS
                                ATTORNEYS AT LAW
20

21

22         (Appearances continued next page.)

23    REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                     Official U.S. District Court Stenographer
24

25
```

1   **APPEARANCES (Continued):**

2   For Defendants:

3                          UNITED STATES DEPARTMENT OF JUSTICE
                           Environmental Defense Division
                           601 D Street, NW, Room 8814
4                          Washington, DC  20004
                 BY:   **BRANDON N. ADKINS, ATTORNEY AT LAW**
5
                           UNITED STATES DEPARTMENT OF JUSTICE
6                          1301 Clay Street, Suite 340-S
                           Oakland, California  94612
7                BY:   **EMMET P. ONG, ATTORNEY AT LAW**

8                          UNITED STATES DEPARTMENT OF JUSTICE
                           Environmental Defense Division
9                          150 M Street, N.E.
                           Washington, D.C.  2002
10               BY:   **PAUL CAINTIC, ATTORNEY AT LAW**

11

12  **ALSO PRESENT:**            DANIEL DePASQUALE, EPA
                           JAY SANDERS (trial tech)
13                         DANNY HAMBRICK (trial tech)

14                         --oOo--

15

16

17

18

19

20

21

22

23

24

25

1

2  Monday, February 12, 2024 - Volume 8

3                      **I N D E X**

4  **DEFENDANT'S WITNESSES**                              **PAGE**   **VOL.**

5  **SAVITZ, DAVID**
   (PREVIOUSLY SWORN)                                   1230      8
6
   Cross-Examination By Mr. Connett:                    1230      8
7  Redirect Examination By Mr. Caintic:                 1282      8
   Recross-Examination by By Mr. Connett:               1307      8
8
   **BARONE, STANLEY**
9  (SWORN)                                              1314      8

10 Direct Examination By Mr. Adkins:                     1315      8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | <u>**Monday - February 12, 2024**</u>                              <u>**8:33 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | --oOo-- |
| 4 | **THE CLERK:**  Court is calling Food & Water Watch, Inc. |
| 5 | versus EPA, Case No. 17-2162. |
| 6 | Counsel, please state your appearance for the record |
| 7 | beginning with the plaintiff. |
| 8 | **MR. CONNETT:**  Good morning, Your Honor, Michael |
| 9 | Connett on behalf of the plaintiffs. |
| 10 | **THE COURT:**  All right.  Good morning, Mr. Connett. |
| 11 | **MR. WATERS:**  Good morning, Your Honor, also for |
| 12 | plaintiffs Andy Waters. |
| 13 | **THE COURT:**  Thank you, Mr. Waters. |
| 14 | **MR. ADKINS:**  Good morning, Your Honor; Brandon Adkins |
| 15 | or behalf of the defendants. |
| 16 | **THE COURT:**  All right.  Good morning. |
| 17 | **MR. ONG:**  Good morning, Your Honor, Emmet Ong on |
| 18 | behalf of defendants. |
| 19 | **THE COURT:**  Good morning, Mr. Ong. |
| 20 | **MR. CAINTIC:**  Good morning, Your Honor; Paul Caintic |
| 21 | on behalf of the defendants. |
| 22 | **THE COURT:**  Mr. Caintic. |
| 23 | **MR. CAINTIC:**  So we have one housekeeping matter for |
| 24 | Your Honor today. |
| 25 | **THE COURT:**  All right.  Hold on for a second.  I'm |

PROCEEDINGS

 1   just going to fire up my computer here.

 2          Okay.  Okay.  Where are we at?

 3          **MR. CAINTIC:**  Okay.  Just a hopefully brief scheduling

 4   issue.

 5          After Dr. Savitz's testimony is wrapped up, we -- the

 6   EPA has two witnesses left, Dr. Ibarluzea, who we will call

 7   through deposition testimony and Dr. Barone, and then we plan

 8   to close.

 9          The video that we plan to play consists of clips from

10   Dr. Ibarluzea's deposition that the plaintiffs selected and EPA

11   selected mashed up into one video, so we would play that at one

12   point.  And we've come to an allocation of time within those

13   video clips for both EPA and the plaintiffs.

14          **THE COURT:**  Okay.

15          **MR. CAINTIC:**  The total time for the video is 2 hours

16   and 24 minutes -- excuse me -- yes, 2 hours and 20 minutes

17   total.

18          The parties have conferred and wanted to suggest a

19   couple options for the Court in light of the additional time

20   that the Court allowed plaintiffs to have and to see if there

21   was a way where we could wrap this trial up tomorrow instead of

22   having it bleed into Wednesday.

23          **THE COURT:**  Uh-huh.

24          **MR. ADKINS:**  And what we would propose is to offer the

25   video as an evidentiary exhibit that the plaintiffs would

PROCEEDINGS

 1  stipulate to as well as the deposition designation testimony in

 2  appendix C to the pretrial statement.  And so we would

 3  stipulate that that would come in as evidence.  The Court could

 4  charge the time that we allocated in the video against the

 5  parties' time, but we wouldn't play the video for Your Honor

 6  in --

 7          THE COURT:  I could just watch it --

 8          MR. ADKINS:  -- open court.

 9          THE COURT:  -- and not be in court.  The time is

10  counted, but we don't have to sit here.  I could watch it.

11          MR. ADKINS:  Absolutely.

12          THE COURT:  You said the deposition designations for

13  Dr. --

14          MR. ADKINS:  Ibarluzea.

15          THE COURT:  -- Ibarluzea --

16          MR. ADKINS:  Uh-huh.

17          THE COURT:  -- that's not already in the clips?  It's

18  not -- is it part of the clips?  Is it in, or do I have to read

19  that --

20          MR. ADKINS:  So the video you would see three things.

21  You would see Dr. Ibarluzea.  You would see what looks like

22  close captioning, but it's the deposition transcript --

23          THE COURT:  Yeah.

24          MR. ADKINS:  -- playing in real-time with the video.

25          THE COURT:  Yep.

PROCEEDINGS

```
 1          MR. ADKINS:  And then when Dr. Ibarluzea was shown an
 2   exhibit at the deposition, you would also see on a side screen
 3   that -- a copy of that exhibit.
 4          THE COURT:  Oh.  Okay.
 5          MR. ADKINS:  It's -- it's an informative video --
 6          THE COURT:  Yeah.
 7          MR. ADKINS:  -- and it's pretty easy to follow, but it
 8   is 2 hours and 20 minutes, and we're trying to be conscious
 9   with the Court's --
10          THE COURT:  Yeah, that's fine.  I just want to make
11   sure that I -- I don't have to read something in addition to
12   watching the video.
13          MR. ADKINS:  No.
14          THE COURT:  Okay.  But there will be a transcript or
15   some sidebar or something that has the --
16          MR. ADKINS:  That's correct.  And the video captions
17   line up with --
18          THE COURT:  Got it.
19          MR. ADKINS:  -- the amended designations that the
20   parties filed over the weekend.
21          THE COURT:  Got it.
22          MR. CONNETT:  And plaintiffs agree with that.
23          I would just -- we would just add that we certainly
24   think the video is more informative than the written text
25   because of what counsel had commented on, that you have the
```

PROCEEDINGS

```
 1  exhibits being shown --
 2          THE COURT:  Yeah.
 3          MR. CONNETT:  -- you see what -- so --
 4          THE COURT:  Yeah.
 5          MR. CONNETT:  But we have no objection to counsel's --
 6          THE COURT:  All right.  That's fine.  So -- I mean,
 7  that's something that I can watch in chambers as part of the
 8  trial, but there's no need for us to sit here and watch a video
 9  is what you're saying.
10          MR. ADKINS:  And with that I think we could move
11  directly into Dr. Barone's testimony after Dr. Savitz wraps up
12  and hopefully wrap this trial up tomorrow.
13          THE COURT:  Okay.  How long do you expect
14  Dr. Barone's --
15          MR. ADKINS:  His direct could last -- it's hard to
16  tell depending on whether the Court has questions, but I would
17  estimate 60 to 90 minutes.
18          THE COURT:  Okay.  And you -- I assume you will
19  complete Dr. Savitz --
20          MR. CONNETT:  Oh, yeah.
21          THE COURT:  -- today?
22          MR. CONNETT:  This morning.
23          THE COURT:  Okay.  Good.  I think that's a fair plan.
24          I'm thinking about closings and whether it makes sense
25  to reserve closings -- well, one, after I've had a chance to
```

PROCEEDINGS

 1   look at the video of course, but it may be more productive for

 2   me to -- I may have some focused questions and some issues that

 3   I'd like each side to address, and that's how the closings

 4   might be most helpful rather than sort of doing a jury closing

 5   thing here.  So we could schedule that, and that could be done

 6   by Zoom as well.

 7         MR. ADKINS:  Okay.

 8         THE COURT:  I mean, in some ways I -- it's nice to

 9   have everybody here.  On the other hand, I know you've traveled

10   a long ways.  It's not -- at that point we're not examining

11   witnesses, so it's not quite as critical, but we could set a

12   time to take -- you know, so we'd reserve however long you

13   think, an hour apiece or something for closings.

14         It may make sense for me to watch everything and then

15   think about it and then maybe focus the parties on a handful of

16   key issues or issues that seem to be key to me, and we'll just

17   set a date.  It's almost like a law and motion at that point.

18   I can put it on the law motion calendar, specially set it

19   for -- set aside a couple hours.  How does that sound?

20         MR. ADKINS:  I think that sounds fine, Your Honor.

21   The only thing I would ask is if we could schedule that sooner

22   than later while it's fresh.  And I also have a trial March 11

23   in the Southern District of Florida that I'm going to be

24   scooting off for pretty quickly here.

25         MR. CONNETT:  I think it's a fantastic idea, and I

PROCEEDINGS

```
 1   would -- likewise, if we could schedule it in the next week or
 2   two, that would be great.
 3           The one thing I would note for the Court is I will be
 4   unavailable Thursday and Friday of this week, so if we could
 5   schedule it for any other day than those two days, that would
 6   be ideal.
 7           THE COURT:  Okay.  Perhaps next week, potentially
 8   maybe Tuesday?  President's Day is Monday, but the 19th it
 9   appears, Vicky, we have time in the morning?
10           THE CLERK:  I am looking right now, Your Honor.  So it
11   would be the 20th on Tuesday?
12           Yes, we do have availability in the morning.
13           MR. ADKINS:  That works for us.
14           THE COURT:  Okay.
15           MR. CONNETT:  That works for plaintiff.
16           THE COURT:  Why don't we plan on doing that, let's
17   say, 9:30.  And then -- and I take it you would prefer to do
18   this by Zoom?
19           MR. CONNETT:  I think that makes sense given that --
20   yeah.  That would be plaintiff's preference.
21           MR. ADKINS:  We'd defer, Your Honor.
22           MR. CONNETT:  But we could also do it in person, Your
23   Honor, so either way.  Whatever the Court's preference is.
24           THE COURT:  All right.  Let me give that a little bit
25   of thought.  I'll let you know certainly by tomorrow morning
```

PROCEEDINGS

```
 1   which way, but let's set that time aside.

 2          MR. CONNETT:  And just to be -- I should say

 3   plaintiffs have no preference on that, so it's -- whether it's

 4   in person or Zoom, we have no preference.

 5          THE COURT:  Okay.  All right.  Good.  Great.  Thank

 6   you.

 7          MR. ADKINS:  Thank you.

 8          THE CLERK:  Counsel, regarding the two-hour and

 9   20-minute video deposition, I'll need to the parties to discuss

10   which time is going to be charged to each person and then send

11   me an email please.

12          MR. ADKINS:  Will do.

13          THE CLERK:  Thank you.

14          MR. ADKINS:  And we can also confer on what the next

15   exhibit number is, and I'd formally move into evidence.

16          THE CLERK:  Okay.

17          THE COURT:  Yeah.  You should do that.

18          Okay.  So we should resume cross-examination of --

19          MR. CONNETT:  Yes, Your Honor.

20          THE COURT:  -- Dr. Savitz?  Okay.

21          All right.  Morning, Dr. Savitz.

22          THE WITNESS:  Good morning.

23          THE COURT:  A reminder that you are still under oath.

24          And Mr. Connett, you may proceed; although, I want you

25   to wait just a minute because my software is still heating up
```

1  here, and I just need a minute to -- for it to come in.

2          Okay.  Proceed.

3      (Previously sworn.)

4                    **CROSS-EXAMINATION**

5  **BY MR. CONNETT:**

6  **Q.**   Good morning, Dr. Savitz.

7  **A.**   Good morning.

8  **Q.**   I've put on the screen here EPA Exhibit No. 14; do you see

9  that?

10 **A.**   Yes, I do.

11 **Q.**   This demonstrative identifies the finding from the Do

12 study that you discussed during your direct exam last week,

13 right?

14 **A.**   That's correct, yes.

15 **Q.**   As you testified, the Do study found no association

16 between fluoride and executive function in children, right?

17 **A.**   Again, using the instruments that are indicated there,

18 they did not find associations.

19 **Q.**   During your direct exam with counsel, you also discussed

20 the Dewey study from Canada and how you found it to be one of

21 the highest-quality studies that has been done to date on

22 fluoride and neurotoxicity, correct?

23 **A.**   Again, it's a high-quality study that contributes in part

24 because it's different in design.  It has different strengths

25 and limitations compared to the other four cohorts we've

SAVITZ - CROSS / CONNETT

1    studied, but I do think it's an informative study.

2    **Q.**   And I've put on the screen here EPA Demonstrative No. 13,

3    and this demonstrative lists the findings from the Dewey study

4    that you discussed with counsel last week correct, right?

5    **A.**   That's correct, yes.

6    **Q.**   These findings that you discussed come from Table 2 of the

7    Dewey paper, right?

8    **A.**   Again, I would need to see that to -- okay.  Well, the

9    footnote says that.  I assume that's correct, yes.

10   **Q.**   And all of the findings that you discussed with counsel

11   that we see here, pertain to the IQ part of the Dewey study,

12   right?

13   **A.**   That's correct, yes.

14   **Q.**   But the Dewey study also investigated fluoride's effect on

15   executive function, right?

16   **A.**   That's right, yes.

17   **Q.**   Just like the Do study looked at executive function as

18   well?

19   **A.**   Again, often one of the challenges in looking at the

20   behavioral outcomes what everybody recognizes is they use

21   different instruments.  There's not the standardization that

22   there is for IQ, even if they're trying to capture the same

23   fundamental construct.

24   **Q.**   Dewey reported the findings on fluoride and executive

25   function in another table, not Table 2, right?

1    **A.**    That's correct.

2    **Q.**    The Dewey study found significant adverse associations

3    between maternal fluoride exposure and children's executive

4    function, particularly in girls, right?

5    **A.**    If I recall correct -- and I don't remember all of the

6    details in the table, but I believe that they looked at number

7    of different indicators or dimensions of executive function,

8    and they -- as you described, they stratified it by -- for boys

9    and girls.

10        And it's back to that issue that if you're summarizing it

11   in one global statement, largely, if not a hundred percent,

12   negative with an isolated finding of unknown significance

13   because, again, it wasn't all the scales.  It was girls now

14   instead of boys as has been found in some of the cognitive

15   studies, and so it is a -- the way I think of it is, there is a

16   broad hypothesis about executive function and then there are a

17   number of much more focused sub hypotheses:  What about girls?

18   What about this instrument?

19        And so in looking at those -- again, I do remember there

20   was an isolated finding of an adverse effect, but it was quite

21   isolated in the context of the other findings of no adverse

22   effect.

23   **Q.**    But to be clear, they did find statistically significant

24   adverse associations between maternal fluoride and executive

25   function, including some analyses which included both boys and

SAVITZ - CROSS / CONNETT

1    girls, right?

2    **A.**    Again, I'd have to see the table to go over it.  I just

3    recall that it was largely but not completely negative.

4    **Q.**    Okay.  Now, certainly the authors of the Dewey study were

5    concerned by what they found regarding fluoride and executive

6    function, correct?

7    **A.**    That's correct.

8    **Q.**    The authors state here --

9          **MR. CONNETT:**  And I'm quoting, Your Honor, from

10   Exhibit 117, page 5.

11   **BY MR. CONNETT:**

12   **Q.**    The authors state, quote, "These findings suggest that

13   exposure to levels of fluoride recommended for dental health in

14   a community water supply during pregnancy may be associated

15   with adverse effects on executive function abilities in young

16   children, particularly girls."  Did I read that correctly?

17   **A.**    You did.

18         And again, not to impugn these particular authors, but it

19   is not uncommon for epidemiologists, maybe other scientists, to

20   sort of highlight the most, if you will, "interesting"

21   quote/unquote findings for the abstract.

22         I personally don't think that's a good practice, but,

23   nonetheless, they -- as you indicated, they chose to highlight

24   that particular finding.

25   **Q.**    And are you aware that that's also the practice of the

 1  EPA, that when the EPA is looking at a study that has some

 2  nonsignificant findings as well as significant findings, the

 3  EPA places greater stress on the significant findings?

 4          **MR. CAINTIC:**  Objection, assumes facts.

 5          **THE COURT:**  Overruled.

 6          **THE WITNESS:**  You know, again, I don't know what the

 7  EPA policy is on that, but again, as -- from my opinion as an

 8  epidemiologist, if the positive findings in an array of data

 9  are of importance, are worth paying attention to, so are the

10  negative findings.

11          And so if you think of it, maybe a table with, you

12  know, 12 numbers is addressing 12 hypotheses, boys and girls at

13  different times and it's adding evidence against an adverse

14  effect for some of those measures and it's adding evidence

15  indicating an effect for another subset of those.  It's sort

16  of -- it's got -- again, EPA, I don't know their policy, but I

17  believe it should be handled even-handedly.  Informative

18  results are informative.

19  **BY MR. CONNETT:**

20  **Q.**   And speaking of evenhandedly, I just want to summarize one

21  thing so far.  In your discussion, in your direct examination,

22  you discussed the null findings on executive function from the

23  Do study, but you did not discuss the positive findings on

24  executive function from the Dewey study, correct?

25  **A.**   Again, what I've tried to do when studies do have mixed

SAVITZ - CROSS / CONNETT

 1  findings, acknowledging that the Dewey study had some findings,

 2  as you've described, the first question is sort of the broad

 3  one.  Overall -- it's more the gestalt of the study's

 4  findings -- generally null.

 5       It's always possible, of course, to zero in.  And there

 6  are, in the case of the Dewey study, there are isolated

 7  positive -- well, I should say isolated indications of adverse

 8  effect, but interpreted in context I would not ascribe undue

 9  importance to any isolated findings that deviate from the

10  overall pattern.

11  **Q.**  Wait.  Dr. Savitz, do you agree that it's important to at

12  least disclose to the reader that those findings exist, even if

13  you do not give much weight to them?

14  **A.**  When you say "important," in a sense, the table discloses

15  it.  I'm thinking from maybe the author's point of view in

16  describing their results, they haven't hidden anything.  And

17  then the choice of what to emphasize, as you've indicated here

18  in the abstract, again, there -- this is an -- if you will, an

19  editorial choice by the authors.  I'm not saying, you know,

20  that it's wrong.  It is factually correct.  I agree with that.

21          **THE COURT:**  Let me ask --

22          **MR. CONNETT:**  So --

23          **THE COURT:**  I'd like to get more to the substance.  I

24  understand your point, but you have a certain amount of time

25  left.

1      I'd like to know, Dr. Savitz, do you have some issue

2  or see some methodological problem with this isolated finding?

3  Did you see anything wrong with it?  Do you see something that

4  suggests this should not have been statistically significant or

5  something wrong, some bias or something?

6      **THE WITNESS:**  No.  I think when -- again, I do not.

7  It's not that there would be some unique methodologic feature

8  that -- you know, only in girls and only for this subscale.

9  But, in putting it in context, as I said, I would say the same

10  thing about all of the null findings.  I don't have any reason

11  to not believe that those add evidence against an effect and

12  I -- I believe it is trying to -- it's just an over-resolve to

13  isolate these findings and overemphasize it.

14      I think that if there were -- again, if the finding is

15  on a particular scale for girls only and there was some

16  replication of that finding, that the next three studies also

17  found that scale in girls, it might start to mean more;

18  otherwise, I attribute to, most plausibly, random error.  If

19  you look at enough results, there will often be aberrant ones

20  that -- in fact, it's certain that there will be if you look at

21  enough findings.  And so when you do identify an association of

22  that nature, again, technically correct, it's a judgment about

23  what to make of it.  And I -- my own judgment would be file

24  that away for future reference and let's see what happens as

25  the literature evolves.  I would not reach a conclusion on that

SAVITZ - CROSS / CONNETT

 1  kind of an isolated finding.

 2          THE COURT:  And that's why a premium is put on

 3  consistency when you look at the weight of scientific evidence?

 4          THE WITNESS:  That's right.  The consistency of a more

 5  specific nature.

 6          Again, this is where I had some different views,

 7  perhaps, than the NTP report.  If this study finds a scale for

 8  executive function in girls, one particular scale, maybe the

 9  next study uses a different instrument, but they find it in

10  boys only, to me that's not consistent.  Even if -- if you're

11  generous enough, you could say they each found suggestion of an

12  adverse effect on executive function.  But I think that when

13  it's isolated in that way I -- I, again, would argue for at

14  least looking at like-to-like comparisons and not sort of

15  overemphasizing this -- these sort of, again, isolated findings

16  that are not lining up with one another.  It's an

17  interpretation issue.  The numbers are, of course, correctly

18  cited.

19  BY MR. CONNETT:

20  Q.   Okay, Dr. Savitz.  Let's go back to your discussion of the

21  Do study.  And the Do study was conducted in Australia, right?

22  A.   That's correct, yes.

23  Q.   It was published in the *Journal of Dental Research*, right?

24  A.   That's correct, yes.

25  Q.   The lead author of the study is a dentist named Loc Do?

SAVITZ - CROSS / CONNETT

1    **A.**    Yes.  That's the lead author.  I believe he is a dentist.

2    **Q.**    And in 2021, you joined Loc Do for a webinar on fluoride

3    sponsored by a dental organization, right?

4    **A.**    I was invited or requested, I should say, to summarize the

5    results of the NASEM committee's report in a forum that

6    involved several other people.  Again, as -- because of their

7    interest in this topic.

8         When I do -- when I do these committee assignments on

9    behalf of NASEM, I feel like part of the obligation is to share

10   those results, which is all -- my only role in that discussion.

11   **Q.**    Now, in advance of the webinar, you and Loc Do

12   communicated about the contents of your respective

13   presentations, right?

14   **A.**    That's right.

15        As I recall, we had a preview of what -- to make sure we

16   weren't overlapping or clarify what each of us was going to

17   speak to.

18   **Q.**    Now, are you aware of Loc Do's advocacy work for water

19   fluoridation?

20   **A.**    I am not.

21   **Q.**    Are you aware that Loc Do's fluoride research, until this

22   paper, had been exclusively focused on the teeth?

23   **A.**    Again, I -- as I said, I was invited to participate in a

24   forum -- I honestly don't remember all the people who were

25   involved -- and certainly wouldn't expect to do my own

1    investigation of potential conflicts or technical expertise for

2    that matter.  I had a very well-defined role, and I tried to do

3    my best to do justice to our report.

4    Q.    Right.  And I'm not talking about here your work with Loc

5    Do for the webinar.  I'm talking about your reliance on his

6    study.  And my question is, is, are you aware that this study

7    by Loc Do is the first time in his 20-plus year career where

8    he's ever studied the neurodevelopmental effects of a chemical?

9    A.    Again, I did not do any background investigation regarding

10   Dr. Do.

11   Q.    Now, one of the measurements or tests that the Do study

12   used was the SDQ test, right, strengths and difficulties

13   questionnaire?

14   A.    That's correct, yes.

15   Q.    That is one of the two outcome measurements that they

16   used?

17   A.    That's correct, yes.

18   Q.    Now, Loc Do's co-author, Rachel Roberts, she performed a

19   separate study to assess the validity of the SDQ test in the

20   Australian population, right?

21   A.    Again, I had not followed back on that because this wasn't

22   a study that was very central to my assessment of the

23   literature.  It was one.  It was listed and included, I'm of

24   course acknowledging that, but it wasn't so central that I

25   would have -- I would have dug deeper.

SAVITZ - CROSS / CONNETT

1  **Q.**  Are you aware that Rachel Roberts found in her study that

2  there are significant problems with the validity of the SDQ

3  test in Australia?

4  **A.**  Again, I -- I have not looked at that myself, and I'm not

5  in a position to really comment on -- on those instruments or

6  other instruments that have been used in the various studies.

7  **Q.**  Okay.  So let's move on here to a different subject.

8      Dr. Savitz, you would agree that there have been many

9  cross-sectional studies from China that have investigated the

10  relationship between fluoride and neurodevelopment, correct?

11  **A.**  Yes, I'd agree with that.

12  **Q.**  The NTP concluded that a number of the Chinese

13  cross-sectional studies are high-quality studies, right?

14  **A.**  Again, in their classification, there was a number of the

15  Chinese cross-sectional studies that were put in the bin for

16  high quality or low risk-of-bias, I should say.

17  **Q.**  One of the general limitations with a cross-sectional

18  study design is that both exposure and outcome are measured at

19  the same time, right?

20  **A.**  That's right.  So if they were measuring children, they

21  were measuring children's fluoride, not prenatal, but making

22  inferences regarding what would have been there prenatally.

23  **Q.**  Now, in 2022 you published a paper titled, "Can

24  Cross-sectional Studies Contribute to Causal Inference.  It

25  Depends," right?

SAVITZ - CROSS / CONNETT

1    A.    That's correct, yes.

2    Q.    In that paper you wrote that some cross-sectional studies

3    can provide insights into the causal effects of a chemical,

4    right?

5    A.    Yes.

6    Q.    In your paper you called for a, quote, "more nuanced

7    assessment," unquote, of cross-sectional studies and cautioned

8    against automatically dismissing them as irrelevant to

9    causality, right?

10   A.    Yes, that's correct.

11   Q.    And Dr. Savitz, you, yourself, have published some studies

12   from China looking at the health impacts of chemicals, right?

13   A.    Yes, that's correct.

14   Q.    And in your research, you have recognized that one of the

15   advantages of studying populations in China is that in some

16   areas there are stable populations with stable concentrations

17   of a chemical contaminant in the water, right?

18   A.    That's right.  Again, it has to be examined on a

19   case-by-case basis.  I certainly would not be dismissive, you

20   know, because of the geography.

21   Q.    One of your studies from China was a cross-sectional study

22   that addressed the association between arsenic and blood

23   pressure, right?

24   A.    That's correct.

25   Q.    And in this paper you stated that one of the strengths of

SAVITZ - CROSS / CONNETT

1   the study is that it has, quote, "A very low migration rate

2   with stable well water arsenic concentrations over time,"

3   right?

4   **A.**   That's correct.  But, again, it depends on the

5   relationship -- the association of interest, the temporal

6   features.

7        There are some times the exposure should be measured at

8   the same time as disease, if it -- if the effect is

9   contemporaneous.  If there's a delay then, as the paper

10  indicated, there has to be this assumption that what you

11  measure today would have been there in the past when the

12  disease was developing.

13  **Q.**   Now, the NTP made similar observations that you made here

14  in your arsenic paper for some of the fluoride IQ studies,

15  right?

16  **A.**   They did address the stability of the water.  And I would

17  agree that if, in fact, the water fluoride concentration has

18  not changed and if that is where the child resided -- well,

19  when -- in utero, during the pregnancy, that presumably the

20  mother would have been exposed to similar levels to the child

21  later on.

22  **Q.**   And are you aware, Dr. Savitz, that in some of the Chinese

23  studies, the authors specifically comment on that point and

24  confirm that the water fluoride levels have remained stable

25  over time in the communities being studied?

SAVITZ - CROSS / CONNETT

1  **A.**   I have seen that in some of the papers that I've looked

2  at, yes.

3  **Q.**   Now, going back to your arsenic study from China, you

4  examined a population that had arsenic levels as high as 100

5  micrograms per liter in the water, correct?

6  **A.**   That's correct, yes.

7  **Q.**   And to put that number in perspective, you noted that the

8  EPA's maximum contaminant level or MCL for arsenic here in the

9  U.S., is 10 micrograms, right?

10 **A.**   That's correct, yes.

11 **Q.**   So in your study, you were looking at a population in

12 China that had up to ten times more arsenic in their water than

13 the maximum level permitted here in the U.S.?

14 **A.**   That's correct.  I mean, again, the use of the information

15 determines the applicability of the studies.  This would not --

16     For example, the study with very high levels wouldn't tell

17 us whether ten a good regulatory limit.  It can tell us

18 something about the fundamental relationship between arsenic

19 and blood pressure which was the purpose.

20 **Q.**   Now, in this study you found that arsenic levels of 21 to

21 50 micrograms per liter were associated with effects on blood

22 pressure, right?

23 **A.**   I believe that is correct, yes.

24 **Q.**   So those were levels two to five times higher than the MCL

25 for arsenic in the United States?

SAVITZ - CROSS / CONNETT

1   **A.**   That's correct, yes.

2   **Q.**   And you did not describe those levels as high, right?

3   **A.**   Well, again, it's -- it's -- I don't remember the -- we

4   called them "modest" because relative in that setting, they

5   were not the highest.  If that occurred in the United States,

6   of course, it would be considered extremely high relative to

7   the standard.

8   **Q.**   Well, your statement from your -- from your study is,

9   quote, "This finding suggests that exposure to modest levels of

10  drinking water arsenic may be associated with a slight but

11  consequential elevation in the population blood pressure mean."

12      That's what you wrote, right?

13  **A.**   That's correct, yes.

14  **Q.**   Now, for your assessment in this case, you considered

15  fluoride levels that are more than two times higher than the,

16  so called, optimal level in the United States.  You considered

17  those levels to be high, right?

18  **A.**   Well, again, as I said, relative to the question of

19  fluoridation and the potential effects in the range that is

20  relevant, those are a bit higher than the -- higher than the

21  studies that would address it more directly.  So they're

22  relevant, but they -- they are a little bit less relevant

23  because of the exposure range.

24  **Q.**   But you didn't say these levels were a bit high in your

25  expert report.  You called these levels high, right?

1  **A.**  Again, I don't recall the choice of adjectives, but they

2  were higher than the ones we are most interested in.  "Higher"

3  would be a fairer statement.

4  **Q.**  And in fact, you considered studies of water fluoride

5  levels exceeding 1.5 to be irrelevant to your analysis of

6  whether water fluoridation can cause neurotoxicity, right?

7  **A.**  I wouldn't call it irrelevant.  I would say of limited

8  relevance.  There's a number of features, but, again, it's not

9  the only feature that makes them of limited relevance.  You

10  have to sort of look at it along the other characteristics of

11  the study.

12     If we had cohorts analogous to the MIREC study or others

13  that were in the range of 1.5 or 2, I would consider those more

14  informative than a cross-sectional study in a couple of

15  villages in India or China.

16  **Q.**  Now, in your expert report for this case, you did not cite

17  or discuss a single cross-sectional study on fluoride and IQ in

18  China, correct?

19  **A.**  That's correct.

20  **Q.**  You did, though, cite one study from China in your report,

21  right?

22  **A.**  I'm trying to recall.  Okay.

23  **Q.**  And Dr. Savitz, in your expert report, you cited a study

24  from China by Wang, et al., 2020, correct?

25  **A.**  Yes, I did.

SAVITZ - CROSS / CONNETT

1  Q.   And in your discussion of the Wang study, you state that

2  "No association was found between fluoride and most of the

3  outcomes including those directly related to ADHD," correct?

4  A.   That's correct, yes.

5  Q.   So the one study that you cited in your expert report from

6  China is a study that you describe as showing no association

7  between fluoride and neurodevelopment, right?

8  A.   Again, this was -- this was really quite secondary or

9  certainly wasn't central to my overall assessment.  I was

10  looking for literature that was temporally following the first

11  trial, not selectively for any particular pattern of results.

12  Q.   But there certainly have been more studies from China

13  published since the last trial and today, right?

14  A.   I -- again, I don't know that for a fact, but I did not do

15  a comprehensive search.

16  Q.   Now, the Wang study is titled "Association Between

17  Fluoride Exposure and Behavioural Outcomes of School-age

18  Children:  A Pilot Study in China," correct?

19  A.   Again, it looks like -- if you back from the previous one

20  I think I indicated incorrectly that it was published in 2020

21  and -- oh, that's okay.  Now I see it's an e publication 2020,

22  but it is the same paper.

23  Q.   Okay.  So let's look at the abstract of the Wang study.

24  And do you see that on your screen, Dr. Savitz?

25  A.   Yes, I do.

SAVITZ - CROSS / CONNETT

1   Q.   And the author's report in the abstract, quote, "It turned

2   out that each 1 milligram per liter increment in urinary

3   fluoride concentration corresponded with an elevation in the

4   psychosomatic problem score of 4.01 and a 97 percent increase

5   in the prevalence of psychosomatic problems after adjusting for

6   potential influencing factors."  Did I read that correctly?

7   A.   Yes, you did.

8   Q.   Okay.  And you didn't discuss that finding in your expert

9   report, right?

10  A.   Again, I haven't -- this is quite a while ago.  I honestly

11  haven't looked at that for probably close to a year now, so I

12  don't really recall the details about that.

13  Q.   Well, no.  My question was just:  You didn't discuss that

14  finding from the study in your expert report?

15  A.   Not in the excerpt that you just showed, no, that's

16  correct.

17  Q.   And that is the only excerpt where you discuss the Wang

18  study in your report, right?

19  A.   I think that's correct, yes.

20  Q.   So as part of your work in this case, you became aware

21  that Dr. Howard Hu and his team from USC, have recently

22  completed a birth cohort study of fluoride and neurodevelopment

23  in the Madres cohort in Los Angeles, correct?

24  A.   Again, my recollection is that I was first provided with

25  some information on that, not -- not detailed but then it was

1    considered not to be applicable, that it was not something,

2    obviously, that's -- that I looked at in detail or included in

3    my report.

4    **Q.**   You did recite the abstract of that study in your rebuttal

5    report, correct?

6    **A.**   That's correct, yes.

7    **Q.**   And so you were provided a copy of that abstract, and you

8    read it, correct?

9    **A.**   That's right.  Just the abstract.

10   **Q.**   Okay.  The study examined the relationship between

11   maternal fluoride exposure and internalizing symptoms in the

12   children, right?

13   **A.**   Again, I don't recall that one.

14   **Q.**   Do you recall, Dr. Savitz, what the abstract reported in

15   terms of whether maternal fluoride exposure was associated with

16   increased internalizing symptoms in the children?

17   **A.**   I do not.  Again, once it's relegated to the category of

18   abstract only, I did not pay the same kind of attention I did

19   to the publications.

20   **Q.**   Would that be a meaningful result for you, Dr. Savitz, if

21   that study shows an increased rate of internalizing symptoms in

22   children as a function of the mother's fluoride exposure?

23   **A.**   Again, I would have to see the paper to make an assessment

24   of what it means.  And again, in the context of these other

25   studies that use such a variety of instruments, it's quite a

1 bit harder to put the pieces together the way it is relative to

2 the studies of IQ.

3 **Q.**   Now, at the first trial in this case, EPA's

4 epidemiologist, Dr. Ellen Chang, relied upon and testified

5 about an unpublished abstract.  Do you disagree with Dr. Chang

6 on that point in terms of do you disagree that that's an

7 appropriate thing to rely upon for expert testimony?

8 **A.**   Again, I think that obviously I was aware of this and I

9 don't know for a fact but if -- accepting what you're saying is

10 true, I would put personally very limited emphasis on any

11 report that can't be scrutinized in detail and, by definition,

12 an abstract can't be scrutinized in detail.

13 **Q.**   Okay.  So other recent studies, Dr. Savitz, have found an

14 association between fluoride and internalizing symptoms,

15 correct?

16          **THE COURT:**  Could you -- show my ignorance.  What is

17 internalizing symptoms?  I don't know what that means.

18 **BY MR. CONNETT:**

19 **Q.**   Dr. Savitz, can you explain that for the Court?

20 **A.**   That's an excellent question.  I'm not sure I have an

21 excellent answer for it.

22          I think it's along the lines of like rumination and --

23 again, I honestly don't -- I'm not sure.  That's my vague

24 understanding admittedly.  I'm not an expert on that.

25          **THE COURT:**  Okay.

SAVITZ - CROSS / CONNETT

1           **MR. CONNETT:**  And Dr. Lanphear did discuss that in his

2    testimony.

3    **BY MR. CONNETT:**

4    **Q.**   So in your report you discuss one of the studies that has

5    found an association between fluoride and internalizing

6    symptoms, correct?

7    **A.**   That's correct, as reported there, yes.

8    **Q.**   And that study is the study by Adkins 2022 based on a

9    cohort here in the United States, right?

10   **A.**   That's correct.

11   **Q.**   And they found in that cohort that childhood urinary

12   fluoride was associated with a significant increase in

13   somatization, right?

14   **A.**   That's correct, yes.

15   **Q.**   And that is a type of internalizing symptom, correct?

16   **A.**   Yes, it is, I believe.

17   **Q.**   Okay.  And the Adkins study found that this association

18   between fluoride and internalizing symptoms was more pronounced

19   in the boys than the girls, right?

20   **A.**   That I don't recall.

21   **Q.**   Now, I want to talk now about the subject of sex-specific

22   effects, okay?

23   **A.**   Okay.

24   **Q.**   And I'm going to start by pointing to some of your

25   testimony last week.  I'm going to start with your testimony

SAVITZ - CROSS / CONNETT

```
 1  that's on page 1027, lines 16 to 20.  Can you see that on your
 2  screen, Dr. Savitz?
 3  A.   Yes, I do.
 4  Q.   And you were asked here, quote, "In your experience in
 5  reading these fluoride epidemiological studies, do you think
 6  that there is a convincing reason to separate out boys versus
 7  girls?"
 8       And your answer was, "In my view there is -- in my
 9  experience there is not for these outcomes."
10       Did I read that correctly?
11  A.   That's correct, yes.
12  Q.   And that's your opinion, right?
13  A.   Yes, it is.
14  Q.   Okay.  And then you -- in your answer later on you stated,
15  quote, "We're talking about prenatal exposure in brain
16  development, and there may be some very subtle ways in which
17  that differs, but it certainly is not something that would be
18  considered obligatory, that you must do this or it's routine to
19  do it even."  That's what you said, right?
20  A.   That's correct.
21  Q.   Okay.  So I want to point you to testimony on the record
22  in this case from the first trial.  And this is from EPA's
23  expert, Dr. Joyce Tsuji.  Can you see that testimony on your
24  screen?
25  A.   Yes, I can.
```

1          **MR. CONNETT:**  And for the record, Your Honor, this

2    testimony is from ECF 243, page 768, lines 7 to 14.

3    **BY MR. CONNETT:**

4    **Q.**   I asked Dr. Tsuji:

5          "**QUESTION:**  You're familiar with your research on arsenic

6          and lead and other neurotoxicants that sex-specific

7          effects are often identified in the literature, correct?"

8          And her answer was:

9          "**ANSWER:**  Yes.  What's causing it differs.  For example,

10         in arsenic there is a suggestion that it is more likely

11         cultural practices and not giving girls sufficient

12         nutrition, because they also were lower body mass and had

13         growth problems compared to the boys."

14         Do you see Dr. Tsuji's testimony on that?

15   **A.**   Yes, I do.

16   **Q.**   Now, do you disagree with Dr. Tsuji that sex-specific

17   effects are often identified in the neurotoxicity literature?

18   **A.**   Again, in the epidemiologic studies, my -- I would

19   disagree.

20   **Q.**   Okay.  Are you aware that there is a large body of

21   scientific research that has investigated both at the

22   toxicological level and on the epidemiological level how sex

23   can influence the impact of neurotoxicants?

24   **A.**   I'm sorry.  Again, I'm not sure that -- the question is --

25   **Q.**   Are you aware that there's a large body of research on the

SAVITZ - CROSS / CONNETT

 1  biochemical or toxicological level as well as on the

 2  epidemiological level regarding how sex can influence the

 3  impact of a neurotoxicant?

 4  **A.**   Again, I can't speak to the toxicology, but I can at least

 5  speak to the conventions in epidemiology, and I am not aware

 6  for the major known neurotoxicants, lead, mercury and so on, I

 7  can't say that there are never sex-specific effects observed,

 8  but my understanding is that one would expect similar harm to

 9  boys and girls for those known neurotoxicants.

10  **Q.**   Do you have any reason to dispute the conclusion by

11  neurotoxicologists and geneticists that sex can mediate or

12  influence the neurotoxic effects of a chemical?

13        **THE WITNESS:**  Objection, assumes facts.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  Again, I'm not -- as I said, I'm not a

16  toxicologist, and so that anything speaking to mechanisms, it

17  may -- again, I have no reason to either doubt it or

18  corroborate it from that line of work.

19  **BY MR. CONNETT:**

20  **Q.**   Have you read the paper "Sex Differences in Neurotoxic

21  Genetics."

22  **A.**   No.

23  **Q.**   And it was published -- to see if it may refresh your

24  memory, it was published in the journal *Frontiers in Genetics*.

25  **A.**   I have not read that to the best of my recollection.

SAVITZ - CROSS / CONNETT

1    Q.   I'll put it on the screen here just to see if it jogs your

2    memory at all.  Does that paper jog your memory?

3    A.   No, it doesn't.

4    Q.   Okay.  So fair to say that your opinion with respect to

5    the sex-specific differences, or lack thereof, of

6    neurotoxicants, is not informed by this review?

7    A.   No.  Again, I mean, I didn't -- in citing sort of the

8    conventional wisdom where it's not routine to do it, that was

9    part of it; but also, in looking at the empirical research on

10   fluoride, yes, there are studies that find sex-specific

11   effects -- sometimes they seem to be inconsistent as to who is

12   more vulnerable -- but I don't think there's a consensus in

13   that literature that an appropriate study of fluoride must look

14   specifically because either boys are more vulnerable or girls

15   are more vulnerable.

16   Q.   Now I'm putting another paper on the screen just to see if

17   you've read it.  It's a study published last year in 2023

18   titled "Sex Difference of Pre- and postnatal Exposure to Six

19   Developmental Neurotoxicants on Intellectual Abilities:  A

20   Systematic Review and Meta-analysis of Human Studies."

21        Dr. Savitz, have you read that study?

22   A.   Not to the best of my recollection, no.

23   Q.   Okay.  So I want to go back, Dr. Savitz, to additional

24   testimony from Dr. Tsuji at the first trial.

25        MR. CONNETT:  And, Your Honor, for the record this

```
 1  testimony comes from ECF 243, pages 767 to 768.
 2  BY MR. CONNETT:
 3  Q.    I asked Dr. Tsuji:
 4        "QUESTION:  You would agree that the Mullenix study found
 5        the sex-specific effect where the males were more
 6        susceptible when exposed in utero than the females;
 7        correct?"
 8        And her answer was:
 9        "ANSWER:  Yes."
10        Do you see that?
11  A.    Yes, I do.
12  Q.    Now, the Mullenix study -- you've never read the Mullenix
13  study, correct?
14  A.    That's correct.
15  Q.    Are you aware that the Mullenix study is one of the animal
16  studies on fluoride neurotoxicity?
17  A.    Again, I'm not familiar with that study.
18  Q.    Okay.  So I want to turn now to the National Toxicology
19  Program's 2016 Review on the Animal Studies on Fluoride.  And
20  this is Trial Exhibit 553.
21        Can you see that on your screen?
22  A.    Yes, I do.
23  Q.    And Dr. Savitz, you haven't read this report, correct?
24  A.    That's correct.
25  Q.    I want to turn to page 58 of the document.
```

1         **MR. CAINTIC:**  Objection, foundation.  He's just said

2    he's never read this.

3         **THE COURT:**  All right.

4         **MR. CONNETT:**  It's in evidence, Your Honor.  I'm going

5    to ask if he agrees or disagrees with a statement, that's it.

6         **THE COURT:**  Okay.

7    **BY MR. CONNETT:**

8    **Q.**   So, Dr. Savitz, I've turned to page 58 here, and do you

9    see there's a section titled "Data Gaps and Research Needs"?

10   **A.**   Yes, I do.

11   **Q.**   And you see here that the NTP is recommending certain

12   types of future research on fluoride neurotoxicity?

13   **A.**   I see that, yes.

14   **Q.**   And on page 59, NTP identified that one of the areas where

15   we need more research is, quote, "Characterization of

16   Differences in Response Associated with Sex."

17        Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   Do you disagree with the NTP on that point or not, or do

20   you have no opinion?

21   **A.**   You know, again, insofar as the issue is unresolved, we

22   always would encourage future research.

23        I don't have an opinion, certainly based on the animal

24   studies that they were reviewing, so it's -- it's -- I think I

25   would be agnostic on that.

SAVITZ - CROSS / CONNETT

1  Q.   Okay.  So I'm going to show you one more bit of testimony

2  from the first trial, and this is from Dr. Kristina Thayer who

3  used to work at National Toxicology Program and now works at

4  the EPA.  And can you see this testimony on the screen?

5  A.   Yes, I do.

6         MR. CONNETT:  Your Honor, for the record this is from

7  ECF No. 242 at page 646, line 1 to 14.

8  BY MR. CONNETT:

9  Q.   And at this part of the trial the EPA asked Dr. Thayer

10  about the McPherson animal study that the NTP conducted on

11  fluoride neurotoxicity.

12       Dr. Savitz, you haven't read that study; is that fair?

13  A.   I am not familiar with that, no.

14  Q.   And EPA asked Dr. Thayer quote, "Do you recall any

15  discussions related to selection of the animal models?"

16       And I'm not going to read you the whole answer because it

17  deals with some other matters, but as part of her answer she

18  says, quote, "A decision was made to focus on the males, since

19  it seemed like they might have been more sensitive."

20       Do you see that?

21  A.   Yes, I do.

22  Q.   Okay.  The McPherson study was published in 2018; are you

23  aware of that?

24  A.   No. I'm not familiar with that study.

25  Q.   But you are familiar that the Green study from the MIREC

1   cohort was published in 2019, right?

2   **A.**   That's correct.

3   **Q.**   It was published after the NTP had found evidence to

4   indicate that males in animal studies may be more susceptible

5   to fluoride's neurotoxicity.  Do you see that?

6   **A.**   Again, I don't -- again, I can't speak to the sequence or

7   the issues there.  I just see the quote, you know.  It isn't

8   something that I have not read before.

9   **Q.**   Is it fair to say that you have no basis to disagree with

10  the NTP that the animal data suggests that males may be more

11  vulnerable in some contexts to fluoride neurotoxicity?

12          **THE WITNESS:**  Objection, foundation, assumes facts.

13          **THE COURT:**  Sustained.

14  **BY MR. CONNETT:**

15  **Q.**   Okay.  So let's move on, Dr. Savitz, and let's go back to

16  one of the four studies that you have principally relied upon

17  for your analysis, and that's the Ibarluzea study, right?

18  **A.**   Okay.

19  **Q.**   And the Ibarluzea study was published after Dr. Grandean

20  and colleagues published the first pooled BMCL analysis of the

21  ELEMENT and MIREC cohorts, right?

22  **A.**   That is correct, I believe, yes.

23  **Q.**   And when the Ibarluzea study was released, some in the

24  dental community pointed out that the very large beneficial

25  association that Ibarluzea found would cancel out the inverse

 1   association that the ELEMENT and MIREC studies had found in

 2   those cohorts, correct?

 3   **A.**   Again, I'm not aware of the statements along those lines.

 4   **Q.**   But the idea was that since the Ibarluzea effect size is

 5   so large and in the opposite direction of Green and Bashash,

 6   pooling all of the data together would pull the aggregate

 7   result somewhere close to null or perhaps even to an overall

 8   positive effect, right?

 9        **THE WITNESS:**  Objection, foundation, assumes facts,

10   argumentative.

11        **THE COURT:**  Sustained.

12   **BY MR. CONNETT:**

13   **Q.**   Well, Dr. Savitz, you, yourself, made this very argument

14   in your expert report in this case, right?

15   **A.**   Again, I did the sort of back-of-the-envelope exercise of

16   trying to aggregate the results in a quantitative way.  But

17   from my opinion, a more influential issue is a third study at

18   that time of high quality that did not find an adverse effect.

19   **Q.**   Now, I'm looking at page 18 of your expert report.  Do you

20   see that?

21   **A.**   Yes.

22   **Q.**   And you write here that, quote, "The addition of the data

23   from Ibarluzea, et al. 2022 would markedly shift the cumulative

24   evidence such that there would likely be no association between

25   maternal urinary fluoride and IQ if results were aggregated

1    across the three studies."  That's what you wrote, right?

2    **A.**    That's correct, yes.

3    **Q.**    And then further below -- after you do your

4    back-of-the-envelope calculation and you estimate that the

5    overall weighted effect would be a net positive of 2.5 IQ

6    points?

7    **A.**    Again, I think the first sentence is probably, at least in

8    my view, the most important one is just recognizing the current

9    body of research is subject to a great deal of uncertainty such

10   that even one study, tipping it in another direction, suggests

11   that it's -- it's unstable.  It's not to say this is a better

12   answer.  It's mainly making the argument that it's still in

13   flux.

14   **Q.**    And you wrote at the end of this paragraph that, quote,

15   "Incorporation of the INMA results would generate a

16   fundamentally different calculation," correct?

17   **A.**    That's correct.

18   **Q.**    Now, I'm looking at the numbers you used for your

19   calculation.  Do you see those numbers in the middle of the

20   paragraph?

21   **A.**    Yes.

22   **Q.**    And for the ELEMENT cohort, you used the 6.4 IQ loss data

23   point for both sexes, right?

24   **A.**    Correct.

25   **Q.**    For the MIREC cohort you used a 2-point loss in IQ for

SAVITZ - CROSS / CONNETT

1   both sexes, right?

2   **A.**   Correct.

3   **Q.**   But for the INMA cohort you only used the IQ loss for the

4   boys, right?

5   **A.**   If so, that would be an arithmetic error.

6   **Q.**   And that is what you did, though.  You used a 15.4 IQ

7   increase for Ibarluzea, right?

8   **A.**   I used the 15.4.  I'd have to look at the paper -- back at

9   the paper to see if that was the -- I intended it to be for

10  both sexes.  I may have erred.

11  **Q.**   Well, sitting here today, Dr. Savitz, you're aware that

12  the 15.4 IQ point increase in Ibarluzea is for the boys, not

13  the boys and girls combined?

14  **A.**   Again, I'd have to go back to the tables, but I -- it --

15  from the table that was shown previously, I think that is

16  correct.

17  **Q.**   Okay.  Now, in your expert report, you never questioned or

18  identified that this very large increase in IQ might be

19  implausible or raise questions about the methodology, right?

20  **A.**   Well, again, I did not find methodologic issues that would

21  explain it.  I don't think I defended it as a -- you know, an

22  accurate measure of the causal benefit of fluoride.

23  **Q.**   But you never -- in your report, you never flagged that,

24  hey, this is a really large effect; we might need to scrutinize

25  that further to see if there's some type of error that is

1  generating it, right?

2  **A.**   Again, I can't recall how -- the description of it.  In

3  fact, it did -- well, again, I've said and I can't recall the

4  wording in the report, but it was recognized this was an

5  unexpected finding which deserved and received a great deal of

6  scrutiny.

7  **Q.**   Understood, Dr. Savitz.  You did write that in your

8  report.  But you didn't flag, hey, there -- we need to

9  scrutinize this further because this is such a large effect,

10  something might have gone wrong.  There's no language like that

11  in your analysis?

12  **A.**   I don't think so, no.

13  **Q.**   Okay.  Now, you would agree that there are some errors

14  that occur in a study that no matter how brilliant you are as

15  an epidemiologist, you are never going to be able to identify

16  them, right?

17  **A.**   "Never" may be a little bit pessimistic but that are not

18  explained as we go through the list of the usual suspects.  I

19  mean, the one that I think is -- you know, again, there's

20  always room for outright errors with the data or the computing

21  or peculiar things to have gone wrong, but this has withstood

22  the usual challenges that we bring to bear on the data.

23       **MR. CONNETT:**  Your Honor, I would like to read

24  deposition testimony.

25       **THE COURT:**  Okay.

1              MR. CONNETT:  This is page 200, line 19 to 201,

2     line 1.

3              MR. ADKINS:  No objection.

4              THE COURT:  Go ahead.

5     BY MR. CONNETT:

6         "QUESTION:  There are some errors, whether they be

7         laboratory errors, whether they be someone misplacing the

8         numbers --

9         "ANSWER:  Yes.

10        "QUESTION:  -- that you, as the reader, no matter how

11        brilliant you are as an epidemiologist, are never going to

12        be able to identify, correct?

13        "ANSWER:  Absolutely.  Yes."

14        So Dr. Savitz, I want to talk now about the

15    creatinine-adjustment issue.

16             THE COURT:  Okay.  Before you go on, let me ask a

17    couple questions.

18             Earlier you stated sometimes there are just

19    aberrations, there are just random errors.  Even when the

20    methodology is right, you're within a confidence interval of 95

21    percent, you have statistical significance, but it's still

22    wrong, right?

23             THE WITNESS:  That's correct.

24             THE COURT:  And when did your weighted average, did

25    you just take that 15.4 and then negative 6.4 and by the number

 1   of study subjects, is that what you essentially did?

 2        THE WITNESS:  Yes.  And again, maybe in hindsight it

 3   was ill-advised, but it was just not for me doing an

 4   independent risk assessment, which I'm not an expert in doing,

 5   but as I said, as an informal calculation to remember that we

 6   are still bouncing around a bit in the overall assessment.

 7        THE COURT:  So you didn't discount any one of -- you

 8   gave it as much weight pro rata based on the number of

 9   subjects?  You didn't do --

10        THE WITNESS:  That's right.  Just weighted by the

11   number of subjects, that's correct.

12        THE COURT:  No plausibility adjustment or discount or

13   anything like that?

14        THE WITNESS:  Nothing.  Nothing.

15        THE COURT:  Okay.

16        THE WITNESS:  As I said, truly a back-of-the-envelope

17   calculation.

18        THE COURT:  Got it.  Thank you.

19   BY MR. CONNETT:

20   Q.   When forming your opinions in this case, Dr. Savitz, you

21   do not know if you were aware of the creatinine-adjustment

22   issue in the Ibarluzea study, correct?

23   A.   Again, I don't remember when I was first directed to that

24   issue.  I -- again, it was not easy to track down, given it was

25   based on an email exchange and a footnote, and so it wasn't

SAVITZ - CROSS / CONNETT

1   part of the general literature.  I don't really recall, though,

2   when I first learned about the issue.

3   **Q.**   And at your deposition I asked you if you had been aware

4   of the creatinine-adjustment problem prior to completing your

5   expert report, and you testified that you did not know; is that

6   fair?

7   **A.**   That sounds like that may well be correct, yes.

8   **Q.**   Okay.  And one of the reasons you didn't know about the

9   creatinine-adjustment problem is, it wasn't published in the

10  paper, right?

11  **A.**   Well, again, there wasn't a problem in the paper.  The

12  problem was in providing the data to the NTP that was not

13  creatinine-adjusted.

14  **Q.**   The unpublished data shows that without adjustment for

15  creatinine, maternal fluoride exposure is associated with a

16  null effect of .1 IQ points in boys, correct?

17  **A.**   I remember it was much smaller than with the creatinine

18  adjustment.

19  **Q.**   And would it refresh your memory to look at your

20  deposition testimony?

21  **A.**   Again, I'm sure it would, but it's a -- again, I just

22  don't have the number in front of me as to what the result was

23  in the unadjusted analysis.

24       **MR. CONNETT:**  Your Honor, at this point we'd like to

25  read deposition testimony.

```
 1              THE COURT:  Go ahead.

 2              MR. CONNETT:  It's 225, 8 to 11.

 3              MR. ADKINS:  No objection.

 4              THE COURT:  Okay.

 5    BY MR. CONNETT:

 6         "QUESTION:  For boys, maternal fluoride exposure was

 7         associated with a null effect of .1 IQ points, prior to

 8         the adjustment for creatinine, correct?

 9         "ANSWER:  Correct."

10         Now after the adjustment for creatinine, the null effect

11    in boys was transformed into a statistically significant

12    increase of 15 IQ points, right?

13    A.   That's correct.

14    Q.   And Dr. Savitz, I just put Plaintiff Demonstrative No. 6

15    on the screen.  Can you see that?

16    A.   Yes, I do.

17    Q.   And on the right of this figure we see the unpublished

18    data where there's no adjustment for creatinine, right?

19    A.   That's -- that's correct, yes.

20    Q.   And that unpublished data shows that maternal fluoride

21    exposure was associated with a 3.75-point reduction in IQ

22    amongst the girls, although not statistically significant,

23    right?

24    A.   That's my recollection as well, yes.

25    Q.   You agree, Dr. Savitz, that the impact of creatinine
```

SAVITZ - CROSS / CONNETT

1 adjustment in the Ibarluzea study causes, quote, "A rather

2 dramatic and, to my knowledge, unexplained difference in

3 results," correct?

4 **A.**   I agree.  It's a very unexpected and peculiar finding.

5 **Q.**   You agree it is a, quote, "fair question," unquote, why

6 creatinine adjustment had such a dramatic effect, right?

7 **A.**   I think -- you know, again, we expect it to have an

8 effect, which is why we -- or at least could have an effect,

9 which is why we do it.  It's the magnitude that would be

10 surprising -- is surprising.

11 **Q.**   And you think it's a fair question for us, the Court and

12 others to ask how did that happen and why did that happen,

13 right?

14 **A.**   Sure.  I mean, I think given that the results were

15 presented -- as I said, it's interesting because most times you

16 wouldn't even see this.  And I -- who knows what it looks like

17 in the MIREC cohort or the OCC.  But because of this

18 miscommunication, it ended up revealing or providing creatinine

19 unadjusted results that are, as I said, usually not published.

20 **Q.**   At your deposition, you testified that if you had been the

21 one doing this study, you would have asked the statistician to

22 do further analyses to see if outlier creatinine levels may be

23 distorting the results, correct?

24 **A.**   That is correct.  I mean, it's not a very specific

25 hypothesis, but it's the sort of -- the best I could offer is

SAVITZ - CROSS / CONNETT

1    some sort of a data aberration where it's also consistent with

2    the extremely wide confidence interval on the boys; I think it

3    was like .19 to 34 or something.

4        When you find those kinds of patterns, it calls into

5    question, you know, in -- to put it in nontechnical terms,

6    whether the model has blown up, meaning you have such small

7    numbers and you get a few peculiar cells and it can make the

8    data bounce in very strange ways.

9        As I said, it's an explorable hypothesis, but that's the

10   only one that I can see that would likely cause that kind of a

11   pattern.

12   Q.  You testified last week about the value of using water

13   fluoride levels as the metric of exposure in fluoride

14   neurodevelopment studies, right?

15   A.  Again, it has merit that is different than urinary

16   fluoride, but it has merit, yes.

17   Q.  Are you aware that Dr. Ibarluzea has collected detailed

18   tap water intake for every pregnant mother in the Basque

19   cohort?

20   A.  I didn't recall the -- I knew there was data on water

21   fluoride.  I didn't recall that it was on every individual.

22   Q.  Are you aware that Dr. Ibarluzea published a paper in 2018

23   where he calculated the individualized fluoride doses that

24   pregnant mothers in the Basque cohort received from drinking

25   water?

SAVITZ - CROSS / CONNETT

 1   A.   Again, I am not -- I don't recall seeing that paper, a

 2   paper that does that.

 3   Q.   Would you agree that analyzing the association between

 4   fluoride intake from water and IQ bypasses any problems with

 5   the creatinine adjustment piece of the analysis?

 6   A.   I think that reasoning is correct.  I think that if you're

 7   comparing people drinking fluoridated and nonfluoridated water,

 8   you're assuming that there will be a whole variety of other

 9   attributes in each of those populations, but the contrast is --

10   is still clear nonetheless, that some are drinking fluoridated

11   water and some are not.

12   Q.   Do you think that Dr. Ibarluzea should have separately

13   analyzed the association between fluoride intake from water and

14   IQ after he got such odd results with the creatinine

15   adjustment?

16   A.   I think independent of the creatinine adjustment, there is

17   merit both to looking at urinary fluoride and looking at water

18   fluoride as alternative exposure indicators.

19   Q.   Sardines and anchovies are two very popular types of

20   seafood in coastal Spain, right?

21   A.   Again, I don't -- I know the fish consumption is.  I

22   wasn't -- I don't know the types of fish specifically in that

23   region.

24   Q.   Sardines and anchovies are types of, quote, "small, oily

25   fish," right?

SAVITZ - CROSS / CONNETT

1  **A.**    I believe that is correct, yes.

2  **Q.**    Small, oily fish have lower mercury levels than large

3  predatory fish like tuna and swordfish, right?

4  **A.**    Again, I don't -- I don't know that to be the case.  I

5  don't have any reason to question it, but I don't have -- I

6  can't verify that.

7  **Q.**    Can you see why, though?  Because you have the large

8  predatory fish that are more bio-accumulating more of the

9  mercury?

10  **A.**    Right.  No, I said on the food chain the higher you are,

11  generally speaking, the more you've accrued with any persistent

12  chemical.

13  **Q.**    Have you reviewed -- or strike that.

14     In your testimony last week, you talked about a WHO report

15  from 2006 that had some comments on fluoride in seafood.  Do

16  you recall that?

17  **A.**    Yes, I do.

18  **Q.**    Have you reviewed any studies that have examined the

19  fluoride content in sardines and anchovies purchased in Spain?

20  **A.**    No, I have not.

21  **Q.**    Do you know if Dr. Ibarluzea had data on the levels of

22  polyunsaturated fatty acids in the -- in the cord blood?

23  **A.**    I don't know.

24  **Q.**    These are the fatty acids in seafood that are beneficial

25  to brain development, right?

SAVITZ - CROSS / CONNETT

**A.**   Right.  Those are the ones that are thought to account for the favorable effects, yes.

**Q.**   Do you agree that if Dr. Ibarluzea had this data on the fatty acids in the mother's cord blood that he should have included that as a covariate in his analysis of fluoride and IQ?

**A.**   Again, it's hard to say in hindsight "should have," I mean, in terms of however prominent or non-prominent the issue was at the time.  I think that it would be of interest, I don't disagree with that, but I don't know that it was a shortcoming on their part.  It's not been done to my knowledge in any other of the studies.  I recognize dietary habits are different in Canada and Mexico and so on, but, you know, again, the results would be interesting.  I agree with that.

**Q.**   Now, Dr. Hu testified at the start of trial that it's more important to control for a confounder, a potential confounder where it's very prevalent in the population than when it is less prevalent or not prevalent in the population.  Would you agree with that general principle?

**A.**   That's right.  I mean, the impact of a potential confounder, of course, is related to the magnitude of association with the exposure and the disease and the -- within -- those are the primary determinants, but then certainly the -- if it's -- you know, if it only applies to 2 percent of the people, it's less impactful than if it applies

1   to 30 percent or 50 percent of the people, that's correct.

2   **Q.**   So with that sort of the general principle in mind, would

3   you agree that it's more important to control for seafood

4   intake when you are dealing with a population with a very high

5   seafood intake level than it is when you're dealing with a

6   population with a low seafood consumption?

7   **A.**   Again, if there's the same magnitude of association with

8   the exposure and the outcome, a higher prevalence of seafood

9   consumption would potentially elevate its importance.  But,

10  again, it depends on the underlying associations of the

11  confounder with exposure and confounder with disease.

12  **Q.**   Now, going back here to demonstrative -- Plaintiff's

13  Demonstrative No. 6, the data -- the unpublished data that we

14  see here on the right, that is based on analyses that did not

15  include the fatty acids in the mother's cord blood as a

16  covariate, correct?

17  **A.**   That's my understanding.  I honestly don't recall, though,

18  what -- what the covariates it was adjusted for.  Again, it

19  wasn't part of the publication, it was part of the email, and I

20  just don't recall what all was adjusted for in that analysis.

21  **Q.**   Well, if Dr. Ibarluzea was to testify that he used all of

22  the same covariates as the published study, would you have any

23  reason to disagree with him on that?

24  **A.**   Again, I -- that would be a logical thing to do.  I would

25  agree with that.

SAVITZ - CROSS / CONNETT

 1  Q.   Okay.  So when we're looking at these effects -- sorry.

 2  Strike that.

 3       When we're looking at the unpublished data here and we see

 4  the null effect of .1 IQ points in boys, that is a null effect

 5  that did not adjust for seafood intake by the mother, correct?

 6  A.   Well, neither of them did -- right? -- either the green or

 7  the purple bars did not adjust, to the best of my recollection,

 8  for seafood.  I think they did adjust for mercury, if I'm not

 9  mistaken, as an indirect marker, but not seafood per se.

10  Q.   Okay.  So let's move on.

11       And Dr. Savitz, I'm looking here at some testimony that

12  you gave last week.  It's from page 1064 of the transcript.

13       Can you see that on your screen?

14  A.   Yes, I do.

15  Q.   And you testified that the size of the beneficial effect

16  in the Ibarluzea study was magnified by roughly 25 percent as a

17  result of presenting the results in terms of milligrams of

18  fluoride per gram of creatinine, right?

19  A.   That's correct, yes.

20  Q.   The corollary to this, in your view, is that if the

21  authors had expressed the results in terms of milligrams

22  fluoride per liter of urine, the effect size would have been

23  about 25 percent lower; is that right?

24  A.   Right.  Again, with creatinine adjustment.

25  Q.   And so under that scenario the effect size would have been

1    about 11 IQ points?

2    **A.**   Again, it would have deflated it but certainly not brought

3    it close to the null.

4    **Q.**   Okay.  So it still would have been a large effect size,

5    but it would have been about 11 IQ points, not 15?

6    **A.**   It would have been -- right.  It would have been large,

7    nonetheless, correct.

8    **Q.**   Now, you were basing your opinion on this on a

9    supplementary table in the Ibarluzea study, right?

10   **A.**   That's correct, yes.

11   **Q.**   And specifically you are relying on a supplemental table

12   where the authors provide the urinary fluoride values in terms

13   of both milligrams per gram of creatinine and milligrams per

14   liter of urine; is that right?

15   **A.**   That's correct, yes.

16   **Q.**   So one fluoride measurement is per gram of creatinine and

17   the other is per liter of urine?

18   **A.**   That's right.  So when they present the means, you can get

19   a sense of what would have happened had they used the other

20   unit for their analysis.

21   **Q.**   Okay.  So let's look at Supplementary Table 3 in the

22   Ibarluzea study.  And do you see that on your screen?

23   **A.**   Yes, I do.

24   **Q.**   And this is the table that you were just referring to,

25   right?

SAVITZ - CROSS / CONNETT

**A.**   I believe so, yes.  I'd have to look at the whole array of them, but that would make sense, yes.

**Q.**   And according to this table, the -- when the urinary fluoride value is expressed in terms of milligrams per liter of urine, it's 25 percent lower than when it's expressed in terms of milligrams per gram of creatinine; is that right?

**A.**   That's right.  Deflating it from .64 to .48.

**Q.**   Now, as we discussed -- so, basically, a concentration of 1 milligram per gram of creatinine corresponds to a concentration of .75 milligrams per liter of urine, correct?

**A.**   That's right.

**Q.**   Now, as we discussed, an increase of one milligram per gram of creatinine was associated in this study with a 15-point IQ increase in boys, right?

**A.**   That's correct, yes.

**Q.**   So a corollary of that is that an increase of .75 milligrams per liter of urine was associated with that 15-point IQ increase, right?

**A.**   I'm trying to follow this.  The -- so that the magnitude -- I'm having trouble doing the arithmetic in my head here, but the units are deflated for milligrams per liter of urine and, again, I think that's correct, but I couldn't swear to it.

**Q.**   Okay.  So based on the data here in Supplementary Table 3, as you increased the maternal urinary fluoride from 0 to .75

**SAVITZ - CROSS / CONNETT**

1 milligrams per liter of urine, this study was finding an effect

2 size of 15 IQ points in boys?

3 **A.**   This is where -- sorry.  And again, I am trying to think

4 through the meaning of that when you -- you could put it on the

5 same axis and --

6           **THE COURT:**  I'm not sure I understand either.  Are you

7 sure it's not the inverse of this?  I thought that the -- if

8 you measure it by milliliter -- by liters, that the IQ point

9 would be 11 you said.

10          **MR. CONNETT:**  That's the estimate that Dr. Savitz had

11 provided, and we're just going and examining it now.

12          **THE COURT:**  Yeah, I know.  Maybe my math is upside

13 down.  I'm not sure.

14          **THE WITNESS:**  As I said, I'm sorry.  It's -- again,

15 I'd have to do some scratching and scrawling to sort of see

16 that.  But my assumption was that because the units are

17 different -- as I said, if we put them on the same axis --

18 that's where I have trouble sort of figuring out what --

19 whether it -- in fact, as I said, I did the calculation.  If

20 it's 25 percent lower, it would deflate it by 25 percent.

21 **BY MR. CONNETT:**

22 **Q.**   But Dr. Savitz, I guess the point here is --

23 **A.**   Yeah.

24 **Q.**   -- we all make mistakes --

25 **A.**   Right.

SAVITZ - CROSS / CONNETT

1  Q.  -- I certainly do all the time, but would you agree now in

2  looking at this that actually, when we adjust for the

3  difference in urinary levels between these two measures that

4  the effect size would actually be higher if we used the

5  milligrams of fluoride per liter of urine?

6  A.  I understand that's what you're saying, and I'm having

7  trouble following it.

8  Q.  Is it fair to say, Dr. Savitz, in looking at this data --

9  A.  Yeah.

10  Q.  -- that right now as you sit here today --

11  A.  Right.

12  Q.  -- you wouldn't stand by what you previously said?

13  A.  I would rework it and see where I ended up.  I am

14  acknowledging it's more confusing than I had presented it to

15  be.  I'm not acknowledging this is the right answer, but it's

16  trying to translate an effect size, which is IQ points per unit

17  change in milligrams per gram of creatinine versus milligrams

18  of -- again, milligrams of fluoride per liter of urine.

19      And that's the part that it's not just the units, it's the

20  IQ points per unit that is the critical factor.

21  Q.  So as we sit here today, fair to say that you wouldn't --

22  you would ask to reconsider your testimony on whether using the

23  milligrams of fluoride per liter of urine deflates the effect

24  size?

25  A.  Again, I'd have to go back and rework that.

SAVITZ - CROSS / CONNETT

1  **Q.**   Okay.

2  **A.**   Agreed.

3  **Q.**   Fair enough.

4       So I want to go back briefly to the Risk Sciences

5  International report that we were discussing last week, okay?

6  **A.**   Okay.

7  **Q.**   I've put on the screen an excerpt from the published

8  report that is at Trial Exhibit 129, page 21.

9       Can you see that on your screen?

10 **A.**   Yes, I do.

11 **Q.**   And we talked about this finding last week -- right? --

12 that the RSI team concluded that the available evidence

13 demonstrates a moderate to strong magnitude of association and

14 that the evidence is consistent in showing this association,

15 correct?

16 **A.**   That was their interpretation, yes, correct.

17 **Q.**   And the RSI team reached this -- reached this conclusion

18 after having considered the findings of the Ibarluzea study,

19 correct?

20 **A.**   They did incorporate it into their assessment, that's

21 correct.

22 **Q.**   So they were fully cognizant of Ibarluzea's findings, and

23 they concluded that the evidence is consistent in showing an

24 association between fluoride and reduced IQ?

25 **A.**   Again, that was their evaluation, and that's what they

1    concluded, correct.

2    **Q.**   Okay.  So let's finish up here, just a few more questions.

3    And Dr. Savitz, I'm looking here at your CV, which is marked

4    Trial Exhibit 650.  Do you see that?

5    **A.**   I do, yes.

6    **Q.**   And this is page 12 of your CV where you talk about -- or

7    where you identify the sources of your research findings; is

8    that correct?

9    **A.**   That's correct.

10   **Q.**   And one of the research grants that you identify here is a

11   grant for $5.3 million from the Electric Power Research

12   Institute to study the association between electric power lines

13   and cancer, right?

14   **A.**   That's correct, yes.

15   **Q.**   And this grant funded some of the research that you were

16   discussing last week related to the potential health effects of

17   electromagnetic radiation?

18   **A.**   That's correct, yes.

19   **Q.**   Now, by my count, this is the third largest research grant

20   that you have identified on your CV.  Does that sound about

21   right?

22   **A.**   It was a large study, obviously, yes.

23   **Q.**   And I'm looking now at page 13 of your CV, and you

24   identified here a research grant that you received from the

25   National Institute of Dental Research to study the impact of

 1  mercury exposures and reproductive outcomes among dentists,

 2  right?

 3  A.   That's correct, yes.

 4  Q.   Now, the source of mercury exposure at issue in this study

 5  was the mercury that dentists use as a filler for silver

 6  fillings, right?

 7  A.   For dental amalgams, yes, that's correct.

 8  Q.   And is the word that is used to describe this sometimes

 9  "mercury amalgams"?

10  A.   Yes, correct.

11  Q.   Okay.  And I've just put on the screen an abstract that we

12  discussed at your deposition.  Do you see that?

13  A.   Yes, I do.

14  Q.   And this is an abstract where you present the findings of

15  your study on the relationship between mercury exposures among

16  dental professionals and spontaneous abortions, correct?

17  A.   That's correct, yes.

18  Q.   And the study was funded by the NIDR the National

19  Institute of Dental Research, correct?

20  A.   That's correct, yes.

21  Q.   And it was also funded by the American Dental Association?

22  A.   Again, indicated there -- as I said, I don't want to make

23  it like I was stealing the credit, but Dr. Kaste was the lead

24  person not just on the abstract but in -- really in doing the

25  research, and I was serving as her faculty adviser, but, yes,

1    it was supported in part by the ADA.

2    **Q.**   And you found in this study that the odds ratio for a

3    spontaneous abortion among those that were mixing the mercury

4    amalgams in the dental office was -- ranged from 1.8 to 4.4,

5    correct?

6    **A.**   That's correct, yes.

7    **Q.**   And you agree that those are large effect sizes for a

8    chemical-induced spontaneous abortion?

9    **A.**   They are extremely large, yes.

10   **Q.**   But Dr. Savitz, you never published these findings in a

11   published paper, correct?

12   **A.**   Again, I can certainly make the case that I always advise

13   students I supervise and do everything I can to encourage them

14   to publish, and I just don't recall that Dr. Kaste chose to do

15   so.

16   **Q.**   So if we look at your CV, for example, we will not see in

17   your list of publications a paper that -- where you published

18   those findings?

19   **A.**   I believe that is correct.

20   **Q.**   Now, at some point after this -- this study, you received

21   another grant from the National Institute of Dental and

22   Craniofacial Research, correct?

23   **A.**   Again, I would -- it's probably not fair to say I received

24   it.  I was a co-investigator on a large team that was studying

25   the issue indicated there, pain in temporomandibular joint

1  disorder.

2  **Q.**   And the grant here was a total of $17.2 million?

3  **A.**   It was a very large undertaking, yes.

4  **Q.**   Now, based on your CV, from what I can tell, this is the

5  largest research grant that you have received in your career;

6  is that correct?

7  **A.**   Again, I would correct it.  I didn't -- I was a part of a

8  very large grant, a very small part, and so it's -- it's --

9  again, I would have been delighted to receive a grant for $17

10  million, but, in fact, I was a coinvestigator for some very

11  modest amount of time, and it provided salary support for my

12  collaboration on the project.

13          **MR. CONNETT:**  Well, Dr. Savitz, thank you.  Those are

14  all the questions I have at this time.

15          **THE WITNESS:**  Thank you.

16          **THE COURT:**  All right.  Thank you.

17          Redirect?

18          **MR. CAINTIC:**  Good morning, Dr. Savitz.

19          **THE WITNESS:**  Good morning.

20          **MR. CAINTIC:**  May I begin?

21          **THE COURT:**  Yes.

22                          **REDIRECT EXAMINATION**

23  BY MR. CAINTIC:

24  **Q.**   Dr. Savitz, I want to focus first on some questions you

25  received this morning about a table 3 in the Dewey study.  Do

 1  you remember that line of questioning?

 2  A.   I do, yes.

 3  Q.   And plaintiff's counsel asked you a series of questions

 4  about results within that table?

 5  A.   That's correct, yes.

 6  Q.   And you said to comment on those results you would want to

 7  see the table itself, right?

 8  A.   Yes.

 9  Q.   But you were not shown that table?

10  A.   That's correct.

11        MR. CAINTIC:  Mr. Hambrick, if we could pull up Trial

12  Exhibit 117, page 5, Table 3.

13  BY MR. CAINTIC:

14  Q.   And Dr. Savitz, do you see Table 3 in front of you?

15  A.   Yes, I do.

16  Q.   And is this the table that you described with

17  Mr. Connett's questioning about the neurobehavioral effects

18  found in the Dewey study?

19  A.   That's correct, yes.

20  Q.   Could you explain this table for the Court?

21  A.   Well, again, the columns are looking at different subsets

22  related to children's behavior, different instruments that have

23  been used to address it.

24        And then as you go down the table, it provides results for

25  the boys and girls together in the top bar, girls alone and

**SAVITZ - REDIRECT / CAINTIC**

1  boys alone and then, within each of those groups, compare those

2  who were not at all exposed during pregnancy, those who were

3  exposed but only for part of the pregnancy and then those fully

4  exposed at the top.

5  **Q.**   And Dr. Savitz, I count 24 different sub analyses in this

6  table.  Does that accurately reflect your count as well?

7  **A.**   That would be -- right.  24 different adjusted odds ratios

8  that correspond to that matrix.

9  **Q.**   And can you go over where they found statistically

10  significant adverse effects?

11  **A.**   Let me search there for a moment.

12      Okay.  For the girls who were fully or partially exposed

13  on the dimensional change cart sort DCCS instrument, they show

14  higher scores, which it's always a challenge in these scales.

15  I think that means worse in this particular case so that in

16  that cell the middle section, far right, is where they found a

17  statistically significant elevation in risk.

18  **Q.**   And then what about in Gift Delay column?

19  **A.**   Oh, there's one --

20      I'm sorry.  There's another one there as well for the

21  girls and then also an overall for the gift delay.  There is

22  some evidence of higher scores associated with more exposure.

23  **Q.**   What about in that NEPSY-II statue column, any

24  statistically significant adverse effects?

25  **A.**   Not for that, no.

SAVITZ - REDIRECT / CAINTIC

1  **Q.**   What about in the Boy-Girl Stroop column, any

2  statistically significant adverse effects?

3  **A.**   No.  None there either.

4  **Q.**   Were there any statistically significant adverse effects

5  for boys alone?

6  **A.**   No.

7  **Q.**   Okay.  So across 24 sub analyses they found four

8  statistically significant adverse effects?

9  **A.**   That's correct, yes.

10 **Q.**   Okay.  And this is not showing a consistent sex-specific

11 effect?

12 **A.**   No.  And, if anything, it's suggesting that girls would

13 have potentially higher risk than boys.  But, again, it's how

14 expelling is that story and that -- again, from one isolated

15 study that might, again, legitimately get attention, but it

16 is -- as I've said, it's hard to resist the temptation, but the

17 positive findings add some support for a very specific

18 hypothesis, you know, DCCS in girls.  It adds support for that.

19 It argues against DCCS overall, the results are not supportive

20 there.

21      And you could go through the table, and you can narrow the

22 hypothesis to an instrument or a sex and zero in on that, but I

23 think the sort of the -- I don't know, the misperception is

24 that only these positive ones are important.  The other ones,

25 we'll just put those aside.

1           Well, if it's a good enough study to generate meaningful

2    positive results, it's a good enough study to generate

3    meaningful null results, and that has to be weighed into the

4    overall assessment of the state of the literature on this and

5    every other paper that has generated these huge arrays of data.

6    It's either all -- all informative or none of it is.  I think

7    all of it's informative.

8    **Q.**   And Dr. Savitz, let's turn to some questions you received

9    about the Health Canada -- or, I should say, the Risk Sciences

10   Institute Systematic Review.

11          So you received some questions last Friday and today where

12   Mr. Connett showed you some quotations, and you said whether

13   you agreed or disagreed with those.

14          Do you remember those questions?

15   **A.**   Yes, do.

16          **MR. CAINTIC:**  Let's pull up one of the quotes that

17   plaintiff's counsel showed you.

18          Mr. Hambrick, could you turn to Trial Exhibit 131,

19   page 1516?

20   **BY MR. CAINTIC:**

21   **Q.**   And we can look at the full page if you can see it all,

22   Dr. Savitz, but the last sentence in that first paragraph, do

23   you see that?

24   **A.**   Okay.  Yes, I do.

25   **Q.**   And for clarity of the record I'll just read it.  Quote,

1    "The overall evidence identified to date, strongly suggests

2    that fluoride can affect cognitive outcomes in children

3    (specifically, reduction in IQ scores), at levels close to

4    those currently seen in North American drinking water."

5         Did I read that correctly?

6    **A.**    Yes, you did.

7    **Q.**    Let's figure out what they meant by "levels close to those

8    currently seen in North American drinking water."

9         **MR. CAINTIC:**   Mr. Hambrick, could we turn to Trial

10   Exhibit 129, and let's go to page 10.

11        And for the record, the exhibit that I had just shown

12   was from the supplementary materials of this published

13   systematic review.

14        And, Mr. Hambrick, if we could zoom in on the top

15   left-hand corner, the first full paragraph that begins

16   "Throughout the review."

17   **BY MR. CAINTIC:**

18   **Q.**    And for completeness, I'll just read this.  Quote,

19   "Throughout the review, evidence summaries and weight of

20   evidence considerations were described in terms relevant to the

21   North American drinking water context.  Naturally occurring and

22   fluoridated community water levels vary widely throughout the

23   world.  The shorthand used in the text is only meant to imply

24   that focus was placed on health risks that may occur at

25   fluoride levels in drinking water just above, close to, or

1  below current maximum allowable concentrations.  This was

2  operationalized in the review as a level of approximately 2

3  parts per million fluoride in drinking water."

4       Dr. Savitz, did I read that correctly?

5  **A.**   Yes, you did.

6  **Q.**   And by 2 parts per million, that's the same as

7  2-milligrams-per-liter concentration, right?

8  **A.**   That's correct.

9  **Q.**   So when the authors here discuss their findings are

10 relevant to the North American drinking water context, they

11 mean about 2-milligrams-per-liter range?

12 **A.**   That's right, up to that, yes.

13       **MR. CAINTIC:**  Okay.  And, Mr. Hambrick, can we turn

14 back to Trial -- let's turn back to the supplementary

15 materials, which is Trial Exhibit 131, page 1518.  And if we

16 could zoom into the paragraph that starts "Considering the

17 currently available evidence."

18       And for completeness I'll just read this.  Quote,

19 "Considering the currently available evidence, possible

20 fluoride effects on childhood IQ should be taken into

21 consideration as an area of public health concern, although

22 less consistent evidence at low exposure levels remains a

23 source of significant uncertainty.  Benchmark dose modeling of

24 high-quality epidemiologic data by Grandjean, et al. 2022

25 predicted increased risks at lower than 1 milligram per liter

SAVITZ - REDIRECT / CAINTIC

 1   fluoride in drinking water; however, different models,

 2   including linear, quadratic and segmented models, predicted

 3   notably different levels of risk from fluoride at these low

 4   concentrations.  At this point in time, mechanistic explanation

 5   and key mode of action events are insufficiently understood to

 6   guide the choice of the most appropriate model to use for

 7   predicting risks at low exposure levels."

 8        Dr. Savitz, did I read that correctly?

 9   A.   Yes, you did.

10   Q.   And I know there's some risk assessment stuff in here, but

11   you as an epidemiologist, generally speaking, do you agree with

12   this statement?

13   A.   Again, it's the -- as noted, I can't really speak to the

14   conventions of how one goes about a risk assessment, but I

15   think that the uncertainty -- this -- again, they're talking

16   mostly at this point about modeling uncertainty.  The

17   uncertainty, whatever the epidemiologic evidence is, how it is

18   applied and interpreted has an impact.

19        I've been more focused on the uncertainty of what's fed

20   into the model and the -- and certainly that would -- obviously

21   if there's modeling uncertainty, that would presumably add to

22   the underlying uncertainty in the raw material that goes in.

23   Q.   But the general statement that the current state of

24   fluoride research is too uncertain, does that -- do you agree

25   with that general proposition?

1          MR. CONNETT:  Overbroad.

2          THE COURT:  Sustained.

3          MR. CAINTIC:  I can move on.

4          Mr. Hambrick, can we turn to Trial Exhibit 131, page

5     1519?

6     BY MR. CAINTIC:

7     Q.    And Dr. Savitz, looking at the sentence which starts

8     "Absent a clear understanding."  And I'll read it for the

9     record.  Quote, "Absent a clear understanding of the underlying

10    biological mechanisms and mode of action by which exposure to

11    fluoride may act to reduce children's IQ, evidence for such

12    effects below 1.5 milligrams per liter remains uncertain."

13          Dr. Savitz, did I read that correctly?

14    A.    Yes, you did.

15    Q.    And do you agree with that statement?

16          MR. CONNETT:  Your Honor, I would object to this just

17    in the fact that it goes beyond the scope of Dr. Savitz's

18    opinion and foundation.

19          MR. CAINTIC:  This is a discussion of the research.

20    And I could just say:  Does this comport with your view of the

21    epidemiological research --

22          THE COURT:  Objection overruled.

23    BY MR. CAINTIC:

24    Q.    Does this comport with your view of the epidemiological

25    research below 1.5 milligrams per liter?

SAVITZ - REDIRECT / CAINTIC

**A.**   It is consistent with it.  It's coming at it from a rather

different line of reasoning but arriving at that point of

saying -- the last part of the expression after the comma is

where I got to as well, based on the epidemiologic evidence.

They're citing it in terms of the mechanism.

**Q.**   So, Dr. Savitz, plaintiff showed you some selected quotes

that you disagreed with last Friday and today and I just showed

you some sentences that you agreed with.  Does it surprise you

that in a systematic review that's weighing the evidence, there

are statements that you agree and disagree with?

**A.**   Again, they're going about it in a different way and there

are -- they follow a certain path, and they have these

milestones along that path in the way they're considering it

And there are some, you know, sort of partial conclusions they

draw along the way that I agree with, some that I disagree with

because of either the importance or the way they've gone about

it.  So it certainly is not surprising.  I think you could --

I've said the same thing with regard to the NTP report.  You

could probably juxtapose the NTP report and the Risk Sciences

report and find some places they differ -- I think they do in a

number of places -- and so it's -- again, I'm not saying my way

is right and their way is wrong, but I think they are different

ways to try to ask this question about the state of knowledge

in the exposure range of interest.

     And as I've said last week, we come to the same

 1    conclusions through a very different pathway.

 2            MR. CAINTIC:  And Mr. Hambrick, can we pull up page 2

 3    of Trial Exhibit 129?  And if we could just zoom in on the

 4    Conclusion section.

 5    BY MR. CAINTIC:

 6    Q.   And Dr. Savitz, can you, either by reviewing this or from

 7    your recollection, can you remind the Court of what the RSI

 8    systematic review's ultimate conclusion was?

 9    A.   It ultimately -- they went back to dental fluorosis as the

10    most -- the primary endpoint despite the evidence pertaining to

11    potential reduction in IQ scores.

12         And so it was -- there were certainly, as some of the

13    earlier quotes indicated, probably more -- had more confidence

14    in the epidemiologic evidence than I did regarding

15    neurodevelopmental, neurocognitive effects, but then even they,

16    despite that confidence, came back around to focusing on severe

17    dental fluorosis as moderate and severe dental fluorosis as the

18    endpoint that should drive the risk assessment that -- again,

19    their judgment.

20    Q.   And was that conclusion consistent with the conclusion of

21    the Health Canada expert panel?

22    A.   Very much so, yes.  Again, not in any way dismissing or

23    unconcerned with the evolving literature on neurocognitive

24    outcomes, but concluding that there simply is too much

25    uncertainty at this time to act on that in this context.

1            **MR. CAINTIC:**  Mr. Hambrick, can we pull up U.S.

2   Demonstrative No. 10?

3   **BY MR. CAINTIC:**

4   **Q.**    And Dr. Savitz, last week plaintiffs raised the issue of

5   cherry-picking.  Do you remember that?

6   **A.**    I do, yes.

7   **Q.**    And in particular, there was some insinuations that we had

8   cherry-picked the results that we put into this table.

9            Do you remember that?

10  **A.**    Yes.

11  **Q.**    And in particular, there were some insinuations that we

12  had neglected to include the Till 2020 and Cantoral 2021

13  studies in this demonstrative.  Do you remember those

14  questions?

15  **A.**    Yes.

16  **Q.**    Why is the Till 2020 formula feeding study not in U.S.

17  Demonstrative No. 10?

18  **A.**    Well, again, it's addressing a different hypothesis.  It's

19  a perfectly appropriate hypothesis that infant exposure

20  postnatally to fluoride is related to further

21  neurodevelopmental outcomes.

22           These are all pertaining to prenatal exposure.  So that's,

23  you know, one of the reasons that -- that the Till study is --

24  is not included as a -- it's its own category.  We could set up

25  another table of postnatal exposure.  We wouldn't find a lot of

SAVITZ - REDIRECT / CAINTIC

```
 1  data, but it would be perfectly reasonable to say, okay, again,
 2  in the spirit of comparing like to like, let's look at the Till
 3  data and other relevant data on that exposure outcome
 4  relationship.
 5      Ideally, other studies that have also looked at
 6  breastfeeding and formula feeding, which, again, is a
 7  reasonable approach to that question, but it is not part of a
 8  larger body of literature.
 9  Q.  Till 2020 is an extension but not a replication of the
10  Green 2019 study?
11  A.  That's right.  It's building on the same population and
12  looking at a different exposure source, namely postnatal
13  drinking water rather than prenatal maternal urine fluoride
14  concentrations, but it's still building off of the MIREC
15  cohort.
16      There are other -- I think now every one of those except
17  for, well, OCC, has generated other papers with either other
18  outcomes or other analytic approaches to the same basic data
19  resource.
20  Q.  Why is the Cantoral 2021 study not a part of U.S.
21  Demonstrative No. 10?
22  A.  Well, again, it's a -- most of my reasoning was concerned
23  simply with the exposure assessment method that is quite
24  different and I didn't -- I don't think I made a judgment that
25  you cannot measure fluoride in diet.  I don't know for a fact
```

1  that you can; I don't know how accurate it is, but it's very

2  different than measuring it in water or urine.  Again, a

3  different approach.

4      You could also say, well, the Dewey study -- well, that's

5  a different approach.  And in focusing and juxtaposing these

6  studies, it's both because they're good studies but also

7  because they are so readily and fully comparable.

8  **Q.**  In the exposure metric in the Cantoral 2021 study, that

9  was a food frequency questionnaire?

10  **A.**  They used food frequency questionnaire to estimate dietary

11  fluoride intake, as I said, which is -- for some nutrients it

12  works well, for some nutrients it doesn't work so well.  I just

13  don't know with respect to fluoride how effective that approach

14  is.

15          **MR. CAINTIC:**  Mr. Hambrick, can we pull up U.S.

16  Demonstrative No. 12?

17  **BY MR. CAINTIC:**

18  **Q.**  Dr. Savitz, plaintiff's counsel asked you a series of

19  questions about this demonstrative last Friday, right?

20  **A.**  That's correct, yes.

21  **Q.**  And this demonstrative shows the summary of findings from

22  table 3 of Cantoral 2021, right?

23  **A.**  That's correct, yes.

24  **Q.**  And plaintiffs' counsel then asked you a series of

25  questions about Table 4 from Cantoral 2021, right?

1    **A.**    That's correct.

2    **Q.**    And you said to comment on Table 4 you would want to see

3    table 4, right?

4    **A.**    That's correct, yes.

5    **Q.**    Plaintiffs' counsel did not show you Table 4, right?

6    **A.**    I believe that's correct.

7            **MR. CAINTIC:**  Mr. Hambrick, can you please pull up

8    Trial Exhibit 110, page 5, Table 4?

9            And for the record, I have highlighted the significant

10   beta coefficients here.

11   **BY MR. CAINTIC:**

12   **Q.**    Dr. Savitz, can you describe Table 4 for the Court?

13   **A.**    What it shows is that looking at the models relating

14   fluoride intake in pregnancy in milligrams per day -- so we're

15   dealing with different units now -- in relation to the IQ

16   scores, cognitive, language and motor, divided by the trimester

17   of pregnancy and averaged across the two trimesters where they

18   took measurements.

19   **Q.**    And is this showing -- compared to Table 3, is this more

20   of a longitudinal analysis?

21   **A.**    That's correct, yes.  This is the longitudinal model.

22   **Q.**    And to be clear, there's six numbers that are in bold

23   here, but the two numbers on the left are the actual beta

24   coefficients, the effect sizes, and the four numbers on the

25   right, that's just the confidence interval, right?

1    **A.**    That's correct, yes.

2    **Q.**    Okay.

3             **MR. CAINTIC:**    And Mr. Hambrick, if we could actually

4    zoom out and show both Table 3 and Table 4 next to each other

5    or on top of each other.

6    **BY MR. CAINTIC:**

7    **Q.**    So, Dr. Savitz, could the longitudinal effects found in

8    Table 4 be driven by the one finding in Table 3 that fluoride

9    had an adverse effect on boys at 24 months on the cognitive

10   scale?

11            **MR. CONNETT:**    Overbroad and leading.

12            **THE COURT:**    Sustained.

13   **BY MR. CAINTIC:**

14   **Q.**    Dr. Savitz, what might be driving the longitudinal effect

15   found in Table 4?

16   **A.**    I mean, it's the same scale.  It's the same sex and -- as

17   the -- across the two tables obviously, the time specific and

18   the longitudinal findings.  It's limited to boys, it's limited

19   to the cognitive scores.

20   **Q.**    And does Table 4 provide the results of boys and girls

21   combined?

22   **A.**    No.

23   **Q.**    So looking across the array of results from Table 3 and

24   Table 4, what is your opinion about whether Cantoral supports

25   there being an adverse effect of fluoride exposure on IQ?

**A.**   Again, it's a -- it is generally not supportive with some

possible exceptions is the way I would describe it.

And again, as I was saying, you could say that, well, what

does it tell us about cognitive scores?  Well, it says there

may be something going on with boys.

What does it tell us about language?  It gives us reason

to believe there's no effect; same thing with motor, same thing

with girls.

And so it sort of -- as you get into these narrower -- I

mean narrower hypotheses based on timing and sex and subscale,

it's not, I think, accurate to generalize that and say, oh, now

they found -- they've found neuro -- adverse neurocognitive

effects in their study.

They have generally found no adverse cognitive effects

with a possible exception, and that -- I would put the first

part of the sentence in the conclusion first if I were writing

the abstract or in describing the study, giving the broad view,

and then, if you want, zero in on the exceptions to it.

**Q.**   Dr. Savitz, you were asked some questions last Friday

about general causation.  Do you remember that?

**A.**   I do, yes.

        **THE COURT:**  Before you get to that, before you go on

to a different subject, I understand that the Till study is

different because it looked at postnatal infant exposure, but

would you agree that there is some potential connection and

 1  relevance between prenatal and post -- because it's all in

 2  early development stages.  One is getting nutrients directly

 3  through the placenta, et cetera, et cetera, so you have a

 4  different mechanism.  But, given the idea that the brain is

 5  still in development or very sensitive at that stage, one could

 6  lend some plausibility to the other?

 7          THE WITNESS:  Oh, no, I would agree with that.

 8  There's -- the period of rapid brain development starts in

 9  utero and doesn't end at birth, it continues on after that, so

10  yes, it is relevant.  It's different, but it is potentially,

11  you know, potentially addressing -- it's addressing the same

12  phenomenon but in a different time window.

13  BY MR. CAINTIC:

14  Q.   And the Till 2020 paper was focused still on the MIREC

15  cohort?

16  A.   That's correct, yes.

17  Q.   Okay.

18  A.   It's building on the same -- with the same strengths and

19  the same limitations.  That's what happens in a given cohort.

20          THE COURT:  Thank you.

21  BY MR. CAINTIC:

22  Q.   So, Dr. Savitz, you were asked some questions about

23  general causation last Friday.  Do you remember those

24  questions?

25  A.   Yes, I do.

1  **Q.**   When you were reviewing the fluoride and IQ literature,

2  were you looking for absolute proof of causation?

3  **A.**   No.  That's -- again, I've written and I was reminded

4  of -- that epidemiologists or really not just epidemiologists,

5  I think we're just maybe more self-critical or honest -- never

6  reach that level of absolute certainty; and yet, we provide

7  evidence that leads to better -- hopefully better-informed

8  decisions.  And so it's really trying to establish and

9  calibrate the weight and where we are in that range from zero

10 to 100 percent, but certainly not holding out for certainty.

11 **Q.**   And you -- you mentioned this kind of spectrum of

12 association when analyzing epidemiologic studies.  What did you

13 mean by that?

14 **A.**   Well, there's -- again, there -- there are degrees --

15 there are different ways of sort of challenging it.  I mean, we

16 start with an association that is reasonably well established,

17 not just one isolated finding from one isolated study but where

18 you have a body of research that says, yes, there is an

19 association present, and then it's a matter of is it plausibly

20 causal.

21     And so the only -- one of the ways of knowing that there's

22 at least an interest in causality is if they adjust for

23 confounders.  There's absolutely no other reason to adjust for

24 confounders if you're not interested in causality.

25     Now, the thoroughness of that and then now we're getting

SAVITZ - REDIRECT / CAINTIC

 1    into the gradations of withstanding challenges to a causal

 2    interpretation.  Again, epidemiology works by almost backing

 3    into it.

 4        We see the association.  Well, could it be due to

 5    measurement error?  Could it be due to confounding?  And then

 6    we sort of keep poking at it and as it survives those

 7    challenges, we move more and more in the direction of being

 8    convinced it's causal.

 9        But as I said, we have to start with that association

10    because -- and it can't just be one study.  There has to be a

11    sufficient sort of confidence that an association really is

12    present and then we can proceed to start to look at how likely

13    it is to be causal.

14    Q.   And Dr. Savitz, in your opinion, where on that spectrum of

15    association is the relationship between fluoride exposure at .7

16    milligrams per liter and IQ?

17    A.   Again, it's -- it's -- and I can't give a percent.

18    Sometimes people want me to -- you know, arbitrary number of

19    that sort, but I think that it is -- it remains quite fragile.

20    And by "fragile," what I mean is that I do not believe that an

21    association, certainly within that range, has been established

22    with -- with much confidence at all.  It's suggested, there are

23    individual studies of high quality that suggest it, absolutely.

24    There's some evidence from higher exposure which may be

25    relevant -- I'm not denying any of the menu -- but when you

 1   zero in on that question is there a reasonably firm basis for

 2   saying yes, there is an association, I don't think that is --

 3   we've arrived at that point.

 4   **BY MR. CAINTIC:**

 5   **Q.**   And Dr. Savitz, plaintiff's counsel just showed some grant

 6   funding that you had received from I guess electric power

 7   companies during your EMF, electromagnetic fields research.

 8        Do you remember those questions?

 9   **A.**   I do, yes.

10   **Q.**   To be clear, your study was the one that found an

11   association between electromagnetic field exposure and

12   childhood cancer, right?

13            **MR. CONNETT:**  Overbroad.

14            **THE COURT:**  Overruled.

15            **THE WITNESS:**  I have to correct that.

16        The childhood cancer study actually had an unusual

17   funding source, the New York State Power Lines Project, where

18   the State had, through I think a legal proceeding, had

19   basically extricated money from the power companies to support

20   researching, and we were competitively awarded that.

21        The Electric Power Research Institute study was

22   looking at electric utility workers where we did find some

23   indication of an elevated risk of brain cancer associated with

24   higher exposure.

25            But maybe at the risk of sounding defensive, they are

 1   very good at shielding investigators from any pressures from

 2   the industry.  The chair of our advisory committee was the Dean

 3   of the UCLA School of Public Health so that I felt that that

 4   sort of illustrates that although in some people's views the

 5   fact that the ultimate source of money was from the utilities,

 6   there are credible ways of ensuring that it is not subject to

 7   industry bias.  And I feel like they do a -- they had in the

 8   past, and I think they continue to do that well.

 9   **BY MR. CAINTIC:**

10   **Q.**   But it was your study that found this adverse association

11   to begin --

12   **A.**   Earlier on, yes.  And so, in that sense, they were willing

13   to engage me as a principal investigator despite what you could

14   say is a sort of a tainted history of having identified

15   problems.

16   **Q.**   And it was later studies conducted by other people that,

17   in a way, proved your original study wrong?

18   **A.**   That's right.

19            **MR. CONNETT:**  Leading.

20            **THE COURT:**  Overruled.

21            **THE WITNESS:**  That's right.  The National Cancer

22   Statute, the Medical Research Council of the UK, of -- there

23   were several other entities in foreign countries that had

24   looked at this.

25            **MR. CAINTIC:**  No further questions.  Thank you,

1    Dr. Savitz.

2         **THE WITNESS:**  Thank you.

3         **THE COURT:**  All right.  Let me just follow up -- we're

4    actually well beyond our break, and I appreciate our court

5    reporter bearing with us here.  I wanted to try to complete

6    this testimony.

7         I know you don't want to give a number on that

8    spectrum, and I'm not going to ask you for a number, but I

9    think you've confirmed it's not zero.  It's on the spectrum

10   somewhere, correct?

11        **THE WITNESS:**  That's correct.

12        **THE COURT:**  And with respect to the Risk Sciences

13   Institute review where it concluded that there was -- the

14   evidence strongly suggests that fluoride can affect cognitive

15   outcomes at levels close to American drinking water being --

16   but that was defined as 2 parts per million not 0.7, 1.5.

17        Given their specification of what they meant by North

18   American drinking water at 2 parts per million, do you disagree

19   with their conclusion about the evidence strongly suggests

20   association at that level?

21        **THE WITNESS:**  I think that this is where, you know, we

22   have the studies we've been talking a lot about that are right

23   in the range of interest.  They're not at 2 or 1.5, they're at

24   .8 or .7, you know, the cohort studies.

25        What we do not have are high-quality studies that pin

1  down the dose-response relationship, in my view, anywhere

2  between 1 and 2.

3      If we had high-quality studies that demonstrated a

4  clear adverse effect in that range, I would -- again, I don't

5  know where I would come down to, but that would be pretty

6  significant.

7      And it's interesting, you know, the -- this focus on

8  1.5 is not based on examining the epidemiology and see where it

9  moves from murky to clear.  It's sometimes as simplified and

10 presented as though, oh, we know above 1.5.  You know, in the

11 NTP report, they talk about studies that have exposures as low

12 as 1.5 or as high as 1.5, but if you want to pinpoint the

13 dose-response relationship, let's say, of 1 to 2, you need

14 studies that have a lot of people between 1 and 2.  That's kind

15 of a gap from my review.

16     **THE COURT:**  What about above 2?  I mean, that's what

17 this --

18     **THE WITNESS:**  Well, that's where a large body of the

19 cross-sectional studies is that are credible.

20     I don't want to say they're -- they're not -- I'm not

21 dismissing them, but for a number of reasons, I would

22 down-weight them in this extrapolation to the range of concern

23 here, again, for the reasons that they are often measuring

24 higher exposure.

25     They're often -- and again, this is just based on a

1  sampling of them -- a lot of them are comparing two

2  communities, one of which is known to have a problem with

3  fluoride -- you know, dental fluorosis and other things --

4  meaning they couldn't blindly assess outcome.  The assessors

5  would surely know which village is which.

6          And I'm not saying that I could prove that is a

7  problem, but it's a bit of a problem with that design.  So

8  it's -- it's more suggestive in that upper range according to

9  the NTP report.

10          It's got sort of a gap in the middle and a lack of

11  high-quality studies addressing the middle.  I think the

12  problem is, I don't know that there are a lot of settings where

13  you could actually conduct a study that refines the

14  dose-response relationship between 1 and 2.  You need -- I

15  mean, we only can study the experiences people have, and

16  there's this gap between the endemic fluoride communities and

17  the -- you know, the fluoridated water studies.

18          THE COURT:  Right.  And we've talked before about the

19  relevance of the higher range turning on and how confident you

20  are that the dose-response curve can be extrapolated down, but

21  I guess you would agree with the obvious proposition that the

22  less distance you are from that reliable range, the less you

23  have to extrapolate; the further you are, the more risky -- I

24  mean the more tentative the extrapolation?

25          THE WITNESS:  That's exactly right is that -- and

1   again, it's not -- but as I said, it's not just high.  If we

2   had high exposures other places in the United States or Canada

3   and we were conducting our more classic epidemiologic studies,

4   I would have more confidence.  But the extrapolation across

5   geography from endemic to, you know -- endemic fluoride to

6   fluoridated water, there's a lot of sort of -- there's a lot of

7   dimensions to that extrapolation.

8           THE COURT:  Okay.  Great.  Thank you.

9           MR. CAINTIC:  Thank you.

10          THE COURT:  All right.  Anything more?

11          MR. CONNETT:  Yes, Your Honor, but I don't know if you

12   have a preference for --

13          THE COURT:  Then we should take the break because

14   we've gone way past the time to give everybody a break.  We'll

15   take our 15-minute break.  Thank you.

16          THE CLERK:  Court is in recess.

17      (Recess taken at 10:43 a.m.)

18      (Proceedings resumed at 11:04 a.m.)

19          THE COURT:  Okay.  Recross.

20          MR. CONNETT:  Shall I proceed?

21          THE COURT:  Yes, you may.

22                    **RECROSS-EXAMINATION**

23   BY MR. CONNETT:

24   **Q.**   Dr. Savitz, I'd like you to turn back to the Risk Sciences

25   International Report, which is at Trial Exhibit 129.  I want to

SAVITZ - RECROSS / CONNETT

1    direct your attention to page 26.

2        Do you see the statement here on your screen?

3    **A.**   Yes, I do.

4    **Q.**   So for the point of departure that the Risk Sciences

5    International team ultimately used, which was moderate -- was

6    for moderate dental fluorosis, right?

7    **A.**   That's what it says there, yes.

8    **Q.**   And they based that point of departure on a study from

9    1942, correct?

10   **A.**   That's correct, yes.

11   **Q.**   That's the Dean 1942 study?

12   **A.**   Yes.

13   **Q.**   Did you read that study?

14   **A.**   No.

15   **Q.**   Dr. Savitz, are you aware that fluoride exposures during

16   infancy as a result of formula feeding a baby with fluoridated

17   drinking water is a major cause of dental fluorosis?

18   **A.**   And I don't know that to be the case.  I'm not an expert

19   on the dental fluorosis.

20   **Q.**   Are you aware that the prevalence of formula feeding a

21   baby with tap water has changed quite dramatically in the

22   United States over the past 100 years?

23   **A.**   I'm certainly aware that there have been periods where

24   breastfeeding has been more and less popular, if you will, as a

25   infant-feeding practice, and there's certainly been a push to

1  increase breastfeeding for public health benefit for quite some

2  time.

3  **Q.**  Are you aware that the Dean 1942 study had very few

4  children who had been formula fed with fluoridated tap water?

5        **MR. CAINTIC:**  Objection, foundation.  He just said he

6  didn't read the study.

7        **THE COURT:**  Sustained.

8  **BY MR. CONNETT:**

9  **Q.**  Are you aware, Dr. Savitz, of the racial composition of

10  the Dean 1942 study?

11        **MR. CAINTIC:**  Same objection.

12        **THE COURT:**  Overruled.  He can ask if he's aware.

13        **THE WITNESS:**  I'm not.

14  **BY MR. CONNETT:**

15  **Q.**  Are you aware of what measures, if any, the Dean 1942

16  study took to ensure that susceptible members of the population

17  were included in the study?

18        **MR. CAINTIC:**  Same objection.

19        **THE COURT:**  Overruled.

20        **THE WITNESS:**  Again, I am not aware of the details of

21  the Dean study.

22  **BY MR. CONNETT:**

23  **Q.**  So let's move on.

24        And you were asked a few questions related to this dose

25  range between one and two parts per million.  Do you recall

1  that?

2  **A.**    Yes, I do.

3  **Q.**    Okay.  So I have up here on the screen the NTP's May 2022

4  Monograph, which is Exhibit 67 and I'd like to direct your

5  attention to Table 6.  Do you see that on your screen?

6  **A.**    Yes, I do.

7  **Q.**    Now, are you aware that Table 6 is the table which sets

8  forth what NTP has identified as the high-quality study?

9  **A.**    Yes, I am.

10  **Q.**    Okay.  So let's look at the study that's on the first page

11  of the table.  And you see there's a study by Ding, et al.

12  2011?

13  **A.**    Yes, I do.

14  **Q.**    That study looked at 331 children?

15  **A.**    Yes, that's correct.

16  **Q.**    In China, right?

17  **A.**    Yes.

18  **Q.**    And the mean urinary fluoride level was 1.31, correct?

19  **A.**    That's -- let me just see where.  I'm looking for that.

20  **Q.**    For the mean -- sorry.  Let me -- I apologize, Dr. Savitz.

21  Let me ask the question again.

22       The mean drinking water level in the study was 1.31

23  milligrams per liter, right?

24  **A.**    That's what the table indicates, yes.

25  **Q.**    And the NTP states that this study found that for each one

1  milligram per liter increase in the children's urinary fluoride

2  content, there was a significant decrease in the IQ score,

3  correct?

4  **A.**   That's correct, yes.

5  **Q.**   And Dr. Savitz, you have not read this study, correct?

6  **A.**   You know, again, I looked at a sampling of them.  I've

7  certainly not read it in detail.  I may have skimmed it.  I

8  can't recall.

9  **Q.**   Fair to say that as you sit here today, you could not tell

10  the Court that you read that study?

11  **A.**   That's correct.

12  **Q.**   So let's move to the next page of the table.  And you see

13  there's a study by Cui, et al. 2018?

14  **A.**   Yes, I do.

15  **Q.**   And the median urinary fluoride levels in the children was

16  1.2 for the boys and 1.3 for the girls, right?

17  **A.**   That's what it indicates, yes.

18  **Q.**   And -- oh.  I might have switched that up.  It's 1.3 for

19  the boys, 1.2 for the girls.

20  **A.**   That's correct.

21  **Q.**   Okay.  And the NTP identifies this study as showing a

22  significant association between IQ score and log transformed

23  urinary fluoride, right?

24  **A.**   That's what it says, yes.

25  **Q.**   So this study is in that sweet spot between 1 and 2,

SAVITZ - RECROSS / CONNETT

1   right?

2   **A.**   Right.  I mean, it's -- they're in the exposure range.  I

3   know there are a handful of those studies that are, but I

4   don't -- again, I might disagree on whether those are

5   high-quality studies in terms of providing a convincing case

6   that in that range there are adverse effects, but yes, they are

7   definitely in that range.

8   **Q.**   And you did not read this study, correct?

9   **A.**   Again, not to the best of my recollection.

10  **Q.**   Okay.

11       So let's move to the next page of the table.  And you

12  see -- well, it might not be the next page, but let's move

13  further down the table.  And you see there's a study by Wang,

14  et al. 2020?

15  **A.**   Yes, I do.

16  **Q.**   And this study looked at a population that had an average

17  urinary fluoride content of 1.28 milligrams per liter?

18  **A.**   Right.  Children's urine it says there.  I think it was

19  children's urine, I think that's what that means is 1.28, and

20  the drinking water is 1.39.

21  **Q.**   Okay.  And this study looked at a population of 571

22  children?

23  **A.**   That's correct, yes.

24  **Q.**   And the NTP states here that the study found significant

25  association between IQ and water and urinary fluoride

1    concentrations in boys and girls combined based on both

2    quartiles and continuous measures?

3    **A.**    That's what it indicates, yes.

4    **Q.**    And you have not read the Wang 2020 study, correct?

5    **A.**    Correct.

6            **MR. CONNETT:**  No further questions, Your Honor.

7            **THE COURT:**  Okay.  Thank you.  Anything else?

8            **MR. CAINTIC:**  Nothing further, Your Honor.

9            **THE COURT:**  All right.  Thank you, Dr. Savitz.   I

10   think that concludes your testimony.  You may step down.

11   You're excused.  Thank you.

12           **THE WITNESS:**  Thank you.

13       (Witness excused.)

14           **THE COURT:**  Okay.  Next witness for the government.

15           **MR. CAINTIC:**  Your Honor, at this time EPA moves into

16   evidence the video of Dr. Ibarluzea's deposition taken in this

17   case as Exhibit 134.  The video run-time is 2 hours and 21

18   minutes.  EPA's designations within the video are represented

19   in blue text and run for approximately 1 hour and 8 minutes,

20   and plaintiffs' designations are in yellow text and run for

21   approximately 1 hour and 12 minutes.

22           **THE COURT:**  Okay.

23           **MR. CONNETT:**  And, Your Honor, at this time plaintiffs

24   move to admit the next-in-line exhibit number, which I'm --

25   plaintiffs move to admit as Exhibit 135 an email that was the

1  subject of some discussion at the pretrial hearing that

2  plaintiffs are moving to admit for purposes of impeachment.

3  And I will identify for the Court the respective page/lines of

4  the deposition that it is responsive to.

5       And the respective portions of the deposition that the

6  email is responsive to is from page 58, line 24 to page 62,

7  line 4 of the deposition.  Now, the pagination is a little

8  different in the amended appendix C to the pretrial statement.

9  The pagination there, Your Honor, is -- can be found on pages 7

10 and 8.

11      **MR. CAINTIC:**  And as long as the email is not the

12 redacted copy, it's the unredacted version that we provided to

13 counsel, we have no objection to that.

14      **THE COURT:**  Okay.

15      **MR. CONNETT:**  And that is correct, Your Honor.  We

16 are -- we are admitting the unredacted copy.

17      **THE COURT:**  All right.  It is so admitted.  Thank you.

18      **MR. ADKINS:**  EPA calls Dr. Stan Barone.

19      **THE COURT:**  All right.

20      **THE CLERK:**  Please raise your right hand.

21   (Witness sworn.)

22      **THE WITNESS:**  Yes, I do.

23      **THE CLERK:**  Thank you.  Please have a seat.

24      Please speak clearly into the microphone, and spell

25 your first and last name for the record.

```
 1              THE WITNESS:  Stanley Barone, S-T-A-N-L-E-Y, Barone,

 2   B-A-R-O-N-E, junior, J-R.

 3              THE COURT:  Thank you, Dr. Barone.  Welcome back.

 4         And you may proceed.

 5              MR. ADKINS:  Thank you, Your Honor.

 6         Mr. Hambrick, could you please put up Exhibit 651 on

 7   the screen.

 8                        STANLEY BARONE,

 9   called as a witness for the Defendant, having been duly sworn,

10   testified as follows:

11                      DIRECT EXAMINATION

12   BY MR. ADKINS:

13   Q.   Dr. Barone, do you see Exhibit 651?

14   A.   I do.

15   Q.   Is this a copy of your CV?

16   A.   It is a slightly older version, yes.

17              MR. ADKINS:  Okay.  Mr. Hambrick, could you take us to

18   page 6, please.

19   BY MR. ADKINS:

20   Q.   Now, Dr. Barone, I see a number of medals, bronze medals

21   listed in your CV.  Can you explain for the Court what those

22   represent?

23   A.   Yes.  I've actually received a number of bronze medals.

24   And the list here on this particular page and to the next page

25   actually address bronze medals for all of the first ten risk
```

1  evaluations done under the Lautenberg context.

2      I also received bronze medals and other awards for

3  assessments, TSCA assessments, prior to Lautenberg passing and

4  gold medals as well.

5  **Q.**   You were a semi-finalist for the Samuel J. Heymen Service

6  to America Award; is that correct?

7  **A.**   I was.

8  **Q.**   What is that distinction?

9  **A.**   Again, this is for service in risk assessment and the risk

10  assessment arena and developing methods approaches for risk

11  assessment for EPA.

12  **Q.**   Are there any recognitions that you received that are not

13  reflected in your CV?

14  **A.**   Yes.  Recently I received a gold medal award for our

15  national testing strategy for PFAS chemicals.  That's in

16  addition to the gold medal for trichlorethylene assessment,

17  hazard assessment and the perchloroethylene hazard assessment.

18  **Q.**   And Dr. Barone, we detailed your employment history when

19  you were testifying as a representative for the Environmental

20  Protection Agency earlier in this trial, but I just want to

21  recap at a very high level your work history.

22      About how much of your 30-year career at EPA have you

23  focused on risk assessment?

24  **A.**   Actually, about 20 years.

25  **Q.**   And Dr. Barone, do you consider yourself to be a

1  toxicologist?

2  **A.**   Yes, I do.

3  **Q.**   Do you have a Ph.D. in toxicology?

4  **A.**   I do not have a Ph.D. in toxicology.  I have a Ph.D. in

5  neurobiology and developmental neurobiology, but most of my

6  postgraduate work was in neurotoxicology and specifically

7  developmental neurotoxicology.

8  **Q.**   Have you published any scientific articles, Dr. Barone?

9  **A.**   Yes, I have.  I have over 75 peer-reviewed papers, book

10  chapters and proceedings.

11  **Q.**   Now, what subjects have you published scientific articles,

12  book chapters, reviews?

13  **A.**   On basic neurobiology, on developmental neurotoxicology,

14  on risk assessment methods, on biomarkers and use of biomarkers

15  in assessments.  Those are the main areas.

16  **Q.**   Now, in this case you were asked to evaluate the weight of

17  the scientific evidence of potential associations with fluoride

18  exposure, correct?

19  **A.**   I was.

20  **Q.**   And you were also asked to respond to the opinions that

21  were offered by doctors Grandjean and Dr. Thiessen, correct?

22  **A.**   Yes.

23  **Q.**   Now, before we get into your opinions, I would like to

24  just ask you some questions about your experience in fluoride,

25  okay?

BARONE - DIRECT / ADKINS

```
 1   A.   Sure.
 2   Q.   Before working on this case have you been involved in any
 3   regulatory actions involving fluoride?
 4   A.   No, I had not.
 5   Q.   Before your work in this case have you been involved in
 6   any literature reviews of fluoride research?
 7   A.   No, I had not.
 8   Q.   Have you been involved in any hazard assessments of
 9   fluoride?
10   A.   I had not.
11   Q.   Have you been involved in any exposure assessments of
12   fluoride?
13   A.   I had not.
14   Q.   Before your work on this case, have you conducted any
15   studies on fluoride?
16   A.   No.  No studies directly in my laboratory when I had a
17   laboratory.
18   Q.   Now, Dr. Barone, why should the Court listen to your
19   opinions on the weight of the scientific evidence of fluoride
20   today?
21   A.   Well, I have experience in risk assessment.  I have
22   experience in developmental neurotoxicology.  I have
23   substantial experience also from my master's and from my EPA
24   work in endocrine disruption and the endocrine disruption
25   screening program is a program that I resolved for several
```

1   years, so I think I can speak to the criteria for evaluating an

2   endocrine disrupter, both estrogenic, androgenic and thyroid

3   hormone disrupting chemicals.

4   Q.   For any of the first ten risk evaluations that you were a

5   coauthor on at EPA, had you had substantive expertise in those

6   particular chemicals before beginning your work on the risk

7   evaluation?

8   A.   Yes, I did.  So as I said with my gold medals on the

9   hazard assessments for trichlorethylene and perchloroethylene,

10  I had significant experience on hazard assessment.

11       I'd also had significant experience prior to the passage

12  of the Lautenberg Act, risk assessment experience in our new

13  chemicals program, overseeing the new chemicals program, but

14  also the existing chemicals program under Section 6 where we

15  did a number of assessments prior to Lautenberg's passing that

16  were focused on 1-bromopropane, trichlorethylene, methylene

17  chloride and N-methylpyrrolidone.  And all four of those were

18  actually subsequently moved into the first ten risk evaluations

19  under TSCA reform.

20       The prior assessments were more limited on fewer

21  conditions of use than the risk evaluations under the reform

22  TSCA, which looked at a more comprehensive portfolio of

23  conditions of use for all of that -- all the conditions of use

24  that were identified.

25  Q.   For the risk evaluations that you worked on for which you

1  didn't have this prior experience in the chemical, did that

2  prevent you from conducting risk assessment?

3  **A.**   No, not at all.  Again, the experience with the

4  prioritization, experience with scoping and problem formulation

5  in forming the background for those assessments, identifying

6  that background, materials for that.  My experience with

7  systematic review and developing systematic review approaches

8  both for the IRIS program as well as efforts in TSCA and

9  applying systematic review principles to TSCA helped me and

10 helped my team -- my experience helped my team to adapt

11 approaches not just to hazard and human health hazard but

12 ecological hazard assessment and exposure assessment.

13 **Q.**   Okay.  So what I want to do with you today is walk through

14 how the evidence that you've observed throughout trial stacks

15 up at each phase of the risk evaluation that you talked about

16 during your 30(b)(6) testimony.

17       **MR. CONNETT:**  Your Honor, at this point I think it

18 might be helpful to get guidance from the Court on a concern

19 that I have, which is that there is obviously an obligation for

20 Dr. Barone's opinions to have been disclosed in this case, and

21 he certainly has opinions that have been disclosed.  I'm just

22 concerned about sort of a roving opinion where he's now

23 entitled to say anything, and I don't think that's allowed

24 under the rules.  We need to be able to expect that his

25 opinions have been disclosed.

1     **THE COURT:**  Well, without something specific, I'm not

2  sure what to make of your objection.  I haven't seen the -- is

3  there -- are you suggesting that his prior disclosures were

4  discrete enough that they -- that what's being asked is going

5  to substantially exceed that or what?

6     **MR. CONNETT:**  Well, my concern is based on the

7  statement that based on what you have heard throughout this

8  trial and that, like, there's -- if he heard something in this

9  trial that then formed a new opinion during the course of this

10  trial, I would submit that that's an undisclosed opinion.

11     If what he's about to testify to is consistent with

12  his opinions that have already been disclosed, obviously

13  there's no issue.  But I just wanted to flag it for the Court

14  because I'm just concerned about this language that Doctor --

15     **THE COURT:**  Well, I guess we'll just have to take the

16  objections one at a time.

17     And, Mr. Adkins, you'll have to be prepared to show me

18  where -- if you are asking him about new things that evolved

19  that he heard at trial, then I'll have to look at how that

20  compares with whatever was disclosed, so . . .

21     **MR. ADKINS:**  Sure.

22     And I'm happy to actually rephrase this question.

23  BY MR. ADKINS:

24  **Q.**   Dr. Barone, based on the testimony you heard from

25  Dr. Grandean and Dr. Thiessen, based on the testimony that you

1  heard from Dr. Savitz, what is your overall opinion on the

2  weight of the scientific evidence concerning exposure to

3  community water fluoridation?

4  **A.**    So again, listening to -- and I expressed this in my

5  deposition -- a lot of concern, as we move through hazard ID,

6  evidence integration and the weight of the scientific evidence

7  evaluation that -- and the systematic reviews that I reviewed

8  as well as the expert testimony that I reviewed from the first

9  trial and from the rebuttal of pretrial reports that there is a

10  lot of uncertainty with the epidemiological studies that have

11  been identified that are relevant to the condition of use of

12  this petition.  There's a lot of uncertainty from the NTP

13  report that I was given to review.  There's a lot of

14  uncertainty in much of the literature that I read and reviewed

15  in preparation for my report, my -- not my report, I didn't

16  have a report, but my summary and rebuttal in the prior

17  submissions.

18      So at this time I would have to agree, actually, with

19  Dr. Savitz' characterization that the evidence is weak, weak

20  and suggestive at lower doses.  And, again, doses below -- I

21  had said in my deposition doses below 2 milligrams per liter.

22  It's -- I even -- I have more doubts now than I did then after

23  listening to trial testimony and looking also at the newer data

24  that has come in from both the meta-analysis from NTP and the

25  meta-analysis from Dr. Grandean and other meta-analyses that

 1  have been published, Veneri, et al.

 2          **MR. ADKINS:**  Mr. Hambrick, could you please put up

 3  U.S. Demonstrative 3?

 4  **BY MR. ADKINS:**

 5  **Q.**    So, Dr. Barone, as I said, let's just march through each

 6  step of the risk evaluation process starting with the hazard

 7  assessment, okay?

 8          What is the -- and, in particular, I want to start with

 9  the hazard identification.  I want to try to do this as

10  methodologically and methodically as we can.  What was the

11  evidence of hazard -- or what is the evidence of hazard

12  identification as it concerns this condition of use?

13  **A.**    So a lot of the evidence for hazard identification really

14  comes from our systematic review efforts that have been

15  reviewed in this case.  And we primarily focused on the NTP's

16  systematic review, which has a literature cutoff date of April

17  2021.  That's a limitation, but I think testimony in the trial

18  has brought out additional evidence, additional studies, key

19  studies that have been identified as important for evaluating

20  hazard ID.

21          And again, the hazard ID step focuses on gathering the

22  information in an unbiased and objective way, screening it with

23  objective criteria and then data evaluation of quality of the

24  individual studies.  That's hazard ID.  And then we move on

25  from the studies that are identified of high quality or medium

BARONE - DIRECT / ADKINS

1  quality into our evidence integration and weight of scientific

2  evidence analysis.

3  **Q.**   Okay.  Well, let's not get there yet.  I want to make sure

4  we round this --

5  **A.**   Sure.

6  **Q.**   -- out for hazard identification.

7       One of the things we heard from you last week was that the

8  agency confirms potential hazards.

9       Using -- based on the evidence that you've seen from

10  Dr. Grandean and Thiessen and Dr. Savitz, have you been able to

11  confirm particular hazards?

12  **A.**   I think there's a lot of evidence for a number of hazards

13  that were identified both in -- to some extent in the NTP

14  report and beyond for neurotoxicity with both the animal

15  evidence, the mechanistic evidence and the epidemiological

16  evidence.  So those are the three lines of evidence that have

17  been evaluated in the NTP report and other systematic reviews.

18  **Q.**   Do you agree that IQ detriments are a potential hazard of

19  fluoride exposure?

20  **A.**   I believe IQ decrements or IQ as a domain, cognitive

21  domain, is an important one to look at, and questions have been

22  raised about IQ decrements in a number of studies.

23  **Q.**   In your opinion, Dr. Barone, are behavioral symptoms, like

24  ADHD, a potential hazard of fluoride exposure?

25  **A.**   I think neurobehavioral consequences of fluoride exposure

 1  are a potential hazard and have been reviewed by the NTP, and

 2  I've also reviewed specific studies related to ADHD and autism

 3  spectrum disorder.  At this time I do not think the evidence

 4  rises to a level of hazard ID even for those particular

 5  studies.  I think it's too -- too weak at this point.

 6  **Q.**  Okay.  So let's move on to weight of the scientific

 7  evidence.

 8      What is your opinion, Dr. Barone, regarding the weight of

 9  the scientific evidence?

10  **A.**  So this time I think the weight of the scientific

11  evidence, particularly when we're looking at the biological

12  gradient, is highly uncertain when we look at the lower-dose

13  studies.

14      I think at the higher-dose studies, there's more

15  consistency in findings across the higher-dose studies.  And

16  I'm talking about above the 2 milligram per liter range and

17  probably above that.  But, again, that's putting things into

18  bins and qualitatively looking at what's relevant to the

19  petition along the biological gradient.

20      I think there's conflicting evidence, conflicting evidence

21  about temporality and specificity with regard to developmental

22  neurotoxicity whether it -- most of the evidence seems to

23  indicate that a critical period might be prenatal.  Some

24  evidence indicates it might be postnatal.  It's not conclusive

25  for the postnatal period.

**BARONE - DIRECT / ADKINS**

1   Again, the issue of specificity with regard to sex

2   differences is also inconclusive, so I think the consistency

3   and coherence of the data along the biological gradient is

4   somewhat in doubt.

5   So I do not believe we have -- we do not have substantial

6   evidence from the weight of the scientific evidence analysis in

7   going through the Hill considerations for -- for basically

8   carrying forward to dose response.

9   **THE COURT:**  Are you referring to the low-dose domain

10   or range or --

11   **THE WITNESS:**  Yes, sir.

12   **THE COURT:**  Yeah.

13   **THE WITNESS:**  Yes, sir.

14   And so you can carry things forward for screening and

15   for approximation in a hypothesis setting and so on; but, for

16   risk assessment at this point, I feel like it's highly

17   uncertain, and it's not defensible for actual risks, so that

18   sort of leads into dose response.

19   **BY MR. ADKINS:**

20   **Q.**   So I want to focus on a couple of the components of the

21   Bradford Hill criteria that you mentioned.  One is consistency.

22   That's one of these components, correct?

23   **A.**   It is.

24   **Q.**   And what, in particular, is your opinion on the

25   consistency of the evidence?

1          **MR. CONNETT:**  I don't mean to interrupt, but

2    Dr. Barone's opinions in this case, in his disclosed opinions,

3    were focused on the less than 1.5 ppm range, so a lot of these

4    questions are going beyond that, which in some instances may be

5    fair.  I'm just concerned that we have potentially -- the

6    questions are inviting undisclosed opinions.

7          **THE COURT:**  Well, one thing to do is clarify because

8    there seems to be a difference in range here, so maybe you

9    should make sure your questions are -- make the predicate of

10   your questions clear.  Are we talking about generally or within

11   the range of -- I don't know if it's 1.5 or 2 or what.

12         **MR. ADKINS:**  I'm happy to do that, Your Honor.  I

13   mean, I'm not sure I agree with the representation that

14   Dr. Barone's opinions were -- the disclosed opinions were

15   limited to 1.5, but maybe I could just ask Dr. Barone now.

16   **BY MR. ADKINS:**

17   **Q.**   In terms of the opinions that you're offering in this

18   case, what was the exposure range that you considered?

19   **A.**   I actually considered a very broad range of exposure.  I

20   considered the higher-dose studies above 2 milligrams per

21   kilogram, some of the studies actually that were brought up in

22   the -- in the cross of Dr. Savitz a few minutes ago, but I did

23   try to focus a lot of attention on the less than 2 milligrams

24   per liter studies for consistency and coherence because that's

25   at least the biological gradient most relevant to the

BARONE - DIRECT / ADKINS

1   consideration of the petition's developmental neurotoxicity

2   claim.

3   **Q.**   Dr. Barone, what was -- what is your opinion on the

4   consistency of the evidence you considered?

5   **A.**   So again, I thought the exhibit that was presented

6   previously to Dr. Savitz is fairly compelling.  I think looking

7   at the newer data -- first off, the inconsistency both within

8   studies is something to pay attention to, and we oftentimes

9   examine, particularly for epidemiological studies, we want to

10  know are we seeing the same kinds of effects across studies

11  from the same cohort.  And in some cases -- Dr. Savitz has

12  already spoken to this -- in some cases for the same cohort we

13  see what might appear to be inconsistencies across publications

14  for the same cohort.

15      With regard to prenatal or postnatal effects, whether it's

16  related to effects with water, fluoride -- milligrams per liter

17  water concentration in association with effects or whether it's

18  related to urinary biomarkers in association with effects.  So

19  those are some of the inconsistencies that you have to grapple

20  with within studies.  And then bigger is the consistency and

21  cohesion across studies.

22      When you look across these longitudinal cohorts of similar

23  design, looking at similar outcomes, ala IQ or measures of

24  cognitive performance with different metrics, there are

25  differences that have been observed.  They're quite

1  substantial.  And the sex differences observed in at least the

2  Canadian cohort are not seen in the Mexico City cohort, so

3  that's also hard to reconcile, not a good explanation for the

4  differences in findings with the Odense cohort, no effect

5  observed in the Odense cohort in the low-dose range is also

6  part of the evaluation of consistency.  And then the

7  counterfactual evidence from the -- for the null effects in the

8  INMA -- the Basque cohort is also part of the evidence that I

9  considered in the weight of the scientific evidence.

10       So taking it altogether and looking at a gestalt of those

11  four different longitudinal cohorts looking at urinary

12  biomarkers trying to compare like to like gives me a lot of

13  pause, gives me a sort of weight of the scientific evidence

14  opinion that we do not yet have a firm or established

15  scientific basis for dose response.

16  Q.  Does your opinion on the consistency and the coherence of

17  the evidence impact your view of the strength of a potential

18  association between fluoride exposure at the ranges you

19  considered and IQ outcomes in the children?

20           MR. CONNETT:  Overbroad.  Vague.

21           THE COURT:  Overruled.

22           THE WITNESS:  So it does.  Again, taking like studies

23  together and not having to do a means difference analysis and

24  other meta-analysis approaches is advantageous.

25           But I also consider the NTP's meta-analysis and

1    reviews in my opinion.  And so all of that together, taking

2    that evidence together, not just the four cohorts with a

3    low-dose of measurement and consistent designs but looking

4    beyond for -- with the implications for other meta-analysis

5    approach informs my opinion.

6    **BY MR. ADKINS:**

7    **Q.**   Dr. Barone, did you consider any experimental animal

8    studies in forming your opinion in this case?

9    **A.**   I did.  And I did look at the NTP review of the animal

10   evidence.  I did look at specific -- specific studies, but I

11   really came to very quickly the opinion that the developmental

12   neurotox battery study that NTP performed, which was mentioned

13   earlier as the McPherson 2018, et al. study, was the most

14   comprehensive looking at both cognitive learning and memory

15   tests, looking at neuropathology, looking at other behavioral

16   measures.  That was -- that was probably the most comprehensive

17   of all the animal tests that I think have been -- has been done

18   to date.  And again, looking at the concentration response in

19   that study the way it was designed to be informative for risk,

20   I believe the no effect finding in that overall study is quite

21   important.

22   **Q.**   And finally, do you have an opinion on whether the

23   evidence of a potential disruption in thyroid function is

24   sufficient for a hazard assessment?

25   **A.**   So -- I do.  As a risk assessor who has a good deal of

BARONE - DIRECT / ADKINS

1  familiarity with endocrine disruption, I think thyroid hormone

2  is one of the critical effects that we consider in our risk

3  assessments.  And I've already spoken to this in our analysis

4  of HBCD, hexabromocyclododecane risk evaluation HBCD.  So in

5  that particular assessment, the most critical -- the most

6  sensitive effect and critical effect that we used was thyroid

7  hormone -- decreases in thyroid hormone in pregnant animals,

8  the rodents, the mothers of offspring and the concerns about

9  developmental -- adverse developmental outcomes in the

10  offspring.  So I do have a good bit of experience in evaluating

11  that kind of data.  I'll stop there.

12        MR. ADKINS:  Okay.  And, Your Honor, I'd like to move

13  to the dose-response assessment.

14        THE COURT:  So but I didn't hear a conclusion.

15        THE WITNESS:  So for -- I thought there might be

16  another question.

17        THE COURT:  I thought so too.  That was a predicate --

18        MR. ADKINS:  And I thought I heard a conclusion, so --

19        THE WITNESS:  Well, what you heard from me was a

20  summary of being able to assess the evidence based upon

21  fluoride hormone disruption.  If you're asking me the question

22  about assessing fluoride and thyroid hormone disruption, I have

23  an opinion.

24  BY MR. ADKINS:

25  Q.   What is your opinion of the weight of the scientific

BARONE - DIRECT / ADKINS

1  evidence on thyroid disruption from fluoride exposure?

2  **A.**   So again, looking at a number of papers, I think

3  Dr. Lanphear's testimony and Dr. Lanphear's actual papers on

4  this subject associate -- tend to associate water intake levels

5  with thyroid hormone disruption.  I think the concerns -- I

6  have significant concerns about the epidemiological findings

7  based upon only being observed -- significant effects only

8  being observed in sub cohort that were self-identified with

9  prior thyroid dysfunction, the moms with prior thyroid

10  dysfunction and that not being controlled for by location or

11  moving or any temporal nature makes those particular findings

12  somewhat questionable.

13       I think there's some other findings -- other papers trying

14  to look at iodine deficiency.  There's a Chinese group that

15  looked at iodine deficiency and interactions with fluoride and

16  IQ with no particular findings at higher levels than what was

17  observed in the MIREC study.  So I think there's some

18  inconsistency.  I don't think the consistency across published

19  literature is very strong yet.  It's something that I think

20  should -- it's a research question, an important research

21  question, but from a risk assessment perspective I don't

22  believe the weight of the evidence is substantial or

23  substantiated for us to carry that forward into the risk

24  derivation -- into dose response.

25  **Q.**   Dr. Barone, are there any other opinions you have on the

1  weight of the scientific evidence that we haven't covered yet?

2  **A.**   Again, I -- this issue of prenatal I think is probably the

3  focus of most of the developmental neurotox concerns.  I'm not

4  going to say that postnatal is not of concern, but I think the

5  evidence is even weaker for postnatal concerns and associating

6  postnatal biomarkers to outcomes.  And that's -- that's, again,

7  a research question; it's not a risk assessment issue yet.

8  **Q.**   So moving to the dose-response assessment --

9  **A.**   Sure.

10 **Q.**   -- Dr. Barone, what is your opinion of the dose-response

11 assessment evidence presented?

12 **A.**   So I raised --

13     **MR. CONNETT:**  Your Honor, this is another example.  I

14 mean, it's one thing to say, "What's your disclosed opinion,"

15 but then to say, "What's your opinion about the evidence on

16 dose-response you've heard in this trial"; I now have to

17 respond to an ever-expanding opinion.

18     **THE COURT:**  Well, let's narrow the question first --

19     **MR. ADKINS:**  Sure.

20     **THE COURT:**  -- and let's see where we're at.

21     **MR. ADKINS:**  But, Your Honor, I mean, if this keeps --

22 Dr. Barone disclosed a rebuttal opinion to Dr. Grandean.

23 Dr. Grandean disclosed a dose-response assessment.

24     I'm not sure what the disclosure issue is here,

25 counsel.

1        **MR. CONNETT:**  That's fair, Your Honor, but the problem

2   I have is he's not saying what is your opinion on this, in

3   which case I have a metric to go against, which is the

4   disclosed opinion.  But when he's asking what's your opinion of

5   the testimony you've heard in this case, now he's expanding it

6   beyond --

7        **THE COURT:**  Well, let's get specific about his opinion

8   on what testimony because that was an open-ended question.

9   Let's take it one piece at a time.

10  **BY MR. ADKINS:**

11  **Q.**   Dr. Barone, do you have an opinion on -- not talking about

12  the subject of your opinion, but do you have an opinion on the

13  evidence that's been presented concerning dose-response?

14  **A.**   Yes, I do.

15       **MR. CONNETT:**  Same objection.

16       **THE WITNESS:**  I do.

17  **BY MR. ADKINS:**

18  **Q.**   And what -- before you tell us your opinion, what is your

19  opinion based upon, Dr. Barone?

20  **A.**   So my opinion is based upon reviewing Dr. Grandean's

21  report, expert report, and Dr. Thiessen's expert report and

22  also Dr. -- both of Dr. Grandean's papers that were discussed

23  previously during the trial.

24  **Q.**   Dr. Barone, what is your opinion of the evidence that you

25  consider for dose-response assessment?

BARONE - DIRECT / ADKINS

**A.**    So one other thing that I considered as it relates to dose response was, of course, the meta -- NTP's meta-analysis and the scope of their meta-analysis as well.  So all those things going into my -- formulating my opinion.  I think there have been some very -- there's been some very elegant work done -- let me say the positive first -- looking at dose response and creating -- generating hypotheses, which I think is important. But, as I said before just because you can mathematically derive a dose response does not mean that we should be using those particular points of departure for risk.  It's really predicated on the strength of the evidence for the specific PODs that are derived.

I think Dr. Grandean presented some specificity in the dose response.  I commented previously in trial some of my concerns about dose response, that is, dose response work and particularly benchmark dose analysis that is not supported by different model-fitting exercises.

And NTP, of course, looked at differently model fits with the data that they evaluated at the time they did their evaluation, which did not include all the cohorts that we have been discussing, particularly the Odense cohort or the INMA cohort data.

So the BSC criticism, the Board of Scientific Counselors working group reviewed their response to the National Academy's comments and raised issues with their -- with their looking at

1    model fit and looking at the determination of a threshold and

2    their basic response was, we looked at other model fits, but

3    linear seemed to be best.

4        When you look at the tables that are in the eTables for

5    NTP's report, my review of those tables -- and those have been

6    reviewed already at trial -- there are other model fits that

7    appear to be better than the linear model.

8        So I raised questions with regard to Dr. Grandean's

9    approach, 2020 approach and, again, the model fitting that was

10   provided for the alternative models.  It looked to me like

11   there was good evidence for using or good justification to use

12   an alternative model than the linear approach.  And the BMCL of

13   .2 to a BMCL with a nonlinear model of .78, substantially

14   different.  And saying that the similar model fits in

15   Dr. Grandean's model-fitting exercise in choosing the linear

16   approach because he was told to by the EPA I just didn't feel

17   was justified.

18       **MR. CONNETT:**  Your Honor, at this point I would ask

19   for proof from counsel that that opinion was disclosed.

20       **MR. ADKINS:**  Are you saying you have an objection to

21   the scope?

22       **MR. CONNETT:**  I do because that opinion -- it was

23   not -- that was not a disclosed opinion.  There was no

24   criticism in Dr. Barone's rebuttal report to Dr. Grandean that

25   examined the fit of the curve.

```
1              The word "linear" or "nonlinear," if you look at --
2    it's a brief discussion.  It's two paragraphs.  There's no
3    discussion of linear fit.
4              THE COURT:  Okay.  Let's -- let's -- counsel, why
5    don't you point out where in the report.
6              MR. ADKINS:  So, Your Honor, I'll just start with
7    Dr. Barone's rebuttal report, but I'd also like an opportunity
8    to look at his deposition transcript --
9              THE COURT:  Okay.
10             MR. ADKINS:  -- where I think this was also discussed,
11   but looking at --
12             THE COURT:  Is this 378-7 document?
13             MR. ADKINS:  I'd have to check with my staff because I
14   do not have the ECF number for --
15             THE COURT:  Filed December 22nd?
16             MR. ADKINS:  That sounds about right.
17             THE COURT:  Okay.
18             MR. ADKINS:  And it would be the rebuttal --
19             THE COURT:  Yep.
20             MR. ADKINS:  Well, first of all, Dr. Barone didn't
21   prepare a report because he is a non-retained expert.  He
22   prepared a summary of the facts that he would rely on in his
23   opinions.  But looking at the page that's stamped Barone 56 --
24             THE COURT:  Okay.
25             MR. ADKINS:  -- you'll see in the last paragraph
```

1  Dr. Barone explains that "The NTP draft meta-analysis authors

2  did not observe an obvious threshold, does not support

3  Dr. Thiessen's or Dr. Grandean's opinions.  Citing

4  Dr. Grandean's report that no threshold was observed was

5  because the draft meta-analysis authors used a linear model."

6        That's exactly what Dr. Barone just explained, that

7  there were questions about using a linear model and that's

8  informing his opinion about Dr. Grandean's BMCL.

9        **MR. CONNETT:**  Your Honor, that's a very distinct and

10 different opinion.  That is an assessment of the NTP's

11 dose-response analysis, and that was Dr. Barone's criticism

12 that Dr. Grandean and Dr. Thiessen were inappropriately relying

13 on the NTP dose-response analysis.  That's a different

14 question.

15       What Dr. Barone just opined on was Dr. Grandean's BMCL

16 analysis and whether a linear model was the appropriate fit.

17       There is nowhere in the rebuttal report where that

18 opinion is offered.

19       **THE COURT:**  All right.  So this seems to be -- and you

20 can tell from the subject title, Roman Numeral I, it's about

21 the draft monograph.  And then Roman Numeral II is about

22 Dr. Thiessen's failure to conduct a risk -- risk assessment for

23 relevant condition of use.

24       I don't see -- and page 5 there's a reference to

25 Dr. Grandean's BMCL not being reliable because it didn't

1  include the Ibarluzea 2022 results, but I don't see anything

2  about curve fitting.

3      **MR. ADKINS:**  Well, Your Honor, this is -- this is kind

4  of catching us on the fly here.  May I have a -- you know, just

5  a brief moment to go through Dr. Barone's transcript of his

6  deposition to point out the instances where Dr. Grandean's BMCL

7  was referred to and discussed by counsel?

8      **THE COURT:**  Okay.  Why don't we do this:  Why don't

9  you do that during a break.  Is there another area you can take

10  on right now --

11      **MR. ADKINS:**  Certainly.

12      **THE COURT:**  -- and we can do another ten minutes or so

13  and then we'll take a break?

14      **MR. ADKINS:**  That will be fine.

15      **MR. CONNETT:**  Just briefly, Your Honor, we would

16  obviously reserve our rights to strike that last testimony

17  subject to --

18      **THE COURT:**  I understand.  I'll let you move once we

19  figure out whether there's something in the deposition.

20  **BY MR. ADKINS:**

21  **Q.**  Okay.  So just focusing for a moment on the NTP

22  meta-analysis, Dr. Barone.  Did the meta-analysis consider the

23  INMA study?

24  **A.**  It did not.

25  **Q.**  Does that affect your opinion on the sufficiency of the

1  NTP meta-analysis to support a dose-response assessment?

2  **A.**   It does.  And that was part of what I referred to in my

3  report was, again, the literature cutoff date did not consider

4  the INMA study.  The INMA study was only considered in the

5  sensitivity analysis and other potential studies published

6  since 2021 were not included in the dose-response assessment

7  meta-analysis that NTP performed.

8  **Q.**   Does Dr. Grandean's -- either of Dr. Grandean's BMDs

9  consider the INMA study?

10  **A.**   No.  Others have testified to that already, including

11  Dr. Grandean.  I believe that there's equal -- at least from a

12  risk-of-bias and quality perspective they're on the same

13  footing as the NTP evaluated the INMA cohort study as a low

14  risk-of-bias study.

15  **Q.**   And Dr. Barone, what is the import of Dr. Grandean's

16  failure to include the INMA data in his BMCLs?

17  **A.**   So again, I agree with Dr. Savitz in his appraisal that

18  looking at all the data of a similar design and considering the

19  counterfactual evidence of the low risk-of-bias studies

20  together is a stronger and more supportable position for dose

21  response.

22       The presumed incorporation of the additional mother-child

23  cohorts in the meta-analysis would probably move the BMCL

24  closer to 1 or above 1 possibly.  But without actually doing

25  the analysis, I think it's still an open question.  And at

 1    least from a -- even from a sensitivity analysis perspective, I

 2    think it's an important follow-on for NTP if they were going to

 3    publish their meta-analysis work in a -- in a future journal

 4    publication.

 5    **Q.**   In your view was Dr. Grandean justified in excluding the

 6    INMA data from his BMD analysis?

 7    **A.**   Again, from reading his report and listening to his

 8    testimony, I did not hear a critical methodological flaw that

 9    did not have a substantial response.  Dr. Ibarluzea commented

10    and responded during his deposition to questions raised about

11    the cohort's -- the Basque cohort study.  I believe a lot of

12    those questions/issues were addressed.  I think Dr. Savitz has

13    also responded to much of that as well.

14         So I do not believe omitting the INMA cohort study or

15    consideration of the INMA cohort from the overall meta-analysis

16    because you don't like the results, that they're counterfactual

17    to your hypothesis or counter to your own findings is

18    particularly compelling reason for leaving them out of the

19    benchmark dose analysis.

20    **Q.**   Dr. Barone, what is your overall opinion based on the

21    evidence you considered of the hazard characterization?

22    **A.**   So for the hazard characterization, we really have to take

23    into account the strength of the evidence and summarize both

24    quantitatively and qualitatively what we have as far as hazard.

25    And one of the real critical aspects of what I received and

1  what I reviewed, both in the first trial and what I received in

2  the expert reports to review and what I disclosed was, you

3  know, we still do not have a risk assessment, we do not have a

4  hazard assessment, there was not a quantitative dose response,

5  a complete quantitative dose response done, taking into account

6  all the critical studies, and the qualitative description was

7  not thorough as well.

8  Q.   So we'll put a pin in coming back to this model in

9  question, but why don't we move on to the exposure assessment.

10        MR. ADKINS:   So Mr. Hambrick, could you put on the

11  screen U.S. Demonstrative 4, please?

12  BY MR. ADKINS:

13  Q.   Do you see that demonstrative, Dr. Barone?

14  A.   Yes, I do.

15  Q.   Okay.  So this is the breakdown of the exposure assessment

16  under EPA's risk evaluation framework correct?

17  A.   It is.

18  Q.   Now, what is your opinion of the evidence of exposure?

19  A.   So there's been a lot of discussion of exposure along this

20  continuum of an exposure assessment, and I know the Court has

21  asked questions about that.  I think it's been somewhat

22  confusing because what has been mentioned has been mostly about

23  water intake levels or water levels, water concentration

24  levels.  And then we've talked about the internal biometrics

25  ala urinary levels.  And some people have misrepresented

 1   urinary levels as an exposure metric.  It's actually not the

 2   exposure metric.  It's the concentration -- hazard

 3   concentration metric.  So that's separate from exposure.

 4        The exposure, at least the way we think about exposure

 5   when we're talking about a risk assessment, is identifying the

 6   exposure pathways, sources and the media that's most important

 7   for the conditions of use.

 8        And we want to define by condition of use what is that

 9   concentration and specifically here, for this condition of use,

10   the water fluoride levels.  We want to identify what is the

11   relevant population.  Are we talking about the mother-child

12   maternal unit -- maternal-fetal unit, or are we talking about

13   children and children's ingestion in formula, or are we talking

14   about adults?  Those are all very different exposure

15   assessments, and we need to be able generally to describe all

16   of those.

17        There's been some mention of occupational exposures as

18   well in some of the trial testimony.  That's important, but I

19   don't think that was really part of the petition specifically

20   and the concern specifically raised about children and IQ.

21   Q.   In your -- did you have a -- were you continuing?

22   A.   I was going to go to exposure level, but I'll wait for a

23   question.

24   Q.   Okay.  So in your opinion, Dr. Barone, has plaintiff's

25   risk assessor, Dr. Thiessen, performed an exposure assessment

 1   to support a risk determination?

 2   **A.**   There's some elements of an exposure assessment in her

 3   report, but there's a lack of transparency and clarity of what

 4   Monte Carlo model did she use it, how did she use it, is it

 5   available, what did she do.  It was only I think through the

 6   deposition process that we even found out that there was a

 7   Monte Carlo analysis used in generation of some of the curves

 8   that were presented in her report, so I was -- when I read the

 9   report, I was very confused until after I read -- read her

10   post -- her last deposition to get some clarity.

11        Still, from what I understand, there is not a full

12   exposure assessment has been provided looking at Dr. Thiessen's

13   Trial 1 testimony and report and looking at Trial 2 testimony

14   and report.  There's not a thorough exposure assessment that

15   has been done for the condition of use and the different sub

16   populations within that condition of use.

17   **Q.**   Is 0.7 milligram per liter the recommended concentration

18   of fluoride for communities that choose to fluoridate their

19   water, is that a media concentration, an intake level, an

20   exposure level or something else?

21   **A.**   0.7 is a media concentration, a nominal media

22   concentration.  It is not the actual exposure level for the

23   condition of use.  We have to go a little bit farther and be

24   more descriptive about what population we're actually focusing

25   on for .7 milligrams per liter.

**BARONE - DIRECT / ADKINS**

 1        And again, as I said before in my first testimony here at

 2   trial, we need to consider what the intake rate is and liters

 3   per day is the intake rate units that we usually consider.

 4        We need to also consider the size of the individual, what

 5   is the dilution of that total intake and that media

 6   concentration within what size body.  And that's a -- that's

 7   substantially different across the population whether we're

 8   talking about infants, whether we're talking about pregnant

 9   women or whether we're talking about general population.

10        **MR. ADKINS:**  Your Honor, I'm happy to continue on.

11   I'm about to move into risk characterization.

12        **THE COURT:**  Okay.  Why don't we go ahead and take our

13   break and then you can look at that scope question.  Okay?

14        **MR. ADKINS:**  Thank you.

15        **THE COURT:**  Thank you.

16        **THE CLERK:**  Court is in recess.

17        (Recess taken at 12:09 p.m.)

18        (Proceedings resumed at 12:31.m.)

19        **THE COURT:**  Okay.  Now, the issue about the scope

20   question?

21        **MR. ADKINS:**  Yes.  Thank you for that bit of time,

22   Your Honor, I'm ready to address that.

23        **THE COURT:**  Okay.

24        **MR. ADKINS:**  So to preface all of this, as I had

25   started to say before, Dr. Barone provided a summary of the

 1   facts and the opinions that he was intending to testify about,

 2   and that's distinct from a expert report, which is a complete

 3   statement of all the facts and opinions and the bases for them.

 4   So that's just kind of at a high level way to think about this.

 5          I want to go back to the expert report provision and

 6   give some more explanation to that, and then I want to take

 7   Your Honor to a couple of the pages from his deposition

 8   transcript that I think will clarify all this.

 9          So looking at Dr. Barone's rebuttal summary, this is

10   the page that ends in Bates stamp 56.  Dr. Barone said that the

11   obvious threshold does not support Dr. Thiessen's or

12   Dr. Grandean's opinions, and he provided a citation to

13   Dr. Grandean's report, page 15.

14          Now, that is the section that starts explaining

15   Dr. Grandean's BMCL calculations in his report.

16          The summary goes on to talk about the fit of the

17   linear term in the NTP meta-analysis and the BSC working

18   group's comments on that, consistent with how Dr. Barone just

19   testified today, how that informed his opinion of

20   Dr. Grandean's BMCL and then it closes -- and this is back in

21   Dr. Barone's report -- "In his opinion there is sufficient data

22   in the low-dose range of exposure that's relevant to whether

23   community water fluoridation is a hazard."

24          Also consistent with how he testified today and how

25   that information from the meta-analysis is informing his

1   analysis of Dr. Grandean's BMCL, which, by the way, Dr. Barone

2   refers to throughout his expert summary.  This isn't just news

3   that he was going to have an opinion on this BMCL.

4          So looking -- unless Your Honor has questions about

5   that, I would like to go to the deposition pages.

6          **THE COURT:**  Well, are you arguing that because of his

7   critique generally about the presumption of using a linear

8   model without exploring the others that that same defect sort

9   of affects Dr. Grandean's analysis and that should have been

10  sort of foreseen by opposing counsel or -- because there's

11  still not a critique of the model-fitting problem with

12  Dr. Grandean.  He's criticizing the use of the linear curve by

13  the NTP meta-analysis.

14         **MR. ADKINS:**  I agree that's not expressly stated in

15  this summary, but I think it's certainly captured within this

16  paragraph that I just brought your attention to.

17         Now looking at the deposition --

18         **THE COURT:**  Again, I mean, you would think that's more

19  specific because you would have to look at Dr. Grandean's

20  specific calculation and look at the different fit and the AIC

21  and all of this stuff.  Whatever was true with respect to the

22  NTP's analysis may or may not be true with respect to the

23  Grandjean analysis, so I don't know if it's fair to say, well,

24  it was easily translatable and transferable.  It kind of is

25  fact-dependent, it seems to me.

1      **MR. ADKINS:**  I think if Dr. Barone were testifying

2   that his concern over the fit had to do with some AIC score or

3   some statistic probability, that would be a fair critique.  But

4   what he testified to was that there's a dearth of data in the

5   low-exposure range and that affects not just the NTP

6   meta-analysis but also Dr. Grandean's BMCL, which is relying on

7   even fewer studies than what the NTP meta-analysis looked at.

8      **THE COURT:**  Well, is there -- you said there's

9   something in the depo that clarifies this?

10      **MR. ADKINS:**  Yes, Your Honor.  So I'd like to show

11   Your Honor page 160, line 13 through 161, line 15 of

12   Dr. Barone's October 30, 2023, deposition.

13      **THE COURT:**  Okay.  Are you going to put that up or is

14   that --

15      **MR. ADKINS:**  Thank you, yes.  We'll put that up on the

16   screen 160, line 13 through 161, line 15.

17      **THE COURT:**  Are you going to read it?

18      **MR. ADKINS:**  Yes, I will.

19      Could you zoom in on some of these pages,

20   Mr. Hambrick, page 160, line 13 through 161 line 15.

21      Okay.  I'll just go ahead and read this, Your Honor.

22   So the questioning starts:

23      "**QUESTION:**  Okay.  So you need to do a dose-response

24      analysis to sort of assess the effects of low-dose

25      exposure?

BARONE - DIRECT / ADKINS

 1      "ANSWER:  You do.

 2      "QUESTION:  Okay.

 3      Now, why -- did you attempt to determine a LOAEL from the

 4   fluoride hazard data?

 5      "ANSWER:  Not in a detailed manner.

 6      "QUESTION:  Why not?

 7      "ANSWER:  So one of the challenges -- and I actually said

 8          this in my report -- is there's no easy way and none of

 9          the meta-analysis or studies thus far have shown me or

10          provided information that you can get from urinary

11          biomarker to total intake of fluoride."

12          Okay.  So we're discussing the meta-analysis and the

13   other studies that Dr. Grandjean -- or that Dr. Barone was

14   considering.

15      "QUESTION:  Okay."

16      Answer -- it continues.

17      "ANSWER:  A good relationship.  And as was brought up in

18          the last deposition -- or a couple of the last depositions

19          from your folks, the uncertainty of fluoridation -- of

20          fluoride distribution during pregnancy is highly variable.

21          And what's happening in the low-dose region versus what's

22          happening in the high-dose, higher than 1.5 ppm, is not

23          necessarily linear, at least from the limited data that

24          I've seen.  So understanding that relationship and whether

25          there's a threshold or not a threshold and relationship

1    between biomarkers and intake and pregnancy laid on top of

2    that is very difficult right now."

3         Dr. Barone also testified -- well, the other excerpt

4    that I'd like to show Your Honor is page 175, line 23 through

5    page 176, line 15.

6         "QUESTION:  Do you have any reason to believe that there

7    would be differences in kidney function between women in

8    fluoridated areas and women in nonfluoridated areas that

9    would explain the difference in urinary fluoride values?

10   "ANSWER:  Again, the impacts on dose transition of

11   fluoride could have an impact on -- in pregnancy have an

12   impact on the higher end on the dose-response range.

13   "QUESTION:  What does that mean?

14   "ANSWER:  So, again, this gets at linear versus non-linear

15   modeling.  If you have threshold responses, and

16   particularly for saturation kinetics and the kidneys

17   function, you could have a difference in response in

18   urinary excretion.  I don't know enough and I'd like to

19   look at this data I'm converting back to intake level if

20   there's something else going on."

21        So again, I think counsel was on fair notice and, frankly,

22   had plenty of notice based the summary, discussion of

23   Dr. Grandean's BMCL, based on the discussion of the linear fit

24   and the BSC's comments, based on Dr. Barone's discussion of a

25   lack of data in the low-threshold range that this opinion was

 1   sufficiently disclosed.

 2            **THE COURT:**  I didn't -- remind me, did he opine

 3   about -- was there testimony about the lack of low-dose data in

 4   Dr. Grandean's analysis?  I don't remember if I heard that or

 5   not.

 6            **MR. ADKINS:**  By Dr. Grandean?

 7            **THE COURT:**  Or that's in the record that -- or that's

 8   what he testified to here.  I mean, I see that that is a

 9   systematic problem, that is, if you have lack of data and you

10   have some biomechanical explanations as to why there may be

11   some different sort of responses at the lower end, but I don't

12   recall testimony -- maybe I forgot -- about whether there was a

13   fair amount of data at the low end in Dr. Grandean's

14   dose-response analysis.

15            **MR. ADKINS:**  I'd have to check my notes on that, Your

16   Honor.  I don't recall that specific point, whether there was

17   testimony on that or not.

18            **THE COURT:**  Well, you can elicit from this witness

19   what he knows on that point, I'll accept that.

20            **MR. ADKINS:**  Okay.

21            **MR. CONNETT:**  Your Honor, could I be heard on this

22   before we proceed?

23            **THE COURT:**  Yeah.

24            **MR. CONNETT:**  First, counsel referred to the rebuttal

25   reports reference to Dr. Grandean's report, and he cited page

1   15, but page 15 of Dr. Grandean's report starts with a summary

2   of the NTP meta-analysis and monograph where he talks about

3   there being no obvious threshold.  That's what Dr. Barone was

4   referencing in his critique here.  It wasn't about a BMCL

5   analysis.  It was Dr. Grandean's discussion of NTP's

6   dose-response analysis.  That's the first thing.

7           The second thing is, as you can see in the deposition

8   transcript that counsel just read, we're talking here about

9   that issue of calculating at a dose from the urinary

10  biomarkers.

11          And later on in this deposition I further explored

12  this with Dr. Barone to understand his criticism of the BMCL

13  and he went back to that.  He goes, again, you have to go back

14  to how you can calculate this urinary bio -- the intake, and I

15  don't think you have enough data to do that.

16          Not once in his rebuttal report or at any point in his

17  deposition did he ever mention any issue or concern with the

18  modeling of Dr. Grandean's BMCL because, Your Honor, if he had,

19  I would have had very distinct questions on statistical

20  modeling for BMCL analyses.  I never asked these questions

21  because none of his testimony prompted that.

22          THE COURT:  All right.

23          You can elicit from him testimony along the lines

24  that's in his deposition about the general -- in generalities,

25  but in terms of the specifics with Mr. -- with Dr. Grandean's

1   model and the -- and the issue of linear versus nonlinear, I

2   just don't see that in there.  So, I mean, I do think that is

3   outside the scope, but you can ask along these other lines if

4   you want to develop his testimony with respect to sort of the

5   more general problems of deriving a dose-response curve when

6   you have these kinds of conditions, because he's testified to

7   that.

8          MR. ADKINS:  Very good.  Thank you, Your Honor.

9          MR. CONNETT:  Your Honor, with that noted, plaintiffs

10  would move to strike that prior testimony from Dr. Barone that

11  dealt with the statistical modeling that Dr. Grandjean --

12         THE COURT:  All right.  So stricken.

13  BY MR. ADKINS:

14  Q.   Okay.  So Dr. Barone, let's follow up on this a little

15  bit.

16       Did the BSC working group's critique of the availability

17  of data in the low-dose range influence the opinions that you'd

18  formed in this case?

19  A.   Yes, it did.

20  Q.   How so?

21  A.   Again, with any benchmark dose modeling or statistical

22  modeling, you have to consider what the range of observed data

23  are and whether you're interpolating or extrapolating.  And one

24  of the issues that the BSC working group raised and I raised in

25  my report was concerns that there was not data in the low-dose

1  region.  There was limited data in the low-dose region.

2      And subsequent to all our reports, there was actually a

3  new publication in 2023 from Dr. Grandean that cited the Odense

4  data, and so that is part and parcel to my opinion of the

5  information that's relevant to the NTP report that I provided

6  comments on.

7  **Q.**   Okay.  And so let's try to take a step back from

8  Dr. Grandean's BMCL --

9  **A.**   Uh-huh.

10  **Q.**   -- just for purposes of the Court's ruling.

11      How is it that having insufficient data in the low-dose

12  range can affect, if at all, the fit of benchmark dose models

13  over that data?

14  **A.**   So again, when you're doing model fitting, there are --

15  there are statistical approaches.  Partially what the NTP tried

16  to do was categorize their data into different bins to look for

17  a threshold, to look for whether there was a fit of the data.

18      During my deposition, there were other graphics that were

19  shown to me that I was asked to comment on from the MIREC study

20  in particular.  And looking at the -- at least those graphics

21  it suggested to me that there was not a linear function in

22  fluoride over pregnancy.

23      So fitting -- trying to fit in the low-dose region

24  fluoride data for pregnancy or fluoride exposed,

25  fluoridated-exposed individuals is a challenge.  And I brought

1  challenge out in my deposition previously and I brought that up

2  in my previous testimony here that we need to be able to

3  understand in our -- in our model fitting what is background

4  and we need to be able to understand what the contribution of

5  the condition of use is to that background.

6       So I think that's part of the uncertainty and part of the

7  challenges in this particular case trying to derive a BMCL or

8  derive a threshold, which is what the -- what the NTP struggled

9  with and why they came to the conclusion they came to of

10  uncertainty and lack of clarity below what was a breakpoint in

11  the data of 1.5.

12       So their own admission was that the linear model fit, but

13  they didn't have enough data below 1.5, substantial data below

14  1.5 to really fit any other kind of form, function or curve.

15  So that's the -- that's the premise of this whole concern or

16  this argument.

17       THE COURT:  So let me just make sure I understand.

18  The NTP did find that a linear model fit, at least fit well

19  enough above 1.5.  It was below that level that there wasn't

20  enough to sort of extend that linear model?

21       THE WITNESS:  Exactly, Your Honor.

22       And actually, if you go back to the tables that have

23  already been reviewed, some of the eTables and some of the

24  statistical aspects, Dr. Thiessen testified that -- actually

25  incorrectly what the NTP did with their -- those eTables and

**BARONE - DIRECT / ADKINS**

1   the binning and the attempt to explore what data was evident in

2   each of the bins from less than 1.5, less than 2, less than 4

3   and so on.

4          So again, the statistical approaches that they used

5   show other models fit as well, but they went with the -- they

6   went with the linear model as the most parsimonious explanation

7   and basically said, look, at the higher dose, the straighter

8   part of that curve, there is a reasonably good fit.

9          **THE COURT:**  As I recall, the bins were below 1.5, then

10  below 2 and then below 4.  It took ever larger chunks.

11         **THE WITNESS:**  Yes, sir.

12         **THE COURT:**  They were each segmented and whatever that

13  statistic was that there seemed to be consistency, I don't

14  know, I forget, the coefficient or whatever it is, that if you

15  look at the blowup 4, there was, it seemed to me, on all --

16  every square that was a -- I don't know if you call it

17  statistically significant or valid, you know, statistical

18  number associated with that, and it seemed less clear as you

19  got lower in the lower levels.  Is that --

20         **THE WITNESS:**  That's correct.  That's correct.

21         And also, they did it by urinary biomarker, and they

22  did it by milliliters per liter.

23         **THE COURT:**  All right.  Both the concentrations --

24         **THE WITNESS:**  The water.

25         **THE COURT:**  -- as well as urinary --

1          THE WITNESS:  The fluoride level in water.

2      (Reporter seeks clarification )

3          THE WITNESS:  Fluoride level in the water was fluoride

4   milligrams per liter.

5          THE COURT:  But the lower-dose data was part of the

6   below 4.  It was a larger universe -- right? -- it included

7   higher and lower?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  But if you only looked at lower, that's

10  where it becomes more fuzzy?

11         THE WITNESS:  When you look only at the -- again,

12  focusing on the low risk-of-bias studies, their analysis of low

13  risk-of bias only and, again, correcting -- trying to get all

14  the studies on the same -- same level, same playing field,

15  there was corrections done by two different methodologies to

16  get all the data that they had in the same context.

17         THE COURT:  So but once you have the larger field of

18  below 4, which includes below 2 and below 1.5, there seemed to

19  be a decent fit, if you will.

20         THE WITNESS:  I think, Your Honor, it would be helpful

21  to actually walk through that -- that eTable to show you that.

22         THE COURT:  It might.  I don't know.  Can you draw

23  that up, because I got to make sure I understand this.

24         MR. ADKINS:  Sure can, Your Honor.

25         Mr. Hambrick, could you please pull up Trial Exhibit 9

 1   and take us to Roman Numeral II-80 PDF page 699.

 2           Why don't we start with page II-79.

 3           **THE WITNESS:**  So one of the points to make, Your

 4   Honor, and again, part of this has already been walked through

 5   is what are the number of studies that are in each of these

 6   bins.  And so in the less than 1.5, when we're talking about

 7   urinary fluoride, there are really five studies that are

 8   predicated on this analysis -- that this analysis is predicated

 9   on.  And then when you go up to the less than 2, you're talking

10   about 7 studies, two more than what you had at 1.5.  And

11   then --

12           **THE COURT:**  Although, if you look at the number of

13   children, which I think would be relevant -- right? -- that

14   shows how many data points you have.  It goes from 3,992 below

15   1.5 to 4,654 so it increases by about 700 or 650 or so.

16           **THE WITNESS:**  It does increase.

17           **THE COURT:**  You get to below 4 and now you're up to

18   68'.  It not quite doubles, but now you're 3,000 more

19   subjects -- right? -- than below 1.5?

20           **THE WITNESS:**  When you get above 2, you're -- you're

21   basically significantly greater than the 1.5.  But, again,

22   looking between 1.5 and 2, and just --

23           Is this the analysis table for the low risk-of-bias

24   studies?

25   \\\

 1   BY MR. ADKINS:

 2   Q.   This is not.  So would you like to look at that?

 3   A.   Yes.

 4   Q.   Okay.  So --

 5   A.   I'm actually -- I think it's more clear in the low

 6   risk-of-bias studies where the donut hole is.

 7        MR. ADKINS:  Mr. Hambrick, could you take us to Roman

 8   Numeral II-80.  It should be the next page.  So this is Table

 9   e4, eTable 4, urinary fluoride low risk-of-bias studies.

10        THE WITNESS:  Again, this is the linear model and

11   linear model comparison, not the -- I'm looking for the table

12   that has linear model and the quadratic and the other model

13   approach.

14   BY MR. ADKINS:

15   Q.   For low risk-of-bias studies?

16   A.   Yes, for low risk.

17   Q.   I don't have that table.  For low risk-of-bias -- well we

18   can address this later I think.

19   A.   Okay.

20        THE COURT:  You've only done a table for linear?

21        MR. ADKINS:  Yeah.  I think with the low risk-of-bias

22   studies we only have the linear model reported.

23        THE COURT:  Yeah.  I think for all the other studies

24   that that's where you have the three different models.

25        THE WITNESS:  Yeah.

1    BY MR. ADKINS:

2    Q.    Right.  But if you look at this -- at this chart --

3          So Dr. Barone, if you look at the less than 1.5-milligram

4    per liter group, there's a negative -- an adverse statistically

5    significant association, right?

6    A.    That's right.

7    Q.    And then in the less than 2, the less than 4 and the All

8    Data, there is no statistically significant adverse

9    association, right?

10   A.    That's correct.

11          THE COURT:  For less than 4 -- is that the one where

12   that's a mistake?

13          MR. ADKINS:  So we discussed that --

14   BY MR. ADKINS:

15   Q.    Do you recall discussing this testimony with Dr. Thiessen,

16   Dr. Barone, about this particular table?

17   A.    Yes.

18   Q.    Okay.

19   A.    There was a mistake in one of these numbers.  The minus --

20   the mean for minus .10.  I don't believe that was correctly

21   identified.

22          THE COURT:  And the beta -- that -- what is the beta

23   number?  Is that the quantitative effect?

24          THE WITNESS:  That's the effect -- that's trying to

25   describe the standardized mean difference effect at that

1   particular -- particular category.

2          THE COURT:  And .1 means .1 of a standard deviation IQ

3   or what is it?  .1 of -- what is it?

4          THE WITNESS:  It's -- remember, this is the mean --

5   this is derived from the standard mean difference, so it's the

6   mean divided by the standard deviation.

7          THE COURT:  Okay.  All right.  In IQ?

8          THE WITNESS:  In the IQ, yes.

9          THE COURT:  In the IQ range.  Standard deviation for

10  IQ was -- was it 15?  Is that what I recall?

11         THE WITNESS:  I believe that's what Dr. Grandean --

12         THE COURT:  It's .1 --

13         THE WITNESS:  -- testified to.

14         THE COURT:  -- of that standard deviation, and that's

15  measured as per milligram per liter?

16         THE WITNESS:  Well, we've actually removed milligram

17  per liter by doing the standardized mean differences.

18         THE COURT:  So that decrement of the .1 of standard

19  deviation is per what or --

20         THE WITNESS:  It's per that particular standard mean

21  difference for that -- for that linear model.

22         THE COURT:  Maybe you can explain what a standard mean

23  difference is again.

24         THE WITNESS:  So again, taking each of these groups

25  and saying, okay, I have this many studies, seven studies below

 1    1.5, what is the mean for that group of studies and divide the

 2    standard deviation for that group of studies.  So you're

 3    basically looking at that effect magnitude for that bin, move

 4    up successfully up to each of the bins.  You're including

 5    what's in all the studies that are within that range.

 6         THE COURT:  Yeah, that I understand.  What I'm trying

 7    to figure out is what the beta means when it says negative .08.

 8    I understand of the standard deviation which can translate into

 9    a certain number of IQ points like 1.5 or something.

10         THE WITNESS:  You could -- you could extrapolate to IQ

11    points --

12         THE COURT:  Okay.

13         THE WITNESS:  -- over -- over -- for the effect --

14         THE COURT:  The effect -- isn't the effect measured by

15    how many loss or gain of IQ points per concentration -- is it

16    by how much --

17         THE WITNESS:  Right.  Yes.  It's converted from the

18    concentration, but it's basically now looking at this in sort

19    of a unitless range.

20         THE COURT:  This is unitless then?

21         THE WITNESS:  This has all been standardized because

22    essentially what NTP grappled with and what many times we

23    grapple with in meta-analysis is, there's Bayley's, there's

24    MacArthur -- McCarthy scores, there's WISC, there's other

25    instruments that were used to assess IQ, and they're trying to

1   put all of them, the range of scores, for IQ and different ages

2   all on the same --

3           THE COURT:  Right.

4           THE WITNESS:  -- on the same coordinate.

5           THE COURT:  Right.

6           THE WITNESS:  So that's the -- that's the beauty and

7   the curse of using a standardized mean difference modeling

8   approach.

9           THE COURT:  Okay.  I think that much I understand.

10  What I'm still trying to grapple with is when you say that

11  there's a mean difference of, you know, .1, .05, .2, whatever

12  it is, that's not on a -- in other words, you've lost a certain

13  amount of IQ points.  It's below, right?  It's a negative means

14  .1 -- presumably that's 1.5 IQ points?

15          THE WITNESS:  That's are in the negative range.

16  They're smaller -- they're small.

17          THE COURT:  Yeah.

18          THE WITNESS:  But again, what -- what I think is

19  important to look at is the beta coefficient is telling you how

20  big -- what's the magnitude of effect.

21          And that and the p value is also important for what --

22  what's the degree of fit.

23          The AIC varies quite substantially across all data to

24  different parts of the bins or blocks that are described here.

25          THE COURT:  And the lower the AIC, the better the fit?

 1              THE WITNESS:  Generally speaking.

 2              THE COURT:  Okay.  So I think we talked about this

 3     before, but you notice there's statistical significance, it

 4     appears, of all things, for the below 1.5.  That's the one box

 5     where your confidence range is below zero and you've got a

 6     fairly low AIC, a small p value.  It almost runs contrary to

 7     the notion that everything down at the lower end is a bit

 8     fuzzy, you can't really draw a good curve down there, it's in

 9     the higher range, yet you're having the one area where there

10     seems to be statistical significance in the low risk-of-bias

11     studies.

12              THE WITNESS:  Right.

13              THE COURT:  What's happening there?

14              THE WITNESS:  There's actually another exhibit that

15     was presented previously that really tweaked my interest when

16     you looked at the -- particularly for the water -- looking at

17     this analysis for the water concentration and the low

18     risk-of-bias.

19              If you start to look at the studies and where those --

20     the impact of the studies on the curve, there's some very

21     interesting transitions in the curve and it basically does not

22     look like a linear curve for the dose-response modeling.

23     BY MR. ADKINS:

24     Q.   Dr. Barone, is this a graphic that was in the

25     meta-analysis?

BARONE - DIRECT / ADKINS

```
 1   A.   This was a graphic that was presented by -- during the
 2   trial this week -- no, not this week; last week.  And I -- I
 3   thought it was Exhibit 10.  It's in my notes.  I don't have
 4   it -- I don't have it in front of me.
 5            MR. ADKINS:  So Your Honor, I can try to streamline
 6   our presentation here now that we're on this --
 7            THE COURT:  Okay.
 8            MR. ADKINS:   eTable if we can move to a different
 9   table.
10            THE COURT:  Go ahead.
11            MR. ADKINS:  Okay.  Mr. Hambrick, could you please put
12   up page II-78.
13            And focus us in on the low risk-of-bias studies at the
14   bottom of this chart.  Actually, you know, this is fine.  You
15   can keep -- okay.
16   BY MR. ADKINS:
17   Q.   So Dr. Barone, do you see the low risk-of-bias studies --
18   A.   I do.
19   Q.   -- for water fluoride?
20   A.   I do.
21   Q.   Okay.  And the -- there are no statistically significant
22   adverse effects in the less than 1.5 and less than 2 groups,
23   right?
24   A.   Yes.
25   Q.   Okay.
```

1          THE COURT:  But the -- the first column, that's for

2    all studies, all data?

3          THE WITNESS:  The first column is all studies.

4          THE COURT:  So even though you don't have -- oh.  So

5    you do have statistically significant effect at less than 4 --

6    right? -- because the margin is below zero.  And you have

7    statistical significance for all studies -- all data, namely

8    because it's probably weighted by the large numbers in that 4

9    range because when you go from less than 2 to less than 4, you

10   went from 921 subjects, children, to 4,251.

11         THE WITNESS:  Right.

12         THE COURT:  So there's your bulk of your population.

13         THE WITNESS:  There's the bulk of the data.

14         Also note that in the rows for the quadratic model and

15   the restricted cubic spline approach where they're segmenting

16   the data and trying to fit the data to different lines.

17   There's, again, significance in the p values raised on both the

18   quadratic model and the restricted cubic explain model.  So

19   saying that only the linear model is the best fit, that's not

20   what I take away from this particular table.

21         THE COURT:  Somebody explained this to me before, but

22   the quadratic model has two beta sets of numbers?  Are those

23   different -- why are there two different beta numbers and p

24   values?

25         THE WITNESS:  That is a point that I don't -- I can't

1    really address very well for Your Honor.  I know you asked that

2    question previously, but I don't -- I don't have a good answer

3    for you.

4              **THE COURT:**  Okay.

5              **THE WITNESS:**  And the same with the restricted cubic

6    spline.  There are two beta coefficients listed for each, but

7    I -- I think it talks -- I think it's trying to address the

8    upper and lower bounds of those -- of those model predictions.

9    But, again, I don't know the specifics.

10             **THE COURT:**  Because for all data it shows statistical

11   significance for the linear, for the first quadratic and the

12   first restricted cubic splines model.

13             **THE WITNESS:**  Correct.

14             **THE COURT:**  Yet, if you divide it into bins, you sort

15   of lose that.

16             **THE WITNESS:**  You do.  And the reason being is if you

17   look at the dose-response curve when you plot all the data out

18   in a cloud and you look at the dose-response model, it looks

19   like a line and then it curves.  There's a -- there's an

20   inflection point.  And exactly where that inflection point --

21   because this is what the BSC was getting at is -- the working

22   group is, there looks like there's a possible inflection point.

23   It's more pronounced in the water milligrams per liter data

24   conversion, but in the milligrams per -- milligrams of fluoride

25   in urine, it looks -- it looks a little bit more linear.  But

 1  there's still between around 2, somewhere between 2 and 4 --

 2  and again, this paucity of data, you're going from 8,000 to

 3  basically 3,000 -- excuse me.  Let's round it up -- 9,000 to

 4  basically 3,000 subjects.  There's -- there's something going

 5  on.  There's a -- there's a donut hole is what I was referring

 6  to earlier in sort of jargon.

 7          And that's -- that's critically important if you're

 8  trying to understand what the shape of the dose-response curve

 9  and how that informs what model you use in a benchmark dose

10  calculation and how you describe that benchmark dose

11  calculation, what confidence you have in that calculation.

12  Again, just looking at AIC's alone is not adequate.

13          **THE COURT:**  Okay.

14          **MR. ADKINS:**  Okay.  May I proceed, Your Honor?

15          **THE COURT:**  Yeah.

16          **MR. ADKINS:**  Thank you.

17  **BY MR. ADKINS:**

18  **Q.**  Dr. Barone, what you are observing in eTable 4 for the

19  urinary fluoride and the water fluoride analysis -- analyses,

20  what is the import of that on your opinion of the sufficiency

21  of this NTP meta-analysis for the dose-response assessment?

22  **A.**  So from a sufficiency perspective, it calls into

23  question -- there's uncertainty about the model fit -- calls

24  into question -- you know? -- what the shape of that

25  dose-response curve is.

 1          Previously Dr. Thiessen says, well, you have a main effect

 2   of exposure.  That's important that there's an observed main

 3   effect.  But, again, I question whether there's a main effect

 4   of exposure if you include other newer data and what influence

 5   that has on the shape of the -- on the significance and on the

 6   shape of the dose-response curve.

 7          So NTP didn't have the luxury of being able to include the

 8   Odense cohort data into this analysis, nor did they include the

 9   INMA data into this analysis.  So that would have been

10   additional -- additional data points substantially to the less

11   than 1.5-milligram-per-liter bin.

12          So all those issues help us define, one, what the

13   magnitude of the effect is, what the shape of the dose-response

14   is and also whether there possibly is a threshold or not.  That

15   was another question that the NTP was asked both by NASEM and

16   particularly by the BSC working group is, you haven't really

17   determined if there's a threshold.  You're still -- it's highly

18   uncertain in this low-dose region because of the lack of data

19   or the fewer studies and fewer children that actually inform

20   that -- that modeling estimate.

21   Q.   So Dr. Barone, in light of your overall opinion on the

22   hazard assessment, would you even get to the risk

23   characterization step in this context?

24   A.   I think it's really challenging trying to get to risk

25   because we're not settled on what the point of departure should

 1  be.  And I think that's what I've struggled with, I think

 2  that's what the Court has been struggling with is where --

 3  where do you -- what would be the point of departure?  Where

 4  would -- if you had a threshold, where would you call a NOAEL

 5  or a LOAEL?

 6      I don't think the current evidence supports a clear

 7  demarcation for a NOAEL or LOAEL.  I don't think the evidence

 8  clearly supports the definition of a BMCL and what shape that

 9  dose-response curve should be, could be, for a POD for hazard.

10      MR. ADKINS:  Mr. Hambrick, could you please put on the

11  screen U.S. Demonstrative 6.

12  BY MR. ADKINS:

13  Q.   So Dr. Barone, U.S. Demonstrative 6 summarizes the risk

14  characterization step of the risk evaluation, right?

15  A.   It does.

16  Q.   And there is that quantitative component, the margin of

17  exposure analysis and the qualitative evaluation, right?

18  A.   It is.

19      MR. ADKINS:  Mr. Hambrick, could you please put on the

20  screen U.S. Demonstrative 7?

21      THE COURT:  Okay.  Before you get to Demonstrative

22  7 --

23      MR. ADKINS:  Yeah.

24      THE COURT:  -- sorry to slow you up, but the -- to get

25  to this point of risk analysis margin of exposure, you can get

 1    there through a benchmark dose-response number and a point of

 2    departure?

 3            THE WITNESS:  That's one way.

 4            THE COURT:  You can get there through a LOAEL or a

 5    NOAEL, right?

 6            THE WITNESS:  You could.

 7            THE COURT:  And if you had a LOAEL or NOAEL and you

 8    were confident in that, would that obviate -- I mean, you might

 9    want to have a benchmark dose-response for a minute -- could

10    you proceed to this just with just a NOAEL or LOAEL?

11            THE WITNESS:  You could, but the point you made just a

12    second ago about strength of the evidence, your confidence in

13    that NOAEL or LOAEL --

14            THE COURT:  Uh-huh.

15            THE WITNESS:  -- and I'll go back to the PCE,

16    tetrachlorethylene, perchloroethylene example I talked about

17    earlier in the trial that I was asked about -- we identified a

18    LOAEL.

19            We did not have confidence in that particular dataset

20    to extrapolate beyond the observed data to a BMCL, so we

21    stopped.  We -- we basically went:  Here's the effect level,

22    adverse effect level within the region of the data -- within

23    the region of data observed.  So that was the LOAEL.

24            We -- what I'm struggling with and what my opinion is

25    predicated on is, I don't think we have a clearly defined

 1   threshold of clearly defined no adverse effect level.

 2        And given the countervailing evidence, it's very

 3   difficult to settle on what -- where that would land.

 4        **THE COURT:**  So let me ask -- I understand why you

 5   would say that with respect to so-called low levels because

 6   both NTP said it and now we have the Canada Science Industry,

 7   whatever it's called, Research sending out the same --

 8        **THE WITNESS:**  Canada Science International.

 9        **THE COURT:**  Okay.

10        -- saying that because it's mixed and it's unclear.

11   You don't have the data points and you've got studies going in

12   different directions, but at some point as you get into the

13   higher levels of exposure, everybody seems to agree that the

14   studies are quite consistent in that regard.  Couldn't one say

15   at the very least there's a LOAEL at, you know, 1.5, 2, 3?

16        At some point, given all the studies that have been

17   done, the 72 studies, the number of studies are deemed a low

18   risk-of-bias, something's gone on at some level.  Isn't that

19   pretty clear?

20        **THE WITNESS:**  Yes, sir, I agree and I said that in

21   my -- I said that in my deposition.  Something is going on at

22   the higher-dose levels where that threshold is right now is

23   very unclear to me and I cannot -- I cannot, sitting here, with

24   the information I have seen just during this trial, tell you

25   where that point would be.  I just can't.

1      THE COURT:  Well, you may not know where the NOAEL is

2  but -- and you may not know the lowest, but, I mean, of the

3  studies done so far would you say, you know, just at the very

4  least there's an effect -- adverse effect observed at 4

5  milligrams per liter?

6      THE WITNESS:  4 milligrams and above there's --

7  there's -- again, as we looked before, there's a lot more data,

8  a lot more data at 4 milligrams and above.  And that's the --

9  that's really the All Data bin that NTP looked at.

10      THE COURT:  Well, just looking at the NTP

11  meta-analysis, there's a lot of data above 2 that is between

12  the 2 and 4, remember there's that big jump.

13      THE WITNESS:  There's a jump.

14      THE COURT:  And there's a lot of data there.

15      THE WITNESS:  But again, drawing the line, where is

16  that line, I couldn't tell you with much certainty where you

17  would draw that line for a LOAEL.

18      THE COURT:  And you would not interpret the NTP's

19  moderate, you know, confident characterization of the

20  association -- strength of the association as supporting a

21  LOAEL of 1.5?

22      THE WITNESS:  I would not.

23      Again, I think they use 1.5 basically as a break

24  point.  They're -- and they're -- I think they're clear about

25  that, that there's -- it's not a point of departure.  1.5 is

 1   not a point of departure.  It is basically, you know, a

 2   categorical binning point that was used based upon WHO's

 3   previous point of departure that they developed for guidance.

 4   It wasn't an actual -- and that was based upon skeletal

 5   fluorosis and dental fluorosis, so it comes full circle.

 6           THE COURT:  And then the Science -- I keep forgetting

 7   the initial --

 8           THE WITNESS:  The Risk Science International report?

 9           THE COURT:  You talked about -- as you testified to

10   earlier, they talked about levels of North America -- strong

11   evidence at levels of North America, which they characterize as

12   above 2 parts per million.

13           THE WITNESS:  They characterize above 2.  And again,

14   because many water systems have endemic fluoride, geologic

15   fluoride sources, not water fluoridation, so there's -- there's

16   that to be considered in water.

17           THE COURT:  All right.  But there -- there are --

18   their conclusion was at least that the 2 points -- parts per

19   million or 2 milligrams per liter, there was strong evidence of

20   an association?

21           THE WITNESS:  Associations but, again, you know, the

22   challenges we have here is what are we going to use for a point

23   of departure and what is the certainty and defensibility of

24   that point of departure.

25           THE COURT:  So strong association does not equal point

1  of departure.  It doesn't tell you where the point of departure

2  is?

3          THE WITNESS:  It has not told me where the point of

4  departure is.

5          I have not -- again, I did not dig heavily into the

6  Risk Sciences International report.  It wasn't in my scope

7  since I wasn't part of the review committee or --

8          THE COURT:  Right.

9          And it doesn't tell you what the LOAEL might be

10 either?

11         THE WITNESS:  Again, they're backing away from any

12 LOAEL.  The way I read the report, they're backing away any

13 determination of a NOAEL or LOAEL for developmental neurotox,

14 which is the subject of this petition.  They're going to dental

15 fluorosis, moderate dental fluorosis and making a determination

16 on a totally different endpoint, which I didn't -- I did not go

17 back and review all of that.

18         THE COURT:  Okay.  Okay.  Thank you.

19 BY MR. ADKINS:

20 Q.  So back to the margin-of-exposure equation -- you see that

21 on your screen, Dr. Barone?

22 A.  I do.

23 Q.  And this is the equation that EPA uses to assess whether

24 there are non-cancer risks under TSCA, right?

25 A.  That's correct.

BARONE - DIRECT / ADKINS

1   **Q.**   What is your opinion of the evidence that Dr. Thiessen,

2   plaintiffs' risk assessor, proffered for the margin-of-exposure

3   analysis in this case?

4   **A.**   So what I heard from Dr. Thiessen, what I saw in her

5   previous reports were several "what ifs" for proposed margins

6   of exposure.  They were not the -- again, one of them was 1.5

7   milligrams per liter.

8       I don't object that you can't take and develop a point of

9   departure in milligrams per liter.  We can correct milligrams

10  per liter or convert milligrams per liter into milligrams per

11  kilogram per day.  We need to make sure that we're choosing a

12  point of departure that's appropriate for the exposure

13  condition or exposure context and population.

14      So the hazard for the population, subpopulation and

15  exposure level for the subpopulation have to match.  And we can

16  make the units match if we have milligrams per liter.

17      So that's -- that is -- can be done, but they have to be

18  contextualized for the condition of use and appropriate for the

19  condition of use.

20  **Q.**   And do you have an opinion on whether that

21  contextualization is satisfied here?

22  **A.**   I do, and it hasn't been satisfied.  We have a bunch of

23  sort of examples and conjecture, but not actual -- any

24  demonstration, real demonstration and -- for different

25  subpopulations.

1     I will say in the first trial Dr. Thiessen's report in the

2   first trial was a little more structured and more focused, but

3   what I reviewed for this trial was not really clear.

4     And when you try to use -- and this has already come up in

5   some of the discussion today -- when you try to use milligrams

6   per milligram of creatinine-corrected fluoride in urine, you

7   can't really do an MOE for the numerator and compare it to the

8   denominator exposure level.

9     In addition, trying to create a point of departure that

10   contextualizes what you're going to use in exposure level of

11   what you're going to do for risk, is important for future risk

12   management and risk communication.  So the -- knowing what

13   subpopulation you're describing risk for is also important

14   later on.

15  **Q.**   The example points of departure that Dr. Thiessen selected

16   were at 1.5- and .7-milligrams-per-liter water concentration as

17   well as Dr. Dr. Grandean's first BMCL, so

18   0.2-milligrams-per-liter urinary fluoride concentration?

19  **A.**   Correct.  Correct.  And we've already talked about the

20   issues about Dr. Grandean's BMCL and trying to convert that

21   into a milligram-per-kilogram-per-day intake level or in a

22   milligram per liter kind of context.  Right now there's no good

23   way to do that -- no reliable way to do that because of the

24   critical period that we're focused on.

25  **Q.**   You know, I see we're coming up to the end of our day

 1   here, so I want to try to tackle one of those two categories.

 2   So why don't we start with the water concentration example,

 3   PODs that Dr. Theissen offered.  And then when we come back

 4   tomorrow we'll talk about urinary BMCL that Dr. Grandean

 5   performed.

 6         So one of Dr. Theissen's opinions is that if you divide

 7   1.5-milligram-per-liter water concentration,

 8   5.7-milligram-per-liter water concentration, you get a margin

 9   of exposure of 2.

10         Dr. Barone, do you have an opinion whether that is

11   sufficient to support a risk determination?

12   **A.**   I do.  I don't think it's sufficient to support a risk

13   determination.  I think the 1.5 particularly, choosing that as

14   a NOAEL or LOAEL, as discussed in Dr. Theissen's report, is

15   arbitrary.  It's not well supported and not defensible under

16   section 6 of TSCA.  We need to have a solid estimate for that

17   point of departure based upon critical effects, and right now

18   that's basically a breakpoint based upon the WHO guideline, not

19   a point of departure for developmental neurotox.

20   **Q.**   And you recall when we were looking at eTable 4 from the

21   NTP Meta-analysis, which is Exhibit 69, that there were no

22   significant adverse effects in the less than

23   4-milligram-per-liter and the less than 2-milligram-per-liter

24   water fluoride concentration?

25   **A.**   Correct.

1  Q.    Does that impact whether using 1.5-milligram-per-liter

2  water concentration is an appropriate point of departure?

3  A.    It does.  And it basically means if you -- if you chose at

4  that route, it's garbage in, garbage out.  It's just unreliable

5  and non-supported and not defensible and under TSCA we would

6  have a very, very difficult time making a risk determination

7  based upon that and, of course, moving further for risk

8  management based upon that degree of uncertainty.

9        THE COURT:  Did you say there were no significant

10  effects less than 4 milligrams even at 4 milligrams per liter

11  and below?

12        THE WITNESS:  That's -- reading the low risk-of-bias

13  analysis -- reading across the low risk-of-bias analysis for

14  NTP, that's part of the -- part of the characterization.

15        So again, when we're developing risk estimates, this

16  is the quantitative part, but we also have to have the

17  qualitative description that goes along with it and talk about

18  the strength of the evidence for that risk estimate and what

19  are we -- what's the uncertainties as well and the assumptions

20  as well.  And there's, as I've said before, a high degree of

21  uncertainty when we're looking across the range of

22  concentrations.

23        MR. ADKINS:  Mr. Hambrick, could you take us to

24  Exhibit 69 Roman Numeral II-78.

25        So I do want to make sure the record is clear on this,

1    Your Honor.

2    **BY MR. ADKINS:**

3    **Q.**   In the low risk-of-bias studies table you see here

4    Dr. Barone less than 2 milligram per liter, no statistically

5    significant adverse effect, right?

6    **A.**   I believe so.

7    **Q.**   Okay.

8         **THE COURT:**  That's for water.  There was one for

9    urine, I think.

10        **THE WITNESS:**  There is.  There is one for urine as

11   well.

12        **THE COURT:**  And that one did find a statistical

13   effect, as I recall?

14        **MR. ADKINS:**  Yeah.  So if we go to Roman Numeral II,

15   page 80.  And in this table this is where we see, "Using the

16   linear model, low risk-of-bias studies urinary fluoride, no

17   statistically significant effect using all data less than 4

18   milligram per liter or less than 2-milligram per liter," right?

19        **THE COURT:**  Well, that's because that negative was a

20   mistake?

21        **MR. ADKINS:**  That's right, Your Honor.

22        **THE COURT:**  I see.

23   **BY MR. ADKINS:**

24   **Q.**   And we know that because of the p value -- right? --

25   Dr. Barone?

BARONE - DIRECT / ADKINS

1    **A.**    That's right.

2    **Q.**    The p value of .082 shows that that result is not

3    statistically significant, correct?

4    **A.**    That's right.

5          And we're going to talk about -- we'll talk the urine

6    again tomorrow, the fluoride urinary levels tomorrow?

7    **Q.**    We'll press ahead here because we do have some time.

8    **A.**    Okay.

9    **Q.**    We heard testimony that EPA prefers a BMCL to a NOAEL or a

10   LOAEL, correct?

11   **A.**    That is correct.

12   **Q.**    And Dr. Grandean's BMCL would be the first order of

13   preference of a point of departure under that rubric?

14   **A.**    A BMCL would be a first order of preference if we could

15   derive a BMCL.

16   **Q.**    And you've offered -- you've started to summarize your

17   opinion that you can't convert a urinary fluoride concentration

18   to an intake concentration or to an intake level?

19   **A.**    To an intake level or a milligram-per-liter level.

20   **Q.**    Why is that important for a margin-of-exposure analysis?

21   **A.**    Again, we want to be able to have the units in the

22   numerator, the point of departure, match the exposure estimate

23   for the -- for the subpopulation that we're looking at for the

24   condition of use, and currently there's been much discussion

25   about -- we talked about urinary levels are influenced -- it's

1    an integrated measure of the fluoride exposure, short-term

2    fluoride exposure; 3 to 7 hours is the half-life.

3         We've talked about the uncertainty in measurement error

4    and those kinds of things as it relates to first void or

5    fasting or so on.

6         But even bigger is the physiological variability across

7    pregnancy.  And when we've looked at the background level of

8    fluoride during pregnancy, you have to consider what is there

9    from kidney function and clearance of kidney -- via kidney

10   function and also what's there from bone demineralization.

11        And of course, that is appreciably increasing from first

12   trimester to second trimester to third trimester.  And it is

13   not linear, which is another challenge of trying to convert a

14   simple urinary measure over time back to an intake level.

15        So being able to account for what's physiologically based

16   and what's going on in the maternal body that will affect the

17   background exposure to the -- to the fetus is important at this

18   stage, to try to understand what that exposure level might be

19   and what the approximate intake level that produced that

20   exposure.

21        One of the other challenges we have is, without that kind

22   of description or quantitative description or semi-quantitative

23   description of background, we can't do source apportionment.

24   So we really need a model to be able to do source

25   apportionment, say what's from food, what's from water, what's

1  from other non-TSCA uses.  We can't -- I can't see how we're

2  going to estimate that that's -- that's important.  We can't

3  estimate those risks and intake levels to be able to get back

4  to what is TSCA and is there a -- is there an added risk or

5  not.

6  **Q.**   We'll discuss aggregation, source apportionment.

7  **A.**   Sorry.

8  **Q.**   Certainly.  That's an important topic.

9      Before we get ahead there, when you say a linear

10  relationship, are you referring to the relationship between the

11  urinary biomarker and the concentration in the media?

12  **A.**   I'm talking about the concentration -- the intake, the

13  intake level.  There's not a one-to-one relationship across

14  dose or across time.  And by time, I'm talking about pregnancy.

15  So those are two major factors.

16      You can't just use a conversion factor, a simple

17  conversion factor to get to what that intake rate would be.

18  **Q.**   How do you know that, Dr. Barone?

19  **A.**   Well, there's a couple of ways of looking at it.  Part of

20  it is by looking at some of the data that's been presented.

21  Dr. Thiessen created a graphic from the Till study looking at

22  the urinary levels.  And when you look across the 50th

23  percentile, 75th percentile and the 95th percentile, you look

24  at the slope for the nonfluoridated versus the fluoridated

25  group and they're dramatically different for those comparisons.

1  They're not the same.  So there's something going on there.

2       There's also differences identified in the Thippeswamy

3  biomarker study looking at urinary serum levels and intake

4  levels.  And there's an inflection point.  There appears to be

5  a curve, not a straight line around 1 milligram per liter.

6       So there's several lines of evidence that suggest to me

7  that we have to look carefully, and we can't just use a gross

8  conversion factor and -- which was actually suggested by some

9  as a conversion factor could be used.  That's -- that wouldn't

10 be appropriate, particularly in the range of this condition of

11 use, which is water fluoridation.

12      **MR. ADKINS:**  Mr. Hambrick, could you please put on the

13 screen figure 4, one of plaintiffs' demonstratives.

14 **BY MR. ADKINS:**

15 **Q.**  Dr. Barone, is this the graphic that you were referring

16 to?

17 **A.**  This is the graphic that was presented to me during my

18 deposition and has also been presented at the trial.

19      And as I studied this, one of the things -- there was a

20 focus or a question raised about, well, if you look at the

21 background and you compare the difference between background

22 unfluoridated and fluoridated, would you perceive that to be

23 the actual difference for the exposure.

24      What struck me was, look, when you draw a line across the

25 green bars and you draw a line across the red bars, the slopes

1   were different.  So if you actually calculate proportionally

2   what those slopes are, they're significant, and something's

3   happening physiologically.  It's an indication that something's

4   happening physiologically as you move to a greater

5   percentage -- greater percentile of the population.

6       Could be explained in a couple of ways, but my best

7   estimate is probably related to physiological parameters and

8   kidney function and bone demineralization are probably involved

9   in that as well as the changes when you look across first

10  trimester, second trimester and third trimester.  Those

11  background changes are probably also related to those

12  physiological parameters.

13          MR. ADKINS:  Your Honor, may we take this off the

14  screen?

15          THE COURT:  Yeah.

16          MR. ADKINS:  Okay.  Your Honor, say we're after time.

17  I'm happy to continue on but --

18          THE COURT:  I think we should go ahead and take our

19  break.  It's now past 1:30.

20          MR. ADKINS:  Okay.

21          THE COURT:  Okay?  So we'll resume tomorrow.

22          MR. ADKINS:  Thank you.

23          THE COURT:  Thank you.

24          MR. ADKINS:  Your Honor, before we break, I think it

25  could benefit EPA to have the same extension in time that the

**PROCEEDINGS**

1  plaintiffs had requested, given that our presentation has --

2  we've done what we could to keep it brief and move quickly.

3      **THE COURT:**  Well, how much -- let's see how much time

4  you have left.

5      **MR. ADKINS:**  I don't a clear calculation on that.

6      **THE COURT:**  This is your last -- this is your last

7  witness, correct?

8      **MR. ADKINS:**  Yes, Your Honor.

9      And what we have left with Dr. Barone is very brief,

10 probably in the realm of 20 to 30 minutes.

11     **MR. CONNETT:**  We have no objection to that, Your

12 Honor.

13     **THE COURT:**  I mean, you should be within your hour --

14 within your time.

15     **MR. ADKINS:**  That may be.  I'm just -- I haven't kept

16 time for today and I'm not sure where we are, but I knew it was

17 going to be close, so . . .

18     **MR. CONNETT:**  On the time question, Your Honor, given

19 that we're not going to be doing the closing arguments --

20     **THE COURT:**  No, you don't get -- it's still counting.

21     **MR. CONNETT:**  Okay.

22     **THE COURT:**  I'm not going to add.  We've added enough.

23     **MR. CONNETT:**  Right.

24     **THE COURT:**  So you better reserve -- you better

25 assume, you know, you'll want to talk 45 minutes or something,

PROCEEDINGS

```
 1   you better make sure you have that in the bank.
 2              MR. CONNETT:  Okay.
 3              THE COURT:  Do we have that number, Vicky?
 4              THE CLERK:  As of Friday, Your Honor, defendants have
 5   used 13 hours and 52 minutes.
 6              THE COURT:  Okay.  And I gave you what, 18?
 7              THE CLERK:  Correct.
 8              THE COURT:  That -- you should be --
 9              MR. ADKINS:  We should be okay.
10              THE COURT:  I think you should be okay, but --
11              MR. ADKINS:  Well, we're certainly not requesting
12   anything beyond what the Court had already allowed plaintiffs,
13   but at this point it does seem that we should be okay.
14              THE COURT:  Let's try to get it done within the
15   timeframe.
16              MR. ADKINS:  Understood.
17              THE COURT:  Okay?
18              MR. ADKINS:  Thank you.
19              THE CLERK:  Court is adjourned.
20         (Adjourned at 1:38 p.m.)
21                          --oOo--
22
23
24
25
```

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7

8     _____          <u>February 13, 2024</u>
      JENNIFER L. COULTHARD, RMR, CRR                   DATE
9     Official Court Reporter
      CA CSR#14457
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25