**Volume 3**

**Pages 348 - 506**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

FOOD & WATER WATCH, INC., ET     )
AL.,                             )
                                 )
          Plaintiffs,            )
                                 )
   VS.                           )      **NO. 17-CV-2162**
                                 )
UNITED STATES ENVIRONMENTAL      )
PROTECTION AGENCY, an agency     )
of the United States, ET AL.,    )
                                 )
          Defendants.            )
_____)


                        San Francisco, California
                        Friday, February 2, 2024

                **TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    WATERS KRAUS & PAUL, LLP
                    222 N. Pacific Coast Highway, Suite 1900
                    El Segundo, California  90245
              BY:   **MICHAEL P. CONNETT**
                    **CHARLES ANDREW WATERS**
                    **ATTORNEYS AT LAW**

                    NIDEL & NACE, PLLC
                    5335 Wisconsin Ave., NW, Suite 440
                    Washington, DC 20015
              BY:   **CHRISTOPHER THOMAS NIDEL**
                    **ATTORNEY AT LAW**


        **(Appearances continued next page.)**

REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
              Official U.S. District Court Stenographer

**JENNIFER COULTHARD, CSR, RMR, CRR                (530)537-9312**

**APPEARANCES (Continued):**

For Defendants:

          UNITED STATES DEPARTMENT OF JUSTICE
          Environmental Defense Division
          601 D Street, NW, Room 8814
          Washington, DC  20004
    BY:  **BRANDON N. ADKINS, ATTORNEY AT LAW**

          UNITED STATES DEPARTMENT OF JUSTICE
          1301 Clay Street, Suite 340-S
          Oakland, California  94612
    BY:  **EMMET P. ONG, ATTORNEY AT LAW**

          UNITED STATES DEPARTMENT OF JUSTICE
          Environmental Defense Division
          150 M Street, N.E.
          Washington, D.C.  2002
    BY:  **PAUL CAINTIC, ATTORNEY AT LAW**

**ALSO PRESENT:**      DANIEL DePASQUALE, EPA
                   JAY SANDERS (trial tech)

                --oOo--

Friday, February 2, 2024 - Volume 3

**PLAINTIFFS' WITNESSES**                               **PAGE**  **VOL.**


**GRANDJEAN, PHILIPPE**
(PREVIOUSLY SWORN)                                        352       3

Direct Examination resumed By Mr. Connett:               352       3
Cross-Examination By Mr. Caintic:                        385       3
Redirect Examination By Mr. Connett:                     466       3
Recross-Examination by By Mr. Caintic:                   481       3
Redirect Examination By Mr. Connett:                     482       3


**BARONE, STANLEY**
(SWORN)                                                   486       3

Direct Examination By Mr. Connett:                       486       3

| | |
|---|---|
| 1 | **<u>Friday - February 2, 2024</u>**                                    **<u>8:34 a.m.</u>** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | --oOo-- |
| 4 |      (In open court.) |
| 5 |           **THE CLERK:**  Court is calling the case Food & Water |
| 6 | Watch, et al. versus Environmental Protection Agency, et al., |
| 7 | Case No. 17-2162. |
| 8 |           Counsel, please state your appearance, beginning with |
| 9 | the plaintiff. |
| 10 |           **MR. CONNETT:**  Good morning, Your Honor; Michael |
| 11 | Connett on behalf of the plaintiffs. |
| 12 |           **THE COURT:**  All right.  Good morning. |
| 13 |           **MR. WATERS:**  Your Honor, Andy Waters for the same. |
| 14 |           **THE COURT:**  Mr. Waters. |
| 15 |           **MR. NIDEL:**  Good morning, Your Honor; Chris Nidel on |
| 16 | behalf of plaintiff. |
| 17 |           **THE COURT:**  Good morning. |
| 18 |           **MR. ADKINS:**  Good morning; Brandon Adkins for the |
| 19 | defendants. |
| 20 |           **THE COURT:**  Thank you, Mr. Adkins. |
| 21 |           **MR. CAINTIC:**  Good morning, Paul Caintic for the |
| 22 | defendants. |
| 23 |           **THE COURT:**  All right.  Good morning, Mr. Caintic. |
| 24 |           **MR. ONG:**  Good morning.  Emmet Ong for the defendants. |
| 25 |           **THE COURT:**  Good morning, Mr. Ong. |

```
 1              Okay.  Are we ready to pick up where we left off
 2    yesterday?
 3              MR. CONNETT:  Yes.
 4              THE COURT:  Why don't we go ahead and do that then.
 5              MR. CONNETT:  At this time, Your Honor, plaintiffs are
 6    going to call back Dr. Grandean to the stand.
 7              THE COURT:  Just give me one second to get the program
 8    up and running here.
 9              THE WITNESS:  Maybe we can switch off the vent here
10    again.
11              THE COURT:  Oh, yeah.  Why don't you turn that off.
12              THE CLERK:  I lowered it this morning so it's not too
13    high.  I put it on the lowest that they have, but I will turn
14    it off for you.  How is that?
15              THE WITNESS:  Okay.  Thank you.
16              THE CLERK:  You're welcome.
17              THE COURT:  Okay.  I'm up and running.  Thank you.
18                        PHILIPPE GRANDJEAN,
19    called as a witness for the Plaintiffs, having been previously
20    duly sworn, testified as follows:
21                   DIRECT EXAMINATION   (resumed)
22    BY MR. CONNETT:
23    Q.   Good morning, Dr. Grandean.
24    A.   Good morning.
25    Q.   I'd like to return to our discussion from yesterday about
```

1   your pooled BMCL analysis, the one where you looked at the

2   three cohorts, including Denmark, okay?

3   **A.**   All right.

4   **Q.**   And I want to start by looking at some of the urinary

5   fluoride data from the Danish cohort itself, okay?

6   **A.**   All right.

7   **Q.**   And can you see here on your screen Figure 2 from your

8   BMCL paper?

9          **THE COURT:**  Is there something up on the screen?  I

10  don't see it.

11         **THE WITNESS:**  Okay.  Here it is.

12         **THE COURT:**  Now we see.

13  **BY MR. CONNETT:**

14  **Q.**   Now can you see Figure 2 on the screen?

15  **A.**   Right.

16  **Q.**   And Figure 2 shows us the urinary fluoride values of the

17  837 pregnant mothers in the Danish cohort; is that right?

18  **A.**   That is correct.

19  **Q.**   And these urinary values, I believe you testified

20  yesterday, were adjusted for creatinine, correct?

21  **A.**   That is correct.

22  **Q.**   And what trimester were these urine samples taken?

23  **A.**   I think they were from the 28th week, gestational week,

24  and that's the third trimester.

25  **Q.**   And so for the Danish cohort you had one sample and it was

1   in the third trimester; is that right?

2   **A.**   Those were the conditions that that's what they did?

3   **Q.**   If the urine samples were available to you from the first

4   and second trimester, would having those samples have improved

5   or not the exposure precision of the study?

6   **A.**   Okay.  There are two issues here.  Number one, the third

7   trimester tends to have higher fluoride because a pregnant

8   woman will release calcium from the skeleton, including stored

9   fluoride, so it would have been better if we also had urine

10  samples from earlier in the pregnancy because these are --

11  compared to the two other cohorts, these are slightly elevated.

12  **Q.**   Okay.

13  **A.**   Okay.

14  **Q.**   Sorry.

15  **A.**   The other thing is that about half of the samples were

16  simply spot samples.  They're reasonably reliable because these

17  were morning spot, that is, the first urine in the morning; but

18  about half of the mothers also delivered, supposedly, 24-hour

19  urine samples.  But, I mean, we know very well that for a woman

20  to carry around a big bottle and to remember to urinate in that

21  bottle every time, there may be some imprecision there, but we

22  didn't find any difference between the spot urines and the

23  24-hour urines, so we regard them as equal.

24  **Q.**   So even the 24-hour urine sample is not a perfect measure;

25  is that fair?

 1  **A.**   Right.  I mean, there is certainly some imprecision.  We

 2  did our best to control it by including the 24-hour samples.

 3  **Q.**   Okay.  Now, if we were interested in comparing fluoride

 4  exposures between the Danish cohort and the exposures in the

 5  fluoridated areas of the MIREC cohort, do you think that we

 6  should be comparing the urinary fluoride values -- or strike

 7  that.  Let me ask the question again.

 8      If we are comparing the urinary fluoride levels between

 9  the Danish cohort and the MIREC cohort, do you think we should

10  be looking specifically at the third trimester values in the

11  MIREC cohort, or does that matter?

12  **A.**   It does matter.  I would recommend third trimester.

13  **Q.**   That's more of an apples-to-apples comparison?

14  **A.**   Correct.

15          **MR. CONNETT:**  Your Honor, at this time I'd like to

16  show the witness Plaintiffs' Demonstrative No. 5.

17          **THE COURT:**  Okay.

18          **MR. CAINTIC:**  No objection.

19          **THE COURT:**  All right.

20  **BY MR. CONNETT:**

21  **Q.**   Dr. Grandean, can you see this figure on the screen?

22  **A.**   Right.  I think that's from MIREC.

23  **Q.**   Right.

24  **A.**   Yeah.

25  **Q.**   Can you tell us what this figure tells us with respect to

1  the urinary fluoride levels in the MIREC cohort?

2  **A.**   Okay.  So for one, it shows clearly that third trimester

3  is higher than second and -- which is higher than the first

4  trimester, so -- so that's shown very clearly.

5      The other thing that -- that's obvious here is that the

6  95th percentile of -- for all three trimesters is higher than

7  the 1.5 milligrams per liter.

8  **Q.**   And --

9  **A.**   And all of them are certainly above the BMCL.

10 **Q.**   What is the concentration in the urine among the 95th

11 percentile pregnant mothers in the MIREC cohort when we adjust

12 for creatinine?

13 **A.**   I mean, the numbers given here are 1.8 for the first

14 trimester and then it goes all the way up to 2.4 in the third

15 trimester.

16         **THE COURT:**  So just to be clear, this is of the

17 MIREC --

18         **MR. CONNETT:**  Yes.

19         **THE COURT:**  -- MIREC cohort?  I don't know if you said

20 that, so . . .

21         **MR. CONNETT:**  Yes.

22         **THE COURT:**  Okay.

23 **BY MR. CONNETT:**

24 **Q.**   So does this mean here that 5 percent of the women in

25 fluoridated areas in the MIREC cohort had at least 2.4

 1   milligrams per liter of creatinine-adjusted fluoride in their

 2   urine?

 3   **A.**   Yes, in the third trimester.

 4   **Q.**   So I want to go back to the figure from your paper, Figure

 5   2 that we were just looking at.

 6   **A.**   Okay.

 7             **THE COURT:**  What is -- hold on.  This Demonstrative 5,

 8   this is not in an exhibit?

 9             **MR. CONNETT:**  Demonstrative 5, Your Honor, the urinary

10   fluoride levels are in Exhibit 88, which has been admitted into

11   evidence.

12             What this demonstrative does is, it superimposes onto

13   it the BMCL.

14             **THE COURT:**  Okay.

15   **BY MR. CONNETT:**

16   **Q.**   So Dr. Grandean, we just saw that in the MIREC cohort, 5

17   percent of the mothers in the fluoridated areas have at least

18   2.4 part per million fluoride in their urine when we adjust for

19   creatinine.

20        I want to now look at this figure.  And can you count for

21   us the number of individual pregnant mothers of the 837 in the

22   Danish cohort that have at least 2.4 milligrams of fluoride per

23   liter in their urine?

24   **A.**   I mean, I don't have the exact numbers on me, but from

25   looking at the figure, it looks like there are three cases,

 1  which means it's less than a half a percent.

 2  **Q.**   So let's go back to Demonstrative No. 5.  And as you

 3  mentioned a few minutes ago, the urinary fluoride levels in

 4  pregnant mothers living in fluoridated areas exceed the BMCL,

 5  correct?

 6  **A.**   Oh, definitely.

 7  **Q.**   And what would you estimate roughly -- not precisely, but

 8  roughly what would you estimate the margin to be, in terms of

 9  how much higher the urinary fluoride levels are in the 95th

10  percentile than the BMCL?

11  **A.**   Well, it looks like there's a factor of close to 10.

12  **Q.**   Does this -- does this sort of merger of the urinary

13  fluoride levels that we observe in fluoridated areas,

14  contrasted with your BMCL, does it inform your opinion as to

15  whether water fluoridation presents a risk of developmental

16  neurotoxicity?

17  **A.**   Given the fact that the exposures are up to 10-fold the

18  BMCL, this certainly indicates a risk.

19  **Q.**   And based on all of your research, including your BMCL

20  analysis, do you have an opinion, Dr. Grandean, as to whether

21  water fluoridation presents a risk of developmental

22  neurotoxicity and, if so, can you tell us what it is?

23  **A.**   Okay.  The water fluoridation means that the drinking

24  water concentration is twice the BMCL.

25      I mean, the BMCL is expressed in milligrams per liter of

1    urine but, I mean, in a standardized case you can actually

2    compare those two types of measurement and by water

3    fluoridation adding twice the BMCL certainly represents an

4    added risk.

5    **Q.**   And when you say, "twice the BMCL," you're referring to

6    the average levels of fluoride in the urine in the fluoridated

7    areas; is that right?

8    **A.**   Well, I was talking about -- I was talking about 0.7 in

9    the drinking water.  But certainly the levels here are much

10   more than even the 50th percentile is for the third trimester,

11   more than twice the BMCL in the MIREC cohort.

12   **Q.**   Now, the concentration of fluoride that is in the drinking

13   water --

14   **A.**   Yeah.

15   **Q.**   -- is different than the dose that any individual will

16   receive from the drinking water; is that correct?

17   **A.**   Right, but in a theoretical case where a person drinks one

18   liter of water per day and does that constantly so that

19   there's, of course, some stored in the bones but what is

20   released represents the long-term 0.7-milligram exposure, one

21   liter per day.  So in that case the urine fluoride will be very

22   similar to the 0.7 that's in the drinking water.

23   **Q.**   And are you referring to the average level in the

24   population, in terms of the urine levels?

25   **A.**   Yeah, and drinking one liter per day.

1  **Q.**   Now, does the extent of drinking water consumption vary

2  across the population?

3  **A.**   It does, and some people drink bottled water or iced tea.

4  And certainly -- I mean, as a physician I know very well that

5  we sometimes ask our patients to drink extra water because we

6  need to have that flow through the kidneys if they have a

7  kidney disease.  So certainly there are people who would drink

8  three or four liters per day.

9  **Q.**   And what is ultimately more important to predict toxicity,

10  the concentration of a toxicant in the water or the dose of the

11  toxicant that we ingest from the water?

12  **A.**   I mean, I don't think that anybody would ever consider in

13  an epidemiological study to use the drinking water

14  concentration as an exposure indicator, simply because people

15  drink different amounts of water and what we're interested in

16  is really what is passed on to the fetus, and that's not -- it

17  doesn't come directly from the drinking water.  It comes

18  through the absorption into the body of the pregnant woman.

19  **Q.**   So is it is a general recognized principle in toxicology

20  that dose is more important than concentration when it comes to

21  predicting an individual's risk for toxicity?

22  **A.**   When you say "concentration," you mean environmental or

23  source concentrations?

24  **Q.**   Yes.

25  **A.**   I mean, this goes back all the way to lead in gasoline.

GRANDJEAN - DIRECT / CONNETT

1  We did not relate neurotoxicity to the lead concentration in

2  the gasoline.  I mean, we would have had to look at the cars

3  that passed the kids' residence.  I mean, we of course measured

4  lead in blood, and that's what EPA accepted to make a decision

5  on lead toxicity.  We're doing the same with fluoride.

6  **Q.**   Now, we talked yesterday about how the EPA used your BMCL

7  on PFAS or PFOA as a basis for its reference dose on that

8  chemical.  Do you recall that?

9  **A.**   It came out in 2022.

10 **Q.**   Okay.  And did EPA apply an uncertainty factor to your

11 BMCL or not?

12 **A.**   I believe so.  What I contributed was the basic equations

13 and results to EPA, and they did the final calculations,

14 including insertion of an uncertainty factor, so I wasn't part

15 of that.  But I understand that because this was human data

16 that an uncertainty factor of 10 was applied to take into

17 account individual vulnerability.

18 **Q.**   And what's your understanding as to why the EPA uses this

19 term "uncertainty factor" when accounting for intraspecies

20 variability?

21         **MR. CAINTIC:**  Objection, foundation.

22         **THE COURT:**  Lay a foundation.

23 BY MR. CONNETT:

24 **Q.**   In the course of working with the EPA and in the course of

25 reviewing EPA's publications that rely on your research, have

 1  you become familiar with the basis for why EPA would apply an

 2  uncertainty factor to your hazard values?

 3  **A.**   I mean, this is something EPA has done for decades.  And

 4  the point is that my results are based on the average human

 5  being because I consider everybody equal when we do these

 6  statistics; and therefore, EPA has to take into account that

 7  there may be subjects with whatever chronic disease or maybe

 8  genetic disposition -- predisposition.  Whatever factors.  And

 9  I can't explain in detail why we ended up with exactly the

10  factor 10, but this is what EPA has done for decades.

11  **Q.**   Okay.  So let's move on.  I am going to ask you about some

12  recent studies that have been published -- not by yourself but

13  by others -- and I just want to get some of your thoughts on

14  these studies, okay?

15  **A.**   Okay.

16  **Q.**   Let's start first with the study that I put on the screen

17  titled "Early Childhood Exposures to Fluorides in Child

18  Behavioral Development and Executive Function:  A

19  Population-Based Longitudinal Study."

20        Do you see that on your screen?

21  **A.**   Yes.

22  **Q.**   And this study was published in the *Journal of Dental*

23  *Research*?

24  **A.**   I see that.

25  **Q.**   Is the *Journal of Dental Research* known to publish

```
 1    high-quality studies on neurodevelopment?
 2              MR. CAINTIC:  Objection, foundation.
 3              THE COURT:  Lay a foundation.
 4    BY MR. CONNETT:
 5    Q.   Dr. Grandean, you are an editor of one of the leading
 6    journals on environmental health, correct?
 7    A.   Right.
 8    Q.   Are you familiar with the journals in the scientific
 9    literature that are known to publish high-quality studies on
10    the neurodevelopmental effects of chemicals?
11    A.   I am.
12    Q.   Is the Journal of Dental Research one of the journals that
13    you would consider as a journal publishing high-quality studies
14    on neurodevelopment?
15    A.   I would occasionally look at publications from that
16    journal, but that would be on dental issues, not environmental
17    epidemiology or neurotoxicology.
18    Q.   And the lead author of this study is Loc Do, right?
19    A.   Right.
20    Q.   What do you know about Loc Do?
21    A.   Well, you know, when I see this -- on the website of
22    National Live Medicine, you can actually click the author name
23    and then get a list of this author's previous publications, and
24    I did that because I thought it was surprising.  And it turns
25    out that Dr. Do has published on dental issues like cariology,
```

1   like, you know, when you get problems with your teeth, so he's

2   a dental researcher.  And I didn't see -- I may be wrong, but I

3   didn't see a single publication from recent years that related

4   to neurotoxicology.

5   **Q.**   Now, one of the cognitive tests that Dr. Do used in this

6   study is a test called the "SDQ test," correct?

7   **A.**   Yeah.  It's a standard test, yeah.

8   **Q.**   Now, are there any issues that have been identified with

9   the application of the SDQ test in Australia?

10  **A.**   What's unfortunate is that this test has been used in the

11  past and for some -- I don't know if for cultural or linguistic

12  reasons it didn't really work in Australia.  But I've forgotten

13  one of the coauthors actually did that study; and therefore,

14  I'm surprised they actually relied on that now.

15  **Q.**   And when you say that one of the coauthors of this study

16  here did a study, what are you referring to?

17  **A.**   I'm sorry?

18  **Q.**   You mentioned that a co-author of Loc Do had done a study

19  on the SDQ test.

20  **A.**   Yeah.

21  **Q.**   Can you explain a little bit about --

22       **MR. CAINTIC:**  Objection.  Scope.  This is not part of

23  Dr. Grandean's disclosed opinions in this case.  This never

24  came up at a deposition.  I do not recall ever seeing this line

25  of inquiry in an expert disclosure.

1          MR. CONNETT:  It's -- he specifically cites this study

2    in his expert report.

3          It's footnote 24 on page 20.

4          THE COURT:  Why don't you take a look at footnote 24

5    and tell me whether it's in there or not.

6          MR. CONNETT:  Or footnote 20 on page 24, one or the

7    other.

8          MR. CAINTIC:  This is the initial?

9          MR. CONNETT:  Yes.

10          MR. CAINTIC:  I withdraw the objection.

11          THE COURT:  Okay.

12   BY MR. CONNETT:

13   Q.   Do you need me to repeat the question, Dr. Grandean?

14   A.   Yes, please.

15   Q.   Okay.  Can you just tell the Court a little bit about the

16   study that Loc Do's coauthor had done on the use of the SDQ

17   test in Australia?

18   A.   Right.  They tried to figure out what the validity of the

19   SDQ as applied in Australia.

20          And I'm not an expert on the SDQ, but it is a standard

21   instrument and it may be that the Australian version is

22   culturally inappropriate for some reason and at least this

23   coauthor found that the validity of the SDQ was null, meaning

24   that the data from the United States, for example, where this

25   is a standard measure didn't really apply to the Australian

1   setting; and therefore, to use this in this study, Dr. Do's

2   study, as an indicator of possible fluoride toxicity, it was

3   not a good idea.  So this really means that the study has less

4   validity.

5   **Q.**   Now, let's talk about exposure characterization in this

6   study.

7        Do you have any concerns with how this study assessed

8   exposure to fluoride?

9   **A.**   I certainly do.  I think -- I think this study is -- I

10  wouldn't say it's negative, but I would say it's

11  non-informative.

12  **Q.**   And how did they -- well, strike that.

13       In this study, did they have any individualized data on

14  water intake?

15  **A.**   They didn't.

16  **Q.**   Did they have any individualized data on whether children

17  drank tap water or bottled water?

18  **A.**   No.

19  **Q.**   Did they have any individualized data on whether the

20  children in this study swallowed fluoride toothpaste?

21  **A.**   No.

22  **Q.**   Did they have any individualized data on whether these

23  children in the study used dental products containing fluoride?

24  **A.**   No.

25  **Q.**   Did they have any urinary fluoride levels in this study?

1   A.   No.

2   Q.   Did they have any individualized biomarkers of fluoride in

3   this study?

4   A.   No.

5   Q.   Now, in Australia is tea a popular beverage?

6   A.   In Australia?  Yeah.

7   Q.   Is tea a popular beverage?

8           MR. CAINTIC:  Objection, foundation.

9           THE COURT:  Overruled.

10          THE WITNESS:  Australia belongs to the countries of

11  the world that have the highest tea intake, but -- and tea does

12  contain fluoride, but there's a lot of difference between

13  different types of tea.

14  BY MR. CONNETT:

15  Q.   Did this study do anything to assess whether the mothers

16  drank tea during their pregnancy?

17  A.   Nope.

18  Q.   Did this study do a single thing to assess the mother's

19  exposure to fluoride during her pregnancy?

20  A.   No.  The focus was on early childhood exposures.

21          THE COURT:  I'm sorry, early childhood?

22          MR. NIDEL:  Early childhood exposures.  That is where

23  they lived.

24  BY MR. CONNETT:

25  Q.   So was the -- was their metric of exposure in this case

GRANDJEAN - DIRECT / CONNETT

1  the child's residence?

2  **A.**   It was based on the residence, and it's not a quantitative

3  measure.

4  **Q.**   So let's look at another recent study that's been

5  published.  This is a study titled "Fluoride exposure during

6  pregnancy from a community water supply is associated with

7  executive function in preschool children:  A prospective

8  ecological cohort study."

9      Dr. Grandean, you have read this study?

10 **A.**   I have read it.

11 **Q.**   And the lead author of this study is Dewey?

12 **A.**   Correct.

13 **Q.**   And if we were to refer to this study as Dewey 2023, would

14 you understand what we meant?

15 **A.**   Yes.

16 **Q.**   Can you tell the Court, in brief, sort of how this study

17 was designed?

18 **A.**   Okay.  So in the Canadian community they had -- for a long

19 time had fluoridated water and then the decision was made to

20 finish that and then continue with nonfluoridated drinking

21 water.

22     So what the researchers did was to take advantage of an

23 existing cohort and then they defined an exposed group where

24 the mother, during pregnancy, had -- during the full pregnancy

25 had access to fluoridated drinking water.  And then there was a

1  interim period they defined of three months and then after the

2  three months they considered that this was nonfluoridated

3  pregnancies, and so they split the children according to the

4  exact birth date in regard to fluoridation and the three-month

5  interim period and the after.  That's how they assessed the

6  exposure.  And then they had access to the children's cognitive

7  function later on in childhood.

8  **Q.**  Did this study have any data on the urinary fluoride

9  levels of the mother?

10  **A.**  No.

11  **Q.**  Did the study have any data on whether the mothers drank

12  tap water?

13  **A.**  No.

14  **Q.**  Did the study have any data on how long the pregnant

15  mothers had lived in Calgary prior to their pregnancy?

16  **A.**  Surprisingly, they didn't use -- I mean, I would think

17  those kinds of data would be available, but they -- they don't

18  report that.

19  **Q.**  Okay.  Now, this study, by the way, it did not find a

20  significant association between their metric of exposure and

21  IQ; is that correct?

22  **A.**  I thought there were some positive findings.

23  **Q.**  But I'm asking here with respect to IQ, they did not find

24  a significant association between --

25  **A.**  Oh, okay.

**GRANDJEAN - DIRECT / CONNETT**

1   **Q.**   -- their fluoride exposure metric and IQ; is that correct?

2   **A.**   Okay.  I don't remember those details, but because the

3   exposure parameter is associated with substantial imprecision,

4   I mean, again, I'm sorry, but I don't think this is an

5   informative study.

6   **Q.**   Now, will a woman who lives her whole life in a

7   fluoridated area have more fluoride in her bones than a woman

8   who lives her whole life in a nonfluoride area?

9   **A.**   Definitely, yes.

10  **Q.**   Will that fact have any bearing on the exposure contrasts

11  that this study was able to evaluate?

12  **A.**   It certainly would.  I mean, very surprisingly, these

13  authors cite an unpublished communication with a colleague who

14  said, oh, just wait three months.

15        And why did they not cite one of my publications?  Because

16  I have shown that people, even several years after cessation of

17  elevated fluoride exposure, would still have elevated fluoride

18  concentrations in blood and urine.

19        And, I mean, the evidence is published and they just

20  relied on an internal communication.  So I'm very sorry, I

21  don't find this informative.

22  **Q.**   Now, would you consider a pregnant mother, who had lived

23  her whole life in fluoridated Calgary, 30 plus years, would you

24  consider her a nonfluoridated or part of a nonfluoridated

25  exposure group if she stopped drinking fluoridated water a

 1  couple months before her pregnancy?

 2  **A.**    No.  But the problem is that our skeleton is continuously

 3  broken down and rebuilt because our cells that help us, making

 4  sure that our skeleton is in good shape, and during the

 5  breakdown of tissue that happens all the time, every day,

 6  fluoride is released from the fluoride that was built into the

 7  skeleton perhaps years ago that will be released to the blood.

 8  **Q.**    So let's turn now to another study.  And this is a study

 9  titled "Prenatal exposure to fluoride and neuropsychological

10  development in early childhood:  One-to 4 years old children."

11  And this is a study published by Dr. Ibarluzea and colleagues.

12  Do you see that on your screen?

13  **A.**    I see that.

14  **Q.**    And Dr. Grandean have you read this study as well?

15  **A.**    I've read -- I've read the study and I also talked to one

16  of the coauthors.

17  **Q.**    This study was published on one of the seven cohorts in

18  the INMA project from Spain; is that right?

19  **A.**    Right.  And I've served as a consultant with INMA in the

20  past.

21  **Q.**    Are there any methodological benefits that accrue when

22  multiple cohorts from the INMA project are analyzed as opposed

23  to just one of the seven cohorts?

24  **A.**    Right.  And you will see that I think there's only two --

25  there are two coauthors from INMA, but these are -- the study

1  was carried out in the Basque country in the north of Spain and

2  its local authors.

3  Q.   Are there methodological benefits from that come from

4  analyzing multiple cohorts within the INMA project?

5  A.   I think -- I mean, as far as I know, the idea was to

6  collaborate on fluoride because there are three other cohorts

7  that had the information, but this study simply presents the

8  Basque country findings alone, and the other data have not been

9  released.

10 Q.   Now, you, in the course of your career, have studied a lot

11 of different chemicals and substances that can impact

12 neurodevelopment; is that fair?

13 A.   Correct.

14 Q.   Are you aware of any substance that can increase IQ by 15

15 or more points in either sex?

16 A.   I have not.  And it's very clear that this is a

17 preliminary draft that was fortunate to get published, but

18 the -- I think this study is simply unreliable because the

19 findings make absolutely no sense.

20 Q.   Do you find it scientifically plausible that maternal

21 fluoride exposure increases the IQ of boys in nonfluoridated

22 areas by 28 points?

23 A.   I mean, I don't have imagination to understand this.  This

24 is wrong.

25 Q.   Now, can you tell the Court about what happened to these

GRANDJEAN - DIRECT / CONNETT

 1   dramatic effects when the authors removed creatinine adjustment

 2   from their analysis?

 3   **A.**   Okay.  They presented their proposed findings in regard to

 4   urine fluoride adjusted for creatinine, which is standard,

 5   and -- but if they just used the unit milligrams of fluoride

 6   per liter of urine rather than per gram of creatinine, then the

 7   associations disappeared and that made me wonder if there was

 8   something wrong with the creatinine measurement.

 9         And, I mean, had I been the editor of this journal, I

10   would have gone back to the authors and said could you, you

11   know, please send those samples to the creatinine laboratory

12   and have them do it again or, I mean, the other possibility is,

13   of course, that an error happened when matching fluoride and

14   creatinine data.  I think they were done at different

15   laboratories, so errors can have happened.

16         I mean, I don't have fantasy to think that the data are

17   somehow doctored.  I think some errors happened during the

18   progress of this study because some of the authors I know are

19   absolutely superb scientists, the non-Basque scientists from

20   INMA.

21         So, I mean, this study I would not consider valid.  I

22   would not use this in my review of the literature.

23   **Q.**   Now, you mentioned that you do know some of the coauthors

24   of this study?

25   **A.**   Yes.

1   **Q.**   You consider them good scientists?

2   **A.**   And the strange thing is, there's an additional -- there's

3   a second paper by Jesus Ibarluzea on ADHD and here the -- all

4   of the authors are from the Basque country; there are no INMA

5   authors.  So I don't know the details, but I would think that

6   maybe there's been some discussion locally in Spain.

7   **Q.**   So the scientists that you describe as superb, were

8   they -- were they coauthors of the second paper, or did they --

9   or were they not coauthors of the second paper?

10  **A.**   The authors of the two papers, they overlap in regard to

11  the Basque country scientists.

12  **Q.**   Right.  And you mentioned that in this first study, there

13  was some scientists that you have respect for and you know

14  you've worked with.  Were those scientists on the second paper

15  or --

16  **A.**   No, no.  There were no INMA authors of the second paper.

17  **Q.**   Now, if the authors of the -- of this study, Ibarluzea

18  2022, if they had detailed data on the amount of tap water that

19  each mother consumed, do you think they should have included

20  that data as part of their fluoride exposure metric?

21  **A.**   That's a good suggestion.  And I happen to know that those

22  data were available for this cohort.

23  **Q.**   Do you consider that a limitation of this study that

24  despite having detailed individualized tap water intake data,

25  the authors made no attempt to assess those exposures?

 1              **MR. CAINTIC:**  Objection, leading.

 2              **THE COURT:**  Overruled.

 3              **THE WITNESS:**  I think it's a serious error.

 4         For one, they should have made this available to the

 5    readers to better understand the study.  And by excluding that

 6    information, they are also potentially making a serious

 7    scientific error because they are simply relying on one aspect

 8    where we have this problem with the creatinine adjustment, and

 9    that's where the intake could have provided some additional

10    insight.

11              **THE COURT:**  But, Doctor, you also have said that the

12    most reliable indicator of exposure is the urinary

13    concentration because there are all these problems trying to

14    measure the intake.

15         But I take it you're saying here in this instance,

16    because of the unusual results and possible problems with

17    creatinine adjustments, this second based exposure would have

18    been a useful tool; is that a fair summary of what you're

19    saying?

20              **THE WITNESS:**  Yeah.  I mean, I agree with you that the

21    best measurement of the exposure is the biological sample

22    analyses.  But in this case, we have a problem with the

23    creatinine, and so in order to supplement, it would have been

24    good to use the data on the fluoride in the drinking water

25    because here we even have the intake volumes per day that

GRANDJEAN - DIRECT / CONNETT

```
 1    could -- when added to the fluoride concentration in water as
 2    such, would give that additional weight as an exposure
 3    parameter for fluoride.
 4         THE COURT:  And we know you think there's a problem
 5    with the creatinine adjustment because of the very strange,
 6    unusual result that the association completely disappears when
 7    you don't -- you would not expect that big a change if you --
 8    between adjusted and unadjusted creatinine levels?  I mean,
 9    that's surprising to you that you go from positive association
10    to null?
11         THE WITNESS:  It's hard for me to say because I think
12    this study is full of questions where I, as a reader, get
13    confused when I read this because the findings don't make
14    sense.
15         THE COURT:  Have you had experience with other studies
16    where you've looked at associations with and without
17    adjustments for either creatinine or specific gravity for
18    concentrations?  What's the impact, typically, when you don't
19    adjust for a concentration?
20         THE WITNESS:  Usually people just report the
21    creatinine or the density adjustment and -- but with our own
22    data, we certainly did all of those analyses as part of the
23    statistics we do before we decide on how to present the
24    findings.
25              And, I mean, usually we get stronger associations when
```

**GRANDJEAN - DIRECT / CONNETT**

 1  adjusting properly because if you're just looking at the

 2  concentration, it could be that a particular mother was very

 3  thirsty when she woke up, so what we call the morning urine was

 4  diluted because she had a glass of water as soon as she woke

 5  up.

 6          I mean, these things happen.  And even if it's morning

 7  urine, we have adjusted for creatinine.

 8          **THE COURT:**  And so when you adjust for creatinine, you

 9  tend to get a stronger negative association, in your

10  experience?

11          **THE WITNESS:**  That's what I would expect.

12          **THE COURT:**  Have you ever had one go in the other

13  direction where it's positive association with or without

14  adjustment and then negative in the other direction once you

15  change the adjustment?

16          **THE WITNESS:**  We have seen -- we've really done many

17  analyses and sometimes we see something that's slightly

18  positive but with a confidence interval that was wide enough so

19  that we couldn't exclude that it was really negative, so --

20          But, I mean, that's -- one milligram of fluoride

21  should create an IQ benefit of, what was it, 24 points or

22  something?  I mean, this is so out of -- I mean, it's beyond my

23  imagination that this is a true finding.  There must be an

24  error in that study.

25          **THE COURT:**  Thank you.

1   BY MR. CONNETT:

2   Q.    Just to follow up on that, when you say you -- adjustment

3   for creatinine may cause a stronger association, have you ever

4   seen a swing in the magnitude of 15 points when you adjust for

5   creatinine, one way or the other?

6   A.    I've never seen that in the published literature, and I've

7   never seen that in our own data on fluoride, lead, mercury,

8   whatever.

9   Q.    So let's turn now to another study.  And this is a study

10  titled "Associations between fluoride exposure in drinking

11  water and cognitive deficits in children:  A pilot study."

12        Dr. Grandean, have you read this study?

13  A.    I've read it.

14  Q.    The lead author is a scientist named last name Godebo?

15  A.    Right.

16  Q.    And if I refer to the study as Godebo 2023, will you

17  understand what I mean?

18  A.    Yes.

19  Q.    Is the Journal *Neurotoxicology and Teratology*, is that a

20  respected journal in the field of neurodevelopment?

21  A.    It certainly is, and I know the editor and respect her.

22  Q.    And is that the journal that published this study?

23  A.    Yeah.  Yes.

24  Q.    And the authors of this study, do you recall their

25  affiliations, where they work?

**GRANDJEAN - DIRECT / CONNETT**

1  **A.**   Well, these were colleagues from I think three different

2  universities, Tulane, Kentucky and, oh, what was the third one?

3       Well, anyway, there were -- there were respected

4  colleagues from US universities.

5  **Q.**   And where was the study, itself, conducted?  What was the

6  study population?

7  **A.**   That's interesting because it was done in Ethiopia where

8  there is very little exposure to fluoride, apart from the

9  fluoride in the drinking water.

10  **Q.**   And, you know, we were talking yesterday about low-dose

11  studies and high-dose study.  What -- would you characterize

12  this study as a low-dose study or as a high-dose study?

13  **A.**   It's a high-dose study.  It really adds to our hazard

14  assessment.

15  **Q.**   The fluoride levels in the water in this study, how far up

16  did they go?

17  **A.**   Oh, I don't remember the details, but like seven, eight,

18  perhaps even ten.  I mean, they -- some of those subjects were

19  exposed to very high levels of fluoride.

20  **Q.**   Okay.  Now, was this a large study, or was this a

21  relatively small study in terms of the number of people who

22  were examined?

23  **A.**   Yeah.  Compared to other studies, this was one of the

24  smaller ones.

25  **Q.**   Now, does the size of the study, the fact that there was a

1    relatively small such study sample, does that, in any way,

2    limit the power of this study to detect an effect?

3    **A.**    Of course, yes.  If you have a smaller study, you can do

4    less statistics.

5          But the advantage of the study was that the exposure range

6    was so wide that even if there were fewer children involved,

7    the differences in exposure were so large that even in a small

8    study like this, you can still pick up statistically

9    significant differences.

10   **Q.**    And we've been using this term "exposure contrasts" --

11   **A.**    Yeah.

12   **Q.**    -- in this case.  Is this one of the studies where we have

13   a good exposure contrast?

14   **A.**    Absolutely.

15   **Q.**    So can you tell the Court a little bit in general about

16   the type of cognitive tests that were performed here?

17   **A.**    They used culturally appropriate tests that were

18   reasonably standardized.  And I guess the most impressive type

19   of testing was the drawing test where the children were asked

20   to, you know, using a pen and paper to, you know, draw some

21   objects.

22   **Q.**    And were -- did the authors comment on whether some of the

23   drawing tasks were more complex than others?

24   **A.**    Right.  As is standard in that type of testing, you have

25   to have some easy tasks and then an increase of complexity.

**GRANDJEAN - DIRECT / CONNETT**

1  **Q.**   And did the authors find any difference in fluoride's

2  association with the cognitive tests based on the complexity or

3  difficulty of the task?

4  **A.**   That's a good point.  This is what they did.

5  **Q.**   And did they make -- did they have -- sorry.  Strike that.

6      So can you explain for the Court briefly how fluoride's

7  association with cognitive deficits in this study differed

8  based on the complexity of the task?

9  **A.**   Right.  As I remember, the most complicated task was for

10  the child to sketch an animal.  And those children who had been

11  exposed to the high levels of fluoride were simply unable to,

12  you know, make a reasonable drawing of that animal and -- and

13  it was clear that there was a dose dependency on the capacity

14  of the child to make a reasonable drawing.  I think it was a

15  donkey or, yeah, something like that.

16  **Q.**   Now, before looking at some of the drawings, does it make

17  sense that a neurotoxicant would affect a child's performance

18  on more complex tasks more so than on simpler tasks?

19  **A.**   I mean, this is really a basic issue in neurotoxicology

20  and neuropsychology that the more complex tasks require more

21  brain power and -- and to make -- to draw a donkey, if it's a

22  donkey, you have to see the donkey for yourself and then you

23  have to, like, use your motor skills.  This is a psychomotor

24  part of it, and so it also has to do with sensory perception,

25  what the animal is supposed to look like.  So drawing tests are

1  frequently used simply because it tests the -- more than one

2  modality of brain function.  And I'm not sure it necessarily

3  correlates very clearly with IQ, but it's a culturally

4  appropriate and valid type of testing.

5  **Q.**  So let's look at some of the donkey drawings.  Can you

6  explain for the Court what we see here in figure 2 from the

7  paper?

8  **A.**  As I remember, this -- and you can see the donkeys on the

9  top left.  I mean, it's not a beautiful drawing.  It looks a

10  little bit like a donkey.  But then when you take the top

11  right, it gets a little sort of questionable.  It does have

12  four legs, but then the two on the bottom are very crude and

13  hard to recognize.

14  **Q.**  And how -- can you explain for the Court how these

15  drawings correlate with the fluoride concentration in the water

16  of the children who drew these donkeys?

17  **A.**  That's actually indicated on the slide.  It's the first

18  number.  So 0.41 for the drawing on the top left is a fluoride

19  level in the drinking water that the mother was exposed to

20  during pregnancy, and then the next one is 5.2 and then 10.7

21  and 15.5.  Very high.  So there's clearly -- I mean, it's --

22  it's a clear association here.  The higher the fluoride

23  exposure level, the worse the drawing.

24  **Q.**  So just want to close here by going back to some of the

25  discussion yesterday where you had mentioned going back to the

1  very beginning that the first time the neurotoxicity of

2  fluoride was identified in the scientific literature was in the

3  1930s, correct?

4  **A.**    That was in the Cryolite workers in Copenhagen.

5  **Q.**    And can you remind the Court the name of the scientist who

6  did that study?

7  **A.**    The father of fluorosis, fluoride poisoning was Kaj

8  Roholm, R-O-H-O-L-M.

9  **Q.**    Now, for subject matter experts on fluoride like yourself,

10  how would you describe the influence of Kaj Roholm in the

11  field?

12  **A.**    He established skeletal fluorosis.  I mean, what he did

13  was to get chest X-rays of the workers.  And when you looked at

14  the chest X-ray, it was like the ribs were made of marble

15  simply because the bones were so full of calcium and fluoride

16  that they turned up the voltage on the X-ray machine.  They

17  couldn't shoot through the bones.

18      And so he did autopsy studies, et cetera, on the workers

19  and also symptomatology, and this way he established skeletal

20  fluorosis.  And this has been much of the time used for the

21  criterion of safe levels of fluoride in drinking water.  And, I

22  mean, like WHO that defined the limit of 1.5 milligrams per

23  liter in 1996, this has really been the basis of fluoride

24  control.

25  **Q.**    So as we stand here today and sit here today in this

GRANDJEAN - DIRECT / CONNETT

1    courtroom, that severe bone disease that Dr. Roholm identified

2    in the 1930s, is that the most sensitive effect that our

3    drinking water regulations on fluoride are still designed to

4    prevent?

5    **A.**   There has been hesitation to consider neurotoxicity as an

6    outcome, and I've not seen any limits from WHO, not at all.

7    And so there has been hesitation to consider neurotoxicity.  I

8    don't know -- I would say it's, of course, problematic if your

9    bones get more brittle, even if they're denser.  But, I mean,

10   with lead and mercury and other neurotoxicants, we really think

11   that a loss of 1 IQ point is a serious adverse effect.  It has

12   socioeconomic consequences.  But for fluoride, for some reason,

13   this hasn't been considered, as far as I know, by authorities

14   here in the United States despite the National Academy of

15   Sciences calling attention to this issue in 2006 in a multitude

16   of scientific publications.

17   **Q.**   Based on the totality of scientific evidence available on

18   fluoride toxicity, do you think that the developmental

19   neurotoxicity is a more sensitive health effect of fluoride

20   exposure than crippling skeletal fluorosis?

21   **A.**   Absolutely.  I would think that EPA would consider this

22   the critical effect.

23         **MR. CONNETT:**  Well, thank you, Dr. Grandean.  Those

24   are all the questions that I have at this time.

25         **THE WITNESS:**  Thank you.

 1          THE COURT:  All right.  Cross-examination?

 2          MR. CAINTIC:  Your Honor, I will warn the Court that

 3   my cross-examination might be quite lengthy.  If the Court

 4   would like to take a break at this time, it might be the most

 5   natural breaking point.

 6          THE COURT:  Well, it throws us off schedule.  We still

 7   have 25 minutes to go, so why don't we get started.

 8          MR. CAINTIC:  Okay.

 9                        CROSS-EXAMINATION

10   BY MR. CAINTIC:

11   Q.   Good morning, Dr. Grandean.

12   A.   Good morning.

13   Q.   I'd like to start off with the last study that we just

14   discussed today, which is the Godebo 2023 study in Ethiopia.

15   A.   Okay.

16   Q.   So that paper is titled "Associations between fluoride

17   exposure in drinking water and cognitive deficits in children:

18   A pilot study," right?

19   A.   I don't have it in front of me, but if you say so --

20          MR. CAINTIC:  Well, it's important we get it right, so

21   Mr. Hamburg, can you pull up title No. G14 and just on page 1.

22   BY MR. CAINTIC:

23   Q.   Dr. Grandean, do you have Godebo 2023 on your screen?

24   A.   That looks like -- I mean, the printed version looks

25   different, but anyway, I recognize the names and the title.

1  Q.    Okay.  And the title is "Associations between fluoride

2  exposure in drinking water and cognitive deficits in children:

3  A pilot study," right?

4  A.    That's correct.

5  Q.    So fair to say this is a pilot study, right?

6  A.    This is what we're discussing, yes.

7  Q.    Right.  Would classify Godebo 2023 as a high-quality

8  study, right?

9  A.    With certain limitations because the number of subjects is

10  quite low.

11  Q.    But you would call it a high-quality study?

12  A.    I don't recall that I found any deficiencies, so I would

13  call it high quality.

14  Q.    And you agree that the population in Ethiopia that Godebo

15  2023 studied has very high fluoride exposures, right?

16  A.    Some of them, yes.

17  Q.    As high as 15.5?

18  A.    That's what the study reports.

19  Q.    Okay.  But you recognize also that Godebo 2023 had a

20  pretty small sample size?

21  A.    Oh, yes.

22  Q.    And one of the two neurodevelopmental measures, the first

23  one that counsel discussed with you, was a drawing test, right?

24  A.    Correct.

25  Q.    And they had three drawing tests, right?

GRANDJEAN - CROSS / CAINTIC

1   **A.**   If you say so.

2   **Q.**   Drawing tests were how well does the child draw a person,

3   a house and a donkey, right?

4   **A.**   Yes.

5   **Q.**   Okay.  And then they analyzed the child's urine fluoride

6   concentration and the water fluoride concentration and tried to

7   figure out if those were associated with the children's ability

8   to draw a person, a house or a donkey, right?

9   **A.**   Right.

10  **Q.**   Okay.  And with both of those fluoride exposure

11  measurements, they found a statistically significant adverse

12  effect on the child's ability to draw a donkey, right?

13  **A.**   Right.

14  **Q.**   They did not find a statistically significant adverse

15  effect on the child's ability to draw a person or a house,

16  right?

17  **A.**   Well, I would say that those tasks were less complex and

18  with the limitations that you have in the small material, you

19  may not find a statistically significant difference.

20  **Q.**   But you agree with me that they didn't find adverse

21  performance on drawing a person or a house based on the

22  fluoride exposure, right?

23  **A.**   But I don't think your question is relevant because in my

24  research, we, of course, put extra weight on the most relevant

25  tests and if in a small material like this you find no clear

1  association, I would say that's -- that could have been

2  predicted.  So I wouldn't put any weight on that.

3       And if you want me to approve that this is what they

4  report, I'd say yes, but the question is not important.

5  **Q.**   So, Dr. Grandean, just to make clear, the answer is yes,

6  they did not find an adverse association between fluoride

7  exposure and the ability to draw a house or a person, right?

8  **A.**   The answer is yes, with the reservation that I just

9  expressed.

10 **Q.**   And they had a second neurodevelopmental measure in that

11 case, right?

12 **A.**   Yes.

13 **Q.**   And that was the Cambridge Neuropsychological Test

14 Automated Battery Paired Associates Learning Tests, right?

15 **A.**   Yeah.  The CANTAB.

16 **Q.**   CANTAB PAL tests, correct?

17 **A.**   Yes.

18 **Q.**   Okay.  And they had six different CANTAB PAL tests, right?

19 **A.**   I don't remember how many they used.

20      **MR. CAINTIC:**  Mr. Hamberg, if we could turn to G14,

21 Godebo 2023, PDF page 14, under section 3.4.

22      **THE COURT:**  So how am I supposed to find these things?

23 You guys are using internal numbers and not exhibit numbers.

24 At some point if you agree to admit these into evidence, how in

25 the world am I going to find these things?

1      **MR. CAINTIC:**  Well, so for purposes of the

2   presentation now, we'll just put it on the screen.  I think it

3   will be clear when the Court has the actual documents what

4   we're referring to.

5          Unfortunately, this particular document doesn't have

6   page numbers in and of itself.  We could potentially find some

7   way to Bates stamp these once we're admitting these into

8   evidence.

9          **THE COURT:**  Okay.

10  **BY MR. CAINTIC:**

11  **Q.**   So, Dr. Grandean, just the first sentence it here it says,

12  "Out of the six PAL tasks that the children completed."  So

13  that means they had six CANTAB PAL tests, right?

14  **A.**   Okay.  Yes, sure.

15  **Q.**   And out of the six CANTAB PAL tests they used, after they

16  adjusted for covariates, they found performance on only one out

17  of those six CANTAB PAL tests was adversely affected by

18  fluoride exposure, right?

19  **A.**   Yeah.  They did find some statistically significant

20  adverse effects.

21  **Q.**   They did not find statistically significant adverse

22  effects?

23  **A.**   Yes, on some of the analyses they did, yes.

24  **Q.**   It was five of the CANTAB PAL tests they found no

25  statistically significant adverse effect and one of them they

GRANDJEAN - CROSS / CAINTIC

1  did find a statistically significant adverse effect after

2  adjustment for covariables, right?

3  **A.**    Frankly, I don't know -- I don't remember those details,

4  but I remember they did find some negative associations.

5           **MR. CAINTIC:**  Mr. Hamberg, if we could -- yes.  It's

6  up there.

7  **BY MR. CAINTIC:**

8  **Q.**   Dr. Grandean, if I could direct you to the second box and

9  the second full sentence that begins "When controlling for

10  covariates."

11 **A.**   Second box.

12 **Q.**   On the screen.  "When controlling for covariates."

13 **A.**   All right.  Okay.

14 **Q.**   In that sentence there.

15 **A.**   All right.  Okay.

16 **Q.**   Does that refresh your recollection?

17 **A.**   Yes.  Okay.

18 **Q.**   So out of the six CANTAB PAL tests they had, after they

19 adjusted for covariates, there was only a statistically

20 significant adverse effect on one of those tests, right?

21 **A.**   That's what the text says.

22 **Q.**   And counsel asked you questions about:  Well, maybe

23 drawing a donkey is a more difficult task, and that's why the

24 task was sensitive enough to pick up an adverse effect, right?

25 **A.**   That's what I just testified.

1    Q.    Okay.  For these CANTAB PAL tests, the authors tried to

2    figure out if the difficulty of the test also had an effect on

3    the performance, right?

4    A.    I think so.

5    Q.    Okay.  The authors concluded that there was no

6    statistically significant interaction between fluoride and

7    drinking water and the task difficulty to the total errors made

8    by the children," right?

9    A.    Well, again, I don't remember that detail.

10         MR. CAINTIC:  Mr. Hamberg, if we could go to PDF page

11   15 of the same document, Godebo 2023 under section 3.5.

12   BY MR. CAINTIC:

13   Q.    And just these last two sentences here, Dr. Grandean, if

14   you could review them and let me know if that refreshes your

15   recollection.

16   A.    Okay.

17   Q.    Dr. Grandean, there was no statically significant

18   interaction between fluoride in drinking water and the task

19   difficulty on the total errors made by the children, right?

20   A.    That's what it says.

21   Q.    Okay.  Dr. Grandean, I'd like to ask you a few questions

22   about some of the testimony you gave yesterday.  You testified

23   yesterday the NTP Monograph reviewed 72 studies on fluoride and

24   IQ, right?

25   A.    Correct.

 1   **Q.**   And then yesterday with counsel you walked through a table

 2   that had some of those studies and identified the mean urinary

 3   fluoride or water fluoride concentration in those studies,

 4   right?

 5   **A.**   Correct.

 6   **Q.**   You did not walk through all 72 studies in that table

 7   yesterday, right?

 8   **A.**   Right.  I mean, if you take the Lin study from China, the

 9   high fluoride exposure group had less than 1.5 milligrams of

10   fluoride per liter.

11         So, I mean, yes, there is a range of studies from very

12   small elevations of fluoride in drinking water to, like, the

13   Ethiopian study, huge elevations.  And so we need to consider

14   that, first of all, in the hazard assessment very clear

15   fluoride is a hazard.  But the way we consider the dose

16   dependence, I would rather use the individual data like those

17   we used in our BMD analysis.

18   **Q.**   But Dr. Grandean, just to clarify, you did not walk

19   through 72 studies yesterday with Mr. Connett?

20   **A.**   I mean, I've read them and I had a Chinese speaking

21   colleague help me with some of the translations.  But, quite

22   frankly, I don't remember all of them in detail.

23   **Q.**   Okay.  Let's shift gears.  I want to turn you to a version

24   of a chart that counsel showed you yesterday from the NTP

25   monograph or NTP meta-analysis.

---

1          **MR. CAINTIC:**  And for the benefit of the Court, this

2   will be at Trial Exhibit 68.  And this is PDF page 68 in Trial

3   Exhibit 68.

4          And Mr. Hamberg, if you could pull up document G19.

5   **BY MR. CAINTIC:**

6   **Q.**   And Dr. Grandean, this chart is from the NTP's

7   meta-analysis on fluoride.

8          I'll represent to you it's the same chart Mr. Connett

9   showed you, except it's stratified by high risk of bias versus

10  low risk of bias studies.

11  **A.**   Okay.

12  **Q.**   And I've also added some highlights here, which we'll

13  explain.

14         But first, Dr. Grandean, just so we can orient ourselves,

15  this is called a forest plot, right?

16  **A.**   Correct.

17  **Q.**   Okay.  And the letters SMD in the top right corner stand

18  for "standardized mean difference," right?

19  **A.**   Correct.

20  **Q.**   And the purpose of generating a standardized mean

21  difference score is to essentially standardize the effect

22  estimate across studies which may use different kinds of IQ

23  measures like Wechsler or Bayley or McCarthy and different

24  kinds of fluoride exposure measures like urinary fluoride or

25  water fluoride, right?

 1   **A.**   Correct.

 2   **Q.**   Okay.  And you acknowledged in your testimony yesterday

 3   that the numbers in the parentheses on the right-hand side are

 4   confidence intervals, right?

 5   **A.**   Correct.

 6   **Q.**   And if the confidence interval, the range, includes the

 7   number zero, then that means it's not statistically

 8   significant, right?

 9   **A.**   Correct.

10   **Q.**   Put differently, if the horizontal lines jutting out from

11   those circles crossed that vertical line at zero, that

12   represents that it's no longer statistically significant,

13   right?

14   **A.**   Right, but it may still be informative and meaningful.

15   **Q.**   Dr. Grandean, I went ahead and I highlighted every

16   instance in this chart where the confidence interval included

17   the number zero, so it's no longer statistically significant.

18   In the interest of time, let's focus just on the

19   low-risk-of-bias studies, which are on the bottom of this

20   chart.

21        So in the low-risk-of-bias studies here in the

22   meta-analysis, I count ten studies.  Does that agree with your

23   understanding?

24   **A.**   I see this forest plot for the first time and it's hard

25   for me to comment on what is high risk of bias and low risk of

1    bias.

2    Q.    So this is the first time you've seen this forest plot?

3    A.    I don't remember having seen it before.

4    Q.    Okay.  Well, if you could just count in the low risk of

5    bias region how many studies are there for the Court?

6    A.    Well, I remember that the colleagues at the NIHS, the

7    National Toxicology Program, found was that there wasn't any

8    major difference in the findings between those with high risk

9    of bias and those with low risk of bias.  And it looks like

10   you're illustrating here that there is a difference, and that's

11   new to me.

12   Q.    Okay.  Well, why don't we walk through some of the

13   highlighted studies in the overall low-risk-of bias.

14         So first there's Ding 2011.  And the confidence interval

15   for that is negative 0.45 to 0.36, right?

16   A.    Okay.  That's what it says.

17   Q.    And that includes the number zero?

18   A.    Of course.

19   Q.    The next one that's highlighted is Trivedi 2012 and the

20   confidence interval for that is negative 0.69 to 0.18, right?

21   A.    But I want to know where did you get these numbers from?

22   Is this from the NTP report?

23   Q.    This is from the meta-analysis.

24   A.    Oh.  It's from the meta-analysis.  Okay.  Because I --

25   that's not my recollection of the -- for example, the Bashash

1   2017 and the Green 2019 studies.  It looks like -- I mean,

2   those numbers look foreign to me.

3   **Q.**   Right.  So why don't we pay attention to Bashash 2017 and

4   Green 2019.  Those are the first fluoride and IQ studies from

5   the ELEMENT and MIREC cohorts, right?

6   **A.**   Apparently.  I mean, I don't know how -- you know, what

7   specific article this refers to.

8   **Q.**   And so when the NTP authors created a standardized mean

9   difference score from the Bashash 2017 and the Green 2019

10  studies, that standardized mean difference became statistically

11  insignificant, right?

12  **A.**   That's what it appears like, but I think those cohorts are

13  produced -- I mean, they have been presented later on with

14  stronger findings.  I mean, it looks like there's some

15  selection of the literature going on here.

16  **Q.**   Does this strike you as strange?

17  **A.**   I mean, I -- I don't -- I can't relate to these numbers

18  because I don't know the validity of what you're showing me

19  here.

20  **Q.**   Okay.  Well --

21          **MR. CAINTIC:**  Mr. Hamberg, you can pull this down now.

22  **BY MR. CAINTIC:**

23  **Q.**   Let's switch gears to your Danish OCC study.

24  **A.**   Okay.

25          **THE COURT:**  Hold on a second.  Perhaps I could benefit

 1   from an understanding of what the standard means deviation, if

 2   that's what it's called, a difference.  How does that work?

 3   What happens?  What is it?  You sort of describe that there's

 4   some adjustment to standardize -- to make the exposure and

 5   decrement impact standardized.  But can somebody explain to me,

 6   may be through your questioning of this witness, what it is?

 7           **MR. CAINTIC:**  Well, should I --

 8           **THE COURT:**  Yeah.

 9   **BY MR. CAINTIC:**

10   **Q.**  Dr. Grandean --

11           **THE COURT:**  Yeah.  Knowing that I don't understand it,

12   you could benefit me by --

13   **BY MR. CAINTIC:**

14   **Q.**  Dr. Grandean, do you understand what happens when you

15   convert a study's results into a standardized mean difference?

16   **A.**  This would -- I mean, I don't know how this was concocted,

17   but -- but we would take the difference between the highly

18   exposed and the low level or lower level exposed groups and

19   express that as in relation to the standard deviation of the IQ

20   scale, which means that if we take the red number in the

21   middle, 0.52, that corresponds to a little over 7 IQ points

22   difference.  And you can see that the confidence interval is

23   several IQ points.

24   **Q.**  Dr. Grandean, do you understand the statistics that are

25   used to convert the effect sizes found in the original paper

1  into a standardized mean difference score?

2  **A.**   Yes, and they can be confusing to some readers because I

3  know that NTP has been criticized for worrying about a

4  difference of 0.52 IQ points, but it's 0.52 times 15 IQ points

5  that is a standard deviation in the standardized IQ scale.

6  **Q.**   How can you explain that the Bashash 2017 and Green 2019

7  study standardized mean difference scores, one became positive

8  and two became statistically insignificant?

9  **A.**   I think you had an occasion to ask Dr. Lanphear yesterday,

10  and I'm not here to explain why this number pops up in your

11  table.

12          **MR. CAINTIC:**  Your Honor, with Dr. Barone's testimony,

13  Dr. Barone is far more well-versed in a lot of these

14  statistics.

15          **THE COURT:**  Okay.

16          **MR. CAINTIC:**  I think we can elicit it out of him

17  during our case-in-chief.

18          **THE COURT:**  Okay.

19  **BY MR. CAINTIC:**

20  **Q.**   Okay.  Dr. Grandean, now let's switch gears to your Danish

21  study.

22          And just to be clear, you are the first author of that

23  paper, which is titled "Dose dependence of prenatal fluoride

24  exposure associations with cognitive performance at school age

25  in three prospective studies," right?

1   **A.**   Correct.

2   **Q.**   Okay.  And that paper does two things.  It both reports

3   out the Danish OCC results for the first time and combines the

4   Danish OCC data with the ELEMENT and MIREC data to calculate a

5   benchmark concentration level, right?

6   **A.**   Correct.

7   **Q.**   And if I refer to that paper as either Grandjean 2023 or

8   your 2023 BMCL calculations or your Danish study, you'll know

9   what I mean?

10  **A.**   That's fine.

11  **Q.**   Okay.

12       You analyzed the fluoride data from the Danish OCC study

13  using the same methodology as the MIREC, ELEMENT -- MIREC and

14  ELEMENT cohorts, right?

15  **A.**   Basically, yes.

16  **Q.**   And because you used the same methodology as ELEMENT and

17  MIREC, you view the OCC data as reliable, right?

18  **A.**   Can you repeat?

19  **Q.**   Yes.

20       **THE COURT:**  Speak slow.

21  **BY MR. CAINTIC:**

22  **Q.**   Because you used the same methodology as the ELEMENT and

23  MIREC cohorts --

24  **A.**   Yeah.

25  **Q.**   -- you view the OCC data as reliable, right?

1  **A.**   Oh, definitely.

2  **Q.**   The exposure variable for the Danish OCC study was

3  maternal urinary fluoride adjusted for creatinine, right?

4  **A.**   And from the third trimester.

5  **Q.**   From the third trimester adjusted for creatinine?

6  **A.**   Exactly.

7  **Q.**   And the reason why you adjust for creatinine is to adjust

8  for urinary dilution, right?

9  **A.**   That's the standard practice.

10  **Q.**   It's important to adjust for urinary dilution studies that

11  analyze maternal urine, right?

12  **A.**   Like we discussed before, correct.

13  **Q.**   It's possible that the results of a study could change, if

14  you didn't adjust for urinary dilution, right?

15  **A.**   Maybe they would change a little bit, but as I said, these

16  are either first morning urines or they are 24-hour urines.  So

17  we already standardized that that way, so -- and I mean, we

18  looked at this in the initial statistics and I don't remember

19  that we saw any substantial difference from adjusting, as is

20  the standard, for creatinine.

21  **Q.**   Dr. Grandean, this isn't the first time we've met, right?

22  **A.**   I seem to remember your face, but I was at a deposition in

23  Boston.

24  **Q.**   I took your deposition in Boston in October of last year,

25  right?

 1  **A.**   Right.  Okay.

 2  **Q.**   Okay.  And at that deposition you swore an oath to tell

 3  the truth, right?

 4  **A.**   Okay.

 5  **Q.**   Okay.

 6  **A.**   Yes.

 7          **MR. CAINTIC:**  At this time, Your Honor, I'd like to

 8  read from Dr. Grandean's deposition transcript, page 93, lines

 9  22 to 24; and page 94, lines 1 through 10.

10          **MR. CONNETT:**  Can I have a second?

11          **THE COURT:**  Yeah.

12          **MR. CONNETT:**  Paul, it's 92?

13          **MR. CAINTIC:**  93, lines 22 to 24 and 94, lines 1

14  through 10.  It should be on the screen as well.

15          **MR. CONNETT:**  Oh.

16  **BY MR. CAINTIC:**

17      **"QUESTION:**  Could your results change depending on whether

18      or not you adjusted for dilution in urinary fluoride or

19      not?

20      **"ANSWER:**  It's possible.  We did not check if -- we did

21      not check --

22      **"QUESTION:**  Okay.

23      **"ANSWER:**  -- in the Danish study if there was any

24      significant change due to the urine density or creatinine,

25      but I'm sure it might have an effect.  But this is

1    standard that you -- you used that, you know, some kind of

2    adjustment."

3    So Dr. Grandean, it's standard that you adjust for urinary

4    dilution in epidemiological studies, right?

5    **A.**   That is correct.

6    **Q.**   You wouldn't carry out a study without adjusting for

7    urinary dilution?

8    **A.**   If I had joint density that -- and I, for example, didn't

9    have enough volume of urine to have creatinine measured, I

10   would be happy with the density.

11        **MR. CAINTIC:**  Your Honor, at this time I'd like to

12   read from Dr. Grandean's deposition transcript, page 94, lines

13   11 through 18.

14        **THE COURT:**  Okay.

15        **MR. CONNETT:**  No objection.

16        **THE COURT:**  Okay.

17   BY MR. CAINTIC:

18        **"QUESTION:**  So if I did not adjust for urinary dilution in

19        my study, you can imagine the results might change if I

20        eventually did adjust for urinary dilution?

21        **"ANSWER:**  I can't relate to that, because I would not

22        carry out a study without that adjustment."

23   Dr. Grandean, failing to adjust for urinary dilution in a

24   fluoride study could give you the wrong impression of what the

25   fluoride exposure was, right?

**GRANDJEAN - CROSS / CAINTIC**

 1   **A.**   I think there's a misunderstanding going on here because

 2   urinary density is also a standard way of adjusting for

 3   dilution.

 4   **Q.**   You mean specific gravity?

 5   **A.**   You can call it that.

 6   **Q.**   Okay.  But failing to adjust for urinary dilution in a

 7   fluoride study could give you the wrong impression of what the

 8   fluoride exposure really was?

 9   **A.**   It depends.  I mean, the way we -- I'm repeating myself

10   here.  We got the first morning spot urine or we got 24-hour

11   urines and because of that way of collecting the data, the

12   density or creatinine adjustments play a lesser role.  And so

13   my answers -- I think the answers during the deposition are

14   very much in agreement with what I say here in that of course I

15   would adjust.  Creatinine isn't the only solution and there may

16   be circumstances, for example, if there's no more urine left in

17   the freezer we will have to -- and density is also available of

18   specific gravity and then we'll just use that.

19          **MR. CAINTIC:**  Your Honor, at this time I'd like to

20   read from Dr. Grandean's deposition transcript, page 94, lines

21   11 to 25 and page 95, lines 1 through 4.

22          **MR. CONNETT:**  Objection to the extent of the first

23   part since it was already read into evidence.

24          **MR. CAINTIC:**  I could start -- I was doing that just

25   for completeness.  I could start at line 20 instead.

```
 1              THE COURT:  Go ahead.

 2              MR. CONNETT:  If I could, Your Honor, I haven't yet

 3   read --

 4              THE COURT:  Okay.

 5              MR. CONNETT:  What line does it go to, Paul?

 6              MR. CAINTIC:  To 95, lines 1 through 4.

 7              MR. CONNETT:  I don't think this is impeachment

 8   testimony, Your Honor, but I have no objection.

 9              THE COURT:  Okay.  Go ahead and read it.

10   BY MR. CAINTIC:

11       "QUESTION:  Okay.

12       "ANSWER:  It doesn't make sense.

13       "QUESTION:  Why doesn't it make sense?

14       "ANSWER:  But you're saying that some urine samples would

15       be diluted, and so that would give the wrong impression of

16       what the fluoride exposure was.  Why should I do that?  I

17       want a valid response.  I want to ascertain the statistics

18       here based on valid data and if I ignore dilution, my data

19       may not be valid."

20   A.   But I think we're talking about two things because at the

21   deposition we talked in general and you said now we were

22   discussing the OCC study and because -- and I'm repeating

23   myself here -- we standardized the urine collection, and that

24   helps us at least part of the way of making sure we have a

25   valid urine fluoride measurement.  And then in addition we
```

1    adjusted for creatinine.

2    **Q.**    Your IQ measure in the Danish study was the Danish version

3    of the Wechsler IQ test, right?

4    **A.**    As standardized for Danish children, yes.

5    **Q.**    Okay.  And you ran various different models on the OCC

6    data, right?

7    **A.**    Speak slowly, please.

8    **Q.**    You ran multiple different models on the Danish OCC data,

9    right?

10   **A.**    Models for associations with fluoride, yes.

11   **Q.**    Okay.

12        Across all of those models that you ran on the Danish OCC

13   data, you never found a statistically significant adverse

14   effect of maternal urinary fluoride concentrations on child's

15   IQ, right?

16   **A.**    I can't say never because we did -- I mean, we started out

17   with a linear association because that's -- that's what EPA

18   would want us to do, and that is the simplest biostatistic

19   approach, but then we also looked at curvilinear and also

20   broken lines.  And I don't recall if we saw any clear negative

21   effects.  I don't think so.  And, I mean, what we reported was

22   the most trustworthy and valid approaches to analyzing data

23   like this.

24   **Q.**    So you ran at least four models on the Danish OCC data

25   alone, and across those four models you never found a

1  statistically significant adverse effect of fluoride on IQ?

2  **A.**   I can't say that we only used four, and I can't say that

3  we never found anything statistically significant, but I would

4  actually refer to our published article as representative of

5  our analysis of these data.

6       **MR. CAINTIC:**  Your Honor, at this time I'd like to

7  read from Dr. Grandean's deposition transcript, page 108, lines

8  21 to 24 and page 109, line 1.

9       **THE COURT:**  Okay.  Counsel?

10      **MR. CONNETT:**  I mean, again, I don't think that this

11  is impeachment testimony, but no objection.

12      **THE COURT:**  All right.  Go ahead.

13  **BY MR. CAINTIC:**

14     **"QUESTION:**  So you ran, by my count, like we just went

15      through, four models of the MUF and child's FSIQ, and no

16      effect was found?

17     **"ANSWER:**  We did.

18     **"QUESTION:**  Okay.

19     **"ANSWER:**  Yep."

20  **A.**   I mean, this was a conversation we had in Boston, and your

21  questions today are slightly different, so you can't hold me

22  up, you know, on slightly different wordings.  And, I mean, I

23  stand by my answers to you in Boston, but, I mean, this setting

24  here is different and you're asking me both specifically and in

25  more general terms.

1        Clearly my statistician colleagues looked at multiple

2   models, but we put emphasis on the four that we described in

3   the paper.

4   **BY MR. CAINTIC:**

5   **Q.**   Dr. Grandean, there is no reason to discount the Danish

6   OCC study's applicability to the question of whether water

7   fluoridation at .7 milligrams per liter is harmful?

8           **MR. CONNETT:**  Vague and ambiguous.

9           **THE COURT:**  Can you rephrase that?

10          **THE WITNESS:**  Can you repeat it, please?

11  **BY MR. CAINTIC:**

12  **Q.**   Sure.  Dr. Grandean, you don't believe that we should

13  ignore the Danish OCC studies when analyzing whether or not

14  fluoride at .7 milligrams per liter is harmful, right?

15  **A.**   The OCC data compliments with substantial background

16  fluoride exposure data on fluoride exposure and IQ and,

17  therefore, makes it -- I mean, we're now up to, I think, 1,500

18  children in the joint analysis of the three cohorts.  So the

19  Danish cohort adds to the evidence that's available for this

20  calculation.

21  **Q.**   You believe that there's no reason we should discount the

22  Danish OCC study when we're asking whether or not .7 milligrams

23  per liter is neurotoxic, right?

24          **MR. CONNETT:**  Vague and ambiguous, asked and answered.

25          **THE COURT:**  Overruled.  You can answer.

1          THE WITNESS:  This was not a hazard study.  This was a

2   contribution to the dose-dependent association.

3          MR. CAINTIC:  Your Honor, at this time I'd like to

4   read from Dr. Grandean's deposition transcript, page 289, lines

5   18 to 25 and 290, lines 1 through 8.

6          THE COURT:  Okay.  Any objection?

7          MR. CONNETT:  No objection.

8          THE COURT:  Okay.

9   BY MR. CAINTIC:

10      "QUESTION:  And just to be clear, you would not discount

11      the Danish Odense child cohort study's applicability to

12      the question of whether water fluoridation at 0.7

13      milligrams per liter is harmful?

14      "ANSWER:  You asked me that question several times, and

15      you've given me no reason why it should be discounted.

16      "QUESTION:  Okay.

17      "ANSWER:  On the contrary.  If we discounted it, we would

18      end up with a BMCL of 0.2 instead of 0.3.

19      "QUESTION:  Okay.

20      "ANSWER:  Do you prefer 0.2?

21      "QUESTION:  So no reason to discount it?

22      "ANSWER:  Okay.

23      "QUESTION:  Do you agree?

24      "ANSWER:  I agree."

25      Dr. Grandean, it wouldn't make sense to discount the

1   Danish study to the question of whether water fluoridation at

2   .7 milligrams per liter is a developmental neurotoxicant,

3   right?

4   **A.**   I think I already answered this.  This is not a study that

5   adds to the hazard assessment, but it's clearly very useful for

6   the dose-dependence determination where it added evidence and

7   material to the BMCL analysis.

8   **Q.**   You could say that the Danish Odense child cohort study is

9   relevant, by itself, to the question of whether fluoridation at

10  a concentration of .7 milligrams per liter is a developmental

11  neurotoxicant, right?

12  **A.**   It could be relevant.  I mean, if we had found clear

13  evidence of fluoride toxicity at background fluoride exposures

14  in Denmark, that would certainly have an impact on our

15  assessment of the safety of 0.7, but we didn't find anything

16  significant and, therefore, so it adds to the material that we

17  can use for assessing the dose dependence.

18  **Q.**   You believe the Danish OCC study is a serious,

19  well-documented and valid study that used standardized

20  methodology, right?

21  **A.**   I believe it's a valid study.  We did everything we could

22  to maximize the validity, and I think that we showed that it

23  did contribute to the BMCL analysis.

24  **Q.**   And in the Danish Odense municipality, their drinking

25  water has a fluoride level of about 0.3 milligrams per liter?

1   A.   0.2 to 0.3.

2   Q.   And in the U.S., water, when it's purposefully

3   fluoridated, is fluoridated to a concentration of .7 milligrams

4   per liter, right?

5   A.   That's what I understand.

6   Q.   And the difference between that 0.3 in the Danish Odense

7   municipality and .7 milligrams per liter in the United States

8   is not significant enough to discount the Danish Odense child

9   cohort's applicability to the question of whether water

10  fluoridation at .7 milligrams per liter is harmful, right?

11         MR. CONNETT:   Your Honor, I'm going to object to the

12  prefatory comment because it misstates the testimony about .3.

13         THE COURT:   I'm not taking his comment as stating any

14  testimony, he's asking the question, so overruled.

15         THE WITNESS:   I mean, I think I already answered this

16  because you will see in our data that most people actually have

17  urine fluoride above 0.2 and there are people with fluoride

18  concentrations above 0.7, which means that we are overlapping

19  with the two North American cohorts, but we're contributing

20  more to the low background levels.

21  BY MR. CAINTIC:

22  Q.   And the maternal urinary fluoride concentration, the

23  average in the third trimester was 0.58 milligrams per liter in

24  the Danish Odense child cohort?

25  A.   I don't remember the exact -- if you say that this is, I'm

 1  willing to accept that.

 2  **Q.**   And Dr. Grandean, you had some discussion with Mr. Connett

 3  today about some of the limitations of the Danish OCC paper in

 4  that it only took urine samples from the third trimester,

 5  right?

 6  **A.**   Correct.

 7  **Q.**   Do you think that's a small weakness of your study?  Would

 8  you characterize that as a small weakness of your study?

 9  **A.**   Well, it's one that's -- that one can adjust for, so it's

10  a small weakness.

11  **Q.**   In terms of the study that you relied on during counsel's

12  questioning for the proposition that urinary fluoride is higher

13  in the third trimester than it is in the first trimester,

14  you're relying on data from the MIREC cohort, right?

15  **A.**   MIREC and ELEMENT.

16  **Q.**   And ELEMENT?

17  **A.**   Yes.

18          **MR. CAINTIC:**  Your Honor, at this time I'd like to

19  read from Dr. Grandean's deposition transcript, page 135, lines

20  18 to 22.

21          **MR. CONNETT:**  No objections, Your Honor.

22          **THE COURT:**  Go ahead.

23  BY MR. CAINTIC:

24          "**QUESTION:**  So in terms of the studies that you are

25          relying on for the proposition that urinary fluoride is

1          higher in the third trimester than the first trimester,

2          it's the MIREC cohort?

3          **"ANSWER:** Right."

4      And Dr. Grandean, at the time you came to your opinions in

5  this case, you didn't know whether MIREC's findings that

6  urinary fluoride concentrations are higher in the third

7  trimester than the first trimester had ever been replicated in

8  any other cohort, right?

9  **A.**   I don't remember, frankly.

10 **Q.**   You don't remember if that first versus third trimester

11 difference had ever been replicated in any cohort?

12 **A.**   I don't remember it, but -- I mean, we relied on multiple

13 urine samples from North America.  We just had one in the

14 Danish study.

15 **Q.**   Okay.

16          **THE COURT:**  So we should take a break soon.

17          **MR. CAINTIC:**  Okay.  I'm at a good stopping point

18 right now.

19          **THE COURT:**  Okay.  We'll go ahead and let's take our

20 break.  Thank you.

21          **THE CLERK:**  Court is in recess.

22      (Recess taken at 10:22 a.m.)

23      (Proceedings resumed at      .m.)

24          **THE COURT:**  I'm going to first remind the audience

25 here to please keep your masks on.  That's one of the protocols

1    we're following here, so appreciate your cooperation.  Thank

2    you.

3            Go ahead.

4    **BY MR. CAINTIC:**

5    **Q.**  All right, Dr. Grandean.  I'd like to turn now to your

6    benchmark concentration level or BMCL calculations from 2023.

7            So you -- in the paper called Grandjean 2023, you both

8    reported out the results from the Danish OCC study, and then

9    you combined it with the Danish -- you combined the Danish OCC

10   data with ELEMENT and MIREC to create a BMCL calculation,

11   right?

12   **A.**  Correct.

13   **Q.**  You have not published the Danish OCC results on their

14   own, right?

15   **A.**  Oh, there are multiple publications of the OCC, so it

16   wasn't necessary?

17   **Q.**  You haven't published the Danish OCC fluoride and IQ

18   results on their own, right?

19   **A.**  We decided that they would better fit in this joint

20   analysis.

21   **Q.**  So you only published the Danish OCC results in connection

22   with this BMCL calculation where you combined the Danish OCC

23   data with ELEMENT and MIREC, right?

24   **A.**  I mean, in science there's something called the "salami

25   technique."  That's when you cut thin slices of your scientific

 1   evidence and publish multitude of papers.  We decided that
 2   enough was published on the cohort and that we could easily put
 3   everything relevant into this joint paper, so we published all
 4   of the results in a paper that we thought would be more
 5   weighted because it had all of the relevant information.
 6   **Q.**   Okay.  You didn't find the Danish OCC results interesting
 7   enough to publish on their own?
 8   **A.**   That was not a consideration.  I mean, I just explained to
 9   you that we didn't want to do the salami technique because we
10   could easily fit in all the relevant information into a joint
11   paper.
12          **MR. CAINTIC:**  Your Honor, at this time I'd like to
13   read from Dr. Grandean's deposition transcript, page 98, lines
14   11 through 25 and page 99, lines 1 through 12.
15          **THE COURT:**  Any objection?
16          **MR. CONNETT:**  I'm looking, Your Honor.
17          Paul, where did it start?
18          **MR. CAINTIC:**  Line 11 on page 98 and it should be on
19   the screen.
20          **MR. CONNETT:**  Yeah.
21          No objection, Your Honor.
22          **THE COURT:**  Okay.
23   BY MR. CAINTIC:
24          "**QUESTION:**  What are the other studies that you just
25          referenced that are looking at the very low levels?

1    "ANSWER:  I mean, there is -- there's 72 papers to choose

2         from.  I can't remember, but a paper on Danish cohort

3         would not, in itself, provide much new information because

4         people would say there are too few kids for you to see a

5         fluoride effect at low exposure levels and we had the

6         number of kids that we got.  And the only way to or the

7         best way of achieving enough information to justify a

8         submission of a scientific manuscript -- I mean, I review

9         about a thousand manuscripts a year for my journal, and I

10        have pretty strong opinions on manuscripts, whether they

11        fit my journal.

12             "I require new information that's worthwhile for

13        readers to spend time on, and that judgment also regards

14        my own work and I figured this is not interesting,

15        interestingly enough.  We need to look at this in

16        perspective and we have a unique chance in that we have

17        already collaborated with the two North American cohorts

18        and they knew the methodology and we -- we already needed

19        to update that because new information came from the

20        ELEMENT cohort because some additional analysis had been

21        carried out, so it was clear to us that that was the way

22        to go."

23        Dr. Grandean, you didn't conduct the BMC analyses in

24   Grandjean 2023 yourself, right?

25   A.   I think there's a table that gives the BMCL for the three

1  cohorts.

2  **Q.**  I can clarify.

3      You did not personally carry out the statistical analyses

4  to create the BMCL calculations, right?

5  **A.**  I have a colleague who is a professor of biostatistics

6  whom I regard highly, and he was responsible for these

7  calculations, not me, but I understand every step, I think, of

8  what he did.

9  **Q.**  The people that did the actual BMC analyses were a post

10  doc named Alessandra Meddis and a professor named Esben

11  Budtz-Jørgenson, right?

12  **A.**  Right.  Alessandra is a highly talented post-doc

13  originally from Italy.

14  **Q.**  And to be clear, just to we can orient ourselves, a BMC --

15  not BMCL, but a BMC in this context is the maternal urinary

16  fluoride concentration that produces a 1 IQ point decrement,

17  right?

18  **A.**  On average based on the total material.

19  **Q.**  And the BMCL is the lower 95th confidence limit underneath

20  that BMC, right?

21  **A.**  Correct, and that's what EPA relies on too.

22  **Q.**  And the BMCL is often used because it's more health

23  protective, right?

24  **A.**  That's what the EPA's policy is.

25  **Q.**  So in addition to calculating a BMCL that combined the

1  OCC, MIREC and ELEMENT data, you also calculated a BMCL for

2  just the OCC data alone, right?

3  **A.**   For all three cohorts individually, yes.

4  **Q.**   Just to clarify, so you calculated a BMCL on just the

5  Danish OCC data, right?

6  **A.**   Yes.  Likewise with the two other cohorts.

7  **Q.**   The BMC that you calculated using just the Danish OCC data

8  was 0.92 milligrams per liter, right?

9  **A.**   I don't have it in front of me, but if you say so.

10       **MR. CAINTIC:**  Mr. Hamburg, if we could pull up

11  Grandjean 2023 page 1, which is internal No. G2.  And if we

12  could just zoom in, in the results section.

13  **BY MR. CAINTIC:**

14  **Q.**   And Dr. Grandean, I'm looking on the third line about

15  midway through there's a sentence that begins "In the OCC."

16       Do you see that?

17  **A.**   I see that.  Yes.

18  **Q.**   Does that refresh your recollection about what the BMC was

19  using just the Danish OCC data?

20  **A.**   As I said, this is what we did for each of the three

21  cohorts, plus we did it for the joint material.

22  **Q.**   The BMC you calculated using just the Danish OCC data was

23  0.92 milligrams per liter, right?

24  **A.**   This is a piece of information we provide for the sake of

25  transparency to inform the readers.  This is not something that

1  we would use for risk assessment or for dose-response

2  assessment.  This is simply a piece of information we provide

3  for that limited distribution in the OCC.

4  **Q.**  But Dr. Grandean, my question -- I'm just trying to get

5  the number, see if you agree.

6      The BMC you calculated using just the Danish OCC data was

7  0.92 milligrams per liter, right?

8  **A.**  I think I've already indicated that I agree, because I can

9  see that right on the screen.

10  **Q.**  The BMCL you calculated using just the Danish OCC data was

11  0.3 milligrams per liter, right?

12  **A.**  Right.  It is fairly low because you must understand that

13  in a limited material like OCC alone, that it would have a

14  wider confidence interval and, therefore, also a relatively low

15  BMCL.

16      So to find a BMCL of 0.3 just in the Danish material

17  should not be taken as an indication that the BMCL should be

18  about that.

19      It happens to be close to what we find for the total

20  material, but it has a statistical reason for being, I would

21  say, artificially low because it's a smaller -- it's a more

22  narrow exposure range, and it's a smaller material.

23  **Q.**  And just to be clear, that BMC and BMCL we just talked

24  about, those were calculated based on a linear model, right?

25  **A.**  If that's what the text says, yes, but we certainly did

1  look at other models.

2  **Q.**  And again, I think we discussed before the average

3  maternal urinary fluoride level in the Odense child cohort was

4  0.58 milligrams per liter?

5  **A.**  Okay.

6  **Q.**  Is that a yes, you agree?

7  **A.**  Yes.  We talked about that before.

8  **Q.**  So the BMCL you calculated using just the Danish OCC data

9  of 0.3 milligrams per liter was lower than the average MUF

10  level of 0.58 milligrams per liter in a municipality that does

11  not fluoridate its water?

12  **A.**  That's possible.

13  **Q.**  And the Danish OCC study found no statistically

14  significant adverse effect of MUF concentrations on full-scale

15  IQ, right?

16  **A.**  Yes, but your question is not relevant, I'm sorry, because

17  this is a smaller material with a limited range of fluoride

18  concentrations, so it will be very hard to find some

19  statistically significant association.

20  **Q.**  Dr. Grandean, before you had the Danish OCC data, you also

21  did a BMC and BMCL calculation for just the MIREC and ELEMENT

22  studies combined, right?

23  **A.**  Correct.

24  **Q.**  And that paper you published in 2022?

25  **A.**  In a journal called *Risk Analysis*.

1   Q.   Okay.  And that paper, just for clarity of the record, is

2   titled "A benchmark dose analysis for maternal pregnancy urine

3   fluoride and IQ in children," right?

4   A.   Yes.

5   Q.   And if I refer to that as your 2022 or -- yeah, 2022 BMCL,

6   you'd understand what I mean, right?

7   A.   Okay.

8   Q.   The statistical calculations in your 2022 BMCL paper were

9   also not done by yourself personally, right?

10  A.   I work closely with my coauthors and Esben and I meet

11  regularly and we have worked together for, I think, 25 years,

12  so I trust the numbers and I relied on my colleague who's a

13  professor of biostatistics to do these calculations in

14  accordance with our agreements and ongoing dialogue.

15  Q.   So the BMCL calculations in your 2022 paper were performed

16  by Professor Esben Budtz-Jørgenson?

17  A.   Yes.  This was before Allesandra came to Denmark.

18  Q.   And in the 2022 BMCL calculation, you found a BMCL of 0.2

19  milligrams per liter, right?

20  A.   Correct.

21  Q.   And that was based off a linear model?

22  A.   Yes.  According to my memory this was it.

23  Q.   And again, that 0.2 milligram per liter BMCL was of the

24  maternal urinary fluoride concentration, not drinking water

25  concentration, right?

**GRANDJEAN - CROSS / CAINTIC**

1   **A.**   Correct.

2   **Q.**   Okay.  In addition to the linear model in your 2022 paper,

3   you also ran a piece-wise model and a squared model, right?

4   **A.**   Right.

5   **Q.**   Okay.  The Akaike, I think you pronounce it the Akaike.

6   It's A-K-A-I-K-E.

7   **A.**   Oh, Akaike?

8   **Q.**   Sure.

9   **A.**   Okay.

10  **Q.**   Information criterion or AIC --

11  **A.**   Yeah.

12  **Q.**   -- is a measure of how well the data fits a particular

13  model, right?

14  **A.**   Correct.

15       And if the difference between two models is greater than

16  three, it's regarded as statistically significant.

17  **Q.**   Okay.  And if I call that the "AIC," you'll know what I

18  mean, right?

19  **A.**   Okay.

20  **Q.**   Okay.  The lower the AIC score the better, right?

21  **A.**   Correct.

22  **Q.**   Okay.  In your 2022 BMCL calculations, you ran models that

23  combined both the boys' and girls' IQ data from both the

24  ELEMENT and MIREC cohorts, right?

25  **A.**   We did boys and girls separately and jointly.

GRANDJEAN - CROSS / CAINTIC

1   **Q.**   Okay.  So that was a yes?

2   **A.**   Yes.

3   **Q.**   Okay.  When you ran the linear model for both boys and

4   girls looking at MIREC and ELEMENT IQ, the BMCL you calculated

5   was 0.2 milligrams per liter, right?

6   **A.**   I don't remember the exact number, but it sounds correct.

7   **Q.**   Okay.  And then with those same parameters of boys and

8   girls IQ, ELEMENT and MIREC, you also ran a squared model,

9   right?

10   **A.**   Of course.

11   **Q.**   Okay.  And then with those same parameters, the squared

12   model calculated a BMCL of 0.768 milligrams per liter, right?

13   **A.**   It may be, but I don't think that that's necessarily

14   relevant.

15   **Q.**   Would it refresh your recollection to see the table?

16   **A.**   Well, the point is that you can get almost any BMCL, or

17   whatever it is, depending on which model you enforce upon the

18   data.

19       And what we did was to look at the linear model as the

20   default starting point, at least, and then we looked at other

21   possible models and then compared with the Akaike criterion.

22   And so we found that the linear model was the best

23   approximation to the data, and that's where we then got the

24   BMD, BMC, BMCL numbers from.  And it's simply, as I said

25   before, we want transparency, and so we provide additional

1  information for the interested reader, but I wouldn't put

2  emphasis on a BMC or BMCL level that happens to be artificially

3  high.

4  **Q.**   Just to be clear, Dr. Grandean, the squared model

5  calculated a BMCL of 0.768 milligrams per liter, right?

6  **A.**   If you got that from my paper, this was what we provided

7  for information.

8          **MR. CAINTIC:**   Mr. Hamburg, if we could pull up

9  Grandjean 2022 BMCL, this is internal number G4.  It's page 17

10 at Table 2.

11 **BY MR. CAINTIC:**

12 **Q.**   And Dr. Grandean, I am looking at the column that says

13 "MIREC and ELEMENT IQ n = 618."

14         And then if you look at the squared model that's for both

15 boys and girls.  Does that refresh your recollection?

16 **A.**   When you look at the AIC for that column, you'll see that

17 they are all within a 3 point difference, which means that it's

18 essentially the same fit.

19 **Q.**   The squared model calculated a BMCL of 0.768 milligrams

20 per liter, right?

21 **A.**   Right.  This is what it says?

22 **Q.**   And the AIC, the fit score for the linear version of that

23 model was that top number, 4,770.1, right?

24 **A.**   Right.  It happens that it's slightly higher for both

25 sexes, but you can see from the data on the boys and the girls

1    separately, you get a lower number.

2    **Q.**    The AIC, the fit score, for the squared model was 4,768.8,

3    right?

4    **A.**    Right.  And it happens to be slightly lower than the

5    linear model, but it's the other way around for boys and girls

6    separately.

7    **Q.**    In your view, the AIC scores are, at minimum, comparable

8    to one another?

9    **A.**    Right.  There's no definite difference between the models.

10   **Q.**    And a squared model assumes that the shape of the

11   dose-response relationship is curved, right?

12   **A.**    Right.

13   **Q.**    You agree that the outcome of a BMCL calculation is

14   dependent on the assumption of the model shape, right?

15   **A.**    Right.  And what we did was simply to test various

16   appropriate models, you know, like -- I'm sure EPA would want

17   us to do that.  And so we provided --

18       I mean, there are so many numbers in this table, and we

19   simply did that in order for -- to provide the reader with all

20   possible information that might be relevant and now you're

21   highlighting some particular numbers, okay, but these --

22   listen, they don't mean that the squared model is better than

23   the linear one.

24   **Q.**    Okay.  So we were just discussing this conversation is

25   about the 2022 BMCL calculations, right?

---

GRANDJEAN - CROSS / CAINTIC

1   **A.**   Okay.

2   **Q.**   And we had discussed earlier your 2023 BMCL calculations,

3   right?

4   **A.**   Okay.  Yes.

5   **Q.**   In your 2023 BMCL model, you ran two models, a linear and

6   a piece-wise model, right?

7   **A.**   Well, there were two piece-wise models.

8   **Q.**   Two piece-wise models.  So you ran a linear one piece-wise

9   model and then another piece-wise model, right?

10  **A.**   I believe we did additional models, but they may not have

11  all made it into the publication.

12  **Q.**   You edited out the squared model from your 2023 BMCL

13  calculation, right?

14  **A.**   That's -- I hope that's what the paper says.

15  **Q.**   That you edited out the squared model from your 2023 BMCL

16  calculation?

17  **A.**   I don't -- I mean, I don't have the paper in front of me,

18  so we routinely try a squared model and a logarithmic model,

19  because those are standard.

20        **MR. CAINTIC:**  Your Honor, at this time I'd like to

21  read from Dr. Grandean's deposition transcript, page 259, lines

22  16 through 24.

23        **THE COURT:**  What's the page again?

24        **MR. CAINTIC:**  Page 259, lines 16 to 24.

25        **MR. CONNETT:**  No objections.

```
 1              THE COURT:  Go ahead.
 2   BY MR. CAINTIC:
 3        "QUESTION:  Did you provide a squared model in the latest
 4        BMCL calculation, 2023, with the Danish data?
 5        "ANSWER:  I don't think so.  I don't remember the details,
 6        but I seem to remember that the squared model didn't fit
 7        as well.
 8        "QUESTION:  Okay.  But that's not reported in the 2023
 9        paper, right?
10        "ANSWER:  I think we edited that out."
11        Dr. Grandean, you didn't report the Chi-squared values for
12   either your 2022 or 2023 BMCL calculations, right?
13   A.   Let us get this right.  Chi-square calculations, that's
14   entirely different.  What did you say "squared," is that the
15   curved model, or are you talking about a Chi-squared test?
16   Q.   Chi-squared test?
17   A.   Why would I do that?
18   Q.   A Chi-squared test is another measure of how good the data
19   fits the model shape, right?
20   A.   I guess you can use a Chi-square, but it has its
21   limitations.
22   Q.   Is the Chi-square test another measure of how good the
23   data fits the model shape?
24   A.   I simply think it's a simplistic way of comparing the
25   data.
```

1  Q.    But it is a test for model fit, right?

2  A.    It's not a test that I would recommend in general as a

3  preferred test because the purpose of using Chi-square is

4  entirely different.  It has nothing to do with curve fitting.

5          MR. CAINTIC:  Your Honor, at this time I would like to

6  read the definition kind of a Chi-squared goodness of fit test

7  from EPA's BMD technical guidance for purposes of impeachment.

8          THE COURT:  Go ahead.

9          MR. CONNETT:  Your Honor, I would just ask that the

10  full definition be provided.

11          THE COURT:  Okay.

12          MR. CAINTIC:  Mr. Hamburg, if you could pull up

13  internal number G15.  Yes.

14  BY MR. CAINTIC:

15  Q.    It begins, quote, "Chi-squared goodness of fit test:  A

16  statistical hypothesis test used to compare observed counts

17  with predicted numbers of independent observations classified

18  into two or more categories.

19      "The total count is assumed to be fixed (and in multiway

20  classifications, sometimes the marginal counts are fixed.)  In

21  the context of dose-response modeling, this test is often used

22  to determine whether the observed response rates at each dose

23  differ significantly from the corresponded predicted (or

24  expected) response rates on a selected model.

25      "Large deviations of observed -- large deviations of

1   observed from expected response rates yield large Chi-square

2   values and indicate a lack of fit of a selected model.

3        "For example, a model for the probability of an outcome in

4   relation to dose might be used to predict the number of animals

5   out of 50 that will respond at each of four dose levels (the

6   categories), generating expected numbers (which may be

7   fractional.)

8        "The Chi-squared statistic is calculated as the sum

9   (across the four doses) of the squared deviations of observed

10  counts from expected numbers, each divided by the expected

11  number.  The exact distribution of the statistic, if the model

12  is correct, is multinomial.

13       "For large samples (and with reasonably large response

14  probabilities), the distribution approach is that of the

15  Chi-squared distribution.

16       "For small samples, Fischer's exact test may be used as an

17  alternative."

18       Dr. Grandean, you have never seen a Chi-squared value

19  reported for a BMCL calculation, right?

20  **A.**   I'm sorry, sir, your question is misleading and the

21  quotation from EPA's guideline relates to animal studies with

22  specific-dose levels.  This is not appropriate for my work in

23  epidemiology.

24       And the reference to the Chi-square test and Fischer's

25  exact test is fine for animal studies, but that's not what my

1    work is about.  So, I'm sorry, your question is misleading.

2    **Q.**   Dr. Grandean, my question is, you have never seen a

3    Chi-squared value reported for a BMCL calculation, right?

4         **THE COURT:**  You're talking about for his BMCL

5    calculation?

6         **MR. CAINTIC:**  For any BMCL calculation.

7         **THE WITNESS:**  I think it has been used -- and my

8    colleagues from EPA can clarify this -- this has been used for

9    animal data.

10         **THE COURT:**  Why don't you ask the question about human

11    data then.

12    **BY MR. CAINTIC:**

13    **Q.**   Dr. Grandean, have you ever seen a Chi-squared value used

14    for a human BMCL calculation?

15    **A.**   I've seen Chi-squared tests used where you simply divide

16    people in highly exposed and less exposed.  That's where it's

17    appropriate.  But we're talking about a continuous scale here,

18    and therefore your question is simply not -- I'm sorry.  This

19    is not relevant.

20    **Q.**   Dr. Grandean, I want to switch gears now.  I'm going to

21    turn you -- I'm going to show you a figure from your trial

22    declaration from the first trial.

23         **MR. CAINTIC:**  Mr. Hamburg, if we could pull up

24    Dr. Grandean's first trial declaration, ECF No. 198-3.

25         And then if we could go to figure 2A, which is at PDF

1   page 45.  Yes.

2   **BY MR. CAINTIC:**

3   **Q.**   Dr. Grandean, do you recognize this figure?

4   **A.**   It looks like one that I've produced, but I'm not sure

5   about the details.

6   **Q.**   This is from your trial declaration for the first trial.

7   Do you remember filing a declaration for the first trial?

8   **A.**   Faintly.  It's a couple of years ago.

9   **Q.**   Okay.  So this graph represents the maternal urinary

10  fluoride distributions in the Green 2019 study by fluoridated

11  versus nonfluoridated cities, right?

12  **A.**   That's what it says.

13  **Q.**   Okay.  And this is called a "box plot," right?

14  **A.**   Correct.

15  **Q.**   And just so we're all understanding what we're seeing

16  here, the yellow box -- well, let me say first, let's just

17  focus on the right-hand side, the fluoridated zone.

18       The yellow box represents the 25th to the 75th

19  percentiles, right?

20  **A.**   The middle 50 percent.

21  **Q.**   Right.  And the darker line in the middle of that yellow

22  box is the median, right?

23  **A.**   Right.

24  **Q.**   That's the 50th percentile?

25  **A.**   Right, correct.

GRANDJEAN - CROSS / CAINTIC

1  Q.  And the two lines that shoot out from the top and the

2  bottom of the yellow box are called "whiskers," right?

3  A.  Well, that's what it says.

4  Q.  Do you know if they're called whiskers?  The lines that

5  shoot out from the top and the bottom of the yellow box, those

6  are called whiskers, right?

7  A.  Correct.

8  Q.  Okay.  The highest point of the whisker at the top of the

9  box is the 90th percentile, right?

10  A.  That's what it says, and apparently it's from the Green,

11  et al. study from 2019.

12  Q.  And the circles that are above that 90 percentile whisker

13  are called "outliers," right?

14  A.  You can call them outliers if you want.

15  Q.  Well, they are called "outliers," right?

16  A.  You can call them outliers.  That's okay.

17      MR. CAINTIC:  Your Honor, at this time I would like to

18  read from Dr. Grandean's deposition transcript, page 81, lines

19  8 through 11.

20      THE COURT:  Objection?

21      MR. CONNETT:  No.

22  BY MR. CAINTIC:

23      "QUESTION:  Okay.  And the circles that are outside the

24      90th percentile in this box plot, those are called

25      "outliers"?

1      "**ANSWER:**  Yeah."

2          Okay.  Dr. Grandean, in terms of --

3              **MR. CAINTIC:**  Or if we can turn back.  Thank you

4      Mr. Hamberg.

5      **BY MR. CAINTIC:**

6      **Q.**   In terms of the circles, the outliers that are strictly

7      above the 1.5-milligram per liter level, there's approximately

8      8 to 10 of those circles, right?

9      **A.**   I can't confirm that because they may be circles on top of

10     each other.

11     **Q.**   What if I refresh your recollection with your deposition

12     transcript, would that help?

13     **A.**   I mean, if you want.  I mean, this is -- this is not my

14     study.  This is the Canadian study.

15     **Q.**   Would it sound reasonable to you that the number of

16     outliers above 1.5 in the fluoridated zone is about 8 to 10?

17     **A.**   We have to look at the total number of participants that

18     contributed to the fluoridated population group, and then it

19     says here that the number of circles represent 10 percent of

20     that material, and that will be the correct way of indicating

21     the number of circles because some of the circles may be on top

22     of each other and, therefore, you can't discount them from what

23     it looks like here on this plot.

24             **THE COURT:**  What is the sample size?

25             **MR. CAINTIC:**  For the entire population I believe is

1    500 -- well, I don't know if it's appropriate for me to just

2    represent this but it's 512.

3         THE COURT:  Well, so 90th percentile, I mean, that

4    means 50 above that.  If it's 500 sample and there's 10 percent

5    above the 90th percentile, there's 50 people, right?

6         MR. CAINTIC:  Well, Your Honor, my particular question

7    is about the numbers that are strictly above that 1.5 level.

8         THE COURT:  Yeah, but I'm trying to get at what it

9    represents because if there's 50 people and you see 8 dots, 8

10   circles, then each circle represents 12 people.  Or are you

11   trying to suggest in questioning this witness that each circle

12   is one person?

13        MR. CAINTIC:  Yes, Your Honor.

14        THE COURT:  That doesn't seem to align.  That's why I

15   asked what the sample size is.  You got to know what the sample

16   size is before this makes sense.  There's no key to it.  So why

17   are we spending time on this?

18        MR. CAINTIC:  I can move on, Your Honor.

19        THE COURT:  Let's move on.

20   BY MR. CAINTIC:

21   Q.   Dr. Grandean, you reviewed the NTP monograph drafts --

22        THE COURT:  Let me go back.  The point of that chart,

23   I take it, is that urine fluoride levels is higher in

24   populations where there is fluoride in the water than when

25   there's not.

1          Let's put the chart back up.  Put the chart back up,

2   please.

3          So the median for nonfluoridated areas at 50

4   percentile looks like around point -- I don't know .3, is that

5   right -- about right?  Below .5.

6          **MR. CAINTIC:**  Below .5.

7          **THE COURT:**  So looks like around .35, something in

8   that range.  And the median for those in fluoride areas looks

9   like, I don't know, .55 or something.  It's some measure above.

10  Isn't that the point of this?  What's the point of this?  I

11  mean, there's two yellow boxes at the 50 percent and one is

12  noticeably higher than the other.  I mean, it might not be

13  double, but it's 40 percent higher, 50 percent higher.

14         **MR. CAINTIC:**  Your Honor, at Dr. Grandean's

15  deposition, he testified that each of the circles in that chart

16  represent one observation and that in terms of the lines that

17  are strictly above 1 point -- in terms of the circles that are

18  strictly above 1.5 milligrams per liter, he testified that

19  there's about 8 to 10.

20         This goes to the question of whether or not we should

21  be using the Green 2019 study and the conclusions of the NTP

22  monograph, that there's effects below 1.5.  There's been some

23  statements that the -- well, because Green 2019 had some people

24  above 1.5 in the fluoridated areas, therefore we should -- we

25  can extrapolate the differences between those two.  One, the

 1  NTP author said there's really only one study that's saying

 2  that, which is Green 2019; and two, Dr. Grandean has testified

 3  it's about 10 people.

 4          THE COURT:  Okay.  What's -- that is relevant, so

 5  let's bring that out.

 6          MR. CAINTIC:  Okay.

 7          THE COURT:  I'm trying to understand.  Maybe you can

 8  elicit from that how do you get from 10 people if the sample

 9  size was -- of fluoridated?

10          MR. CAINTIC:  In the fluoridated zone --

11          THE COURT:  Of 500?

12          MR. CAINTIC:  In the -- oh, I don't know what it

13  precisely was in the fluoridated versus nonfluoridated.  I have

14  the sample size for the entire study, which is 512.

15          MR. CONNETT:  Your Honor, I don't want to talk out of

16  turn, but I do have -- if the Court wants, I have information

17  that may clarify this matter.

18          THE COURT:  Well, maybe we should just clarify what

19  these circles mean.  I mean, that shouldn't be in dispute.

20  Rather than trying to elicit this from the witness can't you

21  just stipulate?  What do these circles mean?

22          MR. CONNETT:  Could I offer the Court some information

23  on this?

24          THE COURT:  Yeah.

25          MR. CONNETT:  So it turns out that this percentile is

```
 1   superimposed that was not published in the Green study of 2019.
 2   So where Your Honor cease the words in blue "90th percentile,"
 3   that does not appear in the published paper.  It appears that
 4   in the creation of the figure, in consulting with the MIREC
 5   authors, that 90th percentile is an error.  It is an imposed
 6   error on the figure that doesn't come from the published study.
 7   It thus remains unclear what that whisker actually represents.
 8           So I would ask, rather than introducing incorrect
 9   information into the record, that we could go to the MIREC
10   authors or -- I think right now there's confusion about what
11   that figure means.
12           THE COURT:  What are we looking at here?  This is not
13   directly from the MIREC study?
14           MR. CONNETT:  It is not.  This is a figure that was
15   created.
16           THE COURT:  All right.  Let me ask the questioner,
17   Mr. Caintic.  What are we looking at here?
18           MR. CAINTIC:  This is a figure that Dr. Grandean put
19   in his trial declaration when we were doing written direct
20   before the first trial.  He adapted this from the table in the
21   Green study.  That's what it says in the top right-hand corner,
22   "Adapted from Green, et al. Figure 2."
23           THE COURT:  This was adapted by Mr. Grandjean?
24           MR. CAINTIC:  Dr. Grandean either directly or through
25   plaintiffs' counsel.  This is plaintiffs' figure.
```

```
 1        I have never heard before that that 90th percentile

 2   isn't true.  I think we could probably elicit some testimony

 3   that when reading a box plot that's what that whisker means is,

 4   it means you're at the 90th percentile.  I have never heard

 5   before that that's a dispute.  But this is plaintiff's figure

 6   from their trial declaration.

 7        THE COURT:  All right.  So the actual figure 2A that's

 8   in the report before you superimposed these things, that's in

 9   the report, correct, these bar charts?

10        MR. CAINTIC:  It's in the study itself.

11        THE COURT:  In the study.

12        MR. CAINTIC:  I could even pull that instead, Your

13   Honor, if that would be more helpful to the Court.

14        THE COURT:  Well, I just want to know what it is.  So

15   the study itself -- if you took out the blue stuff, that's what

16   the study page looks like, correct?

17        MR. CAINTIC:  Essentially so.  I mean, it's a

18   different color and -- but this is basically the same thing.

19        THE COURT:  All right.

20        MR. CAINTIC:  I don't --

21        THE COURT:  So the new information that's not in the

22   study is a notation about the percentiles and the medians?

23        MR. CAINTIC:  Yes, and the BMDL.

24        THE COURT:  And the BMDL.

25        MR. CAINTIC:  Right.
```

1          THE COURT:  And that was added -- this is a plaintiff

2     exhibit that was used?

3          MR. CAINTIC:  This was a plaintiff's trial declaration

4     because we did written direct examination in the first trial to

5     limit the amount of testimony.

6          THE COURT:  Right.

7          MR. CAINTIC:  And this is the figure that plaintiffs

8     used --

9          THE COURT:  Okay.

10         MR. CAINTIC:  -- that I questioned Dr. Grandean about

11    at his deposition.

12         THE COURT:  All right.  So this was attached to the

13    Dr. Grandean trial declaration?

14         MR. CAINTIC:  Yes.  It's, in fact, embedded within the

15    declaration itself.

16         THE COURT:  With these blue and red notations?

17         MR. CAINTIC:  Yes.  I did not alter this in any way.

18         THE COURT:  All right.  Then you can ask the question.

19         MR. CAINTIC:  Okay.

20         THE COURT:  Because -- now that I know where it came

21    from.  So you'll have a chance to explain, but you have to

22    answer the questions first and I'll give you a chance to

23    explain.

24         MR. CAINTIC:  Okay.

25         THE COURT:  So go ahead and ask your question.

1           MR. CAINTIC:  I apologize for the confusion, your

2    Honor.

3           THE WITNESS:  Can I make a correction?

4           THE COURT:  I'll let you make one comment, but we need

5    to ask a question, but I'll let you comment.

6           THE WITNESS:  Because the counsel said that I said

7    each of the circle represented one observation.  I did say some

8    circles might be on top of each other so that there may be more

9    than one person for a particular circle.  I just wanted to

10   clarify that because you didn't quote me correctly.

11          MR. CAINTIC:  Your Honor, may be at this point I could

12   just read the deposition transcript and we can get --

13          THE COURT:  Okay.

14          MR. CAINTIC:  -- some clarity here.

15          THE COURT:  All right.

16          MR. CAINTIC:  This is Dr. Grandean's deposition page

17   84, lines 18 to 25 and then page -- page 85, lines 1 through 4.

18          THE COURT:  Okay.

19          Any objection?

20          MR. CONNETT:  I haven't seen it.  I'm looking right

21   now.

22          I don't believe this is the right quote that's on the

23   screen.

24          MR. CAINTIC:  Oh, I'm sorry.  This should be page 83,

25   lines 18 to 25, page 84, lines 1 through 5.

 1          MR. CONNETT:  No objections, Your Honor.

 2          THE COURT:  Go ahead.

 3  BY MR. CAINTIC:

 4      "QUESTION:  But in terms of the folks that are having

 5      urinary fluoride levels which are above 1.5 milligrams per

 6      liter, it's just those ones that are -- those eight to ten

 7      that are outliers in this box plot?

 8      "ANSWER:  Yeah.  You can call them 'outliers,' but -- but

 9      these are individual observations and what we don't know

10      is -- and I can't remember from -- from this study if --

11      because they used the average from all three trimesters."

12      Okay, Dr. Grandean.  Now we can move on.

13          THE COURT:  But before you do --

14          MR. CAINTIC:  Sorry.

15          THE COURT:  -- it still would be helpful to know what

16  the sample size is of the fluoridated water.  I don't know if

17  you know, Mr. Grandjean, when we looked at that chart you see,

18  I don't know, 8, 10 circles and maybe some are on top of each

19  other so I don't know the exact number, but that's out of how

20  many?  I assume that's a sample size -- if it's the top 10

21  percentile, if it's 80 people, that's 80 sample size?  You

22  multiply by 10, right?  Whatever -- whatever you count as

23  observations --

24          Is my math wrong?  For the total sample size you'd

25  multiply that by 10 because that's the top ten percentile?

1          **MR. CAINTIC:**  I think the thing to clarify is that --

2     if we could pull up the exhibit again --

3          **THE COURT:**  Yeah.

4          **MR. CONNETT:**  Your Honor, I have to say something.

5          We should really go to the published study because

6     this does not show all the dots in the published study.

7          **THE COURT:**  Well, you can do that on direct.  This was

8     your own exhibit, so for you to object to your own exhibit is a

9     little odd.

10         **MR. CAINTIC:**  So I want to be clear.  So Your Honor is

11    absolutely correct that if I'm talking about numbers above the

12    90th percentile, then that is, yes, the top 10 percent.

13         What you can see from this figure, though, is that

14    there's several circles that are below 1.5 that are still,

15    nonetheless, above the 90th percentile.

16         My question to Dr. Grandean is just what are the

17    numbers that are strictly above that 1.5 level?

18         **THE COURT:**  Yeah.  I understand your point, but some

19    of that 10 percentile is below 1.5.  It looks like the bulk are

20    above 1.5 or at or above.

21         It's still relevant to know when you're looking at the

22    number of circles.  If it's a sample of a thousand, that's a

23    very, very small percentage, but if it's a sample of 800 or 80,

24    then, you know.

25         **MR. CAINTIC:**  Uh-huh.

1      THE COURT:  I mean, basically you're just eyeballing

2  this thing?  It looks like that that's the top 10 percent,

3  maybe it's the top 7 percent?  That's at or above it.  I mean,

4  it's crude, but if these circles are accurate and there's one

5  in the middle there looks like three circles -- maybe four all

6  superimposed on each other, I can't tell -- but is that a

7  fair -- maybe I'll ask the witness.

8      If you look at the number of -- just looking at the

9  distribution of the circles, the so-called "outliers," would it

10  be a fair estimate to say that's -- at 1.5 or above, that's

11  about, I don't know, 7 percent to the 93rd percentile,

12  something like that, 92nd, 93rd, 94th percentile?  Is that --

13  is that a fair --

14  A.   I'm sorry.  This is a figure that is a couple of years

15  old, and I haven't revisited the data since then, and so for me

16  to comment on the detail -- I mean, the 1.5 limit originates

17  from the World Health Organization in 1986.

18      THE COURT:  I understand you take issue with that.

19  That's another issue.  I just -- looking at this, what

20  percentage of the fluoridated population hits the 1.5 or above?

21  And I'm just eyeballing it.  Based on what I'm seeing here it

22  looks like could be about 4 -- 7 percent?

23      MR. CAINTIC:  I don't know.

24      THE COURT:  You don't know?  Okay.

25      MR. CAINTIC:  I'm sorry I don't have the precise

 1  figures, Your Honor.

 2          THE COURT:  Okay.  Well, I guess those figures are

 3  available somewhere.  We could -- in a non-chart form, I take

 4  it.

 5          MR. CAINTIC:  I imagine -- I'm very confident that the

 6  Green 2019 study is going to be one of the studies that is

 7  preadmitted into evidence so that we can figure this all out.

 8          THE COURT:  Great.  Thank you.

 9  BY MR. CAINTIC:

10  Q.   Okay.  Dr. Grandean, let's turn to the NTP Monograph.  So

11  you reviewed the NTP Monograph in coming to your opinions in

12  this case, right?

13  A.   I did.

14  Q.   And you believe that, on balance, the NTP Monograph is a

15  high-quality review, right?

16  A.   I would.  I'm surprised it hasn't been published formally.

17  Q.   And the NTP authors concluded that there was low

18  confidence that fluoride exposure was associated with

19  neurobehavioral effects in children like ADHD, right?

20  A.   Right.

21  Q.   And you -- you think that that's an acceptable conclusion,

22  right?

23  A.   I think it's justified and very well -- it is a proper

24  conclusion on that extensive evidence that they reviewed.

25  Q.   And you would agree that the studies looking at the

1    association between fluoride and neurological effects in

2    children, other than IQ, are methodologically less strong?

3    **A.**    Yeah.  They're less strong for methodological reasons and

4    also because there's so few studies so far.

5    **Q.**    And Dr. Grandean, yesterday you testified about NRC 2006,

6    right?

7    **A.**    Right.  I mean, yeah.

8    **Q.**    Okay.  And you identified NRC 2006 as saying that the

9    animal literature is supportive of fluoride causing neurotoxic

10   effects in humans, right?

11   **A.**    Correct.

12   **Q.**    The NTP Monograph of May 2022 disagrees with that

13   conclusion, right?

14   **A.**    They didn't really look at the animal evidence, so I don't

15   think they disagreed.

16   **Q.**    The NTP authors concluded that existing animal studies

17   provide little insight into the question of whether fluoride

18   exposure affects IQ, right?

19   **A.**    Can you blow that by me again?

20   **Q.**    I'll say it again.  The NTP authors concluded that

21   existing animal studies provide little insight into the

22   question of whether fluoride exposure affects IQ, right?

23   **A.**    Well, I mean, you can't measure IQ in a rat, so, I mean,

24   clearly you have to live with the fact that animal studies show

25   fluoride can enter the brain during early brain development,

1  and they can cause changes in the brain biochemistry.  And

2  that's plenty for our purposes of looking at this as a causal

3  association.

4  **Q.**   You believe that the purpose of the NTP Monograph is not

5  to determine whether the level of fluoride added to water for

6  fluoridation, .7 milligrams per liter, poses a risk of

7  neurodevelopmental harm, right?

8  **A.**   I think they were not allowed to look at that, so -- so

9  the monograph looks particularly at the hazard assessment and

10 then they did a group-based dose-response relationship.

11 **Q.**   So it's beyond the purpose of the NTP Monograph to

12 determine whether the level of fluoride added to water for

13 fluoridation poses a risk to neurodevelopmental harm?

14 **A.**   I think this was something that was enforced upon NTP.

15 **Q.**   Do you agree with me that the purpose of the NTP Monograph

16 is not to determine whether the level of fluoride added to

17 water for fluoridation, .7 milligrams per liter, poses a risk

18 of neurodevelopmental harm?

19 **A.**   I can't really answer that question because this is really

20 a superb review of fluoride neurotoxicity.  And whether you

21 want to relate that to fluoride in drinking water is like a

22 separate issue that they did not specifically address, probably

23 because they weren't allowed to.

24 **Q.**   Dr. Grandean, you filed a expert report in this case,

25 right?  You filed an expert report in this case, right?

 1   **A.**   Oh.  I did, yes, of course.

 2         **MR. CAINTIC:**  Okay.

 3         Your Honor, at this time I'd like to read an excerpt

 4   from Dr. Grandean's expert report.

 5         **THE COURT:**  Okay.  Page?

 6         **MR. CAINTIC:**  This is page 9, section 6, the first

 7   sentence.  It will be on the screen.

 8         **MR. CONNETT:**  No objection.

 9         **THE COURT:**  Okay.

10   **BY MR. CAINTIC:**

11   **Q.**   And I'm just going to read the first sentence here.  "The

12   purpose of NTP's systematic review was not to determine whether

13   the level of fluoride added to water for fluoridation, (0.7

14   milligrams per liter) poses a risk of neurodevelopmental harm."

15         And Dr. Grandean, you acknowledge that your opinion that

16   fluoride pose as risk of neurodevelopmental harm at .7 goes

17   beyond the purpose of what the NTP Monograph is?

18   **A.**   I would say it's very much in accordance with what NTP

19   did, but they had to use specific language, not to mention the

20   0.7 addition of fluoride to drinking water in this country.

21   **Q.**   Nonetheless, the NTP authors found that the studies of

22   fluoride exposure at levels typically found in drinking water

23   in the United States are inconclusive, right?

24   **A.**   Are -- are what?

25   **Q.**   Inconclusive.

1    A.    Inconclusive?

2        Well, I mean, under the circumstances of that review, I

3    can understand that's what they had to conclude, but I would

4    say there's no reason in the dose-response relationship to

5    select a particular level, in this case 0.7, and then say, oh,

6    we don't have definite proof.

7        So I don't think it's relevant to our dose-response

8    discussion whether 1.5 or 0.7 are particular points of

9    deviation in the, as far as we know, linear association between

10   fluoride exposure and neurotoxicity.

11   Q.    But you agree that the NTP authors found that the studies

12   of fluoride exposure levels typically found in drinking water

13   in the United States are inconclusive, right?

14   A.    Well, if this is what they say in their report, I don't

15   have to agree with that.

16   Q.    You disagree with that conclusion?

17   A.    I wouldn't express myself that way.

18   Q.    Okay.  Let's turn to the Ibarluzea 2022 paper.

19       Dr. Grandean, you do not like the Ibarluzea 2022 paper on

20   fluoride and IQ, right?

21   A.    You mean the Basque country study?

22   Q.    We can call it the Basque country study.

23   A.    Yeah, okay.  I think it's obvious that that publication

24   has some problems.

25   Q.    You find the results of that paper too surprising, right?

1    **A.**    I just found it incomplete.  I mean, it -- there are so

2    many questions that a reader would have when reading that paper

3    that I can't take it seriously.

4    **Q.**    You think that paper is a pilot study, right?

5    **A.**    We could call it -- I don't know if it was written by a

6    Ph.D. student or something.  I mean, it's like clearly -- it is

7    so full of confusing statements and findings that -- I mean, I,

8    myself, would never have submitted something like that for

9    publication.

10   **Q.**    You believe that the Ibarluzea paper looks like it was

11   written by a Ph.D. student?

12   **A.**    I'm just indicating that as an example.

13        I trust that Jesus Ibarluzea was responsible for the

14   writing, but I understand that he's not eager to do any

15   additional analysis.  That's what I understand from his

16   testimony.

17   **Q.**    In coming to your own opinions about fluoride

18   neurotoxicity, you rely on papers written by Ph.D. students,

19   right?

20   **A.**    Can you speak slowly, please?

21   **Q.**    In coming to your own opinions about fluoride

22   neurotoxicity, you, yourself, rely on papers authored by Ph.D.

23   students, right?

24   **A.**    I don't know if papers are written by Ph.D. students.  I

25   happen to have seen papers over the years that were not really

 1   logical, and so we rely on papers that we consider valid.

 2   **Q.**   The first author of Green 2019 was then Ph.D. student

 3   Rivka Green, right?

 4   **A.**   That may be correct, but she has some very strong

 5   co-authors.

 6   **Q.**   Jesus Ibarluzea is not a Ph.D. student, right?

 7   **A.**   I don't know him personally.

 8   **Q.**   You know who Jordi Sunyer is, right?

 9   **A.**   Pardon?

10   **Q.**   Jordi Sunyer?

11   **A.**   Jordi Sunyer is a good colleague.

12   **Q.**   You believe that Jordi Sunyer is an internationally

13   highly-respect epidemiologist, right?

14   **A.**   I've known him for many years and I agree.

15   **Q.**   Jordi Sunyer is one of the authors of the Ibarluzea 2022

16   paper, right?

17   **A.**   I talked to him and I don't think I should reveal any

18   details, but I know he doesn't feel comfortable.

19   **Q.**   Ibarluzea 2022 you view as not important, right?

20   **A.**   Say that again?

21   **Q.**   You do not think that the Ibarluzea 2022 paper on fluoride

22   and IQ is important, right?

23   **A.**   I would disregard it because there are too many

24   inconsistencies in that paper.

25   **Q.**   NTP's meta-analysis rates the Ibarluzea paper as a

1    high-quality study with a low risk of bias, right?

2    **A.**   I don't remember.  I would be surprised if they did.

3             **MR. CAINTIC:**  Mr. Hamberg, if we could pull up trial

4    Exhibit 68 at Ph.D. page 63.  And this is the July 2022

5    meta-analysis by NTP.

6    **BY MR. CAINTIC:**

7    **Q.**   And you'll see about midway through Ibarluzea 2021

8    meta-analysis only.  And the title of this table is

9    "Low-risk-of-bias studies."

10        Dr. Grandean, does this refresh your recollection as to

11   whether the NTP authors rated the Ibarluzea 2022 paper as a

12   low-risk-of-bias study?

13   **A.**   I understand this is what has been reproduced from an

14   official document but I don't think the authors of that

15   document were aware that if you remove the creatinine

16   adjustment, that entirely different results would be obtained

17   because to get green squares all the way down is very

18   surprising to me.

19   **Q.**   And you said, "green squares."  So the legend in the

20   bottom left corner says that if it has a dark green square with

21   two plus symbols, it's definitely low risk of bias, right?

22   **A.**    This is what the authors judged, but I'm not sure that the

23   authors knew enough in order to do that writing and, for

24   example, if we take the question can we be confident in the

25   exposure characterization, hey, they measured urine fluoride,

1    so that's great, so give it two pluses.

2    **Q.**   Well, why don't we walk through each of these categories

3    and let's say where the NTP authors rated it.

4         Okay.  The first one.  "Did selection of study

5    participants result in appropriate comparison groups?"

6         And then under Ibarluzea 2021 it says a green square with

7    one plus symbol, which means probably low risk of bias, right?

8    **A.**   This is what it says, but the first time I heard about the

9    Basque study, it was meant to contribute 800 mother-child

10   diets -- I mean pairs and to collaborate with three additional,

11   at the time, INMA studies.  And this is not what happened.

12        And so I think this evaluation is very narrow, just

13   looking at some particular parameters of the study, because

14   otherwise there wouldn't be all of those green squares.

15   **Q.**   The second one says, "Did the study design or analysis

16   account for important confounding and modifying variables."

17   And then under Ibarluzea it provides a green square with one

18   plus, which means probably low risk of bias, right?

19   **A.**   This is what it says, but as you can understand, I have my

20   reservations about that judgment.

21   **Q.**   The third one says, "Were outcome data complete with

22   respect to attrition or exclusion from analysis?"

23        And under Ibarluzea it provides a green square with a

24   single plus symbol, which means probably low risk of bias,

25   right?

1    **A.**    I mean, this is -- my reservation is the same, so --

2    **Q.**    The fourth one is, "Can we be confident in the exposure

3    characterization?"

4         And under Ibarluzea 2021, it has a dark green square with

5    two plus symbols, which means it was definitely low risk of

6    bias, right?

7    **A.**    I mean, you're just reading from the report.  All I can

8    say is, that's what it says, but -- but, I mean, if I was the

9    one who was evaluating the Ibarluzea study, I would have said

10   how come they find fluoride toxicity in the nonfluoridated

11   population but not very much in the fluoridated?  It doesn't

12   make sense.

13        And I think the authors of this table simply looked

14   narrowly at the fact that, oh, yes, in this study they did

15   measure fluoride in urine, very good, two pluses.

16   **Q.**    And then the next one says, "Can we be confident in the

17   outcome assessment," and provides a dark green square with two

18   plus symbols, which means definitely low risk of bias, right?

19   **A.**    My answer is the same.

20   **Q.**    The next one says, "Were all measured outcomes reported,"

21   and underneath Ibarluzea it says a dark green square with two

22   plus symbols, definitely a low risk of bias, right?

23   **A.**    My answer is again the same.

24   **Q.**    The last one is, "Were there any other potential threats

25   to maternal validity?"  And under Ibarluzea it provides a

1  single plus symbol within a light green square, which means

2  probably low risk of bias, right?

3  **A.**   Again, my answer is the same.

4  **Q.**   Okay.  Dr. Grandean, a confounding variable is a variable

5  that is both associated with the exposure measurement and the

6  outcome measurement, right?

7  **A.**   In general, yes.

8  **Q.**   Okay.  So regarding fluoride neurotoxicity, a confounding

9  variable is something that would simultaneously be associated

10  with, let's say, both fluoride intake and IQ, right?

11  **A.**   In principle, yes.

12  **Q.**   You've expressed concern that seafood consumption was a

13  confounder in that Ibarluzea 2022 paper, right?

14  **A.**   It's possible.  I mean, this is a study that also found

15  that mercury that I've collaborated with EPA about.  Mercury is

16  beneficial for children's intelligence, this is what this study

17  found.  There's something terribly wrong with this study.

18  **Q.**   And there was a study of the INMA cohort that looked at

19  the effect of pregnant mothers consuming seafood on the IQ of

20  their children, right?

21  **A.**   I don't remember the details, but this is obvious because

22  seafood can contribute Omega 3 fatty acids, fish oil, which is

23  important for brain development.

24  **Q.**   Do you remember the paper Julvez 2016.

25  **A.**   What was the first author?

**Q.** Jordi Julvez 2016.
**A.** Oh, Jordi Julvez. Okay. I'm familiar with it.
**Q.** You're familiar with that paper?
**A.** I don't remember the details, but I'm -- I mean, I know Jordi and --
**Q.** That was a paper studying maternal seafood consumption and IQ benefits in the INMA cohort, right?
**A.** I think you're right.
**Q.** Okay. And in Julvez 2016, they used a food frequency questionnaire to measure food -- fish consumption, right?
**A.** Very likely. I think you're right.
**Q.** Okay. But you're not sure?
**A.** I mean, this is a 2016 paper. I've --
**Q.** Would it refresh your recollection to see the paper?
**A.** If you want.
**Q.** Okay.

**MR. CAINTIC:** Mr. Hamburg, if we could pull up Julvez 2016 at page 172, and if we could just look at the first -- yes. First two sentences on the left-hand side.

**BY MR. CAINTIC:**
**Q.** Dr. Grandean, does this refresh your recollection as to whether Julvez 2016 used a food frequency questionnaire to measure fish consumption?
**A.** I can't say that I recognize this text exactly, but it sounds reasonable. If you say so, I'm willing to agree.

1           MR. CAINTIC:  Your Honor, at this time I'd like to

2    read from Julvez 2016 for impeachment.

3           THE COURT:  Impeachment of the --

4           MR. CAINTIC:  Well, he's --

5           THE COURT:  -- of what?

6           MR. CAINTIC:  -- not answering that, yes, they use a

7    food frequency questionnaire, saying "if you represent to

8    me" --

9           THE COURT:  Well, he just doesn't remember.

10          MR. CONNETT:  Your Honor, I have no objection to just

11   reading the statement --

12          THE COURT:  Right.

13          MR. CONNETT:  -- so that we're all clear.  I don't

14   think it's impeachment, but I have no objection to it.

15          THE COURT:  Yeah, it's not impeachment, but if there's

16   a stipulation to read it, that's fine.

17          MR. CAINTIC:  Okay.

18          THE COURT:  Go ahead.

19          MR. CAINTIC:  Terrific.

20   BY MR. CAINTIC:

21   Q.   It says, "We used a semi-quantitative food frequency

22   questionnaire (FFQ) of 101 food items to assess the usual daily

23   intake of food and nutrients at 10 to 13 weeks of pregnancy and

24   again at 28 to 32 weeks."

25        And in Julvez 2016, the authors found that not all kinds

1   of seafood intake were associated with the positive effects on

2   neurodevelopmental outcomes, right?

3   **A.**   Is that Jordi Julvez?

4   **Q.**   Yes.

5   **A.**   Okay.  He's my post-doc at Harvard.   Okay.

6        I approve.

7   **Q.**   Okay.  There was heterogeneity between the kind of fish

8   consumed and whether that fish actually had a positive effect

9   on the neurodevelopment score, right?

10       **MR. CONNETT:**   Your Honor, I'm going to object to this

11   line of questions now because I think we're beyond

12   foundation -- we don't have a foundation for his knowledge as

13   to these type of specific details.

14       **THE COURT:**   Well, unless this witness knows, now we're

15   just -- this is your way of getting the study in, but it's not

16   appropriate unless he has some familiarity and can comment on

17   it.

18       **MR. CAINTIC:**   He testified in his deposition at length

19   about this study.  He's now saying he doesn't remember it.  I

20   can use it --

21       **THE COURT:**   Well, then let's test it.  Go ahead and

22   ask him more questions.

23   **BY MR. CAINTIC:**

24   **Q.**   Okay.  Dr. Grandean, there was heterogeneity -- or

25   Dr. Grandean, at our deposition we discussed the Julvez 2016

GRANDJEAN - CROSS / CAINTIC

1    study, right?

2    **A.**   I don't recall, but that's very likely.

3    **Q.**   In your supplemental report that you filed in this case,

4    you referenced the Julvez 2016 study, right?

5    **A.**   I might very well have done so.

6    **Q.**   Would it refresh your recollection to see that

7    supplemental report?

8    **A.**   I don't know if it serves a purpose, but I'm certainly

9    willing to do so.

10          **MR. CAINTIC:**  Mr. Hamberg, if we could pull up

11   Dr. Grandean's September expert report in this case and find

12   the paragraph discussing Julvez 2016.  It's the -- there should

13   be a line in there that just discusses Julvez 2016.

14          Mr. Hamberg, if we could scroll up on this page you

15   just showed.  And it's this -- it's going from page 3 to page

16   4.  On page 4 there's a citation here that says "Julvez, et al.

17   2016."

18   **BY MR. CAINTIC:**

19   **Q.**   Dr. Grandean, on the bottom of page 3, if you could please

20   read that paragraph and going over on to page 4 and tell me if

21   that refreshes your recollection about the Julvez 2016 study?

22   **A.**   I see that.

23   **Q.**   Okay.  Do you remember the Julvez 2016 study?

24   **A.**   He did it before he came to Harvard, so I don't remember

25   the details, but Jordi Julvez is a very competent researcher.

1   **Q.**   Do you remember the results from Julvez 2016?

2   **A.**   I don't remember the details.

3   **Q.**   So you can't tell me whether there was heterogeneity

4   between the kind of fish consumed and whether that fish

5   actually had a positive effect on neurodevelopment?

6   **A.**   I mean, I can only comment on this in general, and that is

7   that seafood intake is generally considered beneficial to fetal

8   development, brain development, and that we, as physicians,

9   recommend to pregnant women to get some seafood, but we also

10  stress that they should avoid seafood with high concentrations

11  of contaminants.  I mean, for mercury it's like tuna.

12  **Q.**   Dr. Grandean, whether fish intake is associated with

13  cognitive performance depends on the kind of fish that a person

14  is consuming, right?

15  **A.**   Yeah.  That -- I would say so.

16  **Q.**   You're not an expert on what kinds of fish have elevated

17  fluoride contents, right?

18  **A.**   I'm familiar with the documents.

19  **Q.**   You are not an expert on what kinds of fish have elevated

20  fluoride contents, right?

21  **A.**   I don't know what it takes to be an expert on that

22  particular field, so I can easily say I'm not an expert.

23  **Q.**   You're not sure that all kinds of seafood have elevated

24  fluoride content?

25  **A.**   Very clearly.  I mean, if you think of anchovies, for

GRANDJEAN - CROSS / CAINTIC

1    example, then it's very high in fluoride but not in mercury,

2    so --

3        And since the Basque country has, I guess, the world's

4    highest seafood intake because there are fishing communities

5    all along the coast in Northern Spain, I would say the fish

6    intake there and the data are present for that cohort.  They

7    were available to Jesus Ibarluzea.  And so I would say seafood

8    probably contributed to the fluoride exposure.

9    **Q.**   You can't say that all kinds of seafood intake would have

10   a -- you cannot say that all types of seafood intake would also

11   have an effect on fluoride intake, right?

12   **A.**   I can't -- I can't say that about all seafood, but I can

13   say that about seafood that is particularly commonly -- I don't

14   know if you've been to the Basque country, but if you go to

15   Northern Spain, they serve you anchovies, for example, for

16   lunch, and so I'm very sure that in this particular cohort,

17   seafood is an issue.

18   **Q.**   The World Health Organization has acknowledged that the

19   levels of fluoride in meat and fish are low, right?

20   **A.**   I'm sorry?  Can you --

21   **Q.**   The World Health Organization has acknowledged that the

22   levels of fluoride in meat and fish are low, right?

23   **A.**   If you say so.  I don't remember.

24   **Q.**   The World Health Organization acknowledged that even with

25   a relatively high fish consumption and a mixed diet, the

GRANDJEAN - CROSS / CAINTIC

 1   fluoride intake from fish alone would seldom exceed .2

 2   milligrams of fluoride per day, right?

 3   **A.**   I don't recall.

 4   **Q.**   Okay.  You recognize that there are limitations to the

 5   precision of a food frequency questionnaire, right?

 6   **A.**   There always is.

 7   **Q.**   You're not sure what variable you would use to control for

 8   seafood consumption in the INMA cohort, right?

 9   **A.**   I know the data are available and probably it's the same

10   semi-quantitative questionnaire that was used in previous

11   studies, and so -- I mean, if the data is available for that

12   cohort and fluoride is an issue, I'm sort of asking myself why

13   didn't they do it?

14   **Q.**   You don't know if you would prefer having a food frequency

15   questionnaire to account for seafood intake or a biomarker to

16   account for seafood intake, right?

17   **A.**   Right.  I think what they did was to consider mercury as

18   an indicator, and that's a very questionable approach.

19   **Q.**   You would rely on the judgments of experts on the

20   relationship between seafood consumption and IQ like Jordi

21   Sunyer and Jordi Julvez when determining whether and how to

22   control for seafood intake, right?

23   **A.**   I would certainly listen to their recommendations.

24   **Q.**   You would listen to the judgments of Jordi Sunyer and

25   Jordi Julvez when determining whether and how to control for

GRANDJEAN - CROSS / CAINTIC

1  seafood intake because they know about the circumstances in

2  Spain, right?

3  **A.**    Right.  I mean, you're asking me a very specific question,

4  and all I can say is that both Jordis are respectable and

5  highly-appreciated colleagues, and I would certainly listen to

6  them.

7  **Q.**    And seafood consumption is the primary source of mercury

8  exposure in Spain, right?

9  **A.**    Yes, but you have to consider that, for example, swordfish

10 or tuna -- and particularly the tuna you use for steaks, not

11 the so-called light tuna that you can get in a can -- is high

12 in mercury.  And there are certain fish that are rather low in

13 mercury, and I would think it's probably the same with

14 fluoride, but the data is there to take it into account.

15 **Q.**    You conducted a BMCL like we went over for just the Danish

16 data, right?

17 **A.**    Right.  We've been through that.

18 **Q.**    You conducted a BMCL for just the ELEMENT data, right?

19 **A.**    Correct.

20 **Q.**    You conducted a BMCL for just the MIREC data, right?

21 **A.**    Of course.  Yes.

22 **Q.**    You wouldn't even consider conducting a BMCL for just the

23 Ibarluzea study, right?  You would not even consider conducting

24 a BMCL for just the Ibarluzea study, right?

25 **A.**    No.  Why should I?

1  Q.   Dr. Grandean, you raised concerns that an earlier version

2  of the Ibarluzea study looked at four cohorts of Spain versus

3  one.  Do you remember those concerns?

4  A.   This is what was -- I mean, remember, I was consulting

5  with the INMA colleagues over the years, and I understand the

6  original plan was actually to look at fluoride, taking into

7  account four cohorts.  And for some reason, only one of them

8  has been published.

9  Q.   So your concern was that there's some kind of bias going

10  on when they downsized from looking at four regions of Spain to

11  just the Basque region, right?

12  A.   I don't want to speculate, but something happened.

13  Q.   The version of the Ibarluzea paper that looked at the four

14  regions of Spain still found no statistically significant

15  adverse effect of fluoride on IQ, right?

16  A.   I mean, are you talking about the Basque study?

17  Q.   When the study had four cohorts in it instead of just the

18  basic cohort, the author still did not find a statistically

19  significant adverse effect of fluoride on IQ, right?

20  A.   I don't remember.  I'm sorry.

21  Q.   Would it refresh your recollection to see the poster that

22  had the four cohorts?

23  A.   Oh.  The poster.  Okay.  Now, this is really an abstract,

24  and I must admit that I didn't consider it because it was a

25  preliminary presentation of those four cohorts, and there was

1  too little information in that abstract for me to evaluate what

2  they indicated they found.

3  **Q.**   That preliminary presentation with the four cohorts still

4  did not find a statistically significant adverse effect of

5  fluoride on IQ, right?

6  **A.**   Quite frankly, it -- maybe they said so, but it's very

7  hard for me to judge from a one-page summary of -- because

8  there may be findings in particular.  Let's say they used a

9  different curve shape or something.  That would be relevant for

10  me to know in order to consider the conclusion.  I'm sorry they

11  didn't publish a full paper.

12          **MR. CAINTIC:**  Your Honor, at this time I'd like to

13  read from Dr. Grandean's deposition transcript, page 70, lines

14  17 to 23.

15          **MR. CONNETT:**  No objection, Your Honor.

16          **THE COURT:**  Go ahead.

17  **BY MR. CAINTIC:**

18      **"QUESTION:**  There aren't any results that were presented

19      in this poster that showed a negative effect of fluoride

20      on IQ" -- let me rephrase that.

21          "There's no results in this table 1 in this poster

22      that show a statistically significant negative effect of

23      maternal urinary fluoride on IQ?

24      **"ANSWER:**  That's correct."

25          **THE COURT:**  All right.  Is this convenient?  We're

 1  about approaching our next break point, so you can time it as

 2  you wish.

 3          MR. CAINTIC:  Okay.  One more topic --

 4          THE COURT:  Okay.

 5          MR. CAINTIC:  -- and it should be fairly short.

 6          Actually, Your Honor, if you'd like to take a break

 7  now, that might be better.

 8          THE COURT:  Okay.  Then we'll do that.  Thank you.

 9          THE CLERK:  Court is in recess.

10      (Recess taken at 12:04 p.m.)

11      (Proceedings resumed at 12:26 p.m.)

12          THE COURT:  Okay.  Let's resume.

13  BY MR. CAINTIC:

14  Q.  All right, Dr. Grandean.  Just a few more questions.

15      You -- I showed you today a table from the NTP's

16  meta-analysis, a forest plot.  Do you remember that?

17  A.  I remember.

18  Q.  And you expressed some confusion about where that forest

19  plot had come from, right?

20  A.  It's because it's quite an extensive report that I don't

21  remember all the details about.

22  Q.  You weren't concerned that we had concocted it in some

23  kind of way?

24          MR. CAINTIC:  Well, let me -- how about this:

25  Mr. Hamberg, can you pull up what is internal No. G20.  And if

1    we could zoom into the study more, to the table more.

2    **BY MR. CAINTIC:**

3    **Q.**   Dr. Grandean, this is the version of that forest plot that

4    plaintiffs' counsel showed you yesterday.

5         Do you recall this forest plot?

6    **A.**   I do.

7    **Q.**   Okay.  And this reports out the studies in the

8    meta-analysis, except it's not stratified for high-risk-of-bias

9    versus low-risk-of-bias studies.  Do you see that?

10   **A.**   I see that.

11   **Q.**   And it's the same figures.  It says "SMD" in the top right

12   corner, right?

13   **A.**   Yes.

14   **Q.**   And that --

15   **A.**   I see that too, yeah.

16   **Q.**   And that stands for "standardized mean difference"?

17   **A.**   Sure.

18   **Q.**   And then it has the confidence intervals on the right?

19   **A.**   Yes.

20   **Q.**   Okay.  And then if you look about almost all the way down,

21   may be 10 to 12 studies up it says "Bashash 2017."  Do you see

22   that --

23   **A.**   I see that, yes.

24   **Q.**   -- where it says "Bashash 2017"?

25        Okay.  And then if we look at the confidence interval that

1  they calculated for that, for the SMD it's negative 0.16 to

2  0.42, right?

3  A.   This is what it says.

4  Q.   And that means it's not statistically significant, right?

5  A.   Correct.

6  Q.   And then if we look at Green 2019, and the confidence

7  interval for that is, again, negative 0.19 to 0.21.

8  A.   I see that.

9  Q.   And that is -- sorry.  Go ahead.

10  A.   Sure.

11  Q.   And that includes 0, so it's not statistically

12  significant, right?

13  A.   Correct.

14  Q.   Okay.

15       MR. CAINTIC:  I have no further questions.

16       Thank you, Dr. Grandean.

17       THE COURT:  Okay.  Redirect?

18       MR. CONNETT:  Yes, Your Honor.

19          (Discussion held off the record.)

20       MR. CONNETT:  Could we put G19 on the screen?

21                **REDIRECT EXAMINATION**

22  BY MR. CONNETT:

23  Q.   Dr. Grandean, I know the NTP report has many, many pages,

24  and it's hard to memorize every single page in the document,

25  but I want to follow up on some of counsel's questions to you

1  regarding this particular forest plot titled risk-of-bias

2  subgroup analysis.  Okay?

3  **A.**    Okay.

4  **Q.**    First I want to ask you about the -- sorry.  Strike that.

5        In this forest plot that we see here, we have two groups

6  of studies being addressed.  We have a -- studies with high

7  risk of bias and studies with low risk of bias, correct?

8  **A.**    Correct.

9  **Q.**    Okay.  Let's look at the studies with the high risk of

10 bias first.

11       Can you tell the court what the standard mean deviation is

12 for the studies with a high risk of bias?

13 **A.**    So you mean the red numbers?

14 **Q.**    Yeah.

15 **A.**    So the overall high -- the overall average for the high

16 risk of bias is 0.52, and that is statistically significant.

17 **Q.**    Okay.  So that's a -- so in the studies with the high risk

18 of bias, there is a statistically significant reduction in IQ

19 associated with elevated fluoride; is that correct?

20 **A.**    Right.

21 **Q.**    Okay.  Now let's look at the low-risk-of-bias studies that

22 are included here, okay?

23 **A.**    Okay.

24 **Q.**    Can you tell the Court what the standard mean deviation is

25 for those studies?

1    **A.**    It's lower than the number I read before.  It's minus

2    0.22, but it's also statistically significant.

3    **Q.**    Okay.  So whether we're looking at the high-risk-of-bias

4    studies or the low-risk-of-bias studies, both sets of data show

5    a statistically significant reduction in IQ; is that correct?

6    **A.**    Correct.

7    **Q.**    Okay.  Now, counsel had pointed out to you that for a

8    number of studies, the confidence intervals overlap zero.  Do

9    you recall that line of questioning?

10   **A.**    Right.

11   **Q.**    Now, is that common when you're analyzing a bunch of

12   different environmental epidemiology studies that you're going

13   to have overlap of zero for some of the studies?

14   **A.**    Right.  That's a common finding because of different

15   circumstances, different populations, different methods.

16   **Q.**    And is that pardon of why we do meta-analysis -- well, let

17   me ask -- let me step back.

18       Where you have many different studies looking at the same

19   outcome and you have different confidence intervals across the

20   studies, does a meta-analysis provide greater precision in

21   terms of the relationship between the chemical and the outcome

22   than any one of the given studies?

23   **A.**    That depends.  I mean, the counsel highlighted the Bashash

24   study, the Green study, and the data from those study has

25   really been condensed for the purpose of this particular forest

1  plot; and therefore, the whole truth is not out by indicating

2  the numbers that have been highlighted here.

3  **Q.**   So in this forest plot, this is a means effect analysis,

4  correct?

5  **A.**   Correct.

6  **Q.**   And can you just explain for the Court what you -- what

7  the comparator is when you're looking at a means effect

8  analysis?  Is it binary?  Is it continuous?  Can you explain

9  that for the Court?

10 **A.**   Right.  The idea is that the -- each of these studies has

11 a highly-exposed and a less highly-exposed group, and it's a

12 comparison of those two groups that then ends up with that SMD,

13 the average difference in terms of standard deviation of the

14 IQ.

15 **Q.**   Now, you used a term earlier "continuous data."

16 **A.**   Yeah.

17 **Q.**   For your pooled BMCL analysis, did you analyze continuous

18 data, or did you just take one group with one exposure and

19 another group with another exposure?

20 **A.**   That was a question that related to the Chi-square.  We

21 are much more sophisticated.  We look at individual data that

22 is a continuous exposure scale and a continuous response scale.

23 **Q.**   Dr. Grandean, does an analysis of continuous data provide

24 greater power to detect the association between a chemical and

25 an outcome versus binary analysis of one exposure to another?

1   **A.**   It certainly provides a great -- a much better

2   sensitivity.  It's a much stronger statistical analysis and I

3   would say splitting the data into low and high is -- can

4   sometimes be a little subjective.

5   **Q.**   And one of the -- one of the costs or limitations of doing

6   a means effect meta-analysis, like we see here, is that in some

7   studies you may lose some of the power that that individual

8   study may have had.

9        Would you agree with that or not agree with that?

10  **A.**   I agree with that, but they did it in order to include all

11  of the studies, because they all had that split of that

12  potential analysis in common because some of the studies didn't

13  really have the individual -- or many of the studies didn't

14  have the individual data.

15  **Q.**   So if the facts in this case demonstrate that when we're

16  looking at the Bashash 2017 result here, if the record

17  demonstrates that what the NTP is comparing there is children

18  with more than .8 parts per million fluoride in their urine

19  versus children with less than .8 parts per million in their

20  urine, would you give this finding that we see here more weight

21  than you would the Bashash published study's analysis of

22  continuous data?

23       **MR. CAINTIC:**  Objection, compound and leading.

24       **THE COURT:**  Yeah, plus I think I need to go back

25  before you get into this questioning to make sure I understand.

1    What I'm trying to understand is your statement that

2  in a means effect meta-analysis, some individual studies may

3  lose their power relative -- how does that happen?  I guess I'm

4  still trying to understand the -- what happens in a means

5  effect meta-analysis?

6         THE WITNESS:  You essentially lose power because you

7  assume all of those with quote/unquote elevated fluoride

8  exposure to be equal, so that's -- you assign a joint group to

9  those instead of realizing that some of them are very high and

10  some of them are just above that limit, which will provide a

11  better detail and, therefore, also stronger statistic.

12         THE COURT:  When you say "high," do you mean the

13  exposure or do you mean the outcome?

14         THE WITNESS:  Yeah, yeah, the exposure.

15         THE COURT:  Exposure.

16         THE WITNESS:  And I'm not sure -- I mean, the Lin 1991

17  study the high group was actually below 1.5, so --

18         But you lose information if you assign a group level

19  to all of the children who have exposures within a wide range

20  and where they would all each have individual responses where

21  you would think that the higher the exposure, then perhaps the

22  greater loss in IQ.

23         THE COURT:  So for a study that has a smaller exposure

24  range, does that then tend to get -- lose power in the

25  meta-analysis or gain power in the meta-analysis?

1         THE WITNESS:  In general, yes, but clearly --

2         THE COURT:  Which way, lose or gain?

3         If you have a narrow range -- if the exposure range is

4    narrow, what happens to its power in the meta-analysis?

5         THE WITNESS:  Less --

6         THE COURT:  Less.

7         THE WITNESS:  -- than if it's a wide range.

8         THE COURT:  Is that one explanation as to why the

9    Bashash study may have lost some power in the meta-analysis,

10   because the range was narrower than, let's say, some of the

11   ones where there's a huge range?

12        THE WITNESS:  I think it's the same with the Green

13   study.  Power is lost by doing the simplified analysis here

14   looking at two groups instead of a whole range.

15        THE COURT:  Okay.  And is that what's -- is that the

16   model that underlies the meta-analysis, that there's a split

17   into two groups?

18        THE WITNESS:  It's because that's what many of the

19   studies did, because they compared one village to another

20   village.  And we -- we did -- they didn't have individual data,

21   so they had to do that.  In order to generate this forest plot,

22   they have to have the exposure classified the same way.

23        THE COURT:  I see.  So all of them are converted into

24   some standard where there's an exposure classification that's

25   shared?

1          THE WITNESS:  High versus low, yeah.  And some of them

2    already had that.  And so those that had individual data and a

3    whole scale of different levels of exposure, they were just

4    limited in that the authors here said everything that's above

5    1.5 is called high, everything below is called low.

6          THE COURT:  I see.  Okay.  So the 1.5 was the --

7          THE WITNESS:  Yeah.  Whatever the number is.

8          THE COURT:  What was it here?

9          THE WITNESS:  Usually the median, I would think.

10          THE COURT:  But what was the -- what was the pivotal

11    point of the two classifications of high and low that was used,

12    do you know?

13          THE WITNESS:  I don't remember.

14          THE COURT:  Okay.  All right.  And while we're on it,

15    this allied subject, we're talking about the Chi-squared.  Does

16    that assume also splitting into two groups?  Is that how that

17    statistical measure works?

18          THE WITNESS:  I mean, it's appropriate for, for

19    example, 2-by-2 tables, high and low, and then the outcome

20    could be good and bad.  And so you can calculate the

21    Chi-squared statistic, but that's such a limited perspective

22    statistically.  If you have exact IQ points and exact fluoride

23    concentrations, then you can do much more sophisticated

24    analysis and also more sensitive.

25          THE COURT:  Okay.  Thank you.  Thank you.

1    BY MR. CONNETT:

2    Q.   On this point, Dr. Grandean -- and I don't have this on a

3    slide, so I'm going to read for you.  I'm going to read from

4    page 277 of Trial Exhibit 69, which is the BSC working group

5    report.  Do you want to look at it first?

6              MR. CAINTIC:  Yes.

7              MR. CONNETT:  It's the third paragraph, the second

8    sentence.

9              THE COURT:  Which page?

10             MR. CONNETT:  277.  It's 279, Your Honor, of the PDF

11   277, of the document itself.

12                  (Discussion held off the record.)

13             MR. CAINTIC:  No objection.

14   BY MR. CONNETT:

15   Q.   Dr. Grandean, I'm going to read you a statement from the

16   National Toxicology Program.  They write "When using

17   group-level exposure data as opposed to individual-level

18   exposure data, as was done in the mean effects meta-analysis

19   the power to detect an effect may be limited."

20        Do you agree with the NTP on that point?

21   A.   I do, and I would have expressed myself a little more

22   strongly.

23             MR. CONNETT:  And Jay, could you -- well, let me --

24             Your Honor, at this point I would like to show the

25   witness the data point from Bashash that I believe was used for

JENNIFER COULTHARD, CSR, RMR, CRR          (530)537-9312

 1  this means effect meta-analysis.

 2          MR. CAINTIC:  Your Honor, my only issue is, if there's

 3  actually foundation, if Dr. Grandean actually relied on this or

 4  remembers this.  What I'm a little concerned of is, we're just

 5  showing Dr. Grandean a document and then asking him to repeat

 6  what it says.

 7          MR. CONNETT:  That's fine, Your Honor.  I'll withdraw

 8  it.  I won't show it.

 9  BY MR. CONNETT:

10  Q.  Dr. Grandean, if the record shows that for the mean effect

11  analysis the NTP used the child urinary fluoride content, not

12  the maternal urinary fluoride content, would that affect how

13  much weight you give to the finding that we saw in the mean

14  effect meta-analysis forest plot?

15  A.  I sure would because of -- I mean, for each of those

16  studies we have to consider the validity of the exposure

17  determination and, likewise, also with the outcome.

18  Q.  So can you just explain -- and this -- I don't mean to

19  restate.  Can you just explain why, in the Bashash study, we

20  explain the strength of relying on individual maternal urinary

21  fluoride levels as opposed to Group A of the child's urinary

22  fluoride content?  Can you explain why one dataset may give you

23  more power and validity to assess the relationship?

24          MR. CAINTIC:  Objection, compound and leading.

25          THE COURT:  Overruled.

1          **THE WITNESS:**  No. 1, the exposure assessment has to

2     reflect the exposure at the most vulnerable time, and we've

3     seen from high-quality studies that they have used the maternal

4     urinary fluoride excretion level.  And that, in my mind, is

5     appropriate.  It's a good choice, it's feasible and excellent

6     studies have relied on that parameter.

7          The problem in using other fluoride in excretion data

8     is that they may not reflect the most vulnerable time of

9     exposure.  And so if you look at children's exposure, then that

10    will be affected by, number one, accumulated fluoride in the

11    body but also the current exposure level to which the brain is

12    less sensitive, which means that you will have an exposure

13    scale that has a risk of misclassification.  There's

14    imprecision involved.

15    **BY MR. CONNETT:**

16    **Q.**   So is there anything about the data point that we see in

17    this forest plot for Bashash 2017, the group average children,

18    high and low, is there anything about that data that in any way

19    contradicts the findings of the Bashash 2017 regarding maternal

20    fluoride and IQ?

21    **A.**   I hesitate to say this, but I don't think that the

22    depiction in this forest plot is appropriate; it misrepresents

23    the Bashash study.

24    **Q.**   Well, would you -- so long -- sorry.  I'll move on.

25         And Dr. Grandean, would the same -- what we just talked

1   about with Bashash 2017, would the same principles apply to the

2   Green 2019 data point that we see in the forest plot?

3   **A.**   Absolutely.

4   **Q.**   Okay.

5       Now, counsel asked you some questions about your BMCL

6   analysis from the 2022 paper, which was published in *Risk*

7   *Analysis*.  Do you recall those questions?

8   **A.**   Okay.

9   **Q.**   And counsel pointed you to the BMCL that you derived using

10  the standard or the square, the square approach; is that right?

11  **A.**   Correct.

12  **Q.**   And the value of that BMCL, if you used the square, was

13  .768 milligrams per liter in the mother's urine; is that

14  correct?

15  **A.**   I think so, yes.

16  **Q.**   Now, let's just assume, for a second, that that's the

17  appropriate BMCL to use.

18      Would women living in fluoridated communities still exceed

19  that BMCL?

20  **A.**   A sizable proportion would.

21  **Q.**   Now, there was a long back and forth regarding a figure

22  from your trial declaration regarding maternal urinary fluoride

23  levels as reported in the Green 2019 study, correct?

24  **A.**   Right.

25  **Q.**   If you wanted to know with precision what the distribution

GRANDJEAN - REDIRECT / CONNETT

1   of urinary fluoride levels is in the MIREC study, would you

2   look to the Green study, which is an analysis of a subset of

3   the women, or to the 2018 Till study --

4   **A.**   Yeah.

5   **Q.**   -- which is a study of the entire cohort?

6   **A.**   Yeah.

7   **Q.**   What would you look to if you wanted to know the

8   percent -- the distribution of maternal urinary fluoride in the

9   MIREC cohort?

10  **A.**   The more recent paper by Christine Till is a better source

11  of that information.

12  **Q.**   And that would be the Till 2018 study?

13  **A.**   Yes, exactly.

14  **Q.**   And finally, counsel showed you a definition about the

15  Chi-square or the Chi-square statistics from EPA's BMD guidance

16  document.  Do you recall that?

17  **A.**   I recall that.

18         **MR. CONNETT:**  At this point, Your Honor, I'd like to

19  show the witness another page from that document.

20         **THE COURT:**  Okay.

21             (Discussion held off the record.)

22  BY MR. CONNETT:

23  **Q.**   Dr. Grandean, I want to ask you about this, the last

24  section of the BMD guidance document page 64.  Do you see that

25  on your screen?

1  **A.**   Yes.

2  **Q.**   This is page 64 of the BMD guidance, and it's the section

3  titled "Human Data."  Do you see that?

4  **A.**   I see that.

5  **Q.**   Okay.  So the first 63 pages of the BMD guidance document

6  are dealing with animal data, not human data, right?

7  **A.**   Correct.

8  **Q.**   So let's look at what the EPA says about human data.  And

9  just -- you've been analyzing human data, right?

10  **A.**   Correct.

11  **Q.**   So the first sentence here says, "Opportunities for

12  modeling human toxicological data are limited, and the human

13  studies are less standardized than studies of experimental

14  animals; thus, modeling of human data is done on a

15  case-specific basis."

16      Did I read that correctly?

17  **A.**   Correct, yeah.

18  **Q.**   And the EPA says, "Furthermore, modeling human data often

19  involves adjusting for covariates."  Did I read that right?

20  **A.**   Yes, of course.

21  **Q.**   So is it correct to say that EPA's BMD guidance on things

22  like Chi-squared or Chi-squared modeling is more applicable to

23  the animal data than the human data?

24  **A.**   Of course.

25  **Q.**   And the -- I'm going to read the highlighted portion here

JENNIFER COULTHARD, CSR, RMR, CRR                    (530)537-9312

1   in this one paragraph from the guidance document dealing with

2   human data.  The EPA states, "For some other examples of

3   benchmark dose modeling of human data, please refer to the

4   following references."  Do you see that?

5   **A.**   I see that.

6   **Q.**   And then EPA cites --

7        **MR. CONNETT:**  And to be fair, Jay, could you also turn

8   to the next page, scroll down so we can see the other -- oh,

9   sorry.

10        **MR. SANDERS:**  It's only a two-page document.

11        **MR. CONNETT:**  Yeah.

12   **BY MR. CONNETT:**

13   **Q.**   So strike that.

14   So EPA then cites a couple different papers, right?

15   **A.**   Correct.

16   **Q.**   And one of the papers -- one of the studies that EPA cites

17   here as an example of how to do a BMCL analysis of human data

18   is your study on mercury and IQ; is that right?

19   **A.**   We did this study on contract and in close collaboration

20   with EPA.

21        **MR. CONNETT:**  Thank you, Dr. Grandean.  I have no

22   further questions, Your Honor.

23        **THE COURT:**  Okay.

24        **MR. CAINTIC:**  Just five minutes, Your Honor.

25        **THE COURT:**  Sure.

1          **MR. CAINTIC:**  Mr. Hamburg, if we could pull up G19

2     which is Trial Exhibit 68, PDF page 68.  This is the July 2022

3     meta-analysis and the forest plot.

4                          <u>**RECROSS-EXAMINATION**</u>

5     **BY MR. CAINTIC:**

6     **Q.**   Dr. Grandean, you've been sitting in this courtroom during

7     the last three days of trial, right?

8     **A.**   Right.

9     **Q.**   Did you hear the testimony by Dr. Hu and Dr. Lanphear?

10    **A.**   I heard Dr. Hu.  Maybe not every single word, but yes.

11    **Q.**   Do you recall Dr. Hu and Dr. Lanphear testifying that when

12    they're analyzing an epidemiological study, they don't always

13    pay attention to statistical significance, right?

14    **A.**   Right, of course.

15    **Q.**   They look at the beta values, they look at how close is

16    the P value to 20.5 where it would be significant.  Do you

17    recall that?

18    **A.**   Yeah.  That's a tradition.

19    **Q.**   They also look at the size of the confidence interval,

20    right?

21    **A.**   Right, of course.

22    **Q.**   And they'll look at how close any of the numbers are to

23    zero in that confidence interval, right?

24    **A.**   Of course.

25    **Q.**   Right.  If I could direct you to the confidence interval

1  for the overall low-risk-of-bias part of this meta-analysis

2  forest plot.  And the confidence interval is negative 0.39 to

3  negative 0.05, right?

4  **A.**   I see that.

5  **Q.**   And that's pretty close to zero on the right-hand side,

6  right?

7  **A.**   If you want it is, yes.

8          **MR. CAINTIC:**  Okay.  No further questions.

9          **THE COURT:**  Okay.  Anything else?

10         **MR. CONNETT:**  Very quickly.

11                    <u>**REDIRECT EXAMINATION**</u>

12 BY MR. CONNETT:

13 **Q.**   And the data point that counsel just pointed to you is

14 based on an analysis which did not consider the individualized

15 data from Bashash; is that correct?

16 **A.**   That is correct.

17 **Q.**   And the data point that counsel just pointed to you also

18 did not include the individualized data from Green 2019; is

19 that correct?

20 **A.**   That is correct, and that's why I believe that our

21 benchmark dose study from 2022 is much stronger evidence than

22 just showing this forest plot.

23         **MR. CONNETT:**  Thank you.  No further questions.

24         **THE COURT:**  All right.  Anything further?

25         **MR. CAINTIC:**  Nothing further, Your Honor.

GRANDJEAN - REDIRECT / CONNETT

```
 1          THE COURT:  All right.  Let me -- I have a couple
 2   of -- actually, that's question I wanted to ask you,
 3   Dr. Grandean.
 4          You've been in the field a long time, you've studied
 5   many things, including mercury.  Is it unusual in a situation
 6   where somebody has -- where it's been proven that there is a
 7   toxicant and at levels that are relevant to exposure, is it
 8   common to find sometimes a study that goes the other way and
 9   finds -- in other words, contrary studies?  How often do you --
10   good contrary studies.  I mean, is this something that you
11   typically see in the science?
12          THE WITNESS:  I think the best example is lead,
13   that -- where over the years where publications have claimed
14   that the study couldn't show any adverse effect of lead on
15   brain development in the children.  And sometimes those studies
16   were supported by some industry interest, clearly, and
17   therefore what you had to do when evaluating that was to look
18   at the validity of the exposure assessment, the choice of
19   population, et cetera.  And that's how EPA concluded that lead
20   exposure had to be regulated.
21          THE COURT:  But is it possible that some of those
22   contrary studies would be considered high quality, but they
23   don't carry the day?  In other words, you can have high-quality
24   study on both sides and still make a finding maybe based on the
25   weight, the total weight or meta-analysis or whatever it is.  I
```

1    guess that's what I'm trying to get.  I mean, is it a zero or

2    nothing proposition, or is this something where it's not

3    unusual to find good studies on both sides and somebody's got

4    to make a judgment?

5              THE WITNESS:  It's entirely possible because it

6    depends how do you evaluate the risk of bias?  And that

7    evaluation may not consider everything that's relevant to the

8    overall consideration of the validity and the weight of the

9    study.  And so I can see some possible discrepancies with NTP

10   here because they looked at this narrow exposure determination,

11   either high or low, and that puts a limitation on their

12   evaluation of the data.

13             THE COURT:  All right.  Thank you.

14             THE WITNESS:  Okay.

15             THE COURT:  Any further questions now that I've asked

16   a question?

17             MR. CONNETT:  No, Your Honor.

18             MR. CAINTIC:  Nothing further.

19             THE COURT:  Great.  Thank you, Dr. Grandean.

20   Appreciate your time to come out and testify.

21                   (Witness excused.)

22             THE COURT:  You have the next witness?

23             MR. CONNETT:  Your Honor, I'm wondering, given that

24   we're at about 1:00, the -- my direct will go well over half an

25   hour, and I'm wondering if it may be better for us to start

1  anew on Monday.

2          THE COURT:  Well, I'm worried about losing time.  If

3  you're going to use all the hours that you're allocated, I've

4  got to look at the trial days, and giving up 30 minutes is a

5  big ask, so the answer is no.

6          MR. CONNETT:  With that note --

7          MR. ADKINS:  Your Honor, may I make one clarifying

8  point here?

9          THE COURT:  Yeah.

10          MR. ADKINS:  So Dr. Barone is -- I assume that's the

11  next witness to be called.

12          Dr. Barone is going to testify twice in this case,

13  once as an EPA designee and again as an expert witness for EPA

14  during our case-in-chief.  And of course after Dr. Barone takes

15  the stand, we wouldn't be just having any discussions with him

16  over the weekend about his testimony, anything he was asked or

17  what we think he might be asked during his EPA designee

18  testimony, but I would ask if the Court would allow us to

19  continue to prepare with Dr. Barone on the opinion testimony

20  that we expect to elicit from him during our case-in-chief?

21          THE COURT:  Okay.

22          MR. CONNETT:  I have no objection, Your Honor.

23          THE COURT:  All right.  Fine.  Thank you.  I trust you

24  to adhere to those ethical lines.  And with that, that's fine.

25          MR. ADKINS:  Thank you.

1           MR. CONNETT:  Well, Your Honor, the plaintiffs' next

2    witness is Dr. Stanley Barone.

3           THE COURT:  Okay.

4           THE CLERK:  You may remove your mask.  Please raise

5    your right hand.

6       (Witness sworn.)

7           THE WITNESS:  Yes, I do.

8           THE CLERK:  Thank you.  Please have a seat.  Please

9    speak clearly into the microphone state and spell your first

10   and last name for the record.

11          THE WITNESS:  My first name is Stanley.  My last name

12   is Barone, B-A-R-O-N-E.

13          THE COURT:  All right.  Thank you Dr. Barone.  You may

14   proceed, Mr. Connett.

15                        **STANLEY BARONE**,

16   called as a witness for the Plaintiffs, having been duly sworn,

17   testified as follows:

18                     **DIRECT EXAMINATION**

19   BY MR. CONNETT:

20   **Q.**   Good afternoon, Dr. Barone.

21   **A.**   Good afternoon.

22   **Q.**   You are a risk assessment scientist at the EPA, correct?

23   **A.**   Yes, I am.

24   **Q.**   You work at the EPA office that enforces the Toxic

25   Substances Control Act?

BARONE - DIRECT / CONNETT

1  **A.**   Yes, I do.

2  **Q.**   The Toxic Substances Control Act is sometimes referred to

3  as TSCA?

4  **A.**   Correct.

5  **Q.**   Now, we won't be talking today about fluoride.  Do you

6  understand that?

7  **A.**   I do.

8  **Q.**   We are going to be talking about how EPA evaluates risk

9  under TSCA.  Do you understand that?

10  **A.**   I understand.

11  **Q.**   Now, in this case the EPA selected you to represent the

12  agency at what we attorneys call a 30(b)(6) deposition, right?

13  **A.**   I understand.

14  **Q.**   And the focus of that deposition, as with the focus here

15  today, was on how EPA determines whether a chemical poses an

16  unreasonable risk, right?

17  **A.**   That's what I understand was the topic of the petition

18  that was denied.

19  **Q.**   Now, since trial in this case back in June of 2020, the

20  EPA has released ten final risk evaluations under the amended

21  TSCA, right?

22  **A.**   That's correct.

23  **Q.**   And you, Dr. Barone, were personally involved in each of

24  those ten risk evaluations, including authoring portions of the

25  document and reviewing the documents before being published?

1    **A.**    Yes, I was.

2    **Q.**    And it's fair to say, Dr. Barone, that of all the risk

3    assessment scientists at the EPA, you have the broadest

4    knowledge of those first ten risk evaluations?

5    **A.**    That's probably accurate.

6    **Q.**    Now, in addition to being a risk assessment scientist, you

7    are also a developmental neurotoxicologist, correct?

8    **A.**    Yes, I am.

9    **Q.**    And the EPA has guidelines for how to assess the risk of

10   neurotoxicants, right?

11   **A.**    Yes, we do.

12   **Q.**    And that document is called "Guidelines for Neurotoxicity

13   Risk Assessment," right?

14   **A.**    Yes, they are.

15   **Q.**    And you helped to draft those guidelines, right?

16   **A.**    I was a participant in the authors.  Supporting the

17   authors.  I participated in the authorship.

18   **Q.**    And in addition to helping to author the document, you

19   reviewed it before it was published, correct?

20   **A.**    Yes, I did.

21   **Q.**    And you concurred with those guidelines?

22   **A.**    Yes, I did.

23   **Q.**    Now, one of the purposes of the guidelines for

24   neurotoxicity risk assessment is to promote consistency in how

25   EPA assesses the risks of neurotoxic chemicals, right?

BARONE - DIRECT / CONNETT

1   A.    Yes, it is.

2   Q.    And EPA will use those guidelines when it is assessing

3   neurotoxic hazards under TSCA?

4   A.    Yes, we will.  Yes, we do.

5            MR. CONNETT:  Jay, put up the slide.

6   BY MR. CONNETT:

7   Q.    Okay.  Dr. Barone, what I now want to do is, I want to

8   walk through with you the various steps of a risk evaluation,

9   okay?  Are you with me?

10  A.    Okay.

11  Q.    And I want to start with the first step of a risk

12  evaluation, which is the hazard identification step, okay?

13  A.    The first step of hazard assessment is hazard ID.

14  Q.    Okay.  And Dr. Barone, you agree that hazard and risk are

15  two separate things?

16  A.    Hazard is part of the risk, but it is not the same as

17  risk.

18  Q.    And you agree that hazard and risk are two separate

19  things?

20  A.    Yes.  They are related, but hazard is part of risk.  Risk

21  takes into account other aspects, which are listed on this

22  slide, including exposure assessment and risk characterization.

23  Q.    Now, a hazard, for purposes of hazard identification, is

24  an adverse effect that is associated with a chemical exposure?

25  A.    That is correct.

**BARONE - DIRECT / CONNETT**

1  Q.   And under EPA's guidelines for neurotoxicity risk

2  assessment, there is no need to prove causation to establish a

3  hazard of neurotoxicity, correct?

4  A.   That is correct.  We do not have to prove causation.  We

5  prove association and the strength of the association.

6  Q.   And in EPA's first ten risk evaluations -- and I just want

7  to set one point clear, because it bothers me -- there's ten

8  final risk evaluations, but one of them deals with asbestos,

9  and the asbestos evaluation did not consider non-cancer risks,

10  correct?

11  A.   So in the first -- the first series of the risk

12  evaluations, asbestos was actually expanded and we have a part

13  2 risk evaluation for asbestos to consider non-cancer.

14  Q.   Okay.

15  A.   We also have a supplement to 1,4-Dioxane, which will

16  consider other conditions of use that weren't covered in the

17  first risk evaluation for 1,4-Dioxane.

18  Q.   So when I refer to the first ten risk evaluations that

19  were finalized, I'm referring to all ten except for asbestos.

20  Does that make sense?

21  A.   Okay.

22  Q.   So in the first ten risk evaluations under the amended

23  TSCA, EPA did not exclude high dose studies from its hazard

24  identification, correct?

25  A.   That's correct.  In hazard identification we look, search,

1  screen and evaluate all the studies that are related to

2  different hazards.

3  **Q.**   And EPA did not make separate confidence determinations

4  for the high-dose data versus the low-dose data when evaluating

5  the strength of evidence for a particular end point, such as

6  neurotoxicity?

7  **A.**   So when we look at critical effects and a range of

8  critical effects, whether it's neurotoxicity or liver cancer or

9  whatever, we look at the strength of the evidence across the

10  entire concentration response range.

11  **Q.**   Right.

12      And then when you're looking at -- say the EPA identifies

13  neurotoxicity as a hazard -- okay? -- under TSCA, in its risk

14  evaluations EPA does not make a separate confidence

15  determination for the high dose hazard data -- for the

16  high-dose data versus the low-dose data, correct?

17  **A.**   We don't -- we don't do that until we get to the strength

18  of that the evidence when we're talking about risk

19  calculations.

20  **Q.**   Well --

21  **A.**   That's later.

22  **Q.**   Okay.  But Dr. Barone, if we look through -- and the Court

23  has all of the risk evaluations, okay?  They are in evidence in

24  this case.  When we look through those risk evaluations, we

25  will not see a single sentence in any of those documents where

 1   EPA provides a separate confidence determination for the

 2   high-dose hazard data versus the low-dose hazard data, will we?

 3   **A.**   No, you won't, because we're really talking about the

 4   different risks and the strength of the evidence for the

 5   different risks that are calculated for different types of

 6   critical effects.

 7   **Q.**   Okay.  And for now, Dr. Barone, do you see we're here on

 8   the hazard identification step of the analysis, right?  I'm

 9   not -- I'm not asking about the risk part of the assessment.

10   I'm talking about the hazard part of the assessment.  So I'll

11   ask the question again.

12        In the hazard assessment in EPA's risk evaluations, EPA

13   never makes different confidence determinations for the

14   high-dose data versus the low-dose data, correct?

15   **A.**   So, again, you're jumping outside of hazard when you start

16   talking that way, so that's why I'm a little confused in my

17   response.

18   **Q.**   Let's just take it step by step.

19   **A.**   Okay.

20   **Q.**   Let's just focus on the hazard assessment, okay?

21        And EPA does not, in the hazard assessment, make different

22   confidence determinations for the high-dose data and the

23   low-dose data, correct?

24        **THE COURT:**  Maybe I'm a little confused.  In -- in the

25   hazard identification step is there some gradation?  Is there a

 1    confidence level stated, or is something found to be a hazard

 2    or not?  Is it a binary decision or what is it?

 3              THE WITNESS:  Judge, it's basically a binary decision.

 4              When we're looking at data evaluation, we're saying

 5    this is a -- we have high confidence, moderate confidence or

 6    low confidence in the actual data evaluation for that study for

 7    those end points.  We're not making a dose-response assessment

 8    at that point.

 9              It's not until we get into our evidence integration in

10    the hazard assessment where we're looking at, well, what is the

11    relevance for dose response?  From hazard ID to weight of

12    evidence, we're using that information and that evaluation to

13    say we have studies that are adequate for dose response that we

14    think are relevant for dose response for different types of

15    scenarios.

16              THE COURT:  Okay.  But the very first step of a hazard

17    identification in the final analysis is kind of a binary

18    choice?  It may be based on different strengths of pieces of

19    evidence is what I'm hearing.

20              THE WITNESS:  So -- so to the neurotox guidelines, we

21    have a binary choice of sufficiency and insufficiency.  We take

22    it a step further under TSCA and the hazard ID and we talk

23    about high confidence, medium confidence, and low confidence or

24    uninformative is our other confidence rating, based upon the

25    data evaluation for the study.  It is --

BARONE - DIRECT / CONNETT

```
 1              THE COURT:  So --
 2              THE WITNESS:  It is not a -- it is not a dose-response
 3    question.
 4              THE COURT:  All right.  But there is a general -- in
 5    addition to the binary decision of sufficiency or
 6    insufficiency, there is some expression of confidence in that
 7    selection itself, but it's not dose-related?  It's not broken
 8    down --
 9              THE WITNESS:  Yes, sir.
10              THE COURT:  -- that we have more confidence at a
11    certain dose.  That doesn't even come into play yet?
12              THE WITNESS:  Not yet.
13              THE COURT:  Right.
14              THE WITNESS:  Not yet.
15              THE COURT:  Okay.
16    BY MR. CONNETT:
17    Q.   So if, after looking at all the hazard data, the high dose
18    and the low dose, EPA determines that the chemical is
19    associated with the hazard, EPA will then move to the
20    quantitative dose-response part of the analysis, right?
21    A.   So EPA looks at the -- from all the studies from hazard ID
22    and evaluates generally for dose response studies that are high
23    or medium quality, generally, sometimes low-quality studies are
24    also passed over to dose-response analysis; but, generally
25    speaking, it's the high-quality studies and the medium quality
```

 1   studies that are taken forward to dose response.

 2        It's also informing the weight of evidence evaluation, the

 3   evidence integration across data streams that takes place

 4   during hazard characterization.

 5   **Q.**   Okay.  So just to be clear, if EPA has medium confidence

 6   in the hazard, considering all of the data, EPA will then move

 7   into the quantitative dose-response analysis?

 8   **A.**   Generally speaking, yes.

 9   **Q.**   Okay.  So let's turn to that step of the framework.  Now

10   the quantitative dose-response analysis is designed to identify

11   what EPA calls the point of departure correct?

12   **A.**   That is correct.

13   **Q.**   Sometimes called POD or POD?

14   **A.**   POD oftentimes.

15   **Q.**   Now, I have found, in speaking with people, that that's a

16   term that just doesn't register with people, they don't know

17   what it is, so I'm going to use the more lay friendly term,

18   which is "hazard level," okay?

19   **A.**   Okay.

20   **Q.**   And you, yourself, agreed that the point of departure is

21   often called hazard level?

22   **A.**   In some parlance, yes.

23   **Q.**   And the hazard level can come in various types --

24   right? -- as in EP -- well, strike that.

25        Let me ask it again.  There's three types of hazard levels

1  that EPA uses.  One is a benchmark dose level, a benchmark

2  concentration level.  Another is a no adverse -- no observed

3  adverse effect level, which is "NOAEL," and the third is a

4  lowest adverse effect level which is a "LOAEL"; is that

5  correct?

6  A.   Generally speaking, yes.

7  Q.   Okay.

8  A.   Those are the three types of points of departure that we

9  would use.

10 Q.   And there is sort of a hierarchy from EPA's standpoint as

11 to which you would prefer to use if the data permits, correct?

12 A.   There is a hierarchy that is preferred.  We'd like to be

13 able to use all the dose-response data, if possible, and that

14 generally -- that preference is for benchmark dose analysis.

15 Q.   So if the data permits, you would prefer a benchmark dose

16 or benchmark concentration, correct?

17 A.   That's correct.

18 Q.   And then if you don't have that data, the next preference

19 would be for a no observed adverse effect level or the NOAEL,

20 correct?

21 A.   That is correct.

22 Q.   And then if you can't derive the NOAEL, the third and last

23 option would be the lowest observed adverse effect level,

24 correct?

25 A.   That is generally correct.

 1   Q.   And so now let's turn to this next step of the framework,

 2   which is the -- oh.  Sorry.  Strike that.

 3        I need to ask a few more questions on this.

 4        MR. CONNETT:  Jay, can you turn to the next slide?

 5   Okay.

 6   BY MR. CONNETT:

 7   Q.   Dr. Barone, I'm just going to refer you here to several

 8   undisputed facts in the case, and I'm going to read fact

 9   No. 38.  "Under the amended TSCA, EPA has made unreasonable

10   risk determinations where it did not have high confidence in

11   the hazard data"; is that correct?

12   A.   That's true.

13   Q.   And then the next statement here is that "In its first 10

14   risk evaluations under the amended TSCA, EPA made unreasonable

15   risk determinations where it had medium confidence in the

16   hazard data"; correct?

17   A.   That is also true.

18        MR. CONNETT:  Next slide.

19        And I'm going to -- at this point, Your Honor, I would

20   move to admit Plaintiff's Exhibit or Trial Exhibit 90.

21        THE COURT:  Okay.  Any objection?

22        MR. ADKINS:  Yes, Your Honor.  So this is one of the

23   exhibits for which we had a bellwether objection and I think

24   the outcome of this was if the witness can lay a foundation for

25   the document we would have no objection, but until that

BARONE - DIRECT / CONNETT

```
 1    foundation has been laid, we stand on our objection.
 2          MR. CONNETT:  And the Court, in its order, stated that
 3    these are admissions by the -- by the EPA and that the Court
 4    wanted there just to be testimony to provide context for the
 5    statements.
 6          THE COURT:  So this is -- this particular -- this is
 7    the dioxin risk?
 8          MR. CONNETT:  Yes.
 9          THE COURT:  And this is the EPA -- this is an EPA
10    document?
11          MR. CONNETT:  This is a document that Dr. Barone
12    reviewed and --
13          THE COURT:  Oh, oh, oh.
14          MR. CONNETT:  -- confirmed the accuracy of at his
15    deposition.
16          THE COURT:  Right.
17          Well, what you should do is, you can put it up and you
18    can question him on it.  And after he's essentially confirmed
19    and, in effect, adopted it or confirms his answer, then it
20    could come in.  But that's what I wanted.  I wanted to make
21    sure he agrees with what is said on there, so . . .
22          MR. ADKINS:  That's my understanding as well.
23          THE COURT:  Okay.  So I'll defer admission.
24    BY MR. CONNETT:
25    Q.   And maybe to make this easier for you, Dr. Barone, because
```

JENNIFER COULTHARD, CSR, RMR, CRR                    (530)537-9312

**BARONE - DIRECT / CONNETT**

 1  I know it's a little hard to see on the screen here, I am just

 2  going to go ahead and give you the hard copy.

 3       Your Honor, may I approach the witness?

 4            **THE COURT:**  Yes.

 5            **MR. CONNETT:**  Would Your Honor like a printed copy?

 6            **THE COURT:**  I have it on the screen, so I think I

 7  can --

 8  **BY MR. CONNETT:**

 9  **Q.**   Now, Dr. Barone, you remember at the deposition I handed

10  you this document, and I asked you a bunch of questions about

11  it?

12  **A.**   Yes, I remember it.

13  **Q.**   And that's your handwriting that we see here with all the

14  checkmarks, right?

15  **A.**   Yes, it is.

16  **Q.**   And you remember at the deposition I said, Dr. Barone, if

17  you agree with the statement, would you please put a checkmark

18  next to it.  Do you remember that?

19  **A.**   Yes.  Yes, I did.

20  **Q.**   And so all the checkmarks here are the statements that you

21  personally agreed to during the course of the deposition

22  correct?

23  **A.**   They are, and they were contextual specific for the

24  condition of use that was discussed in the preface for this.

25  **Q.**   Okay.  So why don't you -- why don't you do this,

1   Dr. Barone:  I don't want to misrepresent what you have to say.

2   If there's any contextual information that you think you need

3   to add to the statement, let's go ahead and find out what it

4   is.

5       So what would you need to say to make -- to add to make

6   sure this is 100 percent accurate from your vantage point?

7   **A.**   So I think the line of questioning, if I'm remembering

8   correctly, was about the condition of use, non-incorporative

9   processing in basic organic chemical manufacturing was the

10  condition of use, of focus, for this particular query.

11  **Q.**   And what about that -- are you saying something there is

12  incorrect or what are you --

13  **A.**   That's the context.  That's the condition of use for the

14  unreasonable risk determination.

15  **Q.**   Okay.  So as long as we're clear that this document, Trial

16  Exhibit No. 90, is only referring to this particular condition

17  of use identified here, then you would agree, per your

18  deposition, that this is a -- this document is correct?

19  **A.**   So again, as I raised my points about the context, this

20  only focused on part of the condition of use, which was the

21  route of exposure, dermal route of exposure.

22  **Q.**   And --

23  **A.**   It wasn't the fuller extent of the evaluation of that

24  condition of use.

25  **Q.**   Right.  But the route of exposure is identified here in

BARONE - DIRECT / CONNETT

1  the document, correct?

2  **A.**   Is it.  It's only one of the routes of exposure that we

3  considered for this condition of use.

4  **Q.**   And at your deposition, you confirmed that EPA made a

5  separate and specific risk determination for that route of

6  exposure?

7  **A.**   No, that's not what I said.  I said we made a separate

8  risk calculation for this particular permutation.

9  **Q.**   Okay.  Fair.  So EPA determined that this exposure

10  scenario right here, the dermal exposure for workers in the

11  non-incorporative basic organic chemical manufacturing process,

12  were at risk under this scenario?

13  **A.**   That is correct, for acute -- for this acute scenario for

14  this dermal route for this condition of use.

15       **MR. CONNETT:**  Your Honor, at this point I think

16  there's plenty of foundation to go ahead and admit the

17  document.

18       **MR. ADKINS:**  I think the same objection, Your Honor.

19  There's still notations lower in this document that counsel has

20  not asked the witness about, in particular, not relevant to --

21       **THE COURT:**  Yeah.  I think before I admit this, I'd

22  need to understand what these notations are.

23       **MR. CONNETT:**  Okay.

24       **THE WITNESS:**  So I'll go on --

25  \\\

1   BY MR. CONNETT:

2   Q.   Well --

3   A.   -- or do you have questions?

4   Q.   We'll come back to this document I think in a little bit,

5   so why don't we -- why don't we move on for now.

6        You would agree, though, let's -- that for the dioxane

7   risk evaluation that we were just looking at, EPA had medium

8   confidence in the hazard data, right?

9   A.   In the hazard data used for 1,4-Dioxane for this condition

10  of use, we had medium confidence.

11  Q.   Dr. Barone, if we go look at the conditions of use and the

12  unreasonable risk determinations in EPA's risk evaluations, we

13  are not going to see separate hazard determinations, hazard for

14  each and every condition of use, are we?

15  A.   We are not.

16  Q.   Okay.  In fact, we're not going to see a single difference

17  in any of EPA's hazard determinations when we get to the risk

18  determination stage, right?

19  A.   Actually, you do for cancer versus non-cancer.

20  Q.   I have no interest in any cancer.

21  A.   I was just being complete.

22  Q.   Okay.  I'm talking about non-cancer.

23  A.   Okay.

24  Q.   When we look at the unreasonable risk phase of the

25  analysis, we are not going to see a single example where EPA

BARONE - DIRECT / CONNETT

1   says now we no longer have high confidence in the hazard, we

2   now have medium confidence in the hazard, right?

3   **A.**    Not by condition of use.  Again, that confidence is

4   related to the acute hazards versus the chronic hazards.

5   **Q.**    Right.  EPA will have separate confidence determinations

6   for the acute hazard versus the chronic hazard, right?

7   **A.**    Correct.

8   **Q.**    Okay.

9   **A.**    Just trying to be complete.

10  **Q.**    And I appreciate that.  Thank you, Dr. Barone.

11          **MR. CONNETT:**  So now, let's go to the exposure

12  assessment.  Jay, if you could turn to slide 9.  Great.

13  **BY MR. CONNETT:**

14  **Q.**    So Dr. Barone --

15          **THE COURT:**  If you're about to -- we are -- now we are

16  close and I'm showing it's actually 1:30, so if you're going to

17  go to the next topic, this is a good break point.

18          **MR. CONNETT:**  This is a perfect point.

19          **THE COURT:**  Okay.  All right.  So we will reconvene on

20  Monday, same time, same place.

21          I assume you are keeping track of hours with Vicky,

22  because we've now gone through three days, this is your fourth

23  witness.  I don't know how many hours, but you should check in

24  with her to make sure you use your time efficiently.

25          **MR. CONNETT:**  And Your Honor, we do have a couple

1  matters that we wanted to raise with the Court.

2          THE COURT:  Okay.

3          MR. CONNETT:  The first --

4          THE COURT:  You may step down, Dr. Barone.  Thank you.

5          MR. CONNETT:  The first matter is that Your Honor had

6  mentioned yesterday that submitting particular studies makes

7  good sense.  The parties have conferred.  We agree.  We've had

8  conferrals about this and I think we're confident that by

9  Monday morning, we will be able to present the Court with an

10 agreed-upon set of particular studies that are going to be

11 discussed in this trial.

12         THE COURT:  Okay.  Good.  Thank you.

13         MR. CONNETT:  And the second point is, Your Honor had

14 mentioned at the pretrial conference that you would like to see

15 sort of periodic submissions --

16         THE COURT:  Yes.

17         MR. CONNETT:  -- of --

18         THE COURT:  Yes.

19         MR. CONNETT:  -- statements of fact?

20         THE COURT:  Yes.

21         MR. CONNETT:  And what we would propose -- and I

22 apologize for not raising this with the Court before, but we

23 have conferred and what we would propose is that we submit to

24 the Court by Monday morning before trial a first statement of

25 fact and then on the Thursday, which is a dark day, we submit a

 1  second statement of fact.  And then at the close of evidence --

 2  well, I guess we haven't conferred specifically about that, but

 3  for that two -- for those two we would suggest that might be a

 4  good way forward.

 5          THE COURT:  Okay.  That's fine.  Yeah.  I'd like that.

 6  I would like that Monday because we've now gone through three

 7  days and let's -- let's -- I'll adopt that schedule.

 8          MR. CONNETT:  Great.  And then in terms of the

 9  framework of it, we were thinking that the parties would

10  separately submit facts within the risk evaluation framework,

11  so it's going to be all within that framework.

12          THE COURT:  Yeah.  So long as you -- you know, you're

13  going to have competing, I'm sure, once we get into the

14  details, but I'd like it all to all fit within a framework.  As

15  much of the framework as you can agree on.  You can disagree

16  when you get underneath each one, but it's useful as opposed to

17  having free-floating facts.

18          MR. CONNETT:  In the parties' joint submission from

19  last week, we did collectively put the facts within a singular

20  framework.  Would the Court prefer that approach, or would the

21  Court prefer that we file separately with -- but both within

22  the same framework?

23          THE COURT:  I'd rather have a singular document, and I

24  think it makes sense to use -- looking at my clerk -- what

25  you've jointly filed as a framework.

1          **MR. CONNETT:**  That's what we will do, Your Honor.

2          **THE COURT:**  Good.

3          **MR. ADKINS:**  Great.

4          **THE COURT:**  Thank you.  Appreciate it.

5          **THE CLERK:**  Court is adjourned.

6          (Adjourned at 1:33 p.m.)

7                          --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7

8   _____          <u>February 3, 2024</u>
    JENNIFER L. COULTHARD, RMR, CRR                DATE
9   Official Court Reporter
    CA CSR#14457

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JENNIFER COULTHARD, CSR, RMR, CRR                (530)537-9312