**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

FOOD & WATER WATCH, INC., et al.,

    Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

    Defendants.

Case No. 17-CV-02162-EMC

**FOURTH JOINT ITERATIVE
PROPOSED FINDINGS OF FACT AND
REBUTTAL STATEMENTS FOR
SECOND PHASE OF TRIAL**

## <u>TABLE OF CONTENTS</u>

I.    RISK EVALUATION FRAMEWORK ................................................................. 3

    A.    UNDISPUTED FACTS (Nos. 1–7) ................................................. 3

    B.    EPA'S PROPOSED FACT (No. 8) .................................................. 4

II.    HAZARD ASSESSMENT ............................................................................... 5

    A.    UNDISPUTED FACTS (Nos. 9–15) ............................................... 5

    B.    PLAINTIFFS' PROPOSED FACTS (Nos. 16–81) ............................. 5

    C.    EPA'S PROPOSED FACTS (Nos. 82–348) ..................................... 54

III.    EXPOSURE ASSESSMENT ........................................................................ 171

    A.    PLAINTIFFS' PROPOSED FACTS (Nos. 349–362) ...................... 171

    B.    EPA'S PROPOSED FACTS (Nos. 363–372) ................................. 177

IV.    RISK CHARACTERIZATION ..................................................................... 184

    A.    PLAINTIFFS' PROPOSED FACTS (Nos. 373–392) ...................... 184

    B.    EPA'S PROPOSED FACTS (Nos. 393–405) ................................. 196

V.    RISK DETERMINATION ........................................................................... 201

    A.    PLAINTIFFS' PROPOSED FACTS (Nos. 406–437) ...................... 201

    B.    EPA'S PROPOSED FACTS (Nos. 438–441) ................................. 215

Per the Court's instruction, the instant document provides the parties' rebuttals to the facts set forth in the Third Joint Iterative Proposed Findings of Fact. ECF No. 420. Where the proposed facts are not disputed, the parties have so indicated. To facilitate cross-comparison with the Third Joint Iterative Proposed Findings of Fact, the parties have maintained the same order of facts, with the exception of Section I. The order of facts in Sections II–V of this document is thus identical as the Third Joint Iterative Proposed Findings of Fact. Lastly, the parties have not added to, or modified, the Proposed Findings of Fact with the exception that some clerical errors (e.g., incorrect citations to the record) have been corrected.

## I.   RISK EVALUATION FRAMEWORK

### A.   UNDISPUTED FACTS (NOS. 1–7)

1.   A TSCA risk evaluation is the process for determining whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use, under TSCA section 6. *15 U.S.C. § 2605(b)(4); 82 Fed. Reg. 33,726 (July 20, 2017), Trial Ex. 544; (Trial Phase 1).*

2.   Risk assessment is the process by which scientific judgments are made concerning the potential for toxicity in humans. *Undisputed Fact # 11.*

3.   The National Research Council (NRC, 1983) has defined risk assessment as including the following components: hazard assessment (including hazard identification & quantitative dose response analysis), exposure assessment, and risk characterization. *Undisputed Fact # 12.*

4.   A risk evaluation under the Amended TSCA includes the three aforementioned steps of a risk assessment, as well as a fourth and final step: a risk determination.

5.   The risk assessment is the scientific technical evaluation, encompassing the first three parts of this process, resulting in an unbiased, transparent, and reproducible description of the risk. Barone Trial Tr. Vol. IV, at 654:19–25 (Feb. 5, 2024). The risk determination is the final step of the risk evaluation process, where EPA summarizes its findings and determines whether a chemical does or does not present unreasonable risk. *Id.* at 655:1–11.

6.     EPA risk evaluations must meet the scientific standards under TSCA section 26, including weight of the scientific evidence and best available science. Barone Trial Tr. Vol. IV at 651:20–25, 652:6–8 (Feb. 5, 2024). The term "weight of the scientific evidence" is supported by EPA's systematic analysis of the related information to support the Agency's findings. *Id.* at 651:22–652:5, *see* 40 CFR 702.33. The "best available science" means that TSCA risk evaluations need to be unbiased and objective, and the methodologies employed must be transparent and reproducible and generally peer reviewed. Barone Trial Tr. Vol. IV, at 652:6–16, 40 C.F.R. 702.33.

7.     The evaluation of fluoridation chemicals under TSCA follows the same standards for demonstrating hazard and risk that EPA uses for its evaluations of other industrial chemicals under TSCA (i.e., there is no justification for holding fluoridation chemicals to a higher burden). *Barone Trial Tr. (ECF No. 401) at 742:25-743:8 (Feb. 6, 2023).*

## B.     EPA'S PROPOSED FACT (NO. 8)

8.     As required under TSCA section 6(b)(4)(A), the Risk Evaluation Rule establishes a process for conducting risk evaluations. 15 U.S.C. § 2605(b)(4); 82 Fed. Reg. 33,726 (July 20, 2017), Trial Ex. 544 (Trial Phase 1). The Risk Evaluation Rule requires that each TSCA risk evaluation include all the following components: (i) a scope; (ii) a Hazard Assessment; (iii) an Exposure Assessment; (iv) a Risk Characterization; and (v) a Risk Determination. 82 Fed. Reg. 33,726, 33,750 (July 20, 2017), Trial Ex. 544 (Trial Phase 1). Thus, the traditional components of the risk assessment paradigm, together with a risk determination, constitute a risk evaluation under TSCA. Henry Decl. ¶ 70, ECF No. 201 (Trial Phase 1).

**Plaintiffs' rebuttal**: Plaintiffs do not dispute that the Risk Evaluation rule establishes the process that EPA must use for its risk evaluations under Section 6. However, as this Court has previously ruled, some of the requirements that apply to EPA under Section 6 do not apply to evaluations triggered by citizen petitions under Section 21. *Food & Water Watch, Inc. v. United States Env't Prot. Agency, 291 F. Supp. 3d 1033, 1045–46 (N.D. Cal. 2017)* (finding that Section 21 does not import the requirements imposed on EPA under Section 6(b)).

## II.     HAZARD ASSESSMENT

### A.     UNDISPUTED FACTS (NOS. 9–15)

9.      Hazard identification and dose-response analysis are two components of a hazard assessment. Barone Trial Tr. Vol. III, at 489:11–13, 495:5–8 (Feb. 2, 2024).

10.     Hazard identification is an adverse effect that is associated with a chemical exposure. Barone Trial Tr. Vol. III, at 489:23–25.

11.     EPA reviews, searches, screens, and evaluates all studies related to different hazards to determine whether the data are sufficient or insufficient for identified adverse effects. Barone Trial Tr. Vol. III, at 492:24–494:9.

12.     Proof of causation is not required to establish a hazard of neurotoxicity. Barone Trial Tr. Vol. III, at 490:1–5.

13.     Based on all the studies evaluated in the hazard identification step, EPA identifies studies that are generally of high or medium quality to conduct a dose-response analysis. Barone Trial Tr. Vol. III, at 494:21–495:8.

14.     The quantitative dose-response analysis is designed to identify a point of departure or POD. Barone Trial Tr. Vol. III, at 495:9–14.

15.     There are three types of points of departure that EPA uses, in the following order of preference: a benchmark dose level or benchmark concentration level (BMDL or BMCL); a no observed adverse effect level (NOAEL); and a lowest observed adverse effect level (LOAEL). Barone Trial Tr. Vol. III, at 495:23–496:25.

### B.     PLAINTIFFS' PROPOSED FACTS (NOS. 16–81)

16.     Fluoride passes through the placenta and gets into the fetal brain. *Undisputed Fact No. 30; Grandjean Trial Tr. (ECF No. 397) at 293:7-13 (Feb. 1, 2024).*

**EPA's rebuttal**: The amount of fluoride that crosses the blood-brain barrier during pregnancy is unknown. Hu Trial Tr., Vol. I, 168:20–23 (Q: "But, as far as you know, there's no research establishing how much fluoride reaches the fetus' brain during human pregnancy, correct? A: I'm not aware of it, as I sit here today."). Otherwise, undisputed.

17.     The developing brain during the in utero and neonatal period has a heightened vulnerability to the effects of chemical toxicants. *Trial Ex. 18 at 42; Grandjean Trial Tr. (ECF No. 417) at 289:3-290:4; (Feb. 1, 2024); Grandjean Trial Decl. (ECF No 198-3) ¶¶ 38-40; Thiessen Trial Decl. (ECF No. 202-1) ¶ 159; Grandjean Trial Tr. (ECF No. 240) at 150:15-22 & 151:24-152:13 (June 9, 2020); Lanphear Trial Tr. (ECF No. 241) at 349:5-8 (June 10, 2020); Thayer Trial Tr. (ECF No. 241) at 440:18-441:1, 442:12-443:3 (June 10, 2020).*

**EPA's rebuttal**: Undisputed.

**Animal Data:**

18.     EPA agrees that effects observed in animals are relevant to humans unless human data counterindicate. *Undisputed Fact No. 28.*

**EPA's rebuttal**: Undisputed.

19.     The National Research Council (NRC) of the National Academies of Science has concluded that fluoride interferes with the functions of the brain in animal studies. *Trial Ex. 13 at 221-222; Grandjean Trial Tr. (ECF No. 417) at 294:6-21 (Feb. 1, 2024).* Dr. Stanley Barone, a developmental neurotoxicologist at the EPA, agrees with NRC's finding. *Barone Trial Tr. (ECF No. 418) at 1448:10-16 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. While there is some support for the first sentence in the citation provided, there are also several contravening statements in that same citation. For example, NRC states "[a] few animal studies have reported alternations in the behavior of rodents after treatment with fluoride. **However, the observed changes were not striking in magnitude and could have been due to alterations in hormonal or peptide activity.**" Trial Ex. 13, at 221 (emphasis added). Plaintiffs' proposed fact should therefore be read in context of the grander conclusions of NRC (2006). The 2022 draft NTP monograph also contravenes this assertion. Trial Ex. 67, at 95 ("Existing animal studies provide little insight into the question of whether fluoride exposure affects IQ."). Regarding the second sentence in the proposed fact, Plaintiffs omit Dr. Barone's full explanation: "Those animal studies that were identified then [in NRC (2006)] were generally

higher dose than what we're talking about here under the petition." Barone Trial Tr. Vol. IX, at 1448:17–20.

20.     Animal studies are limited in their ability to detect fluoride's neurodevelopmental effects during the in utero and neonatal period. *Barone Trial Tr. (ECF No. 418) at 1448:24-1449:12 & 1450:3-9 (Feb. 13, 2024)*. This is because the human equivalent to the third trimester of brain development in rats occurs, in part, during the early weeks of postnatal life, a period of time when the rodent pups are breastfed. *Barone Trial Tr. (ECF No. 418) at 1448:24-1449:12 & 1450:3-9 (Feb. 13, 2024)*. Because there is very limited lactational transfer of fluoride, the rodent pups receive little fluoride during this critical window of development, thereby limiting the power of the rodent studies to detect the impact of infant fluoride exposure. *Barone Trial Tr. (ECF No. 418) at 1448:24-1449:12 & 1450:3-9 (Feb. 13, 2024)*. This is a significant limitation given that approximately 17% of infants in the U.S. are exclusively fed formula made with water, with over 70% of these infants receiving tap water some or all of the time. *Thiessen Trial Tr. (ECF No. 402) at 959:7-960:6 (Feb. 7, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 82, 168, & 170*.

**EPA's rebuttal**: Undisputed.

21.     Despite the limitations of rodent studies in detecting the neurodevelopmental effects of fluoride, the National Toxicology Program's (NTP) systematic review of animal literature in 2016 concluded that the available research "suggests adverse effects on learning and memory in animal[s] exposed to fluoride." *Trial Ex. 553, p. vii.* The NTP characterized its confidence in the learning/memory studies as "moderate" for adult studies, and "low" for the fewer available developmental studies. *Trial Ex. 553, p. vii; Thayer Trial Tr. (ECF No. 241) at 453:10-13 & 452:9-13 (June 10, 2020).*

**EPA's rebuttal**: Disputed. Plaintiffs stretch NTP 2016's conclusions and frame them as more supportive of adverse effects found in animal studies. The full citation is as follows: "Very few studies assessed learning and memory effects in experimental animals (rats and mice) **at**

**exposure levels near 0.7 parts per million**, the recommended level for community water fluoridation in the United States. At concentrations **higher than 0.7 parts per million,** this systematic review found a **low to moderate level-of-evidence** that suggests adverse effects on learning and memory in animal [*sic*] exposed to fluoride. The evidence is strongest (**moderate** level-of-confidence) in animals exposed **as adults** and **weaker** (**low** level-of-evidence) in animals exposed during development. Confidence in these findings was reduced primarily based on potential confounding of the learning and memory assessments by deficits in motor function or fear and risk of bias limitations. Additional research is needed, in particular, to address potential effects on learning and memory following exposure during development to fluoride at levels nearer to 0.7 parts per million." Trial Ex. 553, at 8. The NTP 2016 authors were thus not as confident in their conclusions as Plaintiffs paint them out to be. Additionally, the NTP 2016 conclusion on the animal studies should be read in context of NTP's updated assessment of the animal evidence in NTP's 2022 draft monograph. **The 2022 draft NTP monograph concluded: "Existing animal studies provide little insight into the question of whether fluoride exposure affects IQ."** Trial Ex. 67, at 12, 95.

22.     Dr. Kristina Thayer, the lead author of NTP's 2016 review, testified that "moderate" is "typically a descriptor that you would use when, yes, there is some – some hazard there." *Thayer Trial Tr. (ECF No. 241) at 449:7-20 (June 10, 2020).*

**EPA's rebuttal**: Disputed. Plaintiff's proposed fact omits that Dr. Thayer also testified that NTP's 2016 moderate evidence conclusion was focused on higher exposure levels. Thayer Trial Tr. (ECF No. 241) at 451:16–21 (June 10, 2020) (Q: [T]he NTP still concluded that there is moderate evidence that fluoride impairs learning and memory in adult rodents; is that correct? A: Yes. And, in particular, at the – at the higher exposure levels.).

23.     Although there is a debate about the extent to which the animal data can inform the association between fluoride and IQ in humans, it is undisputed that fluoride causes

neurotoxic changes in the brains of laboratory animals. *Thiessen Trial Tr. (ECF No. 401) at 757:21-25 (Feb. 6, 2024); Grandjean Trial Tr. Vol III at 444:20-445:3 (Feb. 2, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact overgeneralizes what NRC 2006 found and what is actually undisputed about fluoride's effects on the brains of laboratory animals at some dose. In the first citation provided, Dr. Thiessen testified that nothing has contradicted NRC's finding that "fluoride interferes with the functions of the brain." Thiessen Trial. Tr. Vol. V, at 757:21–25 (Feb. 6, 2024). In the second citation, Dr. Grandjean testified that "animal studies show fluoride can enter the brain during early development, and can cause changes in the brain biochemistry."

24.   The National Toxicology Program's May 2022 Monograph (discussed further below) found that the majority of high-quality/ low-dose animal studies on fluoride neurotoxicity have been able to detect adverse changes in the brain. *Thiessen Trial Tr. (ECF No. 401) at 758:5-759:16 & 759:22-760:9 (Feb. 6, 2024); Trial Ex. 67 at F4-F5.* For example, the NTP reports that "The majority of the low risk-of-bias studies (11 of 14 drinking water studies) found some histological change in the brain of rats or mice treated with fluoride at concentrations at or below 20ppm, of which eight studies reported histological changes in the brain at or below 10 ppm." *Trial Ex. 67 at F5.*

**EPA's rebuttal**: Disputed. The first sentence of Plaintiffs' proposed fact overgeneralizes the NTP's findings. First, the Plaintiffs only quote some of NTP's remarks about histopathology—which is the examination of brain tissues to explore potential physical changes. The NTP authors investigated other potential mechanisms of neurotoxicity beyond histopathology. The authors noted null or inconsistent findings in those mechanistic studies. For example, for potential brain biochemical effects of fluoride exposure, the NTP authors wrote: "the endpoints measured in brain biochemistry studies were too heterogeneous or limited in number to make any determination on potential relevance of mechanism, even before limiting the review of the data to low risk-of-bias studies." Trial Ex. 67, at 284. The NTP authors further concluded that human studies "have failed to identify consistent evidence to suggest that thyroid effects are a requisite mechanism by which

fluoride causes neurodevelopmental or cognitive effects in humans." *Id.* at 287. Furthermore, the proposed fact cherry-picks a single quote about histopathology and ignores NTP's ultimate conclusions about the animal and human mechanistic literature: that (1) "Existing animal studies provide little insight into the question of whether fluoride exposure affects IQ," and (2) "Human mechanistic studies were too heterogeneous and limited in number to make any determination on biological plausibility." *Id.* at 95.

25.     Dr. Kristina Thayer, the Director of EPA's Chemical and Pollutant Division, testified that the animal data on fluoride "supports the biological plausibility of fluoride causing neurotoxic effects in humans." *Thayer Trial Tr. (ECF No. 241) at 450:9-13.* Dr. Grandjean and Dr. Barone both agree with Dr. Thayer's assessment. *Grandjean Trial Tr. (ECF No. 417) at 295:3-18 & 320:5-12 (Feb. 1, 2024); Barone Trial Tr. (ECF No. 418) at 1448:17-23 (Feb. 13, 2024).*

**EPA's rebuttal**: Dr. Barone's full explanation was that most of the animal data are based upon adult neurotoxicity, not predominantly developmental neurotoxicity. Barone Trial Tr. Vol. IX, at 1448:17–23 (Feb. 13, 2024); *see infra* ¶ 63 (EPA's rebuttal) (describing how biological plausibility fits into weighing the scientific evidence in the hazard assessment portion of a risk evaluation). Otherwise, undisputed.

**Human Data**:

*National Toxicology Program (NTP)*

26.     The National Toxicology Program (NTP) is headquartered within the National Institute of Environmental Health Sciences (NIEHS). The NIEHS "is one of the premier environmental health sciences research institutions in the world." *Barone Trial Tr. (ECF No. 418) at 1425:23-1426:2 (Feb. 13, 2024).*

**EPA's rebuttal**: Undisputed.

27.     The NTP has "a well-earned reputation for producing reliable assessments on the health impacts of environmental chemicals" and "is one of the leaders in the world in the application of systematic review to toxicological evaluations." *Barone Trial Tr. (ECF No. 418) at 1426:3-12 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. NTP's reputation is tied specifically to reliable hazard assessments, not risk assessments. Barone Trial Tr. Vol. IX, at 1426:3–8 (Feb. 13, 2024). Otherwise, undisputed.

28.     By May of 2022, the NTP completed a "prepublication" version of its systematic review of fluoride, titled *Monograph on the State of the Science Concerning Fluoride Exposure and Neurodevelopmental and Cognitive Health Effects: A Systematic Review (hereafter "Monograph"). Berridge Trial Tr. (ECF No. 400) at 535:15-21 (Feb 5, 2024)*; *Barone Trial Tr. (ECF No. 418) at 1427:5-8 (Feb. 13, 2024).*

**EPA's rebuttal**: Undisputed.

29.     The May 2022 prepublication version of the Monograph reflects changes that NTP made in response to two rounds of peer review by the National Academy of Sciences, Engineering & Medicine (NASEM). *Berridge Trial Tr. (ECF No. 400) at 530:8-18 & 532:1-3 (Feb 5, 2024).* NASEM provided critical feedback regarding the clarity with which the NTP communicated its conclusions, but did not challenge the merits of the underlying science upon which NTP based its conclusions. *Berridge Trial Tr. (ECF No. 400) at 531:4-25 (Feb 5, 2024).*

**EPA's rebuttal**: EPA disputes Plaintiffs' assertion that NASEM did not have scientific criticisms of the earlier drafts of the NTP monograph. Dr. Savitz, Chair of the NASEM committees, testified as to several scientific criticisms NASEM pronounced, including "inconsistency in the handling of [the] risk-of-bias assessment, confounding," and "not well-documented assessments of [the] evidence." Savitz Trial Tr. Vol. VII, at 1112:7–21. NASEM's review of the 2019 draft NTP monograph identified at least seven scientific issues with the NTP monograph. Trial Ex. 653, at 14-16 (identifying issues with (1) NTP's literature search, since it

was based on the Fluoride Action Network's selection of studies, (2) NTP's inconsistent application of risk-of-bias criteria, (3) NTP's evaluation of potential confounding, (4) NTP's failure to identify the magnitude and direction of exposure misclassification, (5) NTP's failure to assess adequacy of blinding techniques, (6) NTP's failure to recognize certain statistical errors in several of the studies, and (7) NTP's loose use of the term "consistency."). NASEM ultimately concluded that the earlier NTP drafts had not supported their conclusion that fluoride is a neurodevelopmental hazard and suggested that NTP compare "like-to-like" studies instead of aggregating across methodologically heterogeneous papers. *Savitz Trial Tr. Vol. VII, at 1112:9–13*; Trial Ex. 653, at 16 ("the committee does not find that NTP has adequately supported its conclusion.").

30.    After incorporating the recommendations from NASEM regarding the clarity with which NTP explained its conclusions, the Monograph underwent a third external peer review by five independent experts who had been vetted for potential conflicts of interest and bias. *Berridge Trial Tr. (ECF No. 400) at 533:1-25 (Feb 5, 2024).* The latter form of peer review is the standard process that NTP uses for its monographs. *Berridge Trial Tr. (ECF No. 400) at 526:21-528:3 & 533:21-25 (Feb 5, 2024).* The five independent experts concurred with NTP's conclusions. *Berridge Trial Tr. (ECF No. 400) at 534:2-18 (Feb. 5, 2021).* The NTP's Scientific Director, who typically makes the final decision as to whether a monograph should be published, determined that the May 2022 Monograph was final, complete and fit for publication. *Berridge Trial Tr. (ECF No. 400) at 528:4-16 & 537:19-538:6 (Feb 5, 2024).*

**EPA's rebuttal**: Undisputed.

31.    Although it has not yet been formally published, EPA's risk assessment scientist, Dr. Barone, agrees that the May 2022 Monograph is a "high quality review." *Barone Trial Tr. (ECF No. 418) at 1427:2-4 (Feb. 13, 2024).* According to Dr. Barone, the May 2022 Monograph "followed the rules that have been developed by NTP for conducting systematic reviews." *Barone Trial Tr. (ECF No. 418) at 1427:5-8 (Feb. 13, 2024).* The Monograph had a "rigorous approach

to assembling the evidence," "clearly defined rules for identifying and evaluating studies," and "a well-defined protocol for drawing inferences" from the studies. *Barone Trial Tr. (ECF No. 418) at 1427:9-21 (Feb. 13, 2024).*

**EPA's rebuttal**: Undisputed.

32.     EPA's expert, Dr. David Savitz, agrees that the May 2022 Monograph is likely to have captured all relevant studies that were in existence as of the April 2021 literature cutoff date. *Savitz Trial Tr. (ECF No. 414) at 1197:2-7 (Feb. 9, 2024).*

**EPA's rebuttal**: Undisputed.

*The Findings of NTP's May 2022 Monograph*

33.     The Hazard Identification step of the fluoride hazard assessment is satisfied by the findings in NTP's May 2022 Monograph. *Barone Trial Tr. (ECF No. 418) at 1429:11-21(Feb. 13, 2024).* According to the NTP:

**EPA's rebuttal**: Disputed. As explained below, several subparts to this proposed fact are disputed, including whether they support a hazard identification.

   A.   The **"vast majority"** of the 72 epidemiological studies on fluoride and IQ that had been published by April 2021 found an association between fluoride and reduced IQ, including 18 of the 19 "high quality" studies that were at "low risk of bias." *Trial Ex. 67 at xii; Trial Ex. 69 at 65; Grandjean Trial Tr. (ECF No. 417) at 313:25-314:5 (Feb. 1, 2024)*); *Savitz Trial Tr. (ECF No. 414) at 1197:2-15 (Feb. 9, 2024).* The NTP agreed that this is a "large body of evidence." *Trial Ex. 67 at xiii.*

**EPA's rebuttal**: Disputed. The citation to the "vast majority" quote is incorrect and otherwise taken out of context. The full quote from the 2022 NTP monograph reads: "Despite the lack of adequate consideration of key covariates in the **vast majority** of high risk-of-bias studies, the results across most of these studies (**46 of 53**) consistently provide evidence of an association between fluoride exposure and IQ[.]" Trial Ex. 67, at 65. NASEM and Dr. Savitz also took issue

1  with the term "consistently," as it is used in the NTP monograph, because that term was never fully

2  defined and could mean that the paper found one isolated effect among dozens of stratifications of

3  the data. Savitz Trial Tr. Vol. VII, at 1114:24–1115:1. "The text that is used to justify the assertions

4  of consistently positive results is purely anecdotal and cites isolated findings from specific studies

5  without explaining why those findings, and not others, were highlighted. Selective reporting of the

6  literature in that way is almost certain to generate a false impression of consistency. . . . [S]tudies

7  with low power can nonetheless generate an indication of a positive association and that those with

8  isolated statistically significant findings might not provide an overall pattern indicative of a

9  positive association." Trial Ex. 653, at 53. Otherwise, undisputed.

11  B.  "[T]he **high-quality studies** (i.e., studies with low potential for bias) consistently

12  demonstrate lower IQ scores with higher fluoride exposure [e.g., represented by

13  populations whose total fluoride exposure approximates or exceeds the WHO

14  Guidelines for Drinking-water Quality of 1.5 mg/L of fluoride] . . . . Although some

15  studies that conducted multiple analyses observed within-study variations in results

16  (e.g., differences between subsets of IQ tests), these variations were unique to

17  individual studies and did not detract from the overall consistency in the findings

18  that higher fluoride is associated with lower IQ scores." *Trial Ex. 67 at 47;*

19  *Grandjean Trial Tr. (ECF No. 417) at 314:7-315:8 (Feb. 1, 2024).*

20  **EPA's rebuttal**: Disputed to the extent these findings are cited to generalize to the United

21  States. Of the 55 studies NTP considered in its July 2022 meta-analysis, 53 were outside of North

22  America, with 94% coming from China, India, Iran, or Pakistan. While there may be "high-

23  quality" studies coming from these areas according to NTP, the high methodological quality of a

24  study does not automatically mean it is generalizable to a different population. As Dr. Hu

25  explained, "a neurotoxicant, like fluoride, could have different manifestations of neurotoxicity in

26  a given population," such as culturally different "parenting influences" or "things that they eat."

27  Hu Trial Tr. Vol. I, 102:7–103:11. Regarding socioeconomic status, Dr. Hu explained "there's

many reasons to believe that children of different families, of different means, can have different experiences in terms of their neurodevelopment." *Id.* at 104:13–16.

    C.  "Taken together and considering the consistency in the results despite the variability across studies in which covariates were accounted for, bias due to **confounding is not considered to be a concern** in the body of evidence." *Trial Ex. 67 at 49; Grandjean Trial Tr. (ECF No. 417) at 316:4-317:3 (Feb. 1, 2024); Savitz Trial Tr. (ECF No. 414) at 1197:16-19 (Feb. 9, 2024).*

**EPA's rebuttal**: Disputed. Confounding remains an issue and the NTP authors' treatment of confounding is unsatisfactory. To NTP, a study could be rated low risk-of-bias for confounding so long as it "addressed the three key covariates," which were "age, sex, and socioeconomic status." Trial Ex. 67, at 64. The NTP authors further stated that there was a "lack of adequate consideration of key covariates in the vast majority of high risk-of-bias studies," yet nonetheless dismissed the possibility of confounding. *Id.* at 65. NASEM criticized the NTP authors' treatment of confounding in the monograph's earlier drafts, stating it "identified many cases in which NTP's evaluation or analyses of confounding were insufficient, difficult to understand, or applied inconsistently from one study to another." Trial Ex. 653, at 46. EPA further disputes this proposed fact to the extent that the citation to Dr. Savitz' trial testimony is being used to signify his support for the quoted language. Dr. Savitz testimony was merely acknowledging the text of the monograph.

    D.  "In general, there were **few, if any, risk-of-bias concerns regarding exposure characterization** in the low risk-of-bias studies. These studies mainly had individual exposure data based on urine or water measures with appropriate analyses. Although there are concerns related to using urine samples . . ., the evidence suggests that urinary fluoride is a reasonable measure of exposure." *Trial Ex. 67 at 51; Grandjean Trial Tr. (ECF No. 417) at 317:4-24 (Feb. 1, 2024).*

**EPA's rebuttal**: Undisputed.

E.  "The low risk-of-bias studies have **few concerns regarding outcome assessment**. All 19 low risk of- bias studies used appropriate methods for measuring IQ in the study population being assessed, and blinding of outcome assessors was not a concern in 18 of the 19 studies . . . ." *Trial Ex. 67 at 53; Grandjean Trial Tr. (ECF No. 417) at 318:18-319:10 (Feb. 1, 2024).*

**EPA's rebuttal**: Disputed. Blinding of outcome assessors—those administering the IQ tests—remains a concern that the NTP authors did not satisfactorily address. For example, in Choi (2015) the authors did not blind their outcome assessors, and the children studied had dental fluorosis. Trial Ex. 67, at 193-94. The NTP authors concluded that "it is unlikely that the assessors had knowledge of the individual exposure as children all came from the same area." Trial Ex. 67, at 194. But dental fluorosis is visual—it can be seen on the child's teeth by the assessor while administering the IQ test. Savitz Trial Tr., Vol. VIII, at 1305:25–1306:5 ("[A] lot of them are comparing two communities, one of which is known to have a problem with . . . dental fluorosis . . . meaning they couldn't blindly assess outcome. The assessors would surely know which village is which."). The NTP authors also assumed that the outcome assessors were blinded if the study did not report otherwise. Trial Ex. 67, at 294.

F.  "Although the high risk-of-bias studies may have more potential for bias due to confounding compared with the low risk-of-bias studies, the **consistent IQ findings across high and low risk-of-bias studies** indicate that the results cannot be explained solely by potential bias due to confounding." *Trial Ex. 67 at 51.*

**EPA's rebuttal**: Disputed as to NTP's definition of "consistency," which was addressed above. *See, e.g.,* Trial Ex. 653, at 50 ("However, the consistency might be exaggerated if only positive results were selected from studies that reported both positive and negative results (see, for example, Bashash et al. 2017 or Green et al. 2019).").

G.  "The consistency in direction of the association in the studies with heterogeneity in methods of exposure and outcome assessment in 5 different countries and

accounting for a wide variety of covariates **all serve to rule out the possibility that there is a common factor other than fluoride exposure that can account for this outcome**." *Trial Ex. 69 at 66; Grandjean Trial Tr. (ECF No. 417) at 319:14-21; 320:5-12 (Feb. 1, 2024); Barone Trial Tr. (ECF No. 418) at 1428:12-21 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed as to NTP's definition of "consistency," which was addressed above. *See, e.g.,* Trial Ex. 653, at 50 ("However, the consistency might be exaggerated if only positive results were selected from studies that reported both positive and negative results (see, for example, Bashash et al. 2017 or Green et al. 2019)."). EPA further disputes that the findings can be generalized to the United States. Of the 55 studies NTP considered in its July 2022 meta-analysis, 53 were outside of North America, with 94% coming from China, India, Iran, or Pakistan. While there may be "high-quality" studies coming from these areas according to NTP, the high methodological quality of a study does not automatically mean it is generalizable to a different population. As. Dr. Hu explained, "a neurotoxicant, like fluoride, could have different manifestations of neurotoxicity in a given population," such as culturally different "parenting influences" or "things that they eat." Hu Trial Tr. Vol. I, at 102:7–103:11. Regarding socioeconomic status, Dr. Hu explained "there's many reasons to believe that children of different families, of different means, can have different experiences in terms of their neurodevelopment." *Id.* at 104:13–16.

*Risk Sciences International (RSI)*

34.    Risk Sciences International (RSI), under contract with Health Canada, has conducted an extensive systematic review of the fluoride neurotoxicity literature. *Trial Ex. 129; Trial Ex. 131.* According to RSI: "**The overall evidence identified to date strongly suggests that fluoride can affect cognitive outcomes in children (specifically, reduction in IQ scores), at levels close to those currently seen in North American drinking water.**" *Trial Ex. 131 at 1516; Savitz Trial Tr. (ECF No. 414) at 1205:16-12006:6 (Feb. 9, 2024).*

**EPA's rebuttal**: Disputed as to the misleading use of the phrase "levels close to those currently seen in North American drinking water." RSI defined this phrase to mean "approximately 2 ppm fluoride in drinking water," not 0.7 mg/L, and included natural sources of fluoride in water. Trial Ex. 129, at 10. RSI expressly disclaimed conducting their own dose-response meta-analysis, unlike NTP's eTables 4 and 5. Trial Ex. 129, at 16 ("no meta-analysis was conducted for the current review . . ."). RSI's ultimate conclusion, as supported by the Health Canada Expert Panel, was that there is "considerable uncertainty in the derivation of [a] POD" for fluoride neurotoxicity, and thus they did not recommend doing so. *Id.* at 2.

35.     RSI's conclusion is based, in part, on a Bradford Hill causation analysis of the neurotoxicity literature. *Trial Ex. 129 at 9 & 21; Trial Ex. 131 at 1431-1447; Savitz Trial Tr. (ECF No. 414) at 1207:17-1208:12 (Feb. 9, 2024).* According to RSI: "The available evidence demonstrated a moderate to **strong magnitude (strength) of association** between fluoride and neurocognitive effects with **consistent** evidence across studies for the impact on childhood IQ at fluoride exposures relevant to current North American drinking water levels. Focusing on high quality cohort studies, most of the evidence suggests a reduction in childhood IQ scores associated with fluoride levels, though results from one 2023 study in Spain (Ibarluzea et al. 2022) documented an improvement in specific cognitive domain scores in boys." *Trial Ex. 129 at 21.*

**EPA's rebuttal**: Disputed as to the misleading use of the phrase "levels close to those currently seen in North American drinking water." As said above, RSI defined this phrase to mean "approximately 2 ppm fluoride in drinking water," not 0.7 mg/L, and included natural sources of fluoride. Trial Ex. 129, at 10. Disputed also as to the selective bolding of "strong" magnitude without also bolding "moderate to," which is bolded in the original. *Id.* at 22.

*The North American Birth Cohort Studies (ELEMENT & MIREC)*

36.     The NTP has recognized that "[s]everal of the highest quality studies showing lower IQs in children were done in optimally fluoridated (0.7 milligrams per liter) areas in Canada." *Trial Ex 69 at 83; Grandjean Trial Tr. (ECF No. 417) at 315:11-316:3 (Feb. 1, 2024).*

The ELEMENT study in Mexico, which involved a population with salt fluoridation, had "comparable" urinary fluoride levels to the MIREC cohort in Canada. *Trial Ex. 69 at 32.*

**EPA's rebuttal**: Disputed as to the assertion that there have been several prospective birth cohort studies on fluoride and IQ conducted in Canada. Plaintiffs double-count Till (2020) and Green (2019) as two independent prospective cohorts finding adverse effects, even though both studies analyze the same MIREC cohort. It is not proper to treat Till (2020) and Green (2019) as two independent prospective cohorts. Savitz Trial Tr., Vol. VII, at 1211:23–1212:8 ("Q: Are you familiar with the Till 2020 cohort study in Canada? A: That is the MIREC-based study?" Q: Yes? A: Yes. Q: And that study looked at whether fluoride exposure amongst formula-fed infants is associated with IQ loss, right? A: That's right, but that's not an independent study. It's the same children, the same IQs, the same water sources. It's – it's an extension. It's not a separate – I would not consider that a separate study."). NTP recognized that Green (2019) and Till (2020) "were based on the same Canadian study population." Trial Ex. 67, at 54.

37.     Risk Sciences International, under contract with Health Canada, have also recognized the high quality of the ELEMENT and MIREC studies, noting: "The combined cohort represents high quality evidence partly based on a Canadian population, conducted within a context relevant to Canadian drinking water fluoride exposure levels. Both studies included prospective data collection, with prenatal exposure assessment (maternal urine collection over successive trimesters) and follow-up during the early life of the infants and children." *Trial Ex. 129 at 23.*

**EPA's rebuttal**: Undisputed.

38.     The analyses of fluoride and IQ in the ELEMENT and MIREC cohorts were both funded by the National Institutes of Health. *Hu Trial Tr. (ECF No. 395) at 84:20-85:2 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 201:6-11 (Feb. 1, 2024).* As such, both studies (Bashash 2017 & Green 2019) had their methodologies vetted by the NIH prior to the studies being conducted. *Hu Trial Tr. (ECF No. 239) at 48:22-50:10 (June 8, 2020); Hu Trial Tr. (ECF No.*

*395) at 85:5-14 (Jan. 31, 2024); Lanphear Trial Tr. (ECF No. 241) at 350:8-351:2 & 352:2-13 (June 10, 2020).* Further, both studies have undergone extensive peer review prior to being published. *Hu Trial Tr. (ECF No. 395) at 85:15-86:15 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 202:19-203:6 (Feb. 1, 2024).* In addition, the results of the Green 2019 study were independently verified by three separate statisticians prior to being submitted for publication. *Lanphear Trial Tr. (ECF No. 417) at 201:14-202:18 (Feb. 1, 2024).*

**EPA's rebuttal**: Undisputed.

39.     It is undisputed that the ELEMENT and MIREC studies used state-of-the-art methodologies, including a longitudinal (prospective) design; extensive control for covariates, and individualized measurements of fluoride exposure during the prenatal period. *Undisputed Fact No. 10; Hu Trial Tr. (ECF No. 395) at 95:2-96:5 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 205:6-11 (Feb. 1, 2024); Hu Trial Decl. (ECF No. 198-1) ¶¶ 14-22; Lanphear Trial Decl. (ECF No. 198-2) ¶¶ 37-44.*

**EPA's rebuttal**: Disputed as to the vague phrase "state-of-the-art methodologies." Dr. Savitz and Dr. Lanphear both testified that there are several drawbacks to using urinary fluoride as an exposure metric, especially to the question of whether water fluoridation at 0.7 mg/L is harmful. Lanphear Trial Tr. Vol. Vol. II, at 233:12–14 ("The downside of urinary fluoride is that fluoride has a short half-life, and so it just gives us a snapshot of exposure."); *id.* at 239:6–9 ("because we're trying to measure a risk that happens over many months or years, the water fluoride is better than that snapshot we might get during pregnancy."); Savitz Trial Tr. Vol. VI, at 1015:9–1017:1 (explaining the strengths and weaknesses of using urinary fluoride vis-à-vis water fluoride concentration).

40.     While the ELEMENT and MIREC studies have mostly focused on the impact of prenatal exposure, one study examined the impact of fluoridated water consumption during infancy and found that fluoride exposure during this period was also associated with IQ deficits later in

life (Till 2020). *Lanphear Trial Tr. (ECF No. 417) at 214:4-22 (Feb. 1, 2024); Lanphear Trial Decl. (ECF No. 198-2) ¶¶ 53-65; Savitz Trial Tr. (ECF No. 414) at 1211:23-1213:5 (Feb. 9, 2024).*

**EPA's rebuttal**: Undisputed.

41.     According to the NTP, "Taken together, the three prospective cohort studies (based on two North American study populations) indicate consistency in results across different types of analysis and across two study populations that higher fluoride exposure during development is associated with lower IQ scores." *Trial Ex. 67 at 41; Savitz Trial Tr. (ECF No. 414) at 1213:6-13 (Feb. 9, 2024).*

**EPA's rebuttal**: Disputed that there have been three independent prospective birth cohort studies conducted in North America. Plaintiffs double-count Till (2020) and Green (2019) as two independent prospective cohorts finding adverse effects, even though both studies analyze the same MIREC cohort. It is not proper to treat those two studies as two independent prospective cohort studies. Savitz Trial Tr., Vol. VII, at 1211:23–1212:8 ("Q: Are you familiar with the Till 2020 cohort study in Canada? A: That is the MIREC-based study?" Q: Yes? A: Yes. Q: And that study looked at whether fluoride exposure amongst formula-fed infants is associated with IQ loss, right? A: That's right, but that's not an independent study. It's the same children, the same IQs, the same water sources. It's – it's an extension. It's not a separate – I would not consider that a separate study."). NTP recognized that Green (2019) and Till (2020) "were based on the same Canadian study population." Trial Ex. 67, at 54. Disputed also, as explained above, as to the unclear definition of the phrase "consistency," which ignores the internally inconsistent findings within the Green (2019) study (no effect on boys + girls, and only an effect on boys when subdivided). *See, e.g.*, Trial Ex. 653, at 50 ("However, the consistency might be exaggerated if only positive results were selected from studies that reported both positive and negative results (see, for example, Bashash et al. 2017 or Green et al. 2019)."). Finally, the NTP monograph does not reflect the results of two methodologically similar cohort studies: INMA and OCC.

*Qualitative Dose-Response Assessment*

42.    According to EPA, "[a] dose response relationship is an extremely important measure of a chemical's effect." *Trial Ex. 17 at 46-47.* Dose-response evaluation is thus "a critical part of the *qualitative* characterization of a chemical's potential to produce neurotoxicity." *Trial Ex. 17 at 2 (emphasis added); Thiessen Trial Decl. ¶ 85.*

**EPA's rebuttal**: Disputed. The proposed fact relies on selective quotations without the appropriate context. EPA's Guidelines for Neurotoxicity Risk Assessment more fully state the following: "The level of confidence that an agent produces an adverse effect may be as important as the type of change seen, and confidence may be increased by such factors as reproducibility of the effect, either in another study of the same function or by convergence of data from tests that purport to measure similar functions. A dose-response relationship is an extremely important measure of a chemical's effect; in the case of developmental neurotoxicity both monotonic and biphasic dose-response curves are likely, depending on the function being tested. The EPA Guidelines for Developmental Toxicity Risk Assessment (U.S. EPA, 1991b) may be consulted for more information on interpreting developmental toxicity studies." Trial Ex. 17, at 46–47. With respect to the second sentence of the proposed fact, EPA's Guidelines for Neurotoxicity Risk Assessment more fully state the following: "Dose-response evaluation is a critical part of the qualitative characterization of a chemical's potential to produce neurotoxicity and involves the description of the dose-response relationship in the available data." *Id.* at 50.

43.    The *qualitative* assessment of dose-response data informs whether neurotoxicity is a hazard of the chemical. *Trial Ex. 17 at 50; Thiessen Trial Decl. ¶ 85.* This is distinct from the *quantitative* dose response analysis which EPA conducts to determine the "Point of Departure," or "Hazard Level." *Trial Ex. 17 at 2.*

**EPA's rebuttal**: Disputed. The proposed fact confuses the hazard assessment components. (hazard identification, weight of the scientific evidence, and dose-response) EPA's Guidelines for Neurotoxicity Risk Assessment (Trial Ex. 17) do not differentiate a qualitative versus a

1    quantitative dose-response assessment. Rather, dose-response evaluation informs the qualitative

2    and quantitative components of the hazard assessment. Trial Ex. 17, at 60.

3

4        44.    A dose-response relationship between fluoride and reduced IQ is supported by the

5    prospective studies of prenatal fluoride and IQ in the ELEMENT and MIREC birth cohorts

6    (Bashash 2017, Green 2019). *Trial Ex. 106; Trial Ex. 109; Thiessen Trial Decl. ¶ 86.* Importantly,

7    these studies found evidence of a linear dose response relationship after interrogating the data with

8    both non-linear and linear models. *Hu Trial Tr. (ECF No. 395) at 87:21-91:12 (Jan 31, 2024);*

9    *Lanphear Trial Tr. (ECF No. 417) at 208:8-210:8 (Feb. 1, 2024); Hu Trial Decl. (ECF No. 198-*

10   *1) ¶ 22; Lanphear Trial Decl. (ECF No. 198-2) ¶ 43; Hu Trial Tr. (ECF No. 239) at 56:17-57:14*

11   *& 73:14-74:3; Lanphear Trial Tr. (ECF No. 241) at 354:14-22.*

12       **EPA's rebuttal**: Disputed. The ELEMENT study found that a non-linear, quadratic

13   (squared/curved) model had a better fit than the linear model when adjusting for additional

14   covariates. Hu Trial Tr., Vol. I, 164:14–25 (Q: "You also found there was a significant

15   improvement, statistically significant, in the model fit when you added a quadratic term to the

16   regression model, correct? A: In the sub analysis with the children's urinary fluoride, yes."); *id.* at

17   165:25–166:3 ("Q: So going back to the sensitivity analysis and adding the quadratic term, in other

18   words, when you assumed a curved line, the data fit the model better, correct? A: Yes."). The

19   Bashash (2017) paper reported that, once adjustment for additional covariates was added to the

20   model, "the evidence of **nonlinearity** was more pronounced . . . and **a significant improvement**

21   **in model fit when a quadratic term was added** to the linear regression model (p = 0.01"). Trial

22   Ex. 106, at 9 (emphasis added); *see also id.* at 3 ("the pattern appeared curvilinear"). The MIREC

23   IQ study, Green (2019), did not report the findings of different model fits. *See generally* Trial Ex.

24   109. Instead, the Green (2019) authors only noted, "Including quadratic [terms] . . . did not

25   significantly improve the regression models," but did not discuss whether the non-linear models

26   had comparable model fit. Indeed, when asked if he did anything to evaluate whether there was an

27   observable threshold, Dr. Lanphear conceded that because he believed "the data appeared linearly,

28   there really wasn't any reason to look for a threshold," and he did not do so. Lanphear Trial Tr.,

Vol. II, at 209:15–210:8; *see also* Lanphear Trial Tr. , Vol. III, at 354:23–355:3 (Trial Phase 1) ("Well, to be sure, we didn't do any specific threshold analysis for it . . . .").

Moreover, and as discussed in EPA's proposed findings, a non-linear, curved model fit the pooled data of ELEMENT and MIREC better than, or at least comparably to, the linear model in Grandjean's 2022 BMCL calculation. *See, e.g.*, Trial Ex. 124, at 17 (showing squared model for combined ELEMENT and MIREC IQ data had an AIC score of 4768.8, compared to the linear model's AIC score of 4770.1); Grandjean Trial Tr., Vol. III, at 424:2–12 ("Q: In your view, the AIC scores are, at minimum, comparable to one another? A: Right. There's no definite difference between the models. Q: And a squared model assumes that the shape of the dose-response relationship is curved, right? A: Right.").

45.     A dose-response relationship between fluoride and IQ is further supported by RSI's systematic review. According to RSI, "Significant increasing exposure- response relationships between fluoride in drinking water and reduction in IQ scores were noted in seven epidemiologic studies." *Trial Ex. 129 at 21; Savitz Trial Tr. (ECF No. 414) at 1208:7-12 (Feb. 9, 2024).*

**EPA's rebuttal**: Disputed. The RSI authors specifically note that there are "[u]ncertainties in the shape of the dose-response curve at low levels of exposure to fluoride based on epidemiologic data." Trial Ex. 129, at 28. In criticizing Dr. Grandjean's BMCL calculations, the RSI authors further note the uncertainty about whether a non-linear or linear model fits the fluoride IQ data better. They state: "linear and non-linear models fit by Grandjean et al. (2022) resulted in benchmark concentrations differing by more than 9-fold." *Id.* at 27.

46.     The dose-response relationship between fluoride and IQ gains additional support from the pooled analyses of the ELEMENT, MIREC, and Danish birth cohorts (Grandjean 2022; Grandjean 2023). *Trial Ex. 119; Trial Ex. 123.* These analyses, which benefit from the heightened statistical power and precision that comes from larger sample sizes, further support an inverse linear relationship between prenatal fluoride and reduced IQ. *Hu Trial Tr. (ECF No. 395) at 111:9-112:16  (Jan 31, 2024).* The pooled analyses interrogated the dose-response relationship using

non-linear models and found that a linear association was the best fit. *Grandjean Trial Tr. (ECF No. 417) at 339:24-340:7 (Feb. 1, 2024); Grandjean Trial Tr. (ECF No. 240) at 254:16-257:12 (June 9, 2020).*

**EPA's rebuttal**: Disputed. As stated, Grandjean (2022) found that the non-linear, squared model actually fit the pooled MIREC and ELEMENT IQ data better, or at least comparably to, the linear model. *See, e.g.*, Trial Ex. 124, at 17 (showing squared model for combined ELEMENT and MIREC IQ data had an AIC score of 4768.8, compared to the linear model's AIC score of 4770.1); Grandjean Trial Tr., Vol. III, at 424:2–12 ("Q: In your view, the AIC scores are, at minimum, comparable to one another? A: Right. There's no definite difference between the models. Q: And a squared model assumes that the shape of the dose-response relationship is curved, right? A: Right."). Grandjean (2023) added the Danish OCC results into the pooled BMCL calculation, but Dr. Grandjean **edited out** the non-linear squared model from that paper. *Id.* at 426:3–10. ("Q: Did you provide a squared model in the latest BMCL calculation, 2023, with the Danish data? A: I don't think so . . . I think we edited that out."). So, while Grandjean (2022) reported out a linear, squared, and piecewise **linear** model, Trial Ex. 124, at 17-18, Grandjean (2023) reported out only a linear and piecewise **linear** model, Trial Ex. 119, at 9. The piecewise models are **not** non-linear models; rather, those are two straight lines separated by a breakpoint. *See, e.g.,* Trial Ex. 124, at 15 (showing visual of piecewise linear models). Indeed, Grandjean (2022) and (2023) both refer to the piecewise models as "piecewise linear models". *See, e.g., id.* at 6 ("we estimated a squared effect . . . and **two piecewise-linear models**"); Trial Ex. 119, at 2 ("we derived **two piecewise linear models**"). Grandjean (2023) therefore **did <u>not</u> interrogate the data with linear and non-linear models**, and Grandjean (2022) **found that the non-linear model of the pooled data had the better, or at least comparable fit.**

47.     A dose-response relationship between fluoride and reduced IQ is also supported by the dose-response analyses of *group-level* measures of fluoride that the NTP conducted as part of its July 2022 meta-analysis. *Trial Ex. 68 at 2.* As with the ELEMENT and MIREC studies, the NTP utilized both non-linear, and linear models, and found that "the linear model was the best fit"

for the dose-response relationship between urinary fluoride and IQ. *Trial Ex. 68 at 10; Grandjean Trial Tr. (ECF No. 417) at 333:15-23 (Feb. 1, 2024).* The NTP identified statistically significant linear relationships between urine fluoride and IQ, even when restricting studies to those looking at urine fluoride levels lower than 4 mg/L, 2 mg/L, and 1.5 mg/L. *Trial Ex. 68 at 10; Trial Ex. 68 at Supplemental Materials p. 38; Grandjean Trial Tr. (ECF No. 417) at 333:15-23 (*Feb. 1, 2024).

**EPA's rebuttal**: Disputed. The NTP authors did not "explicitly consider the potential non-linearity of the exposure-outcome association." Trial Ex. 69, at 131. Nor did the NTP authors "address[] the concept of thresholds by applying several data modeling approaches to the children's IQ data." *Id.* In fact, "a threshold was not assessed" because the NTP authors fit a linear term, as the BSC Working Group noted. Thiessen Trial Tr. Vol. V, at 844:25–845:7 (Feb. 6, 2024); Trial Ex. 69, at 324. The BSC Working Group further explained that there are "very few data points" in the low-dose range, which "reduc[es] confidence in this range of exposure." Trial Ex. 69, at 324; Thiessen Trial Tr. Vol. V, at 844:25–845:7 (Feb. 6, 2024).

The proposed fact also mischaracterizes NTP's urinary fluoride dose-response meta-analysis. First, the linear model was not always the best fit. For example, the "Urinary Fluoride – All Studies" dose-response analyses in eTable 5 show that non-linear models had comparable fit to the linear model. Trial Ex. 68, at NIEHS_000460; Thiessen Trial Tr. Vol. VI, at 892:21–893:11 (Feb. 7, 2024). Second the non-linear urinary fluoride models showed **no statistically significant adverse effect < 1.5 mg/L, < 2.0 mg/L, < 4.0 mg/L, or even in the all data groups.** *Id.* (showing p-values for all non-linear models as greater than 0.05 and therefore not statistically significant). When restricted to just the low-risk-of-bias urinary fluoride studies, **even the linear model found no statistically significant adverse effect is found in the < 2 mg/L, < 4 mg/L, and all data groups.** Trial Ex. 68, at NIEHS_000461. eTable 4, which uses a different statistical method, follows the same overall trend, **with the non-linear urinary fluoride models consistently showing no statistically significant adverse effects even in the all data groups,** and, when restricted to just the urinary fluoride low-risk-of-bias studies, the **linear model found no statistically significant adverse effects in the < 2.0 mg/L, < 4 mg/L, and all data groups.** *Id.* at

1   NIEHS_000457-58; Thiessen Trial Tr. Vol. VI, at 876:22–880:16 (Feb. 7, 2024). Plaintiffs'

2   characterization of NTP's dose-response meta-analysis is simply incorrect.

3          As Dr. Barone explained, and consistent with the BSC Working Group's assessment, there

4   is insufficient data in the low-dose range to extrapolate a reliable dose-response curve in that

5   exposure region. Barone Trial Tr. Vol. VIII, at 1353:16–1354:1, 1354:14–1355:21.

6

7          48.    The NTP's dose-response analyses did not always show statistically significant

8   dose-response relationships below the *group average* levels of 1.5 and 2.0 mg/L. *Trial Ex. 68,*

9   *eTable 4 & eTable5; Barone Trial Tr. (ECF No. 418) at 1451:4-12 (Feb. 13, 2024).* The lack of

10  statistical significance at these lower levels was a result, in whole or in part, of the group-level

11  nature of the data. *Thiessen Trial Tr. (ECF No. 402) at 951:3-959:2 (Feb. 7, 2024).* For example,

12  the factors that make the Bashash 2017 and Green 2019 so valuable (e.g., individualized maternal

13  urine fluoride levels adjusted by covariates) were stripped away under the NTP's binary approach

14  to the exposure allocation in the dose-response analysis.  *Thiessen Trial Tr. (ECF No. 402) at*

15  *958:23-959:2 (Feb. 6, 2024); Grandjean Trial Tr. (ECF No. 397) at 469:23-470:14  (Feb. 2,*

16  *2024).*

17         **EPA's rebuttal:** Disputed.

18         The generation of unitless, standardized mean differences scores in eTables 4 and 5 was

19  necessary for the NTP authors to aggregate data across several studies with different study designs,

20  outcome measures (e.g., Bayley Scales, McCarthy Scales, Wechsler IQ test), and exposure metrics

21  (e.g., child's urinary fluoride vs. maternal urinary fluoride, etc.). Grandjean Trial Tr., Vol. III, at

22  393:19–25 (agreeing that the purpose of generating SMD scores is to "standardize the effect

23  estimate across studies which may use different kinds of IQ measures" and "different kinds of

24  fluoride exposure measures."); Barone Trial Tr., Vol. VIII, at 1362:6–1363:24 (saying the SMDs

25  are a unitless score to standardize across different types of IQ tests). Plaintiffs conflate

26  "Standardized Mean Difference" with "Standard Deviation." *See, e.g.*, Trial Tr. Vol. X, at 1542:7–

27  13. Through this conflation, Plaintiffs argued that the SMDs in eTables 4 and 5 could be multiplied

28  by 15—the typical standard deviation for an IQ score—to derive an IQ value. *Id.* This is not true,

and there is no documentary support for this assertion anywhere in the NTP monograph or any other document. SMDs, rather, are unitless values used to standardize across IQ tests, and should be read by themselves and not multiplied by 15 or any other number. *See* Barone Trial Tr., Vol. VIII, at 1362:6–1363:24; Trial Tr. Vol. X, at 1542:15–1543:7 (rebutting Plaintiffs' conflation of SMDs and standard deviations). Using that standardized approach allowed the authors to conduct their dose-response analysis with the total data they had.

49.     The NTP has recognized the diminished power of analyses that that use *group-level* average exposures instead of individualized exposures. *Trial Ex. 69 at 273-74 & 277-78.* According to the NTP, "when using group-level exposure data (as opposed to individual-level exposure data), as was done in the mean-effects meta-analysis, the power to detect an effect may be limited." *Trial Ex. 69 at 277; Grandjean Trial Tr. (ECF No. 397) at 474:15-22 (Feb. 2, 2024).* Consistent with this, the NTP found consistent significant associations between fluoride and IQ when focusing on individualized metrics of exposure, including individualized measures of water fluoride content, urinary fluoride content, and fluoride intake. *Trial Ex. 68 eFigures 19 & 23; Barone Trial Tr. (ECF No. 418) at 1451:13-1453:3 (Feb. 13, 2024); Thiessen Trial Tr. (ECF No. 401) at 764:13-765:11 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The proposed facts ignores NTP's dose-response meta-analysis in eTables 4 and 5, which look at all 55 studies considered in NTP's meta-analysis, Trial Ex. 68, at NIEHS_000456-61, and instead focuses on eFigures 19 and 23, which look only at 9 and 12 studies respectively, *id.* at NIEHS_000467, NIEHS_000470. Unlike the eTables 4 and 5, eFigures 19 and 23 are not dose-response analyses. Barone Trial Tr., Vol. IX, at 1457:3–5 ("Q: Dr. Barone, with respect to . . . eFigure 23, this is not evidence of dose response, correct? A: No, sir."). Rather, these eFigures aggregate data across a subset of studies—less than one-fifth of the studies NTP considered—without regard to where those studies fall on the exposure spectrum. eFigures 19 and 23 are thus *not* evidence of dose-response. *Id.*

*Studies Published After NTP's Literature Date Cut-Off*

50.   NTP's May 2022 Monograph considered all studies published up through April 2021. *Trial Ex. 67 at 12; Savitz Trial Tr. (ECF No. 414) at 1197:2-7 (Feb. 9, 2024).*

**EPA's rebuttal**: Undisputed.

51.   The neurotoxicity of fluoride is supported by studies published since NTP's April 2021 cut-off date, including a recent expanded analysis of the ELEMENT cohort by Dr. Howard Hu and his team (Goodman 2022a). *Trial Ex. 115.* In the expanded analysis, Dr. Hu included approximately 100 additional mother-child pairs from the cohort, thus augmenting the power and robustness of the study. *Hu Trial Tr. (ECF No. 395) at 94:11-18 (Jan 31, 2024).* Dr. Hu controlled for the same extensive set of covariates as he did in the first study (Bashash 2017), and found essentially the same results: i.e., an inverse association between maternal urinary fluoride and childhood IQ. *Hu Trial Tr. (ECF No. 395) at 97:2-17 (Jan. 31, 2024).* The association between fluoride and IQ persisted from age 4 through ages 6 to 12, thus providing further confidence that the association is real, and stable. *Hu Trial Tr. (ECF No. 395) at 97:11-98:9 (Jan. 31, 2024).* Further, the study found that the association between fluoride and IQ was most apparent in the non-verbal domains, which is consistent with the findings from the MIREC and PROGRESS cohorts. *Hu Trial Tr. (ECF No. 395) at 97:13-17 & 98:10-99:15 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 219:24-220:23 & 221:2-18 (Feb. 1, 2024).*

**EPA's rebuttal**: Disputed as to the assertion that the fluoride studies published since NTP's April 2021 cut-off date are supportive of fluoride exposure, let alone low-dose fluoride exposure, being associated with adverse neurocognitive effects. For the reasons stated below and articulated in EPA's facts, the overall movement of the literature since April 2021 has been towards a null effect. *See* Savitz Trial Tr., Vol. VII, at 1165:23–20 (stating that the epidemiological literature since the last trial is "less convincing of there being an adverse effect"). Plaintiffs cherry-pick isolated results from several studies to argue they are supportive of their position, when the bulk of the results from those studies do not support their position. Alternatively, Plaintiffs argue that follow-on analyses of a cohort study are new studies, when they are in fact expanded analyses

that supersede the previous study (e.g., like Goodman 2022a supersedes Bashash (2017)). *Id.* at 1060:10–21 ("Q: And would you consider Goodman 2022 as a replication of Bashash 2017? A: It's not a replication; it's an extension.).

52.     The findings of the Goodman 2022a study of the ELEMENT cohort provide further support for fluoride being a developmental neurotoxicant, including at the levels of exposure used for oral health purposes, such as water fluoridation. *Hu Trial Tr. (ECF No. 395) at 105-2-9 (Jan. 31, 2024).*

**EPA's rebuttal**: Disputed as to the idea that Goodman (2022a) is a new study providing "further" support for Plaintiffs' hypothesis. Dr. Hu, acknowledged that Goodman (2022a) was not an attempt at replicating the results of Bashash (2017), because both studies concerned the same population—the ELEMENT cohort. Hu Trial Tr. Vol. I, at 145:21–24. As Dr. Savitz explained, Goodman 2022a is an "extension" of Bashash (2017), not a replication of it, nor should it be considered a new prospective cohort study. Savitz Trial Tr., Vol. VII, at 1060:10–21. "[P]erhaps the Goodman study provides additional information; but, under no circumstances, would you look at the two studies [Bashash (2017) vs. Goodman (2022a)] and say now we have replicated evidence of an adverse effect of urinary fluoride. You would say that we have one study that has that – that has that outcome, and there are different features of that outcome when you explore more deeply." *Id.* Rather, Goodman 2022a can be thought as supplanting Bashash 2017, since it is now the "most complete, the most extensive" version of the ELEMENT cohort's urinary fluoride and IQ analysis. *Id.* at 1061:9–18. In addition, the primary source of fluoride exposure in the ELEMENT study was fluoridated salt, and Dr. Hu had admitted that he does not know whether the source of fluoride exposure (salt vs. water) affects the concentration of fluoride observed in a urine sample. *See infra* ¶¶ 97–98.

53.     The neurotoxicity of fluoride is also supported by additional analyses of the MIREC cohort by Dr. Bruce Lanphear and his team (Goodman 2022b; Hall 2023). *Trial Ex. 116; Trial Ex. 120.* In one analysis, Dr. Lanphear's team found that iodine deficiency in the mother magnified

the inverse association between fluoride and IQ in boys, which provides further support for the concern that children born to women with iodine deficiencies are a particularly susceptible population vis-à-vis fluoride neurotoxicity (Goodman 2022b). *Trial Ex. 116; Lanphear Trial Tr. (ECF No. 417) at 219:4-23 (Feb. 1, 2024); Thiessen Trial Decl. (ECF No, 202-1) ¶¶ 163-164.*

**EPA's rebuttal**: Disputed as to the assertion that Goodman 2022b is providing further support for the fluoride being a neurotoxicant. Rather than being a replication, Goodman (2022b) engages in the exploratory exercise that, assuming Green (2019) correctly found IQ decrements associated with fluoride exposure, examines whether those IQ decrements were affected at all by iodine deficiency status in the same study population. In fact, Goodman 2022b included a smaller subset of MIREC mother-child pairs than Green (2019). *Compare* Trial Ex. 109, at 1 (stating Green (2019) analyzed 512 pregnant women), *with* Trial Ex. 116, at 1 (stating Goodman 2022b used data from 366 mother-child pairs)). In addition, Dr. Lanphear examined this issue because fluoride exposure and low iodine are both thought to be linked to a greater risk of developing hypothyroidism. Lanphear Trial Tr. Vol. II, at 224:4–25, 227:6–21. But, as described in Hall (2023), Dr. Lanphear, using maternal urinary fluoride samples from the same cohort as Goodman (2022b), failed to find a significant association between maternal urinary fluoride levels and hypothyroidism. *See infra* ¶¶ 259–260.

54.     Another analysis by Dr. Lanphear's team found that water fluoride levels are significantly associated with maternal *hypothyroidism* in the MIREC cohort (Hall 2023). *Trial Ex. 120; Lanphear Trial Tr. (ECF No. 417) at 234:9-235:7 (Feb. 1, 2024).* This finding has important implications for neurotoxicity because it is undisputed that maternal hypothyroidism reduces the IQ of offspring, sometimes severely. *Lanphear Trial Tr. (ECF No. 417) at 231:17-21 (Feb. 1, 2024).* According to the EPA, "thyroid hormones are essential for normal brain development in humans and hypothyroidism during fetal and early neonatal life may have profound effects on the developing brain." *Trial Ex. 18 at 40; Thiessen Trial Decl. (ECF No. 202-1) ¶ 89.*

**EPA's rebuttal**: Disputed. The proposed fact omits that Hall (2023) found no relationship between fluoride and maternal hypothyroidism when using **maternal urinary fluoride** or fluoride

intake as the exposure variables. Trial Ex. 120, at 1 ("we did not find a significant association between urinary fluoride . . . or fluoride intake . . . and hypothyroidism."). Dr. Hu testified that urinary biomarkers provide a more accurate picture of fluoride exposure than water concentration levels, because the former integrates exposure from all sources. Hu Trial Tr. Vol. I, at 131:21–132:1. Dr. Grandjean testified about a general preference for using maternal urinary fluoride as the exposure metric. Grandjean Trial Tr., Vol. III, at 476:1–6 ("we've seen from high-quality studies that they have used the maternal urinary fluoride excretion level. And that, in my mind, is appropriate. It's a good choice, it's feasible and excellent studies have relied on that parameter."). Put differently, two-thirds of the exposure measures in Hall (2023) found no effect. *See* Lanphear Trial Tr., Vol. II, at 264:9–266:12 (walking through how nearly all of the sub-analyses in Hall (2023) found no statistically significant relationship between fluoride exposure and hypothyroidism).

Further, Hall (2023), puzzlingly, found a significant association between water fluoride concentration and primary hypothyroidism but no such association with subclinical hypothyroidism, even though both conditions are related to elevated thyroid hormone levels. Lanphear Trial Tr., Vol. II, at 265:22–266:12. In addition, Hall (2023)'s finding that water fluoride concentration is significantly associated with primary hypothyroidism provides little support for the theory that fluoride is a thyroid disruptor because, for nearly 75% of the mothers studied, it is unknown whether the exposure preceded the hypothesized effect. *See infra* ¶¶ 262–264.

EPA further disputes the assertion that fluoride causes neurotoxicity through disruption of thyroid hormone. That assertion is squarely rebutted by the 2022 NTP draft monograph's conclusion that "human studies that have failed to identify consistent evidence to suggest that thyroid effects are a requisite mechanism by which fluoride causes neurodevelopmental or cognitive effects in humans." Trial Ex. 67, at 287; *see also id.* at 85 ("Although the low risk-of-bias studies provide some evidence of mechanistic effects (primarily changes in thyroid stimulating hormone [TSH] levels in children), the studies were too heterogeneous or limited in number to make any determination on mechanism."). The NTP authors further concluded that "the

data do not support a clear indication that thyroid effects are a mechanism by which fluoride causes these [neurodevelopmental or cognitive] effects in humans." *Id.* at 87.

55.    The results of Goodman (2022b) and Hall (2023) in the MIREC cohort are consistent with prior research linking fluoride exposure to thyroid alterations, particularly in individuals with iodine deficiency. *Thiessen Trial Tr. (ECF No. 401) at 755:10-756:15 (Feb. 6, 2024); Thiessen Trial Decl. ¶¶ 90-92.* Fluoride was once used therapeutically to lower thyroid function in individuals with hyperthyroidism (over-active thyroid), and in 2006, the National Research Council (NRC) determined that fluoride is an agent capable of disrupting thyroid function.  *Lanphear Trial Tr. (ECF No. 417) at 224:4-225:15; 231:24-232:17 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 755:10-756:9 (Feb. 6, 2024); Thiessen Trial Decl. (ECF No, 202-1) ¶¶ 90-92.*

**EPA's rebuttal**: Disputed as to the insinuation that prior research has linked fluoride exposure to thyroid alterations. As stated above, the NTP monograph repeatedly states that "human studies that have failed to identify consistent evidence to suggest that thyroid effects are a requisite mechanism by which fluoride causes neurodevelopmental or cognitive effects in humans." Trial Ex. 67, at 287; *see also id.* at 85 ("the studies were too heterogeneous or limited . . ."); *id.* at 87 ("the data do not support a clear indication that thyroid effects are a mechanism by which fluoride causes these [neurodevelopmental or cognitive] effects in humans.").

56.    The neurotoxicity of fluoride is further supported by other recent studies, including:

A.    A *prospective* study of the PROGRESS birth cohort in Mexico which found a significant, sex-specific association between maternal dietary intake of fluoride and impaired cognitive function among 2-year-old boys (Cantoral 2021). Trial Ex. 110; *Lanphear Trial Tr. (ECF No. 417) at 221:22-222:16 (Feb. 1, 2024).* While the study did not observe a statistically significant association between fluoride and cognitive deficits at 1 year of age; when the results from the age 1 test and age 2 test were combined, the combined result was statistically

significant. *Lanphear Trial Tr. (ECF No. 417) at 221:22-222:16 (Feb. 1, 2024); Savitz Trial Tr. (ECF No. 414) at 1215:13-24 (Feb. 9, 2024).*

**EPA's rebuttal**: Disputed. Plaintiffs cherry-pick one finding of an adverse effect in Cantoral (2021) and ignore all of the other findings which found no association. They ignore that Cantoral (2021) stratified the data by (1) boys vs. girls; (2) 1 year-olds vs. 2 year-olds; and (3) across (a) cognitive, (b) language, and (c) motor IQ scores. Trial Ex. 110, at 5. In total, that resulted in eighteen separate stratifications or sub-analyses of the data. *Id.* **Across those eighteen sub-analyses, the authors found one adverse effect** in boys, aged 2, on their cognitive score. *Id.* Seventeen out of eighteen analyses found no effect of fluoride exposure on IQ. *Id.* Regarding the longitudinal model in Table 4 of Cantoral (2021), the authors again found an adverse effect on boys in the cognitive scale, but not any other of the scales. *Id.* The overall results of Cantoral (2021), as Dr. Savitz explained, are "not supportive" of an adverse effect. Savitz Trial Tr., Vol. VIII, at 1297:23–1298:2. Dr. Savitz further explained that the two isolated results found across the study's dozens of data stratifications can be attributed to "most plausibly, random error." Savitz Trial Tr., Vol. VIII, at 1236:1–18. With each subdivision of the data, the study size becomes "smaller and smaller," and "more aberrant findings are certain to arise." Savitz Trial Tr., Vol. VII, at 1080:22–24.

    B. A neurodevelopmental study by Tulane and Duke scientists of an area in Ethiopia with high levels of fluoride in drinking water. Although the study only included 75 children, it was able to detect impairments in the children's ability to perform complex or challenging drawing tasks as a function of fluoride exposure, with evidence of marked deterioration in drawing skills among children drinking water with 5 to 15 ppm fluoride in water (Godebo 2023). *Trial Ex. 118 at Fig 2; Grandjean Trial Tr. (ECF No. 397) at 378:9-382:23 (Feb. 1, 2024).*

**EPA's rebuttal**: Disputed. Methodological and generalizability issues aside, the Godebo (2023) study found that fluoride exposure was only associated with adverse performance on 2 out

of the 9 cognitive tests administered. The authors found that higher fluoride exposure (as high as 15.5 mg/L in water), had an adverse effect on children's ability to draw a *donkey*, but had no adverse effect on children's ability to draw a *person or a house*. Grandjean Trial Tr., Vol. III, at 386:14–18 ("Q: . . . the population in Ethiopia that Godebo 2023 studied has very high fluoride exposures, right? A: Some of them, yes. Q: As high as 15.5? A: That's what the study reports."); Trial Ex. 118, at 2. The proposed fact omits that the Godebo 2023 authors also used six standardized tests (the CANTAB PAL tests) to analyze neurocognitive performance in addition to the drawing tests. *Id.* at 10-11 (explaining the CANTAB PAL tests). Out of the six CANTAB PAL tests, higher fluoride exposure was only associated with adverse performance on *one* test; the rest were null results. *Id.* at 14-15 ("When controlling for covariates . . . only the PATEA association with F- concentration remains significant."). There was also no association between the difficulty of the tasks, fluoride exposure, and the total number of mistakes made by the children. *Id.* at 15 ("There was no statistically significant interaction between F- in drinking water and the task difficulty . . . on the total errors made by the children."). While Plaintiffs cherry-pick a single result to claim Godebo (2023) is supportive of their position, the overall array of results from Godebo (2023) are **null**.

        C.  A study conducted in the United States, which found significant associations between childhood exposure to fluoride and internalizing symptoms (e.g., anxiety and depression) (Adkins 2022). *Trial Ex. 112; Lanphear Trial Tr. (ECF No. 417) at 241:4-23 (Feb. 1, 2024); Savitz Trial Tr. (ECF No. 415) at 1250:4-16 (Feb. 12, 2024).* The US-based study, of a cohort in Cincinnati, found the association between fluoride and internalizing symptoms to be most prominent in boys, thus further supporting sex-specific vulnerabilities, at least for certain outcomes in certain contexts. *Lanphear Trial Tr. (ECF No. 417) at 240:24-241:23 (Feb. 1, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact characterizes the Adkins (2022)'s findings as stronger than they are. Notably, Adkins (2022) states that "After adjustment for covariates, a

positive **but not statistically significant association** was observed between CUF [child's urinary fluoride] concentrations and increased internalizing behaviors." Trial Ex. 112 at 6. Contrary to Plaintiffs' assertion, the authors also wrote that **"CUF was not associated with depression behaviors,"** and that **"fluoride concentrations were not associated with increased depressive or anxiety symptoms."** *Id* at 6, 14. Adkins (2022) is a neurobehavioral study, and "is the first epidemiologic study to examine the association between internalizing behavioral and child/adolescent fluoride exposure." *Id.* at 6. There has thus been no corroboration of its findings. Moreover, the NTP monograph concluded that, with regard to the fluoride-neurobehavioral literature, "there is low confidence in the literature" for such effects. Trial Ex. 67, at 95.

57.     Various co-factors or susceptibilities can influence the impact or manifestation of neurotoxicants, and as such, it is to be expected that there will be some variability in results across studies of different populations. What may appear, therefore, to be a "contradictory" or discrepant result may, in fact, reflect unmeasured differences in cofactors that influence the course of a chemical's neurotoxicity. *Hu Trial Tr. (ECF No. 395) at 102:22-104:24 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 242:21-243:9 (Feb. 1, 2024); Grandjean Trial Tr. (ECF No. 417) at 328:14-23 (Feb. 1, 2024).*

**EPA's rebuttal**: Undisputed.

58.     As is to be expected, not every epidemiological study on fluoride has found associations with reduced IQ. *Savitz Trial Tr. (ECF No. 414) at 1172:23-1173:6 (Feb. 9, 2024).*

**EPA's rebuttal**: Undisputed.

59.     Several studies published since April 2021 have failed to detect significant associations between low doses of fluoride and IQ and/or other neurodevelopmental outcomes (Dewey 2023; Do 2022; Grandjean 2023). *Trial Ex. 113; Trial Ex. 117; Trial Ex. 119.* The null findings in these studies can be explained in part by the general difficulty of detecting effects among populations with limited "exposure contrasts," particularly for health outcomes, like IQ,

which are affected by many other factors. *Hu Trial Tr. (ECF No. 395) at 114:8-115:6; 180:5-12 (Jan 31, 2024); Grandjean Trial Tr. (ECF No. 417) at 337:14-339:8  (Feb. 1, 2024); Berridge Trial Tr. (ECF No. 400) at 523:12- 24 & 525:2-526:13 (Feb. 5, 2024); Savitz Trial Tr. (ECF No. 414) at 1175:15-1176:3 (Feb. 9, 2024).* For example, whereas over 5% of women in the MIREC cohort had over 2.4 mg/L of (creatinine-adjusted) fluoride in their urine, only 3 of 837 mothers in the Danish cohort had this level of fluoride in their urine. *Grandjean Trial Tr. (ECF No. 397) at 356:24-357:6 & 357:16-358:1 (Feb. 2, 2024); Trial Ex. 108, Table S4; Trial Ex. 119, Figure 2.*

**EPA's rebuttal**: Disputed. While exposure contrast is important in epidemiological studies, it is generally met so long as there is some range of exposures in the population studied. As Dr. Savitz explained, a study with an exposure spectrum of 0 to 1.5 mg/L would be able to pick up adverse effects, if any, within that range so long as the study is of adequate size and there's some spread in the population over that range. Savitz Trial Tr., Vol. VI, at 1010:7–15. The OCC participants had an average MUF concentration of 0.58 mg/L, Trial Ex. 119, at 2; and there was significant clustering of the study participants in the from 0.25 to 2 mg/L MUF range, *id.* at 10. Thus, while the OCC would have limited ability to examine fluoride's effects at > 2 mg/L urinary fluoride, *see* Savitz Trial Tr., Vol. VI, at 1010:7–15 (stating a study looking at ranges between 0 and 1.5 "Can't tell you whether there is a [harm] at 2 or 3 or 4."), it would be able to pick up adverse effects < 2 mg/L, which is the relevant range for water fluoridation, Savitz Trial Tr., Vol. VI, at 1008:10–13 (stating that a study is capable of addressing adverse effects found within its range of exposures). Dr. Grandjean, after all, testified that there "is no reason" to discount the Danish OCC study's applicability to the question of whether water fluoridation at 0.7 mg/L is harmful. Grandjean Trial Tr., Vol. III, at 408:10–24 (A: "You asked me that question several times, and you've given me no reason why it should be discounted . . . Q: So no reason to discount it? A: Okay. Q: Do you agree? A: I agree.").

60.     The null effect findings in the low dose studies can also be explained by methodological limitations that reduced the sensitivity of the studies to observe an effect. For example, the study by Do (2022) suffered from substantial exposure imprecision due to a lack of

individualized data on fluoride intake. *Grandjean Trial Tr. (ECF No. 397) at 366:5-368:3 (Feb. 2, 2024).* Exposure imprecision creates "noise" in the data and generally has the effect of biasing the results toward the null. *Trial Ex. 33 at 9-11*; *Hu Trial Tr. (ECF No. 395) at 106:18-107:16 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 281:14-282:3 (Feb. 1, 2024); Grandjean Trial Tr. (ECF No. 417) at 317:16-22 (Feb. 1, 2024); Savitz Trial Tr. (ECF No. 414) at 1176:4-17 (Feb. 9, 2024).* Another limitation with the Do study is that it used a behavioral test (SDQ) of questionable validity for the population being examined. *Grandjean Trial Tr. (ECF No. 397) at 364:5-20 & 365:15-366:4 (Feb. 2, 2024); Savitz Trial Tr. (ECF No. 415) at 1239:11-1240:6 (Feb 12, 2024).*

      **EPA's rebuttal**: Disputed. The proposed fact overemphasizes exposure misclassification and imprecision as a reasons why null studies find no effect—arguing that exposure imprecision "has the effect of biasing towards the null." But NASEM pointed out that "**Exposure misclassification can bias effect estimates in either direction.**" Trial Ex. 653, at 47 (emphasis added). Dr. Savitz further explained that exposure misclassification should not be used as an improper post-hoc rationalization for why a study found no effect: "it can be used as a means of making null studies be positive or studies with a very small effect look like they have a big effect. In other words, it's – it's a hypothetical." Savitz Trial Tr., Vol. VI, at 1007:3–9. In other words, it is speculation beyond the data. *Id.* at 1007:24–1008:2 ("The data are the data. That's the anchor. That's what we start with."). The more parsimonious and likely explanation for why Do (2022) found no effect of fluoride on neurobehavioral outcomes is because there was no effect present.

      61.    The study by Dewey (2023) did not find a significant association between childhood IQ and maternal residence in a fluoridated community during pregnancy, although it did find an association with adverse impacts on executive function. *Trial Ex. 117 Tbls 2 & 3; Savitz Trial Tr. (ECF No. 415) at 1233:4-17 (Feb 12, 2024).* The power of the Dewey study was limited by potentially substantial exposure imprecision. *Grandjean Trial Tr. (ECF No. 397) at 369:8-371:7 (Feb. 2, 2024).* Although the study was able to identify the fluoridation status of the community water supply during the course of the pregnancy, the study had no individualized

data on tap water intake; urinary fluoride levels; other sources of fluoride intake; and no information on the length of time each mother had resided in fluoridated areas. *Grandjean Trial Tr. (ECF No. 397) at 368:4-370:5 (Feb. 2, 2024).* Further, the exposure contrasts between the women in the study would be further minimized because the woman whose pregnancy occurred after fluoridation ended would likely still have elevated circulating fluoride levels in their body due to prior accumulation of fluoride in their bone. *Grandjean Trial Tr. (ECF No. 397) at 370:6-371:7 (Feb. 2, 2024); Barone Trial Tr. (ECF No. 418) at 1432:19-1433:3 (Feb. 13, 2024).* Prior accumulation of fluoride in bone enters the circulation during pregnancy due to the increased rate of bone mobilization that occurs to meet the calcium demands of the growing fetus. *Hu Trial Tr. (ECF No. 395) at 121:4-20 (Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 221:22-222:16 (Feb. 1, 2024); Barone Trial Tr. (ECF No. 418) at 1448:17-23 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. For the reasons stated above, exposure misclassification should not be used as a post-hoc rationalization for why a study did not find any adverse effects. Savitz Trial Tr., Vol. VI, at 1007:3–8; *supra* ¶ 60 (EPA's rebuttal). Moreover, NASEM explained: "Exposure misclassification can bias effect estimates **in either direction**." Trial Ex. 653, at 47. It is also misleading to say that the Dewey authors found an association between fluoride exposure and executive function. Out of 24 separate stratifications of the data, the authors found fluoride exposure was associated with adverse performance for girls on two neurobehavioral tests. Trial Ex. 117, at 5 (Table 3). The IQ tests found 0 adverse effects across 24 separate stratifications of the data. *Id.* (Table 2). As Dr. Savitz explained, the results of Dewey (2023) are best summarized as "largely, if not a hundred percent negative with an isolated finding of unknown significance . . .". Savitz Trial Tr., Vol. VIII, at 1232:10–12. The lack of comprehensive individualized data is also not a weakness of the Dewey study. The Dewey authors had individualized data about whether a pregnant mother spent all, some, or none of their pregnancy consuming fluoridated water. Trial Ex. 117, at 3. As Dr. Savitz explained, and as explained below, the natural experiment used in Dewey (2023) provided an elegant contrast between "Populations that are extremely indistinguishable other than, you know, one group was exposed to fluoridated water and one group was not." Savitz Trial Tr., Vol. VII, at 1103:1–3.

62.     One study published since April 2021 has reported a beneficial association between maternal fluoride and IQ, although the dramatic associations reported are implausible on their face (Ibarluzea 2022). *Hu Trial Tr. (ECF No. 395) at 111:4-6 (Jan 31, 2024); Grandjean Trial Tr. (ECF No. 397) at 372:10-24 (Feb. 2, 2024).* The study, which was conducted in one of the seven cohorts from the Spanish INMA study, reported a 15-point increase in IQ with each milligram of fluoride in the mothers' urine. *Ibarluzea Designations (ECF No. 404) at 2:9-22 (28:3-20) & 11:12-22 (148:1+).* Although this study has several methodological strengths (e.g., a prospective cohort design, individual measurements of maternal urine, and adjustments for a large number of covariates), there are major issues with the study that warrant giving it significantly less weight in the hazard assessment. These problems include:

**EPA's rebuttal**: Disputed for the reasons explained in EPA's proposed findings of fact ¶¶ 126–142, and as explained further below.

A.  The study never controlled for seafood, despite having detailed data on the mothers' seafood intake and measurements of fatty acid levels in the cord blood. *Hu Trial Tr. (ECF No. 395) at 99:25-100:1 & 110:20-111:3 (Jan 31, 2024); Ibarluzea Designations (ECF No. 404) at 32:2-24 (222:11-223:23).*  Seafood is a potential confounder in the Ibarluzea study because it is associated with both the exposure of interest (fluoride) as well as the outcome of interest (IQ). *Ibarluzea Designations (ECF No. 404) at 34:27-37:24 (230:4-233:19) & 38:10-12 (237:19-24); Hu Trial Tr. (ECF No. 395) at 110:20-111:3 (Jan 31, 2024); Hu Trial Tr. (ECF No. 239) at 100:10-14 (June 8, 2020).*

**EPA's rebuttal**: Disputed. The cited testimony by Drs. Hu and Ibarluzea does not support that data on mothers' seafood intake and measurements of fatty acid levels in the cord blood for the participants in the INMA IQ study was available. And for the reasons articulated in EPA's proposed findings ¶¶ 126–33, seafood is not a hidden confounder in the INMA study because it (1) is not linked to fluoride exposure—*see, e.g.*, Savitz Trial Tr., Vol. VII, at 1110:3–1111:3 (explaining WHO's conclusion that even a relatively high fish consumption diet would rarely

result in elevated fluoride exposure), and (2) the particular kind of fish that Plaintiffs allege are confounders in the INMA study—sardines, anchovies, and tinned-fish—have been shown by Julvez (2016) not to have a beneficial effect on the McCarthy GCI IQ scales used in the INMA cohort, Trial Ex. 105 at 8 (Table 3 showing no child IQ benefit from consumption of "small fatty fish," which is defined earlier as including sardines, anchovies, and tinned fish). Dr. Ibarluzea also does not believe seafood is a confounder. Ibarluzea Designations (ECF No. 404) at 37:25–38:1 (235:1–5), Ibarluzea Designations (ECF No. 404) at 56:1–60:5 (320:6–328:8).

Even if fish consumption was a confounder in the INMA study, it was controlled for by the INMA authors' control for mercury in the mothers' cord blood, which is a proxy for seafood intake due to the high correlation between mercury and seafood intake. *E.g.,* Savitz Trial Tr., Vol. VII, at 1072:24–25 ("mercury is, essentially, a biomarker of fish consumption."); Ibarluzea Designations (ECF No. 404) at 56:1–60:5 (320:6–328:8). Dr. Savitz explained that because mercury is essentially a biomarker of seafood intake, mercury would likely be a better control for seafood consumption than a food frequency questionnaire. Savitz Trial Tr., Vol. VII, at 1075:16–1076:4.

B.  It is well established that failing to control for seafood intake can create spurious impressions that a chemical contained in seafood (e.g., mercury) is increasing IQ. *Hu Trial Tr. (ECF No. 395) at 100:18-101:8; Ibarluzea Designations (ECF No. 404) at 31:15-32:6 (221:11-222:6 & 222:11+).*

**EPA's rebuttal**: The cited testimony does not support that this proposition is "well established." Otherwise undisputed.

C.  The Ibarluzea study's failure to control for seafood intake was particularly problematic because coastal areas of Spain have a very high intake of seafood. *Hu Trial Tr. (ECF No. 395) at 101:9-18 & 110:8-111:3 (Jan 31, 2024).* During the period when the pregnant mothers were enrolled in the INMA study, coastal Spain was reported to have the highest intake of seafood in the world. *Ibarluza*

1   *Designations (ECF No. 404) at 29:15-30:24 (217:24+).* It is more important to

2   control for potential confounders that have a high prevalence in the studied

3   population, and that is the case with seafood consumption in the Basque area.

4   *Savitz Trial Tr. (ECF No. 415) at 1271:15-1272:11 (Feb 12, 2024).*

5   **EPA's rebuttal**: Disputed for the same reasons as above and as articulated in EPA's

6   proposed findings of fact ¶¶ 126-133.

7

8   D.   Several of the findings from the Ibarluzea study are consistent with maternal

9        fluoride exposure being correlated with seafood intake in the Basque cohort,

10       including: (i) maternal urinary fluoride levels were significantly correlated with

11       maternal urinary concentrations of substances (iodine and organic arsenic)

12       which are associated with elevated seafood intake; and (ii) the beneficial

13       association between maternal fluoride and IQ was reduced by 5 points after

14       controlling for a proxy (mercury) of seafood intake. *Ibarluzea Designations*

15       *(ECF No. 404) at 38:25-39:11 (239-240:9), 39:12-23 (242:4-20), & 17:9-17*

16       *(170:24-171:11).*

17  **EPA's rebuttal**: Disputed for the same reasons as above and as articulated in EPA's

18  proposed findings of fact ¶¶ 126-133.

19

20  E.   The significant association between fluoride and IQ in boys was driven by the

21       results in the *non*-fluoridated areas, where maternal fluoride was associated with

22       a 28-point increase in IQ. It is not plausible that fluoride increases IQ in such a

23       dramatic way. *Grandjean Trial Tr. (ECF No. 397) at 372:20-24 (Feb. 2, 2024);*

24       *Ibarluzea Designations (ECF No. 404) at 23:1-7 (184:13+).*

25  **EPA's rebuttal**: Disputed for the reasons explained in EPA's proposed findings of fact ¶¶

26  134–36. The results in the referenced table had been stratified several different ways, such that the

27  effects found in boys in the fluoridated zone were based on a small sample size of 58. Trial Ex.

28  114, at 35; Savitz Trial Tr. Vol. VII at 1080:1–9. "[M]ore aberrant findings are certain to arise as

1   the study size gets smaller." *Id.* at 1080:22–24. Moreover, the large positive effects found in the

2   boys in the non-fluoridated zones are likely a result of the statistical model extrapolating beyond

3   where the bulk of the data in the small sample size is. *Id.* at 1082:5–1084:13.

 

5            F.   The very large beneficial association between maternal fluoride and IQ in boys

6                 disappeared entirely when the authors used a different metric of urinary fluoride

7                 content (i.e., milligrams of fluoride per <u>liter</u> of <u>urine</u> as opposed to milligrams

8                 of fluoride per <u>gram</u> of <u>creatinine</u>). *Savitz Trial Tr. (ECF No. 415) at 1266:6-13*

9                 *(Feb 12, 2024).*

10      **EPA's rebuttal**: Disputed for the reasons explained in EPA's proposed findings of fact ¶¶

11   137–39. The "disappearing" effect was found both as a result of using a different unit (mg/g instead

12   of mg/L) and adjustment for creatinine vs. non-adjustment for creatinine. Savitz Trial Tr., Vol.

13   VII, at 1091:3–25. Moreover, this should be unsurprising given that the Bashash (2017) study

14   originally found no statistically significant adverse effect of MUF on IQ until they adjusted for

15   creatinine. Hu Trial Tr., Vol. I, 102:22–103:18 (Trial Phase 1). Dr. Grandjean even acknowledged

16   that a study's results could change depending on whether it adjusted for creatinine, Grandjean Trial

17   Tr., Vol. III, 401:17–20, and that he would thus never carry out a study without adjusting for

18   urinary dilution, *id.* at 402:18–22. Moreover, even the creatinine unadjusted results for the INMA

19   study still found no adverse effect of fluoride on IQ. Savitz Trial Tr., Vol. VII, at 1090:20–23.

21            G.   While it is preferable to adjust for dilution when measuring urinary fluoride

22                 levels, no plausible reason or explanation has been identified for why creatinine

23                 adjustment should have had such a "dramatic" and "peculiar" effect on the

24                 results. *Hu Trial Tr. (ECF No. 395) at 108:23-110:7 (*Jan 31, 2024); *Grandjean*

25                 *Trial Tr. (ECF No. 397) at 372:25-373:22 (Feb. 2, 2024); Savitz Trial Tr. (ECF*

26                 *No. 415) at 1266:25-1267:4 (Feb 12, 2024).*

27      **EPA's rebuttal**: Disputed for the reasons explained above and in EPA's proposed findings

28   of fact ¶¶ 137–39. The Bashash (2017) study originally found no statistically significant adverse

effect of MUF on IQ until they adjusted for creatinine. Hu Trial Tr., Vol. I, 102:22–103:18 (Trial Phase 1).

H. The beneficial association between fluoride and IQ in the Ibarluzea study was significantly influenced by fluoridation status; creatinine adjustment, co-exposures to lead and mercury; and quality of the family context. *Ibarluzea Designations (ECF No. 404) at 24:12-21 (191:5-17)*. Despite each of these factors significantly influencing the association, these factors were never simultaneously adjusted for in the same analysis. *Ibarluzea Designations (ECF No. 404) at 24:22-25:3 (191:21-192:9)*. It is currently unknown what the association between maternal urinary fluoride and IQ would be if these factors were adjusted for simultaneously. *Ibarluzea Designations (ECF No. 404) at 24:22-25:3 (191:21-192:9)*.

**EPA's rebuttal**: Disputed. It is also currently unknown what such extensive simultaneous adjustment would have caused in the MIREC or ELEMENT studies. MIREC reported only four supplementary tables, Trial Ex. 109, at 10-14, and ELEMENT reported only 1, Trial Ex. 106, at 13-14. To argue that the INMA authors should have baked all 25-supplementary analyses into one analysis is holding the INMA paper to a far higher standard than MIREC and ELEMENT, which reported far less data than the INMA authors did. Savitz Trial Tr., Vol. VII, at 1088:7–19 (explaining that MIREC reported four tables, ELEMENT reported one, and INMA reported 25—in which the INMA authors never found an adverse effect of fluoride on IQ).

63. It is undisputed that biological plausibility is an important component of a hazard assessment. *Savitz Trial Tr. (ECF No. 414), at 1178:8-11 (Feb 9, 2024)*.

**EPA's rebuttal**: Disputed. The citation to Dr. Savitz's testimony does not support the proposition alleged. Savitz Trial Tr., Vol. VII, at 1178:8–11 ("Q: First, you certainly agree that biological plausibility is an important component to the overall causation analysis. Correct? A: Yes."). Moreover, the 2022 draft NTP monograph concluded that the fluoride neurocognitive

studies are "too heterogeneous and limited in number to make any determination on biological plausibility." Trial Ex. 67, at 95.

Further disputed with respect to how biological plausibility plays a part in the hazard assessment. Biological plausibility comes into play during the weight of the scientific evidence portion of the hazard assessment. Barone Trial Tr. Vol. IV, at 658:9–20. This is the step that helps EPA identify endpoints and key studies to bring forward to the dose-response analysis. *Id.* at 658:24–25. During this portion of the hazard assessment EPA looks in part to the Bradford Hill considerations (e.g., coherence, consistency, temporality), with biological plausibility being just one of multiple considerations. *Id.* at 658:9–659:10; 626:8–24. The Bradford Hill criteria are a systematic method used by EPA in TSCA risk evaluations to look at the quality and strength of the evidence to see what confidence it has (e.g., likely causal, suggestive) between the exposure and the outcome. *Id.* at 660:9–661:15.

64. It is a general principle in hazard assessments that plausible findings should be given more weight than implausible findings. *Thiessen Trial Tr. (ECF No. 401) at 822:23-823:12 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 418) at 1448:6-10 (Feb. 13, 2024.*

**EPA's rebuttal**: Disputed with respect to biological plausibility being one of many factors considered in the weight of the scientific evidence step of the hazard assessment. *Supra* ¶ 63 (EPA's rebuttal); Barone Trial Tr. Vol. IV, at 658:9–659:10; 626:8–24.

65. It is undisputed that neurotoxicity is a biologically plausible effect of fluoride exposure in humans. *Thayer Trial Tr. (ECF No. 241) at 450:9-13; Grandjean Trial Tr. (ECF No. 417) at 295:3-18 & 320:5-12 (Feb. 1, 2024); Barone Trial Tr. (ECF No. 418) at 1448:17-23 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. The biological plausibility of fluoride affecting human neurodevelopment is contravened by NTP. The 2022 draft NTP monograph concluded that the "Human mechanistic studies were too heterogeneous and limited in number **to make any determination on biological plausibility**," and that the animal studies on potential mechanisms

to evaluate biological plausibility "provide little insight into the question of whether fluoride exposure affects IQ." Trial Ex. 67, at 95.

66.     Based on the totality of the available data, neurotoxicity is a hazard of fluoride exposure. Grandjean Trial Tr. (ECF No. 417) at 335:23-336:6 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 767:13-769:4 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 418) at 1424:12-14 & 1424:24-1425:3 & 1428:12-21 & 1429:11-21 (Feb. 13, 2024); Ibarluzea Designations (ECF No. 404) at 5:6-9 (41:15-20) & 9:24-10:1 (111:7-112:3).

**EPA's rebuttal**: Disputed to the extent the proposed fact goes beyond hazard identification. Dr. Barone testified that there is sufficient evidence to make a hazard identification call for fluoride and neurotoxicity, but that more evidence and work needs to be done before one can derive a point of departure. Barone Trial Tr. Vol. IX, at 1420:24–1421:1; 1423:1–3. Dr. Barone explained the evidence is "scattered and inconsistent," and so there is a lot of uncertainty in moving from hazard identification to evidence integration and the weight of the scientific evidence analysis where one would select the appropriate threshold of point of departure at this time. Barone Trial Tr. Vol. IX, at 1421:2–6. We cannot determine a threshold at this time based on the current body of evidence. *Id.* at 1423:7–9.

### Quantitative Dose Response Analysis

67.     If EPA has medium, or more, confidence that a chemical is associated with neurotoxicity, the EPA proceeds to identify a "Point of Departure" (aka "Hazard Level") through a Quantitative Dose Response Analysis. *Barone Trial Tr. (ECF No. 397) at 495:9-22 (Feb. 2, 2024); Thiessen Trial Tr. (ECF No. 401) at 773:17-774:10 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. If EPA has medium confidence or higher in the hazard data, and the strength of the evidence of the association between the chemical and the critical effect is likely causal or causal, EPA generally moves the hazard data into the quantitative dose-response analysis. Barone Trial Tr. Vol. III, at 495:5–8; Barone Trial Tr. Vol. IV, at 591:4–11; 592:5–11; 660:25–661:5.

68.     EPA's *Guidelines for Neurotoxicity Risk Assessment* recognize that prospective cohort studies allow "the direct estimate of risk attributed to a particular exposure." *Trial Ex. 17 at 17; Thiessen Trial Decl. (ECF No. 202-1) ¶ 45.*

**EPA's rebuttal**: Disputed with respect to the sentence being incomplete. The Guidelines for Neurotoxicity Risk Assessment also state: "[i]n cohort studies information bias can be introduced when individuals provide distorted information about their health because they know their exposure status and may have been told of the expected health effects of the exposure under study. More credence should be given to those studies in which both observer and subject bias are carefully controlled (e.g., double-blind studies)." Trial Ex. 17, at 17. Relatedly, Dr. Savitz testified that there may not really be blinding for example in studies of villages in China or India with higher fluoride exposures that have a reputation for having fluoride contamination and dental fluorosis. Savitz Trial Tr. Vol. VII, at 1168:16–24.

69.     It is undisputed that the NIH-funded ELEMENT and MIREC birth cohort studies are high quality studies of fluoride neurotoxicity. *Undisputed Fact No. 10.* It is also undisputed that the Danish OCC birth cohort study is a high-quality study. *Savitz Trial Tr. (ECF No. 402) at 1024:7-15 (Feb. 7, 2024).*

**EPA's rebuttal**: Undisputed.

70.     Pooled analyses of multiple cohorts is recognized to be preferable to an analysis of a single cohort. Hu Trial Tr. (ECF No. 395) at 111:9-112:16 (Jan 31, 2024); Ibarluzea Designations (ECF No. 404) at 10:2-11:6 (119:12-124:25).

**EPA's rebuttal**: Disputed because the proposed fact is vague as to the purpose for which a pooled analysis might be preferable.

71.     A pooled BMCL analysis has been conducted of the ELEMENT and MIREC cohorts (Grandjean 2022), as well as of the ELEMENT, MIREC, and OCC cohorts (Grandjean 2023). *Trial Ex. 119; Trial Ex. 124.* The authors of these pooled analyses are leaders in the field

of benchmark dose analysis, as evident by (A) EPA's reference to their work as an exemplar of BMCL analyses in the Agency's Benchmark Dose Technical Guidance manual, and (B) EPA's reliance on their BMCL analysis of other chemicals for standard-setting purposes. *Grandjean Trial Tr. (ECF No. 417) at 287:16-288:18 (Feb. 1, 2024); Grandjean Trial Tr. (ECF No. 397) at 479:25-480:20 (Feb. 2, 2024); Barone Trial Tr. (ECF No. 401) at 748:19-749:15 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. EPA's BMD technical guidance manual mentions one of Esben Budtz-Jorgensen's older BMCL calculations, of which Dr. Grandjean was a co-author, as one of many *examples* of a BMCL. *See* Barone Trial Tr., Vol. V, at 749:20–750:6 ("What's being stated here is – here are **several examples** . . . There's another approach from Budtz-Jorgensen in 2000. There's another approach from the Wijngaarden analysis in 2006. It goes on to talk about another approach in the next sentence. There are multiple approaches, there's not one approach.") (emphasis added). The use of the term "exemplar" as opposed to "example" gives the false impression that Esben Budtz-Jorgensen's BMCL calculation was the best. Additionally, Dr. Grandjean cannot be called a "leader" in the field of benchmark dose analysis since he does not actually calculate the BMCL calculations himself. Grandjean Trial Tr., Vol. III at 416:2–13 (stating 2023 BMCL calculations were done by Esben Budtz-Jorgensen and a post-doctoral fellow); *id.* at 420:8–17 (stating 2022 BMCL calculations were done by Esben Budtz-Jorgensen).

72.     The pooled BMCL analyses of the birth cohorts have sought to determine the level of fluoride in maternal urine that is associated with a 1-point drop in the IQ of the mothers' offspring. *Grandjean Trial Tr. (ECF No. 417) at 339:13-23 (Feb. 1, 2024).*

**EPA's rebuttal**: Undisputed.

73.     As described by Risk Sciences International, "The choice of a BMR of 1 IQ point (corresponding to a 1% reduction from a mean IQ of 100) has been adopted as an appropriate benchmark on this endpoint by several regulatory bodies, including the US EPA and EFSA." *Trial Ex. 129 at 27.*

**EPA's rebuttal**: Undisputed.

74.     EPA has recognized that the loss of 1 IQ point has a detrimental effect on lifetime earnings. In its regulatory impact analyses, EPA has relied upon data showing that a 1-point increase in IQ is associated with an increase in lifetime earnings in the range of 1.76 to 2.38 percent. *Trial Ex. 33 at 10-46; Trial Ex. 34 at ES-10.*

**EPA's rebuttal**: Disputed to the extent the proposed fact is intended to support a risk evaluation. TSCA risk evaluations cannot be driven by non-risk factors, like economic activity.

75.     The pooled BMCL analyses of fluoride and IQ have found that a linear model provides the reasonably best fit for the data. *Grandjean Trial Tr. (ECF No. 417) at 422:19-24 (Feb. 2, 2024); Grandjean Trial Tr. (ECF No. 397) at 425:5-9 (Feb. 3, 2024); Grandjean Trial Tr. (ECF No. 240) at 254:16-257:12 (June 9, 2020).*

**EPA's rebuttal**: Disputed. Grandjean's 2022 BMCL found that the squared (curved) model had the best model fit because it had the lowest AIC score. Trial Ex. 124, at 17 (showing AIC score for the squared model as 4768.8 and the AIC for the linear model as 4770.1). At minimum, the curved model had comparable fit to the linear model, since the AIC scores were close to each other. Grandjean Trial Tr., Vol. III, at 423:19–424:12 ("Q: In your view, the AIC scores are, at minimum, comparable to one another? A: Right."). Dr. Grandjean edited out the curved model from his 2023 BMCL calculation, instead only including a linear and "piecewise linear" model—which is two straight lines and not a non-linear model. Trial Ex. 119, at 9, 2 ("we derived two piecewise **linear** models"); Grandjean Trial Tr., Vol. III, at 426:3–10 ("Q: Did you provide a squared model in the latest BMCL calculation, 2023, with the Danish data? A: I don't think so . . . I think we edited that out."). Thus, there is no way to tell if a non-linear model could have fit the data better in Dr. Grandjean's 2023 BMCL calculation.

76.     The pooled analyses of the ELEMENT, MIRofEC, and Danish cohorts produce a BMCL less than **0.3 mg/L** in maternal urine. *Trial Ex. 119, Trial Ex. 124.*

**EPA's rebuttal**: Undisputed that the results of Dr. Grandjean's analyses report the stated BMCL. Disputed to the extent EPA is being asked to verify the result in the proposed fact because

1   the underlying data are not publicly available and thus may not meet TSCA section 26 science

2   standards upon further assessment of the raw data.

3

4       77.    Scientists at Risk Sciences International have converted the urine-based BMCL

5   (0.192 mg F/L) from Grandjean 2022 into a BMCL for total fluoride intake (**0.274 mg F/day**) as

6   well as a BMCL for water fluoride level (**0.179 mg F/L**). *Trial Ex. 129 at 23-24.* These values

7   would marginally increase if the BMCL from Grandjean (2023) was used.

8       **EPA's rebuttal**: Disputed for the reasons explained in EPA's proposed finding of fact

9   ¶ 290. Further, the RSI authors state after their calculation that "the overall body of evidence

10  suggests significant uncertainty in any low exposure-range derivation with current evidence," Trial

11  Ex. 129, at 25, and recommended a POD be derived for dental fluorosis instead, *id.* at 2. The RSI

12  authors also conducted that calculation based on Grandjean (2022)'s <u>linear</u> model, which, as

13  explained above, was not the best fit of the data, unlike the squared model. Trial Ex. 124, at 17.

14  Moreover, the RSI authors were critical of Dr. Grandjean's BMCL, noting that when Grandjean

15  (2022) "fit different linear and non-linear models, [they] resulted in lower bounds of benchmark

16  concentrations which differed by more than 9-fold." Trial Ex. 129, at 25. They noted further that,

17  while Grandjean (2022) calculated a very low BMCL, "different models, including linear,

18  quadratic, and segmented models, predicted notably different levels of risk from fluoride at these

19  low concentrations. At this point in time, mechanistic explanation and key mode of action events

20  are insufficiently understood to guide the choice of the most appropriate model to use for

21  predicting risks at low exposure levels." Trial Ex. 131, at 1518. The values the RSI authors derived

22  would also more than marginally increase if the RSI authors used the squared models—since the

23  RSI authors noted there was a 9-fold difference between the models in Grandjean's 2022 BMCL.

24  Trial Ex. 129, at 25. Unfortunately, we do not know what the squared model would show with the

25  pooled ELEMENT, MIREC, and Danish OCC data because Dr. Grandjean edited that curved

26  model out of his 2023 BMCL calculations. Grandjean Trial Tr., Vol. III, at 426:3–10.

27

28

78.     According to the Risk Sciences International team, an alternative Point of Departure for the fluoride hazard level would be the water fluoride level (**1.5 mg F/L**) for which NTP expressed moderate confidence in a neurotoxicity hazard. *Trial Ex. 129 at 24.*

**EPA's rebuttal**: Disputed. The proposed fact mischaracterizes the RSI systematic review authors' conclusions. The RSI authors did not recommend an "alternative" point of departure. The RSI authors—in a single isolated sentence in the 34-page report—state that 1.5 mg/L "may be considered" as a "provisional" point-of-departure for neurotoxicity. Trial Ex. 129, at 25. RSI and the Health Canada Expert Panel concluded that derivation of a POD for neurotoxicity is not supported at this time.

Further, the RSI systematic review's main conclusion was to derive a POD for *dental fluorosis*, because of the "considerable uncertainty in the derivation of [a] POD" for potential fluoride neurotoxicity. *Id.* at 2. This conclusion was supposed by the Health Canada Expert Panel, which came to that conclusion after a two-day meeting with experts from Health Canada, Public Health Agency of Canada, Federal-Provincial-Territorial Committee on Drinking Water, and representatives from RSI itself. Trial Ex. 128, at 5, 9. The Court lacks Article III jurisdiction to derive a point of departure for dental fluorosis because Plaintiffs have not proven they suffered dental fluorosis because of exposure to community water fluoridation at a concentration of 0.7 mg/L.

79.     The 1.5 mg/L water fluoride level identified by the NTP is not a NOAEL, nor can it be shown to be a LOAEL either. *Thiessen Trial Tr. (ECF No. 401) at 802:1-18 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 418) at 1443:25-1444:11-18 (Feb. 13, 2024).* In fact, some of the highest quality studies done to date have found significant associations between fluoride and reduced IQ among populations exposed to 0.7 mg F/L in water, or its equivalent from salt. *Trial Ex. 69 at 83; Thiessen Trial Tr. (ECF No. 401) at 804:10-805:2 (Feb. 6, 2024); Hu Trial Tr. (ECF No. 395) at 91:15-20 & 105:2-6 (Jan. 31, 2024); Hu Trial Decl. (ECF No, 198-1) ¶ 13; Lanphear Trial Decl. (ECF No, 198-2) ¶ 72.*

**EPA's rebuttal**: Undisputed that 1.5 mg/L water fluoride is not a NOAEL or any other point of departure. The reason, however, is not because other studies found significant associations between fluoride and reduced IQ among populations exposed to 0.7 mg/L F in water. On the contrary, the weight of the evidence does not support there being an association between those exposure ranges and neurotoxicity. *Infra* ¶¶ 88–192.

80.     The NOAEL for fluoride neurotoxicity in humans is currently not known, nor is it known what the precise demarcation is between the NOAEL and LOAEL. *Barone Trial Tr. (ECF No. 418) at 1443:25-1444:7 (Feb. 13, 2024); Barone Trial Tr. (ECF No. 415) at 1370:6-7 1371:24-1372:1 (Feb. 12, 2024); Savitz Trial Tr. (ECF No. 414), at 1165:25-1166:12 (Feb 9, 2024).* The import of this uncertainty is of little material consequence for the following three reasons.

**EPA's rebuttal**: Undisputed that a NOAEL and LOAEL for fluoride neurotoxicity are not currently known. The "import" of the uncertainties is disputed for the reasons identified below.

A.  There is little dispute that fluoride above 2 mg/L in the water is an observed adverse effect level. *Barone Trial Tr. (ECF No. 418) at 1424:24-1425:3 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. The cited testimony does not support the factual proposition. The cited testimony of Dr. Barone states that "somewhere above 2 parts per million" there may be neurotoxic effects, but that could be anywhere from 2 mg/L to infinity. Barone Trial Tr., Vol. IX, at 1424:24–1425:3. Dr. Barone did not testify that 2 mg/L is a level where observed adverse effects occur. NTP's dose-response meta-analysis further contravenes Plaintiffs' proposed fact. Regarding "Water Fluoride – All Studies," and "Water Fluoride – Low Risk-of-Bias Studies," **even in the linear models** NTP's dose-response meta-analysis found no adverse effect of water fluoride exposure on IQ in exposure ranges < 2 mg/L and < 1.5 mg/L. Trial Ex. 68, at NIEHS_000456. Regarding "Urinary Fluoride – All Studies," NTP's dose-response meta-analysis **never** found an adverse effect of fluoride exposure at < 2 mg/L, even in the linear models, and there was no adverse effect found at all across any of the non-linear models across any of the

exposure groups. *Id.* at NIEHS_000457. The linear model for the "Urinary Fluoride – Low Risk-of-Bias Studies" found no adverse effect of fluoride exposure < 1.5 mg/L, < 2 mg/L, < 4 mg/L, or in the all data group. Thus, the facts are unclear whether 2 mg/L is an observed adverse effect level.

B. EPA does not need to identify a NOAEL in order to proceed to risk characterization. *Barone Trial Tr. (ECF No. 418) at 1440:8 (Feb. 13, 2024); Barone Trial Tr. (ECF No. 414) at 1371:4-6 (Feb. 12, 2024).* For example, in its risk evaluations of methylene chloride and PCE (the two chemicals from the first 10 risk evaluations where the EPA based the Point of Departure on *human* studies of *neurotoxicity*), the EPA was unable to identify a BMCL or NOAEL. EPA thus used LOAELs for both of these evaluations. *Thiessen Trial Tr. (ECF No. 401) at 772:3-11 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 415) at 1371:15-23 (Feb. 12, 2024).*

**EPA's rebuttal**: Undisputed. Whether the data can be used to derive a POD is a chemical-specific inquiry based on the weight of the scientific evidence.

C. TSCA does not require certainty as to the threshold level at which a chemical produces the hazard, and indeed such certainty is very difficult to obtain from epidemiologic studies of human populations. *Barone Trial Tr. (ECF No. 418) at 1440:18-23 (Feb. 13, 2024); Savitz Trial Tr. (ECF No. 414), at 1173:7-13 (Feb 9, 2024).*

**EPA's rebuttal**: Disputed. Selecting a quantitative POD in the hazard analysis is dependent upon the weight of the scientific evidence. *See supra* ¶ 63 (EPA's rebuttal); *infra* ¶¶ 88–90, 273–83

81. Lastly, since there is little dispute that fluoride is associated with neurotoxic effects in the **2 to 4 mg F/L** range, a point in this range could be selected, with appropriate consideration given to the fact that this is unlikely to represent the "lowest" level at which neurotoxic effects

1  occur. *Barone Trial Tr. (ECF No. 418) at 1424:24-1425:3 & 1442:13-1444:10 (Feb. 13, 2024);*

2  *Barone Trial Tr. (ECF No. 415) at 1373:1-17 (Feb. 12, 2024).*

3        **EPA's rebuttal**: Disputed for the reasons explained in EPA's response to Plaintiffs'

4  proposed finding ¶ 80A. NTP's dose-response meta-analysis (eTables 4 and 5) show that there is

5  considerable uncertainty of neurotoxic effects in even the 2 to 4 mg/L fluoride range. For example,

6  the "Urinary Fluoride – All Studies" dose-response analysis in eTable 5 found significant adverse

7  effects in the < 4 mg/L and all data ranges *using the linear model*, but it found **no adverse effect**

8  **using the non-linear models in those same exposure ranges, despite the non-linear models**

9  **having comparable model fit.** Trial Ex. 68, at NIEHS_000460. Restricting the analysis to just

10  "Urinary Fluoride – Low Risk-of-Bias Studies," the NTP authors found no statistically significant

11  adverse effects in the < 2 mg/L, < 4 mg/L, or in the all-data groups. *Id.* at NIEHS_000461. As with

12  Plaintiffs' proposed finding 80A, the cited testimony by Dr. Barone does not support Plaintiffs'

13  contention. In the first citation, Dr. Barone merely acknowledges that there may be neurotoxic

14  effects "somewhere above 2 parts per million," but that could be from 2 mg/L to infinity. Barone

15  Trial Tr., Vol. IX, at 1424:24–1425:3. In the second citation, Dr. Barone merely acknowledges

16  that "4 milligrams and above there's – there's, again, as we looked before, there's a lot more data,"

17  but Dr. Barone did not concede that there was clarity in that data or that 4 milligrams could be

18  chosen as a defensible POD. Barone Trial Tr., Vol. VIII, at 1373:6–9.

19

20      **C.**    **EPA'S PROPOSED FACTS (NOS. 82–348)**

21          **1.**    **Hazard Identification**

22      82.    The first stage of a hazard assessment is hazard identification, which entails

23  finding and confirming a chemical's potential toxic effects, known as endpoints, by identifying

24  and reviewing the best available science. Barone Trial Tr. Vol. IV, at 656:8-657:22.

25      **Plaintiffs' rebuttal**: No dispute that EPA considers all potential toxic endpoints when it

26  conducts risk evaluations under Section 6. Where, however, a Citizen Petitioner has alleged a

27  particular hazard (i.e., neurotoxicity) under Section 21, the Hazard Identification process

28  appropriately focuses on the studies related to the alleged hazard.

83.     During the hazard identification step, EPA reviews, searches, screens, and evaluates all studies related to different hazards to determine whether the data are sufficient or insufficient for identified adverse effects. Barone Trial Tr. Vol. III, at 492:24–494:9.

**Plaintiffs' rebuttal**: No dispute, but with same caveat as above.

84.     The studies evaluated during the hazard assessment process may include, but are not limited, human epidemiological studies, laboratory studies, mechanistic studies, and kinetic studies in a variety of test systems, including but not limited to toxicokinetics. 40 CFR § 702.41(d)(5); *see also* Thayer Trial Tr. Vol. IV, at 623:19–624:20; *id.* at 640:15–641:16 (explaining that, in chemical-specific instances, one data stream may be useful for contextualizing or addressing limitations for reaching causal conclusions in the other evidence streams) (Trial Phase 1).

**Plaintiffs' rebuttal**: No dispute.

85.     Based on all the studies evaluated in the hazard identification step, EPA identifies studies that are generally of high or medium quality to conduct a dose-response analysis. Barone Trial Tr. Vol. III, at 494:21–495:8.

**Plaintiffs' rebuttal**: No dispute that EPA generally selects studies of high or medium quality for the *quantitative* dose-response analysis (the subject of the cited testimony).

86.     Dr. Stanley Barone is a Senior Science Policy Adviser within EPA's Office of Chemical Safety and Pollution Prevention. Barone Trial Tr. Vol. IV, at 641:12–15 (Feb. 5, 2024). Dr. Barone has a Ph.D. in neurobiology, specializing in developmental toxicology, and a master's degree in endocrinology. *Id.* at 642:11–15. Dr. Baron has been conducting risk assessments at EPA for over 30 years. *Id.* at 648:16–25. Dr. Barone managed and co-authored the first ten risk evaluations performed by EPA under amended TSCA. *Id.* at 647:13–21; *see also* Barone Trial Tr. Vol VIII, at 1319:4–1320:12 (Feb. 12, 2024).

**Plaintiffs' rebuttal**: No dispute.

87.     Based on his review of the literature, Dr. Barone agrees that IQ decrements is a potential hazard of fluoride exposure. Barone Trial Tr. Vol VIII, at 1323:5–1324:22. However, the scientific evidence is not sufficient to support behavior symptoms like ADHD as a potential hazard of fluoride exposure. *Id.* at 1324:23–1325:5.

**Plaintiffs' rebuttal**: No dispute that these are Dr. Barone's opinions.

## 2.     Weight of the Scientific Evidence

88.     Before moving to dose-response, EPA conducts a qualitative weight of the scientific evidence analysis as part of the hazard assessment. Barone Trial Tr. Vol. IV, at 666:9–13 (Feb. 5, 2024). In this analysis EPA looks at animal, human, and mechanistic evidence for a given chemical for a particular critical effect (e.g., developmental neurotoxicity), synthesizes and integrates the data, and uses the Bradford Hill considerations to describe the weight of the scientific evidence. *Id.* at 658:12–20. In weighing the evidence, the Agency identifies key studies and endpoints or effects (e.g., IQ) in this step to carry forward to the dose-response analysis. *Id.* at 658:24–25, 659:15–19, 660:2–6.

**Plaintiffs' rebuttal**: There are three factual problems with this statement. **First,** EPA's weight-of-evidence analyses for non-cancer effects (e.g., neurotoxicity) do not reference Bradford Hill, and the Bradford Hill factors are only "nominally considered." *Barone Trial Tr. (ECF No. 400) at 626:8-15 (Feb 5, 2024)*. In EPA's weight-of-evidence analyses for the neurotoxicants PCE and methylene chloride, EPA only addresses two of the nine[1] Bradford Hill factors: consistency and experimental support. *Trial Ex. 96 at 32; Trial Ex. 102 at 288-289.* **Second**, EPA's weight-of-evidence analyses for the critical health effects are very brief (e.g., often less than one page), and provide *much less* explanation for EPA's findings than NTP provided for its findings in the fluoride monograph. *Thiessen Trial Tr. (ECF No. 401) at 769:17-773:16 (Feb. 6, 2024); Trial Ex. 96 at 326* (weight-of-evidence analysis of PCE's critical chronic

---

[1] The nine Bradford Hill factors are: (1) strength of the association, (2) consistency of the association; (3) specificity of the association; (4) temporality of the association; (5) biological gradient (i.e., dose response) of the association; (6) plausibility of the association; (7) coherence of the association, (8) experimental support for the association, and (9) analogies for the association. *Grandjean Trial Decl. ¶¶ 111-125.*

effect, neurotoxicity)*; Trial 97 at 350-52* (same – HBCD/thyroid); *Trial Ex. 98 at 176* (same – 1,4-Dioxane/olfactory epithelium); *Trial Ex. 100 at 202-03* (same –BP/reproductive & developmental toxicity)*; Trial Ex. 102 at 288-289* (same - Methylene Chloride-Liver); *Trial 103 at 237-39* (same – NMP/reproductive); *Trial Ex. 104 at 246-47* (same – TCE/immunotoxicity); *Trial Ex. 99* (no weight-of-evidence analysis); *Trial Ex. 101* (same).  **Third**, while EPA's weight-of-evidence analyses identify the key endpoints for dose response modelling, they do not identify the key studies to use for quantitative dose-response assessment. *See, e.g., Trial Ex. 96 at 326* (identifying impaired visual function as key endpoint, but not the key study to use for dose-response); *Trial Ex. 97 at 350-352* (identifying thyroid hormone effects as key endpoint, but not the key study to use for dose-response); *Trial Ex. 102 at 288-289* (identifying CNS depression as key endpoint, but not the key study to use for dose-response).

89.     When weighing the scientific evidence in a hazard assessment, EPA does not require causation, but the Agency does look to the Bradford Hill causal framework to help inform the confidence in the association between the exposure and the endpoint of concern (e.g., neurotoxicity). Barone Trial Tr. Vol. IV, at 660:9–661:5.

**Plaintiffs' rebuttal**: As noted in the reply above, EPA's weight-of-evidence analyses for non-cancer effects (e.g., neurotoxicity) do <u>not</u> reference Bradford Hill, and the Bradford Hill factors are only "nominally considered." *Barone Trial Tr. (ECF No. 400) at 626:8-15 (Feb 5, 2024)*. Only two of the nine Bradford Hill factors are discussed in EPA's weight-of-evidence analyses for the neurotoxicants PCE and methylene chloride. *Trial Ex. 96 at 32; Trial Ex. 102 at 288-289.*

90.     Dr. Barone explained, consistent with Dr. Savitz' analysis, that the weight of the evidence is highly uncertain that exposures in the range relevant to community water fluoridation are associated with IQ detriments and that the weight of the evidence does not support carrying any particular study forward to a dose-response assessment. Barone Trial Tr. Vol. VIII, at 1325:10–13; 1326:5–18.

**Plaintiffs' rebuttal**: This is an example of EPA continuing to hold fluoride to a heightened burden of proof (i.e., the need for confidence that a hazard exists under the condition of use) that it has not required for any other chemical. *See Henry Trial Tr. (ECF No. 244) at 987:16-18 (June 16, 2020)* (admitting that EPA "held the plaintiffs to a burden of proof that EPA has not held a single chemical under Section 6 before"). Specifically, **EPA does not conduct a separate weight-of-evidence analysis for low-dose studies as part of the hazard assessment.** *Barone Trial Tr. (ECF No. 400) at 618:5-12 (Feb 5, 2024)*. This can be readily confirmed by reviewing the (very brief) weight-of-evidence analyses for any of the nine risk evaluations of non-cancer effects,[2] including the two most analogous chemicals (PCE and methylene chloride) where EPA identified neurotoxicity as the critical effect from human data. *Trial Ex. 96 at 326; Trial Ex. 102 at 288-289*. EPA makes no distinction between the certainties and/or confidence in the high-dose and low-dose hazard data; instead, EPA focuses on whether the hazard data as a whole supports the identification of a hazard, with no discussion of dose at all. *E.g., Trial Ex. 96 at 326; Trial Ex. 102 at 288-289*. If the hazard data as a whole supports an association, EPA moves forward to the quantitative dose-response analysis. *E.g., Trial Ex. 102 at 289* ("Although the MOA [Mode of Action] is not clearly delineated, multiple human and animal studies indicate that methylene chloride is associated with nervous system effects. Based on this evidence, EPA determined that methylene chloride should be brought forward for dose-response modeling.").

### a.   Human Epidemiologic Studies

91.     At the time of phase one of the trial in this matter (i.e., June 2020), there were two high quality prospective birth cohort studies that examined the association between maternal fluoride exposure and child IQ at low doses—ELEMENT and MIREC. ELEMENT was the first of these studies, and found a significant adverse association between maternal urinary fluoride

---

[2]     *See Trial Ex. 96 at 326* (weight-of-evidence analysis of PCE's critical chronic effect, neurotoxicity)*; Trial 97 at 350-52* (same – HBCD/thyroid); *Trial Ex. 98 at 176* (same – 1,4-Dioxane/olfactory epithelium); *Trial Ex. 100 at 202-03* (same –BP/reproductive & developmental toxicity)*; Trial Ex. 102 at 288-289* (same - Methylene Chloride-Liver); *Trial 103 at 237-39* (same – NMP/reproductive); *Trial Ex. 104 at 246-47* (same – TCE/immunotoxicity); *Trial Ex. 99* (no weight-of-evidence analysis); *Trial Ex. 101* (same).

levels and child IQ. Chang Decl. ¶ 195, ECF No. 200. However, the next study, MIREC, found no significant adverse association for its study population as a whole. Chang Decl. ¶ 196, ECF No. 200.

**Plaintiffs' rebuttal**: The last sentence is incorrect. The MIREC study found significant adverse associations between *water fluoride level* and IQ in the study population as a whole (i.e., both boys and girls). *Lanphear Trial Decl. ¶ 46; Lanphear Trial Tr. (ECF No. 417) at 207:2-25 (Feb. 1, 2024).* The MIREC study also found significant adverse associations between *maternal fluoride intake* and IQ in the study population as a whole. *Id.* The only fluoride exposure metric that the MIREC cohort did not find a significant association for *both* boys and girls is the maternal urinary fluoride measure. *Id.*

92.     Although a significant adverse association was found in the MIREC cohort when focusing on boys only, Chang Decl. ¶ 196, ECF No. 200, that result was not replicated in the other cohorts, *see* Hu Trial Tr. Vol. I, at 144:22-145:20 (Jan. 31, 2024), and, in any event, the most informative results of the MIREC study are those concerning boys and girls combined, Savitz Trial Tr. Vol. VI, at 1026:22–23 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: EPA is incorrect in asserting that the Green 2019 study found no significant associations between maternal fluoride and IQ loss in girls. *Lanphear Trial Decl. ¶ 46; Lanphear Trial Tr. (ECF No. 417) at 207:2-25 (Feb. 1, 2024).* As to the sex-specific finding for urinary fluoride, Dr. Savitz offered his opinion on this matter without knowing that toxicological studies have indicated that *males* may be more susceptible to the *in utero* effects of fluoride than females. *Savitz Trial Tr. (ECF No. 415) at 1255:3-17 & 1257:1-1258:8 (Feb. 12, 2024).*

93.     Since phase one of the trial, two additional high-quality prospective birth cohort studies have been published—INMA and OCC. Continuing the trend found in the broader MIREC cohort, the INMA and OCC studies found no significant adverse association between maternal urinary fluoride levels and child IQ. Trial Exs. 114, 119.

**Plaintiffs' rebuttal**: First, EPA omits Cantoral (2021), which Dr. Savitz agreed is a high quality birth cohort study. *Savitz Trial Tr. (ECF No. 414) at 1213:24-1214:9 (Feb. 9, 2024).* Second, EPA's characterization of the MIREC cohort's findings "trending" towards no association ignores the analyses of maternal fluoride intake and maternal water fluoride, as well as the analyses on infant fluoride intake – all of which found significant associations with IQ loss in both sexes. *Lanphear Trial Decl. ¶ 46; Lanphear Trial Tr. (ECF No. 417) at 207:2-25 & 214:15-17 (Feb. 1, 2024); Lanphear Trial Tr. (ECF No. 417) at 214:1-17 (Feb. 1, 2024).* Third, EPA's characterization is at odds with the NTP, which stated: "although not every analysis [in the ELEMENT and MIREC studies] found a statistically significant association, together **the three studies provided consistent evidence that increasing maternal fluoride levels associated with lower IQ scores in children**." *Trial Ex. 67 at 40 (emphasis added).*

94.    Other recent human epidemiologic studies (e.g., Dewey (2023)) have added to the growing body of literature finding the lack of an adverse association between maternal fluoride exposure and child IQ at low exposure levels, thereby casting further doubt that water fluoridation at 0.7 mg/L poses an unreasonable risk of human neurotoxicity.

**Plaintiffs' rebuttal**: The Dewey study had substantial imprecision in the exposure estimates which limited its ability its failure to detect associations between maternal fluoride and IQ, as discussed above in paragraph 61 above. Despite these limitations, Dewey detected significant associations between maternal fluoride and impaired executive function, which supports a finding of hazard. *Trial Ex. 117.*

95.    Most of the other human studies are of very poor quality. Chang Trial Tr. Vol. V, 798:22–800:20 (Trial Phase 1). Almost all these studies are cross-sectional in design, which means that exposures and outcomes were assessed at the same time, preventing identification of which one came first. *Id.*; Chang Decl. ¶¶ 121, 126, 149, 165–66, ECF No. 200 (Trial Phase 1).

**Plaintiffs' rebuttal**: The opinion of Dr. Ellen Chang from the industrial consulting firm

Exponent,[3] is at odds with the NTP's assessment. The NTP identified 19 high-quality epidemiological studies on fluoride and IQ, with 18 of these 19 studies finding an association between fluoride and reduced IQ. *Trial Ex. 67 at ii*. Dr. Chang's dismissal of cross-sectional studies is also at odds with Dr. Savitz's assessment. According to Dr. Savitz, cross-sectional studies can provide insights into the causal effects of a chemical, and should not be automatically dismissed in the simplistic manner that Dr. Chang advocated, particularly when the studies are examining stable populations with stable fluoride levels. *Savitz Trial Tr. (ECF No. 415) at 1240:23-1243:2 (Feb. 12, 2024)*.

### i.     ELEMENT Cohort

96.     Published in September 2017, Bashash (2017) is a manuscript co-authored by Dr. Hu that found a significant negative association between maternal fluoride exposure and child IQ in the ELEMENT cohort, which a prospective birth cohort in Mexico City. Chang Decl. ¶ 195, ECF No. 200.

**Plaintiffs' rebuttal**: No dispute.

97.     Mexico City fluoridates its salt to 250 ppm but does *not* fluoridate its water. Chang Decl. ¶ 195, ECF No. 200. Dr. Hu admitted that data on the source of fluoride exposure of the ELEMENT participants was not available to the ELEMENT study researchers. Hu Trial Tr. Vol. 1 at 120:4–121:23 (Trial Phase 1). Dr. Hu did not investigate whether the absorption rate of fluoride in the body differs by source (i.e., salt v. water). *Id*. at 124:15–22 (Trial Phase 1).

**Plaintiffs' rebuttal**: Dr. Hu explained that the ELEMENT cohort is a population that is exposed to "salt fluoridation," which is a policy designed to provide the same daily "optimal" dose of fluoride as water fluoridation. *Hu Trial Tr. (ECF No. 239) at 78:8-14 & 119:5-25 (June 8, 2020)*. Dr. Hu further testified that it was his "expectation" that public health authorities "have done their job and the required amount of fluoride was provided." *Id. at 119:23-25*.

---

[3] For discussion about the known industry biases of Exponent, see: *Hu Trial Tr. (ECF No. 239) at 65:12-17 (June 8, 2020)*; *Grandjean Trial Tr. (ECF No. 240) at 193:22-194:2 (June 9, 2020)*; *Lanphear Trial Tr. (ECF No. 241) at 364:21-365:3 (June 10, 2020)*.

98.     Dr. Hu admitted that whether the source of fluoride exposure is from salt or water could affect the concentration of fluoride observed in a urine sample. Hu Trial Tr. Vol. I, 125:11–15 (Trial Phase 1). As Dr. Hu explained, this would be comparing "apples and oranges." *Id.* at 125:16–24 (Trial Phase 1).

**Plaintiffs' rebuttal**: Dr. Hu also explained that the urinary fluoride levels among the women in the ELEMENT cohort are "very similar" to the urinary fluoride levels among the fluoridated women in the MIREC cohort. *Hu Trial Tr. (ECF No. 239) at 75:24-76:13 (June 8, 2020)*. Dr. Hu thus opined that "the results of the ELEMENT studies support the conclusion that fluoride is a developmental neurotoxicant at levels of internalized exposure seen in water-fluoridated communities." *Hu Trial Decl. (ECF No. 198-1) ¶ 46.*

99.     Published in August 2022, Goodman (2022a) is a manuscript co-authored by Dr. Hu that examined the association between maternal fluoride exposure and child IQ. Hu Trial Tr. Vol. I, 126:21–25 (Jan. 31, 2024); Trial Ex. 115. Goodman (2022a) studied the ELEMENT cohort, which is the same cohort studied in Bashash (2017). Hu Trial Tr. Vol. I, at 127:1–4. Goodman (2022a) used the same methodology as Bashash (2017). *See generally id.* at 128:6–25.

**Plaintiffs' rebuttal**: While Goodman (2022a) studied the ELEMENT cohort, it included approximately 100 additional mother-child pairs for whom urinary fluoride data had become available since the publication of Bashash (2017). *Hu Trial Tr. (ECF No. 395) at 93:22-94:5 (Jan. 31, 2024)*. The larger sample size increased the power of the Goodman (2022a) analysis. *Id. at 94:11-18.*

100.     The primary objective of Goodman (2022a) was to examine the longitudinal and domain-specific effects of maternal fluoride exposure on child IQ. Hu Trial Tr. Vol. I, at 129:1–6. In Bashash (2017), Dr. Hu and his team looked at associations between maternal urinary fluoride levels and full-scale IQ. *Id.* at 129:7–10. Goodman (2022a) sought to expand that analysis by looking at the two broad cognitive domains that make up full-scale IQ: verbal IQ and nonverbal IQ. *Id.* at 129:11–24.

1    **Plaintiffs' rebuttal**: No dispute.

2

3        101.    In epidemiology, "replication" means following up on a body of research or even

4    a single study's findings to determine whether the same findings are found in a different

5    population using approximately the same methodology. Hu Trial Tr. Vol I, at 144:21–145:2.

6    Replication is a key consideration in the interpretation of epidemiologic research. *Id.* at 145:3–6.

7    Outcomes consistent with a prior claim increase confidence in that claim; outcomes inconsistent

8    with a prior claim decrease confidence in that claim. *Id.* at 145:7–12.

9        **Plaintiffs' rebuttal**: No dispute that consistency of an association across different

10   populations increases confidence that the association is real. However, as Dr. Savitz has explained,

11   "even if there is a real phenomenon, pick anything you want, we don't find it in every single study."

12   *Savitz Trial Tr. (ECF No. 414) at 1172:23-1173:6 (Feb. 9, 2024).* Also, what may appear to be a

13   "contradictory" or discrepant result may, in fact, reflect unmeasured differences in cofactors that

14   influence the course of a chemical's neurotoxicity. *Hu Trial Tr. (ECF No. 395) at 102:22-104:24*

15   *(Jan 31, 2024); Lanphear Trial Tr. (ECF No. 417) at 242:21-243:9 (Feb. 1, 2024); Grandjean*

16   *Trial Tr. (ECF No. 417) at 328:14-23 (Feb. 1, 2024).*

17

18       102.    Although Goodman (2022a) found a statistically significant adverse association

19   between maternal urinary fluoride and nonverbal IQ, it did not find a significant association as it

20   relates to verbal IQ. Hu Trial Tr. Vol I, at 129:25–130:16. Because both studies concerned the

21   same population—the ELEMENT cohort—Goodman (2022a) merely expanded on the findings

22   of Bashash (2017), and was not an attempt at replication. *Id.* at 145:21–23.

23       **Plaintiffs' rebuttal**: The Goodman (2022a) study did not find a statistically significant

24   reduction in verbal IQ when averaging the results across the three age ranges, but the association

25   was negative and very close to statistically significant (i.e. B = -1.29, 95% CI: -2.60, 0.01). *Trial*

26   *Ex. 115.002.* Among the 6-to-12 year old group, the association between maternal fluoride

27   reduced verbal IQ was statistically significant (i.e., B = -1.93, 95% CI: -3.67, -0.18). *Trial Ex.*

28   *115 at 115.022.*

ii.      **MIREC Cohort**

103.     Published in October 2019, Green (2019) is a manuscript co-authored by Dr. Lanphear that examined the association between maternal fluoride exposure and child IQ in the MIREC cohort, which is a prospective birth cohort in Canada. Chang Decl. ¶ 196, ECF No. 200.

**Plaintiffs' rebuttal**: No dispute.

104.     Unlike the ELEMENT cohort, the MIREC study involved communities with optimally fluoridated drinking water (i.e., 0.7 mg/L). Hu Trial Tr. Vol. I, at 142:17-25.

**Plaintiffs' rebuttal**: While 0.7 mg/L is the target concentration for fluoridated water in Canada, the actual measured concentration in the MIREC cohort was 0.59 mg/L. *Trial Ex. 109 at 109.004, Table 1.*

105.     **Unlike the ELEMENT cohort, Dr. Lanphear did not find a statistically significant association between maternal urinary fluoride and child IQ when looking at the entire study population in the MIREC cohort (i.e., boys and girls combined).** Chang Decl. ¶ 196, ECF No. 200.

**Plaintiffs' rebuttal**: No dispute.

106.     The MIREC study found a significant association between fluoride exposure and child IQ when looking at boys only, but no such association was found when looking at girls only. Lanphear Trial Tr. Vol. III, 393:21–25. (Trial Phase 1).

**Plaintiffs' rebuttal**: This is incorrect. The MIREC study found significant adverse associations between maternal *water fluoride level* and reduced IQ in both sexes. *Lanphear Trial Decl. ¶ 46; Lanphear Trial Tr. (ECF No. 417) at 207:2-25 (Feb. 1, 2024).* The MIREC study also found significant adverse associations between maternal *fluoride intake* and reduced IQ in both sexes. *Id.* Additionally, the MIREC study also found significant adverse associations between *infant fluoride intake* and reduced IQ in both sexes. *Lanphear Trial Tr. (ECF No. 417) at 214:15-17 (Feb. 1, 2024); Trial Ex. 123.*

107.    The sex-specific effects are different than what was found in the ELEMENT cohort, and during the first phase of trial Dr. Lanphear said that he not aware of any other published epidemiological study of fluoride exposure that found similar sex-differential effect on IQ. Lanphear Trial Tr. Vol. III, 395:8–20 (Trial Phase 1). Dr. Lanphear admitted that "the reason for this discrepancy is not currently known." Lanphear Decl. ¶ 48, ECF No. 198-2 (Trial Phase 1).

**Plaintiffs' rebuttal**: Dr. Lanphear testified in the *second* trial that several studies have been published since the first trial which have identified sex-specific effects for fluoride neurotoxicity, including the Cantoral (2021) birth cohort study and the Adkins (2022) cross-sectional study from the US. *Lanphear Trial Tr. (ECF No. 417) at 240:24-241:10 (Feb. 1, 2024).*

108.    Dr. Hu testified that another primary objective of Goodman (2022a) was to examine the potential for sex-specific effects based on findings in other studies, such as Green (2019), that boys may be more susceptible to maternal fluoride exposure than girls. Hu Trial Tr. Vol. I, at 143:22–144:6.

**Plaintiffs' rebuttal**: No dispute.

109.    In other words, as Dr. Hu acknowledged, Goodman (2022a) was seeking to replicate in the ELEMENT cohort the sex-specific findings that Green (2019) found in the MIREC cohort. *Id.* at 145:13–20. However, Goodman (2022a) failed to replicate Green (2019)'s findings that boys may be more vulnerable to maternal fluoride exposure than girls. Hu Trial Tr. Vol. I, 144:18–19.

**Plaintiffs' rebuttal**: No dispute that sex-specific effects were not observed in the ELEMENT cohort.

110.    When asked at the first phase of trial why his studies did not find similar effects by sex, Dr. Hu testified that there are "population differences between Canadians and Mexicans," including diet, genetics, and social environment, which could explain why MIREC found sex-

differential IQ effects. Hu Trial Tr. Vol. III, 339:17–340:23 (Trial Phase 1). Dr. Hu emphasized this discrepancy as a reason why one must "look at the whole range of epidemiologic studies to understand the . . . potential impacts on different populations." Hu Trial Tr. Vol. III, 340:14–19 (Trial Phase 1).

**Plaintiffs' rebuttal**: No dispute.

111.    The women in the MIREC cohort are primarily white and tend to be older, more educated, and more likely to be married and use prenatal vitamins than the Canadian population as a whole. Lanphear Trial Tr. Vol. II, at 278:12–20 (Feb. 1, 2024). Dr. Lanphear agrees that these characteristics limit the generalizability of the findings of the MIREC studies to the Canadian population as a whole. *Id.* at 278:21–23. Dr. Lanphear further agrees that these same characteristics also limit the generalizability of these findings to the broader United States. *Id.* at 278:25–279:2.

**Plaintiffs' rebuttal**: No dispute that low-income disadvantaged communities in the United States will likely be **more susceptible** to the neurotoxic effects of fluoride than the MIREC cohort. *Lanphear Trial Tr. (ECF No. 417) at 216:1-23 & 218:14-219:3 (Feb. 1, 2024); Hu Trial Tr. (ECF No. 395) at 103:12-104:16 (Jan 31, 2024).*

112.    As discussed during the first phase of trial, in the MIREC cohort, in the graph showing a negative association between maternal urinary fluoride and full-scale IQ in boys, some of the data points appear to be outliers as defined by the Mexico City method. Chang Trial Tr. Vol. V, 814:4–815:11; Chang Decl. ¶ 215, ECF No. 200 (Trial Phase 1). Including these outliers, as the authors did, would have exaggerated the association. *Id*. (Trial Phase 1). The MIREC cohort authors did not present their data on full-scale IQ and maternal urinary fluoride with and without outliers, even though presenting data with and without outliers is common in scientific publications. *Id*. (Trial Phase 1). The MIREC cohort authors also did not provide their raw data, so it cannot be confirmed that removing the data points would eliminate the negative

association, but removing the two highly negative IQ data points would have flattened the trend line. *Id.* (Trial Phase 1).

**Plaintiffs' rebuttal**: The Green (2019) study performed a statistical analysis to determine if there were any unduly influential outliers, and found that there were none. *Trial Ex. 19 at 109.004* ("Q-Q plots revealed no extreme outliers"). Dr. Chang, from Exponent, did not address this statistical analysis in her cited comments, but instead based her opinion on a visual inspection of the regression data. Further, Dr. Chang's cited comments about the "scatter" in the data would apply equally to the data on lead and IQ. *Grandjean Trial Decl. (ECF No. 198-3) ¶ 119; Hu Trial Decl. (ECF No. 198-1) ¶ 30.*

### iii.      INMA Cohort

113.     Published in the peer-reviewed journal Environmental Research in 2022 (i.e., after Trial Phase One), Ibarluzea (2022) is a new prospective cohort study out of Spain that examined the association between low doses of fluoride exposure on child IQ. Trial Ex. 114. The lead author is Dr. Jesús Ibarluzea. *Id.*

**Plaintiffs' rebuttal**: No dispute.

114.     The parties refer to the Spanish cohort as "INMA," which is short for Infancia y Medio Ambiente. *Id.*

**Plaintiffs' rebuttal**: No dispute.

115.     The study focuses on a sub-cohort in the province of Gipuzkoa, which is the area of Spain that had an active community drinking water fluoridation program in place. Trial Ex. 114; Ibarluzea Designations (ECF No. 404) at 2:23–3:8 (30:19–31:10).

**Plaintiffs' rebuttal**: No dispute.

116.     The INMA IQ study examined the relationship between mothers' urinary fluoride concentration, adjusted for dilution, and their offsprings' intelligence scores. The study had a large sample size and controlled for relevant confounders, including maternal IQ. Trial Ex. 114.

**Plaintiffs' rebuttal**: The Ibarluzea (2022) study did not control for all relevant confounders, as it did not control for seafood intake. *Ibarluzea Designations (ECF No. 404) at 32:2-24 (222:11-223:23).* The high consumption of seafood in the Gipuzkoa cohort was one of the reasons the cohort was created. *Ibarluzea Designations (ECF No. 404) at 28:22-25 (213:18-21).* During the period when the pregnant mothers were enrolled, coastal Spain had the highest intake of seafood in the world. *Ibarluzea Designations (ECF No. 404) at 29:15-30:24 (217:24+).* While the ELEMENT and MIREC cohorts did not control for seafood intake, it is more important to control for confounders when they have a high prevalence in the study population. *Savitz Trial Tr. (ECF No. 415), at 1271:15-1272:11 (Feb 12, 2024); Barone Trial Tr. (ECF No. 418) at 1447:8-12 (Feb. 13, 2024); Hu Trial Tr. (ECF No. 395) at 101:9-18 & 110:8-111:3 (Jan. 31, 2024).*

117.     **Unlike ELEMENT, but like MIREC, the INMA IQ study found no statistically significant adverse effect of fluoride on child IQ for boys and girls combined.** Trial Ex. 114. **Unlike MIREC, but like ELEMENT, the INMA IQ study did not find any significant negative associations when looking at boy and girls separately.** *Id.*

**Plaintiffs' rebuttal**: The MIREC study found statistically significant IQ reductions in both boys and girls when using water fluoride level and fluoride intake as the metric of exposure. *Lanphear Trial Decl. ¶ 46; Lanphear Trial Tr. (ECF No. 417) at 207:2-25 (Feb. 1, 2024).* Unlike Green (2019), however, the Ibarluzea (2022) study did not analyze the relationship between fluoride intake and IQ, despite having detailed data on how much fluoride each mother consumed from tap water. *Grandjean Trial Tr. (ECF No. 397) at 374:17-375:10 (Feb. 2, 2024); Ibarluzea Designations (ECF No. 404) at 8:4-9:5 (62:25-68:15) & 28:5-21 (211:3-212:4).*

118.    The INMA IQ study found a statistically significant beneficial association between maternal urinary fluoride and IQ outcomes by some measures. Trial Ex. 114.

**Plaintiffs' rebuttal**: No dispute.

119.    According to Dr. Savitz, the INMA study has had several important consequences for the overall literature on low-dose fluoride exposure and IQ. Savitz Trial Tr. Vol. VII, at 1062:24–25. At minimum, it showed how "fragile the research remained and how tentative any conclusions would be," since we now have three studies "using a very, very similar design" that are "absolutely equal in quality" with results "not consistent with one another." *Id.* at 1063:1–17.

**Plaintiffs' rebuttal**: The Ibarluzea (2022) study is not "absolutely equal in quality" given (1) its failure to control for a confounder (seafood consumption) that has a very high prevalence in the cohort (*Hu Trial Tr. (ECF No. 395) at 101:9-18 & 110:8-111:3 (Jan 31, 2024); Savitz Trial Tr. (ECF No. 415), at 1272:2-11 (Feb 12, 2024); Barone Trial Tr. (ECF No. 418) at 1447:8-12 (Feb. 13, 2024));* (2) the dramatic and implausible effect that creatinine adjustment had on the results, which Dr. Savitz agreed is suggestive that the model "**has blown up**," (*Savitz Trial Tr. (ECF No. 415), at 1266:6-13 & 1267:20-1268:8 & 1269:12-18 (Feb 12, 2024); Grandjean Trial Tr. (ECF No. 397) at 372:25-373:22 (Feb. 2, 2024);* and (3) its failure to analyze the relationship between fluoride intake and IQ as a check on the dramatic urinary results, despite having detailed fluoride intake data available (*Ibarluzea Designations (ECF No. 404) at 8:4-9:5 (62:25-68:15) & 28:5-21 (211:3-212:4); Savitz Trial Tr. (ECF No. 415), at 1269:12-18 (Feb 12, 2024)).*

120.    Nonetheless, Plaintiffs' lead expert epidemiologist, Dr. Philippe Grandjean, attempted to discredit the INMA study on several, results-based grounds.

**Plaintiffs' rebuttal**: Dr. Grandjean's opinion that the study's results cannot possibly be correct is informed by his expertise in the field of developmental neurotoxicity, and his detailed familiarity with the developmental impacts of many different chemicals, not just fluoride.

1    *Grandjean Trial Tr. (ECF No. 397) at 372:10-13 (Feb. 2, 2024); Grandjean Trial Tr. (ECF No.*

2    *240) at 148:25-149:12 & 155:12-156:1 (June 9, 2020).*

3

4    121.    At the outset, the hypothesis investigated in the INMA study—and that is being

5    investigated in this case—is whether low-level prenatal fluoride exposure is associated with a

6    *negative* impact on IQ. The INMA study squarely answers that question: "no." Savitz Trial Tr.

7    Vol. VII, at 1066:13–17 ("The question I would ask, though, is, is this study indicative – the

8    question being asked – that they asked originally and that I would ask is, is this study indicative

9    of an adverse effect. It would be a whole different sort of process to say, okay, now we're

10   looking for a benefit . . .").

11   **Plaintiffs' rebuttal**: Dr. Savitz agreed has also testified that the dramatic effect that

12   creatinine adjustment had on the results **"calls into question . . . whether the model has blown**

13   **up."** *Savitz Trial Tr. (ECF No. 415) at 1266:25-1267:4 & 1268:4-8 (Feb 12, 2024).* Prior to

14   creatinine adjustment, the results were suggestive of an adverse effect in girls, albeit not

15   statistically significant, and a null effect in boys. *Savitz Trial Tr. (ECF No. 415), at 1266:6-9 &*

16   *1266:20-24 (Feb 12, 2024).* These pre-creatinine results were *not* adjusted for seafood; if they

17   were, the direction of the association between fluoride and reduced IQ would be anticipated be

18   even stronger in the negative direction. *Savitz Trial Tr. (ECF No. 415), at 1273:3-9 (Feb 12,*

19   *2024); Hu Trial Tr. (ECF No. 395) at 101:6-8 (Jan 31, 2024).*

20

21   122.    Nonetheless, Dr. Grandjean argued that the larger positive coefficients found *for*

22   *boys, general cognitive scales* are simply implausible. Grandjean Trial Tr. Vol. III, at 372:14–24.

23   However, Dr. Savitz explained that the large coefficient sizes are partially explained by the

24   INMA authors reporting their results in "milligrams per gram of creatinine," as opposed to

25   "milligrams per liter, adjusted for dilution," which is how the MIREC and ELEMENT studies

26   reported their results. Savitz Trial Tr. Vol. VII, at 1064:17–24. Using INMA supplementary table

27   S3, Trial Ex. 114, at 15, Dr. Savitz estimates that using milligrams per gram of creatinine

28

inflated the INMA study's effect sizes by about twenty-five percent, Savitz Trial Tr. Vol. VII, at 1064:17–24.

**Plaintiffs' rebuttal**: Dr. Savitz testified that he needed to reconsider his testimony on this point, as he agreed he may have made a mistake. *Savitz Trial Tr. (ECF No. 415), at 1277:8-1278:2 (Feb 12, 2024)*. It is *indisputable*, when looking at the predicate facts upon which Dr. Savitz relied for this opinion, that he did, in fact, make a mistake. First, an increase of 1 mg of fluoride per gram of creatinine was associated with the 15-point increase in the Ibarluzea study. *Id. at 1275:12-15*. Second, 1 mg of fluoride per gram of creatinine corresponds to a concentration of 0.75 mg of fluoride per liter of urine. *Id. at 1275:8-11*. Ergo, an increase of 0.75 mg of fluoride per liter of urine was associated with a 15-point increase in IQ. Even Dr. Savitz agreed "I think that's correct." *Id. at 1275:16-23*. If 0.75 mg fluoride per liter of urine is associated with a 15-point increase in IQ, then 1 mg of fluoride per liter of urine (i.e., a *higher* concentration) will be associated with an even *larger* increase in IQ. Thus, **contrary to Dr. Savitz's initial opinion (which he recanted), using the mg per gram of creatinine unit of measurement does not "inflate" the effect size; *it deflates it*. The results from the INMA study thus become *even more extreme, and even more implausible*, when expressing the results in the unit of measurement that Dr. Savitz suggested.**

123.    And Dr. Ibarluzea testified that the results in mg/g creatinine would be divided by two to roughly approximate outcomes per 1 mg/L adjusted urinary fluoride. Ibarluzea Designations (ECF No. 404) at 11:12–14:13 (148:1–153:2), 14:13–16:7 (154:3–157:15). For example, the INMA IQ study reports that a one-unit increase in urinary fluoride exposure by mg/g creatinine results in a statistically significant increase of 15.4 IQ points in boys. *Id.* Using mg/L as the exposure unit, the outcome would be half that increase (an increase of about 7.5 IQ points). *Id.*

**Plaintiffs' rebuttal**: This is the same error that Dr. Savitz made above. It is factually incorrect, and should not be relied upon by this Court.

124.     When the authors adjusted for mercury, the associations between fluoride and IQ were attenuated. Ibarluzea Designations (ECF No. 404) at 16:20–17:9 (164:5–165:3); Trial Ex. 114 (Table 3). For example, the magnitude of the effect in boys per 1 mg/g creatinine reduced the outcome by 5 IQ points to an increase of about 10.5 IQ points. Trial Ex. 114, at 114.007. Using mg/L as the exposure unit, the outcome would be cut in half to an increase of about 5 IQ points. Ibarluzea Designations (ECF No. 404) at 17:9–18 (170:24–171:11). Therefore, the IQ results for boys, when considered in units comparable to the other cohort studies, are not implausibly high. *See id.*

**Plaintiffs' rebuttal**: No dispute that mercury adjustment attenuated the association between fluoride and IQ. However, it is unequivocally false that expressing the results in terms of mg per liter of urine would reduce the effect size. To the contrary, doing so would *increase* the effect size, as explained above in response to paragraph 124.


125.     Additionally, Plaintiffs selectively focus on the largest beta coefficients to undermine the INMA study, without any attention to the several modest, statistically insignificant null effects found. For example, the analyses focused on the Age 1 Bayley Scores had consistently null findings with beta coefficients all under 2 IQ points. Trial Ex. 114, at 6, Table 2 (showing Bayley beta coefficients of (1.48 (-4.2, 7.16); 0.55 (-4.64, 5.74); 1.52 (-2.92, 5.97)); *see also* Trial Ex. 114 at 7, Table 3 (adjusting for mercury and finding Bayley beta coefficients of 2.67 (-3.46, 8.81); 0.89 (-4.55, 6.32); 2.65 (-2.14, 7.45)).

**Plaintiffs' rebuttal**: First, Plaintiffs have focused, as has Dr. Savitz, on the results that are comparable to the ELEMENT and MIREC cohorts (i.e., IQ results, not Bayley scores). Second, the Bayley scores further underscore the implausibility of the IQ results, as such dramatic benefits in IQ at age 4 would presumably be detectable in cognitive testing at age 1. *See Trial Ex. 114 at 114.035* (reporting that maternal fluoride in non-fluoridated areas was associated with a non-significant *reduction* in the Bayley score of 1.41 points at age 1, but a significant **28-point increase** in IQ at age 4).

126. Second, Dr. Grandjean argued that fish consumption is a hidden confounder in the INMA study. Grandjean Trial Tr. Vol. III, 453:12–14. But, as Dr. Savitz explained, for a variable to be a confounder it must be both related to fluoride intake (the exposure variable) and IQ (the outcome variable). Savitz Trial Tr. Vol. VII, at 1070:12–18. Fish consumption is unlikely to be a confounder in the INMA study because "fluoride is not linked to fish consumption. There's not evidence – anything, you know, analogous to the evidence that mercury is very tightly linked to fish consumption." *Id.* at 1071:2–6. In fact, Dr. Savitz cited a 2006 World Health Organization report that concluded even a diet high in fish consumption, including from canned fish and sardines, would rarely result in elevated fluoride exposure. *Id.* at 1110:16–1111:2; 1071:10–15 ("[T]here's very limited research on fluoride and fish consumption, but I've not seen evidence that it's a significant contributor. The World Health Organization report, I can't remember the exact figure, but their assessment of it was that it was, at most, a very limited contributor to fluoride.").

**Plaintiffs' rebuttal**: Research from Spain shows that seafood contains high levels of fluoride – up to 30 parts per million in the edible parts of the fish. *Ibarluzea Designations (ECF No. 404) at 34:27-37:24 (230:4-233:19).* Dr. Savitz admitted that he has not reviewed this data. *Savitz Trial Tr. (ECF No. 415), at 1270:18-20 (Feb 12, 2024).* Further, if seafood is not a confounder in the Ibarluzea study, why did controlling for mercury (a partial proxy for seafood) reduce the effect size by 5 IQ points? *Ibarluzea Designations (ECF No. 404) at 17:9-13 (170:24+).* And why were maternal fluoride levels significantly associated with chemicals (organic arsenic & iodine) that are found in high concentrations in fish? *Ibarluzea Designations (ECF No. 404) at 38:25-39:23 (239:14-242:20).*

127. Dr. Ibarluzea does not believe seafood is a confounder. He explained that while the Basque Country has relatively high seafood consumption, the type and amount of seafood consumed are important variables that are difficult to measure. Ibarluzea Designations (ECF No. 404) at 37:25–38:1 (235:1–5), Ibarluzea Designations (ECF No. 404) at 56:1–60:20 (320:6–328:8).

**Plaintiffs' rebuttal**: Dr. Ibarluzea agreed that seafood "could be" a confounder in the study, and that "I can't deny. Can't deny." *Ibarluzea Designations (ECF No. 404) at 38:9-12 (237:19-24)*.

128.    Plaintiffs nonetheless argued that *sardine or anchovy* consumption in the Basque region is a meaningful confounder in the INMA-Gipuzkoa cohort. However, a study from the INMA cohort called Julvez (2016) studied the cognitive benefits of maternal consumption of different fish types and child's IQ, **including sardines.** Julvez (2016) used a food frequency questionnaire and asked pregnant mothers about their consumption of (1) large fatty fish; (2) small fatty fish; (3) lean fish; or (5) shellfish. Trial Ex. 105 at 4. The authors **defined small fatty fish** as "baked or steamed smaller fatty fish such as mackerel, **sardines, anchovies,** salmon" and "**tinned sardines**/mackerel." *Id.* The authors found **no statistically significant association between small fatty fish consumption (i.e., sardine/anchovy consumption) and performance on the McCarthy GCI scales**—the age 5 IQ scores. Trial Ex. 105 at 8, Table 3. Dr. Grandjean admitted that whether fish intake is associated with cognitive performance depends on the kind of fish that a person is consuming, Grandjean Trial Tr. Vol. III, 458:12–15. Sardine and anchovy consumption is thus unlikely to have confounded the GCI scores reported in the Ibarluzea (2022) paper.

**Plaintiffs' rebuttal**: Plaintiffs' argument on this point has been focused on *total* seafood, not *just* sardines and anchovies. *E.g., Hu Trial Tr. (ECF No. 395) at 110:8-111:3 (Jan 31, 2024); Grandjean Trial Tr. (ECF No. 397) at 453:12-14 (Feb. 2, 2024)*. The Julvez study, as with many other studies, shows significant beneficial associations between total seafood intake and IQ. *Trial Ex. 105*. While small fatty fish were not, *by themselves*, significantly associated with increased IQ in the Julvez study, the direction of the association was positive in every analysis. *Trial Ex. 105 at Table 3*.

129.    Even if fish consumption was a confounder in the INMA study, it was controlled for by the INMA authors' control for mercury in the mothers' cord blood. As Dr. Savitz

explained, "mercury is, essentially, a biomarker of fish consumption . . . it's very closely linked to fish consumption." Savitz Trial Tr. Vol. VII, at 1071:22–1073:2; *id.* at 1073:8–11 (explaining that mercury is a "good marker of chronic long-term fish consumption"). When the INMA authors adjusted for mercury, they still did not find any statistically significant adverse effects of MUF on children's IQ. Trial Ex. 114 at 7, Table 3; Savitz Trial Tr. Vol. VII, at 1074:15–19 ("Q: Are there any statistically significant adverse effects in Table 3 when the authors adjusted for mercury in the cord blood? A: "Let me make sure I look at the whole table. No, there are not.").

**Plaintiffs' rebuttal**: Mercury is a partial but not complete proxy for seafood, as evident by the fact that Spanish women with low or no seafood consumption have elevated mercury levels in their blood. *Ibarluzea Designations (ECF No. 404) at 40:1-41:23 (256:4-259:18).*

130.    As explained by both Drs. Grandjean and Savitz, food frequency questionnaires may suffer from recall imprecision. Grandjean Trial Tr. Vol. III, 460:4–6; Savitz Trial Tr. Vol. VII, at 1100:3–22. Thus, Dr. Savitz believes the INMA authors' control for mercury was a better control for seafood consumption than using self-reported food frequency questionnaires. Savitz Trial Tr. Vol. VII, at 1075:16–1076:4 ("[I]f you're interested in steady-state, long-term, average sort of exposure, mercury is a very attractive biomarker of fish consumption. As I said, it's stable. It's not subject to recall issues. And if I only had one, I would probably prefer that one over self-report.").

**Plaintiffs' rebuttal**: Dr. Ibarluzea did not have the dilemma that Dr. Savitz posits of only having one metric of seafood intake to choose from (i.e. mercury levels or food questionnaire), as Dr. Ibarluzea had *both*. Dr. Ibarluzea also had fatty acid measurements in the cord blood, which Dr. Savitz does not address. *Ibarluzea Designations (ECF No. 404) at 44:1-21 (264:15-266:22).*

131.    Like Dr. Savitz, Dr. Ibarluzea does not believe seafood is a confounder in the INMA study. Dr. Ibarluzea explained that while the Basque Country has relatively high seafood consumption, the type and amount of seafood consumed are important variables that are difficult

to measure. Ibarluzea Designations (ECF No. 404) at 37:25–38:1 ( 235:1–5), 56:1–60:5 (320:6–328:8). Dr. Ibarluzea also explained that the regression analysis the authors ran for mercury, which attenuated the IQ effects observed, is a proxy control for seafood consumption. *Id.* at 56:1–60:5 (320:6–328:8).

**Plaintiffs' rebuttal**: Dr. Ibarluzea agreed that seafood "could be" a confounder in the study, and that "I can't deny. Can't deny." *Ibarluzea Designations (ECF No. 404) at 38:9-12 (237:19-24).*

132.    Dr. Grandjean, on the other hand, admitted that he is uncertain if he would prefer to use a food frequency questionnaire or a mercury biomarker to account for seafood intake. Grandjean Trial Tr. Vol. III, 460:14–18. Dr. Grandjean admitted that he is not an expert on what fish have elevated fluoride contents, nor is he certain that all seafood has elevated fluoride content. *Id.* at 458:19–25. He further admitted that he cannot say that all kinds of seafood intake would influence fluoride intake. *Id.* at 459:9–12.

**Plaintiffs' rebuttal**: In the testimony that EPA cites to support the first sentence, Dr. Grandjean testified that using mercury levels, instead of seafood intake data, as the metric for seafood consumption is a "very questionable approach." *Grandjean Trial Tr. (ECF No. 397) at 460:14-18 (Feb. 2, 2024).* No dispute with the second and third sentences.

133.    Instead, Dr. Grandjean said he would listen to the judgments from experts on the relationship between seafood consumption and IQ like Jordi Julvez and Jordi Sunyer when determining how to control for seafood intake in the INMA study because they know the circumstances in Spain. Grandjean Trial Tr. Vol. III, at 460:19–461:6. Critically, Jordi Sunyer was an author of the INMA IQ study, Trial Ex. 114 at 1, and Dr. Grandjean reveres him as a "highly respected epidemiologist," *Id.* at 449:12–14.

**Plaintiffs' rebuttal**: Dr. Grandjean also testified that Jordi Sunyer "doesn't feel comfortable" about the Ibarluzea (2022) study. *Grandjean Trial Tr. (ECF No. 397) at 449:15-18 (Feb. 2, 2024).* Dr. Sunyer, as well as all of the other national INMA authors, withdrew from the

Ibarluzea team prior to the publication of the 2023 paper on ADHD. *Id. at 373:23-374:16; Compare Trial Ex. 114 at 1* (listing Sunyer as author) *with Trial Ex. 121 at 1* (no mention of Sunyer).

134.    Next, Dr. Grandjean pointed out the larger differential effects found between *boys* in the fluoridated zones vs. *boys* in the non-fluoridated zones in Supplementary Table 21 of the INMA study. Grandjean Trial Tr. Vol. III, 372:20–24; Trial Ex. 114, at 35. Notably, however, the data has been dramatically sliced in this table, such that the effects found in boys in the fluoridated zone are based on a sample size of 58. Trial Ex. 114, at 35; Savitz Trial Tr. Vol. VII, at 1080:1–9 ("Q: So in this particular table, how many times has the data been sliced? A: . . . That depends how you define a slice . . . one way to do it would be to say: How many coefficients have been generated . . . And so now – I mean, it's hundreds at this point . . ."). As Dr. Savitz explained, "more aberrant findings are certain to arise as the study size gets smaller." Savitz Trial Tr. Vol. VII, at 1080:22–24. "[E]pidemiology is better at getting the average than at identifying the nooks and crannies of subtlety . . . And so every time you subdivide, it's at a price. It's at a price in terms of sample size, and it's also at a price in terms of potential distraction." *Id.* at 1081:20–1082:4. As Dr. Savitz explained, the more you subdivide the data, the higher likelihood of "random error." Savitz Trial Tr. Vol. VIII, at 1236:14–18. "If you look at enough results, there will often be aberrant ones that – in fact, it's certain that there will be if you look at enough findings." *Id.* at 1236:18–21.

**Plaintiffs' rebuttal**: The 28-point increase in IQ among boys in the non-fluoridated areas was statistically significant, with the confidence intervals going from 13 to 41. *Savitz Trial Tr. (ECF No. 414) at 1084:18-1085:13 (Feb. 9, 2024).*

135.    Again, the INMA study reported 23 supplementary tables and two supplementary figures. Trial Ex. 114 at 11–41. The Green (2019) MIREC study reported only four supplementary tables, Trial Ex. 109 at 10–14, and the Bashash (2017) ELEMENT study reported only one, Trial Ex. 106 at 13–14. Thus, the MIREC and ELEMENT studies could not be

interrogated for aberrant results to the same degree as INMA since they did not subdivide the data to the degree the INMA authors did. The critical fact is that, across all 23 of the INMA study's supplementary analyses, the authors never once found a statistically significant adverse effect of fluoride on IQ. Trial Ex. 114 at 11–41; Savitz Trial Tr. Vol. VII at 1088:16–25 ("Q: did the INMA authors find any significant adverse effects of fluoride exposure across any of the 25 supplementary tables they provided? A: Not to the best of my recollection . . . there was certainly no hint that somewhere lurking in there is a positive study in the sense of if we, you know, scrutinize it enough and we'll find the evidence that fluoride is harmful in this population.").

**Plaintiffs' rebuttal**: The primary aberrant result in the Ibarluzea study does not require looking at a single supplemental table because it is right in the "main model" of the study: i.e., a **15-point increase in IQ among the boys.** *Ibarluzea Designations (ECF No. 404) at 11:12-22 (148:1+).* No chemical or substance increases IQ by 15 points in human beings. *Grandjean Trial Tr. (ECF No. 397) at 372:10-16 (Feb. 2, 2024); Hu Trial Tr. (ECF No. 395) at 111:4-6 (Jan 31, 2024); Ibarluzea Designations (ECF No. 404) at 11:12-14:16 (148:1-154:3+).* Moreover, there have been many studies on fluoride and IQ, and none of them have found a significant beneficial effect on IQ, let alone a beneficial effect of 15 points. *Grandjean Trial Tr. (ECF No. 417) at 327:20-328:13 (Feb. 1, 2024)* (discussing Figure 2 on page 38 of NTP's Meta-Analysis).


136.    Moreover, the large positive effects found in the boys in fluoridated zones in Supplementary Table 21 are likely a result of the statistical model extrapolating beyond where the bulk of the data in the small sample size is. The population living in the non-fluoridated zones had low mean MUF levels, such that the effect of a 1 mg/g(creatinine) increase—what the statistical model extrapolates—would result in large effects. Savitz Trial Tr. Vol. VII, 1082:5–1084:13 (providing analogy where a statistical model predicts walking one mile per day would result in a bodyweight loss of two pounds, and how that statistical model could be extrapolated to what happens if someone walks twenty miles per day, even if no one in the data set does that).

**Plaintiffs' rebuttal**: The *average* maternal urinary fluoride level in the non-fluoridated

areas was 0.45 mg per gram of creatinine, with a standard deviation of 0.26. *Trial Ex. 114 at 114.017*. Thus, although the urinary fluoride levels were lower than the unit of exposure for the estimated effect size (i.e., 1 mg per gram of creatinine), the difference is not nearly as dramatic as the 20-fold difference (i.e., one versus twenty miles) provided in Dr. Savitz's example.

137.     Next, Dr. Grandjean expressed surprise at how the results seemed to differ depending on whether the results were adjusted or unadjusted for creatinine—a method for controlling urine dilution. Grandjean Trial Tr. Vol. III, 372:25–373:22. Yet, Dr. Grandjean conceded that "[i]t's possible" that "your results [could] change depending on whether or not [a study] adjusted for dilution in urinary fluoride." *Id.* at 401:17–20. Indeed, Dr. Grandjean "did not check . . . in the Danish study if there was any significant change due to the urine density or creatinine," but testified That "I'm sure it might have an effect." *Id.* at 401:17– 25. In fact, Dr. Grandjean testified that he would never carry out a study without adjusting for urinary dilution. *Id.* at 402:18– 22 ("Q: So if I did not adjust for urinary dilution in my study, you can imagine the results might change if I eventually did adjust for urinary dilution? A: I can't relate to that, because I would not carry out a study without that adjustment."). Using unadjusted urine samples, according to Dr. Grandjean, "would give the wrong impression of what the fluoride exposure was." *Id.* at 404:14–16. Dr. Grandjean further explained that "if I ignore dilution, my data may not be valid." *Id.* at 404:17–19. Dr. Savitz further explained that it is "typical" and "routine" to adjust for urine concentration when using a urinary biomarker, since "the more dilute the urine, the more dilute or lower the concentration of the chemical of interest would be." Savitz Trial Tr. Vol. VII, at 1089:13–17.

**Plaintiffs' rebuttal**: There is no dispute that adjusting for creatinine can affect the results. As Dr. Hu explained, adjusting for creatinine should "sharpen the findings," by reducing "noise" in the exposure estimate. *Hu Trial Tr. (ECF No. 395) at 108:11-22 (Jan 31, 2024).* But sharpening the results is different, in both degree and kind, than a dramatic transformation of a null effect into a statistically significant 15-point increase. *Hu Trial Tr. (ECF No. 395) at 109:2-25 (Jan 31, 2024); Savitz Trial Tr. (ECF No. 415), at 1266:6-9 (Feb 12, 2024).*

138.     None of Plaintiffs' experts cast doubt on the ELEMENT IQ results that changed after controlling for urinary dilution. At the first trial, Dr. Hu testified that the graduate thesis by Dr. Thomas that analyzed the same maternal urinary fluoride data from the same ELEMENT cohort population did **not** find statistically significant associations between urinary fluoride and IQ before applying the creatinine adjustment methodology. Hu Trial Tr. Vol. I, 102:22–103:18 (Trial Phase 1). Notably, the graduate thesis also did *not* observe a statistically significant association between fluoride levels in maternal plasma samples and offspring cognitive test scores at ages one, two, and three. *Id.* at 103:19–25.

**Plaintiffs' rebuttal**: The Thomas dissertation looked at a different cognitive test (MDI) at a different age (i.e., ages 1, 2, and 3) than the Bashash study (GCI at age 4). *Hu Trial Tr. (ECF No. 239) at 103:22-25 (June 8, 2020)*. Further, as Dr. Hu explained at the second trial, the differences he has seen from adjusting for creatinine in the ELEMENT cohort are precisely the type of "sharpening of results" that creatinine adjustment is intended to provide.  *Hu Trial Tr. (ECF No. 395) at 109:16-110:7 (Jan 31, 2024).* By contrast, transforming a null effect into a massive 15-point increase in IQ, as occurred in Ibarluzea (2022), is not "sharpening the results." *Savitz Trial Tr. (ECF No. 415), at 1266:6-9 (Feb 12, 2024).* As Dr. Savitz has explained, this 15-point transformation is "dramatic" and **"calls into question . . . whether the model has blown up."** *Id. at 1266:25-1267:4 & 1268:4-8.*


139.     Moreover, the creatinine-*un*adjusted results did not change the INMA results of boys' GCI from a positive to negative effect on IQ—rather, it changed it from a positive to null finding. Savitz Trial Tr. Vol. VII, at 1090:20–23; *see also id.* at 1091:5–17 (explaining that the creatinine adjusted vs. unadjusted results also reflect a difference in units: from mg/g(creatinine) to mg/L, adjusted for creatinine). Plaintiffs' selective emphasis on the creatinine un-adjusted results is misplaced and suggests bias. And the fact that the results differed depending on dilution adjustment is unsurprising given Dr. Grandjean's admissions and the differential effects found between the Dr. Thomas' graduate thesis and Bashash (2017) papers when adjusting and not adjusting for creatinine.

**Plaintiffs' rebuttal**: The creatinine-unadjusted results do not have any control for seafood intake (or other factors that strongly influenced the association between fluoride and IQ in the Ibarluzea study) and thus whether the association between unadjusted urinary fluoride and IQ is null or negative is not yet known. *Savitz Trial Tr. (ECF No. 415), at 1273:3-9 (Feb 12, 2024); Hu Trial Tr. (ECF No. 395) at 101:6-8 (Jan 31, 2024).*

140.    Finally, Dr. Grandjean speculated that the INMA paper may be subject to selection bias, since a 2020 abstract of the INMA paper looked at four regions of Spain while the published paper looked only at the Gipuzkoa region. This criticism is misplaced for several reasons. First, the overall results were not any different when the INMA authors looked at four regions in the abstract. Savitz Trial Tr. Vol. VII, at 1095:9–13 (Q: "When the INMA authors looked at four sub-cohorts instead of just the Basque country sub-cohort, did they find any statistically significant adverse effect of fluoride exposure on IQ? A: They did not.").

**Plaintiffs' rebuttal**: According to Dr. Ibarluzea, there were a "low amount of samples" from the other three cohorts. *Ibarluzea Designations (ECF No. 404) at 58:23-59:6 (320:6+).* According to Dr. Savitz, there was just "a smattering of people from other parts of Spain outside the Basque region, you know, 30 here and 30 there." *Savitz Trial Tr. (ECF No. 414) at 1093:20-23 (Feb. 9, 2024).* The findings from the Gipuzkoa cohort, therefore, were likely driving the findings in the abstract.

141.    Second, restricting the analysis to just the Gipuzkoa region had the benefit of eliminating inter-regional differences that could result in added noise or confounding. As Dr. Savitz explained, "Spain has a lot of cultural variation," so limiting the analysis to Gipuzkoa "enabled them to contrast fluoride exposures within a more homogeneous population." Savitz Trial Tr. Vol. VII, at 1094:3–7. In many epidemiological studies, a significant challenge is controlling for inter-city or inter-regional differences. "Whether they're cities in Canada or communities in China, there's this challenge that, you know, what you're attributing to fluoride may be due to other subtle aspects of the differences. You know, communities vary a lot, and

they vary in many subtle ways. Even after you've adjusted, you know, you have a challenge. When you can restrict it to a more homogeneous region, like the Basque region, and compare, you know, IQ in relation to fluoride exposure, there are fewer ways that you can get the wrong answer. . . . there's more homogeneity in diet and in, you know, educational opportunity and all of these other factors that can really be very influential on IQ." *Id.* at 1095:21–1096:14. Thus, limiting the published INMA paper to just the Gipuzkoa region was a strength, not a weakness.

**Plaintiffs' rebuttal**: Contrary to Dr. Savitz's opinion, the INMA project considers "joint analyses" of multiple subcohorts to be a "priority." *Ibarluzea Designations (ECF No. 404) at 10:2-19 (119:12-120:17).* This is because analyses of multiple cohorts permit assessment of "a wide distribution of exposures." *Id. at 10:20-11:6 (121:18-124:25).*

142.    Plaintiffs' criticisms of the INMA study are further undermined by NTP. The NTP included incorrect, creatinine-unadjusted data from the INMA study in its July 2022 meta-analysis. Savitz Trial Tr. Vol. VII, at 1155:19–1156:8. But nonetheless, the NTP authors rated the INMA study as a "low-risk-of-bias" study across seven different bias ratings, including a "probably low-risk-of-bias" rating for potential confounding. Trial Ex. 68, at 63.

**Plaintiffs' rebuttal**: The two critical problems with the Ibarluzea study (i.e., failure to control for seafood *in a study population with very high seafood intake*, and errors with the creatinine adjustment) are unique issues in the fluoride literature, and not factors that NTP globally considered in its risk-of-bias assessment. *Trial Ex. 67.*

143.    Since the first trial, another fluoride study from the INMA cohort was published in the journal Environmental Research that considered potential associations between prenatal maternal urinary fluoride and symptoms associated with ADHD in the offspring. Trial Ex. 121.

**Plaintiffs' rebuttal**: No dispute.

144.    Across thirty-six different sub-analyses of the data, the INMA ADHD study found no statistically significant adverse relationship between fluoride exposure and ADHD symptoms.

Trial Ex. 121 at 6 (Table 3); Savitz Trial Tr. Vol. VII, at 1097:13–14 ("Q: And can you describe the results? A: In a word, null."); Ibarluzea Designations (ECF No. 404) at 45:14–19 (278:1–7).

**Plaintiffs' rebuttal**: The results were not "null." Dr. Ibarluzea found that maternal fluoride was associated with a significant 20-fold reduction in the odds of developing ADHD symptoms (i.e., inattention problems) at age 11. *Ibarluzea Designations (ECF No. 404) at 46:1-27 (279:22-281:4).* Dr. Ibarluzea is unaware of any other chemical that reduces ADHD symptoms by twenty-fold. *Id. at 49:5-10 (295:6+).* Dr. Ibarluzea did not perform any analysis to see how creatinine adjustment affected the results; nor did he do any analysis to see how the results differed between fluoridated and non-fluoridated areas. *Id. at  49:23-50:16 (297:1-298:7).*

145.    There are relatively few studies that have assessed fluoride's potential neurotoxicity at levels found in optimally fluoridated areas (i.e., 0.7 milligrams per liter), especially regarding pregnant women. Hu Trial Tr. Vol. I, at 142:17–23. Dr. Hu agrees that the INMA study is one of those few studies. *Id.* at 143:6–7.

**Plaintiffs' rebuttal**: By what standard is EPA judging there are "relatively few studies" of fluoride neurotoxicity in fluoridated areas? Dr. Grandjean's pooled BMCL analysis has a larger number of children (n=1,599) than were included in Dr. Lanphear's pooled analysis of lead and IQ (n=1,333), which was the critical study upon which EPA based its regulation on airborne lead. *Trial Ex. 42 at 66977* (identifying the number of children in Lanphear's pooled analysis); *Trial Ex. 119 at 119.009* (identifying the number of children in Grandjean's pooled analysis). If judged against the first 10 chemicals that EPA has evaluated under the Amended TSCA, the amount of studies on fluoride neurotoxicity in fluoridated areas is *large*, and exceeds the *total number of studies (including animal and high-dose studies)* addressing the critical effects for some of the chemicals for which EPA has found unreasonable risk. *E.g., Trial Ex. 103 at 237-38* (relying on only *three* animal studies for the proposition that NMP causes the critical effect [infertility], despite the existence of two studies finding no effect on fertility at any dose). For PCE, which is one of the neurotoxicants that EPA established a point of departure (LOAEL) for from human data, EPA had no epidemiological studies showing harm at the human exposure

level. *Barone Trial Tr. (ECF No. 401) at 744:24-745:6 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 400) at 606:19-607:11 (Feb. 5, 2024).*

146.    Dr. Hu further agrees that the INMA study, which was published in a well-regarded peer-reviewed journal, is a high-quality study, that should be considered when interpreting the sum of the literature. Hu Trial Tr. Vol. I, at 137:5–19, 143:19–21, 159:4–9.

**Plaintiffs' rebuttal**: Dr. Hu testified that it was "a pretty high quality study," but that he had "reservations" about it. *Hu Trial Tr. (ECF No. 395) at 137:5-10 (Jan 31, 2024).*

147.    The NTP authors consider Ibarluzea 2022 a low-risk-of-bias study. Grandjean Trial Tr. Vol. III, at 450:10–18. In fact, the NTP authors rated Ibarluzea 2022 as either a "definitely low-risk-of-bias" or "probably low-risk-of-bias" on each bias measurement. *Id.* at 450:7–453:3.

**Plaintiffs' rebuttal**: No dispute.

148.    However, Dr. Grandjean would disregard Ibarluzea 2022. Grandjean Trial Tr. Vol. III, at 449: 21–24. He characterizes Ibarluzea 2022 as a pilot study and believes it looks like it was written by a PhD student. *Id.* at 448 4–9. But Dr. Grandjean also believes a different study, Godebo (2023), is a high-quality study despite it being titled a "pilot study" and having several other methodological weaknesses described below. *Id.* at 385:23–386:13.

**Plaintiffs' rebuttal**: No dispute with respect to Ibarluzea 2022, given Dr. Grandjean's expertise in developmental neurotoxicology and his opinion that Ibarluzea's "findings make absolutely no sense." *Grandjean Trial Tr. (ECF No. 397) at 372:10-19 (Feb. 2, 2024).* With respect to the Godebo study, Dr. Grandjean qualified his answer by stating that it's a high quality study "with certain limitations because the number of subjects is quite low." *Id. at 386:7-10.*

149.    Dr. Grandjean conducted BMCLs using data from the ELEMENT, MIREC, and OCC cohorts—both individually and in a pooled analysis—but would not even consider calculating a BMCL with the INMA data. Grandjean Trial Tr. Vol. III, at 461:15–25.

**Plaintiffs' rebuttal**: No dispute.

150.    A confounding variable is a variable that is both associated with exposure measurement and the outcome measurement. Grandjean Trial Tr. Vol. III,. at 453:4–7.

**Plaintiffs' rebuttal**: No dispute.

151.    Dr. Hu's chief criticism of the INMA study's methodology is that the authors did not control for fish consumption, Hu Trial Tr. Vol. I, at 140:10–13, even though he is not aware of any fluoride study that has adjusted for seafood intake, *id.* at 142:8–11.

**Plaintiffs' rebuttal**: First, Dr. Hu explained that controlling for seafood is not important in populations where seafood intake is low; it is immaterial therefore if studies of low-seafood consuming populations did not control for seafood. *Hu Trial Tr. (ECF No. 395) at 101:9-18 (Jan 31, 2024).* Second, Dr. Hu did not identify the failure to control for seafood as his "chief" criticism, but as the second of two reservations, with the first being "that they would have such huge differences in the results when they corrected for creatinine." *Hu Trial Tr. (ECF No. 395) at 138:3-14 (Jan 31, 2024).*

152.    Dr. Hu agrees that mercury is a biomarker of fish consumption and that the INMA study controlled for mercury levels in the cord blood. Hu Trial Tr. Vol. I, at 140:17–141:10. He further agrees that controlling for mercury can act as a proxy for fish consumption. *Id.*

**Plaintiffs' rebuttal**: Dr. Hu agreed that controlling for mercury works as a "partial" proxy, but the degree to which it does in any population depends on the types of seafood being consumed. *Hu Trial Tr. (ECF No. 395) at 140:20-141:7 (Jan 31, 2024).*

153.     Seafood intake is the primary source of mercury exposure in Spain. Grandjean Trial Tr. Vol III, at 461: 7–14 (Feb. 2, 2024).

**Plaintiffs' rebuttal**: No dispute.

154.     After controlling for mercury, the INMA study still did not find any statistically significant association between fluoride exposure and an adverse neurodevelopmental outcome. Hu Trial Tr. Vol I, at 141:17–21 (Jan. 31, 2024). Further, controlling for mercury decreased the magnitude of the positive association between maternal urinary fluoride and boys' IQ found by the INMA study. Hu Trial Tr. Vol. I, at 141:22–142:7.

**Plaintiffs' rebuttal**: No dispute.

155.     Dr. Hu's remaining reservations were not related to the INMA study's methodology but his "surprise" at its results. Hu Trial Tr. Vol. I, at 139:6–140:9.

**Plaintiffs' rebuttal**: This is incorrect. Dr. Hu explained that one of his reservations with the Ibarluzea study is "that they would have such huge differences in the results when they corrected for creatinine." *Hu Trial Tr. (ECF No. 395) at 138:3-14 (Jan 31, 2024).*

#### iv.     Odense Child Cohort (OCC)

156.     Published in October 2023, Grandjean (2023) is a manuscript first authored by Dr. Grandjean and co-authored by Dr. Hu. Hu Trial Tr. Vol. I, at 146:3–17 (Jan. 31, 2024); Trial Ex. 119. Grandjean (2023) both (1) examined the association between maternal fluoride exposure and child IQ in a cohort of 837 mother-child pairings ("OCC cohort") in Odense, Denmark, *id.* at 147:2–18, and (2) calculated a BMCL using the pooled data of the OCC, ELEMENT, and MIREC cohorts. *Id.*

**Plaintiffs' rebuttal**: No dispute.

157.     The fluoride concentration in public drinking water in Odense, Demark, is 0.2 to 0.3 mg/L. *Id.* at 148:9–13. However, the mean maternal urinary fluoride concentration, adjusted

for creatinine, in the OCC cohort was 0.58 mg/L. Hu Trial Tr. Vol. I, at 148:14–17. For comparison purposes, the average maternal urinary fluoride concentration, adjusted for creatinine, in the ELEMENT cohort was 0.89 mg/L. *Id.* at 150:2–5. The average maternal urinary fluoride concentration, adjusted for specific gravity, in the MIREC cohort was 0.69 mg/L in the fluoridated areas. *Id.* at 151:3–152:9. Further, the ranges in the maternal urinary fluoride levels in the OCC cohort overlapped with those found in the ELEMENT and MIREC cohorts. *Id.* at 148:18–21.

    **Plaintiffs' rebuttal**: Disputed with respect to the urinary fluoride level from the MIREC cohort that is most appropriate to compare with the OCC cohort. The 0.69 mg/L figure that EPA has cited is the incorrect comparator for two reasons. First, it is the average for the full pregnancy, whereas the OCC cohort urine samples were from the third trimester when urinary fluoride levels are known to be at their highest during pregnancy. *Grandjean Trial Tr. (ECF No. 397) at 353:25-354:11 & 355:8-14 (Feb. 2, 2024).* Second, the MIREC value that EPA has selected is adjusted for specific-gravity, whereas the OCC cohort adjusted the urine for creatinine. *Id. at 353:16-21.* The correct comparator to use from the MIREC cohort is **0.97 mg/L**, as this is the mean creatinine-adjusted value for pregnant women in the third trimester. *Trial Ex, 108 at 108.025.*


    158.    Correcting for urinary dilution can be accomplished through adjusting for creatinine or adjusting for specific gravity. Hu Trial Tr. Vol. I, at 132:6–9; Grandjean Trial Tr. Vol. III, at 400:7–12 (Feb. 2, 2024). Both methods are commonly used to correct for urine dilution with little difference observed between the two methods (Till (2018)). Lanphear Trial Tr. Vol. II, at 259:25–260:5 (Feb. 1, 2024); Hu Trial Tr. Vol. I, at 152:14–24 (Jan. 31, 2024) (agreeing that results from urine adjusted for creatinine and specific gravity are "highly equivalent"); *see also* Plaintiffs' Opening Statement Trial Tr. Vol. I, at 35:11–17 (Jan. 31, 2024) (describing the two methods as the "same thing").

    **Plaintiffs' rebuttal**: It is true that specific-gravity and creatinine-adjusted fluoride values are highly correlated. However, there are differences in the numeric values when urinary fluoride

levels are adjusted using these two methods, as can be seen when reviewing the urinary fluoride data in Table S4 of Till 2018. *Trial Ex, 108 at 108.025.* When the data permits, therefore, it is important to compare creatinine-adjusted values with creatinine-adjusted values, and specific-gravity adjusted values with specific-gravity adjusted values.

159.    For example, Dr. Lanphear and his team chose the MIREC cohort's specific-gravity adjusted maternal urinary fluoride measurement for their primary analyses in both Green (2019) and Hall (2023) because of the larger sample size relative to the creatinine-adjusted measurements. Lanphear Trial Tr. Vol. II, at 260:6–13 (Feb. 1, 2024). Due to the larger sample size, Dr. Lanphear agrees that the mean specific gravity-adjusted urinary fluoride figure is likely more representative of the urinary fluoride levels used for the MIREC IQ studies than the mean creatinine-adjusted figure. *Id.* at 260:22–261:23.

**Plaintiffs' rebuttal**: No dispute that there were more mothers in the Green and Hall studies with specific-gravity data, than creatinine. But, if the interest is comparing the urinary fluoride levels between the MIREC and OCC cohorts, then third trimester values need to be used (*Grandjean Trial Tr. (ECF No. 397) at 355:8-14 (Feb. 2, 2024)*), and those are only reported for the MIREC cohort in Till 2018. The third trimester urinary fluoride value for fluoridated areas in the MIREC cohort is **0.88 mg/L** (specific gravity-adjusted) and **0.97 mg/L** (creatinine-adjusted). *Trial Ex. 108 at 108.02.*

160.    The OCC cohort exposure variable was maternal urinary fluoride adjusted for creatinine using data from the third trimester. Grandjean Trial Tr. Vol. III, at 400:2–6.

**Plaintiffs' rebuttal**: No dispute.

161.    Dr. Grandjean testified that the results of a study may change depending on whether the study adjusts for urinary dilution. Grandjean Trial Tr. Vol. III, at 400:13–15. Dr. Grandjean further agrees that the results of a study are invalid if based on urinary data that is not adjusted for dilution. *Id.* at 404:17–19. Dr. Grandjean and the authors of OCC study did not

check whether the study's results would have changed if they had not adjusted for urinary dilution. *Id.* at 401:17–21.

**Plaintiffs' rebuttal**: No dispute that adjustment for dilution can sharpen the results of a study. *Hu Trial Tr. (ECF No. 395) at 108:11-22 (Jan 31, 2024).* But Dr. Grandjean did not testify categorically that results "are invalid" if urinary data is not adjusted; he testified that the data "may not be valid." *Grandjean Trial Tr. (ECF No. 397) at 404:17-19 (Feb. 2, 2024).*

162.   **Like MIREC and INMA, but unlike ELEMENT, Grandjean (2023) did not find any statistically significant negative association between maternal fluoride exposure and child IQ in the OCC cohort when looking boys and girls combined.** Hu Trial Tr. Vol. I, at 149:13–16 (Jan. 31, 2024). **Like ELEMENT and INMA, but unlike MIREC, the OCC study found no statistically significant adverse effect of maternal fluoride exposure on child IQ when looking at boys and girls separately.** Trial Ex. 119.

**Plaintiffs' rebuttal**: No dispute as to the results from ELEMENT, INMA, and OCC. However, EPA misstates the findings from MIREC. The MIREC study found significant adverse associations between maternal *water fluoride level* and *fluoride intake* and reduced IQ in both sexes. *Lanphear Trial Decl. (ECF No. 198-2) ¶ 46; Lanphear Trial Tr. (ECF No. 417) at 207:2-25 (Feb. 1, 2024).*

163.   Grandjean (2023) also sought to predict the difference in child IQ for the OCC cohort if maternal urinary fluoride levels was doubled (i.e., to a mean of 1.16 milligrams per liter). Hu Trial Tr. Vol. I, at 149:17–150:1. Grandjean (2023)'s comprehensive model, which looked only at mother-child pairings for which there were a complete set of covariate data, found that doubling the maternal urinary fluoride concentration did not predict a statistically significant decreased in the child IQ in the OCC cohort. *Id.* at 153:5–12; 155:2–8. Further, the comprehensive model predicted a slight, albeit not statistically significant, increase in IQ for boys as well as boys and girls combined. *Id.* at 155:9–13. Even focusing on just the twenty-four-

hour samples, the comprehensive model still did not predict a statistically significant adverse association between maternal urinary fluoride and child IQ in the OCC cohort. *Id.* at 156:8–14.

**Plaintiffs' rebuttal**: No dispute that the OCC study, which involved *low exposure contrasts* in a *non-fluoridated* community, did not find a statistically significant association between fluoride and IQ. However, the most reliable analysis that the study performed (24 hour urine + comprehensive set of covariates) found the largest negative association (albeit not significant) of all the analyses, in both boys and girls. *Hu Trial Tr. (ECF No. 395) at 178:10-179:17 (Jan 31, 2024).*

164.    The OCC cohort uses the same methodology as was used in the ELEMENT and MIREC cohorts. Grandjean Trial Tr. Vol. III, 399:12–15 (Feb. 2, 2024)

**Plaintiffs' rebuttal**: For all practical purposes, no dispute.

165.    Dr. Hu agrees that the lack of a significant association between maternal urinary fluoride and child IQ found in the OCC cohort is not consistent with the findings of the ELEMENT studies. Hu Trial Tr. Vol. I, at 157:9–11 (Jan. 31, 2024).

**Plaintiffs' rebuttal**: Dr. Hu also explained that the lower exposure contrasts in the OCC cohort could explain this apparent inconsistency. *Hu Trial Tr. (ECF No. 395) at 180:2-12 (Jan 31, 2024).*

166.    Dr. Hu agrees that the OCC study is a high-quality study and he has no major reservations about its results. Hu Trial Tr. Vol. I, at 157:12–20.

**Plaintiffs' rebuttal**: No dispute.

167.    Dr. Grandjean believes the data in OCC cohort is "definitely" reliable. Grandjean Trial Tr. Vol. III, 399:16–400:1 (Feb 2, 2024). But he claims he did not find the OCC study interesting enough to publish it on its own, *id.* at 414:15–415:25, despite conceding that "[i]t could be relevant" on its own to the question of whether 0.7 mg/L of fluoridated water is

developmental neurotoxicant, *id.* at 409:8–17. So instead, Dr. Grandjean—knowing that it had failed to show a significant association between fluoride exposure and child IQ—only published the OCC study in connection with a BMCL analysis that combined the OCC study with the ELEMENT and MIREC data. *Id.* at 415:1–416:1; Hu Trial Tr. Vol. I, at 158:8–12.

**Plaintiffs' rebuttal**: Dr. Grandjean's decision to publish new primary data from the OCC cohort together with a BMCL analysis is no different than what Dr. Lanphear did with the pooled lead analysis that EPA has relied upon as the critical study for its airborne lead regulations. *Lanphear Trial Tr. (ECF No. 417) at 196:22-197:8 (Feb. 1, 2024); Lanphear Trial Decl. (ECF No. 198-2) ¶ 5.* EPA never criticized Dr. Lanphear for publishing new primary data alongside the pooled analysis. *Lanphear Trial Tr. (ECF No. 417) at 197:17-22 (Feb. 1, 2024).* Further, as Dr. Hu explained, the BMCL analysis provides a "fulsome explanation of the Danish cohort results by themselves" and thus "no one's hiding anything." *Hu Trial Tr. (ECF No. 395) at 177:12-16 (Jan 31, 2024).*

168.    Dr. Grandjean agrees there is no reason to discount the OCC study's applicability to the question of whether fluoridation at 0.7 mg/L is harmful. Grandjean Trial Tr. Vol. III, at 408:9–24.

**Plaintiffs' rebuttal**: No dispute that the OCC study should not be discounted. This does not mean, however, that one should ignore the limitations that stem from the OCC cohort being a non-fluoridated community with low exposure contrasts.

169.    Dr. Grandjean agrees that having data for only the third trimester is a "small weakness" in the OCC 2023 study. Grandjean Trial Tr. Vol. III, at 411:2–10 (Feb. 2, 2024).

**Plaintiffs' rebuttal**: No dispute.

v.      **Other Recent Studies (Not Included in NTP Monograph)**

a.   **Cantoral (2021)**

170.    Plaintiffs and Dr. Lanphear emphasize a single isolated finding in Cantoral (2021) to argue the study suggests adverse effects of fluoride on IQ. Lanphear Trial Tr. Vol. II, at 221:2–222:16. The authors of Cantoral (2021) used a self-reported food frequency questionnaire to estimate participants' fluoride intake. Trial Ex. 110 at 2. In essence, the food frequency questionnaire asked participants to recall how much of a given food they had eaten in the last month, and then back-calculated fluoride intake from an estimation of how much fluoride those foods had. *Id.* The authors then analyzed whether that estimation of fluoride intake was at all related to decrements in IQ. *Id.* at 5.

**Plaintiffs' rebuttal**: What EPA calls a "single isolated finding" (i.e., a significant association between maternal fluoride exposure and reduced cognitive ability in boys) is the *primary finding of the study,* as identified by the authors in the abstract. *Trial Ex. 110*.

171.    The authors' main regression analysis stratified the data into 24 different sub-analyses: looking at (1) boys vs. girls, at (2) ages 12 and 24 months, were there decrements in (3) (a) cognitive, (b) language, or (c) motor IQ scores. Trial Ex. 110 at 5, Table 3.

**Plaintiffs' rebuttal**: The authors do not characterize the regression analyses in Table 3 as the "main" analysis. *Trial Ex. 110.* That is EPA's characterization. Also, EPA fails to explain why the "time-specific" analyses in Table 3 (which Dr. Savitz focused on) are more important than the "longitudinal" analyses in Table 4 (which Dr. Savitz ignored and was unaware of at trial). *Savitz Trial Tr. (ECF No. 414) at 1216:10-1217:8 (Feb. 9, 2024).*

172.    Across 24 different sub-analyses in their main model, 23 sub-analyses found **no** statistically significant adverse effect of fluoride exposure on IQ. Trial Ex. 110 at 5, Table 3. The single statistically significant adverse effect they found was on boys, at 24 months, on their cognitive scale. *Id.* As Dr. Savitz explained, the results from Cantoral (2021) are overall "definitely null." Savitz Trial Tr. Vol. VII, at 1101:23–1101:7.

**Plaintiffs' rebuttal**: This is not the "main model" of the study; that is EPA's characterization, not the authors'. *See Trial Ex. 110.* EPA provides no explanation for why Table 3 should be considered more important than Table 4. EPA also ignores the fact that the analyses in Table 3 include relatively small sample sizes (i.e., as few as 43, 61 and 71), which reduces the power to find statistically significant effects. *Trial Ex. 110 at 110.005*. Despite this, the direction of effect in almost all of the analyses in Table 3 are negative (indicating an adverse association between fluoride and neurodevelopment, albeit not statistically significant). *Id.*

173.     Notably, the sex-specific interaction term for any of the models did not reach the typical statistical significance threshold of $p < 0.05$. For example, across the main model for boys and girls at 12 months, the "*P* interaction term" had a value of $p = 0.43$, $p = 0.99$, and $p = 0.65$ for the cognitive, language, and motor IQ tests. Trial Ex. 110 at 5, Table 3. This means that adding child's sex into the model did not result in a statistically significant difference for nearly all the sub-analyses. The authors, curiously, lowered the significance test to $p < 0.10$ and stated that the sex-specific effects for the boys' cognitive scores at 24 months were statistically significant under this lower threshold, despite having a p-value of 0.06 which would not meet the typical $p < 0.05$ standard. Trial Ex. 110 at 5, Table 3.

**Plaintiffs' rebuttal**: Dr. Savitz testified that the Cantoral study was a "high quality" study that "provides valuable information contributing to the overall assessment of potential neurodevelopmental effects of fluoride in drinking water." *Savitz Trial Tr. (ECF No. 414) at 1213:24-1214:9 (Feb. 9, 2024).* EPA's criticism of using a lower significance test for an *interaction* term is unsupported by any expert testimony in this case. Regardless, the statistically significant effects seen in Table 4 were all below the p value of 0.05. *Trial Ex. 110 at 110.005.*

174.     Plaintiffs and Dr. Lanphear then turned their selective emphasis to Table 4 of Cantoral (2021), which provides a "longitudinal" analysis of the data. Lanphear Trial Tr. Vol. II, at 221:2–222:16. In Table 4, the authors removed the results for boys and girls combined, instead only emphasizing boys and girls separately. Trial Ex. 110 at 5, Table 4. Across eighteen sub-

analyses, the authors, again, only found adverse effects on boys on their cognitive scale when exposed to fluoride in their third trimester but not their second trimester. Trial Ex. 110 at 5, Table 4. Again, no *P* interaction term for sex-specific effects in Table 4 reached the standard statistical significance test of p < 0.05. Trial Ex. 110 at 5, Table 4.

**Plaintiffs' rebuttal**: EPA continues to ignore the fact that the directionality of effect was negative in the vast majority of analyses, including for every analysis of the boys. *Trial Ex. 110 at 110.005*. EPA also continues to ignore the fact that the low sample sizes make it harder to find statistically significant associations. *Id.* And, lastly, EPA ignores the fact that this study detected a *large* magnitude of effect (a loss of 3 to 3.5 cognitive points per 0.5 mg/day), which amounts to a reduction of 6 to 7 points per 1 mg of maternal fluoride intake. *Id*

.

175.     As Dr. Savitz explained, these two isolated findings in Table 3 and 4 do not transform Cantoral (2021) into a study that should be characterized as an adverse-effect study: the full array of results are still null, and the overall study is more appropriately characterized as a null study. "[E]very time you do more analyses, you increase the chances of finding something, let's say, deviant . . . as you stratify by time, by sex, by the IQ scale, again – it's – it's – you increase the potential for spurious results." Savitz Trial Tr. Vol. VII, 1217:7–17. In a study which had, at minimum, 42 different stratifications of the data (Table 3 + Table 4), the fact that the authors found results in 2 stratifications does not provide meaningful evidence of fluoride having an adverse effect on IQ. *Id* ("I'm not saying I know for a fact that the one green [significant] one is wrong, but I have no reason to put more faith in that than all the red [insignificant] ones. The red *ones* are saying no, the green *one* is saying yes." (emphasis added)).

**Plaintiffs' rebuttal**: Dr. Savitz was unfamiliar with Table 4 when asked by Plaintiffs' counsel at trial. *Savitz Trial Tr. (ECF No. 414) at 1216:22-1217:8 (Feb. 9, 2024).* His opinions regarding Table 4 should be weighted accordingly.

### b.  Dewey (2023)

176.    Dewey (2023) provides meaningful evidence against fluoride being a neurotoxicant at low-exposure ranges. The study took advantage of a natural experiment. Calgary, Canada historically fluoridated its drinking water to a concentration of 0.7 mg/L. Trial Ex. 117 at 1. But on May 19, 2011, Calgary stopped. *Id.* The Dewey (2023) authors then categorized 616 mother-child pairs who were pregnant from 2009 to 2012 into three groups: (1) those with full exposure to fluoridated drinking water during their pregnancy; (2) those partially exposed to fluoridated drinking water, and (3) those not exposed at all to fluoridated drinking water. *Id.* The authors then measured whether higher degrees of fluoride exposure were associated with IQ decrements or behavioral issues in the children. *Id.*

**Plaintiffs' rebuttal**: No dispute other than clarifying that the study did not determine if the mothers actually *consumed* fluoridated water (as opposed to bottled or filtered water), or for how long they had done so. *Grandjean Trial Tr. (ECF No. 397) at 369:8-18 (Feb. 2, 2024).* The study's exposure metric was based solely on residence during pregnancy. *Trial Ex. 117.*

177.    For the IQ tests, the authors found **no** statistically significant adverse effect of fluoride on full-scale IQ, verbal IQ, visual IQ, or working memory IQ. Trial Ex. 117 at 5, Table 2. The authors provided the results for boys, girls, and boys and girls combined. *Id.* In total, the authors stratified the results into 24 different sub-analyses and **never** found an adverse effect of fluoride exposure on IQ. *Id.*

**Plaintiffs' rebuttal**: No dispute, albeit with the same caveat as above re: "fluoride exposure."

178.    The Dewey (2023) results for neurobehavioral outcomes were also overall null. Across 24 different sub-analyses using different neurobehavioral tests, stratified by sex, the authors found scattered adverse effects of fluoride exposure on four sub-analyses, and only on girls, not boys. Trial Ex. 117 at 5, Table 3. As Dr. Savitz explained, there is no consistent sex-specific effect found in the Dewey (2023) study and, in contrast to the findings of MIREC, "if

anything, it's suggesting that girls would have potentially higher risk than boys." Savitz Trial Tr. Vol. VIII, at 1285:10–20.

**Plaintiffs' rebuttal**: Dr. Savitz's opinion that the outcomes are "overall null" is at odds with the study authors' assessment. According to the study: "[M]aternal exposure to fluoride throughout pregnancy was associated with poorer inhibitory control, particularly in girls, at 3 to 5 years of age compared to children who were not exposed. Further, exposure to fluoride throughout or for part of pregnancy was associated with poorer cognitive flexibility in girls at 3-5 years of age. These findings suggest that exposure to levels of fluoride recommended for dental health in a community water supply during pregnancy may be associated with adverse effects on executive function abilities in young children, particularly girls." *Trial Ex. 117 at 117.005.*

179.    As Dr. Savitz explained, the null results of Dewey are just as important as the results which found an effect. "[I]f it's a good enough study to generate meaningful positive results, it's a good enough study to generate meaningful null results, and that has to be weighed into the overall assessment of the state of the literature on this and every other paper that has generated these huge arrays of data. It's either all – all informative or none of it is. I think all of it's informative." Savitz Trial Tr. Vol. VIII, 1286:1–7. Given that the Dewey study generated almost entirely null results, it is most fairly characterized as a null study.

**Plaintiffs' rebuttal**:  No dispute that the significant findings from Dewey are "just as important" as the null findings. Dr. Savitz, however, did not treat the two sets of findings as equal, as he only disclosed and discussed the null findings during his direct examination with counsel. *Savitz Trial Tr. (ECF No. 415) at 1231:2-16 (Feb. 12, 2024).*

### c.   Do (2023)

180.    The Do (2023) study provides evidence against there being an association between exposure to community water fluoridation and adverse neurobehavioral outcomes. With a total sample size of 2,682 children, the Do (2023) authors separated children based on records of their residential history. Trial Ex. 113 at 2. The authors were then able to figure out what

percentage of each child's life, from age 0 to 5, was spent in an area that had fluoridated water. Trial Ex. 113 at 2. The authors then measured children's emotional, behavioral, and executive function using the Strength and Difficulties Questionnaire (SDQ) and the Behavior Rating Inventory of Execution Function (BRIEF) test. *Id.*

**Plaintiffs' rebuttal**:  The Do (2023) study, which was written by a dentist and published in the Journal of Dental Research, has significant methodological limitations, including (1) no individualized data on water intake, including whether the children drank tap or bottled water; (2) no individualized data on fluoride toothpaste use; (3) no individualized biomarkers of fluoride exposure; and (4) no individualized data on the mothers' exposure during pregnancy. *Grandjean Trial Tr. (ECF No. 397) at 362:16-364:4 & 366:5-367:20 (Feb. 2, 2024).* Another problem with the study is that the SDQ test has been found to be of questionable validity in the Australian population. *Id. at 365:15-366:4.*

181.    As Dr. Savitz explained, the strengths of this study are the "vast" study size and the clear exposure contrasts that took into account the child's residential moving history. Savitz Trial Tr. Vol. VII, 1107:11–1108:20.

**Plaintiffs' rebuttal**:  No dispute that this is Dr. Savitz's opinion about the study's strengths, and that he did not discuss any of the study's weaknesses. *Savitz Trial Tr. (ECF No. 414) at 1107:11-1108:24 (Feb. 9, 2024); Savitz Trial Tr. (ECF No. 415) at 1239:11-1240:6 (Feb. 12, 2024).*

182.    The authors found no statistically significant adverse association between higher lifetime exposures to fluoridated water and adverse performance on either neurobehavioral test. Trial Ex. 113 at 6, Table 3.

**Plaintiffs' rebuttal**:  No dispute.

#### d.  Godebo (2023)

183.    Dr. Grandjean emphasized a subset of the results from Godebo (2023), a study of a population in Ethiopia titled "Associations between fluoride exposure in drinking water and cognitive deficits in children: A pilot study." Grandjean Trial Tr. Vol. III, at 380:17–15; Trial Ex. 118. In actuality, the results of Godebo (2023) are more suggestive of there being no adverse effects from fluoride exposure. Godebo (2023) looked at whether elevated fluoride exposure was associated with adverse performance on (1) children's ability to draw a house, a person, or a donkey; and (2) six Cambridge Neuropsychological Test Automated Battery Paired Associations Learning tests ("CANTAB PAL"). Grandjean Trial Tr. Vol. III, at 387:5–388:9; 389:11–18.

**<u>Plaintiffs' rebuttal</u>**:  EPA's assertion that "the results of Godebo (2023) are more suggestive of there being no adverse effects from fluoride exposure" is *unsupported by any expert testimony in this case*, and is at odds with the conclusions of the Duke and Tulane scientists who authored the study. *Trial Ex. 118 at 118.002* ("Fluoride in drinking water was negatively associated with cognitive function, measured by both drawing and CANTAB test performance.").


184.    Godebo (2023) found elevated fluoride exposure lead to statistically significant adverse performance on one of the three drawing tests—a donkey—but no statistically significant association on the other two drawing tests—a person or a house. Grandjean Trial Tr. Vol. III, at 386:22–388:9.

**<u>Plaintiffs' rebuttal</u>**:  The donkey was the most complex figure that the children were asked to draw, and it is a basic neuropsychological principle that "the more complex tasks require more brain power." *Grandjean Trial Tr. (ECF No. 397) at 381:16-382:4 (Feb. 2, 2024).* As Dr. Grandjean explained, it is easier to detect the effect of a neurotoxicant on more complex tasks, particularly in studies like Godebo that have a small number of participants. *Id. at 387:10-388:9.*

185.    Godebo (2023) found that, after adjusting for covariates, elevated fluoride exposure only had a statistically significant adverse effect on children's performance on one out of the six CANTAB PAL tests. Grandjean Trial Tr. Vol. III, at 388:10–390:21.

**Plaintiffs' rebuttal**:  No dispute.

186.    Godebo (2023) found no statistically significant interaction between fluoride in drinking water, the difficulty of the type of CANTAB PAL test, and the total errors made by the children. Grandjean Trial Tr. Vol. III, at 391:1–20.

**Plaintiffs' rebuttal**:  No dispute, but the study also found that "[t]he highest average number of errors by the children were measured in the most difficult task (8-box) among those children exposed to the highest F in water (i.e., >8-15.5 mg/L)." *Trial Ex. 118 at 118.015.*

187.    Dr. Grandjean testified that Godebo (2023) has a small sample size. Grandjean Trial Tr. Vol. III, 385:23–386:10 (Feb. 2, 2024). He further testified that some of the population studied in Godebo (2023) had very high levels of fluoride exposure—some as high as 15.5 mg/L. *Id.* at 386: 14–18.

**Plaintiffs' rebuttal**:  No dispute. The small sample size is an important limitation because it reduced the power of the study to detect statistically significant results. *Grandjean Trial Tr. (ECF No. 397) at 379:25-380:4 (Feb. 2, 2024).*

### e.   Malin (2023)

188.    Malin (2023) is a recently published manuscript that examined the urinary fluoride levels during the first and third trimesters of pregnancy in the MADRES cohort. Hu Trial Tr. Vol. I, at 169:2–17 (Jan. 31, 2024); Trial Ex. 112.

**Plaintiffs' rebuttal**:  No dispute.

189.    Malin (2023) did not examine the association between maternal urinary fluoride levels and neurodevelopmental outcomes. Hu Trial Tr. Vol. I, at 169:21–25.

**Plaintiffs' rebuttal**:  No dispute, and thus unclear why this study belongs in the Hazard Assessment part of the risk evaluation.

190.    Malin (2023) found that the cohort's mean urinary fluoride levels were 0.81 and 0.92 milligrams per liter in the first and third trimesters, respectively. Hu Trial Tr. Vol. I, at 171:24–172:6. The higher urinary fluoride levels found in the third trimester could reflect changes in fluoride intake or differences in how pregnant women metabolize fluoride over time, but that issue has yet to be addressed by the scientific literature. *Id.* at 172:10–16.

**Plaintiffs' rebuttal**:  Regarding the last clause of the paragraph: There is no dispute that bone demineralization during the latter stages of pregnancy will increase the urinary fluoride levels. *E.g., Barone Trial Tr. (ECF No. 415), at 1382:6-12 & 1385:6-12 (Feb. 12, 2024).* The question posed to Dr. Hu was whether this issue "has been addressed *thoroughly*," to which Dr. Hu agreed it has not yet been the subject of a thorough investigation. *Hu Trial Tr. (ECF No. 395) at 172:14-16 (Jan 31, 2024).*

191.    There is sparse data on biomarkers and patterns of fluoride exposure among pregnant women in the United States. Hu Trial Tr. Vol. I, at 172:17–20. Aside from Malin (2023), there are only one or two studies that cover this topic. *Id*. at 172:21–23. One of those studies, Abduweli (2020), found that a cohort of women in Northern and Central California had a mean specific-gravity adjusted maternal urinary fluoride level of 0.63 milligrams during the second trimester of pregnancy. *See generally id*. at 172:24–173:24.

**Plaintiffs' rebuttal**:  No dispute. The urinary fluoride level identified here for the Abduweli study is for the whole cohort; the urinary fluoride level for the women in the *fluoridated areas* was **0.69 mg/L**. *Grandjean Trial Decl. (ECF No. 198-3) ¶¶ 153-54.*

192.    The MADRES cohort was predominantly comprised of low-income Hispanic women residing in urban Los Angeles, California.Hu Trial Tr. Vol. I, at 169:18–20, 174:7-20. Approximately 80% of the women in the cohort identified as Hispanic or Latina. *Id*. at 174:10–

12. In contrast, approximately 72% of the women in the United States are white non-Hispanic or black. *Id.* at 174:13–24. Dr. Hu agrees that these differences in racial and ethnic makeup limit the ability to generalize the results of Malin (2023) to the greater United States population. *Id.* at 175:7–11.

**Plaintiffs' rebuttal**: The high percentage of Hispanic participants in the MADRES cohort does limit the generalizability of Malin (2023), but in the likely direction of *underestimating* the urinary fluoride levels in other US communities. According to Malin (2023): "other studies have shown that tap water consumption tends to be lower, and bottled water (which tends to be lower in fluoride) consumption higher, among Hispanic and non-Hispanic Black adults, including pregnant women, in the US in comparison to non-Hispanic White adults. Furthermore, tap water mistrust in Los Angeles tends to be among the highest in the country when compared to other cities, particularly among Hispanic individuals." *Trial Ex. 122 at 122.008.* Consistent with this, Malin (2023) found that the Hispanic mothers in the MADRES cohort had the lowest levels of urinary fluoride level in the cohort. *Id. at 122.006.*

### b.  Literature Reviews

193.    Recent reviews of the scientific literature further weigh against the conclusion that fluoride is a neurotoxicant at levels found in optimally fluoridated areas.

**Plaintiffs' rebuttal**: Disputed, as discussed below.

### i.    NTP Monograph

194.    The two latest drafts of the NTP State of the Science Monograph both acknowledge that the science about potential effects of lower-dose fluoride exposure and children's IQ remains "**unclear**." The NTP authors define lower-dose fluoride exposure as < 1.5 mg/L, or less than double what is in the United States' water supply. Trial Ex. 67, at 92 (May 2022 draft); Trial Ex. 69, at 421 (September 2022 draft).

**Plaintiffs' rebuttal**: The NTP defines lower-dose exposure as a "total fluoride exposure"

that is less than what is expected in areas with 1.5 mg/L fluoride in the water. *Trial Ex. 67 at xiii*. In determining the total fluoride exposure associated with 1.5 mg/L in water, the NTP "relie[d] on empirical observations of a close correspondence between drinking water concentrations and urinary fluoride concentrations first described prior to significant additional fluoride exposures from other sources such as dental products." *Trial Ex. 69 at 35*; *see also Grandjean Trial Decl. ¶ 152* (discussing the early research which established an approximate 1-to-1 relationship between water fluoride and urine fluoride). A urinary fluoride level of 1.5 mg/L would thus represent the total fluoride exposure associated with 1.5 mg/L fluoride in water. *Trial Ex. 69 at 35*.

195.    The May 2022 and September 2022 drafts provide, in relevant part:

**Associations between lower total fluoride exposure** [e.g., represented by populations whose total fluoride exposure was lower than the WHO Guidelines for Drinking-Water Quality of 1.5 mg/L of fluoride (WHO 2017)] **and children's IQ remain unclear.** More studies at lower exposure levels are needed to fully understand potential associations in ranges typically found in the United States (i.e., < 1.5 mg/L in water).

*Id.* (emphasis added).

**Plaintiffs' rebuttal**: No dispute that the NTP found, with moderate confidence, that the hazard is *clear above 1.5 mg/L* in water or urine, but not below. *Trial Ex. 67 at xiii; Berridge Trial Tr. (ECF No. 400) at 519:15-521:5 (Feb. 5, 2024)* (explaining that NTP "very specifically and very intentionally" performs hazard assessments, not risk assessments). The fact that an observed *hazard* is unclear below 1.5 mg/L in water or urine, does not mean the *risk* is unclear.

196.    The NTP authors have stressed that their "conclusions apply to total fluoride exposures, rather than to exposures exclusively through drinking water." Trial Ex. 69, at 21; Thiessen Trial Tr. Vol. V, at 829:15–18 (Feb. 6, 2024). That said, the NTP authors "tend to agree that studies of fluoride exposure at levels typically found in drinking water in the United States are inconclusive." Trial Ex. 69, at 21; Thiessen Trial Tr. Vol. V, at 832:17–833:2 (Feb. 6, 2024). The MIREC study, Green (2019), is the only high-quality prospective study in the draft monograph that evaluated a population exposed to fluoridated drinking water at levels typically

found in the United States. Trial Ex. 69, at 21; Thiessen Trial Tr. Vol. V, at 830:22–831:5 (Feb. 6, 2024).

**Plaintiffs' rebuttal**: The NTP appears to have made an oversight with this statement, as the NTP concluded in the Monograph that *both* Green (2019) *and* Till (2020) are high quality (i.e., "low risk of bias") prospective cohort studies, and both of these studies evaluated populations exposed to fluoridated drinking water. *Trial Ex. 67 at 40-41.*

197.    In response to interagency review comments on the monograph drafts, the NTP authors consistently repeated that the scientific literature about fluoride's potential effects below 1.5 mg/L is unclear. For example, the NTP authors wrote that they "tend to agree that studies of fluoride exposure at levels typically found in drinking water in the United States are inconclusive," and therefore that "more[] studies at lower exposure levels are needed to fully understand potential associations [at fluoride levels in drinking water] typically found in the United States (< 1.5 mg/L)." Trial Ex. 69, at 23, 421; *see also* Savitz Trial Tr. Vol. VII, at 1155:2–9 ("[NTP was] quite clear in the most recent versions that the findings in that range [< 1.5 mg/L] are inconclusive] . . . I would take them at their word that that is their final judgment on that issue.").

**Plaintiffs' rebuttal**: No dispute with respect to NTP's assessment of the *hazard* at total fluoride exposures less than what is found in areas with 1.5 mg/L in water. *Trial Ex. 69 at 35.*

198.    NTP reached these conclusions **even without consideration of the null results in the INMA or Danish OCC IQ studies**. Trial Ex. 67 at 26 (explaining literature cut-off date for the NTP monograph was April 2021). NTP tried to factor the INMA study results into a sensitivity analysis in its meta-analysis, but unfortunately used the INMA results *un*adjusted for creatinine. Savitz Trial Tr. Vol. VII, at 1155:19–1156:8 ("a miscommunication . . . led them [NTP] being provided with estimates that were not creatinine adjusted."). If NTP "had used the creatinine adjusted results, [the INMA study] would have weighed in more strongly against there being an adverse effect when they were integrated in" the sensitivity analysis. *Id.* at 1158:1–3.

**Plaintiffs' rebuttal**: No dispute that NTP's literature cut-off date was April 2021, and that a number of studies were not included in NTP's Monograph because of this, including studies that have further documented the neurotoxicity of fluoride at low levels of exposure. *See, e.g*., Adkins (2022), Cantoral (2021); Grandjean (2022), Grandjean (2023), Goodman (2022a), Goodman (2022b), and Hall (2023).

199.     A committee of the National Academy of Science, Engineering, and Medicine ("NASEM") reviewed two earlier versions of the NTP monograph. According to Dr. Brian Berridge, the former Scientific Director of NTP's Division of Translational Toxicology, the "fundamental question" asked of NASEM is whether "the evidence presented supports the conclusion that was made." Berridge Trial Tr. Vol. IV, at 515:20–516:2, 527:17–25. (Feb. 5, 2024). **NASEM recommended that NTP remove the monograph's hazard classification for fluoride (i.e., that fluoride is a neurotoxin) because the evidence did not support that conclusion.** *Id.* at 546:21–25; *see also id.* 532:1–17, 540:5–16. **NTP agreed to do so because, according to Dr. Berridge, it was "much more fair to the evidence."** *Id.* at 532:18–25.

**Plaintiffs' rebuttal**: NASEM's criticisms were focused on how NTP communicated its conclusions, and not whether the conclusions were correct or incorrect. *Berridge Trial Tr. (ECF No. 400) at 531:4-21 & 560:15-561:3 (Feb. 5, 2024).* At no point, for example, did the NASEM committee dispute that fluoride is a neurotoxicant. *Id. at 531:22-25; see also Trial Ex. 654 at 14 (2021 NASEM Review)* ("Overall, the revised monograph seems to include a wealth of evidence and a number of evaluations that support its main conclusion . . . ."); *Savitz Trial Tr. (ECF No. 414) at 1141:16-1142:8 (Feb. 9, 2024)* (stating that NASEM committee agreed "that there is this pattern of association between higher fluoride levels and decrements in IQ"). NTP's ultimate decision to remove the formal hazard classification reflected the unique "sensitivity" of the fluoride issue, and a desire "to allow risk assessors, policy-makers, maximum latitude in making their determination with all the appropriate context." *Berridge Trial Tr. (ECF No. 400) at 532:18-23 & 539:14-19 (Feb. 5, 2024).*

200.    The NASEM committee also concurred with the interagency comments, stating that the NTP "needs to emphasize that much of the evidence presented comes from studies that involve relatively high fluoride concentrations and that the monograph cannot be used to draw conclusions regarding low fluoride exposure concentrations (less than 1.5 mg/L), including those typically associated with drinking water fluoridation." Trial Ex. 654, at 1–2 (2021 NASEM Review). As Dr. Savitz explained, "the monograph was developed for a particular purpose, and its purpose was not to draw conclusions about low fluoride concentrations. That was not in its mandate. They were looking more broadly at the relationship between fluoride intake and neurodevelopmental outcomes." Savitz Trial Tr. Vol. VII, 1118:12–16. In its earlier review, NASEM also noted that "[a]lthough NTP did not conduct a formal dose-response assessment [in its earlier drafts], it noted that effects on cognitive neurodevelopment were inconsistent at concentrations of about 0.03 – 1.5 ppm" in children. Trial Ex. 653, at 19 (2020 NASEM Review).

**Plaintiffs' rebuttal**: The NASEM committee did not "concur" with the interagency comments, since the interagency comments address the May 2022 monograph which the NASEM committee did not review. *Savitz Trial Tr. (ECF No. 414) at 1195:25-1196:8 (Feb. 9, 2024).* Dr. Savitz testified that the May 2022 monograph made "a significant improvement" in the clarity and balance with how the NTP discussed the findings below 1.5 mg/L. *Id. at 1118:25-1119:11.*

201.    The Parties' experts agreed that it was arbitrary for the NTP authors to select 1.5 mg/L as a dividing line when communicating their findings. Thiessen Trial Tr. Vol. V, at 847:22–848:4; Grandjean Trial Tr., Vol. II, 315:22–316:3. As Dr. Savitz explained, there is no "sharp demarcation" at 1.5 mg/L. Savitz Trial Tr. Vol. VII, 1139:7–16. In fact, there's "very little [literature] in the 1.5 to 2 range." *Id.* at 11:39:17–20.

**Plaintiffs' rebuttal**: EPA is correct that Plaintiffs' experts believe the "dividing line" is lower than 1.5 mg/L, but this does not call into question NTP's conclusion that exposures *above* 1.5 mg/L are consistently associated with reduced IQ. *See, e.g., Thiessen Trial Tr. (ECF No.*

*401) at 802:1-7 (Feb. 6, 2024).* Further, Dr. Savitz's testimony that "there is very little literature in the 1.5 to 2 range" is undermined by the fact that he did not read any of the studies from China, where these levels have been studied. *Savitz Trial Tr. (ECF No. 415) at 1245:16-19 (Feb. 12, 2024).* At least three of the *high-quality* studies that NTP identified from China had water or urinary fluoride levels between 1 and 2 mg/L, but Dr. Savitz admitted he had not read any of them. *Id. at 1309:24-1313:5.* Other *high-quality* studies in the NTP review addressed fluoride levels in the 2 to 4 mg/L region. *Trial Ex. 67 Table 6*; *Grandjean Trial Tr. (ECF No. 417) at 312:21-25 (Feb. 1, 2024).* As previous meta-analyses have found, the bulk of the studies from China have looked at water fluoride levels between 1.5 and 4 mg/L. *Grandjean Trial Decl. (ECF No. 198-3) ¶ 77*; *Grandjean Trial Tr. (ECF No. 417) at 301:7-23 (Feb. 1, 2024).*

202.     eTable 4 from NTP's July 2022 meta-analysis proves the dearth of data in the low-dose region. For example, looking at the "Water Fluoride – All Studies" group, the NTP authors found seven studies below 1.5 mg/L, but zero studies between 1.5 mg/L and 2.0 mg/L. Trial Ex. 68 at 77. Restricting the dose-response analysis found exposures to water fluoridated to < 2 mg/L had no statistically significant adverse effect on children's IQ. *Id.* The authors identified fourteen water fluoride studies between 4.0 mg/L and 2.0 mg/L, and eight such studies above 4.0 mg/L.[4] *Id.*

**Plaintiffs' rebuttal**: There are three problems with EPA's comment. **First**, seven studies in the low-dose region is _not_ a "dearth" of data, particularly when compared against the chemicals for which EPA has found unreasonable risk. *E.g., Barone Trial Tr. (ECF No. 400) at 595:15-596:11 (Feb. 5, 2024)* (EPA did not have any epidemiological studies showing a significant association between HBCD and the critical effect of thyroid disruption); *Barone Trial Tr. (ECF No. 401) at 744:24-745:6 (Feb. 6, 2024)* (EPA did not have any epidemiological studies of PCE neurotoxicity at the exposure levels for which EPA inferred a risk). **Second**, EPA

---

[4]     Confining the analysis to only the low-risk-of-bias water fluoride studies, the NTP authors identified three studies below 1.5 mg/L, zero studies between 1.5 mg/L and 2.0 mg/L, three studies between 2.0 mg/L and 4.0 mg/L, and zero studies above 4.0 mg/L, for a total of six low-risk-of-bias water fluoride studies. Trial Ex. 68, at 77.

fails to acknowledge that eTable 4 does not capture all of the studies in the low-dose region that NTP considered in its meta-analysis. The means-effect dose-response analysis that is set forth in eTable 4 (as well as eTable 5) required each study to provide IQ results in a binary fashion (i.e., high vs low fluoride group). *Barone Trial Tr. (ECF No. 418) at 1451:4-12 (Feb. 13, 2024)*. Thus, any study that analyzed *individualized* fluoride and IQ through a *regression analysis* without providing group-level binary results is excluded from eTable 4 and 5. This can be confirmed by reviewing eTable 2, which shows that **five low-dose studies[5] with individualized exposures were not included in the dose-response analysis.** *Trial Ex. 68 at NIEHS_000438-441*. **Third**, EPA fails to acknowledge the reduced power that comes from using group-level exposures (with no control for covariates) for the dose-response analysis. *Trial Ex. 69 at 277; Grandjean Trial Tr. (ECF No. 397) at 474:15-22 (Feb. 2, 2024); Thiessen Trial Tr. (ECF No. 402) at 954:5-955:4 & 955:16-956:11 (Feb. 7, 2024)*.

203.    Similarly, the NTP authors found five urinary fluoride studies below < 1.5 mg/L, but only two urinary fluoride studies in the 1.5 mg/L to 2.0 mg/L range. Trial Ex. 68 at 78. The authors identified six urinary fluoride studies between 2.0 mg/L and 4.0 mg/L, and six such studies above 4.0 mg/L. *Id.* Strangely, the NTP authors found a statistically significant adverse association of having a urinary fluoride concentration < 1.5 mg/L on IQ, but no statistically significant adverse association for those with urinary fluoride concentrations < 2.0 mg/L. *Id.* Restricting the analysis to urinary fluoride, low-risk-of-bias studies,[6] the NTP authors found no statistically significant adverse association on IQ for those with urinary fluoride concentrations <

---

[5]    *See Trial Ex. 68 at NIEHS_000436* (**Valdez Jiminez 2017**, with urine fluoride levels between **1.9 and 2.7 ppm** urine fluoride levels, not included in dose-response analysis); *NIEHS_000438* (**Till 2020**, with a water fluoride level of **0.7 mg**/L, not included); *NIEHS_000439* (**Cantoral 2021**, with average fluoride intake of **1.12 mg/day**, not included); *NIEHS_000441* (**Wang 2020**, with water fluoride levels between **0.2 and 3.9 mg/L**, not included); *NIEHS_000441* (**Zhao 2020**, with a water fluoride level of **1 mg/L**, not included).

[6]    Confining the analysis to only the low-risk-of-bias urinary fluoride studies, the NTP authors identified four studies below 1.5 mg/L, one study between 1.5 mg/L and 2.0 mg/L, four studies between 2.0 mg/L and 4.0 mg/L, and zero studies above 4.0 mg/L, for a total of nine low risk-of-bias urinary fluoride studies. Trial Ex. 68, at 79.

4 mg/L—far above the women with 95th percentile exposures in the Till 2018 urinary fluoride study. *Id.* at 79.

**Plaintiffs Rebuttal**: The discrepancy in results for the <1.5 mg/L and <2 mg/L is explained with a careful review of eTable 2. Any study with a subscript "u" was used for the urinary dose-response analysis, but only studies with an "*" were used for the <1.5 mg/L dose-response analysis. *Trial Ex. 68 at NIEHS_000441.* The study by Bashash has a "u" but not a "*", which means it was included in the <2 mg/L analysis, but not the <1.5 mg/L analysis. *Trial Ex. 68 at NIEHS_000436.* This can be further confirmed by looking at the difference in the number of children in the <1.5 and <2.0 mg/L groups (n=189), which is exactly the number of children in the Bashash group-level analysis. *Compare Trial Ex. 68 at NIEHS_000436* (showing 77 and 112 children in the two Bashash groups, which totals 189 children) *with Trial Ex. 68 at NIEHS_000461* (showing 4,161 children in the <2 mg/L group and 3,952 children in the <1.5 mg/L group, which is a difference of 189 children). Thus, the addition of the crude binary data from Bashash (where children were divided between those with urinary F > 0.8 mg/L and < 0.8 mg/L, without adjustment for covariates) is the explanation for the elimination of a significant effect below 2 mg/L. *See Thiessen Trial Tr. (ECF No. 401) at 762:17-765:11 (Feb. 6, 2024)* (describing the data from Bashash that was used for the group-level analyses); *Trial Ex. 69 at 277* (same).

204.    The strange findings of NTP's dose-response meta-analysis are indicative of the highly volatile and fragile nature of the fluoride and IQ literature.

**Plaintiffs Rebuttal**: To the contrary, the fluoride/IQ literature is remarkably consistent, with **52 of the 55 studies (95%) included in the meta-analysis finding an inverse association between fluoride and IQ**. *Trial Ex. 68 at 9* ("The pattern of results across the 55 studies was consistent; 52 (95%) reported an inverse association . . . .").

205.    Most of the studies considered in NTP's analysis are also from geographic and socioeconomic settings that make them of questionable generalizability to the North American

context. As. Dr. Hu explained, "**a neurotoxicant, like fluoride, could have different manifestations of neurotoxicity in a given population," such as culturally different "parenting influences" or "things that they eat."** Hu Trial Tr. Vol. I, 102:7–103:11. Regarding socioeconomic status, Dr. Hu explained "there's many different reasons to believe that children of different families, of different means, can have different experiences in terms of their neurodevelopment." *Id.* at 104:13–16. Of the **55** studies considered in NTP's meta-analysis, **53 are from China, India, Iran, Pakistan, or New Zealand**:

China = 39 studies

India = 8 studies

Iran = 4 studies

Pakistan = 1 study

New Zealand = 1 study

Mexico = 1 study

Canada = 1 study

Trial Ex. 68 at 73, eFigure 14. Put differently, **96% of the studies in NTP's meta-analysis come from outside North America.** And because virtually all these studies are in countries with far different cultures, customs, and socioeconomic factors than the United States, they are of poor generalizability to the United States population.

**Plaintiffs Rebuttal**: No dispute that these are the correct numbers for the means-effect meta-analysis. However, Dr. Hu did not espouse EPA's dismissive approach to studies of *human* populations, including high-quality studies with low risk of bias. Dr. Hu did not argue that consistent findings of fluoride neurotoxicity in *human beings* from China, India, or Iran should be ignored or dismissed because the human study participants are not Americans. He made the comments, instead, to explain that the manifestations of a chemical's neurotoxicity, including fluoride, may differ with the presence of various co-factors (which can help to explain seemingly divergent findings across studies), and that some people may be more vulnerable to suffering harm. *Hu Trial Tr. (ECF No. 395) at 101:23-104:16) (Jan. 31, 2024).* Lest the EPA forget, there are populations in the United States that have heightened susceptibility to the impact of

neurotoxicants, including fluoride (e.g., low-income communities). *Lanphear Trial Tr. (ECF No. 417) at 215:20-216:23 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 807:14-812:21 (Feb. 6, 2024).* TSCA commands that these susceptible populations be protected. 15 U.S.C. § 2605(b)(4)(A) & § 2620(b(4). One way to *not* protect these populations is to take the cavalier approach to *human* data from other countries that EPA has taken above.

206.     Thus, Dr. Savitz explained "we don't have studies . . . in settings more similar to the United States that extend in the higher range." Savitz Trial Tr. Vol. VII, 1139:20–23. So not only are the higher-dose studies less relevant to the issue of whether water fluoridation poses an unreasonable risk, they are also of questionable generalizability to the United States context. "You get into this discontinuity where the research on endemic fluoride in various parts of the world – there's a gap between the cohort studies and those other studies in part based on exposure levels but it's also very much based on setting . . . ." *Id.* at 1139:25–1140:4.

**Plaintiffs Rebuttal**: Dr. Savitz has conducted studies in China to understand the health impact of other chemicals, and has recognized the advantages that such studies can have in terms of having stable populations with stable levels of the chemical in their water. *Savitz Trial Tr. (ECF No. 415) at 1241:11-20 (Feb. 12, 2024).* Given his own experience, Dr. Savitz agreed that one "certainly" should "not be dismissive" of Chinese studies "because of the geography." *Id. at 1241:19-20*. Yet, Dr. Savitz did not cite or discuss a single study on fluoride and IQ from China for his assessment in this case—despite the fact that the Chinese studies on fluoride have some of the same strengths that Dr. Savitz recognized in his own studies. *Id. at 1245:16-19 & 1242:13-1243:2*; *see also Grandjean Trial Decl. (ECF No. 198-3) ¶ 69* (discussing the strength of the Chinese studies with stable populations and stable fluoride levels).

207.     Extrapolating the effects of the high-dose fluoride studies to make inferences about the impact of community water fluoridation at 0.7 mg/L thus requires **both** "extrapolation across very, very different settings **and** different exposure ranges." Savitz Trial Tr. Vol. VII, 1168:16–24.

**Plaintiffs Rebuttal**: EPA *routinely* extrapolates from high dose studies in order to make inferences about the risk from low-dose exposures in different settings. *E.g., Barone Trial Tr. (ECF No. 401) at 744:12-17 & 744:24-745:6 & 745:10-17 (Feb. 6, 2024); Trial Ex. 38 at 3* (stating that EPA extrapolates from high-dose studies "in order to make inferences" about the doses that may be harmful in the human population). For example, in the PCE risk evaluation EPA inferred a risk for cashiers and other "ONUs" in the dry cleaning industry who did not personally use PCE based on findings from studies of industrial workers who directly handled PCE and who experienced neurotoxicity at exposure levels that were 89 times greater than the cashiers. *Barone Trial Tr. (ECF No. 400) at 606:1-607:11 (Feb. 5, 2024); Trial Ex. 96 at 530 (stating that the risk for ONUs in the dry cleaning industry is "unreasonable").*

208.    These higher-dose studies are also predominantly cross-sectional in design, limiting the confidence in the inferences that can be drawn from them. Indeed, the NTP's meta-analysis analyzes **51 cross-sectional studies**, and only **4 prospective cohorts** (with the INMA study relegated to a sensitivity analysis only using non-creatinine-adjusted data). *See* Trial Ex. 68 at 48–62, eTable 2 (listing study designs for each study included in meta-analysis).

**Plaintiffs Rebuttal**: According to Dr. Savitz, cross-sectional studies should not be automatically dismissed as irrelevant to causality and that a "more nuanced assessment" of cross-sectional studies is needed. *Savitz Trial Tr. (ECF No. 415) at 1240:23-1241:10 (Feb. 12, 2024).*

209.    The NTP Monograph drafts also conclude there is "low confidence" that fluoride exposure is associated with non-IQ, neurobehavioral and cognitive effects like attention-deficit/hyperactivity disorder ("ADHD"). Trial Ex. 67, at 95; Trial Ex. 69, at 425.

**Plaintiffs' rebuttal**: No dispute. But NTP also stated that the evidence of non-IQ effects provides additional support for the association between fluoride and IQ. To quote: "Although there is heterogeneity in the outcomes assessed and a limited number of directly comparable studies**, the data provide additional evidence (beyond the consistent evidence of an association between fluoride exposure and IQ) of an association between higher fluoride**

**exposure and cognitive or neurodevelopmental effects**." *Trial Ex. 67 at 61; see also Trial Ex. 67 at 63* (stating that 8 of 9 high quality studies on non-IQ effects "reported a significant association between fluoride exposure and a measure of neurodevelopment or cognition other than IQ").

210.    The NTP Monograph drafts also conclude that there is "low confidence" that fluoride exposure is associated with adverse effects on adult cognition. *Id.*

**Plaintiffs' rebuttal**: No dispute.

211.    The purpose of NTP's systematic review was not to determine whether the level of fluoride added to water for fluoridation (0.7 milligrams per liter) poses a risk of neurodevelopmental harm. Grandjean Trial Tr. Vol. III, at 446:11–14 (Feb. 2, 2024).

**Plaintiffs' rebuttal**: No dispute that the purpose of NTP's monograph was to assess the *hazard* of fluoride neurotoxicity, not the *risk* of this hazard under a particular condition of use. As Dr. Berridge explained, NTP conducts hazard assessments with the intention that others, including the EPA, will use the information for risk assessment. *Berridge Trial Tr. (ECF No. 400) at 521:22-522:12 (Feb 5, 2024).*

212.    Plaintiffs' expert epidemiologist Dr. Grandjean agrees that the State of the Science Monograph is a high-quality review. Grandjean Trial Tr. Vol. III, at 443:14–16.

**Plaintiffs' rebuttal**: No dispute.

213.    Dr. Grandjean also agrees with the monograph's conclusion that there is low confidence in the association between fluoride exposure and neurobehavioral effects (e.g., ADHD) in children. Grandjean Trial Tr. Vol. III, at 443:17–24.

**Plaintiffs' rebuttal**: No dispute.

214.    Dr. Grandjean agrees that the studies looking at the association between neurobehavioral effects (e.g., ADHD) in children are methodologically less strong. Grandjean Trial Tr. Vol. III, at 443:25–444:4.

**Plaintiffs' rebuttal**: No dispute. As Dr. Grandjean explained, the non-IQ studies use tests that are not as standardized as IQ tests, which makes them harder to directly compare with each other. *Grandjean Trial Tr. (ECF No. 417) at 322:15-323:8 (Feb. 1, 2024).*

215.    Dr. Grandjean disagrees with the NTP authors' conclusion that studies of fluoride exposure levels typically found in drinking water in the United States are inconclusive. Grandjean Trial Tr. Vol. III, at 447:11–15.

**Plaintiffs' rebuttal**: Dr. Grandjean testified that "I wouldn't have expressed myself that way." *Grandjean Trial Tr. (ECF No. 397) at 447:16-17 (Feb. 2, 2024)*

## ii.    Health Canada Expert Panel Report & Risk Sciences International Systematic Review

216.    In 2010, Health Canada established a guideline of 1.5 mg/L for fluoride in its drinking water. Trial Ex. 128, at 4. The public health agency is in the early stages of reviewing that guideline. To that end, Health Canada engaged six experts to consider the scientific evidence surrounding fluoride's potential association with a variety of different health endpoints—namely dental fluorosis and neurodevelopmental effects. Those six experts were as follows.

**Plaintiffs' rebuttal**: No dispute.

217.    David Bellinger, a distinguished neuroepidemiologist and professor at Harvard University's School of Public Health—Department of Environmental Health. Trial Ex. 128, at 5; Savitz Trial Tr. Vol. VI, at 1003:15–17 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute.

218.    John Fawell, an environmental health expert from the World Health Organization's Expert Committee on the Guidelines for Drinking Water, who holds particular expertise on fluoride. Savitz Trial Tr. Vol. VI, at 1003:18–23 (Feb. 7, 2024); Trial Ex. 128 at 5.

**Plaintiffs' rebuttal**: No dispute, including that Dr. Savitz was unaware if Fawell has a conflict of interest on the fluoridation issue. *Savitz Trial Tr. (ECF No. 414) at 1203:6-9 & 1204:18-22 (Feb. 9, 2024).*

219.    Lynne Haber, a toxicologist from the University of Cincinanati College of Medicine—Department of Environmental and Public Health Sciences. Savitz Trial Tr. Vol. VI, at 1003:24–1004:2 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute.

220.    Steven Levy, a dental epidemiologist from the University of Iowa Departments of Preventative and Community Dentistry, Epidemiology, and College of Public Health, with particular expertise in dental fluorosis. Savitz Trial Tr. Vol. VI, at 1004:3–8; Tr. Ex. 128, at 5.

**Plaintiffs' rebuttal**: No dispute, including that Dr. Savitz was unaware if Levy has a conflict of interest on the fluoridation issue. *Savitz Trial Tr. (ECF No. 414) at 1201:25-1202:4 & 1202:16-20 & 1204:18-22 (Feb. 9, 2024).*

221.    David Savitz, Professor of Epidemiology at the Brown University School of Public Health. Trial Ex. 128, at 5.

**Plaintiffs' rebuttal**: No dispute that this is Dr. Savitz's position at Brown. But Dr. Savitz was also a paid litigation expert for EPA at the time he served on the panel -- a fact which was not disclosed in the expert panel report. *Savitz Trial Tr. (ECF No. 414) at 1201:3-6 & 1201:15-21 (Feb. 9, 2024).*

222.    Rita Schoeny, a consultant in risk assessment and science policy and former U.S. EPA Senior Science Policy Advisor, Office of Science Policy, Office of Research and

Development and Director of the Risk Assessment Forum in EPA's Office of the Science Advisor. Trial Ex. 128, at 5; Savitz Trial Tr. Vol. VI, at 1004:11–21 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute.

223.    The panel was originally tasked with examining a variety of health endpoints—such as dental fluorosis, kidney dysfunction, and thyroid dysfunction. But the panel experts quickly "zeroed in" on two health outcomes: dental fluorosis and neurocognitive development. Savitz Trial Tr. Vol. VI, at 992:1–6.

**Plaintiffs' rebuttal**: No dispute.

224.    The expert panel held meetings on June 8–9 of 2023. Trial Ex. 128, at 4. Representatives from Health Canada, Risk Sciences International, the Public Health Agency of Canada, and the Federal-Provincial-Territorial Committee on Drinking Water all attended these meetings. Trial Ex. 128 at 5.

**Plaintiffs' rebuttal**: No dispute.

225.    Health Canada also contracted Risk Sciences International, a consulting firm, to conduct a systematic review of the fluoride literature—again, examining multiple different health endpoints. *See* Trial Ex. 132. This systematic review was provided to the Expert Panel as "discussion material for the meeting." Trial Ex. 128, at 5.

**Plaintiffs' rebuttal**: No dispute, including that Dr. Savitz did not read RSI's assessment of neurocognitive outcomes as part of his work for the expert panel. *Savitz Trial Tr. (ECF No. 414) at 1055:7-17 (Feb. 9, 2024).*

226.    Ultimately, the Expert Panel concluded that "[b]ased on several considerations, the panel agreed there is not a sufficient basis at this time to recommend a specific point of departure and health-based value for neurocognitive effects." Trial Ex. 128, at 9. While the Expert Panel acknowledged that the fluoride and neurodevelopmental literature should be

1   monitored, they found "questions remain" about whether the weight of the evidence supports an

2   adverse association of fluoride exposure at community exposure levels. Trial Ex. 128, at 9.

3        **Plaintiffs' rebuttal**: The RSI did not merely recommend that the neurodevelopmental

4   literature be "monitored." The RSI recommended that an uncertainty factor be applied to the dental

5   fluorosis Point of Departure "to allow for protection against potential cognitive effects in children

6   at levels below the POD of 1.56 mg fluoride/L." *Trial Ex. 129 at 129.028*. The RSI thus

7   characterized the dental fluorosis POD as the "starting point" for the risk characterization, with the

8   express understanding that an uncertainty factor can be applied to protect against the

9   neurocognitive hazard. *Id.*

10

11        227.    The Expert Panel further concluded that "The point of departure for

12   neurocognitive effects (i.e., IQ reduction) is not yet well defined because of uncertainties,

13   including the shape of the exposure-response curve at low concentrations of fluoride in drinking

14   water." Trial Ex. 128, at 11.

15        **Plaintiffs' rebuttal**: The range of PODs that RSI calculated for fluoride neurotoxicity

16   Is 0.179 mg/L to 1.5 mg/L. *Trial Ex. 129 at 129.025.* Whatever end of this range is selected,

17   fluoridation will present a risk of neurotoxicity under EPA's margin of exposure method.

18   *Thiessen Trial Tr. (ECF No. 401) at 805:3-806:13 (Feb. 6, 2024).* Thus, the uncertainty that RSI

19   identified as to the specific POD to use within this range is ultimately *inconsequential* to the risk

20   determination in this case. The critical, *consequential* fact is that RSI expressed little uncertainty

21   about the hazard of fluoride neurotoxicity above 1.5 mg/L in water. *See Trial Ex. 129 at 129.022*

22   ("The available evidence demonstrated a **moderate to strong magnitude (strength) of**

23   **association** between fluoride and neurocognitive effects with **consistent** evidence across studies

24   for the impact of childhood IQ at fluoride exposures relevant to current North American drinking

25   water levels." (emphasis in original)); *Trial Ex. 129 at 129.010* (defining the relevant level as

26   "approximately 2 ppm fluoride in drinking water").

27

28

228.   Ultimately, "moderate dental fluorosis was selected as the key endpoint of concern." Trial Ex. 128, at 11.

**<u>Plaintiffs' rebuttal</u>**: The RSI described the fluorosis POD as the "starting point" and recommended that consideration be given to adding an uncertainty factor "[t]o allow for protection against potential cognitive effects in children at levels below the POD of 1.56 mg fluoride/L." *Trial Ex. 129 at 129.028*.

229.   The Risk Sciences International systematic review has since been published in a journal. Trial Ex. 129. The review analyzed dozens of different health endpoints (e.g., kidney dysfunction, thyroid dysfunction, skeletal fluorosis, etc.). *See* Trial Ex. 129, at 4.

**<u>Plaintiffs' rebuttal</u>**: No dispute.

230.   The systematic review concluded: "The current review identified moderate dental fluorosis and reduction in IQ scores in children as the most relevant endpoints for establishing an HBV for fluoride in drinking water. PODs were derived for these two endpoints, although there is still some uncertainty in the causal weight of evidence for causality for reducing IQ scores in children and considerable uncertainty in the derivation of its POD. Given our evaluation of the overall weight of evidence, moderate dental fluorosis is suggested as the key endpoint until more evidence is accumulated on possible reduction of IQ scores effects." Trial Ex. 129, at 2. They further concluded that there are "[u]ncertainties in the shape of the dose-response curve at low levels of exposure to fluoride" and "the risk of possible effect on reducing IQ scores across relevant exposure ranges remains uncertain." Trial Ex. 129, at 27.

**<u>Plaintiffs' rebuttal</u>**: No dispute that RSI derived PODs for *both* dental fluorosis *and* IQ reduction. No dispute that RSI identified uncertainty as to which POD to use for IQ reduction within the range of 0.179 and 1.5 mg/L in water. *Trial Ex. 129 at 129.025.* No dispute that RSI selected dental fluorosis as the "starting point" from which to derive the safe level, with a recommendation to add an uncertainty factor to protect against the potential for IQ reduction. *Trial Ex. 129 at 129.028.*

231.    Thus, while the Risk Sciences International systematic review was just one of the materials provided to the Expert Panel, the Expert Panel's topline conclusion—that there is insufficient information to conduct a risk assessment for fluoride's neurocognitive impacts—is consistent with the findings of the systematic review.

**Plaintiffs' rebuttal**: RSI did not conclude there is insufficient information to assess the risk of fluoride's neurocognitive impacts. To the contrary, RSI conducted a Bradford Hill analysis of the available evidence and concluded there is strong evidence associating fluoride with IQ loss at 2 mg/L in water. *Trial Ex. 129 at 129.022*. Further, RSI derived Points of Departure for IQ loss, ranging from 0.179 to 1.5 mg/L. *Trial Ex. 129 at 129.025*. Finally, while RSI selected dental fluorosis as the "starting point" for the risk characterization, it recommended adding an uncertainty factor to protect against the IQ hazard. *Trial Ex. 129 at 129.028*.

### iii.    Dr. Savitz's Overall Assessment of the Literature

232.    Dr. David Savitz is Professor of Epidemiology at Brown University. He's also a Professor of Pediatrics, Obstetrics and Gynecology at the Brown University Medical School. Savitz Tr. Vol IV, at 977:2-979:15. His research focuses on two themes, environmental exposures and reproductive outcomes. *Id.* at 979:16–983:24.

**Plaintiffs' rebuttal**: No dispute.

233.    Dr. Savitz was elected to the prestigious National Academies of Sciences, Engineering, and Medicine or NASEM. Savitz Tr. Vol IV, at 983:25–984:20. He has served on dozens of NASEM committees where his charge was to investigate whether the epidemiological literature surrounding a chemical supported the inference that that chemical was harmful. *Id.* at 984:21–985:19. He chaired over a dozen of those kinds of committees, including the NASEM committee that twice reviewed the NTP monograph on fluoride and neurodevelopment. *Id.* at 985:20–989:20.

**Plaintiffs' rebuttal**: No dispute.

234.   Plaintiffs do not dispute that Dr. Savitz is a "very accomplished epidemiologist." *Id.* at 52:14–16; *see also id.* at 1179:10–14.

**Plaintiffs' rebuttal**: No dispute.

235.   In Dr. Savitz's opinion, the fluoride epidemiological literature does not support there being an adverse association between water fluoride exposure at 0.7 mg/L and neurodevelopment. Savitz Trial Tr. Vol. IV, at 1021:3–10 (Feb. 7, 2024). To come to that opinion, Dr. Savitz focused on what he viewed as the most informative studies in the relevant range of interest, i.e., under 1.5 mg/L. *Id.* at 1021:3–20.

**Plaintiffs' rebuttal**: Dr. Savitz testified at his deposition that he performed a "general causation" analysis of low-dose fluoride. *Savitz Trial Tr. (ECF No. 414) at 1192:13-16 (Feb. 9, 2024).* Further, although Dr. Savitz claims to have focused on studies below 1.5 mg/L, he did not read or consider high-quality studies from China that looked at fluoride levels in this range. *Savitz Trial Tr. (ECF No. 415) at 1245:16-19 & 1310:3-1313:5 (Feb. 12, 2024).* Further, when forming his opinions regarding <1.5 mg/L fluoride, Dr. Savitz was unaware that NTP had performed a dose-response analysis of studies below 1.5 mg/L. *Savitz Trial Tr. (ECF No. 414) at 1193:18-1194:5 (Feb. 9, 2024).* Dr. Savitz was also unaware that the Bashash (2017) and Green (2019) studies had performed non-linear dose-response modeling analyses, and had "assumed" they had only done linear modeling. *Compare id. at 1194:24-1195:8 with Hu Trial Decl. (ECF No. 198-1) ¶ 22* (discussing non-linear analyses in Bashash)*; Lanphear Trial Decl. (ECF No. 198-2) ¶ 43* (discussing non-linear analyses in Green).

236.   Dr. Savitz was "strictly focused on the methodology" when determining which studies are owed the most weight and are therefore the most informative. Savitz Trial Tr. Vol. IV, at 1022:17–20 (Feb. 7, 2024). In principle, Dr. Savitz doesn't "need to even see the introduction to the paper or the discussion, [he] need[s] to see the methods. And once [he's] examined the methods and made an assessment of the informativeness of the study, then [he] can

1  look at the results and see how those relate to one another." *Id.* at 1022:20–25. The quality of a

2  study "is not based on the results. The quality is driven by the methods." *Id.* at 1023:1–10.

3  **Plaintiffs' rebuttal**: Although Dr. Savitz was strictly focused on methodology, and

4  although he focused his analysis on a small number of studies (for which he was paid over

5  $127,500), he did not appear to know that the Green (2019) study examined the association

6  between water fluoride level and IQ. *Savitz Trial Tr. (ECF No. 414) at 1198:23-1199:8 &*

7  *1210:24-1211:3 (Feb. 9, 2024).* He also did not know that the INMA study has detailed data on

8  fluoride ingestion from tap water. *Compare Savitz Trial Tr. (ECF No. 415) at 1268:17-1269:2*

9  *(Feb. 12, 2024) with Ibarluzea Designations (ECF No. 404) at8:4-9:5 (62:25-68:15).* Further, at

10  no point in Dr. Savitz's assessment did he identify the dramatic IQ increases in the INMA study

11  as something that needed to be scrutinized further for potential error. *Savitz Trial Tr. (ECF No.*

12  *415) at 1261:23-1262:12 (Feb. 12, 2024)*

13

14  237.    Dr. Savitz did not require "proof of causation" in his analysis. Savitz Trial Tr.

15  Vol. VIII, 1300:1–10. Rather, he analyzed where the fluoride neurodevelopmental literature falls

16  on the spectrum of association. *Id.* at 1300:11–1301:13.

17  **Plaintiffs' rebuttal**: Dr. Savitz testified differently at his deposition, explaining that his

18  "role and scope" was to perform a "general causation" analysis. *Savitz Trial Tr. (ECF No. 414)*

19  *at 1192:13-16 (Feb. 9, 2024).* Further, Dr. Savitz limited his causation analysis to just "the lower

20  [fluoride] levels." *Id.* Dr. Savitz understands that "general causation" means "whether a given

21  agent is generally capable of causing a particular form of harm." *Id. at 1191:3-17.*

22

23  238.    Based on that approach, Dr. Savitz focused on the four prospective cohorts:

24  ELEMENT, MIREC, INMA, and OCC.

25  **Plaintiffs' rebuttal**: No dispute that these are the four cohorts that Dr. Savitz focused on,

26  but these are not the only cohort studies on fluoride and cognitive effects. The study by Cantoral

27  (2021) is a "high quality" prospective study of the PROGRESS cohort. *Savitz Trial Tr. (ECF No.*

28  *414) at 1213:18-1214:9  (Feb. 9, 2024); Trial Ex. 110.* Also, although Dr. Savitz included the

MIREC cohort, he ignored the MIREC team's findings on infant exposures (Till 2020), which the NTP treated as a separate and distinct prospective study from Green (2019). *Savitz Trial Tr. (ECF No. 414) at 1212:11-1213:15 (Feb. 9, 2024); Trial Ex. 67 at 40.*

239.    These four prospective cohorts had remarkably similar methods, which make them ripe for comparison. Savitz Trial Tr. Vol. VI, at 1023:1–3 (Feb. 7, 2024) ("In this case the methods are unusually similar. Usually we're comparing apples and oranges. Well, these are apples and apples."). NASEM recommended to NTP to focus on comparing like-to-like studies. *Id.* at 1024:16–20; Tr. Ex. 653, at 53–54.

**Plaintiffs' rebuttal**: No dispute that ELEMENT, INMA, MIREC, and OCC cohorts used similar methods with respect to the analysis of maternal *urinary* fluoride levels.[7] However, the cohorts are of different populations that have factors which can influence the ability to observe the association between fluoride and IQ, including **low exposure contrasts in the OCC cohort**, *Grandjean Trial Tr. (ECF No. 417) at 337:14-339:8 (Feb. 1, 2024),* and **high seafood consumption in the INMA cohort**. *Hu Trial Tr. (ECF No. 395) at 101:6-18 & 110:8-111:3 (Jan. 31, 2024); Ibarluzea Designations (ECF No. 404) at 29:15-30:24 (217:24+).* Moreover, something "peculiar" happened with the creatinine adjustment in the INMA cohort which **"calls into question . . . whether the model has blown up."** *Savitz Trial Tr. (ECF No. 415) at 1266:25-1267:4 & 1268:4-8 (Feb 12, 2024).*

240.    The four prospective cohorts are the most informative studies for several reasons. First, they all cover exposure ranges relevant to the issue of water fluoridation—close to 0.7 mg/L. Savitz Trial Tr. Vol. VI, at 1024:1–6 (Feb. 7, 2024). As. Dr. Savitz, explained, "when the interest or the question is focused on . . . judgments about the potential health issues around the

---

[7]    The MIREC study also analyzed the impact of water fluoride levels, as well as the impact of fluoride intake (both prenatal and postnatal). *Lanphear Trial Tr. (ECF No. 417) at 207:2-25 & 214:1-10 (Feb. 1, 2024).* By contrast, the INMA study had detailed fluoride intake data from water but did not analyze its association with IQ. *Ibarluzea Designations (ECF No. 404) at 8:4-9:5 (62:25-68:15).*

range of water fluoridation, . . . the most directly relevant information comes from studies in that range." Savitz Trial Tr. Vol. VII, at 1154:11–14. Trying to understand the potential adverse impacts of water fluoridation by using studies well-above 0.7 mg/L inherently requires extrapolation, which can be imprecise and mischaracterize the shape of the dose-response curve. *See id.* at 1154:15–22. Second, the four prospective cohorts are all high-quality. All the cohorts are from long-standing, high-quality epidemiological projects which have the benefit of blinded assessments, standardized IQ measurements, and control for available confounders. Savitz Trial Tr. Vol. VI, at 1024:7–12; Savitz Trial Tr. Vol. VII, at 1136:15–21 ("I would call them, for the purposes of this, very low-risk-of-bias").

**Plaintiffs' rebuttal**: The weight to be given to Dr. Savitz's assessment of what is "most informative" to the hazard assessment of fluoride should consider that Dr. Savitz: (1) does not know how EPA defines hazard (*Savitz Trial Tr. (ECF No. 414) at 1188:20-24 (Feb. 9, 2024)*); (2) does not know what constitutes sufficient evidence of neurotoxicity for an EPA hazard identification (*id. at 1188:4-8*); (3) does not know how EPA defines risk (*id. at 1188:25-1189:3*); (4) has not read any of EPA's risk evaluations under TSCA (*id. at 1189:4-6*); (5) limited his fluoride assessment to low-dose studies (*id. at 1185:2-18 & 1193:14-17*), which is contrary to EPA's approach to hazard assessment (*Barone Trial Tr. (ECF No. 397) at 490:22-491:10 (Feb. 2, 2024)*); and (6) did not read any of the high-quality studies from China that looked at fluoride levels below 1.5 mg/L (*Savitz Trial Tr. (ECF No. 415) at 1245:16-19 & 1310:3-1313:5 (Feb. 12, 2024)*).

Had Dr. Savitz read EPA's risk evaluations he would have seen that EPA routinely extrapolates from high-dose studies to infer risk at the exposure levels under the condition of use, and that there is no need to show an association (causal or otherwise) with the hazard under the condition of use. *Barone Trial Tr. (ECF No. 400) at 571:19-23 & 606:1-607:11 (Feb. 5, 2024); Barone Trial Tr. (ECF No. 401) at 744:12-745:17 (Feb. 6, 2024); Trial Ex. 38 at 3* (stating that EPA "extrapolates" from high-dose studies "in order to make inferences" about the doses that may be harmful in the human population).

241.     Despite their similar methods, the four prospective cohorts have divergent results. The ELEMENT study is "clearly positive," but MIREC "is mixed." INMA is "flatly negative" to the question of whether fluoride is harmful. Finally, the Danish OCC is "indicating there's not an association." Savitz Trial Tr. Vol. VI, at 1025:13–1026:1.

**Plaintiffs' rebuttal**: The NTP determined that the ELEMENT and MIREC studies are "consistent" with eacher in showing reduced IQ with most of the fluoride measures that were examined. *Trial Ex. 67 at 40*. The INMA study, on the other hand, is not "flatly *negative*," but rather shows *dramatically positive* associations between (creatinine-adjusted) urinary fluoride and increased IQ in boys with effect sizes that are greater than any other chemical or substance. *Grandjean Trial Tr. (ECF No. 397) at 372:14-24 (Feb. 2, 2024).*

242.     According to Dr. Savitz, looking across the four high-quality, prospective cohort studies, "I just don't see the – a degree of consistency to say we're – an association has been established, which is the starting point. Whether it's Bradford Hill criteria or other uses you start with an established association. I don't see the association here." Savitz Trial Tr. Vol. VI, at 1026:1–10 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute that this is *Dr. Savitz's* opinion. However, *EPA* does *not* require evidence of an association under the condition of use. *Barone Trial Tr. (ECF No. 400) at 573:15-22 & 606:1-607:11 (Feb. 5, 2024); Barone Trial Tr. (ECF No. 401) at 744:24-745:6 (Feb. 6, 2024).* The requirement of an association is for the hazard data as a whole. *Barone Trial Tr. (ECF No. 397) at 491:22-492:3 & 494:17-495:8 (Feb. 2, 2024).*

243.     In Dr. Savitz's view, more weight should be put on the boys-and-girls combined results than the results stratified by boys and girls. The sex-combined results are the aggregate results for the population and the largest sample. Savitz Trial Tr. Vol. VI, at 1026:14–17 (Feb. 7, 2024). While Dr. Savitz is not opposed to exploring other permutations of the data, whether that be by sex or other factors, "it's important not to lose sight of the primary summary result," which is the aggregate results of boys and girls together. *Id.* at 1026:22–23.

**Plaintiffs' rebuttal**: No dispute that this is Dr. Savitz's opinion. Despite holding this opinion, Dr. Savitz never addressed the combined results of the MIREC study's analyses of water fluoride level and water fluoride intake, both of which found significant associations with boys and girls. *Savitz Trial Tr. (ECF No. 414) at 1209:15-1210:19 (Feb. 9, 2024).*

244.    Biologically, there is not an established reason to expect prenatal exposure would result in different *neuro*developmental outcomes by sex. Savitz Trial Tr. Vol. VI, at 1028:4–8 (Feb. 7, 2024). Stratifying by sex is "not something that is routinely done or established for cognitive development [or] for neurodevelopment." *Id.* at 1028:15–16.

**Plaintiffs' rebuttal**: Dr. Savitz's opinion on the *biological* basis for sex-specific effects in neurodevelopmental effects is not informed by *any* toxicological research, including the toxicology research which has indicated that *male* animals are more vulnerable to the in utero effects *of fluoride* than female animals. *Savitz Trial Tr. (ECF No. 415) at 1252:25-1253:4 & 1255:3-17 & 1257:1-1258:8 (Feb. 12, 2024) ("I can't speak to the toxicology").* Dr. Savitz admitted he has "no reason" to doubt the conclusions of neurotoxicologists and geneticists that sex mediates the neurotoxic effects of chemicals. *Id. at 1253:10-18*. According to Dr. Barone, "there are sex-specific differences in the way the brain in male animals develops from the way the brain in female animals develop." *Barone Trial Tr. (ECF No. 418) at 1450:21-1451:3 (Feb. 13, 2024).* Unlike Dr. Savitz, Dr. Barone is an expert in *developmental neurotoxicology* (i.e., a type of expertise that permits competent opinions on the sex-specific effects of neurotoxicants). *Barone Trial Tr. (ECF No. 415) at 1316:25-1317:13 (Feb. 12, 2024).* Lastly, contrary to Dr. Savitz's suggestion that sex-specific neurodevelopmental effects are uncommon, EPA's expert from the first trial (Joyce Tsuji) agreed that "sex-specific effects are often identified in the literature" for arsenic, lead and other neurotoxicants. *Tsuji Trial Tr. (ECF No. 243) at 768:7-14 (June 15, 2020).*

245.    The four prospective cohorts do not provide consistent support for there being sex-specific effects. While MIREC found only an adverse effect in boys, and there's some

1   indication of sex-specific effects in INMA, there's no sign of such effect in the OCC or

2   ELEMENT. Savitz Trial Tr. Vol. VI, at 1028:13–14 (Feb. 7, 2024); *see also id.* at 1030:24–21

3   (Dr. Savitz explaining that the small differences in results for boys and girls in the OCC study is

4   "effectively the same with just a little bit of noise injected").

5     **Plaintiffs' rebuttal**: No dispute that there is not a consistent sex-specific effect across

6   these four cohorts.

7

8     246. Early in Dr. Savitz's career, he conducted a study that found an association

9   between electromagnetic fields from powerlines and childhood cancer. Savitz Trial Tr. Vol. VI,

10  1034:3–4. A second study came out soon after that also indicated an adverse effect. *Id.* 1034:4–6.

11  A great deal of research interest ensued, and several large, high-quality studies were conducted.

12  *Id.* at 1034:6–9. "And the better the studies got, the more null they were." *Id.* at 1034:9–10.

13    **Plaintiffs' rebuttal**: No dispute, but irrelevant to the literature on fluoride and IQ.

14

15    247. While the research is still maturing, a similar pattern has currently emerged with

16  the four prospective cohorts. ELEMENT found strong support for an adverse association,

17  MIREC found weaker support for an adverse association, and INMA and OCC found no support

18  for an association at all. Savitz Trial Tr. Vol. VI, at 1032:25–1033:6 (Feb. 7, 2024) ("Think

19  about when you went from, you know, the timeline, ELEMENT to ELEMENT plus MIREC.").

20  "[W]hen the volume is small, each study has a – has this outsized impact." *Id.* at 1032:23–24.

21    **Plaintiffs' rebuttal**: No dispute that this is Dr. Savitz's opinion. What Dr. Savitz does

22  not appreciate, however, is that EPA has relied on much smaller bodies of research for its risk

23  evaluations under TSCA. For example, in its risk evaluation of NMP, EPA relied on one two-

24  generation animal study as the principal study for the chronic effect (infertility), despite the fact

25  that two subsequent two-generation studies failed to find any significant effect on fertility at any

26  dose. *Trial Ex. 103 at 238* ("Other two-generation studies in rats did not replicate effects on

27  reduced fertility.") *& 268* ("Two of the subsequent studies that evaluated fertility in two-generation

28  reproductive studies . . . found no significant effect on fertility at any dose tested.")

248.     Dr. Savitz also analyzed studies of different designs, with a particular focus on studies that have come out since the NTP monograph's April 2021 literature cut-off date. These studies include Dewey (2023), Do (2023), and Cantoral (2021). As explained above, each of these studies provides additional evidence against low-dose fluoride exposures presenting an unreasonable risk of neurodevelopmental harm. As also described above, Dr. Savitz noted that the studies above 1.5 mg/L, and in particular in the 4.0 mg/L to 2.0 mg/L range, are in settings far different than the United States and are thus of questionable generalizability to the United States.

**Plaintiffs' rebuttal**: Dr. Savitz's consideration of different study designs was very limited. In contrast to Dr. Grandjean, Dr. Savitz did not consider (1) studies of toxicokinetics, including placental-transfer; (2) studies of fluoride-exposed animals; (3) studies of occupationally-exposed workers; (4) cross-sectional studies of fluoride and IQ in China; and (5) the National Research Council's 2006 authoritative review of fluoride toxicology. *Compare Grandjean Trial Tr. (ECF No. 417) at 290:5-292:1 & 292:9-13 & 293:19-294:21 & 297:14-298:9 (Feb. 1, 2024) with Savitz Trial Tr. (ECF No. 414) at 1182:18-1184:21 (Feb. 9, 2024) and Savitz Trial Tr. (ECF No. 415) at 1245:16-19 (Feb. 9, 2024).*

249.     Thus, Dr. Savitz concluded that the fluoride neurotoxicity literature "remains quite fragile." And "by fragile," Dr. Savitz means that he "do[es] not believe that an association, certainly within that range [of water fluoridation] has been established with – with much confidence at all." Savitz Trial Tr. Vol. VIII, at 1301:17–22.

**Plaintiffs' rebuttal**: No dispute that this is *Dr. Savitz's* opinion based on his *causal* analysis of the <1.5 mg/L studies. *Savitz Trial Tr. (ECF No. 414) at 1192:13-16 (Feb. 9, 2024).*

250.     Though Dr. Savitz took a different approach to assessing the literature than the approach taken by NTP and the RSI systematic review, they all reached the same conclusion: that the effect of low-level fluoride exposures, including water fluoridation at 0.7 mg/L, on children's IQ remains unclear. Savitz Trial Tr. Vol. VII, at 1138:7–1139:6 ("When you can

follow a different path and you get to the same endpoint, it may be more meaningful than if we had both done systematic reviews and gotten to the same endpoint . . . however you start out and whichever way you make your way, you kind of end up at the same place. I would say the same thing about the Risk Sciences International systematic review.").

**Plaintiffs' rebuttal**: No dispute that NTP and RSI both agreed that the evidence *above* 1.5 mg/L *consistently* shows an association between fluoride and reduced IQ, and that both organizations had lesser confidence in the *hazard* occurring below 1.5 mg/L. *See Trial Ex. 129 at 129.022* ("The available evidence demonstrated a **moderate to strong magnitude (strength) of association** between fluoride and neurocognitive effects with **consistent** evidence across studies for the impact of childhood IQ at fluoride exposures relevant to current North American drinking water levels." (emphasis in original)); *Trial Ex. 129 at 129.010* (defining the relevant level as "approximately 2 ppm fluoride in drinking water"); *Trial Ex. 67 at xiii* ("This review finds, with moderate confidence, that higher fluoride exposure (e.g., represented by populations whose total fluoride exposure approximates or exceeds the World Health Organization Guidelines for Drinking-water Quality of 1.5 mg/L of fluoride**) is consistently associated with lower IQ in children**." (emphasis added)).

### c.   Review of Experimental Animal and Mechanistic Evidence

251.    The "bodies of [experimental animal and mechanistic] evidence do not provide clarity on the association between fluoride exposure and noncognitive or neurodevelopmental human health effects," as the NTP authors of the draft State of the Science Monograph concluded. Trial Ex. 67, at xii; Thiessen Trial Tr. Vol. VI, at 897:14–23 (Feb. 7, 2024). The NTP authors were not able to draw any conclusions about the mechanisms by which fluoride causes IQ loss. Thiessen Trial Tr. Vol. VI, 899:2–4 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute that this is NTP's assessment.

.

252.     The NTP Monograph drafts conclude that the "[h]uman mechanistic studies were too heterogeneous and limited in number to make any determination on biological plausibility." Trial Ex. 67, at 95; Trial Ex. 69, at 425.

**Plaintiffs' rebuttal**: No dispute, but it bears considering that the Goodman (2022b) and Hall (2023) studies were not yet available when NTP made this determination.

253.     NTP researchers conducted a battery of experimental animal tests in a study referred to as McPherson (2018). Thiessen Trial Tr. Vol. VI, at 899:19–23 (Feb. 7, 2024). The study did not observe any histological changes in the hippocampus of the exposed rats or associations between fluoride exposure and impairments to learning and memory. Trial Ex. 67, at F-5; Thiessen Trial Tr. Vol. VI, at 901:7–15, 902:6–13 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute.

254.     Dr. Barone considers McPherson (2018) to be the most comprehensive study of fluoride's cognitive learning, memory, and behavioral effects in animals. Barone Trial Tr. Vol. VIII, at 1330:7–21. As Dr. Barone explained, the no effect finding of that study further underscores the lack of evidence regarding the association between fluoride exposure and child IQ. *Id.*; *see also* Chang Decl. ¶¶ 132-147, ECF No. 200.

**Plaintiffs' rebuttal**: No dispute that this is Dr. Barone's opinion. Dr. Barone has also opined, however, that rodent studies have limited power to detect the developmental neurotoxicity of fluoride. *Barone Trial Tr. (ECF No. 418) at 1448:24-1449:12 & 1450:3-9 (Feb. 13, 2024)*. Dr. Barone has explained that the third trimester of brain development for humans occurs largely during the first few weeks of infancy for rodents, a time period when rodents are breastfed and thus have minimal exposure to fluoride. *Id.*; *see also Thiessen Trial Tr. (ECF No. 402) at 959:18-960:3 (Feb. 7, 2024).* Further, in contrast to most other developmental studies of fluoride, the McPherson study limited *first* trimester exposure by not starting the dosing until the 6th day of gestation. *Thiessen Trial Tr. (ECF No. 402) at 960:4-6 (Feb 7, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶ 81.*

255.    The NTP Monograph drafts also conclude that "[e]xisting animal studies provide little insight into the question of whether fluoride exposure affects IQ." Trial Ex. 67, at 95; Trial Ex. 69, at 425.

**Plaintiffs' rebuttal**: No dispute. As Dr. Grandjean has noted, "you can't measure IQ in a rat." *Grandjean Trial Tr. (ECF No. 397) at 444:23 (Feb. 2, 2024)*.

### d.  Recent Mechanistic Studies

256.    Knowing the mechanism by which a substance causes a neurotoxic effect both enhances plausibility and confidence that there is a real effect. Lanphear Trial Tr. Vol. II, at 224:11–25 (Feb. 1, 2024).

**Plaintiffs' rebuttal**: No dispute. It is rare, however, to know the mechanism by which chemicals cause non-cancer effects. *Barone Trial Tr. (ECF No. 400) at 631:19-22 (Feb. 13, 2024)*. The National Academies of Science has stated that "mechanistic frameworks today could probably be completed for only a few chemicals." *Thiessen Trial Decl. (ECF No. 202-1) ¶ 95.* Even for the most well established neurotoxicants, like lead and methyl mercury, the mechanism of neurotoxicity has not yet been defined. *Barone Trial Tr. (ECF No. 400) at 632:1-7 (Feb. 13, 2024)*. Thus, while knowledge of the mechanism strengthens the evidence, the absence of a mechanism does not prevent a hazard determination. *Id. at 632:8-13*.

257.    The leading possible explanation for how fluoride might be a neurotoxicant is via disruption of the thyroid in a pregnant woman. Lanphear Trial Tr. Vol. II, at 277:22–278:2; Trial Ex. 116, at 116.01 ("In 2006, the National Research Council (NRC) classified fluoride as an endocrine disruptor and recommended more research to understand fluoride's effects on the thyroid gland . . . .").

**Plaintiffs' rebuttal**: Dr. Lanphear testified that thyroid disruption is "one" of the mechanisms by which fluoride may reduce IQ; he did not testify that it was the "leading" explanation. *Lanphear Trial Tr. (ECF No. 417) at 277:22-278:2 (Feb. 1, 2024)*.

258.    However, studies have produced little evidence supporting this claim. Lanphear Trial Tr. Vol. II, at 270:7–10, 272:23–273:3.

**Plaintiffs' rebuttal**: The National Research Council concluded that the evidence is sufficient to conclude that fluoride disrupts the thyroid gland. *Thiessen Trial Tr. (ECF No. 401) at 755:10-22 (Feb 6, 2024).* Subsequent to the NRC's review, a prospective cohort study (Goodman 2022b), as well as several cross-sectional studies (e.g., Hall 2023) have been published showing an association between fluoride and thyroid disruption in fluoridated areas. *Trial Ex. 116; Trial Ex. 120 at 120.002* (describing the findings of other studies). This is more affirmative human data on a *single mechanism* of fluoride neurotoxicity than EPA has had *in toto* for the critical effects of chemicals for which it has found unreasonable risk. *Barone Trial Tr. (ECF No. 400) at 595:15-596:11 (Feb. 5, 2024)* (admitting EPA only had one epidemiological study finding an association between HBCD and the critical effect [thyroid alterations] and it was not statistically significant); *Trial Ex. 97 at 344-45* (same); *Barone Trial Tr. (ECF No. 400) at 596:15-597:4 (Feb. 5, 2024)* (admitting EPA did not have any epidemiological studies on 1,4-dioxane and the critical effect of liver toxicity); *Trial Ex. 103 at 235* (identifying only one human study relevant to NMP's critical effect [developmental toxicity], and describing it as a "case report" of a pregnant mother who experienced "malaise, headache, nausea and vomiting" after being exposed to "unknown" levels of NMP).

### i.    Hall (2023)

259.    For example, in Hall (2023), Dr. Lanphear and his team found no significant association between maternal urinary fluoride levels or daily fluoride intake and maternal hypothyroidism in the MIREC cohort. Lanphear Trial Tr. Vol. II, at 264:16–265:21.

**Plaintiffs' rebuttal**: No dispute that maternal urinary fluoride and daily fluoride intake were not significantly associated with hypothyroidism in the main model. *Trial Ex. 120 at Table 2*. However, daily fluoride intake *was* significantly associated with hypothyroidism among women who did not have the thyroid peroxidase antibody. *Trial Ex. 120 at 120.006* ("[F]luoride intake was significantly associated with risk of primary hypothyroidism among women with

normal TPOAb levels (aOR: 1.75; 95% CI: 1.27, 2.41"); *Lanphear Trial Tr. (ECF No. 417) at 236:18-237:16 (Feb. 1, 2024)* (explaining how the antibody is a major risk factor for hypothyroidism which likely makes it harder to detect an association between fluoride and hypothyroidism among women who have the antibody).

260.    While Dr. Lanphear found a significant association between fluoride concentration in public drinking water and maternal hypothyroidism, this finding provides little support for the claim that fluoride is a thyroid disruptor.

**Plaintiffs' rebuttal**: This assertion is unsupported by any expert testimony in this case.

261.    This is because maternal urinary fluoride measurements provide a more accurate picture of fluoride exposure than concentrations of fluoride in community-level drinking water because the former integrates exposure from all sources. Hu Trial Tr. Vol. I, at 131:21–132:1 (Jan. 31, 2024).

**Plaintiffs' rebuttal**: Dr. Hu's testimony about the value of maternal urinary fluoride was in the context of "examining the association between prenatal fluoride exposure and IQ." *Hu Trial Tr. (ECF No. 395) at 130:25-131:3 (Jan. 31, 2024)*. Dr. Hu was not asked about the relative strength of maternal urinary fluoride for examining the association with a chronic health effect in the mother that *predates* the pregnancy, such as hypothyroidism. Dr. Lanphear, however, was asked this question and he explained that "water fluoride is going to be more of a chronic measure of exposure" than the urinary fluoride levels during pregnancy. *Lanphear Trial Tr. (ECF No. 417) at 233:1-234:8 (Feb. 1, 2024).* As explained in Hall (2023), "thyroid disorders tend to develop over time. Thus, it is reasonable that our more stable measure of fluoride exposure (i.e., water fluoride concentration) would be more strongly associated with risk of primary hypothyroidism than maternal urinary fluoride. . . . [O]ur findings make sense temporally in that we would not expect an exposure variable measured in pregnancy to predict risk of a health condition diagnosed before pregnancy." *Trial Ex. 120 at 120.008.*

262.    In addition, the finding in Hall (2023) that water fluoride concentration is associated with hypothyroidism is based on a flawed methodology.

**Plaintiffs' rebuttal**: This assertion is unsupported by any expert testimony in this case.

263.    Nearly 75% (79 out of 107) of the women classified as hypothyroid in the study were placed in that category based on a diagnosis that took place prior to their pregnancy and enrollment in the study. Lanphear Trial Tr. Vol. II, at 268:4–23. However, the study only measured the women's exposure to fluoride in drinking water *during* pregnancy. *Id.* at 262:6–263:2, 267:12–19. It did not have any pre-pregnancy measurements of fluoride exposure. *Id.* at 267:20–268:3.

**Plaintiffs' rebuttal**: No dispute. However, as explained in Hall, "[f]luoride concentrations in municipal water supplies are relatively constant and therefore are more likely to be indicative of chronic fluoride exposure." *Trial Ex. 120 at 120.008.*

264.    Further, even though 62% of the Canadian population lives in non-fluoridated communities, Lanphear Trial Tr. Vol. II, at 280:8–18, the study did not control for the likelihood that some of the women in the cohort may have lived in a place where the water fluoride concentration differed from their place of residence during their pregnancy, *id.* at 268:24–269:9, 280:19–281:6. The study also did not control for the likelihood that some of the women may have been diagnosed with hypothyroidism long before, even years before, they became pregnant. *Id.* at 269:10–20.

**Plaintiffs' rebuttal**: No dispute, but as Dr. Lanphear explained this limitation in the exposure measurement would result in "non-differential" error, which is a type of error that applies equally to the exposed and non-exposure group. *Lanphear Trial Tr. (ECF No. 417) at 280:19- 281:22(Feb. 1, 2024).* Non-differential error adds "noise" to the analysis, thus diminishing the ability to find an association between an exposure and an outcome (i.e., biases the results towards the null). *Lanphear Trial Tr. (ECF No. 417) at 281:8-282:3 (Feb. 1, 2024);*

*Hu Trial Tr. (ECF No. 395) at 106:25-107:16 (Jan. 31, 2024); Savitz Trial Tr. (ECF No. 414) at 1176:4-17 (Feb. 9, 2024).*

265.    As set forth in Hall (2023), Dr. Lanphear and his team also conducted a mediation analysis to examine whether maternal hypothyroidism explained the association between maternal fluoride exposure and child IQ they found in Green (2019). Lanphear Trial Tr. Vol. II, at 277:4–278:2. However, this analysis failed to find that maternal hypothyroidism significantly mediated the relationship between fluoride exposure and child IQ. *Id.* at 278:3–11.

**<u>Plaintiffs' rebuttal</u>**: There is no scientific dispute that maternal hypothyroidism damages the brain of the developing fetus and reduces IQ. *Lanphear Trial Tr. (ECF No. 417) at 231:17-21 (Feb. 1, 2024); Trial Ex. 18 at 40* (an EPA document explaining that "thyroid hormones are essential for normal brain development in humans and hypothyroidism during fetal and early neonatal life may have profound effects on the developing brain"); *Thiessen Trial Decl. (ECF No. 202-1) ¶ 89* (quoting other statements from EPA). The fact that hypothyroidism did not mediate the effect of fluoride on IQ in Hall (2023) is likely a consequence of insufficient statistical power, as there were only 25 hypothyroid moms with IQ data available for the fluoride analysis. *Trial Ex. 120 at 120.009* ("[C]onsidering only 25 of 107 (23.4%) children of mothers with primary hypothyroidism had IQ data, there may have been insufficient statistical power in the mediation model to detect a significant indirect effect.").

### ii.    Goodman (2022b)

266.    Relevant to the issue of the potential for fluoride to be a thyroid disruptor, Goodman (2022b) is a recently published manuscript co-authored by Dr. Lanphear that examined the interplay between maternal fluoride exposure and iodine deficiency in relation to child IQ. Trial Ex. 116, at 116.008.

**<u>Plaintiffs' rebuttal</u>**: No dispute.

267.    Goodman (2022b) studied the MIREC cohort, which is the same cohort studied in Green (2019). *Id.* at 116.002.

**Plaintiffs' rebuttal**: No dispute.

268.    Goodman (2022b) found that maternal urinary fluoride was not significantly associated with lower IQ in girls whose mothers had low or adequate iodine levels. *Id.* at 116.006.

**Plaintiffs' rebuttal**: No dispute.

269.    In contrast, Goodman (2022b) found that maternal urinary fluoride was significantly associated with lower IQ in boys whose mothers had low or adequate iodine levels. *Id.*

**Plaintiffs' rebuttal**: No dispute, but the impact of maternal fluoride on IQ was greater among the boys born to women with iodine deficiency than among boys born to women with adequate iodine. *Trial Ex. 116 at 1.*

270.    Dr. Lanphear and his team examined this issue because fluoride exposure and low iodine are both thought to be linked to a greater risk of developing hypothyroidism. Lanphear Trial Tr. Vol. II, at 224:4–25. 227:6–21.

**Plaintiffs' rebuttal**: No dispute.

271.    But, as described in Hall (2023), Dr. Lanphear, using maternal urinary fluoride samples from the same cohort as Goodman (2022b), failed to find a significant association between maternal urinary fluoride levels and hypothyroidism.

**Plaintiffs' rebuttal**: No dispute.

272.    As Dr. Barone explained, "from a risk assessment perspective I don't believe the weight of the evidence [concerning fluoride as a thyroid disruptor] is substantial or substantiated

for us to carry that forward . . . into dose response." Barone Trial Tr. Vol. VIII, at 1331:25–1332:24.

**Plaintiffs' rebuttal**: No dispute that this is Dr. Barone's opinion. But mechanistic data does not need its own point of departure in order to strengthen the confidence in the hazard to which the mechanistic data relates; indeed, that is how EPA has used mechanistic data in its risk evaluations. *E.g., Trial Ex. 103 at 267-68* (identifying mechanistic evidence [i.e., competitive binding with BRDT] as supporting hazard determination that NMP impairs reproduction, but only developing PODs for reproductive and developmental effects).

### 3.   Dose-Response Evidence

273.   The quantitative dose-response analysis is designed to identify a point of departure or POD. Barone Trial Tr. Vol. III, at 495:9–14 (Feb. 2, 2024).

**Plaintiffs' rebuttal**: No dispute.

274.   There are three types of points of departure that EPA uses, in the following order of preference: a benchmark dose level or benchmark concentration level (BMDL or BMCL); a no observed adverse effect level (NOAEL); and a lowest observed adverse effect level (LOAEL). Barone Trial Tr. Vol. III, at 495:23–496:25.

**Plaintiffs' rebuttal**: No dispute.

275.   In carrying forward studies from the weight of the scientific evidence analysis to dose-response, EPA looks at the strength of the evidence for a particular endpoint to determine how best to pick a point of departure. Barone Trial Tr. Vol. IV, at 661:18–662:13 (Feb. 5, 2024). EPA may have multiple endpoints to consider, along with multiple studies, and based on the data may determine, for example, that conducting a benchmark dose analysis on as single study, or meta-analysis on a series of studies to determine the best point of departure for a dose-response analysis. *Id.* at 662:13–19. EPA is not focused on trying to derive the lowest point of departure for dose-response but is looking at a range of possible points of departure based on the strength

135

of the evidence and where the data is the most robust or of highest quality. *Id.* at 662:5–9, 675:9–18.

**Plaintiffs' rebuttal**: No dispute.

276.   When selecting a point of departure for dose response, EPA looks at whether the study is the first to show evidence for a particular effect, whether there is supporting evidence, whether it has been replicated. Barone Trial Tr. Vol. IV, at 664:25–665:3. When the Agency has conflicting evidence the Agency must explain that conflicting evidence and the impact that may have on dose-response, and then decide based on the coherence and consistency whether or not to move forward to dose-response. *Id.* at 665:4–12.

**Plaintiffs' rebuttal**: In the NMP evaluation, EPA selected reduced fertility as the critical effect for chronic exposures based on the first two-generation animal study that investigated the fertility endpoint. *Trial Ex. 100 at 265.* Two other two-generation studies were subsequently published, and neither of these were able to "replicate" the effect on fertility. *Id. at 238* ("Other two-generation studies in rats did not replicate effects on reduced fertility.") *& 268* ("Two of the subsequent studies that evaluated fertility in two-generation reproductive studies . . . found no significant effect on fertility at any dose tested.") Despite the failure of these two subsequent similarly designed studies to replicate the effect, EPA moved forward with dose-response and derived a point of departure for risk calculations (albeit with "medium confidence" in the data). *Id. at 269.* EPA justified this decision in a conclusory fashion by pointing to other animal studies, of different design, which also found reduced fertility. *Id. at 237 & 269.* EPA made unreasonable risk determinations based on this health endpoint. *See, e.g., id. at 398-413.*

277.   Using EPA's benchmark dose guidance, when deriving a point of departure based on BMDL or BMCL, EPA first selects the benchmark response rate (BMR) (e.g., 1 IQ point decrement). Barone Trial Tr. Vol. IV, at 667:17–20. It is best if the BMR is biologically informed. *Id.* at 668:4–5. After selecting a BMR--, the Agency runs data through the benchmark dose software to see what the best model fit is—looking at both linear and nonlinear model

types. *Id.* at 668:8–14. There are a multitude of goodness-of-fit tests, with the AIC score being just one of them. *Id.* at 668:15–20. EPA also recommends looking at the plotted the data with the different model curves, which may provide more information on which model fits best when goodness-of-fit metrics (e.g., AIC score) are similar. *Id.* at 668:25–669:13. For non-cancer outcomes EPA looks at all suitable models and interrogates all of them within without defaulting to one model (e.g., linear) over another. *Id.* at 669:14–22, 671:16–22. For each of the first 10 TSCA risk evaluations, EPA included all of the different model outputs and approaches that were employed, and described why it chose one model over another model. *Id.* at 670:1–8.

**Plaintiffs' rebuttal**: No dispute.


278.     When EPA selects a NOAEL or LOAEL as a point of departure, it is generally selecting it from single study based on a dose where the chemical substance is associated with no effect for a NOAEL, or an effect for a LOAEL. Barone Trial Tr. Vol. IV, at 672:4–13.

**Plaintiffs' rebuttal**: While this is "generally" the case, there are important exceptions. First, Dr. Barone testified that EPA may elect to "use some other type of approach" if no particular study is amenable to a BMCL, NOAEL or LOAEL. *Barone Trial Tr. (ECF No. 400) at 658:24-659:10 (Feb. 5, 2024).* Dr. Barone explained that "if we have a number of similar outcomes but they're not quantifiable with benchmark dose modeling, we can look at them in a sort of categorical or quantal way to see what kind of pattern of risk we have for those particular outcomes." *Id. at 659:6-10*. The PCE risk evaluation provides an example of EPA deriving a point of departure from multiple studies. Specifically, EPA derived a "LOAEL" for the critical effect (neurotoxicity) by taking the **"midpoint of the range of the two LOAELs"** from two separate epidemiological studies. *Trial Ex. 96 at 336; see also Barone Trial Tr. (ECF No. 400) at 601:10-22 (Feb. 5, 2024).* One of the studies (Cavalleri 1994) found neurotoxic effects among a group of workers with 6 ppm PCE in the air, while the other study (Echeverria 1995) found neurotoxic effects in workers with 41 ppm PCE in the air. *Trial Ex. 96 at 294-95.* The LOAELs across the two studies thus differed by a factor of 7, which Dr. Barone described as "fairly close." *Barone Trial Tr. (ECF No. 400) at 602:4-12 (Feb. 5, 2024).*

279.     In the first phase of trial, Dr. Thiessen testified that one could use any study that claims to have found an effect, no matter how poorly conducted, to derive a point of departure. Thiessen Trial Tr. Vol. IV, 527:16–22 (Trial Phase 1). However, it is undisputed that if a study is unreliable, then points of departure based on that study are also unreliable. *Id.* at 540:22–541:1 (Trial Phase 1).

**Plaintiffs' rebuttal**: The question posed to Dr. Thiessen did not include the derogatory language "no matter how poorly conducted." *Thiessen Trial Tr. (ECF No. 242) at 527:17-22 (June 12, 2020).* Further, Dr. Thiessen did not state that "any study" could be used. *Id.* She testified, instead, that "t]here are probably some where it would not be possible" and that the quality of a study should be evaluated before deciding to use it for risk calculations. *Id. at 527:20-528:1*

280.     If the selected dose is an internal dose, EPA needs to be able to convert it back to an external dose to conduct a risk evaluation, generally speaking, in milligrams per kilogram per day (mg/kg/day) for the point of departure, so that the number can be compared to the exposure concentration. Barone Trial Tr. Vol. IV, at 672:14–673:4; 676:11–23.

**Plaintiffs' rebuttal**: No dispute that, "generally speaking," EPA uses mg/kg/day as the exposure metric for its points of departure. However, as Dr. Barone explained, what matters is that the "[e]xposure concentration in the denominator **has to be in the same units** as the hazard point of departure or hazard level in the numerator. They have to match up. **The units have to match**." *Barone Trial Tr. (ECF No. 400) at 672:22-673:4 (Feb. 5, 2024).* Dr. Thiessen concurred on this point, explaining: "there's no scientific reason why [the hazard and exposure levels] have to be milligrams per kilogram per day. They could also be milligrams per liter in the drinking water, they could also be milligrams per liter in the urine. . . . **What matters is comparison of a hazard level and exposure level that are in the same units**." *Thiessen Trial Tr. (ECF No. 401) at 790:18-791:16 (Feb. 6, 2024).* Consistent with this, EPA's risk assessment scientist at the first trial, Dr. Tala Henry, testified that **if there is evidence "that allows the**

138

1  **[EPA] to conduct the comparison of exposure to toxicity based on a fairly straightforward**
2  **and simple method, [EPA] can stop there and need not do further refinement.”** *Henry Trial*
3  *Tr. (ECF No. 244) at 973:21-974:1 (June 16, 2020).*

4

5  281.    In 5 of the first 10 risk evaluations, EPA has used a Physiologically-based
6  Pharmacokinetic (PBPK) model, oftentimes to go from an internal dose to an external dose.
7  Barone Trial Tr. Vol. IV, at 673:13–18, 675:11–15. In risk evaluations where EPA did not use a
8  PBPK model, the Agency was using animal studies and knew the external dose. *Id.* at 680:10–
9  15. During pregnancy the PBPK model is more complicated due to numerous body changes
10  during that time. *Id.* at 674:19–675-8.

11  **Plaintiffs' rebuttal**: No dispute that the absence of a PBPK model increases the
12  uncertainty with respect to how human susceptibility to fluoride will vary across the population.
13  EPA addresses this uncertainty by applying an intraspecies uncertainty factor of 10. *Barone Trial*
14  *Tr. (ECF No. 400) at 578:11-23 (Feb. 5, 2024)*. When EPA has a PBPK model, it may elect to
15  use a smaller uncertainty factor for intraspecies variability, typically a factor of 3. *Id.*

16

17  282.    A reference dose or reference concentration is a hazard point of departure divided
18  by uncertainty factors. It is an approach that is concerned about a hazard, but it is not a risk
19  estimate as it does not take exposure into account. Barone Trial Tr. Vol. IV, at 679:1–8. Given a
20  reference dose is not a risk estimate, EPA has not used it for any of the first 10 risk evaluations.
21  *Id.* at 679:9–11.

22  **Plaintiffs' rebuttal**: As Dr. Thiessen explained, the reference dose approach “uses the
23  same information” as the Margin of Exposure framework (i.e., the same point of departure, and
24  the same uncertainty factors). *Thiessen Trial Tr. (ECF No. 402) at 912:21-913:8 (Feb. 7, 2024)*.
25  The only difference is that the comparison with the exposure level is framed differently. With the
26  reference dose (which is calculated by dividing the point of departure by the total uncertainty
27  factor), a risk exists if the human exposure *exceeds* the reference dose. *Id. at 913:17-25.* The
28  Margin of Exposure approach “looks at the same information in the other direction” – i.e., a risk

exists if the margin between the point of departure and exposure level is *less* than the Benchmark MOE (i.e., the total uncertainty factor). *Id. at 913:25-914:2*. Same data, same results – but a different way of expressing it.

283. For neurotoxic hazards, it is assumed that individuals have a reserve capacity to adapt to an environmental stressor before exposure results in manifestations of adversity. Thayer Trial Tr. Vol. IV, 648:10–17 (Trial Phase 1); 1998 Guidelines, at 9, Trial Ex. 17. Thus, the individual threshold hypothesis holds that a range of exposures from zero to some finite value can be tolerated by the organism with essentially no chance of expression of the toxic effect. *Id.*

**Plaintiffs' rebuttal**: No dispute, including that there are "limits to this capacity, and when these limits are exceeded, further exposure [to the previously tolerated dose] could lead to frank manifestations of neurotoxicity at the structural or functional level." *Trial Ex. 17 at 9*.

### a. Weight of the scientific evidence does not support conducting a BMCL calculation or otherwise deriving a POD from the fluoride neurotoxicity literature.

284. At the outset, there are several issues with attempting to derive a POD, like a BMCL, from the fluoride neurotoxicity literature. The exercise of calculating a BMCL is predicated on the assumption that the epidemiological studies used have (1) identified an association between fluoride and IQ with sufficient confidence, and (2) accurately quantified the magnitude of that association. *See* Savitz Trial Tr. Vol. VII, at 1159:9–22.

**Plaintiffs' rebuttal**: No dispute that there needs to be sufficient confidence that there's an association between fluoride and IQ to justify calculating a BMCL. EPA, however, fails to cite any EPA guidance or any EPA authority to support the second statement that the "magnitude" of the association needs to be "accurately quantified" before the BMCL analysis is justified. Instead, EPA cites Dr. Savitz who, by his own admission, is not a risk assessor, and has not read any of EPA's risk evaluations under TSCA. *Savitz Trial Tr. (ECF No. 414) at 1158:15-17 & 1189:4-6 (Feb. 9, 2024).* As a reflection of his lack of expertise in BMCL analysis, Dr. Savitz testified he does not know what the acronym BMCL stands for. *Id. at 1159:1-4 ("I should*

1  know the acronym by now, but as I said, maybe I just need to keep repeating that I'm not a risk

2  assessor, so that's not where I was able to contribute.")

3

4       285.    Dr. Barone, Dr. Savitz, and the Health Canada Expert Panel all agree that the

5  fluoride and IQ literature does not currently support the derivation of a point of departure like a

6  BMCL. Savitz Trial Tr. Vol. VII, 1161:2– 17; Barone Trial Tr. Vol. VIII, at 1328:3–1329:15.

7  The Risk Sciences International systematic review authors also agreed, concluding that "there is

8  still some uncertainty in the causal weight of evidence for causality for reducing IQ scores in

9  children and considerable uncertainty in the derivation of its POD," which lead the authors to

10  derive a POD for dental fluorosis instead. Trial Ex. 129 at 2.

11       **Plaintiffs' rebuttal**: First, contrary to EPA's assertion, the Risk Sciences International

12  team did derive points of departure for neurotoxicity. *See, e.g., Trial Ex. 129 at 129.*002 ("The

13  current review identified moderate dental fluorosis and **reduction in IQ scores** in children as the

14  most relevant endpoints for establishing an HBV for fluoride in drinking water. **PODs were**

15  **derived for these two endpoints** . . . ."); *id. at 129.025* ("[T]he variously **derived BMCLs**

16  ranged from 0.077mg F/L to 0.753mg F/L drinking water"); id. at 129.025; ("The **point of**

17  **departure of 0.179mg F/L** from the combined high-quality cohorts . . . ."); *id. at 129.025* ("At

18  this point in time, **1.5mg/L may be considered as a provisional point of departure** for

19  establishing an HBV for fluoride in Canadian drinking water based on protection against

20  neurocognitive effects in children."). Second, while the Health Canada Expert Panel did not

21  agree with deriving a point of departure for neurotoxicity, the panel was in "consensus that an

22  uncertainty factor should be applied to the dental fluorosis point of departure in order to protect

23  against "possible neurocognitive effects." *Trial Ex. 128 at 128.011*.

24

25       286.    At most, Dr. Grandjean's BMCL is a "what-if exercise." Savitz Trial Tr. Vol. VII,

26  at 1161:2–4. The epidemiological literature does not support deriving a POD from the fluoride

27  neurodevelopmental literature. "[T]here has to be a sufficient level of confidence that [the

28  science] is leaning in a pretty substantial way towards there being an adverse effect, and it

1   seem[s] premature to pursue that based on the epidemiology that is available as of right now."

2   Savitz Trial Tr. VII, at 1159:19–22.

3       **Plaintiffs' rebuttal**: No dispute that this is Dr. Savitz's opinion. Dr. Savitz, however, is

4   not a risk assessor, has never read EPA's Guidelines for Neurotoxicity Risk Assessment, does

5   not know how EPA defines hazard, does not know EPA defines risk, has never read EPA's risk

6   evaluations under TSCA, and by his own admission does not what BMCL stands for. *Savitz Trial*

7   *Tr. (ECF No. 414) at 1158:15-17 & 1159:1-4 & 1187:9-1189:6 (Feb. 9, 2024).*

8

9       287.    Moreover, a peculiar feature of BMCL calculations arises from the BMCL being

10   the *lower confidence limit underneath the BMC.* As Dr. Savitz explained, this means that "the

11   more uncertain you are, the lower the [BMCL] limit you recommend. . . . it's kind of odd that the

12   more ignorant we are, the more restrictive we should be. . . . if we had done less or done it less

13   well, we would set the – we would set the threshold even lower." Savitz Trial Tr. Vol. VII, at

14   1160:8–21. The low BMCLs calculated by Dr. Grandjean (specifically with the linear models)

15   could therefore be attributed not to a high risk of fluoride exposure on IQ, but rather a high level

16   of uncertainty in the data.

17       **Plaintiffs' rebuttal**: What is peculiar here is that the EPA is citing someone with no

18   experience in risk assessment to call into question EPA's *most preferred* type of Point of

19   Departure (which EPA has used *for decades* to keep Americans safe from toxic chemicals). *See*

20   *EPA Proposed Fact No. 274*; *see also Thayer Trial Tr. (ECF No. 242) at 651:19-652:4 (June 12,*

21   *2020)* (describing EPA's practice of using the lower confidence limit as a method for protecting

22   public health). Nor is there merit to EPA's insinuation that there is a large difference between Dr.

23   Grandjean's BMC and BMCL. The difference between the linear BMC and BMCL in Grandjean

24   (2023) is **less than a factor of two**. *See Trial Ex. 119 at 119.009* (listing the linear BMC and

25   BMCL for both sexes in as 0.474 and 0.284 mg/L, respectively). To put this in perspective, there

26   was a **3.4-fold difference** between the BMD and BMDL that EPA selected for HBCD. *Trial Ex.*

27   *97 at 667* (listing the selected BMD and BMDL as 23.9 and 6.99 mg/kg/day, respectively). EPA

28

1  never once cited this 3.4-fold difference as a factor to forego risk calculations in its HBCD risk

2  evaluation.

3

4       288.    Plaintiffs mistakenly emphasize certain quotes from the RSI systematic review,

5  and ignore its primary conclusion: that there is "considerable uncertainty in the derivation of [a]

6  POD" for fluoride neurocognitive effects, and thus it would be premature to calculate one at this

7  time. Trial Ex. 129, at 2. The RSI systematic review does say that "The body of evidence in the

8  current review suggests a positive association of reduced IQ scores for children and fluoride

9  exposures relevant to current North American drinking water levels." Trial Ex. 129, at 24. But

10  the RSI authors defined "North American drinking water levels" as "a level of approximately 2

11  ppm fluoride in drinking water." Trial Ex. 129, at 10. That is triple the drinking water

12  concentrations in the United States.

13       **Plaintiffs' rebuttal**: First, RSI calculated points of departure for fluoride neurotoxicity.

14  *See, e.g., Trial Ex. 129 at 129.002* ("The current review identified moderate dental fluorosis and

15  **reduction in IQ scores** in children as the most relevant endpoints for establishing an HBV for

16  fluoride in drinking water. **PODs were derived for these two endpoints** . . . ."). Second, a three-

17  fold difference between the hazard level and the exposure level (i.e., "triple") is actually *very*

18  *small* in the context of EPA risk evaluations (*Trial Ex. 88 at 5-6*), and well below the Benchmark

19  MOE of 10 that Dr. Barone testified would be the minimum needed for fluoride neurotoxicity

20  (*Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024)*).

21

22       289.    Plaintiffs instead emphasized that the RSI authors engaged in a thought

23  experiment of trying to derive an intake level based on Dr. Grandjean's 2022 BMCL calculations

24  based on six different assumptions. Trial Ex. 129 at 25. But what Plaintiffs failed to mention is

25  that the RSI authors then concluded that Dr. Grandjean's 2022 BMCL calculation was premature

26  given that "the overall body of evidence suggests significant uncertainty in any low-exposure

27  range derivation with current evidence." Trial Ex. 129 at 25. Moreover, the authors were

28  repeatedly critical of Dr. Grandjean's BMCL, noting that when Dr. Grandjean "fit different

linear and non-linear models, [they] resulted in lower bounds of benchmark concentrations which differed by more than 9-fold." Trial Ex. 129 at 25. The RSI authors further noted that "less consistent evidence at low exposure levels remains a significant uncertainty" for derivation of a POD based on childhood fluoride neurotoxicity. Trial Ex. 131, at 1518. "Benchmark dose modeling of high-quality epidemiologic data by Grandjean, et al. 2022 predicted increased risks at lower than 1 milligram per liter fluoride in drinking water; **however, different models, including linear, quadratic, and segmented models, predicted notably different levels of risk from fluoride at these low concentrations. At this point in time, mechanistic explanation and key mode of action events are insufficiently understood to guide the choice of the most appropriate model to use for predicting risks at low exposure levels."** *Id.*

**Plaintiffs' rebuttal**: There are four problems with EPA's assertions here. <u>First</u>, the 9-fold difference in BMCLs that Grandjean (2022) calculated is a much smaller difference in the range of BMDLs than EPA calculated for the critical effect (thyroid) in the HBCD evaluation. Specifically, the BMDLs that EPA calculated for the critical effect for HBCD **differed by a factor of 70** based on the various models that EPA used. *Trial Ex. 97 at 667* (showing BMDLs ranging from 3.21 to 227 mg/kg/day); *Trial Ex. 97 at 370* (showing that EPA selected the second lowest BMCL, 6.99 mg/kg/day, as the POD for risk calculations). <u>Second</u>, any uncertainty as to which of Grandjean's BMCLs to use is *inconsequential*, because **even the highest BMCL (~0.8 mg/L) is readily exceeded by many women in fluoridated areas**. *Trial Ex. 108 at 108.025, Table S4; Trial Ex. 122 at 122.005, Table 2*. <u>Third</u>, EPA does not explain how any of RSI's "six assumptions" are in any way incorrect or inappropriate. The six assumptions are as follows: (1) linear dose-response; (2) 1 IQ point for the BMR; (3) average drinking water intake for Canadians; (4) average excretion rate for fluoride ingestion; (5) average difference between water intake and urinary output; and (6) prenatal exposure is the critical window. *Trial Ex. 129 at 129.025*. <u>Fourth</u>, RSI's assumptions for fluoride are much more straightforward than the assumptions EPA had to use to estimate dermal exposure to HBCD from solder pastes (a condition of use that EPA found to present an unreasonable risk). To estimate dermal exposure from the solder pastes, EPA had to assume the following six factual predicates: (1) whether the

1   workers wear gloves; (2) how much surface area of the body comes in contact with the solder

2   paste; (3) the quantity of the solder/flux that remains on the skin after contact; (4) the fraction of

3   the solder pastes that is absorbed through the skin; (5) the weight fraction of the HBCD within

4   the solder paste; and (6) the frequency of events in the day where the skin comes in contact with

5   the solder paste. *Trial Ex. 97 at 423 & 463* (assuming no gloves or PPE) *& 721* (listing other

6   assumptions). Based on these six assumptions, EPA estimated that workers with *high-end* dermal

7   exposure to solders paste had a Margin of Exposure of 274, which was less than the Benchmark

8   MOE of 300.  *Trial Ex. 97 at 463.* EPA had "low-medium" confidence in this exposure estimate

9   (*Trial Ex. 97 at 446*), but nevertheless determined that the high-end dermally exposed workers

10  were at unreasonable risk of thyroid disruption. *Trial Ex. 97 at 480; Barone Trial Tr. (ECF No.*

11  *400) at 594:14-18 (Feb. 5, 2024).*

12

13      290.    While Plaintiffs selectively emphasize their favorite quotes from the RSI

14  systematic review, there are just as many quotes that contradict their position. It is unsurprising,

15  as Dr. Savitz explained, that a systematic review that is weighing the evidence has quotes going

16  in both directions. Savitz Trial Tr. Vol. VIII, at 1291:6–17. At the end of the weighing exercise,

17  the RSI systematic reviews reached the same conclusion as EPA, Dr. Savitz, Dr. Barone, and the

18  Health Canada Panel: the fluoride neurotoxicity literature is too inconsistent to derive a POD.

19      **Plaintiffs' rebuttal**: <u>First</u>, as already noted, the RSI did derive points of departure for

20  neurotoxicity. *See, e.g., Trial Ex. 129 at 129.025* ("[T]he variously *derived BMCLs* ranged from

21  0.077mg F/L to 0.753mg F/L drinking water"); *id. at 129.025* ("At this point in time, *1.5mg/L*

22  *may be considered as a provisional point of departure* for establishing an HBV for fluoride in

23  Canadian drinking water based on protection against neurocognitive effects in children."). 

24  <u>Second</u>, one important common thread that EPA overlooks between the assessments of RSI, Dr.

25  Barone, and the Health Canada Panel is that all three sources agree there should be an

26  *uncertainty factor* to protect against the potential of fluoride neurotoxicity. *Trial Ex. 128 at*

27  *128.011* ("Given the uncertainty about possible neurocognitive effects at low levels of exposure,

28  the panel recommended the use of an uncertainty factor . . . ."); *Trial Ex. 129 at 129.028* ("To

allow for protection against potential cognitive effects in children at levels below the POD of 1.56 mg fluoride/L, an additional overall database uncertainty factor could be applied to this POD."); *Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024)* (agreeing there should be a Benchmark MOE of at least 10 for fluoride neurotoxicity).

291.    In analyzing the association between maternal urinary fluoride exposure and child IQ in the ELEMENT cohort, Dr. Hu and his team ran both linear and non-linear models. Hu Trial Tr. Vol. I, at 161:2–6. The nonlinear model suggested that there was no clear association between IQ scores for children ages 6 to 12 and maternal urinary fluoride levels below 0.8 milligrams per liter. *Id.* at 161:7–13. However, the nonlinear model found a clear negative association between IQ and urinary fluoride levels above 0.8 milligrams per liter. *Id.* at 161:14–17. When plotted on a graph, the relationship was not straight lined but curved. *Id.* at 161:18–23; Trial Ex. 106, at 106.009 (fig. 3(A)). In other words, the model suggested that there may be a nonlinear relationship between increases in maternal urinary fluoride levels and a negative association with child IQ. Hu Trial Tr. Vol. I, at 161:24–162:4. In addition, there was a non-statistically significant improvement in the fit of the model when the ELEMENT study authors used a curved line instead of a straight line. *Id.* at 163:3–19.

**Plaintiffs' rebuttal**: No dispute that these were the findings for the sensitivity analysis of a subset of 6-to-12 year old children in the ELEMENT cohort. For the 4-year-old children in the ELEMENT cohort, Dr. Hu found a linear relationship, without evidence of a threshold. *Hu Trial Tr. (ECF No. 395) at 90:22-91:7 (Jan. 31, 2024); Hu Trial Decl. (ECF No. 198-1) ¶ 24.* But, even if there were a threshold of 0.8 mg/L, this is a concentration that is widely exceeded in fluoridated areas (*Trial Ex. 108 at 108.55 Table S4; Trial Ex. 122 at 122.005, Table 2*), even if the exposure assessment is limited to just the contribution from fluoridated water itself. *Lanphear Trial Tr. (ECF No. 417) at 244:6-25 (Feb. 1, 2024).*

292.    Dr. Hu and his team also ran a sensitivity analysis on the ages 6 to 12 data that incorporated as additional covariates the children's HOME score as well as the children's urinary

fluoride levels. Hu Trial Tr. Vol. I, at 163:20–164:8. The sensitivity analysis found no clear evidence of an association between IQ and maternal urinary fluoride levels below 1.0 milligrams per liter. *Id.* at 164:9–13. In other words, the evidence of nonlinearity actually became more pronounced when more covariates were included. *Id.* at 164:14–20; Trial Exhibit 106, at 106.009 (fig. 3(B)). In addition, the sensitivity analysis showed that there was a statistically significant improvement in the fit of the model when a curved line was used. *Id.* at 164:21–25, 165:25–166:3. Dr. Hu acknowledged that, for the children ages 6 to 12 in the ELEMENT cohort, a curvilinear relationship is a truer descriptor of the dose-response relationship. *Id.* at 166:8–167:10.

**Plaintiffs' rebuttal**: No dispute that these were the findings for the sensitivity analysis of a subset of 6-to-12 year old children in the ELEMENT cohort. This concentration of maternal urinary fluoride (1 mg/L) is widely exceeded in fluoridated areas (*Trial Ex. 108 at 108.55*), even if the exposure assessment is limited to just the contribution from fluoridated water itself. *Lanphear Trial Tr. (ECF No. 417) at 244:6-25 (Feb. 1, 2024).*

293.    Regarding the MIREC cohort, Dr. Lanphear and his team did not conduct any analysis, such as looking for a threshold, to determine whether there was a non-linear dose-response relationship. Lanphear Trial Tr. Vol. II, at 209:15–210:8 (Feb. 1, 2024).

**Plaintiffs' rebuttal**: This is incorrect. Dr. Lanphear testified that the MIREC team did not assume a linear dose-response relationship, and that the team's biostatistician, Dr. Rick Hornung ("one of the world's experts" in dose-response modeling), determined the appropriate non-linear modeling to use. *Lanphear Trial Tr. (ECF No. 417) at 208:8-209:10 (Feb. 1, 2024).* The methodology that Dr. Hornung chose for the Green (2019) study is explained in the paper. *Trial Ex. 109 at 109.004-005* ("Including quadratic or natural-log effects of $MUF_{SG}$ or fluoride intake did not significantly improve the regression models. Thus, we present the more easily interpreted estimates from linear regression models. Additionally, we examined separate models with 2 linear splines to test whether the $MUF_{SG}$ association significantly differed between lower and higher levels of $MUF_{SG}$ based on 3 knots, which were set at 0.5 mg/L (mean $MUF_{SG}$), 0.8

mg/L (threshold seen in the Mexican birth cohort), and 1 mg/L (optimal concentration in the United States until 2015). For fluoride intake, knots were set at 0.4 mg (mean fluoride intake), 0.8 mg, and 1 mg (in accordance with MUFsq).").

### b. Dr. Grandjean's BMCLs Not Supported as POD

294.    Grandjean (2023) reports the results of the Danish OCC study and a BMCL calculation based on data from the ELEMENT, MIREC, and OCC cohorts. Barone Trial Tr. Vol. III, at 413:7–12; Trial Ex. 119. As explained above, the RSI systematic review was heavily critical of conducting a BMCL calculation using the currently available fluoride literature.

**Plaintiffs' rebuttal**: No dispute with the first sentence. The second sentence is, at best, argumentative. The RSI described Grandjean's BMCL analysis as "high quality evidence" that is based on "high-quality birth cohort data" using regression modeling that adjusts for "critical confounders." *Trial Ex 129 at 129.024*. While the RSI team expressed uncertainty about the point of departure to use (0.179 or 1.5 mg/L), this uncertainty is inconsequential given that either point of departure would result in a risk finding for water fluoridation.

295.    Grandjean (2023) reports a BMCL of 0.28 milligrams per liter based on a linear model. *Id.* at Hu Trial Tr. Vol. I, at 160:11–14. However, Grandjean (2023) did not report any results based on a squared model. *Id.* at 160:15-20. A squared model is a type of non-linear model that assumes the shape of the relationship between the things being studied is curved. *Id.* at 160:21–161:1.

**Plaintiffs' rebuttal**: No dispute that the 2023 study includes one linear and two piecewise models, but not a squared model. *Trial Ex. 119 at 119.09.*

296.    Dr. Grandjean's BMC is the maternal urinary fluoride concentration—not the water fluoride concentration—that produces a 1-IQ point decrement. Barone Trial Tr. Vol. III, at 416:14–18.

**Plaintiffs' rebuttal**: No dispute.

297.     As explained in more detail in subsection (d) below, Plaintiffs have not offered any way to reverse engineer a fluoride intake value for a POD from maternal urinary fluoride values.

**Plaintiffs' rebuttal**: The RSI team has offered a way to calculate a fluoride intake from the urine-based BMCL. *Trial Ex. 129 at 129.025*. RSI's method uses three straightforward inputs: (1) the average intake of water per day (i.e., 1.53 liters/day); (2) the average daily amount of urinary output when water intake is 1.53 liters (i.e., 1.07 liters of urine); and (3) the average percentage of ingested fluoride which is excreted during the course of 24 hours (i.e., 75%). *Trial Ex. 129 at 129.025*.

298.     The urinary fluoride measure of exposure is particularly problematic for assessing dose-response and calculating a BMC. Urinary fluoride is not an indicator of long-term fluoride exposure. Chang Trial Tr. Vol. V, 807:19–808:21 (Trial Phase 1). Rather, the World Health Organization classified urinary fluoride as an indicator of short-term exposure. *Id*. (Trial Phase 1).

**Plaintiffs' rebuttal**: The testimony of Dr. Chang, from the industrial consulting firm Exponent (*Grandjean Trial Tr. (ECF No. 240) at 193:6-194:2 (June 9, 2020)*), is at odds with the NTP. The NTP determined that urinary fluoride is a "reasonable measure of exposure." *Trial Ex. 67 at 51*.

299.     Various factors can affect the concentration of fluoride in a urine sample, such as an individual's metabolism, when a urine sample is collected, and the time since the last void of the individual who provided the sample. Undisputed Fact No. 8, ECF No. 150 (Trial Phase 1). For example, mothers were not asked to fast before providing urine samples in the MIREC and ELEMENT cohort studies. Hu Trial Tr. Vol. I, 89:19–22, Lanphear Trial Tr. Vol. III, 375:15–17 (Trial Phase 1). The absence of a fasting requirement can introduce variability and make urinary fluoride measurements less precise. Hu Trial Tr. Vol. I, 89:23–90:4 (Trial Phase 1). Further, in the MIREC cohort, community water fluoridation explained only 22–24% of the variance in

maternal urinary fluoride concentration, which confirms that there is no straightforward conversion between urinary fluoride and drinking water fluoride concentrations. Chang Decl. ¶ 246, ECF No. 200 (Trial Phase 1).

**Plaintiffs' rebuttal**: <u>First</u>, Green (2019) controlled for time of urine collection as well as time since last void and found that it had no impact on the association between maternal urinary fluoride and IQ. *Trial Ex. 67 at 51* ("Green et al. (2019) found that adjusting for time of urine collection or time of collection since last void during pregnancy did not substantially affect associations with IQ results in either boys or girls."). <u>Second</u>, according to NTP, "Till et al. (2018) demonstrated that there was a linear association between urinary fluoride concentrations in pregnant women and drinking water fluoride concentrations regardless of method used to correct for urine dilution or whether adjustments were made for dilution." *Id. at 52; see also Thiessen Trial Tr. (ECF No. 401) at 792:19-793:4 (Feb. 6, 2024)* ("[T]he main thing – and this is a consistent finding in several decades of literature – is that the urinary fluoride concentration is going to be consistently related to the drinking water fluoride . . . . As the fluoride intake goes up, the urinary fluoride goes up, whether you're talking an individual or a group of individuals.")

300.    The BMCL is the lower 95th confidence limit underneath the BMC, which is used because it is more health protective. Grandjean Trial Tr. Vol. III, at 416:19–24.

**Plaintiffs' rebuttal**: No dispute.

301.    Grandjean (2023) reported a BMCL of 0.3 mg/L, which is lower than the average maternal urinary fluoride level of 0.58 mg/L in the Odense municipality, which does not fluoridate its water. Grandjean Trial Tr. Vol. III, at 419:8–12.

**Plaintiffs' rebuttal**: The BMCL is lower than the average urinary fluoride level in the third trimester, which is the only trimester for which urine samples were taken. *Grandjean Trial. Tr. (ECF No. 397) at 353:14-24 (Feb. 2, 2024).* The third trimester has the highest urinary fluoride levels during the course of the pregnancy. *Hu Trial Tr. (ECF No. 395) at 121:4-123:8 (Jan. 31, 2024).*

302.    The primary BMC and BMCL calculations emphasized in Grandjean (2023) are based on a linear model. Grandjean Trial Tr. Vol. III, at 418:23–419:1.

**Plaintiffs' rebuttal**: No dispute that Dr. Grandjean (2023) selected the linear model as having the best fit for the data. The word "emphasized," however, is not included in the cited testimony, nor is it found in the published paper. *Trial Ex. 119.*

303.    Dr. Grandjean did not personally conduct the statistical analyses to create the BMCL calculations in Grandjean 2023. Grandjean Trial Tr. Vol. III, at 416:2–13. Rather, they were performed by a post-doc named Alessandra Meddis and Professor Esben Budtz-Jorgenson. *Id.* at 416:2–11.

**Plaintiffs' rebuttal**: No dispute. As Dr. Grandjean has explained, his preferred practice is to have BMCL calculations conducted by biostatisticians, including Dr. Budtz-Jorgenson. *Grandjean Trial. Tr. (ECF No. 240) at 229:23-230:22 (June 9, 2020).*

304.    Grandjean (2023) reported a BMC of 0.92 mg/L and a BMCL of 0.3 mg/L MUFcr using data from only the OCC cohort. Grandjean Trial Tr. Vol. III, at 417:22–418:12.

**Plaintiffs' rebuttal**: No dispute.

305.    Grandjean (2022) reports an earlier BMCL based on data from only the ELEMENT and MIREC cohorts.

**Plaintiffs' rebuttal**: No dispute.

306.    Dr. Grandjean did not carry out the statistical analyses himself. Grandjean Trial Tr. Vol. III, at 420:8–17.

**Plaintiffs' rebuttal**: No dispute.

307.    Grandjean 2022 reports a BMCL of 0.2 mg/L maternal urinary fluoride based on a linear model. Grandjean Trial Tr. Vol. III, at 420:18–22.

**Plaintiffs' rebuttal**: No dispute.

308.    Grandjean 2022 also reports a BMCL of 0.768 mg/L maternal urinary fluoride based on a squared model. Grandjean Trial Tr. Vol. III, at 422:11–423:21.

**Plaintiffs' rebuttal**: No dispute.

309.    The Akaike Information Criterion ("AIC") is a measure of how well the data fits a particular model. Grandjean Trial Tr. Vol. III, at 421:5–14. If an AIC score is within three points of each other, then the model fit is comparable. *Id.* at 423:16–18; 424:7–9. Nonetheless, the lower the AIC score, the better the model fit. *Id.* at 421:20–21.

**Plaintiffs' rebuttal**: EPA has recognized in its owns actions and words that the lower AIC does *not* need to be used so long as the fit is comparable. In EPA's risk evaluation of HBCD the Agency selected a BMCL that did *not* have the lowest AIC. *Trial Ex. 97 at 370* (showing that EPA selected the BMCL generated by the "Exponential (M4)" dose response model for thyroid disruption in males); *id. at 667* (showing that the Exponential (M4) dose response model had a higher AIC (29.933) than the "Hill" dose response model (29.829)). Elsewhere in the HBCD evaluation, EPA stated that "the model with the lowest AIC ***may*** be used to calculate the BMDL" and that default preferences such as using the lowest AIC "are **somewhat arbitrary**." *Id. at 361* (emphases added). EPA has also stated that benchmark dose analyses of *human data* needs to be done on a "**case-specific basis**." *Grandjean Trial Tr. (ECF No. 397) at 479:2-17 (Feb. 2, 2024).*

310.    The AIC score for the linear model, which calculated a BMCL of .2 mg/L, was 4,770.1. Grandjean Trial Tr. Vol. III, at 423:22–424:1. But the AIC score for the squared model, which calculated a BMCL of .768 mg/L, was 4,768.8. The AIC score for the squared model

therefore was lower than the AIC score for the linear model. The AIC scores, and thus the model fit, for the linear and squared models are, at minimum, comparable. *Id.* at 424:7–9.

**Plaintiffs' rebuttal**: EPA has stated that "the model with the lowest AIC **may** be used to calculate the BMDL" and that default preferences such as using the lowest AIC "are **somewhat arbitrary**." *Trial Ex. 97 at 361* (emphases added). Thus, EPA did not use the model with the lowest AIC for its BMCL analysis of HBCD's critical effect. *Id. at 370* (selecting the Exponential M4 model for the BMCL) *& 667* (table showing that the BMCL derived from the Exponential M4 had a comparable fit with the Hill model, but a higher AIC).

311.    The size of the BMCL calculation is dependent on the assumption of the model shape. Grandjean Trial Tr. Vol. III, at 424:13–17.

**Plaintiffs' rebuttal**: No dispute.

312.    The squared model assumes the shape of the dose-response relationship is curved. Grandjean Trial Tr. Vol. III, at 424:10–12.

**Plaintiffs' rebuttal**: No dispute.

313.    While his 2022 BMCL calculation reported a squared model, Dr. Grandjean edited out the squared model from his 2023 BMCL calculation. Grandjean Trial Tr. Vol. III, at 426:3–10.

**Plaintiffs' rebuttal**: No dispute that the 2023 study includes one linear and two piecewise models, but not a squared model. *Trial Ex. 119 at 119.09.*

### c.   NTP Meta-Analysis Manuscript

314.    NTP authors performed a dose-response analysis to investigate associations between fluoride exposure and children's intelligence. Trial Ex. 68, at 2.

**Plaintiffs' rebuttal**: No dispute that NTP conducted a means-effect dose-response

analysis as one of three methods for investigating the association between fluoride exposure and IQ. The other two methods were a means-effect meta analysis and a regression slopes meta-analysis. *Trial Ex. 68 at 6-7* (describing the three statistical analyses).

315.    Dr. Thiessen offered an opinion that the NTP's findings demonstrate a risk of adverse cognitive effects at exposures like those resulting from fluoridated drinking water in the United States, without any apparent threshold. Thiessen Trial Tr. Vol. V, at 837:25–838:5 (Feb. 6, 2024).

**Plaintiffs' rebuttal**: Dr. Thiessen's opinion regarding the absence of an apparent Threshold was based on NTP's own characterization of the data. According to the NTP, "The restricted cubic splines model for water fit slightly better than the linear model, however there was **no obvious threshold** as illustrated by the figure at either of the modelled knots." *Trial Ex. 69 at 324.* The NTP cited eFigure 17 from the meta-analysis to support its statement on the absence of an apparent threshold. *Id. at 325*.

316.    Dr. Thiessen did not apply any specific methodology to arrive at her conclusion. Thiessen Trial Tr. Vol. V, at 840:8–12. Dr. Thiessen's opinion that there is no apparent threshold in the association between adverse cognitive effects in children and fluoride exposure is based on the NTP authors' responses to inter-agency review comments. *Id.* at 840:23– 841:7. The BSC Working Group that evaluated those responses found them to be inadequate. *Id.* at 843:25–844:2; Trial Ex. 69, at 131, 324, 325.

**Plaintiffs' rebuttal**: Dr. Thiessen did not apply any specific methodology because she was relying on NTP's own conclusion.

317.    In fact, "a threshold was not assessed" because the NTP authors fit a linear term, as the BSC Working Group noted. Thiessen Trial Tr. Vol. V, at 844:25–845:7 (Feb. 6, 2024); Trial Ex. 69, at 324. The NTP authors did not "explicitly consider the potential non-linearity of the exposure-outcome association." Trial Ex. 69, at 131. Nor did the NTP authors "address[] the

154

1    concept of thresholds by applying several data modeling approaches to the children's IQ data."

2    Trial Ex. 69, at 131.

3        **Plaintiffs' rebuttal**: The EPA is confusing two separate analyses here. The BSC's

4    comment about NTP "fit[ting] a linear term" is in reference to NTP's *regression slopes analysis,*

5    not the dose-response analysis. See *Trial Ex. 69 at 324* (showing that BSC's comment is in

6    response to a question regarding NTP's analysis of "individual-level measures of fluoride and

7    children's IQ"); *Trial Ex. 68 at 6-7* (showing that the regression slopes analysis is the only one of

8    the three NTP analyses that looked at individual level exposures); *Barone Trial Tr. (ECF No.*

9    *418) at 1451:4-1452:8 (Feb. 13, 2024)* (agreeing that NTP's analysis of individual-level

10   exposures was not part of the dose-response assessment).

11

12       318.    There are "very few data points" in the low-dose range, which "reduc[es]

13   confidence in this range of exposure," as the BSC Working Group explained. Trial Ex. 69, at

14   324; Thiessen Trial Tr. Vol. V, at 844:25–845:7 (Feb. 6, 2024).

15       **Plaintiffs' rebuttal**: No dispute. The BSC's comment highlights the reduced statistical

16   power that comes from having fewer observations to analyze. This problem is not present with

17   Dr. Grandjean's BMCL because he had over 1,500 observations (of individualized data) for his

18   dose-response analysis. *Trial Ex. 119 at 119.009* (showing 1,599 children in the pooled BMCL

19   analysis).

20

21       319.    When the NTP authors restricted the results of their dose-response analysis to

22   lower exposure tiers, there was no consistency in model fit. The NTP authors restricted their

23   results to fluoride exposure levels of <4 mg/L, <2 mg/L, and <1.5 mg/L. Trial Ex. 69, at 324;

24   Thiessen Trial Tr. Vol. V, at 849:20–850:2 (Feb. 6, 2024). Those cutoffs represent various

25   regulatory not biological thresholds. Trial Ex. 69, at 119. Thiessen Trial Tr. Vol. V, at 847:22–

26   848:4 (Feb. 6, 2024). The 4 mg/L and 2 mg/L cutoffs are based on EPA's current enforceable

27   and non-enforceable secondary standards for fluoride in drinking water. Trial Ex. 69, at II-43.

28   Thiessen Trial Tr. Vol. V, at 849:20–850:2 (Feb. 6, 2024). The 1.5 mg/L cutoff is based on the

World Health Organization guideline for fluoride in drinking water. Trial Ex. 69, at II-43. Thiessen Trial Tr. Vol. V, at 849:20–850:2 (Feb. 6, 2024).

**Plaintiffs' rebuttal**: First, EPA fails to acknowledge here the reduction in statistical power that arises when removing observations from the analysis, which is what happens when NTP removes the higher dose studies from the assessment. Second, the NTP's reason for selecting 1.5, 2.0 and 4.0 as the cut-offs is immaterial; what matters is what the dose-response analysis shows.

320.    Water concentration results. When restricted to water concentrations <1.5 mg/L and <2.0 mg/L, there were no statistically significant adverse associations between fluoride in drinking water and children's IQ using the linear and non-linear models. Trial Ex. 69, at II-78, II-81; Thiessen Trial Tr. Vol. V, at 852:4–19, 854:9–21 (Feb. 6, 2024). The same was true across both statistical methods. Thiessen Trial Tr. Vol. VI, at 881:6–15; (Feb. 7, 2024); Trial Ex. 69, at II-78, II-81. And the fit of the linear model and non-linear models was comparable across both statistical methods used. Thiessen Trial Tr. Vol. V, at 853:1–854:8 (Feb. 6, 2024); Thiessen Trial Tr. VI, 881:21–25 (Feb. 7, 2024)

**Plaintiffs' rebuttal**: No dispute that the non-linear model was a comparable fit to the linear model for water fluoride. As represented in eFigure 17, the non-linear model shows that the reduction in IQ from fluoride exposure is *steeper below 2 mg/L* than above 2 mg/L. *Trial Ex. 68 at NIEHS_000462; Trial Ex. 69 at 325*. A similar result has been found for lead. *Lanphear Trial Tr. (ECF No. 417) at 210:1-5 (Feb. 1, 2024)* (stating that "at the lower levels [of lead] you actually see steeper decrements in IQ").

321.    Urine concentration results. The results for urine concentration are contradictory. For example, using the first of the two statistical methods employed (eTable 4), when restricted to <1.5 mg/L fluoride in urine, there was an adverse association using the linear model, but the results were not significant when restricted to <2.0 mg/L using the same model. Trial Ex. 69, at II-79; Thiessen Trial Tr. Vol. VI, at 876:9–18 (Feb. 7, 2024). When restricted to low-risk-of-bias

studies, the results become even more unclear. There, the researchers report an adverse association in the <1.5 mg/L group, but no statistically significant adverse associations in the <2.0 mg/L, <4.0 mg/L, and the all-data groups. Trial Ex. 69, at II-80; Thiessen Trial Tr. Vol. VI, at 876:22–880:16 (Feb. 7, 2024). But when using the second of the two statistical methods (eTable 5) and the linear model, there were no statistically significant adverse associations in the <1.5 mg/L and <2.0 mg/L urinary fluoride groups. Trial Ex. 69, at II-82; Thiessen Trial Tr. Vol. VI, at 882:6–12 (Feb. 7, 2024). And there were no statistically significant associations for any of the linear or non-linear models in the <4.0 mg/L group using the second method. Trial Ex. 69, at II-82; Thiessen Trial Tr. Vol. VI, at 892:10–20. (Feb. 7, 2024). All of the models had comparable fit. Thiessen Trial Tr. Vol. VI, at 892:21–893:11 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: The discrepancy in results for the <1.5 mg/L and <2 mg/L is explained with a careful review of eTable 2. Any study with a subscript "u" was used for the urinary dose-response analysis, but only studies with an "*" were used for the <1.5 mg/L dose-response analysis. *Trial Ex. 68 at NIEHS_000441.* The study by Bashash has a "u" but not a "*", which means it was included in the <2 mg/L analyses, but not the <1.5 mg/L analysis. *Trial Ex. 68 at NIEHS_000436.* This can be further confirmed by looking at the difference in the number of children in the <1.5 and <2.0 mg/L groups (n=189), which is exactly the number of children in the Bashash group-level analysis. *Compare Trial Ex. 68 at NIEHS_000436* (showing 77 and 112 children in the two Bashash groups, which totals 189 children) *with Trial Ex. 68 at NIEHS_000461* (showing 4,161 children in the <2 mg/L group and 3,952 children in the <1.5 mg/L group, which is a difference of 189 children). Thus, the addition of the crude binary data from Bashash (where children were divided between those with urinary F > 0.8 mg/L and < 0.8 mg/L, without adjustment for covariates) is the explanation for the elimination of a significant effect below 2 mg/L. *See Thiessen Trial Tr. (ECF No. 401) at 762:17-765:11 (Feb. 6, 2024)* (describing the data from Bashash that was used for the group-level analyses); *Trial Ex. 69 at 277* (same).

322.    The meta-analysis manuscript contains a forest plot that reports standardized mean difference (SMD) to standardize the effect estimate across studies that may use different kinds of IQ measures (e.g., Bayley), and different kinds of exposure measures (e.g., urinary fluoride). Grandjean Trial Tr. Vol. III, at 393:14–394:1; Trial Ex. 68, at NIEHS_000417, NIEHS_000447.

**Plaintiffs' rebuttal**: No dispute.

323.    The SMDs for several of the studies considered were statistically insignificant. Trial Ex. 68, at NIEHS_000417, NIEHS_000447. For example, the SMDs for Bashash 2017 and Green 2019 were not statistically significant. *Id.* at 395:23–396:15; 465:20–466:13.

**Plaintiffs' rebuttal**: The reason that the Bashash and Green studies do not show statistically significant results in the *means-effect* forest plot is because the protocol required use of *group-level* data from the studies, instead of the *individualized data* that gives the Bashash and Green studies their power. *Thiessen Trial Tr. (ECF No. 402) at 958:23-959:2 (Feb. 7, 2024).* According to the NTP, "In Bashash et al., the SMD compares mean IQ scores in children with urinary fluoride levels below vs. above 0.80 mg/L in Mexico. . . . [T]he Bashash et al. study was not designed to measure fluoride exposure by geographical area. However, since the mean IQ scores were provided in the manuscript for children with urinary fluoride levels below vs. above 0.80 mg/L, we included them in this analysis." *Trial Ex. 69 at 273*. The NTP has acknowledged the reduced power that comes from using group-level data in studies with low average exposures. *See Trial Ex. 69 at 277* ("In both Broadbent et al. (2015) and Green et al. (2019), levels of fluoride in water were low, even in communities with fluoridated drinking water. So, when using group-level exposure data (as opposed to individual-level exposure data), as was done in the mean-effects meta-analysis, the power to detect an effect may be limited."). Given the limitations of using group-level data, the NTP has encouraged consideration of "the results of the regression slopes meta-analysis, which used individual-level maternal urinary fluoride (MUF) for the Canadian (Green et al. 2019) and Mexican (Bashash et al. 2017) studies." *Id.*

324.     As Dr. Barone explained, and consistent with the BSC Working Group's assessment, there is insufficient data in the low-dose range to extrapolate a reliable dose-response curve in that exposure region. Barone Trial Tr. Vol. VIII, at 1353:16–1354:1, 1354:14–1355:21. A gap in the data around the 2.0 to 4.0 mg/L urinary fluoride range is critically important to understanding the shape of the dose-response curve and makes modeling a benchmark dose calculation highly uncertain. *Id.* at 1367:16–1368:12, 1368:22–1369:20. Further, the NTP meta-analysis manuscript does not include data from the INMA and OCC cohorts, making it incomplete and not reflective of best available science. *Id.* at 1335:18–22, 1339:21–1340:7, 1340:8–14.

**Plaintiffs' rebuttal**: On one hand, EPA cites non-significant results from NTP's dose-response analysis of <1.5 mg/L studies to argue that there is no effect below 1.5 (see Proposed Fact Nos. 320 & 404), while, on the other hand, EPA says there is "insufficient data" in NTP's dose-response analysis to determine the dose-response curve in the low-end range. This is a contradictory position. Further, contrary to the assertion that there is a "gap in the data around the 2.0 to 4.0 mg/L urinary fluoride range," eTable 4 shows that this range has the highest number of studies (n=6) and observations (n=15) of all of the urinary fluoride categories. *Trial Ex. 68 at NIEHS_000457*. Dr. Barone himself agreed that "there's a jump" in data between 2 and 4 mg/L. *Barone Trial Tr. (ECF No. 415) at 1373:10-13 (Feb. 12, 2024).*

### d.     No Defensible Way to Derive a POD from Urinary Fluoride Measure.

325.     Kinetic studies, including toxicokinetics, are part of the hazard assessment. 40 CFR § 702.41(d)(5); *see also* Thayer Trial Tr. Vol. IV, at 623:19–624:20; *id.* at 640:15–641:16 (Trial Phase 1).

**Plaintiffs' rebuttal**: No dispute. Both Dr. Grandjean and Dr. Thiessen considered toxicokinetics as part of their hazard assessments. *Grandjean Trial Tr. (ECF No. 417) at 292:9-13 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 767:16-768:8 (Feb. 6, 2024).* Dr. Savitz,

on the other hand, did not consider toxicokinetics. *Savitz Trial Tr. (ECF No. 414) at 1182:18-21 (Feb. 9, 2024).*

326.    In general terms, toxicokinetics refers to the amount of a chemical that reaches the target organ or cell where it has its biological impact. Barone Trial Tr. Vol. IV, at 577:15–18. Pharmacokinetics is generally synonymous with toxicokinetics. *Id.* at 578:24–579:5.

**Plaintiffs' rebuttal**: No dispute.

327.    Dr. Thiessen did not attempt to select a point of departure. Thiessen Trial Tr. Vol. VI, at 907:19–908:15, 914:12–14 (Feb. 7, 2024) ("I did not attempt to provide a real point of departure."). Dr. Thiessen identified three "examples" of what a point of departure could be. *Id.* at 909:21–910:5. Two of those examples are water fluoride concentrations of 1.5 mg/L and 0.7 mg/L. Dr. Thiessen identified the first—1.5 mg/L—from the NTP draft State of the Science Monograph, although she admits it is not based on any findings in the monograph. *Id.* at 910:23–911:21. The second is simply the water fluoride concentration of 0.7 mg/L in Canada. *Id.* at 911:22–912:6. The third "example" point of departure that Dr. Thiessen identified is a urinary fluoride concentration of 0.2 mg/L based on Dr. Grandjean's 2022 BMCL. *Id.* at 912:7–12.

**Plaintiffs' rebuttal**: Dr. Thiessen did analyses for each of these points of departure using the *minimum* required Benchmark MOE (i.e., 10). *Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024* (agreeing that a Benchmark MOE of at least 10 should be used for fluoride neurotoxicity). In doing so, Dr. Thiessen explained why a risk is present from fluoridation for each of these points of departure. *Thiessen Trial Ex. (ECF No. 401) at 786:24-788:8 & 801:23-807:10 (Feb. 6, 2024)*.

328.    Dr. Thiessen did not attempt to calculate a point of departure in milligrams per kilogram per day for any of her example points of departure. Thiessen Trial Tr. Vol. VI, at 919:14–18. (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute.

329.     Dr. Grandjean's BMCL of 0.2 mg/L urinary fluoride is below the background fluoride exposures represented in maternal urine samples from non-fluoridated areas in the MIREC cohort. Thiessen Trial Tr. Vol. VI, at 947:17–21 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute, but this does not speak to the merits, or lack thereof, of the BMCL. Instead, it speaks to the fact that there is currently widespread exposure to fluoride across society, just as there was to lead before EPA banned leaded gasoline. *Hu Trial Tr. (ECF No. 395) at 114:15-115:6 (Jan. 31, 2024)* (explaining there was not much research on the impacts of low-level lead before EPA banned leaded gasoline because "there just weren't that many people with low levels"); *Lanphear Trial Tr. (ECF No. 417) at 211:12-212:23 (Feb. 1, 2024)* (explaining there is no "control" fluoride-free population to study the impacts of low-level fluoride today, and analogizing it to the history of lead). One of the reasons there is an elevated "background" level of fluoride in urine is because many beverages and foods are now manufactured with fluoridated water, which in turn exposes people who live in non-fluoridated areas. *Thiessen Trial Tr. (ECF No. 401) at 799:7-800:21 (Feb. 6, 2024).*

330.     Urinary fluoride values can reflect fluoride exposures from other sources like pharmaceuticals, air pollution, tea, seafood, toothpaste, dental products, and fluoride tablets. Thiessen Trial Tr. Vol. VI, at 916:10–14 (Feb. 7, 2024). Fluoride absorption and retention in the body can also be affected by things like calcium intake and kidney function. *Id.* at 932:7–10. The amount of fluoride observed in a urine sample is also dependent on the bodyweight and metabolism of the individual. *Id.* at 932:11–15.

**Plaintiffs' rebuttal**: No dispute.

331.     Fluoride concentration in urine depends on recent fluoride intake, kidney function at higher intake levels, and bone demineralization and other physiological changes over the course of pregnancy. Barone Trial Tr. Vol. IX, at 1399:7–1401:2, 1402:19–1404:10 (Feb. 13, 2024).

**Plaintiffs' rebuttal**: No dispute.

332.     Dr. Grandjean's BMCL reflects exposure from community water fluoridation as well as other fluoride sources. Thiessen Trial Tr. Vol. VI, at 916:4–14 (Feb. 7, 2024). Dr. Thiessen does not know the dose of fluoride for any of the participants in the studies from which she identified "example" points of departure. *Id.* at 916:15–18. None of the "example" points of departure consider fluoride intake rates. *Id.* at 916:19–23. And none of the "example" points of departure consider the body weight of the participants. *Id.* at 917:2–4.

**Plaintiffs' rebuttal**: There is no need to do source allocation for the *hazard* level to determine what percentage of the hazardous dose is coming from water fluoridation. As Dr. Barone explained to the Court, "the hazard data, the evaluation of the hazard data, Judge, is really **condition-of-use-free**." *Barone Trial Tr. (ECF No. 400) at 574:14-15 (Feb. 5, 2024).*

333.     Plaintiffs have not presented any defensible way to convert maternal urinary fluoride values to a fluoride intake value. Barone Trial Tr. Vol. VIII, at 1381:16–1385:5, 1395:24.

**Plaintiffs' rebuttal**: RSI has presented a way for converting maternal urinary fluoride levels into a fluoride intake value. But, even if RSI had not made these calculations, Dr. Barone has conceded that the key requirement is that the hazard and exposure levels be "in the same units." *Barone Trial Tr. (ECF No. 400) at 672:22-673:4 (Feb. 5, 2024)*; *accord Thiessen Trial Tr. (ECF No. 401) at 790:18-791:16 (Feb. 6, 2024).* This requirement is met, for both urinary fluoride level, water fluoride level, and fluoride intake from beverages. *Thiessen Trial Tr. (ECF No. 401) at 791:21-792:8 (Feb. 6, 2024).* As Dr. Tala Henry, EPA's risk assessment scientist at the first trial, explained: if there is evidence "that allows the [EPA] to conduct the comparison of exposure to toxicity based on a fairly straightforward and simple method, [EPA] can stop there and need not do further refinement." *Henry Trial Tr. (ECF No. 244) at 973:21-974:1 (June 16, 2020).*

334.     At no point has Dr. Thiessen attempted to convert maternal urinary fluoride values to a fluoride-intake value. Thiessen Trial Tr. Vol. VI, at 934:24–935:2 (Feb. 7, 2024). In

Dr. Thiessen's view, a "quick and dirty approximation" is that urine and water fluoride concentrations have a 1:1 relationship, but that approximation is quickly proven false by the studies on which her opinions are based. *Id.* at 933:8–15. The MIREC study, Till 2018, showed that average maternal urinary fluoride values were over 40% higher than the average fluoride concentration in the participants' tap water. *Id.* at 937:5–7. And in the Thippeswamy 2021 study, average maternal urinary fluoride values were <u>lower</u> than the average fluoride concentrations in the mothers' drinking water. *Id.* at 942:4–12; Trial Ex. 111, at 111.003. Among the participants in the low/optimum fluoridation group, urinary fluoride values were about 25% less than drinking water concentrations. Thiessen Trial Tr. Vol. VI, at 939:14–17; Trial Ex. 111, at 111.004 (Table 2 showing beta coefficient of 0.247). This is nowhere near a 1:1 relationship. Thiessen Trial Tr. Vol. VI, at 933:8–15 (Feb. 7, 2024). Nor did the researchers find a 1:1 relationship when the low- and high-exposure data were combined. *Id.*

**Plaintiffs' rebuttal**: <u>First</u>, no dispute that Dr. Thiessen did not attempt to convert maternal urinary into a fluoride-intake value, although RSI has done so. *Trial Ex. 129 at 129.025*. <u>Second</u>, the data that EPA cites does not contradict the "consistent finding in several decades of literature" that "as the fluoride intake goes up, the urinary fluoride goes up, whether you're talking an individual or a group of individuals." *Thiessen Trial Tr. (ECF No. 401) at 792:19-793:4 (Feb. 6, 2024); see also Grandjean Trial Decl. ¶ 151* ("Urine-fluoride has been shown to be a good indicator of total daily fluoride intake, and has a close, linear correlation with the fluoride content in water."). <u>Third</u>, the Till (2018) study confirmed that fluoridated water is a major driver of urinary fluoride levels. To quote: "The strongest correlate of [the fluoride level in urine] was water fluoride level, indicating that artificially fluoridated drinking water is a major source of fluoride intake. . . . These findings are consistent with prior studies showing that fluoride levels in drinking water are closely related to those in urine in adults, children and adults, and pregnant women." *Trial Ex. 108 at 108.010 (citations omitted)*. <u>Fourth</u>, the Thippeswamy study, which looked at a different population and used a different study design than Till, confirms that urine fluoride is significantly correlated with water fluoride. According to the authors: "An increase in fluoride levels are observed in the maternal blood and urine when

the fluoride concentration increases in drinking water, as indicated by this present study. This outcome is in line with the studies previously conducted by . . . . Christine Till et al." *Trial Ex. 111 at 111.004*.

335.    Observations of urinary fluoride and water fluoride intake do not share a linear relationship because of physiological considerations during pregnancy. Barone Trial Tr. Vol. VIII, at 1383:12–1384:11, 1384:17–1385:12.

**Plaintiffs' rebuttal**: EPA has identified two physiological influences (bone demineralization and kidney oversaturation) that influence the linearity of the water fluoride - urine fluoride relationship. *Barone Trial Tr. (ECF No. 418) at 1396:24-1397:2 & 1399:12-24 & 1431:4-7 (Feb. 13, 2024).* Based on Dr. Barone's own admissions, **these physiological influences *increase* the source contribution from fluoridation, not decrease it.** First, fluoridated water increases the accumulation of fluoride in bone, which thereby increases the amount of fluoride that is mobilized from bone during pregnancy. *Id. at 1432:12-1433:3.* Second, the kidney oversaturation appears to be occurring among the 95th percentile in the fluoridated areas, but not among the 95th percentile in the non-fluoridated areas. *Id. at 1431:4-7.* Ergo, the physiological influences are magnifying the exposure from fluoridated water, not reducing it. As Dr. Barone stated, "when you look across the 50th percentile, 75th percentile and the 95th percentile, you look at the slope for the nonfluoridated versus the fluoridated group and they're dramatically different for those comparisons. They're not the same. So there's something going on there." *Barone Trial Tr. (ECF No. 415) at 1383:22-1384:1 (Feb. 12, 2024).*

336.    A physiologically based pharmacokinetic or PBPK model can estimate concentrations of a substance in parts of the body based on physiological parameters like absorption. Thiessen Trial Tr. Vol. VI, at 943:1–7 (Feb. 7, 2024). For example, EPA has used animal and human PBPK models to calculate intake values based on lead biomarker data. Barone Trial Tr. Vol. IX, at 1397:6–19.

**Plaintiffs' rebuttal**: No dispute.

337.    Plaintiffs have not offered a PBPK model that can predict maternal urinary fluoride concentrations based on drinking water exposures or that can assess fluoride exposure and maternal urinary fluoride values for pregnant women. Thiessen Trial Tr. Vol. VI, at 943:8–16; Barone Trial Tr. Vol. IX, at 1396:17–1397:2, 1397:23.

**Plaintiffs' rebuttal**: There are no published PBPK models on fluoride exposure during pregnancy. *Barone Trial Tr. (ECF No. 418) at 1396:17-1397:2 (Feb. 13, 2024)*. Plaintiffs have not filled this data gap in the scientific literature.

338.    Plaintiffs' risk assessor, Dr. Thiessen, did not consider the INMA IQ study when forming her opinions for this case. Thiessen Trial Tr. Vol. VI, at 903:15–20 (Feb. 7, 2024). She agrees that prospective cohort studies are generally methodologically superior to cross-sectional studies for purposes of determining an association between fluoride exposure and IQ. *Id*. at 903:2–6.

**Plaintiffs' rebuttal**: No dispute that "a detailed review of the INMA study was beyond the scope" of Dr. Thiessen's analysis. *Thiessen Trial Tr. (ECF No. 402) at 903:15-17*. Dr. Thiessen's analysis was focused on whether the NTP's findings support the existence of an unreasonable risk from fluoridation when evaluated in the context of what EPA does for its risk evaluations under TSCA. *Thiessen Trial Tr. (ECF No. 401) at 837:25-838:14 (Feb. 6, 2024)*.

339.    The attempt by Risk Sciences International to convert Dr. Grandjean's BMCL to a fluoride intake value is highly uncertain. Barone Trial Tr. Vol. IX, at 1436:7–19. Risk Sciences International used a rough conversion parameter of 0.75 for urinary excretion that is a very large an uncertain assumption. *Id.* at 1436:17–19. The conversion parameter is also not appropriate for pregnant women. *Id.* at 1436:22–24. None of Plaintiffs' experts relied on the Risk Sciences International report. In fact, even the authors of the report did not depend on Dr. Grandjean's BMCL to derive a point of departure. *Id.* at 1436:25–1437:3.

**Plaintiffs' rebuttal**: First, as explained above, the physiological changes that occur

during pregnancy (e.g., bone demineralization) would be expected to magnify the exposure from fluoridated water, not decrease it. *Barone Trial Tr. (ECF No. 418) at 1431:4-7 & 1432:12-1433:3 (Feb. 13, 2024)*. Thus, the uncertainty that flows from not having a pregnancy-specific PBPK model likely serves to *under-estimate*, rather than over-estimate, the exposure contribution from fluoridated water. Second, Plaintiffs' experts did not rely on the RSI report because it was not available until the middle of trial, after every Plaintiff expert had completed their direct exams. *Trial Tr. (ECF No. 402) at 861:2-4 (Feb. 7, 2024)* (announcing the publication of the RSI report).

340.    The expectation is that a substance must be able to cross the blood-brain barrier to be toxic to the brain. Hu Trial Tr. Vol. I, at 168:16–19 (Jan. 31, 2024). Although maternal urinary fluoride seems to correlate with fluoride concentrations in serum that may pass the placenta, the amount of fluoride that reaches the fetal brain is unknown. *Id.* at 167:23–168:2. Indeed, as Dr. Hu admitted, there is no research establishing how much fluoride reaches the fetal brain during human pregnancy. *Id.* at 168:20–23.

**Plaintiffs' rebuttal**: It is an undisputed fact in this case that "[f]luoride passes through the placenta and **gets into the fetal brain**." *Undisputed Fact No. 30 (emphasis added)*. Dr. Hu testified he has no reason to disagree with the EPA on this point. *Hu Trial Tr. (ECF No. 395) at 180:16-21 (Jan. 31, 2024)*. Fluoride's passage through the blood brain barrier has been confirmed in both animal and human studies. *Grandjean Trial Decl. (ECF No. 198-3) ¶ 51; Thiessen Trial Decl. (ECF No. 202-1) ¶ 94*.

341.    Finally, there is no evidence of an association of between fluoride exposure and pathological effects on the fetal brain in humans. Grandjean Trial Tr. Vol. II, at 296:12-297:13.

**Plaintiffs' rebuttal**: Toxicological studies on human beings are forbidden on ethical grounds. *Hu Trial Tr. (ECF No. 395) at 107:17-108:6 (Jan. 31, 2024).* However, toxicological studies are not forbidden on laboratory rodents, and these studies confirm that fluoride causes biochemical and pathological changes in the brain. *Grandjean Trial Tr. (ECF No. 417) at 294:6-*

*21 (Feb. 1, 2024) & Thiessen Trial Tr. (ECF No. 401) at 758:5-759:16 & 759:22-760:9 (Feb. 6, 2024).*

### 4.    Hazard Characterization

342.    The hazard characterization describes the quantitative POD representing adverse outcomes that are associated with exposure to a particular chemical substance, as well as the qualitative strength of the evidence related to the potential hazards. Barone Trial Tr. Vol. IV, at 667:17–24. In this step, the Agency describes the confidence in particular outcomes (e.g., medium confidence). *Id.* at 666:9–25.

**Plaintiffs' rebuttal**: There is no "Hazard Characterization" section in any of EPA's first 10 risk evaluations under the Amended TSCA.[8] This fact can be ascertained in a few minutes by searching for the words "Hazard Characterization" in Trial Exhibits 96 to 104. While there is a section in the Hazard Assessment that describes the confidence in the acute and chronic hazards, this section is generally very short and written in conclusory language with much less qualitative explanation than the NTP provided for fluoride.  *See, e.g.*, *Thiessen Trial Tr. (ECF No. 401) at 769:17-770:4 (Feb. 6, 2024)* (comparing EPA's assessments with NTP); *Trial Ex. 96 at 353* (summarizing the confidence in PCE's acute and chronic non-cancer endpoints); *Trial Ex. 97 at 378-79* (same – HBCD); *Trial Ex. 98 at 201* (same - 1,4-Dioxane); *Trial Ex. 99 at 81* (same – PV29)*; Trial Ex. 101 at 169* (same - carbon tetrachloride); *Trial Ex. 102 at 312* (same - methylene chloride); *Trial Ex. 103 at 269* (same - NMP); *Trial Ex. 104 at 282* (same – TCE).

343.    The NTP monograph did not identify a point of departure. Barone Trial Tr. Vol. VIII, at 1373:22–1374:5, 1444:11–18. The authors of the monograph used the World Health Organization guideline of 1.5 mg/L generally to categorize their hazard conclusions. *Id.* at 1444:11–18.

**Plaintiffs' rebuttal**: The fact that the 1.5 mg/L level corresponds to the WHO standard

---

[8]    In the parties' joint filing on January 24, the parties agreed to the steps of a risk evaluation. *ECF No. 391 ¶ 3.* The parties agreed that the hazard assessment contains *two* steps: hazard identification and quantitative dose response analysis. *Id.*

does not, in any way, negate NTP's confidence assessment that levels approximating or exceeding this standard are associated with reduced IQ.  Indeed, based on NTP's review, RSI selected 1.5 mg/L as a "provisional point of departure" for fluoride neurotoxicity. *Trial Ex. 129 at 129.025*.

344.    The NTP meta-analysis did not propose a point of departure. Barone Trial Tr. Vol. IX, at 1421:13–20.

**Plaintiffs' rebuttal**: No dispute.

345.    Dr. Thiessen did not select and justify a point of departure based on any epidemiological studies. Barone Trial Tr. Vol. VIII, at 1376:4–19, 1376:22–1377:14, 1421:21–1422:2.

**Plaintiffs' rebuttal**: This is incorrect. Every point of departure that Dr. Thiessen considered and addressed is based on epidemiological studies, including (A) Dr. Grandjean's 2022 BMCL (0.2 mg/L); (B) the water fluoride level associated with reduced IQ in the MIREC cohort (~0.7 mg/L); and (C) the water/urine fluoride level for which the NTP has moderate confidence of a hazard occurring (1.5 mg/L). *Thiessen Trial Tr. (ECF No. 402) at 910:12-912:12 (Feb. 7, 2024)*. Using the Margin of Exposure framework, Dr. Thiessen has explained why each of these points of departure would result in a finding of risk for fluoridation because the margin between hazard and exposure is well below the minimum necessary Benchmark MOE, and this remains the case even if the exposure assessment is limited to what is directly attributable to fluoridation. *Thiessen Trial Ex. (ECF No. 401) at 786:24-788:8 & 801:23-807:10 (Feb. 6, 2024)*. Dr. Thiessen has also explained why the 1.5 mg/L level identified by the NTP is an "observed adverse effect level," not a "*lowest* observed adverse effect level," which adds further confidence to the risk determination if 1.5 mg/L (or any higher water fluoride level) is selected as the point of departure. *Id. at 802:1-803:12 & 804:10-806:3*.

346.     The Risk Sciences International systematic review does not set a point of departure for neurotoxicity. Barone Trial Tr. Vol. IX, at 1374:21–24, 1375:3–7, 11–17.

**Plaintiffs' rebuttal**: The RSI calculated points of departure for neurotoxicity. *See, e.g., Trial Ex. 129 at 129*.002 ("The current review identified moderate dental fluorosis and **reduction in IQ scores** in children as the most relevant endpoints for establishing an HBV for fluoride in drinking water. **PODs were derived for these two endpoints** . . . ."); *id. at 129.025* ("[T]he *variously* **derived BMCLs** *ranged* from 0.077mg F/L to 0.753mg F/L drinking water"); *id. at 129.025* ("At this point in time, **1.5mg/L may be considered as a provisional point of departure** for establishing an HBV for fluoride in Canadian drinking water based on protection against neurocognitive effects in children.").

347.     As Dr. Barone explained, that one can mathematically assess dose-response assessment does not mean that a POD should be derived from the dose-response analysis and carried forward to the risk characterization step. Barone Trial Tr. Vol VIII, at 1335:8–12. Here, the weight of the scientific evidence does not support selecting as a point of departure fluoride concentration of 2.0, 3.0, or even 4.0 mg/L. Barone Trial Tr. Vol. IX, at 1422:12–23.

**Plaintiffs' rebuttal**: <u>First</u>, EPA has defined the term "weight of the evidence" under the Amended TSCA to mean "**a systematic review method**." *40 C.F.R. § 702.33; Henry Trial Tr. (ECF No. 244) at 944:13-945:20 (June 16, 2020).* Dr. Barone agrees that the NTP's systematic review on fluoride is a "high quality review" that "followed the rules that have been developed by NTP for conducting systematic reviews." *Barone Trial Tr. (ECF No. 418) at 1427:2-8 (Feb. 13, 2024).* Dr. Barone also testified that the NTP's systematic review is "very similar" to the evidence integration process that EPA uses under TSCA. *Barone Trial Tr. (ECF No. 400) at 564:11-22 (Feb. 5, 2024).*

<u>Second</u>, the NTP concluded, with moderate confidence, that total fluoride levels approximating, or exceeding, **1.5 mg/L** are associated with reduced IQ. *Trial Ex. 67 at xiii.* EPA's counsel stated, in opening, that EPA does not dispute NTP's conclusion. *Opening Statement (ECF No. 395) at 59:20-24 (Jan. 31, 2024)* ("I don't disagree that [NTP's] conclusion

1  is technically correct. . . . I don't think we're fighting the NTP monograph on that point."); *id. at*

2  *65:18-21* ("I don't think the NTP is getting it wrong when they say that these studies

3  approximate or exceed [1.5 mg/L] . . . .").

4    <u>Third</u>, there is now a second systematic review on fluoride, by Risk Sciences

5  International, and it has concluded that there is "a **moderate to strong magnitude (strength) of**

6  **association** between fluoride and neurocognitive effects with **consistent evidence** across studies

7  for the impact on childhood IQ" at **2 mg/L**. *Trial Ex. 129 at 129.022* (emphases in original) *&*

8  *129.010* (defining the water fluoride level as 2 mg/L). Thus, there are now two comprehensive

9  systematic reviews, commissioned by the federal governments of Canada and the United States,

10  that have concluded that fluoride is consistently associated with reduced IQ at **1.5 to 2 mg/L**.

11

12    348.  Where, as here, a POD cannot be determined and the hazard assessed, the analysis

13  stops and does not continue to the remaining steps of the risk evaluation. *See* Barone Trial Tr.

14  Vol. IX, at 1420:18-1423:18.

15    **<u>Plaintiffs' rebuttal</u>**: EPA does not cite any statutory or regulatory authority, including its

16  Risk Evaluation Rule, for this broad proposition. EPA's Risk Evaluation Rule states that the

17  characterization of risk can be "quantitative and/or qualitative." *Trial Ex. 544 at 33752*; *Barone*

18  *Trial Tr. (ECF No. 400) at 626:5-7 (Feb. 5, 2024).* Consistent with this, Dr. Henry testified that

19  if the evidence "allows the [EPA] to conduct the comparison of exposure to toxicity based on a

20  fairly straightforward and simple method, [EPA] can stop there and need not do further

21  refinement." *Henry Trial Tr. (ECF No. 244) at 973:21-974:1 (June 16, 2020).* Here, we are

22  dealing with a situation where (A) there is no dispute that neurotoxicity is a hazard of fluoride,

23  and (B) there is no meaningful dispute that fluoride is associated with this hazard at a level that is

24  closer to the fluoridation exposure level than the minimum Benchmark MOE would consider

25  acceptable. *Barone Trial Tr. (ECF No. 418) at 1420:24 (Feb. 13, 2024)* (agreeing that "there's

26  something going on"); *id. 1424:12-14* (agreeing that fluoride causes neurodevelopmental harm);

27  *id. 1423:1-2 & 1429:11-21* (agreeing that Hazard ID has been satisfied); *id at 1424:24-1425:3*

28

(agreeing that fluoride is associated with neurotoxic effects above 2 mg/L);[9] *id. at 1428:12-21* (agreeing that the studies permit confidence that bias is not the cause of the consistent association between fluoride and reduced IQ); *id. 1425:4-22* (agreeing there should be a Benchmark MOE of at least 10 for fluoride neurotoxicity). Under these circumstances, even *if* EPA were correct that a POD cannot yet be specifically determined (which Plaintiffs strongly dispute), a risk is still qualitatively apparent.

## III.    EXPOSURE ASSESSMENT

### A.    PLAINTIFFS' PROPOSED FACTS (NOS. 349–362)

349.    An exposure assessment under TSCA seeks to identify the human exposure level under a specific Condition of Use. *Barone Trial Tr. (ECF No. 400) at 567:18-21 (Feb. 5, 2024).*

**EPA's rebuttal**: Undisputed.

350.    EPA considers "sentinel" (i.e., high end) exposures in its exposure assessment. When the data is reasonably available, EPA will select the 95th percentile as the high-end exposure. *Barone Trial Tr. (ECF No. 400) at 568:17-569:1 & 569:14-19 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The cited testimony does not support the second sentence of the factual proposition. Where statistical data are reasonably available, EPA typically uses the 95th percentile value of the reasonably available data set to characterize high-end exposure for a given condition of use. Barone Trial Tr. Vol. IV, at 569:14–19.

351.    TSCA specifically permits EPA to consider "aggregate exposures" to a chemical. Aggregate exposures may include exposures from multiple sources and conditions of use of a chemical. *Barone Trial Tr. (ECF No. 400) at 567:22-568:2 & 568:13-16 & 733:16-23 (Feb. 5, 2024).*

---

[9]    *See also Barone Trial Tr. (ECF No. 415) at 1325:14-17 (Feb. 12, 2024)* (agreeing that there is consistency in findings at, or above, 2 mg/L).

**EPA's rebuttal**: Disputed. EPA considers aggregate exposures by multiple pathways of exposure (like oral and dermal exposure) within a particular condition of use. *Infra* ¶ 370; Barone Trial Tr. Vol. IV, at 568:3–10; Barone Trial Tr. Vol. V, at 734:2–12.

352.    Urinary fluoride is a metric of the total absorbed dose of fluoride exposure and is thus a measure of aggregate fluoride exposure. *Hu Trial Tr. (ECF No. 395) at 105:10-25 (Jan. 31, 2024); Barone Trial Tr. (ECF No. 418) at 1404:19-21 (Feb. 13, 2024); Hu Trial Decl. (ECF No. 198-1) ¶ 38; Hu Trial Tr. (ECF 239) 75:2-16 (June 8, 2020); Lanphear Trial Tr. (ECF No. 241) at 423:1-424:1 (June 10, 2020).* Based on the totality of available evidence, the NTP has determined that "urinary fluoride is a reasonable measure of exposure." *Trial Ex. 67 at 51-52.*

**EPA's rebuttal**: Undisputed that urinary fluoride is a biomarker of total exposure. The second sentence is disputed as incomplete. The full statement by NTP is: "Taken together, these studies suggest that urinary fluoride is a reasonable measure of exposure despite some potential issues." Trial Ex. 67, at 52. Further disputed with respect to urinary fluoride being a "reasonable measure of exposure" for use in a TSCA risk evaluation without the ability to reverse engineer to find out fluoride source apportionment so that EPA could set specific regulatory values under TSCA. Barone Trial Tr. Vol. IX, at 1396:4–14 (Feb. 13, 2024).

353.    Published data is now available on the urinary fluoride levels in cohorts of pregnant women consuming "optimal" fluoride levels in Canada, Mexico, and the United States. *Trial Ex. 106; Trial Ex. 108; Trial Ex. 122.* The studies from Canada and the US have measured urinary fluoride levels in pregnant mothers living in communities with fluoridated water, whereas the study from Mexico measured urinary fluoride levels in pregnant mothers consuming fluoridated salt. *Hu Trial Tr. (ECF No. 239) at 119:5-25 (June 8, 2020).*

**EPA's rebuttal**: Disputed. The proposed fact is vague as to what "optimal" fluoride levels are, whether it refers to an intake level (for example, an optimal intake for a particular body weight), or whether it refers to a concentration in a particular media (e.g., water or salt). The optimal fluoride concentration in drinking water for the prevention of tooth decay is 0.7 mg/L.

Ex. 108, at 1. In addition, the cited evidence does not support the assertion that the urinary fluoride levels found by the Canada and United States studies are representative of the broader population for each country. The "Canada" cohort studied in Trial Exhibit 108 is primarily white and tended to be older, more educated, and more likely to be married and use prenatal vitamins than the Canadian population as a whole, which, as Dr. Lanphear acknowledged, limits the ability to generalize those results to both the broader Canadian and United States populations. *See supra* ¶ 111. The "United States" cohort studied in Trial Exhibit 122 is predominantly comprised of low-income Hispanic women residing in urban Los Angeles, California, which, as Dr. Hu admitted, limits the ability to generalize those results to the broader United States. *See supra* ¶ 192. Further, Abduweli (2020) found lower urinary fluoride levels in a cohort of women in California than what was found in the MADRES cohort. *See supra* ¶ 191. Otherwise, undisputed.

354. The studies from Canada, Mexico and United States have found similar urinary fluoride levels across the three cohorts of pregnant mothers. *Hu Trial Tr. (ECF No. 395) at 123:11-124:12 (Jan. 31, 2024); Trial Ex. 69 at 32; Hu Trial. Decl. (ECF No. 198-1) ¶¶ 41-42; Lanphear Trial. Decl. (ECF No. 198-2) ¶¶ 33-34; Grandjean Trial Tr. (ECF No. 240) at 187:5-188:23 (June 9, 2020).*

**EPA's rebuttal**: Disputed. The results of the "Canada" (MIREC) and "United States" (MADRES) studies are not representative of the broader population for those two countries. *See supra* ¶¶ 111, 192. The ELEMENT study was of a population in Mexico City, not all of Mexico. Otherwise, undisputed.

355. Pregnant mothers living in Los Angeles, California (a fluoridated city) were found to have a median (specific gravity-adjusted) urinary fluoride level of **0.8 mg/L**, and a 95th percentile level of **1.89 mg/L**, in the third trimester (Malin 2023). *Trial Ex. 122, Tbl. 2.* These values are almost identical to the (specific-gravity adjusted) urinary fluoride levels found in fluoridated areas of Canada (i.e., median = **0.77 mg/L** and 95th percentile = **1.89 mg/L**) (Till 2018). *Trial Ex. 108, Tbl. S4; Hu Trial Tr. (ECF No. 395) at 124:1-16 (Jan. 31, 2024).*

**EPA's rebuttal**: Undisputed.

356.    The NTP has recognized that "some urinary fluoride measurements" from areas with fluoridated drinking water "exceed those that would be expected from consuming water that contains fluoride at 1.5 mg/L." *Trial Ex. 69 at 41.* The NTP's comment is supported by data on urinary fluoride levels in highly exposed (95th percentile) pregnant women in fluoridated areas, which shows that the fluoride levels in this group exceed those which are typically associated with a water fluoride level of 1.5 mg F/L. *Hu Trial Tr. (ECF No. 395) at 124:13-16 (Jan. 31, 2024); Lanphear Trial Tr. (ECF No. 395) at 244:6-11 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 781:782:5, 783:10-18 & 789:4-13 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The selectively quoted language by NTP is but one example of how "individual exposure levels, as documented by repeated urinary measurements, suggest widely varying total exposures from water combined with fluoride from other sources" in the Green study where some participants were exposed to "optimally fluoridated" water. Trial Ex. 69, at 41. The proposed fact also presumes what would "be expected from consuming water that contains fluoride at 1.5 mg/L" and whether data from other studies supports that expectation. Undisputed that water fluoride concentrations and maternal urinary fluoride concentrations do not share a linear relationship. *Supra* ¶ 335.

357.    A reasonable estimate of the contribution from fluoridated water can be obtained by comparing urinary fluoride levels among populations living in fluoridated vs. non-fluoridated areas. *Lanphear Trial Tr. (ECF No. 395) at 244:6-25 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 784:3-18 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 418) at 1430:12-1431:3 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact is vague what a "reasonable estimate." Urinary fluoride values can reflect fluoride exposures from other sources like pharmaceuticals, air pollution, tea, seafood, toothpaste, dental products, and fluoride tablets. Thiessen Trial Tr. Vol. VI, at 916:10–14 (Feb. 7, 2024). Fluoride absorption and retention in the body can also be affected

by things like calcium intake and kidney function. *Id.* at 932:7–10. Fluoride concentration in urine depends on recent fluoride intake, kidney function at higher intake levels, and bone demineralization and other physiological changes over the course of pregnancy. Barone Trial Tr. Vol. IX, at 1399:7–1401:2, 1402:19–1404:10 (Feb. 13, 2024). The amount of fluoride observed in a urine sample is also dependent on the bodyweight and metabolism of the individual. Theissen Trial Tr. Vol. VI, at 932:11–15.

No record evidence permits an estimate of the contribution from fluoridated water to an observed fluoride concentration in maternal urine. *Supra* ¶¶ 330–37.

358.    The study by Till (2018) is the most extensive analysis of urinary fluoride levels among pregnant women that is currently available in the scientific literature. *Lanphear Trial. Decl. (ECF No. 198-2) ¶ 24.* The study measured the urinary fluoride levels in over 1,500 pregnant women living in fluoridated and non-fluoridated areas of Canada. *Lanphear Trial. Decl. (ECF No. 198-2) ¶ 25.*

**EPA's rebuttal**: Disputed. The proposed fact is vague as to "extensive analysis." The OCC and INMA cohorts also analyze urinary fluoride levels in pregnant women and post-date Dr. Lanphear's declaration. And Thippeswamy (2021) studied correlations of drinking water fluoride and internal urinary fluoride, among other things, which is a different type of analysis of urinary fluoride levels. Trial. Ex. 111.

359.    The Till study found that fluoridated water was the most significant source of fluoride in a pregnant woman's urine. In the third trimester, the 95th percentile (creatinine-adjusted) urinary fluoride level in fluoridated areas was **2.41 mg/L**, versus 1.04 mg/L in non-fluoridated areas, for **a difference of 1.37 mg/L between women in the two areas.** *Lanphear Trial Tr. (ECF No. 395) at 244:6-25 (Feb. 1, 2024).* (This difference actually under-states the true contribution from water fluoridation because fluoridation increases the level of urinary fluoride in *non-fluoridated* areas, thus narrowing the difference between fluoridated and non-fluoridated areas. *Thiessen Trial Tr. (ECF No. 401) at 799:7-800:13 (Feb. 6, 2024).*

**EPA's rebuttal**: Undisputed that the proposed fact states the findings of the Till (2018) study.

360.    The fact that fluoridated water causes higher urinary fluoride levels by, in part, increasing the accumulation of fluoride in bone (which enters the bloodstream during pregnancy via bone demineralization) and by potentially oversaturating the kidney in highly exposed women does not alter the fact that fluoridation is the cause of the elevated body burden. *Hu Trial Tr. ECF No. 395 at 121:4-123:9 (Jan. 31, 2024); Barone Trial Tr. (ECF No. 418) at 1399:12-24 & 1432:12-1433:3 (Feb. 13, 2024).* If anything, the fact that fluoridation increases fluoride exposure during pregnancy through these alterations in the body's physiology increases the basis for concern. *Barone Trial Tr. (ECF No. 418) at 1431:4-20 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact assumes that fluoridated water causes higher urinary fluoride levels by increasing the accumulation of fluoride in bone and potentially oversaturating the kidneys. The cited testimony does not support this assumption. Dr. Barone testified that women living their *entire lives* in fluoridated areas, including endemic fluoride areas, may have higher fluoride concentrations in their bones. Barone Trial Tr. Vol. IX, at 1431:22–1433:3. The cited testimony also does not support the second sentence of the proposed fact.

361.    The high levels of fluoride found in the urine of highly exposed pregnant women in fluoridated areas is consistent with estimates of fluoride intake that have been derived from EPA's nationally representative tap water intake data. *Thiessen Trial Tr. (ECF No. 401) at 781:15-782:9 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The cited testimony does not support the factual proposition. Dr. Thiessen testified more generally that as fluoride intake increases, the urinary fluoride concentration increases. Thiessen Trial Tr. Vol. V, at 782:7–9. The proposed fact is otherwise unclear how EPA's nationally representative tap water intake data are consistent with estimates of maternal urinary fluoride observations and what the expected urinary fluoride concentration would be based on a water fluoride concentration. *See supra* ¶¶ 333–35.

362.     According to EPA's tap water intake data, a pregnant woman with *95th percentile* tap water intake will consume about 2.5 times more tap water than pregnant women with 50th percentile intake. *Thiessen Trial Tr. (ECF No. 401) at 779:3-9 & 780:21-781:10 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 418) at 1399:13-15 (Feb. 13, 2024)*  A consequence of this fact is that a pregnant mother with 95th percentile water intake who lives in a fluoridated area (0.7 mg/L) will consume more fluoride from her water then over 50% of pregnant woman living in areas with 1.5 mg/L fluoride in water.  *Thiessen Trial Tr. (ECF No. 401) at 781:4-10 (Feb. 6, 2024).*

**EPA's rebuttal**: Undisputed.


**B.     EPA'S PROPOSED FACTS (NOS. 363–372)**

363.     As described in TSCA section 6(b)(4)(F)(iv), the third component of risk evaluation requires an exposure assessment for the chemical substance under the conditions of use. Exposure assessment is the process of estimating or measuring the magnitude, frequency, and duration of exposure to an agent and the size and characteristics of the population exposed. 15 U.S.C. § 2605(b)(4)(F)(iv); Henry Decl. ¶ 144, ECF No. 201 (Trial Phase 1).

**Plaintiffs' rebuttal**: No dispute.


364.     In the exposure assessment, EPA first seeks to identify all sources and pathways. Barone Trial Tr. Vol. V, at 694:15 (Feb. 6, 2024). Sources include but are not limited to food, water, soil intake, air intake, medicines that may contain the chemical substance, non-TSCA uses. *Id.* at 694:15–19.

**Plaintiffs' rebuttal**: This is incorrect. <u>First</u>, for most of the first 10 risk evaluations, EPA estimated exposures for just the condition of use, and did not consider background sources of exposure. *E.g., Trial Ex. 96 at 270* ("One overarching uncertainty is that the consumer risks may be underestimated, because background exposures were not incorporated to the risk estimations for each COU. While there are documented background exposures of PCE in residential or consumer environments those concentrations were not attributable to a specific condition of use and, therefore, not included in our evaluation."); *Trial Ex. 102 at 437* (same); *Trial Ex. 98 at 34*

("EPA did not evaluate hazards or exposures to the general population from ambient air, drinking water, and sediment pathways for any of the conditions of use in this risk evaluation, and as such the unreasonable risk determinations for relevant conditions of use do not account for exposures to the general population from ambient air, drinking water, and sediment pathways."); *Trial Ex. 104 at 202* ("[B]ackground levels of TCE in indoor and outdoor air are not considered or aggregated in this assessment; therefore, there is a potential for underestimating consumer inhalation exposures, particularly for populations living near a facility emitting TCE or living in a home with other sources of TCE, such as TCE-containing products stored in the home. . . . Similarly, inhalation exposures were evaluated on a product-specific basis and are based on use of a single product type within a day, not multiple products.").

Second, EPA specifically determined that it would *not* consider non-TSCA sources of exposure that fall under the jurisdiction of other statutes. *See, e.g., Trial Ex. 96 at 63* ("[B]ecause the drinking water exposure pathway for PCE is currently addressed in the NPDWR, EPA is not evaluating exposures to the general population from the drinking water exposure pathway in the risk evaluation for PCE under TSCA."); *Trial Ex. 100 at 39* ("EPA believes it is both reasonable and prudent to tailor TSCA risk evaluations when other EPA offices have expertise and experience to address specific environmental media, rather than attempt to evaluate and regulate potential exposures and risks from those media under TSCA."); *Trial Ex. 101 at 25* (same); *Trial Ex. 102 at 37* (same); *Trial Ex. 103 at 52-54* (same); *Trial Ex. 104 at 32* (same).

365.    In the exposure characterization step, first EPA estimates a range of exposure levels for a condition of use from the central tendency exposure (e.g., 50th percentile) to high-end exposure (e.g., 95th percentile), and then provides a qualitative summary of the strength of the evidence for these levels. *Id.* at 697:15–698:3. There are instances where EPA does not have confidence in the high-end data and do not use high-end estimates. *Id.* at 698:4–6. The Agency also seeks to apportion the amount of the chemical that comes from different sources (e.g., background exposure). Barone Trial Tr. Vol. V, at 698:12–699:9.

**Plaintiffs' rebuttal**: First, EPA's statement that it does not always estimate risk for high-

1  end exposures is at odds with its first 10 risk evaluations.[10] EPA estimated non-cancer risk for

2  high end exposures in every one of these evaluations. *Trial Ex. 96 at 475* (table presenting risk

3  estimates for central tendency *and high-end* exposures); *Trial Ex. 97 at 461* (same); *Trial Ex. at*

4  *98 at 256* (same); *Trial Ex. 99 at 79* (same); *Trial Ex. 100 at* 308 (same); *Trial Ex. 101 at 209*

5  (same); *Trial Ex. 102 at 319* (same); *Trial Ex. 103 at 351* (same); *Trial Ex. 104 at 389* (same).

6  Second, if EPA intended to imply that it *always* apportions the amount of the chemical that

7  comes from different sources, this implication is incorrect. As noted above in response to

8  Proposed Fact No. 364, EPA has rarely estimated background exposures, or other *non*-condition

9  of use exposures, in its first 10 evaluations.

10

11  366.    EPA uses a general equation for calculating the average daily dose. Barone Trial

12  Tr. Vol. V, at 700:18–22. EPA used this formula for each of the first 10 risk evaluations. *Id.* at

13  703:22–24. EPA takes the milligrams per liter in the concentration of the chemical substance

14  multiplied by the drinking water intake rate, the product of which is then divided by body

15  weight. *Id.* at 703:6–18. The outcome of this equation is in milligrams per kilogram per day

16  (mg/kg/day). *Id.* at 703:3–5.

17     **Plaintiffs' rebuttal**: EPA *expressly excluded* consideration of drinking water as a source

18  of exposure in most of its first 10 risk evaluations. *Trial Ex. 96 at 63; Trial Ex. 98 at 34; Trial*

19  *Ex. 100 at 39*; *Trial Ex. 101 at 25*; Trial Ex. 102 at 37; *Trial Ex. 103 at 52-53*; *Trial Ex. 104 at*

20  *32*. EPA's focus in its exposure estimates has been on inhalation and dermal exposures, which

21  often involve a lot of assumptions in order to come up with an exposure estimate. *Thiessen Trial*

22  *Tr. (ECF No. 401) at 776:4-18 (Feb. 6, 2024)* (stating that EPA "is often dealing with obscure

23  manufacturing processes" where there is "not much information," and has found unreasonable

24  risk despite having "absolutely no monitoring data"). To estimate dermal exposure to HBCD

25  from use of solder pastes (a condition of use that EPA found to be an unreasonable risk), EPA

26  had to assume the following six factual predicates: (1) whether the workers wear gloves; (2) how

27

28  _____
   [10]    One of the first 10 risk evaluations (asbestos) did not evaluate non-cancer risk and is not
   considered here.

much surface area of the body comes in contact with the solder paste; (3) the quantity of the solder/flux that remains on the skin after contact; (4) the fraction of the solder pastes that is absorbed through the skin; (5) the weight fraction of the HBCD within the solder paste; and (6) the frequency of events in the day where the skin comes in contact with the solder paste. *Trial Ex. 97 at 463* (assuming no PPE)*, id. at 721* (listing the other assumptions), *id. at 480* (finding the condition of use to be unreasonable).

367.    Plaintiffs' risk assessor, Dr. Thiessen, did not perform an exposure assessment for the condition of use. Barone Trial Tr. Vol. VIII, at 1344:2–16. An exposure level considers total intake based on body weight of the individual. *Id.* at 1345:1–9. Water fluoride concentrations of 0.7 mg/L or 1.5 mg/L are media concentrations, not exposure levels. *Id.* at 1344:21–25.

**Plaintiffs' rebuttal**: This is incorrect. Dr. Thiessen conducted an extensive assessment of exposure from the condition of use (water fluoridation) as part of her work in this case,  and has estimated exposures in terms of mg/kg/day. *See, e.g., Thiessen Trial Decl. (ECF No 202-1) ¶¶ 147-156, 167-174 & 188; Trial Ex. 88 at Figs 4-6.* Dr Thiessen's exposure estimates are based on the work she did for the National Research Council (which looked at fluoride exposures "in great detail"), as well as EPA's "most up-to-date and scientifically sound" water intake data, which the EPA compiled for the express purpose of risk assessment. *Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 150-51*; *Thiessen Trial Tr. (ECF No. 401) at 793:19-794:7 (Feb. 6, 2024).*

368.    Urinary biomarkers reflect aggregate exposure to fluoride, including fluoride mobilized from bone and changes in kidney function over the course of pregnancy. Barone Trial Tr. Vol. IX, at 1404:16–25.

**Plaintiffs' rebuttal**: No dispute. Both of these physiological factors *magnify* the exposure from fluoridation, rather than diminish it. First, fluoridated water increases the accumulation of fluoride in bone, which in turn increases the amount of fluoride that is mobilized from bone during pregnancy. *Barone Trial Tr. (ECF No. 418) at 1432:12-1433:3 (Feb. 13, 2024).* Second, the oversaturation of the kidneys only appears to be an issue among the high-end

1  consumers in the fluoridated areas, according to Dr. Barone. *Id. at 1431:4-7*; *Barone Trial Tr.*

2  *(ECF No. 415) at 1383:22-1384:1 (Feb. 12, 2024).*

3

4  369.   Urinary fluoride values can represent a first approximation of exposure, but they

5  do not address the condition of use of community water fluoridation and the exposure

6  contribution from that source. Barone Trial Tr. Vol. IX, at 1406:16–20. For a TSCA risk

7  evaluation EPA needs to parse out exposures from different sources (e.g., food, water). Barone

8  Trial Tr. Vol. V, at 678:11–20 (Feb. 6, 2024).

9  **Plaintiffs' rebuttal**: This is incorrect. Till (2018) did an extensive statistical analysis in a

10  large cohort on the relationship between various sources of fluoride, including fluoridated water,

11  and urinary fluoride in pregnant women. Lanphear Trial Decl. (ECF No. 198-2) ¶¶ 24-25.

12  According to Tilll, "The strongest correlate of [the fluoride level in urine] was water fluoride

13  level, indicating that artificially fluoridated drinking water is a major source of fluoride intake.

14  Specifically, for every 0.5 mg/L increase in water fluoride level, we would expect to see a 74–

15  82% increase in urinary fluoride concentration." *Trial Ex. 108 at 108.010.* The contribution from

16  fluoridated water to urinary fluoride levels in pregnant mothers can also be calculated by

17  comparing the urinary fluoride levels in fluoridated vs. non-fluoridated areas. *Lanphear Trial Tr.*

18  *(ECF No. 395) at 244:6-25 (Feb. 1, 2024); Thiessen Trial Tr. (ECF No. 401) at 784:3-18 (Feb.*

19  *6, 2024); Barone Trial Tr. (ECF No. 418) at 1430:12-1431:3 (Feb. 13, 2024).* This latter

20  analysis has the benefit of being able to calculate the contribution from fluoridated water among

21  high-end consumers (e.g., 95th percentile), as opposed to the average contribution.

22

23  370.   EPA has considered aggregate exposure in the first ten risk evaluations under

24  amended TSCA, but still characterized risk from difference routes of exposure. Barone Trial Tr.

25  Vol. IX, at 1407:23–1408:6; 1415:20–1417:23; *e.g.*, Trial Ex. 103, at 25 (NMP Risk Evaluation).

26  EPA apportioned source contributions in the NMP Risk Evaluation. Barone Trial Tr. Vol. IX, at

27  1418:20–1419:5.

28  **Plaintiffs' rebuttal**: This is incorrect. EPA only calculated aggregate exposures in its

HBCD and NMP assessments. For all other evaluations, EPA did not do any assessment of aggregate exposure. *E.g., Trial Ex. 96 at 447-48* ("EPA determined that aggregating dermal and inhalation exposure for risk characterization was not appropriate due to uncertainties in quantifying the relative contribution of dermal vs inhalation exposure, since dermally applied dose could evaporate and then be inhaled. EPA also did not consider aggregate exposure among individuals who may be exposed both in an occupational and consumer context because there is insufficient information reasonably available as to the likelihood of this scenario or the relative distribution of exposures from each pathway. Risk is likely to be elevated for individuals who experience PCE exposure in multiple contexts."); *Trial Ex. 98 at 237* ("[I]nhalation and dermal exposures were evaluated on a product-specific basis and are based on use of a single product type within a day, not multiple products. There was no aggregation of dermal and inhalation exposure to single products either."); *Trial Ex. 100 at 305* ("EPA determined that aggregating dermal and inhalation exposure for risk characterization was not appropriate due to uncertainties in quantifying the relative contribution of dermal vs inhalation exposure, since dermally applied dose could evaporate and then be inhaled. . . . EPA also did not consider aggregate exposure among individuals who may be exposed both in an occupational and consumer context because there is insufficient information reasonably available as to the likelihood of this scenario or the relative distribution of exposures from each pathway."); *see also Trial Ex. 99 at 61; Trial Ex. 101 at 229; Trial Ex. 102 at 437; Trial Ex. 104 at 381.*

371.     So-called source apportionment is critical for EPA to characterize risk from a condition of use, make a defensible risk determination under TSCA, and manage any risk following that determination. Barone Trial Tr. Vol. IX, at 1406:21–1407:3, 1411:17–1412:21. EPA does not fill gaps in the risk management phase left during the risk evaluation concerning source apportionment. *Id.* at 1414:11–1415:9.

**Plaintiffs' rebuttal**: <u>First</u>, EPA began this litigation by arguing that Plaintiffs needed to evaluate exposures from every condition of use of fluoride in order to assess the risk from fluoridation, which the Court appropriately rejected. *Food & Water Watch, Inc. v. United States*

*Env't Prot. Agency*, 291 F. Supp. 3d 1033, 1044 & 1052 (N.D. Cal. 2017) ("The central dispute is whether Section 21 requires Plaintiffs to address *all* conditions of use in their petition as the EPA contends, or whether citizen petitions . . . may address only the condition of use the petition seeks to regulate." (emphasis in original)). <u>Second</u>, the TSCA statute specifically permits EPA to consider "reasonably available information" during the risk management (rulemaking) phase regarding "the magnitude of the exposure of human beings to the chemical substance or mixture." 15 U.S.C. § 2605(c)(2)(A). The statute's broad authorization to consider "reasonably available information" in the rulemaking proceeding makes clear that EPA is not limited to considering only what is in the risk evaluation.

372.   Considering aggregate exposure from fluoride using a urinary biomarker without source apportionment still does not establish risk on its own. A value of 2.41 g/L urinary fluoride concentration at the 95th percentile from the Till 2018 study is below the "all data" and the <4.0 mg/L exposure groups for which the NTP meta-analysis found <u>no</u> statistically significant adverse effects. Barone Trial Tr. Vol. IX, at 1418:3–12; Trial Ex. 69, at II-80, II-83 (eTable 4 and eTable 5 results using low risk-of-bias studies). The second statistical methodology that NTP used also found no statistically significant adverse effects in the <2 mg/L exposure group among the same studies. Trial Ex. 69, at II-83.

**Plaintiffs' rebuttal**: EPA's selection of two statistically non-significant results among a sea of statistically significant results in NTP's comprehensive meta-analysis is a textbook example of cherry-picking. EPA ignores *all* of the results from the means-effect analysis, *all* of the results from the regression-slopes analysis, and *most* of the results from the dose-response analysis, including NTP's assessment of the "best fit." *See Trial Ex. 68 at NIEHS_000387-389* (summarizing the results); *id. at NIEHS_000417* (forest plot of the means-effect analysis of 55 studies); *id at NIEHS_000462-63* (dose-response figures showing best fit for water fluoride and urine fluoride); *id. at NIEHS_000470* (forest plot of the regression slopes analysis of individual-level data). Further, in seeking to exploit these two isolated results, EPA makes no acknowledgement of the limitations of using group-level data for dose-response analysis, nor of

the reduced statistical power that comes from having fewer observations in the low risk of bias category.

## IV.    RISK CHARACTERIZATION

### A.    PLAINTIFFS' PROPOSED FACTS (NOS. 373–392)

#### 1.    Framework

373.    As codified in EPA regulations, EPA may use quantitative and/or qualitative estimates of risk for risk evaluations under the Amended TSCA. *Trial Ex. 544 at 33752*; *Barone Trial Tr. (ECF No. 400) at 626:5-7 (Feb. 5, 2024); Thiessen Trial Tr. (ECF No. 401) at 786:3-16 (Feb. 6, 2024).*  For example, if there is evidence "that allows the [EPA] to conduct the comparison of exposure to toxicity based on a fairly straightforward and simple method, [EPA] can stop there and need not do further refinement." *Henry Trial Tr. (ECF No. 244) at 973:21-974:1 (June 16, 2020); Thiessen Trial Tr. (ECF No. 401) at 785:6-22 (Feb. 6, 2024).*

**EPA's rebuttal**: Undisputed that EPA's current regulations state that EPA will "[i]ntegrate the hazard and exposures assessments into quantitative and/or qualitative estimates of risk for the identified populations (including any potentially exposed or susceptible subpopulation(s) identified in the final scope document published pursuant to § 702.41(c)(8) and ecological characteristics for the conditions of use within the scope of the risk evaluation." Ex. 544, at 33,752. Plaintiffs' quotation of Dr. Henry's testimony is clear that the facts of this case do not permit a defensible risk characterization even using a qualitative estimate. Henry Trial Tr. Vol. VI, at 973:25–974:1 (Trial Phase 1) ("A. Correct. But that is not at all the case here that we're talking about.").

None of the risk evaluations under Amended TSCA that are in evidence has EPA made a determination of unreasonable risk using a qualitative estimate. Trial Exs. 96–104. That is true even for chemical substances like methylene chloride (MeCl), inhalation of which is acutely lethal in humans. Ex. 102, at 246.

Finally, any risk determination must be supported by best available science and the weight of the scientific evidence, which are two science requirements set by statute in TSCA section 26(h) and (i).

374.    In its first 10 risk evaluations under the Amended TSCA, EPA has used the Margin of Exposure (MOE) framework to characterize risk. *Barone Trial Tr. (ECF No. 401) at 713:25-714:7 (Feb. 6, 2024).* There is no requirement, however, to use the MOE framework under TSCA. As the EPA has recognized, "MOE is just one of several approaches to risk characterization," and "[t]here will be risk scenarios where one approach may be better than another." *Trial Ex. 544 at 33735.*

**EPA's rebuttal**: Undisputed.

375.    The basic framework of risk characterization involves comparing the Point of Departure (i.e., "Hazard Level") with the Exposure Level to see if the margin is adequate to protect against the Hazard. *Barone Trial Tr. (ECF No. 397) at 495:15-22 (Feb. 2, 2024); Barone Trial Tr. (ECF No. 400) at 571:4-10 (Feb. 5, 2024); Thiessen Trial Tr. (ECF No., 241) at 471:11-472:9 (June 10, 2020).*

**EPA's rebuttal**: Disputed. The proposed fact is incomplete and misstates the margin of exposure calculation. *Infra* ¶¶ 398–99.

376.    In comparing the margin between the hazard and exposure level, EPA will consider both average (e.g., median) exposures and high-end (e.g., 95th percentile) exposures. *Barone Trial Tr. (ECF No. 400) at 582:12-19 (Feb. 5, 2024).* Thus, even if average exposures do not present a risk, a condition of use will be found to present a risk if the 95th percentile have exposures of concern. *Undisputed Fact No. 42; Barone Trial Tr. (ECF No. 400) at 583:8-20 & 612:17-613:17 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The cited materials do not support the factual propositions. Generally, EPA has looked at high-end exposures and central tendency as a way to bound the risk

estimate and provide some degree of sensitivity analysis when looking at risks for a specific condition of use. Barone Trial Tr. Vol. IV, at 582:16–19. EPA has found risk for a condition of use based on high-end exposures where average exposures did not present a risk. *Id.* at 612:17–613:17; Undisputed Fact No. 42. But as with all risk evaluations, each step is chemical-specific, based on the reasonably available data (TSCA section 26(k)), and must always adhere to the science requirements of TSCA section 26(h) and (i).

377.   "EPA does not require that human exposure levels exceed a known adverse effect level to make an Unreasonable Risk determination under TSCA." *Undisputed Fact No. 16; Barone Trial Tr. (ECF No. 400) at 571:11-17 (Feb. 5, 2024).* This is consistent with the fact that EPA does not require evidence that the chemical is associated (causal or otherwise) with the hazard under the condition of use. *Barone Trial Tr. (ECF No. 400) at 572:4-13 & 573:15-22 & 595:8-596:11 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact relates to risk determination, not risk characterization. The second sentence is not supported by the cited testimony. EPA does not require proof of causality or human evidence to make an unreasonable risk determination. Barone Trial Tr. Vol. IV, at 572:11–13, 573:15–22. EPA does require the association between the exposure and the critical effect be causal or likely causal for a condition of use, which it has described in its risk evaluations using the terminology "high confidence" and "medium confidence." *Id.* at 591:6–11; 626:25–627:3.

378.   Most of the unreasonable risk determinations that EPA has made in its first ten risk evaluations under the Amended TSCA have involved scenarios where the exposure level (including the high-end exposure) was less than the hazard level. *Barone Trial Tr. (ECF No. 400) at 571:19-23 (Feb. 5, 2024).* For example:

**EPA's rebuttal**: Undisputed.

A.    In the PCE risk evaluation, EPA found unreasonable risks of neurotoxicity where *high-end* human exposure was 51 times lower than the LOAEL that EPA derived from human epidemiological data. *Barone Trial Tr. (ECF No. 400) at 612:17-613:19 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed that EPA found unreasonable risk on the basis described in the proposed fact. EPA determines non-cancer risk by comparing the calculated margin of exposure to a benchmark margin of exposure. *See* Barone Trial Tr. Vol. IV, at 606:25–607:11. Undisputed that mathematically the exposure identified was 51 times lower than the LOAEL.

*B.*    EPA found a risk of neurotoxicity in the PCE risk evaluation (e.g., ONUs in the dry/spot cleaning industry) where the average exposure was 89 times less than the LOAEL. *Barone Trial Tr. (ECF No. 400) at 606:15-607:11 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed that EPA found risk on the basis described in the proposed fact. EPA determines non-cancer risk by comparing the calculated margin of exposure to a benchmark margin of exposure. *See* Barone Trial Tr. Vol. IV, at 606:25–607:11. Undisputed that mathematically the exposure identified was 89 times lower than the LOAEL.

C.    For the only other chemical that EPA derived a Point of Departure from human neurotoxicity data (methylene chloride), EPA found an unreasonable risk for an exposure that was 27 times less than the LOAEL, despite having only low confidence in the exposure data. *Thiessen Trial Tr. (ECF No. 401) at 772:3-11 & 818:25-820:4 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed that EPA found unreasonable risk on the basis described in the proposed fact. EPA determines non-cancer risk by comparing the calculated margin of exposure to a benchmark margin of exposure. *See* Barone Trial Tr. Vol. IV, at 606:25–607:11. Further disputed that EPA had low confidence in the exposure data. In the methylene chloride risk evaluation, EPA had medium to high confidence in inhalation exposure scenarios, and low to

medium confidence in dermal exposure estimates. Ex. 102, at 190–191, 223. Undisputed that mathematically the exposure identified was 27 times lower than the LOAEL.

## 2.     The Benchmark MOE (The "Total Uncertainty Factor")

379.     The adequacy of the margin between the hazard and exposure level is determined by comparing the margin to the "Benchmark MOE." *Barone Trial Tr. (ECF No. 400) at 575:17-22 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The term "adequacy of the margin" is not a concept supported by the cited testimony. To determine whether there is a risk, EPA compares the calculated margin of exposure to the benchmark margin of exposure. Barone Trial Tr. Vol. IV, at 575:17–21; *infra* ¶¶ 399–400.

380.     The Benchmark MOE is the "total uncertainty factor" for the particular critical effect at issue. *Barone Trial Tr. (ECF No. 400) at 576:7-11 (Feb. 5, 2024).* EPA calculates the Benchmark MOE by multiplying together the applicable uncertainty factors. *Barone Trial Tr. (ECF No. 400) at 580:20-24 & 582:6-11 (Feb. 5, 2024).*

**EPA's rebuttal**: Generally undisputed. The uncertainty factors for the benchmark MOE are based on the identified point of departure, the basis for selecting the point of departure, and the type of point of departure. *E.g.*, Barone Trial Tr. Vol. IV, at 575:22–576:6; Barone Trial Tr. Vol. V, at 712:15–23; *infra* ¶¶ 399–400.

381.     In its first ten risk evaluations under the Amended TSCA, the EPA has used Benchmark MOEs of 10 to 300, with 10 being the lowest Benchmark MOE used in any assessment. *Barone Trial Tr. (ECF No. 401) at 741:8-23 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. Whether and what uncertainty factors apply are chemical-specific and based on the best available science and weight of the scientific evidence. *Infra* ¶ 400. For example, in some of the first ten risk evaluations under TSCA, when EPA had a PBPK model it used an intraspecies (human to human variability) uncertainty factor of 3, instead of the default

of 10. *Barone Trial Tr. (ECF No. 401) at 578:8-579:13 (Feb. 6, 2024).* In future TSCA risk evaluations, if EPA had a PBPK model and the key studies selected were human studies, after looking at the weight of the scientific evidence, EPA could select a total uncertainty factor of less than 10.

382.    One of the uncertainty factors that EPA regularly uses for risk evaluations under TSCA is the uncertainty factor for intraspecies (human-to-human) variability. *Barone Trial Tr. (ECF No. 400) at 576:12-17 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The cited testimony does not support that EPA "regularly" uses an uncertainty factor for intraspecies variability. Otherwise, undisputed.

383.    The EPA uses an uncertainty factor for intraspecies variability in order to protect humans who have heightened sensitivity and vulnerability to the effects of a chemical. *Barone Trial Tr. (ECF No. 400) at 577:7-10 (Feb. 5, 2024).* The uncertainty factor for intraspecies variability accounts for the fact that both toxicokinetics (i.e., the amount of the chemical that gets to the target organ/cell) and toxicodynamics (i.e., the amount of the chemical that induces effects at the target organ/cell) vary across the human population. *Barone Trial Tr. (ECF No. 400) at 577:11-578:7 (Feb. 5, 2024); Thiessen Trial Decl. (ECF No, 202-1) ¶¶ 133-134.*

**EPA's rebuttal**: Undisputed.

384.    EPA uses the default uncertainty factor of 10 to account for intraspecies variability, unless it has an adequate PBPK model for the chemical that reduces some of the uncertainty. *Barone Trial Tr. (ECF No. 400) at 578:8-10 & 712:24-713:5 (Feb. 5, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶ 135.* Accordingly, in its first ten risk evaluations under the Amended TSCA, EPA only departed from the default factor of 10 for intraspecies variability when there was an acceptable physiologically-based pharmacokinetic (PBPK) model for the chemical. *Barone Trial Tr. (ECF No. 400) at 578:11-16 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. Uncertainty factors, such as for intraspecies variability, are reduced where EPA has PBPK modeling. Barone Trial Tr. Vol. V, at 712:13–713:22. The cited testimony does not support that this is the only instance where the default uncertainty factory can be reduced. In the first ten risk evaluations under Amended TSCA, EPA generally reduced the uncertainty factor to 3 based on PBPK modeling. Barone Trial Tr. Vol. IV, at 578:16–23; Barone Trial Tr. Vol. V, at 712:24–713:5.

385.    Where EPA uses a LOAEL as the Hazard Level, EPA will apply an uncertainty factor in order to approximate what the NOAEL would be.  *Barone Trial Tr. (ECF No. 400) at 579:14-580:2 (Feb. 5, 2024).*

**EPA's rebuttal**: Undisputed.

### 3.    Risk Characterization for Fluoride

386.    At a minimum, the Benchmark MOE for fluoride neurotoxicity should be at least 10 to account for intraspecies variability. *Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024); Thiessen Trial Tr. (ECF No. 401) at 806:18-22 (Feb. 6, 2024).* An uncertainty factor of 10 is justified for fluoride neurotoxicity because there is no PBPK model. *Barone Trial Tr. (ECF No. 400) at 712:24-713:5 (Feb. 5, 2024).* While no further justification is necessary (*Thiessen Trial Decl. (ECF No. 202-1) ¶ 135*), it bears considering that some subsets of the population are *known* to be more susceptible to fluoride toxicity than others (e.g., bottle-fed infants, people with kidney disease, iodine deficiency, and/or calcium deficiency). *Thiessen Trial Tr. (ECF No. 401) at 755:23-756:20 & 807:25-810:9 & 811:25-812:21 (Feb. 6, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 136, 158-190.* There are also some studies indicating potential genetic susceptibilities to fluoride's hazards, including neurotoxicity. *Thiessen Trial Tr. (ECF No. 401) at 808:20-23 & 812:22-813:2 (Feb. 6, 2024); Trial Ex. 67 at 77.*

**EPA's rebuttal**: Disputed. The uncertainty factors for the benchmark MOE are based on the identified point of departure, the basis for the point of departure, and the type of point of departure. *E.g.*, Barone Trial Tr. Vol. IV, at 575:22–576:6; Barone Trial Tr. Vol. V, at 712:15–23;

*infra* ¶¶ 399–400. Plaintiffs have not identified an appropriate POD, making selection of uncertainty factors for a specific POD impossible.

Dr. Barone testified that he generally agreed with a benchmark MOE of 10 for a human study but also that there might be a different MOE if we had more precision in some of the modeling. Barone Trial Tr. Vol. IX, at 1425:6–12. Dr. Barone also explained how default uncertainty factors are reduced to 3 or 1 in some cases based on available data. Barone Trial Tr. Vol. V, at 712:13–713:22.

387.    There are various Hazard Levels that can be used for the fluoride risk characterization. A BMCL of **<0.3 mg F/L** in maternal urine (Grandjean 2023); a BMCL of **0.274 mg F/day** in total intake (Taher 2024); a BMCL of **0.179 mg F/L** in drinking water (Taher 2024); a "LOAEL" of **1.5 mg F/day** in drinking water (Taher 2024); or an Observed Adverse Effect Level of **2 to 4 mg F/L**. *Trial Ex. 119 (Grandjean 2023); Trial Ex., 129 (Taher 2024) at 24; Barone Trial Tr. (ECF No. 418) at 1424:24-1425:3 & 1442:13-1444:10 (Feb. 13, 2024); Barone Trial Tr. (ECF No. 414) at 1373:1-17 (Feb. 12, 2024).*

**EPA's rebuttal**: Disputed. As Dr. Barone explained, that one can mathematically calculate a POD does not necessarily mean that the evidence supports calculating a POD. *See* Barone Trial Tr. Vol VIII, at 1335:8–12. The weight of the scientific evidence does not support selecting as a point of departure fluoride concentrations of 2.0, 3.0, or even 4.0 mg/L. Barone Trial Tr. Vol. IX, at 1422:12–23; *supra* ¶¶ 284–293; *infra* ¶ 393.

EPA disputes that Dr. Grandjean's BMCL is a reliable study or a defensible POD. *Supra* ¶¶ 294–313, 328–37.

EPA disputes that the RSI systematic review supports the identification of a POD for neurotoxicity (indeed, RSI came to the same conclusion). *Supra* ¶¶ 226–31, 285, 288–90. BMCLs based on mathematical calculations in the RSI systematic review to get to from urinary fluoride to intake values are not defensible PODs for the same reason and also because the assumptions RSI applied do not reflect physiological changes during pregnancy. *Supra* ¶¶ 285–290, 339.

Plaintiffs risk assessor, Dr. Thiessen, did not even identify a POD from the human data. *Supra* ¶ 327. And nearly all the proposed PODs in Plaintiffs' proposed fact are based on the RSI systematic review that was not even part of Plaintiffs' case-in-chief. Plaintiffs proffered no evidence to support that any of the proposed PODs for which they cite the RSI systematic review *should* be used as PODs. Dr. Barone, Dr. Savitz, the RSI researchers, and the Health Canada Expert Panel all agree that the fluoride and IQ literature does not currently support the derivation of a point of departure. Savitz Trial Tr. Vol. VII, at 1161:2–17; Barone Trial Tr. Vol. VIII, at 1328:3–1329:15; *supra* ¶¶ 226–31, 285, 288–90.

388.   Whatever Hazard Level one chooses for fluoride, the result is the same: an unacceptably small (or non-existent) margin between the Hazard Level and the Exposure Level. *Thiessen Trial Tr. (ECF No. 401) at 786:17-787:14 & 802:1-11 & 805:3-15 & 806:4-22 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The weight of the scientific evidence does not support deriving a POD for neurotoxicity. *See supra* ¶¶ 284–93. Because Plaintiffs have not presented sufficient evidence for the Court to calculate and justify a point of departure and the high degree of uncertainty in the hazard assessment, there is insufficient basis to conduct the risk characterization step of the risk evaluation. *Infra* ¶ 393.

389.   If Dr. Grandjean's BMCL of <0.3 mg/L is used as the Hazard Level, a risk is readily apparent because maternal urinary fluoride levels substantially exceed 0.3 mg/L in fluoridated areas. *Thiessen Trial Tr. (ECF No. 401) at 786:17-787:14 (Feb. 6, 2024); Grandjean Trial Tr. (ECF No. 240) at 184:19-185:12 (June 9, 2020).* For example:

**EPA's rebuttal**: Disputed. The weight of the evidence does not support deriving a POD for neurotoxicity. *See supra* ¶¶ 284–93. Because Plaintiffs have not presented sufficient evidence for the Court to calculate and justify a point of departure and the high degree of uncertainty in the hazard assessment, there is insufficient basis to conduct the risk characterization step of the risk evaluation. *Infra* ¶ 393.

A.   Even if the risk characterization limited its consideration of exposure to only the portion of the urinary fluoride level that derives from fluoridated water, a risk is still readily apparent. *Grandjean Trial Tr. (ECF No. 397) at 358:2-18 (Feb. 2, 2024); Thiessen Trial Tr. (ECF No. 401) at 787:15-788:8 (Feb. 6, 2024).* According to data from the MIREC cohort, fluoridated water contributes over 1.3 mg/L of fluoride to the urine among the 95th percentile consumer, which exceeds the BMCL by a fourfold margin. *Thiessen Trial Tr. (ECF No. 401) at 787:15-788:8 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed for the same reasons stated within paragraph 389.

Moreover, the Green (2019) did not find a statistically significant association between maternal urinary fluoride and child IQ when looking at the entire study population in the MIREC cohort (i.e., boys and girls combined). *Supra* ¶ 105.

Further, the aggregate urinary fluoride value of 2.41 mg/L from the MIREC cohort data of women in fluoridated areas during their third trimester is still not supported as a POD. The NTP meta-analysis found no statistically significant adverse effects in the all data, <4 mg/L, and <2 mg/L urinary fluoride groups when limited to low risk-of-bias studies. Trial Ex. 69, at 702 (eTable 5); Barone Trial Tr. Vol. IX, at 1418:3–12.

B.   Even if the highest BMCL identified (0.76 mg/L) in the non-linear modeling analyses in Grandjean 2022 were selected for the Hazard Level, it would still be exceeded by the exposures in fluoridated areas. *Grandjean Trial Tr. (ECF No. 397) at 477:9-20 (Feb. 2, 2024.*

**EPA's rebuttal**: Disputed for the same reasons stated within paragraph 389.

390.   Even if the 1.5 mg/L water fluoride level for which NTP expressed moderate confidence were selected as the Hazard Level, and even if this Hazard Level was treated as a NOAEL, a risk of neurotoxicity is still apparent from water fluoridation. *Thiessen Trial Tr. (ECF No. 401) at 802:1-11 & 805:3-15 & 806:4-22 (Feb. 6, 2024).* Among average consumers, the

Margin of Exposure is just 2, which is well less than the minimum Benchmark MOE of 10. The situation is even more precarious for the 95th percentile exposure, as the Margin of Exposure would be approximately 1 (i.e., no margin). *Thiessen Trial Tr. (ECF No. 401) at 802:1-11 & 805:3-15 & 806:4-22 (Feb. 6, 2024).* As noted by the NTP, "many urinary fluoride measurements" in fluoridated areas "exceed those that would be expected from consuming water that contains fluoride at 1.5 mg/L." *Trial Ex. 69 at 82-83.*

**EPA's rebuttal**: Disputed. The weight of the scientific evidence does not support deriving a POD for neurotoxicity. *See supra* ¶¶ 284–93. Because Plaintiffs have not presented sufficient evidence for the Court to calculate and justify a point of departure and the high degree of uncertainty in the hazard assessment, there is insufficient basis to conduct the risk characterization step of the risk evaluation. *Infra* ¶ 393. Dr. Thiessen did not attempt to select a point of departure. Thiessen Trial Tr. Vol. VI, at 907:19–908:15, 914:12–14 (Feb. 7, 2024) ("I did not attempt to provide a real point of departure."). Dr. Thiessen identified three "examples" of what a point of departure could be. *Id.* at 909:21–910:5. One of those examples was water fluoride concentrations of 1.5 mg/L. Dr. Thiessen identified 1.5 mg/L water fluoride concentration from the NTP draft State of the Science Monograph, although she admits it is not based on any findings in the monograph. *Id.* at 910:23–911:21. Further, the NTP meta-analysis does not support that 1.5 mg/L water fluoride concentration is associated with adverse IQ outcomes. *Supra* ¶ 320.

391.    Even if a *4 mg/L* water fluoride level was conservatively selected as the LOAEL (despite a large body of research identifying harm at lower concentrations), the margin between the hazard and exposure level would still be less than 10, and thus a risk. *Barone Trial Tr. (ECF No. 400) at 575:17-22 (Feb. 5, 2024); Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024).* This is particularly so given that use of a LOAEL typically requires application of an additional uncertainty factor, beyond just the factor of 10 for intraspecies variability. *Barone Trial Tr. (ECF No. 418) at 1435:13-17 & 1443:13-1444:10 (Feb. 13, 2024).*

**EPA's rebuttal**: Disputed. The weight of the scientific evidence does not support deriving a POD for neurotoxicity. *See supra* ¶¶ 284–93. Because Plaintiffs have not presented sufficient

evidence for the Court to calculate and justify a point of departure and the high degree of uncertainty in the hazard assessment, there is insufficient basis to conduct the risk characterization step of the risk evaluation. *Infra* ¶ 393.

EPA does not "conservatively select" PODs. Rather, they must be selected on a defensible scientific basis and consistent with section 26(h) and (i) science standards. And TSCA section 21 requires a finding that fluoride presents unreasonable risk for a section 6 rule—not "may present" as is used in other sections.

Finally, the cited testimony does not support the selection of 4 mg/L water fluoride concentration as a POD or that certain uncertainty factors would apply for a POD of 4 mg/L water fluoride concentration. The uncertainty factors for the benchmark MOE are based on the identified point of departure, the basis for the point of departure, and the type of point of departure. *E.g.*, Barone Trial Tr. Vol. IV, at 575:22–576:6; Barone Trial Tr. Vol. V, at 712:15–23; *infra* ¶¶ 399–400. Plaintiffs have not identified an appropriate POD, making selection of uncertainty factors for a specific POD impossible.

392.     Because the Margin of Exposure for fluoride neurotoxicity is less than the Benchmark MOE of (at least) 10, the analysis proceeds to the Risk Determination step (discussed below). *Barone Trial Tr. (ECF No. 401) at 712:5-8 (Feb. 6, 2024).*

**EPA's rebuttal**: Because Plaintiffs have not presented sufficient evidence for the Court to calculate and justify a point of departure and the high degree of uncertainty in the hazard assessment, there is insufficient basis to the risk characterization step of the risk evaluation. Barone Trial Tr. Vol. VIII, at 1369:24–1370:9, 1371:11–1372:3, Barone Trial Tr. Vol. IX, at 1420:18–1421:12, 1422:24–1423:18. Thus, there is also not sufficient evidence for the Court to reach the risk determination step. *Id.* at 1420:21–1421:12.

Further, Plaintiffs have not identified a margin of exposure for fluoride neurotoxicity and compared it to a benchmark MOE. Plaintiffs' risk assessor, Dr. Thiessen, admitted she did not conduct a margin of exposure analysis using the human epidemiological studies. *Infra* ¶ 402.

1

**B.      EPA'S PROPOSED FACTS (NOS. 393–405)**

2

3      393.    Because Plaintiffs have not presented sufficient evidence for the Court to

4  calculate and justify a point of departure and the high degree of uncertainty in the hazard

5  assessment, there is insufficient basis to the risk characterization step of the risk evaluation.

6  Barone Trial Tr. Vol. VIII, at 1369:24–1370:9, 1371:11–1372:3, 1420:18–1421:12, 1422:24–

7  1423:18.

8      **Plaintiffs' rebuttal**: No dispute that this is Dr. Barone's stated opinion.

9

10      **1.      Margin of Exposure Analysis**

11      394.    Risk characterization is an integrative analysis and a summary intended to

12  communicate the results of the risk assessment to the risk manager in a complete, informative,

13  and useful format. See 1998 Guidelines, at 61, Trial Ex. 17 (Trial Phase 1). This analysis

14  includes integration of the hazard identification and dose-response analysis with the human

15  exposure estimates and provides an evaluation of the overall quality of the assessment and the

16  degree of confidence in the estimates of risk and conclusions drawn. *Id*. (Trial Phase 1)

17      **Plaintiffs' rebuttal**: No dispute. To be clear, however, EPA accomplished this in its first

18  10 risk evaluations by referring back to the assessments of quality and confidence in the

19  exposure (section 2) and hazard (section 3) parts of the analysis. *E.g., Trial Ex. 96 at 374* (stating

20  EPA's confidence level in the exposure estimate and stating that the "the justification" for this

21  confidence determination can be found in the exposure assessment [section 2]); *id. at 417*

22  (referring back to the hazard assessment in section 3 for details on how EPA selected the points

23  of departure). In other words, EPA did not engage in additional, or distinct, assessments of

24  quality or confidence in the risk characterization.

25      395.    The risk-characterization analysis should draw from the key points in each

26  individual component part—hazard identification, dose-response analysis, and exposure

27  assessment. See 1998 Guidelines, at 63, Trial Ex. 17 (Trial Phase 1). "A health risk assessment is

28

only as good as its component parts" and "[c]onfidence in the results of a risk assessment is thus a function of confidence in the results of the analysis of these elements." *Id.* (Trial Phase 1).

**Plaintiffs' rebuttal**: No dispute.

396.    EPA calculates noncancer risk using a margin of exposure ("MOE") analysis. Barone Trial Tr. Vol. V, at 705:9, 707:7–10 (Feb. 6, 2024); Thiessen Trial Tr. Vol. VI, at 903:21–25 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute that EPA has used margin of exposure as the method for noncancer risk characterization in each of its first 10 risk evaluations. EPA's Risk Evaluation Rule, however, states that the margin of exposure framework is not mandated, and that EPA can use other methods as it deems appropriate. *Trial Ex. 544 at 33735*.

397.    EPA used the MOE analysis in all the first 10 risk evaluations. Barone Trial Tr. Vol. V, at 714:2–3 (Feb. 6, 2024).

**Plaintiffs' rebuttal**: No dispute.

398.    The point of departure from the hazard characterization is divided by the exposure level from the exposure assessment (e.g., the exposure for the condition of use at the 50th or 95th percentile). Barone Trial Tr. Vol. V, at 705:9–13, 708:17–19. The product of the division is often referred to as the "calculated" MOE. The units in the numerator and denominator are both in milligrams per kilogram per day (mg/kg/day). The result is a unitless measure of risk for the condition of use. *Id.* at 705:13–16, 707:20–25.

**Plaintiffs' rebuttal**: No dispute to the first, second, and fourth sentences. As to the third sentence, Dr. Barone has testified that the key requirement is that the hazard and exposure data "has to be in the same units." *Barone Trial Tr. (ECF No. 400) at 672:22-673:4 (Feb. 5, 2024).* This is accomplished when both the hazard and exposure data is available in units of urinary fluoride concentrations, or water fluoride concentrations. *Thiessen Trial Tr. (ECF No. 401) at 790:18-791:16 (Feb. 6, 2024).*

399.     The calculated MOE is then compared to a benchmark MOE, which is the product of uncertainty factors. Barone Trial Tr. Vol. V, at 705:13–16, 707:20–25. The uncertainty factors for the benchmark MOE are based on the identified point of departure, the basis for the point of departure, and the type of point of departure. Uncertainty factors, such as for intrahuman variability, are reduced where EPA has PBPK modeling. *Id.* at 712:13–713:22. Uncertainty factors are typically reduced where EPA has PBPK modeling. *Id.* at 712:13–713:22. Whether and what uncertainty factors apply are chemical-specific. *Id.* at 715:25–716:7.

**Plaintiffs' rebuttal**: No dispute.

400.     If the calculated MOE is below the benchmark, there is generally risk and EPA moves on to determine whether the risk is unreasonable (the last step in the risk evaluation process). If the calculated MOE is above the benchmark, there is generally no risk and the analysis ends. *See generally* Barone Trial Tr. Vol. III, at 495:23–496:6 (Feb. 2, 2024); Thiessen Trial Tr. Vol. VI, at 905:6–13 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: No dispute.

401.     EPA has never looked at a benchmark margin of exposure that it applied to one chemical substance when conducting a risk evaluation on a different chemical substance. Barone Trial Tr. Vol. V, at 716:22–25 (Feb. 6, 2024).

**Plaintiffs' rebuttal**: No dispute. However, in this case, understanding how EPA *actually* conducts risk evaluations *in practice* (as opposed to what EPA says in the *litigation* context) has become necessary because EPA has repeatedly subjected the evidence on fluoride neurotoxicity to a standard of proof that far exceeds what EPA has required of other chemicals. In the first trial, EPA's expert conceded that EPA "held the plaintiffs to a burden of proof that EPA has not held a single chemical under Section 6 before." *Henry Trial Tr. (ECF No. 244) at 987:16-18 (June 16, 2020); see also Comments from the Court (ECF No. 245) at 1131:6-9* ("EPA appears to have applied a standard of causation which, from my read of TSCA, is not accurate . . . is not a proper application. It's not the proper standard."). At the second trial, EPA's experts have

required evidence of *hazard* at the condition of use level in order to find risk, which is antithetical to the margin of exposure framework. *E.g., Savitz Trial Tr. (ECF No. 414) at 1192:13-16 (Feb. 9, 2024)* (admitting he used a general causation framework and restricted his analysis to low-dose exposures); *Barone Trial Tr. (ECF No. 415) at 1325:10-13 (Feb. 12, 2024)* (stating that the risk evaluation of fluoride neurotoxicity should not go beyond the hazard assessment phase because the evidence of neurotoxicity is uncertain in the *low-dose studies*). Consistent with this heightened standard, EPA characterizes 4 mg/L as "far above" the 95th percentile urinary fluoride level (2.4 mg/L), despite it being less than a factor of 2, and implies that a three-fold difference ("triple") between hazard and exposure is somehow large, despite being an order of magnitude smaller than what EPA has deemed unreasonable in other assessments. *See EPA Proposed Facts 203 & 288*. In this context, knowing the Margins of Exposure that EPA has found to present an unreasonable risk is important for ensuring that fluoride is not subjected to a burden that is antithetical to EPA's *actual* risk assessment practices.

### 2.   Dr. Thiessen's Risk Characterization

402.   Plaintiffs' risk assessor, Dr. Thiessen, did not conduct a margin of exposure analysis using the human epidemiological studies. Thiessen Trial Tr. Vol. VI, at 907:2–18 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: This is a matter of semantics. Dr. Thiessen identified the available points of departure and showed that, when the margin of exposure framework is applied (using the *minimum* required Benchmark MOE of 10, *Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024))*, a risk from fluoridation is evident for each and every point of departure. *Thiessen Trial Ex. (ECF No. 401) at 786:24-788:8 & 801:23-807:10 (Feb. 6, 2024)*.

403.   Dr. Thiessen offered an opinion that a "margin of exposure of 2" is unacceptable, which she calculated by simply dividing 1.5 mg/L by 0.7 mg/L. Thiessen Trial Tr. Vol. VI, at 909:9–2024 (Feb. 7, 2024).

**Plaintiffs' rebuttal**: This is the calculation that Dr. Thiessen did for *average* exposures

1   in the fluoridated community. Dr. Thiessen did separate a analysis for *high-end* exposures.

2   *Thiessen Trial Ex. (ECF No. 401) at 805:13-15 (Feb. 6, 2024)*.

3

4   404.   Dividing 1.5 by 0.7 mg/L is not sufficient to support a risk determination because

5   1.5 mg/L is based on the World Health Organization guideline for fluorosis, not any observation

6   of a NOAEL or LOAEL for neurotoxicity in the data. 1378:12–19. And the NTP meta-analysis

7   manuscript shows no adverse effect in the 1.5 mg/L water fluoride range. Barone Trial Tr. Vol.

8   VIII, at 1379:3–8, 1380:3–6.

9   **Plaintiffs' rebuttal**: First, EPA fails here to heed its own advice about taking the NTP at

10  its word. *See EPA Proposed Fact No. 197; Savitz Trial Tr. (ECF No. 414) at 1155:2-9 (Feb. 9,*

11  *2024)* (stating that he "would take [NTP] at their word" when NTP states the evidence is

12  "unclear" below 1.5 mg/L). Instead, NTP implies that NTP did not find any significance in the

13  1.5 mg/L level for neurotoxicity, despite NTP's repeated and express statements to the contrary.

14  *E.g., Trial Ex. 67 at xiii, 40, 45, 47, 76-77, & 81.* The fact that 1.5 mg/L happens to be the level

15  that WHO identified as relevant to dental fluorosis in no way negates NTP's confidence in the

16  neurotoxicity literature at this level. Second, EPA's assertion that "NTP's meta-analysis *shows*

17  no adverse effect in the 1.5 mg/L water fluoride range" is based on one cherry-picked *subset* of

18  an analysis, as explained earlier in response to EPA Fact No. 372. *Savitz Trial Tr. (ECF No. 414)*

19  *at 1209:2-4 (Feb. 9, 2024)* (agreeing that "one should never cherry-pick results from studies");

20  *see also id. at 1080:13-24* (cautioning that "as you subdivide" an analysis, "the numbers get

21  smaller and smaller" and "aberrant findings are certain to arise").

22

23  405.   Whether an uncertainty factor of ten, three, or something else depends on the

24  chemical at issue and the studies underlying the point of departure. Barone Trial Tr. Vol. IX, at

25  1442:22–1443:15. Dr. Thiessen did not testify what benchmark MOE should be applied for any

26  point of departure based on the human data on fluoride exposure presented in this case.

27  **Plaintiffs' rebuttal**: Dr. Thiessen testified that the Benchmark MOE for fluoride

28

neurotoxicity would be "a minimum" of 10 in order to account for intraspecies variability. *Thiessen Trial Ex. (ECF No. 402) at 914:21-24 & 922:1-2 (Feb. 7, 2024)*. Dr. Barone concurs with Dr. Thiessen on this point, testifying that 10 would be the minimum Benchmark MOE to account for intraspecies variability, and that an additional uncertainty factor would need to be considered if a LOAEL was selected as the point of departure. *Barone Trial Tr. (ECF No. 418) at 1425:4-22 (Feb. 13, 2024).*

## V.    RISK DETERMINATION

### A.    PLAINTIFFS' PROPOSED FACTS (NOS. 406–437)

406.    To determine whether a risk is "unreasonable," EPA may consider "risk-related factors," including (A) the adversity/severity of the hazard; (B) the known extent of human exposure (e.g., the magnitude, frequency, duration of exposure, as well as the number of people exposed); (C) whether susceptible subpopulations are being exposed; (D) the overall confidence in the hazard and exposure data; and (E) uncertainties. *Trial Ex. 96 at 500; Trial Ex. 97 at 469; Trial Ex. 98 at 271; Barone Trial Tr. (ECF No. 400) at 586:6-9 (Feb. 5, 2024); Barone Trial Tr. (ECF No. 401) at 735:13-736:6 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact invents terminology that is undefined and not used in the materials cited, for example "known extent of human exposure." The cited documents speak for themselves. For example, in the PCE Risk Evaluation, EPA stated: "Whether EPA makes a determination of unreasonable risk depends upon other risk-related factors, such as the endpoint under consideration, the reversibility of effect, exposure-related considerations (e.g., duration, magnitude, or frequency of exposure, or population exposed), and the confidence in the information used to inform the hazard and exposure values." Trial Ex. 96, at 500. Similarly, EPA explained in the 1,4-Dioxane Risk Evaluation: "In making these determinations [of unreasonable risk], EPA considers relevant risk-related factors, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use (including cancer and non-cancer risks); the effects of the chemical substance on the environment and environmental exposure under the conditions of use; the population exposed (including any

potentially exposed or susceptible subpopulations (PESS)); the severity of hazard (including the nature of the hazard, the irreversibility of the hazard); and uncertainties. EPA also takes into consideration the Agency's confidence in the data used in the risk estimate. This includes an evaluation of the strengths, limitations, and uncertainties associated with the information used to inform the risk estimate and the risk characterization." Trial Ex. 98, at 271. As Dr. Barone explained, the risk determination considers the overall strength of the evidence and uncertainties and assumptions included throughout the risk assessment. Barone Trial Tr. Vol. V, at 735:16–736:6.

### 1.  Adversity of IQ Loss

407.    EPA recognizes that chemical-induced cognitive deficits, including IQ loss, is an adverse health effect that warrants regulatory action. *Barone Trial Tr. (ECF No. 400) at 586:14-17 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact is not supported by the cited testimony. In fact, Dr. Barone testified that EPA generally considers cognitive deficits resulting from a chemical exposure to be an adverse health effect. Barone Trial Tr. Vol. IV, at 586:14–16. He did not testify whether any particular health effect warrants regulatory action.

408.    EPA selected cognitive deficits as the critical chronic health effect in its risk evaluation of PCE under the Amended TSCA. *Barone Trial Tr. (ECF No. 400) at 597:9-13 (Feb. 5, 2024).*

**EPA's rebuttal**: Undisputed.

409.     EPA selected IQ loss as the critical health effect in its risk assessments for lead and mercury.  *Barone Trial Tr. (ECF No. 400) at 586:17-587:8 (Feb. 5, 2024).*

**EPA's rebuttal**: EPA selected IQ deficits as the critical effect in hazards assessments that fed into risk assessments done by other offices (not under TSCA). Barone Trial Tr. Vol. IV, at 586:21–25. Dr. Barone also testified that EPA had PBPK models for lead and mercury to take

1    reverse engineer intake levels from integrated measures of exposure in biomarkers to set regulatory

2    standards. Barone Trial Tr. Vol. IX, at 1396:4–11; 1397:3–19; 1420:8–15. Otherwise, undisputed.

3

4        410.    According to EPA's Clean Air Science Advisory Commission, "A population loss

5    of one to two IQ points is highly significant from a public health perspective and the primary lead

6    standard should be set so as to protect 99.5 percent of the population from exceeding that IQ loss."

7    *Lanphear Trial Tr. (ECF No. 241) at 362:8-363:23 (June 10, 2020); Trial Ex. 42 at 67000.*

8    According to a member of the Clean Air Science Advisory Commission, Dr. Bruce Lanphear, this

9    advice would apply equally to fluidated water. *Lanphear Trial Tr. (ECF No. 241) at 363:24-*

10   *364:3 (June 10, 2020).*

11       **EPA's rebuttal**: The state of lead research is **not** analogous to the current state of fluoride

12   research. As Dr. Savitz explained, one of the "key differences" is that that there was "no ambiguity

13   about the adverse effects at higher levels" of lead exposure, as there is in the current state of the

14   fluoride research as exemplified by the "moderate" confidence conclusion of the NTP monograph.

15   Savitz Trial Tr. Vol. VII, at 1163:5–7. In the research on lead exposure, each sequential study

16   found adverse effects at lower and lower levels "so that you weren't way out on a limb as you went

17   the next wrung down the ladder of exposure levels." *Id.* at 1163:7–13. And each study of lead

18   exposure was better than the last at detecting effects at lower levels. *Id.* at 1163:20–1164:11. That,

19   too, stands in contrast with fluoride research on potential neurotoxic effects. *Id.*

20       Further, Dr. Barone testified that EPA had PBPK models for lead and mercury to take

21   reverse engineer intake levels from integrated measures of exposure in biomarkers to set regulatory

22   standards. Barone Trial Tr. Vol. IX, at 1396:4–11; 1397:3–19; 1420:8–15.

23       Finally, Dr. Lanphear's cited testimony stands for the unremarkable proposition that the

24   Clean Air Science Advisory Committee's advice "would be applicable to water fluoridation or

25   other neurotoxicants." Lanphar Trial Tr. Vol. III, at 363:24–364:3 (Trial Phase 1).

26

27

28

FOURTH JOINT ITERATIVE PROPOSED FINDINGS OF FACT AND REBUTTAL STATEMENTS
CASE NO. 17-CV-02162-EMC

411.    In its national air regulations for lead, EPA set the permissible exposure level at a level that would prevent the *most susceptible* members in the population from suffering a loss of 1 to 2 IQ points. *Barone Trial Tr. (ECF No. 400) at 587:7-18 (Feb. 5, 2024).*

**EPA's rebuttal**: Dr. Barone testified that EPA tried to set the lead exposure level under National Ambient Air Quality Standards (Clean Air Act, not TSCA) where the most susceptible population will not suffer more than a 1-to-2 point loss in IQ. Barone Trial Tr. Vol. IV, at 587:14–18. Further, the state of lead research is **not** analogous to the current state of fluoride research. *See supra* ¶ 410 (EPA's rebuttal). Otherwise, undisputed.

412.    As noted by RSI, a loss of 1 IQ point, "has been shown to be associated with reduced educational attainment, employment status, productivity, and earned wages, reflecting substantial public health concerns." *Trial Ex. 129 at 27.*

**EPA's rebuttal**: Disputed. Plaintiffs again cherry-pick from a document that no expert relied upon in forming his or her opinions in this case. And the proposed fact purports to quote from that document while omitting important context. The RSI authors stated, in full: "This level of cognitive effect (in the context of assessing the exposure to lead) has been shown to be associated with reduced educational attainment, employment status, productivity, and earned wages, reflecting substantial public health concerns (Grosse et al. 2002), **though more recent work has not necessarily supported these relationships** (Aggeborn and Ohman 2021)." Trial Ex. 129, at 28(emphasis added). Indeed, the RSI authors (and the Health Canada expert panel that reviewed RSI's systematic review) determined that there is not sufficient evidence to derive a POD for neurocognitive effects. *See supra* ¶¶ 226–27. Also disputed to the extent the proposed fact is intended to support a risk determination in a TSCA risk evaluation. Under TSCA Section 6(b)(4)(A), risk determinations shall not consider "costs or other nonrisk factors . . . ."

413.    The loss of IQ that has been associated with fluoridated drinking water is similar to the magnitude of effect seen with low-level lead. *Hu Trial Decl. ¶ 23; Lanphear Trial Decl. ¶ 47.* Among women in the 95th percentile, *the contribution from fluoridated water alone (i.e., >1.3 mg*

F/L in urine) exceeds the BMCL for a 1-point loss in IQ by over a factor of four. *Grandjean Trial Tr. (ECF No. 397) at 358:2-18 (Feb. 2, 2024); Thiessen Trial Tr. (ECF No. 401) at 787:15-788:8 (Feb. 6, 2024).* Based on the pooled analyses, this subset of the population would be anticipated to have IQ losses from fluoridation in the realm of 4 to 5 IQ points, which is clearly unacceptable under EPA standards. *Lanphear Trial Tr. (ECF No. 241) at 362:8-364:3 (June 10, 2020); Trial Ex. 42 at 67000.*

**EPA's rebuttal**: Disputed. The state of lead research is **not** analogous to the current state of fluoride research. *Supra* ¶ 410 (EPA's rebuttal). The weight of the scientific evidence does not support selecting as a point of departure for neurotoxicity. *Supra* ¶¶ 284–293, 393. EPA disputes that Dr. Grandjean's BMCL is a reliable study or a defensible POD. *Supra* ¶¶ 294–313, 328–37.

### 2.   Known Extent of Exposure to Fluoridated Water

414.   EPA considers various exposure-related factors in the risk determination, including the number of people exposed, as well as the duration, frequency, and patterns of exposure. *Trial Ex. 96 at 500; Thiessen Trial Tr. (ECF No. 401) at 813:9-17 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact invents terminology ("patterns of exposure") that is undefined and not used in the risk evaluation cited. The PCE Risk Evaluation provides as examples of "exposure-related considerations" the following: duration, magnitude, the frequency of exposure, or population exposed. Trial Ex. 96, at 500.

415.   EPA considers the number of people exposed because it helps to identify the extent of potential risk. *Barone Trial Tr. (ECF No. 400) at 587: 19-588:3 (Feb. 5, 2024).*

**EPA's rebuttal**: Undisputed.

416.   The larger and more diverse the exposed population, the greater potential there is for human susceptibility to vary in response to the chemical exposure. *Barone Trial Tr. (ECF No. 400) at 587: 19-588:3 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. Dr. Barone testified that a larger population means there **generally** will be more population variability. Barone Trial Tr. Vol. IV, at 588:8–10.

417.    Approximately 200 million Americans have fluoride intentionally added to their drinking water at a concentration of 0.7 mg F/L. *Undisputed Fact No. 1.* Most other Americans are indirectly exposed to fluoridated water through consumption of commercial beverages and food manufactured with fluoridated water. *Thiessen Trial Tr. (ECF No. 401) at 799:7-801:13 & 814:15-18 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The cited testimony does not support that most Americans who do not have fluoridated drinking water are indirectly exposed to fluoridated water. Nor does the cited testimony support what the contribution from non-community water fluoride sources is.

418.    The duration of exposure to fluoridated water is lifelong, starting at conception. *Thiessen Trial Tr. (ECF No. 401) at 813:18-20 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact is vague as to what population purportedly has lifelong exposure. And the cited testimony does not support the factual proposition. Rather, Dr. Thiessen testified that exposure to community water fluoridation is "intended" to be lifelong.

419.    The frequency of exposure to fluoridated water, for most people, is several times daily. *Thiessen Trial Tr. (ECF No. 401) at 813:21-23 (Feb. 6, 2024).*

**EPA's rebuttal**: Undisputed.

420.    The patterns of exposure to fluoridated water are well documented, and include age-related differences in water intake, with bottle-fed infants drinking more tap water (and therefore more fluoridated water) than all other age groups in the population. *Thiessen Trial Tr. (ECF No. 401) at 813:24-814:9 (Feb. 6, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶ 167.* Other populations with heightened intake of fluoridated water include populations with medical conditions that increase thirst (e.g., diabetes mellitus and diabetes insipidus), athletes, and physical

1  laborers. *Thiessen Trial Tr. (ECF No. 401) at 809:3-19 (Feb. 6, 2024); Thiessen Decl. (ECF No.*
2  *202-1) ¶ 188.*

3      **EPA's rebuttal**: Disputed. The cited testimony does not support the factual proposition.
4  Nor is "patterns of exposure" a defined term. Dr. Thiessen testified that "[f]ormula-fed infants
5  have the highest individual exposure to fluoride of anybody in the population if their formula is
6  prepared with fluoridated water." Thiessen Trial Tr. Vol. V, at 814:1–3. The proposed fact is also
7  incomplete in that it omits that infants "drink[] more tap water" than other age groups **by body**
8  **weight**, which is an important component of calculating a hazard level in mg/kg/day for a margin
9  of exposure analysis that Plaintiffs did not do. Finally, the relevant exposure period pertaining to
10  the evidence of potential neurotoxicity presented at trial is prenatal, not infancy.

11      Plaintiffs proffered only one study that evaluates the neurocognitive effects of fluoridated
12  water exposure among formula-fed infants. *Infra* ¶ 426. That study, Till (2020), found **no**
13  **statistically significant association between use of fluoridated water for infant formula and**
14  **full-scale IQ**. Lanphear Trial Tr. Vol. III, 405:18–406:12 (Trial Phase 1); Thiessen Decl. ¶¶ 178–
15  79, ECF No. 202-1; Chang Decl. ¶¶ 260–61, ECF No. 200.

16      And other studies suggest infant exposures are not associated with adverse effects. A
17  Boston cross-sectional study (Morgan et al. 1998) accounted for exposure through the use of infant
18  formula mixed with fluoridated water, and that study did not find any significant differences in
19  behavior problems between exposure groups. Chang Decl. ¶ 192, ECF No. 200. Additionally, a
20  Dunedin, New Zealand study accounted for exposure by residence in fluoridated areas at various
21  times, including the birth of the children studied, which would have also been indicative of the
22  exposure of the mothers during pregnancy, assuming that they did not move during their pregnancy
23  before giving birth. Chang Trial Tr. Vol. V, 802:19–805:5, 807:8–11 (Trial Phase 1). That study
24  also found no significant association between any measure of fluoride exposure and cognitive
25  outcome. *Id.* at 802:19–805:5. The study found that breastfed infants had a higher IQ than bottle-
26  fed infants, even though fluoride exposure did not vary between the two. *Id.* at 804:23–805:5.

27
28

### 3.   Exposure to Susceptible Populations

421.   A citizen petitioner meets her burden of establishing an unreasonable risk if she is able to establish that the condition of use presents an unreasonable risk to a "potentially exposed or susceptible subpopulation." 15 U.S.C. § 2620(b)(4)(B)(ii). As with Section 21, Section 6 of TSCA also requires protection of susceptible subsets of the population. 15 U.S.C. § 2605(b)(1)(4)(A). EPA thus considers "susceptible" members of the populations as part of its risk evaluations. *Barone Trial Tr. (ECF No. 400) at 588:23-589:10 (Feb. 5, 2024).*

**EPA's rebuttal**: The proposed fact calls for legal conclusions. The text of the statute speaks for itself.

422.   Evidence that susceptible members of the population are being exposed to the chemical under the condition of use weighs in favor of an unreasonable risk determination. *Barone Trial Tr. (ECF No. 400) at 589:11-21 (Feb. 5, 2024).*

**EPA's rebuttal**: Undisputed.

423.   It is undisputed that the developing brain during the in utero and infancy period has a heightened susceptibility to the impact of environmental toxicants. *Trial Ex. 18 at 42; Grandjean Trial Tr. (ECF No. 417) at 289:3-290:4; (*Feb. 1, 2024); *Grandjean Trial Decl. (ECF No 198-3) ¶¶ 38-40; Thiessen Trial Decl. (ECF No. 202-1) ¶ 159; Grandjean Trial Tr. (ECF No. 240) at 150:15-22 & 151:24-152:13; Lanphear Trial Tr. (ECF No. 241) at 349:5-8; Thayer Trial Tr. (ECF No. 241) at 440:18-441:1, 442:22-443.*

**EPA's rebuttal**: Undisputed.

424.   In the case of water fluoridation, it is undisputed that large numbers of susceptible individuals are being exposed each year to fluoride through fluoridation, including approximately 2 million pregnant women, and over 300,000 exclusively formula-fed babies. *Thiessen Trial Tr. (ECF No. 401) at 815:6-816:23 (Feb. 6, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 162 & 180.*

1    **EPA's rebuttal**: Undisputed.

2

3    425.    The number of pregnant women and formula-fed babies who are exposed to water

4    fluoridation each year exceeds, by many orders of magnitude, the entire populations exposed to

5    conditions of use for which EPA has found unreasonable risk. *Undisputed Fact No. 43; Barone*

6    *Trial Tr. (ECF No. 400) at 588:11-17 (Feb. 5, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶ 219.*

7    "With such widespread exposure to fluoridation chemicals among the general population, even

8    small risks can amount to widespread harm." *Thiessen Trial Decl. (ECF No. 202-1) ¶ 219.*

9        **EPA's rebuttal**: Undisputed that the exposed population for the condition of use of

10   community water fluoridation exceeds the exposed populations of the first ten risk evaluations

11   under Amended TSCA. Disputed that community water fluoridation presents a risk or "widespread

12   harm."

13

14   426.    The one study (Till 2020) to evaluate the neurocognitive effects of fluoridated water

15   exposure among formula-fed infants found a significant association with IQ deficits later in life.

16   This finding remains uncontroverted. *Lanphear Trial Tr. (ECF No. 417) at 214:1-10 (Feb. 1,*

17   *2024); Thiessen Trial Tr. (ECF No. 401) at 817:9-21 (Feb. 6, 2024); Trial Ex. 123.*

18       **EPA's rebuttal**: Disputed. Plaintiffs proffered only one study that evaluates the

19   neurocognitive effects of fluoridated water exposure among formula-fed infants. That study, Till

20   (2020), found **no statistically significant association between use of fluoridated water for**

21   **infant formula and full-scale IQ in the combined results**. Lanphear Trial Tr. Vol. III, 405:18–

22   406:12 (Trial Phase 1); Thiessen Decl. ¶¶ 178–79, ECF No. 202-1; Chang Decl. ¶¶ 260–61, ECF

23   No. 200. Other studies similarly were null.

24       A Boston cross-sectional study (Morgan et al. 1998) accounted for exposure through the

25   use of infant formula mixed with fluoridated water, and that study did not find any significant

26   differences in behavior problems between exposure groups. Chang Decl. ¶ 192, ECF No. 200.

27   Additionally, a Dunedin, New Zealand study accounted for exposure by residence in fluoridated

28   areas at various times, including the birth of the children studied, which would have also been

indicative of the exposure of the mothers during pregnancy, assuming that they did not move during their pregnancy before giving birth. Chang Trial Tr. Vol. V, 802:19–805:5, 807:8–11 (Trial Phase 1). That study also found no significant association between any measure of fluoride exposure and cognitive outcome. *Id.* at 802:19–805:5. The study found that breastfed infants had a higher IQ than bottle-fed infants, even though fluoride exposure did not vary between the two. *Id.* at 804:23–805:5.

### 4.     Confidence in Hazard and Exposure Data

427.   EPA does not require "high" confidence in either the hazard or exposure data to make an unreasonable risk determination under TSCA. *Undisputed Fact Nos. 38 & 40; Barone Trial Tr. (ECF No. 400) at 570:6-10 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact misstates two undisputed facts. Under the Amended TSCA, EPA has made Unreasonable Risk determinations where it did not have high confidence in the hazard data. Undisputed Fact No. 38. And under the Amended TSCA, EPA has made Unreasonable Risk determinations where it did not have high confidence in the exposure data. Undisputed Fact No. 40. Risk evaluations are chemical-specific and must abide by the science requirements of TSCA section 26(h) and (i). Whether "high" confidence is "required" depends on the data for the chemical and condition of use.

428.   For the hazard data, EPA does not make separate confidence determinations for "high dose" and "low dose" hazard studies. Instead, EPA provides a single confidence determination for the whole body of hazard data for the critical effect. *Barone Trial Tr. (ECF No. 397) at 491:22-492:6 (Feb. 2, 2024); Barone Trial Tr. (ECF No. 400) at 615:15-618:12 (Feb. 5, 2024).*

**EPA's rebuttal**: Undisputed.

429.     EPA has made unreasonable risk determinations where it has medium confidence in the hazard data, and low to medium confidence in the exposure data. *Undisputed Fact Nos. 39 & 41; Barone Trial Tr. (ECF No. 400) at 570:6-10 (Feb. 5, 2024); Trial Ex. 88 at 5-6.*

**EPA's rebuttal**: Disputed. EPA has not made unreasonable risk determinations where it has low-to-medium confidence in the exposure data for a condition of use. Barone Trial Tr. Vol. IV, at 570:20–24. Rather, EPA has had low-to-medium confidence for certain exposure routes (i.e., dermal) but not the entire condition of use. *Id.* at 570:20–24, 620:9–16. For example, in the methylene chloride risk evaluation, EPA had medium to high confidence in inhalation exposure scenarios, and low to medium confidence in dermal exposure estimates. Ex. 102, at 223; 190-91.

430.     In EPA's first ten risk evaluations under the Amended TSCA, EPA derived a Hazard Level for neurotoxicity based on human data for two chemicals: methylene chloride and PCE. *Thiessen Trial Tr. (ECF No. 401) at 772:3-11 & 819:4-7 (Feb. 6, 2024).* In both instances, EPA was unable to derive a BMCL or NOAEL, and thus utilized a LOAEL, which is the least preferred form of Hazard Level. *Thiessen Trial Tr. (ECF No. 401) at 818:16-19 & 819:11-14 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 397) at 496:10-25 (Feb. 2, 2024).* In both instances, EPA derived the LOAEL from studies it judged to be of "medium" quality. *Trial Ex. 88 at 5-6.*

**EPA's rebuttal**: Disputed with respect to EPA using a human study for the acute effect of neurotoxicity in the methylene chloride risk evaluation, but animal data for the chronic effect. Ex. 102, at 312. Otherwise, undisputed.

431.     For methylene chloride, EPA had low confidence in at least some of the exposure scenarios for which it found unreasonable risk. *Thiessen Trial Tr. (ECF No. 401) at 819:4-820:4 (Feb. 6, 2024).*

**EPA's rebuttal**: EPA has not made unreasonable risk determinations where it has low confidence in the exposure data for the overall condition of use. Barone Trial Tr. Vol. IV, at 570:20–24; *supra* ¶ 429 (EPA's rebuttal). For example, EPA had medium to high confidence in

1  inhalation exposure scenarios, and low to medium confidence in dermal exposure estimates. Ex.

2  102, at 223; 190-191. Otherwise, undisputed.

3

4       432.    Despite having suboptimal confidence in the hazard and exposure data for

5  methylene chloride and PCE, EPA found unreasonable risks for exposure scenarios where the

6  human exposure level was $1/27^{th}$, $1/51^{st}$, and $1/89^{th}$ of the Hazard Level. *Thiessen Trial Tr. (ECF*

7  *No. 401) at 818:7-15 & 819:8-10 (Feb. 6, 2024); Barone Trial Tr. (ECF No. 400) at 612:7-613:19*

8  *(Feb. 5, 2024).*

9       **EPA's rebuttal**: Disputed. The proposed fact is vague as to "suboptimal." And EPA did

10 not find risk or unreasonable risk on the basis described in the proposed fact. EPA determines non-

11 cancer risk by comparing the calculated margin of exposure to a benchmark margin of exposure.

12 *See* Barone Trial Tr. at 606:25–607:11. Nor do any of the hazard ratios identified in the proposed

13 fact bear on whether community water fluoridation presents unreasonable risk.

14

15      433.    The determination of risk for fluoride neurotoxicity from the condition of use of

16 water fluoridation involves far less extrapolation from high-dose studies than was the situation

17 with methylene chloride and PCE. *Thiessen Trial Tr. (ECF No. 401) at 820:5-22 & 821:15-822:15*

18 *(Feb. 6, 2024).* With fluoride, there is little dispute that water fluoride levels just three to five times

19 higher than the Condition of Use level (0.7 mg/L) are associated with neurotoxic effects, and some

20 studies—including high-quality studies—have detected significant adverse neurotoxic effects

21 under the Condition of Use, including an uncontroverted study on formula-fed infants. *Barone*

22 *Trial Tr. (ECF No. 418) at 1424:24-1425:3 (Feb. 13, 2024); Trial Ex. 106; Trial Ex. 107; Trial*

23 *Ex. 109; Trial Ex. 112; Trial Ex. 115; Trial Ex. 116; Trial Ex. 120; Trial Ex. 123.* There is thus

24 less extrapolation required, and thereby greater confidence, in the risk determination for water

25 fluoridation than the risk determinations for the methylene chloride and PCE conditions of use.

26 *Thiessen Trial Tr. (ECF No. 401) at 821:15-822:4 (Feb. 6, 2024).*

27      **EPA rebuttal**: Disputed. The weight of the scientific evidence does not support the

28 proposition that exposures in the range of community water fluoridation area associated with

adverse neurocognitive effects. *Supra* ¶¶ 88–272. Nor does the weight of the scientific evidence support selecting as a point of departure for fluoride concentrations of 2.0, 3.0, or even 4.0 mg/L. Barone Trial Tr. Vol. IX, at 1422:12–23; *supra* ¶¶ 273–348. And the sole study Plaintiffs proffered on formula-fed infant exposures is null, with other studies consistently finding null results. *See supra* ¶ 426 (EPA's rebuttal). Finally, while methodologies and processes of other TSCA risk evaluations may have some relevance to whether community water fluoridation presents unreasonable risk, risk evaluations are based on data specific to the chemical substance under consideration. This is consistent with the scientific standards in TSCA section 26(h) and (i).

434.    The exposure information on fluoride from fluoridated water, which benefits from well characterized data on tap water consumption, permits greater confidence than the limited exposure information that EPA has had available to it for some of the obscure manufacturing processes it has evaluated and found unreasonable risk from under TSCA. *Thiessen Trial Tr. (ECF No. 401) at 775:17-776:18 (Feb. 6, 2024); Thiessen Trial Decl. (ECF No. 202-1) ¶¶ 148-153.* Additionally, published data exists on urinary fluoride levels in *pregnant women* exposed to *the specific condition of use at issue* (water fluoridation), thus significantly limiting the assumptions that need to be made to estimate exposure. *Trial Ex. 108; Trial Ex. 122.*

**EPA's rebuttal**: Disputed. While methodologies and processes of other TSCA risk evaluations may have some relevance to whether community water fluoridation presents unreasonable risk, risk evaluations are based on data specific to the chemical substance under consideration. This is consistent with the scientific standards in TSCA section 26(h) and (i). Further disputed that Plaintiffs proffered any basis for the Court to determine an intake value from maternal urinary fluoride. *Supra* ¶¶ 325–41.

### 5.    Uncertainties

435.    The parties agree that "In the ideal world, all risk assessments would be based on a very strong knowledge base (i.e., reliable and complete data on the nature and extent of

contamination, fate and transport processes, the magnitude and frequency of human and ecological exposure, and the inherent toxicity of all of the chemicals)." *Undisputed Fact No. 17.*

**EPA's rebuttal**: Undisputed.

436.    The parties further agree that "in real life, information is usually limited on one or more of these key data needed for risk assessment calculations." Consequently, "all risk estimates are uncertain to some degree." *Undisputed Fact No. 17; Barone Trial Tr. (ECF No. 400) at 590:10-25 (Feb. 5, 2024).*

**EPA's rebuttal**: Disputed. The proposed fact omits portions of the parties' undisputed fact. The entire undisputed fact states: "In the ideal world, all risk assessments would be based on a very strong knowledge base (i.e., reliable and complete data on the nature and extent of contamination, fate and transport processes, the magnitude and frequency of human and ecological exposure, and the inherent toxicity of all of the chemicals). However, in real life, information is usually limited on one or more of these key data needed for risk assessment calculations. This means that risk assessors often have to make estimates and use judgment when performing risk calculations, and consequently all risk estimates are uncertain to some degree. For this reason, a key part of all good risk assessments is a fair and open presentation of the uncertainties in the calculations and a characterization of how reliable (or how unreliable) the resulting risk estimates really are."

437.    Since data gaps and the uncertainties that arise from data gaps are pervasive to risk assessment, it is to be expected *a priori* that uncertainties exist in the assessment of fluoride. *Undisputed Fact No. 17; Barone Trial Tr. (ECF No. 400) at 590:10-25 (Feb. 5, 2024).* One of the data gaps on fluoride that EPA has pointed to is the absence of a PBPK model to precisely estimate the external intake value for the urine-based BMCL. *Barone Trial Tr. (ECF No. 418) at 1433:23-1434:8 (Feb. 13, 2024).* However, Risk Sciences International (RSI) has converted the urine-based hazard value (i.e., BMCL) into hazard values that are expressed in terms of both mg F/day and mg F/L in water. *Trial Ex. 129 at 24.* Moreover, there is hazard and exposure data that

has been published using the same units of exposure (e.g., urinary fluoride levels) and, as such, the hazard and exposure values can be directly compared. *Thiessen Trial Tr. (ECF No. 401) at 789:20-791:16 (Feb. 6, 2024).*

**EPA's rebuttal**: Disputed. The lack of a PBPK model or other methodology to convert maternal urinary fluoride values to an intake value is one of several gaps EPA identified that prevent the Court from finding that community water fluoridation presents unreasonable risk. *Supra* ¶¶ 325–41. Plaintiffs ask the Court to treat fluoride differently than any of the previous risk evaluations under TSCA. No expert in this case has endorsed the RSI urinary fluoride conversion. The uncontroverted testimony shows that the assumptions RSI made are not reliable because they do not reflect the physiological changes of pregnancy. *Supra* ¶¶ 285–290, 331, 335, 339.

Finally, Dr. Thiessen did not in fact perform the calculation she testified is hypothetically possible. Thiessen Trial Tr. Vol. V, at 790:8–791:5, 791:13–16. Dr. Thiessen did not even attempt to select a point of departure. Thiessen Trial Tr. Vol. VI, at 907:19–908:15, 914:12–14 (Feb. 7, 2024) ("I did not attempt to provide a real point of departure."); *supra* ¶ 327.

## B.     EPA'S PROPOSED FACTS (NOS. 438–441)

438.    In the final component of a TSCA risk evaluation, EPA determines whether the chemical substance does or does not present an unreasonable risk of injury to health or the environment under the conditions of use. 15 U.S.C. § 2605(b)(4)(A).

**Plaintiffs' rebuttal**: No dispute.

439.    A variety of factors may bear on whether a risk is unreasonable, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the population exposed (including any susceptible populations); the severity of hazard; and uncertainties. Trial Ex. 544, at 33,735.

**Plaintiffs' rebuttal**: No dispute, but it bears clarifying that "effects . . . under the condition of use" does *not* require that there be human or animal studies linking the condition of use to the hazard. *Barone Trial Tr. (ECF No. 400) at 593:17-25 (Feb. 5, 2024)*; *see e.g., Trial*

*Ex. 96 at 530-31* (EPA's discussion of risk-related factors that support its finding of unreasonable risk from PCE in the dry cleaning industry makes no mention of whether the data supports an association or effect at the exposure levels). As but one example, EPA found unreasonable risk in the HBCD risk evaluation where it did not have any evidence that HBCD was associated with the critical effect (thyroid) under the condition of use. *Id. at 595:8-11.* Likewise, EPA found unreasonable risk in the PCE risk evaluations where human exposures were 51 to 89 times less than the estimated LOAEL from human epidemiological studies. *Barone Trial Tr. (ECF No. 400) at 606:15-607:11 & 612:17-613:19 (Feb. 5, 2024).*

440.    Where a chemical substance has beneficial health effects, such as fluoride, consideration of those effects should be included as part of the risk evaluation and risk determination. Henry Decl. ¶¶ 51, 100, ECF No. 201; 82 Fed. Reg. at 33,735, Trial Ex. 544 (Trial Phase 1). Dr. Thiessen did not conduct a systematic review of fluoride's anti-caries health effects. Thiessen Trial Tr. Vol. 4, 578:21–25 (Trial Phase 1). Dr. Thiessen did not consider fluoride's anti-caries health effects in a dose-response assessment. *Id.* at 580:8–10 (Trial Phase 1). No evidence in the record demonstrates that Dr. Thiessen considered fluoride's anti-caries health effects as part of an exposure assessment, risk characterization, or risk determination.

**<u>Plaintiffs' rebuttal</u>**: The TSCA statute squarely forbids consideration of "non-risk factors" during the *risk evaluation* phase. *15 U.S.C. § 2605(b)(4).* Any purported benefits from water fluoridation, therefore, cannot be considered at this stage because they are a "non-risk" factor. The Court has addressed and ruled on this issue. *ECF No. 197 at 12* (excluding evidence of benefits because "the plain text of the statute, the structure of the statute, and its legislative history all indicate that consideration of benefits at the risk evaluation stage is inappropriate").

441.    As Dr. Barone explained, there is not sufficient evidence for the Court to reach the risk determination step. Barone Trial Tr. Vol. IX, at 1420:21–1421:12.

**<u>Plaintiffs' rebuttal</u>**: No dispute that this is Dr. Barone's opinion.

Date: March 1, 2024                          Respectfully submitted,

*/s/ Michael Connett*
MICHAEL CONNETT
C. ANDREW WATERS
WATERS, KRAUS & PAUL
11601 Wilshire Blvd., Suite 1900
Los Angeles, CA 90025
Tel: (310) 414-8146

*Attorneys for Plaintiffs*

Date: March 1, 2024                          Respectfully Submitted,

TODD KIM
Assistant Attorney General

*/s/ Brandon N. Adkins*
PAUL A. CAINTIC
BRANDON N. ADKINS
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 514-2593 (Caintic)
Tel: (202) 616-9174 (Adkins)
Fax: (202) 514-8865
Paul.Caintic@usdoj.gov
Brandon.Adkins@usdoj.gov

ISMAIL J. RAMSEY
United States Attorney

MICHELLE LO
Chief, Civil Division

EMMET P. ONG
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Attorneys for Defendants*