```
 1                              Volume 10

 2                              Pages 1467 - 1565

 3                  UNITED STATES DISTRICT COURT

 4                  NORTHERN DISTRICT OF CALIFORNIA

 5   Before The Honorable Edward M. Chen, Judge

 6   FOOD & WATER WATCH, INC., ET   )
     AL.,                          )
 7                                 )
              Plaintiffs,          )
 8                                 )
       VS.                         )    NO. 17-CV-2162
 9                                 )
     UNITED STATES ENVIRONMENTAL   )
10   PROTECTION AGENCY, an agency  )
     of the United States, ET AL., )
11                                 )
              Defendants.          )
12   _____)

13                         San Francisco, California
                           Tuesday, February 20, 2024
14
         TRANSCRIPT OF VIDEOCONFERENCE BENCH TRIAL PROCEEDINGS
15
     APPEARANCES (via Zoom):
16
     For Plaintiffs:
17                        WATERS KRAUS & PAUL, LLP
                          222 N. Pacific Coast Highway, Suite 1900
18                        El Segundo, California  90245
                   BY:    MICHAEL P. CONNETT
19                        CHARLES ANDREW WATERS
                          ATTORNEYS AT LAW
20

21

22        (Appearances continued next page.)

23   REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                   Official U.S. District Court Stenographer
24

25
```

```
 1   APPEARANCES (Via Zoom Continued):

 2   For Defendants:
                         UNITED STATES DEPARTMENT OF JUSTICE
 3                       Environmental Defense Division
                         601 D Street, NW, Room 8814
 4                       Washington, DC  20004
                  BY:   BRANDON N. ADKINS, ATTORNEY AT LAW
 5
                         UNITED STATES DEPARTMENT OF JUSTICE
 6                       1301 Clay Street, Suite 340-S
                         Oakland, California  94612
 7                BY:   EMMET P. ONG, ATTORNEY AT LAW

 8                       UNITED STATES DEPARTMENT OF JUSTICE
                         Environmental Defense Division
 9                       150 M Street, N.E.
                         Washington, D.C.  2002
10                BY:   PAUL CAINTIC, ATTORNEY AT LAW

11
     ALSO PRESENT:
12                       DANNY HAMBRICK (trial tech)

13

14                       --oOo--

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

```
 1   Tuesday - February 20, 2024                      9:29 a.m.

 2                        P R O C E E D I N G S

 3                            --oOo--

 4        THE CLERK:  Calling civil action C17-2162, Food &

 5   Water Watch, Inc. versus EPA.

 6        Counsel, starting with the plaintiff, would you please

 7   state your appearance for the record.

 8        MR. CONNETT:  Good morning; Michael Connett on behalf

 9   of the plaintiffs.

10        THE COURT:  Thank you, Mr. Connett.

11        MR. WATERS:  Also Andy Waters on behalf of the

12   plaintiffs.

13        THE COURT:  All right.  Good morning.

14        Counsel?

15        MR. ADKINS:  Good morning, Your Honor; Brandon Adkins

16   for the defendants.

17        THE COURT:  All right.  Thank you, Mr. Adkins.

18        MR. ONG:  Good morning, Your Honor; Emmet Ong, on

19   behalf of the defendants.

20        THE COURT:  Good morning, Mr. Ong.

21        MR. CAINTIC:  Good morning, Your Honor; Paul Caintic

22   on behalf of defendants.

23        THE COURT:  All right.  Thank you, Mr. Caintic.

24        All right.  Let me first suggest that after this hearing

25   what I would like after reviewing the -- and thank you for the
```

 1  last iteration of the findings of fact and conclusions of law.

 2  I think what would be helpful is with respect to those facts

 3  that each of you have tendered as being disputed, I'd like the

 4  opponent to tell me why it's disputed and give each of you a

 5  chance to add a couple of sentences so that I have them, you

 6  know, paired and I can see because some of those I'm not sure

 7  really truly are disputed and maybe they're not, I don't know.

 8  And if they are, I'd kind of like to see what the

 9  counter-evidence is or why it is, and then that way I can sort

10  of match up specific findings and the response thereto.

11      MR. CONNETT:  Your Honor, I think that's very -- I was

12  going to suggest the same thing because the parties, the way

13  we've been putting these documents together, we really haven't

14  had the time to review each other's submission before we file

15  it, so I do think there are going to be times where we agree on

16  the facts, and I do think there are facts that certainly, from

17  plaintiffs' position, we would like to show why we dispute what

18  EPA is saying, so I think that would be a very helpful thing

19  for all parties concerned.

20      THE COURT:  All right.

21  Mr. Adkins or any of your team, response?

22      MR. ADKINS:  Yeah, we're happy to do that, Your Honor.

23      THE COURT:  Okay.  I think that would be very helpful

24  so I can actually see where the disputes are and where the hot

25  spots are and I can relook at the evidence.  So how much time

 1  do you think -- well, let's figure out a timeline.

 2      I know we have 55 pages of findings, although not all of

 3  those are disputed, but it's a fair amount of work.  But of

 4  course you know the record very well, both of you for both

 5  sides.

 6          **MR. ADKINS:**  I think we're closer to 94 pages of

 7  findings at this point.

 8          **THE COURT:**  Right.

 9          **MR. ADKINS:**  Yeah.

10          **MR. CONNETT:**  I think, Your Honor, that it would be

11  manageable to do this by the end of next week or middle of next

12  week.

13          **THE COURT:**  Okay.  I was thinking end of next week.

14  Is that enough time, Mr. Adkins?

15          **MR. ADKINS:**  I think that's -- yes.  I think we can do

16  that.  I would just ask, you know, once we dive into this task

17  if it looks like it might take a little bit more time, that we

18  could have leave to seek additional time, if necessary.

19          **THE COURT:**  Right.  Well, particularly if you -- I'd

20  like for you to meet and confer because maybe some of those

21  things can be taken off the table and put into the undisputed

22  column.

23      I also want to see, you know, I don't want to see like a

24  whole page of narrations.  I just need something of similar

25  length because you can just key me to the evidence and sort of

1  summarize it, but I don't want, like, t-w-o paragraph long

2  responses to each.  It should be kind of similar to what the

3  length of the various asserted facts are, so --

4       **MR. ADKINS:**  Okay.

5       **THE COURT:**  -- let's try for next -- end of next week

6  because the quicker you can get me those the fresher it is in

7  my mind and the quicker I can get to work on this, so thank

8  you.

9       All right.  So I posed a number of questions.  Some of

10  them are very sort of specific in trying to figure out what the

11  meaning of sort of things are.  Part of it is just to get a

12  sense of what the parties' position are.

13       And what I want to do is talk first about dose response

14  because that's a kind of a complicated area and I want to make

15  sure I understand the disputes in that regard, and I guess I'll

16  see more when we get your final version of the point of fact.

17  But I guess I'd like to know more specifically about the one

18  BMCL that was done quantitatively and it's very specific is Dr.

19  Grandjean's as I recall.  And maybe the government can sort of

20  summarize why it thinks that the -- that his BMCL of .28 is

21  wrong.

22       **MR. ADKINS:**  Thank you, Your Honor.  I do have maybe

23  three to four minutes of a brief overview of the evidence

24  that's been presented in this case.

25       **THE COURT:**  Okay.  Okay.  That's fine.

PROCEEDINGS

1    **MR. ADKINS:**  I'm happy to jump right --

2    **THE COURT:**  Why don't we start with that.

3    **MR. ADKINS:**  Okay.  So I'll provide that brief

4  summation, if you will, and then I'll jump into what I think is

5  question 1 from the Court's questions with respect to

6  Dr. Grandjean BMCL.

7    **THE COURT:**  Yeah.

8    **MR. ADKINS:**  So the weight of the evidence prevents

9  the Court in this case from deriving a point of departure for

10 neurotoxicity.

11    Your Honor, you acknowledged at the end of trial last week

12 that the scientific community has been studying, and that's

13 correct.  So far the scientific community has uniformly

14 declined to adopt a point of departure for neurotoxicity.

15    The Risk Sciences International or RSI systematic review

16 refused to derive a point of departure for neurotoxicity.

17    The Health Canada expert panel and the scientists that met

18 with that panel last summer agreed that there's not a

19 sufficient basis at this time to recommend a point of departure

20 for neurocognitive effects.

21    The NTP Monograph and the NTP Meta-analysis authors did

22 not derive a point of departure for neurotoxicity.

23    And Dr. Theissen, plaintiffs' risk assessor, did not even

24 attempt to identify and justify a point of departure from the

25 human data.

1      Your Honor, this Court would be the outlier if it derived

2   a point of departure for neurotoxicity at this moment.  And

3   I'll explain in responding to the Court's questions why doing

4   so at this time would be error.  But just a quick word

5   summarizing the evidence that EPA presented before I turn to

6   that question.

7      Dr. Savitz offered an unbiased explanation of the state of

8   the science.  He was selected to chair two NASEM committees

9   that reviewed the NTP Monograph and plaintiffs acknowledge that

10  his credentials cannot be impugned.  The NTP Monograph

11  concluded that more research is needed in that low-dose

12  exposure range and Dr. Savitz explained that the studies

13  published since the draft monograph, in particular the INMA and

14  the Odense cohort studies and other cross-sectional studies do

15  not support that fluoride is associated with neurotoxic

16  outcomes in children at doses that are relevant to community

17  water fluoridation.

18     Your Honor, you could find for EPA based on this

19  weight-of-the-evidence analysis alone.

20     Dr. Barone has over 20 years experience doing risk

21  assessment at EPA.  He coauthored the risk evaluations that

22  were completed under amended TSCA and he testified, too, that

23  the weight of the scientific evidence does not support

24  selecting a point of departure for neurotoxicity.

25     In his view the Court shouldn't even advance past the

1   hazard assessment of the risk evaluation.  He's also in

2   agreement with the NTP meta-analysis authors and the BSC

3   working group that there's a dearth of data in that

4   low-exposure range and that lack of data would require the

5   Court to extrapolate from the high-exposure studies in the

6   dose-response curve at that lower range.  That's an --

7            THE COURT:  Don't the -- I know we're going to get

8   into it, but it is true that the -- whether there is an adverse

9   effect from exposure to fluoride at low-dose levels, the

10  evidence is mixed, because we've got studies going both ways.

11  And any dose-response relationship is -- I think most studies

12  suggest it's less clear, it's not clear in that range.  But

13  what do I do with the fact that you don't have to go much

14  higher to find -- in the words of Dr. Barone -- something is

15  going on.  And, undoubtedly, all the studies show that

16  something is going on when you get above whether it's 1.5, 2 or

17  whatever that level is and the studies become more consistent,

18  more almost unanimous when you're talking about higher levels.

19       So even if it's -- if it's hard to find the exact point

20  where the lowest adverse effect is observed, clearly there is

21  an adverse effect at some level, whether it's two, three, four,

22  seven, ten.

23       And the fact that the community water range is not that

24  far off in terms of multitudes -- I mean, if we're talking

25  about, you know, 1/100 the level or something, I could see that

**PROCEEDINGS**

 1   but if you're within a multiple of 10, given the normal MOE

 2   that applies just for human variability alone, never mind the

 3   LOAEL uncertainty factor that adds another ten factor, why

 4   isn't -- it seems odd to say, well, we can't identify exactly

 5   where it is, we know it's -- something is going on in this

 6   range that's within multiples of 10 of the actual community

 7   exposure level in North America and the United States but since

 8   we can't tell exactly where it is, we're going to not do

 9   anything.  And is that consistent with the idea of, you know,

10   trying to draw the inferences in favor of health and making

11   sure that the health concerns are paramount?  That's the issue.

12           MR. ADKINS:  Thank you, Your Honor.  So this I think

13   goes to question 3 in Your Honor's questions for oral argument

14   where you posited can't we use 4 parts per million water

15   fluoride as a conservative lowest observed adverse effect

16   level?  So I'll address that.  There are factual and legal

17   reasons why the Court cannot use 4 or 3 or even 2 as a

18   conservative estimate for a LOAEL.

19       You know, if you look, Your Honor, at eTable 5 of the NTP

20   Meta-analysis --

21       And if it would be helpful, I'm happy to put that on the

22   screen, if you want me to do that.

23           THE COURT:  Yeah, why don't you do that.  We can

24   screen share.

25           MR. ADKINS:  Sure.

PROCEEDINGS

```
 1          THE COURT:  You can do that.
 2          MR. ADKINS:  So Mr. Hambrick is with us and he'll
 3   put -- he'll put this on.  There we go.
 4       So eTable 5 doesn't really support that water fluoride
 5   concentrations even less than 4 milligrams per liter is a
 6   LOAEL.  So if you look, only the linear model, Judge, shows a
 7   statistically significant adverse effect in that grouping
 8   and -- but the linear and nonlinear models have comparable fit.
 9          In fact, the restricted cubic spline model has slightly
10   better fit based on the AIC scores.
11          And if you look over at the less than 1.5- and the less
12   than 2-milligram-per-liter groups, there's no statistically
13   significant effect across all the models, so -- and Dr.
14   Theissen testified at trial that those models are all
15   comparable, so it's no wonder why NTP did not identify less
16   than 4-milligram per liter or even 2-milligram per liter as a
17   point of departure that can be used for water fluoridation.
18          And let's not forget that virtually all the studies that
19   the NTP Meta-analysis was looking at are outside of North
20   America.  In fact, 52 of the 55 studies are from China, India,
21   Iran and Pakistan.  So you don't need --
22          THE COURT:  So that's taken into account, I mean, in
23   terms of if you look at the low risk-of-bias -- if you go to
24   the bottom of that chart, low risk-of-bias linear model below 4
25   it's statistically significant.  If you look at-- actually, if
```

PROCEEDINGS

1   you look at below 2 -- below 1 -- well, below 2 you've got it

2   as well.

3           MR. ADKINS:  But, Judge, this applies low risk-of-bias

4   or all data, that there are only -- there are only three

5   studies that are within the North American -- excuse me.

6   There's the MIREC study, the ELEMENT study -- which are North

7   America -- and then we have Broadbent from Australia.  All the

8   other studies, Judge, are from China, India, Iran and Pakistan.

9       And Dr. Hu even acknowledged at trial that neurotoxicity

10  presents differently, by population, customs, diet, parenting

11  styles.  This just isn't the kind of data that you can just

12  automatically extrapolate and apply to the United States.

13          THE COURT:  Well, the NTP -- NTP, I mean, looked at

14  those and filtered out those that were high risk-of-bias,

15  looked at the low risk-of-bias and did consider those as part

16  of the however many studies, 72 to start with or whatever and

17  they didn't just say -- the NTP didn't say, well, it's not in

18  North America, we can't consider -- it's non -- you can't

19  extrapolate; it's too foreign, too distant, too different that

20  we're going to ignore that.  You can't ignore it.  You're not

21  asking the Court to ignore those studies which NTP found to be

22  low risk-of-bias, are you?

23          MR. ADKINS:  No, certainly not, but there's -- there's

24  two orders to this argument.

25          THE COURT:  Why isn't -- why isn't that significant?

**PROCEEDINGS**

1    I mean, if you look at all studies, not just the below 4, I

2    mean, you still -- everything but below 1.5 is statistically

3    significant, which is exactly what the NTP found, right?

4         I mean, essentially in a narrative form that that

5    association is -- is -- with moderate confidence there is --

6    they found such an association at least above the 1.5.

7              **MR. ADKINS:**  So there are two -- there are two orders

8    to this -- to this argument or two strands to the argument.

9    One is that the findings are not so clear cut as you're

10   summarizing them.

11        As I just pointed out, in the most -- in the best model

12   fit, there's not even a statistically significant adverse

13   effect.  This generalized ability of point is looking at it by

14   taking a step back, right?  So let's look at what the results

15   are for the data that they used but also keep in mind that even

16   with the data that they used, this isn't necessarily

17   generalizable to the United States, so -- and those are the two

18   strands that I wanted to point out.

19        But there are other points here that I want to make sure I

20   address for Your Honor.

21             **THE COURT:**  Before you go a little bit further --

22             **MR. ADKINS:**  Yes.

23             **THE COURT:**  -- while you're on this table if you look

24   at all data in the -- and all studies, there are an additional

25   about 3,000 children that presumably are at 4 or above, right?

PROCEEDINGS

1  The difference between all data and the minus -- and below 4?

2          MR. ADKINS:  Yes.

3          THE COURT:  And there are about eight studies.  As I

4  recall, aren't those -- somewhere there's a table that shows

5  what the exposure range is for these others that exceed 4.

6  Weren't they sort of, I don't know, in the range of 5, 6 or 7

7  mostly, do you recall?

8          MR. ADKINS:  I don't recall that precise fact --

9          THE COURT:  Okay.

10          MR. ADKINS:  -- offhand, no.

11          THE COURT:  So that -- if you look at the all data, it

12  does show under all three models statistically significant

13  relationship, right?

14          MR. ADKINS:  All data, all three models, statistically

15  significant, correct.  And this is what -- we're looking at

16  water fluoride.

17          THE COURT:  Yeah.

18          MR. ADKINS:  Right.  In Table e5.

19          THE COURT:  Okay.  Go on.

20          MR. ADKINS:  So the second point, Judge, is that the

21  Court must identify a point of departure and justify it based

22  on the evidence in the trial record.  And it may be interesting

23  as a thought exercise to consider what the conservative LOAEL

24  is or a conservative NOAEL, but that's not how TSCA works and

25  it's not how EPA does risk evaluation either.  For the

PROCEEDINGS

 1  plaintiffs to prevail in this case, Judge, the Court must find,

 2  by a preponderance of the evidence, that .7 milligrams per

 3  liter of fluoride presents unreasonable risk.

 4       That's distinct from other sections of TSCA where

 5  administrative action can be based on a finding that the

 6  substance may present unreasonable risk, so more in the

 7  hypothetical territory.

 8       And perhaps in those situations the Court could engage in

 9  this kind of thought exercise, but to do so in a petition for a

10  Section 6 rule would be a violation of the statute and would

11  be -- it would constitute error.

12       EPA has never selected a NOAEL or a LOAEL from a

13  systematic review.  That was testimony we heard throughout this

14  trial.  And they select those points of departure based on

15  primary research.  They select a study and you can see that

16  throughout all the risk evaluations that are in evidence.

17       So the Court would be in unchartered territory if it were

18  to rely on a systematic review, whether it be the NTP

19  Meta-analysis or the Risk Sciences International report, to do

20  that here.

21       Now, Your Honor has summarized some of Dr. Barone's

22  testimony in this question, question 3, and I want to -- I want

23  to correct what I think is an inaccuracy in that summary.

24       Dr. Barone didn't admit that he believes fluoride is

25  associated with adverse effects at exposures ranging from 1.5

 1    to 4 milligrams per liter.  He testified that something is

 2    going on at higher levels and that based on the scientific

 3    evidence, he couldn't derive a point of departure at any level.

 4    And he was clear that finding an association at a higher level

 5    doesn't necessarily mean that the weight of the evidence

 6    supports deriving a point of departure.  Remember his testimony

 7    on that?  These are two distinct concepts, and the Court has to

 8    treat those concepts distinctly here.

 9          The Court's question also referred back to the Risk

10    Sciences International systematic review's recommendation of a

11    point of departure for dental fluorosis.  Dental fluorosis is

12    not a harm that plaintiffs alleged in this case, nor has it

13    been the focus either at trial or in their petition.  And

14    because they haven't alleged harm and proven that they've

15    suffered harm from dental fluorosis because of community water

16    fluoridation, this Court lacks jurisdiction to even set a point

17    of departure for dental fluorosis.

18          The relevant conclusion from the RSI systematic review is

19    that significant uncertainty in the data prevent those

20    researchers from deriving a point of departure for

21    neurotoxicity.  That's the health outcome that we're talking

22    about here.

23          And when the Health Canada expert panel met with those

24    researchers and other experts in Canada, they concluded that

25    there's insufficient data to derive a point of departure for

 1   neurotoxicity.

 2        And then I want to make one last point on this, Your

 3   Honor, if you will.  Not even the plaintiffs have offered 4.0

 4   milligrams per liter of water -- water fluoride

 5   concentration -- as a point of departure.

 6        For the Court to find 4 milligrams per liter water

 7   fluoride as a point of departure, it would -- it would be a

 8   first.  It would be a first.  And it would get ahead of the

 9   scientific community that's been focused on this issue.  It

10   doesn't reflect best available science, Judge, and adopting it

11   on this trial record would be error.

12        Plaintiffs have not calculated any points of departure in

13   terms of milligram per kilogram per day for pregnant women.

14   That's another reason why just taking 4 milligrams per liter in

15   the water is not sufficient here.

16        They haven't proffered any evidence what the uncertainty

17   factor would be when using 4 milligrams per liter water

18   fluoride concentration as a point of departure.

19        So, Judge, when you default to the uncertainty factor of

20   10, what's the evidence at trial for the Court to apply that

21   here?  EPA has never used a systematic review to derive a point

22   of departure as a NOAEL or LOAEL, so it's unclear whether that

23   default uncertainty factor would even apply.  And Dr. Barone

24   testified that, yes, that's the default, but in some cases,

25   it's less than 10.  It's less than 10.

PROCEEDINGS

1    And we're looking at 4 milligrams per liter.  I mean,

2  we're talking about four or five times what the condition of

3  use is here.  We can't just --

4        **THE COURT:**  Default uncertainty factor is stemming

5  from a LOAEL, not from human variability.  There's -- there's a

6  factor of 10 for human variability.  I mean, are you contesting

7  that as well?

8        **MR. ADKINS:**  What I'm saying, Judge, is that on this

9  trial record there isn't a basis for the Court to apply an

10  uncertainty factor of 10, there isn't a basis for the Court to

11  apply an uncertainty factor of 3 because Dr. Barone testified

12  that the selection of the uncertainty factor is based on your

13  point of departure and the evidentiary basis that you have for

14  selecting that point of departure.

15    The plaintiffs haven't even offered for the Court a basis

16  to select 4.0 milligrams per liter as a point of departure, so

17  how can we have an evidentiary basis to determine what the

18  uncertainty factors are for that?

19        **THE COURT:**  All right.  Let me -- thank you.

20    Let me hear the response from the plaintiffs.

21        **MR. CONNETT:**  Sorry about that.  Your Honor, could I

22  share my screen at this time?

23        **THE COURT:**  Yeah.

24        **MR. CONNETT:**  Your Honor, I wanted to start by

25  addressing the BMCL analysis from Dr. Grandjean and why it is a

```
 1   legitimate point of departure.

 2        Before I do, I just want to just draw attention to one

 3   curious admission -- omission from virtually every single

 4   argument that EPA has made from the beginning to the end of

 5   this litigation and that is health protective assumptions.

 6        I don't think EPA, at any point in this litigation, has

 7   ever approached a question of uncertainty and applied a health

 8   protective assumption.  Instead, EPA is a way to use

 9   nonprotective assumptions in virtually every situation.

10        Counsel just mentioned that, well, these studies are from

11   China.  Maybe -- maybe Americans respond differently to

12   fluoride.  That is a nonhealth protective assumption.

13        But let's go to the Court's question of whether

14   Dr. Grandjean's BMCL of .28 is a legitimate point of departure.

15        THE COURT:  Okay.  And before you do that, let me ask

16   you, the health protective assumptions, what is the -- what is

17   it, that is, what is the statutory regulatory mandate with

18   regard to health protective assumptions and what does that

19   mean?

20        MR. CONNETT:  Well, Your Honor, as you can see here in

21   the testimony from Dr. Barone, it's just a general approach

22   that EPA takes in risk assessment that when information is

23   lacking, EPA tends to make health protective assumptions.

24        And as we know, and it's an undisputed fact in this case,

25   information is always lacking in risk assessment.  It's part of
```

**PROCEEDINGS**

1  why we do risk assessment because we don't have every piece of

2  the puzzle yet fit into place.

3      So it's not a specific statutory mandate as much, Your

4  Honor, as it is the standard operating procedure for EPA in its

5  risk evaluations, including under TSCA.

6          **THE COURT:**  Is that codified in some way, or is that

7  your interpretation of what it's done historically?

8          **MR. CONNETT:**  Well, it's what EPA states on its

9  website.  And as you can see here -- and, Your Honor, can you

10  see the PowerPoint on your screen?

11          **THE COURT:**  No.

12          **MR. CONNETT:**  Okay.  Let me share that.  Sorry.  I

13  have to share this.  Okay.

14      Okay.  So I asked Dr. Barone:

15      "**QUESTION:**  Do you personally agree that EPA should use

16      health protective assumptions when information is lacking?

17      "**ANSWER:**  We do.  That's part of our agency guidance.

18      "**QUESTION:**  And do you agree with that guidance?

19      "**ANSWER:**  I do."

20      So it's an -- it's just -- it's a standard operating

21  procedure for EPA to use health protective assumptions when

22  information is lacking.

23      Do they have to --

24          **THE COURT:**  Is that guidance -- is that guidance

25  codified in some -- some document, some --

1      **MR. CONNETT:**  Your Honor, I don't know if it's

2  codified expressly in any document.  It is on their website and

3  it is, as Dr. Barone agrees, what they do, but I can't -- I

4  can't cite for Your Honor a particular regulation that would

5  state that.

6      **THE COURT:**  Okay.  I mean, one could say that that's

7  sort of built into the MOE.  That's what -- that's what

8  undergirds the MOE.  And I don't know if you need any

9  additional -- where that assumption plays in additional ways

10 because it's already sort of taken into account in various --

11 whether you call it the uncertainty factor, whether you call it

12 the human variability factor or whether it's because you're

13 choosing a LOAEL versus NOAEL or whatever.

14     **MR. CONNETT:**  And certainly, Your Honor, that is --

15 the benchmark MOE is a sort of health protective assumption.

16     And I think counsel just questioned and disputed

17 Dr. Barone's testimony in this case.  Dr. Barone testified in

18 this case that the benchmark MOE for fluoride neurotoxicity

19 should be at least a factor of 10.  So I'm not quite sure what

20 counsel meant when he said that that's not the testimony in

21 this case.  It is.

22     So Dr. Barone -- Dr. Barone did testify that the benchmark

23 MOE should be at least 10.  That's for intraspecies

24 variability.  And as Your Honor noted if a point of departure

25 was used as a LOAEL, then you would need to consider an

 1  additional uncertainty factor.

 2      But if I could, Your Honor, I will go to discuss the

 3  benchmark -- Dr. Grandjean's BMCL.

 4      And I'll start by noting just, you know, restating for the

 5  Court that if -- under EPA's benchmark dose technical guidance

 6  document, which is EPA's handbook for how to do BMCL analyses,

 7  it specifically flags as an exemplar of how to do benchmark

 8  dose modeling for human data.  It specifically flags Dr.

 9  Grandjean's BMCL analysis with Budtz-Jorgensen in 2000 on

10  mercury and IQ.  That's no small matter, no small fee, EPA

11  specifically referring the scientific community to

12  Dr. Grandjean's BMCL analysis for mercury.

13      And then 2018 Dr. Grandjean and Dr. Budtz-Jorgensen did

14  another benchmark dose analysis of PFAS, one of the most high

15  priority contaminants under the regulatory community these

16  days.

17      And EPA used this BMCL analysis for its proposed reference

18  dose for PFAS.

19      So twice EPA has relied upon Dr. Grandean's BMCL analyses

20  for very high priority toxic chemicals.

21      But let's turn to Dr. Grandjean's BMCL for fluoride.  And

22  I think, Your Honor, there's a few key facts that I would like

23  to emphasize.  First is, Dr. Grandjean's ruled BMCL analysis is

24  based on high-quality studies.  There's no dispute about that.

25      Every expert that has testified to this court has agreed

PROCEEDINGS

 1   that the three studies that Dr. Grandjean has relied on, MIREC,

 2   ELEMENT and the Danish OCC cohort are high-quality birth cohort

 3   studies.  No dispute.

 4       Second, there's no dispute that Dr. Grandjean used both

 5   linear and nonlinear models to interrogate that data.

 6       Third, Dr. Grandjean's pooled analysis used individualized

 7   data on exposure outcome and covariates.  And as we will see

 8   when we discuss NTP's dose-response analysis, this is a very

 9   important strength and feature of Dr. Grandjean's dose-response

10   analysis that is not present in NTP's analysis in eTables 4 and

11   5.

12       Lastly, Your Honor, Dr. Grandjean's pooled analysis

13   analyzed a larger dataset than the pooled analysis of lead that

14   EPA based its airborne lead regulations on.

15       And as you may recall -- and I cite here to Trial

16   Exhibit 42.  As you may recall, the EPA relied on

17   Dr. Lanphear's pooled analysis of lead and IQ.

18       That analysis, Your Honor, as can be seen in Trial Exhibit

19   42, page 66977, had 1,333 children.

20       By contrast, Dr. Grandjean's pooled analysis has 1,599

21   mother-child pairs.  That's more individuals than were present

22   in the pooled analysis of lead.

23       And I think another key point here, Your Honor, is -- you

24   know, I know the Risk Sciences International report flagged

25   that there are differences in the BMCL when you look at the

**PROCEEDINGS**

 1   linear versus nonlinear models, and that's true.  There are

 2   some differences.  It happens in virtually every BMCL analysis.

 3   You're going to see different results when you use different

 4   models.  But the key point here, Your Honor, is, these

 5   differences are ultimately inconsequential to the risk

 6   determination because even if you use the highest BMCL -- and

 7   counsel spent a lot of time talking with Dr. Grandjean about

 8   the highest BMCL, which is .768 or .8 milligrams per liter in

 9   the mother's urine -- even if you used that BMCL from the

10   nonlinear model, you still have mothers in fluoridated areas

11   with more fluoride in their urine than that BMCL.

12       And, in fact, if you look at just the difference -- if you

13   just look at the amount of urinary fluoride that water

14   fluoridation is directly contributing to, as you can see here

15   in Plaintiffs' Demonstrative No. 4, that difference exceeds the

16   highest BMCL in Dr. Grandjean's analyses.

17       I asked Dr. Grandjean about this at trial.  I asked him:

18       **"QUESTION:**  Let's just assume, for a second, that that's

19       the appropriate BMCL to use.  Would women living in

20       fluoridated communities still exceed that BMCL?

21       **"ANSWER:**  A sizable proportion would."

22       So I can go on, Your Honor, to discuss the question 1A as

23   to how plaintiffs reconcile Dr. Grandjean's BMCL calculation

24   with the NTP's comments, if you would like.

25           **THE COURT:**  Before you do that, let me ask you, going

1    back to one of your opening points about:  Based on three

2    studies.  First the government says, well, he did not include

3    the dataset from the INMA study, which was also quite

4    significant and also considered add high-quality study.

5         Isn't that a problem?

6         MR. CONNETT:  It's not a problem, Your Honor.

7         And Dr. Grandjean was very clear about this as with other

8    experts, Dr. Hu included, that the Spanish study is so

9    implausible it's clearly incorrect.  There's no dispute -- I

10   mean, I guess there is a dispute because I guess the government

11   still contends that, you know, that a 15-point increase from

12   fluoride exposure is somehow plausible, but it's just so

13   implausible -- Dr. Grandjean testified that he knows after

14   reviewing so many different neurotoxicants that there is no way

15   that that data is correct.  There's just no way that it's

16   correct.  So why would you put data into a pooled BMCL analysis

17   that you know is wrong, that you know is false?

18        And I would note, Your Honor, that the EPA has contended

19   that the plausibility of the Ibarluzea data doesn't really

20   matter, that the results don't really matter; and yet, EPA

21   still is trying to minimize how enlarge the effect size is by

22   resorting to an error.

23        And I will point this out in my -- in my findings of fact

24   next week, but EPA is relying on an erroneous calculation by

25   Dr. Savitz.  Dr. Savitz agreed in cross-examination that he

**PROCEEDINGS**

1   could no longer stand by his testimony that the use of the

2   milligram per gram of creatinine unit of exposure somehow

3   inflated the effect size.  He admitted that he needed to

4   reconsider that and, Your Honor, his testimony in that was

5   wrong.  It was factual factually incorrect, indisputably so.

6       So what -- the effect size is actually larger when you use

7   milligrams of fluoride per liter of urine, and we will document

8   that in our findings of fact.

9       So you have a clearly implausible and I would say

10  impossible result -- the Spanish study -- impossible.  Fluoride

11  exposure does not increase the IQ of boys by 15 to 30 points.

12  So why put that into a pooled BMCL analysis when the goal is

13  finding the truth?  Why include information which you know is

14  false if your goal is to find the truth?

15              THE COURT:  What was the size of the OCC pool?

16              MR. CONNETT:  About 877 mother-child pairs, I believe.

17              THE COURT:  And that's one study that found no

18  relationship -- no statistically significant relationship,

19  right?

20              MR. CONNETT:  No statistically significant

21  association.

22              THE COURT:  And yet, that data was used -- was part of

23  the Grandjean database?

24              MR. CONNETT:  Correct.

25       And there's no dispute in this case that when you pool

---

PROCEEDINGS

 1   data, it -- you know, pooled analyses are preferable to an

 2   analysis of a single cohort because you have more precision,

 3   more rigor because you have a greater variance in exposure.

 4       So the Danish cohort provided important information on the

 5   low end of the dose-response range that, you know, compliments

 6   the cohorts from Canada and Mexico.

 7           THE COURT:  So the OCC contributed about half, little

 8   more than half of the size of the total pool that

 9   Dr. Grandjean -- the pooled analysis that he performed?  You

10   said 1,599?

11           MR. CONNETT:  That's correct.

12           THE COURT:  And is that -- did he -- remind me did he

13   weight that in any way or does everything get thrown into the

14   pool individualized?  Is there any weighting?

15           MR. CONNETT:  There's no weighting by cohort --

16   there's no weighting -- no individual gets more weight than the

17   other.  But what's a key -- a key fact of Dr. Grandjean's BMCL

18   analysis, which is not present in the NTP's dose-response

19   analysis in eTables 4 and 5 is that Dr. Grandjean's analysis is

20   based on individualized data; individualized data on exposure,

21   individualized data on outcome and individualized data on

22   covariates.  All of that is stripped away from NTP's

23   group-level analyses in eTable 4 and 5.

24       So I do think, Your Honor, that NTP's dose-response

25   analysis provides a useful addition to the literature.  One

PROCEEDINGS

 1  needs to be cognizant of its significant limitations,

 2  particularly when dealing with the low end of the dose-response

 3  range where there's low exposure contrasts.

 4          **THE COURT:**  Okay.  Go ahead.

 5          **MR. ADKINS:**  Would you like me to respond to that,

 6  Your Honor?

 7          **THE COURT:**  Yeah.  Why don't you -- since we're on

 8  this subject, why don't you respond to the fact that we've got

 9  at least one individually-based data analysis that was done and

10  that it included, for half of its basis, the OCC study, which

11  showed no relationship.  So this is not -- it doesn't look like

12  quite cherry-picking -- I know that's one of the government's

13  themes -- that, well, they pick the studies, they picked the

14  cohorts that supported and excluded the INMA.  So I understand

15  that argument.  But the fact that the OCC study, which did not

16  yield the same net result as MIREC and the ELEMENT studies,

17  that accounts for, according to counsel, more than half of the

18  pool that Dr. Grandjean studied.  So what do you say to that?

19          **MR. ADKINS:**  Yes.  Thank you, Your Honor.

20      So I think -- I think there's a way for me to address all

21  of these points, including the BMCL generally and we can maybe

22  put this topic to rest here.

23      So there are three reasons, in the government's view, why

24  Dr. Grandjean's BMCL of .28 is not an appropriate point of

25  departure.  And I'll summarize those three reasons for Your

PROCEEDINGS

1    Honor, and then I'd like to explain each one.

2         So the first is, the BMCL doesn't reflect best available

3    science, as TSCA requires, because it presumes linearity and it

4    cherry-picks the data.  And I'll explain precisely what I mean

5    by that and respond to Your Honor's point, which you just --

6    which you just asked about.

7         The second is, the weight of the scientific evidence

8    doesn't support driving any point of departure at this time.

9    That's related to the theme that I discussed in response to the

10   other question.

11        And thirdly, even if the Court were to use Dr. Grandjean's

12   BMCL, it's a urinary fluoride value.  EPA, Your Honor, doesn't

13   regulate urine and plaintiffs have not proffered any reliable

14   method for this Court to derive an intake value for the

15   condition of use, which is community water fluoridation, from a

16   urine sample.

17        So let me address each of these points.  And if I do this

18   right, I think I can respond to everything that counsel said

19   and respond to Your Honor's questions.

20        So with respect to the first point, Dr. Grandjean presumed

21   linearity without interrogating other model fits.  He testified

22   that EPA told him to do this, but that testimony was

23   unsubstantiated and it was squarely rebutted by Dr. Barone.

24        Even so, does Dr. Grandjean's explanation really ring

25   true?  Why would a scientist just assume a linear model

1  especially where one of the issues in this case and which is

2  unresolved in the research is whether low-dose exposures are

3  associated with neurotoxic outcomes.

4      **THE COURT:**  I thought -- I thought I just heard, I

5  thought I recall that he did apply other models and that's why

6  you get a -- up to a .76 or .8.

7      **MR. ADKINS:**  That's in the 2022 BMCL.  So he performed

8  two BMCLs, a 2022 and a 2023.

9      And Your Honor was proposing to adopt the 2023 BMCL of .28

10  milligrams per liter.  And there's -- there's contrary evidence

11  in this record, Judge, whether that dose-response relationship

12  is even linear.  So think about the ELEMENT IQ study.

13      We heard testimony that that study -- in that study a

14  curvilinear fit, so nonlinear, fit better than the linear

15  model.

16      And look at what the BSC working group and the NTP authors

17  said about the data in that low-dose range.  It was

18  insufficient for them to fit a dose-response curve with any

19  confidence.  That's key here.

20      So Dr. Grandjean himself, he considered, yes, the linear

21  and the nonlinear models in his 2022 BMCL.  But guess what?

22  They both had comparable fit and he testified to that.  But the

23  results of the nonlinear model were significantly higher.

24      What about the 2023 BMCL?

25      We don't even know what the results of the nonlinear model

1  were because he edited that out of his paper.  That's not the

2  work of an unbiased scientist, Judge.  The Risk Sciences --

3          **THE COURT:**  Were the -- oh.

4      You're saying -- okay.  So the 2023 was another attempt at

5  applying a nonlinear model that's not reported as contrasted to

6  the 2022 BMCL?

7          **MR. ADKINS:**  That's correct.

8      And when you -- when he did the linear and the nonlinear

9  models -- so my friend referred to the critique that the

10  risk -- Research Sciences International -- I'm just going to

11  refer to that as "RSI" -- that systematic review was critical

12  of Dr. Grandjean's BMCL because it was a little bit higher than

13  the other one.  No.  They criticized it and they said that the

14  results differed between the linear and the nonlinear models by

15  a nine-fold increase, a nine-fold increase.

16      I mean if we're talking about an uncertainty factor of 10,

17  how far off are we with a nine-fold increase just by using the

18  linear and the nonlinear models?

19      The point is for all of this is that the science is still

20  out whether the relationship is linear or nonlinear and it

21  certainly -- it certainly does not justify a blind presumption

22  that a linear model applies.

23          **THE COURT:**  Well, but what if -- you know, it

24  appears -- I don't know about 2023, but applying a linear and a

25  nonlinear model still resulted in a BMCL, whether it's .28 or

 1    .76, it's something in the range of below 1, right?

 2              **MR. ADKINS:**  Certainly.  Certainly.

 3              **THE COURT:**  Either way -- and if you just -- again, I

 4    know there's a struggle here because the EPA wants to find with

 5    some degree of certainty exactly what that point of departure

 6    is, but if you use -- and maybe you don't like this

 7    methodology, but if you assume that the most conservative

 8    estimate -- and let's say it is the higher end of what

 9    Dr. Grandjean found, if we start with that, I mean, there's

10    still an issue there because if a point of departure is .8 and

11    you apply the interspecies variability MOE of 10, we're in a

12    problematic area, aren't we?

13              **MR. ADKINS:**  There are two -- no, we're not, Your

14    Honor, and there are two reasons for that.  I've already

15    addressed the uncertainty factors.  We don't have a basis here

16    for what the uncertainty factor would be using this particular

17    point of departure.

18         The default may apply in the normal course, but we're not

19    in the normal course because now we're treating fluoride

20    differently from how EPA has done risk evaluation for the first

21    ten chemicals.

22         So the two points I do want to highlight here is -- are

23    this:  The first is, recall Dr. Barone's testimony.  He has

24    over 20 years' experience doing research -- risk assessment at

25    EPA.  He explained, sure, anyone can come up with the math or

PROCEEDINGS

 1    do the math to calculate a BMCL, but the reliability of that

 2    calculation is directly informed by the reliability of the

 3    underlying data.

 4         And Dr. Savitz and Dr. Barone were in agreement that the

 5    weight of the scientific evidence is not there yet to derive a

 6    point of departure.

 7         The RSI systematic review said the same thing.  They

 8    refused to derive a point of departure looking at Dr.

 9    Grandjean Grandean's BMCL for neurotoxicity and the Health

10    Canada panel agreed with them.  The data aren't sufficient at

11    this time to derive a point of departure.  The NTP

12    Meta-analysis and the Monograph, similarly, did not derive a

13    point of departure.

14         So the scientific community is saying something here, that

15    the data just aren't there at this time.  That's the first

16    point.

17         The second point is this:  Even if there was a basis to

18    derive a point of departure, Dr. Grandjean's BMCL is still a

19    urinary fluoride measure.  I said this already.  EPA doesn't

20    regulate pregnant women's urine.  The petition asked the EPA to

21    regulate community water fluoridation.  That's the condition of

22    use here.

23         So it's not that I don't want the Court to do this.  It's

24    not that I really have any preference here, but the petition is

25    asking EPA to regulate community water fluoridation, and this

PROCEEDINGS

1   Court has to make a determination of risk for that condition of

2   use.

3       We heard from Dr. Barone that TSCA is unique in that

4   perspective.  Its regulation by condition of use.  We're not

5   just talking about overrule hazard.  We have to look at the

6   condition of use.

7       So deriving an intake value is especially important here.

8   And this is -- this is a critical point, Judge.  Given that Dr.

9   Grandjean Grandean's BMCL is below background exposures -- so

10  my friend just flashed the figure 4, I think it's Plaintiffs'

11  Demonstrative 4 on the screen.  And remember we heard from

12  Dr. Theissen during her cross-examination Dr. Grandjean's BMCL

13  is below what she considers background exposures in both Canada

14  and the Odense cohort.  If that BMCL is true, what is EPA even

15  being asked to regulate here?

16      And when Dr. Grandjean limited his analysis to just the

17  OCC, that Odense cohort data, where there's no community water

18  fluoridation, what was the result?  The BMCL was still .3

19  milligrams per liter.

20      Judge, how does this make any sense?  The OCC cohort was a

21  null study, null effects and it illustrates -- what does this

22  illustrate?  I think it illustrates that it's imperative to

23  determine whether the data you're using are fit for purpose.

24  It's not just whether the data can be used.  It's whether they

25  should be used to derive a point of departure.

PROCEEDINGS

```
 1        And I'll just close by saying the scientific community,
 2   again, has uniformly said that the data in this field are not
 3   ready to do that analysis yet.  And for the Court to do that
 4   today I believe would be an outlier.
 5        THE COURT:  Remind me what the OCC data mother urinary
 6   fluoride levels were, where I find that data.
 7        MR. ADKINS:  Well, you can look in Dr. Grandjean's
 8   2023 BMCL, and I believe the levels were around .58 milligrams
 9   per liter.  That was the mean.  And my friend, of course, can
10   correct me if that's -- if that's incorrect.
11        THE COURT:  And that's in a nonfluoridated area?
12        MR. ADKINS:  Yes, Judge.
13        THE COURT:  And let me just check.  Is that correct,
14   Mr. Connett, it was around .58 or something is the mean?
15        MR. CONNETT:  The mean for the third trimester,
16   because the Danish cohort only had third trimester urines, and
17   so that will be inflated value if you're comparing it against
18   the average maternal urinary fluoride levels in the Canadian
19   cohort or the U.S. cohort.
20        And also, Your Honor, as you may recall, when you look at
21   figure 2 of Grandjean's 2023 paper, it shows that only three
22   women out of 877 had over 2.4 parts per million fluoride in
23   their urine.
24        By comparison in the MIREC cohort over 5 percent of the
25   women had levels in that range.  So the Danish cohort -- this
```

**PROCEEDINGS**

1    is one of those classic situations where you have low exposure

2    to contrast, where the vast bulk of the data is huddled around

3    that mean and it's harder to detect an effect even if it's

4    present.  And if I could, Your Honor, I'd like to respond --

5            **THE COURT:**  What about the -- what about the point

6    that if you took Dr. Grandjean's .28 as a benchmark, that's

7    below the -- it means that, you know, the mean level found in

8    the third trimester of women were -- even in a nonfluoride --

9    nonfluoride area exceeded that by a lot.

10           **MR. CONNETT:**  The same exact situation, Your Honor,

11   applied to lead.  When the time that EPA regulated leaded

12   gasoline in the 1970s, the background exposure that Americans

13   had was well above the hazardous level.  The background

14   exposures well exceeded what we now know to be the hazardous

15   level.  And we were only able to determine that after EPA

16   phased leaded gasoline out and we were able to get exposure

17   contrasts down in that low range of the dose-response curve.

18           And if you recall, Your Honor, one of the reasons why you

19   have higher levels of fluoride in the urine in women in

20   nonfluoridated areas is because of fluoridated water being

21   made -- being used to make, you know, sodas and juices and

22   beverages and foods so that background level is artificially

23   inflated because of the common practice of water fluoridation

24   as well as dental products.

25           But I don't think counsel's point about the background

**PROCEEDINGS**

1    exposure speaks to the underlying merits of the hazard level.

2    It speaks, instead, to the fact that we do have widespread,

3    ubiquitous exposures to fluoride.  That's undisputed.  It

4    doesn't speak to whether the .28 PPM BMCL is correct or not.

5          **THE COURT:**  Well, but what about Mr. Adkins' point,

6    you know, you're looking at conditions of use that are specific

7    here and what's the EPA to do if, at least according to the

8    lower level, the linear model of Dr. Grandjean, that background

9    exposures even in nonfluoridated areas are already well in

10   excess of it, what's the EPA to do?

11         **MR. CONNETT:**  Well, the fact of the matter is, is the

12   EPA only has one condition of use here to concern itself with,

13   and that's water fluoridation.  And it is undisputed in this

14   record that water fluoridation substantially increases the

15   urinary fluoride levels in pregnant mothers.  Amongst the 95th

16   percentile women the increase is huge and we're looking at

17   about 1.4 parts per million is the differential in the 95th

18   percentile women in fluoridated versus nonfluoridated areas.

19         So we have -- with water fluoridation, we are going well

20   above the BMCL, well above it.

21         So there may be a debate about what do you do if the

22   background exposure is .3 ppm, but that's not a question that

23   the EPA has to confront here.  EPA has to confront here whether

24   water fluoridation is increasing background exposures to the

25   point of concern, and I think the record is clear that it is.

PROCEEDINGS

1        **MR. ADKINS:**  May I be heard on that, Your Honor?

2        **THE COURT:**  Yeah.

3        **MR. ADKINS:**  So, first of all, there's a conflation

4 here of what we mean by background exposure.  I mean, in the

5 lead context background exposure, from what I gather from

6 counsel, is referring to lead in the air from gasoline and

7 pollution, which was exactly what was being regulated at the

8 end of the day.  But the background exposure in the Canada

9 cohort or the OCC cohort is without the water fluoridation.  I

10 mean, we took that part of the equation out, so we're not

11 comparing apples to apples at that point.  Now, with respect

12 to --

13        **THE COURT:**  What about the more general point that

14 even if we assume that background levels, whatever the cause

15 is, is generally high, even in nonfluoridated areas and you

16 ask, well, what's the EPA to do because we're only talking

17 about one condition of use.  And their response is, well, even

18 if you're already in sort of a hazard zone, to add more

19 fluoride into the body is not a good thing, especially if there

20 is some kind of dose-response curve, whether it's linear or

21 nonlinear, such that the more fluoride, the more of an adverse

22 effect.  So even if it's just an additive effect, why wouldn't

23 the EPA -- even if it's already bad, why wouldn't the EPA have

24 the power to do something to make bad even worse?  That's a

25 simple question, you know.

 1          **MR. ADKINS:**  Yes.  And I suspect we'll get to

 2    aggregate exposures at some point in this discussion, so I

 3    won't jump ahead just yet.  But what that shows us, and as Dr.

 4    Barone testified, is that there's so much uncertainty -- you

 5    know, there's this strange thing that happens with the BMCL

 6    where you have more uncertainty you end up with a lower level.

 7    You end up with a lower level.  So this level is so low, it's

 8    below the background exposures because there's so much

 9    uncertainty there.

10          Now, counsel keeps referring to 2.41-milligram per liter

11    urine, so we need to keep separate urine from water

12    fluoridation.  So what I'd like to do with Your Honor's

13    permission is go back to those eTables and we should look at

14    what the urinary fluoride results from NTP Meta-analysis are,

15    because I think those are telling here.

16          So if -- Mr. Hambrick, could you please put up Exhibit 69

17    and take us to page Roman Numeral II-80?

18          So, Your Honor, first we looked at the water fluoride

19    results from the NTP Meta-analysis.  Now we're looking at the

20    urinary fluoride results.

21          And I'd like to -- Mr. Hambrick, if you could actually

22    take us one page after this so we can look at the low

23    risk-of-bias results for urinary fluoride.  So I'd like to go

24    to page II-80.  There we go.  Very good.

25          So Judge, this is the urinary fluoride results.  We're

1   looking at eTable 4.  And we heard from counsel, look at the

2   aggregate, it's 2.41 milligrams per liter fluoride in the 95th

3   percentile.  That's a really high number.

4        Well, what does this meta-analysis show us?  The all data,

5   low risk-of-bias, no statistically significant adverse effect.

6        Less than 4-milligram per liter.  Remember, this is an

7   error.  This negative .01, that was an error.  That should be a

8   positive.  So that's showing you no statistically significant

9   adverse effect below 4 milligrams per liter in the urine,

10  urinary fluoride and also with less than 2.  Now, that doesn't

11  matter so much because we're looking at 2.41, but even less

12  than 2, no statistically significant adverse effect.

13       You don't see a statistically significant adverse effect

14  until you get to less than 1.5, and that's precisely where the

15  NTP authors and the BSC were saying we don't have any data to

16  be able to fit a dose-response curve.  So I submit that that --

17  even that result where you see an adverse effect at that lower

18  dose range, that's not even a reliable result because we have

19  the BSC and the NTP authors saying we don't have enough data

20  down there.

21            **MR. CONNETT:**  Your Honor, could I be heard?

22            **THE COURT:**  Yeah.

23            **MR. CONNETT:**  And I'm going to share my screen here.

24       First, counsel stated -- just going to go back to

25  Grandjean's BMCL analysis.  Counsel stated that Dr. Grandjean

PROCEEDINGS

1    did not use nonlinear models in the 2023 analysis that is

2    (inaudible).  I've pointed Your Honor here to Table S3 of the

3    paper, and you can see here that Dr. Grandjean used linear

4    model and nonlinear model, so I just want to clarify that for

5    the record.

6         Dr. Grandjean did use nonlinear model in his 2023

7    analysis.

8              **THE COURT:**  Where is the nonlinear --

9              **MR. CONNETT:**  The piece-wise models, Your Honor, the

10   breakpoints of .5 and .75 are interrogating the dose-response

11   relationship to see if there's thresholds below .5 or .75.

12             **MR. ADKINS:**  Well, Judge --

13             **THE COURT:**  He did use the quadratic and those other

14   things, the other models that are referred to in the meta

15   study?

16             **MR. CONNETT:**  Right.  But this -- these are nonlinear

17   models.

18             **THE COURT:**  Oh, you're right.

19             **MR. CONNETT:**  These are not linear.

20        So I would like to go now to the NTP's dose-response

21   analysis and talk about the differences between it and Dr.

22   Grandjean Grandean's BMCL.

23        First, a key point here, Your Honor, is that the NTP's

24   dose-response analysis had fewer observations than Grandjean.

25   And at this point it would be -- I know there was a question

 1   raised at trial, and I will clarify now for the Court what we

 2   mean by "observations" in eTable 4 and 5, but NTP's

 3   dose-response analyses had 3 to 39 observations per analysis in

 4   eTable 4 and 5 and these observations are average group

 5   exposure data points.  Okay?

 6        Again, Dr. Grandjean had 1,599 different observations

 7   based on individualized data.  The higher number of

 8   observations in Dr. Grandjean's data provides greater

 9   robustness and rigor in his analysis.

10        So what are the observations in NTP's dose-response

11   analysis?

12        Dr. Savitz couldn't answer Your Honor's question on that,

13   nor could Dr. Barone.  But the fact is, this is not a hard

14   question to answer if you read the meta-analysis.

15        Specifically, when you go to eTable 2, you will see that

16   eTable 2 provides all of the data that is used in eTable 4 and

17   5.  And I have pointed here to one of the studies that was used

18   by Seraj.  And you can see, Your Honor, that some studies, like

19   Seraj, had multiple high-exposure groups.  In the Seraj study

20   they had a medium fluoride group and they had a high fluoride

21   group.  The median fluoride group had 3.1 parts per million in

22   the water.  The high fluoride group had 5.2 parts per million

23   fluoride in the water.  So for this study there was two

24   observations that NTP was able to bring into its dose-response

25   analysis.

**PROCEEDINGS**

1    The medium fluoride group had a drop of IQ about of about

2    9 points where -- about 8 points, sorry, and the high fluoride

3    group had a drop of about 9 IQ points.  So those are two

4    observations from one study.

5         **THE COURT:**  Where do you -- show me where those drop

6    in IQ points are --

7         **MR. CONNETT:**  Yes.  Your Honor, do you see how -- the

8    fluoride exposure levels for the Seraj study include a

9    reference group, the normal group of .8 parts per million?

10        **THE COURT:**  Yeah.

11        **MR. CONNETT:**  And then that -- the IQ of the normal

12   group, which is the reference group, is 97.77; whereas, the IQ

13   of the median group, as highlighted here in pink, is 89.  And

14   then the IQ of the high fluoride group is 88.5.

15        So the NTP will not include the reference group in the

16   dose-response analysis because the reference group is what

17   you're comparing the higher fluoride groups against.  So the

18   Seraj study here provides two observations for the

19   dose-response analysis.

20        By contrast, the Trivedi study, which you can see here in

21   the same table, had one observation because it had only a low

22   fluoride group and a high fluoride group.

23        So when you look at eTable 4 and 5, you will see that the

24   number of observations is quite small for these analyses.

25        You know, as few as three observations for the low

PROCEEDINGS

 1  risk-of-bias studies.

 2       And that's just -- you know, you're looking at 3

 3  observations, 7 observations, 27 observations.  That's just a

 4  much lower number than what Dr. Grandjean was dealing with when

 5  he was looking at individualized data where he had, you know,

 6  1,599 observations.

 7       Another limitation of NTP's dose-response analysis is that

 8  it used a group level on data as Your Honor heard at trial.

 9  I'm going back to eTable 2 here.  You can see that for the

10  Green study.  They -- based on the protocol that NTP had, they

11  just used the average IQ in the women -- in the children born

12  in the fluoridated areas versus the children born in the

13  nonfluoridated areas, and so that's just a basic average group

14  exposure and average group outcome with no individualized data,

15  no adjustment for covariates.  It strips away from Green all of

16  the power of that study.

17       The same thing with the Bashash study where in order to

18  use their binary outcome of high exposure versus low exposure,

19  NTP had to use the children's urinary fluoride levels, not the

20  maternal urinary fluoride levels, and they didn't have any

21  adjustment for covariates.

22       So again, strips away from Bashash all of its power.  I

23  asked Dr. Theissen about this at trial.  I asked:

24       "QUESTION:  Wasn't that the whole point of the MIREC and

25       ELEMENT birth cohort studies, to do analyses of

1    individualized exposures so that we can get away from the

2    problems that come with group average exposures?

3    **"ANSWER:** Yes."

4    And the NTP has acknowledged this limitation, Your Honor,

5    with the group-level data.

6    I strongly encourage the Court to look at pages 277 as

7    well as 273 to 274 of the BSC working group report where NTP

8    provides extensive discussion on this very point.

9    NTP notes here that "When you're using group-level

10   exposure data (as opposed to individual-level exposure data),

11   as was done in the mean-effects meta-analysis, the power to

12   detect an effect may be limited."

13   And the NTP encouraged because of this limitation, the NTP

14   did the regression slope analysis where they used

15   individualized data from the studies, individualized data, not

16   the group level data.  And when you look at the NTP's analysis

17   individualized data, you see consistent significant adverse

18   associations between fluoride exposure and reduced IQ.  Here

19   you can see eFigure 23.

20   And so it's -- I think it's important that we don't focus

21   too much on eTable 4 and 5.  They are an important part of

22   NTP's analysis, but they need to be considered in the context

23   of the other analyses that NTP did, including its qualitative

24   assessment in the Monograph.

25   So that would be -- those are my points, Your Honor, in

 1   terms of how we can reconcile Dr. Grandjean's analysis, which

 2   looks at individualized data with the group-level approach that

 3   NTP used for eTable 4 and 5.  And because the NTP had fewer

 4   observations, much fewer observations, NTP's ability to

 5   determine the fit of the curve at low doses was more limited

 6   than Dr. Grandjean.

 7          **THE COURT:**  Okay.  What about -- can you address the

 8   problem with the BMCL that was derived by Dr. Grandjean as

 9   based on urinary fluoride and you can't -- it's not -- there's

10   no derivation of it, the actual condition of use, which is the

11   water concentration?

12          **MR. CONNETT:**  Well, I know that Dr. Barone has

13   emphasized that point, but the fact of the matter is, is that

14   that was not a stumbling block for RSI.  RSI looked at Dr.

15   Grandjean's BMCL and readily determined a intake-based BMCL as

16   well as a water fluoride-based BMCL from Dr. Grandjean's work.

17          So, you know, if you want the absolute level of precision

18   that Dr. Barone would want, then, yeah, I guess you need to go

19   and spend a few years conducting a PBPK analysis.  EPA says

20   it's the citizen group's responsibility to do that analysis,

21   but I think nowhere recognizes that maybe the EPA had a

22   responsibility to do this a long time ago and is putting the

23   burden on plaintiffs to do that.

24          As you may recall, the NRC told EPA in 2006, that its

25   drinking water standards for fluoride are too high, they're

**PROCEEDINGS**

1    unsafe, they need to be lowered.  EPA has never taken action to

2    address that.  The levels of fluoride in water are still at

3    4 -- the maximum level is still at 4 parts per million.  EPA --

4    and this is -- so I think one needs to be cognizant that -- of

5    not letting the perfect be the enemy of the good.

6        Would we all like a wonderfully exquisite PBPK model for

7    fluoride?  Yes.  We all would like to see that.  But that level

8    of perfection, that level of precision, that level of certainty

9    is not more important than protecting the American public from

10   a clear risk.

11       We do not need to wait for every piece of the puzzle to

12   fit nicely together before we take action to prevent harm.  And

13   Dr. Barone's standard of precision, perfection and certainty is

14   antithetical to the command of TSCA to protect people before

15   known harm occurs.  We need to take action when we have

16   evidence of risk, and we certainly have that here.

17           **THE COURT:**  Don't we have to know something about what

18   urine tells us about the risk and the harm imposed as a result

19   of the condition of use?

20           **MR. CONNETT:**  We do, Your Honor, and we do have that

21   kind of information.  I mean, the NTP -- and I'll address this

22   later, but the NTP -- when it's talking about total fluoride

23   exposures, Your Honor, it explains that it considers a urinary

24   fluoride level of 1.5 to basically be the equivalent of a water

25   fluoride concentration of 1.5.

**PROCEEDINGS**

 1      So that's the general -- over -- that's been the general

 2   sort of rule of thumb.  It's not perfect, it's not precise.  We

 3   all agree with that.

 4          **THE COURT:**  Where does it say -- where does it state

 5   that equation?

 6          **MR. CONNETT:**  So I will point Your Honor to page 35 of

 7   the BSC working group report and share that on the screen here.

 8      So you can see here there was -- there was a comment --

 9   there was a question asked of NTP, "How is exposure in water

10   correlated with overall exposure?"

11      And the reference here is to NTP's comment about total

12   fluoride exposure approximating the water fluoride level of

13   1.5 ppm.  And the question was, is how is NTP determining what

14   total fluoride exposure approximates that water fluoride level.

15   And NTP's response -- and I'll read it -- is, "The statement

16   relies on empirical observations of a close correspondence

17   between drinking water concentrations and urinary fluoride

18   concentrations first described prior to significant additional

19   fluoride exposures from other sources such as dental products.

20      "Our assessment of confidence in the association between

21   higher fluoride exposure and lower children's IQ is supported

22   by studies that report total fluoride exposures as represented

23   by urinary measurements."

24      So what NTP is saying there, Your Honor, is, there is this

25   historic relationship that has been described for decades in

**PROCEEDINGS**

 1   the scientific literature that, on average, urinary fluoride

 2   levels will typically approximate the water fluoride level.

 3   Not a hundred percent precise, there's variability, but roughly

 4   that's what you're looking at.

 5        And NTP has used that rough approximation to basically

 6   equate the urinary fluoride levels with the water fluoride

 7   levels.

 8        Again, it's not precise and there is variability and it

 9   will change, but you have clearly a benchmark to work around

10   that is sufficient for risk assessment.  We don't need that

11   fine-tuned precision in order to -- to assess risk.  And

12   certainly NTP did not think we needed that.

13        **THE COURT:**  Well, I guess that's one of the core

14   questions because what Mr. Adkins is saying is that the science

15   is at a point where we can't derive a point of departure, we

16   can't translate urinary levels, you know, with any precision to

17   intake levels and so, therefore, we really can't proceed along

18   with the risk analysis any further.

19        And I think I understand your point is, well, we don't

20   need necessarily that precision.  If you're clearly within the

21   zone and there's enough correspondence here and enough showing

22   that, you know, we know we're there even though we don't know

23   exactly where "there" is.

24        **MR. CONNETT:**  Yeah.

25        **MR. ADKINS:**  May I be heard on that, Your Honor?

PROCEEDINGS

1          **THE COURT:**  Well, hold on.  I take it that's your

2    position?

3          **MR. CONNETT:**  It is, Your Honor.  And I would just add

4    that when we go back to Demonstrative -- Plaintiffs'

5    Demonstrative No. 4, the testimony was undisputed in this case,

6    and Dr. Barone agreed that the clearest, most obvious

7    explanation for why you have these higher urinary fluoride

8    levels in the fluoridated areas is because of water

9    fluoridation, you know.  And when you look at that 95th

10   percentile, you have a very -- you know, a very significant

11   increase in urinary fluoride at that 95th percentile.

12         And so we know without -- we know that water fluoridation

13   is substantially increasing urinary fluoride levels.  There's

14   no dispute about -- no dispute about that.

15         So I just don't see why this need for precision -- I don't

16   see the consequential nature of that uncertainty.

17         You know, we can sit here all day and come up with one

18   uncertainty after another, but the uncertainty needs to be

19   consequential.  It needs to affect the margin between the

20   exposure and the hazard, and I don't see this uncertainty doing

21   that.  I think we always need to ask when we look at an

22   uncertainty, is it consequential to the risk characterization.

23         **THE COURT:**  Okay.  Go ahead, Mr. Adkins.

24         **MR. ADKINS:**  Thank you, Your Honor.  So first, Dr.

25   Grandjean Grandean's piecemeal model fit something not a

 1  curvilinear fit.  It's two straight lines with an assumed

 2  breakpoint, so this is not a curvilinear model fit.

 3       EFigure 23 from the NTP Meta-analysis, we heard testimony

 4  on this at trial, that's not a dose-response analysis.

 5       Now, Your Honor, what I'm hearing is that the plaintiffs

 6  want special treatment.  They've tried to accuse EPA of

 7  treating fluoride differently than how EPA has treated any of

 8  the other chemicals for which it's conducted risk assessment,

 9  but now they're coming and saying, well, it's close enough.  We

10  don't have to have perfect precision.  Dr. Barone never said

11  you have to have absolute precision or anything like that.

12       What we are submitting is that the statute requires that

13  you find the chemical presents risk, not may present.  And

14  there's a distinction between those two concepts.

15       Now, the health -- excuse me -- the RSI Systematic Review

16  does not provide a basis to reverse engineer a urinary fluoride

17  value to an intake value, and this is why:

18       None of the experts in this case reviewed that formula and

19  disclosed opinions on its reliability.  And Dr. Barone

20  testified, based on his brief review of the paper, that the

21  formula makes several assumptions that are not defensible for

22  pregnant women and the changing physiological dynamics over the

23  course of pregnancy.  The methodology assumes a linear

24  relationship between water concentration and urinary fluoride

25  throughout the entire course of the pregnancy.

 1        That testimony by Dr. Barone is unrebutted.  Why do we

 2   know that?  Because plaintiffs didn't ask about this study of

 3   any of their experts, so that testimony stands and that's the

 4   only record that this Court has about whether that formula can

 5   be used.

 6        Now, with respect to this one-to-one ratio, it's bunk.

 7   Your Honor, it's been completely disproven at this trial.

 8   Plaintiffs came in here at the first trial and Dr. Grandjean

 9   testified you can assume a one-to-one relationship.  That's

10   what we've all been doing.  What's the basis for it?

11        Dr. Theissen disclosed in her report that there's a

12   general one-to-one -- or that there's a general relationship

13   between urinary fluoride and water concentrations.  She cited

14   two studies.  And we talked about this when she was on the

15   stand.  She cited Till 2018 and the Thippeswamy paper.  So we

16   went through the results of those studies.

17        Till 2018 showed that the women in that study had a higher

18   average maternal urinary fluoride value than the mean water

19   concentration value.  Higher.  More fluoride in the urine than

20   what was in the water, on average.

21        Thippeswamy showed the exact opposite.  It showed that

22   there was less urine in the pregnant women's -- less fluoride

23   in the pregnant women's urine than what was in the water.  And

24   Dr. Theissen testified it's nowhere near a one-to-one ratio.

25        So we're not asking for perfection, but we don't even know

PROCEEDINGS

 1   what direction it's going.

 2        THE COURT:  Well, to say we don't know what direction,

 3   we know -- I assume it's not in dispute that the higher the

 4   fluoridation levels in water, the higher the -- at least on

 5   average in the aggregate or on average the higher the level of

 6   urinary fluoride would be found in the mothers?

 7        MR. ADKINS:  That ratio -- that is true, Your Honor.

 8   But remember --

 9        THE COURT:  Okay.

10        MR. ADKINS:  -- what Dr. Barone said.  When you look

11   at that -- the graph that shows background exposure plus the

12   additional what's presumed to be the additional fluoride

13   concentration in the urine over the course of the three

14   trimesters, it was a -- it wasn't a straight line, it was

15   sloped.

16        So remember Dr. Barone said, well, there's something going

17   on because why would you have the ratio so much higher at that

18   higher level than it is at the lower level?  So it's not a

19   perfect one-to-one.

20        THE COURT:  No, I understand that, and it may not be

21   linear, but there is a direction, as you put it, there is a

22   relationship.  The more and I don't think this is disputed, the

23   higher the concentration in water, the higher concentration the

24   body is going to take in and likely the higher, on average, the

25   concentration in the urine.

 1        And I think the plaintiffs' point is that if you actually

 2    look in the real world at urinary levels, fluoride levels of

 3    women in fluoridated areas, you're going to see -- whatever the

 4    relationship is, you're going to find that there is a

 5    concentration level here -- there that's higher than those in

 6    nonfluoridated areas and that the level of urine in the

 7    fluoridated areas, if you assume a point of departure of -- I

 8    don't know -- .28, .8, 1, whatever, that at least a certain

 9    percentage of women are going to be exhibiting that level of

10    urinary fluoride.  And knowing that water -- fluoridated water

11    is a major source -- and I think even the Monograph talks

12    about, you know, 40 to 70 percent of fluoride source -- in

13    fluoridated areas is from water.  You know, why -- it's not

14    hard to conclude that it is contributing to the overall

15    exposure to fluoride.

16        **MR. ADKINS:**  And what the studies say, there's a

17    correlation.  There's a correlation.  And I think that's --

18    you'll see that even in the Thippeswamy study, that there's a

19    correlation.  But what we don't have is a way to get to intake,

20    and that's what's so critical here.

21        We're not asking plaintiffs to do the impossible.

22    Plaintiffs are suing EPA in this case.  It's their burden.  I

23    didn't make that up.  That's in the statute.  It's their burden

24    to show by a preponderance of the evidence.  EPA doesn't have a

25    burden to do a PBPK model for fluoride exposure in this case.

PROCEEDINGS

1    That's not --

2            **THE COURT:**  Preponderance of the evidence to show what

3    precisely?

4            **MR. ADKINS:**  To show that fluoride presents

5    unreasonable risk under the condition of use.  And that

6    condition of use is the artificial fluoridation of public

7    drinking water supplies in the United States.

8        So they need to show that fluoride in community water at

9    .7 milligrams per liter, which is the recommendation from the

10   U.S. Public Health Service presents unreasonable risk, not may

11   present.  Five out of the ten risk evaluations EPA had a PBPK

12   model, five of the ten.

13       We have a PBPK model for lead.  Plaintiffs tried to

14   compare this to lead.  We had a PBPK model for lead.

15   Dr. Savitz testified this isn't anything like lead.  With lead

16   every successive study that came out was showing that there was

17   an adverse effect.

18       What do we have here?  We have the ELEMENT study, which

19   showed adverse effects at the high level.  Then MIREC at the

20   high level, no adverse effect, no statistically significant

21   adverse effect; only when you stratify by sex.

22       So what happens after that?  We have INMA and OCC, both

23   null studies.  ELEMENT is now starting to look like the

24   outlier.

25           **THE COURT:**  What about the -- you said there were five

PROCEEDINGS

1    of ten.  What about the other five?

2         MR. ADKINS:  I don't -- I'd have to double check what

3    Dr. Barone's testimony was on that, but I don't believe it was

4    necessary for the agency to use a PBPK model to get at the

5    hazard level for the conditions of use.

6         THE COURT:  All right.  Let's -- why don't -- we've

7    covered a lot of the questions I think that I've had.  Let

8    me -- let's --

9         MR. ADKINS:  Well, we haven't covered source

10   allocation, Your Honor --

11        THE COURT:  We haven't gotten there yet, but I just

12   want to just --

13        MR. ADKINS:  -- and aggregation.

14        THE COURT:  -- before we get there that I've seen --

15   let me just look.

16        Let me ask you this:  There is -- there was evidence that

17   the -- that there is a dose-response relationship above a

18   certain level, at the higher levels.

19        Even though one can't identify a particular curve -- maybe

20   this is the same question.

21        If you can't identify a particular fit that's

22   statistically significant, does that mean that we don't have

23   evidence that there is some dose-response relationship at all?

24        MR. ADKINS:  So I want to make sure I understand the

25   Court's question, but I -- does this relate to whether we can

1  posit any LOAEL, or is this a separate question?

2         THE COURT:  No, this is a separate question.

3         MR. ADKINS:  Okay.

4         THE COURT:  That is, isn't -- does the EPA take the

5  position now that there has not been proven any dose-response

6  relationship at lower level, let's say lower than 1 or lower

7  than 1.5 because the -- because none of the curves, at least in

8  the Meta-analysis, seemed to be -- well, actually, they did

9  find statistical significance ironically, but, I mean, there's

10  not enough studies there.

11         Does the EPA deny -- I mean, it seems like the EPA does

12  not deny there seems to be some relationship at some level,

13  some higher level, and that would suggest unless you have like

14  a complete fall off, even though we don't know the exact shape

15  of the dose-response curve, unless you have kind of a cliff

16  effect where there's absolutely none, how probable is -- how

17  probable is that?

18         MR. ADKINS:  I think I understand your question now.

19  So I would go back to what Dr. Barone testified to.  He said it

20  looks like there's something going on at the high levels.  Now,

21  he didn't say there was a dose-response relationship at those

22  high levels, but it looks like there's something going on at

23  the high levels.

24         That doesn't necessarily mean or it doesn't equate to a

25  dose-response relationship or that you can derive a point of

PROCEEDINGS

1   departure, whether it be a BMCL, a LOAEL or a NOAEL.  And the

2   exercise that the Court would have to engage in to get to one

3   of those points of departure or to see what the fit is at those

4   lower levels is one of extrapolation.  So we talked about

5   extrapolation.

6        Can the Court extrapolate from the high-dose range into

7   that lower-dose range?  Because we know from the BSC working

8   group and we know from the NTP Meta-analysis authors that there

9   isn't a lot of data in that low-dose range to be able to fit a

10  dose-response curve.

11       And one of the problems we have is that if you look at

12  those tables, eTable 4 and eTable 5, it's not clear what's even

13  going on at the high-dose range.  You have some showings of

14  statistically significant adverse effects and some not.  It

15  looks like the linear model fits some and it looks like the

16  nonlinear models fit others.

17       So there's all sorts of things.  There's uncertainty.

18  There's not even a clear picture on what's even going on at the

19  high-dose range.  That's why I'm hesitant to say that EPA's

20  position admits here that there's a dose response -- dose

21  response at that high level.  Because I think if you look at

22  that chart, you don't see a clear picture of a dose response

23  even at the high range.

24       And then I go back to the point that we talked about

25  during the opening remarks here, which is, nearly all of those

 1   studies are from areas far away from the United States, China,

 2   India, Pakistan, Iran.  Those communities are not like the

 3   United States.

 4        And Dr. Hu testified that neurotoxicity is influenced or

 5   the observed -- observations of neurotoxicity differ based on

 6   the community, eating habits, parental habits, all those sorts

 7   of factors.

 8        So if you want to try to generalize in a sense that

 9   high-dose range down to the low dose and then compare it to the

10   United States, you've got to get over all these hurdles, and we

11   just don't have that in this record.

12        **THE COURT:**  All right.  Let me get to my second

13   question just so I understand the Monograph conclusion.

14        I asked whether that -- the moderate confidence with

15   respect to exposure above 1.5 means exposure based on water

16   concentration, maternal urinary concentrations.  It didn't

17   actually say, and maybe that's to be implied from the analysis,

18   but what am I -- how am I supposed to interpret that?

19        **MR. ADKINS:**  Well, I think the answer on that is

20   none -- none of the above.  So it is admittedly a little

21   unclear what exactly the NTP authors were -- were trying to

22   convey.

23        The 1.5 milligrams per liter comes from the World Health

24   Organization standard, and it's expressed in terms of water

25   fluoride concentration, okay?  So that's the 1.5 WHO water

 1    fluoride concentration.

 2         But the NTP Monograph conclusions are expressed in terms

 3    of total fluoride exposure, not exposure solely through

 4    drinking water.  In framing their conclusions using that WHO

 5    standard, the NTP authors did not explain what they believed

 6    exposures associated with water concentrations of 1.5 or less

 7    means.  And that was a point of criticism by the BSC working

 8    group.

 9         So if Your Honor would like to look at that critique,

10    you'll find it at Trial Exhibit 69 at page 9.  It's PDF page

11    11.  And essentially you'll see there the BSC authors or the

12    BSC working group is saying there's got to be an elaboration,

13    just what you mean by this benchmark.

14         So it's worth thinking why the NTP authors added the

15    reference to the WHO standard in the first place, and we heard

16    testimony on this.

17         The NTP authors said that they did this to provide

18    context.  They wanted to provide context that their confidence

19    conclusions are primarily based on studies that include total

20    exposures that approximate or exceed 1.5 milligrams per liter.

21         They agreed that the studies of fluoride exposure at

22    levels typically found in U.S. drinking water supplies are

23    inconclusive, inconclusive.  So that's Exhibit 69, page 21.

24              THE COURT:  With total exposure meaning what --

25              MR. ADKINS:  Meaning exposure from water.

PROCEEDINGS

1           **THE COURT:**  -- total exposure of measured monitoring?

2      Pardon?

3           **MR. ADKINS:**  Yes.  Total exposure -- generally the

4      measure of total exposure is the biomarker, so the urinary

5      fluoride biomarker.

6           And the NTP authors even acknowledged here that many of

7      the maternal urinary fluoride measures in the MIREC study

8      exceeded those, what they would have expected from consuming

9      fluoride in water only at a concentration of 1.5 milligrams per

10     liter or less, and so --

11          And we heard testimony, you'll recall, from Dr. Theissen

12     that the 1.5-milligram per liter water concentration is not

13     based on any biological finding that the NTP made so that they

14     were using -- that they used that WHO water concentration

15     standard was not because they saw something in the data to

16     suggest a threshold or some specific biological finding.

17          She said it was artificial because there were other

18     sources of fluoride exposure than water.

19          **THE COURT:**  Mr. Connett?

20          **MR. CONNETT:**  Yes, Your Honor.  I'm going to go back

21     to page 35 of Trial Exhibit 69, which is the BSC Working Group

22     report.  And counsel just referenced the BSC Working Group's

23     comments on the lack of clarity in the Monograph about what

24     total fluoride exposure means.

25          And the NTP explains here what it meant.  And, again, it

PROCEEDINGS

 1    was looking at this -- as NTP says, there's this closed

 2    correspondence between drinking water concentrations and

 3    urinary fluoride concentrations such that a urinary fluoride

 4    concentration of 1.5 would be generally considered the total

 5    fluoride exposure in a 1.5 ppm area.

 6         And the BSC working group here, Your Honor, considered

 7    NTP's response to be adequate.  So I just think that's

 8    important to note for the record.

 9         But I want to go back to counsel's comment about the

10    dose-response curve and not having -- from EPA's vantage

11    point -- complete clarity on the dose-response curve at low

12    levels.

13         And I want to remind the Court about how EPA has

14    approached the other two neurotoxicants under TSCA, methylene

15    chloride and PCE.  And in both of those -- for both of those

16    chemicals, Your Honor, EPA only was able to identify a LOAEL.

17    It was not able to identify a BMCL, was not even able to

18    identify a NOAEL.

19         Dr. Barone admitted in this case that you do not need to

20    know what the NOAEL is.  The LOAEL is sufficient.  And for

21    those two neurotoxicants, EPA was only able to identify a LOAEL

22    from human epidemiological literature.  But despite that, EPA

23    found risks of neurotoxicity for exposures that were 1/89 of

24    the LOAEL, exposures that were 1/51 of the LOAEL, exposures

25    that were 1/27 of the LOAEL.

**PROCEEDINGS**

 1       EPA had absolutely zero evidence to show that the effects

 2  were occurring at the human exposure level.  No evidence of

 3  association, nothing, yet EPA found risk in those situations

 4  because EPA compared the margin of exposure against the

 5  benchmark MOE.  That's how EPA determines risk.  That's what it

 6  did there, that's what the plaintiffs are asking for EPA to do

 7  here.

 8       Instead, EPA is imposing additional requirements that go

 9  beyond what EPA has imposed or required for these other

10  neurotoxicants under TSCA.

11       **THE COURT:**  I understand.

12       And we've already addressed the question about why not

13  conservatively use a LOAEL of, for instance, 4, and I've gotten

14  your comments on that.  I'll give you both a chance to make any

15  final comments on that question as to why if one were to use a

16  LOAEL approach and not the benchmark dose analysis for

17  reference dose, why, given the data -- I take Mr. Adkins' point

18  is that, well, if you look at the meta studies, there's some

19  models that show no statistically significant relationship and,

20  therefore, you can't even assume 4 parts per million, for

21  instance.

22       And I guess so let me hear your response to that,

23  Mr. Connett.

24       **MR. CONNETT:**  Yeah.  I think there's a difference here

25  between counsel's comments and their actual expert's testimony

1   at trial.  You know, when we -- when we started this case

2   opening comments, counsel agreed and admitted that -- it agreed

3   with NTP's findings of moderate confidence above 1.5.

4        Dr. Barone testified in this case that he agrees that

5   something is happening above 2 ppm.

6        RSI used 1.5 ppm as the point of departure from the NTP

7   Monograph as that was the level for which NTP had moderate

8   confidence of a neurotoxicity hazard.

9        And contrary to counsel's comments, RSI did calculate a

10  point of departure for neurotoxicity.  It is incorrect to say

11  that RSI did not calculate a point of departure for

12  neurotoxicity.  It did.

13       The only thing that RSI -- I think what counsel is getting

14  at is, they ultimately said, well, go ahead and use the dental

15  fluorosis as your -- as your primary endpoint; but RSI said

16  include an uncertainty factor to account for the neurotoxicity

17  hazard.  It's a different statutory scheme, it's a different

18  regulatory framework, but the end result is the same.  You need

19  an uncertainty factor to protect against the neurotoxicity

20  hazard, and RSI used 1.5 ppm from the NTP report for that.

21       So, in short, Dr. Barone admits there's this neurotoxicity

22  occurring above 2 parts per million.  He agreed that there's

23  lots of data at 4 parts per million.

24       RSI used 1.5 as the hazard level, and plaintiffs very much

25  agree that you can use 4 ppm as a very, very conservative

**PROCEEDINGS**

 1   LOAEL.  But when I say "Very conservative," there is obviously

 2   abundant data to show that there is effects occurring well

 3   below 4 parts per million, but I do not think there's any

 4   meaningful dispute in the record -- maybe from counsel today,

 5   may be from counsel today -- but in the record, in evidence,

 6   there is no meaningful dispute that 4 parts per million is a

 7   neurotoxic level.  And I think you can use that as a point of

 8   departure, but in so doing the benchmark MOE would need to

 9   reflect the fact that this is a observed effect level and,

10   thus, you'd need an extra uncertainty factor to account for

11   that.

12          **THE COURT:**  Well, you say there's no contrary evidence

13   or dispute, but Mr. Adkins has pointed out that the tables from

14   the meta-analysis of the NTP showed that at least as to some

15   models, the nonlinear models, there doesn't seem to be a

16   statistically significant relationship even at the below-4

17   level.

18          And I take it part of your response is, well, again, those

19   are -- those studies are of limited use and power because of

20   the methodology and the fact that -- well, why don't you

21   respond to that.

22          **MR. CONNETT:**  Yes, Your Honor.  It's -- again, I think

23   that eTable 4 and 5 should be read in the full context of NTP's

24   assessment, including the regression slope's analysis, which

25   found consistent significant relationships between

**PROCEEDINGS**

1    individualized measures of fluoride exposure and reduced IQ.

2    That's the first point.

3        Second point is, eTable 4 and 5 do have significant

4    limitations that limit the weight that should be given to those

5    specific analyses, namely they're using group-level data

6    without adjustment for covariates, and that greatly limits the

7    power of those studies.

8        But despite those limitations, Your Honor, I think it's

9    notable that when you look at eTables 4 and 5, you're seeing

10   almost always negative associations.  You're not looking at

11   positive associations.  You're consistently seeing negative

12   associations, most of which are statistically significant.

13       And let's keep in mind what NTP's own assessment of that

14   data was.  NTP's own assessment was that there is a linear

15   dose-response relationship between urinary fluoride and reduced

16   IQ.  That's NTP's conclusion from eTable 4 and 5.  Counsel may

17   differ --

18           **THE COURT:**  Where do I find that particular conclusion

19   that there's a linear -- just give me the cite for that.

20           **MR. CONNETT:**  Yes, Your Honor.  It is in the

21   Meta-analysis, in the main body of the Meta-analysis.  And I

22   will get you the page right now.  It's page 10 of the --

23           **THE COURT:**  Exhibit?

24           **MR. CONNETT:**  -- of Exhibit 68.  And I will read for

25   Your Honor the statement.  Quote, "Based on the AIC and

---

PROCEEDINGS

1   likelihood ratio tests, the best model fit was achieved when

2   quadratic or restricted cubic spline exposure levels were added

3   to the linear models for drinking water.  The linear model was

4   the best fit for urinary fluoride."

5       And then NTP states, "Given the small difference in AICs

6   between the different models and for ease of interpretability,

7   the linear model results were chosen for the purposes of

8   discussion; although, results from all models are presented."

9       So the NTP concluded that the linear model is the best fit

10   for urinary fluoride and reduced IQ, despite the limitations --

11   despite the limitations of using group-level data without any

12   observations.

13       **MR. ADKINS:**  Your Honor, I think you did summarize

14   EPA's position on this.  I think I'll try to be brief here

15   because I know we've been going awhile.  It's, you know --

16       **THE COURT:**  Be brief because we need to give the court

17   reporter a break as well.

18       **MR. ADKINS:**  Yes.  Yes.

19       I mean, the only thing to add really is that EPA has never

20   derived a LOAEL or a NOAEL from scientific review.  So in

21   addition to the reasons that I've already stated on the record

22   and that you adequately summarized, that's another reason why

23   you wouldn't derive a LOAEL or a NOAEL here.

24       You know, yes, the RSI systematic review calculated a

25   point of departure using Dr. Grandjean's BMCL, but what was

 1   their conclusion about it?  It's way too uncertain to use.

 2   They didn't even recommend using it.  Instead, they recommended

 3   to the Health Canada panel to use a point of departure for

 4   dental fluorosis.  It wasn't based on the NTP Monograph

 5   findings.

 6        And we already heard from Dr. Theissen that there was no

 7   finding in the data at 1.5 milligrams per liter, so that's just

 8   a nonissue here.

 9        The meta-analysis at page 10, the linear relationship, I

10   think I would just take Your Honor back to what the BSC said

11   about fitting a linear model and the criticisms that they had

12   to that draft.

13        Remember, this meta-analysis that we're looking at, this

14   isn't the final draft.  This is an unpublished manuscript that

15   was subject to comment by interagency reviewers and then BSC

16   reviewed those comments and they said you didn't do enough to

17   see if that linear fit applies -- right? -- there's a dearth of

18   data at that lower exposure range.

19        And then finally, even with the urine data, it's not true

20   that in each group, that the linear model was the best fit.

21   And we know that because if you look at eTable 5, which is

22   Roman Numeral II-81 of Exhibit 69, the best fit is the

23   restricted cubic splines model for the less than

24   4-milligram-per-liter group.  That model didn't show a

25   statistically significant adverse association.

PROCEEDINGS

```
 1           THE COURT:  Okay.  Last question.  I just -- let me
 2   make sure I understand it.
 3       These Tables 4 and 5 are based on a group analysis, but
 4   there was -- was it the regression analysis that was done using
 5   individualized data, did you say, Mr. Connett?
 6           MR. CONNETT:  Yes, Your Honor, that's correct.
 7       And counsel is correct in that that's not technically a
 8   dose-response analysis, but it's highly probative, Your Honor,
 9   where you are -- you are aggregating every study with
10   regression analyses on the relationship of individualized
11   fluoride exposure and IQ.  And when you aggregate all of those
12   studies, you see a consistent association between individual
13   fluoride exposure and reduced IQ.
14           THE COURT:  And where do I find that again?  What
15   table is that?
16           MR. CONNETT:  Yes.  It's Table -- it's eFigure 19
17   through eFigure 23 -- let me just confirm that.
18       EFigure -- eFigure 23, Your Honor, is the -- is where EPA
19   provides all of the results for water fluoride intake, urine
20   fluoride and total fluoride intake.
21           THE COURT:  And this is of Exhibit 68?
22           MR. CONNETT:  Yes.
23           THE COURT:  All right.  Let's -- let's take a
24   15-minute break for the reporter, we'll come back.  I just want
25   to conclude on a couple more questions and then wrap this up.
```

PROCEEDINGS

1    So we'll take a 15-minute break for the reporter.  Thanks.

2          **MR. ADKINS:**  Thank you.

3          (Recess taken at 11:16 a.m.)

4          (Proceedings resumed at 11:30 a.m.)

5          **THE COURT:**  Okay.  We're back.  Let me -- I've got a

6    couple of follow-up questions before we go on to the next.

7          Mr. Adkins, you say that the EPA has never derived a point

8    of departure from just using a systematic study.

9          Why is that?  Why can't that be done?  I understand it

10   hasn't been done, but is there some theoretical reason or

11   impediment preventing that from happening even if you have an

12   excellent, high-quality, systematic study with meta-analysis

13   and all that, why can't it be done?

14         **MR. ADKINS:**  I think what -- the reason why EPA is

15   always doing it that way using a specific study is because they

16   have an intake value.  They have the dose that is associated

17   with a particular outcome.

18         So think about the experimental animal studies.  In those

19   studies -- and this is, you know, this is in part in the

20   record, but this is how I understand it, Judge, so I'm not sure

21   everything I'm explaining right now is from testimony in the

22   record, but with those animal -- experimental animal studies

23   you can control the dose that the rat or the mouse receives,

24   and so we can have a very precise measurement of what intake is

25   related to the exposure outcome, what the health outcome is,

**PROCEEDINGS**

1    and that allows the agency to just select a single point of

2    departure, a LOAEL or a NOAEL, instead of looking at an overall

3    dose-response curve.

4         **THE COURT:** Yeah.  And here, because -- because we're

5    trying to do a -- NTP did a meta-analysis, you can show maybe a

6    relationship, a fairly strong association, but you don't

7    know -- you can't identify a single point?

8         **MR. ADKINS:** Correct.  I mean, none of the -- none of

9    the scientists that have looked at this with the exception of

10   plaintiff's experts have derived a point of departure for

11   neurotoxicity.

12        **THE COURT:** All right.  And Mr. Connett, if one were

13   not to accept Dr. Grandjean's number, here we're talking about

14   approximations.  There's -- it's -- you're approached to be

15   sort of a presumed LOAEL or what is it that you would be

16   advocating if Dr. Grandjean is not -- if his analysis is not

17   accepted?

18        **MR. CONNETT:** I think there's several available points

19   of departure that are entirely appropriate and reasonable.  I

20   mean, you could start, Your Honor, with .7 milligrams of

21   fluoride per liter in the water because that's the level of

22   fluoride in the water where you see adverse effects in the

23   MIREC cohort.  So I think that's a -- sort of a common-sense

24   component.  You don't have to worry so much about what is the

25   contribution of water fluoride to urine fluoride.

1    The fact of the matter is, is, that study was done under

2    the condition of use at issue in this case, water fluoridation,

3    and it found significant adverse associations between maternal

4    fluoride intake and reduced IQ, between water fluoride level

5    and reduced IQ and between maternal urinary fluoride and

6    reduced IQ in the boys.

7    So .7 is, I think, a reasonable point of departure, but

8    certainly 1.5 ppm is a reasonable point of departure.  And the

9    RSI used 1.5, Your Honor, as the alternative point of departure

10   to Grandjean's BMCL.  RSI took the approach you could use

11   Grandjean's BMCL or you can use 1.5 ppm from the NTP.

12   So I think -- you could use 1.5 as a low -- as a LOAEL.  I

13   don't think that's the lowest observed effect level in the

14   scientific literature, but I think that's an appropriate point

15   of departure, 1.5.

16   And then I think you can use 4 parts per million, Your

17   Honor, as an observed -- clearly an observed adverse effect

18   level.  And as Your Honor noted, it would be conservative to

19   call that a LOAEL, but I don't think anyone -- there's nothing

20   in this case -- nothing in the record -- maybe counsel's

21   comments today, but there's nothing in the record of this case

22   that would dispute 4 parts per million as a neurotoxic level of

23   fluoride.

24   And I think if you start with that 4 ppm as an observed

25   adverse effect level and utilize the appropriate benchmark MOE,

**PROCEEDINGS**

1  which would be intraspecies variability as well as some

2  uncertainty factor to account for the absence of a NOAEL, then

3  that would be an appropriate approach.

4      But the key point I think in all of this, Your Honor, is

5  no matter what hazard level you pick, whether it's the .228

6  BMCL, the .7 ppm in water, 1.5 ppm in water or urine or 4 ppm,

7  in each case the -- there is a risk posed by fluoridation

8  because when you incorporate the benchmark margin of exposure,

9  the benchmark MOE, human exposures in fluoridated areas are

10  clearly exceeding the level of concern.

11      **MR. ADKINS:**  And Your Honor, I would just object on

12  the grounds that this is argument that's not based on evidence

13  in the record.

14      I mean, plaintiffs' risk assessor, Dr. Theissen, testified

15  that she didn't select a point of departure that would be based

16  in an MOE analysis based on the human data.

17      So I think it's fine for counsel to, in essence, testify

18  that -- what the point of departure should be.  But when the

19  Court comes to make a decision on this, it needs to be based on

20  the evidence, not on counsel's argumentation.

21      **MR. CONNETT:**  Well, I wanted to clarify that because

22  Dr. Thiessen testified that if you use 1.5 ppm as a LOAEL --

23  she does not think that's the LOAEL, but if you use 1.5 ppm as

24  the LOAEL, there's a risk from water fluoridation.  So that

25  testimony is in the record.

**PROCEEDINGS**

1    So counsel's objection there is that Dr. Theissen thinks

2  it's below 1.5.  Fine.  But she testified based on EPA's risk

3  assessment methodology that if you select 1.5 ppm as the LOAEL,

4  there's a risk from water fluoridation.

5              **THE COURT:**  All right.

6          **MR. ADKINS:**  The overall point here is --

7              **THE COURT:**  Well, go ahead and then I'll --

8          **MR. ADKINS:**   The overall point, Your Honor, is that

9  the weight of the evidence isn't here to select a point of

10  departure.

11    Sure, we could use .7 from the MIREC study, but the

12  high-level conclusion was no adverse effect with -- between

13  maternal urinary fluoride and the IQ outcomes and then --

14    So how do we account for the INMA study and the OCC study?

15  Because when you look at the overall picture -- plus the

16  cross-sectional studies that found null results, there's

17  just -- there's not a cohesive, coherent story to tell that

18  there's an adverse effect going on at these exposure ranges.

19          **MR. CONNETT:**  And, Your Honor, on that point I would

20  just add that this approach that EPA is taking where we need to

21  have high confidence in the hazard at low levels, that is not

22  the way EPA --

23          **THE COURT:**  I understand that.  I understand,

24  Mr. Connett.  I understand your argument and their argument.

25    Let me ask just a clarification that I asked at the time.

PROCEEDINGS

 1    I'm not sure -- I want to make sure I fully understand the

 2    eTables, I think it's 4 and 5, the meta-analysis using mean

 3    effects.  Is that a change per unit in IQ corresponding to a

 4    change per unit in fluoride exposure or is -- because I also

 5    heard it was just a non-unit number, and I'm not sure I fully

 6    understand.  Maybe you all can explain that to me.  What am I

 7    looking at?

 8            MR. CONNETT:  I can address that, Your Honor.

 9            THE COURT:  Okay.

10            MR. CONNETT:  I'm going to put up on my screen here --

11    can you see my PowerPoint slide?

12            THE COURT:  Yep.

13            MR. CONNETT:  Okay.  So we can answer this question by

14    looking at eFigure 18.  EFigure 18 is based on the all data

15    urinary fluoride level analysis in eTable 4.  Okay?  And when

16    you look at eTable 4, there's 32 observations for the all data,

17    just like there's 32 bubbles here, Your Honor.  Every bubble

18    here is an observation.  There's 32 of them.

19        And NTP reports in eTable 4 that the beta value is

20    negative .16, okay?

21        Now, when you look at this linear regression line that NTP

22    has provided in eFigure 18, you can see that for every

23    1-milligram-per-liter increase in fluoride, there is a

24    reduction of .16 SMD in IQ.

25        Now, negative .16 SMD equates to, I would say, about 2.5

1   or somewhere in the 2.5 IQ point range.

2       And when you look -- this figure here, Your Honor, shows

3   the full spectrum of 6 milligrams per liter in the urine, and

4   you can see that when you get to the 6-milligram level, the SMD

5   change is negative .96, which, again, equates to .16 loss of IQ

6   for every 1 milligram of fluoride in the urine.

7       So for the linear model, Your Honor, in eTable 4 and 5,

8   the SMD value is a -- is the loss of IQ points per 1 milligram

9   of fluoride in the water or the urine.  And SMD you have to, of

10  course, convert that into IQ points because SMD represents 15

11  IQ points.

12      So negative .16 would be -- you'd have to make that

13  calculation to get to the IQ point.

14          THE COURT:  Right.  Right.

15          MR. ADKINS:  Well, Your Honor, I'm not so sure

16  that's -- that's correct.  I mean, if you look at -- if you

17  look at how the authors describe eTables 4 and 5 on page 38 of

18  Exhibit 68, they're referring to the standard mean deviations

19  as IQ.

20      And what the authors did -- because we have -- you know,

21  IQ is a specific -- gosh, it might even be a trademarked

22  intelligence cognitive test.  It's one measure of cognition.

23  There are others that you've heard a lot about, the Bayley

24  score, the Wechsler, the McCarthy scales.  And what the authors

25  did was to try to standardize all those different cognitive

1  tests and they're using a shorthand of IQ, but I don't see

2  how -- I don't see the jump to get to is the point -- the

3  negative .13 referring to .13 of a standard deviation or is it

4  .13 of an IQ point; using a very generic language "IQ"?

5      And when you look at what they describe, their own tables,

6  the NTP authors are saying is this a change in IQ, not a change

7  in the ratio of the standard mean difference of IQ.

8      **THE COURT:**  Well, all right.  That wasn't my question.

9  My question is that per that change, whether you're calling it

10  the change in the standard deviation or the change in actual

11  absolute, is it per some unit of fluoride exposure?  And my

12  understanding is that it is, right?  I mean, that's the

13  relationship.

14      **MR. ADKINS:**  That's correct.

15      **THE COURT:**  Because I thought on the stand somebody

16  told me -- one of the witnesses -- well, no that's an absolute

17  number it's not in units at all, but I always thought a beta

18  coefficient is the change in one variable based on a change in

19  another -- per unit of another variable.

20      **MR. ADKINS:**  There might have been some confusion.  I

21  do agree with counsel that it's a rate of change for a unit of

22  exposure, whether it's urinary or water fluoride.  And the

23  unitless point -- I do seem to recall that testimony now,

24  too -- I think is referring to this idea that it's a

25  generalized cognitive score, it's not necessarily the IQ test.

PROCEEDINGS

1     THE COURT:  Right, right, right.

2     MR. ADKINS:  Yeah.

3     THE COURT:  Okay.  Then let me -- another question is,

4  Mr. Connett, you said that the regression that was done by --

5  in the NTP study was not a dose-response analysis.  What's the

6  difference?  Let me just make sure I understand.  Because

7  doesn't regression supposedly show the relationship?  So what's

8  the difference between a dose-response analysis and the kind of

9  regression that was run?

10     MR. CONNETT:  What NTP is doing is, it's taking all of

11  these studies that had regression analyses of individual

12  fluoride and IQ.  And it's -- and those studies could be

13  looking at -- it's -- they could be looking at different levels

14  of fluoride exposure.  One study might be going from zero to 2,

15  one study might be going from zero to 1.  NTP's analysis is not

16  looking at the dose increment in its aggregation.  It's looking

17  at is there an association between an increase in individual

18  fluoride exposure and reduced IQ.  It's not focused on the dose

19  level, nor is it focused on the curve of the relationship.

20  It's focused on the significance of the association.  As you

21  increase fluoride exposure, does IQ reduce, and that's the

22  focus of that analysis.

23     So it's -- it's -- in many ways, it's very similar to the

24  dose-response analysis, but it's different in that it's not

25  seeking to parse out the effects at different -- at different

 1   parts of the dose-response curve.

 2        **THE COURT:**  Did you say that the NTP did take the

 3   individual data from each of the studies and then ran its own

 4   regression analysis or no?

 5        **MR. CONNETT:**  No, not like Dr. Grandjean did for his

 6   BMCL.  What the NTP did is -- you can see that.  I can bring it

 7   up on the screen, Your Honor.  It's eFigure 23.  Let me --

 8   okay.

 9        So you can see eFigure 23 here.  And so what NTP did is,

10   it took every one of these studies that had these regression

11   analyses whether it looked -- well, these regression analyses

12   did look at the association with 1-milligram-per-liter fluoride

13   in urine or water and whether that was significantly associated

14   with reduced IQ.  So it did do that in this regression analysis

15   and found that an increment increase of 1 milligram of fluoride

16   per liter in water or urine was significantly associated with

17   reduced IQ.

18        Now, to be fair, in some of these studies you might have

19   the increment going from 2 to 3 or 1 to 2 or 0 to 1.  So where

20   the increment exists in any given study might be different, but

21   overall the conclusion is, is a 1-milligram increase in the

22   increment of exposure is associated with a significant

23   reduction in IQ.

24        Overall, Your Honor, NTP found that there was about a 2

25   point drop in IQ with every 1 milligram of fluoride in the

 1   assessment.

 2        THE COURT:  All right.  That's based on a variety of

 3   ranges from whether -- it could be from 1 to 2, from 3 to 4 or

 4   whatever?

 5        MR. CONNETT:  That's correct.

 6        Now, the Green -- you can see, Your Honor, that in this

 7   figure -- you can see the Green 2019 study.

 8        Now, EPA has ignored the effects in Green and with water

 9   fluoride and fluoride intake.

10        NTP does not ignore those results and you can see that in

11   Green there's a significant relationship between individualized

12   water fluoride exposure and that's at, again, less than 1 ppm

13   and IQ and there's also a significant association between

14   fluoride intake in the Green study and reduced IQ.

15        THE COURT:  And the exposure is measured by either

16   water intake or urinary biomarker concentrations or one or the

17   other or . . .

18        MR. CONNETT:  So in eFigure 3, NTP provides three

19   separate measurements --

20        THE COURT:  I see.  That's right.  Urine, water and

21   then intake is a -- and intake is measured by the food and

22   everything else?

23        MR. CONNETT:  Well, in the Green and Till study, which

24   are the studies identified here, intake in Green was based on

25   beverages, so it would have been fluoridated tap water or tap

1   water and tea were the two beverages that drove the intake

2   assessment.  So it wasn't a total fluoride exposure including,

3   you know, food and dental products, it was beverage intake of

4   tap water and tea.

5        And then the Till 2020 study was an assessment of infant

6   fluoride exposure where they measured the level of fluoride in

7   water and then whether the infant was consuming it through

8   formula.

9            THE COURT:  Okay.  Great.  All right.  That's helpful.

10  Thank you.

11       All right.  Last few minutes I've asked several questions

12  about source allocation and want to get your analysis as to how

13  can we proceed -- how far can we proceed, assuming POD and all

14  that, you know, we've gone through those -- those stages.  If

15  we don't have source allocation, can the risk analysis still be

16  completed?

17           MR. ADKINS:  And, Your Honor, I think this question

18  was directed at EPA.  I'm happy to start the conversation here.

19           THE COURT:  Sure.

20           MR. ADKINS:  Okay.

21           THE COURT:  Go ahead.

22           MR. ADKINS:  So the short answer is no, it can't.  You

23  know, EPA may consider aggregate exposures in a risk

24  evaluation.

25       And if you look, Your Honor, to section 6(b)(4)(F)ii,

 1    you'll see the reference to -- in the statute in Section 6 of

 2    TSCA where, you know, it says EPA may consider this.  But

 3    exposures, aggregate exposures and hazard levels are distinct

 4    concepts.

 5         And the overall theme of this response, Your Honor, is we

 6    can't squish those two concepts together.  Aggregation is part

 7    of the exposure analysis, and the Court would still have to

 8    determine a hazard level for the condition of use, which is

 9    community water fluoridation.  And the plaintiffs have failed

10    to provide any methodology for the Court to do that here.

11         Now, the TSCA risk determinations are by condition of use,

12    so without that information they fail to meet their burden on

13    this point.  In addition to that statutory deficiency,

14    determining risk based on aggregate exposures and skipping that

15    hazard assessment would make it impossible for the agency to

16    manage any risk later in the process because without knowing

17    that hazard level and what that hazard level is for the

18    condition of use, the agency cannot then manage the risk.  And

19    we heard that in very clear testimony from Dr. Barone.

20         This overall approach that I'm describing that you have to

21    still disaggregate the cumulative exposures is consistent with

22    how EPA has considered aggregate exposures in other risk

23    evaluations.

24         And I won't bore you with the details on that, but you'll

25    recall the testimony by Dr. Barone where he looked at trial

PROCEEDINGS

 1    Exhibit 103, page 25.  That's 103 at page 25, Your Honor, and

 2    that's the NMP risk evaluation.  That's where EPA considered

 3    aggregate exposures.

 4         Now, the community water -- that community water

 5    fluoridation is a major driver of fluoride observed in the

 6    urinary biomarkers doesn't excuse plaintiffs from having to

 7    show what the hazard level is for the condition of use.

 8         So, Your Honor, in question 8 you cited evidence that

 9    community water fluoridation could range from 40 percent to

10    70 percent of total exposure.  Okay.  That means there are

11    situations where less than half of the fluoride exposure

12    observed in the urinary biomarker is from water.  And the Court

13    can't base a risk evaluation where half of the exposure is

14    coming from an unknown source and just not do the hazard

15    assessment of this process.  That would not be defensible.

16         And if EPA tried to do that, it would surely -- it would

17    surely result in a problem for the agency on judicial review

18    later.

19         Now, the source allocation -- I want to talk about the

20    sequencing issue that Your Honor raised in one of these

21    questions.  I'll try to go through all of this at once and then

22    let plaintiffs respond.

23         The source allocation must be done at the risk evaluation

24    stage.  This isn't a sequencing issue.  Identifying that hazard

25    level for the condition of use is necessary for the hazard

**PROCEEDINGS**

 1   assessment, and without it the Court cannot find unreasonable

 2   risk for the condition of use.  So why does that matter?

 3        Unless and until the Court finds an unreasonable risk for

 4   the condition of use, the Court has no power here to order the

 5   agency to do anything in this case.

 6        The PBPK modeling that we've been talking about, that is

 7   one way to allocate sources from a urinary biomarker, and it is

 8   unquestionably part of the hazard assessment.  So thereto --

 9   this isn't a situation where the Court order the agency to go

10   ahead and fill the gaps, so to speak, in the risk evaluation by

11   doing the PBPK modeling later on.

12        And even if the Court found that there were unreasonable

13   risks -- unreasonable risk, the Court may order -- may order --

14   the agency to commence the requested proceeding.  In this case

15   that's a Section 6 Risk Management Proceeding.

16        But the Court cannot order the agency to fill in those

17   gaps by doing something specific like a PBPK model, and so

18   finally --

19             **THE COURT:**  If the Court were to find -- although we

20   don't have precision here -- that we know that the major source

21   of fluoride is from water, fluoridized water, and that

22   depending on point of departure and all that sort of stuff that

23   we're in this zone and thus the major contributor, why can't it

24   then leave it up to the agency to figure out, well, in order to

25   figure out regulatorily what we need to do.  We need to figure

**PROCEEDINGS**

 1    out what precisely the contribution is and why wouldn't that

 2    natural maybe not order by the Court, but you would think that

 3    the agency would undertake that analysis.

 4         **MR. ADKINS:**  That's spot on and the answer lies in

 5    TSCA being a unique environmental statute.  Remember we heard

 6    from Dr. Barone that TSCA is unique because it requires a

 7    finding of risk by condition of use.

 8         This isn't a hazard assessment.  This isn't a situation

 9    where the Court can do a reference-dose approach or something

10    that the agency might do in other statutory worlds.  This TSCA

11    requires risk under the condition of use.  So if you can't show

12    risk under the condition of use we don't even get to the risk

13    management phase.

14         And I will say again, Your Honor, yes, fluoridated water

15    is a driver of the urinary biomarker, but just based on the

16    cite that Your Honor offered and the question, it could --

17    there could be situations where it's less than 50 percent.  I

18    mean, we're talking about 40 percent driver, even 70 percent

19    driver.  It's a significant driver, but there's so much more

20    going on.

21         So Your Honor asked about the asbestos cases, and I want

22    to just address that very briefly for you.  The asbestos case

23    doesn't support here that source allocation can be done out of

24    sequence.  So as an initial matter, that case was not a Section

25    21 petition, and the Ninth Circuit held that EPA's asbestos

PROCEEDINGS

```
 1    risk determination needed to include additional conditions of

 2    use, these so-called "legacy" uses of asbestos.

 3         And the Court remanded to EPA to complete a risk

 4    evaluation not folded into the risk management but a complete

 5    risk evaluation for those additional uses.

 6         So that case is just not on point and it doesn't support

 7    that the Court could order the agency to do this out of

 8    sequence.

 9              THE COURT:  All right.  Thank you.

10         Response?

11              MR. CONNETT:  Yes, Your Honor.

12         First, I'm not clear on counsel's argument.  It sounded

13    like he was saying that for the hazard determination we need

14    source allocation to fluoridated water.  That, to me, makes no

15    sense at all.  What you need for the hazard determination for

16    the point of departure is to find what is the level of fluoride

17    that is associated with neurotoxicity.

18         And if you have an integrated dose, like urinary fluoride,

19    that's your hazard level.  Then you compare that level to the

20    level of fluoride that fluoridated water produces.  So for the

21    source allocation I see zero need, whatsoever, as a matter of

22    logic and as a matter of risk assessment to do any kind of

23    source allocation on the hazard level component.

24         But going -- as to the statutory question, Your Honor, I'm

25    going to put the statute on the screen here.  And this is
```

 1    Section 6 of 15 U.S.C. 2605(c)(2)(A).  And here the statute

 2    talks about the rule-making proceeding -- okay? -- this is not

 3    the risk evaluation.  This is the rule-making proceeding after

 4    a risk has been determined.

 5         And the statute says that "In proposing and promulgating a

 6    rule . . . the administrator shall consider and publish a

 7    statement based on reasonably available information with

 8    respect to --" and then it lists various -- various matters for

 9    the EPA to address, one of which is the magnitude of the

10    exposure to human beings.

11         Now, the legislative record on this, Your Honor -- and I'm

12    citing here to 162 Cong. Rec. S3517, which is a legislative

13    document that the Court cited in its order of May 19th, 2020,

14    which is at ECF No. 197, page 11.  This legislative document

15    talks about the rule-making proceeding and -- and it

16    specifically is talking about the provision I just read, and it

17    states that in the rule-making proceeding it doesn't require

18    EPA to conduct a second risk evaluation-like analysis, so

19    clearly EPA is not required to do that, but it -- but it can

20    satisfy these requirements on the basis of the conclusions --

21    so what Congress is saying here is EPA doesn't need to do a new

22    risk evaluation or anything like that, but clearly the statute

23    is not saying you can't consider new information, you can't

24    supplement the record with additional data on exposure.

25         The statute is not providing any kind of bar to that type

PROCEEDINGS

 1   of additional information informing the rule-making proceeding.

 2       So to the Court's question is there a statutory bar the

 3   answer is unequivocally no.  There is no statutory bar.

 4       **THE COURT:**  What about -- what about the predicate

 5   before we get there and that is I think you just stated that

 6   you determine hazard level by looking at the level of fluoride

 7   associated with effects whatever the source and then you look

 8   at the amount of fluoride that is introduced by the condition

 9   of use and you -- so doesn't that require some kind of source

10   allocation?  I mean -- well, at least -- even some

11   approximation?  I mean, I guess you're sort of relying on

12   that -- was it the Till study, the one with the green and the

13   red bar of the difference?  Yeah.  That one.

14       I mean, don't you have to show that somehow the condition

15   of use is contributing to getting people into this hazard zone?

16       **MR. CONNETT:**  Yes.  And, Your Honor, we have.  I mean,

17   the Till study, you know, has -- does statistical analyses on

18   the relative contribution of various sources of fluoride to the

19   urinary fluoride level and it found that water fluoride is

20   clearly the most significant driver of the urinary fluoride

21   level in the pregnant mom.

22       And then when you look at this figure here, Plaintiffs'

23   Demonstrative No. 4, you can see quite clearly and plainly that

24   the urinary fluoride levels in the fluoridated areas are

25   substantially higher than in the nonfluoridated areas, and I'm

**PROCEEDINGS**

```
 1  going to show the Court Dr. Barone's testimony on this point.
 2  And I asked him:
 3       "QUESTION:  Can you point me to any other explanation that
 4       you think is more likely to explain the difference in
 5       urinary fluoride levels between women in fluoridated
 6       versus nonfluoridated areas, any other factor that is more
 7       likely to explain that difference than the fluoridated
 8       water itself?"
 9       Dr. Barone's answer is:
10       "ANSWER:  Right now that's the most parsimonious
11       explanation."  And then he explained that that means it's
12       the simplest explanation.
13       And so there's no -- every other expert that's testified
14  on this point, Your Honor, including Dr. Lanphear,
15  Dr. Grandjean and Dr. Theissen have all been in agreement that
16  fluoridated water is clearly the answer for why you see these
17  higher urinary fluoride levels in the fluoridated areas.
18       THE COURT:  But you don't get to quantify that.  I
19  mean, that's the issue.  That's not been quantified with any
20  precision.  I mean, you're looking at it and you kind of -- you
21  sort of eyeball it and say, well, you know, the resulting
22  levels are such high within that exposure range that at least
23  in your view is certainly within the margin that that's enough.
24       MR. CONNETT:  Right.  I mean, if you look at the data
25  the -- and you compare it to the BMCL, so say you used --
```

**PROCEEDINGS**

1    say -- well, Your Honor, again, let's just say we used the

2    highest BMCL that Dr. Grandjean calculated using nonlinear

3    models, which was about .8, okay?  You can see that the

4    contribution from fluoridated water in the 95th percentile,

5    which is 1.37, exceeds the highest BMCL that Dr. Grandjean

6    calculated.

7         But you don't even need to exceed it.  You -- if you go

8    back to this benchmark MOE concept, let's just say that the

9    difference in fluoridated water was only .5 milligrams per

10   liter and it wasn't .8.  Well, that's only a margin of less

11   than 2, so it's still an unacceptably close exposure to the

12   hazard.

13        So I think that the -- the problem for the EPA in this

14   case is no matter how you slice it, the human exposure, the

15   contribution of fluoride from fluoridated water is unacceptably

16   close to any hazard level that has been identified in this

17   case, any hazard level, whether we use 4 ppm, 2 ppm, 1.5 ppm,

18   .7 ppm or .3 ppm.

19        **THE COURT:**  Well, but the background -- even the

20   background levels, according to the Till study, are already

21   within a benchmark margin of error of any, you know, response.

22   So, you know, the question is then what?

23        **MR. CONNETT:**  Well, but the EPA is not being asked in

24   this case to regulate background exposures to fluoride.  EPA is

25   being asked to regulate the water fluoridation.  And water

**PROCEEDINGS**

1  fluoridation, again, is contributing to the background urinary

2  fluoride levels that we see in the nonfluoridated areas through

3  this halo effect where the beverages and food is made with

4  fluoridated water.

5      But I will go, Your Honor, to another point that I think

6  is significant here, and this is the expert panel report that

7  Dr. Savitz coauthored and should be Trial Exhibit 128.  And

8  here they identified an allocation factor for water fluoride

9  and other sources of fluoride and their allocation factor was

10  .5 for non-water sources of fluoride.

11      What that means, Your Honor, is they -- they -- could you

12  see that on the screen?

13          **THE COURT:**  No.

14      **MR. CONNETT:**  Okay.  Let me put that on.  Sorry.  Let

15  me put that on the screen.

16      **MR. ADKINS:**  And, Your Honor, I'm just going to object

17  right now because there's no testimony on what this means.

18      We're just having counsel's testimony at this point about

19  what this report means.

20      **MR. CONNETT:**  This is a document in evidence.  This is

21  Dr. -- this is a document that EPA inquired to Dr. Savitz

22  about.  Dr. Savitz is a coauthor of this statement.

23          **THE COURT:**  All right.  No.  All right.  So this is in

24  evidence, so I see it.

25      **MR. CONNETT:**  And what they're saying here, Your

 1    Honor, is the allocation factor should be .5 for non-water
 2    sources of fluoride which means -- and this is for the group of
 3    children zero to 4 years of age where actually this is a
 4    population that gets higher dental fluoride exposures than
 5    other populations because they swallow a lot of toothpaste.
 6    But the allocation factor that they agreed upon was .5.  That
 7    means 50 percent of the fluoride exposure is coming from
 8    drinking water under this analysis.  50 percent.
 9        This is a document that Dr. Savitz read, reviewed and
10    agreed upon.
11        Now -- and you might recall, Dr. Ibarluzea in this case
12    talked about how 80 percent of fluoride intake comes from
13    fluoridated water, and he was basing that on EPA's own
14    analyses, which is, you know, similar to what the NTP said.
15        So there is -- you know, there is and EPA is not --
16    notably is not citing its own relative source contribution
17    analysis that it published in 2010 on these very points where
18    EPA came up with these estimates of water-borne fluoride
19    exposures and how -- how important they are to overall total
20    fluoride intake.
21        This is not rocket science.  It's not novel.  It's well
22    established in the scientific literature that fluoridated water
23    is a major driver of exposure, 50 percent, 60 percent, 70
24    percent, whatever number you pick, it's a major driver of
25    exposure.  That's not going to change tomorrow, it's not going

 1   to change next year, it's not --

 2        THE COURT:  But the question -- the question is

 3   whether or not the Court, in doing this risk evaluation needs

 4   to come up with a more precise level of allocation, source

 5   allocation to water in order to render an analysis to, for

 6   instance, weighing the severity of the risk or some other

 7   factor, or can it just say it is a major driver in the range of

 8   anywhere from, you know, 50 percent to some other percent and

 9   that's enough -- given where the numbers are, given how close

10   it is to what you purport to be the point of departure,

11   et cetera, et cetera -- well within the margin -- is that

12   enough to find an unreasonable risk, or does the Court need to

13   say you need a precise source allocation?

14        MR. CONNETT:  I think that's an excellent and key

15   question, and it goes back to my comment earlier about when

16   we're assessing uncertainty, we need to be mindful of whether

17   the uncertainty is consequential.  Is it consequential to the

18   margin between the hazard and the exposure.

19        And I would posit, Your Honor, that none of the

20   uncertainties that counsel has identified with respect to

21   the -- how much fluoridated water is driving the exposure

22   affects the margin in any meaningful way because we can see

23   that the contribution from fluoridated water is -- is so close

24   to any of the hazard levels, well within a factor of 10, that,

25   you know, that extra level of precision that you might get

 1   through a PBPK model is not going to change the fundamental

 2   picture of an unacceptably close margin.

 3        Now, if we were in a situation, Your Honor, where the

 4   contribution from fluoridated water was, you know, 1/90 or 1/95

 5   or even 1/50 of the hazard level, then knowing with more

 6   precision what the contribution from fluoridated water is may

 7   be more consequential, but not when you have a margin that's so

 8   precarious like we have right now like fluoride.  It becomes an

 9   academic point, an academic point.

10        **THE COURT:**  All right.  Okay.  I'm going to let

11   Mr. Adkins respond to that last point, then I'm going to have

12   to call a close to this hearing that we don't need because the

13   numbers in this case -- and I know that, you know, there's a

14   debate about ability to choose a POD, et cetera, et cetera, but

15   because the numbers seem so close, if you assume any of the

16   various of the PODs from .28 all the way up to 4, you're within

17   a factor of 4 here even if you just look at the difference

18   between fluoridated water, nonfluoridated water as measured by

19   biomarkers or any other sort of measure that we don't need that

20   kind of precision in order to do a risk assessment here, that

21   the numbers are so close that it sort of doesn't matter.

22        **MR. ADKINS:**  I'll fight the hypothetical.  I don't

23   think the numbers are so close that it doesn't matter, Your

24   Honor.

25        **THE COURT:**  Okay.

PROCEEDINGS

1          **MR. ADKINS:**  I mean, we saw even in the NTP

2    Meta-analysis that 4 milligrams per liter isn't showing an

3    adverse effect by some of those measures.

4          This isn't about uncertainty.  This is a bar to completing

5    the hazard assessment.  If you can't do the source allocation

6    and backtrack from the urinary fluoride value to an intake

7    value, we don't have a point of departure here.  We don't have

8    a point of departure that you can use to get to a milligram per

9    kilogram per day value in the margin-of-exposure analysis.

10         So that's throwing a lot of terminology out there, but

11   this just -- this isn't a precision issue.  This is just a bar

12   to actually getting that numerator, that numerator value in the

13   MOE equation that's the hazard level.

14         It's a significant driver, water fluoridation, but it's

15   not the only driver.  And if all these sources that plaintiffs

16   just showed you say one thing it's that we're all over the

17   place with this.  Some people are saying 40 to 70 percent, some

18   people are saying it's more.

19         The Till data is contradicted by the Thippeswamy study and

20   we heard that from Dr. Theissen, so don't forget that.

21         Even the 2.41 value that counsel showed you in that

22   chart -- and I'm not going to go back to this again, but that's

23   still below where the NTP Meta-analysis authors are saying

24   there's an adverse effect.  In other words, that -- that 2.41

25   urinary value is still within a safe range based on the NTP

 1    Meta-analysis.

 2         And finally, the Health Canada panel report, this .5

 3    contribution for children's fluoride exposure, how does that --

 4    how does that match up -- how is that relevant to pregnant

 5    women's fluoride exposure and what you're seeing in a pregnant

 6    woman's urinary biomarker?

 7         We heard from Dr. Barone, we heard from the other experts

 8    that there's all sorts of physiological changes going on during

 9    pregnancy.  This isn't just picking one point and saying, oh,

10    it's about half, it's about 40 percent, it's about 70 percent.

11    No.  We need to figure out what is the intake that is

12    associated with an adverse effect -- and there's not a record

13    here -- for the Court to find that.

14         Three sentences in closing and then I'll be quiet, Your

15    Honor.

16         EPA's burden in this case is not to prove safety of

17    community water fluoridation, nor is it the Court's duty to

18    determine whether studies foreclose the possibility that water

19    fluoridation is neurotoxic.

20         It's plaintiff's burden to prove that fluoride presents

21    unreasonable risk under the condition of use at issue, which is

22    community water fluoridation at a concentration of .7

23    milligrams per liter; not may present, like other sections in

24    the statute, but presents.  And plaintiffs failed to carry that

25    burden and the Court, therefore, must grant judgment in favor

PROCEEDINGS

1   of EPA.

2        **THE COURT:**  All right.  I will take the matter under

3   submission.

4        What I would like is the -- as I mentioned, by the end of

5   next week responses to the findings of fact from each of the

6   opponents.

7        And I prefer you meet and confer before to see if you

8   might eliminate some of those and might save you some work.

9   Some of them may not be as consequential and so -- but I'd like

10  you to do that, try to trim that down as much as possible and

11  the ones that are left to give me the response.

12       **MR. ADKINS:**  Yes, Judge.

13       **MR. CONNETT:**  Your Honor, I have a question about if

14  you have a -- if I could, about the video recording of the

15  trial.

16       **THE COURT:**  Yeah.

17       **MR. CONNETT:**  We -- I understand that the video

18  recordings at this point are not -- the Court is not

19  contemplating putting them on the Court's website; is that

20  correct?

21       **THE COURT:**  Well, we didn't -- we hadn't talked about

22  that.  I was not -- I had not made any such order.  We do have

23  a pilot project that allows for some posting.  I mean, you

24  could probably look at our website and find out about that

25  pilot project.  There are some requirements in order to take a

**PROCEEDINGS**

1   recording, and I think we have to run it through the AO, but

2   there has to be a -- I guess you could make a nunc pro tunc

3   retroactive motion to be governed by the pilot project.

4           **MR. CONNETT:**  Yes, because that's what we would -- so

5   we -- plaintiffs could file something on that to ask the Court

6   to have those videos be available?

7           **THE COURT:**  You can.  You should look at -- you should

8   look at our website and see.  I think it generally requires

9   consent of both parties on the pilot project, so you might want

10  to talk to your colleagues or your worthy opponent about that.

11          **MR. CONNETT:**  Right.  And there was a consent by the

12  parties, Your Honor, in December to have the trial video

13  recorded and made available to the public, so I'll confer with

14  counsel, but --

15          **THE COURT:**  Okay.

16          **MR. CONNETT:**  Because I know that there are -- we've

17  received comments from some members of the public who thought

18  it would be available and weren't able to watch the live

19  stream, so we're asking about its availability on the Court's

20  website, but Plaintiff --

21          **THE COURT:**  All right.  Well, why don't you make --

22  talk to the other side and make a formal motion and I'll rule

23  on it.

24          **MR. CONNETT:**  Thank you, Your Honor.

25          **THE COURT:**  Great.  All right.  Thanks, everyone.

PROCEEDINGS

```
1   We're going to conclude this proceeding and, you know, if I
2   need any more other than what I've asked for, I'll ask for
3   additional briefing but right now I don't think I need it.
4          MR. ADKINS:  Thank you, Your Honor.
5          THE COURT:  Thank you.  Thanks everyone.
6          THE CLERK:  Thank you.  Court is adjourned.
7      (Concluded at 12:17 p.m.)
8                      --oOo--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3          **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7

8  _____          February 21, 2024
   JENNIFER L. COULTHARD, RMR, CRR                  DATE
9  Official Court Reporter
   CA CSR#14457

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25