

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF
CHEMICAL SAFETY AND POLLUTION
PREVENTION

AUG 2 2 2016

## MEMORANDUM

**SUBJECT:** Transmittal of Minutes of the May 24-25, 2016 Chemical Safety Advisory Committee (CSAC) Meeting Regarding the Draft Risk Assessment for TSCA Work Plan Chemical 1-Bromopropane (CASRN-106-94-5)

**TO:** Wendy Cleland-Hamnett
Director
Office of Pollution Prevention and Toxics

**FROM:** Steven M. Knott, M.S.
Designated Federal Official, CSAC Staff
Office of Science Coordination and Policy

**THRU:** Laura E. Bailey, M.S.
Supervisory Physical Scientist/Executive Secretary, FIFRA SAP
Office of Science Coordination and Policy

Stanley Barone, Ph.D.
Acting Director
Office of Science Coordination and Policy

Attached, please find the minutes of the May 24-25, 2016 CSAC open public meeting held in Arlington, VA. This report addresses a set of scientific issues being considered by the Environmental Protection Agency regarding the Draft Risk Assessment for TSCA Work Plan Chemical 1-Bromopropane (CASRN-106-94-5).

Attachment (1)

cc:

Jim Jones
Louise Wise
Jeff Morris, Ph.D.
Tala Henry, Ph.D.
Alva Daniels, Ph.D.
OPPT Docket

**Plaintiffs' Exhibit**

**044**

Food & Water v. EPA
3:17-cv-02162-EMC

CSAC Members

Kenneth Portier, Ph.D.
Holly Davies, Ph.D.
William Doucette, Ph.D.
Panos G. Georgopoulos, Ph.D., M.S., Dipl. Ing.
Kathleen M. Gilbert, Ph.D.
John C. Kissel, Ph.D.
Jaymie R. Meliker, Ph.D.
Daniel Schlenk, Ph.D.
Kristina Thayer, Ph.D.

CSAC Subcommittee Members for Review of the Draft Risk Assessment for TSCA Work Plan Chemical, 1-bromopropane (CASRN-106-94-5)

James Blando, Ph.D.
Muhammad Hossain, D.V.M., Ph.D.
Melanie Marty, Ph.D.
Michael Pennell, Ph.D.
Lesliam Quiros-Alcala, Ph.D.

# Chemical Safety Advisory Committee
# Minutes No. 2016-02

# A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding The Draft Risk Assessment for TSCA Work Plan Chemical 1-Bromopropane (CASRN-106-94-5)

**May 24-25, 2016**
**CSAC Meeting**
**Held at the**
**Crystal City Marriott**
**1999 Jefferson Davis Highway**
**Arlington, VA**

The Chemical Safety Advisory Committee (CSAC) is a Federal advisory committee operating in accordance with the provisions of the Federal Advisory Committee Act (FACA), 5 U.S.C. App.2 § 9 (c). The CSAC supports the Environmental Protection Agency (EPA) in performing its duties and responsibilities under the Toxic Substances Control Act (TSCA), 15 U.S.C. 2601 et seq., the Pollution Prevention Act, 42 U.S.C. 13101 et seq., and other applicable statutes.  The CSAC provides scientific advice, information, and recommendations to the EPA Administrator on the scientific basis for risk assessments, methodologies, and pollution prevention measures or approaches. The meeting minutes represent the views and recommendations of the CSAC and do not necessarily represent the views and policies of the EPA or of other agencies in the Executive Branch of the Federal government. Mention of trade names or commercial products does not constitute an endorsement or recommendation for use. The meeting minutes do not create or confer legal rights or impose any legally binding requirements on the EPA or any party.

Pls' Ex. 44

## TABLE OF CONTENTS

1.  NOTICE ........................................................................................................... 4

2.  COMMITTEE ROSTER ................................................................................. 6

3.  INTRODUCTION ........................................................................................... 7

4.  PUBLIC COMMENTERS ............................................................................... 8

5.  TABLE OF ABBREVIATIONS ...................................................................... 9

6.  EXECUTIVE SUMMARY OF COMMITTEE DISCUSSION AND
    RECOMMENDATIONS ............................................................................... 11

7.  DETAILED COMMITEE DELIBERATIONS AND RESPONSE TO CHARGE
    QUESTIONS .................................................................................................. 17

8.  REFERENCES ............................................................................................... 73

Pls' Ex. 44

1. NOTICE

The CSAC serves as the primary scientific peer review mechanism of the Environmental Protection Agency (EPA), Office of Pollution Prevention and Toxics (OPPT), and is structured to provide independent expert assessment of chemical and chemical-related matters facing the Agency. These meeting minutes have been written as part of the activities of the CSAC.  In preparing the meeting minutes, the CSAC carefully considered all information provided and presented by EPA, as well as information presented in public comments.

The meeting minutes of the May 24-25, 2016 CSAC meeting held to consider and review scientific issues associated with the draft risk assessment for TSCA Work Plan chemical 1-bromopropane were certified by Dr. Kenneth Portier, CSAC Chair, and Steven Knott, CSAC Designated Federal Official. The minutes were reviewed by Laura E. Bailey, M.S., FIFRA SAP Executive Secretary.  The minutes are publicly available on the CSAC website (https://www.epa.gov/csac) under the heading of "Meetings" and in the public e-docket, Docket No. EPA-HQ-OPPT-2015-0805, accessible through the docket portal https://www.regulations.gov. Further information about CSAC reports and activities can be obtained from its website at https://www.epa.gov/csac.  Interested persons are invited to contact Steven Knott, Designated Federal Official, via e-mail at knott.steven@epa.gov.

Pls' Ex. 44

# CSAC Minutes No. 2016-02

# A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding the Draft Risk Assessment for TSCA Work Plan Chemical 1-Bromopropane (CASRN-106-94-5)

## May 24-25, 2016
## CSAC Meeting
## Held at
## Crystal City Marriott
## 1999 Jefferson Davis Highway
## Arlington VA

Kenneth Portier, Ph.D.
CSAC Chair
Chemical Safety Advisory Committee
Date:

AUG 2 2 2016

Steven Knott, M.S.
Designated Federal Official
Chemical Safety Advisory Committee
Date:

AUG 2 2 2016

Pls' Ex. 44

2. COMMITTEE ROSTER

**Chemical Safety Advisory Committee (CSAC) Chair**

**Kenneth Portier, Ph.D.,** Vice President, Statistics and Evaluation Center, American Cancer Society, Atlanta, GA

**CSAC Members**

**Holly Davies, Ph.D.,** Senior Toxicologist, Department of Ecology, State of Washington, Olympia, WA

**Panos G. Georgopoulos, Ph.D.,** Professor of Environmental and Occupational Health, Rutgers Biomedical and Health Sciences - School of Public Health, Rutgers, The State University of New Jersey, Piscataway, NJ

**Kathleen Gilbert, Ph.D.,** Professor, Department of Microbiology and Immunology, University of Arkansas for Medical Sciences, Little Rock, AR

**John Kissel, Ph.D.,** Professor of Environmental and Occupational Health Sciences, University of Washington, Seattle, WA

**Jaymie Meliker, Ph.D.,** Associate Professor, Program in Public Health, Department of Family, Population, & Preventive Medicine, Stony Brook University, Stony Brook, NY

**Daniel Schlenk, Ph.D.,** Professor of Aquatic Ecotoxicology and Environmental Toxicology, University of California, Riverside, Riverside, CA

**Kristina Thayer, Ph.D.,** Deputy Division Director of Analysis and Director, Office of Health Assessment and Translation, National Toxicology Program, National Institute of Environmental Health Sciences, Research Triangle Park, NC

**CSAC Subcommittee Members for Review of the Draft Risk Assessment for TSCA Work Plan Chemical, 1-bromopropane (CASRN-106-94-5)**

**James Blando, Ph.D.,** Associate Professor, School of Community & Environmental Health, Old Dominion University, Norfolk, VA

**Muhammad Hossain, D.V.M., Ph.D.,** Assistant Professor, Department of Pharmaceutical Sciences, Northeast Ohio Medical University, Rootstown, OH

**Melanie Marty, Ph.D.,** Formerly Acting Deputy Director (Retired), Office of Environmental Health Hazard Assessment, California Environmental Protection Agency, Sacramento, CA

**Michael Pennell, Ph.D.,** Associate Professor of Biostatistics, College of Public Health, Ohio State University, Columbus, OH

**Lesliam Quiros-Alcala, Ph.D.,** Assistant Professor, Maryland Institute of Applied Environmental Health, School of Public Health, University of Maryland, College Park, MD

3.  INTRODUCTION

On May 24-25, 2016 the US EPA Chemical Safety Advisory Committee (CSAC) met in an open public meeting in Arlington, VA to consider and review scientific issues associated with the draft document entitled, "TSCA Work Plan Chemical Risk Assessment 1-bromopropane (n-Propyl Bromide): Spray adhesives, dry cleaning, and degreasing uses (CASRN: 106-94-5)." The assessment focuses on uses of 1-bromopropane in commercial applications (i.e., vapor degreasing, spray adhesives, and dry cleaning) and consumer applications (i.e., aerosol solvent cleaners and spray adhesives). Given the range of endpoints (i.e., cancer and non-cancer; the latter includes potential effects on the developing fetus and adults of both sexes), susceptible populations are expected to include adults (including pregnant women) in commercial uses and children (as bystanders) and adults of all ages (including pregnant women) for consumer uses. Thus, the assessment focuses on all humans and life stages. The CSAC was charged with reviewing the scientific and technical merit of the draft 1-bromopropane risk assessment focusing exclusively on the scientifically relevant issues pertinent to the assessment.

The following US EPA presentations were provided during the CSAC meeting (listed in order of presentation):

**Welcome and Opening Remarks –** Stan Barone Jr., M.S., Ph.D., Acting Director, Office of Science Coordination and Policy and Jeff Morris, Ph.D., Deputy Director, Office of Pollution Prevention and Toxics

**Introduction and Background –** Tala Henry, Ph.D., Director, Risk Assessment Division, Office of Pollution Prevention and Toxics

**Overview of the Draft Risk Assessment for TSCA Work Plan Chemical, 1-Bromopropane (CASRN-106-94-5) –** Katherine Anitole, Ph.D., and Greg Macek, Risk Assessment Division, Office of Pollution Prevention and Toxics

4. PUBLIC COMMENTERS

*Oral public comments were provided by*

Christina Franz and Nancy Beck, Ph.D., on behalf of the American Chemistry Council (ACC)

*Written public comments were provided by:*

Anonymous

Lee Anderson on behalf of the BlueGreen Alliance

Steve Anderson, D.V.M., Ph.D., D.A.B.T., on behalf of Albemarle Corporation

Steven Bennett, Ph.D, on behalf of the Consumer Specialty Products Association (CSPA)

Department of Defense, Office of the Assistant Secretary of Defense for Energy, Installations, and Environment, Environmental Safety and Occupational Health Directorate, Chemical and Material Risk Management Program

Christina Franz on behalf of the American Chemistry Council (ACC)

Eve Gartner and Emma Cheuse, on behalf of Blue Green Alliance, Earthjustice, Environmental Health Strategy, Natural Resources Defense Council, Safer Chemicals Healthy Families and Sierra Club Toxics Committee

Amy D. Kyle, Ph.D., M.P.H., School of Public Health, University of California, Berkeley

Mariana Lo, on behalf of Earthjustice

Ali Mirzakhalili, P.E., on behalf of the State of Delaware, Department of Natural Resources and Environmental Control, Division of Air Quality

Mark Stelljes, Ph.D., on behalf of EnviroTech International

J. Jared Snyder, on behalf of the New York State Department of Environmental Conservation (DEC)

Tracey J. Woodruff, Ph.D., M.P.H., University of California, San Francisco

Public comments are available in the public e-docket, Docket No. EPA-HQ-OPPT-2015-0805, accessible through the docket portal https://www.regulations.gov.

| OSHA | Occupational Safety and Health Administration |
|------|-----------------------------------------------|
| PBPK | Physiologically Based Pharmacokinetics |
| PERC | Perchloroethylene/Tetrachloroethylene |
| personal_care cosmetics prohibited_ASEAN | Association of Southeast Asian Nations (ASEAN) Cosmetic Directive Annex II; substances prohibited in cosmetic products; CPCat description of ACToR list |
| PID | Photo Ionization Detector |
| PNS | Peripheral Nervous System |
| POD | Point of Departure |
| PUMS | Public Use Microdata Sample |
| RAD | Risk Assessment Division |
| REACH | Registration, Evaluation, Authorisation and restriction of Chemicals, EU |
| RF | Reduction Factor |
| RoC | Report on Carcinogens (NTP) |
| TCE | Trichloroethylene |
| TLV | Threshold Limit Value |
| TRI | Toxics Release Inventory |
| TSCA | Toxic Substances Control Act |
| TWA | Time Weighted Average |
| UF | Uncertainty Factor |
| VOC | Volatile Organic Compound |
| WIL | WIL Research Laboratories |
| WOE | Weight of Evidence |

## 6. EXECUTIVE SUMMARY OF COMMITTEE DISCUSSION AND RECOMMENDATIONS

Overall, the Committee found that EPA/OPPT (hereafter referred to in the Committee's responses as the Agency) had developed a good risk assessment document for 1-bromopropane (1-BP). The Committee provided a number of recommendations intended to improve the clarity and transparency of the scientific analyses presented in the Agency's document. In addition, the Committee provided specific recommendations to address or more clearly acknowledge the limitations of the scientific analyses. However, the Committee expressed the view that the Agency should not delay completing the risk assessment because the occupational and consumer use scenarios already evaluated indicate high risks of adverse effects and some Committee members' comments indicate that these risks might have been under- rather than over-estimated.

Committee members agreed that the 1-BP risk assessment (and other TSCA chemical assessments to be presented in the future) would benefit by adoption of systematic review practices to increase the transparency of how studies were selected and evaluated. For example, the Committee recommended that it should be explicitly stated what criteria were used to determine "the monitoring was adequate and of acceptable quality" (risk assessment document, page 44). The Committee also noted that it would be useful to reference studies that were

evaluated but did not meet baseline criteria to inform the exposure estimates. Inclusion of more details on the literature are recommended throughout the report and in Appendix M.

In addition, the Committee noted that the audience for the risk assessment document is unclear. The stated audience is the Agency's risk managers, but some topics are explained at a much more basic level than others.

The following is a summary of the Committee's key recommendations for each theme provided in the Agency's charge to the CSAC.

**General Issues on the Risk Assessment**

In general, the Committee found that the information provided in the Background and Scope of the risk assessment is appropriate and fit for its purpose.  The Committee found that the conceptual model appropriately considers worker exposures and consumer uses, with the majority of exposure occurring via inhalation. Committee members agreed that inhalation exposure is the most important and that while dermal exposures might be important as a contributor to overall exposure, if data are not available for monitoring or modeling efforts, then it is reasonable not to include this route of exposure.  However, the Committee recommended that a quantitative argument would be more persuasive and some Committee members recommended that an estimate for dermal exposure should be included and gaps/limitations clearly stated to address another potential workplace exposure pathway.

Committee members observed that the consumer uses with acute exposures are important to include in this assessment.  In addition, several Committee members commented that there should have been more consideration of exposures from co-residence near dry cleaning facilities, community-level exposures in areas nearby industrial or dry cleaning operations, and the general population (a concern raised by the NHANES data and apparent appearance of 1-BP in some consumer product databases).  The Committee found that the exposure terminology employed in the report needs to be adjusted; i.e., the report should refer to residential rather than consumer exposure.  This distinction is important since residential exposure implies a population with a wider age distribution, and is important to ensure that exposures to children are not under-predicted.

**Occupational Exposure Assessment**

The Committee found that the Agency's analysis of occupational exposures is necessarily complex, entailing multiple occupational scenarios and utilizing both measured and predicted air concentrations to assess hazard.  In addition, the Committee found that for the types of scenarios considered, the Agency has probably collected and adequately "codified" the most pertinent information although data were quite limited for certain scenarios. The Committee observed that many of the charge questions posed by the Agency are requests for additional exposure information. Therefore, the Committee recommended that the Agency further explore various means for obtaining such information for future assessments.

The Committee made several recommendations based on the fact that many dry cleaning facilities are family-owned and operated.  For example, the Committee recommended that the

scenarios for worker hours in dry cleaners could be expanded to include a wider range of scenarios (e.g., 4, 6, 8, and 12 hours). The Committee also noted that estimating exposures to children ("workers" and "bystanders") in dry cleaning facilities could be considered. It is plausible that in family-owned/operated dry cleaning facilities children under 16 could be helping/working (or could be "bystanders" while they wait for their parents to finish their job) and potentially be exposed to 1-bromopropane.  In addition, the committee concluded that it was appropriate for the Agency to assume that the machines in the dry-cleaning exposure scenarios were older models as family-owned and operated facilities may not have the resources to purchase newer equipment.

The Committee noted that inclusion of post-EC (Engineering Control) exposure estimates is useful as this provides an estimate of the impact of ECs in different exposure scenarios; however, as noted in the risk assessment report, it is uncertain whether ECs at dry cleaning facilities would reduce levels by the estimated amount of 90%.

The Committee noted that comparison of modeling results and environmental and/or biomarker measurements is useful, if possible.  The Committee recommended that the Agency consider the feasibility of adding graphical or tabular comparisons between predicted and observed environmental concentrations when the latter are available.  The Committee also noted that comparison of biomarker ranges observed in selected and unselected study populations would be valuable.

The Committee recommended expanding the Monte Carlo simulation of occupational exposures by replacing some of the point estimates of input variables with distributions; an example of such a point estimate that should be replaced by a distribution is the number of working hours.  In contrast to the probabilistic approach used for occupational exposure analysis, the Agency has conducted a deterministic analysis of the consumer exposure scenario. While sympathetic to issues of data insufficiency, the Committee encourages the Agency, going forward, to adopt probabilistic approaches and members of the Committee observed that the Agency would be better served by employing a probabilistic approach for the consumer exposure assessment. The Committee noted that discussion of the type the Committee engaged in regarding the validity of individual estimates (e.g., the overspray fraction) would be obviated by use of distributed values.

The Committee concluded that the Agency appropriately uses a high-end estimate for worker exposure and includes the estimate based on monitoring in the risk characterization section.

**Consumer Exposure Assessment**

The Committee evaluated the approach that was used by the Agency to estimate exposures to 1-BP from use of consumer products in the home, and concluded that, although the basis of the approach is fundamentally reasonable, the scenarios represent a subset of uses of consumer products containing 1-BP. Though these may be the potentially most important scenarios, the Committee noted that it is essential to provide better justification regarding their selection.

Much effort is currently being put into development of consumer exposure models useful in the context of REACH in Europe and for purposes of Life Cycle Analysis in the U.S. Comparability

of consumer exposure modeling within the TSCA Work Plan process and other initiatives is of interest to the Committee. The Committee discussed the utility of comparing a subset of CEM E-FAST calculations with an "external" model of similar sophistication such as those developed for the European REACH program (e.g., ConsExpo or ECETOC).

The Committee suggests that the Agency consider multiple uses on any day of the various aerosol products, and use on multiple days per week. A do-it-yourselfer may have multiple items that need cleaning/degreasing/gluing in a single project and thus may use the product multiple times on a given day or multiple days in a week.  One Committee member expressed concerns related to modeling exposure based on a single short use and spreading the exposure out over 24 hours.  The Committee member noted the possibility of conflating two concepts (modeling of exposure and time extrapolation from experimental exposure to the human scenario), but expressed a concern about very short high exposures being equated in terms of degree of adverse effect to longer exposures to much lower levels.

The Committee further suggested that the Agency consider that the selected exposure scenarios probably represent episodic pathways in a subset of the population (i.e., users and co-habitants of users).  Given the possibility of overlooking a significant exposure scenario, the inclusion of biomarker data could be useful.  Along these lines, the measurement of BPMA levels by Boyle et al. (2016) suggests the possibility of low level, but very widespread, non-occupational exposures to 1-BP; however, the Committee recognizes that there are some questions regarding the specificity of the biomarker used.  Once BPMA or another metabolite has been validated as a biomarker of 1-BP exposure, this could be used for a more accurate assessment of residential exposure.

**Hazard and Dose Response Assessments**

The Committee concluded that the available evidence supports using a low-dose linear model to assess dose-response for carcinogenicity.  Most Committee members agreed that the existing evidence supports a conclusion of mutagenicity/genotoxicity as the primary mode of action (MOA) for 1-BP and some of its metabolites (i.e., oxide, alpha-bromohydrin, and glycidol).  One Committee Member concluded that the evidence for mutagenicity was not convincing.  The Committee suggested the Agency consider broadening the terminology used in the report to describe the primary MOA as "mutagenic/genotoxic" or "genotoxic" to better characterize the contribution of the non-mutagenic endpoints that support genotoxicity.

In general, the Committee members observed that the Agency had conducted a thorough review of the literature and adequately explained the multiple lines of evidence supporting the selected non-cancer endpoints.  The Committee agreed that the Agency had appropriately considered various non-cancer endpoints, including liver, kidney, reproductive, developmental, and neurotoxicity for assessing human risk associated with acute and chronic inhalation exposures to 1-BP. The Committee found that together, the most sensitive non-cancer endpoints seem to be neurologic, reproductive, and developmental endpoints. In most cases, adverse toxic effects were observed in both humans and animals at the concentration range 100-1000 ppm.

Some Committee members suggested that a POD value for the neurologic endpoints from human data is enough to exclude the 10-fold UF for inter-species considerations. Some committee members suggested that comparing POD values derived for neurotoxicity in humans with the HEC from the animal studies may be a good way to check the inferences being made from the animal studies, recognizing the uncertainties in the human data in terms of exposure assessment. As noted above, the Committee suggested the Agency better clarify the basis for key study selection (e.g., use of the WIL report for liver toxicity). The Committee found the evidence that 1-BP causes neurotoxicity very convincing. In this case, the Agency used 15 years of behavioral, neuropathological, neurochemical, and neurophysiological studies in rodents as well as cross-sectional studies and case reports in humans to establish a causal association with 1-BP and neurotoxicity.

The Committee also found that the choice of multiple reproductive endpoints including decreases in prostate, epididymal, seminal vesical weight and sperm motility in male and prolonged estrous cycle, decrease in number of antral follicles and implantation sites in female were appropriate for the assessment of reproductive toxicity. The Committee further found that the POD values selected seemed appropriate given the dose response of 1-BP in the WIL study.

The Committee noted that the model averaging approach used for cancer endpoints has many advantages over the use of a single parametric dose-response model in determining a POD, including addressing model uncertainty when there isn't strong mechanistic support for a particular dose-response relationship, and producing more stable estimates than individual models.  While model averaging used by the Agency has several strengths, the Committee noted it also has several weaknesses. First, since the models the Agency used in computing the average are all monotonic, the average dose-response curve must be monotonic.  Since monotonicity is commonly assumed in dose-response assessment of carcinogens, the Committee did not find this particular assumption to be problematic.

The second major assumption involved in model averaging is that an appropriate model space has been chosen.  The model space chosen by the Agency included the log-probit model.  The Committee found that there are conceptual objections and empirical evidence for not using the log-probit model to generate an average dose-response curve.  Therefore, the Committee recommends removing the log-probit model from the model averaging due to its instability when applied to the three cancer data sets and its disagreement with standard mechanistic assumptions for carcinogens.

The Committee also recommended that the Agency clearly explain the rationale for using an approach for determining the POD which differs from standard Agency practice as described in the Agency's cancer risk assessment guidelines.

### Risk Characterization

The Committee observed that dose-response assessment always involves uncertainty; hence the use of uncertainty factors in the non-cancer risk assessment.  For cancer risk assessment, choice of model to determine the cancer slope factor introduces model uncertainty, and extrapolation from animals to humans always involves some unquantifiable uncertainty.  Nonetheless, overall,

the Committee agrees with the Agency that the uses of 1-BP containing materials present high risks of adverse non-cancer and cancer outcomes to workers and consumers.  The Committee noted that the focus on the high-end acute exposure for occupational (95th percentile) and consumer (90th percentile) populations seems appropriate.  The Agency notes that the MOEs indicate that workplace exposures are mostly unacceptable in terms of non-cancer health risk; even with exposures measured after engineering controls were put into place, many of the MOEs were smaller than the benchmark MOE.  The Committee agrees with the Agency's conclusion.  In addition, the Committee agreed, for the most part, that the estimate of consumer exposure from spray adhesives, cleaning products, spot removers, etc. (Tables ApxL-2, L-3) seemed logical.  Since the MOEs calculated for consumer exposure scenarios were below the benchmark MOE of 100, there is a legitimate reason to believe that risk to consumers exists as well.

A few Committee members expressed concern about the selection of only a total uncertainty factor of 100 to form the basis of the benchmark MOE for the developmental and reproductive endpoints selected.  While some Committee members were comfortable with a benchmark MOE of 100 when using the animal-based POD, one member notes that the Agency could think about a larger uncertainty factor for intra-species variability resulting in a benchmark MOE up to 300 for this chemical.  Further, another Committee member observed that for developmental toxicity, the Agency should consider an additional uncertainty factor, analogous to the Food Quality Protection Act factor applied for assessing pesticide tolerances. It is not clear whether there are short windows of exposure for neurotoxicity in children relevant to an acute exposure scenario as there are for the fetus, but some Committee members noted this should be considered in the choice of the uncertainty factor and discussed in the document.

The Committee found that, based on the dose-response assessment, the Agency appropriately chose the lowest PODs and associated HECs for each of the non-cancer endpoints from among the datasets amenable to dose-response assessment (with the possible exception described below, in Section 7).  The Agency chose to use developmental toxicity based on animal studies as a basis for acute exposure risk assessment for occupational scenarios.  The Committee concluded this was an appropriate endpoint to choose for assessing acute exposures to consumers using 1-BP containing products.  The Committee noted that this endpoint is appropriate for an acute exposure scenario given that developmental toxicity may occur from a brief exposure during a critical window of susceptibility. The Committee found that, overall, using the lowest human equivalent concentrations as the point of departure for the developmental and reproductive toxicity for acute inhalation exposures is appropriate (and is standard risk assessment practice).

The Committee found that the choice to use the Inhalation Unit Risk (IUR) from the lung tumor data presented in the NTP report is appropriate.  One Committee member suggested using a range of values for the IUR, to include the rat model as well as the mouse, but other Committee members considered selection of the most sensitive site in the most sensitive species appropriate.  The Committee also discussed the observation that each of the 3 tumor types occurs in one sex and within one animal species (keratoacanthoma/squamous cell carcinoma in male F344 rats; large intestine adenoma in female F344 rats; and alveolar/bronchiolar adenoma or carcinoma in female B6C3F1 mice).  However, the Committee noted during the discussion that this pattern is

not uncommon and site concordance is not necessary to conclude there is a risk.  Thus, the Committee found that it is appropriate to use the most sensitive site, gender, and species in cancer risk assessment, as is the standard risk assessment procedure.

The Committee also recommended that the Agency should consider incorporating any of the suggestions raised during the dose-response modeling discussion into the IUR analysis, i.e., excluding the log-probit model, only including models that fit the data and are linear at low doses, and expanding the analysis to key non-cancer endpoints.  A number of Committee members asked for a comparison of the modeling analysis used in 1-BP with more typical analysis as outlined in the U.S.EPA Risk Assessment Guidelines for carcinogens (US EPA, 2005a). This seems to be included in an appendix but the Agency should consider whether it needs to be referenced in the main body of the report.  The Committee agreed that it is not appropriate to try to quantitate cancer risk from acute exposures, for all the reasons given by the Agency.

Most Committee members agreed that, overall, the available data and assumptions used by the Agency represented a fair and logical approach to estimating the parameters that determine exposure, but a few Committee members noted that there could be residual concerns between events or there could be relevant exposure mixtures from other chemicals in the consumer products.  In addition, a number of Committee members were concerned that the risk assessment did not take into account the possibility that bystanders could be in the same room as the user for the consumer scenarios.

Several Committee members noted that the exposure calculations in the MOE determination are based on 8-hour time weighted averages (TWA). Committee members noted that there may be scenarios where workers may be exposed during a 12-hour rather than 8-hour shift (e.g., dry cleaners) and, if such scenarios cannot be estimated, the limitations of excluding them should be discussed in the risk characterization.

7.  DETAILED COMMITEE DELIBERATIONS AND RESPONSE TO CHARGE QUESTIONS

## General Issues on the Risk Assessment

EPA/OPPT identified 1-BP as part of the TSCA Work Plan based on high hazard concerns, industrial use profiles which include scenarios with high exposure for workers, and concerns for consumer exposure due to chemical volatility and high content of 1-BP with most consumer products contents ranging between 60-100%.

Based on the physical-chemical properties and use scenarios described in the assessment, EPA/OPPT expects inhalation to be the primary exposure route of concern for 1-BP. Because of limited toxicological data and the lack of toxicokinetic information needed to develop physiologically-based pharmacokinetic models for route-to-route extrapolations, EPA/OPPT did not evaluate dermal exposures.

The Committee also recommended that the Agency clearly explain the rationale for using an approach for determining the POD which differs from standard Agency practice. This comment applies not only to the use of model averaging but also the use of 0.1% added risk as the BMR instead of the more frequently used 10% extra risk. Furthermore, the Agency should show the difference in results using their model averaging method and the more traditional method of determining the POD.

Finally, the Committee noted some issues in the Agency's implementation of the model averaging method and reporting of results. As mentioned earlier, parameters of the Weibull model and multistage model hit boundary values and hence could not be estimated. In these instances, these parameters should not be included in the penalty terms for the AIC and Bayesian Information Criterion (BIC). The penalties are correct in the AICs reported in Tables P-62, P-64, and P-66 but are incorrect in the MADr-BMD output reported in Appendix P-3; since, the Committee assumes, that the AIC values reported by MADr-BMD were the ones used in the averaging, this would mean that the model averaging would have to be corrected. On a similar note, the "degree" labeling for the multistage models in Appendix P-3 is misleading because in only one of the instances were coefficients beyond the linear term nonzero. Finally, the results pasted from MADr-BMD include many decimal places which imply a greater level of precision than what is realistically supported by the data; thus, the Committee recommends reducing the number of decimal places reported.

## Risk Characterization

EPA/OPPT quantified non-cancer risks based on the Margin of Exposure (MOE), which is the product of dividing the scenario specific exposure into the hazard point of departure which is the no adverse effect level, based on animal and/or human studies. EPA/OPPT calculated MOEs for acute or chronic exposures separately based on the appropriate non-cancer POD and estimated exposure concentrations adjusted for durations. To determine if unacceptable risks were present for relevant exposure scenarios, the endpoint-specific MOEs were compared to the endpoint-specific benchmark MOEs. The benchmark MOEs were the product of all of the relevant UFs identified for each non-cancer POD. If the MOE estimate was less than the benchmark MOE, the exposure scenario for non-cancer endpoints was interpreted as a human health risk.

Cancer risk estimation consisted of multiplying the occupational scenario-specific exposure estimates by the cancer IUR to estimate the added cancer risk. Added lifetime cancer risk estimates from 1-BP exposure were compared to benchmark cancer risk levels of $10^{-4}$, $10^{-5}$, and $10^{-6}$ (i.e., 1 in 10,000, 1 in 100,000 and 1 in 1,000,000).

**Question 5-1**: EPA/OPPT interpreted the endpoint of decreases in live litter size following exposure to 1-BP before and during gestation, as a surrogate for frank developmental effects relevant to humans per EPA's Guidelines for Developmental Toxicity Risk Assessment. EPA/OPPT used this endpoint to calculate a point of departure (POD) to assess non-cancer risks associated with acute inhalation exposures to 1-BP. Please comment on the assumptions, strengths and weaknesses of the MOE approaches used to estimate the non-cancer risks to workers and occupational non-users following acute inhalation exposures to 1-BP, including the

MOEs presented in the document. Please comment on the assumptions, strengths and weaknesses of the MOE approaches used to estimate risks to consumers following acute inhalation exposures; including non-users (e.g., bystanders who may be children, or women of childbearing age). Specifically, please comment on the decision to limit the analysis to acute exposures without residual concerns between events and what data could critically inform modifying this approach for consumers. Please comment on the selection of uncertainty factor values in deriving the benchmark MOE for acute inhalation exposures.

**Committee Response**

*MOE Approach*

The Committee found that, overall, using the lowest human equivalent concentrations as the point of departure (POD) for the developmental and reproductive toxicity for acute inhalation exposures is appropriate (and is standard risk assessment practice).

The MOE approach is one of the standard approaches for non-cancer risk assessment.  It is parallel to the approach for site-specific or regional pollutants where one compares exposure estimates to Reference concentrations (RfCs), which are levels at or below which non-cancer health effects are not expected to occur even in sensitive subpopulations.  When developing an RfC for a chemical, the POD is divided by uncertainty factors (UF) to arrive at a concentration that is considered a "safe" exposure level without undue risk of non-cancer health effects.  The uncertainty factors are meant to account for toxicokinetic and toxicodynamic differences between experimental animals and humans as well as differences among humans.  Uncertainty factors are also applied for other database deficiencies. In the MOE approach, the estimated exposure is divided into the POD to calculate a Margin of Exposure.  The calculated MOE is then compared to a benchmark MOE, which is the total UF (product of individual UFs).   If the MOE is lower than the benchmark MOE, then the risk is considered unacceptable.  The assumptions are the same in both approaches, namely that animal evidence is relevant to humans unless data counter-indicate, and that uncertainty factors account for toxicokinetic and toxicodynamic differences between species and among humans in response to toxicants, and account for other database uncertainties or deficiencies.

One Committee member found the description of the MOE approach to be confusing. The calculation of each MOE should be straightforward from the information provided in the tables, but currently not enough information is provided. The conversion of PODs into HECs should be shown, with each assumption clearly stated.

The Agency derived MOEs for acute inhalation exposures to 1-BP for both occupational and consumer use.  The Committee noted that the focus on the high-end acute exposure for occupational (95th percentile) and consumer (90th percentile) populations seems appropriate. Risks were identified for most of the acute occupational exposures scenarios (user and non-user alike), even with use of engineering controls (EC).  Similar findings were noted for the 50th percentile exposure estimates.  For the 90th percentile exposure estimates, and for many of the 50th percentile exposure estimates, risks were also identified for acute inhalation consumer

in sensitive populations.  Additional consideration may also be merited for the reproductive and developmental endpoints because data exists in human populations of potential similar reproductive effects, not just in animal studies.  Blando et al. (2009) presented information related to the cases reported in CDC (2008) regarding a clinical case report of a worker receiving medical treatment before and after an incident with 1-bromopropane showing signs, as measured by his urologist, of decreased sperm counts and motility after significant exposure to 1-bromopropane compared to a reproductive clinical assessment of sperm counts taken before the exposure incident.  It should be pointed out that this was a case report and as such is subject to many limitations in interpretation.  In addition, in a review by Ichihara (2005) signs of clinical reproductive effects including azoospermia, oligospermia, and amenorrhea, were described in factory workers exposed to a similar isomer, 2-bromopropane.  Ichihara (2005) also speculated about the potential for 1-bromopropane to be related to infertility problems reported in a NIOSH health hazard assessment conducted by Reh et al. (2002).  As such, these reports may suggest it is reasonable to ask if further consideration should be given to an additional uncertainty factor for developmental and reproductive endpoints.

The MOEs presented in the document based on both monitoring and modeling are mostly well below the benchmark MOEs indicating relatively high risk for non-cancer health effects for almost all the endpoints and exposure scenarios.  Note that the MOEs calculated based on exposure monitoring data were even smaller than the MOEs based on exposure modeling.  The Agency notes that these MOEs indicate that workplace exposures are mostly unacceptable in terms of non-cancer health risk; even with exposures measured after engineering controls were put into place, many of the MOEs were smaller than the benchmark MOE.   The Committee agrees with the Agency's conclusion.

In terms of weaknesses, the uncertainties associated with the exposure assessment and with the dose-response assessment are folded into the risk characterization.  This is one of the limitations of risk assessment. It is clear from the epidemiological literature including case reports and animal studies that 1-BP is neurotoxic.  It is also clear from the toxicological literature that 1-BP is a reproductive and developmental toxicant; this is supported by some evidence in humans. In this document, there were limited data to use to estimate consumer exposures in particular. Thus, those estimates are fairly uncertain.  The data for occupational studies involved both monitoring and modeling and for risk assessment were relatively robust.  The dose-response assessment always involves uncertainty; hence the use of uncertainty factors in the non-cancer risk assessment.  For cancer risk assessment, choice of model to determine the cancer slope factor introduces model uncertainty, and extrapolation from animals to humans always involves some unquantifiable uncertainty.  Nonetheless, overall, the Committee agrees with the Agency that the uses of 1-BP containing materials present high risk of adverse non-cancer and cancer outcomes to workers and consumers.

**Question 5-3**: Please comment on the assumptions, strengths and weaknesses of the approach used to estimate added lifetime cancer risks to workers which EPA/OPPT-derived from an inhalation unit risk based on lung tumors in female mice for estimating incremental or added individual lifetime cancer risk.