**Summary of the facts and opinions to which Tala R. Henry, Ph.D is expected to testify:**

**I.      Summary of Opinions**

In response to the expert opinions offered by Dr. Kathleen Thiessen and Dr. Phillipe Grandjean on the methods for conducting risk assessments, and in particular, the methods for conducting a risk evaluation under the Toxic Substances Control Act (TSCA) based on the currently available scientific evidence, Dr. Henry will testify to the following:

- Dr. Thiessen's report is not a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations, including:

  *1.      Mischaracterization of EPA hazard assessments and dose-response analyses as "risk assessments" and omission to any reference to or discussion of resources available in the public domain that describe the relevant and sound requirements and procedures for conducting a risk evaluation under section 6(b)(4) of TSCA.*

  *2.      There are inadequate or undocumented literature searches and Systematic Review. Literature searches for critical components of a risk evaluation (exposure assessment) appear not to have been conducted; and quality and relevancy reviews, using systematic review methods, for hazard data (animal and human) are not provided to ensure the risk determination is based on the weight of the scientific evidence (WoSE).*

  *3.      The reference dose (RfD) derived by EPA in the document, Fluoride: Dose-Responses Analysis for Non-cancer Effects, has as no relevance to the question of whether the artificial fluoridation of drinking water creates unreasonable risk because it is not fit-for-purpose for a TSCA risk evaluation.*

  *4.      The methodology for determining unreasonable risk is fundamentally flawed because it relies on the statutory framework and assessment methodologies used to review new chemicals substances under TSCA Section 5, which has different risk assessment requirements and findings than for risk evaluations on existing chemicals under TSCA Section 6.*

- Dr. Grandjean's report is not a credible source of evidence for making conclusions regarding unreasonable risks under TSCA due to critical limitations, including:

  *1.      The methodology for determining unreasonable risk is fundamentally flawed because it fails to demonstrate that the key tenets of systematic review were applied to his report and is presented in a manner that suggests biased and pre-conceived conclusions.*

  *2.      The report draws inappropriate and unsupported conclusions. Conclusions in the purported risk assessment conducted are inappropriate because the calculation exercise and the conclusions for making unreasonable*

1



*risk determinations are fundamentally flawed because they rely on a different statutory framework and assessment methodologies that are not fit-for-purpose for a TSCA risk evaluation.*

## II.   Qualifications

Dr. Henry is a toxicologist with over 25 years of technical and managerial experience at the U.S. Environmental Protection Agency (EPA, or "the Agency"). Dr. Henry received a Ph.D. in Pharmacology from the University of Minnesota in 1994 and completed post-doctoral research in Toxicology at the University of Wisconsin in 1996.

During Dr. Henry's 25 years at EPA, Dr. Henry has provided toxicology and risk assessment expertise and guidance, oversight and daily programmatic management to multiple chemical management programs, and leadership of science policy development and implementation across EPA, with other federal agencies and in several international fora. Dr. Henry's most recent toxicology and risk assessment experience at EPA has been in the Office of Pollution Prevention and Toxics (OPPT), which is responsible for implementing the TSCA, including to interpret statutory provisions, develop policy and implementation strategies, and execute the 2016 amendments to TSCA. Since May 2019 Dr. Henry has been the Deputy Director of OPPT and was acting in this position from May 2018 to May 2019.

From October 2013 to May 2018 Dr. Henry was the Director of the Risk Assessment Division (RAD) within OPPT. As Division Director of RAD Dr. Henry provided technical and managerial leadership and oversight for conducting human health and environmental hazard, exposure and risk assessments of new and existing chemicals under TSCA. Dr. Henry was also a senior toxicologist in RAD from April 2006 to July 2009. From July 2009 through October 2013, Dr. Henry served as a senior manager and ultimately the Division Director, of the National Program Chemicals Division (NPCD) within OPPT. Dr. Henry's responsibilities in that position included to lead and oversee development of regulatory and non-regulatory approaches for managing risks of chemicals of high priority to the Agency, including those that pose persistent risks due to past uses (e.g., lead, PCBs, mercury, and asbestos).

During Dr. Henry's tenure in OPPT, she also represented EPA and the United States government in a number of international chemical assessment and management venues, including task forces and expert panels and fora such as the Organization for Economic Cooperation and Development (OECD), the Helsinki Chemicals Forum, and the United Nations Persistent Organic Pollutants Review Committee (POPRC) for the Stockholm Convention.

Dr. Henry has also worked within other EPA offices, including the Office of Water (OW), Office of Research & Development (ORD), and the Region 8 Office in Denver, Colorado. In OW, Dr. Henry was a Senior Toxicologist and the Program Manager/Coordinator of the Chemical Criteria Program. As such, Dr. Henry participated in the technical aspects of Ambient Water Quality Criteria Program. In particular, Dr. Henry provided technical expertise and oversight for implementing the then newly revised, *2000 Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health* and led an effort to revise the *Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms*

2

U.S. EXHIBIT 513.0002

*and their Uses.* These efforts entailed adoption and incorporation of state-of-the-science risk assessment approaches, methods and models and integration of Agency policy and guidelines into the processes for developing national ambient water quality criteria. While in ORD, from 2000 to 2002, Dr. Henry was a Principal Investigator on research projects to characterize endocrine disrupting chemicals and characterize modes of toxic action of reactive chemicals. Dr. Henry provided technical expertise on dioxins, PCBs, and other bioaccumulative compounds to develop Agency-wide ecological risks assessment guidance for these types of chemicals. Research results and applications were presented at professional meetings, in scientific journals and at Agency-sponsored Program/Regional Office meetings, workshops and symposia.

For eight years, from 2004-2012, Dr. Henry was nominated, selected for, and served on EPA's Risk Assessment Forum. The Risk Assessment Forum is a standing committee of senior EPA scientists established to promote Agency-wide consensus on difficult and controversial risk assessment issues and to ensure that this consensus is incorporated into appropriate Agency risk assessment guidance. The Forum assembles Agency risk assessment experts in a formal process to study and report on a range of issues from an Agency-wide scientific perspective. Major Forum guidance documents are developed in accordance with the Agency's regulatory and policy development process and become Agency policy upon approval by EPA's Science Advisor. Risk Assessment Forum products include: risk assessment guidelines, technical panel reports on special risk assessment issues, and peer consultation and peer review workshops addressing controversial risk assessment topics.

Dr. Henry has been an active member of the Society of Environmental Toxicology & Chemistry since 1989 and the Society of Toxicology since 1993. Dr. Henry has served on editorial boards of several scientific journals and as a technical reviewer for several more. Dr. Henry has been a contributing author of numerous peer-reviewed EPA reports related to conducting chemical risk assessments. Dr. Henry has published in peer-reviewed scientific literature on chemical toxicology, chemical risk assessment, application of toxicology and risk assessment within a regulatory context and assessing and improving the reliability and relevance of scientific studies for regulatory decision-making.

Dr. Henry was also one of the primary EPA authors of the response to the petition submitted by the Fluoride Action Network in November 2016. Therefore, much of the technical basis for EPA's response reflect Dr. Henry's expert opinion regarding approaches and methods used in applying scientific evidence within the context of EPA's risk assessment guidance for supporting regulatory decision-making.

Attached to this summary is Dr. Henry's curriculum vitae.

## III.    Overview of Response to Dr. Thiessen's and Dr. Grandjean's Conclusions of Unreasonable Risk under TSCA

Risk assessment is a process that evaluates available scientific information on the properties of an agent and its effects in biological systems to provide an evaluation of the potential harm as a consequence of environmental exposure. On the other hand, the term "risk evaluation" is a specialized term under TSCA. "Risk evaluation" is the process contemplated by TSCA section

3

6(b)(4) for determining whether a chemical substance presents an unreasonable risk of injury to health or the environment under the conditions of use. Congress delegated to EPA the authority to establish, by rule, a specific process to conduct the risk evaluations required by TSCA section 6(b)(4). 15 U.S.C. § 2605(b)(4)(B). Subject to public notice and comment, EPA did promulgate a rule describing the process for conducting risk evaluations under TSCA. Procedures for Chemical Risk Evaluation under the Amended Toxic Substances Control Act (Risk Evaluation Rule) (82 Fed. Reg. 33726 (July 20, 2017). The rule sets forth the risk evaluation process (as discussed in Section IV of this summary), which includes the scientifically accepted tenets of risk assessment, culminating in an ultimate determination of whether a chemical substance presents an unreasonable risk of injury to health or the environment (or a "risk determination") under the conditions of use. Together, the components of EPA's risk assessment process, coupled with the ultimate risk determination, constitute a "risk evaluation" under TSCA. Thus, the term "risk assessment" does not include all aspects of a TSCA risk evaluation as specified under TSCA section 6(b)(4).

Section 26(l)(5) of TSCA requires EPA to develop guidance to assist interested persons in submitting draft risk evaluations (U.S. EPA, 2017). In accordance with TSCA, the guidance shall, at a minimum, address the quality of the information submitted and the process to be followed in developing draft risk evaluations. External parties are encouraged to follow the key factors and risk evaluation process laid out in this guidance to foster predictability and transparency in making a risk determination under TSCA. This guidance incorporates the science requirements of the amended statute, including best available science and WoSE.

Neither Dr. Thiessen nor Dr. Grandjean identify the minimum components that should be included in a TSCA risk evaluation of any chemical substance. Due to these fundamental and significant flaws in approach, neither Dr. Thiessen's nor Dr. Grandjean's conclusion regarding unreasonable risk of neurotoxic effects of fluoride are supported. More specifically, consideration of the WoSE requires the use of a systematic review method that is applied in a manner suited to the nature of the evidence or decision. Scientifically acceptable systematic review methods use a pre-established protocol to evaluate the evidence, including the strengths and limitations of the information used in a risk evaluation. Both Dr. Thiessen and Dr. Grandjean fail to demonstrate that the key tenets of systematic review were applied to their analyses. Based on Dr. Henry's years of experience conducting risk assessments, application of systematic review principles to provide a WoSE for fluoride neurotoxicity is particularly pertinent due to the vast disagreement among learned scholars with regard to this question [(e.g., Tsuji, 2019; Chang, 2019; Thiessen, 2019; Grandjean, 2019). As such, Dr. Thiessen's and Dr. Grandjean's "weight of evidence" assertions are not credible because they fail to demonstrate foundational considerations, such as objectivity and transparency, in the process.

To properly respond to Dr. Thiessen's and Dr. Grandjean's opinions, and to address gaps in the key factors and risk evaluation process they provide, Dr. Henry provides a background on TSCA's statutory requirements for risk evaluations. Dr. Henry then uses EPA's risk evaluation guidance to identify the gaps in the analysis provided by Dr. Thiessen and Dr. Grandjean in

4

reaching a determination of unreasonable risk.  Finally, Dr. Henry offers specific critiques of Dr. Thiessen's and Dr. Grandjean's reports.

## IV.     Background on TSCA Risk Evaluations

In Dr. Henry's experience, most recently within the context of TSCA, changes in legislation and regulation, as well as in science, shape the evolution of requirements associated with conducting risk assessments in general, and to support public policy and regulation. The current methods and approaches of risk assessment, both across EPA and as articulated in TSCA, have been built upon decades of expert development, scientific peer review, refinement, and scientific advances.

> *Risk assessment has become a dominant public-policy tool for informing risk management and the public about the different policy options for protecting public health and the environment. Risk assessment has been instrumental in fulfilling the missions of the U.S. EPA and other federal and state agencies in evaluating public-health concern, informing regulatory and technologic decisions, setting priorities for research and funding, and developing approaches for cost-benefit analyses.*

(National Research Council, 2009).

TSCA describes the requisite components of a risk evaluation, most of which are components of risk assessment as established in National Academy of Sciences (NAS)/National Research Council (NRC) reports and described in EPA guidance.  As required by TSCA, EPA developed a rule to establish the process for conducting risk evaluations under TSCA. 82 Fed. Reg. 33726 (July 20, 2017).  Dr. Henry served as an EPA subject matter expert on risk assessment for the development of this rule.  In this capacity, Dr. Henry guided the development of the Risk Evaluation Rule to build upon existing established methodologies for assessing risk generally and at EPA.  The Risk Evaluation Rule includes the statutorily required components of a risk evaluation, while also including provisions that enable EPA to meet statutory objectives by providing flexibility to adopt expert recommendations from, among others, the National Academy of Sciences (NAS) and by providing an opportunity for public participation and increasing transparency in the risk evaluation process.

The following sections describe the components of and process for conducting risk assessment at EPA and, the unique requirements for conducting risk evaluations under TSCA.  In Dr. Henry's opinion these components are scientifically sound and suitable for informing risk determination by the fact that they are based on accrued experience of the Agency in conducting risk assessments for regulatory purposes, are informed by input and recommendations by various authoritative bodies such as Agency Advisory Committees, the NAS/NRC, and international chemical assessment and management bodies such as the OECD and the World Health Organization.

### A.     TSCA Risk Evaluation Steps

5

### 1.     Scope

The first step of a risk evaluation is the development of the scope.  The scope is a critical step in the process of defining what will be assessed, i.e., the conditions of use, which in turn inform which exposures and hazards need be evaluated. Based on Dr. Henry's work on the petition response from plaintiffs, the condition of use has been identified by plaintiffs as the addition of fluoridation chemicals in public drinking water.  Identification of conditions of use, exposures, and hazards inform the types and quantities of data and types of scientific methods (e.g., models, statistics, etc.) that are necessary to conduct the risk evaluation.

### 2.     Hazard Assessment

As established by the National Research Council (1983), a hazard (or effects[1]) assessment includes two components: hazard identification; and dose-response assessment.  Hazard identification is the determination of whether a particular chemical is or is not causally linked to a particular health effect.  Dose-response assessment is the determination of the relation between the magnitude of exposure and the probability of occurrence of the health effects in question.

This step requires identification, evaluation, and synthesis of information to describe the health effects of individual chemicals or chemical mixtures. In the dose-response assessment, the relationship between the exposure or dose of a contaminant and the occurrence of health or environmental effects or outcomes is assessed. The response assessed might be incidence of some endpoint or outcome or it might describe the magnitude of a response. The approaches employed for these components, including, for example, the level of detail and complexity of quantitative aspects may vary across different risk assessments. Thus, TSCA sections 26(h) and (i) require that all information used in the assessment will be reviewed in a manner consistent with reliance on the best available science and a weight of the scientific evidence approach.

In Dr. Henry's experience information sources that support hazard assessments are most commonly provided by *in vivo* laboratory animal studies.  Hazard assessments are often supported and supplemented with or in vitro laboratory studies, mechanistic or toxicokinetic and toxicodynamic studies using a variety of test systems, including but not limited to high-throughput assays, genomic response assays, data from structure-activity relationships, and other predictive models. When available and of sufficient quality, human epidemiological studies may support the hazard assessment. However, in Dr. Henry's experience, many, if not most, available epidemiological studies document associations between exposures and effects, but are insufficient for causal inference due to their methodological limitations, which limitations are outlined in detail in Dr. Chang's report.

### 3.     Exposure Assessment

---

[1] The hazard assessment may also be referred to as the Effects Assessment in EPA's Guidelines for Ecological Risk Assessment (U.S. EPA, 1998b) and EPA's Framework for Human Health Risk Assessment to Inform Decision Making (U.S. EPA, 2014).

U.S. EXHIBIT 513.0006

An exposure assessment includes information on chemical-specific factors, including but not limited to: physical-chemical properties and environmental fate and transport parameters. An exposure assessment includes some discussion of the size, nature, and types of individuals or populations exposed to the agent, as well as discussion of the uncertainties in this information. Exposure can be measured directly, but in Dr. Henry's experience, it is rare that such data – specific to a particular assessment or all of the exposure scenarios within any given assessment – is available. When data is unavailable it is estimated indirectly through use of measured chemical concentrations in the environment, models of chemical transport and fate in the environment, and estimates of human contact or intake or environmental exposure over time.  TSCA requires that EPA, where relevant, "take into account the likely duration, intensity, frequency, and number of exposures under the conditions of use in an exposure assessment."  15 U.S.C. 2605(b)(4)(F)(iv).

### 4.    *Risk Characterization*

A risk characterization conveys the risk assessor's informed, professional judgment as to the nature and presence or absence of risks, along with information about how the risk was assessed, where assumptions and uncertainties still exist, and where policy choices will need to be made. While TSCA requires that a risk evaluation "integrate and assess available information on hazards and exposures," 15 U.S.C 2605(b)(4)(F), risk characterization is not new or novel to TSCA nor to EPA risk assessments. In 1983, the National Research Council defined risk characterization in the landmark risk assessment report, Risk Assessment in the Federal Government: Managing the Process. Subsequently, in 1995 EPA established an implementing policy, Policy for Risk Characterization (U.S. EPA, 1995) and in 2000 published the Risk Characterization Handbook, a centralized body of risk characterization implementation guidance for Agency risk assessors and risk managers.  Based on Dr. Henry's background in risk assessment, she agrees with and adheres to these procedures.  In Dr. Henry's experience, and in accord with NAS/NRC recommendations and EPA guidance, risk characterization is a key component of all risk assessments – both human health risk assessments and ecological risk assessments.

As defined in TSCA, the risk characterization identifies and assesses uncertainty and variability in each step of the risk evaluation; discusses considerations of data quality such as the reliability; relevance and whether the methods utilized were reasonable and consistent; explains any assumptions used; and discusses information generated from independent peer review. 15 U.S.C. 2625(h). Thus, each component of the risk evaluation (e.g., hazard assessment, dose-response assessment, exposure assessment) has an individual characterization written to carry forward the key findings, assumptions, limitations, and uncertainties. The set of these individual characterizations provide the informational basis to write an integrated risk characterization. The final, overall risk characterization thus consists of the individual component characterizations plus an integrative analysis. Each risk evaluation will quantitatively and/or qualitatively estimate and characterize risk for the identified receptors (human or ecological).

7

U.S. EXHIBIT 513.0007

### 5.   Determination of Unreasonable Risk

Under TSCA section 6(b), EPA must undertake a risk evaluation process to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment. Prior to the 2016 amendments to TSCA, chemical substance risk assessments did not include a determination of unreasonable risk. Instead, the determination of "unreasonable risk" was made as part of the risk management rulemaking process. The amended statute now requires that a risk evaluation include a risk assessment as well as the EPA's determination of unreasonable risk, and, most significantly, requires that this determination be independent of consideration of cost or other non-risk factors.

In its final Risk Evaluation Rule, EPA did not promulgate a definition of unreasonable risk.  This approach was finalized after overwhelming public comment supporting EPA's decision that it would not be scientifically appropriate to define "unreasonable risk" given the uniqueness of each chemical-specific risk evaluation. EPA reasoned that defining specific risk measures for use in all risk evaluations would be inappropriate to capture the broad set of health and environmental risk measures and information that might be relevant to chemical substances. In addition, a single definition would not account for the number of different risk characterization approaches or for changes in the scientific understandings of chemical hazards, exposures and risk.

EPA explained that, in general, it may weigh a variety of factors in determining unreasonable risk. In making this determination, EPA considers relevant risk-related factors, including, but not limited to: the effects of the chemical substance on health and human exposure to such substance under the conditions of use; the effects of the chemical substance on the environment and environmental exposure under the conditions of use; the population exposed (including any potentially exposed or susceptible subpopulations); the severity of hazard (including the nature of the hazard, the irreversibility of the hazard); and uncertainties. EPA takes into consideration the Agency's confidence in the data used in the risk estimate. This includes an evaluation of the strengths, limitations and uncertainties associated with the information used to inform the risk estimate and the risk characterization. The factors EPA may consider are the subject of considerable scientific complexity and policy debate. In Dr. Henry's opinion, Agency deliberations and decisions regarding these types of issues can be informed by a variety of stakeholders through the public comment process and that this is a compelling reason not to have promulgated a rigid and static definition.

### 6.   Public Comment and Peer Review

TSCA requires that EPA publish a draft risk evaluation for the purpose of soliciting public comment. To ensure transparency and to facilitate public participation, EPA announces the availability of the draft risk evaluations in the Federal Register and opens an electronic docket via www.regulations.gov to receive public comment.

U.S. EXHIBIT 513.0008

Additionally, to ensure that the best available science and weight of the scientific evidence are appropriately applied in developing the draft risk evaluations as is required by TSCA section 26, which Dr. Henry describes more fully in the next section, EPA conducts a peer review for each risk evaluation. EPA defines peer review as a documented process for enhancing a scientific or technical work product so that the decision or position taken by the Agency, based on that product, has a sound, credible basis (EPA, 2015). Peer review of risk assessments is neither a new exercise for EPA nor is it novel in light of the 2016 amendments to TSCA. At EPA, peer review of all scientific and technical information that is intended to inform or support Agency decisions is encouraged and expected (EPA, 2015). The goal of peer review is to obtain an independent review of the product from experts who have not contributed to its development. The peer review of draft risk evaluations addresses aspects of the science underlying the assessment – including, but not limited to, the hazard dose-response, and exposure assessments and the risk characterization.

Based on Dr. Henry's experience in developing Agency risk assessments, she believes that public participation and independent scientific peer review are important because they provide opportunity for interested public stakeholders to provide input, including additional data, analysis and interpretations not known to or considered by EPA. Independent peer review by subject matter experts help ensure the quality and integrity of the technical aspects of EPA risk assessments. And, because scientific data and information may be interpreted differently, even among recognized experts, effective public involvement by a variety of stakeholders can enhance the deliberative process. Both types of inputs ensure EPA is transparent, clear, consistent and reasonable, as required by EPA's Risk Characterization Policy and Handbook.

### B.   Scientific Standards

TSCA section 26 requires that EPA decisions based on science are based on the best available science and on the weight of the scientific evidence. 15 U.S.C. 2625(h)-(i). TSCA does not, however, explicitly define either of these terms. Based on Dr. Henry's experience in risk assessments, she believes these factors are important to consider in assessing the risks of chemicals, not only because they are required by the statute, but because by considering these factors adds transparency regarding the evidence and logic incorporated into risk evaluations, which in turn provides the opportunity for meaningful exchange of scientific views and input by experts and interested parties from outside the Agency during peer reviewer. This type of exchange is an integral part of the process to vet scientific assessments.

### 1.   *Reasonably Available Information*

TSCA section 26(k), 15 U.S.C. 2625(k), requires that EPA consider information that is "reasonably available," without defining that term. EPA defines "reasonably available information" to mean information that EPA possesses, or can reasonably obtain and synthesize for use in risk evaluations, considering the deadlines for completing the evaluation. EPA will

9

seek to generally ensure that sufficient information to complete a risk evaluation exists and is available to the Agency prior to initiating the evaluation.

### 2. Best Available Science

Section 26(h) lists factors to consider, as applicable, in employing best available science. These are: (1) the extent to which the scientific information, technical procedures, measures, methods, protocols, methodologies, or models employed to generate the information are reasonable for and consistent with the intended use of the information; (2) the extent to which the information is relevant for the Administrator's use in making a decision about a chemical substance or mixture; (3) the degree of clarity and completeness with which the data, assumptions, methods, quality assurance, and analyses employed to generate the information are documented; (4) the extent to which the variability and uncertainty in the information, or in the procedures, measures, methods, protocols, methodologies, or models, are evaluated and characterized; and (5) the extent of independent verification or peer review of the information or of the procedures, measures, methods, protocols, methodologies, or models.

The best available science requirement is an integral component of section 6 risk evaluations. EPA incorporated a definition of the term (40 CFR 702.33) in the final rule titled "Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act" (82 Fed Reg. 33726 (July 20, 2017))("Risk Evaluation Rule"). The first part of the definition originates from the Safe Drinking Water Act (SDWA) (42 U.S.C. 300f et seq.) and is also included in the EPA's Information Quality Guidance (U.S. EPA, 2002). The SDWA definition was cited by a number of commenters, and EPA agreed this definition, already in use at the Agency, is appropriate. The second part of the definition is taken directly from TSCA section 26(h), which identifies mandatory approaches to fulfilling the science standards under TSCA.

In Dr. Henry's opinion, by basing its definition of 'best available science' on these two sources, EPA is remaining consistent with the current approach already used Agency-wide, while also acknowledging the specific standards under TSCA. The Risk Evaluation Rule defines "best available science" as science that is reliable and unbiased. This involves the use of supporting studies conducted in accordance with sound and objective science practices, including, when available, peer reviewed science and supporting studies and data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data).

### 3. Weight of the Scientific Evidence

The application of weight of the scientific evidence has generated much discussion in the scientific community, in Dr. Henry's experience, she agrees with the National Academies who stated, "because scientific evidence use in weight of the scientific evidence (WoSE) evaluations varies greatly among chemical and other hazardous agents in type, quantity and quality, it is not possible to describe the WoSE evaluation in other than relative general terms." (National

10

Research Council, 2009). Application of weight of the scientific evidence analysis is an integrative and interpretive process. It is more than a simple tallying of the number of positive and negative studies.

There are certain principles of weight of the scientific evidence that are universal, including foundational considerations, such as objectivity and transparency, and the general process. This process starts with assembling relevant information, evaluating the information for quality and relevance, and synthesizing and integrating the different lines of evidence to support conclusions (U.S. EPA, 2016).

With this recognition and understanding and based on public comment requesting transparency, EPA codified a definition of WoSE in the Risk Evaluation Rule to provide transparency regarding the processes for how the Agency reviews scientific information used in risk evaluations. In the Risk Evaluation Rule, EPA promulgated a definition of weight of the scientific evidence as:

> "[w]eight of the scientific evidence means a systematic review method, applied in a manner suited to the nature of the evidence or decision, that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance."

40 CFR 702.33.

This definition of WoSE requires the use of a systematic review method that is applied in a manner suited to the nature of the evidence or decision. The systematic review method must use a pre-established protocol to evaluate the evidence, including the strengths and limitations of the information used in a risk evaluation. EPA's definition is largely based on, and therefore consistent with systematic review as defined by the Institute of Medicine as: "a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies (National Academies of Sciences, 2017). The goal of systematic review methods is to ensure that the review is complete, unbiased, reproducible, and transparent" (Bilotta, 2014).

The principles of systematic review have been developed in the context of evidence-based medicine (e.g., evaluating efficacy of medical interventions tested in multiple clinical trials) (Higgins and Green, 2011) and are being adapted for use across a more diverse array of systematic review questions, using a variety of computational tools. For instance, the National Academies' National Research Council has encouraged EPA to move towards systematic review processes to enhance the transparency of scientific literature review that support chemical-specific risk assessments to inform regulatory decision making (National Research Council,

U.S. EXHIBIT 513.0011

2009). Key elements of systematic review, which EPA has incorporated into its process for risk evaluation under TSCA, include:

- A clearly stated set of objectives (defining the question);
- Developing a protocol which describes the specific criteria and approaches that will be used throughout the process;
- Applying the search strategy criteria in a literature search;
- Selecting the relevant papers using predefined criteria;
- Assessing the quality of the studies using predefined criteria;
- Analyzing and synthesizing the data using the predefined methodology;
- Interpreting the results and presenting a summary of findings (Stephens, *et al.,* 2016).

Because integrating systematic review into the TSCA risk evaluation process is critical to making risk determinations, EPA adopted systematic review principles and developed systematic review methods for conducting the first 10 risk evaluations under TSCA. The roadmap for implementing systematic review is provided in EPA's Application of Systematic Review in TSCA Risk Evaluations, published in May 2018. This document sets out general principles in guiding application of systematic review in the TSCA risk evaluation process and clearly presents a pre-established method and criteria to critically assess the quality of data/information to support TSCA risk evaluations. See Figure 1 below. It is anticipated that systematic review approaches will evolve over time as based on peer review and public comments to EPA's implementation of systematic review to support risk evaluations under TSCA.

In Dr. Henry's experience as the Division Director of the Risk Assessment Division, and supervisor of the primary author of *Application of Systematic Review in TSCA Risk Evaluations* (U.S. EPA, 2018), she agrees with and concludes that this document adheres to the principles and current state-of-the-science related to systematic review.

U.S. EXHIBIT 513.0012



**Figure 1. TSCA Systematic Review Process**

## V. Critical Gaps in Dr. Thiessen's and Dr. Grandjean's Processes for Risk Determination.

### A. Gaps in the Risk Evaluation Steps

#### 1. Scope

While neither Dr. Thiessen's nor Dr. Grandjean expressly identify a scope for their reports, Dr. Henry understands both reports to be offering an opinion of whether developmental neurotoxicity is a hazard of exposure to artificially fluoridated community water in the United States.

#### 2. Hazard Assessment

Based upon Dr. Tsuji's and Dr. Chang's expert review and evaluation of the literature supporting the opinions of both Dr. Thiessen and Dr. Grandjean, the existing animal toxicology and the human epidemiological studies do not provide sufficient evidence to conclude that the recommended drinking water fluoridation level of 0.7 mg/L would cause developmental neurotoxicity in the U.S. population.

U.S. EXHIBIT 513.0013

### 3.    Risk Characterization

Because the "reasonably available information" do not provide sufficient evidence to conclude that the recommended drinking water fluoridation level of 0.7 mg/L would cause developmental neurotoxicity in the U.S. population, it is not possible to integrate information on hazards and exposures into a risk characterization.

### 4.    Public Comment and Peer Review

The information, methods, analyses, and conclusions to the extent they are provided by Dr. Thiessen's and Dr. Grandjean, have not been subject to either public comment or an independent peer review process. While certain pieces of the information and analyses cited were in themselves subject to peer reviews (e.g., studies published in peer reviewed journals), neither expert discusses or presents the strengths, limitations, and uncertainties of these studies. Furthermore, Dr. Thiessen's and Dr. Grandjean do not represent the author's conclusions regarding strengths, limitations and uncertainties associated with the studies relied upon. In addition, as Dr. Tsuji points out, many of the studies relied on are likely subject to publication bias. The opportunities for public comment and independent peer review are important processes that aim to mitigate against these types of biases.

## B.    Gaps in the Scientific Standards

### 1.    Reasonably Available Information

Based on Dr. Tsuji's and Dr. Chang's expert review and evaluation of the body of literature that has been developed since Plaintiffs petitioned EPA for the rulemaking at issue in this litigation, Dr. Henry does not believe that sufficient information is reasonably available at this time to conduct a robust TSCA risk evaluation, which is necessary to determine whether fluoride presents risks for neurotoxicity in humans, especially at concentrations in U.S. drinking water (0.7 mg/L).

## VI.    Comparison of TSCA Risk Evaluations to Other Non-TSCA Risk Assessments

EPA faces regulatory, licensing, and other decisions covering a wide range of environmental issues and pollutants. These decisions are made within a number of EPA program offices, each responding to a unique mixture of statutory responsibilities and authorities, legal precedents, and stakeholders. Congress establishes legal requirements that generally describe the level of protectiveness that EPA regulations must achieve, and, on occasion, Congress imposes specific risk assessment requirements.  In addition, judicial opinions set precedents that can affect how EPA considers assessments of risk. As such, it is to be expected that one EPA program office implementing one particular environmental law to address one particular environmental issue may apply different risk considerations and/or seek different public health protection goals from those in other EPA program offices implementing another environmental law and/or addressing different environmental issues.

14

### A.    Risk Assessment in General

Since EPA's beginning, human health and ecological risk assessment has informed a broad range of regulatory decisions made to protect humans and the environment. In the early days risk assessment was not a formally recognized process. However, the scientific approach and methods employed for risk assessment have evolved and developed considerably over the decades. In developing and refining risk assessment processes, frameworks, and guidance documents, EPA has incorporated recommendations from expert technical panels, internal and external peer reviews, and a number of influential reports from the NAS/NRC. Specifically, in 1983, the NAS published Risk Assessment in the Federal Government: Managing the Process (National Research Council, 1983). In this groundbreaking report, the NAS/NRC defined the steps in risk assessment: (1) hazard identification; (2) dose-response assessment; (3) exposure assessment; and (4) risk characterization and defines these steps as follows:

- Hazard identification: the process of determining whether exposure to an agent can cause an increase in the incidence of a health condition (cancer, birth defect, etc.).

- Dose-response assessment: is the process of characterizing the relation between the dose of an agent administered or received and the incidence of an adverse health effect in exposed populations and estimating the incidence of the effect as a function of human exposure to the agent.

- Exposure assessment: is the process of measuring or estimating the intensity, frequency, and duration of human exposure to an agent currently present in the environment or of estimating theoretical exposure that might arise from the release of new chemicals into the environment.

- Risk characterization: is the process of estimating the incidence of a health effect under the various condition of human exposure described in the exposure assessment. It is performed by combining the exposure and dose-response assessments. The summary effect of the uncertainties in the preceding steps [hazard identification, dose-response assessment and exposure assessment] are described in this step.

EPA has integrated the principles of risk assessment from this groundbreaking report into its practices to this day. In 1984, EPA published Risk Assessment and Management: Framework for Decision Making (U.S. EPA, 1984), which emphasizes making the risk assessment process transparent, describing the assessment's strengths and weaknesses and more fully, providing plausible alternatives with the assessment. Throughout the 1980s and 1990s, EPA issued a series of guidelines for conducting risk assessments, including for mutagenicity (U.S. EPA, 1986a), cancer (U.S. EPA, 1986b), health assessment of mixtures (U.S. EPA, 1986c), developmental toxicity (U.S. EPA, 1991), exposure assessment (U.S. EPA, 1992), reproductive toxicity (U.S. EPA, 1996), and neurotoxicity (U.S. EPA, 1998a). These initial efforts focused on human health risk assessment, but the basic model was adapted to ecological risk assessment in the 1990s.

15

U.S. EXHIBIT 513.0015

Over time, the NAS expanded its risk assessment principles in a series of subsequent reports, including Science and Judgement in Risk Assessment (National Research Council, 1994) and Understanding Risk: Informing Decisions in a Democratic Society (National Research Council, 1996). Included in these reports, NAS placed equal emphasis on fully characterizing the scope, uncertainties, limitations, and strengths of the assessment and on the social dimensions of interacting with decision makers and other users of the assessment in an iterative, analytic-deliberative process. In 2009, NRC published Science and Decisions: Advancing Risk Assessment (National Research Council ,2009). This summary recommends that risk assessment should be viewed as a method for evaluating the relative merits of various options for managing risk. Risk assessment is not as an end in itself, but a means to develop policies that make the best use of resources to protect the health of the public and of ecosystems (National Research Council, 2009). The NRC report implies a greater need for upfront planning of the risk assessment, and the involvement of risk managers, risk assessors, and other stakeholders to determine the risk-management questions that risk assessment should address. NRC also recommended that the technical analyses within the risk assessment should be more closely aligned with the questions to be answered.

In direct response to the 2009 NRC report, EPA developed the Framework for Human Health Risk Assessment to Inform Decision Making (U.S. EPA, 2014) (Framework). This Framework is expected to promote and increase the transparency of the human health risk assessment process at EPA. It highlights the important roles of planning and scoping, as well as problem formulation, in designing a risk assessment that will fulfill a specific need and purpose. Consistent with longstanding EPA policy, it also emphasizes the importance of scientific peer review and public, stakeholder and community involvement.

Risk assessments at EPA are also required to follow the Agency-wide Risk Characterization Policy (U.S. EPA, 1995). The EPA policy calls for all risk assessments performed at EPA to include a risk characterization to ensure that the risk assessment process is transparent; it also emphasizes that risk assessments be clear, reasonable, and consistent with other risk assessments of similar scope prepared by programs across the Agency.

### B.     Integrated Risk Information System (IRIS) Hazard Assessments

The IRIS program, located within EPA's National Center for Environmental Assessment (NCEA) in the Office of Research and Development (ORD), identifies and develops toxicity values for health effects (i.e., hazards) resulting from chronic exposures to chemicals found in the environment.  As described above, risk assessment, as defined by the National Research Council (National Research Council, 1983), is a four-step process. An IRIS assessment includes only the first two steps of the risk assessment process:  Hazard Identification and Dose-Response Assessment.  IRIS toxicity values may be used by EPA's program and regional offices in combination with Exposure Assessments conducted by these offices to characterize potential public health risks (Risk Characterization).  EPA program offices may use toxicity values "as

U.S. EXHIBIT 513.0016

derived" by the IRIS program in conducting risk assessments that meet the requirements of the statutes they implement, or program offices, including OPPT, may leverage parts of the IRIS Program's work (i.e., just the hazard identification and dose-response analysis, but not the RfD or RfC). Whether a program office uses all or part of the IRIS program's scientific analysis generally depends on whether the toxicity value 'in total' or in part is "fit-for purpose" within the statutory/regulatory framework that the risk assessment is being conducted.

In deriving toxicity values for TSCA risk evaluations, like the IRIS program, OPPT generally follows EPA risk assessment guidelines (as described previously). However, EPA/OPPT often may not use the IRIS program toxicity values "as derived." This may be because the IRIS toxicity value does not reflect current reasonably available information (i.e., it is out-of-date). A significant reason OPPT does not use IRIS program RfDs/RfCs is that they are not fit-for-purpose for a TSCA exposure scenario.

OPPT does, however, leverage IRIS program analyses in a variety of ways in developing fit-for-purpose risk evaluations under TSCA. For example, OPPT started with components of the IRIS program's systematic review process (e.g., literature search, screening and key study identification) in developing the TSCA risk evaluation for 1,4-Dioxane (one of the first 10 TSCA risk evaluations). However, OPPT needed to update the literature search and consider data/information that has become available since the IRIS toxicity values were developed. Hence, while leveraging past work by EPA's IRIS program, to meet the requirements of TSCA, OPPT deemed it necessary to apply the TSCA systematic review process and to re-derive an IUR/CSF that incorporated/considered newer information. OPPT has also found it necessary to derive toxicity values as part of TSCA risk evaluations when IRIS toxicity values are not available. For example, to conduct the TSCA risk evaluation for 1-bromopropane (one of the first 10 TSCA risk evaluations), OPPT needed to derive an IUR because the IRIS program has not developed one.

The IRIS program derives RfDs and RfCs for non-cancer toxicity endpoints. In deriving RfDs and RfCs, the IRIS program "incorporates" uncertainty factors (for intra-species, inter-species, etc.) into the toxicity value; that is, the IRIS program decides which uncertainty factors to apply and what magnitude they are assigned and adjusts the point-of-departure (e.g., NOAEL) identified in the dose-response analysis by the uncertainty factors, as follows:

$$RfD \text{ or } RfC = NOAEL \div Uncertainty\ Factors$$

These IRIS program RfDs and RfCs may be used "as derived" in certain program offices to plug into their risk characterization process, to derive a Hazard Quotient, as follows:

$$Hazard\ Quotient = RfD \text{ or } RfC \div Exposure$$

In conducting TSCA risk evaluations, however, OPPT generally uses the Margin-of Exposure (MOE) approach. In this approach, the uncertainty factors are not applied to the point-of-

17

departure (e.g., NOAEL) identified in the dose-response analysis. Rather, an MOE is calculated by comparing (dividing) the point-of departure directly to the expected exposure level,

$$\text{MOE acute or chronic} = \text{NOAEL (POD)} \div \text{Exposure}$$

The MOE is then compared to a benchmark MOE, which is the product of all relevant uncertainty factors. OPPT considers the MOE, relative to the benchmark MOE, in addition to other factors, in determining whether risks are unreasonable under TSCA.

While the mathematical arrangement of terms is different, the general principles of hazard identification and dose-response assessment used by the IRIS program and in TSCA risk evaluation process are generally the same. Nonetheless, under OPPT's approach, the IRIS program toxicity values "as derived" are not fit-for-purpose in a TSCA risk evaluation.

### C.    Maximum Contaminant Level (MCL) Derived under the Safe Drinking Water Act (SDWA)

Contaminants in drinking water are regulated by setting a Maximum Contaminant Level (MCL). Prior to setting the MCL, EPA develops a maximum contaminant level goal (MCLG). The MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. While based on similar scientific approaches, derived from the basic tenets of risk assessment, the process and procedure for deriving an MCLG are different than determining under TSCA whether a chemical presents an unreasonable risk under the conditions of its use.

Under SDWA, the way EPA determines MCLGs depends on the type of contaminant targeted for regulation. For chemical contaminants that are non-carcinogens but can cause adverse non-cancer health effects the MCLG is based on the reference dose. A reference dose (RfD) is an estimate of the amount of a chemical that a person can be exposed to on a daily basis that is not anticipated to cause adverse health effects over a lifetime. First EPA reviews health effects data; however, the procedures and criteria used are not the same systematic review procedures that EPA has more recently developed for TSCA risk evaluations.  To determine the RfD, the concentration for the non-carcinogenic effects from an epidemiology or toxicology study is divided by uncertainty factors, as described previously in the IRIS program section.  This provides a margin of safety for consumers of drinking water. This is an example of where a program office (Office of Water) uses IRIS program values directly. However, Dr. Henry will testify that the current EPA MCLG is not, in fact, derived from an IRIS program RfD; rather, the Office of Water determined their own RfD, as presented in Fluoride: Dose-Responses Analysis for Non-cancer Effects. (U.S. EPA, 2010).

The RfD is then multiplied by body weight and divided by daily water consumption to provide a Drinking Water Equivalent Level (DWEL). The DWEL is multiplied by the relative source contribution (the percentage of total drinking water exposure for the general population, after considering other exposure routes (for example, food, inhalation). These two steps in deriving an

18

MCLG, are significantly different than the exposure assessment and risk characterization steps in a TSCA risk evaluation and reflect fit-for-purpose procedures necessary to implement different statutory and/or regulatory frameworks.

Under the SDWA process, once the MCLG (non-enforceable health goal) is determined, EPA sets a Maximum Contaminant Level (MCL) (enforceable standard), which does consider costs and other non-risk factors. In most cases, the standard is a maximum contaminant level (MCL).

## VII.    Critique of Dr. Thiessen's Report

Dr. Henry will testify that Dr. Thiessen's report is not a credible source of evidence for making conclusions regarding unreasonable risks under the Toxic Substances Control Act (TSCA) due to critical limitations, as described below.

### A.    Mischaracterization of Hazard Assessments and Dose-Response Analysis as "Risk Assessments."

Dr. Thiessen continuously refers to as "risk assessments" Toxicological Profiles developed by EPA's IRIS Program. IRIS assessments provide only the first two steps in a risk assessment – the hazard identification and dose-response assessment. As such, IRIS assessments are hazard/effects assessments only. Thus, any mention in Dr. Thiessen's report of IRIS assessments as risk assessments is a mischaracterization. For example, Dr. Thiessen claims that EPA applied its Guidelines for Neurotoxicity Risk Assessment to 10 risk assessments, while instead citing to 10 IRIS assessments. Dr. Thiessen also incorrectly characterizes the 2011 and 2014 NRC/NAS recommendations to the IRIS program as recommendations on how to conduct risk assessments. This is fundamentally inaccurate. Moreover, Dr. Thiessen inaccurately refers to the fluoride dose-response analysis conducted by EPA in 2010 as a risk assessment, when it contains the hazard identification and dose-response analysis only. Therefore, any conclusions drawn regarding risks that are based on a reference to an IRIS hazard assessment or an EPA dose-response analysis are not accurate or credible.

### B.    Lack of Reference to Requirements for Conducting a Risk Evaluation under TSCA.

Dr. Thiessen's report omitted any reference to or discussion of resources available in the public domain that describe the requirements and procedures for conducting a risk evaluation under section 6(b)(4) of TSCA (See TSCA Statute; Procedures for Chemical Risk Evaluation under the Amended Toxic Substances Control Act (Risk Evaluation Rule) (82 Fed. Reg. 33726 (July 20, 2017)); Guidance to Assist Interested Persons in Developing and Submitting Draft Risk Evaluations Under the Toxic Substances Control Act and Application of Systematic Review in TSCA Risk Evaluations). The Risk Evaluation Rule identifies the requisite steps and data requirements of a risk evaluation process. The additional guidance documents provide transparency about the components that should be included and the processes by which EPA will consider risk evaluations under TSCA. In Dr. Henry's opinion, any expert opinion regarding risk assessment approaches or procedures necessary to support an action under TSCA section 6

19

should consider these available resources and, at the very least, attempt to provide data and information consistent with such guidance. Such an approach is absent from Dr. Thiessen's report. Because EPA's guidance presents the key factors and risk evaluation process necessary to foster predictability and transparency in making a risk determination under TSCA, any conclusion omitting such considerations, including best available science and weight of the scientific evidence, is not credible.

### C.    Inadequate or Undocumented Literature Searches and Systematic Review.

Literature searches for critical components of a risk evaluation (i.e., exposure assessment) do not appear to have been conducted, and quality and relevancy reviews using systematic review methods for hazard data—for both animals and humans—are not provided. Omission of exposure information is a critical limitation because to make an unreasonable risk finding under TSCA, regulations requires all components of a risk evaluation and all streams of evidence to have been systematically reviewed to ensure that risk determinations are based on the Weight of the Scientific Evidence. Not only is a properly conducted systematic review required under TSCA, but, in Dr. Henry's opinion, it is a necessary course of action to demonstrating reliance on the best available science and WoSE.

Additionally, Dr. Thiessen's report focuses primarily on only one component of a risk evaluation, the hazard assessment. Even within this limited domain, Dr. Thiessen's report fails to document that systematic review methods or approaches were applied in reviewing the literature she identifies to support her hazard assessment. Instead, Dr. Thiessen's report focuses on the quantity of studies and does little to address the quality of studies used to make conclusions based on the WoSE.  As such, Dr. Thiessen's ad hoc "weight of evidence" assertion is not credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process.

### D.    Inappropriate Use of RfD Derived by EPA's Office of Water.

In Dr. Thiessen's critique of the RfD derived by EPA (Fluoride: Dose-Response Analysis for Non-cancer Effects (U.S. EPA, 2010)) she refers to the "[c]urrent EPA Reference Dose," which is an RfD derived by EPA's OW for the specific purpose of supporting the development of water quality standards, which has no relevance in the TSCA context because it is not fit-for-purpose for a TSCA section 6 risk evaluation. More specifically, this RfD has no relevance to the question at hand because EPA does not generally use RfDs for TSCA risk evaluations for a variety of reasons.

In the time that has passed since the OW derived their RfD, numerous additional studies of potential fluoride toxicity have been published as documented by Dr. Chang and Dr. Tsuji. Consequently, scientific standards and the WoSE approaches laid out in TSCA section 26 and implementing regulations (Procedures for Chemical Risk Evaluation under the Amended Toxic Substances Control Act (82 Fed. Reg. 33726 (July 20, 2017)) would necessitate that EPA undertake its systematic review process to identify and evaluate not only the data/information

20

that underlies the OW RfD, but also data that has become available since the time the OW RfD was derived. Furthermore, the procedures and methods established in the TSCA statute, regulations, and guidance would need to be applied in order to develop a hazard assessment for a TSCA risk evaluation. Not only are these scientific standards required by statute and regulations under TSCA, but they are generally accepted scientific standards for making risk determinations based on the Best Available Science and WoSE. For these reasons—lack of systematic review, WoSE and, most notably that EPA does not use RfDs in TSCA risk evaluations—the RfDs presented by Dr. Thiessen are irrelevant to a credible risk determination under TSCA.

### E.   Fundamental Flaws in Methodology for Determining Unreasonable Risk.

First, Dr. Thiessen erroneously asserts that EPA has defined unreasonable risk. In fact, EPA did not define unreasonable risk based on overwhelming public comment supporting EPA's position that a static definition of unreasonable risk would be inappropriate to capture the broad set of health and environmental risk measures and information that might be relevant to chemical substances and, as public commenters correctly pointed out, the science of risk characterization is still evolving. Second, Dr. Thiessen asserts several factors EPA considers in determining unreasonable risk. These assertions, however, are based on risk determinations made under Section 5 of TSCA rather than Section 6.

Section 5 of TSCA provides the statutory authority and requirements for assessing and managing new chemicals (i.e., chemicals not currently in commerce). Fluoride chemicals appear on the TSCA inventory, meaning they are existing chemicals as defined by TSCA, and therefore the statutory requirements governing risk evaluation and risk management for fluoride chemicals are those defined in TSCA section 6. Indeed, the plaintiffs' petition for rulemaking specifically requested that EPA take action under TSCA section 6. The framework EPA applies in conducting risk assessments under TSCA section 5, while based on widely accepted fundamental risk assessment principles and the National Research Council's (NRC) risk assessment paradigm, identify methods and assumptions are necessarily different than considerations for actions under section 6 due to: (1) substantial differences in the quantity and types of data typically available for new chemicals; and (2) the short timeframe (i.e., 45 to 90 days) TSCA imposes for completing new chemical reviews including both the assessment and associated risk management. Additionally, Dr. Thiessen's report utilizes the TSCA Section 5 screening analysis, which was designed to support a rapid hazard assessment for the purpose of efficiently binning chemical assessments into those which require additional and often more detailed or refined analysis (for high or moderate hazard chemicals) and those which conservative screening indicate are of low hazard and do not warrant detailed or refined analysis.

This classification scheme is based on dose/concentration values from standardized, guideline animal toxicity tests. As such, the approach was neither intended nor envisioned to be used with human studies. This is because human toxicity data are rarely, if ever, available for new chemicals. In conducting risk evaluations of existing chemicals under TSCA section 6, EPA generally does not deploy rapid screening or 'binning' of a chemical to inform the level of

21

analysis that will be required, but rather EPA performs a much more intensive literature review and systematic review process as described in Application of Systematic Review under TSCA. This more robust process is appropriate in making risk determinations on existing chemicals, like water fluoridation chemicals. Hence, this entire section of Dr. Thiessen's report is flawed in that it claims to support an unreasonable risk determination using risk assessment approaches and a regulatory framework that EPA uses for new chemicals rather than for existing chemicals.

Due to these fundamental and significant flaws in approach, Dr. Thiessen's conclusion regarding unreasonable risk of neurotoxic effects of fluoride are not supported.

## VIII.   Critique of Dr. Grandjean's Report

Dr. Henry will testify that Dr. Grandjean's report is not a credible source of evidence for making conclusions regarding unreasonable risks under the Toxic Substances Control Act (TSCA) due to critical limitations, as described below.

### A.      Inadequate or Undocumented Literature Searches and Systematic Review.

To make risk determinations under TSCA, regulations require all components of a risk evaluation and all streams of evidence to have been systematically reviewed to ensure that risk determinations are based on the Weight of the Scientific Evidence. Not only is a properly conducted systematic review required under TSCA, but it is the necessary course of action when making a risk determination that is based on the Best Available Science and WoSE. Dr. Grandjean claims to have followed the general approaches used and applied by the World Health Organization's International Agency for Research on Cancer (IARC) (IARC, 2006) and EPA when evaluating scientific information, however, Dr. Grandjean's statement is not supported by his presentation of the scientific information, which lacks the key elements of systematic review. For example, Dr. Grandjean stated that his expert report focused on the evidence that "carries the greatest weight"; however, Dr. Grandjean did not describe the principles and methods used, the reliability of the principles and methods, nor how he reliably applied the principles and methods with evaluating or "weighing" the quality, reliability, and relevance of the cited scientific information. Dr. Grandjean also stated that he does not "necessarily cite all reports that may be relevant," which suggests that his review is not be based on sufficient facts or data and that he did not utilize reliable principles and methods that would ensure a comprehensive gathering and evaluation of that information.

Dr. Grandjean summarizes studies on fluoride and childhood IQ testing, but did not state the principles and methods that he used and applied with identifying the cited literature, evaluating the quality of the individual studies, and stating why specific studies were included or excluded from his review.  Dr. Grandjean provides an opinion on fluoride neurotoxicity in humans that he asserts is based on the "weight of epidemiological evidence," however, nowhere in his report is described the methods and criteria he used to review studies or to conduct a weight of evidence analysis.  As such, and as discussed above, Dr. Grandjean's "weight of evidence" assertion is not

22

credible because it fails to demonstrate foundational considerations, such as objectivity and transparency, in the process. Rather, it is Dr. Henry's opinion that Dr. Grandjean selectively cited literature, including data from his own publications, to support biased and pre-conceived conclusions about the neurotoxicity of fluoride.

### B.   Inappropriate and Unsupported Conclusions.

First, Dr. Grandjean twice references the 2006 NRC Report as supporting his assertion that fluoride's predominant benefit to teeth comes from topical contact with the outside enamel, and not from ingestion. The NRC report makes no such conclusion, and in fact explains that is not the consensus on this matter (National Research Council, 2006).

Second, Dr. Grandjean makes conclusions by "[a]pplying methods for standards setting routinely used by EPA," but then applies methods used to derive a Maximum Contaminant Level (MCL) in drinking water, under the Safe Drinking Water Act (SDWA). Not only are the regulatory purpose and statutory framework in which MCLs are applied different than the purpose and framework under TSCA, but the values derived, and the methods used to derive them are necessarily different than conducting a risk evaluation under TSCA. Most notably, the MCL is a concentration in water that must not be exceeded under the implementing framework of the SDWA. In contrast, a TSCA risk evaluation would compare the exposure of humans and the environment (i.e., the dose resulting from exposure to the fluoride), specifically applicable to the condition(s) of use, to the dose of fluoride identified in the hazard assessment to have no adverse effects. Using this comparison, the risk characterization, would indicate the 'margin of exposure, by which the exposures are greater than or less than the no adverse effect levels. The TSCA risk evaluation process results in a risk estimate, rather than an exposure concentration. The risk estimate is then used to make a determination about unreasonable risk under TSCA. Dr. Grandjean's associated calculation exercise and the conclusions for making unreasonable risk determinations are not fit-for-purpose for a risk evaluation under TSCA. Furthermore, Dr. Grandjean's derivation has not been subject to peer review nor public notice and comment – both of which are required components of making a final unreasonable risk determination under TSCA and are scientifically sound processes for making risk determinations based on the best available science and WoSE.

Third, Dr. Grandjean concedes that it is "hard to judge the overall fluoride exposure levels in U.S. populations exposed to fluoridated drinking water" due to paucity of data. Consequently, Dr. Grandjean relies on Canadian data in his analysis. While it is not uncommon to use data derived from non-US populations in conducting risk evaluation under TSCA, it is imperative that such data be evaluated for its relevance to the US population. EPA's application of systematic review under TSCA includes an evaluation domain against which studies are evaluated to judge such relevance [Evaluation domain = Study Participation: Study design elements characterizing the selection of participants in or out of the study (or analysis sample), which influence whether the exposure-outcome distribution among participants is representative of the exposure-outcome

23

distribution in the overall population of eligible persons.]. Given that Dr Grandjean did not conduct a systematic review of the studies he used to support his analysis, there is not enough data or information from which to opine on whether Dr. Grandjean's use of Canadian fluoride levels as representative for the US population is reliable or relevant.

Due to these fundamental and significant flaws in approach, Dr. Grandjean's conclusions regarding the neurotoxic effects of fluoride are not supported.

**References**

Bilotta GS, Milner AM, Boyd I (2014) *On the use of systematic reviews to inform environmental policies.* Environ Sci Pol. 42: 67-77. http://dx.doi.org/10.1016/j.envsci.2014.05.010

Chang, E (2019) Expert Report of Ellen Chang, Sc.D., *prepared on behalf of defendant 01 August 2019*, Food and Water Watch, et al. v. U.S. EPA, Action No. 17-CV-02162, U.S. Federal Court, 95 pp.

Grandjean, P (2019) *Expert report of Philippe Grandjean, MD, DMSc, prepared on behalf of plaintiffs 21 June 2019*, Food and Water Watch, et al. v. U.S. EPA, Action No. 17-CV-02162, U.S. Federal Court, 77 pp.

Higgins JPT and Green S (editors) (2011) *Cochrane Handbook for Systematic Reviews of Interventions* Version 5.1.0. The Cochrane Collaboration. Available from http://handbook.cochrane.org

IARC (2006) *Preamble, IARC monographs on the evaluation of carcinogenic risks to humans, International Agency for Research on Cancer (IARC),* World Health Organization, Lyon, France, 27 pp., available at: https://monographs.iarc.fr/wp-content/uploads/2018/06/CurrentPreamble.pdf (accessed on 28 July 2019)

National Research Council (1983) *Risk Assessment in the Federal Government: Managing the Process.* Washington, DC. National Academies Press.

National Research Council (1994) *Science and Judgment in Risk Assessment.* Washington, DC. The National Academies Press.

National Research Council (1996) *Understanding Risk: Informing Decisions in a Democratic Society.* Washington, DC: The National Academies Press.

National Research Council (2009) *Science and Decisions: Advancing Risk Assessment.* Washington, DC: The National Academies Press.

U.S. EXHIBIT 513.0024

National Research Council (2014) *Review of EPA's Integrated Risk Information System (IRIS) Process*. Washington, DC: The National Academies Press.

National Academy of Sciences (2017) *Application of systematic review methods in an overall strategy for evaluating low-dose toxicity from endocrine active chemicals*. In Consensus Study Report. Washington, D.C.: The National Academies Press.

Stephens MF, Betts K, Beck NB, Cogliano V, Dickersin K, Fitzpatrick S, Freeman J, Gray G, Hartung T, McPartland J, Rooney AA, Scherer RW, Verloo D, Hoffmann S (2016) *The Emergence of Systematic Review in Toxicology*. Toxicological Sciences. 152 (1): 10-16. 2016. DOI: *https://doi.org/10.1093/toxsci/kfw059*

Thiessen, K (2019) *Expert Report of Kathleen M. Thiessen*, PhD, *prepared on behalf of plaintiffs 21 June 2019*, Food and Water Watch, et al. v. U.S. EPA, Action No. 17-CV-02162, U.S. Federal Court, 151 pp.

Tsuji, J (2019) *Expert Rebuttal Report of Joyce Tsuji, prepared on behalf of defendant 01 August 2019*, Food and Water Watch, et al. v. U.S. EPA, Action No. 17-CV-02162, U.S. Federal Court, 57 pp.

U.S. EPA (1984) *Risk Assessment and Management Framework for Decision Making*. EPA 600-9-85-002. https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=20008KTF.txt

U.S. EPA (1986a) *Guidelines for Mutagenicity Risk Assessment*. EPA 630-R-98-003. https://www.epa.gov/sites/production/files/2013-09/documents/mutagen2.pdf

U.S. EPA (1986b) *Guidelines for Carcinogen Risk Assessment*. EPA 630-R-00-004. https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=54933

U.S. EPA (1986c) *Guidelines for the Health Risk Assessment of Chemical Mixtures*. EPA 630-R-98-002. https://www.epa.gov/sites/production/files/2014-11/documents/chem_mix_1986.pdf

U.S. EPA (1991) *Guidelines for Developmental Toxicity Risk Assessment*. EPA 600-FR-91-001. https://www.epa.gov/sites/production/files/2014-11/documents/dev_tox.pdf

U.S. EPA (1992) *Guidelines for Exposure Assessment*. EPA 600-Z-92-001. https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=15263

U.S. EPA (1992) *Framework for Ecological Risk Assessment*. RPA/630/R-92/001/ https://www.epa.gov/risk/framework-ecological-risk-assessment

U.S. EPA (1995) *Policy for Risk Characterization; Science Policy Council Handbook*. EPA-100-B-00-002 https://www.epa.gov/risk/risk-characterization-handbook

U.S. EXHIBIT 513.0025

U.S. EPA (1996) *Guidelines for Reproductive Toxicity Risk Assessment.* EPA 630-R-96-009.
https://www.epa.gov/sites/production/files/201411/documents/guidelines_repro_toxicity.pdf

U.S. EPA (1998a) *Guidelines for Neurotoxicity Risk Assessment.* EPA 630-R-95-001F. 1998.
https://www.epa.gov/sites/production/files/2014-11/documents/neuro_tox.pdf

U.S. EPA (1998b) *Guidelines for Ecological Risk Assessment.* EPA-630-R-95-002F
https://www.epa.gov/risk/guidelines-ecological-risk-assessment

U.S. EPA (2000) *Risk Characterization Handbook.* EPA 100-B-00-002
https://www.epa.gov/sites/production/files/2015-10/documents/osp_risk_characterization_handbook_2000.pdf

U.S. EPA (2002) *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility and Integrity of Information Disseminated by the Environmental Protection Agency.* EPA-260R-02-008 https://www.epa.gov/quality/guidelines-ensuring-and-maximizing-quality-objectivity-utility-and-integrity-information

U.S. EPA (2005) *Guidelines for Carcinogen Risk Assessment.* EPA-630-P-03-001F
https://www.epa.gov/sites/production/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf

U.S. EPA (2010) *Fluoride: Dose-Responses Analysis for Non-cancer Effects.* EPA-820-R-10-018 https://www.epa.gov/sites/production/files/2015-09/documents/fluoride-study-summaries.pdf

U.S. EPA. (2014) *Framework for Human Health Risk Assessment to Inform Decision Making.* EPA/100/R-14/001  https://www.epa.gov/sites/production/files/2014-12/documents/hhra-framework-final-2014.pdf

U.S. EPA (2015) *Peer Review Handbook*, 4th edition. EPA 100-B-15-001.
https://www.epa.gov/sites/production/files/2016-03/documents/epa_peer_review_handbook_4th_edition.pdf

U.S. EPA (2016) Weight of Evidence in Ecological Assessment. EPA-100-R16-001
https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=OSA&dirEntryId=335523

U.S. EPA (2017) *Guidance to Assist Interested Persons in Developing and Submitting Draft Risk Evaluations Under the Toxic Substances Control Act.* EPA-740-R17-001 https://www.epa.gov/sites/production/files/2017-06/documents/tsca_ra_guidance_final.pdf

U.S. EPA (2018) *Application of Systematic Review in TSCA Risk Evaluations.* EPA-740-P1-8001 https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/application-systematic-review-tsca-risk-evaluations

U.S. EXHIBIT 513.0026

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
CALIFORNIA

Case Number: 3:17-cv-02162-EMC

PLTF / DEFT EXHIBIT
NO.___513_____

Date
Admitted:_____

By:_____

Angella Meuleman, Deputy Clerk