TODD KIM
Assistant Attorney General

BRANDON N. ADKINS
PAUL A. CAINTIC
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174 (Adkins)
Tel: (202) 514-2593 (Caintic)
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Paul.Caintic@usdoj.gov

EMMET P. ONG
Assistant United States Attorney
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Tel: (510) 637-3929
Fax: (510) 637-3724
Emmet.Ong@usdoj.gov

*Additional counsel listed in signature block*

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>    Defendants. | Case No. 17-CV-02162-EMC<br><br>**EPA'S RESPONSE TO PLAINTIFFS' CLOSING BRIEF** |

# INTRODUCTION

The Court's inquiry should end at the hazard assessment. The weight of the scientific evidence prevents the Court from deriving a point of departure ("POD") for neurotoxicity. ECF No. 421, at 46:9–17; *cf.* Trial Ex. 102, at 286 (declining to consider immune effects for dose-response analysis because "data are sparse and inconclusive"). To date, the scientific community has uniformly declined to adopt a POD for neurotoxicity. The Risk Sciences International ("RSI") systematic review and Health Canada expert panel concluded that doing so would be inappropriate right now. *E.g.*, ECF No. 421, at 141:4–10, 145:13–18. The NTP draft monograph and meta-analysis authors have not done so. *Id.* at 167:22–25, 168:6–7. And Plaintiffs' risk assessor did not even try to identify and justify a "real" POD from the human data and instead engaged in what-if exercises that would be indefensible for EPA to include in a risk evaluation. *Id.* at 160:9–17. Even the National Research Council 2006 review that Plaintiffs highlight in the first paragraph of their closing brief concluded that the available data were *inadequate to demonstrate a risk for neurotoxicity at 4.0 mg/L*. Undisputed Fact No. 23, ECF No. 385.

Thus, the Court would be the outlier if it derived a POD for neurotoxicity.

It was not EPA's burden at trial to prove the safety of community water fluoridation. Nor is it the Court's duty to determine whether studies foreclose the possibility that water fluoridation is neurotoxic. Rather, it was Plaintiffs' burden to prove by a preponderance of the evidence that fluoride presents unreasonable risk under *the condition of use* at issue—community water fluoridation at a concentration of 0.7 mg/L. 15 U.S.C. § 2620(b)(4)(B)(ii). Not "may present," the standard in other parts of TSCA. *E.g.*, *id.* § 2620(b)(4)(B)(i). But "presents." Plaintiffs failed to carry that burden. And the Court therefore must grant judgment for EPA.

## I.     HAZARD IDENTIFICATION

Although Plaintiffs devoted nearly three pages of their brief to "hazard identification," it is undisputed that IQ decrements are a potential hazard of fluoride exposure (at some dose). EPA addresses Plaintiffs' incorrect contentions regarding "EPA's rebuttal on Hazard." Pls.' Br. 2–3.

*First*, EPA and its experts have not "disavowed" their positions on the hazard identification step. *Id.* In fact, EPA's proposed fact #87 contends that IQ decrements are a potential hazard of

1  fluoride exposure. *See* ECF No. 421, at 56:1–2; *see also id.* at 46:9–12.

2  Plaintiffs' claim that EPA "disputes" a conclusion by the National Research Council that fluoride interferes with the brain in animal studies is a dramatic overstatement. Pls.' Br. 2–3 (citing ECF No. 421, at 6:14–19). EPA explained that "there is some support" and "also several contravening statements" in the authority cited and noted that Plaintiffs omitted Dr. Barone's full explanation of his opinion—that is, that the animal studies in the report "were generally higher dose than what we're talking about here under the petition." ECF No. 421, at 6:28–7:2.

Plaintiffs' claim that EPA "disputes" that animal data support the biological plausibility of fluoride causing neurotoxic effects in humans is another overstatement. Pls.' Br. 2–3 (citing ECF No. 421, at 45:21–25). EPA agrees that animal data *support* the biological plausibility of fluoride causing neurotoxic effects in humans. Trial Tr. 1448:17–23. But Plaintiffs overreach by concluding there is no dispute that neurotoxicity is a biologically plausible effect of fluoride exposure in humans. That conclusion is contravened by NTP. ECF No. 421, at 45:25–46:2.

Plaintiffs claim that EPA "disputes" that the NTP draft monograph establishes hazard identification for fluoride neurotoxicity. Pls.' Br. 2–3 (citing ECF No. 421, at 13:12–15). This is again a dramatic overstatement. Plaintiffs' proposed fact #33 consists of seven subparts labeled A through G. EPA disagreed with Plaintiffs' use of selective citations or misquotations and endeavored to clarify and context to Plaintiffs' black-and-white characterizations of the science. EPA explained in its rebuttal of proposed fact #33 that it disputed "several subparts to this proposed fact . . . including whether they support a hazard identification." ECF No. 421, at 13:15–16. EPA then provided specific rebuttals with record citations to each subpart.

*Second*, EPA does not ask the Court to ignore "adverse data." *See* Pls.' Br. 3. EPA has not asked the Court to ignore any studies or even suggested so much. Quite the opposite: during trial, EPA showed the Court full tables of results from studies to refute Plaintiffs' repeated cherry-picking of results only favorable to their position. *E.g.*, Trial Tr. 1295:24–1296:8. And EPA's experts offered an objective evaluation of the strengths and relevancy of the scientific evidence. For example, EPA explained—consistent with Dr. Howard Hu's testimony—that *virtually all* the studies NTP considered in the draft monograph are not generalizable to the United States—no

1  matter if they were "high" or "low" quality—because they were conducted in culturally
2  disanalogous countries like China, India, Iran, and Pakistan. ECF No. 421, at 14:20–15:2, 17:9–
3  19. Relatedly, Dr. Savitz explained why the results of recent developmental neurotoxicity studies
4  like Cantoral (2021), Dewey (2023), Godebo (2023), and Till (2020) are overall null. Plaintiffs
5  offered no argument to contradict these findings. Pls.' Br. 3 (citing ECF No. 421:35:14–16, 92:27–
6  28, 95:24, 213:3–4). But more importantly, taken together in the weight-of-the-scientific-evidence
7  analysis, the prospective birth cohort studies—ELEMENT, MIREC, OCC, and INMA—do not
8  support an association between maternal fluoride exposure and child IQ overall. The findings of
9  adverse effects in the ELEMENT study have not been replicated. ECF No. 421, at 58:21–59:28.

10  *Third*, Plaintiffs' contention that EPA "cherry-picks from NTP's eTables 4 and 5" is plainly
11  wrong. Plaintiffs confusingly raise this critique under "hazard identification," even though the
12  meta-analysis relates to the dose-response assessment. *E.g.*, *id.* at 155:21–156:2, 156:9–16,
13  156:24–157:10, 159:1–9. In any event, the eTables refute Plaintiffs' sweeping assertions that
14  fluoride exposure and cognitive outcomes have a linear relationship. When the NTP authors
15  restricted the results to lower exposure tiers, there was *no* consistency in model fit. *Id.* at 155:21–
16  22. In fact, linear and non-linear models often had comparable fit. *Id.* at 26:15–18. And that is not
17  just based on the data; *it is also what Plaintiffs' expert Dr. Thiessen testified to at trial*. *See id.*

18  Besides trying to distance themselves from their risk assessor's testimony, *see* ECF
19  No. 426, at 3 n.3, Plaintiffs now complain that EPA somehow did not "acknowledge[] NTP's own
20  conclusions on the 'best model fit.'" Pls.' Br. 3. Plaintiffs again overreach. The page of the draft
21  meta-analysis that Plaintiffs cite states that *non-linear* models had the best fit for drinking water
22  exposures. Trial Ex. 68, at NIEHS_000389. The authors state that the linear model was the best fit
23  for urinary fluoride exposures but—consistent with Dr. Thiessen's testimony—there were only
24  "small difference[s] in AICs between the different models." *Id.* And the BSC working group
25  explained that there are "very few data points" in the low-dose range, which "reduc[es] confidence
26  in this range of exposure." ECF No. 421, at 26:11–13, 155:12–14. Even so, when restricted to low-
27  risk-of-bias urinary fluoride studies, even the linear model found no statistically significant adverse
28  effect in the <2 mg/L, <4 mg/L, and "all data" groups. *Id.* at 26:21–23, 26:25–27. Several other

record citations also contradict Plaintiffs' contention that fluoride exposure and IQ outcomes have a linear relationship. *See id.* at 23:12–24:10, 146:6–17, 146:27–147:9, 147:16–18 (ELEMENT and MIREC data); *id.* at 24:16–21, 143:22–144:10 (RSI authors' conclusions); *id.* at 25:4–23, 49:12–23, 152:25–153:2 (Dr. Grandjean's BMCL).

## II.     DOSE-RESPONSE ANALYSIS

At closing argument, EPA explained why Dr. Grandjean's 2023 BMCL is not a legitimate POD. First, the BMCL does not reflect best available science, which TSCA requires, because it presumes linearity and cherry-picks data. Second, the weight of the scientific evidence does not support deriving a POD. Third, the BMCL is a urinary fluoride value. EPA does not regulate pregnant women's urine, and Plaintiffs proffered no reliable method for the Court to derive an intake value for the condition of use (community water fluoridation) from urine.

Plaintiffs attempt to resuscitate Dr. Grandjean's 2022 BMCL by pointing to EPA's selection of a model in the HBCD risk evaluation. Pls.' Br. 4 (citing ECF No. 421, at 152:9–23). This argument splits hairs on an irrelevant issue. Nor did Plaintiffs explain (or elicit testimony at trial) the reasons for EPA's HBCD model selection and why it supports Dr. Grandjean's selection. And Plaintiffs' argument that the two models Dr. Grandjean considered had comparable fit contradicts the portion of their brief where they try to downplay their expert's testimony that many linear and non-linear models considered in the NTP draft meta-analysis had "comparable fit." *Id.* at 3. Plaintiffs—without record support—try to recast the piecewise models in Dr. Grandjean's BMCLs as "non-linear." *Id.* at 4. That is nonsense. Even Dr. Grandjean's papers called them linear. *See* ECF No. 421, at 25:16–23.

The scientific community has uniformly concluded the data are not ready to derive a POD for neurotoxicity. The NTP's and RSI's conclusions are not "to the contrary." Pls.' Br. 4–5. It was arbitrary for NTP to select 1.5 mg/L as a dividing line when communicating their findings. ECF No. 421, at 105:21–25. In fact, 1.5 mg/L is based on the World Health Organization guideline for fluorosis, not any observation of a NOAEL or LOAEL for neurotoxicity in the data. *Id.* at 200:4–8. In addition, the NTP draft monograph does not reflect all the recent studies. *Id.* at 103:21–28. And the meta-analysis shows no adverse effect in the 1.5 mg/L water fluoride range. *Id.*

      Plaintiffs wrongly assert that RSI selected 1.5 mg/L as an "alternative" POD for neurotoxicity. Pls.' Br. 4. RSI used no such language. ECF No. 421, at 51:4–18. Rather, RSI and the Health Canada panel concluded that significant uncertainty prevented deriving any POD for neurotoxicity. *Id.* at 141:4–10, 145:13–18. Instead, RSI identified a POD for dental fluorosis. *Id.* at 117:1–2, 117:13–22. Because Plaintiffs showed no harm in the form of dental fluorosis from community water fluoridation, this Court lacks Article III jurisdiction to set a POD based on that outcome.

      Finally, Plaintiffs seize on a single word in EPA's rebuttal statement that the hazard level could be anywhere from 2 mg/L to "infinity." Pls.' Br. 5. EPA's rebuttal statement merely explained that Plaintiffs' proposed fact was not supported by evidence and quoted Dr. Barone's testimony that there may be neurotoxic effects "somewhere above 2 parts per million"—meaning the hazard could be anywhere above 2 mg/L. ECF No. 421, at 52:18–22.

## III.   RISK CHARACTERIZATION

      There is an insufficient basis to reach the risk characterization step. *Id.* at 196:2–6. Even if the Court did, however, EPA has always used a margin of exposure analysis for noncancer risks under TSCA, and Plaintiffs failed to conduct any such analysis based on the human data. *Id.* at 196:10–15, 196:25–197:2, 197:5–7, 197:13–14, 199:16–18. For example, Plaintiffs failed to derive a hazard level *by body weight* (mg/kg/day) to match the units for exposure levels. *Id.* at 138:14–17, 160:25–27, 179:11–16, 180:12–19, 197:17–22, 207:3–10. Instead, Plaintiffs invite the Court to ignore how EPA has characterized noncancer risk in *every risk evaluation under TSCA*, *id.* at 179:11–16, and instead simply apply "a factor of 10 of the exposures generated by the condition of use." Pls.' Br. 5. The Court should decline to do so.

      Plaintiffs claim that EPA "seeks to erase" what benchmark margin of exposure should apply to fluoride neurotoxicity. Pls.' Br. 5 (citing ECF No. 421, at 190:14–191:7). The Court need not even reach this issue. In any event, EPA's rebuttal explains how benchmark margins of exposure are identified; that Plaintiffs have not identified an appropriate POD, making selection of uncertainty factors for a specific POD impossible; and provides more record citations for Dr. Barone's testimony on the topic. *See* ECF No. 421, at 190:26–191:7.

| | |
|---|---|
| Date: March 22, 2024 | Respectfully Submitted, |
| | TODD KIM |
| | Assistant Attorney General |
| | |
| | */s/ Brandon N. Adkins* |
| | BRANDON N. ADKINS |
| | PAUL A. CAINTIC |
| | United States Department of Justice |
| | Environment & Natural Resources Division |
| | P.O. Box 7611 |
| | Washington, D.C. 20044 |
| | Tel: (202) 616-9174 (Adkins) |
| | Tel: (202) 514-2593 (Caintic) |
| | Fax: (202) 514-8865 |
| | Brandon.Adkins@usdoj.gov |
| | Paul.Caintic@usdoj.gov |
| | |
| | ISMAIL J. RAMSEY |
| | United States Attorney |
| | |
| | MICHELLE LO |
| | Chief, Civil Division |
| | |
| | EMMET P. ONG |
| | Assistant United States Attorney |
| | 1301 Clay Street, Suite 340S |
| | Oakland, California 94612-5217 |
| | Tel: (510) 637-3929 |
| | Fax: (510) 637-3724 |
| | Emmet.Ong@usdoj.gov |
| | |
| | *Attorneys for Defendants* |