```
 1                              Volume 9

 2                              Pages 1388 - 1466

 3                  UNITED STATES DISTRICT COURT

 4                  NORTHERN DISTRICT OF CALIFORNIA

 5      Before The Honorable Edward M. Chen, Judge

 6      FOOD & WATER WATCH, INC., ET   )
        AL.,                          )
 7                                     )
                  Plaintiffs,          )
 8                                     )
          VS.                          )     NO. 17-CV-2162
 9                                     )
        UNITED STATES ENVIRONMENTAL    )
10      PROTECTION AGENCY, an agency   )
        of the United States, ET AL.,  )
11                                     )
                  Defendants.          )
12      _____)

13                              San Francisco, California
                                Tuesday, February 13, 2024
14
                   TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
15
        APPEARANCES:
16
        For Plaintiffs:
17                              WATERS KRAUS & PAUL, LLP
                                222 N. Pacific Coast Highway, Suite 1900
18                              El Segundo, California  90245
                           BY:  MICHAEL P. CONNETT
19                              CHARLES ANDREW WATERS
                                ATTORNEYS AT LAW
20

21

22          (Appearances continued next page.)

23      REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
                      Official U.S. District Court Stenographer
24

25
```

1   **APPEARANCES (Continued):**

2   For Defendants:
                            UNITED STATES DEPARTMENT OF JUSTICE
3                           Environmental Defense Division
                            601 D Street, NW, Room 8814
4                           Washington, DC  20004
                    BY:   **BRANDON N. ADKINS, ATTORNEY AT LAW**
5
                            UNITED STATES DEPARTMENT OF JUSTICE
6                           1301 Clay Street, Suite 340-S
                            Oakland, California  94612
7                   BY:   **EMMET P. ONG, ATTORNEY AT LAW**

8                           UNITED STATES DEPARTMENT OF JUSTICE
                            Environmental Defense Division
9                           150 M Street, N.E.
                            Washington, D.C.  2002
10                  BY:   **PAUL CAINTIC, ATTORNEY AT LAW**

11
        **ALSO PRESENT:**          DANIEL DePASQUALE, EPA
12                          JAY SANDERS (trial tech)
                            DANNY HAMBRICK (trial tech)
13

14                              --oOo--

15

16

17

18

19

20

21

22

23

24

25

```
1

2    Tuesday, February 13, 2024 - Volume 9

3
     DEFENDANTS' WITNESSES                              PAGE   VOL.
4

5    BARONE, STANLEY
     (PREVIOUSLY SWORN)                                 1395    9
6
     Direct Examination resumed By Mr. Adkins:          1395    9
7    Cross-Examination By Mr. Connett:                  1424    9
     Redirect Examination By Mr. Adkins:                1457    9
8

9

10

11

12                             --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

 1   <u>Tuesday - February 13, 2024</u>                                <u>8:31 a.m.</u>

 2                       P R O C E E D I N G S

 3                            --oOo--

 4        (In open court.)

 5             **THE CLERK:**  Court is calling the case Food & Water

 6   Watch, Inc. versus EPA, Case No. 17-2162.

 7             Counsel, please state your appearance for the record

 8   beginning with the plaintiff.

 9             **MR. CONNETT:**  Good morning, Your Honor; Michael

10   Connett on behalf of plaintiffs.

11             **THE COURT:**  All right.  Good morning, Mr. Connett.

12             **MR. WATERS:**  Also Andy Waters for the plaintiffs, Your

13   Honor.

14             **THE COURT:**  Thank you, Mr. Waters.

15             **MR. ADKINS:**  Good morning, Your Honor; Brandon Adkins

16   for the defendants.

17             **THE COURT:**  All right.  Good morning, Mr. Adkins.

18             **MR. ONG:**  Good morning, Your Honor; Emmet Ong for the

19   defendants.

20             **THE COURT:**  Good morning, Mr. Ong.

21             **MR. CAINTIC:**  Good morning, Your Honor; Paul Caintic

22   for the defendants.

23             **THE COURT:**  All right.  Thank you, Mr. Caintic.

24             Two things before I forget, procedural matters.  You

25   have both used demonstratives, which are, of course, not in

PROCEEDINGS

1   evidence, but it would be useful for the Court, as it's

2   reviewing the testimony, to have those available.  So if you

3   could make sure those are lodged or somehow given to Vicky in

4   case I need to look at it.

5           MR. ADKINS:  Yes, Your Honor.

6           THE COURT:  Okay?

7           And then let's talk about the post-trial briefing

8   schedule.  So I've decided I'm not going to drag you guys out

9   here.  We can do this by Zoom.  But I assume you will want to

10  file some posttrial briefs; is that a fair assumption?

11          MR. ADKINS:  If it would assist the Court, then

12  certainly, yes.

13          I think it would be helpful to know -- we understood

14  that Your Honor would provide some questions that you had

15  focused on throughout the trial?

16          THE COURT:  Yeah.  I'm going to do that.

17          MR. ADKINS:  It would be helpful to understand those

18  first.

19          THE COURT:  Maybe I should wait and see how the

20  argument -- if my answers -- if my questions are answered in

21  the process of hearing oral argument.  Maybe I won't need

22  briefing because I do -- I assume I will get your final revised

23  findings of fact, conclusions of law.  I appreciate the two

24  iterations that you filed, but once today's over, it would be

25  useful to have that as well.

PROCEEDINGS

1    Why don't we reserve that question.  I may ask for
2 some additional select briefing; and if I do, I'll probably
3 want that.  I know some of you have trial and stuff, but I
4 would like that on a fairly expedited basis because as time
5 goes on, memory fades, and I want to do it while it's still
6 kind of fresh.
7    MR. ADKINS:  When would you like the final iteration
8 of the proposed findings of fact?
9    THE COURT:  Well, can you have it by the end of
10 Thursday?
11    MR. ADKINS:  This Thursday?
12    THE COURT:  Yeah.
13    MR. ADKINS:  May I ask for Friday?  I think a lot of
14 our team is going to be flying back on Wednesday --
15    THE COURT:  Okay.
16    MR. ADKINS:  -- so it's a bit of a burn day for us.
17    THE COURT:  If I can get that not at 6:00 in the
18 evening on Friday but, you know, 1:00 or something like that,
19 Western Time, Pacific Time.
20    MR. ADKINS:  Yes, Your Honor.
21    MR. CONNETT:  That works.
22    THE COURT:  That would be useful.  And that will help
23 me prepare for the argument.
24    The other thing is timing-wise.  According to the
25 clock, I think you -- the plaintiffs, after I gave additional

 1    time, has I think -- Vicky, is it an hour and 31 minutes?

 2          THE CLERK:  Correct, Your Honor.

 3          THE COURT:  And the defense has like 46 minutes or

 4    something like that?

 5          THE CLERK:  8.

 6          THE COURT:  48.  So what I'm going to do is give you

 7    the benefit of having the exact same time left as the

 8    plaintiffs, so I'm going to add another 40-something minutes to

 9    yours, so you can complete the testimony here, and that should

10    leave, you know, I don't know, 45 minutes to an hour each for

11    closing -- for argument, which should be plenty.

12          MR. ADKINS:  Thank you.

13          THE COURT:  So -- and then we have the video for the

14    last testimony that I'm going to hear.  You don't need to be

15    here, court reporter doesn't need to be here, I'm just going to

16    watch that.  So I guess we'll just complete the testimony of

17    Dr. Barone, right?

18          MR. ADKINS:  That's correct.

19          THE COURT:  Okay.

20          MR. ADKINS:  Thank you.

21          THE COURT:  Well, let's go ahead and pick up where we

22    left off, see if I can get my computer fired up here.

23      (Brief pause.)

24          THE COURT:  Okay.  Good morning, Dr. Barone.  Welcome

25    back.

 1           **THE WITNESS:**  Good morning.

 2           **THE COURT:**  All right.  So you may continue,

 3    Mr. Adkins.

 4           **MR. ADKINS:**  Thank you, Your Honor.

 5           (Previously sworn.)

 6              **DIRECT EXAMINATION**   (resumed)

 7    BY MR. ADKINS:

 8    **Q.**   Dr. Barone, home stretch.

 9    **A.**   Yes.

10    **Q.**   So yesterday, just to get us repositioned here, we were

11    discussing Dr. Thiessen's example points of departure and we

12    went through the two water fluoride concentrations that she

13    identified.  And now I'd like to talk to you about the --

14    Dr. Grandean's BMCL, his first BMCL of 0.2 milligrams per liter

15    urinary fluoride, okay?

16    **A.**   All right.

17    **Q.**   So before we get into the specifics of the BMCL, just an

18    over -- or a generalized question.  Are there any defensible

19    ways to reverse engineer from a urinary fluoride concentration

20    to a fluoride intake value?

21    **A.**   Not at this time.

22    **Q.**   There are no defensible ways presented in this case you

23    mean?

24    **A.**   Not in this case at all.

25    **Q.**   And just kind of pulling out from the evidence that's been

1  presented here generally, are there any defensible ways that

2  one could extract an intake value from a urinary fluoride

3  concentration?

4  **A.**    There is.  And this was discussed at my deposition as

5  well.  So for other compounds like lead, mercury, we've

6  actually used PBPK models to be able to take a dose metric,

7  either in blood or hair or fingernails, integrated measures of

8  exposure to back-calculate and reverse engineer the actual

9  intake level for different media in order to determine what

10  course to take in setting regulatory values for lead and

11  mercury respectively -- methyl mercury.

12  **Q.**    A PBPK model stands for physiologically-based

13  pharmacokinetic model, correct?

14  **A.**    It does.

15  **Q.**    Okay.

16  **A.**    It does.

17  **Q.**    And are there any -- are you aware of whether there are

18  any PBPK models for fluoride intake?

19  **A.**    There are.  There are a couple of PBPK models for

20  fluoride.  I mentioned this to the plaintiffs during my

21  deposition, both of them published 30, 40 years ago, if I

22  remember.  I think the last publication might have been 20

23  years ago.

24      Neither of them actually incorporate pregnancy.  Neither

25  of them incorporate bone mineralization or demineralization.

1   They don't incorporate kidney function to the degree of

2   pregnancy output, and they don't include the fetal compartment.

3   **Q.**   And Dr. Barone, you mentioned that there have been PBPK

4   models for lead, right?

5   **A.**   Yes, I did.

6   **Q.**   Are you familiar with how EPA has used PBPK models for

7   lead?

8   **A.**   Generally, yes.

9   **Q.**   Could you explain that for the Court, please.

10  **A.**   There are actually a couple variations.  There's an animal

11  PBPK model, there's human PBPK models.  There's two different

12  versions of the human PBPK model that have been used for

13  different purposes for different media to help in getting to

14  intake levels in media levels.

15  **Q.**   Has EPA used a PBPK model to calculate an intake value

16  based on a bio measure?

17  **A.**   Yes.  Yes.  They've -- we've used the PBPK models to go

18  from blood lead levels in children to an intake level either in

19  water or in air or in dust; soil as well.

20  **Q.**   And so in the nearly four years since the first trial in

21  this case, plaintiffs still have not performed a PBPK model to

22  extract a urinary fluoride value to an intake value, right?

23  **A.**   No, they haven't.

24       **MR. ADKINS:**  So, Your Honor, I'd like to turn to

25  aggregate exposures unless Your Honor has any questions on this

1    point.

2         THE COURT:  No.  Well, I do have one question.  I

3    notice in the Monograph, there's a cite to -- I guess it's the

4    Till study or something, and it says that there is a linear

5    relationship between intake and urinary flow or urinary

6    concentration.  Do you disagree with that?

7         THE WITNESS:  I do vigorously.  Again, it depends upon

8    what level you're talking about whether there's linearity or

9    not.

10        And as I was discussing yesterday, when you get to

11   higher levels, concentration levels, you get to a linear

12   portion of the curve where at least the ratio of urine-to-water

13   levels are in the linear range.  But it's really problematic as

14   we get to the lower concentration ranges where we have flux and

15   a high degree of variability in the urine-to-water intake

16   levels.  And by that I refer to the references of Thippeswamy

17   in particular; but also, if you look at the slopes of the Till

18   data, you can tell there's something different going on as you

19   get to higher concentrations and you get to the higher

20   percentiles.

21        THE COURT:  Well, the slopes that you looked at

22   yesterday were simply the urinary levels of fluoride and

23   fluoride -- nonfluoride areas at the 50th, 75th and 95th

24   percentile.  I don't know if that tells you about what the

25   relationship is because it depends on how much intake -- part

 1  of that depends on how much water is truly taken in by 95th

 2  percentile --

 3            THE WITNESS:  Right.

 4            THE COURT:  -- in the fluoride area versus nonfluoride

 5  area.  I don't know if it's apples to apples.  I don't know if

 6  that has a slope that you can directly compare.

 7            THE WITNESS:  It's not the total answer and, again,

 8  that's why would you want a PBPK model, to get more precision

 9  to control for excretion.  But the slopes suggest that, at

10  least at the higher levels, you've got something

11  physiologically different going on.

12            Again, the intake levels are going to be increasing in

13  both groups, you know.  In the 95th percentile women are -- the

14  assumption is, the intake level is close to -- close to 3

15  liters per day.  So other things -- holding other things equal,

16  there's something else going on physiologically, and the most

17  parsimonious explanation is, it's kidney function and probably

18  saturation kinetics.

19            THE COURT:  Kidney functions at higher intake levels

20  are going to vary differently?

21            THE WITNESS:  You're reaching a saturation at those

22  higher intake levels of what the kidney output can actually

23  handle.  When you're talking about the -- you're talking about

24  fluoride, higher fluoride levels.

25            THE COURT:  Okay.  But that slope changes at the

1  higher consumption levels.  It seemed like at the 50th and then

2  in the 75th percentile, they seemed kind of proportionate just

3  looking at a rough --

4        THE WITNESS:  50 to 75th, they're closer --

5        THE COURT:  Yeah.

6        THE WITNESS:  -- in slope.  It's the 75th to the 95th

7  percentile where things -- where the slopes seem to --

8        THE COURT:  Right.

9        THE WITNESS:  -- depart from one another.

10       THE COURT:  So how does that square with -- I thought

11  your comment earlier was that at high levels that's where you

12  see linearities.  At the lower level you're not here -- you're

13  looking -- it seems there's proportionality or perhaps implied

14  linearity at the sort of 50th -- the lower level.  It's when

15  you from 75 to 95 that it looks like there's something going on

16  there.

17       THE WITNESS:  So, again, when we're talking about the

18  Till study and we're talking about the Green and the other

19  cohort studies, we're talking about that lower-dose range, the

20  concentrations from 0 to 1.5 kind of area.

21       When we look at Thippeswamy, that break point in the

22  two -- between the low-dose region and the high-dose region,

23  they're suggesting from the biomarker data that there's really

24  below 1 a lack of linearity.  There's something different going

25  on below 1 ppm.

1           THE COURT:  And that's below 1 ppm in the intake?

2           THE WITNESS:  Intake.

3           THE COURT:  And the -- remind me again, you just

4     mentioned that the cohort study, the Till and the Green, the

5     lower range were from -- what was the range there?

6           THE WITNESS:  The range, off the top of my head, is

7     around .8 is I think the median for the -- for the fluoridated

8     group.

9           THE COURT:  Okay.  So from what you can tell, the

10    linearity or nonlinearity problem according to Thippeswamy is

11    when you get below 1 parts per million, the curve doesn't seem

12    to be --

13          THE WITNESS:  That is my interpretation from looking

14    at that data and looking across water intake, serum, mother's

15    serum, to urine, maternal urine, and then there's also

16    umbilical cord data as well.

17          THE COURT:  Okay.  But above 1 part per million, the

18    Thippeswamy study seemed to show rough linearity?

19          THE WITNESS:  Roughly a linear relationship between

20    urine and maternal water intake.

21          THE COURT:  And if you have that kind of linearity,

22    let's say in that upper range, can you imply -- I know it's not

23    precise because you don't have the PB --

24          THE WITNESS:  PBPK.

25          THE COURT:  -- PBPK, but can you -- you know, if

1  somebody has a concentration, if the concentration is 1.5, for

2  instance, does that imply that the intake is roughly in that

3  range too?

4         THE WITNESS:  It's very uncertain.  The

5  relationship -- there's an association, but the relationship is

6  not equal.  It's not one-to-one.

7         THE COURT:  So what can you infer if you know there's

8  linearity, you just know the change -- the change is going to

9  be -- the amount of change will be roughly the same, but you

10 don't know what the absolute value will be?

11        THE WITNESS:  That's correct.  That's correct.

12        And again, that precision -- having more precision in

13 that metric would make it easier to extrapolate to the actual

14 dose.

15        THE COURT:  And excuse my ignorance about physiology,

16 but if the human body intakes a certain amount of fluoride,

17 other than being excreted, does some of that -- if income

18 doesn't equal the output, what happens?  Where does it go?

19        THE WITNESS:  Yeah.  That's actually a very good

20 question and a technical question because trying to account for

21 the, you know, total mass is the important thing and right now

22 we can't really do a mass balance -- mass-balance conversion or

23 a mass-balance analysis.  That's the beauty of having a model

24 where you can actually test that, test what the data is.

25        Again, you've heard repeatedly from several witnesses,

1  including myself, that bone demineralization is a very active

2  part of this.  And the fetus during the third trimester is

3  doing a lot of bone mineralization, so the fetus becomes more

4  important.  That's why a fetal compartment becomes important in

5  a PBPK model because there's going to be calcium fluoride,

6  other metals deposited in bone.

7          And again, the maternal bone matrix is highly

8  mobilized during that third trimester to make sure that there's

9  a homeostatic balance in calcium for the fetus to develop

10 preferably over her own skeleton.

11         THE COURT:  So some of that fluoride is being absorbed

12 in the bones of the -- or mineralized, I guess is the term, in

13 the bones of the mother as well as the fetus --

14         THE WITNESS:  Correct.

15         THE COURT:  -- and therefore you're not going to

16 excrete -- you're going to intake more than you excrete, at

17 least during some period?

18         THE WITNESS:  That's correct.

19         And being able to account for that is actually an

20 important factor because there's estimates of 50 percent to 70

21 percent, depending upon age, timing, how much is actually -- of

22 the intake is actually mobilized and taken up by bone, how much

23 is actually excreted.

24         So this whole relationship of intake to excretion is a

25 highly variable relationship depending upon life stage.

1    **THE COURT:**  But if some of the fluoride is being

2    absorbed and not excreted, one would think even if you don't

3    know the exact relationship, at the very least you would know

4    that the amount excreted is less than the intake.

5    **THE WITNESS:**  That is generally correct, yes,

6    generally correct.

7    And that's another reason why some of the literature

8    or some of the testimony saying that there's a one-to-one

9    relationship that assuming excretion equals intake is just

10   wrong.  That's incorrect.

11   **THE COURT:**  Okay.  All right.  Sorry for the side

12   trip, but that's been helpful.  Thank you.

13   **THE WITNESS:**  Okay.

14   **BY MR. ADKINS:**

15   **Q.**    So let's turn to aggregate exposures.

16   Dr. Barone, the Court asked some question about aggregate

17   exposure throughout this trial, so I want to follow up on this

18   topic.

19   Does the urinary biomarker reflect an aggregate exposure

20   to fluoride?

21   **A.**    Yes, it does.  It's an integrated measure of exposure, but

22   it's also an integrated measure of what I just talked about is

23   the mobilization from bone during pregnancy as well as changes

24   in kidney function over pregnancy, so there's -- there's more

25   to it than just intake, total intake, is what I'm getting at.

1              **MR. ADKINS:**  Mr. Hambrick, could you put on the screen

2    Plaintiffs' Demonstrative 4?

3    **BY MR. ADKINS:**

4    **Q.**   So, Dr. Barone, you're familiar with this bar graph,

5    correct?

6    **A.**   Yes, I am.

7    **Q.**   This is a bar graph that counsel showed you at your

8    deposition?

9    **A.**   Yes, he did.

10   **Q.**   Could you explain to us what the red and the green bars

11   represent in this graph?

12   **A.**   Sure.  So the green bars are representing the

13   nonfluoridated areas for the 50th -- this is the third

14   trimester from Till, et al., and this is the 50th, the 75th and

15   the 95th percentile.

16   **Q.**   You see the indications for the difference at each

17   percentile --

18   **A.**   I do.

19   **Q.**   -- 50th, 75th and 95th?

20   **A.**   I do.  And so basically, the inference here is that you're

21   subtracting the background across the 50th percentile, 75th

22   percentile and the 95th percentile from the non -- the

23   nonfluoridated areas from the fluoridated areas.

24   **Q.**   In your opinion, Dr. Barone, would it be appropriate to

25   infer that the difference represented in this bar graph is from

1   community water fluoridation alone?

2   **A.**   Alone?  No.  I think that was the inference that was --

3   that is being made by Dr. Theissen and the plaintiffs during my

4   deposition.

5       Again, the difference in slope that I was just referring

6   to between the 75th and 95th percentile I don't believe can be

7   accounted for solely by difference in intake, intake rate of

8   drinking water.  I believe there's probably a significant

9   physiological -- physiological changes that are being uncovered

10  with this higher intake and the saturation kinetics that are

11  probably physiologically based.

12  **Q.**   Now, Dr. Barone, if we know that urinary fluoride

13  represents an aggregate fluoride exposure, can the Court just

14  use that aggregate exposure to perform a risk evaluation in

15  this case?

16  **A.**   So there -- the Court or others could use the aggregate

17  measure as a first approximation, but it does not address the

18  condition of use of water fluoridation specifically, and it

19  makes it -- as we already talked about -- makes it very

20  difficult to get at what is the source contribution.

21      And source attribution is critical for us to make a

22  determination, a characterization of the concentration response

23  for the risk calculation.  So we want to be able to understand

24  the relationship between different sources, whether they're

25  TSCA sources, whether they're from food or water or from other

 1  non-TSCA sources.  And being able to make those source

 2  attributions is critical to help us understand what portion is

 3  related to water fluoridation.

 4  **Q.**  What you just described, do you understand that to refer

 5  to source apportionment?

 6  **A.**  It is source apportionment and understanding source

 7  attribution and source apportionment is critical to

 8  back-calculate and get to an intake level that's related to

 9  watered, that's related to other media.

10  **Q.**  And, Dr. Barone, why would you need to do source

11  apportionment for a risk evaluation under TSCA?

12  **A.**  So what we want to do in the characterization and the

13  exposure and the end part of the hazard characterization for

14  risk is understand what risk is attributed to the COU -- COUs,

15  possibly, but in this case for specifically water fluoridation;

16  what proportion is attributable to water fluoridation.

17  We've -- we've done this a couple of times in the first ten

18  risk evaluations.

19  **Q.**  Do you remember any examples of when you've done this

20  under --

21  **A.**  Yes.

22  **Q.**  -- the first ten risk evaluations?

23  **A.**  Yes.  And we've taken different approaches.  But, again,

24  PBPK modeling was critical to our N-methylpyrrolidone approach

25  where we were able to look at dermal -- the dermal route of

1  exposure, the inhalation route of exposure and the oral route

2  of exposure for gestation and be able to extrapolate from

3  animals to humans what the different routes were and be able to

4  aggregate different routes of exposure.

5  **Q.**   The chemical that you're referring to, does that go by the

6  acronym NMP?

7  **A.**   It is.  It is.  N-methylpyrrolidone, its acronym is NMP.

8         **MR. ADKINS:**  Mr. Hambrick, could you put on the screen

9  Trial Exhibit 103?

10         **THE COURT:**  Before you do, let me ask:  Back to the

11  Till bar graph there, I understand that the difference as it

12  grows between the red and the green may be attributable to

13  physiological factors not just that, but it seems to me it's a

14  different question.  If you just look at any one of those --

15  take any one of those percentiles, the 75th.  The .62

16  difference in urinary concentrations of fluoride between women

17  in water -- fluoridized water and nonfluoridized water areas,

18  what else could that be attributed -- just the difference

19  itself, not looking at different percentiles, but if you take

20  any given percentile, if you -- if the only difference, at

21  least in the aggregate or in the average is water, what would

22  account for that .62-milligram difference?

23         **THE WITNESS:**  So that would be the -- that would --

24  you're asking a question looking at the 50th versus the 75th

25  percentile where there's essentially a doubling between the

1    50th and 75th percentile.

2          THE COURT:  Well, I'm just saying just look at the

3    75th and isolate -- forget the other two.

4          THE WITNESS:  Okay.  Just the difference of .62

5    milligrams per liter?

6          THE COURT:  Exactly.

7          THE WITNESS:  That difference is the -- the difference

8    is not clear, but the parsimonious presumption -- again,

9    presumption is that it's due to intake, total intake, and

10   that's probably both food and water.  And water is a

11   significant portion -- proportion of that.

12         THE COURT:  And the food -- wouldn't it for the green

13   bar be the same, I mean, the only difference is the fluoridized

14   water or is it that water then affects the local agriculture or

15   something?

16         THE WITNESS:  Again, from the Till study, it's hard

17   looking at -- looking at the contribution of food, you have

18   to -- you would have to presume that, basically, it would be

19   approximately the same in both groups.

20         Again, there's going to be variability, but there's

21   basically the same contribution of -- from food intake in both

22   groups.

23         THE COURT:  Right.  So that's holding everything else

24   equal whether it's food, soil --

25         THE WITNESS:  That's right.

1          THE COURT:  -- and toothpaste use, et cetera.

2          THE WITNESS:  Toothpaste.  That's assuming -- that's

3  assuming that this group is a higher socioeconomic group in the

4  entire study, so it assumes that the dietary levels would --

5  and other uses, non-TSCA uses being relatively similar.

6          THE COURT:  Do you know if that was done in this --

7  when we look at this graph?  Was there some assurance of

8  equalization?

9          THE WITNESS:  Not clear, Your Honor.  Not clear.

10         The regression analysis accounted for -- for those

11 particular aspects, for the concentration outcome.  The actual

12 analysis here is purely looking at the maternal fluoride

13 levels.  This is looking at biomarker levels.

14         THE COURT:  Right.  Right.  So if women in fluoridized

15 water areas have a different socioeconomic status than those in

16 nonfluoridized or they have different habits, that could

17 explain it?

18         THE WITNESS:  It could.  It could.

19         THE COURT:  But if you assume it all the same, then,

20 by deduction, you're left with one explanatory factor?

21         THE WITNESS:  What we -- what we don't have, again,

22 from this graphic or from this presentation is, what is the

23 variability.  And that would be captured -- that variability

24 would capture that.

25         THE COURT:  Okay.  So second question is, you're

**BARONE - DIRECT / ADKINS**

1  discussing the need for apportion -- source apportionment, and

2  I can see obviously why that's useful, because you want to know

3  whether the condition of use is a, you know, tiny contributor,

4  or a nonsignificant contributor or the contributor.

5         But if you're looking at trying to assess and

6  characterize risk, if you assume, as Dr. Theissen sort of, I

7  think, testified, that the major driver of all -- everything

8  you see is in fluoridized water area is the water intake of

9  fluoridized water.  It may not be the only, but it's a major

10  driver.  Wouldn't that -- if you knew you had all the other

11  risk factors at the certain concentrations and you satisfied

12  everything else but you didn't know exactly what the

13  apportionment was, how much was food, how much was toothpaste,

14  how much was, you know, tea, but you knew that the condition of

15  use was a major driver, couldn't you still do some risk

16  characterization there?

17         THE WITNESS:  You could do some risk characterization

18  again for -- in general terms.  But one of the challenges we

19  have under TSCA is trying to be as discriminative as possible

20  about the condition of use and what degree that condition of

21  use matters, and that's critical to the risk determination,

22  it's critical to what we do after the risk determination.

23         What kinds of options can you put in place to do risk

24  mitigation is informed, greatly informed by that source

25  apportionment.  And trying to do rule writing for TSCA without

1    some precision or at least some bounding of -- with precision

2    is very difficult and would not be defensible.

3         THE COURT:  Right.  That I understand after the

4    risk -- if you find unreasonable risk and you go on to the

5    rule-making stage or the mitigation, you would want to know the

6    difference between being a 20 percent contributor, a 50 percent

7    contributor, an 80 percent contributor.  But that is something

8    that is -- can be done outside of that first step analysis of

9    risk characterization, isn't it?

10        THE WITNESS:  Your Honor, it has to be informed and

11   based upon the risk it can't be "Oh, we kind of think it's

12   somewhere in the ballpark."  This is not a game of horseshoes.

13   We really need to know where that -- where that is, where that

14   condition of use lies in the -- in sort of the court.  I'm

15   using the --

16        THE COURT:  Yeah, yeah, yeah.

17        THE WITNESS:  The horseshoe analogy.  You need to know

18   where that pin stands.  If you don't know where that pin

19   stands, throwing the horseshoe and just saying it's close but

20   we don't know how close it is.  You really need to know how

21   close it is in order to make a defensible risk determination.

22        THE COURT:  But can that pin location -- and is it

23   ever done that the EPA does further analysis after finding an

24   unreasonable risk more precision about exactly what the

25   apportionment is, what the contribution is, in determining and

 1    informing its then regulatory approach?

 2           THE WITNESS:  So basically the question that you're

 3    asking is how does further analysis get incorporated into a

 4    post-risk determination phase.

 5           THE COURT:  Yes.  Yes.

 6           THE WITNESS:  Basically, right now we are basing our

 7    risk management options on what comes out of the risk

 8    evaluation.

 9           We are not allowing for, at least to date with the

10    first ten risk evaluations, additional analysis with the

11    exception of the two remands that we accepted for 1,4-Dioxane

12    and asbestos part 2.  In those particular assessments, we're

13    allowing for, in our rule-making, additional peer review for

14    the risk evaluations and additional analysis will be brought in

15    later after peer review.

16           THE COURT:  And so how does that work that you do --

17    you mentioned remand?

18           THE WITNESS:  So with asbestos, there was an agreement

19    to go back and look at other asbestos forms in the non-cancer

20    evaluation of asbestos fibers.  We are continuing with the

21    asbestos part 1 risk evaluation, which focused on one fiber

22    type, chrysotile, and really a very narrow range of conditions

23    of use.

24           So that is -- that rule is based upon the risk

25    evaluation that was peer reviewed in 2020 and the finalization

1    of that risk evaluation in 2020.

2        **THE COURT:**  There's a remand for another form?

3        **THE WITNESS:**  For part 2.  In part 2 we're looking at

4    that further analysis and we will base a rule potentially on

5    the findings from that additional evaluation.

6        So we've basically bifurcated.  But there's no --

7    there's not an opportunity to come back and say, oh, well,

8    we're not precise.  We have to have a degree of precision and

9    confidence in the risk evaluation to carry forward for

10   rule-making or we don't.

11       **THE COURT:**  But is there anything -- and maybe this is

12   beyond your legal expertise, but is there any reason why the

13   EPA, if it is determined for instance under TSCA that there is

14   an unreasonable risk, that it then, in its rule-making

15   process -- I don't know if you call it "remand" or do further

16   studies to figure out, for instance, the apportionment

17   question?

18       **THE WITNESS:**  Not -- no, sir, not at this time.

19       **THE COURT:**  There is no prohibition on that, or there

20   is no practice of that?

21       **THE WITNESS:**  There is no practice of that.

22       **THE COURT:**  Do you know if there's a prohibition on

23   that?

24       **THE WITNESS:**  I don't -- I can't speak to that

25   specifically.

1      **THE COURT:**  That's why I asked.

2      **THE WITNESS:**  I can't speak to that specifically from

3  a -- I'm not the agency's lawyer.  But at least from practice

4  now, everything that we've done to date is based upon the risk

5  evaluation.  And because the TSCA statute is risk-based, we

6  really have to have that risk assessment to support the risk

7  determination to support the regulatory outcomes that we

8  pursue.

9      **THE COURT:**  Okay.  Thank you.

10  BY MR. ADKINS

11  **Q.**  Dr. Barone, as far as you're aware are there any other

12  environmental statutes that EPA is involved with managing that

13  use that term "condition of use"?

14  **A.**  No.  No.  Condition of use for chemicals,

15  commercialization and industrialization of chemicals is really

16  TSCA-specific.

17  **Q.**  And a risk determination under section 21 or section 6B

18  must be done for a condition of use, correct?

19  **A.**  That is correct.  That is correct.

20      **MR. ADKINS:**  So, Your Honor, I'd just like to go to

21  one of the examples that Dr. Barone mentioned about where the

22  agency has looked at aggregate exposure.  And we're going to

23  come back to this graph.  May we move -- move to that?

24      **THE COURT:**  Yeah.

25      **MR. ADKINS:**  Okay.  So, Mr. Hambrick, could you put up

1  Trial Exhibit 103, please?

2  **BY MR. ADKINS**

3  **Q.**   So, Dr. Barone, this is the risk evaluation for NMP; is

4  that right?

5  **A.**   It is.  It is.

6  **Q.**   Okay.

7          **MR. ADKINS:**  Mr. Hambrick, could you take us to PDF

8  page 25.  And I'd like you to highlight the paragraph that

9  begins "The exposure estimates."

10  **BY MR. ADKINS:**

11  **Q.**   So, Dr. Barone, I'll just read a portion of this

12  paragraph.  It says, "The exposure estimates EPA used to

13  evaluate human health risks were based on a large amount of

14  monitoring data and were supported by modeling data for many

15  conditions of use.

16       "The availability of validated rat and human

17  physiologically-based pharmacokinetic (PBPK) models that

18  include a dermal compartment allow EPA to evaluate all

19  exposures and hazards in terms of internal dose metrics and to

20  evaluate risks from aggregate exposures from simultaneous

21  dermal, inhalation, and vapor-through-skin exposures."

22       Dr. Barone, could you explain, just in lay terms, what EPA

23  is communicating in this portion of the risk evaluation for

24  NMP?

25  **A.**   Sure.

1      One of the challenges with this particular compound

2  chemical and its conditions of use, multiple conditions of uses

3  that we recognized that there were multiple routes of exposure

4  and that looking at one route at a time or basing a POD on

5  animal studies for one route of exposure verses another route

6  of exposure was not going to be adequate for predicting human

7  risk and human exposures.

8      The condition of use, oftentimes they range from spot

9  cleaning to, really, paint removal, paint removal being one of

10  the significant conditions of use where there's dermal contact,

11  some degree of dermal contact and absorption.  But because the

12  vapor pressure of this particular substance is such that at

13  room temperature there is vaporization, evaporation and

14  sublimation in the room air to come in contact with the skin,

15  whether it's the skin on the hands or the skin on the face or

16  other parts of the body that are exposed.

17      So trying to -- this particular approach, the PBPK

18  modeling approach for the internal dose metrics gives you a

19  unified and combined exposure of all routes of exposure.  So

20  this is an aggregation of routes.  There was not, at least in

21  this particular example, an attempt to look across conditions

22  of use.  We were looking within a condition of use of all

23  routes of exposure.

24          **MR. ADKINS:**  Mr. Hambrick, could you go back to

25  Plaintiffs' Exhibit -- or excuse me, Plaintiffs' Demonstrative

1    4?

2    **BY MR. ADKINS**

3    **Q.**    So Dr. Barone, if you were to assume that the

4    2.41-milligram-per-liter urinary fluoride concentration at the

5    95th percentile, fluoridated community, reflects aggregate

6    exposure.  And we'll just set aside for a moment that you don't

7    have source apportionment for this exposure.  The 2.41 value is

8    still below the values for which the NTP meta-analysis found

9    were statistically significant for adverse effects below

10   4-milligram per liter and -- well, below 4 milligrams per

11   liter, correct?

12   **A.**    That is correct.  That is correct.

13   **Q.**    So let's turn to the final step, the risk determination.

14           **THE COURT:**  Before you do that, let me just ask a

15   question back on the NMP.

16           Using the PBPK model, you've got a unified and

17   aggregation of routes exposure.  Was there also parsing out an

18   apportionment of routes, of how much was dermal, how much was

19   inhalation, how much was vapor through skin?

20           **THE WITNESS:**  Very good question.  We were able to

21   apportion what the contribution was by route, and dermal

22   exposure was at least contextually the major route of exposure,

23   major contributor.

24           If there were to be oral exposure, at least for the

25   conditions of use we were looking at, there would be very

1    little oral exposure.  But the advantage of being able to

2    incorporate oral is being able to look at all the data that we

3    have from the animal studies.  More animal studies were done by

4    the oral route.  So making that animal-to-human conversion was

5    a critical aspect to the physiological models.

6            I hope that I didn't confuse you.

7            **THE COURT:**  So animal studies obviously played a big

8    part of that risk assessment there.

9            **THE WITNESS:**  They did.

10           **THE COURT:**  Was there also a fair amount of human data

11   and attempts to derive a dose-response curve at the human

12   level?

13           **THE WITNESS:**  Good -- good question.  The human

14   database was actually more limited and was used in the

15   weight-of-evidence analysis, but we did not use a human study

16   specifically for derivation of a point of departure.

17           The human data -- human monitoring data and the dermal

18   penetration and -- estimates were part of the exposure

19   assessment and were used to help inform and validate the human

20   PBPK model.

21           **THE COURT:**  Okay.  So it seems that when you don't

22   have as much human data and you have to rely on inference or

23   extrapolation from the animal studies, then I could see where

24   you'd put a premium on PBPK modeling, even more so than if you

25   had direct human; is that a fair?

1          THE WITNESS:  For -- for -- when we have a lot of

2     animal data, we'll use the PBPK model for not just

3     route-to-route extrapolation but also animal to human

4     extrapolation.  There are other examples -- again, going to the

5     issue where we have a lot of human data, we'll use a PBPK model

6     in the human data to try to derive from internal dose metrics

7     what that point of departure is as well.

8          THE COURT:  Okay.  And that example would be lead, for

9     example?

10         THE WITNESS:  That example would be lead.  One of the

11    preeminent examples the agency has used was, you know, lead,

12    based upon lead blood levels in children and looking at the

13    dose response of lower and lower concentration -- effect

14    concentrations and converting that into media concentrations

15    for regulation of lead.

16         THE COURT:  Thank you.  You may proceed.

17    BY MR. ADKINS

18    Q.   So Dr. Barone, in your opinion, is there sufficient

19    evidence for the Court to get to the risk determination step of

20    the analysis?

21    A.   So this is the -- the answer is no.  This is the real

22    quandary with this case.  There's uncertainty in the dose

23    response.  There's uncertainty overall in the hazard.  There's

24    something -- I believe personally there's something going on,

25    but at what concentration?  Is that -- what is that point of

 1  departure?  Where is that threshold?

 2      The current evidence is scattered and inconsistent, so

 3  going from hazard ID and through the evidence integration and

 4  weight-of-evidence analysis, there's a high degree of

 5  uncertainty about what an appropriate threshold or what an

 6  appropriate point of departure would be.

 7      I don't think we can move to determining a threshold, I

 8  don't think we can move to determining a POD with the current

 9  evidence that we have, and the science isn't settled.  So

10  making a risk determination with this degree of uncertainty is

11  not desirable; highly undesirable from my professional

12  perspective.

13  **Q.**  And just to unpack that a little bit, the National

14  Toxicology Program did not identify a point of departure in its

15  Monograph, correct?

16  **A.**  It did not.  They said from the evidence integration that

17  they did for systematic review that there was a moderate degree

18  of certainty above 1.5, but they did not identify a point of

19  departure.  They did a meta-analysis to support their

20  conclusions, but they didn't actually produce a POD, per se.

21  **Q.**  And Dr. Theissen did not select and justify a point of

22  departure?

23  **A.**  I didn't see or hear the rationale and the evolution of a

24  point of departure.  I heard a number of "for instances" with

25  some vague assumptions, which doesn't satisfy, at least for our

 1  TSCA purposes, a -- it doesn't -- it doesn't meet the burden of

 2  proof that we would have to have for a TSCA risk determination.

 3  **Q.**   And the Court asked yesterday whether we could use 4

 4  milligrams per liter, 3 milligrams per liter, 2 milligrams per

 5  liter as a NOAEL or a LOAEL for the hazard characterization.

 6  In your view, the weight of the scientific evidence doesn't

 7  support selecting any of those values at this point in time,

 8  correct?

 9          **MR. CONNETT:**  Leading.

10          **THE COURT:**  Sustained.  Rephrase that.

11  BY MR. ADKINS:

12  **Q.**   In your view, Dr. Barone, does the weight of the

13  scientific evidence support selecting as a point of departure a

14  value of 3 or 2 or 4 milligrams per liter in this case?

15  **A.**   At this time I don't think we have clarity.  I think we

16  have -- generally, the NTP report was trying to focus across a

17  broad range and tried to focus at water fluoridation and what

18  was the -- what was the literature contribution to informing

19  the water fluoridation, that was the context of much of their

20  discussion.  And I don't think we have specifically gotten to a

21  point of certainty around picking a point of departure in the

22  upper range above -- above 1.5 and make any determination of a

23  POD at this time.

24  **Q.**   For that reason you would end your analysis at the hazard

25  assessment, right?

1  **A.**   I think that's where we are right now.  I think we have

2  hazard ID.  I think we've got, as I said yesterday, more work

3  to do on dose response.

4      I've outlined a number of issues that are research

5  questions that relate to PBPK modeling to get at extrapolation

6  from a urinary level to an intake level.  I think that would

7  help elucidate what that point of departure would be and

8  potentially provide convergence between the information we have

9  on -- from some studies looking at milligrams per liter and

10  also convergence between -- potentially more convergence

11  between the urinary biomarker data.

12      Having a biomarker that has a short half-life also

13  presents its challenges, and one of the -- again, with methyl

14  mercury and lead, those -- the biomarkers are integrative

15  measures for a persistent toxic compound, a persistent and

16  bioaccumulative toxic compound.  We to have quite the same

17  situation with fluoride, as far as persistence of

18  bioaccumulation.

19      **MR. ADKINS:**  Thank you, Dr. Barone.  No further

20  questions at this time.

21      **THE COURT:**  All right.  Thank you.

22      **MR. CONNETT:**  Your Honor, I know it's not yet our

23  break time, but would it be possible to have a five-minute

24  restroom break?

25      **THE COURT:**  Okay.  Take a very short break.  Thank

**BARONE - CROSS / CONNETT**

1  you.

2          **THE WITNESS:**  I'm good with that.

3          **THE COURT:**  Okay.  We're all good with that.

4          **THE CLERK:**  Court is in recess.

5      (Recess taken at 9:23 a.m.)

6      (Proceedings resumed at 9:31 a.m.)

7          **THE COURT:**  All right.  Mr. Connett, the floor is

8  yours.

9          **MR. CONNETT:**  Thank you, Your Honor.

10                         <u>**CROSS-EXAMINATION**</u>

11  BY MR. CONNETT:

12  **Q.**   Dr. Barone, you do not dispute that fluoride is capable of

13  causing neurodevelopmental harm, correct?

14  **A.**   I do not.  I said that in my deposition.

15  **Q.**   You agree that the current evidence is suggestive that

16  low-dose fluoride causes neurodevelopmental effects, correct?

17  **A.**   The hazard ID is probably in the suggestive range, but it

18  is highly uncertain.

19  **Q.**   You agree that fluoride is associated with neurotoxic

20  effects at water fluoride levels exceeding 2 parts per million?

21  **A.**   I don't necessarily agree to a point of departure at 2

22  parts per million.

23  **Q.**   That wasn't quite my question.

24      My question is, Dr. Barone, you agree that fluoride is

25  associated with neurotoxic effects at water fluoride levels

1  exceeding 2 parts per million?

2  **A.**    Exceeding 2 parts per million, somewhere above 2 parts per

3  million, yes.

4  **Q.**    You agree that there should be a benchmark MOE of 10 for

5  fluoride neurotoxicity, correct?

6  **A.**    So I'm not going to say I agree, because depending upon

7  the study or study type, it may be more than ten.

8         So again, if you're asking me the question do I agree that

9  a benchmark MOE of 10 for a human study, generally speaking, I

10  would say yes.  But if it was based upon an animal study or if

11  we had more precision in some of the modeling, there might be a

12  different benchmark MOE.

13  **Q.**    Right.  If we were using a human study and only had a

14  LOAEL, like was the case with PCE, you would, at that point,

15  consider an additional uncertainty factor beyond the

16  intraspecies variability uncertainty factor?

17  **A.**    Generally, yes.  Yes, we would.

18  **Q.**    And the benchmark MOE, the 10 number that you were talking

19  about, that base number, that would be to account for

20  intraspecies variability, correct?

21  **A.**    It accounts for life stage and all intraspecies

22  variability.

23  **Q.**    Now, let's talk about the National Toxicology Program.

24  First, the National Institute of Environmental Health Sciences

25  or NIEHS is one of the premier environmental health sciences

1   research institutions in the world, correct?

2   **A.**   Focusing on environmental toxicology, yes.

3   **Q.**   The National Toxicology Program, NTP, which is

4   headquartered at NIEHS, has a well-earned reputation for

5   producing reliable assessments on the health impacts of

6   environmental chemicals, correct?

7   **A.**   Reliable assessments of hazard, and mostly on human health

8   hazard.

9   **Q.**   The NTP is one of the leaders in the world in the

10  application of systematic review to toxicological evaluations,

11  correct?

12  **A.**   It is one of.

13  **Q.**   Now, let's talk about the NTP Monograph.

14       Dr. Barone, you agree that NTP's May 2022 Monograph on

15  fluoride is a high-quality review, correct?

16  **A.**   It is a high-quality review with some exceptions.  And the

17  biggest exception is the literature cutoff date does not

18  include much of the more recent literature.

19       **MR. CONNETT:**  Your Honor, at this point we would

20  introduce impeachment testimony, page 96, lines 9 to 12.

21       **THE COURT:**  Okay.

22       **MR. ADKINS:**  One moment, please.

23       **MR. CONNETT:**  It's on the screen too.

24       **MR. ADKINS:**  No objection.

25       **THE COURT:**  Okay.

BARONE - CROSS / CONNETT

1    BY MR. CONNETT:

2        "QUESTION:  You would agree that NTP's review of the

3        literature is a high-quality review, correct?

4        "ANSWER:  I think it's a high-quality review."

5        You agree, Dr. Barone, that NTP's monograph on fluoride

6    followed the rules that have been developed by NTP for

7    conducting systematic reviews, right?

8    A.   Yes.

9    Q.   You agree that NTP had a rigorous approach to assembling

10   the evidence on fluoride neurotoxicity?

11   A.   Yes.

12   Q.   You agree that NTP conducted a thorough review of the

13   fluoride literature?

14   A.   Up until the date of their literature cutoff, yes.

15   Q.   You agree that NTP had clearly defined rules for

16   identifying and evaluating studies for its fluoride monograph,

17   correct?

18   A.   I agree.

19   Q.   And lastly, you agree that NTP had a well-defined protocol

20   for drawing inferences from the fluoride studies, correct?

21   A.   Yes.

22   Q.   So let's turn to the NTP's findings.

23       Dr. Barone, you agree that there is no clear reason for

24   thinking that some form of bias can explain the consistent

25   association that NTP observed between high fluoride and reduced

**BARONE - CROSS / CONNETT**

1  IQ, correct?

2  **A.**    The NTP looked at IQ and a range of neurobehavioral

3  outcomes, and I believe their systematic review was thorough.

4  **Q.**    And to my question, you agree that the consistent

5  association that the NTP has found between elevated fluoride

6  and reduced IQ, that there's no clear reason to ascribe that

7  association to some form of bias, right?

8  **A.**    Again, the -- I agree with the NTP's conclusions that at

9  some level above 1.5 that there is moderate evidence to support

10 an association between fluoride and developmental IQ

11 decrements.

12 **Q.**    And my question is a little different than that.  It's

13 specific to a question that I asked you in your deposition

14 which is this:  You agree that there's no clear reason for

15 thinking that the consistent association between elevated

16 fluoride and reduced IQ can be ascribed to bias, correct?

17 **A.**    I think the NTP looked at bias, a range of contributions

18 to bias and at least above the benchmark that they -- the

19 breakpoint that they identified, there's some degree of

20 confidence that bias is not attributing to the relationship

21 between fluoride and association with IQ decrements.

22 **Q.**    Okay.  And you agree that the body of evidence that -- on

23 fluoride neurotoxicity that the NTP evaluated -- is sufficient

24 for satisfying the hazard identification prong of a TSCA hazard

25 assessment, correct?

1  **A.**   For that hazard identification, I think the NTP Monograph

2  state-of-the-science report is very helpful, but it's not

3  complete.

4        **MR. CONNETT:**  Your Honor, impeachment testimony.  It

5  is page 136, lines 10 to 22.

6        **THE COURT:**  Okay.

7        **MR. ADKINS:**  One moment, please.

8        No objection.

9        **THE COURT:**  Okay.

10 BY MR. CONNETT:

11       **"QUESTION:**  In terms of total fluoride exposure, you would

12       agree that the literature that NTP reviewed up through

13       April 2021 meets EPA's sufficient human evidence standard

14       under the guidelines?

15       **"ANSWER:**  For hazard ID.

16       **"QUESTION:**  You agree with that?

17       **"ANSWER:**  I would agree that there's significant evidence

18       there for a sufficiency call.

19       **"QUESTION:**  And you agree that it meets the sufficient

20       human evidence standard?

21       **"ANSWER:**  It meets the sufficient evidence standard."

22       So let's turn to the demonstrative figure, Plaintiffs'

23 Demonstrative No. 4.  That was the subject of some discussion

24 earlier.

25       And, Dr. Barone, you agree that the simplest explanation

1  for why the urinary fluoride levels are 1.37 ppm higher in the

2  95th percentile women in the fluoridated areas is because of

3  water fluoridation, correct?

4  **A.**   So from the long discussion that we had before, I thought

5  it was clear that I do not think that that particular

6  difference is explained just by water fluoridation.

7          **MR. CONNETT:**  Okay.  Impeachment testimony, Your

8  Honor.  It's page 176, line 24 to page 177, line 18.

9          **MR. ADKINS:**  No objection.

10         **THE COURT:**  Okay.

11 BY MR. CONNETT:

12     "**QUESTION:**  Now, just to be clear, can you point me to any

13      other explanation that you think is more likely to explain

14      the difference in urinary fluoride levels between women in

15      fluoridated versus nonfluoridated areas, any other factor

16      that is more likely to explain that difference than the

17      fluoridated water itself?

18     "**ANSWER:**  Right now that's the most parsimonious

19      explanation.

20     "**QUESTION:**  That the fluoridated water is the cause of

21      this difference?

22     "**ANSWER:**  It's the most parsimonious explanation.

23     "**QUESTION:**  Okay.  This is a dumb question.  How do you

24      define parsimonious because I'm not entirely clear offhand

25      what it means?

1       "**ANSWER:**  It's the simplest explanation.

2       "**QUESTION:**  Like Occam's razor?

3       "**ANSWER:**  It's the simplest explanation."

4       Now, Dr. Barone, you testified earlier today that there

5   may be oversaturation going on in the kidney at the 95th

6   percentile level in the fluoridated areas.  Do you recall that?

7   **A.**   I did.

8   **Q.**   Do you feel comfortable as a risk assessor exposing

9   pregnant women to a level of fluoride that is so high that the

10  kidney is oversaturated?

11  **A.**   There are a lot of things that we ingest as far as food

12  components, nutrients that reach a saturation level in the

13  kidney that do not necessarily reflect toxicity.

14  **Q.**   Are you comfortable then with a pregnant woman having so

15  much fluoride in her circulating system that her kidney has

16  lost the ability to efficiently process it?

17          **MR. ADKINS:**  Objection, vague and argumentative.

18          **THE COURT:**  Overruled.

19          **THE WITNESS:**  Again, putting this in context, my

20  comfort level, I don't think, is really germane.

21  **BY MR. CONNETT:**

22  **Q.**   So, Dr. Barone, you agree that adults who live their lives

23  in fluoridated areas have significantly higher levels of

24  fluoride in their bone than adults who live in nonfluoridated

25  areas, correct?

1  **A.**   That's not totally, correct.  Again, there's endemic

2  fluoride in many, many areas, including in the U.S.  So the

3  form of your question is not really complete.

4      Individuals who live in an area with high-fluoride content

5  in their water will generally have higher fluoride levels in

6  their bone.

7          **MR. CONNETT:**  Impeachment testimony, Your Honor, page

8  292, lines 13 to 20.

9          **THE COURT:**  Okay.

10          **MR. ADKINS:**  No objection.

11  **BY MR. CONNETT:**

12      **"QUESTION:**  And are you aware that there have been studies

13      which have shown that adults who have lived their life in

14      fluoridated areas have significantly higher fluoride

15      concentrations in their bone than adults living in

16      nonfluoridated areas?

17      **"ANSWER:**  I think that's true.  I think there's also

18      animal studies to that effect too."

19      Now, Dr. Barone, at your deposition, you agreed that a

20  pregnant woman who has lived her whole life in a fluoridated

21  area will have higher levels of fluoride in her urine and in

22  her blood during pregnancy even if she is drinking

23  fluoride-free water during the pregnancy.

24      And she will have more fluoride in her blood and urine

25  than in pregnant women who live their whole life in a

1  nonfluoridated area, correct?

2  **A.**   I think so and I think the Cantoral data, actually, study

3  addresses that point too.

4  **Q.**   Now, data gaps are common in risk assessment, correct?

5  **A.**   They are.

6  **Q.**   And the absence of a PBPK model for fluoride exposure

7  during pregnancy is a data gap in the fluoride literature,

8  correct?

9  **A.**   I think it's more than a data gap.  It's a means to

10  deriving an intake level.  There are additional data gaps, but

11  it's a tool to get at the point of departure, certainty about

12  the point of departure.

13       **MR. CONNETT:**  And, Your Honor, at this point we would

14  introduce impeachment testimony, page 290, 25 to 291, 11.

15       **THE COURT:**  Okay.

16       **MR. ADKINS:**  Your Honor, I'm not sure if all of this

17  is impeachment testimony, but I'm not -- I won't object to

18  reading this into the record.

19       **THE COURT:**  Okay.

20       **MR. ADKINS:**  No objection.

21       **THE COURT:**  Okay.  Thank you.

22  BY MR. CONNETT:

23       "QUESTION:  As it currently stands, this is a data gap

24       that we have in the literature on fluoride, namely how one

25       takes a urinary fluoride level and converts it into a

 1     total fluoride dose, correct?

 2        "ANSWER:  That's my estimation.  I haven't been able to

 3     find -- been able to fill it, and I can't answer that

 4     question for you.

 5        "QUESTION:  But as we know, data gaps are common in risk

 6     assessment, correct?

 7        "ANSWER:  Data gaps and uncertainty are common in our risk

 8     assessments, yes."

 9        Now, despite the data gap that you've identified, lack of

10     a PBPK model for fluoride exposure during pregnancy, the Risk

11     Sciences International team was able to -- able to calculate a

12     BMCL for total fluoride intake based on Dr. Grandean's

13     urine-based BMCL, correct?

14        MR. ADKINS:  Objection, Your Honor.  This is outside

15     of the scope of direct testimony.  This isn't a document that

16     counsel provided to us as part of their witness disclosure, and

17     Dr. Barone has already testified that his opinions are not

18     based on the Health Canada systematic review or the panel's

19     report.

20        THE COURT:  Okay.

21        MR. CONNETT:  Well, Your Honor, Dr. Barone

22     specifically testified on direct to the Risk Sciences

23     International report, and so I'm entitled to pursue that with

24     him.

25        THE COURT:  Remind me what his testimony precisely was

 1    on the RSI report.

 2         **MR. CONNETT:**  I believe the testimony was something to

 3    the effect that they did not have sufficient confidence to use

 4    neurotoxicity as a point of departure and instead used dental

 5    fluorosis.

 6         **THE COURT:**  And the point of -- the line of

 7    questioning you seek to pursue now is to what?

 8         **MR. CONNETT:**  It's just simply to confirm that the RSI

 9    team took Dr. Grandean's urine-based BMCL and converted it into

10    a daily fluoride intake as well as the water fluoride

11    concentration.  So they used three BMCLs, one urine-based, and

12    from the urine-based one they used a milligram per day BMCL,

13    and then they used a milligram fluoride per liter of water

14    BMCL.

15         **MR. ADKINS:**  Well, Your Honor, I mean, the scope

16    objection still stands with that.  This is far outside the

17    scope of his testimony, and especially with the scope

18    objections that we dealt with yesterday and the narrow reading

19    of Dr. Barone's disclosures, there's got to be some aspect of

20    fairness here.

21         **THE COURT:**  Well, in this case it's evident that

22    Dr.  Barone is familiar with the RSI study, so I think it's a

23    fair ground.  I'm going to overrule the objection.

24    **BY MR. CONNETT:**

25    **Q.**   So, Dr. Barone, you see here on the screen it's Trial

1    Exhibit 129, and this is the recently published systematic

2    review from the RSI team?

3    **A.**   I do.

4    **Q.**   And we're looking here at an excerpt from page 24 of the

5    report?

6    **A.**   I see that.

7    **Q.**   And so in this analysis the RSI team, not withstanding

8    some of the issues with the lack of a PBPK model, were able to

9    calculate a BMCL in terms of milligrams of fluoride per day,

10   correct?

11   **A.**   They did.  And again, I have already mentioned, and I

12   was -- my uncertainty and criticism of the BMCL that is the

13   basis for this is highly uncertain.

14   **Q.**   And so --

15   **A.**   And the use of -- excuse me, if I can --

16            **THE COURT:**  Let him finish.

17            **THE WITNESS:**  -- the use of a .75 conversion parameter

18   for urinary excretion is also highly uncertain and a very large

19   assumption --

20   **BY MR. CONNETT:**

21   **Q.**   Okay.  But --

22   **A.**   -- in this particular calculation, and I don't believe

23   it's accurate to presume that .75 is appropriate for pregnant

24   women.

25        And this uncertainty here is part and parcel to why the

1   report -- the RSI report says they didn't -- while they

2   calculated the BMCL, they didn't actually depend upon the BMCL

3   for either urine or water intake.

4   **Q.**   But they did say that if you use a point of departure for

5   dental fluorosis, you should use an uncertainty factor for

6   neurotoxicity to protect against the potential for neurotoxic

7   effects, right?

8   **A.**   Again, there's -- you have to look at that language very

9   carefully.  There's a suggestion of use of a database

10  uncertainty factor.  It is not a requirement to use a database

11  uncertainty factor.  And, in fact, in the TSCA program in our

12  first ten risk evaluations, we did not use a database

13  uncertainty factor in the absence of data for any of the risk

14  evaluations.

15  **Q.**   And the BMCL for fluoride ingestion that the RSI team

16  calculated from Dr. Grandean's urine-based BMCL was .274

17  milligrams of fluoride per day, correct?

18  **A.**   That is what they calculated.  Again, you can calculate a

19  BMCL with lots of assumptions, and there's going to be a lot of

20  uncertainty.

21  **Q.**   Now, you agree, Dr. Barone, that TSCA does not require

22  factual certainty regarding the existence of an unreasonable

23  risk in order for EPA to take regulatory action, correct?

24  **A.**   TSCA requires us to evaluate the risks for condition --

25  conditions of use, and we do our best to characterize that

```
 1  risk, the strengths and uncertainties, in our risk

 2  determination.

 3          MR. CONNETT:  And at this time, Your Honor --

 4          THE WITNESS:  Requirement.  That's a requirement under

 5  TSCA is the risk determination.

 6          MR. CONNETT:  At this time, Your Honor, we have

 7  impeachment testimony from page 269, lines 3 to 16.

 8          THE COURT:  Okay.

 9          MR. ADKINS:  No objection.

10          THE COURT:  Okay.

11  BY MR. CONNETT:

12      "QUESTION:  And the first highlighted portion of the page

13      Congress states, 'This standard for taking action under

14      section 6A recognizes that factual certainty respecting

15      the existence of an unreasonable risk of a particular harm

16      may not be possible, and the bill does not require it.'

17      Did I read that correctly?

18      "ANSWER:  You did.

19      "QUESTION:  Is that statement there that we just read

20      consistent with your own understanding of section 6A under

21      TSCA?

22      "ANSWER:  I believe it is."

23      Now, you agree that uncertainties as to the threshold

24  level of causation is not a basis to preclude action under

25  TSCA, right?
```

 1  **A.**   Could you repeat the question?

 2  **Q.**   You agree that uncertainties as to the threshold level of

 3  causation is not a basis to preclude action under TSCA?

 4          **MR. ADKINS:**  Objection, vague.

 5          **THE COURT:**  I'm not sure what that means.  What does

 6  threshold level of causation mean?

 7          **MR. CONNETT:**  I'll rephrase, Your Honor.

 8  **BY MR. CONNETT:**

 9  **Q.**   You agree, Dr. Barone, that uncertainties as to the

10  threshold level at which we have confidence that the chemical

11  is causing an effect or is associated with an effect is not a

12  basis to preclude action under TSCA?

13  **A.**   So again, threshold level is a triggering term.  I'm going

14  to say threshold level -- I don't understand what you mean, I'm

15  going to rephrase and what I think I understand you to mean.

16  You're talking about the strength of the evidence and whether

17  we have the strength of the evidence for causation; is that

18  correct?

19  **Q.**   My question -- I'll rephrase it to the exact question that

20  I asked you at your deposition, okay?  Would that be helpful if

21  I asked you the same exact question at your deposition?

22  **A.**   Sure.

23  **Q.**   So the question was at your deposition:  You agree that

24  uncertainties as to the threshold level at which a chemical

25  causes the effect is not a basis to preclude action under TSCA.

 1    You agree with that, right?

 2            **MR. ADKINS:**  Asked and answered, Your Honor.

 3            **THE COURT:**  Well, again, answer.

 4            **THE WITNESS:**  So again, threshold level, if you're

 5    talking about the threshold in the dose response, then do we

 6    know what the threshold level is and I'm going to say that,

 7    generally speaking, what the NOAEL is, no observed adverse

 8    effect level.  Do we have to know the NOAEL?  The answer is no.

 9            We have to have some idea around what level that

10    NOAEL -- where that -- where that is.  We have to have some

11    certainty, and this gets back to the strength of the evidence.

12    We have to have some certainty about that.

13            **MR. CONNETT:**  And, Your Honor, at this time we would

14    read impeachment testimony, page 273, lines 4 to 10.

15            **THE COURT:**  Okay.

16            **MR. ADKINS:**  No objection.

17    **BY MR. CONNETT:**

18        "**QUESTION:**  And you would agree that uncertainties as to

19         the threshold levels of causation is not by itself a basis

20         to preclude action under TSCA?

21        "**ANSWER:**  By itself, no, but the weight of the scientific

22         evidence for a likely or a causal association is really

23         key to making the case for a risk determination."

24         And, Dr. Barone, you agree that EPA does and should use

25    health protective assumptions when information is lacking,

 1  right?

 2  **A.**    So again, health protective means different things to

 3  different people.  We use risk-based assumptions, default

 4  assumptions, which we discussed -- we've discussed at length

 5  and that -- those include different uncertainty factors.

 6          MR. CONNETT:  And, Your Honor, we have impeachment

 7  testimony at page 277, line 15 to 278, line 3.

 8          THE COURT:  Okay.

 9          MR. ADKINS:  No objection.

10  BY MR. CONNETT:

11      "QUESTION:  And then the next highlight EPA states, quote,

12      'In general where information is lacking, assessors use

13      health protective assumptions, particularly in the early

14      stages of a risk assessment,' unquote.

15      Did I read that correctly?

16      "ANSWER:  You did.

17      "QUESTION:  Do you personally agree that EPA should use

18      health protective assumptions when information is lacking?

19      "ANSWER:  We do.  That's part of our agency guidance.

20      "QUESTION:  And do you agree with that guidance?

21      "ANSWER:  I do."

22      So I'd like to turn now to the discussion on the NTP's

23  dose-response analysis in the meta-analysis, okay?

24          THE COURT:  Before you do that, let me ask Dr. Barone

25  a question.

 1          You had just stated, you know, do we have to know the

 2     NOAEL yet, and I think you said we should have some certainty

 3     as to that.  What if you don't have a NOAEL but what about a

 4     LOAEL?

 5          I mean, here we have a phenomenon where I think

 6     everybody agrees, as you put it, something's going on, at least

 7     at a certain level, high levels there's something going on, and

 8     the meta-analysis shows pretty consistently that, at least if

 9     you look at studies from below 4 milligrams or more, that the

10     dose-response analysis under most of the models, the best

11     fitting models, seems to show statistically significant adverse

12     effect.

13          And knowing that the EPA is to use health protective

14     assumptions when the information is lacking, why can't one

15     approach it from the LOAEL approach?  You seem to know that

16     there's some level in which something is going on, there's

17     adverse effects.  We may debate where it is, but wouldn't it be

18     proper to use even a conservative estimate of LOAEL?  Maybe it

19     won't reach this situation, but, I mean, why not, for instance,

20     pick a LOAEL of 4, like we talked about before, where the

21     studies seemed to show pretty good relationship?

22          **THE WITNESS:**  So again, when counsel asks about health

23     protective values, we do use LOAELs in -- in our risk

24     assessments.  We do use uncertainty factors, default

25     uncertainty factors.  And if you're equating health protection

1   to default uncertainty factors, that's a -- that is what I

2   understood counsel to mean, and that's why I restated what I

3   stated is that these default uncertainty factors are routinely

4   used to account for the uncertainty that we may have from a

5   LOAEL to a NOAEL approach.

6          Oftentimes in the PCE example that we discussed

7   earlier, we did not have confidence in extrapolating beyond the

8   data of observation and using a BMCL, so -- a BMCL approach, so

9   in that case we did use a LOAEL approach and the appropriate

10  uncertainty factors.

11         Whether you use a ten or a three, it really depends

12  upon the case-specific examples what's -- what data do you have

13  and what certainty do you have around that LOAEL and its

14  potential closeness to a NOAEL, no observed adverse effect

15  level.

16         **THE COURT:**  And in this situation -- I understand the

17  more certainty you have, some definition between LOAEL and

18  NOAEL might shrink that margin of error.  I think that's what

19  you're saying, right?

20         **THE WITNESS:**  The default.

21         **THE COURT:**  The default?

22         **THE WITNESS:**  It could shrink the default uncertainty

23  factor.

24         **THE COURT:**  Right.

25         From the evidence you see, could you, with some

 1  confidence, say there is a NOAEL here?  I mean, there's mixed.

 2  We have evidence going both ways, and the dose-response curve

 3  gets a little fuzzy below 2 or below 1.5, but can you -- is

 4  there anything here to show there is a NOAEL here or one

 5  that's -- even a range of NOAEL?

 6          **THE WITNESS:**  There's not a clear -- there's not a

 7  clear no observed adverse effect level.

 8          **THE COURT:**  We're all just sort of uncertain.  It

 9  seems like at some point you're seeing something, but below

10  that's it's unclear?

11          **THE WITNESS:**  Yes, sir.  I agree with the NTP report.

12  They could not settle on a NOAEL.  I think they would have

13  stated clearly if they could have gotten their heads wrapped

14  around a no observed adverse effect level, but there was not

15  that conclusion.  They basically used the WHO's benchmark and

16  said:  Above this benchmark we have confidence in the evidence.

17  Below that benchmark they didn't, and I would not interpret

18  that as a NOAEL.  That's not what they said.

19          **THE COURT:**  All right.  Thank you.

20  **BY MR. CONNETT:**

21  **Q.**   So I was going to talk about the dose-response analysis

22  from the NTP, but maybe we'll move forward and turn to

23  something else.  I'm going to ask you a few questions about the

24  Ibarluzea study, okay?

25  **A.**   Sure.

1    **Q.**   Dr. Barone, you agree that it's a good question why

2    creatinine adjustment had such a dramatic effect on the

3    association between fluoride and IQ, correct?

4    **A.**   Could you repeat that question one more time?

5    **Q.**   You agree that it's, quote, "a good question," unquote,

6    why creatinine adjustment had such a dramatic effect on the

7    fluoride IQ association in the Ibarluzea study?

8    **A.**   I do think it's -- it's an important thing to look at.

9         I think some of the issues that have already been

10   discussed, both in Dr. Ibarluzea's testimony, in his deposition

11   and in Dr.  Savitz's testimony with regard to the differences

12   in the correction and the differences in the estimation for

13   the -- with the modeling approach that was used, the regression

14   modeling approach that was used.

15        I'd also add that, you know, this flip-flopping with

16   creatinine correction was also observed in Dr. Hu's student's

17   dissertation that was part of, you know, pretrial deposition

18   and showing that that data, too, uncorrected for creatinine,

19   did not have an effect on IQ decrements.

20   **Q.**   Dr. Barone, when you were forming your opinions in this

21   case as EPA's risk assessor, you didn't even have this

22   unadjusted data at your disposal, did you?

23   **A.**   Actually, I had not this exact plot of the data but had

24   some understanding of the differences from the communication

25   that took place between NTP and the INMA study director, so I

BARONE - CROSS / CONNETT

 1   understood that there was a difference.

 2   **Q.**   So you had the NTP email between -- you had

 3   Dr. Ibarluzea's email to NTP?

 4   **A.**   I did.   That was shared with me as well as we had

 5   discussions prior to -- again, deliberative discussions, so I

 6   did understand this.

 7           **MR. CONNETT:**  Your Honor, impeachment testimony,

 8   page 234, lines 4 to 7.

 9           **THE COURT:**  Okay.

10           **MR. ADKINS:**  No objection.

11   BY MR. CONNETT:

12       "**QUESTION:**  Did you receive a copy of this email exchange,

13        the exchange between Dr. Ibarluzea and the NTP, at some

14        point after finishing your initial report?

15       "**ANSWER:**  Yes."

16   **A.**   That's what I said.

17   **Q.**   So with respect to the seafood component in the Ibarluzea

18   study, you agree that it is more important to control for

19   seafood intake when the population has a very high seafood

20   intake than it is when the population has a low or normal

21   intake, correct?

22   **A.**   Again, I think it's an important question to address.   I

23   said that in my deposition.   I think the -- the INMA authors

24   attempted to control for seafood intake via the surrogate or

25   proxy, which was mercury as a covariate.   I don't believe the

1   benchmark dose analysis from 2023 for the Danish cohort

2   actually controlled for seafood either.

3          MR. CONNETT:  Impeachment testimony at page 252, lines

4   18 to 23.

5          THE COURT:  Okay.

6          MR. ADKINS:  No objection.

7   BY MR. CONNETT:

8          "QUESTION:  In a study on fluoride and IQ, would you agree

9          that it is more important to control for seafood intake

10         when the population has a very high intake of seafood than

11         when the population has a low intake of seafood?

12         "ANSWER:  Generally speaking."

13   And you do agree, Dr. Barone, that further investigation

14   to understand the potential confounding effect of seafood in

15   the Ibarluzea study would be helpful, right?

16   A.   Generally speaking, I would say yes.

17   Q.   Now, you agree as a risk assessor that in a hazard

18   assessment, plausible findings should generally be given more

19   weight than implausible findings, correct?

20   A.   Again, it depends upon how you define "plausible."

21          MR. CONNETT:  Impeachment, Your Honor, page 213, lines

22   1 through 5.

23          THE COURT:  Okay.

24          MR. ADKINS:  Just one moment, please.

25          Your Honor, again, I don't know if this is impeachment

1  material.  The witness asked, "It depends on how you define

2  implausible."  I won't object to reading this into evidence

3  though.

4       THE COURT:  Okay.  Well, you can read it.

5  BY MR. CONNETT:

6       "QUESTION:  The first statement here is in a hazard

7       assessment plausible finding should be given more weight

8       than implausible findings.  Do you agree with that,

9       Dr. Barone, or disagree?

10      "ANSWER:  I generally agree with that."

11      Now, you agree with the National Research Council's

12  conclusion in 2006 that fluoride interferes with the functions

13  of the brain in animal studies, correct?

14  A.   I do.  Those animal studies that were identified then were

15  generally higher dose than what we're talking about here under

16  this petition.

17  Q.   You agree with Dr. Kristina Thayer, a former NTP scientist

18  as well as a current EPA scientist, that the animal data on

19  fluoride supports the biological plausibility of fluoride

20  causing neurotoxic effects in humans, correct?

21  A.   Most of that was based upon adult neurotoxicity, not

22  predominantly developmental neurotoxicity, but the general --

23  general conclusion I think I agree with.

24  Q.   And you recognize when we're dealing with the

25  developmental period in rodent studies that rodents are

1  actually going to be less sensitive to fluoride's neurotoxic

2  effects than humans, correct?

3  **A.**    I've already written to that particular finding that at

4  least rodent studies -- rodent models are less sensitive since

5  the third trimester in rodents is -- in comparison to humans'

6  brain development is postnatal.

7      And so given that fluoride exposure through lactational

8  transfer is very limited, there would be less exposure during

9  the -- into rodent pups during the postnatal period until eye

10  opening where, around day 13, they start drinking the water

11  that the mom is drinking.  So the exposure -- there's a gap in

12  exposure generally during the postnatal period in rodents.

13  **Q.**    Right.  And that's an important difference when we're

14  looking -- we're comparing the results in animals with the

15  results in humans because in human populations, it's a common

16  practice for babies to be fed formula made with fluoridated

17  water, correct?

18  **A.**    So if you're comparing like to like, the first week

19  postnatally would be the third trimester in humans.  So if

20  you're talking about essentially around the time of eye

21  opening, they're getting the same water and during that whole

22  period they're -- they're lactating.  So there's a -- there is

23  a difference in lactational transfer between rodents and

24  humans.

25      If you're talking about formula feeding, formula feeding

 1  would be more like the rats second to third week -- day 13 --

 2  between day 13 and day 21 is usually weaning in rodent models.

 3  Q.   And at your deposition, you agree that these limitations

 4  with animal studies, including the limited third trimester

 5  window in utero as well as the lack of lactational transfer to

 6  the newborn pup, those factors will reduce the sensitivity of

 7  animal models in detecting fluoride's developmental

 8  neurotoxicity, correct?

 9  A.   That's what I wrote too.

10  Q.   And, Dr. Barone, you published a paper in 2000 where you

11  summarized a lot of the developmental neurotoxicology

12  literature that you were looking at, at that time, correct?

13  A.   Deborah Rice and I summarized the cross-species milestones

14  for development of the brain and growth and development in

15  general, tried to put that in a cross-species context for the

16  very questions we're talking about, so that risk assessors and

17  researchers would better understand how to extrapolate across

18  species and how -- where some of the data gaps were, actually,

19  in extrapolating across species about critical periods of brain

20  development.

21  Q.   And in your review, you identify and discussed how there

22  are sex-specific differences in the way the brain in male

23  animals develops from the way the brain in female animals

24  develop, correct?

25  A.   We did.  And at least for development of the -- again, the

1  neuroendocrine axis, the brain is a neuro -- is an endocrine

2  organ and there are discrete differences between males and

3  females that develop and differences in behavior that develop.

4  **Q.**   Now, with respect to the NTP's dose-response analysis,

5  counsel showed you tables during direct, eTable 4 and eTable 5.

6  Do you recall that?

7  **A.**   I do.

8  **Q.**   And you're aware, Dr. Barone, that those tables are

9  looking at group average exposures, correct?

10 **A.**   They have to.  They're looking at group average exposures

11 and group average outcome, the exposure outcome relationship in

12 order to do the meta-analysis.

13 **Q.**   And you're aware that NTP did a separate analysis where

14 they looked at individual data and -- you're aware of that,

15 right?

16 **A.**   I am.

17 **Q.**   And you see here eFigure 23 on the screen; do you see

18 that?

19 **A.**   I do.

20 **Q.**   And that's page 53 of the supplemental materials to the

21 meta-analysis, Dr. Barone?

22 **A.**   It is.

23 **Q.**   Okay.  And here counsel didn't ask you a single question

24 about this figure, right?

25 **A.**   No.  I don't remember this figure actually coming up

BARONE - CROSS / CONNETT

1   because, again, we're talking about the individual studies.

2   This is an analysis of the individual studies and, again, we

3   talked about the forest plot previously, but this is sort of

4   sub analysis to that.

5   **Q.**   Right.  In this analysis here, NTP is aggregating the

6   relationship between individualized exposure to fluoride and

7   IQ, correct?

8   **A.**   Yes.

9   **Q.**   And they're looking at three separate metrics of

10  individualized exposure.  They're looking at water fluoride,

11  urine fluoride and fluoride intake, correct?

12  **A.**   They are looking at different exposure metrics as it

13  relates to outcome.

14  **Q.**   And for each and every one of those three metrics, when

15  NTP aggregated the available data, it found a statistically

16  significant reduction in IQ, correct?

17  **A.**   I'm not sure I totally agree with that, but overall, yes,

18  I would agree with that.

19  **Q.**   Well, is the -- is the effect for water -- individualized

20  water fluoride exposure and IQ, is that effect statistically

21  significant?

22  **A.**   I think it is, yes.

23  **Q.**   Is the effect of individualized urine fluoride and IQ

24  statistically significant?

25  **A.**   Yes, I believe so.

BARONE - CROSS / CONNETT

1  **Q.**   And is the effect for fluoride -- individualized fluoride

2  intake and IQ significant?

3  **A.**   With fairly large confidence intervals.

4       **MR. CONNETT:**  Thank you, Dr. Barone.  Those are all

5  the questions I have.

6       **THE COURT:**  All right.  Just so I understand, could

7  you put that last chart up?  I just want to make sure I

8  understand you.

9       So this was done differently than the other

10 meta-analysis in the forest plot?  This was not just averages,

11 or maybe you can explain to me your understanding as to what

12 we're looking at here.

13      **THE WITNESS:**  So again, we're looking at a number of

14 studies which have very different ranges of exposure.  The

15 urine exposure -- Ding 2011, for example, didn't see -- didn't

16 see effects on -- associated with IQ decrements until about

17 3 mgs per liter of urinary fluoride.

18      The 2 to 3 range was sort of where they were because

19 it was endemic fluoride.

20      So you're looking across a wide range of exposure and

21 wide range of conditions.

22      So what the NTP is trying to do here is look at per

23 milligram per liter urinary fluoride and do their regression

24 analysis.  It's, again, another way to try to normalize a

25 large, diverse group of studies.

1        THE COURT:  Uh-huh.

2        THE WITNESS:  I think, you know, counsel had -- the

3   plaintiffs' counsel has brought up issues about looking at each

4   of the studies and looking at the actual -- all the data.  This

5   is another way to normalize the data and try to bring it

6   together -- bring the studies together, so it's another way of

7   reviewing and analyzing the data.

8        THE COURT:  So if you look at just water, look at the

9   Green 2019, was the beta value there that which -- how was that

10  obtained?  Was that -- was that inferred or extracted, or was

11  that in the study, or how is that --

12       THE WITNESS:  No.  This is -- these beta values, I

13  believe, beta coefficients are -- if I remember correctly is

14  coming from the derivations that each -- that was done by NTP.

15  I don't think these are the beta coefficients of each study.

16       THE COURT:  And how do they derive that beta

17  coefficient?

18       THE WITNESS:  Honestly, I don't remember, Your Honor.

19       THE COURT:  And then the weight percentage, what is

20  that in the far right column?

21       THE WITNESS:  So I believe the weight percentage had

22  to do with a combination of factors.  I believe it had to do

23  with the -- one of the factors, of course, was the number of

24  subjects, but I think the other had to do with the ranking

25  given from the systematic review for the risk of bias.  There

BARONE - CROSS / CONNETT

1  were different ranking factors.  So I think they came up with a

2  weight percentage based upon those two discernments.

3          THE COURT:  So that's the weight to be accorded to

4  that particular study in the meta-analysis?

5          THE WITNESS:  Accorded to the study is what I believe.

6          THE COURT:  Okay.  And then -- I should know this --

7  heterogeneity.  Can you explain that?

8          THE WITNESS:  So, again, heterogeneity comes from

9  different factors; heterogeneity in the study, exposure

10  assessment.  There can be heterogeneity in the outcome

11  assessment.  I think they are trying to look at the

12  heterogeneity overall in their regression.

13          THE COURT:  Is that a way of combining or summarizing

14  the --

15          THE WITNESS:  It's a way of getting at how similar are

16  these or how different these are.

17          THE COURT:  How different or similar which are?

18          THE WITNESS:  The studies within the group, the water

19  studies, the urine studies, the intake studies.

20          So you're trying to get at how much heterogeneity is

21  there between studies, not necessarily heterogeneity within the

22  study.

23          THE COURT:  Okay.

24          So if there's large heterogeneity among or between the

25  studies, what's the statistical value of that?  Is it -- what

1  does one infer from that?

2         THE WITNESS:  One infers that it's hard to compare

3  across studies if there's large heterogeneity in that group.

4         THE COURT:  And so if you look at urine, there's

5  numbers there, T square, I square, H square; whereas, it's zero

6  for the water and the intake, but there are certain numbers

7  there for urine, the center group.  What does that mean?

8         THE WITNESS:  Honestly, Your Honor, I don't know.  I

9  would only be speculating at this point.

10        THE COURT:  Okay.  And is that heterogeneity related

11 to the size of the confidence interval?

12        THE WITNESS:  It's going to be related to the size of

13 the confidence intervals around the means.

14        THE COURT:  Okay.

15        THE WITNESS:  And generally, just speculating because

16 I'm looking at the plot of the heterogeneity, generally the

17 plot of the heterogeneity -- the larger the R squared, the

18 smaller the plot --

19        THE COURT:  Okay.

20        THE WITNESS:  -- if that's any help.

21        THE COURT:  It is of some help.  Okay.  Thank you.

22        Redirect?

23        MR. ADKINS:  Yes, Your Honor.

24 \\\

25 \\\

1      <u>**REDIRECT EXAMINATION**</u>

2    **BY MR. ADKINS:**

3    **Q.**   Dr. Barone, with respect to eTable or eFigure 23, this is

4    not evidence of dose response, correct?

5    **A.**   No, sir.

6    **Q.**   And I want to briefly go back to something that counsel

7    showed from your deposition.  This was deposition page 234,

8    lines 2 through 7 where you confirmed that you received a copy

9    of the email exchange from Kyla Taylor of the NTP --

10   **A.**   I did.

11   **Q.**   -- at some point after finishing your initial report.  And

12   you remember that discussion --

13   **A.**   Yes.

14   **Q.**   -- with counsel?

15   **A.**   I did.

16   **Q.**   Now, you had received a copy of that email before

17   disclosing your rebuttal summary, correct?

18   **A.**   Yes, I did.

19   **Q.**   And you referred to that -- that email exchange in your

20   rebuttal summary?

21   **A.**   I did.

22   **Q.**   In fact, you interviewed Dr. Ibarluzea about what he wrote

23   to Kyla Taylor; isn't that right?

24   **A.**   I did.  I asked questions to help understand what was the

25   nature, you know, of the units and why were the units -- why

 1  was -- why weren't there correction of units in a transfer of

 2  that information.

 3  **Q.**   In your rebuttal report, you wrote that the NTP

 4  misrepresents the data that Dr. Ibarluzea provided to

 5  Dr. Taylor based on that interview you conducted, right?

 6  **A.**   That's correct.

 7          **MR. ADKINS:**  Okay.  No further questions, Your Honor.

 8          **THE COURT:**  All right.  Anything further?

 9          **MR. CONNETT:**  Nothing further, Your Honor.

10          **THE COURT:**  All right.  Thank you, Dr. Barone,

11  appreciate your testimony.  You may step down.  You're excused.

12          And I believe, with the exception of the video

13  deposition of Dr. Ibarluzea, that concludes the presentation of

14  evidence, no further evidence on either side?

15          **MR. ADKINS:**  Yes, Your Honor.  EPA rests.

16          **MR. CONNETT:**  Your Honor, we have just one -- we have

17  rebuttal evidence on the topic of if dental fluorosis were to

18  be used as a point of departure, we have 30(b)(6) testimony

19  from EPA earlier in this litigation where the EPA

20  representative talks about the database uncertainty factor and

21  how you -- how you would use the database uncertainty factor to

22  account for the concern for neurotoxicity.

23          We think that -- we would -- we would -- we would ask

24  to be able to submit that -- those 30(b)(6) designations on

25  that one limited topic as an exhibit.

 1          **MR. ADKINS:**  Well --

 2          **THE COURT:**  Tell me again what this 30(b)(6) -- this

 3    is a 30(b)(6) depo?

 4          **MR. CONNETT:**  Yes, of EPA's representative in the

 5    first phase of litigation, Your Honor.

 6          And he testified that based on the NRC's findings in

 7    2006 that there was enough concern at that time on

 8    neurotoxicity to use a database uncertainty factor of 10 to

 9    account for that concern, even though using a dental fluorosis

10    endpoint as the -- as the POD.

11          So it's a limited testimony, Your Honor, it's about

12    six pages of testimony, but it explains what is a database

13    uncertainty factor and why you would use it to account for an

14    endpoint for which you have meaningful concern but which is not

15    the endpoint that you're basing the risk assessment on.

16          **THE COURT:**  Okay.  Mr. Adkins?

17          **MR. ADKINS:**  Your Honor, this was disclosed last

18    night, not in December when Your Honor's order said that the

19    parties needed to exchange deposition designations.  So I think

20    the only way this could come in is as true rebuttal evidence.

21          Now, Dr. Barone testified clearly -- I thought it was

22    clear -- that the point of departure from this -- the

23    systematic review that the Health Canada panel reviewed was not

24    appropriate to use in this case because we're talking about

25    neurotoxicity.

 1          And, in fact, if we were talking about dental

 2    fluorosis, we would remove -- renew our motion to dismiss this

 3    case for lack of standing because none of the plaintiffs in

 4    this case have articulated a concrete injury from dental

 5    fluorosis based on community water fluoridation.  So I don't

 6    think in is rebuttal evidence.

 7          With respect to plaintiffs' counsel's representations

 8    about the actual designations, the testimony relates to the

 9    Safe Drinking Water Act.  So even if this could be rebuttal

10    evidence, I don't see how it has any relevancy here, because

11    we're talking about a completely different statute and a

12    completely different health outcome.

13          MR. CONNETT:  Your Honor, just --

14          THE COURT:  So what is this in rebuttal to?

15          MR. CONNETT:  Well, it's in rebuttal to -- and we can

16    live without this, but, like, it's just -- you know, this

17    notion of a database uncertainty factor arose within the course

18    of this trial.  It had -- we hadn't been talking about data

19    base uncertainty factors at any point in the second phase of

20    this litigation, so it wasn't something that I was thinking of

21    as something I would want to introduce evidence on.  But then

22    during the course of this trial we get this RSI report from

23    Canada which uses this phrase "database uncertainty factor,"

24    and I thought, you know, to the extent that the Court wanted

25    information to understand what that means, this 30(b)(6)

1    designation would provide that.

2          But, Your Honor, it's not something that I'll -- you

3    know, that I would -- I want to spend much of my time on, given

4    that we have limited time, but that's it.  We just wanted to

5    introduce those designations so that the Court would have some

6    information about how EPA applies database uncertainty factors.

7          **THE COURT:**  Well, I'm trying to recall what in the RSI

8    report talked about database uncertainty factors, but, frankly,

9    I haven't reviewed that since it was a new piece, but is there

10   something in the EPA protocol or something that addresses this

11   thing called "database uncertainty"?

12         **MR. CONNETT:**  They --

13         **THE COURT:**  Is that part of the --

14         **MR. CONNETT:**  The EPA typically -- they don't use

15   database uncertainty factors under TSCA because under TSCA with

16   the risk evaluation, you select your endpoint -- right? -- and

17   then you -- and then you apply your uncertainty factors on that

18   endpoint.

19         So it is -- it is a different framework, and I

20   certainly accept that.  It's definitely a different framework.

21         But to the extent that the Court wanted to understand

22   more fully, well, hey, if we had -- if we did take the approach

23   that Canada took here, what would a database uncertainty factor

24   mean, that's what this 30(b)(6) designation would show the

25   Court.  But, again, I don't think it's -- you know, it's not

1    the most important bit of evidence, and I don't want to take up

2    the Court's time on it, but that's -- that's the only bit of

3    rebuttal evidence that we would seek to introduce.

4            **THE COURT:**  All right.  Well, it seems to me it's not

5    directly relevant from what I could see.  It's -- it's

6    questionable whether it's really rebuttal because I don't --

7    it's not in rebuttal to something the government raised, so I'm

8    going to exclude that.  I don't think we need that.

9            **MR. CONNETT:**  Okay.

10           **THE COURT:**  Okay?  Other than that are we concluded

11   with the evidence?

12           **MR. CONNETT:**  Yes, Your Honor.

13           **MR. ADKINS:**  Yes, Your Honor.

14           **THE COURT:**  All right.  And just to make clear, with

15   respect to the first trial, I think we -- I had stipulated that

16   that would be part of this record.  There wasn't a whole lot of

17   reference in this trial to that, and maybe that's one thing I

18   should ask you.  Is there -- I don't have to reread the trial

19   record, Trial 1; a lot has evolved since then, but as you sit

20   here right now or as you stand here right now, are there key

21   parts -- and I don't think you've cited much in your proposed

22   findings from the first trial, but is there much from the first

23   trial that you think that the Court should examine or

24   reexamine?

25           **MR. CONNETT:**  Well, for -- for -- from plaintiffs'

---

1    vantage point, Your Honor, we have cited in our proposed

2    findings of fact quite a few references, actually, to the

3    first -- to the evidence in the first trial.

4         And I think, generally speaking, I think some of the

5    most important evidence there is the trial declarations by our

6    experts, which kind of lay out sort of detailed discussion of

7    some of the studies at issue.  But we have cited in our

8    proposed facts, Your Honor, a number of -- trial testimony,

9    exhibits and trial declarations.

10        **THE COURT:**  All right.  Well, that's why there's a

11   premium on your submitting to me these findings of facts and

12   conclusions of law, because I don't want to have to just go

13   through, indiscriminately, the whole first trial, but if

14   there's some key things that either one of you think that I

15   should relook at, I'm going to rely on you to pinpoint that for

16   me --

17        **MR. ADKINS:**  Okay.

18        **THE COURT:**  -- okay?

19        All right.  So we'll have revised sort of, you know,

20   final iteration of the proposed findings of fact and

21   conclusions of law by -- did I say 2:00 or something on Friday?

22        **MR. ADKINS:**  I think it was 2:00 on Friday, yeah.

23        **THE COURT:**  2:00?

24        **MR. ADKINS:**  2:00 Pacific.

25        **THE COURT:**  Pacific.

1           **THE CLERK:**  I have 1:00.

2           **THE COURT:**  Oh, 1:00.  Ah.  Good.  Thank you.  That's

3    right.

4           **MR. ADKINS:**  Honest mistake, I promise.

5           **THE COURT:**  2:00 Mountain Time I was thinking.

6           So 1:00 Pacific Standard Time, and then we will see

7    you on Zoom on Tuesday at 9:30.

8           I think you all went over the clock.  You know, I

9    anticipate that, you know, we'll go for an hour, hour and a

10   half or something, so I don't expect more than 45 minutes of

11   close.

12          I'm probably going to be more interested, as I say, in

13   some questions I'm going to propound to you, and so you don't

14   have to present this like a normal closing to the jury.  I

15   think there's some key things I -- and I'll give you a chance

16   to emphasize some things too.  I will try to get you those

17   questions within the next couple of days --

18          **MR. ADKINS:**  Okay.

19          **THE COURT:**  -- the focus areas, anyway.

20          **MR. CONNETT:**  And, Your Honor, are you going to be

21   providing the questions in advance of closing?

22          **THE COURT:**  Yeah, within the next day or two.

23          **MR. CONNETT:**  Great.

24          And would it be -- would we have an option, the

25   plaintiffs, to reserve a brief -- out of our time -- a brief

1    time for rebuttal?

2        **THE COURT:**  Yeah.  I mean, normally you get a

3    rebuttal.

4        I'm almost seeing this as a -- almost like a

5    law-and-motion kind of argument and it's -- you know when we do

6    these things -- when I do these things, it's almost a dialogue.

7    It's not a structured stand up for the jury.  I think I have

8    questions and -- question by question, I may ask each of you to

9    respond.  So I don't think we're going to have a formal

10   rebuttal, but you'll have a chance -- probably an iterative

11   process going back and forth about some of these questions.

12       But if there's some key things you want to emphasize,

13   you might prepare a five or seven-minute thing, you know, to

14   highlight what you think should be highlighted, but I will want

15   to get to some of the questions.

16       **MR. ADKINS:**  Very good.

17       **THE COURT:**  Okay?

18       **THE CLERK:**  Do you want to know how much time each

19   party has left?

20       **THE COURT:**  Well, you can tell us.

21       **THE CLERK:**  It's really close.  Plaintiffs have 43,

22   defendants have 41.

23       **THE COURT:**  Oh.  So that's just about what I said.

24   We're going to do about an hour and a half or something I

25   anticipate.  Okay?

1            **MR. CONNETT:**  Thank you, Your Honor.

2            **THE COURT:**  All right.  Thank you all.  Appreciate it.

3    This has been very interesting.

4            Obviously this is a significant issue and we've known

5    about its significance and so does the scientific community,

6    obviously, given all the work that's been done by the NTP and

7    the reviewers and now we have Canada and everything else as

8    well as other areas, but -- you know? -- so I will have some

9    questions.  Great.  Thank you. Appreciate it.

10           **THE CLERK:**  Court is adjourned.

11        (Adjourned at 10:38 a.m.)

12                          --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1

2

3                    **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7

8    _____          February 14, 2024
     JENNIFER L. COULTHARD, RMR, CRR              DATE
9    Official Court Reporter
     CA CSR#14457
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25