1  ADAM R.F. GUSTAFSON
   Acting Assistant Attorney General
2

3  BRANDON N. ADKINS
   United States Department of Justice
4  Environment & Natural Resources Division
   P.O. Box 7611
5  Washington, D.C. 20044
   Tel: (202) 598-9562
6  Fax: (202) 514-8865
   Brandon.Adkins@usdoj.gov
7

8  *Attorneys for Defendants*

9

10              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
11               **SAN FRANCISCO DIVISION**

12
   FOOD & WATER WATCH, INC., et al.,
13
                    Plaintiffs,          Case No. 17-CV-02162-EMC
14
          v.                             **EPA'S OPPOSITION TO PLAINTIFFS'**
15                                        **MOTION FOR ATTORNEY FEES**
   U.S. ENVIRONMENTAL PROTECTION         **AND EXPENSES**
16 AGENCY, et al.,

17                  Defendants.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...............................................................................................1

BACKGROUND .................................................................................................1

LEGAL STANDARD ..........................................................................................2

ARGUMENT .....................................................................................................2

I.       No Award of Fees or Expenses for the First Trial is Appropriate. ....................................3

II.      Plaintiffs May Only Receive an Award that is Based on Reasonable Rates for
         Environmental Litigation in this District and Reasonably Charged Hours. ......................8

         A.       The Court Should Use the Real Rate Reports to Set Counsel's Rates...................8

                  1.       Data from the Real Rate Reports Are Objective and Reliable...................9

                  2.       EPA's Expert Calculated Reasonable Rates Using
                           Reliable Methodologies. .........................................................10

                  3.       Plaintiffs' Proposed Rates Are Not Reasonable.....................................11

                           a.       The LSI Laffey Matrix is Not Useful............................................12

                           b.       Plaintiffs' Upward Cost-of-Living Adjustment is Unsupported. ..13

                           c.       Plaintiffs' Attorney-Declarants Do Not Support the
                                    Requested Rates.........................................................14

                           d.       Plaintiffs' Requested Rates are Inflated......................................19

                           e.       Plaintiffs Fail to Justify Why Mr. Connett Should Skip Ahead
                                    Four Years. ............................................................20

         B.       The Court Should Reduce Plaintiffs' Claimed Hours That Are Not
                  Reasonably Charged. ...........................................................................20

                  1.       Non-Litigation Hours ..........................................................21

                  2.       Litigation Over Public-Records Requests..............................................22

                  3.       Irrelevant Non-Party Depositions.........................................................23

III.   No Multiplier of Mr. Connett's Lodestar is Appropriate.................................................23

       A.    The Lodestar Presumptively Reflects a Reasonable Fee. .................................23

       B.    Plaintiffs Fail to Overcome the Presumption of Reasonableness. ....................24

IV.   No Award of Litigation Expenses is Appropriate. ...........................................................27

       A.    Plaintiffs Already Recouped Their Litigation Costs...........................................27

       B.    Litigation Expenses Relating to the First Trial.................................................28

       C.    Improperly Charged Travel Expenses................................................................28

             1.    Mr. Connett's Non-Litigation Travel ..................................................28

             2.    Mr. Connett's Travel to and Extended Stay in Spain..........................28

             3.    Mr. Connett's Travel to and Extended Stay in Denmark ....................29

             4.    Mr. Connett's Travel to Canada for a Scientific Conference ..............29

             5.    Mr. Connett's Travel for Irrelevant Non-Party Depositions................29

             6.    Philippe Grandjean's Extended Stay in the United States....................30

             7.    Plaintiff's Stay in San Francisco for Second Trial..............................30

CONCLUSION.................................................................................................................................30

APPENDIX A (revised lodestar calculations)

APPENDIX B (hours reductions)

APPENDIX C (expenses reductions)

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Savage,*
  No. 15-54, 2019 WL 3293425 (D. Mont. July 22, 2019)........................................................11

*Am. Petrol. Inst. v. EPA,*
  72 F.3d 907 (D.C. Cir. 1996).....................................................................................................2

*B. & E.F. Maldonado v. Morgan Hill Unified Sch. Dist.,*
  No. 21-6611, 2022 WL 4371003, at *13 (N.D. Cal. Sept. 21, 2022), *aff'd sub nom. Maldonado
  v. Morgan Hill Unified Sch. Dist.*, No. 22-16572, 2023 WL 7671371
  (9th Cir. Nov. 15, 2023) ................................................................................. 10, 16, 17, 19

*Blum v. Stenson,*
  465 U.S. 886 (1984) ........................................................................... 8, 15, 20, 24, 27

*Brackett v. Mayorkas,*
  No. 17-988, 2023 WL 5094872 (D.D.C. Aug. 9, 2023).........................................................12

*Cabrales v. Cnty. of L.A.,*
  935 F.2d 1050 (9th Cir. 1991) ...................................................................................................7

*Californians for Alts. to Toxics v. Kernen Constr.,*
  No. 20-1348, 2023 WL 4991861 (N.D. Cal. Apr. 21, 2023), *amended report &
  recommendation adopted by* 2023 WL 4995716 (June 13, 2023)............................................11

*Camacho v. Bridgeport Fin., Inc.,*
  523 F.3d 973 (9th Cir. 2008) ....................................................................................................8

*Chambers v. Whirlpool,*
  980 F.3d 645 (9th Cir. 2020) .....................................................................................23, 24, 25

*Chen v. BMW of N. Am., LLC,*
  No. 21-3531, 2022 WL 18539356 (N.D. Cal. Nov. 14, 2022) ...............................................10

*City of Burlington v. Dague,*
  505 U.S. 557 (1992) ...........................................................................................................24, 25

*Coastal Env't Rts. Found. v. Aztec Perlite Co.,*
  No. 24-385, 2024 WL 4520350 (S.D. Cal. Oct. 16, 2024).....................................................11

*Cohodes v. U.S. Dep't of Justice,*
  No. 20-4015, 2025 WL 572888 (N.D. Cal. Jan. 24, 2025) ......................................................9

*Dishman v. UNUM Life Ins. Co. of Am.*,
  269 F.3d 974 (9th Cir. 2001) ................................................................21

*Ferguson v. Cnty. of L.A.*,
  No. 18-6861, 2021 WL 3516260 (C.D. Cal. Jan. 4, 2021)................................ 9, 16, 17, 19, 25

*G & G Fire Sprinklers, Inc. v. Bradshaw*,
  156 F.3d 893 (9th Cir. 1998), *vacated on other grounds*, 526 U.S. 1061 (1999)....................17

*Gates v. Deukmejian*,
  987 F.2d 1392 (9th Cir. 1992) ................................................................21

*GemCap Lending I, LLC v. Unity Bank Minn.*,
  No. 18-5979, 2019 WL 3842010 (N.D. Cal. Aug. 15, 2019)............................ 13, 14

*Gonzalez v. City of Maywood*,
  729 F.3d 1196 (9th Cir. 2013) ................................................................15, 17

*Haw. Wildlife Fund v. Cnty. of Maui*,
  No. 12-198, 2022 WL 617987 (D. Haw. Feb. 15, 2022) ...............................11

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ................................................................ 8, 23, 24, 27

*Human Rts. Def. Ctr. v. Cnty. of Napa*,
  No. 20-1296, 2021 WL 1176640 (N.D. Cal. Mar. 28, 2011) ...............................25

*Ibrahim v. U.S. Dep't of Homeland Sec.*,
  912 F.3d 1147 (9th Cir. 2019) ................................................................7

*Inland Empire Waterkeeper v. Corona Clay Co.*,
  No. 18-333, 2024 WL 4492294 (C.D. Cal. Jan. 19, 2024)........................6

*J.T. v. District of Columbia*,
  652 F. Supp. 3d 11 (D.D.C. 2023) ................................................................12, 14

*Kohler v. Eddie Bauer LLC*,
  792 F. App'x 446 (9th Cir. 2019) ................................................................8, 9, 17

*LaToya v. S.F. Unified Sch. Dist.*,
  No. 15-4311, 2016 WL 344558 (N.D. Cal. Jan. 28, 2016) ...............................15

*Lauritzen v. Lehman*,
  736 F.2d 550 (9th Cir. 1984) ................................................................3

*Li v. ArcSoft, Inc.*,
  No. 19-5836, 2024 WL 4800753 (N.D. Cal. Oct. 8, 2024) ...............................9

*Mackey v. Cal. Highway Patrol,*
  No. 11-3560, 2018 WL 6137166 (S.D. Cal. Jan. 23, 2018) ...................................................27

*McMahon v. United States,*
  342 U.S. 25 (1951) ........................................................................................................2, 22

*Michigan v. EPA,*
  254 F.3d 1087 (D.C. Cir. 2001) ...........................................................................................21

*Moreno v. City of Sacramento,*
  534 F.3d 1106 (9th Cir. 2008) ......................................................................... 8, 12, 15, 17

*N.Y. Gaslight Club v. Carey,*
  447 U.S. 54 (1980) ...............................................................................................................21

*Parsons v. Ryan,*
  949 F.3d 443 (9th Cir. 2020) ...............................................................................................24

*Pennsylvania v. Del. Valley Citizen's Council for Clean Air,*
  478 U.S. 546 (1986) .......................................................................................................23, 24

*Perdue v. Kenny A. ex rel. Winn,*
  559 U.S. 542 (2010) ....................................................................2, 23, 24, 25, 26, 27

*Peterson v. Sutter Med. Found.,*
  No. 21-4908, 2023 WL 5181634 (N.D. Cal. Aug. 10, 2023) ...............................................13

*Pollinator Stewardship Council v. EPA,*
  No. 13-72346, 2017 WL 3096105 (9th Cir. June 27, 2017), *aff'd,* No. 23-2911,
  2025 WL 1823959 (9th Cir. July 2, 2025) ...........................................................................13

*Prison Legal News v. Schwarzenegger,*
  608 F.3d 446 (9th Cir. 2010) ....................................................................................... 13, 14

*Public.Resource.org v. IRS,*
  No. 13-2789, 2015 WL 9987018 (N.D. Cal. Nov. 20, 2015)................................................13

*RG Abrams Ins. v. L. Offs. of C.R. Abrams,*
  342 F.R.D. 461 (C.D. Cal. 2022) ..........................................................................................9

*Roosevelt Campobello Int'l Park Comm'n v. EPA,*
  711 F.2d 431 (1st Cir. 1983)................................................................................................21

*Ruckelshaus v. Sierra Club,*
  463 U.S. 680 (1983) ..............................................................................................3, 5, 6, 7

*Sam K. ex rel. Diane C. v. Haw. Dep't of Educ.,*
  788 F.3d 1033 (9th Cir. 2015) ..................................................................................... 8, 15

*Seven Signatures Gen. P'ship v. Irongate Azrep BW LLC*,
   871 F. Supp. 2d 1040 (D. Haw. 2012) ..................................................................8

*Shirrod v. Dir., Off. of Worker's Comp.,*
   *Progs., 809* F.3d 1082 (9th Cir. 2015) ............................................... 11, 13, 14

*Sierra Club v. EPA,*
   No. 23-1744, 2025 WL 2097611 (D.D.C. July 25, 2025)......................................12

*St. John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.,*
   574 F.3d 1054 (9th Cir. 2009) ..............................................................................3

*Strojnik v. Inn at Jack London Square, LLC,*
   No. 20-1289, 2021 WL 11586331 (N.D. Cal. Jan. 28, 2021),
   *report & recommendation adopted by* 2021 WL 11586330 ..................................9

*United States ex rel. Thrower v. Acad. Mortg. Corp.,*
   No. 16-2120, 2024 WL 5424428 (N.D. Cal. May 31, 2024) ............................... 10, 19, 26, 27

*Van Gerwen v. Guarantee Mut. Life Co.,*
   214 F.3d 1041 (9th Cir. 2000) ............................................... 24, 25, 27

*Vogel v. MS Food Servs., Inc.,*
   No. 16-8433, 2018 WL 11027947 (C.D. Cal. Dec. 26, 2018)......................................9, 15, 20

*Webb v. Bd. of Educ. of Dyer Cnty, Tenn.,*
   471 U.S. 234 (1985) ..............................................................................21

*Welch v. Metro. Life Ins. Co.,*
   480 F.3d 942 (9th Cir. 2007) ..............................................................................21, 27

*Widrig v. Apfel,*
   140 F.3d 1207 (9th Cir. 1998) ..............................................................................15

**Statute**

15 U.S.C. § 2620 ...............................................................................1–3, 21–22, 24, 27, 30

**Federal Rule of Civil Procedure**

Fed. R. Civ. P. 12(h)(3) ...............................................................................3

**INTRODUCTION**

The Toxic Substances Control Act ("TSCA") authorizes an award of reasonable fees of attorneys and expert witnesses and litigation costs when such an award is appropriate. This statutory authorization is meant to compensate successful litigants, not endow their attorneys with windfalls. Subject to the pending appeal of the judgment, EPA agrees that the statute authorizes an award for work performed in connection with the second trial in this case. But Plaintiffs and their newly hired fees counsel demand that U.S. taxpayers pay windfall fees and expenses. They base their request on rates for lawyers in the District of Columbia under the guise of convenience and attempt to paper over their unreliable methodology with the unsupported assertion that rates in San Francisco are even higher. That assertion is contradicted by objective survey data that even Plaintiffs admit is credible. Plaintiffs cite no case where their requested rates were found to be reasonable for environmental litigation in this or any other district. And the form declarations they submitted to support their request are so generic they could have been submitted in any case. Instead, if the Court is inclined to issue a fee award, it should award rates based on objective data and reliable methodologies for estimating rates for environmental litigation in this District. The Court should also trim hours that were not reasonably charged, such as for non-litigation tasks and time spent litigating other cases (including one where Plaintiffs recently demanded fees).

No award of litigation expenses is appropriate because Plaintiffs recouped those same costs and much more through targeted fundraising for this case, including by their lead counsel. Even if the Court awards litigation expenses, no award is appropriate for unreasonable costs, especially those for counsel's extended and unnecessary international trips.

**BACKGROUND**

In April 2017, Plaintiffs commenced this action under TSCA section 21, 15 U.S.C. § 2620, after EPA denied their 2016 petition seeking the issuance of a nationwide rule to prohibit the fluoridation of community drinking water. ECF No. 1. In December 2019, the Court denied the parties' cross-motions for summary judgment. ECF No. 156. In June 2020, the Court held a seven-day bench trial on Plaintiffs' claim that fluoridated drinking water presents an unreasonable risk of injury to human health. In August 2020, the Court placed the case in abeyance without a decision

EPA'S OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. 17-CV-02162-EMC

and instructed Plaintiffs to submit a new petition to EPA. ECF No. 262. In October 2022, the Court lifted the abeyance, and a second round of discovery ensued. Beginning in January 2024, the Court held a second, ten-day bench trial. In September 2024, the Court issued findings of fact and conclusions of law and ordered EPA to initiate an administrative proceeding. ECF No. 445. The judgment is on appeal. ECF No. 455. EPA agreed to $102,727.33 in taxable costs, payable subject to the outcome of an appeal. ECF No. 454. Plaintiffs now request an award of more than $10 million in fees for their attorneys and experts and litigation expenses. Mot. 28, ECF No. 479.

## LEGAL STANDARD

If the Court determines it is "appropriate," the Court may award "costs of suit and reasonable fees for attorneys and expert witnesses." 15 U.S.C. § 2620(b)(4)(C). TSCA's fee-shifting provision is a waiver of sovereign immunity and, as such, must be "construed strictly in favor of the [United States]." *See McMahon v. United States*, 342 U.S. 25, 27 (1951). In exercising its discretion, the Court should consider that "expense[s] or fees that may not be unreasonable between a first[-]class law firm and a solvent client, are not always supported by indicia of reasonableness sufficient to allow us justly to tax the same against the United States." *Am. Petrol. Inst. v. EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) (cleaned up); *see also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 559 (2010) ("[F]ees are paid [by] taxpayers, and . . . money that is used to pay attorney's fees is money that cannot be used for programs that provide vital public services.").

## ARGUMENT

If inclined to issue an award, the Court should award Plaintiffs no more than $1,352,085 in reasonable fees for attorneys and no litigation expenses. An award of fees and expenses is "appropriate" only for work performed for the second trial and all pre-trial motions. In awarding reasonable fees for Plaintiffs' attorneys, the Court should use reliable survey data for environmental litigation in this District, not an outdated matrix for general litigation in the District of Columbia. And the Court should reduce some of the attorney hours Plaintiffs charged because they are not reasonable. No multiplier of Michael Connett's lodestar is appropriate. No award for litigation expenses is appropriate because Plaintiffs fully recovered their costs through targeted fundraising. If the Court awards expenses, it should also remove improperly charged expenses.

1

## I.    NO AWARD OF FEES OR EXPENSES FOR THE FIRST TRIAL
##        IS APPROPRIATE.

2

Plaintiffs demand reimbursement for over 6,000 hours of work by attorneys, law clerks,

3    and support staff plus expert fees and expenses that span two separate discovery periods and two

4    trials. The Court should award no fees or expenses for the first trial where Plaintiffs failed to prove

5    standing or the merits. The Court allowed this civil action to continue for prudential reasons, but

6    those reasons do not overcome the rule that no fee award is "appropriate" where a party is entirely

7    unsuccessful on the merits. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983). Thus, the

8    Court's award should consist of reasonable fees and litigation expenses incurred after January

9    2021 (a month before Plaintiffs moved for leave to amend), plus fees and expenses relating to

10   motions practice before January 2021. This alone would reduce the demand by 3,711 attorney

11   hours and $341,481 in expenses. *See* App'x B; Adkins Decl. Exs. O & P.

12       TSCA section 21 permits, but does not require, an award of expenses and fees when

13   "appropriate." 15 U.S.C. § 2620(b)(4)(C). "Appropriate" generally means "specially suitable: fit,

14   proper." *See Ruckelshaus*, 463 U.S. at 683 (cleaned up). In the Ninth Circuit, denial of any award

15   to a *prevailing* plaintiff is typically limited to where there are "special circumstances." *See St.*

16   *John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1063 (9th Cir.

17   2009). But no award is ever "appropriate" to a party that achieves no success on the merits. *See*

18   *Ruckelshaus*, 463 U.S. at 694. And the Court's determination of whether an award is "appropriate"

19   must also be construed narrowly and not beyond what the statutory language requires. *See id.* at

20   686; *Lauritzen v. Lehman*, 736 F.2d 550, 555–56 (9th Cir. 1984).

21       Plaintiffs achieved no success at the first trial. Before trial, Plaintiffs "barely" survived a

22   standing inquiry and, even then, with the help of inferences that the Court had to draw at that stage

23   (that fluoride caused their headaches). Summ. J. Order 9, ECF No. 156. Plaintiffs failed to prove

24   standing at the first trial. *See* Abeyance Order 2, ECF No. 262 ("Plaintiffs have failed to

25   demonstrate any link between the evidence presented at trial . . . and the harms of which they

26   personally complain."); *id.* at 3 ("[I]t is doubtful [Plaintiffs] have carried their burden of

27   demonstrating that they would likely be redressed by a favorable ruling from the Court."). The

28   Court should have dismissed. *See* Fed. R. Civ. P. 12(h)(3). No fee award could have followed.

Nor were Plaintiffs successful on the merits at the first trial. Rather, after closing statements, the Court stated that an important piece of the scientific puzzle was missing—a monograph that the National Toxicology Program was finalizing. 1st Trial Tr. 1130:4–6, 16 (June 17, 2020) ("I had also ruled initially that I wasn't going to extend the trial date and allow discovery into the NTP then[-]draft monograph. . . . But the Court is aware that this is a significant study."); *see also* Hr'g Tr. 7:8–13 (Apr. 22, 2021) ("[The monograph] is so critical . . . it'd be irresponsible for the Court to make findings without seeing what the NTP ultimately does."). EPA had tried to incorporate the monograph *before* the dispositive motions deadline and *before* the first trial to prevent delay and inefficiency. ECF No. 113. But Plaintiffs downplayed the importance of the draft monograph, ECF No. 114, at 2–3, and the Court denied EPA's request. ECF No. 115.[1]

Rather than decide the case on the record of the first trial, which the parties urged the Court to do, the Court placed the case into abeyance. The Court offered prudential reasons for doing so— to allow Plaintiffs to deal with their "serious standing issues" and the expectation that the National Toxicology Program's monograph and other scientific papers would be published. *See* Abeyance Order 4–5. The Court directed Plaintiffs to file a new petition with EPA. *Id.*

Despite the Court's instruction, Plaintiffs submitted a "supplement" to their petition. ECF No. 270. Plaintiffs did so "based on their apprehension that a new petition [would require] an entirely new, lengthy and costly litigation." ECF No. 279, at 5 n.2. TSCA section 21 provides no mechanism for supplementing a petition (much less years after that petition was denied). In February 2021, Plaintiffs moved to amend the Complaint with new allegations about an existing standing declarant. ECF No. 279. EPA opposed both because supplementation violated the parties' stipulation on standing evidence that the Court endorsed, and on which the parties had relied, and based on the Court's statement shortly after the first trial: "I'm not going to allow any new evidence on standing. That door is closed." ECF No. 285, at 1 (cleaned up).

For prudential reasons, the Court granted leave to amend the pleadings. ECF No. 290. The

---

[1]    In a reversal of position, Plaintiffs then sought to introduce the draft monograph as a trial exhibit. EPA moved in limine to exclude the document. ECF No. 141. Plaintiffs later withdrew their opposition to EPA's motion, ECF No. 182, which the Court denied as moot, ECF No. 197.

Court echoed Plaintiffs' concerns over having to start a new litigation and develop a new record potentially in a new proceeding. *See* Tr. 29:18–21 (Aug. 6, 2020); Order Granting Leave 11–12, ECF No. 290 (explaining that requiring Plaintiffs to file a new case would have required the parties to "re-do discovery, dispositive motions, and even trial"). The Court stated that the case should be adjudicated considering the "existing record" from the first trial and supplemented with "limited discovery" on recent developments. *Id.* at 10.

But the second trial was not a supplementation of the first. Rather, Plaintiffs relitigated the merits after a second round of discovery and based on a standalone record developed during a second trial. Plaintiffs even abandoned many of the factual issues from the first trial—for example, reliance on experimental toxicological studies and the proposition that community water fluoridation causes non-IQ adverse effects like ADHD. *See, e.g.*, ECF No. 54–63, 38–39, 111. The second trial focused on the monograph that EPA had tried to incorporate into the record before the first trial.

The Court's decisions also demonstrate that the second trial was independent from the first. The Court held that Plaintiffs had standing based on new facts that were not presented—and could not have been presented—at the first trial. Order Granting Pls.' Mot. to Lift Stay 3, ECF No. 319; Findings of Fact & Conclusions of Law ¶ 22, ECF No. 445. And virtually all the Court's findings on the merits were based on the record from the second trial. In nearly eighty pages of findings, the Court cited no testimony from the first trial (and only a handful of citations at the end of citation strings to written declarations submitted before the first trial). *See* Findings of Fact & Conclusions of Law ¶¶ 51, 90(b), 103–05, 111.

An award of fees and expenses for work solely related to the first trial is not appropriate and would exceed Congress' narrow waiver of sovereign immunity and traditional notions of fairness. EPA does not seek to relitigate the standing and merits issues in this forum. But the reasons animating the Court's decision to give Plaintiffs another chance *after a full merits trial* do not support any award of costs and fees for the first trial when Plaintiffs failed to muster evidence to prove standing or the merits. Such an award would circumvent the principle that no award is appropriate to an unsuccessful party. *See Ruckelshaus*, 463 U.S. at 694.

*Inland Empire Waterkeeper v. Corona Clay Co.*, No. 18-333, 2024 WL 4492294 (C.D. Cal. Jan. 19, 2024), is a useful analogue. There, environmental organizations sued a private defendant for violations of the Clean Water Act. An initial trial resulted in a verdict for the defendant. But the Ninth Circuit vacated that judgment and remanded based on an intervening change in the law. After a second trial, a jury found for the environmental organizations under the new legal standard. The environmental organizations argued they were entitled to fees for the first trial "as a necessary step to the ultimate victory in [the] case." 2024 WL 4492294, at *4. But the district court rejected that argument because the environmental organizations could not be considered the prevailing party at the first trial. *Id.* Here, too, Plaintiffs enjoyed no success on the merits after the first trial. In fact, the Court would be on even firmer ground declining to award fees for work relating to the first trial because the second trial was based on a new record from the first, not just an intervening change in the law.

Awarding fees for work solely related to the first trial would be unfair, too. *Ruckelshaus*, 463 U.S. at 687 (whether an award is appropriate is guided by "intuitive notions of fairness"). Citizen petitioners decide when they believe the scientific data are sufficient to warrant the issuance of a rule or order under TSCA. Here, Plaintiffs jumped the gun. Most of the scientific data the Court found persuasive was published after the petition was submitted in November 2016 and some even after the first trial in June 2020. *See* Findings of Fact & Conclusions of Law ¶ 31 (National Toxicology Program monograph dated May 2022); *id.* ¶ 35(a) (Mexico City cohort IQ study published in 2017); *id.* ¶ 35(b) (Canada cohort IQ study published in 2019); *see also id.* ¶¶ 37–38, 44–45 (discussing studies, including Denmark cohort IQ study, published after literature review cutoff date of April 2021). Indeed, one analysis the Court cited was published in the middle of the second trial. *Id.* ¶¶ 37(e), 66, 71.

Moreover, EPA urged the Court to reopen discovery before the first trial so the parties and their experts could account for a draft of the monograph and incorporate that evidence into expert testimony in an orderly way. The Court allowed Plaintiffs to press ahead. And what resulted was what EPA tried to avoid—disjointed proceedings and duplicative work. Taxpayers should not have to pay duplicative fees and expenses resulting from Plaintiffs' haste.

Plaintiffs are wrong to state that the first trial "involved the same course of conduct and the same legal theories on which Plaintiffs eventually won the case." Mot. 22. To be sure, where statutory fees must be awarded to a "prevailing party" and that party prevails on some claims but not others, courts ask whether the unsuccessful claims related to the successful ones—with a focus on whether the claims arose out of a "common course of conduct." *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1172 (9th Cir. 2019). While TSCA does not expressly require that Plaintiffs be a "prevailing party," some degree of success on the merits is required. *See Ruckelshaus*, 463 U.S. at 694. But the issue here is not whether Plaintiffs prevailed on some counts and not others. Rather, Plaintiffs had two independent bites at the apple. They were unsuccessful on the first; no fees for that attempt are appropriate. *See Ruckelshaus*, 463 U.S. at 694.

Plaintiffs' reliance on *Cabrales v. County of Los Angeles*, 935 F.2d 1050 (9th Cir. 1991), and its progeny is similarly misplaced. Mot. 22. *Cabrales* teaches that a litigant who is successful on some claims may still recover for time spent on other claims that fail if they "contribute to the ultimate victory in the lawsuit." 935 F.2d at 1052. The government does not contend that Plaintiffs should recover only for the motions or claims for which they enjoyed success.

Plaintiffs try to cast the first trial as "indispensable to the second." Mot. 23 (citing Connett Decl. ¶¶ 63, 88, 89). But the Court's judgment refutes that theory. As explained above, the Court cited no testimony from the first trial. And none of the testimony at the second trial relied on or presumed facts established at the first trial. Only one of the three paragraphs from Mr. Connett's declaration that Plaintiffs cite even supports their contention. Paragraph 63 restates that the "two phases" of trial produced "one singular evidentiary record." Perhaps that is true in a procedural sense, but it is immaterial to whether the work in the first trial was "indispensable" to the second. Paragraph 89 relates to Mr. Connett's background and experience.

Paragraph 88, on the other hand, contends that evidentiary rulings on the parties' motions in limine—specifically on the admissibility of health benefits evidence and EPA's draft risk evaluations for other chemicals—"streamlined" preparation for the second trial. Connett Decl. ¶ 88. Plaintiffs' argument is reasonable because the evidentiary rulings applied equally to the second trial. The same could be said of other pre-trial motions. For this reason, the government

agrees an award of reasonable fees for Plaintiffs' counsel's work on motions is appropriate. Exhibit B to Mr. Connett's declaration identifies time entries relating to motions; none of the entries before November 2021 were removed in EPA's proposal.

## II. PLAINTIFFS MAY ONLY RECEIVE AN AWARD THAT IS BASED ON REASONABLE RATES FOR ENVIRONMENTAL LITIGATION IN THIS DISTRICT AND REASONABLY CHARGED HOURS.

The starting point for calculating a reasonable fee for attorneys is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The resulting product is the lodestar and, absent the most exceptional circumstances, reflects a reasonable fee.

Plaintiffs have the initial burden "to produce satisfactory evidence of the prevailing market rates." *Sam K. ex rel. Diane C. v. Haw. Dep't of Educ.*, 788 F.3d 1033, 1041 (9th Cir. 2015) (cleaned up). On top of their own statements, attorneys must submit additional evidence that the rate charged is reasonable. *Seven Signatures Gen. P'ship v. Irongate Azrep BW LLC*, 871 F. Supp. 2d 1040, 1053 (D. Haw. 2012). If Plaintiffs do so, the burden shifts to EPA to submit evidence "challenging the accuracy and reasonableness" of the facts asserted in Plaintiffs' affidavits. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (cleaned up).

### A. The Court Should Use the Real Rate Reports to Set Counsel's Rates.

A reasonable fee is "adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Blum v. Stenson*, 465 U.S. 886, 897 (1984) (cleaned up). To strike this balance, the Court determines "reasonableness" according to the prevailing market rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11; *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (A reasonable fee "compensate[s] counsel at the prevailing rate in the community for similar work; no more, no less."). The relevant community and services are the San Francisco market for environmental litigation. *See Camacho*, 523 F.3d at 979 ("Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits."); *Kohler v. Eddie Bauer LLC*, 792 F. App'x 446, 448 (9th Cir. 2019) (affirming rates for labor-and-employment services in disability case); Adkins Decl. Ex. A (district court opinion

in *Kohler*). The Court should set reasonable rates for Plaintiffs' counsel based on objective and reliable data for environmental litigation in San Francisco.

### 1.     Data from the Real Rate Reports Are Objective and Reliable.

The Court should set rates based on survey data reported in the Real Rate Reports because the data are reliable, objective, and reflect prevailing rates for the relevant community and services. The Real Rate Report is an annual publication by Wolters Kluwer that analyzes data derived from *actual* rates charged to (and paid by) clients on law firm invoices—in other words, objective data based on true billing information, not just a firm's advertised rates. Malowane Decl. ¶¶ 5–8. The rates are categorized by areas of expertise (including environmental litigation), geography (including San Francisco), firm size, and timekeeper role. *Id.* ¶ 5. Each rate is shown alongside the number of sampled attorneys used to derive it. *Id.* When the sample size is insufficient, no rate is shown, which ensures the rate is statistically sound and reliable. *Id.*

The Ninth Circuit has upheld reliance on Real Rate Report data for specific practice areas to determine lodestar rates. *See Kohler*, 792 F. App'x at 448. And courts in and around this District often rely on the Real Rate Reports because of their objectivity compared to attorneys' self-reported rates. *E.g.*, *Cohodes v. U.S. Dep't of Justice*, No. 20-4015, 2025 WL 572888, at *12 (N.D. Cal. Jan. 24, 2025) (adopting rates supported by Real Rate Report); *Li v. ArcSoft, Inc.*, No. 19-5836, 2024 WL 4800753, at *3 (N.D. Cal. Oct. 8, 2024) (same); *Strojnik v. Inn at Jack London Square, LLC*, No. 20-1289, 2021 WL 11586331, at *4 (N.D. Cal. Jan. 28, 2021), *report & recommendation adopted by* 2021 WL 11586330 (N.D. Cal. Apr. 19, 2021) (same); *see also Ferguson v. Cnty. of L.A.*, No. 18-6861, 2021 WL 3516260, at *6 (C.D. Cal. Jan. 4, 2021) ("[T]he Real Rate Report is a much better reflection of the true market rates than self-reported rates in all practice areas." (cleaned up)); *Vogel v. MS Food Servs., Inc.*, No. 16-8433, 2018 WL 11027947, at *3 (C.D. Cal. Dec. 26, 2018) ("The Court finds the Real Rate Report persuasive here, as it is based on actual legal billing, matter information, and paid and processed invoices from more than 90 companies—not just on posted or advertised rates."); *RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 524 n.13 (C.D. Cal. 2022) ("The information provided by the Real Rate Report is persuasive because, rather than using self-reported rates aggregated across all practice areas

throughout the country, as appear in other surveys, it reflects actual legal billing through paid and processed invoices disaggregated for location, experience, firm size, areas of expertise, industry, and practice areas." (cleaned up)).

Indeed, Plaintiffs rely on the Real Rate Report, too, to support the requested rate for Richard M. Pearl (one of their fees counsel), though they cherry-picked the rate on which they rely, as explained below. *See* Pearl Decl. ¶¶ 19–20; *infra* Part II.A.3.c. Mr. Pearl often relies on the Real Rate Reports. *See, e.g.*, *United States ex rel. Thrower v. Acad. Mortg. Corp.*, No. 16-2120, 2024 WL 5424428, at *6 (N.D. Cal. May 31, 2024) (Chen, J.); *B. & E.F. Maldonado v. Morgan Hill Unified Sch. Dist.*, No. 21-6611, 2022 WL 4371003, at *13 (N.D. Cal. Sept. 21, 2022), *aff'd sub nom. Maldonado v. Morgan Hill Unified Sch. Dist.*, No. 22-16572, 2023 WL 7671371 (9th Cir. Nov. 15, 2023); Malowane Decl. ¶¶ 6–7.

### 2. EPA's Expert Calculated Reasonable Rates Using Reliable Methodologies.

Using Real Rate Report data, EPA's expert, Laura A. Malowane, Ph.D., calculated rates for environmental litigation in San Francisco for the years 2016 to 2025 using two methodologies. Malowane Decl. ¶ 9. Dr. Malowane is an economist and lawyer with twenty years of experience analyzing and testifying on issues relating to attorneys' fees awards. *Id.* ¶¶ 1–2. Each of her methodologies is targeted at the community and services relevant here and thus avoids a common critique when practitioners rely on the reports' national averages. *See, e.g.*, *Chen v. BMW of N. Am., LLC*, No. 21-3531, 2022 WL 18539356, at *3 (N.D. Cal. Nov. 14, 2022) (declining to use Real Rate Report national averages).

In the first methodology, Dr. Malowane started with national environmental litigation rates. Malowane Decl. ¶ 10. To make them applicable to San Francisco, Dr. Malowane multiplied the rates by the percentage difference between average national rates and San Francisco rates for each billing year. *Id.* ¶ 11. Between 2016 and 2024, San Francisco partner rates ranged from being about 8.2% higher to 0.3% lower than national rates. *Id.* The results for each billing year using the first methodology are presented in the "Fees Under Methodology 1" table. *Id.* ¶ 12.

In the second methodology, Dr. Malowane started with billing rates in San Francisco for

all fields for associates and partners of varying experience. *Id.* ¶ 13. To make the San Francisco rates applicable to environmental litigation, Dr. Malowane multiplied them by the percentage difference between all specialties and environmental litigation. *Id.* ¶ 14. For example, environmental litigation partner rates were about 23% to 35% percent less than all specialties. *Id.* The results for each billing year using the second methodology are presented in the "Fees Under Methodology 2" table. *Id.* ¶ 15.

The results of both methodologies were consistent with each other. *Id.* ¶ 16. The average of the methodologies is presented in Dr. Malowane's Proposed Fee Schedule. *Id.* ¶¶ 4, 17. Using these rates and without any adjustments to Plaintiffs' charged hours (including removing hours relating to the first trial) would result in a total lodestar of $2,794,966. *See* App'x A.

The Court should base any fee award on the Real Rate Report rates because they reflect "market rates in the relevant community." *Shirrod v. Dir., Off. of Worker's Comp. Progs.*, 809 F.3d 1082, 1091 (9th Cir. 2015). They are based on objective survey data and reliable methodologies. And they are in line with rates awarded in other environmental litigation in and around this District. *See, e.g.*, *Coastal Env't Rts. Found. v. Aztec Perlite Co.*, No. 24-385, 2024 WL 4520350, at *17 (S.D. Cal. Oct. 16, 2024) (awarding $350 and $650 per hour in Clean Water Act citizen suit); *Californians for Alts. to Toxics v. Kernen Constr.*, No. 20-1348, 2023 WL 4991861, at *4 (N.D. Cal. Apr. 21, 2023), *amended report & recommendation adopted by* 2023 WL 4995716 (June 13, 2023) (awarding $320 to $700 per hour in Clean Water Act citizen suit for attorneys in northern reach of this District); *Haw. Wildlife Fund v. Cnty. of Maui*, No. 12-198, 2022 WL 617987, at *6 (D. Haw. Feb. 15, 2022) (awarding $375 to $747 per hour for Earthjustice attorneys); *All. for the Wild Rockies v.* Savage, No. 15-54, 2019 WL 3293425, at *6–7 (D. Mont. July 22, 2019) (awarding $305 to $350 per hour for district court work between 2016 and 2019 for attorneys with "substantial experience in environmental litigation" who were "solidly in the prime of their careers").

### 3. Plaintiffs' Proposed Rates Are Not Reasonable.

Plaintiffs derived rates from a schedule for complex federal litigation in the District of Columbia—the LSI Laffey Matrix—and applied a 9% cost-of-living adjustment purportedly to

make the rates applicable to San Francisco. Dardarian Decl. ¶ 16; *see also* Mot. 18. Their data and methodology are unreliable. And the resulting rates are not representative of San Francisco environmental litigation. *See Moreno*, 534 F.3d at 1111.

a.   **The LSI Laffey Matrix is Not Useful.**

The LSI Laffey Matrix is outdated, defunct, and unreliable. *See J.T. v. D.C.*, 652 F. Supp. 3d 11, 24–25, 33–35 (D.D.C. 2023). As Dr. Malowane details, the LSI Laffey Matrix is based on a single attorney's self-serving declaration from 1989, updated annually for inflation. Malowane Decl. ¶¶ 20–35. The rates in that 1989 declaration were not the product of a reliable or robust survey, and the annual inflation adjustments compound their unreliability. *Id.* ¶¶ 25–29. Most of the rate is now the product of the inflation adjustments. *See id.* ¶ 29, 33; *Brackett v. Mayorkas*, No. 17-988, 2023 WL 5094872, at *3 (D.D.C. Aug. 9, 2023) ("Today, more than 71% of a given LSI rate consists entirely of inflation adjustments."). And even then, the inflation adjustments do not model how hourly rates for D.C. lawyers have changed. *See J.T.*, 652 F. Supp. 3d at 25. Finally, the rates for years 2019 through 2025 are especially unreliable because the matrix's developer died in 2019, yet the rates are still published. Malowane Decl. ¶¶ 30–31.

Plaintiffs fail to explain how the LSI Laffey Matrix rates were calculated, why they are reliable, or who is even publishing them. *See id.* ¶¶ 34–35 (explaining that Ms. Dardarian mistakenly states the matrix is "published by LSI"). In fact, of the nearly 1,100 pages of briefing associated with their motion, Plaintiffs justify using the LSI Laffey Matrix in two sentences. They used it for convenience. *See* Mot. 18–19; Dardarian Decl. ¶ 16 (stating that LSI Laffey Matrix was used "to simplify calculation [sic]"). Convenience says nothing about why the rates reflect the community and services at issue. Nor is it a credible basis. After all, other sources—like the Real Rate Reports—provide hourly rates for attorneys and support staff. And a different, more reliable matrix for rates in the District of Columbia—the Fitzpatrick Matrix—displaced the LSI Laffey Matrix and would have resulted in more reliable rates. *See, e.g.*, *Sierra Club v. EPA*, No. 23-1744, 2025 WL 2097611, at * 3–5 (D.D.C. July 25, 2025); *J.T.*, 652 F. Supp. 3d at 32 (Fitzpatrick Matrix is "a superior measure" compared to Laffey Matrix.); *Brackett*, 2023 WL 5094872, at *5 (LSI Laffey Matrix is an "inferior measure" compared to Fitzpatrick Matrix.); Malowane Decl. ¶¶ 36–

12

40. Unsurprisingly, the Fitzpatrick Matrix would have resulted in significantly lower rates, even using Plaintiffs' flawed "cost-of-living" conversion. Malowane Decl. ¶ 41; *infra* Part II.A.3.b; *see also* Malowane Decl. ¶ 45 (Fitzpatrick rates properly adjusted to San Francisco).

The Ninth Circuit repeatedly has warned against using the LSI Laffey Matrix. *See Pollinator Stewardship Council v. EPA*, No. 13-72346, 2017 WL 3096105, at *6 (9th Cir. June 27, 2017) ("The Laffey Matrix is not determinative of a reasonable hourly rate for San Francisco-based . . . and Seattle-based [attorneys]."); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) ("[J]ust because the *Laffey* matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away."). *Prison Legal News* is particularly relevant because the defendants advocated for Laffey Matrix rates plus a 9% cost-of-living adjustment—what Plaintiffs request here. 608 F.3d at 454. The Ninth Circuit affirmed the district court's rejection of that request. *Id.* And this District likewise routinely rejects using the Laffey Matrix. *See, e.g.*, *Peterson v. Sutter Med. Found.*, No. 21-4908, 2023 WL 5181634, at *6 (N.D. Cal. Aug. 10, 2023), *aff'd*, No. 23-2911, 2025 WL 1823959 (9th Cir. July 2, 2025); *GemCap Lending I, LLC v. Unity Bank Minn.*, No. 18-5979, 2019 WL 3842010, at *5 (N.D. Cal. Aug. 15, 2019); *Public.Resource.org v. IRS*, No. 13-2789, 2015 WL 9987018, at *6 (N.D. Cal. Nov. 20, 2015).

**b.    Plaintiffs' Upward Cost-of-Living Adjustment is Unsupported.**

Even if the LSI Laffey Matrix were reliable, Plaintiffs failed to make the rates applicable to the San Francisco market for environmental litigation. Using a proxy market rate constitutes error where the proxy data are not tailored to the relevant community. *See Shirrod*, 809 F.3d at 1088. Plaintiffs tried to tailor the LSI Laffey Matrix rates to San Francisco by applying a 9% upward adjustment, purportedly based on general cost-of-living differences. Mot. 18–19; *see also* Dardarian Decl. ¶ 16. But Plaintiffs proffer no support that a 9% upward cost-of-living adjustment accounts for differences in attorney fees across the District of Columbia and San Francisco legal markets. Only Mr. Pearl's declaration attempts to provide justification. Pearl Decl. ¶ 15; *see* Dardarian Decl. ¶ 16 (citing Pearl Declaration). Mr. Pearl cites, without explanation, a U.S. Courts webpage for Judiciary Salary Plan Rates. Pearl Decl. ¶ 15; *see also* Mot. 19. None of Plaintiffs'

13

merits attorneys had office addresses in San Francisco. And even if 9% is an appropriate salary adjustment for *cost-of-living* differences in 2025, there is no record for the Court to conclude that the same adjustment applies in 2016 to 2024, much less to differences in *fee rates* for environmental litigation each year. *See Shirrod*, 809 F.3d at 1088; *cf. J.T.*, 652 F. Supp. 3d at 25.

Plaintiffs try to excuse their unfounded assumptions with the conclusory statement that their proposed rates are "generally lower" than San Francisco rates. Mot. 19 (citing Dardarian Decl. ¶ 16). Neither Plaintiffs' counsel nor their "expert" claims to be qualified to opine about rates in the District of Columbia. Ms. Dardarian cites *Prison Legal News* for the proposition that "courts" have "noted" that LSI Laffey Matrix rates are "generally lower" than San Francisco rates. Dardarian Decl. ¶ 16. Nonsense. The Ninth Circuit affirmed a district court's *refusal* to use the LSI Laffey Matrix because it is not a "sound basis" for determining rates in San Francisco, not based on or even noting a comparison of rates between the District of Columbia and San Francisco. *See Prison Legal News*, 608 F.3d at 454.

And the data disprove Plaintiffs' assumption. San Francisco rates were *lower in every year* between 2016 and 2025, ranging, for example, from about 12.6% to 17.5% lower than D.C. partner rates, based on the Real Rate Reports, which Plaintiffs concede are "credible surveys." Pearl Decl. ¶ 19 (heading); *see* Malowane Decl. ¶ 42. Thus, Plaintiffs' assumption that rates in San Francisco are generally higher is disproven for every year, and inflates their requested fees by 29%. Malowane Decl. ¶ 43; *see also GemCap Lending*, 2019 WL 3842010, at *5 n.3 (noting that applying LSI Laffey Matrix rates would have resulted in a higher overall fee award in that case).

### c.    Plaintiffs' Attorney-Declarants Do Not Support the Requested Rates.

Plaintiffs submit declarations by Linda M. Dardarian, Richard Toshiyuki Drury, and Mr. Pearl.[2] None demonstrates that Plaintiffs' requested rates are in line with environmental litigation rates of comparable counsel in San Francisco.

---

[2]    Messrs. Pearl and Drury each disclaim that they are providing expert opinions as to counsel's rates, yet their declarations are full of opinions about the requested rates. *See, e.g.*, Pearl Decl. ¶¶ 9, 19; Drury Decl. ¶¶ 33 n.3; 35.

First, a few principles should inform the Court's analysis of the declarations. The Court should view the opinions of Plaintiffs' declarants, who specialize in advocating for attorney-fee recoveries, with a degree of skepticism. "That other attorneys may think that a given rate is reasonable does not necessarily say what the prevailing market rates actually are. That is especially true when the opinions are expressed by attorneys whose own professional interests might motivate them to favor higher rates." *Sam K.*, 788 F.3d at 1041 (cleaned up); *see Widrig v. Apfel*, 140 F.3d 1207, 1209-10 (9th Cir. 1998) (attorneys' statement that a certain dollar amount was reasonable, without showing they charged or had obtained that rate, does "not establish the prevailing market rate"); *see also* Malowane Decl. ¶¶ 50–55 (explaining that Plaintiffs' declarants' opinions are unreliable due to various biases). Plaintiffs' counsel are incentivized to pursue inflated rates here because they keep the excess award. *See* Adkins Decl. Ex. B (Pearl retainer agreement stating he keeps any award above $900 per hour for his work). That is not how fee-shifting statutes are designed to work. *See Blum*, 465 U.S. at 897.

No declarant cites an instance where a court found Plaintiffs' requested rates to be reasonable for environmental litigation in this or any other district. Rather, the declarations are form documents that could be submitted in any case. *See LaToya v. S.F. Unified Sch. Dist.*, No. 15-4311, 2016 WL 344558, at *12 (N.D. Cal. Jan. 28, 2016).

None of Plaintiffs' declarants explains why counsel who received awards in other cases are of comparable skill, reputation, and experience to counsel in this case, or that those cases required similarly complex work. *See Moreno*, 534 F.3d at 1111. "[S]imply listing the names of law firms and the hourly rates they charge, without more, [does] not assist the district court in determining whether attorneys of comparable skill, experience and reputation commanded those rates, or did so while performing similarly complex legal work." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1208 (9th Cir. 2013) (cleaned up).

Nor have Plaintiffs compared the size or subject-matter focus of the firms in those cases to their own. *See Vogel*, 2018 WL 11027947, at *4 ("[A]ccording to the Real Rate Report, the most important determinant of a lawyer's hourly rate is the size of the firm producing the work." (cleaned up)). Reliable data confirm that legal specialty, geographic location, and firm size

1  significantly affect rates. Malowane Decl. ¶¶ 59–66. Environmental litigation and smaller firms

2  (like the firms in this case) typically fetch lower rates. *Id.* ¶¶ 14, 61, 63–66.

3        Two recent instances where Mr. Pearl's opinions have been rejected illustrate these

4  principles and why the three declarations here are also not useful. *Morgan Hill*, 2022 WL 4371003,

5  at *13; *Ferguson*, 2021 WL 3516260, at *5–7. In *Morgan Hill*, the parent of a disabled child sued

6  to recover reasonable attorney's fees and costs after prevailing in administrative proceedings under

7  the Individuals with Disabilities Education Act, or IDEA. 2022 WL 4371003, at *1–3. Mr. Pearl

8  submitted a declaration to support the reasonableness of the requested fees. *Id.* at *13. The court

9  noted that Mr. Pearl failed to "cite a rate from a single case that involved the IDEA or similar

10 administrative proceedings" and instead "point[ed] to rates awarded in cases involving complex

11 federal litigation." *Id.* Mr. Pearl also attached "an extensive list of rates awarded in 'San Jose Area

12 Cases' in the past few years," but again, none was an IDEA case. Finally, Mr. Pearl attached rates

13 charged by San Francisco area firms and the 2020 Real Rate Report. Those exhibits were unhelpful

14 because they did "not include any information about the prevailing rates in the community for

15 work performed by attorneys of comparable skill, experience, and reputation to [the plaintiffs'

16 attorney] in the area of education or special education law or comparable areas of practice." *Id.*

17 The court characterized Mr. Pearl's declaration as "not helpful." *Id.*

18       Mr. Pearl's opinion was rejected for similar reasons in *Ferguson*, a Fair Labor Standards

19 Act (FLSA) case. 2021 WL 3516260, at *6 (describing Mr. Pearl's declaration as "useless"

20 because it was "[c]learly . . . not tailored . . . to this particular case"). For example, the court noted

21 that Mr. Pearl's practice is nearly devoted to attorney-fee litigation and criticized his declaration

22 as appearing to be "a form document that can be submitted in any case no matter the field of law."

23 *Id.* at *5. The court rejected Mr. Pearl's opinion that the requested rates are in line with fees

24 charged by comparably qualified attorneys for comparable services. *Id.* The only information

25 Mr. Pearl provided to determine a lawyer's qualifications from other cases was the year each was

26 admitted to the bar. *Id.* Nor did Mr. Pearl try to explain why any of the cases cited in his declaration

27 was comparable; indeed, none was identified as an FLSA case. *Id.* Mr. Pearl provided several

28 pages of law firm names and rates they charge but "ma[de] no effort to identify those attorneys

1    with comparable skills or practices." *Id.* at \*6. Finally, the court rejected Mr. Pearl's attempt to

2    rely on the LSI Laffey Matrix because it does not reflect rates in California. *Id.*

3    Plaintiffs' justification for the requested rates here boils down to identical cut-and-pasted

4    statements by Ms. Dardarian and Mr. Drury that the rates are reasonable "based on my own firm's

5    rates and my knowledge of the legal market." Dardarian Decl. ¶ 19; Drury Decl. ¶ 35. As an initial

6    matter, opinions grounded in one's nebulous "knowledge of the legal market" should be rejected

7    because they cannot be tested. *Gonzalez*, 729 F.3d at 1208; *see G & G Fire Sprinklers, Inc. v.*

8    *Bradshaw*, 156 F.3d 893, 907 (9th Cir. 1998), *vacated on other grounds*, 526 U.S. 1061 (1999)

9    (holding that statements that the rates charged are "equal to or less than those generally billed by

10   attorneys in [the relevant community] for similar services" are insufficient to

11   show reasonableness).

12   Ms. Dardarian lists her firm's 2025 rates and identifies seven cases where her firm's rates

13   were "approved by federal and state courts." Dardarian Decl. ¶ 10. Ms. Dardarian's firm

14   specializes in class-action litigation and consumer, employment, and civil rights matters. *See id.*

15   ¶¶ 6–7. Only two of the representative cases she identified appear to have been environmental, and

16   those commenced about three decades ago. *See id.* ¶ 6(o), (p). Each of the seven cases she

17   highlights was a class-action settlement where class counsel's fee motion was granted without

18   opposition, objection, or even specific analysis of her firm's rates. *See* Dardarian Decl. Ex. B;

19   Adkins Decl. Exs. C–H. None of the seven cases involved environmental issues. The rate an

20   attorney obtains in a consumer protection class action, for example, does not establish the same

21   rate is reasonable for environmental litigation. *See, e.g.*, *Morgan Hill*, 2022 WL 4371003, at \*13;

22   *Kohler*, 792 F. App'x at 448 (criticizing counsel for "provid[ing] rates for mostly class action

23   litigation"). Moreover, the fees in those consumer-protection class actions were generally

24   evaluated as a percentage of the overall settlement value. In fact, in the only order Ms. Dardarian

25   provided, the court approved a fee that represented 38% of the total lodestar (thus, not her firm's

26   2025 rates, as she contends). *See* Dardarian Decl. ¶ 10 & Ex. B ¶ 9(e) (*Abrishamcar* order). Nor

27   does Ms. Dardarian attempt to explain why the cases or the counsel who were awarded fees are

28   like this case and counsel here. In at least one case where rates for each lawyer were available,

Ms. Dardarian's rate was $300 higher than the merits attorney with the highest billing rate. *See* Adkins Decl. Ex. I (Fees and Expenses Summary from *Githieya*). And in most cases, the fees were approved by the endorsement of proposed orders (including the text from *Flowers v. Twilio, Inc.* that Ms. Dardarian quotes in her declaration as a finding of the court). *See* Dardarian Decl. ¶ 10. In short, Ms. Dardarian's firm's 2025 rates and the dissimilar cases she cites do not support that Plaintiffs requested rates for the attorneys in this case for 2016 to 2025 are in line with rates for attorneys handling environmental litigation in San Francisco.

Mr. Drury does not identify his firm's fee rates in his declaration but does at least identify environmental matters where his firm was awarded fees in certain years. *See* Drury Decl. ¶ 23. Even so, Mr. Drury fails to explain whether his firm's work in those cases was environmental, or simply to recover fees, or why any of the attorneys in those cases were of comparable skill and experience to Plaintiffs' counsel here. *See Moreno*, 534 F.3d at 1111. And even then, many of the rates awarded were hundreds of dollars *lower* than what Plaintiffs are requesting. *See* Drury Decl. ¶ 23; *see also* Malowane Decl. ¶¶ 56–58.

The most recent fee award that Mr. Drury lists is particularly revealing. Mr. Drury states that his firm was awarded partner rates of $1,000 per hour in *Supporters Alliance for Environmental Responsibility v. City of Ingleside* in California state court. Drury Decl. ¶ 23. Again, this award is lower than the rate he seeks here. But the court in fact applied a *negative* 0.5 multiplier "given Drury and Lozeau's $1,000 hourly rates," among other reasons. *See* Adkins Decl. Ex. J, at 7 (opinion). Thus, Mr. Drury's rate was effectively $500 per hour in that case, which is well below the rate that EPA proposes here.

In another example, Mr. Drury states that a state court made an "express finding" that certain rates were reasonable. Drury Decl. ¶ 23 (describing *Environmental Research Center v. Rain International*). In fact, the court entered a stipulated consent judgment that distributed about $8,000 to Lozeau Drury LLP as reimbursement for attorney's fees. Adkins Decl. Ex. K, at ¶ 4.5. The order granting the motion says nothing about the rates his firm charged. Adkins Decl. Ex. L.

Mr. Drury states he is "familiar with" several cases in this District, but none was an environmental case. *See* Drury Decl. ¶¶ 24–32. Instead, they range from copyright infringement

to federal securities class actions. *See id.* ¶¶ 26, 29–31. The only case with any environmental significance appears to be *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*. *Id.* ¶ 27. But the consumer claims in that class action are based on fraudulent business practices, which are distinct from typical environmental litigation. And the wide range of rates Mr. Drury reports from the case (for example, partner rates ranging from $275 to $1,600) are also in line with what EPA proposes. Finally, Mr. Drury makes no attempt to compare the lawyers in those cases to counsel here, or even to identify the firms involved. *See also* Malowane Decl. ¶¶ 59–66.

Mr. Pearl states that his requested rate is reasonable based on the Court's recent decision in *Thrower*, an excerpt from the 2024 Real Rate Report, and awards of "other Bay Area courts." Pearl Decl. ¶¶ 17–18. Mr. Pearl lists the law school graduation year of attorneys in other cases but otherwise makes no effort to explain why they are comparable to himself. None is identified as an environmental case. Similarly, Mr. Pearl cherry-picked a single excerpt from the 2024 Real Rate Report for the seventy-fifth percentile among litigation partners in San Francisco while ignoring rates for environmental litigation, the relevant services here. Again, environmental litigation rates are significantly lower than average rates for all specialties. *See* Malowane Decl. ¶¶ 14, 61. He identifies no case where he was awarded a fee nearing that seventy-fifth percentile rate. Nor were Plaintiffs willing to pay him that rate here. *See* Pearl Decl. ¶ 15; *infra* Part II.A.3.d. The Court should thus reject Mr. Pearl's generic declaration. *See Morgan Hill*, 2022 WL 4371003, at *13 (rejecting Pearl declaration for similar reasons); *Ferguson*, 2021 WL 3516260, at *5–7 (same).

### d.    Plaintiffs' Requested Rates are Inflated.

Where, as here, a party seeking fees submits no evidence of rates their counsel charges clients, the Court has "room to reduce the hourly rates now claimed." *Thrower*, 2024 WL 5424428, at *9. In response to a post-judgment interrogatory, only Mr. Nidel identified an environmental matter where a fee was charged to a client.[3] Adkins Decl. Ex. M, at 7. In that case, he is

---

[3]    Mr. Connett identified a child-custody matter, and Messrs. Drury and Pearl identified matters where they served as fee counsel. Their fees in all those non-environmental representations were still lower than what they seek here.

compensated at $550 per hour—far below what Plaintiffs request and even less than what EPA proposes for Mr. Nidel. *Id.* Plaintiffs try to explain away that the rate is "discounted," *id.*, but because firms customarily do so, a "discounted" rate better reflects the market for comparable services. *See* Malowane Decl. ¶¶ 67–71; *Vogel*, 2018 WL 11027947, at *3 (adopting Real Rate Report because it is based on "actual legal billing . . . not just posted or advertised rates").

Plaintiffs' requested rates are inflated beyond what they were willing to pay their own counsel in this case. For example, Mr. Pearl states in his declaration that Plaintiffs agreed to pay him at a rate lower than what he now demands taxpayers should pay him. Pearl Decl. ¶ 15; Malowane Decl. ¶ 57; *see also* Adkins Decl. Ex. B (retainer agreement stating Mr. Pearl would request his 2025 rate in the fee motion).

Finally, Plaintiffs' requested rates are even more than the average Real Rate Report rates for San Francisco litigators across all subject matters. Malowane Decl. ¶¶ 72–73.

### e.    Plaintiffs Fail to Justify Why Mr. Connett Should Skip Ahead Four Years.

Plaintiffs treat Mr. Connett as having an extra four years of experience for purposes of determining his rate under the LSI Laffey Matrix. Mot. 19. The result is to start Mr. Connett at a ninth-year rate, rather than a fifth-year rate. *Id.* Plaintiffs' vague statements that starting at a fifth-year rate "understates the market value of [his] work" are no justification. *Id.* (citing Dardarian Decl. ¶ 17–18; Pearl Decl. ¶ 15). The cited declarations fail to offer specific comparators to support the enhancement or otherwise explain why a four-year enhancement is appropriate rather than say a two-year or five-year enhancement. And Plaintiffs offer the same justification for two other enhancements—for applying their 9% "cost-of-living" increase and, as explained below, to double Mr. Connett's lodestar—which, when compounded, has the effect of padding the already unreliable LSI Laffey Matrix rates far beyond what is reasonable. *See* Mot. 19, 24; Malowane Decl. ¶¶ 46–48. This is a "clear example of double counting." *Blum*, 465 U.S. at 899.

### B.    The Court Should Reduce Plaintiffs' Claimed Hours That Are Not Reasonably Charged.

Plaintiffs shoulder the burden of "documenting the appropriate hours expended in the

1    litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987

2    F.2d 1392, 1397 (9th Cir. 1992). The Court may remove hours if the documentation is inadequate,

3    the case is overstaffed, the hours are duplicative, or the hours are otherwise excessive or

4    unnecessary. *E.g.*, *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945–46 (9th Cir. 2007). As

5    explained above, no award for fees is appropriate for work performed before January 2021, except

6    for motions practice. As explained below, the Court should also reduce the hours Plaintiffs claim

7    that are not reasonably charged. All adjustments are reflected in Appendices A and B. *See also*

8    Adkins Decl. Ex. O (listing excised hours).

9                    **1.    Non-Litigation Hours**

10         Plaintiffs seek reimbursement for time spent on the administrative petition and their

11   "supplement" thereto. *See* Connett Decl. ¶ 25. The Court should not include this time in any award

12   because it relates to a separate administrative proceeding. The Court may award "costs of suit"

13   and reasonable fees for attorneys or experts in connection with a civil action authorized under

14   TSCA subparagraph 21(b)(4)(A). 15 U.S.C. § 2620(b)(4)(C). This statutory authorization, which

15   the Court must construe strictly in favor of the United States, does not extend to recovery of fees

16   and costs for administrative proceedings that predate the civil action. *See Dishman v. UNUM Life*

17   *Ins. Co. of Am.*, 269 F.3d 974, 987 (9th Cir. 2001) (explaining that fees for administrative

18   proceeding before lawsuit are not recoverable under similar fee-award provision of Employee

19   Retirement Income Security Act); *Michigan v. EPA*, 254 F.3d 1087, 1091 (D.C. Cir. 2001)

20   (excluding fees for preparing administrative petition before judicial proceeding under similar fee-

21   award provision of Clean Water Act); *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 711 F.2d

22   431, 439 & n.14 (1st Cir. 1983) (similar fee-award provisions of Clean Water Act and Endangered

23   Species Act limit recovery to judicial proceedings); *compare N.Y. Gaslight Club v. Carey*, 447

24   U.S. 54, 60 (1980) (statute authorizing fee award in "any action *or proceeding*" authorizes fee

25   awards for legal work done in administrative proceedings (emphasis added)). Thus, while the costs

26   of some services performed before a civil action commences may be recoverable—such as drafting

27   pleadings or developing a theory of the case—services related to administrative proceedings are

28   not. *See Webb v. Bd. of Educ. of Dyer Cnty, Tenn.*, 471 U.S. 234, 243 (1985).

1

### 2.    Litigation Over Public-Records Requests

Plaintiffs demand reimbursement for time spent on five cases over federal and state public-records requests. Plaintiffs initiated the requests based on their (incorrect) theory that pro-fluoridation forces improperly delayed the publication of the monograph. *See* Mot. 12. The Court should award no fees for work relating to the requests.

To begin, the requests related to a theory of Plaintiffs that the Court determined was irrelevant. Civil Minutes 2 (Apr. 10, 2023), ECF No. 351. And Plaintiffs' contention that the public records gave them an advantage in the litigation lacks support. Mr. Connett contends that the public-records requests helped him to exclude a "prominent pro-fluoride meta-analysis." Connett Decl. ¶ 85. His basis is that EPA accepted Plaintiffs' offer not to call Dr. Kumar as a witness so long as EPA's counsel did not elicit testimony about Dr. Kumar's meta-analysis during direct examination of EPA's experts. *See id.* Mr. Connett's assumption about EPA's reasoning for stipulating is unsupported. Dr. Kumar's meta-analysis was not an essential study on which EPA's experts relied, and it was clear that Plaintiffs were eager to make a side-show over Dr. Kumar's responsibilities as a public health official. *See, e.g.*, Savitz Dep. Tr. 316:14–24 (Nov. 3, 2023) (explaining that the meta-analysis was not fundamental to his opinions); *id.* at 317:25–318:9 (explaining that Dr. Kumar's job responsibilities include promoting policies to improve public health).

Nor should the Court credit Plaintiffs' contention that they exercised "significant billing judgment" by not seeking reimbursement for some hours relating to the records requests. Mot. 20. The contention is not accurate. Mr. Connett states that he seeks reimbursement for only time spent reviewing the records. Connett Decl. ¶ 86. But the time entries show charges for other work, too. *See* Connett Decl. Ex. A, at 154 (listing time charged by Kay Reeves to "prepare draft FOIA"). And Plaintiffs failed to explain how they may recover *in this case* fees for work performed *in other cases*. *See* 15 U.S.C. § 2620(b)(4)(C); *McMahon*, 342 U.S. at 27 (statutory fee-shifting provision must be strictly construed in favor of sovereign). And in at least one of the records cases, Plaintiffs already agreed to bear their own costs and fees when stipulating to dismissal. Stipulation Regarding Dismissal With Prejudice, *Lavelle v. Nat'l Inst. of Health*, No. 22-5118 (N.D. Cal.),

ECF No. 15. In another case—just months ago—Plaintiffs submitted a fee proposal to the government. *See* Joint Case Mgmt. Statement 2, *Lavelle v. U.S. Dep't of Health & Human Servs.*, No. 23-1040 (N.D. Cal.), ECF No. 42. In sum, Plaintiffs failed to show they may recover for work on the public-records requests here, much less that they should be credited for exercising "billing judgment" over them.

### 3.     Irrelevant Non-Party Depositions

Plaintiffs demand reimbursement for time relating to the depositions of non-parties Christine Wood and Jayanth Kumar that occurred in March 2023. Connett Decl. Ex. H, at 283. The depositions related to Plaintiffs' (incorrect and irrelevant) theory that publication of the monograph was delayed because, they believe, pro-fluoridation forces exerted some improper political influence. Taxpayers should not have to reimburse Plaintiffs for their fishing expedition. And even if the charges were reasonable, over 150 hours charged for two non-party, irrelevant depositions—mostly for time preparing—is not reasonable.

*     *     *

Applying the adjustments described above reduces Plaintiffs' counsel's total hours to 2,380, for a total lodestar of $1,352,085. *See* App'x A.

## III.     NO MULTIPLIER OF MR. CONNETT'S LODESTAR IS APPROPRIATE.

Plaintiffs ask the Court to apply a 2.0 multiplier to Mr. Connett's lodestar. Mot. 24–28. The Court should reject Plaintiffs' request because they fail to overcome the strong presumption that the lodestar reflects a reasonable fee.

### A.     The Lodestar Presumptively Reflects a Reasonable Fee.

An attorney who "obtained excellent results" is normally entitled to recover fees for "hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. In rare and exceptional circumstances, the Court may adjust the lodestar upward or downward based on a variety of factors. *See Chambers v. Whirlpool*, 980 F.3d 645, 665 (9th Cir. 2020). But "an enhancement may not be based on a factor that is subsumed in the lodestar calculation." *Perdue*, 559 U.S. at 553.

"[M]ost, if not all, of the relevant factors constituting a 'reasonable' attorney's fee" are subsumed in the lodestar. *Pennsylvania v. Del. Valley Citizen's Council for Clean Air*, 478 U.S.

23

546, 566 (1986); *see Whirlpool*, 980 F.3d at 665–68. For example, the novelty or complexity of a case may be reflected in a higher number of hours charged or the billing rate of attorneys in the community with experience in a particular field, like environmental litigation. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). And the "overall quality of performance" is ordinarily not used to adjust the lodestar because quality considerations are "normally . . . reflected in the reasonable hourly rate." *Del. Valley*, 478 U.S. at 566. To prevent double counting, these factors "generally should not be used to adjust the lodestar." *Perdue*, 559 U.S. at 553; *see Blum*, 465 U.S. at 898–99. The "strong presumption" is that the lodestar already represents a "reasonable" fee. *Dague*, 505 U.S. at 562.

Reliance on factors subsumed in the lodestar is an abuse of discretion. *Parsons v. Ryan*, 949 F.3d 443, 467 (9th Cir. 2020). And any adjustment must be supported by "specific evidence" and "detailed findings . . . that the lodestar amount is unreasonably low or unreasonably high." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (cleaned up).

### B.     Plaintiffs Fail to Overcome the Presumption of Reasonableness.

Plaintiffs identify no valid reason why Mr. Connett's lodestar is unreasonably low. *See* Mot. 24–26. First, their assertion that "Mr. Connett secured a superior result" does not justify a departure from the lodestar. *Id.* at 25 (cleaned up). Plaintiffs secured the only result available by statute—an order directing the Administrator to initiate an administrative action. *See* 15 U.S.C. § 2620(b)(4). And even where counsel obtains an "excellent result," a lodestar award—no more, no less—is appropriate. *See Hensley*, 461 U.S. at 435. Plaintiffs also contend that the "superior result" is evidenced by Mr. Connett having handled nearly every aspect of the litigation. But that factor is already reflected in the number of hours Mr. Connett charged and thus subsumed in the lodestar. *See Dague*, 505 U.S. at 562; Drury Decl. Ex. B. Modifying the lodestar on that basis would be error. *See Perdue*, 559 U.S. at 553; *Blum*, 465 U.S. at 898–99.

Second, Plaintiffs complain that the LSI Laffey Matrix assigns a rate "without reference to superior expertise, skill, or results." Mot. 25. The argument is unusual considering Plaintiffs selected the LSI Laffey Matrix to support their rate requests. Nor have Plaintiffs shown with specific evidence how the LSI Laffey Matrix is unreasonably low for Mr. Connett's rate. *See Van*

*Gerwen*, 214 F.3d at 1045; *e.g.*, *Human Rts. Def. Ctr. v. Cnty. of Napa*, No. 20-1296, 2021 WL 1176640, at *16 (N.D. Cal. Mar. 28, 2011) (rejecting request to increase lodestar because "skill of [the] attorneys," "excellent results," and other factors are subsumed in lodestar). Plaintiffs' assertion that the LSI Laffey Matrix rates are "significantly lower" than what "many" attorneys charge and are awarded in this District is not actually supported by the vague and conclusory statements in the attorney declarations cited. *See* Mot. 25 (citing Dardarian Decl. ¶¶ 16–17; Pearl Decl. ¶ 15). Even so, the assertion is wrong. *See supra* Part II.A.3.b; Malowane Decl. ¶¶ 42, 73. Nor have Plaintiffs explained why Mr. Connett is "comparable" to lawyers who were "awarded $1,500 per hour and more" in San Francisco (or how any of the firms or cases listed in Mr. Pearl's declaration is comparable). *See id.* (citing Pearl Decl. ¶¶ 18–20). The Court should reject these generic contentions. *See Ferguson*, 2021 WL 3516260, at *6 (rejecting Mr. Pearl's "generic declaration" that rates are in line with "comparably qualified attorneys for comparable services" as "useless").

Third, Plaintiffs confusingly ask the Court to adjust Mr. Connett's lodestar to reflect contingency risk while also acknowledging that "contingent risk itself may not be considered." Mot. 26. Plaintiffs are correct that such an adjustment would be impermissible. *See Dague*, 505 U.S. at 567 ("[E]nhancement for contingency is not permitted under the fee-shifting statutes at issue [with similar language as TSCA section 21].); *Whirlpool*, 980 F.3d at 668. Plaintiffs also speculate that other attorneys "would be highly unlikely to undertake a similar action" on a contingency-fee basis based on LSI Laffey Matrix rates. Mot. 26; *Van Gerwen*, 214 F.3d at 1045. Nor is such speculation plausible. After all, three law firms were willing to be part of this case (plus two more to handle the fees motion)—all seeking LSI Laffey Matrix rates.

Fourth, Plaintiffs contend "unexpected and extraordinary" delay justifies "a small but significant component" of the overall multiplier they request. Mot. 26. To be sure, the Supreme Court "d[id] not rule out the possibility that an enhancement may be appropriate where an attorney assumes [contingent litigation] costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense." *Perdue*, 559 U.S. at 556. But any enhancement for delay must be "calculated using a method that is reasonable, objective, and capable of being

reviewed on appeal." *Id.* at 555. Plaintiffs fail to explain what period of this case constitutes "unexpected and extraordinary" delay, what a "fair and adequate delay multiplier" would be, or on what objective and reviewable basis the lodestar should be modified to reflect that delay. Mot. 26; *see Perdue*, 559 U.S. at 557. Even then, no delay was "unjustifiably caused by the defense." *Perdue*, 559 U.S. at 556. Just the opposite. Plaintiffs brought this case to trial despite the Court's warnings that they could not establish standing (absent favorable inference) and after successfully opposing EPA's attempt to incorporate the monograph. Those were the primary drivers of the Court's decision to put this case in abeyance and hold a second trial.

Fifth, the Court's recent decision in *United States ex rel. Thrower v. Academy Mortgage Corp.*, No. 16-2120, 2024 WL 5424428 (N.D. Cal. May 31, 2024) does not support a multiplier, contrary to Plaintiffs' argument. Mot. 26–28. There, a relator brought a qui tam action under the False Claims Act in the name of the United States. 2024 WL 5424428, at *2. The government declined to pursue the matter, but the Court denied the government's motion to dismiss in what the Court described as an "unprecedented" decision. *Id.* at *12. The relator requested attorney's fees and a 2.0 multiplier because of the "unusual skill" of counsel and a "purportedly extraordinary" $38.5 million settlement. 2024 WL 5424428, at *11. The Court applied an upward multiplier of 1.75 because "keeping the case alive, notwithstanding the government's attempts to extinguish it" was an "unexpected and positive result" for the relator. *Id.* The Court credited counsel's investigative work in overcoming the motion to dismiss. *Id.*

*Thrower* does not support any adjustment of Mr. Connett's lodestar. As an initial matter, Plaintiffs' reading of *Thrower* is overly generalized. That Defendants here are a federal agency and its Administrator and that they vigorously defended the agency's decision do not automatically mean an enhancement of the lodestar is appropriate at taxpayers' expense. *See* Mot. 27. If that were the rule, a multiplier may be available in every case against the government, thereby detracting resources from critical programs in a manner inconsistent with the objectives of provisions like TSCA section 21. Rather, *Thrower* was specifically based on the relator "battling" two parties—the defendant and the government. 2024 WL 5424428, at *12.

Nor was the Court's judgment here an "unexpected" result. The relator in *Thrower*

achieved a significant monetary settlement that exceeded even the government's estimated value of the claim. Here, the Court granted the only remedy available. And awarding a multiplier because of *potential* health benefits that *might* grow out of future agency action would be speculative. Mot. 27; *Van Gerwen*, 214 F.3d at 1045.

Finally, and respectfully, *Thrower* did not explain why the lodestar was unreasonably low—in other words, why the investigative work the relator's counsel performed was not subsumed in the lodestar. Here, the factors Plaintiffs identify—Mr. Connett's presentation of the evidence without "clear precedent"—are subsumed in the hours he billed and a reasonable rate. Mot. 27; *see, e.g.*, *Perdue*, 559 U.S. at 553; *Blum*, 465 U.S. at 898–99.

## IV.    NO AWARD OF LITIGATION EXPENSES IS APPROPRIATE.

The Court may award "costs of suit" upon determining that such an award is appropriate. 15 U.S.C. § 2620(b)(4)(C). Plaintiffs request reimbursement of expert fees and expenses totaling $458,663. Plaintiffs bear the burden to prove these expenses are reasonable. *See Hensley*, 461 U.S. at 437. The Court should award no litigation expenses because Plaintiffs collected donations for this case that *far exceed* their incurred costs before any adjustments. Any award should be for expenses associated with only the second trial and reduced to remove improperly charged travel expenses, which would result in expenses of $106,642. *See* App'x C; Adkins Decl. Ex. P.

### A.    Plaintiffs Already Recouped Their Litigation Costs.

To avoid a windfall, the Court should adjust any award of litigation costs and expert fees by the amount Plaintiffs already recouped through targeted fundraising efforts. Plaintiffs raised $663,702 to pay for the costs of this litigation, including expert expenses. Adkins Decl. Ex. M, at 11. Requiring taxpayers to reimburse those same litigation costs would amount to an improper double-recovery. *See, e.g.*, *Welch*, 480 F.3d at 945–46.

The government does not contend that Plaintiffs' fundraising disqualifies them from an award for reasonable attorneys' fees. Nor is the requested deduction based on funds raised for the Plaintiff-organizations' general programatic interests. *See Mackey v. Cal. Highway Patrol*, No. 11-3560, 2018 WL 6137166, at *9 (S.D. Cal. Jan. 23, 2018) (rejecting request to adjust award where plaintiffs' website thanked donors for financial support "over the years"). Rather, Plaintiffs

27

solicited and received donations to pay *the same litigation expenses* that they now ask taxpayers to reimburse. For example, in May 2019, Plaintiff Fluoride Action Network posted a "Spring Lawsuit fundraiser" video of their lead counsel asking for money, accompanied by a written request to fund expert costs.[4] Plaintiffs fully recouped their litigation expenses, even without applying any of the adjustments discussed below. No award for the same expenses is appropriate.

### B.    Litigation Expenses Relating to the First Trial

Even if the Court awards Plaintiffs' litigation expenses notwithstanding their fundraising success, no award for costs incurred in connection with only the first trial is appropriate. *See supra* Part I. An appropriate award thus reflects only work performed and expenses incurred after January 2021, plus expenses relating to motions practice. Accordingly, Plaintiffs expenses should be reduced by $341,481.

### C.    Improperly Charged Travel Expenses

The Court should not award expenses for other travel and accommodations for Mr. Connett, an expert, and a party representative that were improperly charged and total $15,609.

#### 1.    Mr. Connett's Non-Litigation Travel

Plaintiffs seek to recover Mr. Connett's travel expenses totaling $470.69 for a meeting with EPA in January 2017 to discuss the administrative petition. *See* Connett Decl. Ex. H. These expenses are not recoverable because they relate to an administrative proceeding, not this civil action. *See supra* Part II.B.1. Nor could the expenses be considered necessary to the litigation.

#### 2.    Mr. Connett's Travel to and Extended Stay in Spain

Plaintiffs charge $3,654.70 for flights and hotel expenses for a deposition of EPA's non-retained expert Dr. Jesus Ibarluzea in San Sebastian, Spain. None of these expenses is reasonable. First, deposing Dr. Ibarluzea in Spain, rather than remotely, was unnecessary. The government proposed the deposition be taken remotely. Plaintiffs declined. Adkins Decl. Ex. N. Yet Plaintiffs had advocated to conduct the second trial remotely because of concerns over travel and costs. ECF No. 361. They cannot reasonably claim that an in-person deposition of a non-retained witness

---

[4]    FAN Launches NEW Fundraiser as TSCA Fluoride Lawsuit Gains Steam, YouTube.com, *available at* https://www.youtube.com/watch?v=3mIla-67b9s.

halfway around the world was necessary. Second, the charges include nearly $2,000 for Mr. Connett's extended six-night stay in a "panoramic" room for two. Connett Decl. Ex. I, at 639–41. Dr. Ibarluzea's deposition lasted one day. There is no reasonable justification for these charges.

### 3.    Mr. Connett's Travel to and Extended Stay in Denmark

Plaintiffs charge $3,456.63 for Mr. Connett to travel to Denmark for a "multi-day meeting" with an expert witness in August 2018. Connett Decl.¶ 105 & Ex. H (listing five expenses for "Meeting with expert (Ole Fejerskov)"). The submitted receipts reflect a two-night stay in Copenhagen, a three-night detour in Aarhus, and an additional night in Copenhagen (followed by a final night in New York). *See* Connett Decl. Ex. I, at 311–20. Plaintiffs offer no explanation why international travel to meet with an expert was necessary. Nor have Plaintiffs explained why the meeting required six days of travel across two European cities.

### 4.    Mr. Connett's Travel to Canada for a Scientific Conference

Plaintiffs charge $1,142.14 for "an August 2018 meeting in Ottawa, Canada with prospective experts." Connett Decl. ¶ 105. The dates of Mr. Connett's travel (August 26 to 30) coincide with a meeting of the International Society for Environmental Epidemiology that was held in Ottawa in 2018.[5] *See* Connett Decl. Ex. H (listing charges for "ISEE Conference & Meeting with Prospective Experts"); *Id.* Ex. I, at 321–28. Plaintiffs identify no such "prospective experts" by name. Mr. Connett's time sheets reflect a charge of 0.2 hours on August 28, 2018, for "Email to prospective expert (Zoeller)" and a charge of 8 hours the same day for "Attending the ISEE conference and meeting with researchers." *Id.* Ex. C, at 66. No other charges appear related to meetings during the conference. Thus, Plaintiffs failed to justify why a five-day trip to attend a scientific conference was necessary or why taxpayers must reimburse the associated expenses.

### 5.    Mr. Connett's Travel for Irrelevant Non-Party Depositions

Plaintiffs seek reimbursement of $1,924.43 for Mr. Connett's travel expenses regarding the depositions of Christine Wood and Jayanth Kumar in March 2023. Connett Decl. Ex. H, at 283. The depositions related to Plaintiffs' theory that publication of the monograph was delayed because pro-fluoridation forces exerted improper political influence. As explained above,

---

[5]    Past Meetings, ISEE, *available at* https://www.iseepi.org/past_meetings.php.

taxpayers should not have to pay expenses related to these non-party depositions because they were irrelevant. *See supra* Part II.B.3; Civil Minutes 2 (Apr. 10, 2023), ECF No. 351.

### 6. Philippe Grandjean's Extended Stay in the United States

Plaintiffs seek reimbursement of $2,094.04 for the four-night hotel stay of one of their experts, Philippe Grandjean, in October 2023. Connett Decl. Ex. H, at 284; *Id.* Ex. I, at 590–92. Dr. Grandjean's deposition lasted one day. And Mr. Connett met with him once for 4.4 hours on October 15, the day before the deposition. Connett Decl. Ex. C, at 115. Plaintiffs offer no reason why taxpayers must reimburse Dr. Grandjean for his extended stay in the United States. Indeed, their counsel stayed at the same hotel for only two nights. The charge for Dr. Grandjean's hotel expense should at least be reduced by $1,133.94 to $960.10, the same amount as Mr. Connett's two-night stay at the same hotel. *See* Connett Decl. Ex. I, at 589.

### 7. Plaintiff's Stay in San Francisco for Second Trial

Finally, Plaintiffs seek reimbursement of $3,826.61 for "Hotel for Plaintiff (CiCi)" in January to February 2024. Connett Decl. Ex. H, at 285. Cici Reed is the executive director of one of the Plaintiff organizations. *See* ECF No. 100-2. The charge is not an expense of a lawyer or expert and thus not recoverable. *See* 15 U.S.C. § 2620(b)(4)(C).

### CONCLUSION

For all these reasons, the Court should award Plaintiffs no more than $1,352,085 in reasonable fees for attorneys and no litigation expenses. If the Court awards litigation expenses notwithstanding Plaintiffs' recoupment of those same expenses by fundraising, the litigation expenses award should be $106,642. Consistent with the stipulated order regarding Plaintiffs' bill of costs, EPA requests that payment of any award be contingent on the outcome of the appeal and made payable within 120 days of final resolution of the appeal (that is, issuance of the mandate), provided that and only if Plaintiffs are the prevailing party on appeal. ECF No. 454.

1   Date: August 29, 2025                    Respectfully Submitted,

2                                            ADAM R.F. GUSTAFSON
3                                            Acting Assistant Attorney General

4                                            */s/ Brandon N. Adkins*
                                             BRANDON N. ADKINS
5                                            United States Department of Justice
                                             Environment & Natural Resources Division
6                                            P.O. Box 7611
                                             Washington, D.C. 20044
7                                            Tel: (202) 598-9562
                                             Fax: (202) 514-8865
8                                            Brandon.Adkins@usdoj.gov

9
10                                           *Attorneys for Defendants*

1

**APPENDIX A**

| Attorney | Year | Real Rate Reports Rate | Plaintiffs' Charged Hours[6] | Lodestar (RRR rate & no hours adjustments) | Cumulative Adjusted Hours[7] | Lodestar (RRR & adjusted hours) |
|---|---|---|---|---|---|---|
| Waters | 2018 | $464 | 30.8 | $14,291.20 | 0 | $0.00 |
| | 2019 | $497 | 43.3 | $21,520.10 | 7.9 | $3,926.30 |
| | 2020 | $550 | 111.1 | $61,105.00 | 1.5 | $825.00 |
| | 2021 | $530 | 11.4 | $6,042.00 | 11.4 | $6,042.00 |
| | 2022 | $583 | 12 | $6,996.00 | 12 | $6,996.00 |
| | 2023 | $657 | 27.4 | $18,001.80 | 26.6 | $17,476.20 |
| | 2024 | $636 | 109.2 | $69,451.20 | 108.1 | $68,751.60 |
| | 2025 | $684 | 4.1 | $2,804.40 | 4.1 | $2,804.40 |
| Nidel | 2017 | $452 | 5.9 | $2,666.80 | 2 | $904.00 |
| | 2018 | $440 | 16.3 | $7,172.00 | 1.2 | $528.00 |
| | 2019 | $488 | 23.7 | $11,565.60 | 1.3 | $634.40 |
| | 2020 | $523 | 73.1 | $38,231.30 | 0 | $0.00 |
| | 2021 | $506 | 1.1 | $556.60 | 0.7 | $354.20 |
| | 2022 | $576 | 1.2 | $691.20 | 1.2 | $691.20 |
| | 2023 | $659 | 0.4 | $263.60 | 0.4 | $263.60 |
| | 2024 | $636 | 55 | $34,980.00 | 55 | $34,980.00 |
| Reeves | 2019 | $497 | 10 | $4,970.00 | 0 | $0.00 |
| | 2020 | $550 | 437.9 | $240,845.00 | 2.5 | $1,375.00 |
| | 2021 | $530 | 20.1 | $10,653.00 | 14.8 | $7,844.00 |
| | 2022 | $583 | 13.2 | $7,695.60 | 13.2 | $7,695.60 |
| | 2023 | $657 | 27.5 | $18,067.50 | 27.5 | $18,067.50 |
| | 2024 | $636 | 1.6 | $1,017.60 | 1.6 | $1,017.60 |
| | 2025 | $684 | 4.1 | $2,804.40 | 4.1 | $2,804.40 |
| Connett | 2016 | $268 | 95.4 | $25,567.20 | 0 | $0.00 |
| | 2017 | $259 | 137.8 | $35,690.20 | 64.9 | $16,809.10 |
| | 2018 | $287 | 809 | $232,183.00 | 52 | $14,924.00 |

---

[6]    *See* Connett Decl. Exs. F & G; Drury Ex. A; Pearl Ex. B.

[7]    Some of the charged hours should be reduced for more than one reason. The cumulative adjusted hours values reflect the amount when all reductions are applied, including hours that relate to the first trial. Appendix B lists the reductions by category. *See also* Adkins Decl. Ex. O.

| Attorney | Year | Real Rate Reports Rate | Plaintiffs' Charged Hours[6] | Lodestar (RRR rate & no hours adjustments) | Cumulative Adjusted Hours[7] | Lodestar (RRR & adjusted hours) |
|---|---|---|---|---|---|---|
| | 2019 | $306 | 1580.2 | $483,541.20 | 297 | $90,882.00 |
| | 2020 | $369 | 711.6 | $262,580.40 | 10.2 | $3,763.80 |
| | 2021 | $506 | 147.7 | $74,736.20 | 146 | $73,876.00 |
| | 2022 | $576 | 159.5 | $91,872.00 | 145.5 | $83,808.00 |
| | 2023 | $659 | 827.4 | $545,256.60 | 660.4 | $435,203.60 |
| | 2024 | $646 | 531.6 | $343,413.60 | 532 | $343,672.00 |
| | 2025 | $694 | 54.8 | $38,031.20 | 54.8 | $38,031.20 |
| **Legal Assistants** | | | | | | |
| | 2019 | $153 | 31.9 | $4,880.70 | 0 | $0.00 |
| | 2020 | $233 | 32.7 | $7,619.10 | 0 | $0.00 |
| | 2021 | $230 | 15.5 | $3,565.00 | 15.2 | $3,496.00 |
| | 2023 | $344 | 20.25 | $6,966.00 | 20.25 | $6,966.00 |
| | 2025 | $367 | 4.2 | $1,541.40 | 4.2 | $1,541.40 |
| | | | | | | |
| **Drury** | 2025 | $684 | 35.6 | $24,350.40 | 35.6 | $24,350.40 |
| | | | | | | |
| **Pearl** | 2025 | $684 | 45 | $30,780.00 | 45 | $30,780.00 |
| | | | | | | |
| **Total** | | | | $2,794,966.10 | 2380.2 | **$1,352,084.50** |

1

**APPENDIX B**

| Attorney | Year | Plaintiffs' Charged Hours[8] | First Trial Time | Non-Litigation Hours | Public-Records Requests | Irrelevant Non-Party Depositions | Cumulative Adjusted Hours |
|---|---|---|---|---|---|---|---|
| **Waters** | 2018 | 31.40 | -31.4 | | | | 0.0 |
| | 2019 | 43.30 | -35.4 | | | | 7.9 |
| | 2020 | 111.10 | -109.6 | -7.1 | | | 1.5 |
| | 2021 | 11.40 | | | | | 11.4 |
| | 2022 | 12.00 | | | | | 12.0 |
| | 2023 | 27.40 | | | | -0.8 | 26.6 |
| | 2024 | 108.10 | | | | | 108.1 |
| | 2025 | 4.10 | | | | | 4.1 |
| | | | | | | | |
| **Nidel** | 2017 | 5.90 | -3.9 | | | | 2.0 |
| | 2018 | 16.30 | -15.1 | | | | 1.2 |
| | 2019 | 23.70 | -22.4 | | | | 1.3 |
| | 2020 | 73.10 | -73.1 | -0.8 | | | 0.0 |
| | 2021 | 1.10 | | | -0.4 | | 0.7 |
| | 2022 | 1.20 | | | | | 1.2 |
| | 2023 | 0.40 | | | | | 0.4 |
| | 2024 | 55.00 | | | | | 55.0 |
| | | | | | | | |
| **Reeves** | 2019 | 10.00 | -10.0 | | | | 0.0 |
| | 2020 | 437.90 | -435.4 | -3.6 | | | 2.5 |
| | 2021 | 20.10 | | | -5.3 | | 14.8 |
| | 2022 | 13.20 | | | | | 13.2 |
| | 2023 | 27.50 | | | | | 27.5 |
| | 2024 | 1.60 | | | | | 1.6 |
| | 2025 | 4.10 | | | | | 4.1 |
| | | | | | | | |
| **Connett** | 2016 | 95.40 | -95.4 | -86.8 | | | 0.0 |
| | 2017 | 137.80 | -72.9 | | | | 64.9 |
| | 2018 | 809.00 | -757.0 | | | | 52.0 |
| | 2019 | 1583.60 | -1286.6 | | | | 297.0 |
| | 2020 | 711.63 | -701.4 | -42.8 | | | 10.2 |
| | 2021 | 148.00 | | | -2.0 | | 146.0 |
| | 2022 | 159.50 | | | -14.0 | | 145.5 |

---

[8]    Connett Decl. Exs. F & G; Drury Ex. A; Pearl Ex. B.

| Attorney | Year | Plaintiffs' Charged Hours[8] | First Trial Time | Non-Litigation Hours | Public-Records Requests | Irrelevant Non-Party Depositions | Cumulative Adjusted Hours |
|---|---|---|---|---|---|---|---|
| | 2023 | 827.40 | | | -16.8 | -150.2 | 660.4 |
| | 2024 | 532.00 | | | | | 532.0 |
| | 2025 | 54.80 | | | | | 54.8 |
| | | | | | | | |
| **Legal Assistants** | | | | | | | |
| | 2019 | 28.50 | -28.5 | | | | 0.0 |
| | 2020 | 32.70 | -32.7 | | | | 0.0 |
| | 2021 | 15.20 | | | | | 15.2 |
| | 2023 | 20.25 | | | | | 20.3 |
| | 2025 | 4.20 | | | | | 4.2 |
| | | | | | | | |
| **Drury** | 2025 | 35.6 | | | | | 35.6 |
| | | | | | | | |
| **Pearl** | 2025 | 45.00 | | | | | 45.0 |
| | | | | | | | |
| **Total** | | 6280.48 | -3710.8 | -141.1 | -38.5 | -151.0 | 2380.2 |

### APPENDIX C

| Litigation Expense (Connett Decl. Ex.) | Plaintiffs' Demand | Cumulative Amount After Adjustments |
|---|---|---|
| Expert fees (Ex. J) | $361,146 | $72,021 |
| Travel expenses (Ex. H) | $54,544 | $21,599[9] |
| EPA expert depositions (Ex. L) | $9,660 | $2,100 |
| Legal research (Ex. M) | $19,406 | $2,864 |
| Transcripts (Ex. N) | $13,907 | $8,058 |
| **Total** | $458,663 | **$106,642[10]** |

---

[9]    Reflects a reduction of Dr. Grandjean's extended hotel expense on October 14, 2023, by $1,133.94 to $960.10. *See supra* Part IV.C.6.

[10]    Some of the charged expenses should be removed for more than one reason. *See* Adkins Decl. Ex. P. The total adjusted expenses reflect the amount when all reductions are applied, including expenses that relate to the first trial.