MICHAEL CONNETT, ESQ., CA Bar No. 300314
SIRI GLIMSTAD LLP
700 Flower St, Suite 1000
Los Angeles, CA 90017
213-376-3739 Telephone
646-417-5967 Facsimile

C. ANDREW WATERS, ESQ., CA Bar No. 147259
KAY GUNDERSON REEVES, ESQ., *Pro Hac Vice*
WATERS, KRAUS & PAUL
11601 Wilshire Blvd, Suite 1900
Los Angeles, CA 90025
310-414-8146 Telephone
310-414-8156 Facsimile

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## AT SAN FRANCISCO

| | |
|---|---|
| FOOD & WATER WATCH et al. | Civ. No. 17-CV-02162-EMC |
| Plaintiffs, | |
| | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES** |
| vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY et al. | |
| Defendants. | Date: December 18, 2025 |
| | Time: 1:30 pm |
| | Courtroom: 5, 17th Floor |
| | Judge: Hon. Edward M. Chen |

# **TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................1

   A. EPA'S ARGUMENT THAT NO FEES OR COSTS SHOULD BE AWARDED FOR THE FIRST PHASE OF TRIAL IS PREDICATED ON DEMONSTRABLE FACTUAL ERROR AND INAPPOSITE LAW.................................................................................1

     1. The Second Trial Was Not a Separate "Standalone" Proceeding from the First...........1

     2. The Plaintiffs Did Not Lose the First Trial, Nor Were They "Completely Unsuccessful" ...................................................................................................3

     3. Even if EPA's Factual Characterization Was Correct (It Is Not), an Award of Fees and Costs for the First Phase of Trial Would Still Be Appropriate ............................4

   B. COUNSEL'S HOURLY RATES ARE REASONABLE ....................................................5

     1. Mr. Connett's Rate Is Significantly Understated ........................................................6

     2. EPA's Expert Is Unqualified to Testify About the Northern District of California ......8

     3. Dr. Malowane's Opinions, and EPA's Arguments, Are Premised on a Misinterpretation of Applicable Law ..........................................................................9

        a. The correct standard looks to the rates charged and awarded for comparably complex litigation of all types, not just "environmental" litigation".....................10

        b. Plaintiffs' evidence of complex litigation rates in the Northern District legal marketplace is far more relevant and "objective" than the isolated Real Rate Report category Dr. Malowane exclusively relies on ...........................................11

        c. The size of Counsel's law firms is not a valid reason to reduce their rates...........13

        d. EPA's other objections to Plaintiffs' evidence are meritless................................15

   C. PLAINTIFFS' REQUEST FOR A MULTIPLIER IS SUPPORTED BY RARE AND UNIQUE CIRCUMSTANCES................................................................................17

   D. A CITIZEN GROUP'S ENTITLEMENT TO COSTS SHOULD *NOT* DEPEND ON THE SOURCE OF THEIR FUNDING, AND EPA OFFERS NO LEGAL AUTHORITY TO THE CONTRARY……………………………………………………………….....19

MODIFICATION/SUPPLEMENTATION OF FEES AND COSTS REQUEST ........................20

CONCLUSION.......................................................................................................20

APPENDIX A ........................................................................................................22

APPENDIX B ........................................................................................................23

APPENDIX C ........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Arnold v. United States,*
  163 Fed.Cl. 13 (Fed. Cl. 2022) ................................................................ 8, 12

*Blum v. Stenson,*
  465 U.S. 886 (1984) ............................................................................... 6, 10

*Cabrales v. Cty. of L.A.,*
  935 F.2d 1050 (9th Cir. 1991) ................................................................ 4, 5

*California Open Lands v. Butte County Dept. of Public Works*
  (E.D. Cal. No. 2-20-cv-00123-DJC-DMC( 2024) ....................................... 14

*Camacho v. Bridgeport Fin. Inc.,*
  523 F.3d 973 (9th Cir. 2008) ............................................................... 10, 11

*Cell-Crete Corp. v. Fed. Ins. Co.,*
  82 Cal. App. 5th 1090 (2022) ..................................................................... 19

*Charlebois v Angels Baseball, LP,*
  2012 U.S. Dist. LEXIS 91069 (C.D. Cal. 2012) .......................................... 14

*Cruz v. Starbucks,*
  2013 WL 2447862 (C.D. Cal. 2013) ........................................................... 14

*Davis v. City & County of San Francisco,*
  976 F.2d 1536 (9th Cir. 1992) .................................................................... 13

*DL v. Dist. of Columbia,*
  924 F.3d 585 (D.C. Cir. 2019) .................................................................... 15

*Ecological Rts. Found. v. Hot Line Constr., Inc.,*
  No. 5:20-CV-01108-AB-KK, 2024 WL 3507023 (C.D. Cal. July 19, 2024) ........... 11

*Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.,*
  218 F. Supp. 3d 27 (D.D.C. 2016) ................................................................ 9

*Food & Water Watch, Inc. v. EPA,*
  291 F. Supp. 3d 1033 (N.D. Cal. 2017)………………………………..…...20

*Gonzales v. City of Maywood,*
  729 F.3d 1196 (9th Cir. 2013) ..................................................................... 7

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ................................................................................... 17, 20

*Human Rights Def. Ctr. v. Cty. of Napa*,
   No. 20-cv-01296-JCS, 2021 WL 1176640, 2021 U.S.Dist. LEXIS 59778
   (N.D. Cal. March 28, 2021) ......................................................................... 16

*Ibrahim v. United States Dep't of Homeland Sec.*,
   912 F.3d 1147 (9th Cir. 2019) .................................................................... 3, 5

*Inland Empire Waterkeeper v. Corona Clay Co.*,
   2024 WL 4492294 (C.D. Cal. Jan. 19, 2024) .......................................... 3, 5

*Kerr v. Screen Extras Guild, Inc.*,
   526 F.3d 67 (9th Cir. 1975) ........................................................................ 14

*Larita-Martinez v. INS*,
   220 F.3d 10925 (9th Cir. 2000) .................................................................. 2

*Lee v. District of Columbia*,
   298 F. Supp. 3d 4 (D.D.C. 2018) ............................................................... 8

*Lei Li v. Arcsoft, Inc.*,
   2024 WL 4800753, 2024 U.S. Dist. LEXIS 210166 (N.D. Cal. 2024) .................. 13

*Love v. Reilly*,
   924 F.2d 1492 (9th Cir. 1991) .................................................................... 11

*Mackey v. Cal. High Patrol*,
   No. 11-3560, 2018 WL 6137166 (C.D. Cal. Jan. 23, 2018) ..................... 19

*Medtronic, Inc. v. Daig Corp.*,
   789 F.2d 903 (Fed. Cir. 1986) .................................................................... 2

*Mejia v. O'Malley*,
   120 F.4th 1360 (9th Cir. 2024) .................................................................. 5

*O'Neal v. City of Seattle*,
   66 F.3d 1064 (9th Cir. 1995) ...................................................................... 4

*Perdue v. Kenny A.*,
   559 U.S. 542 (2010) ............................................................................. 17, 18

*Pickering v. Holman*,
   459 F.2d 403 (9th Cir. 1972) ...................................................................... 19

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

*Prison Legal News v. Schwarzenegger,*
 608 F.3d 446 (9th Cir. 2010) ............................................ 10

*Radin v. Hunt,*
 No. 10-08838, 2012 U.S. Dist. LEXIS 202345 (C.D. Cal. 2012) ............................ 19

*Ruckelshaus v. Sierra Club,*
 463 U.S. 680 (1983) ............................................ 5

*Shirrod v. Dir., OWCP,*
 809 F.3d 1082 (9th Cir. 2015) ............................................ 13

*Steelworkers of Am.v.. Phelps Dodge Corp.,*
 896 F.2d 403 (9th Cir. 1990) ............................................ 12

*Stonebrae, L.P. v. Toll Brothers,*
 2011 U.S. Dist. LEXIS 39832 (N.D. Cal. 2011) (Chen, J.), aff'd 521 Fed. Appx. 592
 (9th Cir. 2013) ............................................ 10

*Thorne v. El Segundo,*
 802 F.2d 1131 (9th Cir. 1986) ............................................ 5

*U.S. v City & County of San Francisco,*
 748 F. Supp. 1416 (N.D. Cal. 1990) ............................................ 13, 16

*United States ex. rel Thrower v of America v. Acad. Mortg. Corp.,*
 No. 16-2120, 2024 WL 5424428 (N.D. Cal. May 31, 2024) ........................... 16, 17, 18

*Van Skike v. Director. Office of Workers Compensation Programs,*
 557 F.3d 1041 (9th Cir. 2009) ............................................ 10

*Wit v. United Behavioral Health,*
 578 F.Supp.3d 1060 (N.D. Cal. Jan. 5, 2022) ............................................ 16

**RULES**

Cal. Rules of Prof. Cond. 4–200(B)(1)–(11) ............................................ 14

**OTHER AUTHORITIES**

Pearl, Richard. M., *California Attorney Fee Awards*, 3d ed., §9.106 (Cont. Ed. Bar, 2025
 Update) ............................................ 10, 14

Wolters Kluwer Real Rates Report ................................................................6

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

Plaintiffs hereby submit the following reply to EPA's opposition ("Opposition" or "Opp") to Plaintiffs' motion for fees and costs. *See* ECF No. 496.

## ARGUMENT

**A.    EPA'S ARGUMENT THAT NO FEES OR COSTS SHOULD BE AWARDED FOR THE FIRST PHASE OF TRIAL IS PREDICATED ON DEMONSTRABLE FACTUAL ERROR AND INAPPOSITE LAW**

Although Plaintiffs' counsel is the first legal team in the 40+ year history of TSCA to shepherd a citizen petition all the way to a federal trial and *prevail*, EPA argues they should receive no attorney fees or costs for the entire first phase of the litigation (i.e., "the first trial"), other than for certain motions.[1] EPA bases this sweeping argument (which would negate **3,711 hours** of attorney time and **$341,481** in costs) on the grounds that (1) the two phases of trial were "standalone" proceedings and (2) the Plaintiffs "achieved no success" during the first phase. EPA's argument is meritless, both factually and legally. As documented in Michael Connett's reply declaration, EPA's factual assertions are repeatedly belied by the record. *See* Connett Reply Decl. ¶¶ 4-23. But even if EPA were correct on the facts (it is not), the controlling law (which EPA misstates) would *still* support a full award for Plaintiffs' fees and costs from the first phase of trial.

**1.    The Second Trial Was Not a Separate "Standalone" Proceeding from the First**

EPA's depiction of the trials as entirely separate proceedings is premised on demonstrable factual error.

First, EPA asserts that the second trial "was not a supplementation of the first." Opp. at 5:7. Yet, as the Court explained, the second trial was "**a continuation of the trial and *not a replacement***." Connett Reply Decl. ¶¶ 5-6 (citing ECF No. 473 at 12:16-18) (emphasis added).

Second, EPA asserts that the second trial had a "standalone record" (Opp. at 5:8), yet **EPA cited evidence from the first trial *at least 75 times*** in its proposed findings of fact after the second

---

[1] EPA concedes that Plaintiffs' counsel should be compensated for their motion work during the first phase (*see* Opp. at 7:24-8:3), but fails to include the time spent on discovery motions (i.e., discovery letter briefs) and motions in *limine* in its calculation of the recoverable fee. *See* Connett Reply Decl. at 6 n.6 & 7 n.7.

1

1    trial. Connett Reply Decl. ¶ 7 (citing ECF No. 421); *see also id.* ¶¶ 8, 10-11 & 18-19.

2        <u>Third</u>, EPA asserts that "none of the testimony at the second trial relied on or presumed

3    facts established at the first trial." Opp. at 7:18-19. Not so. Mr. Connett repeatedly referred to the

4    declarations of Plaintiffs' experts from the first trial instead of re-eliciting testimony about their

5    qualifications, *as but one example. See* Connett Reply Decl. ¶ 8 (providing citations to record).

6        <u>Fourth</u>, EPA asserts that Plaintiffs "abandoned" their "reliance on experimental

7    toxicological studies" during the second phase of trial. Opp. 5:9-11. Again, not so. Mr. Connett

8    cited the toxicological studies (i.e., animal studies) in his opening statement, as well as in his

9    questioning of Dr. Grandjean, Dr. Thiessen, and Dr. Barone. Connett Reply Decl. ¶ 9 (providing

10   citations to record). Mr. Connett also cited the toxicological data in Plaintiffs' second trial brief,

11   Plaintiffs' proposed findings of fact, and Plaintiffs' closing brief. *Id.* (providing citations to

12   record).

13       <u>Fifth</u>, EPA asserts that the Court's decisions "demonstrate that the second trial was

14   independent from the first." Opp at 5:14. False. The Court's Findings of Fact cited evidence from

15   the first trial ***19 times***.[2] Connett Reply Decl. ¶ 10 (providing citations to the record). Nor is EPA

16   correct that the Court "cited no testimony from the first trial." *See* Opp at 5:19. The Court cited

17   the trial declarations (which were "direct testimony" at the first trial) of Dr. Grandjean, Dr. Hu,

18   and Dr. Thiessen. *Id.* ¶ 10 (providing citations to the record).

19       <u>Sixth</u>, EPA asserts that the Court's findings on standing were based entirely on evidence

20   from the second phase. Opp at 5:14-15. Again, false. The Court cited and relied upon the standing

21   declaration from Scott Edwards, a co-director of the Plaintiff Food & Water Watch, which was

22   submitted as part of the first phase of trial. Connett Reply Decl. ¶ 11 (citing ECF No. 445 ¶ 22b).

---

23   [2] Even if the Court had *not* specifically cited evidence from the first trial in its Findings of Fact, it
24   would be *error* to assume that the Court had not considered this evidence. *See Larita-Martinez v.*
     *INS*, 220 F.3d 1092, 1095 (9th Cir. 2000) ("It is so expected that a court would review all relevant
25   materials in the record that reviewing courts have presumed it."); *Medtronic, Inc. v. Daig Corp.*,
     789 F.2d 903, 906 (Fed. Cir. 1986) ("We presume that a fact finder reviews all the evidence
26   presented unless [it] explicitly expresses otherwise."). *See also* ECF No. 445 ¶ 114 ("Based on the
     aforementioned factors, *and in view of the record evidence*, the risk at issue . . . is an unreasonable
27   risk." (emphasis added))

28                                    2

1

2

**2.    The Plaintiffs Did Not Lose the First Trial, Nor Were They "Completely Unsuccessful"**

EPA contends that "Plaintiffs achieved no success at the first trial." Opp at 3:21. If EPA was correct, this case would have been over at that point. But unlike *Inland Empire Waterkeeper v. Corona Clay Co.*, 2024 WL 4492294 (C.D. Cal. Jan. 19, 2024), Plaintiffs did *not* lose the first phase of the trial. In fact, on the one issue (standing) that the Court expressed *concerns* regarding Plaintiffs' trial evidence, the Court made clear that it had *not decided* the issue. *See* ECF No. 277 at 3 ("In fact, the Court has not yet ruled on whether Plaintiffs have standing or not, so there is nothing to reconsider."). Since the Court did not decide the standing issue, this was not an "unsuccessful" result for purposes of a fee award. *See Ibrahim v. United States Dep't of Homeland Sec.*, 912 F.3d 1147, 1173 (9th Cir. 2019) ("We agree with our sister circuits that a district court's 'failure to reach' certain grounds does not make those grounds 'unsuccessful' . . . .)."

EPA's contention that Plaintiffs "achieved no success" during the first phase is also incompatible with the Court's comments at the end of the first trial. *See* Connett Reply Decl. ¶¶ 12-15. Immediately after the parties finished their closing arguments, the Court observed that EPA had used the *wrong standard* to assess the evidence of risk. *See* ECF No. 245 at 1131:5-9 ("[T]he EPA appears to have applied a standard of causation which, from my read of TSCA, is not accurate . . . is not a proper application. It's not the proper standard."). The Court mentioned this to explain why a stay might be appropriate: to give EPA a chance to assess the evidence "under the proper standard of review." *Id.* at 1132:20-21, 1137:20-24. Mr. Connett considered these comments from the Court to be a "major breakthrough in the case." Connett Reply Decl. ¶ 14. After all, the "central argument" in Plaintiffs' motion for summary judgment was that "EPA had failed to materially controvert Plaintiffs' evidence of risk because EPA had judged it against the wrong standard." *Id.*

Not only did the Court recognize that EPA used the wrong standard, it also noted that Plaintiffs had presented "serious evidence" which raised "serious questions" about the safety of fluoridation. ECF No. 245 at 1133:5-10. Thus, while *neither* Plaintiffs *nor* EPA secured a verdict during the first phase, the Court's comments indicated that *Plaintiffs* were on the right track (albeit

3

with a standing issue to iron out), and that EPA was *not*. *See* Connett Reply Decl. ¶ 15.

**3.     Even if EPA's Factual Characterization Was Correct (It Is Not), an Award of Fees and Costs for the First Phase of Trial Would Still Be Appropriate**

Even *if* EPA were correct that the first trial was a separate proceeding at which Plaintiffs achieved no success, an award for fees and costs would *still* be appropriate under controlling precedent. As the Ninth Circuit has explained, "[j]ust as time spent on losing claims can contribute to the success of other claims, time spent on a losing *stage of litigation* contributes to success because it constitutes a step toward victory." *Cabrales v. Cty. of L.A.*, 935 F.2d 1050, 1052 (9th Cir. 1991) (emphasis added). Under *Cabrales*, therefore, "a plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage." *Id.*; *see also O'Neal v. City of Seattle*, 66 F.3d 1064, 1069 (9th Cir. 1995) (awarding fee for unsuccessful class action certification motion because it "was not a separate claim, but rather a method of pursuing her ultimately successful claims").

Here it is beyond reasonable dispute that the work Plaintiffs' counsel performed during the first phase was a necessary step to the success of the second. *See* Connett Reply Decl. ¶¶ 16-23. Most obviously, if Plaintiffs had not pursued phase one of the litigation, there would not have been a phase two.[3] Further, EPA concedes that the motion practice during the first phase contributed to the success of the second. Opp. at 7:24-8:3. This is fatal to EPA's position because the motion practice did not exist in a vacuum, but relied on information that Plaintiffs secured through fact and expert discovery. *See* Connett Reply Decl. ¶ 22. EPA's attempt to draw a distinction, therefore, between motion practice and discovery is as meritless as it is unworkable. *See also id.* ¶ 20-21.

EPA fails to explain why Plaintiffs' phase one fees are not recoverable under *Cabrales*. Instead, EPA *incorrectly* asserts that *Cabrales* established a rule about unsuccessful "claims" as

---

[3] As discussed in Mr. Connett's reply declaration, the extensive fact and expert discovery in the first phase generated and shaped much of the evidence that was used at the second trial, including exhibits, undisputed facts, and trial declarations. Connett Reply Decl. ¶¶ 7 & 19-22.

opposed to unsuccessful *stages* in the litigation.[4] *See* Opp. at 7:11-15. The exact *opposite* is true. *Cabrales* addressed a situation where the *same claim* was argued at different stages in the same litigation (i.e., across several appeals) with different results: some successful, some unsuccessful. *See* 935 F.2d at 1052. Consistent with this, *Cabrales*'s holding is specific to unsuccessful "stages of litigation" and not unsuccessful "claims." *See* 935 F.2d at 1052.

Finally, EPA's argument is not salvaged by *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683 (1983) or *Waterkeeper*, 2024 WL 4492294. *Ruckelhaus* addressed a situation where the plaintiff's claims were a "complete failure" (i.e., all claims were dismissed). 463 U.S. at 683-84. Similarly, *Waterkeeper* addressed a situation where the plaintiffs *lost* a jury verdict.[5] Although the *Waterkeeper* plaintiffs ended up winning at a second trial, this was the result of an *intervening change in law*. Here, unlike *Ruckelhaus* and *Waterkeeper*, Plaintiffs did not *lose* at any stage in the litigation, and their victory in the second phase was not the result of an *intervening change* in law.

**B.    COUNSEL'S HOURLY RATES ARE REASONABLE**

Plaintiffs' moving papers presented extensive evidence that the hourly rates their Counsel request are "in line with" the hourly rates charged by and awarded to reasonably comparable attorneys for reasonably comparable complex litigation in the Northern District of California. That showing consisted of evidence uniformly relied on by the courts to determine whether the requested fee rates are reasonable: (1) the exceptional qualifications, expertise, and skill of the

---

[4] If the first phase of trial in this case was characterized as an unsuccessful "claim," Plaintiffs would easily satisfy the Ninth Circuit's two-pronged inquiry, and EPA does not contend otherwise. *See Mejia v. O'Malley*, 120 F.4th 1360, 1367 (9th Cir. 2024) (quoting *Ibrahim*, 912 F.3d at 1172); *see also Thorne v. El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986). First, the facts (i.e., fluoride's neurotoxicity), course of conduct (i.e., water fluoridation), and legal theory (i.e., water fluoridation poses an unreasonable risk) that were at issue in the first trial are *related*—and, indeed, virtually identical—to the facts, course of conduct, and legal theory at issue in the second trial. *See Ibrahim*, 912 F.3d at 1172. Second, Plaintiffs obtained "excellent results" at the second phase of the trial. *See id.*

[5] The *Waterkeeper* court only reduced the fee by $151,671.60. Since the plaintiffs' fee demand was $4.8 million, this suggests that the court limited the fee reduction to the time spent at the first trial itself, as opposed to all of the fact and expert discovery that preceded it.

Plaintiffs' merits lawyers, especially Mr. Connett who did the lions' share of the merits work; (2) the hourly rates found reasonable for comparably complex litigation by local courts, including this Court; (3) the hourly rates charged by numerous local attorneys who litigate comparably complex cases; and (4) rate surveys documenting the rates charged by hundreds of Bay Area litigators for complex litigation. This is the very type of evidence that courts have repeatedly found sufficient to establish that the rates requested are reasonable.

In contrast, EPA's Opposition rests on a bed of sand: the opinion of an "expert" with absolutely *no* experience with the Northern District legal marketplace and whose opinion is based *solely* on one inapt category from the Wolters Kluwer Real Rates Report. Rather than look to marketplace data from the Northern District of California, her opinion is based entirely on the factually and legally flawed notion that the rates charged for "environmental litigation" by as few as 19 attorneys scattered across the nation, with an additional reduction for the small size of Plaintiffs' law firms (*see* 2022 Real Rate Report, p. 125), is more probative of Counsel's reasonable rates than Plaintiff's body of Northern District-based evidence.

Other than this flawed opinion, EPA's opposition to Counsel's requested rates consists largely of a series of random criticisms of Plaintiffs' evidence. Those potshots, however, are based largely on the same incorrect legal standards that its "expert" employs, none of which undermine Plaintiffs' showing that their Counsel's rates are "in line with" the Northern District marketplace for complex litigation.

1. **Mr. Connett's Rate Is Significantly Understated**

The heart of the hourly rate issue here is whether Mr. Connett's requested hourly rates, which range from $663 in 2016 to $1,033 in 2025, are reasonable for the incredible work he has performed as Plaintiffs' lead counsel. As Plaintiff's Opening Memorandum showed, the applicable standard is whether the hourly rates requested by Plaintiffs' Counsel are "in line with" the hourly rates charged by reasonably comparable attorneys for reasonably comparable litigation. *See Blum v. Stenson*, 465 U.S. 886, 885, n.11 (1984). In making that determination, numerous factors must be considered, including the expertise and experience of attorneys in the relevant market, as well

as the novelty and complexity of the issues, the special skills or experience of counsel, the quality of representation, and the results obtained. *Gonzales v. City of Maywood*, 729 F.3d 1196, 1205-07 (9th Cir. 2013).

EPA's Opposition and its expert's opinion take almost none of these factors into account. Instead, they focus only on Mr. Connett's year of bar admission, claiming that when he originated this landmark case and in its early years, even though he was lead counsel, his work should be compensated at "associate" rates ranging from $268 an hour in 2016 to $369 an hour in 2020, then at "partner" rates ranging from  $506 an hour in 2021 to $694 in 2025. As anyone with any familiarity with the San Francisco legal marketplace for complex litigation would recognize, the rates EPA proposes are absurd. When all the relevant factors are considered, EPA's contention that Mr. Connett's work should be compensated at such incredibly low rates based solely on his years of experience simply cannot be squared with the correct legal standards or the Northern District legal marketplace.

The plain fact is that Mr. Connett's background and talents are incredibly unique. *See* Connett Decl. ¶¶ 2-18. Given his extraordinary expertise on the subject of water fluoridation (*see id.* ¶¶ 13-18), his skill and tenacity as a litigator of complex scientific issues affecting the public's health (*see id.* ¶¶ 6-12), and the excellent results he and his team have achieved in this vitally important case (*see id.* ¶¶ 26, 52, 56, 62, 93), the notion that in 2025, he would command only $694 an hour cannot be justified under any legal standard or any untainted view of the San Francisco legal marketplace. Indeed, as this Court's vast experience with local hourly rates must show, any fee-paying client of means who had a similar stake in a similarly complex and important matter would no doubt retain lawyers billing at $1,000 an hour or more regardless of their years of experience. Indeed, $694 an hour is less than they would be billing for first-year associates. It is  certainly not even close to the range of rates that would be charged for the work of highly-skilled lead counsel in complex, hard-fought, nationally significant litigation like this case. *See id.* ¶¶ 94-99.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

**2.      EPA's Expert Is Unqualified to Testify About the Northern District of California Legal Marketplace**

The primary evidence EPA presents and relies on is the declaration of Dr. Laura A. Malowane, a frequent government "expert" and economics professor at the University of Toronto. *See* Malowane Decl, ¶¶ 1-2 and Appx 1. Dr. Malowane's qualifications as an expert on Northern District attorney fee rates is dubious at best.  Nothing in her declaration points to any experience with the Northern District of California legal marketplace, let alone the rates charged by or awarded to Northern District law firms for similarly complex litigation, environmental or otherwise. Nor does her testimony appear to have ever been cited in any Northern District of California case.

Rather than being an expert in local attorney fee rates, Dr. Malowane "specializes in analyzing damages and liability issues in defamation, employment, and complex commercial litigation issues". claims. ECF No. 496-1 at 32 damages Experience with liability and monetary claims, however, is *not* expertise on the Northern District legal marketplace.

Nor does the knowledge of one report on the rates charged for "environmental litigation" by as few as 19 unnamed and unknown attorneys from unspecified areas of the country make one an expert in the Northern District legal marketplace.  *See* 2022 Real Rate Report, p. 125. Indeed, Dr. Malowane's similar testimony on the St. Louis legal marketplace was expressly rejected in *Arnold v. United States*, 163 Fed.Cl. 13, 28 (Fed. Cl. 2022):

> The Court places limited weight on the government's proffered expert analysis and opinion. In her declaration, Dr. Malowane notes she is relying on a single national survey–i.e., Real Rate Report (2016, 2018, 2020, and 2021 editions)–that offers analyses on law firm rack rates as compared to actual collected rates, staffing, and billing practice in major markets including, relevant here, St. Louis. . . . Although  relevant, the singular resource, without pressure tests against other available data sources, is not determinative.

Other courts have expressed similar concerns about Dr. Malowane's heavy reliance on a single category in the Real Rate Report. *See Lee v. District of Columbia*, 298 F. Supp. 3d 4, 14 (D.D.C. 2018) ("Dr. Malowane's observation . . . carries little weight because Dr. Malowane's

8

methodology involved equating 'federal litigation' with a catch-all 'other litigation' category."); *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 49 (D.D.C. 2016) ("The Government's sole evidence is the declaration of the economist, Dr Laura A. Malowane. . . . Dr. Malowane's declaration fails to establish that the firms in her sample primarily engage in such work. Accordingly, the Government has failed to meet its burden."). These courts' reasoning squarely applies here, where Malowane provides no other evidence of the Northern District marketplace.

In contrast to Dr. Malowane, Plaintiffs' expert, Linda Dardarian, is a highly-respected Bay Area litigator with extensive knowledge of Bay Area rates. Likewise, Plaintiffs' fees counsel, Mr. Drury and Mr. Pearl, have practiced complex litigation in the Bay Area for decades and have presented extensive evidence of Bay Area rates, as Ms. Dardarian's, Mr. Drury's, and Mr. Pearl's declarations show. *See* Dardarian Decl. ¶ 7 & Reply Decl. ¶ 7; Drury Decl.¶¶ 22-32& Reply Decl. ¶¶ 8-11; Pearl Reply Decl. ¶¶ 14-16. In rebuttal to Dr. Malowane's flawed opinion, Plaintiffs' reply includes the declaration of Christopher Sproul, a highly-respected local environmental attorney with extensive knowledge of the rates charged and awarded for comparably complex environmental litigation. *See* Sproul Reply Declaration, ¶¶ 3-11, 13-16. Mr. Sproul's declaration exposes the flaws with Malowane's assessment, including citations to the numerous local fee awards in complex environmental cases that fatally undermine her opinion. *See* Sproul Decl. ¶¶ 25-34.

**3.    Dr. Malowane's Opinions, and EPA's Arguments, Are Premised on a Misinterpretation of Applicable Law**

In addition to her lack of knowledge of the local legal marketplace, Dr. Malowane premises her opinions on several blatant misinterpretations of the applicable law: a)  that Plaintiffs' hourly rates must be measured only by the rates charged for "environmental litigation"; b) that the rates found reasonable by local courts and the testimony of local attorneys are less "objective" evidence of the local legal marketplace than the nationwide rates for "environmental litigation"  of a small number of unknown law firms from unknown legal markets across the country; and c) that

Plaintiffs' Counsel should receive lower rates because of the smaller size of their law firms. Each of these premises, which the EPA also adopts, are contrary to well-established Ninth Circuit law.

> ### a. The correct standard looks to the rates charged and awarded for comparably complex litigation of all types, not just "environmental" litigation".

First, a fundamental error with EPA's Opposition and Dr. Malowane's report is their insistence that the only relevant rate at issue is the rate charged for "environmental litigation." That is not the law. The US Supreme Court and the Ninth Circuit have firmly and unequivocally established that Counsel are entitled to the rates charged by comparably qualified attorneys doing comparably complex work, *regardless of the subject matter*. For example, in *Blum v. Stenson*, 465 U.S. 886, 885, fn 11 (1984), the seminal hourly rate case, the Court affirmed the rates found reasonable for the plaintiffs' Legal Aid lawyers in a welfare benefits case not by looking at other welfare benefit cases but to the attorneys' special qualifications and the rates charged by comparably qualified private attorneys in the New York legal marketplace for similarly complex services.

The Ninth Circuit rule is in accord and unquestioned. For example, in *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454-455 (9th Cir. 2010), the court stated this rule unequivocally: "[W]e cannot say that the rates billed by PL's attorneys are out of step with the rates charged by others in the relevant legal community. Although the state officials urge us to look only to the rates charged by other attorneys involved in prison litigation*, the proper scope of comparison is not so limited, but rather extends to all attorneys in the relevant community engaged in 'equally complex Federal litigation,' no matter the subject matter*." (emphasis added). Numerous other Ninth Circuit cases repeat and affirm this rule. *See, e.g., Van Skike v. Director. Office of Workers Compensation Programs,* 557 F.3d 1041, 1046 (9th Cir. 2009); *Camacho v. Bridgeport Fin. Inc.*, 523 F.3d 973, 979 (9th Cir. 2008); Pearl, California Attorney Fee Awards, 3d ed., §9.106, p. 9-123 (Cont. Ed. Bar, 2025 Update) (collecting cases).

Likewise, this Court reached the same conclusion in *Stonebrae, L.P. v. Toll Brothers*, 2011

U.S. Dist. LEXIS 39832 (N.D. Cal. 2011) (Chen, J.), *aff'd* 521 Fed. Appx. 592 (9th Cir. 2013). *Stonebrae* was a real estate contract case in which the plaintiff, supported by Mr. Pearl's expert witness testimony, sought hourly rates based on the rates found reasonable for all types of comparably complex litigation.  As here, the defendant argued that only the lower rates applicable to real estate litigation were relevant. This Court squarely rejected that argument: "Toll argues that these general rates do not apply and that the Court should look at rates charged by real estate litigators as a discrete submarket. As noted above, courts have rejected similar arguments." 2011 U.S. Dist. LEXIS 39832, *9. That ruling was then affirmed by the Ninth Circuit: "[T]he district court did not abuse its discretion in calculating the market rate based on rates for complex litigation. The market for complex litigation is an appropriate reference even where a more specific sub-market may be identifiable." 521 Fed. Appx. at 595.

Furthermore, the Ninth Circuit has held that environmental litigation is a specialized field involving highly complex matters that require higher, not lower rates. *See, e.g., Love v. Reilly*, 924 F.2d 1492, 1496 (9th Cir. 1991); *Ecological Rts. Found. v. Hot Line Constr., Inc.*, No. 5:20-CV-01108-AB-KK, 2024 WL 3507023, at *3 (C.D. Cal. July 19, 2024), appeal dismissed, No. 24-5093, 2024 WL 4824040 (9th Cir. Sept. 25, 2024).

> **b.** **Plaintiffs' evidence of complex litigation rates in the Northern District legal marketplace is far more relevant and "objective" than the isolated Real Rate Report category Dr. Malowane exclusively relies on**

EPA and Malowane's second unsupportable premise is that hourly rates awarded by local courts for comparably complex litigation or the testimony of local attorneys with knowledge of the local legal marketplace are "unreliable" or "subjective" evidence, and, worse, that this evidence should be disregarded in favor of a small sample of attorneys conducting "environmental litigation" in other jurisdictions. Again, her opinion conflicts with well-established law.

The declarations of other attorneys and the hourly rates awarded comparable attorneys performing similar services have long-been the most common and acceptable evidence for proving hourly rates: "Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

in the community, and rate determinations in other cases are satisfactory evidence of the prevailing market rate.'" *Camacho*, 523 F.3d at 980 (citing *Steelworkers of Am. v.. Phelps Dodge Corp*., 896 F.2d 403, 407 (9th Cir. 1990)). Plaintiffs' evidence meets these standards. It includes extensive, objective evidence of the rates found reasonable for all types of complex litigation in the Northern District. *See* ECF No. 484 at 16-20. In response, EPA does not contest the rate for any type of complex litigation other than "environmental." On that issue, EPA contends that the rates it proposes on "are in line with rates awarded in other environmental litigation in and around this District," citing four cases. Opp. at 11:14-25. That is simply untrue.

First, of the four cases EPA cites, one is from Montana, one is from Hawaii, and a third is from San Diego, all lower market areas that are hardly "in and around this District." The fourth case, *Californians for Alternatives to Toxics v. Kernen Construction,* 2023 WL 4995716 (N.D. Cal. 2023), is simply an outlier.

Second, even if only environmental litigation is considered, Counsel's requested rates are clearly in line with those rates. In fact, the actual decisions from "environmental litigation in and around this District" overwhelmingly support Counsel's rates here. Those decisions include at least ten relatively recent cases showing that Counsel's rates here are "in line with" rates for environmental work as well as other complex litigation. *See* Pearl Reply Decl. ¶¶ 16-17.

Third, EPA's and Dr. Malowane's claim that the rates stated in these and other court awards, in other attorneys' declarations, and in the Real Rate Report's category for litigation partners in San Francisco (Pearl Decl. ¶¶ 19-20 and Exh. D) must take second place to one small category of nationwide rates in the Real Rate Report defies the law. *See Arnold*, 163 Fed.Cl. at 28. No Northern District case says anything like that, nor is one cited. Instead, the reality is that the Ninth Circuit and this District have repeatedly held that rates are properly proven by prior fee awards to counsel and others, as well as declarations from non-participating attorneys and experts. Plaintiffs don't dispute that the Real Rate Report is another type of evidence that can be relied upon where it is based specifically on local rates, a sufficient sample size, and in conjunction with local court awards, expert declarations, and the Laffey Matrix. *See* Pearl Decl. Exh. D (showing

12

that in 2024, the Third Quartile rate among 166 San Francisco litigation partners was $1,208). In such cases, the Real Rate Report can serve as solid evidence that Counsel's requested rates are reasonable but only so long as the correct categories are chosen – i.e. forum rates, litigation as opposed to non-litigation, significant sample size – and the factors unique to Counsel's performance in the case taken into account. *See,* e.g., *Lei Li v. Arcsoft, Inc.,* 2024 WL 4800753, 2024 U.S. Dist. LEXIS 210166, at *8 (N.D. Cal. 2024) (citing the 2023 Real Rate Report to support hourly rates of up to $1,384, even though that rate exceeded the Report's Third Quartile rate); Sproul Decl. at 17 n.2  (setting rates at Third Quartile rate is appropriate); at 23 n.3 (citing Bureau of Labor Statistics data showing 18.3% general inflation in hourly rates since 2023).

On the other hand, EPA's reliance on an obscure Real Rate Report category of nationwide rates and a very small sample of attorneys nationwide who practice some type of "environmental litigation" is neither legally correct nor factually probative. Instead, it is well-established that, with limited exceptions inapplicable here, statutory rates must be based on the rates that prevail in the forum – here the Northern District of California. *See Shirrod v. Dir., OWCP*, 809 F.3d 1082, 1087 (9th Cir. 2015) (rejecting statewide survey in favor of local one). Simply extrapolating a small sample of nationwide numbers on environmental litigation of all types to arrive at Northern District rates for complex litigation, as Malowane has done, is little more than guess-work, not evidence. *See* Sproul Decl. ¶ 27.

c.    **The size of Counsel's law firms is not a valid reason to reduce their rates**

Third, EPA and Dr. Malowane also claim that the smaller size of Counsel's law firms support the greatly reduced rates they claim are reasonable. *See* Malowane Decl. ¶ 66. Again, their position defies well-established Ninth Circuit case law.

It has long been established that law firm size is not relevant to determining a reasonable attorney's fee. *See, e.g.*, *U.S. v City & County of San Francisco*, 748 F. Supp. 1416, 1431 (N.D. Cal. 1990) (plaintiffs' sole practitioners, small law firms, and nonprofit law firms entitled to commercial rates charged by "corporate attorneys of equal caliber"), *aff'd in relevant part sub nom*

1   *Davis v. City & County of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992) ("[R]ates should

2   be established by reference to the fees that private attorneys of an ability and reputation comparable

3   to that of prevailing counsel charge their paying clients for legal work of similar complexity.");

4   *Charlebois v Angels Baseball, LP*, 2012 U.S. Dist. LEXIS 91069, *22 (C.D. Cal. 2012) ("[T]he

5   Supreme Court and the Ninth Circuit have expressly endorsed comparisons to 'lawyers of

6   reasonably comparable skill, experience, and reputation' and have never required prevailing

7   party's counsel to also prove that their firm is the same size or has the same level of prestige as

8   that of comparator attorneys"); *Cruz v. Starbucks*, 2013 WL 2447862 (C.D. Cal. 2013), at *5 n.8

9   ("The Court finds no authority from the Ninth Circuit that supports [expert's] assertion that

10  attorneys who practice at small firms should be awarded fees at lower rates than are awarded to

11  attorneys who practice at large firms. Nor does the Court find Defendants' position on this question

12  persuasive."). *See also* Sproul Decl. ¶ 34; California Attorney Fee Awards, 3d ed. (Cont. Ed. Bar

13  2010, April 2025 Update) § 9.108, p. 9-126 (collecting cases).

14          These cases recognize that compensating smaller firms at lower rates based solely on their

15  size would undermine the purpose of most fee-shifting statutes, which is to encourage firms of all

16  sizes to bring important public interest cases by promising market value rates if they succeed. The

17  relevant factors are the attorneys' skill, background, and experience, the market value of the work

18  produced, the type of case, the stakes involved, the nature of the opposition, the results achieved,

19  and the like. *Kerr v. Screen Extras Guild, Inc.,* 526 F.3d 67, 70 (9th Cir. 1975) (listing 12 factors).

20  Costs, overhead, and the size of the firm have no relevance to whether hourly rates are reasonable

21  in the legal marketplace. *See* Cal. Rules of Prof. Cond. 4–200(B)(1)–(11) (factors used to

22  determine conscionability of attorney fees do not include size of firm or firm's costs).

23          The fact is that many sole practitioners, small and mid-size firms charge and are awarded

24  rates that are comparable to larger firms' rates (although, as here, even then those rates generally

25  are still significantly lower than "BigFirm" rates). As this Court's fee awards demonstrate,

26  implicitly if not explicitly, when smaller law firms take on difficult but important litigation like

27  the instant case, they frequently litigate against major law firms. *See, e.g.*, *California Open Lands*

28

14

1    *v. Butte County Dept. of Public Works* (E.D. Cal. No. 2-20-cv-00123-DJC-DMC, Order filed

2    Nov.18, 2024 (Doc 123) at 6-7. It makes no sense to award lower rates simply because the

3    successful attorneys are sole practitioners or small firms when those attorneys have comparable

4    skills, experience, and expertise, and produce work that is equally as good and successful as the

5    work produced by larger firms.

      **d.     EPA's other objections to Plaintiffs' evidence are meritless**

6

7         In addition to basing their primary attacks on Plaintiffs' rates on the wrong legal standards,

8    Defendants also raise various objections that are equally unavailing.

9         Initially, noting that Plaintiffs' Counsel used the LSI Laffey Matrix as a standard from

10   which to base their requested rates, EPA and Dr. Malowane go to great lengths to discredit that

11   survey. Their objections, however, are misguided.  Plaintiffs do not contend that the LSI Laffey

12   Matrix itself establishes the reasonableness of their rates. Rather, they used it to select their rates

13   from within the range of reasonable rates because its annual surveys date back to 2016, which

14   obviated the need for each attorney to determine and scale different hourly rate for each year, and

15   because it also constitutes, along with Plaintiffs' other evidence, some evidence of the range of

16   rates for each year that the courts have considered probative. *See DL v. Dist. of Columbia*, 924

17   F.3d 585, 593 (D.C. Cir. 2019). And, while Defendants urge the Court to consider the "Fitzpatrick

18   Matrix instead, the facts are a) the "Fitzpatrick Matrix" was not introduced until 2021, so it would

19   not even apply to Plaintiffs' earlier work, and b) the Fitzpatrick Matrix, which purports to be based

20   on all types of complex litigation, shows current rates that are significantly higher than the rates

21   EPA urges this Court to apply here. *See* Pearl Reply Decl. ¶ 18.

22        Second, while understandably not challenging Ms. Dardarian's credentials or complex

23   federal litigation experience, EPA criticizes her declaration because it does not demonstrate her

24   "environmental litigation" experience. There are two flaws in that argument. First, as shown, the

25   correct standard looks to rates charged for comparably complex litigation of all types, not just

26   environmental litigation. Second, as Ms. Dardarian's Reply declaration shows, she does have

27   significant experience with complex environmental litigation. Dardarian Reply Decl. ¶ 7.

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

Similarly, EPA attempts to discredit Mr. Pearl's testimony by repeatedly citing the same two cases in which his expert opinions were rejected. *See* Opp. at 19. These two cases, however, are clearly outliers. Pearl Reply Decl. ¶¶ 8-14. The fact is that Pearl's opinions on hourly rates have been recognized and relied on in at least 47 published opinions, including numerous cases in this District. *See* Pearl Decl. ¶ 9; Pearl Reply Decl. ¶¶ 7-13. These 47 reported fee awards affirming Pearl's knowledge of hourly rates greatly outweigh the two outliers cited by Defendants. Indeed, this District has expressly found Pearl's testimony on Northern California hourly rates to be highly credible. As one court noted,

> [T]he Court places significant weight on the opinion of Mr. Pearl that the rates charged by all of the timekeepers listed above are reasonable and in line with the rates charged by law firms that engage in federal civil litigation in the San Francisco Bay Area. Mr. Pearl *has extensive experience in the area of attorney billing rates in this district and has been widely relied upon by both federal and state courts in Northern California [] in determining reasonable billing rates*.

*Human Rights Def. Ctr. v. Cty. of Napa*, No. 20-cv-01296-JCS, 2021 WL 1176640, 2021 U.S.Dist. LEXIS 59778, *32 (N.D. Cal. March 28, 2021) (emphasis added). This assessment of Pearl's work was repeated in both *Wit v. United Behavioral Health*, 578 F.Supp.3d 1060, 1079 (N.D. Cal. Jan. 5, 2022), and *Andrews v. Equinox Holdings, Inc*., No. 20-cv- 00485-SK, Order on Motion for Attorney Fees and Costs filed, Dkt. No. 110 at 4:13-19 (N.D. Cal. Nov. 9, 2021).

Third, the EPA raises the agreement Mr. Pearl and Mr. Drury have with their non-profit client which set minimum guarantees from any fee award. Again, the EPA disregards well-established case law. In contingent public interest litigation like this case, successful plaintiffs' counsel are entitled to market rates regardless of what they may charge any fee-paying clients. *City & County of San Francisco*, 748 F Supp at 1431 (plaintiffs' sole practitioner attorneys not limited to rates charged clients; instead, rates based on rates charged by "corporate attorneys of equal caliber").

In contrast to these minimal guarantees from any fee award, as Plaintiffs showed, this Court has expressly found that hourly rates for fee motion work of the same type fully support both Mr.

Pearl's and Mr. Drury's requested rates here. *See United States ex. rel Thrower v of America v. Acad. Mortg. Corp.,* No. 16-2120, 2024 WL 5424428 (N.D. Cal. May 31, 2024). No contrary evidence or argument is even presented.  The "environmental litigation" rates EPA attempts to assign them are simply irrelevant to the fee motion work they performed.

EPA's other criticisms of Mr. Drury's declaration fare no better. The fact that he was recently awarded a $1,000 rate for his environmental litigation work only shows that the $1,244 rate he requests here, which is based on an additional year of experience and inflation in legal rates, is "in line with" the Bay Area legal marketplace.

## C.    PLAINTIFFS' REQUEST FOR A MULTIPLIER IS SUPPORTED BY RARE AND UNIQUE CIRCUMSTANCES

Plaintiffs request that a 2.0 lodestar memorandum be applied to Mr. Connett's lodestar, on the grounds set out in Plaintiff's memorandum and Mr. Connett's declaration. EPA's response starts with the accepted principle that lodestar multipliers are appropriate only in "rare" and "exceptional circumstances." Plaintiffs agree, but this case presents just such circumstances: as *Thrower* illustrates, multipliers under federal law are rare but not non-existent. While the EPA starts its response by quoting *Hensley v. Eckerhart*, 461 U.S. 424 (1983), it inexcusably leaves out the last clause of that quote, that *"in some cases of exceptional success an enhanced award may be justified."*

The essence of Plaintiffs' entitlement to a multiplier is expressly recognized in *Perdue v. Kenny A.*, 559 U.S. 542, 554 (2010): "When a plaintiff's attorney achieves results that are more favorable than would have been predicted based on the governing law and the available evidence, the outcome may be attributable to superior performance and commitment of resources by plaintiff's counsel." When Mr. Connett filed the Complaint, no citizen group had ever taken a Section 21 citizen petition to a federal trial, let alone won a federal trial. *See* Connett Decl. ¶ 62. Moreover, it was the adamant position of every federal health agency at that time, including the EPA, that water fluoridation is a completely safe public health measure that poses no risk to human health. If ever there was a case that resembled David vs Goliath, this was it. Few attorneys would

17

have been willing to take on a case with these odds, particularly not one that would last 8 years.[6] But thanks to Mr. Connett's knowledge, talent, and persistence, *David won*. This is precisely the type of rare and exceptional result for which a multiplier is justified.

This Court's decision in *Thrower* supports the application of a multiplier. Contrary to EPA's characterization, the multiplier in *Thrower* was not based on the fact that the plaintiffs' attorneys had two opponents; it was based on the fact that the Relator was the first litigant to overcome the government's effort to have the case dismissed. The instant case is similar: Plaintiffs' ability to require that the EPA reconsider a practice that it had confidently proclaimed to be safe for over 40 years is a very rare and significant result and one that is due almost entirely to Mr. Connett's superior knowledge and performance.

Lastly, the fact that the multiplier is applied to the lodestar does not mean it involves "double-counting." All multipliers are calculated from the lodestar which includes hour spent. If that was always "double-counting," there could never be a multiplier. Here, Mr. Connett's superior performance does not double-count his hours because a) it includes recognition of Mr. Connett's creativity and ingenuity simply by choosing to bring the litigation; b) by handling so much of the case himself, and by having an unparalleled subject matter expertise on fluoride, the hours claimed were exceptionally efficient, and c) the number of hours alone does not reflect his perseverance in staying with the case for eight-plus years in the face of so many obstacles he encountered. None of these factors were considered in Plaintiffs' lodestar calculation.

Federal multipliers also are appropriate when the hourly rate used for the lodestar is below or at the low end of reasonable rates. The fact that Mr. Connett's requested lodestar rate is far lower than would be justified in the Bay Area legal marketplace is amply shown above. While that rate may be a reasonable rate for the average case, as in *Thrower*, it fails to reflect his superior performance and the fact that the result he achieved was not something that could have been predicted when he initiated the litigation. Likewise, the fact that few attorneys would have been

---

[6] EPA actually criticizes Mr. Connett for "jump[ing] the gun" by filing the case before (in EPA's view) the risk of fluoridation could be demonstrated. *See* Opp. at 6:6-18.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

1   willing to take this case on a contingent basis simply meets *Perdue*'s recognition multipliers may

2   take into account that the litigant has "achieve[d] results that are more favorable than would have

3   been predicted."

4   **D.     A CITIZEN GROUP'S ENTITLEMENT TO COSTS SHOULD *NOT* DEPEND ON**

5           **THE SOURCE OF THEIR FUNDING, AND EPA OFFERS NO LEGAL**

6           **AUTHORITY TO THE CONTRARY**

7           EPA argues that because Plaintiffs successfully raised funds and "fully recouped their

8   litigation expenses," no award for costs is appropriate. Opp. at 27-28. The Ninth Circuit has

9   previously addressed a similar argument and squarely rejected it, as have other courts. *See*

10  *Pickering v. Holman*, 459 F.2d 403, 407-08 (9th Cir. 1972) (rejecting argument that prevailing

11  party should not be able to recover costs paid by a third party); *Cell-Crete Corp. v. Fed. Ins. Co.*,

12  82 Cal. App. 5th 1090, 1095-96 (2022) ("[T]here is no requirement that a party claiming costs

13  must have personally incurred the obligations enumerated in the memorandum. What is important

14  . . . is that Defendants incurred legal liability to pay the costs of the litigation even though some

15  other party may have agreed to reimburse them or to pay all the expenses of the litigation."

16  (citations omitted) (cleaned up)); *Radin v. Hunt*, No. 10-08838, 2012 U.S. Dist. LEXIS 202345, at

17  *10-11 (C.D. Cal. 2012) ("It would also give Plaintiff a windfall if she could avoid fees merely

18  because Defendants happened to be indemnified by Sony Pictures."). The practical reality is that

19  someone always has to front the costs of citizen suit litigation, whether it's through fundraising,

20  debt, or diversion of resources from other activities. When these costs are recovered, citizen groups

21  are able to allocate the recouped funds to other activities that support their mission.

22          To Plaintiffs' knowledge, no court has ever adopted the rule that EPA espouses, including

23  the one case that EPA cites. Opp. at 27 (citing *Mackey v. Cal. High Patrol*, No. 11-3560, 2018

24  WL 6137166, at *9 (C.D. Cal. Jan. 23, 2018)). Indeed, one of the reasons that the district court in

25  *Mackey* gave for awarding fees to the party that fundraised was that it was a "non-profit" which

26  "has to solicit donations in order to accomplish its mission." 2018 WL 6137166, at *9. It should

27  not matter if fundraising is specific to the litigation or for "general programmatic interests," as

28

                                              19

EPA implies. *See* Opp. at 27. The line between case-specific and general fundraising is often a murky one,[7] and distinguishing between the two will generally require extensive and intrusive discovery, which runs counter to the rule that fee motions "should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

## **MODIFICATION/SUPPLEMENTATION OF FEES AND COSTS REQUEST**

To simplify the issues in this case, Plaintiffs are foregoing their request for most of the specific categories of fees and costs identified on pages 21-23 and 28-30 of EPA's opposition. *See* Connett Reply Decl. ¶¶ 24 & 31. In total, Plaintiffs are foregoing $228,551.2 of the fees (*see id.* ¶ 25) and $7,532 of the costs requested in their motion (*see id.* ¶ 32).

Plaintiffs are also supplementing their request for fees and costs with the additional hours and expenses they have logged and incurred over the past 4 months. The documentation for these additional fees and costs is set out in each attorneys' reply declaration. *See* Connett Reply Decl. ¶¶ 26-27 & 33-37), Drury Reply Decl. ¶¶ 17-20; Pearl Reply Decl. ¶ 19). No lodestar multiplier is requested on these supplemental fees. The updated calculations for Plaintiffs' fees and costs request are set forth in Appendices A to C herein.

## **CONCLUSION**

The citizen petition provision of TSCA was enacted to "to ensure that bureaucratic lethargy does not prevent the appropriate administration of this vital authority." *Food & Water Watch, Inc. v. EPA*, 291 F. Supp. 3d 1033, 1048 (N.D. Cal. 2017). Plaintiffs and their Counsel expended enormous time and expense to do just that. As allowed for under the statute, Plaintiffs now respectfully request that the Court grant $9,256,341.95 in fees and $496,745 in costs as appropriate compensation for this historic effort.


DATED: October 14, 2025                    Respectfully submitted,

                                           LAW OFFICES OF RICHARD M. PEARL
                                           By: */s/ Richard M. Pearl*

---

[7] This distinction becomes even murkier when considering that fundraising for a specific lawsuit may come at the expense of fundraising for the general budget (ala "robbing Peter to pay Paul").

---

Richard M. Pearl

LOZEAU & DRURY
By: /s/ *Richard Toshiyuki Drury*
Richard Toshiyuki Drury
Attorneys for Plaintiffs

21

| APPENDIX A | | | | |
|---|---|---|---|---|
| REVISED LODESTAR & MULTIPLIER CALCULATION[8] | | | | |
| Attorney | Law Grad Year | Range of Hourly Rates | Hours | Lodestar |
| M. Connett (Merits) | 2011 | $663-$1033 | 4709.6 | $3,957,791.9 |
| M. Connett (Fees) | 2011 | $1033 | 167.8 | $173,337.4 |
| A. Waters | 1986 | $900-$1244 | 345.6 | $361,398.4 |
| K. Reeves | 1991 | $974-$1244 | 530.1 | $530,759.7 |
| C. Nidel | 2003 | $747-$1244 | 175.5 | $165,612.7 |
| R. Drury | 1990 | $1244 | 92.4 | $114,945.6 |
| R. Pearl | 1969 | $1244 | 104.7 | $130,246.8 |
| M. Resciniti | 2019 | $636 | 15.3 | $9,730.8 |
| K. Staley | 2022 | $473 | 6.1 | $2,885.3 |
| Paralegals/Law Clerks | NA | $204-$281 | 109.25 | $25,178.85 |
| **Lodestar** | | | | **$5,471,887.40** |
| **2.0 Multiplier Merits Work** | | | | **$7,915,583.8** |
| **Total Fee Requested** | | | | **$9,256,341.95** |

---

[8] This revised lodestar and multiplier calculation starts with the data set forth on page 16 of Plaintiffs motion, and then incorporates the 279.6 attorney hours for which Plaintiffs have agreed to forego recovery (Connett Reply Decl. ¶¶ 24-25) and the additional attorney and paralegal that have been logged over the past four months (Connett Reply Decl. ¶¶ 26-27 & Ex. A; Drury Reply Decl. ¶¶ 17-20 & Ex. B; Pearl Reply Decl. ¶ 19 & Ex. A).

| APPENDIX B REVISED LODESTAR CALCULATION BY ATTORNEY AND YEAR[9] | | | | | |
|---|---|---|---|---|---|
| **Attorney** | **Year** | **Rate** | **Hours** | **Lodestar** | **Subtotal** |
| **Waters** | 2018 | 942 | 30.8 | 29013.6 | |
| | 2019 | 974 | 43.3 | 42174.2 | |
| | 2020 | 980 | 104 | 101920 | |
| | 2021 | 996 | 11.4 | 11354.4 | |
| | 2022 | 1002 | 12 | 12024 | |
| | 2023 | 1087 | 27.4 | 29783.8 | |
| | 2024 | 1152 | 109.2 | 125798.4 | |
| | 2025 | 1244 | 7.5 | 9330 | |
| Waters Subtotal | | | 345.6 | | $361,398.40 |
| | | | | | |
| **Nidel** | 2017 | 747 | 5.9 | 4407.3 | |
| | 2018 | 782 | 16.3 | 12746.6 | |
| | 2019 | 809 | 23.7 | 19173.3 | |
| | 2020 | 814 | 72.3 | 58852.2 | |
| | 2021 | 827 | 0.7 | 578.9 | |
| | 2022 | 833 | 1.2 | 999.6 | |
| | 2023 | 1087 | 0.4 | 434.8 | |
| | 2024 | 1244 | 55 | 68420 | |
| Nidel Subtotal | | | 176.7 | | $165,612.70 |
| | | | | | |
| **Reeves** | 2019 | 974 | 10 | 9740 | |
| | 2020 | 980 | 434.3 | 425614 | |
| | 2021 | 996 | 14.8 | 14740.8 | |
| | 2022 | 1002 | 13.2 | 13226.4 | |
| | 2023 | 1087 | 27.5 | 29892.5 | |
| | 2024 | 1152 | 1.6 | 1843.2 | |
| | 2025 | 1244 | 28.7 | 35702.8 | |
| Reeves Subtotal | | | 530.1 | | $530,759.70 |
| | | | | | |
| **Connett** | 2016 | 663 | 8.6 | 5701.8 | |
| | 2017 | 693 | 137.8 | 95495.4 | |
| | 2018 | 809 | 809 | 654481 | |

[9] This revised lodestar calculation by attorney and year starts with the data set forth in Exhibit B to Richard Drury's Opening Declaration (see ECF No. 482 at 18), and then incorporates the attorney hours for which Plaintiffs have agreed to forego recovery for in the years 2016, 2020, 2021, 2022, and 2023 (Connett Reply Decl. ¶ 25) and the additional attorney and paralegal hours that have been logged over the past four months (Connett Reply Decl. ¶¶ 26-27 & Ex. A; Drury Reply Decl. ¶¶ 17-20 & Ex. B; Pearl Reply Decl. ¶ 19 & Ex. A).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

| | | | | | |
|---|---|---|---|---|---|
| | 2019 | 814 | 1580.2 | 1286283 | |
| | 2020 | 826 | 668.8 | 552263.6 | |
| | 2021 | 827 | 145.7 | 120493.9 | |
| | 2022 | 833 | 145.9 | 121534.7 | |
| | 2023 | 904 | 710.6 | 642382.4 | |
| | 2024 | 957 | 531.6 | 508741.2 | |
| | 2025 | 1033 | 139.16 | 143,752.28 | |
| Connett Subtotal | | | 4877.6 | | $4,131,129.28 |
| | | | | | |
| **Resciniti** | 2025 | 636 | 15.3 | 9730.8 | $9,730.80 |
| | | | | | |
| **Legal Assistants** | | | | | |
| | 2019 | 220 | 31.9 | 7018 | |
| | 2020 | 221 | 32.7 | 7226.7 | |
| | 2021 | 224 | 15.5 | 3472 | |
| | 2023 | 245 | 20.25 | 4961.25 | |
| | 2025 | 281 | 8.9 | 2,500.90 | |
| Legal Assistants subtotal | | | 109.25 | | $25,178.85 |
| | | | | | |
| **Drury** | 2025 | 1244 | 92.4 | 114,945.60 | $114,945.60 |
| | | | | | |
| **Staley** | 2025 | 473 | 6.1 | 2,885.30 | $2,885.30 |
| | | | | | |
| **Pearl** | 2025 | 1244 | 104.7 | 130,246.80 | $130,246.80 |
| | | | | | |
| **TOTAL REVISED LODESTAR** | | | | | **$5,471,887.4** |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES

| APPENDIX C | |
|---|---|
| REVISED COST SUMMARY[10] | |
| **Cost Item** | **Amount** |
| Travel | 48,276 |
| Expert Fees | 405,496 |
| EPA Expert Depos | 9,660 |
| Legal Research (Westlaw) | 19,406 |
| Transcripts | 13,907 |
| **TOTAL** | **$496,745** |

---

[10] This revised cost summary is based on the data set forth in paragraphs 102 to 122, and the associated exhibits, in Mr. Connett's Opening Declaration. S*ee* ECF No. 481. It also incorporates the costs that Plaintiffs have agreed to forego (*see* Connett Reply Decl. ¶¶ 31) as well as the additional costs that Plaintiffs have incurred since the filing of their motion for fees and costs (*see id.* ¶¶ 33-37).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES