UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOOD & WATER WATCH, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 17-cv-02162-EMC   (EMC) <br><br> **ORDER AWARDING FEES & COSTS** <br><br> Docket Nos. 479, 484 |

On November 20, 2024, the Court entered judgment in favor of Plaintiff Food & Water Watch, Inc. under the Toxic Substances Control Act after almost ten years of litigation and two trials. Dkt. No. 452. Plaintiffs now seek approximately ten million in fees and costs from EPA. Dkt. Nos. 479, 499. For the reasons set forth below, the Court awards Plaintiffs **$5,263,705** in fees and **$496,745** in costs, for a total award of **$5,760,450**. Per the parties' stipulation, these fees are payable subject to the pending appeal in this action.

## I.   FACTS AND BACKGROUND

In April 2017, Plaintiffs commenced this action under TSCA section 21, 15 U.S.C. § 2620, after EPA denied their 2016 petition seeking the issuance of a nationwide rule to prohibit the fluoridation of community drinking water. Dkt. No. 1. In December 2019, the Court denied the parties' cross-motions for summary judgment. Dkt. No. 156. In June 2020, the Court held a seven-day bench trial on Plaintiffs' claim that fluoridated drinking water presents an unreasonable risk of injury to human health. In August 2020, the Court placed the case in abeyance without a decision and instructed Plaintiffs to submit a new petition to EPA. Dkt. No. 262.

In October 2022, the Court lifted the abeyance, and a second round of discovery ensued.

1  Beginning in January 2024, the Court held a second, ten-day bench trial. In September 2024, the
2  Court issued findings of fact and conclusions of law and ordered EPA to initiate an administrative
3  proceeding. Dkt. No. 445. The judgment is on appeal, with oral argument to be heard in March,
4  2026. Dkt. No. 455; *see also* No. 25-384, Dkt. No. 69.

5  EPA agreed to $102,727.33 in taxable costs, payable subject to the outcome of an appeal.
6  Dkt. No. 454. Plaintiffs then moved for $10,047,973.20 in attorney fees and expenses. Dkt. No.
7  479. The Government opposed, contending that an award of only $1,352,085 is appropriate. Dkt.
8  No. 496. On reply, Plaintiffs conceded certain fees and costs raised by Defendants' opposition
9  (totaling $228,551.2 of the fees and $7,532 in costs) and submitted further fees incurred in
10 briefing the instant motion, bringing their request to $9,256,341.95 in fees and $496,745 in costs.
11 ECF No. 499.

## II.  LEGAL STANDARD

Under the Toxic Substances Control Act ("TSCA"), if the Court determines it is "appropriate," the Court may award "costs of suit and reasonable fees for attorneys and expert witnesses." 15 U.S.C. § 2620(b)(4)(C). TSCA's fee-shifting provision is a waiver of sovereign immunity and, as such, must be "construed strictly in favor of the [United States]." *See McMahon v. United States*, 342 U.S. 25, 27 (1951).

## III.  DISCUSSION

A. <u>Fees Are Appropriate for Plaintiffs' Work in the First Trial</u>

The Government argues that the Court should not award the Government fees for work connected with the first trial, except for certain motions practice. Dkt. No. 496 at 14.

Prevailing party fee statute caselaw makes clear that "Just as time spent on losing claims can contribute to the success of other claims, time spent on a losing stage of litigation contributes to success because it constitutes a step toward victory." *Cabrales v. Cty. of L.A.*, 935 F.2d 1050, 1052 (9th Cir. 1991). Therefore, "a plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage."

2

1  *Id.*; *see also O'Neal v. City of Seattle*, 66 F.3d 1064, 1069 (9th Cir. 1995) (awarding fee for unsuccessful class action certification motion because it "a method of pursuing her ultimately successful claims").

Here, the EPA concedes that some of the motion practice in the first phase of the trial "streamlined" the second trial. Dkt. No. 496 at 14. But the EPA argues that none of the testimony at the second trial relied on or presumed facts established at the first trial" and that the testimony was "independent" from the first trial. Dkt. No. 496 at 5, 14.

However, this assertion is not supported by the record. When the Court ordered the proceedings at the first trial held in abeyance, the Court noted that it was holding the trial record open. Dkt. No. 262 at 5. The Court described the second trial as a "phase two." Dkt. No. 311 at 7:24-8:1 ("My intent is to reopen the evidence . . . . And do phase two of this trial."); *id.* at 15:2-3 ("[W]e're going to have a sort of phase 2 trial."); ECF No. 473 at 12:16-18 (describing the second trial as "a continuation of the trial and not a replacement."). The exhibit list in the second phase of trial included all of the exhibits admitted in the first phase. *Compare* ECF No. 378-2 (exhibit list from second phase) *with* ECF No. 217-1 (exhibit list from first phase). Both parties cited to evidence from the first trial in their Fourth Joint Iterative Proposed Findings of Fact and Rebuttal Statements for Second Phase of Trial. Dkt. No. 421. In this filing Plaintiffs cited evidence from the first trial at least 121 times, while the EPA cited evidence from the first trial at least 75 times. Dkt. No. 499-1 ¶ 7 (counting occasions). In examining witnesses, Plaintiffs referred to their trial declarations from the first trial instead of re-eliciting testimony on their qualifications. Dkt. No. 499-1 ¶ 8. Finally, when the Court made its findings of fact and conclusions of law, the Court cited evidence from the first phase of trial. *See* ECF No. 445; Dkt. No. 499-1 ¶ 10 (counting 19 citations to evidence from the first trial phase). The record thus demonstrates that the second trial was a continuation of the first, not entirely independent.

Defendant also argues that it would be unfair to award fees for the first trial because Plaintiffs could have avoided the inefficiencies of two trials by waiting for further scientific evidence but "jumped the gun." Dkt. No. 496 at 13. This argument is not well taken. EPA suggests that Plaintiffs should have waited for publication of the National Toxicology Program's

draft monograph before going to trial. *Id.* at 11. But EPA raised this argument at the time, and the Court denied its motion to extend expert discovery and stay the trial because the National Toxicology Program had "disclaim[ed] the finality of the draft's conclusions" and stated that it must still "undergo 12 months of peer review by the National Academy of Sciences" as well as "extensive public comment" prior to finalization. Dkt. No. 115 at 3. It was highly uncertain when, if ever, the monograph would be finalized and published. It was reasonable for Plaintiffs to conclude that their best course of action was to proceed on the evidence they had, rather than potentially wait another year on finalization of one study. Plaintiffs cannot be faulted for moving forward a case that, from their perspective, implicated serious health risks. As the Ninth Circuit has observed, "a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning." *Cabrales*, 935 F.2d at 1053.

Since the second trial was a continuation of the first, and Plaintiff's decision to embark upon the first trial was not unreasonable, the Court finds it appropriate to award fees for work done on the first phase of the trial. However, in recognition of the inefficiencies caused by having a second trial as well as some inefficiencies from litigation by multiple counsel, the Court imposes a discretionary five percent "haircut" to the lodestar. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (district may impose a small reduction no greater than 10 percent based on discretion).

B. Reasonable Rates

In the Ninth Circuit, reasonable attorneys' fees are determined by first calculating the "lodestar." *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996) (citation omitted).

At oral argument, it was evident that neither party disputed that the Real Rate Report generally provides a reliable baseline for the Court to determine rates in this action. The Real Rate Report is an annual publication by Wolters Kluwer that analyzes data derived from actual rates

4

charged to (and paid by) clients on law firm invoices. It has been referenced in this circuit to assess reasonable historical rates. *See e.g.*, *Kohler v. Eddie Bauer LLC*, 792 F. App'x 446, 448 (9th Cir. 2019) (district court reasonably considered Real Rates Report) (mem.); *Ep Family Corp. v. Changzhou Win Up Time Tech. Co., Ltd.*, No. CV 22-4242-GW-MARx, 2025 U.S. Dist. LEXIS 53261, at *5 (C.D. Cal. Feb. 12, 2025) (RRR provides "objective, empirical, market-based data"). While Plaintiffs based their proposed rates on the Adjusted Laffey Matrix, a D.C.-based metric that is no longer updated, they cross-checked these rates with the Real Rates Report and their fees expert used the Real Rates Report to determine his own rates. The parties' substantive disagreements in rates thus primarily concern not reliance on the RRR, but whether (1) the Court should apply the RRR's rates as adjusted for environmental litigation specifically and (2) whether the Court should use a higher quartile and experience bracket for Mr. Connett's rates. *Compare* Dkt. No. 484; Dkt. No. 480 (Declaration of Richard Pearl); Dkt. No. 485 (Declaration of Linda Dardarian) *with* Dkt. Nos. 496-1 (Declaration of Dr. Laura Malowane).

      A reasonable rate "compensate[s] counsel at the prevailing rate in the community for similar work; no more, no less." *Moreno*, 534 F.3d at 1111. To determine the rate for similar work, the "proper scope of comparison" is not limited to the precise subject matter of the litigation "but rather extends to all attorneys in the relevant community engaged in 'equally complex Federal litigation,' no matter the subject matter." *In Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454-455 (9th Cir. 2010) (rejecting argument in prison litigation case that the court must look only to rates charged in prison litigation cases specifically); *see also Stonebrae, L.P. v. Toll Brothers*, 2011 U.S. Dist. LEXIS 39832 (N.D. Cal. 2011) (Chen, J.), aff'd 521 Fed. Appx. 592, 595 (9th Cir. 2013) ("[T]he district court did not abuse its discretion in calculating the market rate based on rates for complex litigation. The market for complex litigation is an appropriate reference even where a more specific sub-market may be identifiable.").

      The Court does not find it appropriate to limit rates by environmental litigation. As Plaintiffs have noted, litigating under Section 21 of the TSCA, as they did, is not typical, and certainly not typical of environmental litigation which is often based on review of an administrative record and not, as here, an extensive trial *de novo*. Indeed, the fact that the case

1    involved litigating through trial with heavy use of experts more closely resembles other forms of

2    complex litigation than it does a typical environmental litigation case. Accordingly, the Court

3    considers the Real Report Rates for San Francisco attorneys generally engaged in civil litigation,

4    not for environmental litigation attorneys.

5        The Court next considers whether it is reasonable to use third quartile rates, rather than

6    median rates for Mr. Connett, and to award rates to Mr. Connett based on higher years of

7    experience than he had at the time the fees were incurred. As Plaintiffs have emphasized, Mr.

8    Connett served as lead counsel on this case from the outset, when he was an attorney with only

9    five years of experience. When he incurred over 2,000 hours in 2019 and 2020, preparing for and

10   conducting the first phase of the trial, he was still an associate. Nonetheless, Mr. Connett came to

11   the case with a high level of subject matter knowledge, due to his extensive prior work researching

12   fluoride for the American Environmental Health Studies Project. Based on this Court's

13   observations, Mr. Connett conducted the trial effectively and efficiently. Due to Mr. Connett's

14   outsized responsibility as an associate, his subject matter expertise, and the quality of his

15   performance in this case, the Court finds it appropriate to award Mr. Connett third quartile, rather

16   than median, rates for the fees he incurred as an associate.[1]

17       That said, the Court does not find it reasonable to look to a higher rates bracket for Mr.

18   Connett than his actual experience during the years he litigated the case or to award higher quartile

19   rates once he reached partner level. Awarding Mr. Connett higher than average rates for his work

20   as an associate accounts for his early responsibility on the case and initial subject matter

21   experience—there is no warrant for a further increase.

22       The Court accordingly finds the below lodestars reasonable based on the Real Rates Report

23   for San Francisco attorneys of Plaintiffs' years of experience. The Court provides a year-by-year

24   breakdown for Mr. Connett's rates, which constitute the majority of the fee award. As noted, the

25   rates for Mr. Connett's associate years are in the third quartile, while his partner rates reflect

26   median rates.

---

[1] The RRR includes three rate categories – first quartile, median, and third quartile. Third quartile rates are thus the highest rate category the RRR provides.

Mr. Connett:

| Year | Category | Rate |
|---|---|---|
| 2016 | SF Associate, 3-7 Years | $530 |
| 2017 | SF Associate, 3-7 Years | $537 |
| 2018 | SF Associate 7 or more years | $641 |
| 2019 | SF Associate 7 or more years | $643.5 |
| 2020 | SF Associate 7 or more years | $646 |
| 2021 | SF Partner, less than 21 years | $705 |
| 2022 | SF Partner, less than 21 years | $750 |
| 2023 | SF Partner, less than 21 years | $798 |
| 2024 | SF Partner, less than 21 years | $923 |
| 2025[2] | SF Partner, less than 21 years | $1033 |

Lodestar Totals:

| Attorney | Total Hours | Lodestar |
|---|---|---|
| Connett | 4,877.6 | $3,459,650.48 |
| Waters | 345.6 | $273,335.7 |
| Nidel | 176.7 | $132,817.7 |
| Reeves | 530.1 | $395,643.8 |
| Pearl | 104.7 | $108,155.1 |
| Drury | 92.4 | $95,449.20 |
| Resciniti | 15.3 | $9,730.8 |
| Staley | 6.1 | $2,885.30 |
| Legal Assistants | 109.25 | $25,178.85 |

---

[2] In the absence of a 2025 partner rate from the Real Rate Report, the Court adopts Plaintiff's requested rate of $1,033, which appears in line with the 15% rate increase the RRR reported between 2023 and 2024 in this category.

7

| Total | | $4,502,845.93 |
|---|---|---|

### C. A Modest Multiplier Is Warranted for Mr. Connett's Work

Generally, there is a "strong presumption that the lodestar," absent a multiplier, is sufficient. *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 665 (9th Cir. 2020) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546-52, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010)). Thus, adjustments are reserved only for "rare and exceptional circumstances." *Id.* at 665. Such exceptional circumstances can include when the hourly rate in the lodestar does not adequately measure the attorney's true market value, where the litigation was "exceptionally protracted" with an "extraordinary outlay of expenses," or there is an exceptional delay in the payment of fees, particularly due to Defendant's delay. *Perdue*, 559 U.S. at 555, 556. Results that are "more favorable than would have been predicted based on the governing law and the available evidence" may be a sign of superior attorney performance meriting a multiplier. *Id.* at 554.

However, an enhancement should not be awarded based on a factor that is subsumed in the lodestar calculation. *Id.* at 553. Such subsumed factors typically include the "novelty and complexity of a case" and "the quality of an attorney's performance." *Id.*; *EDF v. EPA*, 217 U.S. App. D.C. 189, 672 F.2d 42, 60 (1982) (in TSCA case, lodestar "fully compensated" for the fact that the case was "extremely important and complicated" and that plaintiff's counsel "performed with great skill"). A multiplier is also not appropriate to account for contingent risk. *See City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S. Ct. 2638, 2641 (1992).

Plaintiffs seek a 2.0 multiplier for Mr. Connett's lodestar on the grounds that his superior performance obtained an outcome "more favorable than would have been predicted" based on the law and facts at the time. Dkt. No. 499 at 22; *Perdue*, 559 U.S. at 554. Plaintiffs assert that at the time Mr. Connett filed the complaint, no citizen group had ever taken a Section 21 citizen petition to federal trial, and that "it was the adamant position of every federal health agency" that water fluoridation is safe. *Id.* Defendant counters that Plaintiffs secured "the only result available by statute—an order directing the Administrator to initiate an administrative action." *See* 15 U.S.C. § 2620(b)(4). In other words, Defendants argue that since the only possible results were binary,

Plaintiffs achieved no exceptional result separate and apart from the fact that they prevailed.

EPA is correct that it is more difficult to show an exceptional result when there is only a single possible win state. In this case, however, the novelty of Plaintiff's success speaks for itself and merits some upward multiplier. The successful trial under the TSCA was the first of its kind, and required enormous work. *See e.g.*, *United States ex rel. Thrower v. Academy Mortgage Corp.*, No. 16-2120, 2024 WL 5424428 (N.D. Cal. May 31, 2024) (awarding 1.75 multiplier under the False Claims Act in "unprecedented" action where a qui tam relator maintained a lawsuit that the Government itself sought to dismiss).

Plaintiffs also argue that Mr. Connett is undercompensated by the lodestar rate, emphasizing his outsized role in bringing the litigation, handling so much of the case himself, and having subject matter expertise on fluoride. But these are factors already subsumed into the lodestar calculation. Indeed, the Court specifically recognized these factors in awarding Mr. Connett third quartile, rather than median, rates for his work as an associate. To base a multiplier on these factors would be to engage in the double-counting that *Perdue* warns against.

Finally, the almost ten-year delay in fees, including over an unexpected 2-stage trial, militates in favor of a multiplier. These delays, which included awaiting the finalization of scientific studies, though not strictly the fault of EPA, were based in circumstances outside of Plaintiff's control.

Taking the above factors into account, the Court finds that a 1.3 multiplier is reasonable, and congruent with multipliers that have been awarded in the rare comparable case under the TSCA. *See EDF v. EPA*, 217 U.S. App. D.C. 189, 672 F.2d 42, 61 (1982) (awarding a 17% increase to the lodestar in TSCA case).

Accounting for the five percent haircut, this multiplier of Mr. Connett's fees brings Plaintiff's fees award to **$5,263,705**.

D. Plaintiffs' Claimed Litigation Costs Are Appropriate

The Court may award "costs of suit" upon determining that such an award is appropriate. 15 U.S.C. § 2620(b)(4)(C). Plaintiffs request reimbursement of $496,745 in costs. EPA argues

9

that because Plaintiffs successfully fundraised $663,702 and "fully recouped their litigation expenses," no award for costs is appropriate. Dkt. No. 496 at 27-28. Plaintiffs do not deny that they fully recouped these litigation expenses through targeted fundraising. Dkt. No. 499 at 24.

The Ninth Circuit has awarded costs to a prevailing party even when those costs were already paid for by a third party. *See Pickering v. Holman*, 459 F.2d 403, 407-08 (9th Cir. 1972). The rationale is that if any party is to gain a "windfall," it should be the prevailing party, not the "wrongdoer." *Id.*; *see also Radin v. Hunt*, No. 10-08838, 2012 U.S. Dist. LEXIS 202345, at *10-11 (C.D. Cal. 2012) ("It would also give Plaintiff a windfall if she could avoid fees merely because Defendants happened to be indemnified by Sony Pictures."). EPA offers no cases supporting an exception to this general rule for costs recouped through fundraising. Indeed, in the lone case EPA offers, the district court *granted* fees despite the opposing party's argument that the organization had recouped them through its fundraising. *Mackey v. Cal. High Patrol*, No. 11-3560, 2018 WL 6137166, at *9 (C.D. Cal. Jan. 23, 2018).

Accordingly, the Court follows the general rule that a third-party's prior payment does not grant a windfall to the party obliged to pay fees.

The Court thus awards costs if the costs were reasonable. Plaintiffs have provided an itemized list of their claimed litigation costs, which consist of travel expenses, expert fees, payments to Westlaw, and court transcripts. Dkt. No. 481 at para 100-122. Plaintiffs have sought recovery only for fees paid to their testifying experts, not their consulting experts. *Id.* at 109. On reply, Plaintiffs have also abandoned costs that EPA argued were unreasonably incurred. Dkt. No. 499. The Court finds that the remaining costs Plaintiffs seek are reasonable and awards Plaintiffs $496,745 in costs.

IV.   CONCLUSION

The Court awards Plaintiffs **$5,263,705** in fees and **$496,745** in costs, for a total award of **$5,760,450,** payable subject to the pending appeal. Payment thereof is stayed pending the appeal.

**IT IS SO ORDERED**.

Dated: 1/5/2026

_____
EDWARD M. CHEN
United States District Judge